# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **CR 11-1013-TUC-RCC** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | March 22, 2011 |
| **Jaime Santiago Lopez-Lorenzo,** | ) | |
| **et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE BERNARDO P. VELASCO, MAGISTRATE JUDGE**


## TRANSCRIPT OF PROCEEDINGS


## ARRAIGNMENT/DETENTION/DANGEROUSNESS HEARING


Transcriptionist:
Candy L. Potter
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

```
 1

 2                        A P P E A R A N C E S

 3

     For the Plaintiff:
 4          U.S. Attorney's Office
            By:  Kimberly E. Hopkins, Esq.
 5               Angela Woolridge, Esq.
            405 West Congress Street, Suite 4800
 6          Tucson, Arizona 85701

 7   For Defendant Ruiz:
            Attorney at Law
 8          By:  Thomas E. Higgins, Jr., Esq.
            325 West Franklin
 9          Tucson, Arizona 85701

10   For Defendant Valenzuela-Lopez:
            Sherick & Bleier
11          By:  Adam Netel Bleier, Esq.
            222 North Court Avenue
12          Tucson, Arizona 85701

13   For Defendant Pineda:
            Douglas S. Younglove
14          By:  Douglas S. Younglove, Esq.
            P.O. Box 10766
15          Phoenix, Arizona 85064

16   For Defendant Ghermon Tucker:
            Law Office of Michael L. Brown
17          By:  Michael Laird Brown, Esq.
            222 North Court Avenue
18          Tucson, Arizona 85701

19

20

21                          I N D E X

22   WITNESS:                DIRECT    CROSS    REDIRECT   RECROSS

23   JON EDWARDS
     By Ms. Hopkins            9
24   By Mr. Higgins                     28
     By Mr. Bleier                      36

25
```

1            THE CLERK:  Calling case number CR 11-1013, U.S.A.

2    versus Defendant Number 4 Ruiz, Defendant Number 5

3    Valenzuela-Lopez, Defendant Number 6 Pineda, and Defendant

4    Number 7 Tucker, all on for an arraignment, detention and

5    dangerousness hearing.

6            Counsel, please state your appearance.

7            MS. HOPKINS:  Good afternoon, Your Honor, Kimberly

8    Hopkins and Angela Woolridge for the United States.

9            MR. HIGGINS:  Good afternoon, Judge, Tom Higgins

10   appearing with Mr. Gregorio Ruiz, who is present with me in

11   custody.

12           MR. BLEIER:  Good afternoon, Judge, Adam Bleier on

13   behalf of Yovani Valenzuela-Lopez.  He's present, he's in

14   custody.

15           MR. YOUNGLOVE:  Good afternoon, Your Honor, Doug

16   Younglove making a special appearance on behalf of Attorney

17   Philip Kendall -- Kimble, I'm sorry, for Defendant Andy Pineda.

18           MR. BROWN:  Good afternoon, Your Honor, Mike Brown for

19   Ghermon Tucker, who's in custody.

20           THE COURT:  Okay.  You may proceed.

21           MS. HOPKINS:  Your Honor, the Government calls Special

22   Agent Jon Edwards to the stand.

23           MR. BROWN:  Judge, actually we have -- Mr. Bleier and

24   I have a pending discovery question before the Court.

25           THE COURT:  What it is?  Go ahead.

1          MR. BROWN:  It's document number 53.  And there was a

2     response filed by Miss Hopkins, document number 62.

3          Does the Court have those?

4          THE COURT:  No.

5          MR. BROWN:  Do you want to look at them?

6          THE COURT:  Sure.

7          MR. BROWN:  May I approach?

8          THE COURT:  Yes, sir.

9          (Discussion held off the record)

10          THE CLERK:  Please raise your right hand.

11          (JON EDWARDS, GOVERNMENT WITNESS, SWORN)

12          THE CLERK:  Thank you.

13          THE COURT:  Okay.  Can you give -- have you given him

14     the documents that were disclosed in the prior hearing?

15          MS. HOPKINS:  Your Honor, what the Government

16     disclosed to the defense attorneys were the notes that he is

17     going to -- or may potentially use while he's testifying on the

18     stand.

19          The Government disclosed a report that he did write

20     regarding this case.  It was a conversation that he had with

21     the source.  And --

22          THE COURT:  How about the binder?

23          MS. HOPKINS:  The contents of the binder, which as

24     they relate to the defendants that are here today, which are

25     the same things that was disclosed to the other defense

UNITED STATES DISTRICT COURT

1    attorneys at the other dangerousness hearing.

2           THE COURT:  Counsel wish to be heard?

3           MR. BROWN:  Judge, first off, I'm not aware of the

4    package that I got this afternoon of a report from the Agent

5    with the source.

6           MS. HOPKINS:  There is one page, it's probably towards

7    the back.

8           MR. BROWN:  If I can just confer with Miss Hopkins.

9           (Discussion held off the record)

10          MS. HOPKINS:  Your Honor, the other statement that the

11   Agent wrote was the basis of the Complaint, which outlines

12   basically pretty much everything that he testified to at the

13   prior hearing, which all the defense counsel has a copy of that

14   as well.

15          THE COURT:  Okay.

16          MR. BROWN:  Judge, I've looked at a copy of the report

17   that I got from the Government.  If I could just approach for a

18   moment to show this to the Court.

19          THE COURT:  Sure.

20          MR. BROWN:  This is the -- been represented as the

21   Agent's report regarding the confidential source.

22          THE COURT:  Okay.

23          MR. BROWN:  Judge, I reviewed the transcript from the

24   hearing on the 7th and the 8th, and it's pretty clear that the

25   Agent testified pretty broadly to a conspiracy, testified

1   broadly to a conspiracy that involves 17 -- 16 people, I guess.

2   And uses the source -- or his discussions and debriefs with the

3   source as basically his umbrella to cover everybody.

4          I think under 26.2, since the Agent did testify, I

5   think we're entitled to any reports he's authored.  I think

6   we're entitled to any reports that relate to his testimony.  If

7   he's testifying, Judge, to this broad conspiracy -- and he's

8   clearly creating this umbrella, things he wants to talk about,

9   to entrap everybody into what actually a small group of people

10  were doing in Tucson, I think we're entitled to those reports

11  that he relied upon as the basis for making those very broad

12  general statements to the Court.

13         This arrest took place on 3-2.  It's now 3-22.  And to

14  sit here today and say there are no reports that he's relied

15  on, there's no reports that he's looked at, there's no reports

16  that he's actually authored, I don't think is a good faith

17  assertion.  I think 302s clearly should have been done a long

18  time ago.

19         Since it's kind of a unique situation, Judge, that

20  this case got bifurcated, I mean these detentions hearings, and

21  so we do have a large gap in time between the testimony of the

22  Agent and now.  And I think under 26.2 we're entitled to

23  anything that was done that relates to his testimony, whether

24  he personally did the report or someone else did the report.

25         THE COURT:  It's my understanding from the examination

1  of this witness that they weren't going to prepare any reports

2  until this dangerousness hearing was over.  Isn't that right?

3          THE WITNESS:  I believe that's correct.  I don't

4  recall for sure, but I believe that's correct.

5          MR. BROWN:  And, Judge, is that legal grounds for this

6  Court to not provide a statement of witnesses to say, well,

7  we're going to wait until after the dangerousness hearing so we

8  don't have to give the defendants the opportunity to have a

9  fair opportunity to participate?

10          THE COURT:  Well, I can order them to disclose what

11  they have, but I can't order them to create something to

12  disclose.

13          MR. BROWN:  Well, I think all of these witnesses -- I

14  think, you have broad discretion, Judge, to view what's going

15  to be a fair determination in this hearing.  And I think that

16  you can look at what -- who this witness has talked to.  Those

17  people have rough notes.  If they have put it into a form of a

18  finalized report, I think this Court can say, well, that's

19  clearly intended to violate the spirit of 26.2, which is after

20  a witness testifies you get his information.

21          I don't think you can delay preparing reports

22  intentionally to not comply with 26.2.

23          I also think, Judge, based on what I've read of the

24  Agent's testimony, is that he was present at the debriefs with

25  the confidential source on more than one occasion.  So far I

1    don't have any notes that say anything about what his actual

2    conversations were, what questions were asked, what information

3    was given to the source, what information the source provided.

4    And I think at a minimum that's really clear from his prior

5    testimony.

6            And we're at a distinct disadvantage, and I think that

7    it's kind of just an end run around 26.2, since this witness

8    has already testified what -- all we got today is what the

9    Court has seen before, which is the record check summaries.

10           And I'd say this case has been -- according to the

11   Agent's reports, this case has been ongoing since December of

12   2010.  And to say that there are no reports, no official

13   reports in this case, may or may not be true.  But if it's true

14   that there are no reports, I think this Court can see through

15   that and order the disclosure of rough notes so this hearing

16   can proceed fairly, certainly for my client.

