1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3    UNITED STATES OF AMERICA

4    vs.                                    CR-11-1013-TUC-RCC

5    GHERMON LATEKE TUCKER, et al.,

6
        Defendants.
7    _____

8                                      March 26, 2012
                                       Tucson, Arizona
9

10

11

12

13              EVIDENTIARY HEARING

14    BEFORE THE HONORABLE RANER C. COLLINS
           UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22    Court Reporter:         Erica R. Grund, RDR, CRR
                              Official Court Reporter
23                            405 W. Congress Street
                              Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                     translation

1                    A P P E A R A N C E S

2

3    For the Government:    James T. Lacey
                            Kimberly E. Hopkins
4                            Assistant U.S. Attorneys

5

6    For Ghermon Tucker:    Dan Cooper
                            Cooper & Udall PC
7

8

9    For Jerome Ranger:     Stephen Jonathan Young
                            Williamson & Young
10

11

12   For Ja'Cory Ranger:    Bradley James Armstrong
                            Armstrong Law Office
13

14

15   For Jeremy Tucker:     Eric Scott Manch
                            Manch Law Firm
16

17

18

19

20

21

22

23

24

25

EXAMINATION INDEX

JOSE B. GAMEZ
    DIRECT BY MR. YOUNG . . . . . . 6
    DIRECT BY MR. COOPER . . . . . 35
    DIRECT BY MR. MANCH . . . . . . 42
    DIRECT BY MR. ARMSTRONG . . . . 58
    CROSS BY MR. LACEY . . . . . . . 72
    REDIRECT BY MR. COOPER . . . . . 74

ANTONIO GUTIERREZ
    DIRECT BY MR. YOUNG . . . . . . 79
    DIRECT BY MR. COOPER . . . . . 139
    DIRECT BY MR. ARMSTRONG . . . . 168
    DIRECT BY MR. MANCH . . . . . . 191
    CROSS BY MR. LACEY . . . . . . . 210
    VOIR DIRE BY MR. COOPER . . . . 212
    FURTHER CROSS BY MR. LACEY . . . 214
    REDIRECT BY MR. YOUNG . . . . . 218
    REDIRECT BY MR. COOPER . . . . . 220

P R O C E E D I N G S

THE CLERK:  CR-11-1013 United States of America vs. Ghermon Lateke Tucker, et al., on for a continued motion hearing.

Counsel, please state your appearance.

MR. LACEY:  Good morning, Your Honor. James Lacey and Kim Hopkins for the United States.

THE COURT:  Good morning.

MR. COOPER:  Good morning.  Dan Cooper on behalf of Ghermon Tucker.

THE COURT:  Good morning.  Mr. Tucker is present and in custody.

MR. ARMSTRONG:  And Brad Armstrong for Ja'Cory Ranger.  He's not here yet.  I understand he's being transported.  He has permitted me to waive his appearance until he arrives.  Hopefully he'll be here very quickly.

THE COURT:  Marshals believe he'll be here at least before 11:30, and for some reason he was deleted from the system, I'm told this morning.

MR. ARMSTRONG:  Right.  And I want to thank the Court's staff for immediately looking into the situation, calling really early in the morning, and thanks for getting him here.

THE COURT:  All right.

1          MR. MANCH:  Good morning, Your Honor.

2   Eric Manch appearing for Jeremy Tucker, present, in

3   custody.

4          THE COURT:  Good morning.

5          MR. YOUNG:  And good morning, Your Honor.

6   Jon Young for Jerome Ranger, who is present, out of

7   custody.

8          THE COURT:  Good morning.  We shall

9   continue.  I believe the defense was calling

10  witnesses when we last met; correct?  Because the

11  Government had rested.

12          Next witness.

13          MR. LACEY:  Your Honor, Detective Gamez is

14  here from Phoenix.  He was the one detective who

15  wasn't present last week because he was out of

16  state.

17          THE COURT:  Let's get rid of Detective

18  Gamez.  I got a feeling he's going to be real

19  quick.  Of course I've had bad feelings and wrong

20  feelings before.

21          Mr. Young, you were out of town last week,

22  weren't you?

23          MR. YOUNG:  I was, Your Honor.

24          THE COURT:  How was it?

25          MR. YOUNG:  It was good.  Thank you.  I

1  was able to watch some Supreme Court arguments.

2          JOSE B. GAMEZ, JR., WITNESS, SWORN

3          THE CLERK:  Please state your full name

4  for the record and spell your last name.

5          THE WITNESS:  Jose B. Gamez, Jr.,

6  G-a-m-e-z.

7          THE CLERK:  Thank you.

8                  DIRECT EXAMINATION

9  BY MR. YOUNG:

10  Q.   Sir, what kind of work do you do?

11  A.   I'm a Phoenix police officer.

12  Q.   And what is your job with the Phoenix Police

13  Department?

14  A.   I'm a detective in the Drug Enforcement Bureau

15  assigned to the home invasion/kidnapping

16  enforcement unit.

17  Q.   How long have you had that position?

18  A.   Since September of 2009.

19  Q.   And in the course of your employment with that

20  drug enforcement division at the Phoenix Police

21  Department, you traveled to Tucson on March the

22  2nd, I believe it was, of last year?

23  A.   Yes.

24  Q.   And that was in connection with an

25  investigation?

1  A.   Correct.

2  Q.   And who was being investigated?

3  A.   A group of individuals, Hispanic males and

4  black males that were involved in armed robberies.

5  Q.   I understand from the Government that you

6  wrote approximately a 50-page report detailing your

7  involvement in this investigation.

8  A.   I did write a report.  I don't believe it was

9  50 pages though.

10  Q.   Is there also a two-page summary of that

11  report someplace?

12  A.   There is an original report that includes a

13  summary/narrative of my involvement.

14  Q.   Okay.  And at the four days of dangerousness

15  hearings last year, Agent Edwards led us to believe

16  that there was approximately a 50-page report that

17  you compiled.

18  A.   There is a report that I authored as the case

19  agent which has numerous supplements, which I would

20  imagine has probably at least 50 pages or more, but

21  I was not the author of all of those.

22  Q.   And first, with the subpoena you received here

23  today, you brought the report and those supplements

24  with you?

25  A.   Yes.

1    MR. YOUNG:  Your Honor, I'd ask that the
2    Government or the witness be ordered to turn those
3    reports over.
4            THE COURT:  It was your subpoena, wasn't
5    it?
6            MR. YOUNG:  Yes, it was.
7            MR. LACEY:  Your Honor, they've already
8    got the reports.
9            THE COURT:  We've been through this song
10   and dance, but --
11           MR. LACEY:  I know we have.
12           THE COURT:  If you have the reports that
13   you brought pursuant to the subpoena, give them to
14   Mr. Young so we can move ahead.
15           MR. YOUNG:  Does anybody else have reports
16   from Mr. Gamez?
17           THE COURT:  Well, don't forget, Mr. Young,
18   you didn't sign the disclosure agreement, so you
19   don't have everything necessarily, or at least you
20   lost it.
21           MR. YOUNG:  Funny story, Your Honor.
22           MR. LACEY:  May I approach, Your Honor?
23           THE COURT:  Yes.
24           MR. YOUNG:  Tuesday after the hearing
25   last, 14 CDs showed up at my office in the mail

1   postmarked the day before the hearing, so I'm

2   spending some quality time with those.

3           MR. MANCH:  Your Honor, just for

4   everyone's benefit, so we're all on the same page,

5   I have -- I've been going through the Phoenix

6   Police Department reports that I have.  I have

7   Bates numbered pages 85 to 111 that are Phoenix

8   Police Department reports, which are mostly just

9   inventory sheets, nothing for Detective Gamez.

10          I have pages 260 to 284, nothing there

11  either that I've seen from Detective Gamez.  Also

12  from 309 to 365, Bates numbered, I have a bunch of

13  different reports related to various 404(b)

14  material, but nothing in particular -- I haven't

15  seen anything in particular from Detective Gamez.

16          THE COURT:  You're about to see it today,

17  if you haven't seen it.

18          MR. MANCH:  Okay.  I just wanted to put

19  that out there.

20          MR. ARMSTRONG:  I'm in the same boat as

21  Mr. Manch.

22          MR. COOPER:  Me too, Your Honor.

23          THE COURT:  You now have that problem

24  licked.

25          MR. YOUNG:  May I approach the witness,

1    Your Honor?

2              THE COURT:  You may.

3              Detective Gamez, what you just gave to

4    Mr. Young was everything in response to the

5    subpoena that you know about; is that correct?

6              THE WITNESS:  Except for the remainder of

7    my original report and all the supplements attached

8    to that.  My narrative and summary is in there, but

9    the remainder of that report is not.

10             THE COURT:  Why is the remainder of the

11   report not --

12             THE WITNESS:  It wasn't provided to me.  I

13   have a copy of it in the office that I can provide,

14   but that was -- that was provided by me to Agent

15   Edwards a long time ago.

16             THE COURT:  All right.  Go ahead,

17   Mr. Young.

18   BY MR. YOUNG:

19   Q.   Sir, you said there was an investigation that

20   you were conducting on March the 2nd that you were

21   in Tucson for?

22   A.   I was assisting in an investigation with Agent

23   Edwards.

24   Q.   You were assisting Agent Edwards in that

25   investigation?

1  A.   Correct.

2  Q.   Okay.  Prior to being contacted by Agent

3  Edwards, did you have an investigation involving

4  any of these individuals?

5  A.   Which individuals are you talking about?

6  Q.   Any of the Mexican codefendants or the black

7  codefendants in this case.

8  A.   Yes.

9  Q.   And I guess, specifically, was Jerome Ranger

10  one of the names you were investigating in

11  connection with your investigation?

12  A.   No.

13  Q.   So prior to March the 2nd, the name Jerome

14  Ranger really hadn't appeared on your radar?

15  A.   Yes.  I knew of -- I learned of Mr. Ranger or

16  Mr. Tucker in February, but not through my

17  investigation.  I learned of those names through

18  the investigation that I was assisting Agent

19  Edwards with.

20  Q.   Okay.  So what you're telling us, I guess, is

21  that you know that at one point in January, January

22  6th of last year, Ghermon Tucker borrowed Jerome

23  Ranger's vehicle and took it on a little chase?

24  A.   I did learn that in February, yes.

25  Q.   And that was really the only thing about

1  Mr. Ranger that you were aware of?

2  A.   After the fact, yes.

3  Q.   So at that point Mr. Ranger, Jerome Ranger,

4  was not a suspect in any home invasions?

5  A.   Not that I was aware of.

6  Q.   And he was not a suspect in any sort of drug

7  dealing transactions?

8  A.   Not that I was aware of.

9  Q.   And you're on the drug dealing task force for

10 the Phoenix Police Department; right?

11 A.   No.

12 Q.   You said you're on -- what did you call it?

13 A.   I told you I'm assigned to the Drug

14 Enforcement Bureau, but I work in the home

15 invasion/kidnapping enforcement unit.

16 Q.   Okay.  Is one part of the other, or do you

17 work in someplace where you're not assigned?

18 A.   I'm working under the Drug Enforcement

19 Bureau.  That's where I'm housed.

20 Q.   And this Drug Enforcement Bureau, prior to

21 March the 2nd, they were not investigating Jerome

22 Ranger for anything?

23 A.   I couldn't answer that, sir.  I don't know

24 what other detectives were investigating Mr. Tucker

25 or Mr. Ranger.

1   Q.   To your knowledge, they weren't?

2   A.   To my knowledge, correct.

3   Q.   Likewise, there was, prior to March 2nd, no

4   investigation of Ja'Cory Ranger?

5   A.   Not by this investigator.

6           THE COURT:  By that you mean you?

7           THE WITNESS:  Correct, sir.

8   BY MR. YOUNG:

9   Q.   Now, I understand from Agent Edwards that on

10  November 11 of 2010 there was a vehicle chase.

11  A.   Correct.

12  Q.   And that vehicle chase involved a Jeep, I

13  believe, that had marijuana bales being thrown out

14  of it?

15  A.   Yes.

16  Q.   Do you know how many bales of marijuana were

17  thrown out of that vehicle?

18  A.   Not specifically.  I know there were numerous.

19  Q.   And people also ran from that vehicle; is that

20  right?

21  A.   Yes.

22  Q.   How many people ran from that vehicle?

23  A.   At least three.

24  Q.   Any descriptions of those people?

25  A.   Yes.

1   Q.  And what were they?  What were they described

2   as?

3   A.  Hispanic males.

4   Q.  All three of them?

5   A.  Yes.

6   Q.  So none of them were black males?

7   A.  No.

8   Q.  And where did they go?

9   A.  One was arrested.  One was not.  Two of them

10  bailed out of the vehicle.  One of those was

11  arrested, and the second one was not found or not

12  identified, and the driver of the Jeep eluded

13  police.

14  Q.  The one that bailed out that got arrested,

15  what was his name?

16  A.  I would have to look at the report.

17  Q.  Was he any of the codefendants involved in

18  this case?

19  A.  No.

20  Q.  The one that bailed out of the vehicle, where

21  did he go?

22  A.  He got away.

23  Q.  And the driver of the vehicle, where did he

24  go?

25  A.  He eluded the police, sir.  I couldn't tell

1    you.

2    Q.   I'm given to understand, I think, that he went

3    down to Mayco Ledezma-Prieto's house?

4    A.   According to the report, they did a K-9 search

5    and tracked to that location, yes, to Mr. Mayco

6    Ledezma's residence.

7    Q.   So they didn't actually follow the driver of

8    that vehicle to Mayco's house.  A dog followed the

9    driver to the house?

10   A.   Not the driver, the person that bailed from

11   the vehicle.  The driver eluded police in the Jeep.

12   Q.   So the driver and the Jeep both got away?

13   A.   Yes.

14   Q.   And the person that bailed out that was not

15   arrested, he was tracked by dog to Mayco's house?

16   A.   Correct.

17   Q.   And that person was Hispanic?

18   A.   According to the report, yes.

19   Q.   And while the dog was tracking this person to

20   Mayco's house, the police had lost sight with this

21   person; is that right?

22   A.   Yes.

23   Q.   Now, when the dog and the police got to

24   Mayco's house, there were vehicles at Mayco's

25   house; is that correct?

1   A.   Correct.

2   Q.   None of those vehicles was a Jeep?

3   A.   No.

4   Q.   What vehicles were present?

5   A.   I believe there was a sedan and a SUV.

6   Q.   And so what did the police do?

7   A.   While they were searching for the person that

8 got away?

9   Q.   Yes.

10   A.   They found that there were weapons and bales

11 of marijuana in vehicles near Mr. Ledezma's

12 residence.

13   Q.   And what vehicles did they find bales of

14 marijuana in?

15   A.   I want to say the SUV.

16   Q.   And what kind of SUV was that?

17   A.   I'd have to look at the report.  It may have

18 been a Tahoe.

19   Q.   If you looked at your report, would that

20 refresh your recollection?

21   A.   It's not my report, but if I looked at it, it

22 would.

23        MR. YOUNG:  May I approach the witness,

24 Your Honor?

25        THE COURT:  You may.

1          MR. YOUNG:  There is some of your report.

2     Tell me if you need more.

3          THE COURT:  Did you find it?

4          THE WITNESS:  Yes.

5     BY MR. YOUNG:

6     Q.   Okay.  And what vehicle was the marijuana

7     found in?

8     A.   It lists a Chevy.  And this is not my report,

9     as I stated earlier.  This is a report that was

10    authored by another officer.

11    Q.   What kind of Chevy?

12    A.   Well, it says a four-door.

13    Q.   Is there a registration or a license plate or

14    anything associated with that Chevy?

15    A.   There is.

16    Q.   Okay.  And who was that Chevy registered to?

17    A.   Hermillo Ramirez-Bonilla.

18    Q.   And that name, that's none of the codefendants

19    in this case, was it?

20    A.   No.

21    Q.   Was Hermillo at Mayco's house?

22    A.   He was.

23    Q.   Where were the people who were at Mayco's

24    house?  Were they inside or were they outside?

25    A.   According to the report, inside.

1  Q.  And did the police go inside to bring them

2  outside?

3  A.  I wasn't there, sir.  It doesn't sound like it

4  though.

5  Q.  Did the people come outside in response to the

6  police knocking on the door?

7  A.  I believe so.

8  Q.  Was the dog able to figure out which one of

9  the people he was looking for?

10 A.  I don't know what the dog was able to do.

11 They didn't identify anyone in the report as the

12 person who bailed from the Jeep and wasn't

13 arrested.

14 Q.  Was the person who bailed from the Jeep, was

15 he still at that house or had he moved on?

16 A.  I don't know, sir.

17 Q.  Did he ever go inside the house or did he just

18 go past the house?

19 A.  I don't know.  I didn't participate in this

20 investigation.

21 Q.  What were the names of the people that were

22 present at Mayco's house?

23 A.  According to the report, Joshua Young, Yovani

24 Valenzuela-Lopez, Juan Acosta-Beltran, Ja'Cory

25 Dante Ranger, Hiro Gamez-Angulo, Alejandro

1  Quintero, Maria Concepcion Quintero, Gabriela

2  Quintero, Elizabeth Felix-Quintero, Brandon

3  Pineda-Guzman, Ghermon Lateke Tucker, Hermillo

4  Ramirez-Bonilla, and Mayco Prieto.

5  Q.   Were any of those people arrested for

6  anything?

7  A.   Not according to the report.

8  Q.   I didn't hear the name of the owner of the

9  vehicle with the marijuana in it.  Was he at the

10  house?

11  A.   I did say that name.

12  Q.   That name was at the house?

13  A.   Yeah.  That was the last name I mentioned.

14  Q.   So he had bales of marijuana in his vehicle.

15  Was he arrested?

16  A.   Not according to the report.

17  Q.   Was his vehicle towed or impounded?

18  A.   Yes.  It was towed.

19  Q.   And what other vehicles were there?

20  A.   According to the report, a Mercedes.

21  Q.   Okay.  And whose vehicle was the Mercedes?

22  Who did that belong to?

23  A.   Mr. Tucker, Ghermon Tucker.

24  Q.   And what type of Mercedes was it?

25  A.   It lists a four-door.

1  Q.   Mr. Tucker wasn't arrested that day?

2  A.   Not according to the report.

3  Q.   And there was no marijuana found in his

4  vehicle?

5  A.   No.  There were weapons found in his vehicle.

6  Q.   He wasn't arrested for the weapons?

7  A.   Not according to the report.

8  Q.   So the police that day, on November the 11th,

9  they never did find the guy that they were chasing

10  with the dog?

11  A.   Correct.

12  Q.   And that was an Hispanic male that they were

13  chasing with the dog?

14  A.   Correct.

15  Q.   And it sound like it wasn't so much chasing

16  him with the dog as tracking him by scent with the

17  dog.

18  A.   Correct.

19  Q.   Was there a particular home invasion that the

20  police were responding to this day?

21  A.   Regarding this traffic stop, sir?

22  Q.   Regarding this particular Jeep vehicle, yes.

23  A.   Not that I'm aware of.

24  Q.   What led to the stop of that vehicle?  Was

25  that just a traffic stop?

1  A.   According to the report, yes, a traffic
2  violation.
3  Q.   So there was no reported home invasion that
4  was going on that particular day?
5  A.   Not according to the report.
6  Q.   Looking at Officer Salgado's report, I believe
7  that you were together with Detective Cordova; is
8  that correct?
9  A.   Yes.
10 Q.   On March the 2nd of last year?
11 A.   Correct.
12 Q.   And Salgado, he was with Detective Sergeant
13 Ortiz?
14 A.   Yes.
15 Q.   I understand you and Cordova contacted Salgado
16 and Ortiz and asked them to contact the Tucson
17 Police Department for assistance in arresting the
18 black codefendants in this case.
19 A.   In stopping a vehicle, yes.
20 Q.   And your interest in stopping the vehicle was
21 to arrest the people that were driving the vehicle;
22 is that right?
23 A.   To detain the people that were in that
24 vehicle.
25 Q.   Okay.  And after detaining them, what were you

1  going to do?

2  A.   That wasn't my investigation.  I was simply

3  assisting the FBI in stopping these vehicles.

4  Q.   So the FBI had asked you to ask TPD to provide

5  assistance in stopping those vehicles?

6  A.   They asked us if we could assist them in

7  finding someone to stop those vehicles.  In turn we

8  contacted TPD, Tucson Police Department.

9  Q.   And what information did you give to TPD about

10  the vehicles that you wanted stopped?

11  A.   I didn't speak to TPD, sir.  My supervisor

12  did.

13  Q.   And that would be Detective Sergeant Ortiz?

14  A.   Correct.

15  Q.   Did he talk to the 911 prior to at TPD?

16  A.   Sir, I couldn't tell you who he talked to.

17  Q.   TPD was not willing to provide you any

18  assistance in stopping those vehicles?

19  A.   I'm not aware of that.  I didn't have the

20  conversation with TPD, so I couldn't provide you

21  any answer.

22  Q.   Did you also attempt to contact DPS for

23  assistance in stopping those vehicles?

24  A.   Yes, we did contact DPS.

25  Q.   And was DPS willing to help stop those

1  vehicles?

2  A.   They were willing.  However, they didn't have

3  enough units in the area to assist with the stop.

4  Q.   What time did you arrive in Tucson on March

5  the 2nd?

6  A.   Approximately 9, 9:30 in the morning.

7  Q.   And what did you do?  Where did you go when

8  you got to Tucson?

9  A.   I went to the FBI office here in Tucson.

10 Q.   Okay.  And who was there?

11 A.   Agent Edwards.  There was a lot of agents that

12 were there.  That was command center for the

13 operation that day.

14 Q.   Was there some sort of a meeting that was held

15 explaining the operation that was going on that

16 day?

17 A.   Yes.

18 Q.   There was some surveillance that was taking

19 place that day?

20 A.   That's what I was told, yes.

21 Q.   Some of the surveillance was being done by an

22 airplane?

23 A.   Yes.

24 Q.   And some of the surveillance was on the

25 ground?

1  A.    Correct.

2  Q.    That would be in vehicles being driven by

3  other agents?

4  A.    Yes.

5  Q.    At that meeting, you would have talked about

6  the vehicles that you were looking for on March the

7  2nd?

8  A.    The surveillance at that meeting that I was

9  at, I never met with the surveillance units or the

10  air units, and I don't recall that, you know, that

11  being discussed.

12  Q.    Where did you go after the meeting?

13  A.    I stayed there in the office.

14  Q.    Okay.  So you weren't actually part of the

15  surveillance?

16  A.    No, sir.  I didn't participate in the

17  surveillance or in the operation of the

18  investigation.

19  Q.    And you weren't part of the arrest?

20  A.    No, I was not.

21  Q.    You never pulled your gun out that day?

22  A.    No, sir.

23  Q.    Did you spend the whole day at the FBI office

24  downtown?

25  A.    For the most part.

Q.   What vehicles were you or was the surveillance
team looking for?

A.   I know that there were vehicles that the
confidential source had been told would be
arriving.  I know they were SUVs.  I want to say
one was an Expedition, and I don't recall what the
other one was.

Q.   And is that written down someplace?  Is that
in any of your reports?

A.   I believe so.

Q.   Okay.  You're going to be quicker than me.
Could you look for it and find it?

A.   Sure.  Okay.

Q.   And while I think of it, these reports that
you're referring to, these reports were prepared
approximate in time to the actual events that
you're referring to?

A.   Yes.

Q.   And by looking at these reports, you're able
to refresh your recollection as to what you wrote
down on that day?

A.   Correct.

Q.   And having refreshed your recollection, can
you tell us what vehicles you were looking for on
March the 2nd?

1  A.   I wasn't looking for any specific vehicle,
2  sir.
3  Q.   What vehicles was the surveillance team
4  looking for?
5  A.   They had identified a red Ford Expedition and
6  a black Cadillac Escalade.
7  Q.   Was that prior to observing them in the
8  parking lot, or was that after observing them in
9  the parking lot?
10 A.   I don't know when they would have learned that
11 information.  I received this information after,
12 after the fact, after they had observed them.
13 Q.   So what you're talking about is not something
14 that you found out at the meeting the morning of
15 March the 2nd?
16 A.   Correct.
17 Q.   And in fact, the Expedition and the Escalade
18 were the two vehicles that were stopped on I-10
19 headed back towards Phoenix?
20 A.   Correct.
21 Q.   But you didn't find out about the Expedition
22 and the Escalade the morning of March the 2nd at
23 the meeting that was held at the FBI office?
24 A.   No, sir.  I knew of individuals, not of
25 vehicles.

1  Q.   And of the individuals that you knew of,

2  Jerome Ranger was not a name that you were

3  expecting or anticipating would be part of the

4  investigation?

5  A.   Not Jerome Ranger but Jerome (sic) Tucker.

6  Q.   We're pronouncing it Ghermon, but it's

7  confusing.

8  A.   You got the last name wrong.  You said Ranger.

9         THE COURT:  He meant the name Ranger.  He

10  meant the name Ranger himself.  He did.

11         THE WITNESS:  Okay.

12  BY MR. YOUNG:

13  Q.   I think everybody that's left is named Jerome

14  in one way or another.

15       So Jerome Ranger was not one of the names that

16  was on your list of people you were anticipating

17  the morning of March the 2nd?

18  A.   Jerome (sic) Ranger, yes.

19  Q.   Explain.

20  A.   One second.

21       In the report from the traffic stop from

22  Mr. Ledezma's residence, that was -- that occurred

23  in November of 2010, Mr. Ranger's brother Ja'Cory

24  was listed in this report.

25       And when I did research regarding all the

1  subjects that were listed in that report, that's
2  how I became aware of the individuals that were
3  subsequently arrested on that day.
4  Q.   Okay.  So what you're telling me is Ja'Cory
5  Ranger was present on November the 11th of 2010 at
6  Mayco's residence?
7  A.   Correct.
8  Q.   And based on Ja'Cory Ranger's name, you knew
9  that or were able to find out that he had a brother
10 named Jerome Ranger?
11 A.   One second.  It was Ja'Cory Ranger's name that
12 I was referring to, and I think I was confusing
13 Ghermon Tucker with Jerome Ranger when you
14 mentioned the name.  That's when I corrected it
15 earlier.
16      But I was aware of Mr. Ja'Cory Ranger's name
17 prior to March 2nd.
18 Q.   Okay.  So when speaking about my client, who
19 is Jerome Ranger, his name was not one of the names
20 that you were anticipating possibly seeing on March
21 the 2nd?
22 A.   I did not know of him until March 2nd.
23 Q.   Now, his brother Ja'Cory Ranger, you said he
24 was present on November 11th at Mayco's house when
25 a drug dog or a tracking dog tracked a bailout to

1  Mayco's residence in that neighborhood?

2  A.   Correct.

3  Q.   And there were a lot of other people who were

4  present at that house that day?

5  A.   Yes.

6  Q.   Some of those people black; some of those

7  people Hispanic?

8  A.   Correct.

9  Q.   And the officers with the tracking dog, they

10  were looking for an Hispanic male?

11  A.   From the GPS.

12  Q.   Now, Ja'Cory Ranger is black.  He's clearly

13  not the person that they were looking for from the

14  Jeep?

15  A.   I couldn't tell you, sir.  According to the

16  report, they were looking for a Hispanic male.

