1          IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3   UNITED STATES OF AMERICA

4   vs.                              CR-11-1013-TUC-RCC

5   GHERMON LATEKE TUCKER, et al.,

6

          Defendants.
7   _____

8                                    July 23, 2012
                                     Tucson, Arizona
9

10

11

12

13

14                  MOTION HEARING

15      BEFORE THE HONORABLE RANER C. COLLINS
            UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22  Court Reporter:        Erica R. Grund, RDR, CRR
                           Official Court Reporter
23                         405 W. Congress Street
                           Tucson, Arizona 85701
24

25    Proceedings prepared by computerized realtime
                      translation

<pre>
 1                    A P P E A R A N C E S

 2

 3   For the Government:     James T. Lacey
                             Kimberly E. Hopkins
 4                           Assistant U.S. Attorneys

 5

 6   For Ghermon Tucker:     Dan Cooper
                             Cooper & Udall PC
 7

 8

 9   For Jerome Ranger:      Stephen Jonathan Young
                             Williamson & Young
10

11

12   For Ja'Cory Ranger:     Bradley James Armstrong
                             Armstrong Law Office
13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

```
 1              P R O C E E D I N G S
 2              THE CLERK:  CR-11-1013, United States of
 3    America vs. Ghermon Lateke Tucker, Ja'Cory Dante
 4    Ranger, and Jerome Noel Ranger, on for pending
 5    motions.
 6              Counsel, please state your appearance.
 7              MR. LACEY:  Good afternoon, Your Honor.
 8    James Lacey and Kim Hopkins for the United States.
 9              THE COURT:  Good afternoon.
10              MR. COOPER:  Good afternoon.  Dan Cooper
11    on behalf of Ghermon Tucker.  He's present, Your
12    Honor.
13              THE COURT:  Good afternoon.
14              MR. ARMSTRONG:  And Brad Armstrong for
15    Ja'Cory Ranger.  He's also present.
16              THE COURT:  Good afternoon.
17              MR. ARMSTRONG:  Good afternoon.
18              MR. YOUNG:  And good afternoon, Your
19    Honor.  Jon Young for Jerome Ranger, who is out of
20    custody but not yet present in court.  I talked to
21    him 14 minutes ago.  He said he was 10 minutes
22    away, so I imagine he's getting close.
23              THE COURT:  Good afternoon.  Do you want
24    to wait for his presence?
25              MR. YOUNG:  If the Court's willing, I'm
```

1    willing to waive it, Your Honor.  I'll waive.

2              THE COURT:  Let's wait.

3              MR. YOUNG:  Okay.

4              THE COURT:  If he's just a few moments

5    away, let's wait.  When you said 14 minutes ago, he

6    was 10 minutes away.  I'm not that good at math,

7    but that means he should be close.

8              MR. YOUNG:  He's probably putting his

9    shoes back on, Your Honor.

10             MR. ARMSTRONG:  Your Honor, I just

11   received a text from Mrs. Ranger.  She says they're

12   just a few minutes out.

13             THE COURT:  Okay.

14             (Off the record.)

15             THE COURT:  Show that Mr. Jerome Ranger is

16   now present.

17             DEFENDANT JEROME RANGER:  Yes, sir.

18             THE COURT:  Which motion do you want to

19   deal with first?

20             MR. COOPER:  May I approach the podium?

21             THE COURT:  You may.

22             MR. COOPER:  Your Honor, the issue that

23   I'd request that we do first would be our motion

24   regarding the suggestiveness of the initial

25   identification, and in our joint motions in limine,

1   I believe it would be three.

2            I think there are numerous motions the

3   Government believes are going to be uncontested

4   today.  This is one of the contested motions.

5            THE COURT:  Okay.

6            MR. COOPER:  The Government's response to

7   the motion -- and we have to go back in time to the

8   motions hearing, or the hearing I guess a couple

9   weeks ago in which the Government indicated it was

10  not going to use the suggestive identification

11  procedure by the FBI with the informant.  That was

12  the procedure we had objected to in which

13  Mr. Tucker had then, at the change of plea, been

14  asked about whether he was present at the February

15  4th.

16           I indicated that I thought that now that

17  he was being -- that his plea was being, by the

18  Government, requested to be thrown out, that he was

19  at a great disadvantage because he had basically

20  admitted to being at that February 4th meeting.

21           The Government then indicated quite

22  magnanimously that it would not use that

23  identification procedure, and the Court I remember

24  indicated -- because I had then said at that time,

25  that puts me in somewhat of a bind as to what I'm

1  going to be saying about the identification.

2         We now know what the Government had in

3  mind, because in their response, they say, we're

4  not going to worry about the procedure on February

5  14th in which Agent Edwards showed a one-person

6  photographic show-up to the informant and said,

7  basically, is this the person, and Mr. Tucker was

8  identified.

9         We're absolutely not going to go there;

10 however, what we are going to do is we're going to

11 ask the informant at trial to make an in-court

12 identification of Mr. Tucker as being present at

13 the February 4th meeting.  And the problem with

14 that is, you know, the Government's magnanimity is

15 not quite so much.

16        The real issue, Your Honor, is the

17 suggestiveness of the initial identification, which

18 was on February 14th and which was the subject of

19 the motion to suppress.  And then the Government,

20 when we -- when I said, you know, how can you now

21 pull Mr. Tucker's plea when he admitted that, when,

22 he didn't really need to during the colloquy for

23 the change of plea and the Government said, don't

24 worry, we're not going to use it, the whole issue

25 is suggestiveness and whether or not the

suggestiveness of the initial identification then taints any subsequent procedures.

So what the Government is doing is having it all its own way. It's saying, we're not going to go into the procedure by which the informant identified Mr. Tucker. Well, that's great, because our claim is that it was a fully suggestive identification.

So the Government says, we're just going to skip that, and Tucker and his attorney are not going to be able to challenge that. We're not going to go into it. All we'll do is we'll jump ahead to the in-court identification which, Your Honor, under all the case law, under the Arizona case law, under the case -- under federal case law, the issue is the suggestiveness of the initial identification.

And we believe we've made a prima facie case that this identification, this photo identification procedure, absolutely was suggestive and could not help but have tainted any subsequent identification, particularly an in-court identification.

So the Government simply can't say, we're just going to ignore the February 14th absolutely

1  suggestive procedure, and we'll give Cooper that.

2  Instead we'll just jump ahead to the trial and have

3  the informant identify him at trial.

4       They're intertwined.  They're totally

5  related.  You can't say, well, we won't deal with

6  the February 14th procedure.  We'll just jump ahead

7  to the in-court identification, which has now been

8  tainted by the February 14th procedure.

9       And we believe that the Government, the

10  Government's offer not to use the February 14th

11  identification amounts to absolutely nothing if

12  they're now going to use the subsequent tainted

13  in-court identification.

14       THE COURT:  Mr. Lacey?

15       MR. LACEY:  Yes, Your Honor.  Good

16  afternoon, Your Honor.

17       THE COURT:  Good afternoon.

18       MR. LACEY:  Your Honor as far as the

19  February 14th showing of photographs to the

20  informant back on that date, there were a total of

21  18 photographs shown.  There were two black males

22  that were in that spread, and the rest were

23  non-black, if you will.

24       The way the two black males were selected

25  was by license plates that were identified outside

1  of the meeting on 2/4 or thereafter when they did

2  some follow-up surveillance, and it comes back to

3  Michael Austin and Mr. Tucker as the two males that

4  were identified through license plate tags.

