1      IN THE UNITED STATES DISTRICT COURT

2            DISTRICT OF ARIZONA

3   UNITED STATES OF AMERICA

4   vs.                              CR-11-1013-TUC-RCC

5   GHERMON LATEKE TUCKER, et al.,

6
                Defendants.
7   _____

8                                   August 13, 2012
                                    Tucson, Arizona
9

10

11

12

13                   JURY TRIAL

14                   DAY FOUR

15   BEFORE THE HONORABLE RANER C. COLLINS
              UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22   Court Reporter:        Erica R. Grund, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                      translation

A P P E A R A N C E S

For the Government:        James T. Lacey
                          Kimberly E. Hopkins
                          Assistant U.S. Attorneys


For Ghermon Tucker:        Dan Cooper
                          Cooper & Udall PC


For Jerome Ranger:         Stephen Jonathan Young
                          Williamson & Young


For Ja'Cory Ranger:        Bradley James Armstrong
                          Armstrong Law Office

EXAMINATION INDEX

ROBERT HOWELL
    DIRECT BY MS. HOPKINS . . . . . 16
    CROSS BY MR. COOPER . . . . . . 32
    CROSS BY MR. ARMSTRONG . . . . . 45
    CROSS BY MR. YOUNG . . . . . . . 49
    REDIRECT BY MS. HOPKINS . . . . 50

JORGE FERNANDEZ
    DIRECT BY MS. HOPKINS . . . . . 53
    CROSS BY MR. COOPER . . . . . . 63
    CROSS BY MR. ARMSTRONG . . . . . 103
    CROSS BY MR. YOUNG . . . . . . . 109
    REDIRECT BY MS. HOPKINS . . . . 113

TAKESHA FLOWERS
    DIRECT BY MR. LACEY . . . . . . 115
    CROSS BY MR. COOPER . . . . . . 151

BRIAN HOOTON
    DIRECT BY MS. HOPKINS . . . . . 163
    CROSS BY MR. COOPER . . . . . . 167

JAMES SHARMAN
    DIRECT BY MS. HOPKINS . . . . . 172
    CROSS BY MR. COOPER . . . . . . 188
    CROSS BY MR. ARMSTRONG . . . . . 201
    CROSS BY MR. YOUNG . . . . . . . 206
    REDIRECT BY MS. HOPKINS . . . . 210

MICHAEL J. SHARKEY
    DIRECT BY MS. HOPKINS . . . . . 212

1            P R O C E E D I N G S

2            THE COURT:  Let's go on the record.  Show

3    the presence of all counsel and defendants, absence

4    of the jury.

5            I distributed to counsel a little bit of a

6    memo about an incident with a juror yesterday, and

7    I assume all counsel have had a chance to read it.

8            MR. ARMSTRONG:  Yes, sir.

9            THE COURT:  It's my intention to bring the

10   juror in and make further inquiry about it and then

11   decide what to do.

12           MR. COOPER:  Yes, Your Honor.

13           THE COURT:  All right.  Bring Juror No. 9

14   in.

15            (Juror No. 9 enters the courtroom.)

16           THE COURT:  Please be seated.  Good

17   morning, ma'am.

18           JUROR NO. 9:  Good morning.

19           THE COURT:  How are you doing?

20           JUROR NO. 9:  Okay.

21           THE COURT:  I'm going to ask you to take

22   the microphone so we can be sure and hear you.

23           I got a phone call yesterday afternoon,

24   and I suspect you know the genesis of the phone

25   call.

1          Your boyfriend called the FBI.

2          JUROR NO. 9:  Yes.

3          THE COURT:  The FBI called the marshals.

4          JUROR NO. 9:  Yes.

5          THE COURT:  The marshals called me.

6          Couple of things.  I understand that last

7     week at some point in time you and Mr. Ranger rode

8     up the elevator together; is that correct?

9          JUROR NO. 9:  No words were exchanged.

10          THE COURT:  He didn't do anything

11     inappropriate?

12          JUROR NO. 9:  No, not at all, no.

13          THE COURT:  And at some point in time last

14     week you saw members of the family at the patio.

15          JUROR NO. 9:  Right.

16          THE COURT:  Again, nobody did anything

17     inappropriate?

18          JUROR NO. 9:  No.

19          THE COURT:  All right.  Apparently on

20     Thursday someone visited your apartment --

21          JUROR NO. 9:  Yes.

22          THE COURT:  -- and asked for the

23     landlord?

24          JUROR NO. 9:  Yes.

25          THE COURT:  And that happened to be a

1  black gentleman?

2          JUROR NO. 9:  Yeah.

3          THE COURT:  Someone you didn't recognize?

4          JUROR NO. 9:  No.

5          THE COURT:  Someone you haven't seen in

6  court?

7          JUROR NO. 9:  Right.

8          THE COURT:  Had no way of in any way

9  indicating that he was in any way involved with the

10  Ranger family or anybody else involved in this

11  case?

12          JUROR NO. 9:  No, no.

13          THE COURT:  But in discussions with your

14  boyfriend, he kind of overreacted.

15          JUROR NO. 9:  I think he did.  He doesn't

16  think he did, but --

17          THE COURT:  He called the FBI.

18          JUROR NO. 9:  (Nodding.)

19          THE COURT:  He also called my office, by

20  the way, and left a message, just so you know, and

21  as a result, the marshals came and visited you; is

22  that correct?

23          JUROR NO. 9:  Yes, yes, and I talked with

24  both of them.

25          THE COURT:  All right.  Now, have you

1 discussed this with anybody else, other than your

2 boyfriend and the marshals who came by?

3        JUROR NO. 9:  No.

4        THE COURT:  So the other jurors have no

5 idea about it?

6        JUROR NO. 9:  Oh, no, no, not at all.

7        THE COURT:  My other question is this.

8 How much does your boyfriend know about the case?

9        JUROR NO. 9:  Just that, after the

10 gentleman visited my apartment, because we live at

11 the very back apartment, and anyhow, I was sort of

12 upset because of everything that, you know, putting

13 it all together, I guess, and so he knew something

14 was wrong, and he kept saying, "What's wrong?"

15        And we got in sort of an argument about

16 it, and then I finally told him, just that the case

17 involved a black gentleman and just the three

18 things that you discussed right now, nothing about

19 what the case is about, nothing about anything

20 other than the guy knocking at my door.

21        THE COURT:  What made you associate that

22 with this case?

23        JUROR NO. 9:  Because nobody knocks at our

24 door hardly.  I mean, it's a real small little

25 complex.  And in fact, usually the only people that

1   come to my house are, like, a neighbor, or across

2   the way is another four-plex, one of them comes.

3         And so when we got a knock at the door, I

4   had just said, "Come on in," and of course nobody

5   -- you know, he didn't open the door, and my dog

6   barked, but the neighbor knows the dog and

7   everything.

8         So that's when I opened the door, and he

9   just said, you know, "Who do I see about renting

10   here?" And we don't have a "for rent" sign out,

11   there is no vacant units now, and we're in the very

12   last apartment. I mean, we have two gates and two

13   sidewalks for each of the properties. You know,

14   there is a four-plex and a four-plex, and we're the

15   very end unit of the four-plex on the north side.

16         It just seemed unusual that somebody would

17   come all the way down through the complex and knock

18   on the last door when there's three other

19   apartments, and I know two of those people are

20   home, to ask about renting a place, when there's no

21   "for rent" sign.

22         THE COURT: Okay.

23         JUROR NO. 9: I mean, it just seems odd.

24         THE COURT: All right. Now let me ask you

25   a more direct question. Based upon what you just

1  told me, do you think you can still be a fair and

2  impartial juror in this case?

3          JUROR NO. 9:  I believe so.  I mean, I

4  don't feel threatened by anybody here.  You know, I

5  don't -- I mean -- and it's not -- it's not going

6  to change my view up to this point.

7          THE COURT:  Okay.  All right.  Thank you.

8  I'm going to excuse you for a moment and talk to

9  the attorneys for a few minutes.  Thank you.

10         And please don't discuss this with any of

11 the jurors in the back.

12         JUROR NO. 9:  Oh, no. I haven't.

13         (Juror No. 9 exits the courtroom)

14         THE COURT:  Mr. Young, it was your client

15 that she saw first, so why don't we start with

16 you.

17         MR. YOUNG:  Well, Your Honor, I guess this

18 is a little window for me, and it's enlightening.

19 I've never scared anybody that badly by getting on

20 an elevator with them, and I've --

21         THE COURT:  She didn't say she was scared

22 by being on the elevator with your client.  She did

23 not say that.

24         MR. YOUNG:  It was a concern that got

25 relayed to the FBI and then the marshals.  I've

1    never made eye contact with anybody and had them

2    react quite that way.

3          I have advised my -- and in fact, this

4    elevator ride happened on August 7th, and that was

5    the same date that I told Mr. Ranger and his family

6    that I wanted them not to ride the elevator with

7    the jurors and to avoid making eye contact with

8    them or anything like that.

9          THE COURT:  Time out.  Nobody's accusing

10   Mr. Ranger or his family of doing anything wrong at

11   this point.  Okay?  I don't need to start there.

12         I want to know what you think I should

13   do.  That's my question.

14         MR. YOUNG:  I think she's far more scared

15   of black people than I suspected when we --

16         THE COURT:  She didn't call the FBI.  Her

17   boyfriend did.

18         MR. YOUNG:  And maybe it's her boyfriend

19   that is overreacting, although she took it up with

20   her boyfriend.  She discussed the case with her

21   boyfriend.  And I've got concerns if I've got her

22   boyfriend as a 13th juror.

23         THE COURT:  What do you think we should

24   do?

25         MR. YOUNG:  I think we should excuse her.

1        THE COURT:  All right.  Mr. Armstrong?

2        MR. ARMSTRONG:  Podium?

3        At the least I think she should be

4   excused.  My concern is that she was so upset by

5   the contact at the man at the door that she started

6   sort of, her testimony, piecing back together the

7   contact with Mr. Ranger and what was probably his

8   family, just seeing them here in the courthouse,

9   and it took her -- you know, got her so upset, I

10  think was her testimony, that she spoke to her

11  boyfriend.

12       And you know, I am concerned.  Obviously,

13  you know, in the next two weeks, if she remains a

14  juror, I'm concerned that she's going to -- there's

15  going to be discussion between her and --

16       THE COURT:  Like I asked Mr. Young, what

17  do you think I should do?

18       MR. ARMSTRONG:  I think at the very least

19  she needs to be excused.

20       THE COURT:  Thank you.  Mr. Cooper?

21       MR. COOPER:  I agree.

22       THE COURT:  Mr. Lacey, Ms. Hopkins?

23       MR. LACEY:  Given the backdrop, we have no

24  objection either, Your Honor.

25       THE COURT:  Thank you.  Based upon the

1  record that we've made here and the fact that I

2  don't see how she could put two and two together

3  and come up with three the way she did is beyond my

4  belief, so I'm going to excuse her.

5        Ask Juror No. -- is it No. 9? -- to come

6  back in.

7        Also, by the way, Juror No. 10 has been

8  involved in a car accident and will be here as soon

9  as he can.

10        (Juror No. 9 enters the courtroom.)

11        THE COURT:  Ma'am, as indicated during

12  jury selection, while I consult with the lawyers,

13  any decision I make is mine and mine alone, and

14  that's the case here too.

15        I have decided to excuse you, and the

16  reason is -- I want to make it real plain to you --

17  I am -- my goal here is to make sure that everyone

18  in the courtroom receives a fair trial, and I have

19  three young black men sight sitting over there, and

20  they're going to be thinking, a black guy comes to

21  a door and knocks and asks for who the landlord is,

22  and all of a sudden she thinks something untoward

23  is going on with black people, and there are black

24  people involved in the case.

25        And I don't want them to have that kind of

1    thought in their mind, so I'm going to excuse you,

2    and I thank you for your service.

3            JUROR NO. 9:  Okay.  Thank you.

4            MR. LACEY:  I just wanted to make sure

5    that there wasn't any communication.

6            THE COURT:  I'm going to have her go out

7    the front door.

8            If you have anything in the jury room,

9    we'll get it for you.  Thank you again, ma'am.

10           (Juror No. 9 exits the courtroom.)

11           THE COURT:  We'll check and see if Juror

12   No. 10 has arrived yet.  He was waiting for the

13   police.

14           MR. LACEY:  We just want to invoke the

15   Rule again.  I know there's more people in court.

16           THE COURT:  The Rule has been invoked, and

17   I'm sure everyone knows that they should keep

18   people out that will be witnesses.

19           MR. COOPER:  I was working on my witness

20   list still.

21           THE COURT:  Don't put too much time into

22   your witness list, Mr. Cooper.

23           (Off the record.)

24           THE COURT:  Is Juror No. 10 here yet?

25           THE CLERK:  No, sir.

1           THE COURT:  Okay.  We'll wait a few

2      minutes for Juror No. 10 to show up.  Thanks.

3                (Off the record.)

4                (The jury enters the courtroom.)

5           THE COURT:  Good morning.  I'm not taking

6      the fall for this one.  It is not my fault.  It's

7      actually nobody's fault.  I understand one of you

8      had a little car accident.  I'm glad that you're

9      okay, and we're glad that you're here.

10          We lost Juror No. 9, so if you want to

11     move over one, feel free to do so.

12          Hope you all had a pleasant weekend, other

13     than the fact that it was hot.  It was really hot.

14     I had to do some yard work.  I was out there until

15     about 10:30 in the morning.

16          At any rate, I had a thought on Friday

17     afternoon I wanted to share with you, and I didn't

18     get a chance to do so, so I'll do it now.

19          There have been a couple of times

20     throughout the trial where there was kind of a

21     light moment or something like that and people

22     laughed and so forth.

23          I want to remind you, while laughing is

24     appropriate when something funny happens, we're

25     still here about serious business.  Okay?  So I'm

1  not going to do anything or say anything to detract

2  from the fact that this is serious business for

3  each side in this case.  All right?

4          Mr. Lacey?

5          MR. LACEY:  Ms. Hopkins.

6          THE COURT:  Ms. Hopkins?

7          MS. HOPKINS:  Your Honor, the Government

8  called Special Agent Robert Howell to the stand.

9          THE COURT:  I was thinking specifically

10  about when Mr. Armstrong said something like it

11  felt like a first date.

12              ROBERT HOWELL, WITNESS, SWORN

13          THE COURT:  Sir, the Rule has been invoked

14  in this case.  That means, except during the time

15  that you're testifying, you must remain outside the

16  courtroom, and you are only allowed to discuss your

17  testimony with the attorneys involved in the case.

18          All right?

19          THE WITNESS:  Yes, sir.

20          THE CLERK:  Please state your name for the

21  record and spell your last name.

22          THE WITNESS:  Robert M. Howell,

23  H-o-w-e-l-l.

24          THE CLERK:  If you'll pull the microphone

25  just a little closer, please.  Thank you.

DIRECT EXAMINATION

BY MS. HOPKINS:

Q.   Good morning, Agent Howell.

A.   Good morning.

Q.   Where do you work?

A.   Tucson.

Q.   For who?

A.   With the Federal Bureau of Investigation.

Q.   And what's your title?

A.   Special Agent.

Q.   And what are some of your duties as a Special

Agent?

A.   I am assigned to a surveillance squad, so we

conduct covert surveillance.

Q.   And what kind of training did you receive to

be a member of the surveillance squad?

A.   There's been numerous training classes I've

attended, photography, ground surveillance, things

of that nature.

Q.   And what's your educational background?

A.   I have a bachelor of arts in criminal justice

and a J.D. in law.

Q.   Now, I'd like to direct your attention to

February 4th, 2011.

     Were you conducting surveillance that day in

1  Phoenix?

2  A.   Yes, I was.

3  Q.   And what kind of surveillance was being

4  utilized that day?

5  A.   Both ground and air.

6  Q.   And were you in the air or were you on the

7  ground?

8  A.   I was on the ground.

9  Q.   And were you in a vehicle by yourself, or did

10  you have partner with you?

11  A.   I was by myself in the vehicle.

12  Q.   And do you know approximately how many people

13  were conducting surveillance on the ground that

14  day?

15  A.   There were seven of us.

16  Q.   And what was your role as a surveillance agent

17  that day?

18  A.   My role was to identify a vehicle that was

19  departing from a set meet location and going to

20  another location.  It was to identify that location

21  and the vehicle by plate, obtain photographs, if

22  possible.

23  Q.   Now, when did you initiate surveillance?

24  A.   11:30 a.m.

25  Q.   And where were you positioned that day?

1    A.   I was on the perimeter, approximately half a
2    mile to the north.
3    Q.   Half a mile north of the --
4    A.   Of the meet location, 536 North Fifth Place in
5    Phoenix, Arizona.
6    Q.   Why were you positioned so far away from the
7    meet location?
8    A.   I was positioned for a takeaway.  The primary
9    surveillance was to be done by aircraft, so I was
10   just there to assist them, obtain plates and the
11   location.
12        So the primary surveillance was done by the
13   aircraft.  I was hanging back where I was not
14   visible.
15   Q.   Now, did you follow any of the vehicles after
16   the meeting?
17   A.   Yes, I did.
18   Q.   What vehicle did you follow, or vehicles?
19   A.   It was a black Cadillac CTS.
20   Q.   And approximately what time did you start
21   following that vehicle?
22   A.   The vehicle departed at 12:07, and that's when
23   we began surveillance on it.
24   Q.   How far behind the vehicle were you?
25   A.   It varied.  For the most part, a hundred yards

1  or more.

2  Q.  Did you have a constant visual on the vehicle?

3  A.  I did not.

4  Q.  Did the aerial surveillance team have a

5  constant visual?

6  A.  Yes, they did.

7  Q.  And were you in communication with the aerial

8  surveillance team?

9  A.  Yes, I was.

10  Q.  And were you obtaining information from them?

11  A.  Yes.

12  Q.  Now, where did you follow the vehicle to?

13  A.  3102 East Chipman Road in Phoenix.

14  Q.  Was that a residence or --

15  A.  It's a residence.

16  Q.  Okay.  And what was the closest you were --

17  actually, what did you observe when you followed --

18  you said you followed the vehicle to a residence.

19  Did it park there?

20  A.  Yes, it did.

21  Q.  And what was the closest you were to that

22  vehicle before it parked at the residence?

23  A.  Like I said, I was a hundred yards or more.

24  Q.  And what did you observe when you got to the

25  residence or when you were approaching the

1  residence?

2  A.   As I was approaching the residence, I observed

3  a group of approximately five to seven individuals

4  standing outside, close to the house, on the west

5  side.

6  Q.   And where was the -- I guess -- let me back up

7  a little bit.

8       Was the Cadillac that you followed to the

9  residence the same vehicle that you followed from

10  the meet location?

11  A.   Yes, it was.

12  Q.   And did you take any photographs that day?

13  A.   I did not.

14  Q.   And why not?

15  A.   Because my first view of the residence, as I

16  mentioned, there was a number of people standing

17  outside.  To do so covertly would have jeopardized

18  the surveillance.  It was just not possible to do

19  it at that time.

20  Q.   Were you able to obtain a license plate for

21  that Cadillac CTS?

22  A.   Yes, I was.

23  Q.   How and when did you get that license plate

24  information?

25  A.   I drove by the residence.  I was driving

1  eastbound on Chipman, turned north on 31st Street.

2  The car was parked -- the residence is right at the

3  northeast corner of Chipman and 31st Street.

4      I parked out close to the residence, facing

5  north, so as I drove north on 31st Street, I was

6  able to obtain the license plate.

7  Q.   How many cars did you observe at the

8  residence?

9  A.   There were approximately three others in

10  addition to the Cadillac.

11  Q.   Do you recall what type of vehicles they were?

12  A.   There was a dark colored Chevy Malibu and an

13  older model Chevy Impala, and there was also a blue

14  Tahoe parked at the residence.

15  Q.   Okay.  I'd like to show you what's been marked

16  for identification as Government's Exhibit Nos.

17  50-A and 50-B.

18  A.   Okay.

19          THE COURT:  They should appear on the

20  screen right here.

21          MS. HOPKINS:  And if we could show 50-B.

22  BY MS. HOPKINS:

23  Q.   Do you recognize those?

24  A.   It looks to be a little different angle we're

25  looking at.  I can't quite make out the streets.

1    Okay.  Yes, that is the residence.

2  Q.  Okay.  So why don't you tell us what that is

3  that we're looking at?

4  A.  That's 3102 East Chipman Road in Phoenix.

5  Q.  And does this map of the area accurately

6  depict Chipman Road and the surrounding area as you

7  saw it that day?

8  A.  Yes, it does.

9         MS. HOPKINS:  The Government moves to

10  admit into evidence what's been marked for

11  identification as Government's Exhibits 50-A and

12  50-B.

13         THE COURT:  With the exception of the

14  vehicles on the Exhibit?

15         THE WITNESS:  Yes, that's correct.  The

16  vehicle in the photograph was not present at the

17  time I drove by there.

18         THE COURT:  Any objection, counsel?

19         MR. COOPER:  (Shaking head.)

20         MR. ARMSTRONG:  No, sir.

21         MR. YOUNG:  No objection, Your Honor.

22         This is a Google Map, is it?

23         MS. HOPKINS:  That's correct.

24         MR. YOUNG:  Okay.  With that note --

25         THE COURT:  Do you have stock in Google or

1  something?

2          MR. YOUNG:  The question was whether it

3  fairly and accurately depicted what was happening

4  that day.

5          THE COURT:  No, not that day.

6          MR. YOUNG:  I wanted to clarify that.

7          THE COURT:  Just the residence.

8          MR. YOUNG:  No, I don't have stock in

9  anything.

10          THE COURT:  All right.

11          MS. HOPKINS:  May I publish it to the

12  jury?

13          THE COURT:  Your Google Map is admitted.

14          MS. HOPKINS:  Thank you.

15          THE COURT:  It can be published.

16  BY MS. HOPKINS:

17  Q.  All right.  Will you please point out the

18  residence on Chipman Road?

19  A.  Yes.  It's right at the northeast corner of

20  Chipman and 31st Street.

21  Q.  You could probably put an arrow or an X on the

22  screen.

23  A.  I don't know if that --

24          THE COURT:  If you touch it, it will

25  actually make a mark.  Actually touch it.

BY MS. HOPKINS:

Q.   So we see a couple of dots on the screen?

A.   That's correct.

Q.   Is the residence -- okay.  So you put the dots
on the house.  All right.

        THE COURT:  The dot's on the house
itself?

        THE WITNESS:  Yes, that's correct.

BY MS. HOPKINS:

Q.   Now, using this map, can you just kind of
either describe or point out the direction that you
were driving?

A.   I was driving north on 31st Street.  The cars
were parked on the west side of the residence,
right in this area, and that's when I obtained the
license plates and observed the vehicles and the
people standing by the house.

Q.   And when you drove past the residence, were
you looking out of your -- out of the passenger
side, the driver's side?

A.   Initially I was looking out of the passenger
side of my windshield.  As I got further north, I
was looking out of the passenger windows of my car.

Q.   And you said that the vehicles were parked in
that front yard area where you kind of made the --

1  A.  Correct.

2  Q.  Okay.  And where was the Cadillac CTS parked?

3  A.  It was parked right on the street, closest to

4  the road, right in this area.

5  Q.  And was the rear of the vehicle facing out?

6  A.  Yes.  It was facing north, which was the

7  direction I was traveling in, so it was clearly

8  visible.

9  Q.  And how fast were you driving?

10  A.  I was able to slow to approximately 10 miles

11  an hour to make the northbound turn onto 31st

12  Street from Chipman, so approximately 10 miles an

13  hour.

14  Q.  And how much time did you have to look at the

15  license plate?

16  A.  Very little, probably approximately four to

17  five seconds.

18  Q.  And could the people at the residence that you

19  mentioned that were outside, could they see inside

20  your vehicle?

21  A.  No.  I have dark windows.  They possibly could

22  have seen a very faint outline in the front where

23  light comes in the windshield, but that would have

24  been it.

25  Q.  And what did you do when you got the license

1  plate number?

2  A.  I called them out over the radio so that they

3  could be recorded and then just continued driving

4  to the north.

5  Q.  Now, did you call out the license plate number

6  as you were driving by the house or?

7  A.  Yes, I did.

8  Q.  And did anyone respond when you called out the

9  license plate number?

10  A.  Yes, they acknowledged.

11  Q.  Did you write the license plate number down?

12  A.  No.

13  Q.  And how many vehicle license plate tags did

14  you get that day?

15  A.  I believe there were three parked there at

16  that time.  The fourth vehicle, I was not able to

17  get the tag.

18  Q.  Did you call all the of those vehicles that

19  you got --

20  A.  Yes, I did.

21  Q.  Okay.  Now, what was the license plate number

22  for the Cadillac CTS?

23  A.  Alpha November Yankee 1373.  Excuse me, Alpha

24  November Lima 1373.

25  Q.  And so that's A-N-L?

1  A.   A-N-L-1-3-7-3.

2  Q.   And were your observations memorialized in a

3  report?

4  A.   Yes, they were.

5  Q.   What kind of a report?

6  A.   It was a surveillance log from that day's

7  surveillance.

8  Q.   And do you recall who wrote that surveillance

9  log?

10  A.   Kent Hush.

11  Q.   And did that conclude your involvement that

12  day surveillancewise?

13  A.   We were in the area for a few more minutes,

14  but essentially that was the conclusion of that

15  day's surveillance.

16  Q.   Okay.  I'd like to turn your attention now to

17  March 2nd, 2011.

18  A.   Okay.

19  Q.   Were you also conducting surveillance that

20  day?

21  A.   Yes, I was.

22  Q.   Ground or aerial?

23  A.   I was ground surveillance.

24  Q.   And what was your role as a surveillance agent

25  that day?

1  A.   Just to provide support where needed to

2  aircraft, to identify locations, individuals, take

3  photographs, if possible.

4  Q.   And when did you initiate surveillance?

5  A.   Nine a.m.

6  Q.   Where?

7  A.   We had set up at various exits along I-10,

8  from essentially Riggs Road up near Phoenix to

9  Picacho Peak to attempt to identify a vehicle that

10  would be coming eastbound on I-10.

11  Q.   So were you looking for a particular vehicle?

12  A.   Yes, we were.

13  Q.   What vehicle were you looking for?

14  A.   A gray Nissan Murano.

15  Q.   So what did you observe that morning?

16  A.   The vehicle was spotted by another

17  surveillance unit.  Myself and another agent were

18  on I-10.  It drove passed us at a high rate of

19  speed.  We were able to confirm the license plate,

20  that that was the vehicle we were looking for.  We

21  were not able to observe who was in the vehicle.

22      At that point the surveillance was turned over

23  to the aircraft, and the ground personnel backed

24  off.

25  Q.   Do you recall approximately what time that

1    Nissan Murano blew passed you?

2    A.   11:05, I believe.

3    Q.   And did you follow the Murano?

4    A.   Yes.

5    Q.   And how far behind the Murano were you?

6    A.   Probably approximately a mile.

7    Q.   And you said that you observed the license

8    plate?

9    A.   Yes.

10   Q.   Did you call it in, or you said there was two

11   of you?

12   A.   We were aware that that was a plate that might

13   be involved, so we confirmed that was the tag, and

14   we announced that on the radio at the time.

15   Q.   Did anyone respond after you called that

16   license plate number?

17   A.   Yes.  That was acknowledged.

18   Q.   And do you recall the license plate number for

19   that Nissan Murano?

20   A.   I believe phonetically it was Alpha Mike Hotel

21   4879.