17           THE COURT:  Request is denied.

18           You may proceed.

19           You realize you're under oath?

20           THE WITNESS:  Yes.

21           MS. HOPKINS:  Your Honor, the Government is going to

22   submit on the record in the case based on the evidence I

23   presented at the dangerousness hearing held on March 7th and

24   March 8th.

25           The Government will ask the Agent questions --

1    specific questions as to these defendants and their

2    dangerousness.  And Government counsel is aware that I believe

3    all defense attorneys here have a copy of the transcript and

4    have had a chance to review it.

5              MR. BROWN:  Judge, that's true.  My only concern about

6    that is if the Agent is going to testify about anything

7    differently than what's in the transcript, he's got to do that

8    on direct.  So if he's going to say in between the hearing on

9    the 7th and 8th and today he's done some other work or talked

10   to some other people, that's got to come out on direct.

11             THE COURT:  Why can't it come out on cross?

12             MR. BROWN:  I think -- because I think it's his direct

13   testimony.  I don't think that I should -- because, one, I'm

14   entitled to rely on his prior testimony.  And if he's testified

15   one way -- and I'm sure the Court is aware lots of his answers

16   were, I just don't know yet.  I don't think it's efficient or

17   proper for me to have to say, well, you didn't know then and

18   he's going to say, oh, but I do now.  I think he should just on

19   direct, the Government's witness say, this is what I know now

20   in response to this.

21             THE COURT:  Overruled.

22             You may proceed.

23                        DIRECT EXAMINATION

24   BY MS. HOPKINS:

25   Q.  Will you please state your name again for the record?

 1   A.   Jon Edwards, J-O-N, E-D-W-A-R-D-S.

 2   Q.   And I just want to briefly go into your background again.

 3   Where do you work?

 4   A.   I work for the FBI, for the Tucson Resident Agency.

 5   Q.   And what's your title?

 6   A.   Special Agent.

 7   Q.   And how long have you been a Special Agent?

 8   A.   Approximately seven years.

 9   Q.   Okay.  And what are your responsibilities in your position

10   with the FBI?

11   A.   I'm assigned to the Hybrid Squad that investigates crimes

12   associated with the southern border.

13   Q.   Okay.  Now I'd like to turn your attention to Defendant

14   Gregorio Ruiz.

15   A.   Okay.

16   Q.   Now do you -- is there a nickname that's associated with

17   this defendant?

18   A.   Yes.  Gollito.

19   Q.   Okay.  Now did your investigation reveal that he was a

20   member of a home invasion crew?

21   A.   Yes.

22   Q.   And how?

23   A.   On March -- or sorry, February 22nd FBI confidential source

24   met with Gregorio Ruiz, his father Gregorio Guzman-Rocha, Andy

25   Pineda, and Jaime Lopez Lorenzo-Santiago in Phoenix.

1    Q.  Okay.  And was that meeting recorded?

2    A.  Yes.

3    Q.  Audio or video?

4    A.  It was audio recorded.

5    Q.  And do you -- based on the investigation, do you know what

6    this meeting was about?

7    A.  Yes.  They were discussing a future home invasion plan that

8    was going to occur in Tucson, Arizona.

9    Q.  And when was this home invasion set to occur?

10   A.  Well, that -- March 2nd is when Gregorio Ruiz traveled to

11   Tucson --

12   Q.  Okay.

13   A.  -- to carry out the home invasion.

14   Q.  So let's explore that more.

15        MR. BROWN:  Judge, I don't think that was responsive

16   to the question.  I think -- she didn't ask when it was

17   supposed to occur.  She just asked what happened on the 22nd.

18        THE COURT:  She asked when was the home invasion to

19   occur, March 2nd, which is when --

20        MR. BROWN:  So then I guess my question was -- did --

21   it wasn't clear, did that conversation or did that take place

22   on that date of the 2nd, actually get brought up on March 22nd?

23        THE COURT:  We'll figure that out during cross.

24        MR. BROWN:  Okay.

25   BY MS. HOPKINS:

1    Q.  Now I'd like to direct your attention to March 2nd, 2011.

2    What was Mr. Ruiz' role in the events that day?

3    A.  He traveled to Tucson in his Nissan Murano with Jaime Lopez

4    Lorenzo-Santiago, also known as Chapito or Chivo, and they

5    drove to the Food City parking lot, which was a predetermined

6    location set up by the FBI.  And that's where they met the FBI

7    source in that -- in that lot, the Food City lot.

8    Q.  And what happened after they met the source?

9    A.  That's when Lorenzo-Santiago entered the source's vehicle

10   and they drove to the FBI warehouse, and Gregorio Ruiz followed

11   in his Nissan Murano to the FBI warehouse.

12   Q.  Was there anyone else in the car with Mr. Ruiz?

13   A.  At that time, no.

14   Q.  Okay.  So what happened once they got to the warehouse?

15   A.  Once they arrived at the warehouse, they discussed the home

16   invasion plan, and the source wanted to -- they indicated that

17   other members of the home invasion crew were at the Food City

18   parking lot, and the source, FBI source, indicated he wanted to

19   see all the members.

20          And shortly after that Gregorio Ruiz drove back to the

21   Food City parking lot and he picked up Mayco Ledezma, Prieto,

22   Andy Pineda, and Yovani Valenzuela-Lopez.

23   Q.  So what happened after they got back to the warehouse?

24   A.  They got back to the warehouse and they discussed the home

25   invasion plan.  At that time the FBI source drew a map -- drew

1   a map of the stash house and the location of the items that the

2   home invasion crew was going to steal.

3        And he discussed that his -- the FBI source said that

4   his cousin was going to be inside of the house.  He wanted to

5   ensure that his cousin was not going to be hurt.  Provided a

6   photograph to those individuals in the warehouse.

7        And shortly after they understood the plan, viewed the

8   map, and had a picture of the FBI source's cousin, they were

9   arrested.

10  Q.  Now where exactly was -- or to your knowledge, based on the

11  investigation, where was Gregorio Ruiz arrested?

12  A.  He was actually in the driver's side of his Nissan Murano.

13  He had made it out the front door and was at the driver's side

14  of his Nissan Murano.

15  Q.  Now were there -- did he have a weapon on his person?

16  A.  There was a Jennings Bryco .380 located in the console of

17  the Nissan Murano.

18  Q.  And you said when he was arrested he was in the driver's

19  seat?

20  A.  Yes, ma'am.

21  Q.  Okay.  Now after he was arrested, did he make any

22  statements?

23  A.  Yes.  Yes, he did.  He had stated that he drove to Tucson

24  with his friend Chapito.

25  Q.  And who is Chapito?

1    A.  Jaime Lopez Lorenzo-Santiago.

2         He drove in his Nissan Murano.  The others in the

3    warehouse -- Andy Pineda, Mayco, and Mayco's friend -- drove to

4    Tucson in a white Jeep Commander with Arizona license plates.

5    They drove to the Food City.  They were joined at the Food City

6    by an unspecified number of individuals in a red Ford

7    Expedition.  And he mentioned a blue Chevy Avalance and a gray

8    sedan.

9    Q.  Was a Chevy Avalance actually at the scene?

10   A.  No, but a Black Cadillac Escalade EXT, which is the same

11   body style as an Avalance, was.

12   Q.  Okay.

13   A.  And the gray sedan was the FBI source, his vehicle.

14        He indicated that those individuals were associates of

15   Mayco.

16   Q.  That was one of the codefendants in this case?

17   A.  Yes, Mayco Ledezma Prieto is a codefendant.

18        They traveled from Phoenix to Tucson to meet with an

19   unknown individual who claimed to know the location of where

20   the son of El Azul was storing 65 kilograms of coke and 15

21   pounds of meth.  And in addition he admitted that they were

22   going to kidnap the son of El Azul and hold him for ransom.

23        MR. HIGGINS:  Excuse me, Your Honor, I might have

24   missed the track here.  These are statements by Gregorio Ruiz,

25   or are you just going back and speaking again of what the

1    confidential source told you?

2            THE WITNESS:  These are statements of Gregorio Ruiz.

3            MR. HIGGINS:  Okay.

4    BY MS. HOPKINS:

5    Q.  Did Mr. Ruiz make any admissions of ownership regarding the

6    gun?

7    A.  Yes, he admitted that that was his gun.

8    Q.  And did he make any admissions regarding any prior home

9    invasions?

10   A.  Yes.  He admitted to participating in a home invasion that

11   was conducted by Mayco and his associates in Phoenix, which

12   occurred in the vicinity of 83rd Avenue and McDowell Road a few

13   months ago.  And he indicated that he received $10,000 on that

14   occasion for his role as a lookout.

15   Q.  Okay.  Now did any other codefendants in this case make any

16   statements implicating him?