17  Q.   And Ja'Cory Ranger is not an Hispanic male?

18  A.   No.

19  Q.   After the arrests on March the 2nd of last

20  year, Phoenix Police Department did some search

21  warrants up in Phoenix?

22       MR. LACEY:  Objection.  Relevance, Your

23  Honor.

24       THE COURT:  Sustained.

25  BY MR. YOUNG:

1   Q.   Let me ask you, Mayco's house, does he live

2   anywhere near any of the black codefendants?

3   A.   Not that I'm aware of, sir.

4   Q.   Mayco's house is at 3707 West Maricopa Street?

5   A.   Correct.

6   Q.   And that would be approximately eight miles

7   from the Rangers' Grove Street address?

8   A.   What was the second address again?

9   Q.   The second address would be 1342 East Grove

10  Street.

11  A.   I don't know how many miles.

12          MR. YOUNG:  May I approach the witness,

13  Your Honor?

14          THE COURT:  You may.

15  BY MR. YOUNG:

16  Q.   Sir, as a Phoenix police detective, you're

17  well familiar with the Phoenix area; is that

18  correct?

19  A.   For the most part.

20  Q.   And you have a general idea of where the

21  address I just gave you on Grove Street might be?

22  A.   I didn't know where Grove was located.

23  Looking at your MapQuest map, though, I have an

24  idea now.

25  Q.   And that MapQuest map, that refreshes your

1  recollection?

2          THE COURT:  You may be giving him new

3  information he didn't have before.

4          MR. YOUNG:  Well, I suspect he knows

5  Phoenix pretty well, Your Honor.

6          THE COURT:  He's --

7  BY MR. YOUNG:

8  Q.  According to MapQuest it's approximately eight

9  miles from Mr. Ranger's Grove Street address to

10  Mayco's residence.

11  A.  According to your map, yes, but that's not an

12  address I was aware of.

13  Q.  And in fact, you'd have to take -- it looks

14  like the fastest way there is to take the 17th to

15  the 10.  You've got to go on two different freeways

16  to get from one --

17          MR. LACEY:  I would object to relevance,

18  Judge.

19          THE COURT:  Sustained.  They're not

20  close.  Eight miles.

21          MR. YOUNG:  I need another witness to

22  connect up, Your Honor.  I'll get there this

23  afternoon.

24          THE COURT:  What if we all agree they're

25  not close?

1          MR. LACEY:  We agree.

2          MR. YOUNG:  I'll take it, Your Honor.

3          THE COURT:  All right.

4    BY MR. YOUNG:

5    Q.   Even further away would be Chivo's address; is

6    that correct?

7    A.   Which address are you referring to, sir?

8    Q.   And by Chivo, that name is Jaime Santiago

9    Lopez-Lorenzo.

10         MR. LACEY:  Object to relevance as to

11   where these people live, Judge.

12         THE COURT:  Mr. Young.

13         MR. YOUNG:  The relevance, Your Honor?

14         THE COURT:  Yeah.  What's relevant about

15   it?

16         MR. YOUNG:  The relevance is that,

17   repeatedly in the disclosure, I'm looking at Chivo

18   says that the black guys are his neighbors.

19         What I'm trying to establish here is that

20   Mayco lives eight miles away; Chivo, I believe,

21   lives 16 miles away.  The black guys who are

22   supposed to be showing up are clearly not Chivo's

23   neighbors.

24         MR. LACEY:  Judge, the disclosure shows

25   there's two different groups of blacks, apparently,

1  one group that is close to him and then the

2  defendants involved in this case.

3          THE COURT:  Okay.  You stipulate that the

4  defendants involved in this case are not close?

5          MR. LACEY:  That's not next-door

6  neighbors.  They're not close.  I stipulate.

7          THE COURT:  All right.  Stipulate.  Move

8  on.

9          MR. YOUNG:  Can we stipulate that one

10  group is guilty and one group is not, Your Honor?

11          THE COURT:  We could but we'd have trouble

12  picking which group.

13          MR. YOUNG:  Okay.

14  BY MR. YOUNG:

15  Q.  Moving right along, the addresses 850 North

16  61st Drive and the address 7006 West Villa Street,

17  those are nowhere near the Grove Street address?

18          MR. LACEY:  Objection.  Relevance, Judge.

19          THE COURT:  He stipulated that they're

20  not.

21          MR. YOUNG:  Okay.

22  BY MR. YOUNG:

23  Q.  Now, one other line of questioning for you.

24      Is the Phoenix Police Department

25  investigating, that you're aware of, a murder case

1  involving Jesus Quintero, who is supposedly Chivo's

2  cousin?

3            MR. LACEY:  Objection.  Relevance, Judge,

4  to this hearing.

5            THE COURT:  How is it relevant, Mr. Young?

6            MR. YOUNG:  Well, I think that this is a

7  fabrication by Chivo at the meetings where he was

8  meeting with the informant.  I think it's relevant

9  to the outrageous Government conduct motion.

10            I think there is a fair amount of puffing

11  going on by both sides.  This is one example of the

12  puffing.

13            THE COURT:  Okay.  Assume there's

14  puffing.  How does that -- where does that take

15  us?

16            MR. YOUNG:  I think Chivo is far less

17  involved than he would have led the informant to

18  believe.  I believe that the informant wrapped him

19  up in something that he would not have otherwise

20  been wrapped up in.  I think it's part of the

21  outrageous Government conduct.

22            MR. LACEY:  Totally not relevant, Judge.

23            THE COURT:  I have to agree.  The

24  objection will be sustained.

25            MR. YOUNG:  Could I have just a moment,

1 | Your Honor?

2 | THE COURT: Sure.

3 | MR. YOUNG: That's all I have for this

4 | witness, Your Honor.

5 | THE COURT: Mr. Cooper?

6 | MR. COOPER: Thank you, Your Honor.

7 | Your Honor, I'm a little bit limited

8 | because I haven't had a chance to read all the

9 | disclosure we just received, but with what I have

10 | been able to go through, I just have a few

11 | questions for Detective Gamez.

12 | DIRECT EXAMINATION

13 | BY MR. COOPER:

14 | Q. You -- had you known Agent Edwards prior to

15 | becoming involved in this case?

16 | A. I did not.

17 | Q. Okay. And when did you first become involved

18 | in the investigation when you first met Agent

19 | Edwards?

20 | A. I believe that was February 3rd of 2011.

21 | Q. Okay. And you were asked for assistance in

22 | identifying certain people. Is that one of the

23 | reasons Agent Edwards contacted you?

24 | A. Correct.

25 | Q. And that's because you had been involved in

1  essentially home invasion cases for a couple of
2  years by that point; correct?
3  A.   Yes, sir.
4  Q.   Okay.  And as a result of being contacted, you
5  wound up going to Tucson, I believe, on February
6  4th?
7  A.   No.
8  Q.   Did you go to Tucson at some point in
9  February?
10 A.   I did come down here, yes, during February,
11 but not on February 4th.
12 Q.   Okay.  February 4th, you were aware that there
13 was going to be a meeting between the confidential
14 source and some potential alleged home invaders?
15 A.   Correct.
16 Q.   Okay.  But you were with Agent Edwards
17 discussing that possible meeting in Phoenix?
18 A.   Yes.
19 Q.   Okay.  And were you aware whether or not there
20 was going to be surveillance on that meeting?
21 A.   I was.
22 Q.   And that surveillance would include wiring the
23 confidential source; correct?
24 A.   I believe so.
25 Q.   Okay.  Were you told where the February 4th

1  meeting was going to be?

2  A.   At what point, sir?

3  Q.   Well, prior to the meeting, were you told --

4  were you provided an address on Seventh Street?

5  A.   I believe I was.  I definitely was told that

6  it was going to be at Chivo's workplace.

7  Q.   Okay.  And did you have a discussion with any

8  other law enforcement person as to who was going to

9  be surveilling that meeting?

10 A.   No, sir.  I didn't have any -- I didn't have

11 any interaction on the surveillance itself.

12 Q.   That was going to be conducted strictly by the

13 FBI?

14 A.   Correct.

15 Q.   Did Phoenix police -- when FBI conducts

16 operations like this, does the Phoenix Police

17 Department get warning or get told that that's

18 going to be happening?

19 A.   In this case, we were notified the day before,

20 when Detective or Agent Edwards contacted us.

21 Q.   As a result of being notified, would you at

22 some point provide assistance or backup or have

23 patrol cars in the area, anything like that?

24 A.   I was the assistant, sir.  That was the

25 purpose of my participation the following day.

1  Q.   Okay.  That would be on the 4th?

2  A.   On the 4th, correct.

3  Q.   And where were you when this meeting was

4  taking place?

5  A.   I met at a Fry's Electronics parking lot.

6  Basically it's the edge of Phoenix, on Baseline

7  Road and the I-10 freeway.

8  Q.   Okay.  And how far from the Seventh Street

9  address was that?

10  A.   It's numerous miles.  I'd say five, six miles

11  away.

12  Q.   Did you ever go to the Seventh Street address?

13  A.   I did not.

14  Q.   Did you meet with the FBI agents prior to the

15  meeting on the 4th at the Fry's?

16  A.   With Agent Edwards, yes.

17  Q.   Does the Phoenix Police Department have

18  cameras at their disposal?

19  A.   I'm not sure I understand what you mean.

20  Q.   Well, when you investigate cases sometimes, do

21  you ever use cameras?

22  A.   We use cameras to photograph evidence.  We use

23  surveillance cameras.  That's what I'm saying.  I'm

24  not sure which type of cameras you're talking

25  about.

1   Q.   How about surveillance cameras?

2   A.   We do have access to surveillance cameras.

3   Q.   And was there anything preventing either the

4   FBI or the Phoenix Police Department from taking

5   photographs, surveillance photographs, of who was

6   going to be at or who was at the meeting on

7   February 4th?

8   A.   Preventing that to occur?  No.

9   Q.   No.  And when you -- as part of your job,

10  you've done that previously.  You've taken

11  surveillance photographs, have you not?

12  A.   I have not physically done it myself.

13  Q.   But you've had people you work with do it?

14  A.   Correct.

15  Q.   And that's just standard police procedure when

16  you're trying to identify people, for instance?

17  A.   Correct.

18  Q.   Did you ever on the 4th speak with the

19  confidential source?

20  A.   Yes.

21  Q.   Had you known him previously?

22  A.   I did not.

23  Q.   So you met him for the first time on the 4th?

24  A.   Yes.

25  Q.   And did you speak with him before or after he

1  went in to this meeting on the Seventh Street

2  address?

3  A.   Both times.

4  Q.   Both.  Okay.  The address on the -- on the

5  4th, the Seventh Street address, was where Chivo

6  apparently worked.  Is that fair to say?

7  A.   That's what I was told, yes.

8  Q.   Okay.  Let me jump ahead a little bit to March

9  the 2nd, and that's the day, I believe, that you

10  did come to Tucson; is that correct?

11  A.   That's one of the days.  That was the day the

12  operation was to occur.

13  Q.   Okay.  And you were coming to Tucson to assist

14  in apprehension or surveillance?  What was the

15  reason for asking you to come?

16  A.   No.  My assistance with Agent Edwards was to

17  provide intelligence and information from Phoenix

18  regarding the individuals that were from Phoenix.

19  Q.   Okay.  But you can provide intelligence on the

20  telephone; right?

21  A.   Not during active investigations that are

22  fluid and moving.  That was the reason Agent

23  Edwards had asked me to assist.

24  Q.   And when you came down to Tucson, you then

25  became involved in what you indicated was a stop of

1   vehicles headed northbound on the I-10; right?

2   A.  If you want to call making a phone call to my

3   supervisor -- that would be my involvement.

4   Q.  Okay.  But it was your understanding that the

5   vehicles were being stopped to detain the people

6   who were in these vehicles; right?

7   A.  Correct.

8   Q.  Okay.  And at the time that the vehicles were

9   stopped, you were not told that these people were

10   being arrested; right?  It was to detain them?

11   A.  I don't know that I was specifically told they

12   were going to be arrested, but I was told they

13   wanted those vehicles stopped.

14   Q.  Okay.  And sometimes police officers or police

15   detain individuals simply to try to question them

16   to get additional information.

17       Is that fair to say?

18   A.  Sure.

19       MR. COOPER:  Okay.  That's all I have.

20   Thank you.

21       THE COURT:  Mr. Armstrong, your client is

22   just passing Tucson Mall, I'm told.  I'm not sure

23   if he's shopping or not, but I'm told he's passing

24   Tucson Mall.

25       MR. ARMSTRONG:  I hope he is.

1    DIRECT EXAMINATION

2    BY MR. MANCH:

3    Q.   Detective Gamez, good afternoon.  Or good

4    morning.  Excuse me.

5    A.   Good morning.

6    Q.   Detective Gamez, some reference has been made

7    to a report that you had some input in regarding

8    the events that we're talking about in this case.

9    A.   Yes.

10   Q.   And just for reference, I have pages 297 to

11   307, which I believe you had some input in.

12        MR. MANCH:  Could I approach?

13        THE COURT:  You may.

14   BY MR. MANCH:

15   Q.   I'm sorry.  Do you have a report sitting up

16   there?

17   A.   The ones that were provided to me.

18   Q.   Can I take them?

19   A.   Sure.

20   Q.   Thanks.  But you did author a report in this

21   case?

22   A.   I did.

23   Q.   You authored a report memorializing Phoenix

24   Police Department's involvement in this

25   investigation?

1  A.   Correct.

2        MR. MANCH:  Dan, do you have a copy of

3  297, 397, just real quick?

4        May I approach the witness, Your Honor?

5        THE COURT:  You may.

6  BY MR. MANCH:

7  Q.   I have here what appears to be about a 10-page

8  report that I -- it's not named at the top, but I

9  think you might have authored it.

10       Could you take a look at that?

11 A.   Yes.  This is my --

12 Q.   Is that your report?

13 A.   This is my narrative summary of what's

14 included in my original report.

15 Q.   Okay.  So this is your narrative summary of

16 the larger report; is that right?

17 A.   Yeah.  This is the original report but just

18 the summary narrative portion of it.

19 Q.   Okay.

20 A.   And then there are other supplements that were

21 authored by other detectives that assisted in this

22 investigation.

23 Q.   Okay.  I'm just going to take that, if I

24 could.  Thank you.

25       So Detective Gamez, on -- let's go -- let's

1   talk about May 2nd and your involvement in the

2   investigation at that time.

3           MR. LACEY:  May 2nd, Judge?  I think it's

4   a little bit after the fact.

5           MR. MANCH:  I meant to say May 7th.  I'm

6   sorry.

7           MR. LACEY:  You mean March 2nd?

8           MR. MANCH:  March 2nd.

9           THE COURT:  We're safe talking about March

10  2nd.

11  BY MR. MANCH:

12  Q.   Yes.  Just to clarify, Detective, we're

13  talking about March 2nd, 2011.

14       And you came down to Tucson that day, correct?

15  A.   I did, yes, sir.

16  Q.   And you spoke to Agent Edwards on that day;

17  correct?

18  A.   Correct.

19  Q.   And it was your testimony earlier that you

20  spent most of that time in the command post with

21  Agent Edwards; is that right?

22  A.   No.

23  Q.   Okay.

24  A.   I stayed at the command post, but Agent

25  Edwards was not at that command post.  He was at a

1    different command post.

2    Q.   Okay.  But you were at the command post most

3    of the time; correct?

4    A.   Yes, until the wee hours of the night is the

5    only time I left.

6    Q.   Did you -- did you author any search warrants

7    during that time?

8    A.   I did.

9    Q.   Okay.  And you authored a search warrant for

10   the Villa Street address, which I believe was

11   Gregorio Guzman-Rocha's address?

12   A.   Correct.

13   Q.   Did you write out that report or that warrant,

14   or was it given orally, over the telephone?

15   A.   No.  It was a -- it was a typed report that I

16   had completed prior to coming to Tucson.

17            MR. MANCH:  And have we received a copy of

18   that report?  I'm addressing that to the

19   Government.

20            MS. HOPKINS:  The report or the warrant?

21            MR. MANCH:  I'm sorry.  The search

22   warrant.

23            MS. HOPKINS:  Yes.

24            THE COURT:  You take her word for it now

25   all of a sudden?

1        MR. MANCH:  I'm sorry?  What?  I just
2   wanted to check.
3   BY MR. MANCH:
4   Q.   All right.  And you also interviewed Mayco
5   Ledezma-Prieto at one point?
6   A.   Yes.
7   Q.   Okay.  And did you write a supplemental report
8   consisting of -- summarizing the interview that you
9   conducted with him?
10  A.   I did not.
11  Q.   How long did you interview him?
12  A.   I'd say we spent approximately an hour and a
13  half.
14  Q.   So you spent an hour and a half talking to
15  him?
16  A.   Correct.
17  Q.   Was anyone else present during that interview?
18  A.   Yes.
19  Q.   Who else?
20  A.   Detective Cordova.
21  Q.   Did Detective Cordova prepare a report of
22  that, summarizing that?
23  A.   He did not prepare a report.  Our conversation
24  with him did not pertain to this investigation that
25  Mr. Ledezma was arrested for.

1    Q.   I see.  And was that interview recorded?

2    A.   I believe it was, sir.

3    Q.   You also prepared a search warrant for the red

4    Chrysler 300 sedan; is that right?

5    A.   Yes.

6    Q.   And that vehicle also belonged to Gregorio

7    Guzman-Rocha, AKA Gollo; is that right?

8    A.   That's what I was told.

9            MR. MANCH:  And we've been disclosed that

10   as well, I take it?

11           MS. HOPKINS:  (Nodding.)

12           THE COURT:  The answer was yes.

13           MR. MANCH:  Yes.  Thank you.

14           If I could just have a moment, Your

15   Honor?

16           THE COURT:  Take your time.

17   BY MR. MANCH:

18   Q.   You testified earlier, Detective Gamez, that

19   you didn't participate in the operation on March

20   the 2nd, 2011; is that --

21   A.   Correct.

22   Q.   Is that a fair statement?

23   A.   (Nodding.)

24   Q.   But when you say "the operation," are you

25   talking about the actual service of the search

1  warrants or the searching of these various

2  residences that were searched on that particular

3  date and time?

4  A.   I was talking about the -- basically the

5  complete operation.  I didn't assist in the

6  surveillance.  I wasn't part of any arrest team.

7       Even though I authored the search warrant, I

8  did not participate in the service of the search

9  warrant at any of the residences or the vehicles.

10 Q.   But you participated insofar as you put the

11 warrants together and swore to them over the

12 telephone?

13 A.   Correct.

14 Q.   Let me speak about a conversation that you

15 had.  Again, forgive me.  I'm looking at my notes.

16      Again, this is on page 304 of what's been

17 numbered in our disclosure.  This is part of your

18 report.  Obviously it's got a different number on

19 your own report.

20      You -- at the command post on March the 2nd,

21 2011, you were not there with Agent Edwards;

22 correct?

23 A.   Correct.

24 Q.   Okay.  Did you -- you received information

25 that an Expedition and Escalade were coming to

1  Tucson?

2      Does that sound familiar?

3  A.   Yes.

4  Q.   And did you hear that from Agent Edwards?

5  A.   I was in contact with Agent Edwards throughout

6  the day, and I would receive secondhand information

7  after he learned it, either through Agent Edwards

8  or through people at the command center.

9  Q.   So that piece of information that additional

10 suspects involved in this case would be coming to

11 Tucson from Phoenix in an Expedition and Escalade,

12 you received that information from Agent Edwards?

13 A.   I don't recall specifically, but I want to say

14 yes.

15 Q.   Okay.  But you didn't have a conversation with

16 the confidential human source on that date?

17 A.   No, sir.  I didn't have any contact with any

18 of the operation, other than with Agent Edwards

19 through a phone conversation.

20 Q.   And you never prepared a search warrant to

21 search either the Expedition or the Escalade?

22 A.   No, sir.

23 Q.   Okay.  And then, on page 305 of your report,

24 you list a name, Jeremy Tucker, among several other

25 names, and this was a list of people who were

1 arrested in the conspiracy investigation.

2     Do you recall putting that in your report?

3 A.   Yes.

4 Q.   That was the first time, at that time, that

5 you had ever heard the name Jeremy Tucker; correct?

6 A.   Give me a minute, please.

7 Q.   Sure.  I'm sorry.  Did you need to refer to

8 your report?

9 A.   I do.

10 Q.   Okay.  You can go ahead and refresh your

11 recollection.

12 A.   What was the name again, sir, that you -- it

13 was Jeremy?

14 Q.   It was Jeremy Tucker, not Ghermon, but Jeremy

15 Tucker.

16 A.   Okay.  No, that was not the first time I had

17 heard his name.

18 Q.   That was not the first time you'd heard his

19 name?  What was the first time you heard his name?

20 A.   Correct.  After the surveillance was conducted

21 on February 4th by the FBI, I received that

22 information approximately a week later, and I

23 conducted research on the license plates and names

24 that I received from Agent Edwards.

25     During that research, I found a field

1  interrogation card which listed Mr. Ja'Cory Dante

2  Ranger and Jeremy Tucker in that field

3  interrogation card.

4      And basically that was a traffic stop where

5  patrol officers had made contact with these

6  individuals and documented a rifle inside that

7  vehicle.

8  Q.  And it was Mr. Ranger, Mr. Ja'Cory Ranger, who

9  claimed ownership for that rifle; is that right?

10 A.  Yes.

11 Q.  Now, you're just going off your report;

12 correct?

13 A.  I'm --

14 Q.  Well, what I mean to say is -- I'm sorry.

15 I'll clarify my question.

16      You didn't have any firsthand experience with

17 that traffic stop; correct?

18 A.  Correct.

19 Q.  You didn't participate in it?

20 A.  I did not.

21 Q.  You're just looking at the gang card that was

22 filled out?

23 A.  It wasn't a gang card, but this was a field

24 interrogation card which we use to document contact

25 with persons.

1  Q.  Okay.  And is that different -- I'm sorry.  Is

2  that different from a gang card that you fill out?

3  A.  If you're talking about what they call a GMIC

4  card, yeah.

5  Q.  Yeah.

6  A.  That would be different.

7  Q.  Okay.  Understood.

8          MR. MANCH:  I have nothing further.  Thank

9  you.

10          THE COURT:  Mr. Armstrong, do you have any

11  questions of this witness?

12          MR. ARMSTRONG:  I do.  Mr. Ranger -- I

13  would not want to do that without Mr. Ranger

14  present, Your Honor.  I'm told he'll be here soon.

15          THE COURT:  He was passing the Tucson Mall

16  not long ago.

17          MR. ARMSTRONG:  And I don't --

18          THE COURT:  Do you guys know when he'll be

19  up?  Is he here?

20          UNITED STATES MARSHAL:  He's coming up,

21  Judge.

22          THE COURT:  All right.  He should be here

23  momentarily.

24          MR. ARMSTRONG:  Okay.  Your Honor, is -- I

25  don't see Mr. Ranger here yet.

1          THE COURT:  He should be momentarily.

2   Just wait.

3          MR. ARMSTRONG:  May I suggest --

4          THE COURT:  Let's at least wait and let

5   him say good morning.

6          MR. ARMSTRONG:  Happy to do that.

7   Wouldn't want to run off without that.  Perhaps we

8   might want to break a little early --

9          THE COURT:  We've only got a few moments

10  anyway.  I'm just waiting to make sure I see him.

11         MR. ARMSTRONG:  Okay.

12         MR. YOUNG:  We were going to suggest, Your

13  Honor, that a copy of the reports -- the defense

14  attorneys look through the reports over the lunch

15  hour --

16         THE COURT:  You just got the reports.

17         MR. YOUNG:  I think they went back up to

18  the witness stand.

19         THE COURT:  I didn't give them to him.

20         MR. MANCH:  I just gave them back to Jim,

21  so --

22         THE COURT:  They gave them to you.

23  Mr. Young had possession.

24         MR. LACEY:  We have --

25         THE COURT:  He gave them up.

1          MR. LACEY:  We have Bates-stamped pages on

2    them, which shows us they were on disks given to

3    the defense, packets 309, 357, 461, and pages in

4    between.

5          MR. YOUNG:  They were given to some of the

6    defense, Your Honor.  Here's 244 and 245.  This is

7    what I get.  Mr. Cooper gets the same pages with

8    nothing crossed out.

9          THE COURT:  Mr. Cooper's special.

10         MR. YOUNG:  Well, I feel like I'm not

11   being given a full deck or something.

12         THE COURT:  Mr. Young, the officer brought

13   the reports down today.  You have them.  You're

14   going to get them.  They're yours.  You subpoenaed

15   them.

16         MR. YOUNG:  Okay.

17         THE COURT:  But you gave them up.

18         MR. YOUNG:  I'd like to read them before

19   we release him to go back up to Phoenix.

20         THE COURT:  Fine.  You can go get them

21   right now, wherever they are.

22         MR. LACEY:  They're over here.

23         THE COURT:  Mr. Lacey has them.  And

24   Mr. Lacey, for the record, has indicated every

25   report that's in that file has been Bates stamped.

1          MR. LACEY:  That's correct.  That's

2    correct.

3          THE COURT:  So you've previously disclosed

4    it?

5          MR. LACEY:  Yes.  Now, what we'll have to

6    do is check with the detective when we leave here

7    to make sure that these are all the reports that

8    were part of his parcel.  That's the one gap that

9    we haven't double-checked on yet, but we will.

10          THE COURT:  All right.

11          MR. YOUNG:  Were there some other reports

12    that you had?  Is this all of them?

13          THE WITNESS:  My narrative portion that,

14    I'm sorry, the other attorney, the other counsel --

15          MR. COOPER:  (Indicating.)

16          THE WITNESS:  Yeah, that one, that one,

17    along with all the supplements that came with it.

18          THE COURT:  The one you have in your left

19    hand is the supplements.  The one you have in your

20    right is the summary.

21          MR. YOUNG:  Thank you

22          THE WITNESS:  Actually, Judge, I think the

23    ones in his left hand are the related reports that

24    we found, and the one in his right hand is my

25    original narrative.

1      THE COURT:  Okay.

2      THE WITNESS:  That should have some more

3  supplements with it.

4      THE COURT:  Okay.

5      MR. LACEY:  Judge, for the record, back on

6  March 8th of this year, we sent a letter to all

7  counsel with an inventory of the various Bates-

8  stamped pages and what they were.

9      As an example -- and again, it's a March

10  8th letter to all counsel, including Mr. Young.

11  Bates-stamped pages 309 to 565 are Phoenix Police

12  Department reports.  If you go further on page 576

13  to 603, Phoenix Police Department reports.  902 to

14  904, Phoenix reports.  954 to 955, another report.

15      So again, what we've done to try and make

16  it easy for all counsel is have a summary of all

17  the Bates-stamped pages that they've received with

18  an index as to what they are.  So I can't make it

19  much easier.

20      THE COURT:  Right.

21      MR. YOUNG:  Right.  They could have made

22  it easier by doing it sooner, Your Honor.  That was

23  actually postmarked the day before the hearing.

24      THE COURT:  Okay.  Fine.  You got it.  You

25  now have it.

1          MR. YOUNG:  I haven't had a chance to look

2    at it.