5           THE COURT:  The two photographs were of

6  Michael Austin and Mr. --

7           MR. LACEY:  Mr. Tucker, yes, Your Honor.

8           THE COURT:  -- Tucker?

9           MR. LACEY:  That's correct.

10          And as far as it being unduly suggestive,

11 would it have been better to have a six-pack or an

12 eight-pack, you know, if it was a bank robbery or

13 on the scene of things, but as we've heard

14 testimony from the agent, this was a developing

15 investigation, trying to see where the tentacles

16 led them.

17          It was not an issue of, was this a split-

18 second meeting.  If we need to have a hearing

19 regarding that particular spread of photographs

20 that were shown to the informant, so be it.

21          THE COURT:  We've already had testimony

22 about that issue already.

23          MR. LACEY:  We have, so I just don't see

24 the point, but I suggest to the Court that it was

25 not unduly suggestive.  It was just, do you see

1  anyone here that was at that meeting back on 2/4?

2  He picked out Mr. Tucker, and he picked out -- I

3  believe there were three or four of the Mexican

4  defendants that were similarly at that meeting that

5  were in that package of 16 photographs.

6         One kind of corroborates the other, and we

7  now know from the Mexican defendants who have pled

8  guilty in the investigation that the informant, the

9  cooperator, was right on as far as all the people

10  that he identified back on 2/14 that had been at

11  the meeting on 2/4.

12         And I don't -- I submit to the Court it

13  wasn't unduly suggestive, and any in-court

14  identification which has already been made on two

15  different occasions, as I recall, by the

16  cooperator, should happen in front of the jury as

17  well, that he should be permitted, if he can, to

18  pick out Mr. Tucker as being present at the 2/4

19  meeting.

20         THE COURT:  So your argument is that it

21  wasn't unduly suggestive --

22         MR. LACEY:  That's correct.

23         THE COURT:  -- number one and, therefore,

24  any in-court identification shouldn't be tainted?

25         MR. LACEY:  Exactly.

1          THE COURT:  Okay.  Mr. Cooper, anything

2   further?

3          MR. COOPER:  No, Your Honor.

4          THE COURT:  Thank you.  I'll take it under

5   advisement.

6          Next motion.  Was that motion -- which

7   motion was that, No. 1?

8          MR. COOPER:  Number 3, Your Honor.

9          THE COURT:  Well, your No. 3 is --

10         MR. COOPER:  It's our -- on the joint

11  motions in limine that was filed --

12         THE COURT:  It's Motion 702 then.  That's

13  what I need, the docket number.

14         MS. HOPKINS:  I think it's 767.

15         THE COURT:  767?  Okay.  That's the one I

16  need.  That's the number I need.  Okay.

17         MR. COOPER:  I've got CR-702.  Document

18  767 is the Government's response.

19         THE COURT:  Okay.  702.  Next motion.

20         MR. COOPER:  Your Honor, I believe the

21  other one that I -- and I think Mr. Young and

22  Mr. Armstrong would like to address this as well,

23  which would be No. 1, which would be our Crawford

24  motion, essentially, and it's CR-585.  Under the

25  joint motions in limine, it would be No. 1.  The

1  Government's response is Document 585.

2          THE COURT:  Okay.

3          MR. COOPER:  What I would point to, Your

4  Honor -- and this is our motion regarding the

5  conversations essentially taking place between the

6  informant and various Mexican defendants.

7          Really the Government can't point to

8  hardly any conversations between the black

9  defendants, if any.  These are all the tape

10 recorded conversations that the informant had with

11 all of the defendants who already pled and will not

12 be involved in this case.

13         I'd point you to the last sentence of the

14 Government's response, which essentially

15 demonstrates that the Government has totally missed

16 the point.  That sentence says, "Defendants who are

17 suspected of ongoing criminal activity have no

18 protection from their own misplaced confidence in

19 an undercover Government informant."

20         Well, that does nothing for Crawford, Your

21 Honor, because frankly, this language, the

22 misplaced confidence in the undercover Government

23 informant was from the Mexicans.  That's where the

24 Crawford issue is.  The black guys didn't have any

25 confidence in this informant.  They didn't have any

1 dealings with him.

2 So the Government can't now come in and

3 argue, citing a 1966 case, Hoffa v. United States,

4 that it's these defendants' fault that they had

5 confidence in Tony. They had nothing to do with

6 Tony. All these conversations were with the

7 defendants who are no longer in this case, and we

8 won't have the opportunity to cross-examine them.

9 THE COURT: And you're saying these are

10 conversations that occurred prior to the arrest?

11 MR. COOPER: That's correct.

12 THE COURT: These are conversations that

13 were in the quote/unquote planning stage of the --

14 MR. COOPER: Yes.

15 THE COURT: -- supposed rip?

16 MR. COOPER: That's right.

17 THE COURT: And they were all held with

18 the Mexican codefendants.

19 MR. COOPER: That's right.

20 THE COURT: The Government's claiming that

21 those are statements made by co-conspirators, and

22 they should come in for that reason.

23 MR. COOPER: Right. And they cite the

24 fact that Crawford doesn't apply because of the

25 misplaced confidence the person involved in

1  criminal activity has in the Government's

2  informant.  They had no misplaced confidence in the

3  Government informant because they hadn't met him.

4      MR. LACEY:  As the Court I suspect is

5  seeing with the argument being made by counsel,

6  here we have statements made during and in

7  furtherance of the conspiracy, albeit mostly by the

8  Mexican defendants, although you recall on 2/4

9  there were also statements in English between a

10  black male who was present at this meeting and

11  Mayco and the informant.

12      Where someone joins in the existing

13  conspiracy, the law has been here for just about

14  forever, one who joins in an existing conspiracy is

15  accountable for all that took place during -- prior

16  to them joining the conspiracy.

17      So first we have the blacks that joined

18  afterwards.  We submit that, first off, Tucker was

19  part of that.  But second, anyone that came in

20  later is accountable for what the codefendants or

21  co-conspirators said early on.  Whether they were

22  there or not, whether they were even part of the

23  conspiracy at that point in time, they adopted

24  anything that took place during the planning stages

25  of this particular rip that was going to be done

1  here in Tucson.

2  THE COURT:  Mr. Young, did you want to say

3  something additional about this?

4  MR. YOUNG:  Yes, Your Honor.

5  The motion -- this motion started at

6  CR-277, I filed a supplement to it at 585.  The

7  supplement addressed only the confrontation portion

8  at 585.  There is the Government's response at

9  606.  It's No. 1 in the joint motions in limine.

10  It's 767.  And it's No. 1 in the Government's

11  response to the motions in limine at 790.

12  What I'm raising, the portion of what I'm

13  raising, Saji Vettiyil originally raised this as a

14  hearsay and confrontation motion at 277, but since

15  then, I've analyzed it as a confrontation motion.

16  So what I'm -- what I'm advancing is not a

17  hearsay objection at all.  It's a confrontation

18  objection.

19  THE COURT:  Under Crawford.

20  MR. YOUNG:  Under Crawford, right.  So the

21  hearsay objection, the co-conspirator statement is

22  really not relevant to what I want to talk about,

23  which is Crawford.

24  Crawford requires confrontation of

25  testimonial evidence, and it offers up a definition

1  of testimonial evidence, because that's not a term

2  that we've really been using up until now.  It

3  defines testimonial evidence to include, at a

4  minimum, police interrogation, at a minimum, police

5  interrogation.  So I know it includes that much.

6           Then the question is, is this police

7  interrogation, everything this informant has gone

8  out and inquired of everyone in the course of his

9  investigation?