22   Q.   Okay.  That would be A-M-H?

23   A.   A-M-H, yes.  That's the way we call in our

24   plates, so it's clear.

25   Q.   I understand.

So I'd like you to take a look at what's been admitted as Government's Exhibit 7-A.

Do you recognize this?

A.   That appears to be a similar Nissan Murano. It appears to be a photograph of a similar vehicle.  It appears to be a different color.

Q.   Okay.  Does it look a little bit dark?

A.   It could be just that the picture is not that clear.  That is a Nissan Murano.

Q.   Okay.  Now, after you called the plate in, you said that you followed the vehicle for a little while.

What happened next?

A.   It went to the Food City, 2950 South Sixth Avenue in Tucson.

Q.   And did you travel to Food City?

A.   I did not, no.  I stopped short of that location.

Q.   And so what was the rest of your involvement that day?

A.   This is just the way it worked out.  It hadn't been planned that day.  I ended up on the perimeter for most of that day.  I caught glimpses of the vehicles.

Q.   The perimeter where?

1  A.   The perimeter being not the immediate

2  surveillance location, but outside to take away any

3  vehicles that may need to be identified or

4  followed.

5  Q.   So the perimeter of the Food City?

6  A.   Yes.

7  Q.   Okay.  And so how far away would you say you

8  were from the Food City?

9  A.   Probably approximately half a mile.

10  Q.   And were you stationary or were you --

11  A.   Stationary.

12  Q.   And were you able to observe any activity?

13  A.   No.  My role was to -- the surveillance at

14  that point was being conducted by units that had

15  been prepositioned at the Food City and supported

16  by aircraft, so they were doing the immediate

17  surveillance and announcing what was transpiring.

18      I was not in a position to see that, as other

19  units were covering that.

20  Q.   So on this day, what else, if anything, did

21  you observe?

22  A.   The vehicle had gone to a Circle K in Tucson

23  where there was a gathering of some parties.

24          THE COURT:  Which vehicle?

25          THE WITNESS:  Which vehicle?  There was a

1  black Cadillac Escalade and a red Ford Expedition.

2  BY MS. HOPKINS:

3  Q.   And so it went to the Circle K, you said?

4  A.   Went to the Circle K, departed that location,

5  went westbound I-10.  I observed it go westbound

6  I-10.  It got off at Prince Road, got back on I-10

7  eastbound.  I observed that.

8       And essentially the next activity that I saw

9  was when those two vehicles were pulled over on the

10 side of I-10 by marked and unmarked personnel.

11 Q.   How far away were you from those vehicles?

12 A.   When they were pulled over on I-10?

13 Q.   Well, when you observed them at the Circle K

14 and the activity on the freeway?

15 A.   100 yards.

16 Q.   Were you able to see inside the vehicles?

17 A.   No.

18       MS. HOPKINS:  May I have a moment, Your

19 Honor?

20       THE COURT:  You may.

21       MS. HOPKINS:  No more questions for this

22 witness.

23       THE COURT:  Mr. Cooper?

24       MR. COOPER:  Thank you, Your Honor.

25                  CROSS-EXAMINATION

BY MR. COOPER:

Q.   Good morning.

A.   Good morning.

Q.   Before beginning, I'd like to ask you a few questions about your background.

     You've been an agent for how long?

A.   21 years.

Q.   Okay.  And surveillance is a separate squad?

A.   Correct.  We do nothing but surveillance.

Q.   Okay.  And I assume that in 21 years you've done more than surveillance.

A.   Yes.

Q.   You've been a regular agent?

A.   Yes, for seven of those years.

Q.   Okay.  And so 14 years surveillance?

A.   Correct.

Q.   Let me ask you a couple other questions.

     Did I hear correctly you went to law school?

A.   I did.

Q.   Okay.  So you're a lawyer?

A.   I did not take the bar, but I have a law degree.

Q.   Did you finish at the top of your class, like I did?

A.   Do I have to answer that question?

1  Q.   No.  I did not --

2  A.   Okay.

3  Q.   I'd be long retired.

4  A.   Well, if you did do that, I --

5  Q.   I'd be long retired if I was at the top of my

6  class.

7       Surveillance involves a lot of sitting around;

8  is that fair?

9  A.   It is, yes.

10 Q.   And then driving covertly so people can't see

11 you?

12 A.   Correct.

13 Q.   And in this case, I'd like to go back to the

14 February 4th surveillance that you helped conduct.

15 A.   Okay.

16 Q.   Okay.  And you know, I don't know if I heard

17 you wrong, but I believe that you indicated you

18 began at 11:30 at 536 North Fifth Place, but --

19 A.   South.

20 Q.   South?

21 A.   If I said north, I misspoke.

22 Q.   I might have heard you wrong.  Okay.

23       South Fifth Place, which is in Phoenix; right?

24 A.   Correct.

25 Q.   And 536 South Fifth Place would be a few

1    blocks south of, I believe, Washington?

2    Jefferson?  Or Van Buren, I guess.

3    A.   That I'm not sure.  It's not -- it's in the

4    vicinity of Buckeye, not far from Buckeye.

5    Q.   Okay.  Getting toward the south Phoenix area?

6    A.   Yes.

7    Q.   All right.  And at 11:30, you -- the

8    surveillance involved seven agents for this meeting

9    at a certain residence; right?

10   A.   Correct, seven ground personnel.

11   Q.   And you also had how many in the air?

12   A.   I believe there were three aircraft that day.

13   Two aircraft had two individuals, a pilot and a

14   copilot, and I believe a third aircraft had three.

15   Q.   Okay.  And we're not talking helicopters.

16   We're talking planes.

17   A.   Fixed-wing, yes, that's correct.

18   Q.   And 11:30 you're given your assignment, and

19   the other agents are also in the vehicles, for the

20   most part?

21   A.   Yes.

22   Q.   For the surveillance in this case, did any of

23   them get out of their vehicles and were, I guess,

24   covertly hidden behind trees or whatever?

25   A.   No.

1    Q.   Do you ever do that, or is that just
2    television?
3    A.   Yes, we do, when necessary.
4    Q.   Okay.  So you actually can be out of a vehicle
5    in a place where people can't see you?
6    A.   Yes.
7    Q.   All right.  And part of the tools of the trade
8    of surveillance is a camera; is that fair?
9    A.   Yes, it is.
10   Q.   And you all -- you all are equipped with
11   cameras; right?
12   A.   All of the people on the squad who do nothing
13   but surveillance, we all have cameras.  There were
14   a couple additional personnel, supervisory
15   personnel, who did not have cameras that day.
16   Q.   Let me ask you about the cameras that you
17   have.
18        Because of the nature of your work, these
19   cameras have to be able to take pictures from
20   sometimes a considerable distance; is that fair?
21   A.   That's correct.
22   Q.   And that would include, I guess, I'm not sure
23   the right word, zooming in to take close-ups from a
24   distance?
25   A.   Correct.

1   Q.   Can you explain how far -- let's say you

2   wanted to get some identifying features of a

3   person, and because of the nature of the

4   surveillance, you had to be a hundred yards away.

5        Could you take a close-up of somebody?

6   A.   From 100 yards?

7   Q.   Right.

8   A.   Yes, you could.  100 yards is pretty far out

9   there, even with our lenses, so you lose some --

10  you know, you lose some clarity.

11  Q.   But certainly at 100 yards, 300 feet.  But you

12  could, let's say at 50 yards, be able to take a

13  pretty good close-up; is that fair?

14  A.   Yes.  Something that would be identifiable,

15  yes.

16  Q.   What about numbers?  Would you be able, from

17  50 yards, to be able to take a photograph of the

18  license plate of a vehicle and get those numbers?

19  A.   Yes.

20  Q.   Okay.  So in this case, you arrived at 11:30,

21  and I think you said you took off following the

22  Cadillac at around 12:07; right?

23  A.   Correct.

24  Q.   And in the meantime, you had -- I guess you

25  were able to see where the Cadillac was; right?

1　A.　Prior to 12:07?

2　Q.　Right.

3　A.　No.　The aircraft had primary surveillance --

4　Q.　Okay.

5　A.　-- and I was on the outside, so I did not see

6　it prior to that.

7　Q.　Okay.　Were there agents in an area where they

8　could see who was coming in and out of this

9　meeting?

10　A.　There were -- it was covered by aerial

11　surveillance.　There were not ground personnel

12　inside that area.　It was covered strictly by

13　aircraft.

14　Q.　And so the agents that were going to be taking

15　photos of the -- I guess the home where the meeting

16　was, how would they be taking these photos?　Were

17　they from the air?

18　A.　Well, there were no photos taken of the

19　residence, and the reason was, the circumstances

20　were not such that any could be taken.

21　Q.　Okay.

22　A.　If we had been aware of the location prior, we

23　may have done things differently and set up on it

24　to get photographs, but that did not happen.

25　Q.　And do you know why you weren't made aware of

1   the meeting prior?

2   A.   We were aware of the meeting.  We weren't sure

3   where the participants were going to go following

4   the meeting.

5   Q.   No.  I meant -- I'm not talking about

6   following the meeting.  I'm talking about the

7   meeting itself.

8        You were aware of where it was going to be

9   prior to the meeting; right?

10  A.   Yes.

11  Q.   And that was at an address that was not a

12  Fifth Place address.  It was a different address;

13  right?

14  A.   The meeting was in that same area.  Like I

15  say, we did not have ground personnel inside there.

16  Q.   Do you know what the address was at where the

17  meeting took place?

18  A.   Beyond what I gave you, no.

19  Q.   Okay.  I guess my question was, prior to

20  showing up at 11:30, did you know the building

21  where the meeting was going to be held?

22  A.   No.

23  Q.   And do you know if anybody, any of the agents,

24  knew that?

25  A.   It wasn't conveyed to me.

1    Q.   Okay.  And to this day, do you even know where

2    the meeting was held?

3    A.   No.  Beyond the general area, no, I don't.

4    Q.   All right.  And who was the agent that was --

5    I don't know.  Did you have an agent in charge who

6    was coordinating the surveillance?

7    A.   A team leader, yes, and his name is Kent Hush.

8    Q.   He was the team leader?

9    A.   Yes.

10   Q.   And he would be the person who would write the

11   surveillance log?

12   A.   He did write the log that day.  It wouldn't

13   necessarily always work out to be the case, but it

14   did that day.

15   Q.   The Chipman residence that you indicated you

16   drove to?

17   A.   Yes.

18   Q.   The Google photograph that you saw, 50-A and

19   50-B, there actually are some significant

20   differences now to that residence from the Google

21   photograph.

22        Is that fair to say?

23   A.   I have not been to the residence since that

24   day.

25   Q.   Do you remember if the yard was dirt, as it

1  appears in the photograph?

2  A.   The yard was dirt, but it appeared to have

3  been somewhat modified.  It was more of a parking

4  area than a yard.

5  Q.   All right.  Do you know if you received word

6  from another agent that the person was actually

7  leaving the meeting and going to get into the

8  Cadillac?

9  A.   I think the aerial surveillance called by

10 description.  The person had gotten out of the

11 Cadillac.  They called that person getting back in

12 the Cadillac.

13 Q.   So the aerial people alerted you that somebody

14 had arrived to the meeting in the Cadillac, right,

15 and was getting out of it?

16 A.   Yes, yes.

17 Q.   And then, when they got back in, they said the

18 Cadillac is about to leave or is leaving, that sort

19 of thing?

20 A.   Right, that there was an individual getting in

21 it, and the car left shortly thereafter.

22 Q.   And were you -- I guess was it divided up as

23 to the vehicles at the meeting where you were going

24 to -- everybody had a different vehicle to follow,

25 or --

1    A.    Yes.    There were a number of potential targets

2    that we'd be following, and the team leader during

3    the course of it said, okay, that myself and

4    another agent would be going with the Cadillac.

5    Q.    And there was another vehicle there, I guess a

6    green Ford Explorer.    Did you see the other

7    vehicle?

8    A.    No.

9    Q.    So the only one you're aware of is you're

10   told, when a Cadillac leaves, you follow it?

11   A.    Correct.

12   Q.    All right.

13        Jumping ahead real briefly to the March 2nd

14   date, March 2nd, 2011.

15   A.    Yes.

16   Q.    Your job was to be on I-10 looking for a

17   Murano; right?

18   A.    Correct.

19   Q.    And you saw the Murano, and I think you

20   indicated this was roughly, I think, 11 o'clock in

21   the morning, 11:05?

22   A.    11:05, correct.

23   Q.    All right.    And how did you know it was the

24   Murano you were looking for?

25   A.    When an agent called out that he had a

possible for the vehicle, we then got on I-10.  It
was traveling at a higher rate of speed than we
were.  It passed us, and we able to confirm the
license plate as it drove by.

Q.  By the plate, then?

A.  Yes, by the plate.

Q.  So in advance you were told what the plate
was?

A.  Yes.

Q.  All right.  And you then followed it 30 miles,
roughly, or a little more --

A.  Approximately.

Q.  -- into Tucson to where the Food City is
located?

A.  Correct.

Q.  And at that point there were air -- I guess
airplanes up that day as well?

A.  Correct.

Q.  And then multiple agents on the ground?

A.  Yes.

Q.  Given different assignments?

A.  Yes.

Q.  And how many perimeter assignments are there,
or agents --

A.  Well, the assignments primarily were for the

1  people that were to be in place at the Food City
2  prior to the Murano arriving there.
3  Q.   All right.
4  A.   And there were two of those, and everyone else
5  assumes a position on the perimeter where they
6  would be in a -- be able to follow a vehicle away.
7  Q.   I guess what I'm asking is, how many people
8  are actually at the Food City surveillancing or
9  observing what's going on in that parking lot?  Do
10  you know?
11  A.   Two units.
12  Q.   And was that four agents?
13  A.   Two agents.
14  Q.   One per car?
15  A.   Yes.
16  Q.   Okay.  And everybody else is on the perimeter
17  waiting for assignments or being told what to do?
18  A.   Waiting for any vehicles to move.  That's
19  correct.
20  Q.   And who are the agents, do you remember, who
21  were at the Food City parking lot observing what
22  was going on?
23  A.   Special Agent Michael Sharkey was one of them,
24  and now retired Special Agent Jorge Fernandez was
25  the other.

1  Q.  And I assume they'd be at different ends of

2  the parking lot to cover all bases?

3  A.  I believe that Jorge Fernandez was actually

4  across the street, across from the parking lot.

5  Michael Sharkey was in the parking lot.

6  Q.  And as you described earlier, they have

7  cameras to be able to record what's going on at

8  Food City and any vehicles or people they want to

9  record; correct?

10  A.  Yes, they do.

11       MR. COOPER:  Okay.  That's all I have.

12  Thank you.

13       THE COURT:  Mr. Armstrong?

14       MR. ARMSTRONG:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16  BY MR. ARMSTRONG:

17  Q.  Good morning.  I just have a few questions for

18  you.

19  A.  Okay.

20  Q.  What's the name of the agent who was riding in

21  your car on March -- excuse me -- February 4 up in

22  Phoenix?

23  A.  There were no agents riding in my car.  It was

24  just me.  We are one-person units.

25  Q.  Okay.  Maybe I misunderstood your testimony.

1  There was two people assigned to observe the
2  Cadillac CTS?
3  A.   Correct, two people assigned, separate
4  vehicles.
5  Q.   What was the other agent's name?
6  A.   Supervisory Special Agent Mark Van Steenburg.
7  Q.   You testified about a CTS Cadillac and an
8  Escalade Cadillac?
9  A.   Correct.
10  Q.   Just to be clear, those are two different
11  vehicles; is that correct?
12  A.   Yes.  The Escalade Cadillac is a truck.  The
13  CTS is a sedan.
14  Q.   And your organization had surveillance
15  beginning up on Riggs Road in Phoenix?
16  A.   Correct.
17  Q.   South of Phoenix?
18  A.   Yeah.  We had units spread all the way from
19  Riggs Road all the way down to approximately
20  Picacho Peak.
21  Q.   And Riggs Road, just to be thorough here, it's
22  about 10 miles before you get into sort of the
23  heart of Phoenix from the south side?
24  A.   Yes.
25  Q.   And it's a road that runs east/west; is that

1  correct?

2  A.  Yes.

3  Q.  All right.  I want to talk about the area that

4  you surveilled on February 4th, 2011.

5      How would you describe that?  Is that a

6  parking lot or a series of parking lots?

7  A.  Oh, no.  This would be by how it was described

8  to me, because as I testified, I was not directly

9  at that location.  I was a little bit away to take

10 vehicles away, but --

11 Q.  You were about a half a mile away?

12 A.  Yes, correct.

13 Q.  Okay.  Had you ever been at that location?

14     And just to be clear, we're talking about 536

15 South Fifth Place, not North?

16 A.  Yes, South.

17 Q.  South Fifth Place.

18     Had you ever been to that location before?

19 A.  No.

20 Q.  Have you been -- since then, have you been by

21 it?

22 A.  No, no.

23 Q.  Would you agree that it's near the Bank One

24 Ballpark, generally?

25 A.  I think it's a ways south of that.

1   Q.   And you were positioned, as I recall your

2   testimony, you were about a half mile away from 536

3   South Fifth Place?

4   A.   Correct.

5   Q.   Were you east?  West?  North?  South?

6   A.   North.

7   Q.   And where was your, for lack of a better term,

8   your partner, Agent Van Steenburg?  Where was he

9   situated?

10  A.   I don't know where he was set up.

11  Q.   All right.  Just one final area I want to talk

12  about.  Do you know the most number of surveillance

13  officers who had -- who were assigned to have their

14  eyes on the Food City parking lot on March 2nd of

15  2011?

16  A.   There were two initially that were

17  prepositioned prior to the Murano arriving.  In the

18  course of the surveillance, a third unit was sent

19  in, so three would be the maximum.

20  Q.   And the surveillance of that area began at

21  what time, if you know?

22  A.   I'm not positive of the time on that.

23  Q.   Do you know what time the third unit joined

24  the surveillance team?

25  A.   No, I'm not.  I'm not positive.

1  Q.   So three was the most people surveilling?

2  A.   Yes.

3        MR. ARMSTRONG:  I believe that's all.

4  Thank you.

5                CROSS-EXAMINATION

6  BY MR. YOUNG:

7  Q.   Sir, I'm going to ask you a little bit about

8  the February 4th surveillance up in Phoenix.

9        On that date, you said you followed a black

10 Cadillac CTS from the meet location?

11 A.   Correct.

12 Q.   And if I understand correctly, you never got

13 close enough to that black Cadillac to see who was

14 driving it?

15 A.   That is correct.

16 Q.   In any case, you said you followed the black

17 Cadillac to 3102 East Chipman Road?

18 A.   Correct.

19 Q.   And that address at Chipman Road, that address

20 is Miami's address; is that right?

21 A.   I'm sorry?  That's whose address?

22 Q.   Miami?

23 A.   I'm not familiar with what you're referring

24 to.

25 Q.   How about Keith B. Anderson?  Do you recognize

1   that name?

2   A.  No.

3   Q.  In any case, the address 3201 East Chipman

4   Road that you followed that vehicle to, that's not

5   Ghermon Tucker's address?

6   A.  I do not know whose residence that is.

7   Q.  So you're not familiar with the names in the

8   case?

9   A.  No, I'm not.

10   Q.  You just followed the vehicle?

11   A.  Correct.

12        MR. YOUNG:  I'll take that up with a

13   different witness then.

14        That's all I have, Your Honor.

15        THE COURT:  Anything further, Ms. Hopkins?

16        MS. HOPKINS:  One minute, Your Honor.

17              REDIRECT EXAMINATION

18   BY MS. HOPKINS:

19   Q.  Now, you testified that when you went past the

20   residence at Chipman Road, there were a number of

21   people outside?

22   A.  Yes.

23   Q.  Were there males, females?

24   A.  The majority of them were males.  There was at

25   least one female, but my primary concern was to

observe the tags, so I was not focusing on the

individuals.

Q.   And could you -- could you determine the

nationality of the people that were standing

outside the residence?

A.   Black.

Q.   And you testified that you did not take any

photos that day.

A.   I did not.

Q.   And why didn't you take any photos?

A.   Because the way things happened, with all of

the people standing unexpectedly outside, it would

have jeopardized the covert nature of the

surveillance to have attempted it at that point,

and the risks was just too great.

          MS. HOPKINS:  I have no further questions.

          THE COURT:  If the jurors have any

questions, please place them in writing.

          It appears there is none.  All right.  You

may step down.

          Do you have another short witness,

Mr. Lacey?

          MR. LACEY:  Yes.

          THE COURT:  I'm not talking about height.

          MR. LACEY:  He's about five-four.

1          MS. HOPKINS:  Your Honor, the Government

2     calls Special Agent Jorge Fernandez to the stand.

3          THE COURT:  Just so the jury knows, we

4     will take a lunch break, but we figured if we

5     didn't get at least an hour done this morning,

6     you'd think you wasted your time.

7               He is about five-four.

8          JORGE FERNANDEZ, WITNESS, SWORN

9          THE COURT:  Sir, the Rule has been invoked

10    in this case.  That means, except during the time

11    that you're testifying, you must remain outside the

12    courtroom and you're only allowed to discuss your

13    testimony with the attorneys involved in the case.

14              All right?

15         THE WITNESS:  Correct, yes.

16         THE COURT:  Now, forget about my little

17    joke.  You had nothing to do with it.

18         THE WITNESS:  I wasn't paying attention

19    but that's fine.

20         THE COURT:  Okay.

21         THE CLERK:  Please state your name for the

22    record and spell your last name.

23         THE WITNESS:  First name Jorge,

24    J-o-r-g-e.  Middle initial L.  Last name Fernandez,

25    F-e-r-n-a-n-d-e-z.

1    THE COURT:  You may proceed.

2                 DIRECT EXAMINATION

3  BY MS. HOPKINS:

4  Q.    Agent Fernandez, are you currently working

5  right now?

6  A.    No.

7  Q.    Are you retired?

8  A.    Yes.

9  Q.    Where did you work before your retirement?

10 A.    The Federal Bureau of Investigation.

11 Q.    And where were you stationed?  Was it in

12 Tucson?

13 A.    My last station was Tucson.

14 Q.    Okay.  And what was your title?

15 A.    Special agent.

16 Q.    And how long were you a special agent with the

17 FBI?

18 A.    27 and a half years.

19 Q.    And were you assigned to a specific unit?

20 A.    The last five and a half years, I was with the

21 surveillance team here in Tucson.

22 Q.    And what were some of your duties as a

23 surveillance agent?

24 A.    Basically surveil the subjects that were

25 assigned on the different cases that would be

1  requested for surveillance, and I was part of a

2  team, and that's what we'd do.

3  Q.  Okay.  I'd like to direct your attention to

4  March 2nd, 2011.

5  A.  Okay.

6  Q.  Were you conducting surveillance that day?

7  A.  I believe I was, yes.

8  Q.  And were you conducting surveillance in

9  Tucson?

10  A.  Yes.

11  Q.  And what kind of surveillance were you

12  participating in?  Were you on the ground?

13  A.  I was on the ground.

14  Q.  And were you in a vehicle by yourself?

15  A.  Yes, I was.

16  Q.  And what was your role as a surveillance agent

17  that day?

18  A.  Well, my role was watching and calling out for

19  observations.  I was also keeping the log on that

20  day.

21  Q.  Surveillance log?

22  A.  The surveillance log, correct.

23  Q.  And when and where did you initiate

24  surveillance that day?

25  A.  You know, I don't have a log in front of me,

1  but it was some time early in the morning, around

2  8:30, 8:40, across from a -- I think it was a Food

3  City on Sixth Avenue, just north of the I-10

4  crossing there.

5  Q.   And where are you positioned in relation to

6  that Food City?

7  A.   On the -- on the east exit on Sixth Avenue,

8  across the street, in a little strip mall that's

9  located there, because I was watching the exit and

10  the cars coming and going from my location.

11  Q.   And were you stationary?

12  A.   Yes, I was.

13  Q.   I'd like you to take a look at what's been

14  identified as Government's Exhibits 54-A through

15  C.

16      What we're showing here is a Google Map.  Do

17  you recognize the area?

18  A.   I believe -- I think that's going to be the

19  Safeway here on the bottom.

20  Q.   Safeway or the Food City?

21  A.   I'm sorry.  Food City.

22           THE COURT:  He has stock in Safeway.

23  BY MS. HOPKINS:

24  Q.   Can you -- from this photograph, can you point

25  out where you were parked, or would it be better --

1   A.   No.  I was --

2            THE COURT REPORTER:  Can you talk in the

3        microphone?

4            THE WITNESS:  Oh, I'm sorry.

5   BY MS. HOPKINS:

6   Q.   Where you were positioned, is it depicted on

7   this?

8   A.   No, I don't believe it is.

9   Q.   So let's try 54-A.

10  A.   Yeah.

11  Q.   It's a little -- how about here?

12  A.   Yeah, I would have been, on this picture, on

13  the little strip mall just on the outside of the

14  exit.

15       Oops.  Actually, more like around here.

16  Q.   So right around that area?

17  A.   Yeah, right around that area here.  I believe

18  so.

19  Q.   Were you on the other side of Sixth Avenue?

20  A.   No.  Yes, I was on the other side of Sixth

21  Avenue because that's going to be I-10.

22  Q.   Food City?

23  A.   Excuse me?

24  Q.   Were you on the side of Sixth Avenue near the

25  Food City or on the other side?

1  A.   On the other side, yeah.  The pictures throw

2  me off because it's not north/south, so I'm trying

3  to -- but yeah.

4  Q.   Okay.  Now, were you looking for a particular

5  vehicle or vehicles?

6  A.   Yeah.  We were told to be on the lookout for I

7  think a Nissan Murano, and there was also a Chevy

8  Optra or something like that that we were supposed

9  to be looking for, which different individuals that

10  would be showing up.  We didn't really -- as far as

11  the team or myself, I didn't know who those

12  individuals were going to be, particularly.

13  Q.   So --

14        MS. HOPKINS:  If we could take that off

15  the screen.

16  BY MS. HOPKINS:

17  Q.   Now, what did you first observe that day?

18  A.   You know, I really don't recall, unless I have

19  a log.  I don't --

20  Q.   If you saw the log, would that refresh your

21  memory?

22  A.   Yes, it would.

23  Q.   Okay.

24  A.   That was a year and a half ago.  I retired and

25  I haven't even thought about this case for a

1   while.  Sorry.

2              MS. HOPKINS:  May I approach, Your Honor?

3              THE COURT:  You may.

4   BY MS. HOPKINS:

5   Q.   Take a look at that.  See if it refreshes your

6   memory.

7   A.   Okay.  Okay.

8        So around 11:45 a.m., the Nissan Murano with

9   Arizona tags Alpha Mike Hotel 4879 arrived at the

10  Food City, and that's -- and then it departed at

11  12:26.

12       And that's -- so that's the first thing that I

13  observed.

14  Q.   Okay.  Did you follow the vehicle after it

15  departed?

16  A.   I did not.

17  Q.   Did you stay stationary?

18  A.   I stayed stationary where I was.

19  Q.   Okay.  Did you -- what happened?  What did you

20  observe next?

21  A.   The Murano returned at 12:44 p.m. back to the

22  Food City, and then around 1:24, I repositioned

23  inside the parking lot.  I have no idea where it

24  went in the parking lot when I got there at 12:44

25  because my angle was mainly for the entrance and

1    the exit and not so much for inside the parking

2    lot.