17   A.  His father, Gregorio Guzman-Rocha, indicated that he had

18   sent his son down here to be in charge of the home invasion.

19   Q.  And did his father make any statements as far as how they

20   were going to split the proceeds or split the cocaine?

21   A.  Yes.  His father indicated that out of the 65 kilograms of

22   cocaine, 48 kilos were going to be split up.  24 of the kilos

23   were going to go to him, Gregorio Guzman-Rocha.  And they were

24   going to split that amongst Jaime Lopez Lorenzo-Santiago and

25   his son Gollito.  The other 24 were going to be split up by

1   Mayco Ledezma, Andy Pineda, and Brandy, who he referred to as

2   Brandon.

3   Q.  Any indication of who Brandon --

4   A.  The Brandon is Brandon Pineda, Andy's brother.

5   Q.  Okay.  Now at the February 22nd meeting with the CS, did

6   Mr. Ruiz' father brag about his capabilities?

7   A.  Yes.  He indicated that his son had recently kidnapped

8   three individuals that were associated with a cartel in Mexico.

9   Q.  Okay.  Now you testified that when he was arrested he had a

10  handgun in the center console of his vehicle?

11  A.  Yes.

12  Q.  Was the handgun loaded?

13  A.  Yes.

14  Q.  How many rounds were inside the handgun?

15  A.  Thirteen rounds.

16  Q.  Did he make any admissions that the gun was going to be

17  used for the home invasion?

18  A.  I know that Jaime Lopez Lorenzo-Santiago indicated that

19  Gregorio Ruiz had the handgun.  However, Jaime was going to be

20  using it in the home invasion.

21  Q.  Now I'd like to turn your attention to Yovani

22  Valenzuela-Lopez.  Did your investigation reveal that he was a

23  member of a home invasion crew?

24  A.  Yes.

25  Q.  And how?

1    A.  He was present at the Food City parking lot, which was the

2    FBI's location.  He then traveled to the FBI warehouse in

3    Gregorio Ruiz' Nissan.  And he was present when the FBI source

4    discussed the layout of the house and where the items were.

5    And he was present when the photograph of the source's cousin

6    was revealed, and understood the plan, and was arrested after

7    that.

8    Q.  Okay.  And did -- did your investigation reveal how he

9    traveled to Tucson?

10   A.  Yes.  In a white Jeep Commander, which was registered to

11   him.

12   Q.  And who else was in the vehicle with him?

13   A.  Mayco Ledezma and Yovani's brother-in-law.

14          MR. BLEIER:  Can we have some foundation?

15          THE COURT:  Lay a foundation.

16          MS. HOPKINS:  I'm sorry?

17          THE COURT:  Lay the foundation, please.

18   BY MS. HOPKINS:

19   Q.  How do you know that these were the occupants in the

20   vehicle?

21   A.  Yovani admitted to agents that he came down with his friend

22   Mayco or Flaco and his brother-in-law.

23   Q.  Now you testified that Yovani was arrested at the

24   warehouse?

25   A.  Yes.

1   Q.  Now did he have a weapon on his person when he was

2   arrested?

3   A.  Yes, he had a Springfield 1911 .45.

4   Q.  Now while at the warehouse did Mr. Valenzuela-Lopez make

5   any statements to the CS?

6   A.  Yes.  When the -- when the FBI source was explaining that

7   he was worried about his cousin that would be in the stash

8   house and he didn't want him to be hurt, Yovani indicated that

9   at the end of this he may have one less cousin but he would

10  have a lot of money.

11  Q.  Now after Mr. Valenzuela-Lopez was arrested, did he make

12  any statements?

13  A.  Yes.  He admitted to having the pistol in his waistband at

14  the warehouse.  He indicated that he had bought the pistol from

15  an unknown person with cash, and that he -- you know, that he

16  wasn't going to buy a weapon that wasn't clean.  He indicated

17  that he had bought a 2007 Jeep for $9,000.

18          And he indicated that he had met his friend Flaco,

19  Mayco and his brother-in-law at a gas station before driving to

20  Tucson.  He didn't know the full name of his brother-in-law.

21          Once they got to Tucson, to the Food City in Tucson,

22  he then got into the Nissan Murano and advised that he was --

23  with the intentions of going for a joy ride.  And he did

24  not -- indicated he did not know any individuals at the Food

25  City and he was not introduced to them.

1    Q.  And do you have any evidence to the contrary?

2    A.  Yes.  I reviewed a Phoenix Police Department report where

3    it was a possession of marijuana case, where Yovani was present

4    at 3707, I believe, West Maricopa Street, which is Mayco

5    Ledezma's residence.  And he was one of the occupants of that

6    residence when they were interviewed by Phoenix.

7    Q.  And according to the reports who else was present at that

8    house?

9    A.  Ghermon Tucker was present.  Josh Young was also in the

10   house.  And I believe Andy and or Brandon also, my memory.

11            MR. BLEIER:  Your Honor, may I move for disclosure of

12   that report?  It's clearly within the scope of Rule 26.2.  He's

13   testifying to it.  He's saying he's relying on it.  And I don't

14   have a copy of the report.

15            MR. BROWN:  I'd join, Your Honor.

16            THE COURT:  Okay.  How did you get this information?

17            THE WITNESS:  Through the Phoenix –– Phoenix Detective

18   Jose Gamez, who is part of the H.I.K.E. Squad in Phoenix.

19            THE COURT:  So did he provide you with the report or

20   did he tell you about it?

21            THE WITNESS:  Both.

22            THE COURT:  All right.  Do you have the report here?

23            THE WITNESS:  I do not.

24            THE COURT:  Where is it?

25            THE WITNESS:  It's back at –– back at my office.

```
 1                THE COURT:  Okay.  We'll get it sometime today.

 2                You are in Tucson?

 3                THE WITNESS:  Pardon me?

 4                THE COURT:  Your office is here in Tucson?

 5                THE WITNESS:  Yes, sir.

 6                THE COURT:  Okay.  Go ahead.

 7     BY MS. HOPKINS:

 8     Q.  Now, Agent Edwards, the gun that was found on

 9     Mr. Valenzuela-Lopez, was it loaded?

10     A.  Yes.

11     Q.  And how many rounds were in there?

12     A.  Seven rounds.

13     Q.  Okay.  I'd like to turn your attention to Andy Pineda.  Did

14     your investigation reveal that he was a member of a home

15     invasion crew?

16     A.  Yes.

17     Q.  How?

18     A.  Andy was present on the February 22nd meeting with the FBI

19     source in Phoenix to discuss the home invasion plan.  He

20     arrived in Tucson March 2nd, 2011.  And he was present at our

21     predetermined meet location at the Food City.  And he also was

22     present in the FBI warehouse.  He was present for the

23     explanation and the map that the source drew.  He was present

24     when the source discussed his cousin, provided a photograph.

25     And he was subsequently arrested after being advised of those
```

1   things.

2   Q.  And while he was at the warehouse and before his arrest,

3   did he make any statements to the CS about the home invasion?

4   A.  Yes.  He said the other members were in the Food City

5   parking lot, and they had all the guns and the vests in their

6   vehicles.

7   Q.  And did the investigation later prove that this was true?

8   A.  Yes.

9   Q.  Okay.  Now did Mr. Pineda make any statements after his

10  arrest?

11  A.  He only indicated that he was -- he only commented that he

12  was hanging out with friends.

13  Q.  Now did any other codefendant implicate him?

14  A.  Yes.  Gregorio Guzman-Rocha, Gollo, indicated that Andy and

15  Mayco and Brandon were in charge of getting the connections

16  with the Black crew and splitting up the 24 kilos of cocaine

17  with those persons, with the Black crew that were going to

18  actually enter the residence.

19  Q.  Now during the course of your investigation did you become

20  aware of any arrests or convictions of this defendant?

21  A.  Yes.

22  Q.  And have you -- actually can you tell the Court what those

23  arrests and convictions are?

24  A.  February of 2000 it looks like interfering with a judicial

25  proceeding, received community service.  April 2000 it looks

1    like it was an assault with a court dismissal.  November 2002,

2    theft by extortion with a weapon, kidnapping, aggravated

3    assault, armed robbery, it was a court dismissal.  December

4    2003, driving with suspended license, community service.

5    September 2008, carrying a concealed weapon, one day in jail.

6    And I believe five failures to appear.

7    Q.  Okay.  I'd like to turn your attention to Ghermon Lateke

8    Tucker.  Now did your investigation reveal that he's a member

9    of a home invasion crew?