3          THE COURT:  You now have it.

4          MR. YOUNG:  It's sitting on my desk, but I

5    haven't had a chance to cross-check everything.

6    I've been out of town for a week.  It came with 14

7    CDs, then more disclosure, then another CD.  I'm

8    fast, but I'm not that fast.

9          THE COURT:  Mr. Young, you have complained

10   over and over again that you don't have certain

11   disclosure.  The Government has claimed over and

12   over again that they've given you certain

13   disclosure, so they did it again.  I hope that you

14   now have it.

15         Mr. Ranger.

16         JA'CORY RANGER:  Yes, sir.

17         THE COURT:  How are you doing this

18   morning?

19         JA'CORY RANGER:  Fine.  And you?

20         THE COURT:  I'm okay.  You got a little

21   frantic this morning.  Everybody was leaving except

22   you.

23         JA'CORY RANGER:  Yeah.  I'm glad to make

24   it.

25         THE COURT:  Okay.  The record can indicate

1  that Mr. Ranger is now present.

2          We're going to -- now, we're going to

3  break for lunch.  We'll feed you too.  Start back

4  at 1:15.  1:15.  1:15.  1:15.  Thank you.

5          (Off the record.)

6          THE COURT:  Mr. Armstrong?

7          MR. ARMSTRONG:  Thank you, Your Honor.

8                  DIRECT EXAMINATION

9  BY MR. ARMSTRONG:

10  Q.   Good afternoon, Detective.

11  A.   Good afternoon.

12  Q.   I want to follow up on a couple areas that

13  were brought up by the other lawyers.

14       You had mentioned a field interrogation card

15  in which one of the Tuckers and Ja'Cory Ranger were

16  interrogated or interviewed by law enforcement when

17  you were -- you mentioned that when you were

18  answering questions put to you by Mr. Manch.

19       Do you recall that?

20  A.   Yes.

21  Q.   Okay.  Do you recall the -- which law

22  enforcement agency was -- had made up that or put

23  together that card?

24  A.   Yes.  That was Phoenix.

25  Q.   It was Phoenix?

1  A.   PD, yes.

2  Q.   To the best of your knowledge, you have never

3  met Ja'Cory Ranger, other than, well, he's here in

4  court today, but other than that, you've never seen

5  him, to the best of your knowledge; is that right?

6  A.   Correct.

7  Q.   And earlier in the day, I think when you were

8  answering questions from Mr. Young, the first

9  lawyer that asked you questions, I think you said

10  that you didn't know -- you didn't have any

11  information about Ja'Cory Ranger, but later you

12  clearly testified that you did.

13       Were you just confusing the Rangers, or do you

14  have confusion regarding a name, perhaps?

15  A.   No.  I believe what I testified to earlier

16  was, during the time frame that Mr. Young was

17  asking me about, I didn't have any knowledge.

18  Q.   Okay.

19  A.   Prior to the investigation.

20  Q.   Okay.  And the investigation from your

21  perspective began in early February of 2011?

22  A.   Correct, February 3rd.

23  Q.   So I want to -- I want to find out exactly how

24  it was that you came -- you were contacted by

25  Special Agent Edwards regarding the home invasion

1  crew that he was looking at; is that right?

2  A.   My boss was contacted by Agent Edwards, and

3  then he contacted me afterwards.

4  Q.   He -- your boss?

5  A.   My boss.

6  Q.   Who is your boss?

7  A.   Alex Ortiz, Detective Sergeant.

8  Q.   So in your conversation with -- in your

9  initial conversation with Agent Ortiz, did Ja'Cory

10  -- did Ja'Cory Ranger's name ever come up?

11  A.   No.

12  Q.   Okay.  When was the first time you had any

13  information regarding Ja'Cory Ranger?

14  A.   It was when -- it was -- may I refresh my

15  memory with my report?

16  Q.   Absolutely.

17  A.   Okay.  Okay.  I learned of Mr. Ja'Cory Ranger

18  on February 14th, 2011, and I learned of him

19  through the report that I found at Mayco Ledezma's

20  home, which occurred on November 11th of 2010.  He

21  was listed in that report.

22  Q.   All right.  That's the house at the 3700 block

23  of Maricopa?

24  A.   Yes, 3707 West Maricopa Street.

25  Q.   That's the first time you'd heard Ja'Cory

1  Ranger's name, was on Valentine's Day of '11?

2  A.   Yes.

3  Q.   What was the next bit of information, if any,

4  that you received about Mr. Ranger?

5  A.   Well, after I learned of that report, I did my

6  own records check of the individuals in that

7  report, and that's where I learned of the field

8  interrogation cards that had been done, that had

9  been completed by other officers.

10  Q.   And you said there was multiple field

11  interrogation cards?

12  A.   Yeah.  I testified to those earlier.

13  Q.   Did you receive any information out of the

14  Scottsdale Police Department regarding Ja'Cory

15  Ranger?

16  A.   Not that I specifically recall.

17  Q.   Okay.  If you were to run an investigation --

18  you know, run sort of a background check -- well,

19  tell me, how is it that you conducted any research

20  into Ja'Cory Ranger?

21  A.   I used our police database and conducted a

22  records check.

23  Q.   Is that exclusive -- is that exclusive to the

24  Phoenix Police Department?

25  A.   It's exclusive of Phoenix and a couple other

1  agencies.  It will not give us all the agencies in

2  the valley.  It won't give us, you know, Tucson

3  information.  It won't give us Yuma.  It won't give

4  us some of the cities in the Phoenix

5  metropolitan --

6  Q.   Does it give you Scottsdale, as far as you

7  know?

8  A.   I believe Scottsdale is one of the ones that

9  can be documented in our system.

10  Q.   And the field interrogation cards are

11  essentially, if someone is pulled over or has any

12  contact with law enforcement, a record is made by

13  the law enforcement officer and then entered into a

14  database?

15  A.   Those cards are made for where there's no

16  other documentation, like a report completed, you

17  know, a report for whatever crime was being

18  investigated.

19      So those cards are completed to document

20  contact with individuals that patrol officers make.

21  Q.   What -- so you received some information

22  regarding Ja'Cory Ranger at the 3700 block of West

23  Maricopa.  You did a records search.

24      And what other investigation did you do

25  regarding Ja'Cory Ranger before March 2nd of 2011?

1    MR. LACEY:  I'm objecting to the relevancy

2    of our hearing, Judge.

3          THE COURT:  Overruled.

4    A.   That was it.  I did -- after I did the records

5    checks and I found what I had documented in my

6    original report, I may have placed file stops on

7    the subjects, but I don't recall specifically at

8    this point.

9    Q.   So at some point you gathered up, you know,

10   whatever information you had about Ja'Cory Ranger,

11   and then at some point you communicated that

12   information to Agent Edwards; is that right?

13   A.   Yes.

14   Q.   Did you communicate with anybody else

15   involved?  Did you communicate with anybody else

16   from the FBI regarding Mr. Ranger?

17   A.   No.  I dealt specifically with Agent Edwards.

18   He was my contact for this investigation.

19   Q.   What did you tell or what information did you

20   convey to Agent Edwards about Ja'Cory Ranger?

21   A.   The information that I learned from the report

22   found at Mr. Ledezma's residence on Maricopa Street

23   and these field interrogation cards that listed

24   Mr. Ranger.

25   Q.   Okay.  Did you ever tell Agent Edwards that

1  Ja'Cory Ranger was part of a home invasion crew?

2  A.  No.

3  Q.  Did you ever tell Agent Edwards that Ja'Cory

4  Ranger was a gang member?

5  A.  I never told him he was a gang member, but I

6  did provide him information regarding gang

7  documentation from Detective Denney, Steve Denney,

8  from the Phoenix Police Department.

9  Q.  So Denney provided you some information about

10  Ja'Cory Ranger related to gangs; is that correct?

11  A.  He provided information on all the subjects

12  that were arrested as to whether or not they had

13  documentation with gangs.

14  Q.  The arrested subjects, we're talking about the

15  folks from the March 2nd event?

16  A.  Correct, sir.  I'd have to look to see what

17  was said about Mr. Ranger.

18  Q.  What was said to you by Sergeant or by -- is

19  it Sergeant Denney?

20  A.  It's Detective Denney.

21  Q.  What was said to you by Detective Denney, is

22  that what you're referring to?

23  A.  Right.

24  Q.  Okay.  So, you're pretty clear, though, that

25  you didn't tell Special Agent Edwards that Ja'Cory

1  Ranger was part of a home invasion crew?

2  A.   No.

3  Q.   Okay.  The fact is, you don't have any

4  information that he's part of a home invasion crew

5  out of Phoenix, do you?

6  A.   At the time, no, I did not.

7  Q.   And Ja'Cory was -- going back to the November

8  10th event at the 3700 block of West Maricopa, was

9  Ja'Cory Ranger -- he wasn't cited, I take it.  He

10 was not charged with any crime.

11 A.   Not according to the report.  I didn't

12 participate in that --

13 Q.   Right.

14 A.   -- incident.

15 Q.   And there was a total of nine or 10 people at

16 that house, is that right, judging by the names you

17 read off here earlier?

18 A.   I think there were more.  There was several

19 women at the residence.

20 Q.   Yeah.  There were three women present; is that

21 correct?

22 A.   Sir, I don't remember how many women were

23 present without looking at the report.  I did not

24 author it.

25 Q.   Why did you think it was -- did you tell Agent

1    Edwards about Ja'Cory's connection to that house on
2    West Maricopa?
3    A.   I told Agent Edwards that I found this report
4    and what the information inside that report
5    contained involving all the individuals in that
6    report.
7    Q.   Okay.  But there was no marijuana or weapons
8    located in the residence as far as -- as far as you
9    can tell from that report?
10   A.   I want to say there was a handgun found in the
11   residence as well.  That's documented in the
12   report.
13   Q.   Okay.  Did anyone claim ownership of that
14   weapon?
15   A.   Not that I recall.
16   Q.   Did you ever tell Agent Edwards -- well, let
17   me ask you this.  Do you have any knowledge whether
18   Ja'Cory Ranger has ever been shot?
19   A.   I believe yes.  I learned --
20   Q.   Let me ask that question in a different way.
21        Before March 2nd of 2011, did you have
22   information that Ja'Cory Ranger had ever been shot?
23   A.   My recollection is, yes, that we -- and I say
24   "we."  I don't recall who learned the information.
25   We knew that Mr. Ranger had been shot.

1    Q.   I want to know more about what it is that you

2    -- the information that you had about Ja'Cory

3    Ranger being shot.

4         Do you have that contained in a report

5    anywhere?

6    A.   No, sir.  I don't have -- there was other

7    information that was learned of the individuals

8    that we were investigating, that the FBI was

9    investigating, that I learned after the fact, so --

10   Q.   After the fact of March 2nd?

11   A.   No, not necessarily after March 2nd, but after

12   I learned of them through the investigation at

13   Mayco Ledezma's residence.  So I provided initial

14   information/intelligence from what I learned from

15   Mr. Ledezma's residence, and then the FBI did their

16   own investigation in those subjects as well.  And

17   that, I don't know specifically what was done.

18   Q.   Okay.  Did you communicate any knowledge about

19   Ja'Cory Ranger being shot to Special Agent Edwards

20   before March 2nd of 2011?

21   A.   I don't recall that, sir.

22   Q.   I want to move on to the date February 4th of

23   2011, up in Phoenix.

24        You'd indicated -- you told Mr. Cooper that

25   you had met with the confidential human source

1   before and after the meeting on Seventh Street; is

2   that accurate?

3   A.   Yes.

4   Q.   Did you speak with that person, the

5   confidential human source?

6   A.   Yes.

7   Q.   What language did you speak to that person in?

8   A.   English and Spanish.

9   Q.   Did that person -- did you discuss -- well,

10  when you spoke with the -- with that source, were

11  there other persons present?

12  A.   Agent Edwards was present.

13  Q.   Okay.  Just the two of you?

14  A.   Yes.

15  Q.   And Agent Rubalcalva, was he present?

16  A.   I don't recall.  I don't recall that name.  I

17  want to say there were other agents present

18  initially that participated in the operation, but I

19  don't know who they are.

20  Q.   Was there anyone else from the Phoenix Police

21  Department present when you met with the source

22  before -- you know, at any time on February 4th?

23  A.   No.

24  Q.   So you were asked by Agent Edwards to come to

25  Tucson on February -- excuse me -- March 2nd, 2011?

1    A.    Correct.

2    Q.    All right.  And the purpose of you coming

3    here -- I thought you testified you were there just

4    to give information about any of the subjects.

5    A.    Yeah, I was there to give them any

6    intelligence information or assist them in any way

7    I could, but really I wasn't involved in the

8    operation.

9    Q.    Okay.  What information did you provide to

10   Agent Edwards before, let's say, three o'clock in

11   the afternoon on February -- I'm sorry -- March

12   2nd, 2011, if you recall?

13   A.    Well --

14   Q.    Confine it to the time you got to Tucson

15   until, say, three o'clock in the afternoon.

16   A.    Yeah.  The information that I provided Agent

17   Edwards had already been provided days ahead of

18   that date.

19   Q.    Okay.

20   A.    So all the information that I provided

21   regarding the records checks that I completed were

22   some -- were weeks prior to the March 2nd date, the

23   operation date.

24   Q.    And you drove down with Sergeant Cordova?

25   A.    Detective Cordova.

Q.  Excuse me.  Detective Cordova.

A.  On March 2nd.

Q.  Right.  Did either you or he place a call to

-- I got confused about who called who or who may

have called TPD.

      Was that Detective Cordova calling TPD that

day?

A.  I called my supervisor, Sergeant -- Detective

Sergeant Ortiz -- and --

Q.  And he was here in Tucson too?

A.  No.  He was driving to Tucson.  And I called

and informed him that we needed to have some

vehicles stopped, that they were asking -- the FBI

was asking for our assistance, and then he

contacted TPD and DPS.

Q.  And when you were -- when you were on location

here, you were at the FBI building; is that right?

A.  Yes.

Q.  Downtown?

A.  Yes.

Q.  Did you ever venture out over to the Circle K,

the Circle K at Congress and the freeway?

A.  No, I did not.

Q.  Did you have any communication with any law

enforcement who were observing the activities at

1  the Circle K on that day?

2  A.   I did not.  I received secondhand information

3  after they provided that to agents.

4  Q.   There was some -- I believe you provided in

5  your report some information about a homicide that

6  occurred in the Phoenix area in 2011; is that

7  correct?

8  A.   Yes.

9  Q.   Involving somebody named Jesus?

10 A.   Yes.

11 Q.   What was the victim's name, if you recall?

12 A.   I don't recall his full name.

13 Q.   He's -- do you remember the date?  I remember

14 the name Jesus in your report, but I don't recall

15 the date that this may have occurred.

16         MR. LACEY:  Objection, Judge.  I think

17 we're getting astray from where we should be.

18         MR. ARMSTRONG:  Well, Your Honor, I'll

19 re-ask it.

20         THE COURT:  Go ahead.  We are getting far

21 afield.

22         MR. ARMSTRONG:  Okay.

23 BY MR. ARMSTRONG:

24 Q.   Did you ever tell Agent Edwards that Ja'Cory

25 Ranger was involved in a homicide occurring in

1  Phoenix that predated March 2nd, 2011?

2  A.   No.

3          MR. ARMSTRONG:  Your Honor, may I have

4  just one moment?

5          THE COURT:  Sure.

6          MR. ARMSTRONG:  Thank you, Detective.  No

7  further questions.

8          THE COURT:  Mr. Lacey or Ms. Hopkins?

9          MR. LACEY:  Very briefly, Your Honor.

10                  CROSS-EXAMINATION

11  BY MR. LACEY:

12  Q.   Detective, going back to the incident at

13  Mayco's residence up in Phoenix, do you recall

14  those -- the questions about that event?

15  A.   Yes.

16  Q.   Where he was -- where a person was followed

17  by -- the dogs led to that residence?

18  A.   Correct.

19  Q.   You mentioned that there were two vehicles

20  there, at least, that you've told us about this

21  morning.  One had bales of marijuana, and you also

22  mentioned another one, another vehicle that had

23  weapons in it.

24          Which vehicle was it that had the weapons?

25  Who did that come back to?

1  A.   The vehicle that had the weapons was the

2  Mercedes, and that was registered to Ghermon

3  Tucker.

4  Q.   Ghermon Tucker?

5  A.   Yes.

6  Q.   Did your investigation, or that of your other

7  officers and detectives working with the Phoenix

8  Police Department, come to any conclusion as to

9  whether a home invasion had just been conducted

10 prior to the finding of this marijuana and weapons?

11        MR. COOPER:  Judge, that's not relevant.

12        THE COURT:  Overruled.

13 A.   Yes.

14 Q.   And what was that determination and what was

15 it based on, if you can tell us?

16 A.   It is an ongoing investigation, and that was

17 based on Mr. Mayco Ledezma, who had been the target

18 of an investigation involving a group of armed

19 robber/home invaders.

20 Q.   What weapons were found, if you can tell us,

21 in Ghermon Tucker's vehicle outside of Mayco's

22 residence?

23 A.   I don't recall the makes without looking at

24 the report.  I want to say there was handguns and

25 rifles in the vehicle.

1      MR. LACEY:  I have nothing further, Your

2  Honor.

3      THE COURT:  Mr. Young?

4      MR. YOUNG:  Nothing further, Your Honor.

5      THE COURT:  Mr. Manch?  I'm sorry.  I went

6  to -- Mr. Cooper, you were first.

7      MR. COOPER:  Just a couple questions, Your

8  Honor.

9                REDIRECT EXAMINATION

10  BY MR. COOPER:

11  Q.  The weapons that were found in Mr. Tucker's

12  vehicle were found -- I believe it's November 11;

13  is that correct?

14  A.  Correct, of 2010.

15  Q.  Okay.  And I assume that one of the things

16  that happens when police officers come across

17  weapons is that they get processed for prints and

18  DNA; is that fair?

19  A.  Sometimes.

20  Q.  Okay.  How about in this case?

21  A.  Those weapons were not processed for prints

22  and DNA.

23  Q.  So there's no connection that you can make

24  between those weapons and any home invasion that

25  took place in Phoenix in 2010; is that correct?

1   A.   That's not correct.

2   Q.   So those weapons were connected to a home

3   invasion?

4   A.   That is my belief, yes.

5   Q.   Based on physical evidence?

6   A.   It's part of an ongoing investigation that I'm

7   not willing to discuss.

8   Q.   Okay.   But these weapons were not

9   fingerprinted?

10   A.   Correct, sir.

11   Q.   And they were not processed for DNA?

12   A.   Correct.

13   Q.   Okay.   And the investigation is going on today

14   as we speak still?

15   A.   It is ongoing.

16   Q.   Okay.   When you -- did you ever learn in

17   November of 2010 that somebody had contacted

18   Mr. Tucker to talk to him about his vehicle being

19   found that night?

20   A.   No, sir.   I wasn't aware of that investigation

21   until I became involved with Agent Edwards'

22   investigation.

23   Q.   I understand that, but have you since learned

24   that -- in November, did anybody contact Mr. Tucker

25   to say, why are there weapons in your vehicle?

1  A.   According to the initial report, he was

2  interviewed that night.

3  Q.   Okay.  And he denied that they were his

4  weapons; correct?

5  A.   Correct.

6  Q.   And he was not arrested for being in

7  possession of those weapons; correct?

8  A.   Not at that time, no, sir.

9  Q.   And you're aware that he's a prohibited

10  possessor; correct?

11  A.   I am.

12        MR. COOPER:  That's all I have.

13        THE COURT:  Mr. Manch?

14        MR. MANCH:  I have nothing further, Your

15  Honor.

16        THE COURT:  You may step down.

17        THE WITNESS:  Thank you.

18        MR. LACEY:  Your Honor, the only other

19  person that was requested to be here today was the

20  informant in the matter.  One thing I would point

21  out to the Court, and we've already filed some

22  pleadings in this regard, where we have testimony

23  before the Court that enables you to get a complete

24  picture, a pretty complete picture through hearsay

25  and otherwise, there shouldn't be any need, in our

1    opinion, to have to call the witness.

2            There's a lot of cases that talk about

3    hearsay being admissible.  Agent Edwards talked at

4    length about his involvement and that of the

5    source, and I'd be happy to show you lots of cases

6    that --

7            THE COURT:  You've already shown me lots

8    of cases, Mr. Lacey.

9            MR. LACEY:  I can show you some more.

10           But it's the Government's position that we

11   shouldn't have to produce him at this point in

12   time.  We can if we need to.  We'll need a little

13   bit of a break because of him not being in the

14   building, but beyond that, it's the Government's

15   position that the whole reason he would have to

16   testify would be on the motion to suppress the

17   evidence.

18           We've laid out through hearsay, plus the

19   direct testimony of Agent Edwards and now a few

20   hours of testimony, at least, from the Phoenix

21   Police Department officers who've laid out the

22   background leading up to the events of March 2nd,

23   Agent Edwards filling in from when he first got

24   involved, what happened at the meeting back on

25   February 4th, Tucker's vehicle being present there,

1　the follow-up from that, the Phoenix Police
2　Department input as to who was a suspect, and more
3　importantly, what happened during the day of March
4　2nd as these vehicles surfaced here in Tucson.
5　　　　　And the old res ipsa loquitur I think
6　definitely applies to the facts of this case.  It's
7　the Government's position that we shouldn't --
8　there shouldn't be a need to call additional
9　testimony at this time based upon the facts before
10　the Court.
11　　　　　THE COURT:  I know that's your position,
12　Mr. Lacey.  I still have a different position.
13　　　　　MR. LACEY:  That's fine.  I had to try.
14　　　　　THE COURT:  All right.
15　　　　　MR. LACEY:  That being the case, we'll
16　need a little bit of a break.
17　　　　　THE COURT:  I've already told the
18　marshals.  They're on the witness getting him here,
19　I do believe; correct?  So we'll take about a
20　10-minute recess until he gets here.
21　　　　　MR. LACEY:  Thanks, Judge.
22　　　　　THE COURT:  I will tell counsel, we're
23　going to keep it tight to the events before March
24　2nd and what happened on March 2nd.  All right?
25　　　　　Thank you.

1          (Off the record.)

2          THE COURT:  I understand the witness is

3   now here?

4          MR. LACEY:  That's correct, Judge.

5          THE COURT:  Bring him in.

6          ANTONIO GUTIERREZ, WITNESS, SWORN

7          THE COURT:  State your name for the

8   record.

9          THE WITNESS:  Antonio Gutierrez.

10         THE COURT:  Mr. Young?

11                DIRECT EXAMINATION

12   BY MR. YOUNG:

13   Q.   Sir, would you please tell us, prior to March

14   2nd of last year, what kind of work you did.

15   A.   I was a manager.

16   Q.   Okay.  Manager for what kind of --

17   A.   For a cleaning company.

18   Q.   I'm sorry?

19   A.   A cleaning company.

20   Q.   You were also working for the FBI at the time?

21   A.   Yeah.

22   Q.   You were working at the job of informant for

23   the FBI?

24   A.   Yeah.

25   Q.   And they paid you for that job?

1  A.   Yeah.

2  Q.   You report to the FBI?

3  A.   What do you mean?

4  Q.   Is there somebody at the FBI that you talk to?

5  A.   Yeah.

6  Q.   And that would be Special Agent Rubalcalva?

7  A.   Yep.

8  Q.   So he's kind of your supervisor within the

9  FBI?

10 A.   Yeah.

11 Q.   How often do you report to that special agent?

12 A.   It depends, you know.

13 Q.   Is it daily, weekly, monthly?

14 A.   Maybe weekly.

15 Q.   And how do you report to him?  Do you report

16 to him by telephone, or do you see him in person?

17 A.   Sometimes in person; sometimes on the phone.

18 Q.   Do you ever give him written reports?

19 A.   What?

20 Q.   Do you ever give him written reports?

21 A.   No, because when we meet, he writes

22 everything.

23 Q.   And your job with the FBI, that doesn't come

24 with a badge, does it?

25 A.   No.

1  Q.  You don't get any benefits with that job,

2  other than getting paid?

3  A.  No.

4  Q.  There's no retirement benefits or health

5  benefits or anything like that?

6  A.  No.

7  Q.  You just get cash; right?

8  A.  Yeah.

9  Q.  When they give you cash, do they give you cash

10  money, or do they give you a check?

11  A.  Cash.

12  Q.  Now, I understand that, in this particular

13  case, you've been paid $75,000 in cash?

14  A.  Yeah.

15  Q.  And on top of that, you've been paid another

16  $33,933.53 in relocation expenses?

17  A.  Yeah.

18  Q.  And that was to move you to a different

19  location?

20  A.  Yeah.

21  Q.  Did you have to pay taxes on any of that

22  money?

23  A.  Yeah.

24  Q.  You pay taxes on the money you make as an

25  informant?

1  A.   Yeah.

2  Q.   So it's one of your jobs; right?

3  A.   What?

4  Q.   Working as an informant is one of your jobs?

5  A.   No.

6  Q.   Well, you get paid to do it?

7  A.   Yeah.

8  Q.   You have a supervisor for it.

9  A.   Well, he's not my supervisor.  He's -- he's in

10 charge of me.

11 Q.   And you even pay taxes on the money that you

12 make as an FBI informant?

13 A.   Yeah.

14 Q.   And did you get any training to work for the

15 FBI?

16 A.   No.

17 Q.   Did they give you any legal training?

18 A.   No.

19 Q.   They didn't put you through any academy or

20 anything like that?

21 A.   No.

22 Q.   There was no classroom training?

23 A.   No.

24 Q.   You didn't have to take any examinations?

25 A.   My background.

1    Q.    They ran your background?

2    A.    Yeah.

3    Q.    Did they give you any ethical training?

4    A.    What do you mean?

5    Q.    Talk to you about what's right and what's

6    wrong.

7    A.    Yeah. He talked to me about it, you know.

8    Q.    Who did?

9    A.    The agent in charge of me.

10    Q.    Okay. And what did he tell you about what's

11    right and what's wrong?

12    A.    Well, you know, we got to do the right thing.

13    I would never go after innocent people, like, you

14    know.

15    Q.    Do you have any certification as an FBI

16    informant?

17    A.    No.

18    Q.    So you don't have to worry about losing any

19    kind of certification; right?

20    A.    Well, if I lie, you know, I won't work for

21    them anymore, so if I lie, I won't work for them no

22    more. That's it.

23    Q.    Were you ever sworn to uphold the law when you

24    went to work for the FBI?

25    A.    No.

1  Q.   Were you ever sworn to uphold the Constitution
2  when you went to work for the FBI?
3  A.   No.
4  Q.   In your work for the FBI, you try to make as
5  much money as possible; right?
6  A.   No.
7  Q.   You don't try to make as much money as
8  possible?
9  A.   Huh-uh, because I don't know how much they're
10  going to --
11          THE COURT:  Do me a favor.  Say either
12  "yes" or "no."  Don't say "huh-uh" or "uh-huh."
13          THE WITNESS:  Okay.  No.
14  BY MR. YOUNG:
15  Q.   Now, you understand how the pay scale works on
16  these operations; right?
17  A.   No.
18  Q.   It hasn't been explained to you?
19  A.   They never -- they never promise me money, you
20  know.
21  Q.   I'm sorry?
22  A.   I never know when -- how much they're going to
23  pay me.  I never know.
24  Q.   Have you noticed that, when you arrest more
25  people, you get paid more money?