10          The police hired this confidential

11 informant many years ago.  They paid him many

12 thousands of dollars, over $100,000 in this case,

13 plus much more money in many other cases.  He's

14 clearly working for the police.  He's a paid

15 informant.

16          Paid informants have done police

17 interrogation for many years, and I'll throw out a

18 couple cases there.  Henry and I think the Messiah

19 case, the jailhouse informant cases.  Paid

20 informants working for the police, if they're

21 working for the police before they start looking,

22 are police interrogation.

23          And as far as what's interrogation and

24 what's not interrogation, the CI in this case

25 clearly -- and he admitted on the stand.  He stated

1  that he did deliberately elicit responses, which is

2  the test for interrogation.  You can use a

3  functional equivalent test too, but they both come

4  down to the same thing, deliberately eliciting

5  responses.

6          He was working for the police, and he

7  deliberately elicited responses, so everything that

8  he got back is police interrogation, and it needs

9  to be confronted.

10          The Government's response starts out by

11  citing a case here, United States vs. Larson, at

12  460 F.3d 1200.  I took a look at the Larson case

13  over the weekend and frankly lost interest in it

14  when I realized that it was vacated later the same

15  year.  The subsequent -- it was vacated at 471 F.3d

16  1359.

17          The subsequent case in Larson at 495 F.3d

18  1094 does not address out-of-court statements at

19  all.  It finds error in precluding cross-

20  examination on a CI's mandatory minimum.  The CI

21  was facing life in that case, and the Court

22  precluded that.  Clearly that's something that the

23  defense would have liked the jury to know about in

24  that case.  So that's where the Larson case went.

25          The Government's thought here is

1    interesting to me because their thought is that the

2    declarants, mostly Chivo and Gollo in this case,

3    they did most of the talking, their thought is that

4    the declarants had no expectation, that's what they

5    say, because the declarants had no expectation that

6    the statement might be used at trial.

7           Somehow because Chivo and Gollo had no

8    expectation that this would be used in court,

9    therefore I don't need to cross-examine their made-

10   up statements, that just on the face of it is not

11   making any sense to me, particularly in light of

12   some of the other stuff I'm seeing, the unreliable

13   nature of everything that Gollo and Chivo had to

14   say.

15          Chivo starts out this case by having

16   claimed -- and this is what I understand to be a

17   false claim, but he claimed to have cut some guy's

18   head off for $5,000.  He claimed that Chilango

19   drove him to this murder where he cut somebody's

20   head of as part of a contract killing.

21          Gollo and Chivo both repeatedly claimed to

22   have kidnapped and thrown away three workers for

23   Macho Prieto, thrown away, slang for having

24   killed --

25          THE COURT:  Stop for a second.  Do you

1    intend to go into those conversations that he just
2    talked about at all?
3                MR. LACEY:  No.
4                MR. YOUNG:  The point being --
5                THE COURT:  Those two conversations --
6    Okay.
7                MR. YOUNG:  There is a whole lot of other
8    conversations that are also unreliable because
9    these two guys are unreliable.  They are puffing
10   their ability.  They are talking about blacks.
11   They claimed one, two, or four blacks, but they
12   never claim anywhere near nine blacks.
13               And in fact, Gollo, Gollito, and Chivo
14   also said on March the 2nd that they didn't bring
15   any blacks.  That they did not bring the blacks.
16               The kidnapping, they claimed yet another
17   kidnapping, a son of a Macho Prieto worker, for
18   which they got $300,000.  And I imagine -- I don't
19   know if the Government wants to go into that or
20   not.  It doesn't really matter.
21               THE COURT:  Are you going into that one?
22               MR. LACEY:  No.
23               MR. YOUNG:  It's further indicia of the
24   unreliability of these two guys and why we really
25   need to cross-examine these two guys rather than

1  just let everything that they said about blacks

2  generally roll into the case.

3         Now, when they're talking about blacks,

4  they never once name or identify anybody, certainly

5  not these three defendants, and they don't name or

6  identify any of the other defendants.  Nobody gets

7  named.  They're just talking about blacks that they

8  have working for them, that they have doing other

9  jobs, that they have doing things for them, that

10 they're tough, that they're dangerous.

11        You've seen my list of other home

12 invasions.  It's No. 6, and we'll get to that down

13 the line.  There's a long line of made-up stuff

14 about blacks, or it's about some other blacks.  I

15 don't know which, but it's not about these blacks.

16 It's something that needs to be -- needs to be

17 addressed.  It's unreliable.

18        And also I'm noticing, as I look back at

19 the docket this past week, I'm realizing that Chivo

20 and Gollo have both been sentenced, so it's looking

21 to me like they're not going to be testifying as

22 part of this case, and I'll extrapolate just a

23 little bit from my knowledge of having tried cases

24 here before, my guess is that they have probably

25 been debriefed by the Government and were unable to

1  identify any of these three people or probably any
2  of the nine blacks that were involved in the case.

3     I'm thinking that there is probably some
4  exculpatory evidence that Gollo and Chivo could
5  bring to the case that these are the wrong people
6  or that these guys were not hired by Gollo and
7  Chivo and that they have never been hired by Gollo
8  and Chivo, and that's why Gollo and Chivo are
9  sentenced and they're not testifying in this case.

10    So for many reasons their statements about
11 blacks should not be used in this case.
12 Unreliability, the fact that they are clearly not
13 talking about these blacks, and the fact that we
14 have a right to confront testimonial evidence in
15 this case.

16    And I think just simply the definition of
17 "testimonial evidence" gets us where we need to be,
18 but I really can't talk about that without talking
19 about the unreliability of everything that those
20 two had to say, and also the possible exculpatory
21 nature of what came out in their debriefings.

22    I haven't gotten it yet. I don't know
23 what it is, but if they did say that these are not
24 the blacks and we didn't hire the blacks and we've
25 never worked with these three guys before, I assume

1  I would have that in my hand by now.

2          And that's all I have, Your Honor.

3          THE COURT:  Mr. Armstrong?

4          MR. ARMSTRONG:  Your Honor, very briefly.

5          I'm probably not adding much to anything

6  Mr. Cooper and Mr. Young have brought up, but I do

7  think that we need to go beyond whether this is

8  merely testimonial or nontestimonial for the

9  Crawford analysis.

10          I wholeheartedly agree with Mr. Young that

11  the reliability aspect of this needs to be

12  considered, and I'm asking the Court to consider

13  that, given what Chivo and Gollo, the statements

14  they may have made, even if the Government isn't

15  going to bring in some of the more salacious

16  comments, I think these are people that the jury

17  would -- I feel I would need to be able to cross-

18  examine what it is they're saying, the various

19  claims that they may be making about, you know,

20  what was going to happen here, the planning stage,

21  things such as that.

22          So, Judge I would ask the Court to also

23  consider the reliability factor that was -- I guess

24  that was the state of the law before 2004

25  Crawford.  That was one of the prongs that the

1  Court would have to look at.

2        But in this case in particular, given that

3  there is a confidential informant, you've got

4  folks -- he's recorded, and they're saying all

5  sorts of wild things, and even when we get rid of

6  the wild things, we're still going into things that

7  the jury is going to hear about my client that I'm

8  going to be completely unable to cross-examine.

9        And so for that reason I'd ask that the

10  Court find that these are testimonial and exclude

11  them.

12        THE COURT:  Thanks.

13        MR. LACEY:  Just one thing.  The only

14  thing I would point out to the Court is Messiah

15  deals with people that have been indicted.  We're

16  not there.

17        And I've already addressed the other

18  issues, unless Court has anything further.

19        THE COURT:  All right.  Thanks.  Next

20  motion.