3        When you saw from the photo the cars parked in

4    the assigned parking spaces, I didn't -- it would

5    block my view into the Food City in the parking lot

6    for a lot of the time, but did I notice that it

7    seemed to reposition, because I saw it going back

8    and forth in the lot at 1:24 and then did some kind

9    of drive around the parking lot of 1:35.

10       And then at 1:36, a Chevrolet Optra arrived at

11   the Food City and parked across -- from my angle at

12   that point I could see that it was parked across

13   from the Murano.

14       Then I saw a Hispanic male exit from the

15   Murano and get into the second vehicle, and then

16   the Hispanic male returned to the Murano, and an

17   unknown Hispanic male exited and got into the

18   second vehicle.

19       And at 1:39, the Murano and the second vehicle

20   departed from the Food City.

21   Q.   Now, did you follow the vehicles when it

22   departed from the Food City?

23   A.   No, I did not.

24   Q.   Did you stay stationary where you were?

25   A.   Yes, I did.

1  Q.   What's the next thing that you observed?

2  A.   Okay.  At about 2:04, the Murano returned to

3  the Food City, where they picked up an unknown male

4  that was standing in front of the store.

5      And again, my angle, I could just happen to

6  see through the parking lanes that there was

7  somebody standing around out there in front of the

8  Food City.  The Murano came by, and the person got

9  into the vehicle, and they depart at 2:05.

10  Q.   And did you follow that Murano this time?

11  A.   Actually, then they picked up two additional

12  males, and then they departed at 2:06, and no, I

13  did not follow it.

14  Q.   So what did you observe next?

15  A.   At 2:34 p.m., I saw the —— a third vehicle,

16  which is a Ford Expedition, a red Ford

17  Expedition —— I have to go back because I have it

18  by the license plate —— with what I could —— what I

19  could see inside appeared to be four black males,

20  and another vehicle, a Cadillac Escalade, a black

21  Cadillac Escalade.

22  Q.   Did you see them in the Food City, or did you

23  see them arrive at the Food City parking lot?

24  A.   I saw them depart.

25  Q.   And you were able to see the occupants inside

1  the vehicle as they --

2  A.   As they left, I caught quick glimpses because

3  they had their windows open, so I could kind of

4  see.  I'm not sure I had everybody, but that's what

5  it looked like when they went by with their windows

6  open when they exited.

7  Q.   And what direction did they travel when they

8  left the Food City?

9  A.   You know, I don't recall because I didn't

10 follow them, and I didn't list it.  It could have

11 been -- I don't recall.

12 Q.   Okay.

13 A.   Either north or south.

14 Q.   Were you in communication with the aerial

15 surveillance team that day?

16 A.   Yes, I was.

17 Q.   And you were obtaining information from them?

18 A.   Yeah, whatever observations they had for the

19 log, I would put down.

20 Q.   And so did you stay at the Food City lot?

21 A.   Yes, I did.

22 Q.   What's the next thing that you observed at the

23 Food City?

24 A.   At the Food City, at 3:12, the Expedition and

25 the Escalade returned to the Food City and --

1  excuse me.

2  Q.   Go ahead.

3  A.   So I saw them come back, and that's between --

4  during that time I had left my stationary location

5  because they had moved further north, and so I kind

6  of moved north.

7       But then once it looked like they were coming

8  back, then I raced back to get back into position,

9  just to see what was going to happen at the Food

10 City, so -- and then at 3:15, I have them departing

11 the Food City.

12 Q.   Now, did you observe any activity involving

13 those vehicles within the Food City?

14 A.   No.  Just -- I'm not even sure why they had

15 returned or what they were doing or why they had

16 come back, no.

17 Q.   Okay.  So you said they departed the lot.  Did

18 you see what direction they headed?

19 A.   I think on that occasion they might have gone

20 towards the I-10.

21 Q.   Okay.  And what did you do next or what did

22 you observe, if anything?

23 A.   I didn't observe anything else at that point

24 until -- I know I was hearing that they were --

25 they had gone to other locations, and that was --

1    but then the last thing I observed was, after they

2    were on I-10 headed technically west, when they

3    were pulled over on the side of the road on I-10 by

4    the border patrol team that had pulled them over,

5    and that's it.

6    Q.   Did you stop at the scene?

7    A.   No, I did not.

8         MS. HOPKINS:  I have no further questions.

9         THE COURT:  Mr. Cooper?

10                    CROSS-EXAMINATION

11   BY MR. COOPER:

12   Q.   Good afternoon.

13   A.   Good afternoon.

14   Q.   Agent -- or Mr. Fernandez now?

15   A.   That works for me.

16   Q.   You were assigned on March the 2nd to be a

17   surveillance officer for the Food City area;

18   correct?

19   A.   That's just where I started the surveillance.

20   You know, surveillances are mobile --

21   Q.   Okay.

22   A.   -- and so they can be fluid, but it just so

23   happened we had enough people to cover, and the

24   Food City was where a lot of the stuff was evolving

25   and rotating around, so that's where I set up.

1  Q.  I guess I didn't start out where I should

2  have.

3       My next question, where I should have gone is,

4  prior to starting the surveillance on March the

5  2nd, you don't just go blindly.  You have meetings

6  to discuss where people are going to be assigned.

7       Is that fair?

8  A.  Yes.

9  Q.  And do you remember, for this March 2nd

10  surveillance, when the meeting was that you, the

11  whole -- the team got together with the working

12  agents on the case and decided where you all were

13  going to be located?

14  A.  I don't recall, but it might have been the day

15  before or earlier that morning.  I don't --

16  Q.  But that's something that's standard that

17  happens when you're going to do a surveillance?

18  You all get together and discuss --

19  A.  Not always.  Things happen so fluidly.  I

20  mean, I can get -- well, not anymore.  I used to

21  get calls and be asked to, you know, report

22  someplace within an hour, and then when we got out

23  there, we'd just figure it out.

24  Q.  But in a case where you have the

25  opportunity -- let's say that for a day or so the

1  FBI has known there's going to be something coming
2  down at Food City and at a warehouse a mile away or
3  whatever.
4  A.   Right, correct.
5  Q.   It's better if you can get together and have a
6  meeting to discuss where you're going to be and how
7  you're going to operate; is that fair?
8  A.   Yeah, I would agree with that.
9  Q.   Okay.  And were you the surveillance agent in
10  charge?
11  A.   No, I was not.
12  Q.   Who was that?
13  A.   I believe that would have been Kent Hush who
14  was the team leader, but he wasn't out on the
15  surveillance.
16  Q.   Okay.
17  A.   So --
18  Q.   So when you're out on surveillance, who's in
19  charge of you, on this day at least?
20  A.   Through the radio.  It would still probably be
21  Kent Hush or whoever the supervisor was out there.
22  Q.   That's my next question.
23       When you're doing surveillance, you're sitting
24  in a car watching; right?
25  A.   Correct.

1  Q.  And do, sometimes do you have binoculars?

2  A.  Yes.

3  Q.  Okay.  But you're receiving over the radio

4  either instructions or people telling you what's

5  going on; right?

6  A.  Yes.

7  Q.  So you're not acting blindly when you're

8  looking at things; right?

9  A.  Correct.

10  Q.  Okay.  And for a surveillance such as this,

11  you're not the only vehicle there watching the

12  parking lot; right?

13  A.  I believe we had one -- well, actually, we

14  ended up having two more vehicles watching the

15  parking lot, right.

16  Q.  And who were the other agents that were

17  involved?

18  A.  In the parking lot, I believe it was James

19  Sharman and Mike Sharkey.

20  Q.  And do they write reports?

21  A.  Not in this particular instance.  We just

22  write one report per surveillance.

23  Q.  And that's what you call the surveillance log;

24  right?

25  A.  Correct.

1  Q.  And that's what you've been referring to in
2  response to the prosecutor's questions?
3  A.  Yes, correct.
4  Q.  Okay.  Let me ask you about the surveillance
5  log and how it is generated and how it is written.
6      Are you keeping notes while you're watching
7  what you're supposed to be watching?
8  A.  No, not really.  Mostly I just type it into
9  the laptop computer that I have with me in the
10  vehicle.
11  Q.  Oh, okay.  So you're writing it on your
12  laptop?
13  A.  Correct.
14  Q.  Well, that's sort of keeping notes, just not
15  handwritten.
16  A.  Okay.  If you want to call it notes, exactly.
17  Q.  And actually, the laptop makes it so that you
18  can type in what's going on without taking your
19  eyes off what you're watching.
20      Is that fair?
21  A.  I'm not that good of a typist.
22  Q.  I was going to ask if you hunt and peck.
23  A.  No, so -- no.  But again, most of the time
24  there's nothing going on in front of me anyway.
25  Q.  Okay.

A.   And I'm really listening on the radio to
everybody's observation, and that's what I'm typing
in.

Q.   So you're basically taking your notes on your
laptop while you're sitting there listening to the
radio and watching what's around you?

A.   Correct.

Q.   Okay.  Do you remember where the other two
agents were located on the -- I guess would be 54-A
you were describing, the --

A.   I didn't physically see them.  I believe Mike
Sharkey was on the north side of the parking lot,
also outside of the Food City parking lot.  They
asked us not to be inside the Food City parking
lot.

Q.   Okay.

A.   So I believe Mike Sharkey was on the north
side, also outside of the parking lot.

     And then Sharman was in the vicinity.  I'm not
really sure where, but I know Sharman ended up
driving through the parking lot --

Q.   Okay.

A.   -- on a couple of occasions.

Q.   Did you all start at the same time, your
surveillance?

1  A.   Yes.  The surveillance started at 8:40 a.m.

2  That's when we were all in position waiting for

3  activity.

4  Q.   And the three agents, is what I mean, that

5  were assigned at the same time to go to Food City,

6  as opposed to doing other kind of surveillance?

7  A.   Sharkey was -- I can't speak for Sharman.  I'm

8  not sure exactly what he was assigned before he

9  went to the Food City.

10  Q.   Do you know when he showed up at Food City?

11  A.   Let's see.  When I have his first entry, it

12  looks like 11:45.  Well, that's not Sharman.  I'm

13  sorry.  Let me see something.

14      Probably sometime before 2:19 p.m.

15  Q.   Okay.  Now, let me just clarify for the jury

16  how you know that because they can't -- they

17  haven't seen your surveillance log.

18      But up at the top of the surveillance log,

19  there's a heading that says "Surveillance Agents";

20  right?

21  A.   Yes.

22  Q.   Okay.  And then for this surveillance, on

23  March 2nd, you list -- there's 12 different names;

24  right?

25  A.   Yes.

1    Q.   And those -- that does not include the agents

2    that are in the air; correct?

3    A.   Yes, it does, some of them.

4    Q.   Who's in the air?

5    A.   I believe Alex Jones and Richard Gonzales.

6    Q.   And how many planes were in the air?

7    A.   We ended up using two planes, I believe, on

8    that particular day.

9    Q.   So two of the pilots are not listed here, or

10   two of the people in the air are not listed; right?

11   A.   I believe that that's correct, because --

12   yes.  It doesn't look like them, that I recognize,

13   because we have people coming in from off side, and

14   -- yes.

15   Q.   Okay.  Well, then, after you list the name,

16   there's a parenthesis with a number inside the

17   parenthesis, and that's a number assigned for this

18   specific surveillance to the agent?

19   A.   No.  These are, like, our assigned code

20   numbers that are referred to when we talk to each

21   other on the radio.

22   Q.   Okay.  So you, for instance, would say, this

23   is No. 31, and people would know it's Agent

24   Fernandez talking; right?

25   A.   Correct.

1    Q.   And then, when you list the log itself, you

2    begin -- for instance, at 8:40 a.m., it says the

3    time, and then next to the time, it says initials;

4    right?

5    A.   Right.

6    Q.   And that initial follows the log all the way

7    down, and after 8:40 a.m., there's two different

8    initials.  There's 30 and 31; right?

9    A.   Yes, for the first entry, correct.

10   Q.   Okay.  So 30 means that you and Sharkey began

11   surveillance at 8:40 a.m.; right?

12   A.   Actually, the whole squad did, but just for --

13   there wasn't really a need to list everybody there

14   because that's just the beginning of surveillance.

15   Q.   But the whole squad didn't begin surveillance

16   of Food City?

17   A.   Oh, no.

18   Q.   Okay.  So when that first log entry says

19   surveillance initiated in the vicinity of Food

20   City, the 30 and 31 means that it's the two of you;

21   right?

22   A.   Because we're the eyes on the Food City,

23   correct.

24   Q.   Okay.  And the other people have different

25   assignments at other areas of the investigation.

1      Is that fair?

2  A.   Correct.

3  Q.   All right.  Then at 11:45, which is roughly a

4  three-hour period, there's an indication that agent

5  18 -- that would be Jones, who apparently is in an

6  airplane; correct?

7  A.   Right.

8  Q.   And he's on the radio telling you you've got a

9  Murano coming into the Food City; right?

10 A.   Actually, I probably told him there was a

11 Murano coming into the Food City.

12 Q.   Okay.

13 A.   And then he would pick it up because there's

14 -- since I have the direct eye on the entrance,

15 then I would probably see him, and then I'd call it

16 out, and then he circles around and he spots it and

17 he continues with it.

18 Q.   Do you know when the Murano was first seen

19 that morning before the investigation?

20 A.   11:45, as far as I know.

21 Q.   And you then would advise the air person the

22 Murano's entering Food City?

23 A.   Correct.  And everybody that's on the

24 surveillance would become aware of it because it

25 goes out on the radio and everybody hears it.

Q.   When you say that?

A.   Right.

Q.   You say, this is 31, Murano is entering Food City?

A.   Correct.

Q.   Or something like that.

A.   (Indicating.)

Q.   Then about 45 minutes later, at 12:26, 40 minutes later, that Murano left Food City; right?

A.   Yes.

Q.   But you stayed there?

A.   Yes.

Q.   It wasn't your job to go track them down or --

A.   No.  That's why we have airplanes and we have, like, 10 other agents on the ground in vehicles.

Q.   And are you able to say who followed him, the Murano?

A.   I can say the airplane and it looks like Sharkey.

Q.   Sharkey is No. 30?

A.   Number 30, correct.

Q.   Okay.  But you think the airplane did, but there's no listing of the airplane following him, is there?

A.   Because I only log down direct observations.

1    Q.   So you're the one that's logging this in?

2    A.   Correct.

3    Q.   And there's only one agent assigned to log in?

4    A.   Yes, per surveillance.

5    Q.   Okay. But you're logging in what other agents

6    are telling you?

7    A.   Yes.

8    Q.   All right. And then at -- according to

9    Sharkey, at least, at 12:34, that Murano does a

10    u-turn, and that's because you had to make a u-turn

11    when you leave the Food City and go southbound on

12    Sixth Avenue; right?

13      Do you see what I'm talking about?

14    A.   Yeah, I'm seeing. I suppose. I mean --

15    Q.   I'm talking about --

16    A.   Yeah, I know. I'm just -- I don't think you

17    needed to do a u-turn to go southbound, but that

18    doesn't matter. That's what he called out, so

19    that's in the report.

20    Q.   And then about seven minutes later, after

21    going for a ways south on Sixth Avenue, he turns

22    around and heads northbound.

23    A.   Again, that's what Sharkey reported, yes.

24    Q.   And you had no idea why or what he was doing,

25    just --

1  A.   Nope.

2  Q.   You're just writing down what Sharkey is

3  saying?

4  A.   Correct.

5  Q.   But Sharkey was assigned to be a surveillance

6  agent at the Food City?

7  A.   He was mobile and I was stationary.

8  Q.   Okay.

9  A.   And again, like I said, it's a fluid

10 situation, so at any point in time, someone can

11 leave their position and follow.

12 Q.   But you had eight other agents who were also

13 mobile; right?

14 A.   Yes.

15 Q.   Why would Sharkey leave his position?

16 A.   I don't know where the other agents were

17 positioned that they needed to -- that they

18 couldn't move or they were close enough to follow

19 at that point.

20 Q.   So at this point you -- do you still have two

21 agents watching Food City?

22 A.   No, probably just me.

23 Q.   Just you.  What about Sharman?

24 A.   I don't think Sharman is in the area of Food

25 City yet, but I'm not a hundred percent sure, but I

1    don't think --

2    Q.   And is there any way from the surveillance log

3    you could tell if Sharman was there?

4    A.   Only as I said, when I have him making an

5    observation there at 2:19 p.m.

6    Q.   So he could have been sitting there up until

7    2:19 and not see --

8    A.   No, I'm pretty sure that he wasn't, though.  I

9    don't have it because, again, I only log

10   observations that are pertinent, not when people

11   move around within the surveillance.

12   Q.   What I'm asking you, though, is that Sharman

13   could have been sitting there and not said anything

14   because he hadn't seen anything.

15   A.   It's possible.

16   Q.   Okay.  But you can't tell when he exactly

17   arrived; right?

18   A.   No.

19   Q.   Okay.  Not from the log at least?

20   A.   Right.

21   Q.   All right.  Then we have apparently the Murano

22   coming back to the Food City and arriving back at

23   the Food City at, I guess, 12:44; right?

24   A.   Correct.

25   Q.   But then there's a jump, and maybe you can

1  explain this jump.

2      At 12:44 -- and this is, again, Agent 31, who

3  is you?

4  A.   Right.

5  Q.   Describes the Murano arriving at the Food

6  City; right?

7  A.   Yes.

8  Q.   At 1:24, you say he repositions in the Food

9  City.

10  A.   Correct.

11  Q.   So that means he got there, parked in a place

12  and then drove within the parking lot to a

13  different place; right?

14  A.   He may have done more than that.  Again, my

15  line of view was such that I didn't have constant

16  view of the entire parking lot, because there were

17  parked cars, so I saw when they got there at 12:44

18  and entered, and I couldn't be certain of where it

19  parked, just that it was in there and that I was

20  just looking out for when it would come back out

21  again, and I would look into the parking lot with

22  binoculars to see if anything was going on.

23      And then at 1:24 is when I first saw the

24  Murano moving.  Now, that doesn't mean it didn't

25  move before, but that's when I first saw it moving

1    and repositioning, what I thought was

2    repositioning, because I saw it park.

3    Q.   And when you have planes flying above in this

4    investigation or the surveillance, there's a pilot

5    and then there's -- not a copilot, somebody who is

6    sitting next to the pilot; right?

7    A.   It's a copilot.  It can be, yeah.

8    Q.   And that agent is the one that's operating a

9    camera; right?

10   A.   I believe so, yes.

11   Q.   Well, you don't -- you don't want the pilot to

12   be doing the camera, do you?

13   A.   No.

14   Q.   Okay.  So you've got an agent sitting there

15   operating a camera, and it has the ability, then,

16   to be taking pictures of what's going on in the

17   parking lot; right?

18   A.   If it's covering the parking lot, yes.

19   Q.   Okay.  And to your knowledge, was the airplane

20   covering the parking lot?

21   A.   At this time, it doesn't appear that it was.

22   Q.   And you can tell that how?

23   A.   Well, because I don't have any entries for the

24   plane.  It might have been, but I didn't have any

25   entries for the plane.

1    Q.    Well, could the plane be taking pictures and
2    not saying anything to you, just flying around and
3    taking pictures of anything in the parking lot?
4    A.    Especially if it's video because the video
5    runs nonstop.
6    Q.    And they wouldn't necessarily have to be
7    telling you anything; right?
8    A.    Correct.
9    Q.    So again, it's difficult for you to tell from
10   this surveillance log what the airplane was doing
11   actually.
12   A.    Yes, that would be true.
13   Q.    Okay.  And you actually were able to see the
14   Murano circling the parking lot within the parking
15   lot itself and then parking; right?
16   A.    Yeah, by circling, you know, again, if you're
17   looking down a parking lot lane, and a car, you
18   know, comes into view, gets behind cars, comes into
19   view again, that to me is circling around the
20   parking lot.
21   Q.    Okay.  And at this point, right about 1:36 is
22   when you see a gold Chevy Optra?
23   A.    Optra, yes.
24   Q.    Optra.  Okay.
25         Now, at any point in your briefings or before

1  beginning this surveillance, did you learn what

2  kind of case you were going to be surveilling?

3  A.   Yes.

4  Q.   Okay.  So did you know that there was a

5  confidential FBI informant involved?

6  A.   Yes.

7  Q.   And were you told what kind of car that person

8  was driving?

9  A.   Yes.

10  Q.   Okay.  So you were aware, when you saw the

11  notation that a gold Chevy Optra had shown up, that

12  was being driven by the informant?

13  A.   That was my understanding, yes.

14  Q.   Okay.  Well, you were told that by whoever's

15  in charge; right?

16  A.   Correct.

17  Q.   Okay.  And you saw this Optra park -- you

18  write that it was across from the Murano in the

19  Food City parking lot; right?

20  A.   Correct.

21  Q.   So you had visual of those two vehicles where

22  you were --

23  A.   Yes, partially blocked, but yeah, I could tell

24  the two vehicles.

25  Q.   Were you taking pictures or just looking?

1  A.   Just looking.

2  Q.   Okay.  You saw somebody get out of the Murano

3  and get into the Optra; right?

4  A.   Correct, yes, correct.

5  Q.   And when that happened, do you -- do you get

6  on the radio and say to the plane, I got a guy

7  leaving or a target vehicle, I want you to get some

8  pictures, be aware of them or look for them, that

9  kind of thing?

10 A.   I just call it out, and everyone knows their

11 responsibilities, so I don't ask specifically for

12 pictures.  Everybody knows, if they can, they're

13 supposed to take pictures.

14 Q.   So the plane is supposed to be taking pictures

15 because you --

16 A.   Or video, whatever they're using, yes.  And

17 not all planes are equipped with video or photos

18 anyway, but --

19 Q.   Whose decision would it be to get a plane

20 that's equipped with a camera for this?

21 A.   It depends on the planes that are available.

22 Q.   Okay.

23 A.   It's certainly above my pay grade.

24 Q.   A camera is not a hand-held camera, then?

25 It's a camera that's attached to the plane?

1  A.   Sometimes, yes.  It just depends.  Sometimes

2  it is a hand-held.

3  Q.   Okay.  So if the plane that has the camera

4  attached to it is not available, the agent would be

5  table to take a camera up in the air and photograph

6  what he's supposed to be photographing; right?

7  A.   It's feasible but not really that practical.

8  Q.   So you'd prefer to have the plane that has

9  the --

10  A.   The mounted camera, correct.

11  Q.   And you don't know whether that was available

12  that day, do you?

13  A.   No, sir.

14  Q.   Okay.  So all the other agents, then, are

15  being made aware by you at 1:37 that this -- you

16  call them an unknown Hispanic male has gotten out

17  of the Murano and gotten into the Optra, which is

18  the car of the confidential informant; correct?

19  A.   Correct.

20  Q.   And he's there for about one minute,

21  apparently, and then you say he returns to the

22  Murano; right?

23  A.   Yes, and another male exits.

24  Q.   The Murano?

25  A.   The Murano and gets into the Optra.

1  Q.  And your visibility is good enough that you

2  can tell the race of these people; right?

3  A.  Well, I'm Hispanic myself, so I can -- I can

4  kind of gauge what a person is.

5  Q.  But you couldn't tell what race I am if I'm

6  hidden like this, could you?

7  A.  They weren't hidden.  They were just going

8  from one car to the another.

9  Q.  Right.  That's all I'm asking.  You had the

10  visibility where you could tell their race?

11  A.  I believe so, yes.

12  Q.  Well, that's what you wrote here, two Hispanic

13  males.  One gets out, gets into the Murano and gets

14  out.  Another gets out of the Murano and gets into

15  the informant's car; right?

16  A.  Yes.

17  Q.  Both Hispanic?

18  A.  They looked -- they appeared Hispanic to me.

19  Q.  And they weren't black?

20  A.  I don't believe that they were black.

21  Q.  Because you would have noted that if they

22  were?

23  A.  I think so.

24  Q.  Okay.  And at that point, your visibility is

25  such that you're able to see both these vehicles

1  drive out of the Food City lot and head, I think

2  you write, southbound on Sixth Avenue; right?

3  A.   Yes.

4  Q.   And again, you just stay there watching the

5  parking lot?

6  A.   Watching the entrance to the parking lot.

7  Q.   The entrance.  Okay.  Well, you're watching

8  whatever you can, whatever you can see inside the

9  parking lot; right?

10  A.   Yes.

11  Q.   And you know, this is like a shopping area, so

12  there's cars coming and going; right?

13  A.   Yes.

14  Q.   And you're making notations of cars that you

15  think might be involved in this situation based on

16  what you're being told and what you see them doing

17  with the Murano or other vehicles; right?

18  A.   Yes.  If I'm advised of a vehicle being

19  involved, then yes, that's what I'm looking for and

20  that's what I make a notation of, but I don't make

21  notations of cars coming and going from the Food

22  City.

23  Q.   You were never at a warehouse that day?

24  A.   No, I was not.

25  Q.   Okay.  But you're aware, based on what -- I

1  believe it's Sharman?  Sharkey actually --

2  A.   Sharkey.

3  Q.   -- is telling you.  He gets to the warehouse;

4  right?

5  A.   Yes.

6  Q.   And he's telling you, along with -- I guess

7  there's another agent.  Klawenn?  Is that --

8  A.   Klawenn, yes, Klawenn.

9  Q.   They're at the warehouse, and they're on the

10  radio telling you that this Murano has arrived at

11  the warehouse; correct?

12  A.   Correct.

13  Q.   And we're talking right now, it's like getting

14  close to two, 1:51 in the afternoon.

15  A.   Yes.

16  Q.   And you're still observing people coming and

17  going or trying to watch for vehicles that might be

18  important or significant coming into Food City;

19  right?

20  A.   Yes.

21  Q.   And were you told at this point what vehicles

22  to look for, other than the Murano?

23  A.   No.

24  Q.   So in the briefing, there was nothing that was

25  told to the surveillance agents that you can

1　remember about any other car, other than Murano;

2　right?

3　A.　That's true, yes.

4　Q.　And you want to know what you're looking for.

5　That's important; right?

6　A.　Yes.

7　Q.　Okay.　Then, at roughly 1:57, the two agents I

8　mentioned earlier informed you these guys have left

9　the warehouse?

10　A.　Correct.

11　Q.　Okay.　And they get to Food City seven minutes

12　later; right?

13　A.　Yes.

14　Q.　All right.　And you're able to see the Murano

15　pick up another male standing in front of the

16　store; right?

17　A.　Yes.

18　Q.　I'm a little confused about what you've

19　written, so you have to help me out here.

20　　　　You say the Murano arrived at the Food City,

21　and then you say where M-2 picks up unknown male.

22　"M-2" means?

23　A.　The driver of the Murano.

24　Q.　Okay.　And you're able to tell that M-2 was

25　the driver?

1   A.   Not -- again, I don't even know who M-2 is,

2   just I assign a number to go by for each subject as

3   they come into and out of the surveillance.

4   Q.   But you have M-2 and M-1 previously getting

5   out of the Murano?

6   A.   Correct.

7   Q.   Did you know that M-2 was the driver this time

8   around?  Are you able to see that?

9   A.   I don't really recall.

10        THE COURT:  Whenever you think is a good

11  time to take a break, let us know.

12        MR. COOPER:  We can take a break, Judge,

13  I'm hungry.

14        THE COURT:  We'll come back at 1:50,

15  1:50.  Remember the admonition I've given you

16  before.

17        (The jury exits the courtroom.)

18        THE COURT:  See you then.

19        (Off the record.)

20        (The jury enters the courtroom.)