10   A.  Yes.

11   Q.  How?

12   A.  He was present on the February 4th, 2011 meeting in Phoenix

13   where they discussed the home invasion plan.  Also present was

14   Gregorio Guzman-Rocha, Gollo; Jaime Lopez Lorenzo-Santiago,

15   Chivo, Chapito; and Ghermon Tucker and Mayco.

16   Q.  And I presume the source was there as well?

17   A.  Yes.  The FBI source, yes.

18   Q.  Now what was his role in the events on March 2nd?

19   A.  He was present in the Ford Expedition that was in the

20   Food City parking lot, and which also had traveled to the

21   Circle K parking lot.  He was observed by surveillance talking

22   to the occupants of the white Jeep Commander at the Circle K

23   parking lot which was registered to Yovani.  And he was in that

24   vehicle when it was stopped by the BORTAC, Border Patrol, on

25   I-10 westbound.

1    Q.  And were there any weapons found in that vehicle?

2    A.  Yes.  There were three handguns and also two tactical

3    vests.

4    Q.  And what kind of handguns were there?

5    A.  There were -- inside the Expedition there was a Ruger nine

6    millimeter, Taurus .45, and a Glock 17 nine millimeter.  And

7    there was a point-blank body armor and a green ballistic vest.

8    Q.  Now after his arrest, did he make any statements?

9    A.  Yes.  He denied knowing Chivo, Mayco or Gollo.  Chivo or

10   Chapito is Jaime Lopez Lorenzo-Santiago.  Mayco is Mayco

11   Ledezma Prieto.  Or Gollo, Gregorio Guzman-Rocha.

12   Q.  Do you have any evidence to the contrary?

13   A.  Yeah, he was present with all three of those individuals on

14   February 4th, 2011, at the meeting.  And he was also listed in

15   the Phoenix Police Department report at the 3707 West Maricopa

16   Street address, which was identified at Mayco's.

17   Q.  Now did he make any other statements?

18   A.  He denied having any knowledge of firearms or body armor in

19   the vehicle.  And he did not answer the question when he was

20   asked why he came to Tucson.

21   Q.  Now do you have any other information linking him to other

22   home invasions in Phoenix?

23   A.  When his presence --

24           MR. BROWN:  Foundation for that before he --

25           MS. HOPKINS:  I was going to get to that.

 1           MR. BROWN:  Okay.

 2           THE WITNESS:  His presence at the --

 3  BY MS. HOPKINS:

 4  Q.  Well, it's yes or no, first.

 5  A.  Yes.

 6  Q.  Okay.  And what is the basis of your knowledge?

 7  A.  Reviewing and -- or discussing the defendants with the

 8  Detective Gamez with the Phoenix Police Department

 9  H.I.K.E. Unit.

10  Q.  Okay.  And what was the information that you found?

11  A.  During that same incident in Phoenix it looked like there

12  was weapons and marijuana involved.  And he was at that

13  residence of -- Mayco's residence at 3707 West Maricopa Street.

14  Q.  Now during the course of your investigation did you become

15  aware of any arrests or convictions pertaining to this

16  defendant?

17  A.  Yes.  December 1999, marijuana possession.  August of 2001,

18  license plate violation, one day in jail.  May 2002, drug

19  possession for sale, nine months in jail.  September 2002,

20  narcotic drug violation, it was a court dismissal.  June 2002,

21  endangerment and aggravated assault with a deadly weapon, three

22  year probation.  May 2005, prohibited possession of a weapon,

23  prison five years.  And January 2011, unlawful flight from law

24  enforcement, and the disposition was not recorded yet.

25  Q.  Do you know why it wasn't recorded?

1    A.  Because it was March 3rd he was supposed to be in Maricopa

2    County Superior Court for his sentencing.

3    Q.  And that was the day after he was arrested --

4    A.  Correct.

5    Q.  -- in this case; correct?

6    A.  Yes.

7    Q.  Okay.  And what vehicle was he driving when he was arrested

8    for the 2011 unlawful flight arrest?

9    A.  The red Ford Expedition, that was the same vehicle that was

10   stopped on Interstate 10.

11   Q.  And who was the driver of that vehicle?

12   A.  Jerome Ranger.

13          MR. BROWN:  Objection.

14          THE COURT:  Sustained.

15   BY MS. HOPKINS:

16   Q.  Now do you have any knowledge as to whether Mr. Tucker is a

17   member of a gang?

18   A.  Yes.

19   Q.  What's --

20   A.  Further --

21   Q.  First, what's the basis of your knowledge?

22   A.  Information received from the Phoenix Police Department.

23   Q.  Okay.  And what is the information that you have?

24   A.  That he's a Vista Blood associate.

25   Q.  Okay.  Now you testified that there were three guns found

1    in the Expedition?

2    A.  Yes.

3    Q.  How many rounds were in each gun?

4    A.  The Ruger nine millimeter, that was loaded with 15 rounds.

5    The Taurus .45 was loaded with ten rounds.  And the Glock 17

6    nine millimeter was loaded with 16 rounds.

7    Q.  And were the guns easily accessible to anyone in that

8    vehicle?

9    A.  Yes.

10            MS. HOPKINS:  Your Honor, may I have one moment?

11            THE COURT:  You may.

12            (Discussion held off the record)

13            MS. HOPKINS:  No further questions, Your Honor.

14            THE COURT:  Where's your office?

15            THE WITNESS:  1 South Church Ave.

16            MS. HOPKINS:  Your Honor, I believe I have a copy up

17   in my office.  I need to check.  The only problem is, I believe

18   there needs to be redactions to the report.

19            THE COURT:  Okay.  Can that be done in half an hour,

20   45 minutes?

21            MS. HOPKINS:  I can certainly try.

22            THE COURT:  Well --

23            MS. HOPKINS:  I would say 30 minutes is fine.

24            THE COURT:  Well, let's take 45.

25            MS. HOPKINS:  Okay.

 1              THE COURT:  We'll stand at recess for 45 minutes.

 2              (Recess taken)

 3              THE COURT:  You may proceed.

 4              MS. HOPKINS:  Your Honor, may I address the Court?

 5              THE COURT:  Yes.

 6              MS. HOPKINS:  I'd like the Court to know that the

 7    Government gave defense counsel a two-page summary that the

 8    detective wrote regarding the police report.  The police report

 9    is actually approximately 50 pages long.  It's a little

10    convoluted.  The detective that wrote the police report wrote

11    the summary and gave it to the Agent.  The basis of the Agent's

12    testimony is what was in that summary.  He doesn't have the

13    intricate knowledge and details of what was in the police

14    report, it's based off the summary.  And that's what the

15    Government gave to defense counsel.

16              And there was actually one discovered piece that if I

17    could --

18              THE COURT:  Okay.

19              MS. HOPKINS:  -- redirect just so I can get that out.

20    BY MS. HOPKINS:

21    Q.  Now, Agent, we reviewed a two-page document referencing an

22    incident that happened on November 11th of 2010?

23    A.  Yes.

24    Q.  And you testified as -- briefly as to this incident?

25    A.  Yes.

1   Q.  Now were there any discrepancies in what you testified to?

2   A.  Yeah.  I think I had mentioned I wasn't sure if it was Andy

3   or Brandon Pineda.  And after reviewing it I didn't

4   have -- there was no information that Andy was present.

5           MS. HOPKINS:  Okay.  No further questions.

6           MR. BROWN:  Judge, I just wait to -- I've read the

7   report, and I'll just wait to cross to see if I have any reason

8   to request looking at the full copy of the report.

9                         CROSS-EXAMINATION

10  BY MR. HIGGINS:

11  Q.  Agent Edwards, my name is Tom Higgins.  I represent

12  Gregorio Ruiz.  I'd like to ask you a couple of background

13  questions.

14          The Hybrid Unit that you work for that deals with

15  border issues out of Tucson, how long has that been in

16  existence?

17  A.  Right about January -- approximately January of this year.

18  Q.  All right.  So this thing that came up in December that --

19  the reason we're here today, the first contact between the

20  confidential source and anyone involved as a defendant in this

21  case occurred in December, approximately the 22nd; correct?

22  A.  I think -- even prior to that there was probably more

23  contact.

24  Q.  But we're talking about December?

25  A.  Yeah.

1   Q.  It's safe to say that the hybrid unit has not done any real

2   home invasion investigations and prosecutions?

3   A.  Are you talking -- I'm not sure if I understand the whole

4   question.

5   Q.  Okay.  The Hybrid Unit of which you are associated with

6   through the FBI, that deals with things that come up along the

7   border, like home invasions, drugs; correct?

8   A.  Sure, okay.

9   Q.  Is it safe to say they don't have -- they have not

10  investigated any real home invasions?

11  A.  I can't speak for the whole squad.  I can speak for myself.

12  I know this is the first one for me, specifically a home

13  invasion case for me.

14  Q.  Okay.  Are you aware of any real home invasion cases rather

15  than a sting home invasion?

16  A.  As to --

17          THE COURT:  Anybody in general.

18          THE WITNESS:  Anybody in general?

19  BY MR. HIGGINS:

20  Q.  In your unit.

21  A.  Yeah, there's been other home invasions cases that's been

22  worked by the Tucson Resident Agency.