1    A.    No.

2    Q.    Have you noticed that bigger cases bring you

3    more money?

4    A.    No.

5    Q.    Smaller cases bring you less money?

6    A.    It's -- I just don't know how much they're

7    going to pay me, you know.

8    Q.    It's totally up to them, isn't it?

9    A.    I don't know who it's up to.  I don't know.

10   Q.    So how much you get paid is a surprise?

11   A.    If I get paid.

12   Q.    Sometimes you don't even get paid at all.  Is

13   that what you're telling me?

14   A.    Yeah.

15   Q.    So it just depends on how valuable your

16   information was?

17   A.    Yeah.

18   Q.    And a big part of how valuable your

19   information is, is how many people get arrested?

20   A.    No.

21   Q.    And another big part would be what they get

22   arrested for?

23   A.    That what?

24   Q.    What they get arrested for.

25   A.    I don't know.  It just depends, you know.

1   Q.   If you had gotten all these people arrested

2   for trying to steal one kilogram of cocaine, that

3   wouldn't have paid you very much money, would it,

4   in your experience?

5   A.   I can't tell you yes or no, you know.  I don't

6   know.

7   Q.   Just based on your experience, would you have

8   gotten less money for one kilogram of cocaine?

9   A.   I don't know, because I don't know how much

10  they're going to pay me.

11  Q.   What if --

12  A.   You know, I'm not on a salary or something.

13  Q.   I'm sorry?

14  A.   It's not they tell me, hey, if we can get a

15  kilo of cocaine, we're going to give you 5,000.  I

16  don't know.

17  Q.   What if, for instance, this arrest had only

18  resulted in the arrest of two people?  Would you

19  have gotten less money?

20  A.   Probably.

21  Q.   And that's based on your previous experience

22  as an informant?

23  A.   Yeah.

24  Q.   I notice in looking at the reports that you're

25  very familiar with the name Chapo Guzman of the

1    Sinaloa cartel; is that right?

2    A.   Yeah.

3    Q.   You're able to describe in some detail how he

4    moves about, vehicles he drives, the operation of

5    his organization?

6    A.   Well, it's in the news, you know.

7    Q.   So you found out about Chapo Guzman from

8    watching the news?

9    A.   Yeah, pretty much from the news too.

10   Q.   The name Juan Jose Esparragoza Murano, El

11   Azul, of the Sinaloa cartel, did you get that name

12   in the news?

13   A.   Yeah.  He's in the news too.

14   Q.   He's on the news?

15   A.   Yeah.

16   Q.   Did you talk about that name with the FBI?

17   Did they give you that name?

18   A.   No.

19   Q.   You just came up with that name yourself from

20   watching the news?

21   A.   Yeah.

22   Q.   He has a son named Jose Juan Esparragoza

23   Jimenez, also of the Sinaloa cartel.  Where did you

24   come up with that name?

25   A.   I know -- I know him.

1  Q.   You know him personally?

2  A.   Yeah.

3  Q.   And how do you know El Azul's son?

4  A.   What?

5  Q.   How do you know him?

6  A.   His son?

7  Q.   Yes.

8  A.   He told me.

9  Q.   You met him?

10  A.   Yeah.

11  Q.   Where did you meet him?

12          MR. LACEY:  Objection.  Relevancy, Your

13  Honor.

14          THE COURT:  Sustained.

15  BY MR. YOUNG:

16  Q.   So it sounds as if you've worked closely with

17  the Sinaloa cartel in the past.

18          MR. LACEY:  Objection.  Relevancy.

19          THE COURT:  Sustained.

20  BY MR. YOUNG:

21  Q.   Did you have any charges with the federal

22  government that you had to work off in exchange for

23  this information?

24  A.   No.

25  Q.   You've never been charged with anything?

1   A.   I got arrested once but not charged.

2   Q.   And you didn't get charged because you started

3   working for the FBI?

4   A.   I was already working.

5   Q.   Oh, you were already working for the FBI when

6   you were arrested?

7   A.   No, DEA.

8   Q.   You were working for the DEA then?

9   A.   Yeah.

10   Q.   Okay.  So before you became an FBI informant,

11   you were also a DEA informant?

12   A.   Yeah.

13   Q.   And what made you change jobs?

14   A.   I don't know.  I guess try something new.

15   Q.   So did you talk to the FBI about the fact that

16   you were going to use El Azul's name in this

17   operation?

18   A.   Yeah.

19   Q.   And they were okay with that?

20   A.   Yeah.

21   Q.   They told you to go ahead and do that?

22   A.   Yeah.

23   Q.   And did you talk to the FBI about the fact

24   that you were going to use El Azul's son's name as

25   part of this operation?

1    A.   Yeah.

2    Q.   And they were okay with that as well?

3    A.   Yeah.

4    Q.   They told you to go ahead and do that?

5    A.   Yeah.

6    Q.   You were first introduced, I understand, to

7    Chivo, Mr. Lopez-Lorenzo, at a supermarket in

8    Phoenix near Seventh and Southern, on December 29th

9    of -- that must have been 2010?

10   A.   What?

11   Q.   Tell me when you first met Chivo.

12   A.   It was probably, like, a year ago, you know,

13   over a year ago.

14   Q.   Would that have been on approximately December

15   29th?

16   A.   Yeah.  Probably, yeah.

17   Q.   A little after Christmas in December of 2010?

18   A.   Yeah.

19   Q.   And you were introduced to him through

20   Chilango, also known as Roberto del Solar-Ramos?

21   A.   Yeah.

22   Q.   How did you know Mr. Ramos?

23   A.   Oh, Roberto?  He used to work with me, for me.

24   Q.   For you?

25   A.   Yeah.

1  Q.  So he was one of your employees?

2  A.  Yeah.

3  Q.  Did you tell the FBI that you were bringing

4  one of your employees into this?

5  A.  Yeah.

6  Q.  And how did you get Roberto interested?

7  A.  How?

8  Q.  Yes.

9  A.  Because he told me he didn't like to work.  He

10  said that, when he was in Mexico, he was a drug

11  dealer.

12  Q.  And he was working for you when he told you he

13  didn't like to work?

14  A.  Yeah.

15  Q.  And what did you tell him?  Did you tell him

16  that you could get somebody else to do the work?

17  A.  No.  I didn't say nothing.  You know, if you

18  don't like to work, what do you do?

19  Q.  So you suggested another line of work for him?

20  A.  He told me he used to move a lot of drugs, you

21  know, and I asked him if he knew people who did

22  home invasions, and told me yes, he did.

23  Q.  He told you he used to move a lot of drugs?

24     What kind of work did you say he was doing for

25  you?

1   A.   Cleaning.  He was maintenance.

2   Q.   Janitorial work?

3   A.   Yeah.

4   Q.   So -- okay.  So he'd gone from drug dealing to

5   janitorial work?

6   A.   I didn't hire him for, like -- he never told

7   me he was a drug dealer.  You know, when he was

8   working, he told me, "I don't like to work."

9        And I asked him, "What did you do before?"

10       He said, "I was a drug dealer."

11       He never put on the application, I'm a drug

12   dealer, you know.

13   Q.   So he's the one that introduced you to

14   Lopez-Lorenzo?

15   A.   Who is that?

16   Q.   Chivo.

17   A.   Roberto.

18   Q.   Yes.  Roberto introduced you to Chivo?

19   A.   Yeah.

20   Q.   Now, Roberto never approached you and asked

21   you to find a stash house for him to rob, did he?

22   A.   After he told me that, he told me, if I know

23   where there is a house, you know, to let him know.

24   Q.   How did that conversation go?  You're his

25   boss; right?

1    A.   Yeah.

2    Q.   And he approached you, his boss, and said he

3    doesn't like to work, he'd like to rob stash

4    houses, and do you know of any?

5    A.   No, no, no.  He didn't tell me he liked to rob

6    houses.  He told me he was a drug dealer and he did

7    houses like that.

8    Q.   So he approached you and told you he would

9    like to rob stash houses --

10   A.   Yeah.

11   Q.   -- and do you know of any?

12   A.   Yeah.

13   Q.   So you're telling me this was Roberto's idea?

14   A.   No.

15   Q.   This was your idea, wasn't it?

16   A.   Yeah.

17   Q.   You approached Roberto with this idea to rob a

18   stash house?

19   A.   Kind of.

20   Q.   And you're the one that told Roberto you knew

21   where there was a stash house?

22   A.   Yeah.

23   Q.   Now, Roberto told you that he knew someone in

24   Phoenix who could do that kind of work?

25   A.   Yeah.

1  Q.   Did he have any references for these guys or a

2  résumé or anything like that?

3  A.   He told me they were crazy, Chivo.

4  Q.   So he just told you he'd introduce you to

5  Chivo?

6  A.   Yeah.

7  Q.   And he took you up to Chivo, and you met with

8  Chivo?

9  A.   Yeah.

10 Q.   Okay.  And who else was there the first time

11 you met with Chivo?

12 A.   Me, Roberto, Chivo, and myself.

13 Q.   Just the three of you?

14 A.   Yeah.

15 Q.   Now, Chivo told you he wasn't -- he hadn't

16 been robbing any stash houses lately?

17 A.   What did you say?

18 Q.   Chivo told you that he had not been robbing

19 any stash houses lately?

20 A.   That he had been robbing houses?

21 Q.   Not been robbing houses.

22 A.   Oh.  Yeah, he told me he stopped.

23 Q.   He told you he stopped?

24 A.   Yeah.

25 Q.   Why did he stop robbing stash houses?

1    A.   Because the police was into him.

2    Q.   Okay.  So he was going straight at the time?

3    A.   I don't know, you know.

4    Q.   But he told you he'd stopped robbing stash

5    houses, Chivo did?

6    A.   Yeah.

7    Q.   How did you get Chivo to agree to this stash

8    house robbery?

9    A.   Why?

10   Q.   How.

11   A.   How?

12   Q.   How did you get him to agree?

13   A.   Well, I told him there was a house with

14   cocaine.

15   Q.   You told him it was a whole lot of cocaine;

16   right?

17   A.   65 kilos.

18   Q.   It started out at 50 kilos; right?

19   A.   Yeah.

20   Q.   And that was on the first meeting.  You told

21   them 50 kilos, yeah?

22   A.   I don't remember.

23   Q.   There was a second meeting that you had with

24   Chivo and some other people?

25   A.   Yeah.

1  Q.  And that was February 4th of last year, 2011.

2  Does that sound right?

3  A.  It sounds about right.

4  Q.  And at that meeting there were more people

5  present?

6  A.  Yeah.

7  Q.  And that meeting was held at a different

8  location.  That was held at Chivo's work?

9  A.  Yeah.

10  Q.  What kind of work was Chivo doing?

11  A.  I think he did maintenance too.

12  Q.  So he was in maintenance too?  He was a

13  janitor too?

14  A.  Yeah.

15  Q.  He was a janitor for a mobile home park up in

16  Phoenix?

17  A.  I believe so.

18  Q.  So you went to his maintenance room, I guess,

19  and had the meeting there?

20  A.  Yeah, yeah.

21  Q.  At that meeting, you increased the weight of

22  cocaine from 50 kilograms to 65 kilograms; right?

23  A.  Yeah.

24  Q.  Did the FBI tell you to do that?

25  A.  No.

1   Q.   Did you do that all by yourself?

2   A.   Yeah.

3   Q.   You didn't check with the FBI first?

4   A.   No.

5   Q.   Now, why did you increase the weight to 65

6   kilograms?

7   A.   I don't know.  I just came up with a number in

8   the meeting, you know.

9   Q.   You just made it up yourself?

10   A.   Yeah.

11   Q.   And the FBI had no idea that you were going to

12   do that?

13   A.   No.  We said 50, and then when I meet them, I

14   said 65.

15   Q.   And you also added in 15 pounds of

16   methamphetamine?

17   A.   Yeah.

18   Q.   Did the FBI know you were going to do that?

19   A.   Yeah.

20   Q.   Did you talk to them about that first?

21   A.   No.

22   Q.   So they didn't tell you that was okay?

23   A.   They didn't say nothing to me, you know.

24   Q.   Okay.  You just did that on your own?

25   A.   Yeah.

1   Q.   At that same meeting, you added that Jose Juan

2   Esparragoza Jimenez, the son of El Azul, was going

3   to be there and that you could kidnap him?

4   A.   Yeah.

5   Q.   Did the FBI tell you to do that?

6   A.   No.

7   Q.   You didn't check with the FBI ahead of time?

8   A.   We talked about it.

9   Q.   They told you it would be okay?

10  A.   Yeah.

11  Q.   So the FBI said that you could throw in a

12  kidnap victim here?

13  A.   Well, he -- one of the guys brought it up

14  first, you know.

15  Q.   One of the FBI agents?

16  A.   No, no, no, no.  One of Chivo's friends.

17  Q.   Chivo's friend.  When did you first meet

18  Chivo's friend?

19  A.   I think the first week of February.

20  Q.   Okay.  At this meeting; correct?

21  A.   Yeah.

22  Q.   And this friend of Chivo's, that would be

23  Gollo?

24  A.   Yeah.

25  Q.   So prior to meeting Gollo on February the 4th,

1  you hadn't cleared any of this kidnapping business

2  with the FBI?

3  A.   No.

4  Q.   That just came up at the meeting?

5  A.   Yeah.

6  Q.   And you're the person who added that El Azul's

7  son is going to be there; right?

8  A.   Yeah.

9  Q.   Now, at some point you were saying that you

10  could get maybe $3 million ransom for El Azul's

11  son?

12  A.   Yeah, yeah.

13  Q.   Sometimes you said you might only get $2

14  million for El Azul's son?

15  A.   You know, I don't remember.

16  Q.   But it was pretty big money regardless?

17  A.   Well, yeah.

18  Q.   Now, you also said at the stash house there

19  would be $700,000 present from a buyer; is that

20  right?

21  A.   Yeah.

22  Q.   And whoever did the home invasion could steal

23  the $700,000 too; right?

24  A.   Yeah.

25  Q.   You had several conversations subsequent with

1  Chivo where you said there was going to be another

2  $30,000 in a fanny pack?

3  A.  Yeah.

4  Q.  And you were suggesting to Chivo that Chivo

5  could steal that $30,000, and you and he could

6  split it between the two of you; right?

7  A.  Yeah.

8  Q.  So you're working pretty hard to make sure

9  that Chivo stays involved in this operation?

10  A.  What do you mean?

11  Q.  You keep making this better and better as you

12  talk to these guys; is that right?

13  A.  Yeah.

14  Q.  Did you clear the $700,000 with the FBI, or

15  did you just make that up too?

16  A.  No.  I cleared it with them.

17  Q.  Prior to meeting Gollo on February 4th, you

18  cleared with the FBI $700,000 --

19  A.  No, no, because we never talked about the

20  $700,000 in Phoenix.

21  Q.  That was by telephone; right?

22  A.  Yeah.

23  Q.  And the FBI said, yeah, go ahead and tell them

24  that there's going to be $700,000 there?

25  A.  Yeah.

1  Q.  Did you talk to the FBI about the fact that

2  you were going to tell Chivo that there was another

3  $30,000 there that you could steal together?

4  A.  I believe so.  I don't remember that good, you

5  know.

6  Q.  You don't remember if the FBI told you that

7  would be okay?

8  A.  Yeah.

9  Q.  Is that "yeah," you don't remember?

10  A.  No, but I never do something on my own.  I

11  always have something like that, you know.

12  Q.  So did you get permission from the FBI first

13  or not?

14  A.  Yeah.

15  Q.  The FBI gave you permission to talk about the

16  $30,000 to Chivo?

17  A.  Yeah.

18  Q.  And you're positive of that?

19  A.  I believe so.

20  Q.  And who in the FBI gave you that permission?

21  A.  My handling agent.

22  Q.  I'm sorry?

23  A.  My handling agent.

24  Q.  Your handling agent.  And that would be

25  Special Agent Rubalcalva?

1  A.  Yeah.

2  Q.  Did Gollo ever tell you that he doesn't do

3  kidnapping and was not interested in kidnapping El

4  Azul's son?

5  A.  No.

6  Q.  At some point you told people that your cousin

7  would be at the stash house; is that right?

8  A.  Yeah.

9  Q.  And did the FBI tell you to do that?

10  A.  Yeah.

11  Q.  They said it was okay to say your cousin was

12  going to be there?

13  A.  Yeah.

14  Q.  And you got permission to say that your cousin

15  was going to be there from Special Agent

16  Rubalcalva?

17  A.  Yeah.

18  Q.  And you got that permission before you told

19  other people that your cousin would be present?

20  A.  I don't understand what you mean.

21  Q.  You got permission first?

22  A.  Well, yeah.

23  Q.  Now, you met with Chivo and also with Gollo

24  and Gollo's son Gollito and Andy later in February,

25  on about February 22nd.

1    Does that sound right to you?

2    A.   I believe so.

3    Q.   And that was the occasion when you added the

4    $700,000 to the deal?

5    A.   No.

6    Q.   You'd done that previously?

7    A.   No.

8    Q.   When did you do that?

9    A.   Do what?

10   Q.   Add $700,000.

11   A.   On March 2nd.

12   Q.   The first time you talked about $700,000 was

13   on March 2nd?

14   A.   Yeah.

15   Q.   Now, on February 22nd, Gollo said that his son

16   had once kidnapped three workers for Chapo Guzman;

17   is that right?

18   A.   I think so, he said that.

19   Q.   And I may be mixing up -- was it for Chapo

20   Guzman or was it for Macho Prieto?

21   A.   I think Macho Prieto.  Well, I don't remember,

22   because he said he did a few kidnappings, so I

23   don't know which one, but he told me they kidnapped

24   someone, you know.

25   Q.   But he didn't mention anything like that at

1  the February 4 meeting?

2  A.   Oh, yeah, he did.

3  Q.   He did at the February 4 meeting?

4  A.   Yeah.

5  Q.   You threw in the fact that the -- you said

6  that the feds have a $5 million bounty on El Azul;

7  is that right?

8  A.   Yeah.

9  Q.   Is that true, that they have a $5 million

10 bounty?

11 A.   Up to five.  I don't know.  You know, that's

12 what's in the posters.

13 Q.   And you got that information from the posters?

14 A.   Yeah.

15 Q.   Did you clear it with the FBI that you were

16 going to throw in the business about the $5 million

17 bounty?

18 A.   What do you mean $5 million?

19 Q.   On El Azul.

20 A.   I didn't say we're going to -- I didn't say

21 we're going to take Azul.  I said that's what

22 they'd pay.

23 Q.   So if there is a bounty on El Azul, you're

24 trying to convince these people that it would be

25 all right to kidnap his son too; correct?

1    A.    No.

2    Q.    You don't want to convince them to kidnap his

3    son?

4    A.    No.

5    Q.    You mentioned a few times the cocaine is

6    stamped "Versace."

7    A.    Yeah.

8    Q.    And that's a trademark within the business; is

9    that right?

10   A.    I believe so.

11   Q.    And that trademark is an indication that the

12   cocaine is really good cocaine?

13   A.    I don't know if it's good or not, but I know

14   they put stamps on, you know.

15   Q.    Now, you even mentioned that the cocaine is

16   oily.

17   A.    Yeah.

18   Q.    And you'll have to forgive my ignorance on

19   this matter.  Is oily cocaine especially good?

20   A.    I don't know.

21   Q.    Well, why would you tell them that the cocaine

22   was oily if that wasn't an indication that it's

23   especially good cocaine they're getting?

24   A.    I don't understand your question that way.

25   Q.    My question is, you're working pretty hard to

1 sell this whole episode to the people you're

2 talking to.

3 A.   You know, explain to them what the cocaine

4 looked like, you know.

5 Q.   And you're telling them how good it is.

6 A.   Yeah.

7 Q.   You tell them details about El Azul, like the

8 fact that he has a green light to kill; is that

9 right?

10 A.   Yeah.

11 Q.   You know what hotels he stays in in Nogales;

12 right?

13 A.   I don't know, you know.  No.

14 Q.   Well, you named them.

15 A.   Yeah.  I make them up.

16 Q.   When you told these people what cars El Azul

17 rides in, did you make that up too?

18 A.   Yeah.

19 Q.   Now, you had a lot of conversations with Chivo

20 on March 1st, the day before the arrest; is that

21 right?

22 A.   Yeah.

23 Q.   And by March 1st, Chivo still doesn't have a

24 gun; is that right?

25 A.   No.

1  Q.  Is that --

2  A.  I don't know, you know.  He wasn't with me.

3  Q.  He wasn't with you?

4  A.  Yeah.

5  Q.  What handgun did Chivo eventually get?

6          MR. LACEY:  Objection.  Relevancy, Judge.

7          THE COURT:  Overruled, if he knows.

8  BY MR. YOUNG:

9  Q.  He showed up with a .380; right?

10 A.  I don't know.  I never saw it.

11 Q.  On March 2, you talked to him about the gun

12 that he had?

13 A.  Yeah.

14 Q.  You talked to him about the gun at the

15 warehouse?

16 A.  Yeah.

17 Q.  And you and he had talked about he had gotten

18 a .380 for a home invasion?

19 A.  That's what he told me.

20 Q.  Now, I noticed that you told Chivo that a .380

21 was a big gun; is that right?

22 A.  No.

23 Q.  A .380 is actually a small gun, isn't it?

24 A.  Yeah.  I just said that he didn't have a big

25 gun.

Q.   So you said he didn't have a big gun?

A.   Yeah.

Q.   I got you.

     So the .380 is kind of a lady's gun; right?

          MR. LACEY:  Objection, Judge.  Relevancy.

          THE COURT:  Sustained.  It's a smaller

gun.

          MR. LACEY:  Smaller than an AK-47, we'll

stipulate.

BY MR. YOUNG:

Q.   Now, you recorded your meetings on February 4

and February 22 and March the 2nd.

A.   What did you say?

Q.   You recorded those meetings?

A.   Yeah.

Q.   And you had -- did you have some sort of

recorder that the FBI gave you?

A.   A digital device.

Q.   And you recorded them so that you could

remember later what was said?

A.   That I would use it to remember what they

said?

Q.   Yes.

A.   No.  It's not mine.  I gave it to them.

Q.   So that was also a reason that you recorded

1  it, was so that you could give it to the FBI?

2  A.   Yeah.

3  Q.   They could use those recordings in the

4  investigation; right?

5  A.   I believe so.

6  Q.   And the things that were said at those

7  meetings, they were going to be important?

8  A.   Yeah.

9  Q.   And they needed to be accurate?

10  A.   I don't know.

11  Q.   And your expectation was that the FBI might

12  need those recordings to use in court or in the

13  course of their investigation?

14  A.   I believe so.

15  Q.   Now, when you met with the people you met with

16  on December 29 and February 4 and February 22 and

17  March 2, you asked them a lot of questions; right?

18  A.   I don't remember, you know.

19  Q.   So you asked them questions and you found out

20  details about maybe prior robberies?

21  A.   Well, I didn't have to ask them.  They told

22  me.

23  Q.   Now, they told you after you told them other

24  things; right?

25  A.   Yeah.

1  Q.   And the reason that you were telling them

2  other things, like about cocaine and like about

3  methamphetamine, like about cash, like about

4  kidnapping victims, was you told them those things

5  so that they would tell you things.

6  A.   Yeah.  You blend in, you know.

7  Q.   And so when they were telling you things, they

8  were responding to what you were telling them?

9  A.   They was bragging.  I wasn't bragging.

10  Q.   You weren't bragging.  You were just lying to

11  them about things.

12  A.   Yeah.

13  Q.   And lying to them about things got them to

14  brag to you about other things?

15  A.   I believe so.

16  Q.   And you intended to do that so that you could

17  deliberately elicit their statements?

18  A.   What do you mean?

19  Q.   I mean get them to say things.  You wanted

20  them to say things.

21  A.   I didn't force them.  They talk on their own.

22  Q.   Well, I didn't say you forced them, but you

23  were trying to find things out, is what I'm

24  saying.

25  A.   Well, you blend in, you know.  What are you

1  going to do?

2  Q.   Yeah, but you wanted to find things out from

3  these people.

4  A.   Yeah.

5  Q.   And that was your reason for providing them

6  this information about this stash house?

7  A.   Yeah.

8  Q.   Jerome was not at the -- any of the planning

9  meetings in Phoenix, was he?

10  A.   Who?

11  Q.   Jerome Ranger?

12  A.   I --

13  Q.   You've never heard the name Jerome Ranger

14  before in your life, have you?

15  A.   I hear it before.

16  Q.   Where did you hear the name Jerome Ranger?

17  A.   Oh, no.  No, not that one.

18  Q.   You haven't heard that name, have you?

19  A.   No.

20  Q.   So Jerome Ranger, he was not at the February

21  29 meeting, was he?

22       MR. LACEY:  Objection.  The meeting wasn't

23  on February 29.  I think there is some confusion.

24       MR. YOUNG:  I'm sorry.  Too many

25  Februaries.  December 29.

1  A.  No.  I told you it was me, Chivo, and Roberto.

2  Q.  Now, Jerome Ranger, as far as you know, he was

3  not at the February 4 meeting, was he?

4  A.  No.

5  Q.  He was not at the February 22 meeting?

6  A.  No.

7  Q.  You never talked to Jerome Ranger about any

8  kind of drugs?

9  A.  Never.

10  Q.  You never talked to Jerome Ranger about any

11  kind of drug ripoff?

12  A.  No.

13  Q.  You never saw anyone talk to Jerome Ranger

14  about any kind of drugs?

15  A.  No.

16  Q.  Nobody ever told you they talked to Jerome

17  Ranger about any kind of drugs?

18  A.  No.

19  Q.  There is a place at 921 in the disclosure

20  where Chivo tells you that there are four black

21  guys, and with his friend, his brother-in-law, and

22  himself, that will make seven people going; is that

23  correct?

24  A.  I believe so.

25  Q.  Do you recall that conversation, four black

1   guys?

2   A.   Yeah.

3   Q.   Later you were told by Chivo that there were

4   no black guys going at all.

5   A.   Yes, he told me that.

6   Q.   He also told you that even Mayco was being set

7   aside because of the blacks that he associates

8   with.

9   A.   That what?

10   Q.   That Mayco was not being brought along because

11   he associates with blacks.

12   A.   I don't remember him saying that, you know.

13   Q.   You don't recall that conversation?

14   A.   I don't remember.  It's a year ago.

15   Q.   On March 2nd, you met with Gregorio Ruiz,

16   Gollo?

17   A.   Gollo.

18   Q.   And Chivo?

19   A.   Gollito.

20   Q.   Oh, I'm sorry.  Ruiz is Gollito.

21   A.   Yeah.

22   Q.   Gollo's son.

23        You met with Gollito and Chivo at the Food

24   City on South Sixth Avenue?

25   A.   Yeah.

1  Q.  And they were driving a gray Nissan Murano?

2  A.  Yeah.

3  Q.  Chivo rode with you to the warehouse, and

4  Gollito followed you?

5  A.  Yeah.

6  Q.  At the warehouse, you asked to see the rest of

7  the crew; is that right?

8  A.  Yeah.

9  Q.  So you wanted to see everybody who was

10 involved in the operation?