21        MR. COOPER:  Your Honor, I know that we're

22  jumping around a little bit, and I don't have the

23  number, but I filed a couple of Brady motions last

24  week, and I'd like to address the issues in them,

25  if I could.

1          THE COURT:  Okay.

2          MR. COOPER:  The informant in this case

3    will play a central role as to what happens.

4          THE COURT:  You filed them on the 19th,

5    motion 787 and 786.

6          MR. COOPER:  Thank you.

7          I believe that there is a considerable

8    amount of Brady material with respect to him that

9    we haven't received.  In particular, Your Honor, he

10   testified at the suppression hearing that he had

11   been stopped in New Mexico and arrested with

12   multiple pounds of marijuana and that he had been

13   released.

14         I believe that that happened because he

15   was working for the Government, and I believe that

16   that is Brady material, and it's a benefit to him,

17   and I'd like to see all of the information with

18   respect to that arrest, why he was not charged, and

19   how this, as he put it, mistake, wound up not

20   costing him anything.

21         I'd like to know who, in fact, authorized

22   there being no charges.  We've seen no

23   documentation whatsoever from this incident.  Even

24   if he at the time was not working on this case, he

25   was working as an informant for the Government at

the time, and prior to -- I believe prior to
getting involved in this case.

But I think it's relevant as to the kinds
of benefits he receives as an informant, and it's
also highly material as to how he is treated as an
informant.

And the second main issue that I have with
respect to Brady, Your Honor, is -- has to do with
his tax returns.  He indicated specifically that he
pays income taxes on the money that he's earned as
an informant.  I don't believe that.  And I believe
that the testimony in this case was that he was
handed cash and not given a Government check, that
he was given cash for his work in this case.

And I cannot fathom that, after he was
handed 70-something-thousand dollars worth of cash,
he then turned around and reported it on his income
tax, although that is what he testified to.  But I
think if he didn't tell the truth about that, and
I'm fairly certain he did not, we're entitled to
that, and I'd like to see his tax returns and see
how much of that 70 -- actually 100,000, if you
include moving expenses, he declared.

Those are the two main issues with respect
to Brady, although as Mr. Young just mentioned, I'd

1   like to see the presentence reports, if nothing

2   else, of Chivo and Gollo to see what they said

3   about this offense and to see if in there they've

4   indicated that they knew any blacks, that they knew

5   blacks were going to be involved, anything about

6   the offense.

7           We don't have any of the -- any of those

8   presentence reports, and I'd request not just for

9   those two, but for all the sentenced individuals in

10  this case.  We'd like the presentence reports to

11  see if there is Brady material in there as to what

12  they said was taking place with respect to the

13  black defendants.

14          This is sort of an aside.  It's not in the

15  motion.  However, Mr. Young has ordered and I

16  thought my office has also, the transcript of the

17  informant, from his testimony at the motion to

18  suppress.  We don't have it yet.  And we'd request

19  that the court order that whoever's preparing it,

20  whatever court reporter is preparing it, expedite

21  that, because we anticipate that sometime in the

22  week before trial, we're going to be receiving a

23  significant amount of additional discovery from the

24  Government, and it would -- it would be pretty

25  onerous for us to receive that transcript right at

1   the time of trial while we have the other material

2   from the Government.

3          So if the Court would do that, we'd

4   appreciate it the.

5          (A discussion was held off the record

6          between the Court and Court Reporter.)

7          THE COURT:  You'll have it in about three

8   days.

9          MR. COOPER:  Thank you.

10         MR. LACEY:  Your Honor, starting with the

11  New Mexico reports requested by defense counsel, I

12  see that as an issue of inquiry, and deservedly so,

13  that the defense should go into.

14         I was out on leave last week, but I

15  understand in my absence we got at least one report

16  that came in from New Mexico dealing with that

17  incident.  When we give out a week before trial the

18  information pertaining to our source, that will be

19  in there as well.

20         Next the tax returns.  We don't have tax

21  returns for our informant.  We don't have tax

22  returns as far as I'm aware for any of the

23  defendants in this case.  We're not going to get

24  them, and it's a cumbersome process.  The U.S.

25  Attorney has to authorize it.  It's got to go

1    through all sorts of hoops through IRS, and we

2    don't have an obligation, I submit to the Court, to

3    get those, and we don't have them.

4           And talk about time.  I don't think there

5    will be enough time anyway, even if we were

6    inclined to go out and get them.  But we don't have

7    them, and we don't think there's an obligation on

8    our part to produce tax returns for any of the

9    witnesses in this case, including the informant.

10          As far as the presentence reports for the

11   -- for Gollo and Chivo and the other defendants, I

12   also see that the defense is entitled that.  I had

13   a case with Judge Roll some years ago that that was

14   an issue, even where the reports hadn't been

15   generated, and the Ninth Circuit sent it back for

16   additional findings, which Judge Roll made in one

17   of my tunnel cases.

18          So I have put together -- I had put

19   together in my absence last week the PSRs for all

20   the defendants in this case.  We'll be redacting

21   all the nonpertinent stuff and bringing them to the

22   Court in camera for you to bless what the redacted

23   versions --

24          THE COURT:  When you say "nonpertinent

25   stuff," you're talking about the identification of

1   people, such as social security numbers and stuff

2   like that?

3        MR. LACEY:  Yes, Your Honor.

4        THE COURT:  Date of birth, too, I think

5   they'd redact.

6        MR. LACEY:  Anything -- the personal data

7   that would cause issues with those people, but as

8   far as the factual statements and all the things

9   that they made, obviously the defense is entitled

10  to do that.  Especially if they're anything

11  exculpatory, which I don't think there is, but

12  regardless, they'll be getting those as well.

13       THE COURT:  Okay.

14       MR. LACEY:  If there is anything else the

15  Court has questions about -- thank you.

16       THE COURT:  Mr. Young?

17       MR. YOUNG:  If I could be heard still on

18  the Brady issue, Your Honor, the presentence report

19  is probably not going to do it for what I'm

20  interested in.

21       What I'm interested in is that part of the

22  debriefing where --

23       THE COURT:  If there was a debriefing.

24       MR. YOUNG:  If there was.

25       THE COURT:  Okay.

1          MR. YOUNG:  Where Agent Edwards --

2          THE COURT:  Stop for a second.

3          MR. LACEY:  To cut it short, I've had

4   those pulled as well, and we'll be having them

5   redacted as far as personal data.  All the

6   statements of all the defendants in this case where

7   they gave postarrest statements or statements any

8   time thereafter, those will be part of the

9   materials we'll give to counsel for all defendants

10  in this case.

11         THE COURT:  All right.

12         MR. YOUNG:  Well, coming down the pike

13  it's a bit of an issue for me, Your Honor, because

14  we're so close to trial.  My suspicion is that

15  there was a point during one of these debriefings

16  that I'm presuming happened where Agent Edwards put

17  an eight-by-ten glossy photo of my client, Jerome

18  Ranger, in front of Gollo and in front of Chivo and

19  said, who is this guy, did you hire him, have you

20  ever worked with him before, and they said no.

21         I need that part of the debriefing, and

22  once I get that part of the debriefing, that's

23  certainly something that I would like to present in

24  the course of my case in chief.  It's exculpatory

25  because Gollo was the person running this thing,

1  and if he didn't hire my client, and if Chivo

2  didn't hire my client, and if neither of them have

3  ever worked with my client before -- what the

4  Government would like to do is talk about all this

5  stuff that the blacks have done, and I've got one

6  of the three black guys sitting in the courtroom,

7  and everybody's going to be looking at these three

8  blacks like this is all stuff that they've done

9  when I have a very good feeling that Chivo and

10  Gollo have both told the Government we've never

11  seen these guys before.