21        THE COURT:  Show the jurors returning to

22  the courtroom, the presence of all counsel and the

23  defendants.

24        Mr. Cooper, you may continue.

25        MR. COOPER:  Thank you, Your Honor.

BY MR. COOPER:

Q.  Sir, before I go back to the time line on the
surveillance log, I'd like to ask you, if you
would, to look at page 2 of the surveillance log.

    And one of the things that you did when you
wrote the log is that you have a section here for
vehicles observed; correct?

A.  Yes.

Q.  And the vehicles observed are the vehicles
observed by both you and the other surveillance
agents; correct?

A.  Correct.

Q.  Okay.  And those would be vehicles that you
determined during the course of the observation to
have some sort of significance with the case;
correct?

A.  Yes.

Q.  Okay.  And there are six separate vehicles
that you have described in the vehicles observed;
right?

A.  Yes.

Q.  Okay.  Briefly, there was the Nissan Murano
we've already talked about; right?

A.  Yes.

Q.  Then there's the Chevrolet Optra that we've

1  talked about; right?

2  A.   Yes.

3  Q.   And then there's four additional vehicles.  A

4  Ford Expedition, 2004; right?

5  A.   Yes.

6  Q.   A 2002 Cadillac Escalade?

7  A.   Yes.

8  Q.   And unknown Buick LeSabre; right?

9  A.   Yes, unknown -- the year was unknown.

10  Q.   Year.  Okay.  And then a 2003 white Jeep

11  Commander?

12  A.   Yeah, 2007, yes.

13  Q.   I'm sorry.  2007.

14      Could we go back up to the Buick LeSabre?

15  A.   Sure.

16  Q.   In the section for the license plate, you have

17  written that it's an Arizona plate; correct?

18  A.   Yes.

19  Q.   And then you have "AG" and a question mark

20  "4442."  And the question mark is because?

21  A.   It wasn't completely read.  It was a very

22  short-term thing, and the person that read out the

23  license plate, that was -- gave me a partial, so

24  when I get a partial, that's what I use.

25  Q.   Okay.  So let me ask you about computers and

1  the FBI and your ability to do some tracking.

2      As part of your investigation and part of your

3  training, you are able to, let's say, take a

4  license plate number, and you know that that

5  license plate number is supposed to match a certain

6  vehicle; correct?

7  A.  Correct.

8  Q.  Okay.  And so you would then be able to,

9  through various computer, I guess, programs or

10  whatever, take even a partial plate and see if a

11  Buick LeSabre, for instance, might have those

12  partial -- because you're only missing one number;

13  right?

14  A.  Correct.

15  Q.  And you could do that to try to find out who

16  the registered owner is of that Buick LeSabre;

17  right?

18  A.  Yes, but that's not something that I would do

19  in my normal course of --

20  Q.  Well, I know, not you.  I'm not talking about

21  you.

22  A.  Right, but that's the reason why I put in the

23  partial; correct.

24  Q.  But that's something that, if you were not,

25  let's say, being a surveillance officer, just a

1  regular agent trying to determine who was the

2  registered owner, that's one thing that you could

3  try to do to determine that.

4      Is that fair?

5  A.  Yes, that's correct.

6  Q.  Even if you only -- even if you're missing a

7  number or a letter from the description; right?

8  A.  Yes.

9  Q.  Okay.  Do you know if that was done in this

10  case?

11  A.  No, I do not know.

12  Q.  Okay.  So therefore, in the section where it

13  says the Buick LeSabre, it's registered to -- and

14  you had to write "unknown" because when you put a

15  partial plate into the computer system, it doesn't

16  come back with anything; right?

17  A.  Correct.

18  Q.  Okay.  If we could go back to what we were

19  talking about before lunch, we were at the point

20  where the -- we had discussed who was the driver of

21  the Murano, and that driver apparently or the

22  Murano had picked up an unknown male standing in

23  front of the store; right?

24  A.  Yes.

25  Q.  Okay.  And that was at about 2:04, and what

1    happens then, and this is written by -- or this is

2    from your own observations.  You're able to see the

3    Murano go and pick up two additional people

4    standing outside the store?

5    A.   Yes.

6    Q.   And do you know where these two additional

7    people had come from?

8    A.   No.

9    Q.   You saw the Murano move, you see these two

10   people there, and they get into the Murano?

11   A.   Yes.

12   Q.   And you described the Murano another minute

13   later leaving Food City; right?

14   A.   Yes.

15   Q.   Okay.  And when you write that it's M-2, M-4,

16   M-5, and M-6 in the Murano, that's all the people

17   that you believed were in the Murano; right?

18   A.   Yes.

19   Q.   At least all that you saw get into it?

20   A.   Okay.  M-2 is going to the driver of the

21   Murano, and I believe when I came back, I could

22   only see the driver.

23   Q.   All right.

24   A.   So I assumed that the rest of the Murano was

25   empty, and I only saw three people get in.

1    Now, if more people got in where my view was
2 blocked, then --
3 Q.   They might -- okay.  There might have been
4 five leaving the Food City?
5 A.   It's possible.
6 Q.   Okay.  And there actually might have been
7 somebody who came back but was -- didn't get out of
8 the Murano.  You just don't know that.
9 A.   Oh, right.  Well, again, looking through the
10 windshield and the windows, it looked like it was
11 just the diver, but yeah, it's possible somebody
12 could have been in there.
13 Q.   Okay.  You are then told that at 2:15 in the
14 afternoon the Murano had arrived at the warehouse;
15 right?
16 A.   Yes.
17 Q.   And you're told that by the two other agents,
18 Agent 34, who is Sharkey, and Agent 35, who is
19 Klawenn.
20 A.   Klawenn, correct.
21 Q.   Okay.  And they were observing where the
22 Murano went after it left the Food City; right?
23 A.   Yes.
24 Q.   And they're letting you know it's at the
25 warehouse, and you then, four minutes later, there

1　is a notation in your surveillance log of observing

2　three additional cars; right?

3　A.　Yes.

4　Q.　But at this point, the people from the Murano

5　are no longer present; right?

6　A.　Correct.

7　Q.　That's at we're talking 2:19 p.m.

8　A.　Yes.

9　Q.　And neither is the driver who was in the

10　Optra; right?

11　A.　No, correct.

12　Q.　That person had also left initially with the

13　Murano.

14　A.　Yes.

15　Q.　Okay.　But at 2:19, you are able to see a Ford

16　Expedition, a Cadillac Escalade, and a gold Buick

17　LeSabre; right?

18　A.　No, that was not me.

19　Q.　Okay.　That would then be Agent 19, who is

20　Sharman?

21　A.　Correct.

22　Q.　Okay.　And where was Sharman located at Food

23　City?

24　A.　At that point, I believe that we got a request

25　from the case agent or team leader for someone to

1  drive through the Food City parking lot --

2  Q.   Okay.

3  A.   -- and see if we could identify other people

4  that might be there waiting, because that was the

5  understanding, that there were people there waiting

6  to go to the warehouse once it was determined that

7  it was clear to go to the warehouse.

8  Q.   And you had a car 15 minutes earlier, though,

9  that had left to go to the warehouse; right?

10 A.   Yes.

11 Q.   And so Sharman apparently drives through and

12 sees the Expedition, and he is able to eyeball four

13 black men in the Expedition, right, four black men

14 occupants?

15 A.   Yes.

16 Q.   He also was able to count in the Escalade five

17 black men; right?

18 A.   Yes.

19 Q.   Okay.  And then he also sees the LeSabre, and

20 apparently these three cars are parked side by

21 side, the three of them; right?

22 A.   I didn't see them.  I assume that --

23 Q.   I'm just talking about what he told you.

24 A.   Right.  He just calls out that they were in

25 the parking lot, yeah, side by side.  Again, that's

1  what he reported on the radio.

2  Q.  All right.  And in the LeSabre are two black

3  men?

4  A.  Again --

5  Q.  We have 11; right?

6  A.  Yes.

7  Q.  Five plus four plus two?

8  A.  Yeah.

9  Q.  I did it.  Okay.

10     Right after you get this call from Agent 19,

11  from Sharman, at 2:20, the LeSabre leaves the

12  parking lot; right?

13  A.  Yes.

14  Q.  Okay.  And is there a call that's noted in the

15  surveillance log that anybody was assigned to

16  follow that car?

17  A.  The LeSabre?

18  Q.  The LeSabre.

19  A.  I don't believe so, not at that time.

20  Q.  And I guess that would be my next question is,

21  at 2:19, Sharman is told to drive through the lot

22  to see if there's any other vehicles that might be

23  connected to this situation, and he describes these

24  three vehicles, including a LeSabre with two black

25  men in it, and it leaves a minute later, and

1  nobody -- and you have at least, like, seven or

2  eight other FBI agents in the perimeter area, and

3  nobody follows the LeSabre; right?

4  A.   Yes.

5  Q.   And you don't know why that is?

6  A.   Other than the other agents were busy in other

7  locations.   That's it.

8  Q.   Okay.   But there -- there were numerous agents

9  at the Food City location?

10  A.   No, that's not true.

11  Q.   In the perimeter?

12  A.   Again, I'm not sure where everybody was

13  stationed, but we had people at the warehouse and

14  we had people in other locations, and the decision

15  was made not to go after the LeSabre at that point

16  because we had two other vehicles, and we still had

17  the Murano, so at some point we just got stretched

18  too far.

19  Q.   Who made that decision?

20  A.   I can't say it was -- that somebody actually

21  said -- it might have been someone from the command

22  post.   I don't recall.

23  Q.   Do you know where Agent Howell was?

24  A.   No, I do not.

25  Q.   At 2:30, again, you get -- you write --

1  there's another notation indicating that the

2  Escalade and the Explorer -- or I'm sorry -- the

3  Expedition and the Escalade are parked side by side

4  in the parking lot at 2:30; right?

5  A.  Yes.

6  Q.  Okay.  And that's repetitive, because that had

7  already been told to you 11 minutes earlier; right?

8  A.  Yes, but the reason why I do that is because I

9  have a notation with a "P."  That's that photos

10  were taken at that time.

11  Q.  Okay.

12  A.  So that's why that repeats, because photos

13  were taken, so the photos will coincide with the

14  notations on the log.

15  Q.  But if you're looking at this log in

16  hindsight, it would tell you that these cars had

17  not moved.  If they had moved that you knew about

18  or you'd been told, you would have noted that they

19  had moved within the parking lot?

20  A.  Oh, yes.

21  Q.  Okay.  So they're basically in the same

22  position as they were at 2:19?

23  A.  Yes.

24  Q.  All right.  And the difference between the

25  2:30 notation and the 2:19 is that the LeSabre

1  isn't there anymore; right?

2  A.   Correct.

3  Q.   Do you know, from the 2:19 notation, is there

4  anything indicating that photos were taken of the

5  LeSabre parked next to the other two vehicles?

6  A.   No, there were not.

7  Q.   And then the two vehicles we're talking about,

8  the Expedition and the Escalade, at 2:34 p.m., both

9  leave Food City; right?

10 A.   Yes.

11 Q.   Okay.  And my next question, then, is at 2:34,

12 had you been in contact with whoever was at the

13 warehouse, what agent was at the warehouse, I mean?

14 A.   Just whatever I would pick up over the radio.

15 Q.   Do you know if people had been arrested at the

16 warehouse at that point?

17 A.   I believe there had -- something had happened

18 at the warehouse, yes, but I --

19 Q.   That wouldn't be something you'd put in a

20 surveillance log?

21 A.   It was not part of my surveillance, no.

22 Q.   But at 2:34 is when these two vehicles leave;

23 right?

24 A.   Yes.

25 Q.   Now, I'd like to talk about the front seat --

1  front sheet of your surveillance log, where you

2  have a listing called "Individuals Observed."

3  A.   Yes.

4  Q.   And in that, you've listed from M-7 through

5  M-18, those are people that either you or one of

6  the other surveillance agents observed; right?

7  A.   Yes.

8  Q.   And you list them all as black males; right?

9  A.   Yes.

10  Q.   And thus far, we've listed 11 black males.

11  That would be at time 2:19 where you have four in

12  one vehicle, five in another, and two in another;

13  right?

14  A.   Yes.

15  Q.   Okay.  And the 12th black man you are told

16  about at 2:47; right?

17  A.   Yes.

18  Q.   And that's a black man who's in a white Jeep

19  Commander?

20  A.   Yes.

21  Q.   And that's one of the vehicles that we talked

22  about earlier, one of the six vehicles; right?

23  A.   Yes.

24  Q.   And that's the 12th black man that you noted

25  in your surveillance log to have some sort of

1  connection to what you were observing; right?

2  A.   Yes.

3  Q.   All right.  And you saw that this black man,

4  or at least you were told by either Sharkey or

5  Sharman, that the unknown black man in the

6  Commander was seen talking to three of the black

7  males from one of those vehicles that had left the

8  Food City; right?

9  A.   Yes.

10  Q.   And right now you're at Circle K, and I think

11  you've listed the address in your log as Two North

12  Freeway; right?

13  A.   Yes.

14  Q.   Okay.  And so now we've counted up to 12 black

15  males, and that's the M-7 through M-18; right?

16  A.   Yes.

17  Q.   And about five minutes later, it appears to me

18  that there's a conversation relayed to you

19  apparently by Sharkey between a black woman, who's

20  listed as F-1; right?

21  A.   Yes.

22  Q.   And people in vehicle four, which would be

23  which car, the Escalade or --

24  A.   The Escalade.  I believe the Escalade.

25  Q.   The Escalade?

1  A.   Yes.

2  Q.   Okay.  And that conversation lasted -- well,

3  you don't know the exact amount of time, do you?

4  A.   No, I do not.

5  Q.   Because the vehicles left the Circle K about

6  five minutes after the conversation is told to you;

7  right?

8  A.   Yes.

9  Q.   But you don't know when the conversation

10  began; right?

11  A.   Me personally, no.

12  Q.   And you don't know who the black woman is

13  either, do you?

14  A.   No, I do not.

15  Q.   And that's the sort of thing, when you're told

16  by another agent, we're watching this black woman

17  do something, if let's say 20 minutes later an

18  agent stops her and gets her identification

19  information and relayed that over the radio, you

20  would put that in your report if that happened;

21  right?

22  A.   If it was relayed to me?

23  Q.   Right.

24  A.   To put it in, yes.

25  Q.   Yeah, like we saw this black woman talking.

1  We stopped her 20 minutes later.  We found out who

2  she is.  Here she is.

3      That would go in your log?

4  A.  It would depend.

5  Q.  Well, apparently Sharkey, I guess, made a

6  notation of it for you to put down that these guys

7  are talking to a black woman at the Circle K.

8  A.  Right, yes.

9  Q.  Okay.  And if they had found out who she was

10 15, 20 minutes later and relayed that information

11 to you, it would have gone into your log?

12 A.  If there had been a positive identification,

13 then yes, I would have put it in.

14      MR. COOPER:  Thank you.  That's all I

15 have.

16      THE WITNESS:  Okay.

17      THE COURT:  Mr. Armstrong.

18                CROSS-EXAMINATION

19 BY MR. ARMSTRONG:

20 Q.  Agent Fernandez, just a few follow-up

21 questions here.  Ms. Hopkins asked you earlier

22 today whether you saw the black Cadillac Escalade

23 arrive at the Food City parking lot.  Did you --

24 did you -- and your answer was, you saw them depart

25 or you saw it depart.

1  A.   Correct.

2  Q.   You didn't see it come into the lot?

3  A.   No, because I was not looking for a black

4  Cadillac Escalade at the time.

5  Q.   And when were you provided -- well, when were

6  you called out to participate in a surveillance

7  operation, in this particular surveillance

8  operation?

9  A.   We probably were notified, I don't know, the

10  week before or the day before.  I don't recall.

11  But we were told, this is going to be happening, so

12  that's when we would be advised, and that's why we

13  get there at 8:40 in the morning.

14  Q.   And did you have a meeting with other agents

15  about how the surveillance was going to take place

16  and who was going to be assigned particular

17  responsibilities?

18  A.   Yes, I believe we did.

19  Q.   Okay.  Did you have a meeting with Agent

20  Edwards regarding the surveillance operation?

21  A.   I don't believe I met with Agent Edwards, no.

22  Q.   And you know who Agent Edwards is?

23  A.   Yes, I do.  He's sitting at the table there.

24  Q.   Did you -- was there a meeting of other

25  surveillance officers prior to you conducting the

1  surveillance?

2  A.   The team leader is the one that would go to

3  the briefings.

4  Q.   That was Kent?

5  A.   Kent, correct.  And then -- because otherwise

6  you'd have just a lot of people running through the

7  office, so the team leader is the one that goes,

8  meets with the case agent and gets the information,

9  gets briefed, and then the team leader then brings

10  the information out to the agents out in the field.

11  Q.   So you were briefed by Kent?

12  A.   Yes.

13  Q.   I mean no disrespect.  It's just a name I'm

14  not able to pronounce right now.

15  A.   That's fine.

16  Q.   Kent met -- he briefed you about what to look

17  for on that date?

18  A.   Correct.

19  Q.   Okay.  He never told you to look for a

20  Cadillac Escalade, did he?

21  A.   No, he did not.

22  Q.   Did he tell you to be on the lookout for a

23  Ford Expedition, a red Expedition?

24  A.   Not that I recall, no.

25  Q.   Who else was present during the briefing?

1  A.   Probably most of the agents that are on the

2  top of the log.  I don't recall exactly who was

3  there, but I'd say probably most of them.

4  Q.   Okay.  We'll get to that later.

5       You testified earlier that when you –– you

6  were able to look into –– you were able to see who

7  was inside of the Escalade and the Expedition when

8  those vehicles were inside the Food City parking

9  lot because the windows were down?

10  A.   No.

11  Q.   No, you were not?

12  A.   Not when they were inside the Food City

13  parking lot.  Sharman is the one that observed them

14  inside the Food City parking lot.

15  Q.   Okay.

16  A.   I saw them when they were exiting and their

17  windows were down, so it's just that brief thing as

18  someone is exiting from a shopping center, that's

19  when I get a glimpse of them through the open

20  windows.

21  Q.   Okay.  Which vehicle went first, if you

22  recall?

23  A.   I think whichever vehicle is listed first.  I

24  think it was probably the Expedition that went

25  first.

1  Q.  And it was at that time when you made your --

2  made your observations of the numbers of people in

3  the car and the races of the people?

4  A.  Using the information that was provided to me

5  earlier by Sharman, who made the initial

6  observation at 2:19, yes.

7  Q.  Do you know, prior to 2:19, was Sharman in the

8  Food City parking lot driving around looking for

9  people?

10 A.  No, I do not believe he was.  But --

11 Q.  Sorry?

12 A.  No, you -- I mean, I do not believe -- I saw

13 him drive in, and as far as I know, that was the

14 first time that he had gone into the Food City

15 parking lot.

16 Q.  And on your surveillance log, does it indicate

17 to you what time you saw him drive into the Food

18 City parking lot?

19 A.  No, but it was right before 2:19.

20 Q.  Okay.  So it was Sharman drove in and then

21 shortly after that saw --

22 A.  He made the observation, correct, to the best

23 of my knowledge.

24 Q.  Did you write a report in connection with

25 this, or are you just relying on your memory?

1  A.   No.   This is -- this is it.   This is not my

2  memory.   This is what took place when we were on

3  the street.

4  Q.   I notice you've got the comings and goings of

5  the different vehicles at particular times, but

6  there's nothing in this log, unless I'm missing

7  something, about when it was that Sharman entered

8  the Food City parking lot?

9  A.   No, that's correct.   That's not something that

10  we normally log, where we move and how we're

11  operating, no.

12  Q.   Were you in a vantage point that after 2:19

13  you were able to see the Cadillac and the Ford?

14  A.   No.

15  Q.   Other vehicles obstructing your view?

16  A.   Yes.

17  Q.   Is Agent Sharman, is he one of the people

18  outside today?

19  A.   Yes, he is.

20  Q.   Okay.   We can get some more answers from him,

21  perhaps.

22      Who -- and so it would have been Kent, your

23  team leader, who asked you to conduct the

24  surveillance in the parking lot?

25  A.   Well, technically it would be the case agent,

but yes, Kent is the one that would relay that

information us.

Q.   He communicated that information directly to

you?  It was Kent?

A.   Kent, yes.

          MR. ARMSTRONG:  Thank you.  Nothing

further.

                    CROSS-EXAMINATION

BY MR. YOUNG:

Q.   Sir, if I understand correctly, your only

involvement in this case was as ground surveillance

on March 2?

A.   That's correct.

Q.   And on that date, you were told to look for a

Nissan Murano and a Chevy Optra?

A.   Correct.

Q.   And those were the only vehicles that you were

told to look out for?

A.   As far as direct vehicles, yes.

Q.   Now, it was your job to record the present-

sense impression of the other agents, plus your own

observations as they were called out on the radio?

A.   On that day, yes.

Q.   At 2:19, if I understand correctly, you or

other agents noticed the Expedition, the Escalade,

1   and the gold Buick LeSabre, all parked side by side

2   by side in the Food City parking lot?

3   A.   That's the entry on the log, yes.

4   Q.   And a minute later, at 2:20, the LeSabre and

5   two black males left, never to be seen again?

6   A.   At least -- well, yes.

7   Q.   As far as you know, they were never seen

8   again?

9   A.   Correct.

10   Q.   In fact, they turned off their cell phones and

11   disappeared?

12   A.   I wouldn't know if they had cell phones or

13   not.

14   Q.   There might have been earlier testimony on

15   that. You weren't briefed about their cell phones?

16   A.   No, I was not.

17   Q.   At 2:34, you saw the Expedition and the

18   Escalade depart the Food City?

19   A.   Yes.

20   Q.   And from there, they went to the Circle K,

21   where they bought gas and engaged a black female in

22   conversation?

23   A.   I'm not sure what they did at the Circle K

24   other than they looked like they met up, and they

25   engaged a black female in conversation.

1   Q.   And some of the other agents might have

2   pictures of them buying gas at the Circle K?

3   A.   If that's what they were doing, because I do

4   have them with photos at the scene there, yes.

5   Q.   The Expedition and the Escalade then returned

6   to the Food City.  You saw them come back in at

7   3:12?

8   A.   Yes.

9   Q.   And they left again at 3:15?

10  A.   Yes.

11  Q.   Now, you don't know what time the Expedition

12  and the Escalade first arrived at Food City?

13  A.   That's correct.

14  Q.   And that's because you were not looking for

15  them going in?

16  A.   Correct.

17  Q.   The only vehicles you were looking for were

18  the Murano and the Optra?

19  A.   Correct.

20  Q.   Your report lists the Optra, V-2, as

21  registered to an unknown person?

22  A.   Yes.

23  Q.   And I believe you testified earlier that the

24  Optra was, in fact, registered to the confidential

25  informant in this case?

1    A.   That's the information I had received, yes.

2    Q.   So actually the Optra was registered to a

3    known person to you.

4    A.   I don't know who it was registered to because

5    I don't believe that we ran the tag.

6    Q.   But you knew who was supposed to be driving

7    the Optra?

8    A.   Oh, yes, but the driver is not necessarily the

9    registered owner of the vehicle.

10   Q.   Now, the driver of the vehicle, that would be

11   M-1?  Your report lists him as an unknown Hispanic

12   male?

13   A.   Correct.

14   Q.   And he was, in fact, the confidential

15   informant in this case?

16   A.   I believe he was, yes.

17   Q.   And so your report is not necessarily entirely

18   accurate when it says that the vehicle and the

19   driver were unknown to you.  They were both very

20   well known to you.

21   A.   I don't -- I still to this day do not know who

22   the confidential source is.

23   Q.   Well, somebody within the FBI would probably

24   know that.

25   A.   I imagine so.

1  Q.  And your report shows a total of 11 black

2  males, M-7 through M-18?

3  A.  Yes.

4  Q.  And it shows four were in the Expedition?

5  A.  Yes.

6  Q.  Five were in the Escalade?

7  A.  Yes.  That's what -- yep.

8  Q.  Two unknown black males were in the gold Buick

9  LeSabre?

10  A.  Yes.

11  Q.  And there was one more, M-18, one more black

12  male in a white Jeep Commander at the Circle K.

13  A.  Yes.

14  Q.  And F-1, she was the unknown black female at

15  the Circle K that was seen talking to vehicle four,

16  the Cadillac Escalade?

17  A.  Yes.

18        MR. YOUNG:  That's all I have, Your Honor.

19              REDIRECT EXAMINATION

20  BY MS. HOPKINS:

21  Q.  Do you recall how many entrances there were to

22  that Food City lot?

23  A.  I believe there were two, the one off Sixth

24  Avenue and one on the north side, because I-10 kind

25  of blocks the other side, and there's an old motel

1    or something.  I think there were two.

2    Q.  Were you able to see every vehicle that was

3    coming in through both entrances?

4    A.  Oh, no, no, because I could only see the ones

5    coming in off the Sixth Avenue entrance, exit.

6    Q.  Did you personally see the person that was

7    listed that came out of the Jeep Commander, the

8    black male?

9    A.  No.

10           MS. HOPKINS:  Okay.  I have no further

11   questions.

12           THE COURT:  If the jurors have any

13   questions, please place them in writing.

14           It appears there are none.  You may step

15   down.

16           You may call your next witness.

17           MR. LACEY:  Thanks, Your Honor.  Takesha

18   Flowers.

19            TAKESHA FLOWERS, WITNESS, SWORN

20           THE COURT:  Ma'am, the Rule has been

21   invoked in this case.  That means, except during

22   the time that you're testifying, you must remain

23   outside the courtroom and you are only allowed to

24   discuss your testimony with the attorneys involved

25   in the case.

1    THE CLERK:  Please state your name for the

2  record and spell your first and last name.

3    THE WITNESS:  Takesha Flowers.

4  T-a-k-e-s-h-a.  Flowers, F-l-o-w-e-r-s.

5    THE CLERK:  Thank you.  And that

6  microphone, you can adjust it.  Thank you.

7    THE COURT:  You may proceed.

8    MR. LACEY:  Thanks, Your Honor.

9                 DIRECT EXAMINATION

10 BY MR. LACEY:

11 Q.  Would you tell us who you're employed by,

12 please.

13 A.  I'm employed by the Federal Bureau of

14 Investigation.

15 Q.  And you've been with the FBI for how long?

16 A.  10 years.

17 Q.  And what's your educational background?

18 A.  I have a B.A. in English.  That's about it.

19 Q.  And what's your working function with the FBI?

20 A.  Currently I am an investigative specialist.

21 Q.  What does that mean?

22 A.  I do mobile surveillance in support of cases.

23 Q.  What does that mean?

24 A.  We support case agents by conducting mobile

25 surveillances on targets of their choice.

1  Q.  And when you say "mobile surveillance," is

2  that in vehicles or aircraft?

3  A.  In this case it's vehicles.

4  Q.  Okay.  Prior to that, were you ever in the

5  Tucson area assisting back in March, March 2nd,

6  specifically, of last year?

7  A.  Yes.

8  Q.  In what capacity were you assisting or working

9  back on that date?

10  A.  At that time I was a surveillance specialist,

11  and I did fixed surveillance, and as an ancillary

12  duty, I did aerial surveillance.

13  Q.  And back on March 2nd, were you doing fixed or

14  aerial surveillance?  What exactly were you doing?

15  A.  I was doing aerial surveillance in which I

16  worked a FLIR system, forward-looking infrared

17  system, from the air so we can watch the subjects.

18  Q.  And when you say the FLIR system, forward-

19  looking, what is all that about?