23  Q.  Okay.  Now this one, pretty much everybody, all the

24  defendants anyway, are from Phoenix; correct?

25  A.  Yes.

1   Q.  And in this case it was a invented stash house, and an

2   invented 65 kilos of cocaine, and an invented 15 pounds of

3   methamphetamine, and an invented $700,000; correct?

4   A.  It was information -- misinformation produced by the

5   Government, the FBI.

6   Q.  Well, you made it up?

7   A.  It was -- yes, it was not real.

8   Q.  Okay.  Now I would imagine that Phoenix has pretend stash

9   houses and pretend money and pretend drugs.  But this went down

10  in Tucson; correct?

11  A.  The second part of your question was, it went down in

12  Tucson, yes.  The first part of your question about Phoenix

13  and -- I do not know that, what they have.

14  Q.  You don't know if they can make up things like that in

15  Phoenix?

16  A.  I don't work in Phoenix.  I don't know.

17  Q.  Okay.  Is the reason for this -- all these people being

18  brought or encouraged to come to Tucson because your Hybrid

19  Unit wanted to get its stats established --

20          MS. HOPKINS:  Objection, Your Honor.

21          THE COURT:  Overruled.

22  BY MR. HIGGINS:

23  Q.  Because you wanted to establish some stats?

24  A.  No.  The reason that these guys came to Tucson was they

25  had -- the indicated members of the home invasion crew that --

1   specifically I think Jaime Lopez Lorenzo-Santiago had said that

2   they felt like the police were on them in Phoenix, and that

3   Tucson seemed to be a good fit for them to go and do more work.

4   Q.  Well, didn't the idea of a Tucson rip-off come from your

5   confidential source?

6   A.  It came from the FBI.

7   Q.  They didn't say, we want to do a job in Tucson, do you know

8   anything that's going on there; correct?  You're the ones that

9   invented this Tucson stuff?

10  A.  We provided the information about the cocaine and the stash

11  house in Tucson, yes.

12  Q.  Made it up?

13  A.  It was information made up by the Government.

14  Q.  Okay.  And so there wasn't any discussion between you and

15  any of your peers or other agents or law enforcement regarding

16  having this in Tucson as opposed to Phoenix?

17  A.  It came to Tucson -- I mean, because of just the logistics

18  and how it worked out, that Tucson was the best for the case,

19  the investigation.

20  Q.  Okay.  And who was -- are you the case agent, for lack of a

21  better word?

22  A.  Yes.

23  Q.  Okay.  Was that your decision to use Tucson instead of

24  Phoenix?

25  A.  It was my decision as well as the -- you know, other

1   agent -- source handling agent.  It was not just my decision,

2   but there were a lot of other agents working on this, that this

3   is where it fit into the investigative plan.

4   Q.  Because that's where you were?

5   A.  Well, I am based out of Tucson, yes.

6   Q.  Okay.  Was there any discussion of how you came up -- why

7   65 kilos of cocaine?  Why not ten or 114?  Where did that

8   number come up at?

9   A.  It was just, you know, a number that we had just been

10  talking about.  It really was nothing in particular.  But that

11  was what we thought was a good number.

12  Q.  So you guys just sat around at a desk or table --

13          MS. HOPKINS:  Objection, Your Honor.

14          MR. HIGGINS:  -- and asked, how much should we --

15          THE COURT:  Overruled.

16          THE WITNESS:  It really wasn't like we were -- I mean,

17  it's just when we're, you know, developing an investigative

18  plan, that's -- you make the discussions, you try and figure

19  out what is appropriate, what fits.

20  BY MR. HIGGINS:

21  Q.  Was there any discussion among the agents formulating this

22  plan that you had to get enough cocaine to get it over a

23  certain amount for prosecution purposes?

24  A.  No.

25  Q.  Where did the 15 pounds of methamphetamine come from?

1    A.  That was just, as the meetings progressed, that's how it

2    went.  And that's -- it just -- it fell in line with the

3    meetings and talking, and the face-to-face meetings and the

4    phone conversations.  That's just how the plan started playing

5    itself out.

6    Q.  Same with the money, the 700,000?

7    A.  It made sense with the way that the buyer was going to be

8    there.  It was the whole part of the plan that was --

9    Q.  That was made up?

10   A.  Correct, yes.

11   Q.  All right.  Now speaking of these meetings, there is in

12   your notes that we've been provided an indication that my

13   client, Gregorio Ruiz, was at a February 22nd meeting; is that

14   correct?

15   A.  Yes.

16   Q.  And that was with the confidential source; is that right?

17   A.  Yes.

18   Q.  Do you have information that -- how long my client was

19   there?

20   A.  I don't know exactly at this time.

21   Q.  Do you have information that he left shortly after the

22   meeting began because he had to do something else?

23   A.  I believe that there was information that he did depart in

24   the Nissan Murano.

25   Q.  Before the meeting was over?

1  A.  No.

2  Q.  All right.  You don't have that information?

3          Do you have body wire recordings or anything of that

4  meeting?

5  A.  There is a recording.

6  Q.  Okay.  And that has not been available to you yet, I

7  realize that; correct?

8  A.  Yes, it's not available.

9  Q.  Do you have any information from taped, monitored calls

10  that -- between my client and any of the other co-conspirators

11  after appearing at that February 22nd meeting?

12  A.  No.

13  Q.  You did a records check on my client; is that correct?  And

14  that was in the information we received today; correct?

15  A.  A records check was done, yes.

16  Q.  And it was negative, meaning no criminal history; correct?

17  A.  Correct.

18  Q.  And did -- you didn't get anything from Officer Denny of

19  the Gang Unit concerning gang activities by my client, did you?

20  A.  Let me check real quick.

21          No, I did not.

22  Q.  And I believe you said that there was -- you got

23  information that someone else was going to use the .380

24  automatic that was found in the Murano glove compartment or

25  console?

1    A.  Yes.

2    Q.  I heard you correctly earlier when you said that?

3    A.  Yes.

4    Q.  Yes.

5           And who was going to use it?

6    A.  Jaime Lopez Lorenzo-Santiago had said that Gregorio had

7    brought the .380, however, that he was going to use the .380.

8    Q.  All right.  Now did -- the entire time that my client was

9    at the warehouse, do you have any information that he called or

10   notified any co-conspirators that were not at the warehouse?

11   A.  I don't know that at this time.

12   Q.  Okay.  What type of surveillance and/or electronic

13   monitoring was taking place while they were at the warehouse?

14   A.  Audio and video.

15   Q.  All right.  Have you reviewed those?

16   A.  I have reviewed -- yes, I have reviewed those.

17   Q.  Okay.  Do you have any information that he contacted any

18   co-conspirators while he was at the warehouse?

19   A.  I don't -- at this time I don't know for sure.

20   Q.  Now did you get a cellphone from him?

21   A.  I know that there was a cellphone, I don't know -- there

22   was several cellphones taken.  I haven't had a chance to go

23   over all that at this point.

24   Q.  Well, do you remember taking one from him or somebody

25   taking one from him?

1    A.  I don't know that.

2    Q.  All right.  And I take it that the normal investigative

3    track will be that those cellphones, the logs anyway, will be

4    obtained by law enforcement to see if they match up with any

5    other numbers; correct?

6    A.  Yes.

7    Q.  And has any of that been done so far?

8    A.  No.

9    Q.  All right.  And Mr. Ruiz, Gregorio Ruiz, came under your

10   radar, so to speak, because of statements by his father at

11   those meetings in February; correct?

12   A.  That was the first we had heard of him, yes.

13           MR. HIGGINS:  That's all I have.  Thank you.

14           MR. BLEIER:  One moment, Judge.

15                        CROSS-EXAMINATION

16   BY MR. BLEIER:

17   Q.  Agent Edwards, my name is Adam Bleier.  I represent Yovani

18   Valenzuela-Lopez.

19           Good afternoon.

20   A.  Good afternoon.

21   Q.  You prepared the Complaint in this case; is that correct?

22   A.  Yes, I was the primary person.

23   Q.  Okay.  Were there other people writing the Complaint?

24   A.  There were other people assisting.

25   Q.  Okay.  Who were those people?

JON EDWARDS – CROSS-EXAMINATION BY MR. BLEIER          37

1   A.  Let's see.  I can't remember all of them now.  But off the

2   top of my head, right now I know that there was Special Agent

3   Jeff Cortezi (ph) was present, and --

4   Q.  That's Jeff Cortezi?

5   A.  Yes.

6   Q.  And what was his involvement in the case?

7   A.  He's -- he's an agent on my squad.

8   Q.  Okay.  And he was involved in this investigation?

9   A.  Yes.

10  Q.  And who else?

11  A.  I'm trying to remember here.  I think Scott Laub (ph) was

12  present.  And that's all I can remember at this point right

13  now.