11 A.  Yeah.

12 Q.  And Gollito, he went back and he picked up

13 Andy Pineda and Yovani Valenzuela-Lopez and Mayco

14 Ledezma-Prieto; is that right?  Three people?

15 A.  Yeah.

16 Q.  Three people's all that came back with him?

17 A.  Yeah.

18 Q.  It looks like March 1st of 2011, you met with

19 Special Agent Rubalcalva and Special Agent Stacey

20 Gutierrez.

21     Do you recall that meeting?

22 A.  On March 1st?

23 Q.  It looks like on March 1st.

24 A.  Yeah.

25 Q.  And at that point you talked to them about the

1  February 22nd meeting?

2  A.   I don't remember.

3  Q.   Do you remember telling them that Chivo had

4  advised you that the blacks were no longer

5  participating and further advising you that Mayco

6  would also not be participating, due to his

7  affiliation with the black gang?

8  A.   I -- well, Gollo told me that the blacks are

9  not coming because he sent them to do another job.

10  That's all he told me.

11  Q.   And did he tell you that even -- now, I'm

12  talking about Chivo, what Chivo told you.

13  A.   I don't remember what Chivo told me, you know.

14  Q.   You don't remember Chivo telling you that

15  Mayco was going to be cut out due to his

16  affiliation with the black gang?

17  A.   I don't remember that one.

18  Q.   You told Special Agent Rubalcalva and Special

19  Agent Edwards and Special Agent Gutierrez, Stacey

20  Gutierrez, that you recalled the conversation where

21  Chivo had told you that the members of the home

22  invasion crew would be traveling in an Expedition

23  and an Escalade.

24       Do you recall telling them that?

25  A.   I don't remember.

1  Q.   You don't remember telling them that?

2  A.   It's a year ago, you know.

3  Q.   Do you remember telling them that on March

4  8th, which was six days after the arrest?

5          MR. LACEY:   I'd object to relevancy,

6  Judge, as far as March 2nd.  It's six days after.

7          THE COURT:   Sustained.

8  BY MR. YOUNG:

9  Q.   Was that the first time you told them that?

10  A.   I don't remember.

11  Q.   Do you recall ever telling them that the home

12  invasion crew would travel in an Expedition and an

13  Escalade?

14  A.   I think he had told me something, but I don't

15  know what day, what day or nothing.

16  Q.   Now, your communications with Chivo, those

17  were recorded; right?

18  A.   Yeah.

19  Q.   So we would know what got said?

20  A.   Yeah.

21  Q.   And your telephone conversations with Chivo,

22  those were recorded?

23  A.   Yeah, all of them.

24  Q.   And your text messages with Chivo, those were

25  saved?

1    A.    I believe so.

2    Q.    And in none of your text messages and none of

3    your recorded phone calls and none of the recorded

4    meetings does anybody ever say anything about

5    traveling in an Expedition and an Escalade, do

6    they?

7    A.    I just don't remember, you know.

8    Q.    And so you didn't have any conversations with

9    Chivo that were not recorded, did you?

10    A.    No.

11    Q.    So if Chivo told you this, it must be recorded

12    someplace; right?

13    A.    It would have to be.

14    Q.    You just don't know where it would be because

15    you don't have the recordings; right?

16    A.    I don't have it no more.

17    Q.    You give them to the FBI?

18    A.    Yeah.

19    Q.    Now, you had a conversation back on February

20    14th by telephone with Chivo.

21         Do you remember that?

22    A.    What about?

23    Q.    Do you remember asking Chivo who would be

24    coming, and Chivo told you it would be you, him,

25    his brother-in-law, Gollito, Mike or maybe Mayco,

1    Shaquille, and one or more blacks.  He's not really

2    sure how many more.

3         Do you recall that conversation?

4    A.   I don't remember, but -- you know.

5    Q.   So at that point he's thinking maybe just one

6    black would be --

7              MR. LACEY:   Objection as to what he was

8    thinking, Judge.

9              THE COURT:   Rephrase your question.

10   BY MR. YOUNG:

11   Q.   At that point he told you maybe just one black

12   was coming.

13   A.   He told me one black is coming?

14   Q.   He told you maybe one black was coming.

15   A.   I don't remember, you know.

16   Q.   At -- 629, still talking to -- page 629, still

17   talking to Chivo, on the same day, Chivo told you

18   that the black guys were his neighbors; is that

19   right?

20   A.   Yeah.  He told me he has some black neighbors.

21   Q.   Okay.  And you understood that the black guys

22   that were coming, those would be Chivo's neighbors?

23   A.   No, because he told me some other things, you

24   know.  I didn't know who was coming.

25   Q.   But as -- if there were black guys coming,

1  they would be Chivo's neighbors; right?

2  A.   I don't know.

3  Q.   Did Chivo tell you that the black guys are his

4  neighbors?

5  A.   He told me he had neighbors.  They're black.

6  He didn't tell me they're his neighbors.  He just

7  told me that, that his neighbors are black.  He

8  told me that.

9  Q.   When you and Chivo were talking about the

10 black guys having guns and having vests, Chivo said

11 that the black guys were his neighbors; is that

12 correct?

13 A.   But what black guys?

14 Q.   The black guys that Chivo was talking about.

15 A.   Well, he was talking about some black guys.  I

16 don't know who he was talking about.

17 Q.   Would there be a reason that Chivo was talking

18 to you about his black neighbors if they were not

19 coming on the home invasion?

20 A.   I don't know.

21 Q.   So is it fair to say that the -- that the

22 black guys that you were expecting, if any, would

23 be Chivo's neighbors?

24 A.   I don't know.  They never told me -- well,

25 they never gave me a list of who's coming, you

1   know. They gave me so many names, you know, like I

2   had an invitation to give me the names, you know.

3   Q. Now, during part of the meeting on February 4,

4   Chivo says that his brother-in-law would be coming,

5   along with himself, Gollito. He said Mayco would

6   be coming, and he said two black guys would be

7   there and another friend of Gollito's.

8      Is that right?

9   A. I don't remember but I think so.

10   Q. So sometimes there was a conversation about

11   two black guys coming?

12   A. Well, I told you, they told me so many people

13   were coming. I didn't know who was coming.

14   Q. Later on, at page 636, Gollo said he's not

15   going to bring the blacks, they'll use some other

16   guys, and you told them that would be a good idea

17   because blacks are more tricky.

18      Is that right? Do you recall that?

19   A. I -- yeah.

20   Q. So Gollo told you he's not bringing blacks at

21   all; right?

22   A. Yeah.

23   Q. And then you told Chivo the black guys aren't

24   coming; right?

25   A. I told them what Gollo said.

1  Q.  Later on you ask if Mayco's coming, and Gollo

2  says he doesn't think so.  They'll send other

3  guys.  This way they don't involve the blacks.

4      Right?

5  A.  No.  He told me the blacks only are not coming

6  because they went up north to do another job.

7  That's what he told me.

8  Q.  Now, when you were meeting at the warehouse on

9  March 2nd, you said you wanted to meet all the guys

10  so they don't screw you over; right?

11  A.  Yeah.

12  Q.  And Chivo said it would be a good idea for

13  them to meet you and that he would tell Mayco to

14  bring all the guys; is that right?

15  A.  Yeah.

16  Q.  Mayco didn't show up with any blacks, did he?

17  A.  No.

18  Q.  No blacks came to the warehouse?

19  A.  No.

20  Q.  Now, at page 720, you asked about the black

21  guys, and you were told that none of the black guys

22  were coming.

23      This was on March 2nd, the day of the arrest

24  at the warehouse.

25  A.  Can you repeat that again.

1   Q.   On March 2nd, at the warehouse, you asked
2   about the black guys and said that you were told
3   that no black guys were coming, and Chivo told you
4   it would only be Mexicans.
5   A.   No.
6   Q.   Chivo did not tell you on 720 that it would
7   only be Mexicans on March 22nd?
8   A.   No.  He told me there was some blacks.
9   Q.   Did you tell him that you had been told none
10  of the blacks were coming?
11  A.   Yeah, but I told you, they told me so many
12  things, you know.
13  Q.   And then after you said that, Chivo said it
14  will only be Mexicans then; right?
15  A.   What date?
16  Q.   March 2nd, at the warehouse.
17  A.   No.  He told me there was some blacks.
18  Q.   So you would disagree that Chivo told you at
19  the warehouse that it would only be Mexicans?
20  A.   I asked him, the black guy in Phoenix, and he
21  told me yes.
22  Q.   But Chivo told you that he wouldn't be using
23  him?
24  A.   They told me so many things, like I told you.
25  Q.   One of the things that they told you, on page

1    723, Chivo said, "All he's bringing is six guys";

2    right?

3    A.   What did he say?

4    Q.   Chivo said, "All he is bringing are six

5    guys."

6    A.   Yeah.  He -- yeah.  He said that.  He told me,

7    you know.

8    Q.   Now, eventually, at the meeting at the

9    warehouse on March 2nd, the FBI blew the door off

10   the hinges and ran into the building; right?

11   A.   Yeah.

12   Q.   And the door landed out in the middle of the

13   room?

14   A.   Yeah.

15   Q.   Right before the FBI blew the door off the

16   hinges, you told the others that five more people

17   had arrived at the stash house.

18        Do you recall that?

19   A.   Yeah.

20   Q.   And everybody started wondering what they

21   should do.

22        Do you recall that?

23   A.   Yeah.

24   Q.   Now, Yovani, he thought that they should still

25   go to the stash house; right?

1  A.   All of them, not only Yovani.

2  Q.   Now, Chivo, he said that you should probably

3  go to the house and check things out?

4  A.   Yeah.

5  Q.   Yovani agreed and said that they should not go

6  in without a plan.  They should think things

7  through.

8       Do you remember that?

9  A.   I don't remember but he probably did, you

10  know.

11  Q.   So Yovani and Chivo, they were thinking that

12  maybe they should make a plan if there's going to

13  be five people in there.

14  A.   They said they didn't care how many people

15  were there.

16  Q.   Now, Mayco, he said that they should go in

17  quickly.  He's the one that didn't care; right?

18  A.   I think all of them didn't care, but he looked

19  more anxious, you know, to go.  Everybody was

20  really anxious.

21  Q.   So everybody was -- well, everybody except

22  Mayco.  Everybody else was wondering what they

23  should do when you told them there were five more

24  people there; right?

25  A.   What do you mean?

1  Q.  They're thinking about whether or not to go do

2  this or not because there's five more people

3  there.

4  A.  Well, they never told me they weren't going to

5  do it no more.

6  Q.  But they told you they were going to think

7  things through; right?

8  A.  I don't remember.

9  Q.  Now, in the course of thinking things through,

10  one of the things that they might think of is not

11  to do this because there's too many people there?

12  A.  I don't know.

13  Q.  We didn't find out because the FBI blew the

14  door off the hinges at that point; right?

15  A.  They never told me that, well, we're going to

16  go back home, you know, or tell me, we don't want

17  to do this no more.

18      They told me, let's go, let's go.  We want to

19  see the place.

20  Q.  On page 729, still at the warehouse, Chivo

21  told you there were six guys; right?

22  A.  No.  In the warehouse?

23  Q.  Yes.

24  A.  No.  He told me there were 15.

25  Q.  Chivo says they brought a lot of people.  You

1  say that is a problem.  Chivo says there are six

2  guys.

3      Would you disagree with that interpretation of

4  what happened at the warehouse?

5  A.  I just don't remember that good, you know.  It

6  was at the moment, you know, everything.

7  Q.  On pages 916 and 917, you were talking to

8  Chivo by telephone at 9:05 the morning of March

9  2nd.

10     You said that Gollo told you that he was going

11  to bring a black dude; is that right?

12  A.  I don't remember if he said it.

13  Q.  Is that what Gollo told you?

14         MR. LACEY:  Objection.  He just said he

15  doesn't remember.

16         THE COURT:  Sustained.

17  BY MR. YOUNG:

18     Q.     On February 22, at 7:46 in the evening,

19  you had a phone call with Chivo, and Chivo told you

20  that, on February 22, in the phone call, that Mayco

21  was set aside because of the blacks he was

22  associated with.

23     Do you remember that?

24  A.  I don't remember.

25  Q.  You don't remember that?  Is it possible that

1    you were told that?

2    A.   I don't remember.

3    Q.   Gollito, Gollo's son, he was kind of running

4    the operation for his father on March the 2nd. Do

5    you recall that?

6    A.   That's what Gollo said.

7    Q.   Now, Gollito, he said on a phone call to you

8    at 11:47 on March 2nd, he said his father didn't

9    send the black dudes.

10       Do you recall that conversation with Gollito?

11    A.   I don't remember.

12    Q.   Chivo and Gollito, they're kind of running

13    things, aren't they?

14    A.   I don't know who was running the whole thing.

15    You know, they told me one thing, but I didn't know

16    who was running the deal.

17    Q.   So you don't recall Gollito telling you that

18    his father didn't send the black dudes?

19    A.   They told me too many things, like I told you

20    before. They told me -- they told me who's coming,

21    who's not coming. I didn't know for sure.

22    Q.   I'm just asking you about one particular thing

23    that they told you. Do you recall being told that?

24    A.   I don't remember.

25    Q.   On the evening of March the 2nd, after the

1   arrest, Chilango called you.  Talked to Chilango by

2   telephone?

3           MR. LACEY:  Objection.  Relevancy.  After

4   arrest.

5           THE COURT:  Sustained.

6   BY MR. YOUNG:

7   Q.  Now, your meeting on February 4, that was

8   recorded.  Do you recall that?

9   A.  February what?

10  Q.  February 4.

11  A.  Where at?

12  Q.  That would have been at Chivo's work.

13  A.  Oh, yeah.

14  Q.  There was a black guy who was present at that

15  meeting.  Do you remember that?

16  A.  Yeah.

17  Q.  Do you see that black guy in the courtroom

18  today?

19  A.  Yeah.

20  Q.  You do?

21  A.  Yeah.

22  Q.  Now, let me ask you, has the Government shown

23  you a photograph of the black guy?

24  A.  Yeah.  I think so.  Yeah.

25  Q.  When did they show you that photograph?

1  A.   I don't remember.  It was a year ago.

2  Q.   Have they shown you the photograph recently?

3  A.   Yeah.

4  Q.   How recently?

5  A.   Probably like three weeks ago, something like

6  that.

7  Q.   Three weeks ago they were showing you a

8  photograph of the black guy who was at the meeting

9  on February 4th?

10  A.   Yeah.

11  Q.   Was it an 8-by-10 picture?  Took up a whole

12  sheet of paper?

13  A.   I don't know what size you're talking about,

14  you know.

15  Q.   This size (indicating)?  Was it this size?

16  A.   I don't remember if it's as big or smaller,

17  you know.

18  Q.   How many pictures were there on one sheet of

19  paper?

20  A.   I don't remember how many.

21  Q.   Just one picture on one sheet of paper; right?

22  A.   If you say one page, you know, one page.

23  Q.   Now, at the meeting on February 4th, in the

24  presence of the black guy, you refer to the blacks

25  as monkeys and niggers, don't you?

1    A.    I didn't call them monkeys.

2    Q.    You didn't call them monkeys?

3    A.    No.

4    Q.    Gollo started by calling them monkeys.  Do you

5    recall that?

6    A.    Yeah.

7    Q.    And then Gollo called them niggers?

8    A.    I believe so.

9    Q.    And this was right in front of the black guy;

10   right?

11   A.    Yeah.

12   Q.    And he didn't have any idea what you were

13   talking about?

14   A.    I don't know if he understand or not.

15   Q.    At one point during that meeting, on page 19

16   of the transcript of that meeting, you asked Mayco,

17   you asked, "Does he speak Spanish or not?"

18         And Mayco told you, "No, he's black."

19         Do you remember that?

20   A.    Yeah.

21   Q.    Why did you want to know if the black guy

22   spoke Spanish?

23   A.    Why?  Well, he was right there, you know.  I

24   just wondered, did he speak Spanish or not?

25   Q.    Page 22, Gollo went on to call them monkeys

1   again.  Do you remember that?

2   A.   I don't remember but he probably did.

3   Q.   At page 23, right in front of the black guy

4   that was there, he said, "We sent the niggers."

5   A.   Who said that?

6   Q.   Gollo.

7   A.   He probably did.  I don't remember.

8   Q.   Page 24, he said, "That's why we bring the

9   niggers," right in front of the black guy; right?

10  A.   Well, he told me they're bringing the blacks

11  because they look like -- you know, so nothing

12  comes back to the Mexicans.

13  Q.   On page 25, we get down to you actually

14  talking, and you say, "The fucking blacks are

15  rats."

16       Do you recall saying that?

17  A.   I don't remember, but if it's in there, I said

18  it.

19  Q.   And at that point, Chivo says, "Trust the

20  niggers."

21       This is all in front of the black guy that's

22  there; right?

23  A.   What day?

24  Q.   And then Gollo goes on to say, "Is he a

25  nigger?"

1  A.  Who said that?

2  Q.  Gollo.

3  A.  I don't remember.

4  Q.  At page 26, you go on to say, "What I'm saying

5  is be careful with these fucking niggers."

6      Those are your words.  Do you recall those

7  words?

8  A.  I don't remember, but if it's in there, I said

9  it.

10  Q.  You were able to say that right in front of

11  the black guy?

12  A.  Yeah.

13  Q.  And he didn't understand a word that you were

14  saying?

15  A.  I don't know if he understand or not, you

16  know.

17  Q.  Let me ask you, did you ever tell Special

18  Agent Edwards or Special Agent Rubalcalva that you

19  received a telephone call from Chelo?  Do you know

20  which Chelo?

21  A.  I do know him.

22  Q.  Did you ever tell the agents that you received

23  a call from Chelo and that some of the guys who

24  were arrested were not part of it?

25      This is at page 3865 of the disclosure.

1  A.  I don't know what you're talking about.  You

2  know, I don't know where that came up.

3  Q.  You don't --

4  A.  When did they talk to Chivo after the arrest?

5  Q.  And after the arrest, as part of the

6  outrageous Government conduct motion, did you relay

7  to any of the agents that Chelo told you that he

8  felt that some of the guys who were arrested were

9  not part of it?

10 A.  I don't know how he talked to Chivo.

11         MR. LACEY:  Objection, Your Honor.

12         THE COURT:  His answer may stand.

13 BY MR. YOUNG:

14 Q.  You don't recall?

15 A.  When Chivo got arrested?  What are you trying

16 to say?

17 Q.  When you talked to Chelo on the phone on March

18 15?

19 A.  How do I talk to him?  He was in jail on March

20 15.  He didn't call me from jail.

21 Q.  It says, "Chelo tells CHS that he feels some

22 of the guys who were arrested were not part of

23 it."

24      Do you recall that conversation on 3/15?

25 A.  I didn't talk to Chivo March 15th.

1   Q.   You didn't talk to him?

2   A.   Well, he was in jail.

3   Q.   Would you have talked to somebody else that

4   was identifying themselves as Chelo?

5   A.   I don't remember.

6   Q.   And just so we know who we're talking about,

7   Chelo, is that Marcelo Ramirez?

8   A.   I don't know who you're talking about.

9   Q.   Do you know Chelo?

10  A.   Chelo?  I know him by Chelo.  I don't remember

11  his first name.

12  Q.   Maybe I'm pronouncing it wrong.  Chelo?

13  A.   Oh, okay.  Repeat the question again.

14          THE COURT:  You mean all of this has been

15  because you mispronounced the name?

16          MR. YOUNG:  I took first-year Spanish a

17  lot of times, Your Honor.

18          THE COURT:  Yeah, you probably did take it

19  a lot of times.

20  BY MR. YOUNG:

21  Q.   Chelo, on March 15, do you know --

22  A.   Chivo?

23  Q.   Chelo, Chelo.

24  A.   Oh.

25  Q.   C-h-e-l-o.

1    A.    Okay.  Go ahead.

2    Q.    That would be Chelo; right?

3    A.    Yeah.

4    Q.    Talking to Chelo on March 15, he told you that

5    some of the guys that were arrested were not

6    involved in it?

7    A.    I don't remember.

8    Q.    You don't remember talking to him about that?

9    A.    It was a year ago.

10    Q.    Okay.  Do you recall ever relaying that kind

11    of information on to the agents in this case?

12    A.    He told me the other people who got arrested

13    were black.  That's all he told me.

14    Q.    Do you recall him telling you that he thought

15    some of the people who were arrested were not

16    involved?

17    A.    I don't remember.

18    Q.    At pages 244 and 245, it looks like you had a

19    meeting with Special Agent Rubalcalva, and at that

20    meeting, you described --

21              THE COURT:  When?

22              MR. YOUNG:  I'm sorry?

23              THE COURT:  What meeting?  When?

24              MR. YOUNG:  It looks like the date of this

25    contact was February 4 of 2011.

1    BY MR. YOUNG:

2    Q.   You had a meeting with Special Agent

3    Rubalcalva immediately after the meeting that you

4    had with some of the conspirators.

5    A.   Yeah.

6    Q.   So after that meeting, you met with Special

7    Agent Jon Edwards, Special Agent Stacey Gutierrez,

8    and Special Agent Gerald Rubalcalva?

9    A.   Yeah.

10   Q.   Had you described to them the black male that

11   was at the meeting?

12        Is that right?

13   A.   Yeah.

14   Q.   And you described him as being six feet tall,

15   weighing 175 pounds?

16        Do you recall that?

17   A.   Yeah.

18   Q.   You advised that he was dressed all in black

19   and had a nylon stocking on his head covered by a

20   baseball cap?

21   A.   Yeah.

22   Q.   You advised that, in addition to being 175

23   pounds, that the black male was from Tucson.

24        Do you recall telling them that?

25   A.   Yeah.

1    Q.   Who told you that the black male was from

2    Tucson?

3    A.   Mayco.

4    Q.   Mayco told you that?

5    A.   Yeah, yeah.

6    Q.   I'm mispronouncing his name too, aren't I?  I

7    apologize.  Mayco.

8    A.   Yeah, something like that.

9    Q.   So Mayco told you that the black male who was

10   there was from Tucson?

11   A.   Yeah.

12   Q.   You had a subsequent meeting with Special

13   Agent Jon Edwards and Special Agent Stacey

14   Gutierrez and Special Agent Gerald Rubalcalva on

15   February 14 of last year.

16   A.   Where?

17   Q.   I don't know where.

18   A.   Can you repeat that again?

19   Q.   On February 14.

20   A.   What -- can you repeat the question?

21   Q.   The question was, 10 days after the February 4

22   meeting, on the 14th, you had another meeting with

23   the agents?

24   A.   I don't remember but I probably did.

25   Q.   And at that meeting, they showed you a picture

1  of a black male.  Do you recall that?

2  A.  I don't remember.

3  Q.  Do you recall them showing a picture of

4  Ghermon Tucker?

5  A.  I don't remember, you know, exactly what day

6  or whatever.

7  Q.  It was a long time ago, wasn't it?

8  A.  Yeah, a year ago, or more than a year.

9  Q.  And you told them that you believe that Tucker

10  was the black male that you were introduced to on

11  February 4; is that right?

12  A.  If it's there, you know, I did.

13  Q.  You told them you believed it.  You didn't say

14  you were certain; right?

15  A.  Yeah.

16  Q.  You did point out that, when you met with the

17  black male, when you saw the black male on February

18  4, he didn't have any facial hair when you saw him?

19  A.  I don't remember.

20        MR. YOUNG:  That's all I have, Your Honor.

21        THE COURT:  Let's take 10 minutes.  We'll

22  be right back.  Only 10.

23        (Off the record.)

24        THE COURT:  Go ahead, Mr. Cooper.

25        MR. COOPER:  Thank you, Your Honor.

1  DIRECT EXAMINATION

2  BY MR. COOPER:

3  Q.  Good afternoon, sir.

4  A.  Hi.

5  Q.  How are you doing today?

6  A.  So far so good.

7  Q.  Okay.  We'll see how that continues.  All

8  right?

9  A.  Yeah.

10  Q.  Listen, I tried to write down things that you

11  were saying, but I'm -- because of my advanced age,

12  I'm not that quick, so I need to cover a couple

13  things again.  Okay?

14  A.  That's fine.

15  Q.  Okay.  Your name is Antonio Gutierrez?

16  A.  Yeah.

17  Q.  And what was your middle name?  Did you say?

18  A.  I don't have a middle name.

19       MR. LACEY:  Objection.  Relevancy, Your

20  Honor.

21       THE COURT:  He doesn't have a middle name,

22  he said.

23  BY MR. COOPER:

24  Q.  Okay.  And how much education do you have,

25  sir?

```
1   A.   High school.

2   Q.   High school graduate?

3   A.   Yeah.

4   Q.   Okay.  And you said, I think, that back in

5   2010 you were working as a manager of a -- was it

6   your own company?

7   A.   No.

8   Q.   What kind of company was it?

9   A.   For maintenance.

10  Q.   A company that basically did janitorial work?

11  A.   Yeah.

12  Q.   And you were a supervisor of a crew of

13  janitors?

14  A.   Yeah.

15  Q.   Okay.  And how many people did you supervise?

16  A.   It was like 50, 60, you know.

17  Q.   15.  Okay.

18  A.   No, 50.

19  Q.   Okay.  You had 50 janitors under your control?

20  A.   Yeah.

21  Q.   Okay.  And how long had you done that sort of

22  work?

23  A.   I think three years.

24  Q.   Three years?  Okay.  And what did you do

25  before becoming a janitor?
```

1  A.  I worked for an electrician.

2  Q.  Okay.  You were an electrician?

3  A.  Like, helper.

4  Q.  Helper.  Okay.  And so have you done mostly

5  construction-type work most of your life?

6  A.  Not most of my life.  I've done -- I don't

7  know.  And then I sold cars.

8  Q.  You sold cars?

9  A.  Yeah.

10  Q.  Okay.  And how long did you do that?

11  A.  Like a year.

12  Q.  And prior to selling cars?

13  A.  I work in Target.

14  Q.  Target?

15  A.  Yeah.

16  Q.  Okay.  There's a little bit of a confusion

17  over the agency that you were working for at

18  various times, and I'd like to ask you about when

19  was it that you started working for the DEA?  What

20  year?

21  A.  Probably 2000.  Around there, I think.

22  Q.  The year 2000?

23  A.  Yeah.  I don't remember but I think 2000.

24  Q.  So by the time you met Agent Edwards over

25  here, you had been an informant, a Government

1    informant, for about 10 years.

2         Is that fair to say?

3    A.   Yeah.  Yeah, probably I did.

4    Q.   Okay.  And you know, I'm not -- I'm not a

5    prosecutor, so I don't know how all these things

6    work, but it's my understanding that, at some

7    point, if you sign up and you get paid, you sign a

8    contract of some sort with the Government.

9         Is that fair?

10   A.   I don't sign a contract.

11   Q.   So you never sat down with the Government and

12   said -- and they said here's your contract to be an

13   informant, sign it, here's the rules we have?

14        Nothing like that happened?

15   A.   I signed a paper, you know, you can't do

16   nothing illegal, lie, you know.

17   Q.   Okay.  Well, you signed the paper.  It might

18   not have been a contract, but it was something that

19   had, in writing, what the conditions were of your

20   employment.

21        Is that fair?

22   A.   No, because it doesn't say I'm going to get

23   paid.