12      And if that's the case, what are we doing

13  here?  And I would like to present that to the

14  jury, and if I am going to present that to the

15  jury, I'm going to need three weeks to get a writ

16  of habeas corpus ad prosequendum together and get a

17  subpoena together and get those served, and

18  hopefully Gollo and Chivo are still in Arizona.

19      We're getting up pretty close to the -- so

20  coming down the pike is not really what I want to

21  hear.  I don't want to hear it a week before

22  trial.  I just want to know now.  I just want to

23  know today, end of the day today, is there

24  exculpatory from Gollo and Chivo with respect to my

25  client.

1          THE COURT:  Can you answer that,

2  Mr. Lacey?

3          MR. LACEY:  I'd have to check with the

4  agent.  Let me check.

5          But first off, as the Court's well aware,

6  the way this investigation came together, they had

7  the Mexican crew.  Mayco Ledezma came into the

8  picture.  He was the connection with the blacks.

9  That speaks for itself.  I can check with the case

10  agent to see if he has any information, if you

11  will.

12          (Off the record.)

13          MR. LACEY:  Your Honor, I spoke with Agent

14  Edwards.  He tells me that many of the Mexican

15  defendants, including Gollo and Chivo, were shown

16  photographs and identified some of the black

17  members in this -- that are going to trial and also

18  that were involved in the case.

19          I asked them specifically, is there

20  anything negative where they did not identify any

21  of the players involved in this case, and he didn't

22  have any recollection, although we'll definitely

23  check on that.

24          But again, we're -- we have a Brady

25  obligation, and we're well aware of it.  We'll know

1   this week, and we'll get to defense counsel

2   anything this week that falls in that category.

3         So they're on notice. Anything where

4   there's negative as far as photo IDs by any of the

5   defendants, we'll let the defense know this week.

6         THE COURT: All right.

7         MR. COOPER: I have one more issue, one

8   more motion I'd like to discuss, if I could.

9         THE COURT: Okay.

10         MR. COOPER: This, Your Honor, would be --

11   it would be under -- I guess would be CR-745. It's

12   No. 2 in our motion and No. 2 in the Government's

13   response but 745 is the Court's number.

14         This has to do with the request to

15   suppress the warrantless nighttime search of Mayco

16   Ledezma's residence on November 11th of 2010, and

17   the Government's -- the reason I'd like to address

18   it is the Government indicates in its response that

19   it does not intend to introduce evidence from the

20   search of the residence in its case in chief at

21   trial.

22         The issue that we had raised previously

23   and what I thought we were trying to raise in this

24   motion was, are they going to try to introduce

25   anything, including the identity of people that

1 took place or that they learned during the course

2 of the search.

3          They don't indicate that --

4          THE COURT:  I'm sure that they're going to

5 try to.

6          MR. COOPER:  And that's what our motion

7 was intended to preclude.

8          THE COURT:  Okay.

9          MR. LACEY:  Your Honor, as far as the

10 November search, we don't intend to go into the

11 facts pertaining to that at all in our case.  It's

12 only if the defendants, through their putting on

13 their case or cross-examination of our witnesses,

14 opens up those doors, that it would be -- that

15 we'll reconsider that issue.

16          But in our case in chief, we have no

17 intention of going into what happened back in

18 November up in Phoenix.

19          THE COURT:  So you're not going to be

20 talking about the dog sniffing and following a car

21 to that particular residence and all that kind of

22 stuff?  You're not going to touch it?

23          MR. LACEY:  We're not going to go there in

24 our case in chief unless the doors are opened.

25          THE COURT:  All right.

1    MR. ARMSTRONG:  Thank you, Your Honor.

2  Just a couple of brief matters.

3    Paragraphs eight, nine and 10 of the joint

4  motions in limine, eight is dealing with gang

5  affiliation.

6    THE COURT:  Right.  I thought we already

7  said there was going to be no testimony at all

8  about gang affiliations in this case.

9    MR. LACEY:  That's correct.

10    MR. ARMSTRONG:  Okay.  And then I read the

11  response.  I'm just seeking clarification for nine

12  and 10.  I would like to be heard on eight a little

13  bit.

14    Unless the Government's conceding they're

15  not going to be —— my concern is, and this is

16  something that I should have filed a supplemental

17  motion in limine, is the mere color and the make of

18  the vehicle that Ja'Cory was ——

19    THE COURT:  The color of the vehicle is

20  gang affiliation?

21    MR. ARMSTRONG:  Red.

22    MR. LACEY:  We're going into that.

23    MR. ARMSTRONG:  I missed that.  You're not

24  going into that?

25    MR. LACEY:  We are going to go into it,

1   but we're not going to suggest it's gang

2   affiliated.

3       MR. ARMSTRONG:  Having lived in Tucson for

4   14 years, I think, you know, when I hear folks

5   talking about gang affiliation, whether folks are

6   involved in a gang or not, if they talk about a red

7   Escalade, I think the general perception is that

8   the individuals associated with that vehicle may be

9   involved in a gang.

10      Judge, I don't think that the color of the

11  vehicle or the make of the vehicle, the fact that

12  it's an Escalade, a Cadillac Escalade, has anything

13  to do with whether or not these folks were involved

14  in a conspiracy.  I think it's completely

15  irrelevant.  I think it would be offered merely to

16  make a suggestion to the jury that the Government's

17  already conceded that does not need to be made and

18  shouldn't be made.

19      THE COURT:  The Government also said

20  they're not going to try and make that inference

21  anyway.  That's what I thought I heard.

22      MR. ARMSTRONG:  Well, and again, it may be

23  something that they're not even trying to elicit.

24  My point is, you heard red Escalade, and folks may

25  jump to the conclusion that --

1       THE COURT:  Until you just said that, I
2   have never heard that, ever, that because someone
3   drives a red car, they're in a gang.

4       MR. ARMSTRONG:  Well, a red Cadillac
5   Escalade, I think, carries certain -- certainly
6   carries connotations of potentially gang activity.
7   That's been my experience, Your Honor.

8       THE COURT:  All right.

9       MR. ARMSTRONG:  And again, I don't know
10  why it would matter that it's a Cadillac, that it's
11  an Escalade, or that it's red.  The colors -- the
12  color and the make have absolutely nothing to do.
13  It's irrelevant, and I'd ask the Court make a
14  further order that they be precluded from bringing
15  up those issues.

16      MR. LACEY:  The Escalade was black, the
17  Expedition was red, just for the record.

18      I've got to set the record straight here.
19  Just so there is no confusion, when I mentioned on
20  the earlier point, when we talked about the
21  November incident up in Phoenix, one way I can see
22  the door being opened is if the defendants on trial
23  here are suggesting that they didn't know Mayco or
24  Mayco Ledezma.

25      He was at that meeting in November, and as

 1  were some blacks.  If that door gets opened, we're
 2  sure going there, and that was an example of how it
 3  would become relevant, if they suggested there was
 4  no connection between Mayco and these defendants.
 5       But other than that, again, we have no
 6  intention of going into it in our case in chief,
 7  but there are many things that could cause that to
 8  change, and that's one example.
 9       MR. YOUNG:  We're jumping back and forth
10  between a couple of different motions here, Your
11  Honor.
12       With respect to the November 11th, 2010
13  search, that's a Fourth Amendment violation.  It's
14  a warrantless search of a house in the middle of
15  the night.  It's clearly not coming in under the
16  Fourth Amendment.  It was a two-and-a-half-hour
17  wait before they went into the house.  There is no
18  exigent circumstances.  There is no reason to be
19  going into it.
20       The Government is discussing it in terms
21  of relevance, which is making me just a little bit
22  uneasy, because relevance is really not a Fourth
23  Amendment exception.  What would be a Fourth
24  Amendment exception is if one of the defendants
25  took the stand and then said something contrary to

1   what the police discovered or didn't discover or

2   whatever they found out that night.