20  A.  It's a video system in which you can use

21  infrared to track or follow targets.

22  Q.  If you see a vehicle that's a target vehicle

23  you're trying to track, how do you direct this FLIR

24  system to track the vehicle?

25  A.  It's much like a gaming system in which you

1  have a joint that you hold, and you can turn the

2  ball wherever you want, at whatever you want to

3  view.

4  Q.   So back on March 2nd of last year, you

5  indicated that you were here in the Tucson area; is

6  that correct?

7  A.   That is correct.

8  Q.   In an aircraft?

9  A.   Yes.

10  Q.   What type of camera is in place for that

11  particular aircraft?

12  A.   I think it was -- I don't remember.  I'm

13  sorry.  I don't know exactly what the system is.

14  Q.   And where was the camera located?

15  A.   It's underneath the plane.

16  Q.   And what type of plane is this?  Is it a fixed

17  wing?

18  A.   It's a fixed-wing Cessna.

19  Q.   And what kind of speed does it cruise at when

20  you're out there doing your surveillance?

21  A.   I don't know by heart.

22  Q.   Okay.  You obviously weren't flying the

23  plane.

24  A.   No.

25  Q.   So you're up in the plane.  You were tasked

1  with a certain assignment that day.

2      Is that correct?

3  A.   Yes.

4  Q.   What were you looking for?

5  A.   We were tasked with tracking and following at

6  the very beginning a specific vehicle, a silver

7  SUV.

8  Q.   And when did you first engage that particular

9  vehicle?  Did you see it during the course of March

10 2nd of last year?

11 A.   Yes, I did.

12 Q.   Where?  At what location?

13 A.   At a grocery store, which I now know is a Food

14 City.

15 Q.   Now, from your aerial position, how high up

16 were you when you were doing this, looking down?

17 A.   At least two miles.

18 Q.   Two miles?

19 A.   (Nodding.)

20 Q.   And what can you see when you're two miles

21 high looking down with the assistance of the camera

22 apparatus that you had on board?

23 A.   It's a lot like a satellite view.  You look

24 down on everything.  It's like they're ants.

25 Q.   And with those ants, can you see -- for

1 example, on a vehicle, could you see from two miles
2 high a license plate tag on a particular vehicle?
3 A.   No.
4 Q.   Could you see facial characteristics of the
5 people you were looking down at, these so-called
6 ants?
7 A.   Not at that height, no.
8 Q.   And what's your reason or what was your
9 reason, if you know, why you were flying two miles
10 high?
11 A.   Planes are loud.  To reduce noise, and so that
12 you don't know you're being followed, you get as
13 high as possible.  And since this is Arizona, it's
14 pretty clear.
15 Q.   So you're two miles high looking down, and you
16 say you saw this target vehicle, a silver SUV or
17 gray SUV?
18 A.   Yes.
19 Q.   At a Food City, you mentioned?
20 A.   Yes.
21 Q.   What time approximately was that, do you know?
22 A.   That was around 11:45.
23 Q.   Now, you have a log in front of you, do you
24 not?
25 A.   Yes, correct.

1    Q.   And the log, is that something you kept or
2    someone else kept that was on the ground?
3    A.   No, someone else keeps a log on the ground.
4    Q.   When you're up in the plane looking down, what
5    exactly are you doing?  You mentioned something
6    about a gaming system comparison.  What were you
7    doing?
8    A.   You're tracking, in this case a silver or gray
9    SUV, and recording what you see and then calling it
10   out to the ground crew.
11   Q.   And when you're recording it, how does the
12   pilot know how to coordinate his flying direction?
13   How do you synchronize what you're seeing and where
14   the target vehicle is going?
15   A.   Well, you have a map system on the gimbal, or
16   our FLIR system, it has a map and a gimbal, and you
17   can see from -- you can see from the target range
18   what you're looking at and where it is.
19   Q.   When you say "gimbal," what's a gimbal?
20   A.   A gimbal is the ball.  It's the system itself
21   that orients it for how far down you are, what
22   you're looking at, the angles, that kind of thing.
23   Q.   And do you control that gimbal, that ball?
24   A.   Yes, I control the direction, yes.
25   Q.   So you're doing that with the camera looking

1  down that's based underneath the airplane?

2  A.   Yes.

3  Q.   And how is the pilot coming into synch with

4  what you're doing?

5  A.   Well, the pilot, basically, when you do

6  surveillance, you do a circular route, so we go out

7  about a mile from the actual target and circle it.

8  Q.   And what's the purpose of going a mile out and

9  circling?

10  A.   Well, that's what you do.  That's just how

11  it's done.  It's found to be the best way to track

12  a target.

13  Q.   Okay.  So you don't just hover over the

14  vehicle and try and follow it?

15  A.   Exactly.

16  Q.   You spotted this silver or gray SUV at the

17  Food City parking lot.  How did you know it was a

18  Food City parking lot?  Could you tell from where

19  you were positioned?

20  A.   No.  The ground team informed us -- once we

21  were put on the target, the ground team lets me

22  know exactly when I call it out where am.  All I

23  can say is, we're at this store or we've turned

24  into this mall, and once the ground team is there,

25  they can tell me exactly where they go.

1    Q.   And all you're doing is looking at the screen

2    and following it and directing the camera's

3    direction; is that correct?

4    A.   Correct.

5    Q.   And you're not making notes or dictating some

6    report, typing into some machine as to what's

7    happening?

8    A.   No.

9    Q.   That's being done presumably by people on the

10   ground?

11   A.   Correct.

12   Q.   Once you started tracking that SUV, where did

13   you go?  Where did you take it?

14   A.   Once I started tracking the SUV, it was -- we

15   got up on it in the Food City.  It left a couple of

16   times, came back to the Food City.

17   Q.   When you say "a couple times," what time --

18   you mentioned -- when you first saw the SUV, when

19   was that again?

20   A.   That was at 11:45.

21   Q.   And did it leave the Food City, and if so,

22   about what time?

23   A.   Yes.  I have it left the Food City at 12:26.

24   Q.   Now, do you have -- you don't have any

25   specific recollection of this.  You're looking and

1    refreshing yourself by the report.

2        Is that correct?

3    A.   Correct.

4    Q.   Okay.  It left at 12:26.  Where did it go

5    next?

6    A.   It made a u-turn and went back to the Food

7    City.

8    Q.   And what time would that be, about?

9    A.   It returned to the Food City at 12:44.

10   Q.   And do you know how long it stayed there at

11   that point in time?

12   A.   It stayed there for almost -- for more than an

13   hour or about an hour after that.

14   Q.   And could you see whether or not there was any

15   people inside the vehicle getting out from where

16   you were positioned?

17   A.   Yes.  If they got out, I could see them.

18   Q.   And did you see anyone get out of the SUV in

19   the Food City parking lot during that time frame?

20   A.   Yes.

21   Q.   About what time?

22   A.   That was at 1:37.

23   Q.   And what did you see?

24   A.   I saw a male get out of the vehicle, met with

25   an unknown vehicle.

1  Q.  Do you know what that description of that

2  vehicle would be?  Can you tell?

3  A.  I said gold vehicle.  It's up to the ground

4  team to get the specifics on that because that's

5  all I can see.

6  Q.  It looked to be gold in appearance to you?

7  A.  Yes.

8  Q.  Okay.  After you saw the male get out of the

9  target SUV, the silver one or gray one, and go to

10  this other vehicle, what happened next?

11  A.  Well, he got into the vehicle, and then he

12  got -- after a few minutes, he got out.  Someone

13  else exited the silver vehicle and got into the

14  gold vehicle, and they left the Food City.

15  Q.  Okay.  And did you follow them at that point?

16  A.  Yes.

17  Q.  To what location?

18  A.  To a warehouse.

19  Q.  And where was that roughly in position in

20  reference to the Food City?

21  A.  I don't know.  It was about 10 minutes away.

22  Q.  And when you say 10 minutes, that's driving

23  time, as opposed to flying time?

24  A.  Correct.

25  Q.  What happened at that location, when you saw

1    it go to -- was it a warehouse?

2    A.    Yes, it was a warehouse.  They went to the

3    warehouse, parked in front and entered.

4    Q.    Could you tell how many people exited the

5    vehicle?

6    A.    I couldn't give you an exact number.

7    Q.    Okay.  If you don't have a recollection or you

8    couldn't see it, that's fine.

9    A.    Yeah.

10   Q.    I know it's been a year plus since these

11   events took place.

12         What happened next?

13   A.    After about five minutes, I didn't actually

14   see anybody get into the vehicle, but the silver

15   SUV started moving.  I asked if they wanted me to

16   stay there or go with the vehicle.  We told them to

17   go with the vehicle.

18   Q.    Okay.  And where did you follow it to?

19   A.    I followed it back to the Food City.

20   Q.    What time was this about?

21   A.    This was at 2:04.

22   Q.    And what happened then?

23   A.    They picked up some more people in front of

24   the store and returned to the warehouse.

25   Q.    Could you tell how many people were picked up

1    at that time?

2    A.    It says here about two.

3    Q.    And when you say "about two," is that from

4    your observation or from somebody on the ground?

5    A.    I can say it was more than one, but they

6    said -- the ground team saw two, so two.

7    Q.    And all you saw was more than one, from your

8    recollection?

9    A.    Yes, from my recollection, more than one.

10   Q.    Did the vehicle, after it picked up more than

11   one person, go anywhere from the Food City?

12   A.    It went back to the warehouse.

13   Q.    And what time was that, roughly?

14   A.    That was at 2:15.

15   Q.    And again, this is based upon the report, not

16   your recollection?

17   A.    Correct, uh-huh.

18   Q.    What happened then?

19   A.    Well, they were there for maybe 10 or 20

20   minutes, and then the arrest took place.

21   Q.    Okay.  And after the arrest took place, where

22   did you go at that time?

23   A.    They put me on another target, a red SUV.

24   Q.    Where did you go to find that target vehicle?

25   A.    I went to the Circle K.

1  Q.  And here in Tucson?

2  A.  Yes.

3  Q.  Do you know roughly what area of town that was

4  in?

5  A.  No.

6  Q.  Do you know whether it was close to the

7  freeway or not?

8  A.  Yes.

9  Q.  So was it close to the freeway or not?

10  A.  Yes, it was close to the freeway.

11  Q.  Okay.  After you went to the Circle K, what

12  exactly did you see there?

13  A.  I saw the red vehicle enter the parking lot of

14  the Circle K, park near some gas pumps.

15  Q.  When you saw this red vehicle pull into the

16  Circle K, how far away were you positioned up in

17  the air?  Were you still two miles high?

18  A.  Yes.

19  Q.  And what happened then?

20  A.  I saw someone exit the vehicle, a male, and I

21  think he was wearing a white shirt.

22  Q.  And do you know what door or what part of the

23  vehicle the person got out of?

24  A.  No.  He was underneath the awning, but you can

25  -- at the angle I was at, you can see that he got

1   out of the car, and I just couldn't see what door,

2   like, if it was driver or passenger.  I just saw --

3   Q.   And could you tell whether he was Hispanic,

4   white, black?

5   A.   No.

6   Q.   What happened then?

7   A.   He walked towards the entrance of the Circle

8   K, and I followed, but instead of going in, he

9   walked over towards some phone booths by Circle K.

10   Q.   Okay.  And those phone booths were located

11   where in reference to the store?

12   A.   It was right next to it.  If you're in front

13   and facing away from the Circle K, it's on the

14   left.

15   Q.   Okay.  How long was the person by the phone

16   booths, by the phones?

17   A.   I'm going to say two or three minutes.

18   Q.   What did you see next?

19   A.   I saw him meet up with a couple of other

20   people.  They seemed to walk either -- well, when I

21   saw them, it was like they were walking from the

22   Circle K, like, on the sidewalk.

23   Q.   And what happened next?  What did you see

24   next?

25   A.   They talked, and then he walked back towards

1    the vehicle.

2    Q.    Which vehicle?

3    A.    The red SUV.

4    Q.    Okay.  Was the red SUV under the cover of the

5    overhangs at that time, or could you tell?

6    A.    Yes, it was still there.

7    Q.    Okay.  What happened then?

8    A.    One of the people he was talking to walked

9    away in an opposite direction towards the right,

10   and so since he -- since they met or mingled, I

11   followed him over because I didn't know who he was,

12   and he walked over to a black truck.

13   Q.    Okay.  Could you tell what kind it was from

14   the air?

15   A.    No.

16   Q.    And this was what time, approximately?

17   A.    This happened around 2:49, 2:50.

18   Q.    Okay.  What happened then?

19   A.    The red truck filled up with gas, and then the

20   black truck went over to the other pumps, and I

21   guess they did the same.  They went to a gas pump.

22   Q.    You couldn't actually see them pumping gas?

23   A.    No.

24   Q.    You just saw them go over to the area where

25   the pumps were located?

1    A.    Right.

2    Q.    What happened next?

3    A.    After some time, both vehicles departed the

4    Circle K.

5    Q.    Okay.  Now, did you -- was any video made,

6    recorded, of what you were watching that day?

7    A.    Yes.

8    Q.    Have you had occasion to look at that

9    particular video recently?

10    A.    Yes.

11    Q.    And I would ask the witness be shown Exhibit

12    62-A.

13        When did you view this disk or the video of

14    what you observed that day?

15    A.    Last week.

16    Q.    And how long approximately did that last?

17    A.    There were two disks.  Each disk holds about

18    two and a half hours.  It was a total of maybe four

19    hours, three and a half or four hours.

20    Q.    And that video -- the videos encompass what

21    period of time?  When did it start and when did it

22    finish, roughly?

23    A.    Oh, it started as soon as I started recording,

24    so that's around 11:45, until surveillance was

25    terminated at 4:30.

1    Q.   Does the video stay active and current the

2    whole time you're up in the air when you're doing

3    your surveillance?

4    A.   I think so, yes.

5    Q.   Do you have any control over starting or

6    stopping the video?

7    A.   I do, but you don't do that.  It's not --

8    policy is against it, so.

9    Q.   Okay.  And the video that you observed last

10   week, could you see fairly clearly from your

11   two-mile-high vantage point the events you've

12   talked about today?

13   A.   Yes.

14   Q.   And thereafter, were you shown even here today

15   in the courthouse some clips of that so we don't

16   have to listen to -- or view four hours or so of

17   video?

18       Did you see some snippets, some smaller

19   segments of that video?

20   A.   Yes.

21   Q.   And those snippets or small segments of that

22   particular video surveillance from March 2nd of

23   last year, did they accurately depict what was

24   shown in the full video that you watched last week?

25   A.   Yes.

1    MR. LACEY:  I would ask at this time, Your

2  Honor, that we have marked for identification

3  purposes -- and we have it in the computer system

4  here, but it's Exhibits No. 62-A, the full

5  surveillance clip.

6  BY MR. LACEY:

7  Q.  And then I also believe -- were there some

8  still photographs that were taken of -- that were

9  taken from the snippets of the clips you looked at,

10  some videos you could look at like this?

11  A.  Yes.

12  Q.  And did you view those today as well?

13  A.  Yes.

14  Q.  And do those accurately depict what you had

15  seen on the video itself when you looked at that?

16  A.  Yes.

17  Q.  Now, you mentioned -- I would ask the witness

18  be shown Exhibit 62-A.1 at this time.

19      Can you identify that for us?

20  A.  This is at the Circle K when I observed the

21  target at the phone booths.

22  Q.  And is there a time listed on this, on the

23  bottom right?

24  A.  Yeah.  It's says here 2142.

25  Q.  And what is 2142?  Is that local time or what

1  is that?

2  A.    That's Zulu, Greenwich Mean Time.

3  Q.    And Greenwich as in England?

4  A.    Yes.

5  Q.    And what time would be it locally, then, on

6  the bottom right, here in Tucson?

7  A.    That would be 2:42.

8  Q.    2:42 p.m. in the afternoon?

9  A.    Yes.

10  Q.    And again, does this particular still

11  photograph accurately represent what you saw on the

12  video as recorded by your -- by you on the airplane

13  back on March 2?

14  A.    Yes.

15         MR. LACEY:   I would offer 62-A at this

16  time, Your Honor.

17         MR. COOPER:   No objection, Your Honor.

18         MR. ARMSTRONG:   No objection.

19         MR. YOUNG:   No objection, Your Honor.

20         MR. LACEY:   And published.

21         THE COURT:   It'll be admitted, can be

22  published.

23  BY MR. LACEY:

24  Q.    Now, just so we get a perspective, you can see

25  in the back of this particular Exhibit 62-A.1, what

1    seems to be a store, is that correct, on the top

2    left?

3    A.   Yes.

4    Q.   And what exactly did you identify from this

5    particular photograph?  You mentioned earlier there

6    were some phones in the area?

7    A.   Yes.  As I said before --

8    Q.   Touch the screen.  You can show us where they

9    would be.

10   A.   Up here on the left, you can see --

11   Q.   And it looks like a phone bank of maybe three

12   or four phones?

13   A.   Yes.

14   Q.   Now, there seems to be someone depicted there

15   wearing a white shirt or sweatshirt or whatever it

16   would be?

17   A.   Uh-huh.

18   Q.   Now, did you see -- was that the person you

19   just told us about that you saw?

20   A.   Yes.

21   Q.   And that person got out of what vehicle?

22   A.   A red SUV.

23   Q.   And is this how it would have appeared to you

24   from two miles high, or could you have seen even

25   more clear than what the picture shows us here in

1  court today when you were looking back then, or at
2  the video?
3  A.   That's what I saw.
4  Q.   Okay.  And so as you indicated, there is no
5  way you can tell the license plate here or facial
6  features; correct?
7  A.   Correct.
8  Q.   We'd ask the witness be shown 62-A.2, please.
9       Can you identify this for us.
10 A.   Yes.  This is still at the Circle K, and this
11 is where he parked at the gas pump.
12 Q.   And does this picture also accurately reflect
13 what you viewed that day from the plane and is
14 memorialized in the video?
15 A.   Yes.
16       MR. LACEY:  We'd offer 62-A.2 at this
17 time.
18       MR. COOPER:  No objection, Your Honor.
19       MR. ARMSTRONG:  No, none.
20       MR. YOUNG:  No objection, Your Honor.
21       THE COURT:  It can be admitted.
22 BY MR. LACEY:
23 Q.   And will you show us what you were looking
24 at.  You mentioned certain vehicles -- and I think
25 if you push on the bottom left, that will get rid

1    of the arrow that's already there, and can you put

2    an arrow where the person or persons you were

3    looking at and the vehicle or vehicles you were

4    looking at are located on this.  Can you tell?

5    A.    Yeah.  That's my primary vehicle here.

6    Q.    And is that -- is that the red SUV there?  I

7    can't tell for sure.

8    A.    Yes.

9    Q.    Okay.  There appears to be a person in front

10   of that.  Is that the case, or is that a shadow, or

11   can you tell?

12   A.    No, that is a person.

13   Q.    And did you see that person get in or out of

14   that particular vehicle?

15   A.    I may have.  I can't recall.  But he was

16   definitely interacting with the vehicle.

17   Q.    Okay.  I want to show the witness Exhibit

18   62-A.3, please.

19         Can you identify 62-A.3?

20   A.    Yes.

21   Q.    And what is that?

22   A.    That's the red SUV.

23   Q.    Okay.  And again, does this picture accurately

24   depict what the video recorded back on March 2 of

25   last year?

A.   Yes.

          MR. LACEY:  We'd offer 62-A.3.

          MR. COOPER:  No objection.

          MR. YOUNG:  No objection.

          MR. ARMSTRONG:  No objection.

          THE COURT:  It'll be admitted, can be

published.

BY MR. LACEY:

Q.   And if you'll push the bottom left-hand corner

again.

          Now, you mentioned the red SUV.  Is this it

kind of in the center of the photograph again?

A.   Yes.

Q.   Now, there's a person in a white shirt.  Can

you tell where -- had you already seen that person

at the -- or a person at the phone wearing a white

shirt before this or after this?  Do you remember?

          MR. COOPER:  Objection, Your Honor.

          THE COURT:  Overruled.

A.   Yes.

Q.   And do you remember if it was before or after,

or will you have to look at the time stamp to see

which happened first?

A.   I would have to see the time stamp.

Q.   And just so we know, on the bottom right, we

1   talked before about the Zulu time?

2   A.   Right.

3   Q.   And so it would be about 2:47 p.m. and 35

4   seconds?

5   A.   Right.

6   Q.   The time that's on there, how do you ensure

7   that that time's accurate when these videos are

8   being recorded?

9   A.   In honesty, the system is set up where we have

10   to, whenever we go for maintenance, after a certain

11   amount of mileage, it goes in for maintenance, and

12   they have to correct the time if it's off, but we

13   go by time of the ground crew.

14   Q.   Okay. So the log you've been looking at today

15   is more the ground crew's time frames as far as

16   what they clocked on their watch as opposed to what

17   you saw on the plane?

18   A.   Yeah.

19   Q.   Now, with Exhibit 62-A.3, the person wearing a

20   white shirt, were you able to observe what he did?

21   It seems like he's on the right side of the

22   vehicle, towards the front.

23   A.   Uh-huh.

24   Q.   Do you know what happened? Was he getting in

25   or going out or do you know?

1    A.   No.  I would have to see the video.

2            MR. LACEY:  Okay.  We'd ask the witness be

3    shown Exhibit 62-B at the time.

4            And I believe this is a clip, Your Honor,

5    for the record, a clip.  It's not just a still

6    photograph.

7            THE COURT:  Has it been admitted?

8            MR. LACEY:  Not yet.  Just to get a

9    foundation, just let her see it first for a

10   snippet, and then we'll go from there.

11           (The recording was played in open court.)

12   BY MR. LACEY:

13   Q.   Can you identify this for us, Exhibit 62 --

14   this is 62-D.  Can you identify that for us?

15   A.   Yes.

16   Q.   And what is that?

17   A.   This is when they're about to depart the

18   Circle K.

19   Q.   It's what now?

20   A.   When they're about to depart.

21   Q.   And this video, can we stop it for a second?

22       Do you see any vehicles on there that were

23   your target vehicles you were looking at that day

24   when you were looking down?

25   A.   Yes.

1    Q.   What vehicles are those?

2    A.   Both the red SUV and the black truck.

3    Q.   And they're in the center of the photograph,

4    and it's now 21 -- so about 2:57; is that correct?

5    A.   That is correct.

6    Q.   According to what's on the camera?

7    A.   Right, uh-huh.

8            MR. LACEY:  Okay.  Can we keep playing

9    that, please?

10            Well, first I would offer 62-D at this

11    time, Your Honor.

12            MR. YOUNG:  Not B?

13            THE COURT:  D as in dog.

14            MR. COOPER:  Did we see 62-B?

15            THE COURT:  He was looking at D.

16            MR. LACEY:  I may have mispronounced the

17    word, the letters.

18            Whatever the case, 62-D is on the screen,

19    and that's what I'm going by.

20            THE COURT:  You haven't seen the B yet.

21    You've seen the D.

22            MR. LACEY:  We'll come back.

23            MR. COOPER:  Can't wait.

24            THE COURT:  It'll be admitted, can be

25    published.

1      MR. LACEY:  Keep playing it, please, D as

2  in dog.

3          (The recording was played in open court.)

4  BY MR. LACEY:

5  Q.  Now, the location we're seeing here as these

6  vehicles leave, was that the Circle K that they

7  just left?

8  A.  Correct.

9  Q.  Okay.  62-B, as in boy, if we can do that one,

10  please.

11      Can you identify this for us?

12  A.  Yes.  This is when the red SUV arrived at the

13  Circle K.

14      MR. LACEY:  I would offer 62-B at this

15  time, Judge.

16      MR. ARMSTRONG:  No objection.

17      MR. YOUNG:  No objection, Your Honor.

18      MR. COOPER:  None.

19      THE COURT:  We're at B this time?

20      MR. LACEY:  B.

21      MR. COOPER:  Got it.  Thank you.

22      THE COURT:  Can be admitted.

23      MR. LACEY:  And published?

24      THE COURT:  Yes.

25      MR. LACEY:  Thank you.

1   BY MR. LACEY:

2   Q.   Can you tell us what we're looking at here as

3   far as the target vehicles you were looking at, at

4   this time?

5   A.   Sure.  What I have here is the red SUV

6   arriving here at the Circle K and arriving at the

7   pump.

8   Q.   Mark where that is.

9      And it seems to be under a little bit of an

10   overhang, at least part of it; is that true?

11   A.   Right.  That is correct.

12   Q.   Keep playing it, please.

13         (The recording was played in open court.)

14         MR. LACEY:  Okay.  Next 62-C, as in

15   Charlie, please.

16         (The recording was played in open court.)

17   BY MR. LACEY:

18   Q.   Can you identify that for us?

19   A.   Yes.

20   Q.   Is this part of the video you took that day

21   back on March 2 of last year?

22   A.   Yes.

23         MR. LACEY:  We'd offer 62-C, as in

24   Charlie.

25         MR. COOPER:  No objection.

1    MR. ARMSTRONG:  No objection.

2    MR. YOUNG:  No objection, Your Honor.

3    THE COURT:  It'll be admitted and can be

4  published.

5    MR. LACEY:  Thank you.

6  BY MR. LACEY:

7  Q.  And if you would, as it's being played, would

8  you tell us and maybe mark what vehicles you were

9  looking at that day.

10    Is that the red SUV you've checked there?

11  A.  Yes.

12    MR. LACEY:  Okay.  Keep playing, please.

13    (The recording was played in open court.)

14  BY MR. LACEY:

15  Q.  Now, do you see the telephones that are at the

16  Circle K area?

17  A.  Yes.

18  Q.  Where would they be?

19  A.  (Indicating.)

20  Q.  And do you see any person that was by the

21  phones there?

22  A.  Yes.

23  Q.  Is that the person you told us about before

24  that was wearing a white top?

25  A.  Yes.

1    Q.   And talking to some other people?

2    A.   Yes.

3    Q.   Now, they seem to be in an area -- on the

4    bottom left-hand side of the screen, there's a

5    white vehicle and then a darker vehicle to the

6    left.

7         Was that darker vehicle one that you targeted

8    that day?

9    A.   Not that I know of.

10   Q.   You can't tell from that?

11   A.   I can't tell from there.  I know when I first

12   spotted it.  After he was talking with two of these

13   people, the vehicle I saw is over to the right.

14   Q.   And the vehicle to the right is that white-

15   colored vehicle?

16   A.   That's the black truck.

17   Q.   Pardon?

18   A.   The black truck.

19   Q.   Okay.

20   A.   And you can see an unknown walking to the

21   truck.

22   Q.   Okay.  And is that a black truck then?

23   A.   Yes.

24   Q.   And the time is about 2:40 --

25   A.   6.

1    Q.   2:46.

2         Now, at the top of -- in the middle of the

3    screen, off to the right, is that the red vehicle

4    you'd showed us earlier, the red SUV?

5    A.   Yes.

6    Q.   And that's the person walking towards that

7    vehicle?

8    A.   Yes.

9    Q.   In the white shirt you talked about before?

10   A.   Yes.

11   Q.   That was over by the phones?

12   A.   Yes.

13   Q.   Seeing him get into the front passenger side?

14   A.   Yes.

15   Q.   We'd ask the witness be shown Exhibit 62 as in

16   Edward.

17        Can you identify this for us, 62-E?

18   A.   Yes.

19   Q.   And is this part of the video you took that

20   day back on March 2?

21   A.   Yes.

22   Q.   Of the target vehicles that you first picked

23   up at the Circle K?