14  Q.  Was the CI present when you were writing the Complaint?

15  A.  No.

16  Q.  And obviously when you draft a Complaint you want to

17  include all the important facts with respect to probable cause;

18  correct?

19  A.  Yes.

20  Q.  And also another important goal perhaps is to include all

21  relevant facts with respect to detention; correct?

22  A.  I don't know relevant to detention.  I don't know that.

23  Q.  Okay.  And in writing this Complaint with you and

24  Mr. Cortezi and Mr. Laub, agents, sorry, you attempted to do

25  that, attempted to include all important facts in the

UNITED STATES DISTRICT COURT

1    Complaint; correct?

2    A.  I attempted just to put the facts that I had at that time

3    that were relevant.

4    Q.  Relevant to probable cause; correct?

5    A.  The basis for a Complaint, yes.

6    Q.  Okay.  And going through that Complaint, the first meeting

7    between -- well, Roberto Del Solar Ramos introduces the CI to

8    Lorenzo-Santiago; is that correct?

9    A.  Yes.

10   Q.  And that's a meeting on December 29th, 2010?

11   A.  Yes.

12   Q.  And at that meeting there's no mention of Mr. Yovani

13   Valenzuela-Lopez; correct?

14   A.  Correct.

15   Q.  He's not present at that meeting?

16   A.  Correct.

17   Q.  Then there's a subsequent meeting on February 4th where the

18   CI allegedly meets with Lorenzo-Santiago, Gollo, Mayco, and

19   Ghermon Tucker, and there's a discussion of the stash house at

20   that meeting; is that correct?

21   A.  Yes.

22   Q.  And at that meeting my client is not present; correct?

23   A.  Correct.

24   Q.  And there's no mention of Mr. Valenzuela-Lopez; correct?

25   A.  I don't believe so.

1  Q.  Okay.  Well, specifically -- do you have your Complaint

2  with you?

3  A.  Yes, I do.

4  Q.  Okay.  And I'm referring -- there were two Complaints filed

5  in this case.  The first Complaint is a March 3rd Complaint.

6  And then there was a March 7th Complaint that was amended to

7  reflect Roberto Del Solar Ramos' involvement; is that correct?

8  A.  Yes.

9  Q.  Which Complaint do you have?

10  A.  I have the March 7th, the one with --

11  Q.  Okay.

12  A.  -- all the defendants on it.

13  Q.  Okay.  Now with respect to the February 4th meeting, in

14  that case I believe Guzman -- and I can refer you -- well, I'll

15  just ask you.

16       Guzman specifically advised the CI as to who would be

17  the crew.  He indicates four Black males, and then he says

18  Lorenzo-Santiago, Gregorio Ruiz, Ledezma Prieto, and

19  Lorenzo-Santiago's brother-in-law; is that correct?

20  A.  Yes.

21  Q.  He doesn't mention Yovani Valenzuela-Lopez; correct?

22  A.  No.

23  Q.  And then there's another meeting on February 22nd, a

24  meeting between the CI, Lorenzo-Santiago, Gregorio Ruiz, Gollo,

25  and Andy Pineda, and they talk about the status of the plan;

1    correct?

2    A.  Correct.

3    Q.  And Yovani Valenzuela is not mentioned at that meeting;

4    correct?

5    A.  Correct.  To my understanding right now he's not.

6    Q.  Okay.  And there's -- and he's not present at that meeting;

7    correct?

8    A.  Right, he's not present.

9    Q.  Were you present at that meeting -- or were you surveilling

10   that meeting?

11   A.  Was I present at the meeting?

12   Q.  Obviously you weren't present.  Strike that.

13   A.  No.

14   Q.  Were you surveilling the meeting?  Were you listening in on

15   it?

16   A.  I was on the perimeter.  I was on the outside.

17   Q.  Okay.  And these are all meetings that are recorded in

18   Spanish; is that correct?

19   A.  I believe the majority, if not all, is in Spanish.

20   Q.  Okay.

21           THE COURT:  Excuse me.  Just for my purposes,

22   Mr. Valenzuela wasn't present 12-29.  He wasn't present at the

23   2-11 meeting.  He wasn't named by Guzman as a member of the

24   crew.  And I have a note that says he wasn't present at

25   meeting.  And which one are we talking about?

1          MR. BLEIER:  There's the 12-29 meeting, Your Honor,

2     there's the 2-4 meeting, and the 2-22 meeting that he's not

3     present at.

4          THE COURT:  Okay.  2-22.  Thank you.

5     BY MR. BLEIER:

6     Q.  Okay.  And now prior to March 2nd, which is when you first

7     encounter my client, Mr. Valenzuela-Lopez, you have no

8     knowledge of Mr. Valenzuela-Lopez; correct?

9     A.  Well, it's tough to -- well, from the Phoenix Police

10    Department.  I had a lot of information coming in.  His name

11    was in those documents, but I don't remember ever -- you know,

12    there was just a lot of information.  I don't remember -- his

13    name was in there, I just don't remember coming across it.

14    Q.  Okay.  So you had no recollection of him prior to March

15    2nd?

16    A.  Correct, yes.

17    Q.  And the CI -- I mean, did you have numerous debriefings

18    with the confidential informant?

19    A.  There were several debriefings, yes.

20    Q.  Okay.  And were these debriefings happening after the 12-29

21    meeting, the 2-4 -- February 4th meeting and the February 22nd

22    meeting?

23    A.  They usually occurred after the meetings.

24    Q.  Okay.  And -- and during those debriefings

25    Mr. Valenzuela-Lopez is not mentioned by name?

1    A.  To my knowledge, no.

2    Q.  Okay.  So you don't have any recollection of that?

3    A.  Right.  Correct.

4    Q.  Okay.  And to your knowledge prior to March 2nd he had no

5    contact with any other agents in this case; correct?

6    A.  Any other agents?

7    Q.  Yes.

8    A.  To my knowledge I don't believe he's had any contact with

9    any other agents.

10   Q.  And during these meetings with the CI, the -- the people

11   that are meeting with him, whether it's Lorenzo-Santiago or

12   others, brag about other home invasions; correct?

13   A.  They had talked about other home invasions, yes.

14   Q.  Okay.  And they also in those -- in that bragging or

15   whatever it is, they mentioned other people; correct?

16   A.  I believe so, yeah.

17   Q.  And Mr. Yovani Valenzuela is not mentioned; correct?

18   A.  I don't believe he was.

19   Q.  Mr. Yovani Valenzuela wasn't in any gang database that you

20   reviewed; is that correct?

21   A.  Let me refer real quick.

22        Correct.

23   Q.  And so essentially -- and you have no specific information

24   that he was involved in prior home invasions; correct?

25   A.  He was present at the 3707 West Maricopa.

1    Q.  And that was a home invasion?

2    A.  No, it was vehicles -- I think it was possession of

3    marijuana and vehicles with firearms.

4    Q.  Okay.  So my question is:  Do you have specific facts

5    saying that he was involved in a specific home invasion beyond

6    this?

7    A.  Beyond the 3707 West Maricopa Street or --

8    Q.  Beyond the allegations in this Complaint, in the

9    Indictment.

10   A.  I would say that that 3707, from that address and talking

11   to the officers, that that was right after they felt like a

12   home invasion had been done.

13   Q.  Okay.  Is there any specific house that they knew that had

14   been invaded?

15   A.  I don't think they ever linked it back to a specific house.

16   Q.  Nobody arrived at the hospital from a specific apartment

17   that had been -- or house that had been broken into and people

18   had been shot?

19   A.  I don't know that.

20   Q.  Okay.  So basically on March 2nd you encountered a number

21   of people in the warehouse; Andy Pineda, Lorenzo-Santiago,

22   Gregorio Ruiz, and then Mr. Valenzuela-Lopez.  Am I leaving

23   anybody out?

24   A.  Yes.

25   Q.  Who?

1    A.  Mayco Ledezma-Prieto.

2    Q.  Okay.  Mayco Ledezma-Prieto.

3            And all those people, aside from Valenzuela-Lopez, had

4    been seen before by your CI and by your agents; is that

5    correct?

6    A.  Yes.

7    Q.  Except Mr. Valenzuela-Lopez?

8    A.  Yes.

9    Q.  You know of no juvenile history from my client; is that

10   correct?

11   A.  Not at this time, no.

12   Q.  Okay.  No misdemeanor charges that have ever been filed

13   against him?

14   A.  To my knowledge right now; correct.

15   Q.  No misdemeanor convictions?

16   A.  Correct.

17   Q.  He's never been charged with a felony outside of this case;

18   correct?

19   A.  That -- to my understanding right now; correct.

20   Q.  You know of no specific facts and history of violence

21   outside of this case; correct?

22   A.  That's what I know is only in this case right now, yes.

23   Q.  Okay.  Now you indicated that you prepared the Complaint in

24   this case; correct?