24   Q.   It doesn't say you're going to get paid?

25   A.   No.

1   Q.  Well, who told you you were going to get paid?

2   A.  They don't tell you you're going to get paid.

3   Q.  So when you volunteered to work for the DEA in

4  the year 2000, you didn't know if you were going to

5  get paid?

6   A.  They never promised you money.

7   Q.  Well, did they say you were going to do it

8  just because you're a good American?

9   A.  No, you know.  They never told me you're going

10  to get paid or not.  They never told me that.

11   Q.  Okay.  So what was your reason for deciding,

12  then, to become an informant in the year 2000 to

13  start off, if it wasn't money?

14   A.  I like -- I put bad people in jail, you know,

15  and I like the excitement.

16   Q.  You like putting bad people in jail?

17   A.  I like putting bad people in jail, and I like

18  the excitement.

19   Q.  You like the assignment?

20   A.  Excitement.

21        THE COURT:  Excitement.

22        MR. COOPER:  Excitement.  I'm sorry.

23  Excitement.  Okay.

24  BY MR. COOPER:

25   Q.  And at some point, however, between 2000 and

1  2010, I was a little bit unclear.  I think you

2  indicated you had been arrested --

3  A.   Yeah.

4  Q.   -- in that period of time; right?

5  A.   Yeah.

6  Q.   About when was that?

7  A.   I think two or three, something like that.

8  Q.   2003 or 2004?

9  A.   Two or three, I think.

10  Q.   Okay.  So about three years after you started

11  working for the DEA, you got arrested?

12  A.   Yeah.

13  Q.   And was the arrest because of your work for

14  the DEA?

15  A.   Kind of.

16  Q.   Well, I don't understand "kind of."  Could you

17  explain?

18  A.   Yeah.

19  Q.   Okay.  And what happened to the -- so you were

20  being prosecuted by the federal government sometime

21  in 2003 or 2004?

22  A.   I didn't get prosecuted.

23  Q.   Okay.  After you got arrested, the charges got

24  dismissed?

25  A.   Dropped.

1    Q.   Pardon me?

2    A.   Dropped.

3    Q.   Dropped?

4    A.   Yeah.

5    Q.   Dropped.   Okay.

6         Now, before the charges had been dropped in

7    2004, had you been paid by the DEA?

8    A.   Yeah.

9    Q.   And how much -- you indicated previously that

10   you'd been paid over $70,000, $75,000, just in this

11   case alone; is that correct?

12   A.   Yeah.

13   Q.   Okay.   In the decade that you worked for the

14   DEA before meeting Agent Edwards, how much money

15   had you made as an informant?

16   A.   With DEA?

17   Q.   With DEA.

18   A.   I think close to 35,000.

19   Q.   35,000?

20   A.   Yeah.

21   Q.   So the FBI pays a lot better than the DEA; is

22   that correct?

23   A.   Yeah.

24   Q.   Okay.   And is that why you made the change?

25   A.   No.

1  Q.  Well, so you'd been paid -- by 2004, you'd

2  been paid how much money?

3  A.  I don't know.  Close to 200,000, you know.  I

4  don't know.

5  Q.  I couldn't understand.

6  A.  Close to 200 -- more than 200,000.  Around

7  that area.

8  Q.  200,000?

9  A.  I think so.

10  Q.  That's in the 10 years you got paid 200,000?

11  A.  Well, you said --

12        MR. LACEY:  Your Honor, I think there is

13  some confusion as to when he -- it's not clear as

14  to when he left DEA and started working for the

15  bureau.  Perhaps we can clarify that.  There's some

16  confusion here.

17        MR. COOPER:  I'm not confused.

18        MR. LACEY:  I'm confused and maybe the

19  witness is too.

20        THE COURT:  Try it again.

21  BY MR. COOPER:

22  Q.  Okay.  You started with the DEA in the year

23  2000?

24  A.  Yeah.

25  Q.  Okay.  And you switched over to Agent Edwards

1  and the FBI in about 2010; right?

2  A.   No.

3  Q.   When did you switch to the FBI?

4  A.   2004.

5  Q.   2004 you went to the FBI?

6  A.   Yeah.

7  Q.   Okay.  In the 2000 to 2004 period, you had

8  made how much money?

9  A.   Around 36,000.

10  Q.   Okay.  From 2004 until now, I think you just

11  said you've made another 200,000; is that right?

12  A.   No, no, no, no.  I told you, with DEA, around

13  36,000.

14  Q.   Okay.

15  A.   And with the FBI, it's around 200,000.

16  Q.   Well, that's all I'm asking.  You've been with

17  the FBI since 2004; right?

18  A.   Yeah.

19  Q.   And since that time you've made 200,000?

20  A.   Around there, yeah.

21  Q.   So in the 11 years that you've been an

22  informant, the total amount that you've made is

23  about 230,000 -- 235,000; right?

24  A.   Yeah.

25  Q.   Okay.  And 75,000 of that is in this case

1  where you, I guess, were responsible for the

2  arrests of about 15 people.

3      Is that right?

4  A.   I don't know how many people, but yeah.

5  Q.   Okay.  So we got -- just so we got that clear,

6  235,000 in the 11 years; right?

7  A.   Yeah.

8  Q.   Okay.  And all of that has been in cash;

9  right?

10  A.   Yeah.

11  Q.   And does the handling agent, either Rubalcalva

12  or Agent Edwards or anybody else -- who is in

13  charge of making certain that you pay taxes on

14  that?

15  A.   I gotta sign the paper and I gotta pay taxes.

16  Q.   Well, I understand.  We all have to sign

17  papers.  But you signed a paper that says you will

18  pay taxes.  Who makes sure that you do?

19  A.   Nobody.

20  Q.   Okay.  So that means Agent Edwards here or

21  Rubalcalva would have to trust that you've paid

22  taxes on that 230,000 right; yeah?

23  A.   Yeah.

24  Q.   Okay.  The arrest that took place in about

25  2004, that's about the same time that you went over

1  to work for the FBI; right?

2  A.   No --

3        MR. LACEY:  Objection.  It was 2003, 2003.

4        THE WITNESS:  2003.

5        MR. COOPER:  Well, I wouldn't know.  It

6  hasn't been disclosed.

7        THE COURT:  He said 2003 a while ago when

8  he testified.

9        MR. COOPER:  Oh, okay.

10  BY MR. COOPER:

11  Q.   So that arrest, was that a reason why you went

12  to work for the FBI?

13  A.   No.

14  Q.   It had nothing to do with it?

15  A.   No.

16  Q.   Did anybody from the FBI or the Government

17  indicate, well, you can certainly work off charges

18  for the Government?

19  A.   No.

20  Q.   So they're totally unrelated?

21  A.   Yeah.

22  Q.   Okay.  And prior to that arrest in 2003, had

23  you ever been arrested before?

24  A.   Never.

25  Q.   No criminal history whatsoever?

1    A.   No.

2    Q.   Okay.  And you filed federal income taxes in

3    2010 and 2011?

4    A.   It would be this year.

5    Q.   Well, let's try 2009 and 2010.

6    A.   Yeah, I did my taxes last year.

7    Q.   Okay.  Are you able to estimate about how many

8    cases you've worked for the Government?

9    A.   No.  How many cases I did?

10   Q.   Yeah, how many cases you did.

11   A.   I don't remember.

12   Q.   You don't know how many?

13   A.   No.

14   Q.   Well, how about since 2004 with Rubalcalva as

15   your handler?

16   A.   I don't remember how many cases.

17   Q.   Okay.  And by a case, I mean, where you're

18   actually talking to somebody and they wind up

19   getting arrested.  How many people have been

20   arrested because of your work?

21   A.   I don't know.  I don't keep a count, you know.

22   Q.   You don't keep a count?

23   A.   No.

24   Q.   Okay.  Do you think Mr. Rubalcalva might?

25   A.   I don't know.

1    Q.    Okay.    The period of the end of 2010, from

2    November through -- of 2010 through March the 2nd

3    of 2011 was a period in which you became involved

4    in the case for which we are here; right?

5    A.    Yeah.

6    Q.    Okay.    During that period, did you drink any

7    alcohol?

8    A.    No.

9    Q.    You don't drink at all?

10   A.    No.

11   Q.    Never?

12   A.    Maybe one glass, you know, but I don't drink.

13   Q.    Okay.    Have you ever had any kind of a

14   drinking problem?

15   A.    No.

16   Q.    Okay.    How about drugs?    Ever do any drugs?

17   A.    No.

18   Q.    Never?

19   A.    No.

20   Q.    Okay.    I know that in the last 11 years or so

21   you haven't had money problems, but have you ever

22   filed for bankruptcy, had that kind of money

23   problems?

24   A.    I don't know what you mean.

25   Q.    Well, have you ever filed for bankruptcy?

```
 1    A.   No.

 2    Q.   You have not?

 3    A.   No.

 4    Q.   Who introduced you to Chivo.  Do you remember?

 5    A.   Roberto.

 6    Q.   And do you know what Roberto's last name is?

 7    A.   Del Sol (sic).

 8    Q.   And about when did that happen, that you were

 9    introduced?

10    A.   Last year.  I think November, December, around

11    there, November, December.

12    Q.   Well, last year's 2011.  Are you meaning in

13    2010?

14    A.   I think 2010, yeah.

15    Q.   Okay.  Do you remember where you first met

16    him?

17    A.   In -- who?

18    Q.   Chivo?

19    A.   Oh, in a parking lot in Albertsons.

20    Q.   A parking lot at Albertsons?

21    A.   Yeah.

22    Q.   I'd like to jump ahead.

23         The February 4 meeting that we were talking

24    about before the break, do you remember that?

25    A.   Yeah.
```

1   Q.   February 4th, where I think it was at about

2   the 8000 block of South Seventh Street.

3   A.   Is that where Chivo works?

4   Q.   Right.

5   A.   Yeah.

6   Q.   Do you remember going there?

7   A.   Yeah.

8   Q.   Okay.  And it's a -- it's kind of a trailer

9   park; is that right?

10  A.   Yeah, mobile homes.

11  Q.   Mobile homes?  Okay.

12       And there's a lot of cars parked in the area?

13  A.   I didn't -- I don't remember how many cars I

14  saw, you know.

15  Q.   Okay.  Were there cars parked near the mobile

16  homes?

17  A.   Oh, I don't remember.

18  Q.   Okay.  And did you go inside the home, or did

19  you go inside the office?

20  A.   We went in, like, a small, like, maintenance

21  room or something.

22  Q.   Okay.  And you went there with who?

23  A.   With who?  With Chivo.

24  Q.   Did you go by yourself?

25  A.   Yeah.

1  Q.   Okay.  And in the room where you were, how

2  many people were there?

3  A.   It was -- first it was Gollo, Chivo, myself,

4  and then after I don't know how long, Mayco and a

5  black guy showed up.

6  Q.   Okay.  And this is after the meeting was half

7  over the black guy showed up; is that right?

8  A.   No, I don't think that long.  I don't remember

9  how long, but not until the end.

10  Q.   Okay.  But the black guy was there, and you

11  don't know if he speaks Spanish; right?

12  A.   I don't know.

13  Q.   That's what I'm asking.  You don't know?

14  A.   Yeah, I don't know.

15  Q.   But you speak Spanish; right?

16  A.   Yes.

17  Q.   And the other people that were there were

18  speaking Spanish; right?

19  A.   Yeah.

20  Q.   Okay.  And you speak English; right?

21  A.   I'm talking to you right now.

22  Q.   You are.  You're doing a good job.

23     And so if you wanted to, you could have turned

24  to whoever was there, black guy, white guy, and

25  talked in English; right?

1  A.   I think I talked to him in English.

2  Q.   Okay.  And what did you say?

3  A.   That I rent the houses.

4  Q.   What?

5  A.   I rent the houses.

6  Q.   You rent the houses?

7  A.   Yeah.

8  Q.   And what houses do you rent?

9  A.   We were talking about dope for the stash

10 houses.

11 Q.   Okay.  And you were talking about you rent the

12 houses, and you were talking to him in English?

13 A.   I just told them that I rent the houses in

14 English.

15 Q.   Okay.  And this is during the conversation

16 inside the --

17 A.   The little maintenance room.

18 Q.   Okay.  And this was being tape recorded;

19 right?

20 A.   Yeah.

21 Q.   Okay.  And you had a wire or a device that the

22 FBI Agent Edwards or Rubalcalva had given you;

23 right?

24 A.   Yeah, a digital recorder.

25 Q.   Okay.  So since it was being recorded, it

1  should be in the transcript; right?

2  A.   Yep.

3  Q.   Okay.  And the conversation --

4  A.   Yes.

5  Q.   -- was about houses that you rent; right?

6  A.   What?

7  Q.   Houses that you rent.

8  A.   Oh, yeah.

9  Q.   Okay.  And as part of your -- and this is --

10  you don't do it really, because you're --

11  A.   No, it's BS, you know.

12  Q.   BS?  Okay.

13  A.   Yeah.

14  Q.   Okay.  I know what that is.  And that's part

15  of your front, your lies as an informant; right?

16  A.   Yeah.

17  Q.   Okay.  And so you were explaining to whoever

18  was there that you, in English, that you're the

19  person who -- you get stash houses for people and

20  they get suckered --

21  A.   No, no, no.  I just said I rented the houses.

22  That's all I said.

23  Q.   Okay.  And did you say anything else in

24  English?

25  A.   "Do you speak Spanish"?

1  Q.  Okay.  You said, "Do you speak Spanish?" to

2  him?

3  A.  Yeah.

4  Q.  Did you say that in English?

5  A.  Yeah.  No.  I said it in Spanish.  Sorry.  I

6  said it in Spanish.  Sorry about that.

7  Q.  So the only English that you said was,

8  basically, I do houses; right?  I rent houses for

9  stash houses?

10  A.  I did something -- I said something in

11  English, but I don't remember what else I said.

12  Q.  Okay.  But you're clear about the stash

13  houses; right?

14  A.  Yeah.  That one, yes.

15  Q.  Okay.  Then let me just jump ahead again to

16  about three weeks ago, okay, in 2012.  All right?

17  A.  Okay.

18  Q.  And at that point you had a meeting with

19  agents and -- were any federal prosecutors there?

20  A.  Yeah.

21  Q.  Do you know what a federal prosecutor is?

22  A.  That guy.

23  Q.  The guy that's looking at me?

24  A.  Yeah.

25  Q.  That guy, the big guy?

```
1   A.   Yeah.
2   Q.   Okay.  And you had a meeting with him; right?
3   A.   Yeah.
4   Q.   And there was an agent there as well?
5   A.   Yeah.
6   Q.   And -- Agent Edwards; right?
7   A.   Yeah.
8   Q.   Okay.  And you all were talking about the
9   hearing that's coming up; right?
10  A.   Yeah.
11  Q.   And that the lawyers were going to be
12  questioning you; right?
13  A.   Yeah.
14  Q.   Okay.  And they were talking to you about what
15  had happened in -- about a year ago in the
16  transactions; right?
17  A.   Yeah.
18  Q.   And I'd like to -- I'd like to ask you about
19  what happened then, because -- did they go over
20  with you some of the things that you had said at
21  that time in February of 2011, in that period?
22       They talked to you about what was said then,
23  what you had said?
24  A.   What did I say?
25  Q.   Did you discuss with Mr. Lacey and Agent
```

1  Edwards what you had said in February of 2011?

2  A.   Yeah.

3  Q.   That's one of the reasons for the meeting,

4  right --

5  A.   Yeah.

6  Q.   -- is to go over what you said before; right?

7  A.   Yeah.

8  Q.   And they talked about the February 4th

9  meeting; right?

10 A.   Yeah.

11 Q.   Okay.  And that's the meeting in the little --

12 A.   Maintenance room.

13 Q.   Maintenance room.  Okay.  And with the five

14 people where you were talking about stash houses in

15 English; right?

16 A.   In Spanish.

17 Q.   Now, you just said you said stash houses in

18 English.

19 A.   Oh, oh.  We was talking to the people.  Oh,

20 yeah.  I said it to him in English.

21 Q.   Okay.  Well, that's what I want to ask you

22 about --

23 A.   Okay.

24 Q.   -- because you were asked -- I think you had a

25 meeting with -- after that February 4th meeting,

1  you then met with Agent Edwards about 10 days

2  later; right?

3  A.   I don't remember but I probably did.

4  Q.   Okay.  And this was in Casa Grande?

5  A.   Yes.

6  Q.   Okay.  So you had to drive to go meet Agent

7  Edwards in Casa Grande; right?

8  A.   Yes.

9  Q.   And did you go to a hotel to meet with him?  A

10  restaurant?  Where was it?

11  A.   I think a hotel.

12  Q.   Okay.  And you sat down with him and went over

13  who was at and what had happened on February 4th;

14  right?

15  A.   Yeah.

16  Q.   And one of the things you did was you gave him

17  a description of the black guy that was in the

18  maintenance room; right?

19  A.   Yeah.

20  Q.   Okay.  And do you remember that description

21  that you gave?

22  A.   Well, he was -- he was wearing a black shirt

23  and a hat, you know, 175 pounds, six foot.

24           MR. COOPER:  Could I approach the

25  witness?

1  BY MR. COOPER:

2  Q.   Okay.  This is on Bates page 245.  Could you

3  read this paragraph?

4  A.   "A short while later" --

5  Q.   To yourself.

6  A.   Oh, I thought to everybody.

7  Q.   That's okay.

8  A.   You didn't explain to me.

9       Yeah.

10  Q.   Did you have a chance to look at the

11  description that you gave to Agent Edwards?

12       This would have been February 14th of 2011;

13  right?

14  A.   Well, you have the date right there.

15  Q.   Yeah.

16  A.   Right.

17  Q.   Okay.  And in that description, you described

18  the black male as being six feet tall; right?

19  A.   Yeah.

20  Q.   175 pounds; right?

21  A.   Yeah.

22  Q.   Kind of slender; is that right?

23  A.   Yeah.

24  Q.   Okay.  And you said that he actually was

25  wearing a hat; right?

```
1   A.   Yeah.
2   Q.   And that you told Agent Edwards this man was
3   from Tucson; right?
4   A.   That's what Mayco told me.  That's what Mayco
5   told me --
6   Q.   Okay.  And it was your understanding --
7   A.   -- that he was from Tucson.
8   Q.   Okay.  And also the description you gave did
9   not indicate whatsoever that he had any kind of
10  cornrows or braids, did it?
11  A.   What?
12  Q.   Do you know what cornrows are?
13  A.   No.
14  Q.   Okay.  Like braids that come down, like on my
15  hair.
16  A.   I don't remember seeing that.
17  Q.   Not from my hair.
18  A.   No, no.  I don't remember, no.
19  Q.   Okay.  Well, you didn't tell Agent Edwards
20  that the person had cornrows, did you?
21  A.   This is the first time I hear corn -- corn --
22  Q.   Or braids or curls coming down.
23  A.   Yeah, no.
24  Q.   You didn't tell him any of those things, did
25  you?
```

1   A.   I don't remember.

2   Q.   Well, it's not here in the report.

3   A.   Yeah, yeah.

4   Q.   Okay.  And at that same meeting, that's when

5   Agent Edwards said to you, I want to show you a

6   picture of the person who was there at the February

7   4th meeting; right?

8   A.   Yeah, probably -- yeah.

9   Q.   Okay.  And he said, I want you to see -- look

10  at the picture of the guy who was there at the

11  February 4th meeting.

12  A.   No, he didn't tell me that.

13  Q.   He said look at this picture; right?

14  A.   Look at -- I think it was two pictures, I

15  think I remember.

16  Q.   Okay.  Well, one was a Mexican; right?

17  A.   I don't remember it was a Mexican.  No, I

18  don't think so.

19  Q.   Well, one was a picture of a black guy;

20  right?

21  A.   It was -- I think it was two black guys.

22  Q.   Okay.  Let me just show you what's been marked

23  as 5-A.

24          MR. COOPER:  Can I approach again, Your

25  Honor?

1    BY MR. COOPER:

2    Q.   Do you remember being shown this picture?

3    A.   I don't remember, but --

4    Q.   Okay.  And this picture has?

5    A.   How do you call that?

6    Q.   What's that?

7    A.   How do you call this?

8    Q.   Those are called cornrows.

9    A.   Oh, cornrows.  Okay.

10   Q.   Do you remember being shown that picture with

11   cornrows?

12   A.   I don't remember.

13   Q.   Okay.  So did you -- do you remember

14   identifying this as the picture, or you don't even

15   remember being shown this picture?

16   A.   I don't remember.  I think it was a different

17   picture.  I don't remember, you know.

18   Q.   Okay.  So it probably wasn't this picture,

19   right, that you were shown?

20   A.   I don't remember.

21   Q.   Okay.  I just have a few more questions for

22   you.

23        On March 2nd of 2011 --

24   A.   Uh-huh.

25   Q.   -- you were in Tucson; right?

1    A.    Yeah.

2    Q.    And you were at a warehouse; right?

3    A.    Yeah.

4    Q.    Okay.  And you knew that there were a lot of

5    FBI agents and law enforcement people around, ready

6    to make some kind of a bust; right?

7    A.    I didn't know how many but, you know --

8    Q.    Well, I just used the words "a lot" because I

9    don't know how many either.

10   A.    Yeah.

11   Q.    But you knew that; right?

12   A.    Yeah.

13   Q.    And that morning you had talked to either

14   Rubalcalva or Agent Edwards about what was going to

15   happen; right?

16   A.    Yeah.

17   Q.    Okay.  And at the warehouse, you were not

18   aware of whether or not there were black guys in

19   Tucson who had come to participate, were you?

20   A.    In the warehouse?

21   Q.    There weren't any black guys at the

22   warehouse.

23   A.    Oh, no.

24   Q.    And you didn't know, because you were at the

25   warehouse the whole time, if the black guys had

1  even come to Tucson, did you?

2  A.   No.

3  Q.   You didn't have any idea; right?

4  A.   Chivo just told me that the black guy that I

5  met in Phoenix, he was here.  That's all he told

6  me.

7  Q.   One black guy?

8  A.   Yeah.

9  Q.   Okay.  And on March 2nd of 2011, where were

10  you when you got up?  Were you in Tucson?

11  A.   Yeah.

12  Q.   Okay.  And when you left your house, did you

13  go straight to the warehouse?

14  A.   I don't remember.  I don't remember where I

15  went, you know.

16  Q.   Where was it that you went to go meet with

17  Agent Edwards?

18  A.   I don't remember where I met him.  I assume in

19  the warehouse, but I don't know -- I remember --

20  after I wake up, I don't remember where I went.

21  Q.   Okay.  Just a couple more.

22      On February 22nd, there was a conversation

23  that you had also where you were told that the

24  black guys were getting cut out of the whole deal;

25  right?

1    A.    Yeah.  Gollo told me that they're not coming

2    no more because he sent them up north to do another

3    job.

4    Q.    Okay.  When you met with Agent Edwards in Casa

5    Grande, remember --

6    A.    What date?

7    Q.    On February 14th.  I'm sorry.

8    A.    Okay.

9    Q.    Okay.  Ten days after the maintenance room

10   meeting; right?

11   A.    Yeah.

12   Q.    It was just you and Agent Edwards; right?

13   A.    No, I don't think so.

14   Q.    Who else was there?

15   A.    I don't remember.  I think it was another

16   guy.  I think it was police or something.  I don't

17   remember.

18   Q.    Okay.  And you're having a little bit of a

19   hard time right now remembering which picture you

20   were shown; right?

21   A.    Yes.  Yeah.

22   Q.    Okay.  The conversation you had with Agent

23   Edwards on February 14th was not tape recorded, was

24   it, to your knowledge?

25   A.    With him?

1  Q.  Agent Edwards, right.

2  A.  I don't record him.  Why I gotta record him?

3  Q.  Well, I know you didn't.  I mean he didn't

4  record you.

5  A.  No.  What meeting?

6  Q.  He didn't have a tape recorder out saying,

7  we're going to tape record this conversation as I

8  show you this picture, did he?

9  A.  I don't think so.  I don't -- you know, I

10  don't think he recorded me.

11  Q.  Well, if he recorded you, it would have been a

12  secret because he didn't tell you; right?

13  A.  Yeah.

14       MR. COOPER:  Okay.  You know, sir, thank

15  you.  That's all that I have.

16       THE WITNESS:  Can I go to the restroom?

17       THE COURT:  Sure.  We'll take a quick

18  break.  We'll wait.

19       (Off the record.)

20       THE COURT:  All right.  We're back.

21       MR. ARMSTRONG:  Thank you, Your Honor.

22                 DIRECT EXAMINATION

23  BY MR. ARMSTRONG:

24  A.  Howdy.

25  Q.  Good afternoon.

169

1  A.   Howdy.

2  Q.   So in the past, roughly, three weeks ago, you

3  had a meeting with Agent Edwards and Mr. Lacey to

4  discuss your testimony here today; is that correct?

5  A.   Yeah.

6  Q.   And at that meeting, were you shown a

7  photograph?

8  A.   Yeah.

9  Q.   Were you shown more than one photograph?

10 A.   Yeah.

11 Q.   How many photographs were you shown?

12 A.   I don't know.  Probably, like, nine.  I don't

13 remember, you know, but a few.

14 Q.   Okay.  Were you shown photographs of people,

15 close-up photographs of people?

16 A.   Yeah.

17 Q.   Okay.

18      MR. ARMSTRONG:  Your Honor, may I have

19 just a moment?

20      THE COURT:  Sure.

21      MR. ARMSTRONG:  Your Honor, may I approach

22 the witness?

23      THE COURT:  You may.

24 BY MR. ARMSTRONG:

25 A.   This is the picture that he showed me.

1   Q.   State's Exhibit 5-A, is that one of the

2   photographs you were shown at your meeting with

3   Mr. Lacey and Agent Edwards?

4   A.   I don't remember, you know.  Different

5   picture, you know.  The background, I don't

6   remember.

7   Q.   You don't remember?

8   A.   Yeah.

9   Q.   Were you shown a photo -- were you shown a

10  photo like that?

11  A.   Yeah, I think so, but different -- I think

12  different background, you know, or different, like,

13  back.  I don't remember.

14  Q.   Were you shown other photographs like that?

15  A.   Like which one?

16  Q.   I mean close-up photographs --

17  A.   Oh, yeah.

18  Q.   -- of a black person's -- a black male's face?

19  A.   Yeah, I think -- yeah.

20  Q.   You think so?

21  A.   Yeah.

22  Q.   How many photographs were you shown?

23  A.   Oh, man.  He showed nine, eight pictures.

24  Q.   Were they all photographs like that?

25  A.   From people.

1   Q.   Were they photographs like what I just showed

2   you, like photograph 5-A?

3   A.   Oh, yeah.

4   Q.   They were?

5   A.   Yeah.

6   Q.   No photographs of cars, buildings, things like

7   that?

8   A.   No.

9   Q.   Were the photographs of different people?

10   A.   Yeah.

11   Q.   Did Mr. Lacey or Agent Edwards tell you who

12   the photographs were of?

13   A.   No.

14   Q.   Did you recognize any of the people from those

15   photographs?