3           They can be impeached with a Fourth

4   Amendment violation, so really the terminology

5   should be in terms of impeachment rather than

6   relevance.  Impeachment is what would make it

7   relevant.

8           And as long as that's the understanding,

9   then I'm comfortable with what's going on with

10  respect to the November 11th search.

11          MR. LACEY:  I have nothing further.

12          THE COURT:  All right.

13          MR. YOUNG:  And the same with respect to

14  the gang affiliation, Your Honor.  Again, they're

15  looking at it in terms of relevance.  I have to

16  remind --

17          THE COURT:  I don't see at any point in

18  time gang affiliations in this case being relevant.

19          MR. YOUNG:  I don't think that could

20  happen either.  I also don't think that it would be

21  sufficient, and my motion is really couched in

22  terms of sufficiency of the evidence.  In terms of

23  Huddleston vs. United States, I don't think there

24  is sufficient evidence to go to the jury.

25          That's why I had Sergeant Denney, if you

1  recall, down here to testify at the hearing.  He

2  came in, got on the stand.  It was kind of an

3  embarrassment for me.  It turned out I had no

4  questions for him at all because the issue of gang

5  involvement was not going to be used.

6         But again, I don't want to see it twisted

7  up into some sort of relevance exception.  The

8  problem is there's no evidence of gang --

9         THE COURT:  I don't see any way we get

10  involved in a gang discussion in this case.

11         MR. YOUNG:  Good.  Me neither, Your Honor.

12         MR. COOPER:  He's trying to tell you to

13  stop.

14         THE COURT:  I'm trying to tell you I've

15  already ruled that gangs aren't to be mentioned --

16         MR. YOUNG:  Yes.

17         THE COURT:  -- that we're not going to

18  talk about gangs.  We're not going to imply that

19  they're gang members.  It's not going to happen.

20         MR. YOUNG:  On to the next one?

21         THE COURT:  Yes.

22         MR. YOUNG:  Is there any one that you guys

23  want to do?

24         MR. COOPER:  No.

25         MR. YOUNG:  Four and five are both

1  responding to the Government as being premature,

2  Your Honor.  I'm doing my best here.  Last time I

3  was in Court the Government wanted a deadline on

4  motions in limine, so I'm trying to bring this in

5  good faith as quickly as I can, but as the

6  Government points out, they haven't given me the

7  disclosure yet.  That's hardly my fault.

8          THE COURT:  Four and five being?

9          MR. YOUNG:  Very similar motions having to

10  do with pretrial IDs.

11          THE COURT:  I just want to make sure we're

12  looking at the same piece of paper.  That's all.

13          MR. YOUNG:  I'm imagining that the

14  pretrial IDs with Yovani, Gollito, Andy Pineda,

15  with Yovani's brother-in-law probably all happened

16  in the exact same fashion, that they happened with

17  the confidential informant, eight-by-ten glossy

18  photos rather than a six-pack line-up, unless Agent

19  Edwards changed his procedure between the time he

20  talked to the informant and the time that he talked

21  to these cooperating codefendants.

22          And I understand that they have not been

23  disclosed as cooperating codefendants, but Gollito,

24  Yovani, and Andy Pineda stick out.  If they had

25  been shown eight-by-ten glossy photos of our

1 clients and identified those photos of our clients

2 as being present at this, that, or the other thing,

3 those are more bad IDs, and we might as well get

4 into it sooner rather than later.

5      If we want to wait until closer to trial,

6 until after the Government's disclosed those facts,

7 that's okay. I bring them now. It's premature,

8 but I still bring them now because I think that's

9 probably what happened.

10      THE COURT: Mr. Lacey?

11      MR. LACEY: Your Honor, we've already

12 addressed some of the issues as far as the

13 defendants in this case who have pled out or

14 resolved their case, and we will be giving the

15 defense all the debriefings, photo identifications

16 that were made by any people in this case, whether

17 they're going to be testifying in court or not.

18      You know, we have a fairly good idea about

19 who we're going to be calling as witnesses in the

20 case, as you can well imagine, but there are some

21 variations to that, and I think it's premature at

22 this point, and perhaps it's a ploy by defense

23 counsel to try and see who our witnesses are going

24 to be earlier on than the week before, but a week

25 before they'll have the information.

          THE COURT:  All right.  Anything else,
Mr. Young?

          MR. YOUNG:  Yes, Judge.  On to No. 6, with
respect to other home invasions committed by
unnamed blacks who are not here in this courtroom
today.

          As I've indicated, I really think that
Gollo and Chivo probably already told the
Government that these blacks did not do other home
invasions with them.  There is a list of stuff that
they got to say about blacks generally, that the
black males wear police uniforms.  That's what the
blacks do.  Mayco is the boss of a black crew.
Home invasions Brandon's crew has conducted in the
past.  Black males who conduct home invasions --

          THE COURT:  Slow down.

          MR. YOUNG:  I'm sorry.  Miami was in
charge of a group of blacks who would enter the
houses they would rip off.  These black guys are
crazy.  A truck that carries the tools of the black
guys.  They're good workers.  Blacks are more
tricky.  The blacks got sent up to another job.
They send the black guys because they don't give a
shit.  The black guys go anywhere.  They dress as
police and wear the vests and everything.  They're

1　extreme, but as long as they get paid, they won't

2　hurt the kid.  The black dudes just got one

3　yesterday, and it turned out well.  There is no

4　problem with them.

5　　　　I don't want to read the whole thing.  It

6　goes on for a couple of pages, Your Honor.  There

7　is a lot in there about black dudes.  There is no

8　names of any black dudes.  There's no dates,

9　there's no places, there's no nothing to back up

10　anything that Gollo and Chivo are saying.

11　　　　And as we've discussed earlier, Gollo and

12　Chivo are both notoriously unreliable and happily

13　talking about heads that they've cut off that they

14　didn't really cut off and kidnap victims that

15　they've thrown away that they really didn't kidnap

16　and throw away and making up stuff for the sake of

17　puffing up their own abilities, and they're puffing

18　up their own abilities at the sake of our clients,

19　although they didn't know it at the time.  Their

20　our clients now.

21　　　　Now they've apparently got nothing to say

22　about our clients and don't recognize our clients.

23　But they've said all of this stuff about blacks,

24　and here I am representing one of the three blacks

25　in the courtroom, and all this stuff about blacks

1  is going to come rolling in as a co-conspirator

2  statement.

3         I understand hearsay, but I also

4  understand Huddleston, and Huddleston says, if

5  you've got other act information, if you've got

6  prior bad acts, you've got to have sufficient

7  evidence of it to go to the jury, and I submit that

8  anyone of these prior bad acts that they're talking

9  about is insufficient -- would be a directed

10 verdict straight out of the box.

11        If you just tried to convict them on

12 that's what the blacks do, that's a directed

13 verdict straight out of the box.

14        They just got one yesterday and it turned

15 out well.  That's not enough evidence to go to a

16 jury.  It's not a place.  It's not a date.  It's

17 not a -- it's not a name.  It's --

18        THE COURT:  Where did you get all these

19 statements of, the recording?