24   A.   Yes.

25             MR. LACEY:  We'd offer 62-E at this time.

1          MR. COOPER:  The video or the --

2          MR. LACEY:  The video.

3          MR. COOPER:  Can we approach, Your Honor?

4          (The following proceedings occurred at the

5          bench.)

6          MR. COOPER:  The video that has been

7    started now could encompass a long amount of time,

8    including up to the arrest, the stop and the

9    arrest.  I just want to make sure we're not going

10   that far.

11         MR. LACEY:  We're not -- I'm not going to

12   put anybody to sleep if I can help it today.  It's

13   a snippet.

14         MR. COOPER:  If anybody's going to go to

15   sleep today, it's going to be me.

16         MR. LACEY:  And the reason I'm doing the

17   snippet is because I knew you wouldn't have much

18   sleep today.

19         MR. COOPER:  I didn't.

20         THE COURT:  All right.

21         (End of bench conference.)

22         THE COURT:  It's been admitted.  It can be

23   played.

24         (The recording was played in open court.)

25   BY MR. LACEY:

1  Q.  Can you tell on the screen where the target

2  vehicles are that you were following that day?

3  A.  Yes.

4  Q.  Where would they be?

5  A.  Here and here.

6  Q.  Okay.  Thank you.

7          MR. LACEY:  62-F, as in Frank, please,

8  we'd ask that the witness be shown that.

9          Again, this is a short snippet.

10          (The recording was played in open court.)

11  BY MR. LACEY:

12  Q.  Can you identify this for us?

13  A.  Yes.

14  Q.  Is that also part of the video recorded back

15  on March 2 of last year?

16  A.  Yes.

17          MR. LACEY:  We'd offer 62-F.

18          MR. COOPER:  No objection.

19          MR. YOUNG:  No.

20          MR. ARMSTRONG:  No objection, Your Honor.

21          THE COURT:  It can be admitted, can be

22  played.

23          (The recording was played in open court.)

24  BY MR. LACEY:

25  Q.  And do you have any idea what streets that

1  these vehicles were on back then?

2  A.   Back then, yes.  Not now.

3  Q.   Okay.  I understand.

4       Do you know if it's a highway or a city street

5  or can you tell?

6  A.   That's a freeway.

7  Q.   And do you know what direction they're going

8  at this point in time?

9  A.   Back then, yes.

10 Q.   What direction?  I'm sorry.  Now you don't

11 know.  I don't want to push it.

12 A.   Yeah, right.

13 Q.   Okay.

14 A.   Back then.  It looks like they were headed

15 back to the Food City, so that would have been

16 east.

17          MR. LACEY:  Okay.  We'd ask that the

18 witness be shown 62-G, as in George.

19      BY MR. LACEY:

20 Q.   Can you identify this for us?

21 A.   Yes.  This is them returning to the Food City,

22 both the black truck and the red SUV.

23          MR. LACEY:  We'd offer 62-G at this time.

24          MR. COOPER:  No objection, Judge.

25          MR. ARMSTRONG:  No objection.

1        MR. YOUNG:  No objection, Your Honor.

2        THE COURT:  It can be admitted, can be

3    published.

4    BY MR. LACEY:

5    Q.  And the two vehicles, would you point them out

6    to us?

7    A.  (The witness complied.)

8    Q.  Thank you.  And this is back at the Food City

9    parking lot?

10   A.  Yes.

11   Q.  And the time now is -- is it 3:12?

12   A.  Yes.

13       MR. LACEY:  Okay.  62-H, as in Henry.  And

14   this should be our last video clip.  We'd ask that

15   the witness be shown 62-H.

16   BY MR. LACEY:

17   Q.  Can you identify this for us?

18   A.  Yes.

19   Q.  And is this also part of the same video we've

20   been looking at?

21   A.  Yes

22       MR. LACEY:  We'd offer 62-H, as in Henry.

23       MR. ARMSTRONG:  No objection.

24       MR. COOPER:  No objection.

25       MR. YOUNG:  No objection, Your Honor.

1            THE COURT:  It can be admitted, can be

2    published.

3            (The video was played in open court.)

4    BY MR. LACEY:

5    Q.  Do you see our target vehicles here, the ones

6    you were looking at back then?

7    A.  Yes.

8    Q.  And would you -- I'll wait just a second.  Can

9    you see the two vehicles at this time?

10   A.  Yes.

11   Q.  Would you mark those for us?

12   A.  (The witness complied.)

13   Q.  Thank you.

14       And this is about 3:14, per the clock on the

15   video; is that correct?

16   A.  That's correct.

17   Q.  And do you know where the vehicles are

18   situated at this time?

19   A.  This is the exit of the Food City.

20   Q.  Okay.

21   A.  I don't know which exit, like west or --

22   Q.  And can you tell where you are now or where

23   the vehicles, the target vehicles, are located?

24   A.  Yes.

25   Q.  Where would that be?

1    A.   (The witness complied.)

2    Q.   And geographically, here in Tucson, do you

3    know what store or what area they would be located

4    at, at this point?

5    A.   This is -- it looks like it's just past the

6    Food City.

7    Q.   Now, you're based where, Houston right now?

8    A.   Correct.

9    Q.   And you flew in for your testimony from

10   Houston today?

11   A.   Yes.

12        MR. LACEY:   I have no further questions.

13   Thanks, Your Honor.

14        THE COURT:   Mr. Cooper?

15        MR. COOPER:   Thank you, Your Honor.

16                  CROSS-EXAMINATION

17   BY MR. COOPER:

18   Q.   Hello.

19   A.   Hello.

20   Q.   The job that you were doing on March 2nd of

21   2011 was as part of a surveillance team; right?

22   A.   Yes.

23   Q.   And how long had you been on that surveillance

24   team on March 2nd of 2011?

25   A.   That specific team?  The aerial or the

1  ground?

2  Q.  Oh, so they break it up into aerial and

3  ground?

4  A.  Well, I'm from Houston.  The plane is from

5  Houston.  That's an aerial team, and it's Phoenix

6  or Tucson's ground team.

7  Q.  Okay.  So you were based in Houston even in

8  2011?

9  A.  Yes.

10  Q.  How long have you been in Houston?

11  A.  Eight years.

12  Q.  Okay.  So were you ever based in Tucson --

13  A.  No.

14  Q.  -- as an agent?

15      Okay.  So the surveillance in this case then

16  involved bringing a plane from Houston?

17  A.  Yes.

18  Q.  And how many planes were in the air on March

19  2nd 2011?

20  A.  I don't know.  I know mine was.

21  Q.  And did you fly over with the pilot?

22  A.  Yes.

23  Q.  And the name of the pilot was?

24  A.  We had two.  One is Jim Cunningham, and I

25  think the other was David Silvera.

Q.   And these pilots were -- did they trade off?

A.   As in flying the plane?

Q.   No.  I mean, who was flying on March 2nd,
2011?

A.   Oh, I don't remember who was the -- they do
switch off depending on the day, so if one person
is pilot, the other person is copilot.

Q.   One at one time though; right?

A.   Right.  Well, not -- no.  Actually, not
always.  They do trade off in that way, yes.  If
someone gets tired or --

Q.   Okay.  Do you remember if they traded off on
that day?

A.   No, I do not remember.

Q.   Let me ask you about -- do you know what a
surveillance log is?

A.   Yes.

Q.   The agents in this case, had you known them
previously?

A.   I may have worked with some of them on a prior
case in this area.

        MR. COOPER:  Can I approach real quickly,
Your Honor?

        THE COURT:  You may.

BY MR. COOPER:

1  Q.   Have you had a chance to look at surveillance

2  logs in this case?

3  A.   Yes.  They gave it to me today.

4  Q.   And there were two?

5  A.   This is the one I have for the day that I

6  participated.

7  Q.   March 2nd of 2011?

8  A.   Correct.

9  Q.   Okay.  Well, let me -- I have two, so let me

10  ask you which one we're talking about.

11  A.   Okay.  Okay.  The one that says March 2nd.

12  They're both -- oh.  Can I look through --

13  Q.   Sure.

14  A.   This is the one that I have.

15  Q.   Okay.  I'll ask you some questions about it.

16       You have indicated a five-page report; right?

17  A.   Yes.

18  Q.   And the surveillance log author is?

19  A.   Jorge Fernandez.

20  Q.   And there's a two-page report.  What's the

21  date on that one?

22  A.   That is March 2nd, 2011.

23  Q.   Authored by?

24  A.   Robert Howell.

25  Q.   Okay.  And here's the question on both those

1  reports.  Where is your name?

2  A.  Oh, I'm not on the log.

3  Q.  Okay.  And how about the pilot that was up in

4  the air?  Is he on the log?

5  A.  No, not that I can see.

6  Q.  Okay.  Let me ask about when you're up in the

7  air flying around.  Who are you taking orders from?

8  A.  Since we were assisting Tucson's ground team,

9  we took our orders from Tucson's ground team.

10  Q.  I guess my next question is, who on the ground

11  is telling you where to go or what to do?

12  A.  I'm sure it's the team leader, usually.

13  Q.  You don't remember who it was?

14  A.  No.

15  Q.  Are you informed, though, that there are going

16  to be other planes in the area?

17  A.  Well, I'm sure they told the pilots.

18  Q.  Not you, though.

19  A.  That's not pertinent to my duties, so if they

20  told me, I didn't remember it.  I didn't need to.

21  Q.  All right.  And I guess the pilot is listening

22  to air traffic control as well?

23  A.  Yes, I guess.

24  Q.  I mean, you have a certain area where you're

25  allowed to fly in when you're doing this sort of

1    thing and not to get in the way of other airplanes,

2    that sort of thing?

3    A.   Oh, I don't know.  I don't fly.

4    Q.   Okay.  Well, you do fly, but --

5    A.   Well, I don't fly.

6    Q.   I get it.

7         Now, the video that's attached to the plane is

8    basically a camera, a video camera that you operate

9    from inside the plane; right?

10   A.   Correct, yes.

11   Q.   And you have the ability to turn it off, but

12   you don't because it's against policy.

13   A.   Correct.

14   Q.   But do you have the ability to guide it as to

15   where it's -- where the lens is going to go?

16   A.   Correct.

17   Q.   And what degree of angle does that lens take,

18   do you know?

19   A.   I don't understand the question.  What do you

20   mean by "degree of angle"?

21   Q.   That was a bad question.

22        Well, when you're looking at the picture that

23   you're seeing --

24   A.   Right.

25   Q.   -- can you go how far to the left and how far

1  to the right, or does it go 360 degrees?

2  A.   Yeah, it can.

3  Q.   It can go 360?

4  A.   Yes.

5  Q.   And you're the one that's operating it?

6  A.   Yes.

7  Q.   Okay.  Do you remember if on March 2nd you had

8  any orders to video what was taking place at Food

9  City?

10  A.   Did I have orders to video what was taking

11  place at Food City?

12  Q.   Right.

13  A.   Yes.

14  Q.   And for how long?

15  A.   As long as they wanted me up there.

16  Q.   You have in front of you the surveillance log;

17  right?

18  A.   Yes.

19  Q.   Could you go ahead and look at it and give me

20  a statement as to when it was that you got involved

21  video -- I guess, would you call it videotaping?

22  A.   Okay.  You can say that.

23  Q.   Thanks -- the Food City lot and area?

24  A.   Well, this shows that I was overhead and

25  recording at 11:45.

1  Q.  And how can you tell that?

2  A.  There's a time listed here on the log.

3  Q.  It says 11:45.  What I have is gray Murano

4  bearing a certain license plate arrives at Food

5  City.

6  A.  Right.

7  Q.  And L-1, is that you?

8  A.  No, that's location one.

9  Q.  Location one?

10  A.  Which is the Food City.

11  Q.  Okay.  And how do you -- how do you tell,

12  then, that you arrived there at 11:45?

13  A.  Well, because I -- that's the whole reason for

14  them to put it there.  What I'm calling out, I see

15  on the video --

16  Q.  Okay.

17  A.  -- I am on the target.

18  Q.  So you were specifically targeting the Murano

19  and followed it to the Food City?

20  A.  That's what they put me on, yes.

21  Q.  Okay.  Once the Murano is at the Food City,

22  are you supposed to follow it if it leaves?

23  A.  Yes.

24  Q.  So you don't know if anybody else was

25  videotaping the Food City from, let's say, 11

1  o'clock until 2:40 in the afternoon.

2  A.    No.  I wouldn't know if anybody else --

3  Q.    That wasn't your job?

4  A.    No.

5  Q.    Okay.  And yours was just basically to see

6  what's happening with the Murano?

7  A.    Yes.

8  Q.    Okay.  At some point, however, was the Murano

9  ever not the focus of what you were looking at?

10  A.    Only at the end, when we were at the Circle K

11  and I was put on the red SUV.

12  Q.    And you got instructions to do that; right?

13  A.    Yes.

14  Q.    And again, at this point, you still didn't

15  know if there was another plane up in the air;

16  right?

17  A.    Correct.

18  Q.    Okay.  Do you write your own log or report of

19  this, what takes place?

20  A.    No.

21  Q.    That would be up to whoever's keeping the log

22  on the ground?

23  A.    Correct.

24  Q.    And in this case, that would have been both

25  Mr. Howell and Mr. Fernandez?

1   A.   Well, from my part, it would be Mr. Fernandez.

2   Q.   Okay.  Do you know what time the arrest took

3   place?

4   A.   It had to be -- no, I don't know the exact

5   time.  It was 2:15 when I took them back to the

6   warehouse.  The arrest was sometime after that.

7   Q.   Where was the Murano at the time of the

8   arrest?

9   A.   It was at the warehouse.

10   Q.   And would that Murano -- would you have been

11   filming the Murano at the time of the arrest?

12   A.   Yes.

13   Q.   And but that's not -- is that in the log

14   anywhere?

15   A.   Oh, there was nothing to say, so there's --

16   after I say that it's there --

17   Q.   Okay.  The -- from where you are, the video

18   picture that we're seeing --

19   A.   Uh-huh.

20   Q.   -- is that what you're seeing when you're

21   photographing --

22   A.   Recording, yes.

23   Q.   -- the objects on the ground?

24   A.   Yes.

25   Q.   So you can -- you might not be able to see a

license plate number, but you can certainly see the
type of vehicle we're talking about.

A.   Well, if it's a truck, a car, an SUV, yes.

Q.   Right, sedan, SUV, truck.

A.   And sometimes it can depend, because
hatchbacks and smaller mini vans can sometimes look
like SUVs.

Q.   Okay.  But you can at least depict, you know,
whether it's a sedan versus an SUV.

A.   Yes.

Q.   And you can tell colors as well?

A.   Sometimes.  They can vary due to sunlight and
the system itself, the colors in the system itself,
so --

            MR. COOPER:  Okay.  Thank you, ma'am.
That's all I have.

            THE WITNESS:  Okay.

            MR. YOUNG:  I don't believe I have any
questions, Your Honor.  Thank you.

            MR. ARMSTRONG:  No questions, Your Honor.

            THE COURT:  Mr. Lacey?

            MR. LACEY:  Nothing further.  Thank you
very much.

            THE COURT:  Do the jurors have any further
questions for the witness?

1    Okay.  You're back to Houston.

2    THE WITNESS:  Thank you.

3    THE COURT:  Thank you.  We'll take about a

4    five-minute recess.  We're going to stop around

5    four o'clock, so we've only got five minutes.

6    (The jury exits the courtroom.)

7    (Off the record.)

8    (The jury enters the courtroom.)

9    THE COURT:  Show the jurors returning to

10   the courtroom, the presence of all counsel and the

11   defendants.

12   You may call your next witness.

13   MS. HOPKINS:  The Government calls Agent

14   Brian Hooton.

15   BRIAN HOOTON, WITNESS, SWORN

16   THE COURT:  Sir, the Rule has been invoked

17   in this case.  That means, except during the time

18   that you're testifying, you must remain outside the

19   of the courtroom and you're only allowed to discuss

20   your testimony with the attorneys involved in the

21   case.

22   THE CLERK:  Please state your name for the

23   record and spell your last name.

24   THE WITNESS:  Brian Hooton, H-o-o-t-o-n.

25   THE CLERK:  And Brian, is it B-r-i-a-n?

1    THE WITNESS:  Yes.

2    THE COURT:  You may proceed.

3    DIRECT EXAMINATION

4  BY MS. HOPKINS:

5  Q.    Good afternoon, Agent Hooton.

6  A.    Good afternoon.

7  Q.    Where do you work?

8  A.    With the Federal Bureau of Investigation.

9  Q.    And is that here in Tucson?

10  A.    Yes.

11  Q.    And what's your title?

12  A.    I'm a special agent with the FBI.

13  Q.    Do you belong to a specific unit?

14  A.    Yes, I do.  I belong to the field intelligence

15  group.

16  Q.    And what are some of your duties?

17  A.    I work to support the substantive squads, so I

18  operate and handle informants and then work with

19  the squads to provide the information.

20  Q.    Okay.  And what sort of training did you

21  receive to become a special agent?

22  A.    I attended the FBI academy in Quantico,

23  Virginia, and I've attended various trainings.

24  When I first got out of the academy, I worked

25  narcotics for four years on an OCDETF Squad.

1  Q.  And how long have you been a special agent?

2  A.  For seven years.

3  Q.  I'd like to direct your attention to March

4  2nd, 2011.

5  A.  Okay.

6  Q.  Were you on duty that day?

7  A.  Yes, I was.

8  Q.  And did you come into contact with a person

9  later known to you as Mayco Ledezma-Prieto?

10  A.  Yes, I did.

11  Q.  And where did that take place?

12  A.  I was part of the arrest team, and when

13  Mr. Ledezma was arrested, I was one of the initial

14  agents that took custody of him.

15  Q.  And where was the -- where did the arrest take

16  place?

17  A.  In Tucson, Arizona.  I don't recall the exact

18  address.

19  Q.  Was it at a warehouse?

20  A.  Yes, it was.

21  Q.  And do you recall what time you arrived at the

22  warehouse?

23  A.  It was approximately -- it was, you know,

24  two p.m., you know, between two and three p.m.

25  Q.  And when you arrived at the warehouse, had he

1  already been arrested, or did you actually place

2  him under arrest?

3  A.   I was not the initial agent that placed him

4  under arrest.  I was part of the arrest team.

5  There was a group of vehicles.  I was one of those

6  vehicles that arrived on the scene.

7       My job was to provide perimeter security, so I

8  was parked directly in front of the warehouse where

9  the arrest took place.  Our SWAT team took custody

10  initially of the -- Mr. Ledezma, and then he was

11  handed over to myself and another agent.

12  Q.   Now, I'd like to show you what's already been

13  admitted as Government's Exhibit No. 9.

14       Do you recognize the person in this

15  photograph?

16  A.   Yes, I do.

17  Q.   And who is that?

18  A.   That is Mr. Ledezma.

19  Q.   And is that the person that you came into

20  contact with on March 2nd?

21  A.   Yes, it is.

22  Q.   Now, did you, as part of your duties that day,

23  did you search Mr. Ledezma-Prieto?

24  A.   I did.  When the SWAT team had initially

25  placed him under arrest and put handcuffs on him,

1  they did a very brief patdown just to look for

2  weapons, and then he was immediately handed over to

3  myself and the other agent.

4      At that time we moved him behind my vehicle,

5  and we proceeded to do what we call a high-risk

6  search, and that's where we, you know, do a little

7  more extensive search of the subject.

8  Q.  And what did you seize from his person?

9  A.  I'd have to, you know, look at a log to see

10  the exact items, but I remember, you know, he had a

11  wallet, items in his wallet.  There was a

12  photograph we found in his pocket.

13      You know, typically when we do a high-risk

14  search, we take off the belt.  We search his

15  shoes.  I did not find any weapons on him at the

16  time.  It was more personal items.

17  Q.  Okay.  I'd like to show you what's been marked

18  for identification as Government's Exhibit No. 46.

19      Do you recognize this?

20  A.  Yes, I do.

21  Q.  And what is that?

22  A.  That is the photograph that was taken out of

23  his pocket.

24  Q.  On March 2nd?

25  A.  Yes, it was.  It was taken out of

1    Mr. Ledezma's pocket.

2            MS. HOPKINS:  At this time the Government

3    moves to admit what's been previously marked as

4    Government's Exhibit No. 46 into evidence.

5            MR. YOUNG:  No objection.

6            MR. COOPER:  No objection.

7            MR. ARMSTRONG:  No objection, Your Honor.

8            THE COURT:  It can be admitted.

9            MS. HOPKINS:  May I publish it to the

10   jury?

11           THE COURT:  You may.

12   BY MS. HOPKINS:

13   Q.   Now, after you seized his belongings, in

14   particular this photograph, what did you do with

15   this photograph?

16   A.   My recollection is that we were at the arrest

17   scene, so our job was to maintain custody over

18   Mr. Ledezma.  We placed the items into an evidence

19   bag, and you know, I kept possession of them, you

20   know, throughout the day until I turned them over.

21           MS. HOPKINS:  Okay.  May I have one

22   moment, Your Honor?

23           THE COURT:  You may.

24           MS. HOPKINS:  No further questions.

25                    CROSS-EXAMINATION

1  BY MR. COOPER:

2  Q.   Good afternoon.

3  A.   Good afternoon.

4  Q.   I just have a couple questions for you about

5  your current assignment.

6       You indicated you were sort of like almost a

7  support specialist agent; is that right?

8  A.   No.  I work on what's a squad that's called

9  the Field Intelligence Group, so you know, I still

10 have a few cases.  My primary job is to recruit and

11 handle informants.

12 Q.   Okay.

13 A.   And so I would typically -- you know, a lot of

14 informants that we handle provide information, and

15 that information would be, you know, more

16 applicable to a substantive squad.

17      So for instance, if I recruit an informant

18 that can report on drug trafficking --

19 Q.   Okay.

20 A.   -- my job would typically be to take that

21 information, handle the informant, and go work with

22 the drug squad.

23 Q.   But you also indicated that you get

24 information to agents who actually have their own

25 cases; is that right?

1  A.   That can be correct.  I mean, so if agents in,
2  you know, my office might be familiar that I have
3  informants that kind of report on a certain area, I
4  might be tasked from time to time to inquire about
5  something, yes.
6  Q.   And not just informants, though.  Would an
7  agent come to you and say, I have an eight-digit
8  license plate number and one of the numbers is
9  missing, but I know the type of car it is, and I
10  need somebody to try to run that to see who's the
11  registered owner --
12  A.   No.  It would not happen in that fashion.
13  Q.   Then my next question is, who would then --
14  where would that information go to try to track
15  down that vehicle.  Not you; right?
16  A.   Not me.  So we would typically have
17  individuals in our office that, whether they're an
18  analyst or we call them a staff operation support
19  person.
20  Q.   Okay.
21  A.   And those individuals would be responsible for
22  running a criminal check, running a license plate
23  check.
24  Q.   And you're familiar with what I'm asking, that
25  you know, if you have a license plate with a digit

1  missing but you know the car, you try to run --

2  A.   Sure.   There's ways you could track it down,

3  sure, but that would not be something that would

4  fall under my purview of duties.

5          MR. COOPER:   Okay.   Great.   Thank you very

6  much.

7          THE WITNESS:   Sure.

8          MR. YOUNG:   I don't have any questions,

9  Your Honor.   Thank you.

10          MR. ARMSTRONG:   No questions, Your Honor.

11          MS. HOPKINS:   Nothing further from the

12  Government.

13          THE COURT:   Do the jurors have any

14  questions for this witness?   If so, please place

15  them in writing.

16          There's one.

17          (The following proceedings occurred at the

18          bench.)

19          THE COURT:   "What was the nickname of the

20  man in the picture we saw?"

21          I don't know that he knows.

22          MS. HOPKINS:   He wouldn't know that.

23          THE COURT:   "At this location, is he the

24  only person arrested?"

25          "Were there any weapons?"

1        MR. LACEY:  If he knows.

2        MR. COOPER:  If he knows.

3        (End of bench conference.)

4        THE COURT:  I have a couple of questions

5   from the jurors I'll ask on their behalf.

6        Do you know the nickname of the man in the

7   picture that we just showed you?

8        THE WITNESS:  No, I do not.

9        THE COURT:  All right.  At the location,

10  was he the only one arrested, the person you

11  referenced?

12        THE WITNESS:  No.  There were multiple

13  people arrested.  This was the only individual that

14  I came in contact with on, you know, that close.  I

15  was responsible for that individual at the arrest

16  scene, but I know there was multiple other persons

17  arrested.

18        THE COURT:  Do you know if any weapons

19  were found?

20        THE WITNESS:  No, I do not.

21        THE COURT:  All right.  Any questions

22  based upon the jurors' questions, Ms. Hopkins?

23        MS. HOPKINS:  No.  No, Your Honor.

24        THE COURT:  Mr. Cooper?

25        MR. COOPER:  No, Your Honor.

1    THE COURT:  Thank you.  You may step down.

2        You may call your next witness.

3        MS. HOPKINS:  The Government calls Special

4    Agent James Sharman to the stand.

5            JAMES SHARMAN, WITNESS, SWORN

6        THE COURT:  Sir, the Rule has been invoked

7    in this case.  That means, except during the time

8    that you're testifying, you must remain outside the

9    courtroom and you're only allowed to discuss your

10   testimony with the attorneys involved in the case.

11       THE CLERK:  Please state your name for the

12   record and spell your last name.

13       THE WITNESS:  James Sharman,

14   S-h-a-r-m-a-n.

15       THE CLERK:  Thank you.

16       THE COURT:  You may proceed.

17                  DIRECT EXAMINATION

18   BY MS. HOPKINS:

19   Q.   Good afternoon, Agent Sharman.

20   A.   Good afternoon.

21   Q.   Where do you work?

22   A.   The FBI.

23   Q.   Is that here in Tucson?

24   A.   In Phoenix.

25   Q.   And what's your title?

1    A.    Special agent.

2    Q.    And are you assigned to a specific unit?

3    A.    Surveillance group.

4    Q.    And what kind of training did you receive to

5    become a special agent?

6    A.    Well, we go through the academy at Quantico.

7    It's four months solid.

8    Q.    All right.  I'd like to direct your attention

9    to February 4th, 2011.

10   A.    Yes.

11   Q.    Were you conducting surveillance in Phoenix

12   that day?

13   A.    Yes.

14   Q.    Were you conducting ground surveillance or

15   aerial surveillance?

16   A.    Ground.

17   Q.    And were you in a vehicle by yourself?

18   A.    Yes.

19   Q.    What was your role as a surveillance agent

20   that day?

21   A.    Just basically to participate in the

22   surveillance as seen fit.  Typically, in a

23   surveillance, only one person has an eye on the

24   target, and I did not have an eye on the target

25   until the very end of that particular surveillance.

1  Q.  So when did you initiate surveillance that
2  day?
3  A.  I'd have to refer to my notes.
4  Q.  And what are you referring to right now?
5  A.  The log for February 4th.
6  Q.  The surveillance log?
7  A.  Yes.
8  Q.  Okay.
9  A.  So the surveillance was initiated at 11:30,
10 and I did not actually see the target, have the eye
11 on the target until about 12:40ish.
12 Q.  And so just to back up, starting from your
13 initial surveillance that day, where were you
14 positioned in relation to the target area?
15 A.  Not within eyesight.  I could not see the
16 target from where I was sitting.  I was sitting a
17 couple blocks away in case the target got in a
18 vehicle and started moving.  I was covering a
19 direction.
20 Q.  Now, was surveillance being conducted on a
21 building, a particular building?
22 A.  I believe it was a residences.
23 Q.  Okay.  And so you didn't have visual contact
24 or a visual of that residence?
25 A.  Correct.