25   A.  Yes.

1   Q.  Okay.  And you tried to include all the important facts;

2   correct?

3   A.  Yes.

4   Q.  In the Complaint in this case you did not indicate -- you

5   did not write that Mr. Valenzuela-Lopez possessed a firearm; is

6   that correct?

7   A.  Can you state the last part again?

8   Q.  There's no indication in this report that Mr. -- in this

9   Complaint that Mr. Valenzuela-Lopez possessed a firearm; is

10  that correct?

11  A.  I believe that was mistakenly left out.

12  Q.  Okay.  So mistakenly left out that he had a firearm.

13          Also, with respect to any statements, there's no

14  state -- you testified to a statement that Mr. Yovani

15  Valenzuela-Lopez allegedly made.  That was not in the

16  Complaint, was it?

17  A.  No.

18  Q.  So after the -- and just regarding that -- that statement,

19  did he make any other statements in the warehouse?

20  A.  Right now I don't know everything that he said.  I do know

21  that was in my notes that that was a statement that was made.

22  Q.  Okay.  So how did that come into your notes?  Was the

23  statement in English or Spanish?

24  A.  That was a statement that the confidential human source had

25  indicated was said to him.

1   Q.  Okay.  So the informant in this case said to you, this is

2   what he told me; is that correct?

3   A.  He had said that to -- yes.

4   Q.  Okay.  So you never heard a recording that he made that

5   statement; correct?

6   A.  There's a recording, but I haven't had -- it's in Spanish.

7   Q.  Okay.  So you didn't hear that statement.  Did you hear the

8   statement in Spanish?

9   A.  No.

10  Q.  Okay.

11  A.  Well, if I did I wouldn't know.

12  Q.  Well, I guess I'm asking, did the CI say, hey, this is

13  where he's saying?

14  A.  No.

15  Q.  Okay.  So it's just recorded -- it was just relayed to you

16  by the CI, hey, he told me this?

17  A.  Correct.

18  Q.  Did he relay any other statements he made?

19  A.  No.

20  Q.  Okay.  What -- just what crime was the confidential

21  informant working off?

22          MS. HOPKINS:  Objection, Your Honor.

23          MR. BLEIER:  Goes to the credibility of the

24  confidential informant with respect to the statement.

25          MS. HOPKINS:  It's not at issue here.

1          THE COURT:  Because?

2          MS. HOPKINS:  Well, the defendant already testified at

3    the last hearing, someone asked him if he had -- if he had

4    knowledge that the informant was reliable, and he answered yes.

5          And this hearing is about the dangerousness of the

6    defendants here, not the reliability.  We've already -- we're

7    not establishing probable cause here.

8          THE COURT:  Sustained.

9    BY MR. BLEIER:

10   Q.  After the arrest -- how -- well, was the warehouse door

11   locked after everybody went inside?

12   A.  I don't recall.

13   Q.  Okay.  Do you know who closed the warehouse door?

14   A.  I don't recall.

15   Q.  Okay.

16   A.  I don't know at this time right now.

17   Q.  Okay.  Were you guys positioned by one of the doors?

18   A.  Can you be more --

19   Q.  Well, I guess let me back up.

20          How many entrances or exits were there to this

21   warehouse?

22   A.  Four.

23   Q.  Okay.  Were all of those blocked?

24   A.  Were all of them blocked?  I don't know that.

25   Q.  Okay.  Do you know which agent encountered

1   Mr. Valenzuela-Lopez after the arrest signal was given?

2   A.  No, I do not.

3   Q.  After the arrest signal was given, Mr. Valenzuela-Lopez

4   surrendered; is that correct?

5   A.  I believe that he complied with the officers' commands.

6   Q.  Okay.  And so his demeanor, as far as you know, was

7   cooperative?

8   A.  Yes.  And he advised he had a gun on him.  He told the

9   officers he had a gun.

10  Q.  Okay.  So he immediately advised he had a gun on him, he

11  went down on the ground and he complied with commands; correct?

12  A.  I don't know if it was immediate.  I know that he did

13  comply.  I don't know if it was immediate.

14  Q.  Okay.  Now did he give -- he gave the statement to you; is

15  that correct?

16  A.  Can you be more -- who --

17  Q.  Mr. Valenzuela-Lopez, you testified previously -- I'm

18  sorry, strike that.

19        You had testified previously that my client gave a

20  statement.  Was that statement given to you?

21  A.  No.

22  Q.  Okay.  Who was that given to?

23  A.  I don't know the agent that took his statement right off

24  the top of my head.

25  Q.  Okay.  How did you get --

1    A.  I believe it was Special Agent Fitzsimmons.  And there was

2    one other one, but I can't remember who the other one was at

3    this time.

4    Q.  Okay.  You testified essentially that he had stated that

5    he'd gone on a joy ride or something like that?

6    A.  Correct.

7    Q.  How did you get that statement?

8    A.  In talking with Special Agent Fitzsimmons.

9    Q.  Okay.  Did he give you a report to review or did he just

10   say, Yovani told me this?  How did that transpire?

11   A.  Initially -- he told me verbally was initially.

12   Q.  Okay.  And you said "initially," how was --

13   A.  He eventually generates a report, he writes a report.

14   Q.  Okay.  And prior to your testimony today, have you reviewed

15   that report?

16   A.  I have reviewed some of that report.

17   Q.  Okay.  What part of the report?

18   A.  I've reviewed -- I've been looking at a lot of reports.  I

19   don't know exactly what part of it.

20   Q.  And whose -- what other reports have you reviewed?

21          MS. HOPKINS:  Objection, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  The other reports -- I mean, interview

24   reports.  I've looked at a lot of surveillance reports, videos,

25   surveillance videos, other law enforcement reports, firearms

1    reports.  That's just off the top of my head right now.

2              MR. BLEIER:  I would move for the disclosure of those

3    reports again.

4              UNIDENTIFIED SPEAKER:  Join in, Your Honor.

5              UNIDENTIFIED SPEAKER:  We do as well, Your Honor.

6    BY MR. BLEIER:

7    Q.  The issue why we're here -- obviously it's not a probable

8    cause hearing, the issue is whether the Government can prove by

9    clear and convincing evidence that no combination of release

10   conditions will reasonably assure that my client isn't out

11   there committing more crimes.

12             Do you have any specific facts of any more crimes that

13   he planned to commit?

14             MS. HOPKINS:  Objection.  Speculation.

15             THE COURT:  Overruled.

16             THE WITNESS:  No.

17   BY MR. BLEIER:

18   Q.  You have no specific -- you have no evidence that he won't

19   follow the instructions of the Pretrial Services Officer or the

20   orders of this Court; correct?

21   A.  I don't know that, no.

22   Q.  You're not aware -- do you have any knowledge of the

23   recidivism rates of reverse sting operations?

24   A.  No.

25   Q.  Do you have any knowledge of the recidivism rate of people

1    that are monitored by Federal Pretrial Services?

2    A.  No.

3              MR. BLEIER:  No further questions.

4              THE COURT:  Okay.  Miss Hopkins, what legal authority

5    is there for me to deny providing the defendants with copies of

6    any audio or written statements of their interviews?

7              MS. HOPKINS:  Your Honor, there's no -- according to

8    the statute, it says any reports that he authored.  He didn't

9    author any of those reports that Mr. Bleier is referring to.

10   There's no case law stating that defense counsel is entitled to

11   every single report that is read.

12             THE COURT:  No, no, I -- I'm not asking you about

13   every report that he indicated he looked at.  The only ones I'm

14   asking about are defendants' statements.

15             MS. HOPKINS:  He did not author the reports that

16   summarize the defendants' statements.  And he did not

17   interview --

18             MR. BLEIER:  Sorry.

19             MS. HOPKINS:  -- the defendants either.  He's

20   testifying as to hearsay, as to conversations that he's had.

21   He might have read some of the reports, but he did not author

22   them.  He's not proffering the facts of the report, he's just

23   testifying as to his basic knowledge of their statements.

24             THE COURT:  Mr. Bleier?

25             MR. BLEIER:  Your Honor, our position is that at this

1    point in time, after he's reviewed numerous reports -- he's

2    already testified in a prior hearing.  He's testified also in

3    front of a Grand Jury, and now he's testifying at this

4    detention hearing.  He's -- I mean, he could -- and the

5    Government could try to parcel out what he's relying on, what

6    he's not.

7            But our position is, he's essentially adopting -- it's

8    impossible to do that.  And by this point he's adopting those

9    statements and, therefore, they are statements within the

10   purview -- and adopting and approved I think is the language

11   from 26.2 in the case law.  And I think he's done that at this

12   point and they should be disclosed.

13           I'd further say we've already -- you know, we've

14   agreed -- we've waived the preliminary hearing in agreement

15   for early Jencks disclosure.  And there is case law, the Wiktor

16   case.  It's a magistrate decision.  I believe it's Judge Aspen

17   or Aspey, I get confused.  That did held -- it cited

18   essentially disclosing similar reports in a preliminary

19   hearing.