16   A.   Yeah.

17   Q.   Who?

18   A.   Gollo, Gollito, Chivo, Roberto, Mayco, Andy,

19   Yovani, and I think that guy (indicating).

20   Q.   Okay.  So from the sound of it, there was one

21   black male in the photographs that you saw.

22   A.   That, yeah, I recognize, yeah.

23   Q.   And that was the only -- that was the only

24   photograph you were shown of a black male, was --

25   A.   No.  There was more, but I don't know -- I

1  don't know the other ones.

2  Q.  Do you -- you don't know the other ones?

3  A.  The other black people I don't know.

4  Q.  You didn't recognize?

5  A.  Yeah, I didn't recognize.

6  Q.  How many photos in total were you shown?

7  A.  I don't remember.  There was a few, you know.

8  I can't tell you.  I don't remember how many, but

9  it was a few, a few.

10 Q.  Okay.  Help me again.  Why -- why -- you were

11 telling Mr. Cooper about your experience with the

12 DEA.  It lasted from 2000 to 2004.

13     And you became involved with the DEA -- tell

14 me if I'm mistaking your testimony.

15 A.  Okay.

16 Q.  You became a confidential informant because

17 you like the thrill or the excitement of it; is

18 that correct?

19 A.  I like the excitement, yeah.

20 Q.  That was the only reason?

21 A.  No.  I like to put bad people, you know, put

22 people in jail.

23 Q.  You like putting people in jail?

24 A.  Bad people.  Not good people.  Bad people.

25 Q.  All right.  All right.  And that was the

1 reason you connected with the DEA back in 2000?

2 A.   Yeah.

3 Q.   No other reason?

4 A.   No.

5 Q.   Did you approach them or did they approach

6 you?

7 A.   I think I approached them.

8 Q.   You don't remember?

9 A.   I approached them.

10        THE COURT:  He said I think -- he

11 approached them.

12 BY MR. ARMSTRONG:

13 Q.   Okay.  Are you certain that you approached

14 them?

15 A.   Yeah.

16 Q.   Just for the thrill and for the excitement and

17 to put bad people away?  That's the reason?

18 A.   And -- yeah.

19 Q.   So in 2003, you were arrested?

20 A.   Yeah.  Yes.

21 Q.   What were you arrested for?

22 A.   50 pounds of marijuana.

23 Q.   Not personal use, I take it?

24 A.   No.  I'd be stoned all day.

25 Q.   Okay.  Were you using marijuana back then?

```
1   A.   No.

2   Q.   And you're not using marijuana now?

3   A.   No.

4   Q.   Do the agents drug test you at all?  Does

5   Rubalcalva offer you a drug test?

6   A.   No.

7   Q.   All right.  So 50 pounds of marijuana, and

8   that case has been dismissed, I take it?

9   A.   Yeah.

10  Q.   Were you facing any immigration consequences

11  as a result of the arrest?

12  A.   No.

13  Q.   No.  Are you a U.S. citizen?

14  A.   Yeah.

15  Q.   Okay.  And why was it again that you switched

16  from the DEA to the FBI?

17  A.   Just to try something new.

18  Q.   Nothing to do with the arrest in 2000?

19  A.   Oh, no, no.

20  Q.   Were they cool with that, the DEA?

21  A.   Yeah, you know.  It's a free country.  You do

22  whatever you want to.

23  Q.   What?

24  A.   It's a free country.  You do whatever you want

25  to do.
```

Q.   The DEA wasn't upset with you for being
arrested in 2003?

A.   Oh, I thought if they were okay if I move to
work for the FBI.

THE COURT:  He answered a different
question than what you asked.

MR. ARMSTRONG:  Apparently.  I think so.

BY MR. ARMSTRONG:

Q.   The DEA wasn't upset with you for being
arrested in 2003 with 50 pounds of marijuana?

A.   No.

Q.   Was it 50 pounds or 50 kilograms?

A.   I think 50 pounds.

Q.   Okay.  They were not upset?

A.   No.

Q.   They didn't terminate your agreement with
them?

A.   No.

Q.   So how was it that you found the FBI?  How
does somebody find --

A.   In the phonebook.

Q.   So you wanted -- you approached them or did
they approach you?

A.   I approached them too.

Q.   Okay.  Were you -- was there a period when you

1    were working for both the DEA and --

2    A.   No, huh-uh.

3    Q.   Okay.  Hold on a second.  We both can't talk

4    at the same time.

5    A.   Okay.  Go ahead.

6    Q.   There was not a period when you were working

7    for the DEA and the FBI at the same time?

8    A.   No.

9    Q.   It was one and then the other?

10   A.   Yeah.

11   Q.   When did you quit working for the DEA?  I know

12   it's 2003 but when?

13   A.   No, 2004.

14   Q.   Yeah.  That's right.  2004.

15   A.   It's, I believe, in the summer of 2004.

16   Q.   How did you -- how did you break up?

17   A.   Nothing.  I told them I was not going to work

18   for them no more.

19   Q.   Why?

20   A.   I don't know.  Just to try something new, you

21   know.

22   Q.   Okay.  And then when was it that you started

23   working for the FBI?

24   A.   In August 2004.

25   Q.   When?

1  A.   August.

2  Q.   August?

3  A.   Yeah.

4  Q.   So you just approached the FBI on your own?

5  A.   Yeah.

6  Q.   You liked -- again, for the thrill?

7  A.   Yes, and I like to put bad people in jail.

8  Q.   Put bad people in jail.  Right.

9  A.   There you go.

10  Q.   And you don't get any more money for putting

11  more bad people in jail than for --

12  A.   No, because they never promise me that I'm

13  going to get paid, you know.  I don't know how much

14  I'm going to get paid.  If I put one or if I put

15  50, I don't know.

16  Q.   You got paid $75,000 for this?

17  A.   Yeah.

18  Q.   Any more?

19  A.   For relocation.

20  Q.   Okay.  Aside from the relocation and the

21  75,000, have you been paid any more money for this?

22  A.   Yeah, well, 200 -- I think, yeah, close to

23  250, around that area.

24  Q.   250 total?

25  A.   Yeah, or more, you know.

1 Q. Okay. You didn't know how many people were

2 charged in this, in this event?

3 A. I find out at the end how many people, but I

4 didn't know at first.

5 Q. How many people did they tell you?

6 A. I think 15, 16, something like that.

7 Q. Okay. Prior to this, what's the highest

8 number of people that you've put away?

9 A. I don't know. I don't keep track, like I told

10 that guy before.

11 Q. No?

12 A. No.

13 Q. How many -- you don't know how many cases

14 you've been involved in?

15 A. A few, but I don't know how many, you know.

16 Q. So you really don't expect the FBI to pay you

17 money when you do this?

18 A. Yeah.

19    MR. LACEY: Objection. Asked and

20 answered, Judge.

21    THE COURT: He can answer one more time.

22 Q. Okay. I won't -- you really have no

23 expectation of being paid?

24 A. No, because they tell me -- they don't offer

25 me that I'm going to get paid. I don't know.

```
 1   Q.   Have they ever not paid you?
 2   A.   No.
 3   Q.   Okay.  So when -- you were expecting to get
 4   paid for this case.
 5   A.   Yeah.
 6   Q.   Yeah.
 7   A.   But I don't know how much, you know.  Can be
 8   $1.  Can be -- I don't know.
 9   Q.   Was $75,000 a lot?
10   A.   I didn't know how much I was going to get
11   paid.
12   Q.   Well, when they brought -- did they deliver
13   $75,000 to you all at once?
14   A.   Yeah.
15   Q.   Did your eyes light up or were you
16   disappointed?
17   A.   No.  I was happy.
18   Q.   Okay.
19   A.   Go on vacation.
20   Q.   I know you don't keep track of these things,
21   but do you think that was the most amount of money
22   you've ever received?
23   A.   I think so.
24   Q.   All right.  I wanted to talk to you about the
25   drugs and the amounts of the drugs and the types of
```

1  drugs that you discussed.

2  A.  With everybody?

3  Q.  With everybody, with Chivo.

4     The idea for the cocaine, the simple fact that

5  it was going to be -- this fake drug was going to

6  be cocaine, whose idea was that?

7  A.  The idea?

8  Q.  The idea.

9  A.  Jon.

10  Q.  Jon said we're going to use cocaine?

11  A.  Yeah.

12  Q.  Okay.  We're going to --

13  A.  No.  No, we never said cocaine.  We said a

14  stash house.  We never said, okay, we're going to

15  do cocaine.  You know, a stash house.

16  Q.  That's -- who comes up with cocaine?

17  A.  I think they told me for 50 kilos of cocaine.

18  Q.  Okay.  Okay.  "They," you're meaning?

19  A.  Yeah, Jon.

20  Q.  And Rubalcalva or just Jon?

21  A.  I think Rubalcalva too.

22  Q.  Okay.  So it was their idea, the cocaine, the

23  fact that you were dreaming up cocaine and not --

24  A.  I was not dreaming.

25  Q.  You weren't dreaming?

1  A.   No.

2  Q.   Was there cocaine?

3  A.   No.

4  Q.   Okay.  Well, do you understand everything that

5  I'm saying here?

6  A.   Yeah.

7  Q.   You're sure?

8  A.   Yeah.

9  Q.   Okay.  All right.  All right.

10      Whose idea was it to tell Chivo and the other

11  fellows that you had a stash house full of cocaine?

12  A.   Cocaine.  Edwards.

13  Q.   And the amount, the 50 kilograms, was that

14  Edwards' idea?

15  A.   Yeah.

16  Q.   Okay.  And then the amount went up to 65

17  kilograms.  Was that --

18  A.   Yeah, that was my idea.

19  Q.   That was your idea?

20  A.   Yeah.  We just came up with a number in the

21  meeting.

22  Q.   Did Edwards or Rubalcalva ever talk to you

23  about the significance of 50 kilograms of cocaine?

24  A.   No.

25  Q.   65 kilograms of cocaine?

1  A.   No.

2  Q.   And the methamphetamine, the fake meth?

3  A.   Yeah.

4  Q.   Your idea?

5  A.   Yeah.

6  Q.   Nobody else's?

7  A.   I just, you know, tell them there was meth

8  too.

9  Q.   Sorry?

10 A.   Nobody else.  That was my idea.

11 Q.   That was your idea?

12 A.   Yeah.

13 Q.   And then the business about the fake $700,000,

14 that was the FBI's idea?

15 A.   Yeah.

16 Q.   Yeah?

17 A.   (Nodding.)

18 Q.   And then the $30,000 in a fake fanny pack, the

19 fake $30,000, that was also the FBI's idea?

20 A.   No.  I think I brought that up too.

21 Q.   You did that?

22 A.   Yeah.

23 Q.   Why?

24 A.   Just -- I don't know, you know.

25 Q.   I mean, you're just making stuff up as you go

```
 1   along?  Is that it?
 2   A.   Yeah.
 3   Q.   Were you having any trouble or Chivo or Gollo
 4   or Gollito going along with this?
 5   A.   No.
 6   Q.   So why did you keep sort of -- why did you
 7   create this greater fantasy than the one you
 8   already had?
 9   A.   I don't know.  I just brought that up, you
10   know.
11   Q.   Now, I take it -- you were telling
12   Mr. Cooper --
13   A.   Who is Cooper?  Oh, the guy over there.
14   Q.   -- who is that man over there, you signed an
15   agreement not to lie.
16   A.   Yeah.
17   Q.   Okay.  But when you're out having -- you know
18   putting bad guys away and having fun, you're lying
19   through your teeth, aren't you?
20   A.   Yeah.
21   Q.   And you also made up some names of hotels in
22   Nogales, as I understood.
23   A.   Yeah.
24   Q.   Were you worried that -- I mean, Nogales is --
25   A.   A small town.
```

1  Q.  Were you worried that, if you were making up

2  names, that Chivo and some of the other fellows

3  might recognize the fact that those hotels didn't

4  exist?

5  A.  I think those hotels exist, but I don't know

6  where they're at.  I just came up with a name.  I

7  don't remember what hotel I said.

8  Q.  I can't hear you.

9  A.  I don't remember what hotel I told them.

10  Q.  All right.  Okay.  I want to talk about some

11  of the conversations you had with Chivo and any of

12  the other people.

13  A.  Okay.

14  Q.  Were all of the calls between you and Chivo --

15  well, let me back up.

16      When you spoke with Chivo, sometimes you

17  talked to him in person, face-to-face, and

18  sometimes over the telephone; is that correct?

19  A.  Yeah.

20  Q.  And sometimes you'd text him; is that correct?

21  A.  Yeah.

22  Q.  Okay.  Were all of the phone calls that you

23  had with him over the telephone recorded?

24  A.  Yeah.

25  Q.  All of them?

1  A.   I believe so.

2  Q.   Were all of the meetings between you and Chivo

3  face-to-face?  Were they always recorded?

4  A.   Only not the first one.

5  Q.   Say it again.

6  A.   Not the first meeting.

7  Q.   Back in December?

8  A.   Yeah.

9  Q.   Now -- okay.  So Chivo's the fellow that --

10 excuse me.

11      Del Solar is the fellow that works for you?

12 A.   Yeah.

13 Q.   And you're just working along one day and he

14 asked you if he knows of any stash houses to rip

15 off?

16 A.   No, no, no.

17 Q.   No?

18 A.   He told me that he didn't like to work, that

19 he used to be a doper in Mexico, and that he had a

20 crew who could rob home invasion houses.

21 Q.   You're his boss and he told you that?

22 A.   Yeah.

23 Q.   Had you ever told him anything before about --

24 A.   No.

25 Q.   -- about your past life or current life?

1  A.    Huh-uh.

2  Q.    You're just a working man, running a crew of

3  50 or 60 people?

4  A.    Yeah.

5  Q.    And he tells you he likes to rip off stash

6  houses?

7  A.    No, he didn't tell me that.  He told me he

8  used to stash drugs in Mexico and that he was a

9  drug dealer.

10  Q.    Okay.

11  A.    And that he knew a crew who do houses.

12  Q.    Say that again?

13  A.    That he used to rob houses in Phoenix too.

14  Q.    Okay.  Well, then how do we get from that

15  point to talking about organizing a crew here in

16  Tucson -- excuse me -- in Phoenix?

17  A.    When he told me that, I told that to Jerry

18  Rubalcalva, and we went from there.

19  Q.    So Rubalcalva at that point says, okay, let's

20  set him up?

21  A.    No, no, no.  He didn't say that.

22  Q.    Well, okay.  So the conversation you had, that

23  conversation, when you first learned that he was a

24  drug dealer in Mexico, that obviously was not

25  recorded, and then your conversation in December,

1  late December of 2010, that's not recorded; right?

2  A.  No.

3  Q.  No?

4  A.  No.

5  Q.  Okay.  So do you recall when Chivo said, in

6  February, that the blacks weren't part of this?  Do

7  you recall Chivo saying that?

8  A.  I think Gollo is the one who told me.

9  Q.  Okay.  Excuse me.  It was Gollo?  Gollo told

10  you that?

11  A.  Yeah.

12  Q.  Okay.  Did anyone else tell you that?

13  A.  I don't remember.

14  Q.  I mean, that's kind of a important thing;

15  right?  You want -- you're putting together a crew,

16  and you want to know who's in and who's out; right?

17  A.  Yeah.

18  Q.  And probably Mr. -- Agent Edwards and

19  Rubalcalva, they want to know who's in and who's

20  out too; right?

21  A.  Yeah.

22  Q.  Did you ever tell them that the blacks are

23  out?

24  A.  Because they keep changing.  They're coming --

25  like I told you, they didn't give me a list who's

1  coming.  You know, they change it so many times.

2  You know, every time they told me they changed it,

3  I'd tell them.

4  Q.  You'd tell them what?

5  A.  That somebody was not coming, they're coming,

6  they're not coming.

7  Q.  Okay.  So did you tell Edwards and Rubalcalva

8  that the blacks were out?

9  A.  Yeah.

10  Q.  Do you remember when you said that?

11  A.  I don't remember.

12  Q.  Did you tell them face-to-face?

13  A.  I believe so.

14  Q.  That wasn't -- did you tell them in Casa

15  Grande?

16  A.  I don't remember.  No, not over there.

17  Q.  Okay.  So after you told them that the blacks

18  were out --

19  A.  Yeah.

20  Q.  -- did you ever tell them, Rubalcalva and/or

21  Edwards, that the blacks are back in?

22  A.  No.

23  Q.  Did you think that the blacks were in on this?

24  A.  The only thing that Chivo told me that I asked

25  him, the black guys are here.

```
1    Q.   Who told you this?

2    A.   Chivo.

3    Q.   C-h-i-v-o?

4    A.   Yeah.

5    Q.   All right.

6    A.   He told me -- I asked, is the black guy down

7    there with Mayco?  Is he here?  He said yes.

8    That's all he told me.

9         And I never seen him, but he told me that.

10   Q.   In Tucson?

11   A.   Yeah.

12   Q.   He told you -- Chivo told you that --

13   A.   The black guy that he met at his work, he was

14   there with Mayco.

15   Q.   The black guy?

16   A.   Yeah, because I only met one.  You know, I

17   didn't know who was coming.

18   Q.   When you were at the warehouse and you said

19   everybody's here, there were no blacks present;

20   correct?

21   A.   No.  In the warehouse, I didn't see any

22   blacks.

23   Q.   And you didn't expect any -- that the blacks

24   were coming to the warehouse, did you?

25   A.   I didn't know who was coming.
```

1   Q.  Did you ever tell -- do you know -- do you

2   know the name Ja'Cory Ranger?

3      Or let me ask you this.  Before March 2nd,

4   2011, did you ever know the name Ja'Cory Ranger?

5   A.  No.

6   Q.  Did you have any conversation with the

7   Mexicans before March 2nd, 2011, about the cars

8   that were going to -- that were going to be used in

9   Tucson?

10   A.  I think so.  You know, it had been so long.  I

11   think they told me, Chivo told me, but I don't

12   remember what day, you know.

13   Q.  Chivo told you?

14   A.  Yeah.

15   Q.  Agent Edwards and Mr. Lacey, they didn't talk

16   to you about that two weeks ago?

17   A.  Yeah.

18   Q.  They did?

19   A.  Yeah.

20   Q.  Have you looked at any reports or any recorded

21   conversations?

22   A.  Yeah, the phone calls, yeah.

23   Q.  Okay.  You looked at the phone calls?

24   A.  Yeah.

25   Q.  Okay.  Do you remember telling anything or

1  having any discussion about the cars that were

2  going to be used here in Tucson?

3  A.   It had been so -- you know, I went through

4  some of the phone calls, but I haven't finished,

5  you know.

6  Q.   Okay.  But as you sit here today, you haven't

7  seen any mention of the cars that were to be used;

8  is that right?

9  A.   Yeah.

10  Q.   And you never told Edwards or Rubalcalva that

11  a Cadillac Escalade was going to be coming to

12  Tucson, did you?

13  A.   I don't remember.  I don't remember.

14  Q.   And you never told them that a Ford Expedition

15  was going to be coming to Tucson, did you?

16  A.   I don't remember.

17          MR. ARMSTRONG:  Okay.  Thank you, Your

18  Honor.  No further questions.

19                  DIRECT EXAMINATION

20  BY MR. MANCH:

21  Q.   Good afternoon, sir.

22  A.   Hi.

23  Q.   Sir, Mr. Gutierrez, you mentioned that you

24  received 75,000 -- over $75,000 in compensation for

25  your work in this case; is that right?

1   A.   Yeah.

2   Q.   And you received another 33,000 -- 33 to

3   $36,000 in moving expenses?

4   A.   Expenses, yeah.

5   Q.   So you received over $100,000 in compensation

6   total --

7   A.   Yeah.

8   Q.   -- for this case alone; correct?

9   A.   Yeah.

10  Q.   Now, that's a benefit that you received from

11  the Government?

12  A.   Yeah.

13  Q.   Right?

14       Another type of benefit would be having a case

15  dismissed against you, would you agree?

16  A.   Yeah.

17  Q.   Now, because of your work for the FBI, you

18  didn't receive as compensation the dismissal of

19  your marijuana charges?

20  A.   No.

21  Q.   No?

22  A.   No.

23  Q.   Did those charges -- did they take place here?

24  A.   No.

25  Q.   In federal court?

1    A.    Huh-uh.

2    Q.    State court?

3    A.    I didn't go to court.  They got dismissed.

4    Q.    You never went to court or they got dismissed?

5    A.    I didn't go to court.  I think they got

6    dismissed.

7    Q.    Were they here in Arizona?

8    A.    No.

9    Q.    Where were you arrested?

10   A.    In Albuquerque.

11   Q.    Albuquerque.  Where in Albuquerque?

12   A.    I think Albuquerque.

13   Q.    Okay.  Well, Albuquerque is a city.  That's

14   fair enough.  I haven't spent much time in New

15   Mexico.

16         Did you have a lawyer in that case?

17   A.    No.

18   Q.    No representation?

19   A.    No.

20   Q.    Charges were just dismissed and that was the

21   end of it?

22   A.    Yeah.

23   Q.    What about family members?  Did -- have you

24   ever had a family member charged with an offense?

25   A.    No.

1   Q.   No family members ever charged with a crime?

2   A.   No.

3   Q.   None that were later dismissed as a result of

4   your cooperation --

5   A.   No.

6   Q.   -- with the FBI?

7   A.   No.

8   Q.   No?  Okay.  None of your family members or

9   friends received financial benefits from the

10  Government?

11  A.   No.

12  Q.   You mentioned that you worked with the FBI

13  before; is that right?

14  A.   What?

15  Q.   You testified that you've worked with the FBI

16  before; correct?

17  A.   Yes.

18  Q.   Before this case?

19  A.   Yeah.

20  Q.   And before that the DEA; right?

21  A.   Yeah.

22  Q.   Did you ever work with them on a sting

23  operation like this?

24  A.   Yeah.

25  Q.   You know what I -- do you know what I mean

1  when I say "sting operation"?

2  A.   Yeah.

3  Q.   It's where you set up -- you tell a bunch of

4  people, a group of people, that you're going to rob

5  a stash house?

6  A.   Yeah.

7  Q.   And then you set it up -- the way you set it

8  up is you set up a warehouse -- I'm sorry.  That

9  was a little loud.

10       Right?

11 A.   Yeah.

12 Q.   That's the way you've done it before; right?

13 A.   No.

14 Q.   Never done it that way before?

15 A.   No.

16 Q.   You ever work with Agent Rubalcalva before in

17 a similar case?

18 A.   Yeah.

19 Q.   That's a similar sting operation?

20 A.   Yeah.

21 Q.   Correct?

22 A.   Yeah.

23 Q.   When you worked with him, did you set up --

24 did they set up so you got -- you arranged for a

25 vacant warehouse for everyone to meet?

```
1    A.   Now what?

2    Q.   You know, like here, in this case --

3    A.   Yeah.

4    Q.   -- people came to a vacant warehouse; right?

5    A.   Yes.

6    Q.   You told them that's where they were going to

7    bring the drugs after the job was done; right?

8    A.   No, I didn't say that.

9    Q.   No?

10   A.   No.

11   Q.   Didn't tell them that?

12   A.   No.

13   Q.   You told them to meet at the warehouse; right?

14   A.   Yeah, but not to bring the drugs.

15   Q.   Not to bring the drugs?

16   A.   Yeah.

17   Q.   But you were going to show them how to do the

18   job; right?

19   A.   Yeah.  Well, not how to do the job.  They're

20   supposed to get the picture of my cousin and get a

21   layout of the house.

22   Q.   Right, because you wanted to see if they were

23   really serious about going through with the job;

24   right?

25   A.   Well, I think they're serious because they
```

1    came here, you know.  I didn't have to bring them

2    to a warehouse to believe them.

3    Q.   Right.  So these people who visited you -- who

4    came to this warehouse --

5    A.   Yes.

6    Q.   -- it was Chivo --

7    A.   Gollito.

8    Q.   Gollito?

9    A.   Andy, Mayco, Yovani.

10   Q.   Mayco.  You know all their names; right?

11   A.   Yeah.

12   Q.   Because you met all of them personally; right?

13   A.   Yes.

14   Q.   You'd be able to recognize each one of them in

15   a picture; right?

16   A.   Yes.

17   Q.   And you explained to them exactly what it is

18   they were going to do?

19   A.   What?  Can you repeat that one?

20   Q.   You explained to them exactly how this

21   operation, this sting, was going to work; right?

22   A.   I didn't want to tell them how to do it.  I

23   explained to them where the house was, not how to

24   break into the house.

25   Q.   Well, you showed them a picture of your

1   cousin; right?

2   A.   Yes.

3   Q.   Or what you told them was your cousin; right?

4   A.   Yes.

5   Q.   It wasn't really your cousin, was it?

6   A.   No.

7   Q.   It was all a lie; right?

8   A.   Yes.

9   Q.   It's all BS, like you said?

10  A.   Yes.

11  Q.   Just like the whole idea of going into the

12  warehouse was a lie; right?

13  A.   Yes.

14  Q.   But you did that to make sure that they were

15  committed to the job; right?

16  A.   Well, I didn't have to -- yes.

17  Q.   Yeah.

18  A.   Yeah.

19  Q.   Okay.  And you showed them a picture of the

20  cousin so they -- so they knew not to -- not to --

21  A.   Hurt him.

22  Q.   Hurt your cousin; right?

23  A.   Yeah.

24  Q.   So by showing them the picture, you knew that

25  they were in for the job; right?

```
 1   A.   Yeah.
 2   Q.   That was best way I can say that, but you know
 3   they're on board.
 4   A.   I think when they came to Tucson, they were on
 5   board, you know.
 6   Q.   But at the same time, maybe they showed up
 7   with someone you hadn't seen before and you hadn't
 8   talked to them before.
 9   A.   I don't understand your question.
10   Q.   Well, suppose the people who showed up in the
11   warehouse, they showed up with someone you haven't
12   talked to before.
13   A.   They're going to show up to the warehouse?
14   Q.   Yeah.
15   A.   If I didn't know them?  How are they going to
16   bring them if I don't know them?
17   Q.   Well, let's say they did.
18        MR. LACEY:  Objection as to speculation,
19   Your Honor.
20        THE COURT:  Sustained.
21        MR. MANCH:  Okay.  I'll move on.
22   BY MR. MANCH:
23   Q.   In any event, these people who showed up at
24   the warehouse, you were convinced they were ready
25   to do the job?
```

1  A.   When they come to the warehouse?

2  Q.   That's right.

3  A.   Well, Gollito was telling me to hurry up, that

4  he wanted to do it, you know, wanted to get to the

5  warehouse.

6  Q.   They were anxious to do the job?

7  A.   Yeah.  They were ready to go.

8  Q.   The people at the warehouse?

9  A.   No.  Before they got to the warehouse, over

10  the phone, he told me he's ready to go, to hurry

11  up.

12  Q.   I understand.  But it was Agent Edwards who

13  explained to you to tell them that it was for at

14  least 50 kilograms of cocaine that they were going

15  to take; right?

16  A.   Yes.

17  Q.   That idea came from Agent Edwards?

18  A.   Yes, or Rubalcalva.  I don't remember.  One of

19  those, but -- I think both.  I don't remember which

20  one --

21  Q.   One or both --

22  A.   Yeah, both FBI, yeah.  Yeah.

23  Q.   Okay.  Now, the idea for the stash house, for

24  the warehouse, to have everybody go to the

25  warehouse to receive instructions, that was from

1  Agent Edwards also?

2  A.   Yes.

3  Q.   Now, a previous attorney mentioned to you a

4  name.  I'm going to mention another name.  The name

5  is Jeremy Tucker.