20        MR. YOUNG:  The page number of the

21 disclosure that these page numbers are from?

22        THE COURT:  No, I mean these are not the

23 recordings?  This is the page number.

24        MR. YOUNG:  This is the page number.

25        THE COURT:  This is not from the

1  recordings themselves?

2          MR. YOUNG:  No.  This is from the

3  translation of the recordings.

4          THE COURT:  Okay.

5          MR. YOUNG:  So that's what I have with

6  respect to Huddleston and 404(b) and other home

7  invasions.  I don't want to deal with home

8  invasions that other blacks may or may not have

9  committed.  It's got nothing to do with me, it's

10  got nothing to do with my client, and it just

11  dirties up the trial by a lot for me.

12          I don't think it's sufficient to go to the

13  jury under Huddleston.

14          THE COURT:  Mr. Armstrong, anything

15  additional you want to add?

16          MR. ARMSTRONG:  No, thank you, sir.

17          THE COURT:  Mr. Cooper, anything

18  additional you want to add on this?

19          MR. COOPER:  No, Your Honor.

20          THE COURT:  Mr. Lacey?

21          MR. LACEY:  Yes.  Thank you, Your Honor.

22          Your Honor, there's some delicate areas

23  that have to be addressed or will be addressed

24  during the course of the trial.

25          For example, one or more of the witnesses,

1  Government witnesses, that will be testifying were
2  involved in other home invasions.  They may have
3  been involved, depending upon which witness it may
4  be, with some of these defendants.
5          If on cross-examination by -- I need to
6  know or would request to know whether the defense
7  is going to cross-examine some of these witnesses,
8  the Government witnesses, about prior home
9  invasions they may have committed, and if they are,
10 then I want to go into it on direct examination
11 first, for the obvious reasons.
12         If they're going to say we're not going to
13 ask them any questions about any prior home
14 invasions, then that makes it a little different,
15 and we can try and sterilize the case as much as we
16 can up to a point.
17         But part of the conversations that were
18 had by the Mexicans with the informant, some of the
19 recorded meetings are where Mr. Tucker may have
20 been present on 2/4, for example, conversations
21 where the Mexican co-conspirators were talking,
22 trying to build up the confidence of the informant
23 about the credentials of the people they were
24 working in conjunction with, that is, the black
25 crew that they worked with in the past and we're

1  going to work with on this job.

2          In that -- in that respect, it's relevant

3  because it's during and in furtherance of the

4  conspiracy, trying to build up the credentials of

5  the co-conspirators who were not present.

6          So it's a delicate balance, but it will be

7  something that we need address further beyond just

8  throwing out some statements that were --

9          THE COURT:  How many of these recordings

10  do you intend to play?

11          MR. LACEY:  We intend to play certain

12  portions of the 2/4 meeting, portions, redacted,

13  because it's a fairly long meeting, and I'm not

14  going to bore the jury out of their socks.

15          And we'll have those ready a week before

16  trial with the redacted versions of what we intend

17  to play in front of the jury, similarly with the

18  other calls or the other meetings that may have

19  taken place.  For example, on 3/2, the informant

20  was in a vehicle driving with one of the Mexican

21  crew members down to the warehouse.  That was

22  recorded.

23          It was a recording done at the warehouse

24  where there's a conversation about -- the blacks

25  came up during the course of that conversation,

1    during the course of that day, on 3/2.  That would

2    be highly relevant about what was going to take

3    place with the people that were present in Tucson

4    on that day.

5        So it depends.  We'll have all that laid

6    out for the defense a week before trial when we

7    video our redacted versions.

8        THE COURT:  When you lay that out for

9    them, lay it out for me too.  I want to see them.

10        MR. LACEY:  Absolutely.  Yes, Your Honor.

11    I'd be happy to.

12        MR. YOUNG:  Well, Your Honor, there he

13    goes again with the relevance.  I'm not attacking

14    the relevance.  I'm attacking the sufficiency.

15    There is no evidence of these other home invasions.

16        THE COURT:  I understand what you're

17    saying, Mr. Young.  Here's the bottom line.  There

18    is going to be some testimony, and the question is

19    how much testimony, about the fact that Gollo or

20    whoever it was said there is a black crew.  We're

21    going to use a black crew.  They're going to have

22    vests.  They're going to have guns.  We'll use them

23    to kick down the door or something like that.

24    That's probably coming in.

25        The fact that they've done this before,

1   done it many other times, that's a whole different

2   ball game.  I'm not sure we need to go there.

3         Okay?

4         MR. YOUNG:  Okay.

5         THE COURT:  I'm with you to that point,

6   and I think Mr. Lacey is going to be with you until

7   that point.

8         This stuff like these black guys are

9   crazy, that kind of stuff, I don't think we need

10  those kind of statements either, so -- but there is

11  going to be some testimony that there is talk about

12  a black crew coming down with them, that they're

13  going to have vests, they're going to have guns.

14        That limited testimony for sure is going

15  to be coming in.  The fact that these other, let me

16  say, extrajudicial statements are made aren't

17  necessarily coming in.  We're not going to be --

18  we're not going to be trying to prove whether they

19  committed another home invasion or not.  That's

20  really not the issue.  The issue is, were they

21  involved in this one.

22        MR. YOUNG:  And while we're redacting the

23  February 4 statement, I was just talking to

24  Mr. Cooper about that, and so I speak for him a

25  little bit too, I can see where the Government

1  would like to redact some of that language out of

2  the February 4 statement, and I'm -- I'm not sure

3  that the defense team is going to go along with

4  that, because it displayed some real derogatory

5  language and disrespect and disregard for blacks

6  generally.

7           THE COURT:  All right.  You look at what

8  they put and you tell them what else you want out

9  of that February 4th meeting.  I remember that

10 there was quite some derogatory stuff that was

11 said, and a lot of it was said by the confidential

12 informant, if my memory is correct.

13          MR. LACEY:  Most of it was said by the

14 Mexican defendants.  There was some, relatively

15 speaking, a very small part by the informant.

16          THE COURT:  All right.

17          MR. YOUNG:  On to the next one, Your

18 Honor?

19          THE COURT:  On to the next one.

20          MR. YOUNG:  Seven and 12, I've got some

21 comments to both of these that are somewhat --

22          THE COURT:  Postarrest statements?

23          MR. YOUNG:  Seven is a Bruton motion with

24 respect to the postarrest statements, yes, sir.

25          THE COURT:  Who made a post arrest

1    statement that the Government is trying to get in

2    in their case in chief?

3          MR. YOUNG:  Well, everybody made

4    postarrest statements when they were stopped.  I'm

5    maybe misinterpretering what the Government says in

6    its response to No. 7.

7          It talks -- it distinguishes nontestifying

8    codefendants and defendants going to trial.  Now,

9    the defendants that go to trial may well also be

10   nontestifying codefendants, and if that's the case,

11   under Bruton, I don't want to be hearing from any

12   of these other nontestifying codefendants as well.

13         The reason this is concerning me is,

14   because I look down to the response at No. 12 with

15   respect to the Colt python.  The Colt Python was

16   used to murder somebody's father in Vacaville years

17   ago.  That person is now doing jail time.  He

18   apparently sold it at a pawnshop before, and it

19   never got found.  It turned up.