1  Q.  Now, did you -- when did you come into contact

2  with the target?

3  A.  I didn't come into contact.  I basically saw

4  the target park in a parking lot that had, like, a

5  chuckwagon-type vehicle, a mobile chow stand, I

6  guess.

7  Q.  And what type of vehicle was it?

8  A.  A red Chrysler 300.

9  Q.  And were you in communication with the other

10 ground units and the aerial surveillance team?

11 A.  We're in constant communication.  We have a

12 half-duplex radio system.

13 Q.  And were you obtaining information from them

14 about --

15 A.  Yes, absolutely.  At any point anybody on the

16 surveillance knows exactly what's going on because

17 whoever has the point is giving a visual

18 description over the radio.

19 Q.  And did you follow this Chrysler 300 or the

20 Chrysler vehicle?

21 A.  Yes.

22 Q.  And do you recall approximately what time you

23 started to follow the vehicle?

24 A.  Well, when you say "follow," we all follow in

25 the surveillance.  It's the point that sees the

1  vehicle.  Everybody else pretty much stays back so

2  at a stop light, say, we don't all stack up right

3  behind him.

4     What will happen normally is, if a car that's

5  being followed pulls off to the side, the point

6  will just continue on.  So I was farther back.  So

7  as I came up onto the location where I knew the

8  vehicle was, I parked.

9  Q.  And did you know where the vehicle was based

10  on the radio communication?

11  A.  Yes.

12  Q.  And approximately -- like, how far away were

13  you from the vehicle?

14  A.  A couple hundred feet maybe.  Across the

15  street.

16  Q.  And where did you follow that vehicle to?

17  A.  It's the northwest corner of Third Street and

18  Buckeye.

19  Q.  Okay.  Did you observe anything else that day

20  regarding that vehicle or any other vehicles?

21  A.  Not a thing.

22  Q.  And did that conclude your involvement on that

23  day?

24  A.  Yes.

25  Q.  Okay.  I'd like to turn your attention to

1  March 2nd, 2011.

2      Were you conducting surveillance on that day

3  also?

4  A.   Yes.

5  Q.   Ground or aerial?

6  A.   Ground.

7  Q.   And what was your role as a surveillance agent

8  that day?

9  A.   Again, just to participate in the

10 surveillance.

11 Q.   When and where did you initiate surveillance?

12 A.   We started around nine o'clock.  We had

13 information that a grayish Murano, Nissan Murano,

14 would be heading towards Tucson from Phoenix, so my

15 team and a number of individuals from the Phoenix

16 -- the Tucson team set up along I-10 on the, I

17 guess, eastbound I-10 side, looking at vehicles

18 going by until we saw a gray Nissan Murano, and we

19 identified it positively as the vehicle that we

20 were looking for.

21 Q.   Now, as to your observations, did the Murano

22 pass you?

23 A.   Yes.

24 Q.   And do you recall exactly where you first

25 observed that Murano?

1  A.  Exactly where, no.  It was on the eastbound

2  I-10 lanes.  It was going very quickly.

3  Q.  And do you recall about what time you observed

4  the Nissan Murano?

5  A.  It was like 11, 11:03, maybe.  I believe it

6  was 11:03 it was called out.

7      See, I'll call it out, and then whoever has

8  the log will look at their watch and write the time

9  down.

10  Q.  So did you call out the vehicle, or did you

11  call out the license plate?  What did you --

12  A.  We were looking for a specific plate, I

13  believe, so I got up close enough to see the

14  vehicle's plate, identify it, and then I backed

15  off.

16  Q.  Okay.  So --

17  A.  I also I determined what the speed was.

18  Q.  What was the speed?

19  A.  About 90 miles an hour.

20  Q.  And so did you have to travel about 90 miles

21  an hour to keep up with it?

22  A.  I had to go faster to catch up, caught it,

23  identified it, and then I backed off.

24  Q.  So after you backed off, what did you do next?

25  A.  I felt -- when you do something like that,

1  that's considered an aggressive maneuver.  You

2  basically fall to the rear of the surveillance and

3  then fall into line at the end.

4  Q.  Okay.  So what did you do next?

5  A.  We followed -- the team followed the Murano

6  down to Food City in South Tucson.  I did not see

7  it go into the Food City.  I went and parked off a

8  few blocks off to the side in case he was to get

9  onto a street and go east.

10      And then after that -- do you want me to get

11  into --

12  Q.  Well, did you have -- from where you were

13  parked a couple blocks away, did have you a visual

14  of what was happening --

15  A.  No.

16  Q.  -- within the Food City parking lot?

17  A.  No.

18  Q.  And how long were you sort of parked -- were

19  you parked or were you --

20  A.  I was parked.

21  Q.  And how long were you parked there?

22  A.  It was a while.  I think the Murano got there,

23  and then I might have been off for like an hour or

24  two, off to the side.

25      There was -- the vehicle arrived at Food City

1  and then departed, and we were told to just kind of
2  stay put.
3  Q.  Did you see the vehicle depart, or is that
4  when you learned --
5  A.  No, I did not see it depart.
6  Q.  So you were still in communication with --
7  A.  Yes, listening.
8  Q.  So you said you were sitting across the street
9  for about an hour or two.
10      What did you do next?
11  A.  A couple blocks away.
12  Q.  A couple blocks away.  What did you do next?
13  A.  At one point my team leader advised me to go
14  into the Food City lot and look for anything that
15  looked out of the ordinary.
16  Q.  So what did you do?
17  A.  I went into the Food City lot and looked
18  around and immediately found -- the parking lot was
19  all -- was full of Hispanics, because it's a
20  Hispanic neighborhood, and in the middle of the
21  parking lot there was two vehicles that stood out,
22  mainly because there was a guy leaning out of the
23  his window, knocking on the window of the vehicle
24  next to him.
25  Q.  What were the two vehicles that you observed

1  in the parking lot?

2  A.    Well, at one point there were three.    There

3  was a Buick, a red Ford Expedition, and a black

4  Escalade, Cadillac Escalade EXT, I think.    It's a

5  truck.

6  Q.    And how close were you -- when you went into

7  the lot, how close were you to those vehicles?

8  A.    Pretty close.    I was maybe a hundred feet or

9  less.

10  Q.    Did you park your vehicle?

11  A.    I parked my vehicle.    I drove -- as I was

12  driving, I believe I entered the parking lot from

13  the north side, drove along the store front,

14  looking at the lot.    I saw this vehicle, because

15  it's a pretty high-end vehicle for the other

16  vehicles that were in the lot.

17      And I came and parked over in the vicinity of

18  that and then began taking some pictures.

19  Q.    Now, what type of vehicle were you in that

20  day?

21  A.    I was in a minivan.

22  Q.    And so are the windows tinted?

23  A.    Yes.

24  Q.    Would people be able to see you taking

25  photographs from your vehicle?

1   A.   No.

2   Q.   Now, I'd like to show you what's been marked

3   for identification as Government's Exhibits 57-A

4   through E.  That's A.

5        Do you recognize those photographs?

6   A.   Yes.

7   Q.   And where are they from?

8   A.   I took them.

9   Q.   And were these photos that you took while you

10  were in the Food City parking lot?

11  A.   While I was parked in the Food City parking

12  lot.

13  Q.   And do these photographs accurately depict

14  what you observed that day?

15  A.   Yes.

16       MS. HOPKINS:  At this time the Government

17  moves into evidence what's been marked for

18  identification as Government's Exhibit's 57-A

19  through E.

20       MR. COOPER:  No objection.

21       MR. YOUNG:  No objection.

22       MR. ARMSTRONG:  No objection.

23       THE COURT:  They can be admitted.

24       MS. HOPKINS:  May I publish to the jury?

25       THE COURT:  And published.

BY MS. HOPKINS:

Q.   Okay.  Can you tell us what we're seeing in this photo, 57-A?

A.   The red Ford Expedition and the Cadillac Escalade truck.

Q.   And do they appear to be communicating with each other?

A.   Yes.

Q.   Okay.  What about 57-B?

A.   An individual from inside the red Ford Expedition got out and started walking around the back.

Q.   And, now, can you read the license plate that's depicted on that red Ford Expedition?

A.   Alpha Mike Alpha 4844.

Q.   What about 57-D, as in dog, please?

A.   Escalade EXT.

Q.   And was the vehicle in transit, or was it still parked in the lot?

A.   That picture looks like it was when they were taking off out of the parking lot.

Q.   57-E.  Same vehicle?

A.   Yeah.  My camera takes quick pictures.  Same vehicle.

Q.   Now, did you have an opportunity to observe

1   the license plate for the Cadillac Escalade as

2   well?

3   A.   I believe I did.

4   Q.   And did you call in the license plate for both

5   vehicles?

6   A.   I believe I did.

7   Q.   What did you observe next, after the vehicles

8   traveled out of the parking lot?

9   A.   They went out to the Main Street and turned

10   south towards the freeway.

11   Q.   And what did you do once the vehicles left?

12   A.   Well, I let them completely leave from where

13   they could see me, and then I left. I fell in to

14   the rear of the surveillance.

15   Q.   And how far behind the vehicles were you?

16   A.   I was probably a couple miles.

17   Q.   Okay. And were you still in radio

18   communication?

19   A.   Oh, absolutely.

20   Q.   So where did you go next?

21   A.   I went over to the Circle K at Two North

22   Freeway, I believe.

23   Q.   I'm sorry?

24   A.   The Circle K. It's right across the street

25   over there.

Q.   In Tucson?

And what -- do you recall approximately what time you got to the Circle K?

A.   I got to the Circle K at 2:40.  I probably got there -- the entry shows 2:40, so I probably got there maybe a couple minutes later.

Q.   Okay.  Now, what happened once you got to the Circle K?

A.   Once we land at a particular location, someone will try to establish an eye on the vehicle in question.  In the meantime, the plane keeps an eye on the vehicles.

And I had gone by and then around the block, and I was coming back west on Congress, and I turned into a parking lot, and I got my camera out and was taking -- taking a few pictures, and then I noticed that another surveillance agent was actually in the lot, and at that point I went over and parked in a different part of the parking lot.

Q.   Now, did you -- did you take any photos at the Circle K?

A.   A few, not many.

Q.   Okay.  I'd like to show you what's been marked for identification as Government's Exhibit 57-F.

Do you recognize this photograph?

A.   Yes.

Q.   And what's this a photograph of?

A.   The Jeep Commander that we saw parked in the
Circle K where the occupants interacted verbally
with the people in the Expedition and the Escalade.

Q.   And you took this photograph?

A.   I believe I did, yes.

Q.   And does it accurately depict what you
observed that day?

A.   Yes.

          MS. HOPKINS:  At this time the Government
moves to admit into evidence what's been marked for
identification as Government's Exhibit 57-F.

          MR. COOPER:  No objection, Judge.

          MR. YOUNG:  None.

          MR. ARMSTRONG:  No objection, Your Honor.

          THE COURT:  It can be admitted.

          MS. HOPKINS:  And published to the jury?

          THE COURT:  It can be.

BY MS. HOPKINS:

Q.   Now, right now we just see the Jeep.  Why did
the Jeep at this point stand out to you?

A.   I believe the plane called out the vehicle was
arriving, and they may have had the window down and
were interacting verbally with someone else.  I

1    don't particularly remember exactly what happened.

2        But I took a picture of it because we had two

3    vehicles that went to that Circle K together, and

4    we had another vehicle arriving, which is -- I take

5    pictures just in case it's pertinent.

6    Q.   Now, after you were at the Circle K, how long

7    were you at the Circle K?

8    A.   Not too long.  10 minutes.

9    Q.   What did you do next?

10   A.   Waited for the agent with the eye to call them

11   departing, and then we departed.

12   Q.   Do you recall who that agent was who had the

13   eye?

14   A.   I believe Michael Sharkey.

15   Q.   So what did you then do next?

16   A.   We followed them onto the freeway.  Well, we

17   follow them loosely because the plane -- basically,

18   when they start moving, the plane takes the eye.

19   Q.   So how far behind the vehicles were you?

20   A.   I was miles behind.

21   Q.   Okay.  So where did you follow the vehicles

22   to?

23   A.   I believe they did a u-turn or something, and

24   then we basically ended up on I-10 westbound near

25   Casa Grande, where they got stopped and pulled over

1  by some SWAT teams.

2  Q.   Now, did you go back to the Food City that

3  day?

4  A.   Personally?

5  Q.   Yes.

6  A.   No, no.

7  Q.   And did that conclude your involvement --

8  A.   Yes.

9  Q.   -- on March 2nd?

10          MS. HOPKINS:  May I have one moment, Your

11  Honor?

12          THE COURT:  You may.

13          MS. HOPKINS:  No further questions.

14          THE COURT:  Mr. Cooper?

15          MR. COOPER:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. COOPER:

18  Q.   Hello.

19  A.   Hello.

20  Q.   Agent Sharman, you are stationed in Phoenix;

21  right?

22  A.   Yes.

23  Q.   Okay.  And how long have you been an FBI

24  agent?

25  A.   Since '96.

1  Q.   Six years.  No.  16 years.

2  A.   Yes.

3  Q.   In that time have you been stationed in

4  Tucson?

5  A.   No.

6  Q.   Phoenix and where else?

7  A.   Just Phoenix.

8  Q.   Just Phoenix.  Okay.

9       How often do you come to Tucson to work cases?

10 A.   A few times a year.

11 Q.   Okay.  Could you tell me, where in Tucson do

12 black people live?

13 A.   I have no idea.

14 Q.   Okay.  You have an idea where there are

15 Hispanic neighborhoods though?

16 A.   Only because the parking lot seemed to have

17 mainly Hispanics in there.

18 Q.   Okay.  And you were observing that parking lot

19 for a couple of hours?

20 A.   Not me personally.  I pulled into the lot, and

21 the vehicles were not there for very long after I

22 pulled into the lot.

23 Q.   So the observation of the race of who was in

24 the parking lot took place while you were driving

25 through the lot?

1  A.   While I was driving through the lot, who was

2  walking in front of me.

3  Q.   And you saw a lot of Hispanics?

4  A.   Only Hispanics.

5  Q.   Okay.  Who were walking?

6  A.   Correct.

7  Q.   What about driving?  What were the race of the

8  people who were driving around the parking lot?

9  A.   I don't know.

10  Q.   And how many people did you see walking in the

11  parking lot?

12  A.   Maybe 30.

13  Q.   30 people in the parking lot at Food City?

14  A.   Yes.  It was fairly full.

15  Q.   There should be video of that; right?

16  A.   I guess.

17  Q.   Well, I'm asking.

18  A.   I don't -- I have no idea.

19  Q.   Okay.  Well, on that day, on March 2nd, was

20  there air surveillance?

21  A.   Yes.

22  Q.   And how many airplanes?

23  A.   I believe there were two.

24  Q.   These airplanes have the capability of

25  photographing what's going on in, let's say, a

1  parking lot; right?

2  A.   Our plane does not.

3  Q.   Are there airplanes that the FBI has that can?

4  A.   Yes.

5  Q.   Okay.  Was there one there that day?

6  A.   I don't know.  I wasn't in the planes.

7  Q.   Well, I know, but don't you all get together

8  and discuss what's going to be happening?

9  A.   Only with the pilots on my team.  I don't know

10  who was in the other plane.

11  Q.   Okay.  So there's no -- what do you call it, a

12  briefing?  Is that what they call those things

13  where you all get together and talk about what's

14  going to happen?

15  A.   Beforehand?

16  Q.   Beforehand, right.

17  A.   Yes.

18  Q.   Was there a briefing in this case?

19  A.   Yes.

20  Q.   Okay.  And did anybody say, we have a plane

21  with a camera on it that's going to look at Food

22  City?

23  A.   I don't recall that.

24  Q.   Okay.  How many people were at the briefing?

25  Do you remember?

1    A.    Just my team.

2    Q.    Just your team?

3    A.    Yeah.

4    Q.    Okay.  And how many people on your team?

5    A.    At the time maybe five, six.

6    Q.    Okay.  What about all the other agents that

7    were conducting surveillance besides your team?

8    There wasn't a big meeting of everybody saying --

9    A.    Not before.

10   Q.    Not beforehand?

11   A.    (Shaking head.)

12   Q.    Okay.  Were you -- who was giving you

13   instructions?

14   A.    My team leader.

15   Q.    And that was?

16   A.    Kimberly Stoddard.

17   Q.    Kimberly Stoddard, was she present as part of

18   the surveillance team?

19   A.    I believe she was.

20   Q.    Do you have your log in front of you?

21   A.    I'll check.

22         Yes, she was there.

23   Q.    What about -- was she present at the Food City

24   also?

25   A.    I don't believe she went into the lot.

Q.   Okay.  Let me ask you about the target on
February 4th.  Okay?

You've described -- I think you said there was
a Chrysler 300 that was your target?

A.   That was -- that's the vehicle that we
identified and we followed.

Q.   I understand, but you said that you -- what
you -- you learned about a target prior to the
surveillance beginning; right?

A.   Yes.

Q.   And who tells you what the target's going to
be?

A.   Well, I think that day they told us an
address.

Q.   All right.

A.   The vehicle happened to be there, so we
followed it away.

Q.   How many other vehicles were at the address?

A.   I didn't see the address, so I'd have to refer
to the log.

Q.   Yeah, go ahead and refer to it and look for
the address, what it was.

A.   All right.  One, two, three, four, five, six
vehicles were identified during the -- during that
surveillance.

1  Q.   And who then determined which vehicle was the

2  target vehicle?

3  A.   The team leader probably said, let's follow

4  that, that vehicle.

5  Q.   Okay.  And do you remember, that would be

6  Ms. Stoddard?

7  A.   You know, I think Kent Hush was in charge that

8  day.  He's the team leader from Tucson.

9  Q.   Okay.  So your assignment at some point was to

10  go to this street location and wait for somebody to

11  tell you what to do?

12  A.   No.  We were going to there and determine

13  what's going on at that location and try and

14  determine if there were any vehicles there and then

15  follow the vehicles to wherever they go.

16  Q.   What was the address of the location where you

17  were?

18  A.   536 South Fifth Place in Phoenix.

19  Q.   And what was that, a house?  What was it?  Do

20  you remember?

21  A.   I didn't see it.  I didn't go by the

22  residence.  I think it's a residence, but I didn't

23  go by it.

24  Q.   Okay.  And where were you compared to the

25  Fifth Place address?

1  A.   A few blocks away.

2  Q.   And you were getting information from --

3  A.   Over the radio.

4  Q.   All right.  You weren't able to see who went

5  into the residence then?

6  A.   Correct.

7  Q.   And so as indicated in the log, you arrived at

8  about 11:30 to begin the surveillance?

9  A.   That's what it says, yes.

10  Q.   Okay.  In all the time that's being described

11  in the log of cars arriving, doing what they're

12  doing, you're just sitting there waiting for

13  somebody to direct you to do something; right?

14  A.   Yes.

15  Q.   Okay.  And it appears that you waited for 45,

16  50 minutes.  Is that about right?

17  A.   There are days that we don't move a whole lot.

18  Q.   Yeah, I'll bet.

19       At that point, then, you were told there's a

20  Chrysler leaving this area, you need to follow it;

21  right?

22  A.   Yes.

23  Q.   And you were getting assistance from -- you

24  were getting assistance from the air at that time;

25  right?

1    A.    Most likely, yes.

2    Q.    Okay.  And you then followed that vehicle

3    to -- I think you said the corner of Third Street

4    and Buckeye.

5    A.    Yes, I believe so.  Yes, Third Street and

6    Buckeye.

7    Q.    And tell me, because I don't know, was there a

8    plan for an agent or surveillance to follow every

9    vehicle that was at this meeting?

10   A.    No.  We don't have enough manpower to do that.

11   Q.    Do you know how it was determined, we're going

12   to follow the Chrysler 300?

13   A.    No, I don't.

14   Q.    One of the things that happens in surveillance

15   is that you take down information such as license

16   plates; right?

17   A.    Yes.

18   Q.    Okay.  And this was being taken down by

19   apparently somebody who was -- who had visual

20   observation of the place where these people were

21   meeting; right?

22   A.    Okay.

23   Q.    Well, I'm asking.

24   A.    That sounds logical.

25   Q.    Okay.  And as a surveillance agent, you

1  obviously have a camera at your disposal; right?

2  A.   Yes.

3  Q.   And those cameras can be used to take pictures

4  of people; right?

5  A.   Yes.

6  Q.   Okay.  And if they are able to see the license

7  plate, they'd be able to take a picture of a person

8  as well; right?

9  A.   Yes.

10 Q.   Do you know how far away the surveillance

11 individuals were who were watching the house in

12 this case?

13 A.   I have no idea.

14 Q.   Okay.  When did you have the briefing for this

15 case or learn about this assignment even?  Do you

16 remember?

17 A.   These things happen rather quickly.  It might

18 have been the evening before that we were told that

19 tomorrow we're going to work this.

20      I don't recall the specifics.

21 Q.   Do you remember, did you write a report about

22 that, about a briefing, for instance, that we met,

23 we were told what this assignment was, anything

24 like that?

25 A.   If I wrote a report on a briefing?  No.

1  Q.  Anything like that?  No?

2  A.  No.

3  Q.  Okay.  The Jeep Commander that you saw at the

4  Circle K, I think you indicated there was a black

5  man in the Jeep Commander.

6  A.  You know, I don't really recall.

7  Q.  Do you have the surveillance log in front of

8  you for March 2nd?

9      Could you go ahead and look at 2:47 p.m.?

10  A.  Yep, an unknown black male.

11  Q.  And right after the words or the numbers and

12  the letters "2:49 p.m." is a number 19.

13      What does that signify?

14  A.  That would be my call sign.

15  Q.  Okay.  So would that be you indicating to

16  whoever's keeping the log that there's an unknown

17  black male in the Jeep Commander?

18  A.  I believe it would be Sharkey.  He had the

19  direct eye on Circle K.  I believe the 19 there

20  means that I took a picture as I was driving

21  through.  I might have called it out.

22  Q.  Okay.

23  A.  We probably both saw the same thing because my

24  car was about as close as right here to Mike

25  Sharkey, so we saw the same thing.

1  Q.   And did you then take a picture of the black

2  man in the Jeep Commander?

3  A.   The picture I took, I don't think you can

4  tell.

5  Q.   Well, I guess my next question is, did you --

6  did that black man get out of the Jeep Commander

7  while you were there?

8  A.   I don't recall seeing him get out.

9  Q.   Did you see the Jeep Commander leave the

10  Circle K?

11  A.   No, I -- as I said earlier, I came in, started

12  to take some pictures, and was getting ready to

13  take an eye at the Circle K, and then I saw Agent

14  Sharkey already parked.

15  Q.   Okay.

16  A.   So I left that area and went to a

17  neighboring -- an adjacent parking lot and parked

18  over there so that they wouldn't see my vehicle

19  again.

20  Q.   Again.  Okay.

21      Where you were, were you able to see the

22  Circle K or --

23  A.   Perhaps intermittently through traffic, but I

24  was kind of buried back in the parking lot.

25  Q.   The black man in the Jeep Commander, was he --

1  he was driving the Jeep Commander?

2  A.   I'm guessing, yes.  That's what the log

3  indicates.

4  Q.   And you didn't -- you would have indicated if

5  there were any other people in the Jeep Commander

6  besides this black man; right?

7  A.   Only if we were able to see through the tint,

8  which I believe it did have dark tint.

9  Q.   But it was clear enough for you to see at

10  least one --

11  A.   I believe his window was down.

12  Q.   And you don't think the window on the other

13  side was down?

14  A.   It wasn't facing me.

15  Q.   But if you -- were you seeing through the

16  driver's side window, then, to --

17  A.   It was at an angle like this --

18  Q.   Okay.

19  A.   -- so I could see that, and going -- you know,

20  I didn't see the passenger side.  I saw the

21  driver's side.

22  Q.   And that was the black man driving the Jeep

23  Commander?

24  A.   Yeah.

25         MR. COOPER:  Okay.  thank you.

1          MR. ARMSTRONG:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. ARMSTRONG:

4    Q.   When you were at the Circle K, you saw agent

5    Sharkey.  Was he right at the Circle K when you

6    arrived at the -- arrived near the Circle K?

7    A.   He was not at the Circle K.  He had an eye on

8    the Circle K.  He was across the street.  There's a

9    parking lot.

10   Q.   Did you -- he was already at that location?

11   A.   He was already there.

12   Q.   Okay.  Where in reference to the Circle K, so

13   I don't keep saying he was at the Circle K?  Was it

14   east?  West?

15   A.   South.

16   Q.   Okay.

17   A.   It was across the street to the south.

18   Q.   And there is a little paid parking lot

19   directly south?

20   A.   I don't know if it was a paid parking lot.

21   Q.   You're from Phoenix, so you may not know

22   that.

23        Okay.  And you took up a position where, in

24   which direction in relation to the Circle K?

25   A.   If you cross the street to the south, there's

1  the lot that Agent Sharkey was.  The street, the

2  little drive that you come in to get into that lot,

3  on the other side, to the east of it, is another

4  lot, and I was over there.

5  Q.  So you were both south of the Circle K?

6  A.  Correct.

7  Q.  Across the street, and it's Congress or

8  Broadway?

9  A.  Congress, I believe, yes.

10  Q.  Were there any other agents, any other FBI

11  agents, conducting surveillance at the time that

12  you and Agent Sharkey were surveilling?

13  A.  I don't know where everybody else was sitting.

14  Q.  Did you later learn that there was another

15  agent or agents present in the lot?

16  A.  I doubt it, because we had a plane up, and

17  Agent Sharkey had a great eye, so everybody else

18  would pretty much back off, like I did.

19  Q.  You mentioned that you took photographs of

20  vehicles at the Circle K, just in case it became

21  pertinent, I think was your testimony.

22  A.  Yes.

23  Q.  In addition to the red -- or the Expedition,

24  the Escalade, and the Jeep Commander, did you take

25  other photographs of vehicles in that lot?

1  A.   There was -- at the Food City, there was a

2  Buick that I took -- I managed to get a partial

3  plate on.

4  Q.   Okay.  What -- we can talk about that, but I

5  want to talk about while you were at the Circle K.

6       You did take some photographs of vehicles at

7  the Circle K?

8  A.   Yes.

9  Q.   In addition to the Expedition, the Escalade,

10  and the Jeep, did you photograph any other

11  vehicles?

12  A.   You know, from the distance I was at, if I

13  take a picture of one vehicle, I'm taking a picture

14  of everything in the lot.

15  Q.   Were there other vehicles that were the focus

16  of your photographic intention?

17  A.   No, I don't believe so.

18  Q.   All right.  So back at the Food City, you took

19  a photograph of another -- of a Buick, and -- were

20  there any other cars?

21  A.   No, just those three.

22  Q.   Of course.

23       Those three.  Which three?

24  A.   The Escalade EXT, the Expedition, and the

25  Buick.

1  Q.   Okay.  That's at the Food City?

2  A.   That's at the Food City.

3  Q.   All right.  Where in relation to the Buick --

4  or the Escalade and the Expedition was the Buick?

5  A.   Right next to it.  I think it went, from east

6  to west, the Expedition, the Escalade, and the

7  Buick.

8  Q.   Okay.  Was the Buick gold in color, if you

9  recall?

10  A.   Light colored.

11  Q.   And you've testified that what drew your

12  attention to the Escalade and the Expedition was

13  the race of the gentleman in the vehicle; correct?