20           MR. BROWN:  Judge, if I could just briefly.  I mean,

21   clearly the video has been testified to, the Circle K video,

22   the videos of what's going on at the warehouse, all those

23   things --

24           THE COURT:  Those videos aren't helpful to the

25   determination of dangerousness.

1           MR. BROWN:  Well, I think they said -- one of the

2      things that we're not getting a picture of is the time frame of

3      the thing -- with which things happened.  I think things are

4      happening very quickly.  And I think the CS is basically

5      shuffling people along to get them into the warehouse, into the

6      takedown location, shuffling out, here's what you need to do,

7      so they can have enough information to say, oh, we can now bust

8      everybody.

9           So the videos all along the way are important.

10          And I think Mr. Bleier is correct that if he's

11     reviewed reports, there is no possible way in his brain to

12     separate at this point when he's testifying, well, I'm just

13     testifying from memory, but guess what, my memory is the same

14     as the reports.

15          I think we're entitled to the reports.

16          MS. HOPKINS:  Your Honor, the Government's fully aware

17     of the disclosure obligation.  They're preparing to disclose

18     the documents.  We've been very busy preparing for hearings and

19     preparing for Indictments.  There's only so much the Government

20     can do.

21          We are planning on disclosing reports as soon as we

22     can get them ready.  As far as -- I mean --

23          THE COURT:  I guess, here's my question:  Were all the

24     defendants Mirandized and were statements taken from all of

25     them?  All the defendants here.

1            MS. HOPKINS:  Some statements were --

2            That might be best answered by the Agent.

3            THE WITNESS:  Yes, all these guys, defendants here,

4    were Mirandized and gave a statement.

5            THE COURT:  Okay.  And those statements were recorded

6    or no?

7            THE WITNESS:  No.  The FBI doesn't record their

8    interviews.

9            THE COURT:  I forgot.

10           They took notes?

11           THE WITNESS:  I would assume the agents did, yes, sir.

12           THE COURT:  Okay.  And they're within the possession

13   of your office or the U.S. Attorney's, or both?

14           THE WITNESS:  The notes or the --

15           THE COURT:  The notes of the interviews.

16           THE WITNESS:  The notes of the interviews should

17   either be in the possession of the agents or submitted to the

18   file.

19           THE COURT:  Okay.  And the file that we're talking

20   about is in your possession or the Government's possession?

21           THE WITNESS:  It would be in the FBI's possession.

22           THE COURT:  Okay.  And so we're talking about the

23   notes on four interviews?

24           THE WITNESS:  Yes, these -- yes, sir.

25           THE COURT:  Okay.  I'm going to order disclosure of

1    the notes of the interviews, deny the request as to all others.

2          And we'll stand at recess.

3          MS. HOPKINS:  Your Honor.

4          THE COURT:  Yes.

5          MS. HOPKINS:  If I may just ask a question.

6          If there are actual reports of the statements that

7    have been finalized, is it possible to disclose the report as

8    opposed to the notes that have been -- the reports will

9    incorporate what the notes said.

10          THE COURT:  Okay.  That's fine.  I mean, give me your

11   best product, whatever that is.

12          Okay.  So can we do that in -- tell me by when you can

13   do it.

14          MS. HOPKINS:  I don't know if I have the reports.

15          Do you want to continue it today or --

16          THE COURT:  No.  I want to recess today.

17          MS. HOPKINS:  Okay.

18          THE COURT:  So now I need to know the number of days

19   you need.

20          MS. HOPKINS:  I don't -- I don't need days.  Probably

21   we can resume tomorrow.

22          THE COURT:  See what I'm doing tomorrow, Tiffany.

23          THE CLERK:  Yes, Your Honor.

24          THE COURT:  Yes, sir.

25          MS. HOPKINS:  I mean, unless the Agent thinks --

1          UNIDENTIFIED SPEAKER:  Your Honor, if any reports were

2    generated that were -- that utilized handwritten notes in

3    reliance on those notes, we would request that the notes

4    themselves be disclosed as well as the reports.

5          THE COURT:  You're going to get the notes, if no

6    report is written.  If a report is written, all you do is get

7    the report.

8          What did she say?

9          THE CLERK:  We have from 9:00 to 11:00 and then from

10   1:30 to (inaudible).

11         THE COURT:  Okay.  We'll start at 2:15.

12         UNIDENTIFIED SPEAKER:  Your Honor, I have a 3:00

13   o'clock hearing.

14         THE COURT:  Okay.  In front of who?

15         UNIDENTIFIED SPEAKER:  I'm sorry, it's actually a

16   probation interview in Superior Court.

17         THE COURT:  Oh, okay.

18         A Wednesday?  Find out about Wednesday.

19         Okay, Thursday.

20         UNIDENTIFIED SPEAKER:  I'm good Thursday afternoon, or

21   Friday.

22         THE COURT:  Everybody good Thursday or Friday?

23         MS. HOPKINS:  One moment, Your Honor.

24         Government's available.

25         THE CLERK:  The whole afternoon, Thursday afternoon is

```
1    open.

2            THE COURT:  Okay.  1:30.

3            MR. YOUNGLOVE:  Your Honor, is it possible to request

4    Friday as a preference day?  I've got a conflict Thursday

5    afternoon.

6            THE COURT:  Okay.  Friday?

7            I didn't catch your name, sir.

8            MR. YOUNGLOVE:  Doug Younglove.

9            THE COURT:  Okay.  Are you from where?  Here in Tucson

10   or Phoenix?

11           MR. YOUNGLOVE:  Phoenix.

12           THE COURT:  Okay.  I'll treat you that way then.  No.

13           THE CLERK:  (Inaudible) case management at 1:30

14   (inaudible).

15           THE COURT:  Okay.  I can do it.

16           THE CLERK:  After the 1:30?

17           THE COURT:  Right.  1:45.

18           UNIDENTIFIED SPEAKER:  You can detain the people

19   getting married.

20           THE COURT:  It's my mechanic, I can't upset him.

21           UNIDENTIFIED SPEAKER:  1:30 on Friday then?

22           THE COURT:  Yes, sir.

23           UNIDENTIFIED SPEAKER:  Thank you.

24           THE COURT:  Oh, did you guys want to have your

25   arraignment today, or do you want them brought in April 1st?
```

UNITED STATES DISTRICT COURT

1           UNIDENTIFIED SPEAKER:  We might as well do it now.

2           UNIDENTIFIED SPEAKER:  Whatever is the Court's

3    pleasure.

4           THE COURT:  All right.  Do you have a copy of the

5    Indictment?  Waive reading?  Enter pleas of not guilty?

6           MULTIPLE VOICES:  Yes, Your Honor.

7           THE COURT:  What's the trial date?

8           April 22nd -- no, trial is May 10th.  Plea deadline is

9    April 22nd.

10          MS. HOPKINS:  Your Honor, on Friday did you say 1:30

11   or 1:45?

12          THE COURT:  1:45.

13          MS. HOPKINS:  Okay.

14          UNIDENTIFIED SPEAKER:  Judge, I have one last thing.

15          Part of my questioning was going to go into what

16   reports have actually been authored since this case has been

17   going on.  Do you just want me to wait until Friday?

18          I mean, I'd like to have it all done at one point in

19   time, but I can't imagine that no reports have actually ever

20   been written in this case.

21          THE COURT:  I'm actually only going to grant you what

22   I said I was going to grant.

23          UNIDENTIFIED SPEAKER:  Okay.  I'll address that on

24   cross then.

25          THE COURT:  Okay.

1          UNIDENTIFIED SPEAKER:  Thank you.

2          UNIDENTIFIED SPEAKER:  And, Your Honor, this two-page

3   document of Detective Gamez out of Phoenix, is this the only

4   law enforcement report that Agent Edwards relied upon in

5   Phoenix?

6          THE COURT:  As far as I know it's the report that he

7   used to discuss the criminal activity that took place in

8   Phoenix.

9          MS. HOPKINS:  He relied on the summary that you were

10  given and not the crux --

11         UNIDENTIFIED SPEAKER:  The two-page?

12         MS. HOPKINS:  -- and not the crux of the 50-page

13  police report.

14         THE COURT:  Right.

15         Okay.  We'll stand at recess.

16

17                         -oOo-

18

19

20

21

22

23

24

25

1

2

3

4

5

6                         C E R T I F I C A T E

7

8          I, CANDY L. POTTER, court-approved transcriber,

9   certify that the foregoing is a correct transcript from the

10  official electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13         DATED at Phoenix, Arizona, this 23rd day of March,

14  2011.

15

16

17

18                              s/Candy L. Potter__
19                              Candy L. Potter

20

21

22

23

24

25

UNITED STATES DISTRICT COURT