6  A.   Okay.

7  Q.   Have you ever heard that name before March the

8  2nd, 2011?

9  A.   I think so.

10  Q.   You think so?

11  A.   Yeah.

12  Q.   Where did you hear it?

13  A.   Jon.

14  Q.   Beg your pardon?

15  A.   From Edwards.

16  Q.   From Jon?

17  A.   Yeah.

18  Q.   Now, keep in mind I'm talking about Jeremy

19  Tucker.  There is two different guys with similar

20  names.  J-e-r-e-m-y.

21       Have you ever heard of that guy?

22  A.   Can you repeat the name again?

23  Q.   Jeremy Tucker.  Have you ever heard of that

24  name?

25  A.   Well, not Jeremy.  I think Ghermon.

1   Q.   Ghermon.

2   A.   Yeah.

3   Q.   Ghermon's the one you've heard of?

4   A.   Oh, yeah.

5   Q.   Not Jeremy Tucker?

6   A.   Oh, no, you know.  I confused -- you know,

7   they're kind of screwed up.  You know, I confused

8   the names, yeah.

9   Q.   It's confusing?

10  A.   Yeah.

11  Q.   But that name, you never spoke to somebody

12  named Jeremy Tucker; correct?

13  A.   No, no.

14  Q.   To this day you've never spoken to anybody

15  named Jeremy Tucker?

16  A.   No.

17  Q.   Okay.  Now, I'm going to refer for a moment to

18  what's been marked as -- let me get the marked

19  copy.  I have another copy here.

20          MR. MANCH:  Is that okay if I use that

21  just to refer to --

22          THE COURT:  Sure.

23          MR. MANCH:  I'll just flip to it.  It

24  states -- excuse me.  It's Government's Exhibit

25  9-A.

1          May I approach the witness?

2          THE COURT:  You may.

3          MR. MANCH:  Thanks.

4  BY MR MANCH:

5  Q.   Do you recognize that photograph?

6  A.   Yeah.

7  Q.   Is that a text message?

8  A.   Yeah.

9  Q.   Did you send that text message?

10  A.   Yeah.

11  Q.   Who did you send it to?

12  A.   To Jerry Rubalcalva.

13  Q.   So you sent this message to Agent Rubalcalva?

14  A.   Yeah.

15  Q.   You sent it, it looks like, at 2:01 p.m.?

16  A.   I think it was 1:34 or something like that.

17  Q.   1:34?

18  A.   Yeah.

19  Q.   Okay.  And you say here -- it looks like you

20  texted, "There are 15 people"?

21  A.   "People."

22  Q.   "15 people"?

23  A.   Yeah.

24  Q.   There weren't 15 people at the warehouse;

25  right?

1   A.    No.   That's the Food City.   That's what Chivo

2   told me.

3   Q.    That's what Chivo told you?

4   A.    Yeah, that there were 15 people here parked,

5   ready to go.

6   Q.    Okay.   So did you talk to -- did you know who

7   all these 15 people were?

8   A.    No.   I had no idea.

9   Q.    Had you talked to all these 15 people before?

10  A.    No.

11  Q.    So you had -- now, at the warehouse you

12  personally spoke to the people that you understood

13  were going to participate in this --

14  A.    Yes.

15  Q.    -- sting, this rip; right?

16  A.    Yes.

17  Q.    You didn't talk to these other 15 people, did

18  you?

19  A.    No.

20  Q.    You didn't know if they were going to

21  participate in this rip, did you?

22  A.    I didn't know.

23  Q.    This is what you apparently received word from

24  Chivo; right?

25  A.    Chivo, yeah.

1  Q.  So obviously you're good at lying.  You've

2  done this before.

3      Fair to say?

4  A.  Yeah.

5  Q.  Okay.  So as part of your job as an undercover

6  informant, it's your job to figure out who the

7  criminals are, I guess; right?

8  A.  That isn't my job, you know.  I don't know.  I

9  can't tell you, you know, who's a criminal or not.

10  Q.  Well, it's not your job to turn people into

11  criminals.

12  A.  No.

13  Q.  No?

14  A.  No.

15  Q.  It's your job to find out who criminals are;

16  right?

17  A.  It's not my job.  You know, if I run into

18  somebody, I run into somebody.

19  Q.  Run --

20  A.  I don't look for criminals.  You know, I'm not

21  going to jump in my car and say, okay, let's go

22  find a criminal, no.

23  Q.  But as far as these 15 people go, you didn't

24  go any further to find out who they were or whether

25  they wanted to participate?

1   A.   No.

2   Q.   And Jeremy Tucker -- a guy named Jeremy Tucker

3   you never met or spoke to?

4   A.   No.

5            MR. MANCH:   If I could have just one

6   moment, Your Honor?

7            THE COURT:   Take your time.

8   BY MR. MANCH:

9   Q.   Now, when you received this text message, you

10  had already received information that --

11           THE COURT:   You mean when he received it

12  or when he sent it?

13           THE WITNESS:   When I sent it.

14  BY MR. MANCH:

15  Q.   I'm sorry.   Let me rephrase.   When you sent

16  the text message.

17  A.   Okay.

18  Q.   Well, apparently you received word from --

19  backing up, you received word from Chivo that there

20  were 15 people ready to go.

21  A.   Right there, when he jumped in the car with

22  me, he told me there are 15 people here waiting.

23  Q.   Now, prior to that, you received information

24  that the blacks were not participating?

25  A.   Well, in the morning, Gollo told me that he

1    would send the blacks so nothing would come back to

2    the Mexicans.  That's what he told me in the

3    morning, like nine o'clock in the morning,

4    somewhere around in there.

5    Q.    I'm sorry.  Who told you that?

6    A.    Gollo.

7    Q.    He told you what?

8    A.    That he would send a couple black guys so

9    nothing comes back to the Mexicans.

10   Q.    Okay.  Well, that was something that he told

11   you way back.

12   A.    No, I think that day, in the morning.  I

13   believe it was in the morning.

14   Q.    He told it to you again?

15   A.    I think so.

16   Q.    Was that meeting recorded?

17   A.    Not a meeting.  A phone call.

18   Q.    Was that phone call recorded?

19   A.    Yeah, yeah.

20   Q.    It was?

21   A.    Yeah.

22   Q.    Now, you didn't remember the types of cars

23   that were coming to Tucson; right?

24   A.    Yeah.

25   Q.    You don't remember being told what type, make,

1    model?

2    A.    I think Chivo told me, but I don't remember

3    what day, you know, when he -- it's a phone call,

4    but I don't remember which day or something.

5    Q.    Now, on February the 4th, you had a planning

6    meeting with Chivo and Gollo and some other

7    individuals.

8    A.    Yeah.

9    Q.    Is that right?

10   A.    Yes.

11   Q.    And during that meeting, you were explaining

12   in broad outlines what the plan was going to be;

13   right?

14   A.    I told them there was going to be a house with

15   drugs.

16   Q.    And you told them about Azul and Azul's son;

17   right?

18   A.    Yeah.

19   Q.    You told them he was going to be there?

20   A.    Uh-huh, yes.

21   Q.    You talked about grabbing El Azul's son?

22   A.    Yes.

23   Q.    You discussed that with them?

24   A.    Yeah, with Gollo and Chivo and Mayco.

25   Q.    Okay.  And it was you who mentioned the amount

1  of cocaine involved?

2  A.  Yes.

3  Q.  Okay.  And the basic amounts, at least the

4  premise that it was going to be 50 kilograms or

5  more, that started from Agent Edwards; correct?

6  A.  Yes.

7  Q.  And then on your own?

8  A.  Yeah, 65.

9  Q.  You improvised and brought it up to 65; right?

10  A.  Yeah.  I came up with a number, you know.

11  Q.  Now, going back to the compensation you

12  received for this case, this is the single largest

13  amount of money that you've ever received in one of

14  these investigations; is that right?

15  A.  Yes.  I already told you, yes.

16  Q.  And as you testified earlier, you'd receive

17  more money if there's 15 people arrested or 16

18  people arrested than if there's only two people

19  arrested?

20  A.  I don't know how much I'm going to get paid,

21  you know.  I'll probably get paid more, but I don't

22  know.  They never told me, when you get more

23  people, you get more money.  You know, I don't know

24  how much.

25  Q.  But it seems that your experience has proven

1  to you that you received more money when there

2  was --

3  A.  Right now, yes.

4          MR. MANCH:  That's all I have, Your

5  Honor.  Thank you.

6          THE COURT:  Mr. Lacey?

7                    CROSS-EXAMINATION

8  BY MR. LACEY:

9  Q.  Good afternoon.

10  A.  Hi.

11  Q.  The February 4th meeting that took place at

12  the business --

13  A.  Where Chivo worked.

14  Q.  -- where Chivo worked, do you see any people

15  in court today that were present at that meeting?

16  A.  Yes.

17  Q.  Will you point that person or persons out for

18  us.

19  A.  Yeah, the guy next to the -- right here, right

20  there.

21  Q.  How far over from the --

22  A.  Next to the lawyer with the glasses.

23  Q.  Okay.

24          THE COURT:  No.  All the lawyers have got

25  glasses.

1          THE WITNESS:  Okay.  The one with no
2    hair.
3          THE COURT:  He said the one with no hair.
4          MR. LACEY:  Right.  Let the record reflect
5    that's Ghermon Tucker.
6          MR. COOPER:  He said that or the judge
7    said that?
8          MR. LACEY:  Huh?
9          MR. COOPER:  He said that or the judge
10   said that?
11         THE COURT:  He said that.  You were
12   laughing about the glasses comment.  You didn't
13   hear that part.
14         MR. COOPER:  I never heard a bald joke
15   before, Judge.
16         THE COURT:  Never; right?
17   BY MR. LACEY:
18   Q.   You also mentioned a conversation that took
19   place at the February 4th meeting, and a few words
20   were said in English.
21        Do you recall that?
22   A.   Yeah.  I told them that I rent houses.
23   Q.   How far away from this person you've
24   identified here, Ghermon Tucker, were you when this
25   -- these few words were said in English?

1   A.   Well, I was, like, next to him.

2   Q.   So by way of distance, would you say --

3   A.   From like here to there, right there.

4   Q.   Maybe four feet, give or take?

5   A.   Yeah, yeah, something like that.

6   Q.   When you were -- when you were having this

7   conversation at this meeting on February 4, were

8   you primarily talking in Spanish?

9   A.   To Gollo, yeah.

10  Q.   And was a lot of the meeting you talking with

11  Gollo?

12  A.   Yeah.

13  Q.   While you were talking to Gollo, were there

14  any other conversations going on at the same time

15  in this room?

16  A.   Yeah.  Mayco and that guy, Mayco was telling

17  him it was going to be 65 birds.

18  Q.   Mayco's telling this to whom?

19  A.   That guy over there.

20  Q.   Mr. Tucker?

21  A.   Yeah.

22       MR. COOPER:  Excuse me.  I'd object, Your

23  Honor.  I'd like to voir dire the witness.

24       THE COURT:  Sure.

25            VOIR DIRE EXAMINATION

1  BY MR. COOPER:

2  Q.  Sir, you were having a conversation in Spanish

3  during the time; is that correct?

4  A.  Yes.

5  Q.  Okay.  And you were talking to Gollo; right?

6  A.  Yeah.

7  Q.  And at that time you were discussing with

8  Gollo what was going to be taking place; right?

9  A.  Yes.

10  Q.  And because you were having this conversation

11  in Spanish, you weren't able to hear what was being

12  said by other people in the room; right?

13  A.  Yeah, but I remember Mayco told him, 65 birds,

14  white birds, 65 white birds.

15  Q.  Okay.  This is -- the conversation took place

16  over your conversation with Gollo?

17  A.  Yeah.

18  Q.  Okay.  So the conversation was going on at the

19  same time; is that right?

20  A.  Yes.

21          MR. COOPER:  Your Honor, that's all I

22  have, and I'd object to him characterizing what he

23  heard since he was having a conversation at the

24  same time and he couldn't possibly have heard it.

25          THE COURT:  The objection is overruled.

FURTHER CROSS-EXAMINATION

BY MR. LACEY:

Q.   Sir, did you come to listen to the recording
that was made at that February 4 meeting
afterwards?

A.   Yeah.

Q.   And during the course of listening to that
recording of the meeting that took place on
February 4, were you able to hear any voices
besides your own that were voices that were using
English?

A.   Yeah, him and Mayco --

        MR. COOPER:  Objection on foundation as to
when he was listening to this.

        THE COURT:  I'm guessing it's the three
weeks ago when he showed up at the office.  That's
my guess.

        MR. COOPER:  I suspect you're right.

BY MR. LACEY:

Q.   When approximately was that, that you listened
to that tape?

A.   Three weeks ago.

        MR. LACEY:  Judge, you're clairvoyant.

        THE WITNESS:  You read my mind.

BY MR. LACEY:

1  Q.  Listening to that tape, did you help in any

2  translations of that, or at least --

3  A.  Yes.

4  Q.  -- as to identification of voices that were

5  involved in that?

6  A.  Yes.

7  Q.  And was there also an FBI translator involved

8  in that process?

9  A.  Yes.

10  Q.  After the warehouse incident on February -- on

11  March 2nd, did you have any conversation with Agent

12  Edwards after the explosion and the doors came off?

13  A.  Yes.

14  Q.  And where did that conversation take place?

15  A.  Outside of the warehouse.

16  Q.  And -- pardon?

17  A.  Go ahead.

18  Q.  And at that -- what was said by you during

19  that conversation?

20  A.  There is people in the Food City.

21  Q.  There were people in the Food City?

22  A.  Yeah.  There was other people in the Food

23  City.

24  Q.  Had you already sent the text message to Jerry

25  Rubalcalva --

1   A.   Yes.

2   Q.   -- prior to this?

3   A.   Yes.

4   Q.   At the meeting back on February 4 that we

5   talked about where you've identified Mr. Ghermon

6   Tucker as being present, do you recall what he was

7   wearing, if anything, on his head back at that

8   meeting?

9   A.   I remember a nylon, a nylon thing on the head.

10   Q.   What's that called?

11   A.   A nylon?  Nylon?  I don't know what the name

12   is, but it's a nylon something.

13   Q.   And did that cover his entire hair?

14   A.   Yeah.  He had a hat, yeah.

15   Q.   And was there a hat also or --

16   A.   Yeah.

17   Q.   When you were shown a photograph sometime

18   after this February 4 meeting by the FBI, you

19   mentioned that there were a couple of black males

20   in that selection of photographs you were shown?

21   A.   Yeah.

22   Q.   Do you know whether any of the two black males

23   in those photographs were wearing hats or

24   otherwise?

25   A.   No.

1    Q.  You said you recognized one of the two.  Did

2    you recognize it because of the hair or because of

3    the facial expressions?

4    A.  The facial expressions.

5    Q.  And you couldn't recognize the hair anyway,

6    could you?

7    A.  No.

8    Q.  By way of the February 4 meeting, when you

9    first saw Ghermon Tucker, who did he come to the

10   meeting with, if you could tell?

11   A.  Mayco.  Mayco.

12   Q.  When you saw Mayco in Tucson on March 2nd, did

13   you have any idea who he brought with him on that

14   occasion?

15   A.  Yeah.  Chivo told me that he brought him.

16   Q.  Chivo told you he brought --

17   A.  Yeah, he brought him.

18   Q.  The fellow, Ghermon Tucker, as you later found

19   out?

20   A.  Yeah.

21         MR. COOPER:  Judge, that -- well

22   (indicating.)

23         MR. LACEY:  I have nothing further.

24         THE COURT:  Mr. Young, I'll give you three

25   minutes.

REDIRECT EXAMINATION

BY MR. YOUNG:

Q.   Sir, some of the other lawyers have asked you questions about more people, more money.

A.   What?

Q.   Some of the other lawyers have asked you questions about getting more money if more people are arrested.

THE COURT:  You asked him those questions, too, by the way.

MR. YOUNG:  Some of the other lawyers brought it up as well, Your Honor, yes.

THE COURT:  That's true.  They did.

A.   Like I told you, I don't know how much I'm going to get paid.  I don't know if I'm going to get paid.  I don't know.

Q.   At page 920, it looks like you had a discussion with Chivo.

A.   What date?

THE COURT:  He said, "What date?"

MR. YOUNG:  Monday, February 28, at 1:12 in the afternoon.

MR. LACEY:  The 28th?  There was no meeting, if it was a meeting.  Maybe it was a phone call.  I don't know.

1    Can we have some clarification?

2    MR. YOUNG:  Discussion by telephone.

3  A.   What?  Can you repeat the question?

4  Q.   You had a telephone call with Chivo on

5  February 28th at 1:12 in the afternoon.

6    Do you recall that?

7  A.   I don't remember, you know, it was a year ago,

8  for a phone call.

9  Q.   But you had phone calls with Chivo?

10  A.   Yeah.

11  Q.   And do you recall telling Chivo that he should

12  persuade his neighbors, the black dudes, to come so

13  they can apply pressure to collect their money --

14  A.   No.

15  Q.   -- but warns him not to tell Gollo that they

16  are coming too.

17    Do you recall telling Chivo that?

18  A.   No.  Chivo told me that he can use his

19  neighbors if he got ripped off for the money.

20  Q.   You don't recall suggesting to Chivo that he

21  persuade his neighbors, the black dudes, to come?

22  A.   I don't remember.

23    MR. YOUNG:  That's all I have, Your Honor.

24    THE COURT:  Mr. Cooper, I'll give you the

25  same three.  I'll give you your own three minutes.

1     MR. COOPER:  I won't take that long.

2                 REDIRECT EXAMINATION

3  BY MR. COOPER:

4  Q.   Sir, you indicate that on the February 4th

5  meeting in the maintenance room --

6  A.   Yeah.

7  Q.   -- okay, the black man that you saw, you could

8  not see cornrows coming down because he had a --

9  A.   A nylon and a hat.

10 Q.   Okay.  So he had a hat on over what you

11 thought was nylon; right?

12 A.   Well, I don't know the correct name, but it

13 looked like a nylon to me.

14 Q.   Okay.  But above it was a hat.  You could see

15 what was underneath the hat?

16 A.   Yeah.

17 Q.   You could see nylon underneath the hat?

18 A.   Because it like hangs in the back or something

19 you know.  I don't know.

20 Q.   You don't know.  Okay.

21      And that would have been on February 4th;

22 right?

23 A.   Yeah.

24 Q.   And this person you had never seen before;

25 right?

1    A.    No.

2    Q.    And he was in your presence for maybe five

3    minutes, about.

4    A.    No.  More than that.

5    Q.    How long?

6    A.    Probably like 15, 10 minutes, you know.

7    Q.    Okay.  And during that time, however, you were

8    speaking Spanish almost exclusively; right?

9    A.    Yes.

10   Q.    Because you were talking to Gollo; right?

11   A.    Gollo, Chivo, Mayco, yeah.

12   Q.    So you were paying attention to the guys who

13   could answer you in Spanish; right?

14   A.    Yes.

15   Q.    Okay.  And you say that you actually turned to

16   this man, whoever it was, and talked to him in

17   English for a period of time; right?

18   A.    Yeah.  One time, yeah.

19   Q.    And you talked to him about stash houses;

20   right?

21   A.    I rent houses, yeah.

22   Q.    Okay.  And what you did three weeks ago is

23   you, when you were with the prosecutors and the

24   agent, you had an FBI interpreter there, right,

25   helping you out?

1  A.  Yes.  Yes.

2  Q.  Okay.  And you went over the --

3  A.  The phone call, yes, the recording, yeah.

4  Q.  Okay.  And there is no place in here anywhere

5  mentioned in English of stash houses, is there?

6  A.  I don't say stash houses.  I rent houses.

7  Q.  And there is no place in here that says, "I

8  rent houses"?

9  A.  I don't know.  I don't have the --

10  Q.  Well, do you want to take a look at it?  It

11  won't take too long.  There is not much English

12  here.

13       MR. LACEY:  Your Honor, page 10 of the

14  transcript, about 15 lines down, "I rent houses and

15  everything."  That's where he'll find it.

16       THE COURT:  Page 10, line 15.

17       MR. LACEY:  Of the transcript from

18  February 4.  One, two, three, four lines from the

19  bottom.  "I rent houses and everything," by the

20  informant.  That's where he'll find it.

21  A.  There you go.

22  Q.  Are you happy that he said that to you?

23  A.  No, I remember.  I heard it, you know.  It's

24  not like he saved me.  I heard the meeting, so he

25  was there.

1    Q.   And this is when you had the transcriber with
2    you, looking and looking at this, right, or the
3    translator?
4    A.   Yeah.
5    Q.   Okay.  And at that point, March 20th, they
6    showed you a photograph; right?
7    A.   On March what?
8    Q.   On March -- well --
9         THE COURT:  Three weeks ago.
10   BY MR. COOPER:
11   Q.   Three weeks ago.
12   A.   Oh, yeah.
13   Q.   They showed you a photograph; right?
14   A.   Yeah.
15   Q.   Of a black man; right?
16   A.   A few black males, yes.
17   Q.   Well, how many black men were in the
18   photographs?
19   A.   I don't remember.  It was -- it was some of
20   the Mexicans and a few black guys, you know.
21   Q.   And the black guys that you'd never seen
22   before?
23   A.   Yeah.
24   Q.   You'd never seen the black guys in the
25   photographs that they showed you; right?

1   A.   No.  Only one.

2   Q.   Only one?

3   A.   Yeah.

4   Q.   That was the photograph you'd seen before;

5   right?

6   A.   Yeah.

7   Q.   And that was this photograph, 5-A; right?

8   A.   Yes.

9   Q.   That's the photograph that they showed you

10   three weeks ago, and they said this is the guy --

11   A.   I think it's a different picture.  I think

12   it's a different picture, but I don't remember, you

13   know.

14   Q.   You don't remember?

15   A.   Yeah.  I don't remember if it's the same

16   picture that you have in your hand.  I don't

17   remember, you know.

18   Q.   But you remember the fact that they were

19   talking about stash houses; right?

20   A.   Yeah.

21   Q.   And you remember sitting there with a

22   translator and going over -- talking about 65 kilos

23   in English; right?

24   A.   Yes.

25   Q.   You remember all those details; right?

1  A.  Yeah.

2  Q.  But you don't remember the picture with the

3  cornrows?

4  A.  No.

5  Q.  No?

6      And what is it exactly that these people told

7  you when they showed you the picture of the black

8  man?

9  A.  Nothing.

10 Q.  Exactly.  What did they say exactly?

11 A.  Nothing.

12 Q.  They said, here, look at this picture?

13 A.  It was just give me the pictures.  That's it.

14 Q.  Did they say who these people are?

15 A.  The people who got arrested.

16 Q.  The people who got arrested?

17 A.  Yeah.

18 Q.  They showed you 15 pictures?

19 A.  No, I don't think so.  I think less pictures,

20 you know.

21 Q.  Okay.  Was this tape recorded, this

22 conversation you had with Mr. Lacey and the agent

23 three weeks ago?

24 A.  No.

25 Q.  Okay.  But they said, we want to show you the

1  pictures of the people who got arrested?

2  A.   They didn't -- they didn't tell me that.

3  Q.   What did they tell you?

4  A.   I just started looking at the pictures.

5  Q.   What?

6  A.   I just looked at the pictures.

7  Q.   What for?  Why were you looking at the

8  pictures?

9  A.   I don't know.

10  Q.   Well, did you say, why am I looking at these

11  pictures, to these people who are showing them to

12  you?

13  A.   No.

14  Q.   Then why were you looking at the pictures?

15  A.   I don't know.  Just looking at the pictures

16  right there.

17  Q.   To remind you of something?

18  A.   No.

19  Q.   They you just sat there and they said, here,

20  boom, boom, boom, boom, put a bunch of pictures in

21  front of you and --

22  A.   No.  I put them on -- like, like, I met

23  people.  I put for Chivo.  I put myself.  I got the

24  picture.  I put Chivo -- no, Roberto, Chivo, Gollo,

25  Gollito, Mayco, and that guy, and the rest, I

1  didn't know who they were.

2  Q.  The guy on February 4th, the black guy, you'd

3  never seen him before in your life; right?

4  A.  Yeah, never.

5  Q.  Okay.  And then 10 days later, they showed you

6  a picture of a black guy and said, this is the guy

7  that was there February 4th; right?

8  A.  No.  They didn't tell me that.

9  Q.  They said, is this the guy?

10  A.  Yeah, it is the guy.

11  Q.  And you said, yeah, I think that is; right?

12  A.  I believe so.

13  Q.  You believe but you're not certain; right?

14  A.  It's a long time ago, man.

15  Q.  But you weren't certain then.  February 14th

16  you weren't certain, were you?

17  A.  Yeah.

18  Q.  And you said "I believe" because you weren't

19  certain; right?

20  A.  Yeah.

21        MR. COOPER:  Thank you.

22        MR. ARMSTRONG:  Nothing, Your Honor.

23        THE COURT:  Mr. Manch?

24        MR. MANCH:  That's all, Your Honor.  Thank

25  you.

1          THE COURT:  Thank you.  You may step
2  down.
3          Last witness, Mr. Young?
4          MR. YOUNG:  We'd like to call Agent Jon
5  Edwards to the stand.
6          THE COURT:  Agent Jon Edwards.  How long
7  is it going to take?
8          MR. YOUNG:  It would go past five, Your
9  Honor.  We're eight minutes away now.
10         THE COURT:  Yeah.  It's going to go past
11  five?
12         MR. YOUNG:  There is no way five attorneys
13  are going to get through this.  I can do it in
14  eight minutes, but --
15         THE COURT:  You could do it in eight
16  minutes?  I doubt it.
17         MR. LACEY:  Let's prove it.
18         THE COURT:  No.  I've got to be
19  someplace.  Can we meet tomorrow?
20         MR. MANCH:  I have a jury trial at City
21  Court tomorrow.
22         THE COURT:  Wednesday?  Look at your
23  calendars.  I guess I'll look at mine too.
24         I can do something tomorrow, I can do
25  something Wednesday.  I can do something Thursday.

1          MR. MANCH:  Thursday is a better day for

2   me, Your Honor.

3          MR. ARMSTRONG:  Thursday for me also.

4          THE COURT:  Edwards, can you be here on

5   Thursday?

6          MR. LACEY:  We'll work around it, Your

7   Honor.

8          THE COURT:  All right.  How about Thursday

9   at 10:30.  All right?

10          Marshals, make sure everybody comes back.

11          UNITED STATES MARSHAL:  Yes, Judge.

12          THE COURT:  All right.  Thank you.

13          (Proceedings concluded in this matter.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Erica R. Grund, do hereby certify that

4    I took the machine shorthand notes in the foregoing

5    matter; that the same was transcribed via computer-

6    aided transcription; that the preceding pages of

7    typewritten matter are a true, correct, and

8    complete transcription of those proceedings

9    ordered, to the best of my skill and ability.

10         Dated this 26th day of July, 2012.

11

12                        s/Erica R. Grund
                          Erica R. Grund, RDR, CRR
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25