20         That's obviously not relevant to anything,

21   but the Government's response at 12 is that it may

22   use Ja'Cory Ranger's postarrest statement regarding

23   knowledge and possession of that particular Colt

24   Python, and since, since Ja'Cory Ranger is my

25   client Jerome Ranger's brother, I certainly don't

1    want Ja'Cory Ranger's statements coming in in my
2    client's trial, because anything my client's
3    brother said is quite naturally going to be
4    imputed, is going to rub off on my client.
5           Ja'Cory Ranger claimed several of the guns
6    that were in his vehicle.  Now, that may have been
7    ill-advised on his part, but anything that he said
8    that hurts himself as one of the two drivers in
9    this case is going to rub off on the other driver,
10   which is his brother.
11          So I want to make sure that the
12   codefendant's statements are not coming in in my
13   case.  Both the codefendants who've already pled
14   and the codefendants who are going to trial with
15   me, I don't think there is a distinction between
16   them.  They're all codefendant statements to me.
17          THE COURT:  Mr. Lacey?
18          MR. LACEY:  Your Honor, counsel's
19   correct.  All three defendants made some sort of
20   statement postarrest.  One example he refers to is
21   Ja'Cory Ranger admitting to borrowing one of the
22   weapons that was seized that day from a third
23   party.  We think that that is admissible, should be
24   admissible.  It's an admission against that
25   defendant.

1       Mr. Young's client made several admissions

2   as well implicating himself or saying that they

3   partook in search activities that morning, going to

4   a 7/11 and some other things that we may have heard

5   -- or Circle K.  They were going to go hunting.

6   That was to justify the weapons being present.

7   That was one of the things that was thrown out

8   there.

9       So we think it is relevant, and that is an

10  issue that will need to be addressed.

11      THE COURT:  Let me see those statements,

12  too, before we get there.

13      MR. LACEY:  Of course.

14      MR. COOPER:  Can I ask a question, Your

15  Honor?

16      THE COURT:  Sure.

17      MR. COOPER:  Given what Mr. Lacey has just

18  indicated and your request to see the statements,

19  did you want -- I haven't done it yet, but it's

20  been in the back of my mind throughout.  The

21  potential Bruton issue, did you want a brief or any

22  authority on the Bruton possibilities?

23      THE COURT:  I think I know Bruton fairly

24  well, but until I see what the statements are, I

25  don't need you to -- I don't need you to chop down

1    any more trees.

2         MR. COOPER:  I can see that coming down

3    the pike, actually.

4         MR. YOUNG:  The other motions I had were

5    all pretty quick, and I think the Government's

6    addressed them, Your Honor.

7         With respect to bullet holes in Ja'Cory's

8    car that were put there by one of his friends, the

9    gunshot wound to Ja'Cory's --

10        THE COURT:  Slow down.

11        MR. YOUNG:  The bullet holes in Ja'Cory's

12   car that were put there by a friend.  The gunshot

13   wound to Cory's --

14        THE COURT:  Is it gunshot -- is the bullet

15   hole in the car relevant in the case in chief?

16        MR. LACEY:  Not relevant.  Not going to be

17   brought in by us.

18        THE COURT:  All right.  The fact he shot

19   himself in the leg, is that relevant?

20        MR. LACEY:  No, and he may not have been

21   shot by himself, but whatever the case, we're not

22   going into it.

23        THE COURT:  All right.

24        MR. YOUNG:  Ghermon Tucker's January 6

25   joyride in my client's vehicle.

1          THE COURT:  No.

2          MR. YOUNG:  And obviously Ardawwn's prior

3   defaced weapon arrest, none of that's coming in?

4          THE COURT:  Ardawwn Bryant's prior defaced

5   weapons arrest?  Depends on whether he testifies or

6   not.

7          MR. YOUNG:  I don't think he will be, Your

8   Honor.

9          THE COURT:  All right.  Otherwise his

10  arrest wouldn't be necessarily relevant, would it?

11         MR. YOUNG:  No, Your Honor.

12         THE COURT:  Do you agree Mr. Lacey?

13         MR. LACEY:  I do, Your Honor.

14         MR. YOUNG:  That's all I have, Your Honor.

15         MR. LACEY:  I would point out that the --

16  Mr. Tucker being arrested in Mr. Ranger's vehicle

17  or being pursued by the police, we don't see the

18  relevance of that pursuit, but we do have someone

19  from law enforcement to say that, on a particular

20  day, that Mr. Tucker was in Mr. Ranger's vehicle.

21         That may be relevant to show the

22  associations between these people, again, in a more

23  -- in a sterile environment, asking Officer Jon,

24  can you tell us what happened on this date?  Yes.

25  On this date, at this location, I stopped this

1  vehicle registered to Mr. Ranger.  Who was in the

2  vehicle?  Mr. Tucker.  And just stop it cold.

3       Again, for associations, not to go

4  anything further as far as any legal pursuit or

5  anything else, unlawful flight that may have taken

6  place.

7       THE COURT:  All right.

8       MR. LACEY:  Your Honor, one thing I'd also

9  request of the Court, a week before trial we're

10  going to be making our witness list available,

11  exhibit list, and the other things we've talked

12  about.

13       I would also request to the Court to have

14  the defense do the same a week before trial, to

15  give us the witness list, with the exception, of

16  course, of their clients, who may or may not

17  testify.

18       MR. COOPER:  Well, I'm in the process of

19  preparing that lengthy list, Your Honor.

20       THE COURT:  A lengthy list?

21       MR. COOPER:  As we speak.

22       MR. LACEY:  If we could have it a week

23  before trial at the same time as ours, that would

24  be appreciated.

25       THE COURT:  Mr. Armstrong?

1    MR. ARMSTRONG:  No objection to that.

2    THE COURT:  Mr. Young?

3    MR. YOUNG:  I'm in the process, Your

4  Honor.  I'm going to have to return to Phoenix, if

5  I can get up there this week.  There are a number

6  of people that I need to talk to.  The case has

7  changed a lot since I was up there last summer.  I

8  need to talk to the witnesses again and see who's

9  -- who it is that I want to use.

10   THE COURT:  Do you think you can get it to

11 them a week before trial?

12   MR. YOUNG:  I think so.

13   THE COURT:  Okay.  Anything else?

14   MR. LACEY:  No, Your Honor.  Thank you.

15   MR. COOPER:  No, Your Honor.

16   MR. ARMSTRONG:  No.  Thank you.

17   THE COURT:  I have one question.  How long

18 do we think the trial's going to take?

19   MR. COOPER:  I think if it was just one

20 lawyer and the prosecutors maybe two weeks, but I

21 really think with three attorneys it will be three

22 weeks, on top of which, as I want to remind you

23 again, the first week is going to be a little bit

24 abbreviated.

25   THE COURT:  I remember you have someplace

1  you have to be.  Have you already rented the

2  tuxedo?

3          MR. COOPER:  I am not in the wedding.  I

4  am an observer.

5          THE COURT:  You have to a wear a suit or

6  something.

7          MR. COOPER:  I'll wear a tie.

8          THE COURT:  You'll wear a what?

9          MR. COOPER:  A tie.

10          THE COURT:  And a coat?

11          MR. COOPER:  Well, maybe.

12          THE COURT:  All right.  I'll get a ruling

13  out on these motions so you know exactly where you

14  are.

15          Thank you.

16          MR. ARMSTRONG:  Thank you, Your Honor.

17          MR. LACEY:  Thanks, Your Honor.

18          (Proceedings concluded in this matter.)

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Erica R. Grund, do hereby certify that I took the machine shorthand notes in the foregoing matter; that the same was transcribed via computer-aided transcription; that the preceding pages of typewritten matter are a true, correct, and complete transcription of those proceedings ordered, to the best of my skill and ability.

Dated this 2nd day of January, 2013.


                              s/Erica R. Grund
                         Erica R. Grund, RDR, CRR
                         Official Court Reporter