14  A.   In particular, there was one guy hanging out,

15  banging on the window of the other vehicle.

16  Q.   All right.  Fair enough.

17  A.   And that caught my eye, because they're tall

18  vehicles.

19  Q.   So somebody's tapping on the window, saying

20  hey, pay attention here?

21  A.   Yeah.

22  Q.   Other than that, was there any other reason

23  that you paid attention to these two particular

24  vehicles, the Ford or the Cadillac?

25  A.   The Escalade looked out of the place.

1  Q.  Okay.  You were not told in advance, in your

2  briefing --

3  A.  No.

4  Q.  -- to pay attention to either a red Expedition

5  or a black Cadillac?

6  A.  No.

7  Q.  All right.  And your briefing for your

8  February 4th meeting was conducted with Kent Hush?

9  Am I getting that correct?

10  A.  Yes.

11  Q.  He was the team leader for that, and Kim

12  Stoddard was your team leader for the surveillance

13  on February -- I'm sorry -- March --

14  A.  I believe -- I believe actually Kent Hush

15  might have been in charge that day because this

16  case is considered a Tucson case, so we would be

17  working basically for the Tucson team, enhancing

18  their numbers.

19  Q.  So on March 2nd, 2011, if there was a

20  briefing, and you think there was, it would have

21  been Kent Hush conducting -- leading it?

22  A.  Yes.

23  Q.  And he didn't mention anything about paying

24  attention to the Cadillac or the Escalade --

25  A.  I don't --

1    Q.   -- or excuse me, the Expedition?

2    A.   I don't recall.

3             MR. ARMSTRONG:  Thank you, sir.

4                      CROSS-EXAMINATION

5    BY MR. YOUNG:

6    Q.   Sir, you testified that the Murano was going

7    about 90 miles an hour as it was coming towards

8    Tucson?

9    A.   Yes, sir.

10   Q.   And that's pretty fast, isn't it?

11   A.   Yes.

12   Q.   The Murano was probably passing other traffic?

13   A.   Yes.

14   Q.   And it was going well above the speed limit in

15   the area?

16   A.   Yes.

17   Q.   The speed limit in the area is certainly no

18   more than 75; right?

19   A.   Correct.

20   Q.   And for some parts of that drive, it's 65 or

21   even lower?

22   A.   During construction areas, yeah.

23   Q.   And there have been construction areas

24   throughout that drive for years now?

25   A.   That's correct.

1  Q.  Did you have to contact DPS and tell them not

2  to stop that vehicle to give it a ticket?

3  A.  No.

4  Q.  So they just got lucky and didn't get pulled

5  over?

6  A.  They were going faster than the cops go.

7  Q.  Okay.  So the cops just didn't catch up with

8  them?

9  A.  No, I'm just saying that they don't -- they

10  don't normally catch vehicles going that fast when

11  there's a lot of traffic.

12  Q.  And that's because vehicles going that fast

13  probably come up behind the cops and not the other

14  way around?

15  A.  Correct.

16  Q.  Got it.

17      Now, you said there were three vehicles that

18  you saw at the Food City?

19  A.  Yes.

20  Q.  And one of those vehicles was the gold Buick

21  LeSabre?

22  A.  It was a Buick.  I'm not sure what the color

23  was.

24  Q.  And that vehicle left relatively quickly after

25  you got there?

1  A.  Yes.

2  Q.  You noticed it at 2:19.  It left at 2:20.

3  A.  Correct.

4  Q.  Leaving you with no chance to get any photos

5  of that vehicle?

6  A.  No.  I believe I got a picture of it, but I

7  think it had, like, a trailer hitch to obscure part

8  of the plate.

9  Q.  You did get a partial license plate off of

10  that vehicle?

11  A.  Yes.

12  Q.  And you noticed that it had two black males in

13  it which you assigned an M-16 and M-17 to; right?

14  A.  Jorge Fernandez, the log-taker, assigned them

15  that number.

16  Q.  Okay.  And then, while you were in the parking

17  lot, the Expedition and the Escalade, they both

18  hung around for a full 15 minutes?

19  A.  Okay.

20  Q.  So they were there from at least 2:19, from

21  the time you first saw them, until 2:34, when they

22  finally left?

23  A.  Yes.

24  Q.  The surveillance log has the initials of all

25  the surveillance officers on the front of it?

1   A.   Okay.

2   Q.   Am I correct?

3   A.   That's standard operating procedure.

4   Q.   And your initials are next to your name and

5   the number 19?

6   A.   Yes.

7   Q.   And the surveillance log indicates at 2:47

8   that No. 19 saw a black male in a 2007 white Jeep

9   Commander; is that right?

10  A.   Yeah.  I believe I did see them, but that

11  might -- that column might be for -- meaning that I

12  took photographs.

13       But I do believe I saw the arm basically

14  sitting on the -- where the window was going down.

15  Q.   And on this date, you were reporting your

16  observations as you observed them; right?

17  A.   Yes.

18  Q.   And you were reporting them over the radio,

19  and Fernandez was writing them down?

20  A.   Yes.

21  Q.   And after he wrote them down, in fact, you

22  reviewed all the observations for your number, No.

23  19, and you initialed them as being correct?

24  A.   Yes.

25  Q.   The Expedition that you noticed is listed as

1  Vehicle No. 3, and that is a 2004 Expedition?

2  A.   Yes.

3  Q.   And the Escalade is listed as Vehicle 4, and

4  that is listed as a 2002 Cadillac Escalade EXT?

5  A.   Yes.

6       MR. YOUNG:  That's all I have, Your Honor.

7       THE COURT:  Ms. Hopkins?

8                 REDIRECT EXAMINATION

9  BY MS. HOPKINS:

10 Q.   Just a quick question about your February 4th,

11 2011, surveillance.

12      Do you know of anyone that was close enough to

13 the building to see the tags or the persons in

14 attendance at that meeting?

15 A.   No.

16 Q.   And then directing your attention back to

17 March 2nd, you testified that you were directed to

18 go back to -- or you were directed to drive into

19 Food City to look for suspicious vehicles or

20 anything suspicious?

21 A.   Yes.

22 Q.   And you testified that you observed the

23 Escalade and the Expedition?

24 A.   Yes.

25 Q.   And did the occupants of those vehicles appear

1  to be shopping at the Food City?

2  A.   No.

3  Q.   Did they appear to be leaving any time soon?

4  A.   They appeared --

5       MR. ARMSTRONG:  Objection.

6       THE COURT:  Rephrase your question.

7  Rephrase your question.

8       MS. HOPKINS:  I know.  I'm trying to --

9       THE COURT:  You're trying to rephrase your

10  question; right?

11       MS. HOPKINS:  Yeah.

12  BY MS. HOPKINS:

13  Q.   Were they -- did you observe them just parked

14  in the parking lot?

15  A.   Parked in the parking lot, talking.

16  Q.   Talking to?

17  A.   Each other.

18       MS. HOPKINS:  Okay.  I have no further

19  questions.

20       THE COURT:  If the jurors have any

21  questions, please place them in writing.  It

22  appears there are none.

23       Can we finish the next witness,

24  Mr. Lacey?

25       MS. HOPKINS:  I think so.  It should be

1   quick.

2          MR. LACEY:  We're moving fairly quick on

3   our end.

4          THE COURT:  That sounds like a challenge.

5          MR. COOPER:  It is.

6          MR. LACEY:  Since we had a late start

7   today --

8          THE COURT:  Bring him in.

9          MR. LACEY:  He's not five-four, Judge.

10         THE COURT:  No, he's not.

11         MICHAEL J. SHARKEY, WITNESS, SWORN

12         THE COURT:  Sir, the Rule has been invoked

13  in this case.  That means, except during the time

14  that you're testifying, you must remain outside the

15  courtroom and you are only allowed to discuss your

16  testimony with the attorneys involved in the case.

17         THE CLERK:  Please state your name for the

18  record and spell your last name.

19         THE WITNESS:  Michael J. Sharkey,

20  S-h-a-r-k-e-y.

21         THE COURT:  You may proceed.

22                  DIRECT EXAMINATION

23  BY MS. HOPKINS:

24  Q.  Good afternoon, Agent Sharkey.

25  A.  Good afternoon.

1   Q.   Where do you work?

2   A.   For the Federal Bureau of Investigation.

3   Q.   Are you stationed in Tucson or Phoenix?

4   A.   I'm stationed in Tucson.

5   Q.   What's your title?

6   A.   Special agent.

7   Q.   And how long have you been a special agent

8   with the FBI?

9   A.   For the past 21 years.

10   Q.   And are you currently assigned to a specific

11   unit?

12   A.   I'm assigned to one of our mobile surveillance

13   teams.

14   Q.   Okay.  I'd like to direct your attention to

15   March 2nd, 2011.  Were you conducting surveillance

16   that day?

17   A.   Yes, I was.

18   Q.   Were you on the ground or aerial surveillance?

19   A.   I was on the ground that day.

20   Q.   And what was your role as a surveillance agent

21   that day?

22   A.   I was assigned to a certain location, this

23   location being the Food City on Sixth Avenue.

24   Q.   And what time did you initiate surveillance

25   that day?

1  A.   At about 8:40 a.m.

2  Q.   And was that at the Food City?

3  A.   At the Food City at 2950 South Sixth Avenue.

4  Q.   And where were you positioned in relation to

5  the Food City?

6  A.   Well, there were -- at 8:40, when we started,

7  it was just myself and Agent Jorge Fernandez that

8  were assigned there.  The rest of the team was

9  assigned up north.

10      So Jorge positioned himself in one area to

11  view the parking lot, and I positioned myself more

12  to the north where I had a partial view of the

13  parking lot.

14  Q.   How many blocks away or how far away were you

15  from the parking lot?

16  A.   I was across a little side street, so maybe 50

17  yards from the parking lot.

18  Q.   And did you have a good visual of the parking

19  lot?

20  A.   I had a minimal visual of the parking lot.

21  Q.   And you -- were you stationary?

22  A.   No.  I was -- my job was more to respond to

23  movement that would be coming in and out of the

24  lot, so I was kind of standing by and listening to

25  my radio, our agent radio.

1  Q.  Now, were you looking for a particular vehicle

2  or vehicles that day?

3  A.  Yes.  We were waiting for a silver Nissan

4  Murano to arrive.

5  Q.  And when did you first -- or did you observe

6  that Nissan Murano?

7  A.  Yes, I did observe it.

8  Q.  And when did you first observe it?

9  A.  I did not observe it when it first arrived.  I

10  was alerted to its presence.  So when it did

11  arrive, well, I would have to say the first time I

12  saw it was after it left the parking lot.

13  Q.  Do you recall what time that was?

14  A.  That was approximately 12:30.

15  Q.  Okay.  When it left the Food City parking lot?

16  A.  When it left after it first arrived, yes.

17  Q.  And did you follow that vehicle?

18  A.  Yes.  I followed it, not very closely.  We had

19  air coverage up, and the airplane was the

20  primary -- what we call the eye, what would be the

21  primary on the vehicle as it moved around.

22      It was broadcasting off the radio its

23  position, and I followed along behind maybe two or

24  three blocks, just to assist the plane.  If it lost

25  it or if the vehicle stopped and we needed to make

1  a closer ground observation, then I was there to

2  provide that support.

3  Q.   So what did you observe next?

4  A.   Well, it left the parking lot.  It went north

5  on Sixth and did a u-turn, approximately a mile up

6  or so at 12th Street, and then it went south on

7  Sixth, went past the Food City again, went down to

8  44th Street, did another u-turn, and then it went

9  back to the Food City parking lot.

10  Q.   Okay.  What did you observe?  Did you go into

11  the Food City parking lot?

12  A.   No, I didn't.  I stayed way behind.  We were

13  still early in the operation, and I did not want

14  the individuals to see me, so I stayed quite a ways

15  behind, and when it turned in, I didn't turn in

16  behind it.  I went back to my original location and

17  waited for any further movement.

18  Q.   So what did you do next?

19  A.   So approximately an hour went by, and then it

20  left again.  It left -- the Murano left the Food

21  City parking lot, along with a gold Optra, and they

22  went to -- they went south on Sixth, and they went

23  to our planned takedown location.

24  Q.   And were you following the vehicle at this

25  time?

1  A.   Yes.  Again, I was very discreet and far

2  behind him, maybe two blocks behind, because the

3  plane, again, had primary coverage of the vehicles.

4  Q.   Now, where did you follow the vehicle to?

5  A.   To a warehouse at 3226 East 46th Street.

6  Q.   And did you observe the vehicle pull into the

7  warehouse?

8  A.   I did not actually turn into the warehouse.

9  We had other units assigned there.  It accessed the

10  warehouse off of Ajo Way, and I stayed behind it on

11  Ajo, and then when it turned off, I turned into the

12  neighborhood nearby but did not follow it into the

13  warehouse.  I didn't want them to be suspicious of

14  any surveillance behind them.

15  Q.   So what did you do next?

16  A.   I waited a few minutes.  I learned that it was

17  on its way back out.  Both vehicles were on their

18  way back out of that area, so I waited it out, and

19  when I saw it on Ajo, I proceeded behind it again,

20  and it then returned back to the Food City parking

21  lot.

22  Q.   Okay.  And again, were you along the perimeter

23  of the lot?

24  A.   Yeah.  I was still way behind.  The plane was

25  still working.  This time it was only there a few

1  minutes, and then the Murano then proceeded back to

2  the warehouse.

3  Q.   And were you able to observe any activity

4  within the Food City parking lot at that time?

5  A.   No, I didn't.

6  Q.   Were you communicating with the radio

7  communication?

8  A.   Yes.

9  Q.   So what did you -- what did you do next?

10 A.   The last time the Murano went to -- the second

11 time it went to the warehouse, the arrest plan was

12 executed, and it was about 2:15 or so.

13     At that point, you know, we were standing by

14 in case any other vehicles were alerted -- if we

15 were alerted to any other vehicles being involved

16 in the case, and I did learn of two, so I left the

17 area of the warehouse and proceeded back towards

18 the Food City.

19 Q.   So what happened once you went back to the

20 Food City?

21 A.   Radio traffic happened, occurred.  I listened

22 to it, and I learned of two additional vehicles

23 that were involved that we were -- then became our

24 targets.

25 Q.   And what vehicles were they?

1  A.   It was a red Ford Explorer and a black

2  Cadillac Escalade, and they were -- I learned

3  through the radio traffic that they were at the

4  Food City, and so I started -- I started my way

5  back there from the warehouse area, but by the time

6  I got near the Food City, those vehicles had

7  already departed the Food City and were heading

8  westbound on I-10, and so that's what I did.  I

9  came up Sixth Avenue and immediately went onto I-10

10  west.

11  Q.   So where did you go after that?

12  A.   Additional radio traffic happened, and I

13  learned that the vehicles, the red Explorer and the

14  black Escalade, had stopped at the Circle K.  They

15  exited the freeway at Congress and stopped at the

16  Circle K right there at the freeway and Congress.

17       And that's when I was approximately three to

18  four minutes behind them.  I exited the freeway at

19  Congress.  Then I saw the red Explorer parked under

20  one of the gas ports, and so I took a position

21  across the street, across Congress from the

22  Explorer, from the Circle K.

23       And it's a public parking lot there.  I pulled

24  into the parking lot and began taking photos.

25  Q.   Do you recall approximately what time you got

1  to that parking lot across from the Circle K?

2  A.  I would say -- well, if I could read my

3  report, I could get the exact --

4  Q.  Do you have it front of you?

5  A.  I have a copy of it.

6  Q.  Okay.  If it'll refresh your memory.

7      And just for the record, are you looking at

8  the surveillance log?

9  A.  I am looking at a surveillance log that was

10  written by Jorge Fernandez.  It's our team

11  surveillance log.

12      I arrived there approximately 2:43.

13  Q.  And you said when you arrived you took

14  photographs?

15  A.  Yeah.  Then I began snapping photographs

16  probably a minute after.  Probably 2:44, I started

17  snapping photographs.

18  Q.  Okay.  I'd like to show you what's been marked

19  for identification as Government's Exhibit Nos. 50

20  -- actually, 61-A through Q.

21      Do you recognize those photographs?

22  A.  Yes, I do.

23  Q.  Did you take those photographs?

24  A.  Yes, I did.

25  Q.  And what are they photographs of?

1  A.   Photographs of three vehicles involved in or

2  that became targets of our surveillance.

3  Q.   And where were these photographs taken?

4  A.   They are at the Circle K at -- I believe the

5  address is Two North Freeway, so the freeway and

6  Congress.

7  Q.   And do these photographs accurately depict

8  what you observed on March 2nd, 2011, at the Circle

9  K?

10  A.   Yes, they do.

11       MS. HOPKINS:  At this time, Your Honor,

12  the Government moves to admit into evidence what's

13  been marked for identification as Government's

14  Exhibits 61-A through Q.

15       MR. COOPER:  No objection.

16       MR. ARMSTRONG:  No objection.

17       MR. YOUNG:  No objection, Your Honor.

18       THE COURT:  They can be admitted and

19  published.

20  BY MS. HOPKINS:

21  Q.   All right.  So this is 61-A.  What are we

22  seeing here?

23  A.   There is the red Ford Explorer.

24  Q.   Now, we see two red vehicles.  Which one is

25  the target vehicle?

1  A.   The target vehicle is the one to the rear in

2  the photograph.  The foreground is a vehicle

3  passing by on Congress.

4  Q.   Okay.

5  A.   The vehicle in the rear part of the picture is

6  a target vehicle.

7  Q.   Let's take a look at 61-B.

8  A.   Another photograph of the vehicle.

9  Q.   61-C.  What do we see here?

10  A.   A white Jeep Commander that was parked in the

11  Circle K lot just a short distance from the red

12  Ford Explorer.

13  Q.   And why did this vehicle come to your

14  attention?

15  A.   At the time I wasn't sure who was involved in

16  the activity with these vehicles, so I started just

17  taking photographs of people that were in and

18  around the Ford Explorer, and I was also keeping an

19  eye out for the black Escalade, but my view from

20  the Escalade was blocked, so -- initially it was

21  blocked, so I could only really focus on activity

22  around the red Ford Explorer.

23       And then I noticed these individuals

24  congregating near this -- near this white Jeep

25  Commander, so I photographed them.

1  Q.  Do you recall if these individuals were

2  associated with the red Expedition or the black

3  Escalade?

4  A.  I didn't know at the exact moment that I took

5  this photograph that they were, but I learned.  I

6  watched them, and I watched two of them walk over

7  to the -- to the Ford Explorer and get into the

8  Explorer.

9  Q.  Take a look at 61-D, 61-E, F.

10        THE CLERK:  The monitors don't come up

11  that quick in the jury box.

12        THE COURT:  Slow down just a tad, is what

13  she's saying.

14  BY MS. HOPKINS:

15  Q.  Do you want to go back to -- I don't know

16  what's the last one they saw, so D.  You can just

17  go through them.

18  A.  Another individual.  The Escalade was parked

19  west of the Ford Explorer, so people that were

20  moving towards the Explorer from that direction I

21  photographed.

22  Q.  Take a look at 61-G.  Now, we see the white

23  Jeep Commander and a person standing next to that.

24        Do you recall if this person was associated

25  with the white Jeep Commander?

1    A.   I don't know.  As you can see, there's a palm

2    tree that's between me and the Jeep Commander, so I

3    can't -- I don't know if the individual exited the

4    Jeep Commander, but he was definitely near it when

5    I photographed him.

6    Q.   Okay.

7    A.   And he wasn't walking around the parking lot.

8    Q.   Not walking?

9    A.   He was not walking around the parking lot.

10   Q.   What did you --

11   A.   I would have photographed him earlier if he

12   was.

13   Q.   Okay.  Let's take a look at 61-H.

14        And does -- was this person depicted in the

15   video the same person that you observed

16   communicating with the Jeep Commander?

17   A.   Yes.  This is one of the individuals that was

18   standing on the passenger side of the Jeep

19   Commander appearing to have a conversation with

20   somebody in the Commander at the time I pulled up

21   and started taking photographs.

22   Q.   61-I.  What do we see here?

23   A.   Well, now this is the Escalade.  What had

24   happened here is I finally got a view of the

25   Escalade from where I was.

1    They had repositioned the Escalade from a
2  parking spot that was out of my view but near the
3  -- near the Circle K building and they backed it
4  into the gas pump here where I could see it, and
5  then I began photographing it.
6  Q.   Okay.  Next photo.  It's a little blurry.
7  Next one.
8     And what are we seeing here?
9  A.   That's the Jeep Commander that was parked near
10  the Ford Explorer.  It is now departing, and I
11  photographed it as was departing the Circle K.
12  Q.   Now, did you observe the license plate on the
13  Jeep Commander?
14  A.   Yes, I did.
15  Q.   Do you recall whether or not you called that
16  license plate in?
17  A.   Yes, I did.
18  Q.   Okay.  Let's see L -- H, I, J, K, L.
19  A.   And there I photographed the license plate.
20  Q.   Okay.  Next picture.
21     And does the red Ford appear to be in transit?
22  A.   Yes.  After -- I believe they purchased fuel,
23  although I'm not sure.  They then repositioned it
24  to the west side of the Circle K but out of my
25  view.

1 Q.   Let's go to N.

2 A.   I photographed the license plate of the red

3 Ford Explorer.

4 Q.   Next photo?

5 A.   The same.  It's just another step down the row

6 that I photographed as it moved by.

7 Q.   Next photo.

8 A.   And this is a photograph now of both the red

9 Ford Explorer and the black Escalade just before

10 they departed the Circle K.

11 Q.   Now, obviously the windows are down in this

12 photograph.  Does it appear that the driver of the

13 Escalade is talking on the phone?

14 A.   It appears as though he is.  His hand's up to

15 his ear.

16 Q.   Let's look at the next photo.

17 A.   And this is the vehicle that's actually

18 exiting the Circle K parking lot and on to the on

19 ramp for I-10 west.

20 Q.   Now, do you recall observing the pay phones at

21 the Circle K?

22 A.   Yes.

23 Q.   And did you observe any occupants of either

24 the Expedition or the Escalade using the pay phone?

25        MR. ARMSTRONG:  Objection.  Leading.

1    THE COURT:  Overruled.

2    A.    I photographed them.  I don't recall any

3    particular individual.  I know I photographed

4    somebody at a pay phone, but I'm not sure where

5    that person ended up as far as in the vehicles.

6    Q.    How long were you at the lot across from the

7    Circle K?

8    A.    Just -- the vehicles were there for about 20

9    minutes, and I was there a few minutes behind them,

10   so probably 15, 16 minutes.

11   Q.    So you said that the vehicles departed the

12   Circle K.  What happened next?

13   A.    They proceeded on to the on ramp for I-10

14   west, and again, the plane had a primary for

15   vehicle movement, so I departed my location and --

16   onto Congress and then onto the on ramp following

17   the vehicles, but I was a good distance behind.  I

18   couldn't see them.

19   Q.    Were you in communication with radio traffic?

20   A.    I was in communication, yes.

21   Q.    So what did you observe after that?

22   A.    I learned through the radio that they had

23   exited at Prince, and then I also exited at Prince,

24   but again, they were way ahead of me.

25        And by the time I got down to the bottom of

1   the on ramp -- the off ramp at Prince, I could see

2   them then turning back eastbound onto the on ramp

3   for I-10 east.

4   Q.   Did you continue following them?

5   A.   Yes.  I continued following them as they

6   proceeded onto I-10 east.

7   Q.   And what happened next?

8   A.   Then they proceeded back to the Sixth Avenue

9   exit, and they went back to the Food City.

10  Q.   Okay.  Did you go into the Food City?

11  A.   No, I didn't.

12  Q.   Where did you go?

13  A.   I stayed out on Sixth Avenue this time.  I

14  wasn't sure what these people were doing, but I was

15  just making myself available on Sixth so, in case

16  they split up, I could cover a direction, either

17  north or south, if the vehicles split up, so I was

18  standing by waiting to see if they separated.

19  Q.   Now, were you able to observe any activity in

20  the Food City parking lot?

21  A.   No.

22  Q.   Okay.  So you said you were positioned

23  somewhere around Sixth Avenue.  What did you do

24  next?

25  A.   Well, I learned that they only were there a

1    minute or two, and then they came back out of the

2    Food City parking lot and proceeded again back on

3    I-10 westbound.

4    Q.   The vehicles did?

5    A.   The red Ford Explorer and the black Escalade.

6    Q.   And did you follow them?

7    A.   Yes, I did.

8    Q.   And so what happened next?

9    A.   This time they continued I-10 west out of

10   Tucson towards Phoenix, and I stayed a good

11   distance behind, sometimes up to a mile.  I didn't

12   always have a visual on them.

13        Again, the plane had primary, and I would

14   sometimes run up on them.  I could see them in the

15   distance, and then I'd fall back again.

16        We were waiting for marked units to assist in

17   an interdiction to stop them.

18   Q.   And did any units stop them?

19   A.   Yes.

20   Q.   And did you observe the stop?

21   A.   I didn't observe the stop.  They were a bit

22   ahead of me.  I saw the units come by me, so I knew

23   that they were getting ready.  I could hear on the

24   radio that they were getting ready to stop them,

25   and when they did stop them, I was probably a

1  quarter mile back, and I began slowing traffic down

2  behind me on the interstate so that nobody was --

3  so traffic wouldn't run up on the stop scene.

4  Q.   So other than slowing traffic, did you

5  participate in the stop at all?

6  A.   No.  No, I just slowed traffic.

7  Q.   And was your primary role that day --

8  A.   Yes.

9  Q.   -- to do surveillance?

10 A.   Yeah.  There was -- I stopped in one lane.

11 There was another unit.  I'm not sure which one of

12 us, but another one stopped in the other lane, so

13 we basically stopped I-10 while the interdiction

14 happened.

15 Q.   And did that conclude your involvement that

16 day?

17 A.   Yes, it did.

18        MS. HOPKINS:  May I have one moment, Your

19 Honor?

20        THE COURT:  You may.  Actually, you can

21 have overnight.

22        MS. HOPKINS:  I think I'm --

23        THE COURT:  You can still have overnight.

24        MS. HOPKINS:  I have no further questions.

25        THE COURT:  Can I see counsel for a

1    second?

2            (A bench conference was held off the

3            record.)

4            THE COURT:  9:45 tomorrow.  All right.

5    Tomorrow's not Monday, so we're going to make our

6    best effort to be on time.  9:45.

7            Leave your notes in your chair.  Don't

8    research about the case.  Don't talk about the

9    case.  Don't Twitter, Tweet, Facebook.  Whatever

10   they do, don't do it.

11           See you tomorrow at 9:45.

12           (The jury exits the courtroom.)

13           THE COURT:  Show the absence of the jury,

14   presence of all counsel and the defendants.

15           So the record is clear, the juror that was

16   excused was Juror No. 17 in seat nine.  I kept

17   calling her Juror No. 9, but it's 17 in seat nine.

18           See you all tomorrow.

19           (Proceedings concluded in this matter.)

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, Erica R. Grund, do hereby certify that

4     I took the machine shorthand notes in the foregoing

5     matter; that the same was transcribed via computer-

6     aided transcription; that the preceding pages of

7     typewritten matter are a true, correct, and

8     complete transcription of those proceedings

9     ordered, to the best of my skill and ability.

10         Dated this 2nd day of January, 2013.

11

12                              s/Erica R. Grund
                          Erica R. Grund, RDR, CRR
13                           Official Court ReporteR

14

15

16

17

18

19

20

21

22

23

24

25