1        IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3   UNITED STATES OF AMERICA

4   vs.                              CR-11-1013-TUC-RCC

5   GHERMON LATEKE TUCKER, et al.,

6

          Defendants.
7   _____

8                                    August 14, 2012
                                     Tucson, Arizona
9

10

11

12

13                    JURY TRIAL

14                    DAY FIVE

15     BEFORE THE HONORABLE RANER C. COLLINS
            UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22   Court Reporter:        Erica R. Grund, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                     translation

1               A P P E A R A N C E S

2

3   For the Government:        James T. Lacey
                               Kimberly E. Hopkins
4                              Assistant U.S. Attorneys

5

6   For Ghermon Tucker:        Dan Cooper
                               Cooper & Udall PC
7

8

9   For Jerome Ranger:         Stephen Jonathan Young
                               Williamson & Young
10

11

12  For Ja'Cory Ranger:        Bradley James Armstrong
                               Armstrong Law Office
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXAMINATION INDEX

MICHAEL J. SHARKEY
    CROSS BY MR. COOPER . . . . . . . 4
    CROSS BY MR. ARMSTRONG . . . . . 44
    CROSS BY MR. YOUNG . . . . . . . 50
    REDIRECT BY MS. HOPKINS . . . . 58

EDUARDO CANTU
    DIRECT BY MR. LACEY . . . . . . 65
    CROSS BY MR. COOPER . . . . . . 89
    CROSS BY MR. ARMSTRONG . . . . . 90
    CROSS BY MR. YOUNG . . . . . . . 92
    FURTHER BY MR. ARMSTRONG . . . . 96

JONATHAN OMAN
    DIRECT BY MR. LACEY . . . . . . 97
    CROSS BY MR. COOPER . . . . . . 110
    CROSS BY MR. ARMSTRONG . . . . . 112
    CROSS BY MR. YOUNG . . . . . . . 116

JOSE DOMINGUEZ
    DIRECT BY MR. LACEY . . . . . . 121
    CROSS BY MR. COOPER . . . . . . 133
    CROSS BY MR. ARMSTRONG . . . . . 136
    CROSS BY MR. YOUNG . . . . . . . 140

ARNULFO SALGADO
    DIRECT BY MR. LACEY . . . . . . 144
    CROSS BY MR. COOPER . . . . . . 170
    CROSS BY MR. ARMSTRONG . . . . . 178
    CROSS BY MR. YOUNG . . . . . . . 181
    REDIRECT BY MR. LACEY . . . . . 191
    FURTHER BY MR. ARMSTRONG . . . . 194
    FURTHER BY MR. LACEY . . . . . 195

BRETT MILLS
    DIRECT BY MS. HOPKINS . . . . . 196
    CROSS BY MR. ARMSTRONG . . . . . 206
    CROSS BY MR. YOUNG . . . . . . . 208

JORGE ABEL MEDINA-SANTOS
    DIRECT BY MR. LACEY . . . . . . 211
    CROSS BY MR. COOPER . . . . . . 225

1          P R O C E E D I N G S

2              (The jury enters the courtroom.)

3              THE COURT:  Let the record reflect the

4     jurors returned back to the courtroom, the presence

5     of all counsel and the defendants.

6              Good morning.  It is 9:45.  You all were

7     ready to go, as were we.

8              Ms. Hopkins indicated she had no further

9     questions, so Mr. Cooper will get us started.

10             MR. COOPER:  Thank you, Your Honor.

11        MICHAEL J. SHARKEY, WITNESS, PREVIOUSLY SWORN

12                      CROSS-EXAMINATION

13    BY MR. COOPER:

14    Q.   Good morning.

15    A.   Good morning, sir.

16    Q.   I'd like to discuss with you a little bit

17    about surveillance and about specifically March the

18    2nd.

19         I think you indicated yesterday you've been an

20    FBI agent 21 years?

21    A.   Yes, sir.

22    Q.   And how many of those years have been as a

23    surveillance agent?

24    A.   Six years.

25    Q.   Okay.  So the past six years?

```
1   A.   The past six years, yes.  That's correct.

2   Q.   Okay.  And much of that in Tucson?

3   A.   Yes.

4   Q.   So you know Tucson pretty well?

5   A.   I do know Tucson pretty well.

6   Q.   And as a surveillance agent, I assume that you

7   work cases all over the town; is that fair?

8   A.   Yes.  That's fair to say.

9   Q.   Okay.  Prior to March 2nd of 2011, did you

10  know anything about this investigation or this

11  case?

12  A.   I was briefed on it the night prior by our

13  team leader.

14  Q.   Okay.  That's what I was going to ask you

15  about.

16       And your team leader was?

17  A.   Kent Hush, Agent Kent Hush.

18  Q.   All right.  And the briefing would have been

19  the evening of March 1st?

20  A.   I believe it was on the afternoon, maybe

21  midday or afternoon.

22  Q.   All right.

23  A.   March 1st.

24  Q.   And how many people were present at the

25  briefing?
```

1   A.   I'm not sure.  I don't recall.

2   Q.   Do you have in front of you your surveillance

3   log?

4   A.   Yes.

5   Q.   Could you go ahead and get it out?  I'm going

6   to refer to it quite a bit, so I'd like to have you

7   be able to look at it.

8   A.   Okay.  I do have it in front of me.

9   Q.   All right.  At the top of the log is a section

10  devoted to who basically the author is, and that

11  would be Jorge Fernandez?

12  A.   That's correct.

13  Q.   Okay.  And Agent Fernandez was not on your

14  team; is that right?

15  A.   Yes, he is on my team.

16  Q.   He is on your team?

17  A.   Yes, sir.

18  Q.   But he's not the team leader?

19  A.   No, he's not the team leader.

20  Q.   Okay.  But he was designated to be the person

21  who would be the log holder?

22  A.   Yeah, yeah.  He was assigned the log that day.

23  Q.   Okay.  And Agent Hush was the team leader?

24  A.   That's correct.

25  Q.   And how many on your team?

1  A.  At that time, there was changes.  It was

2  myself, Agent Klawenn, Agent Howell, and Agent

3  Fernandez.  That's it.

4  Q.  And how many surveillance teams are there in

5  Tucson?

6  A.  There are two teams.

7  Q.  Two teams.  Okay.  Under the section listed

8  "Surveillance Agents," it lists 12 different

9  agents?

10  A.  That's correct.

11  Q.  But it does not list Agent Hush.

12  A.  That's because Agent Hush wasn't involved in

13  the active surveillance, which this log is

14  written --

15  Q.  Just for the people that are actually watching

16  what's going on?

17  A.  Right.  The people making observations are the

18  people listed.  Agent Hush was assigned on March

19  2nd at the command post, and he was communicating

20  with us via the radio.

21  Q.  Okay.  So he's on the radio while you all are

22  out watching what's going on?

23  A.  That's correct.

24  Q.  And he would -- who was giving directions as

25  to what -- what you were to do, Hush or anybody

1  else?

2  A.   Hush or the other team leader that was out

3  there that day was Agent Kim Stoddard.   She's the

4  team leader for our Phoenix team.

5  Q.   All right.

6  A.   And they were also involved in this operation.

7  Q.   All right.   And to the right of the names is a

8  number; right?

9  A.   That's correct.

10  Q.   Okay.   And you are listed as No. 30?

11  A.   That's correct.

12  Q.   And before you go out there, you memorize who

13  all the other numbers are so you know where these

14  persons are when they talk?

15  A.   Yeah.   We refer to each other by number on the

16  radio.

17  Q.   All right.   And the briefing indicated to you

18  that there would be primarily three different

19  locations you were going to be watching; right?

20  A.   Yes.

21  Q.   And those are the ones that are listed below

22  the surveillance agents?

23  A.   Well, let me correct that.   There were two

24  locations we had planned.   The third location on

25  the -- on the surveillance log was a location we

1  ended up going to, but we didn't know that prior

2  to, you know, the day of the surveillance.

3  Q.   Okay.  That was my next question is, the Food

4  City and the warehouse you actually knew you were

5  going to be watching at some point?

6  A.   That's correct.

7  Q.   And during surveillance, you're not locked

8  into a location necessarily; right?

9  A.   Well, not as the surveillance is moving.  It

10  depends on how the targets are moving.  But when we

11  started that morning, I was assigned to the Food

12  City location.

13  Q.   Does that mean you have to stay there?

14  A.   Until I'm directed otherwise, yes.

15  Q.   And so you were waiting for Hush, I guess, or

16  whoever's at the -- what do they call it?

17  A.   At the command post.

18  Q.   -- command post to tell you; right?

19  A.   That's correct.

20  Q.   Okay.  At the briefing, were you told to be

21  looking for a specific type of car?

22  A.   Yes.

23  Q.   And just one car you were told about?

24  A.   Just one car.

25  Q.   And that would be the Murano; right?

1   A.   That's correct.

2   Q.   And on the surveillance log, there's six cars

3   listed; right?

4   A.   Yes, there's six.

5   Q.   And the five cars besides the Murano are cars

6   that you came upon during the course of the morning

7   and afternoon of the 2nd; right?

8   A.   That is correct.

9   Q.   All right.  Let me ask you about the Food City

10   itself and the location.  It's in -- getting toward

11   the South Tucson area of the metro Tucson area;

12   correct?

13        You know where the city of Tucson --

14   A.   I think it's in the actual city of South

15   Tucson, if that's what you mean.

16   Q.   Well, yeah.  I was asking, how close is it to

17   South Tucson?

18   A.   It might be within the city limits.  I'm not

19   sure.

20   Q.   But at least it's very close to South Tucson?

21   A.   Right.

22   Q.   Is that fair?

23   A.   Yes.

24   Q.   Okay.  And when you prepare to do a

25   surveillance of a place like that, do you drive

1  around and look for the best places where you can

2  be parked so that you wouldn't be noticed and have

3  the best view?

4  A.   That's correct.

5  Q.   Okay.  And when was that done?

6  A.   Prior to us -- well, probably around 8:40,

7  when we initiated, we'll do a quick survey of the

8  area and choose a location that we feel was

9  somewhat excluded.

10  Q.   Okay.  How many entrances and exits were there

11  at the Food City?

12  A.   There were two.

13  Q.   And if you could describe -- I think you said

14  you were located on the north side; is that right?

15  A.   Yes, that's correct.

16  Q.   Near the north exit?

17  A.   Near the north exit.

18  Q.   And where was the other exit?  Was it south

19  or --

20  A.   East onto Sixth Avenue.

21  Q.   Onto Sixth Avenue.  And then the freeway

22  buttresses one side?

23  A.   The freeway -- there may be a business right

24  along the south side of the Food City lot, but

25  south of that is the onramp for I-10.  There's no

entrance on the I-10 from the south side of the
parking lot.

Q.   So for anybody to get into the Food City
parking lot, they'd have one of two choices; right?

A.   Right.

Q.   Okay.  And you were near one of those choices?

A.   That's correct.

Q.   And from your view -- I guess when you started
at 8:30, 8:40 in the morning, the parking lot
wasn't very full; right?

A.   It was not full.  I don't recall how many
cars, but I don't recall it being packed or --

Q.   But you had a good vantage of the parking lot
from where you were at 8:30 or 8:40.

A.   I had a partial view of the parking lot
because there are businesses that are along the
north side of the parking lot, so I couldn't see
into the west very -- western edge of the parking
lot.  Like, in other words, close to the front of
the Food City I couldn't see.  My view was
obstructed to that area there.

Q.   On the other side, there were how many other
agents watching the parking lot?

A.   There was one other agent.

Q.   And that was?

1   A.   Agent Fernandez.

2   Q.   Agent Fernandez?

3   A.   That's correct.

4   Q.   Okay.  And he got there 8:40 as well?

5   A.   That's correct.

6   Q.   So all the other 12 people, the agents that

7   are listed here, were assigned other places besides

8   Food City?

9   A.   Yes, initially they were.

10   Q.   That would be Sharman, for instance, or

11   Howell, all of them?

12   A.   Yes.  They were assigned to locations north of

13   Tucson.

14   Q.   That would be the I-10; right?

15   A.   Well, I believe there was some surveillance

16   that was taking place in the city of Phoenix,

17   initially.

18   Q.   Okay.

19   A.   By the --

20   Q.   That's on March 2nd you're talking about?

21   A.   Yes.  And then there was another location that

22   was staffed by our personnel.  The remainder of our

23   team plus parts of Phoenix's team that was I-10

24   between Phoenix and Tucson.

25   Q.   And there were airplanes up there; right?

1    A.   There were.   There was two airplanes, but only

2    one was flying at any given moment.

3    Q.   One was -- only one was flying at any given

4    moment?

5    A.   Yeah, I believe they -- one airplane did the

6    initial part of the surveillance.   Then it was

7    handed off to another airplane and then handed back

8    to the other airplane.

9    Q.   Did both airplanes have cameras, do you know?

10   A.   No, I believe only one airplane has cameras.

11   Q.   Who is Alex Jones?

12   A.   Alex Jones is a pilot from Phoenix.

13   Q.   And he's listed at 11:45 as No. 18; right?

14   A.   What do you mean 11:45.

15   Q.   11:45 a.m. time wise under the observation

16   section?

17   A.   Oh, yes.   Let me see.   Alex -- yeah, I can't

18   tell you if whether he was on the ground or the air

19   that day at 11:45.   I don't know.   He does both.

20   Q.   Okay.

21   A.   He's on the air and ground.

22   Q.   But at least at 11:45 there is a notation that

23   he had -- and you --

24   A.   Oh, okay.   That's right.   Yeah.   He must have

25   been then flying the first part of the shift, if

1  he's on there, so he was -- he was flying.

2  Q.   And Jones is located in Tucson; right?

3  A.   Jones is an agent assigned to the Phoenix

4  team.

5  Q.   Phoenix, but an Arizona agent?

6  A.   Yes.

7  Q.   Not from Texas?

8  A.   Texas, no.

9  Q.   Okay.  Did you know of any Texas agents who

10  were present that day?

11  A.   I believe the other aircraft that was utilized

12  that had the camera was out of Houston.

13  Q.   And the names -- you don't know names of those

14  people, do you?

15  A.   No.

16  Q.   You know all the names listed as surveillance

17  agents though?

18  A.   The names listed on this surveillance log,

19  these people I know.

20  Q.   Okay.  So at 11:45, you're told by both

21  Fernandez and Jones that the Murano has shown up at

22  Food City; correct?

23  A.   That's correct.

24  Q.   Okay.  Let me ask you about waiting time.  You

25  got there about 8:40, and so you basically just sat

1  there for three hours waiting for something to
2  happen?
3  A.   That's correct.
4  Q.   Okay.  There's an indication that, after it
5  had been there for a period of time, the -- it
6  looks like maybe 35, 40 minutes, the Murano then
7  left the Food City.
8       That indication is given by Fernandez; right?
9  A.   That's correct.
10 Q.   Were you told to follow the Murano?
11 A.   I was assigned to follow any activity that was
12 going on at the Food City.  If it did depart, yes,
13 I was assigned to follow that vehicle.
14 Q.   Okay.  So when you left the Food City at -- it
15 looks like you would have left at 12:34, right?
16 A.   Yes.  I left behind the Murano, as it departed
17 northbound on Sixth Avenue.  I left my position,
18 waited to hear which way it turned onto Sixth
19 Avenue before I even approached Sixth Avenue, and
20 then I heard on the radio that it went north, so I
21 pulled up and pulled in behind it, quite a distance
22 behind it, not right behind it.
23 Q.   Did you follow the Murano to where it was
24 going?
25 A.   I followed, yes.  As it was going north, I

1  followed behind it.

2  Q.   Because if you'd look at page 2, if you look

3  at the bottom of page 2, where it talks about --

4  this is your describing the vehicle heading

5  northbound on Sixth Avenue at 12:41.

6      See that?

7  A.   At 12:41, it's -- it was -- it already had

8  done a u-turn.  It left the parking lot, went

9  northbound, did a u-turn, then went southbound past

10  the Food City, did another u-turn.  At 12:41 it

11  does a second U-turn.

12  Q.   I guess what I'm asking you is, at 12:44,

13  Agent Fernandez is saying the Murano comes back to

14  Food City; right?

15  A.   Right.

16  Q.   So it didn't go to the warehouse in that trip;

17  right?

18  A.   No, and that's -- that short time frame there

19  it just drove up and down Sixth and did two u-turns

20  and then returned to the --

21  Q.   Right.  That's what I wanted to clarify.

22  A.   Yes.

23  Q.   And so you then returned to where you were,

24  which is at Food City watching; right?

25  A.   Yeah, back to the north, covering that north

1  exit.

2  Q.  North exit.  All right.

3       And it appears, though, that you then were

4  watching, and the Murano was the only vehicle at

5  that time, from 12:44 up through 1:36, that you

6  were able to see that had anything you thought to

7  do with the case; right?

8  A.  That is correct.

9  Q.  And in fact, you document that the Murano at

10 one point drove -- when you say repositioned, that

11 means they drove around the parking lot and got

12 parked in another spot; right?

13 A.  Well, I don't know.  That's what Agent

14 Fernandez reported seeing.

15 Q.  31 is Fernandez.  I'm sorry.

16 A.  Yeah.

17 Q.  You're 30?

18 A.  Right.

19 Q.  Okay.  Did you see that?  Do you remember --

20 A.  No.

21 Q.  Okay.  That's Fernandez reporting that --

22 "reposition" means change spots?

23 A.  That's correct.

24 Q.  All right.  He does write that, at 1:35, the

25 Murano circles the parking lot; right?

1   A.   That's correct.

2   Q.   Did you see that?

3   A.   No.

4   Q.   But you're sitting there; right?

5   A.   I'm sitting a distance away, north of the Food

6   City.

7   Q.   Okay.  And you had a camera with you; right?

8   A.   Yes.

9   Q.   Binoculars?

10   A.   Yes.

11   Q.   Okay.  The first vehicle that you, other than

12   the Murano, that you noticed that arrived in the

13   parking lot was at 1:36 p.m.; right?

14   A.   I didn't notice it.  Agent Fernandez --

15   Q.   I'm sorry.  An agent noticed.

16   A.   An agent noticed.

17   Q.   Okay.  That would be a gold Chevy Optra?

18   A.   That's correct.

19   Q.   Did you know anything about the Chevy Optra or

20   who was driving it, anything like that?

21   A.   No.

22   Q.   So you weren't told to watch out for a Chevy

23   Optra the day before?

24   A.   No, but I do recall over the radio from the

25   command post that there was some talk about

1  watching for a gold Chevy Optra.

2  Q.  Do you know why?

3  A.  No.

4  Q.  So you don't know who this unknown Hispanic

5  male that's being described by Fernandez is who

6  gets out of the -- who's driving the Optra?

7  A.  No.

8  Q.  All right.  It appears from what Fernandez is

9  writing that an unknown Hispanic man gets out of

10 the Murano and gets into -- it looks like Vehicle

11 2, which is the Optra; right?  That's at 1:38.

12 A.  What he's written at 1:37 --

13 Q.  1:37, I'm sorry, the Hispanic male gets out of

14 the Murano and gets into the Optra.

15 A.  That's correct.

16 Q.  And you're being given that information over

17 the radio?

18 A.  That's correct.

19 Q.  But you don't know why this is happening;

20 right?

21 A.  No.

22 Q.  And you also get told that a short time later

23 another -- well, that the Murano leaves the Food

24 City; right?

25 A.  That's correct.

1  Q.  At that point you leave Food City as well;
2  right?
3  A.  Well, not only the Murano left.  The Optra
4  left as well.
5  Q.  Okay.  And you follow both the vehicles to
6  where they're going?
7  A.  That's correct.
8  Q.  And it looks like you are with Klawenn
9  following as well?
10  A.  Yes.  Agent Klawenn then joined the
11  surveillance.  He was assigned further north and
12  made his way down to us.
13  Q.  And you went to the warehouse, and at least
14  three different men got out of the -- got out of
15  the vehicles and go inside the warehouse; right?
16  A.  I didn't see that.
17  Q.  I know, but -- well, it's -- you're listed as
18  having said that.
19  A.  Right.
20  Q.  So that would be Klawenn who said it?
21  A.  Well, I -- the last I saw of those vehicles is
22  when they turned onto the street leading to 46th
23  street from Ajo.
24  Q.  Okay.
25  A.  I didn't go into the warehouse area because we

1  had agents assigned to that area there.

2  Q.  All right.

3  A.  And they weren't surveillance agents.  They

4  were other agents.

5     So my duties were to wait, and if any of the

6  vehicles came back out, to go ahead and reinitiate

7  surveillance on the vehicles coming back out.

8  Q.  Well, maybe I'm missing something and you can

9  clarify.  At 1:51, it indicates that these fellows

10 get out of the vehicles and go inside the

11 warehouse; right?

12 A.  That's correct.

13 Q.  Okay.  And it indicates that the agents who

14 are observing that are Agent 30 and Agent 35.  That

15 would be you and Klawenn?

16 A.  Well, maybe Agent Klawenn did.  I was about a

17 block away from the warehouse.

18 Q.  All right.

19 A.  I didn't see anybody get out.

20 Q.  But at the very least you're getting that

21 information?

22 A.  Right.

23 Q.  Okay.  And then six minutes later, it leaves

24 the warehouse, and you again pick up the tail and

25 head back to Food City; right?

1  A.   That's correct.

2  Q.   Okay.  And it arrives at Food City at -- it

3  looks like 2:04 and goes into the parking lot;

4  right?

5  A.   Yes.

6  Q.   And you're informed that it picks up an

7  unknown male who's standing in front of the store;

8  right?

9  A.   I'm informed of that by Agent Fernandez, yes,

10 correct.

11 Q.   All right.  And this male is designated as

12 M-4, right, at 2:04?

13 A.   Right.  Picks up an unknown male M-4, that's

14 correct.

15 Q.   You don't know what has happened to Male 1 and

16 Male 3 though?

17 A.   No.

18 Q.   Okay.  They could -- for all you know, they're

19 back at the warehouse.

20 A.   They could be.  I don't know.

21 Q.   Or they could be in the Murano.

22 A.   Or they could be in the Murano, yes, sir.

23 Q.   Okay.  The Murano only stays another minute

24 and picks up M-5 and M-6, two more men; right?

25 A.   Right.

1   Q.   Okay.  If you could, would you look under

2   "Individuals Observed."  M-1 through M-6 are all

3   Hispanic males; correct?

4   A.   Yes.

5   Q.   Okay.  So everybody we've talked about so far,

6   and we're now at about 2:05 p.m., are Hispanic

7   males dealing with the Murano and the Optra; right?

8   A.   Yes.

9   Q.   All right.  The Murano then leaves at 2:06;

10  right?

11  A.   That's correct.

12  Q.   And you leave with it; right?

13  A.   Yes.  I follow behind as it departed again, a

14  distance behind.

15  Q.   And once again, we get to I think 2:15, and

16  that's when, at the warehouse, four men leave the

17  Murano and go inside; right?

18  A.   That's what's written in the log.  I didn't

19  see that, but --

20  Q.   All I'm asking is about what's in the log.

21  A.   Yes, that's what's in the log.

22  Q.   And again, you didn't see it because you're

23  located --

24  A.   Again, I stayed about a block away from that

25  area.

1    Q.   There are agents surrounding the warehouse,
2    watching it?
3    A.   Right.
4    Q.   Do you know where the airplane is at this
5    point?
6    A.   Overhead.
7    Q.   Watching the warehouse or Food City?
8    A.   They would be at the warehouse with us.
9    Q.   And why is that?
10   A.   Because that's the target that was moving at
11   that time.
12   Q.   Okay.  And the target being the Murano?
13   A.   Right.
14   Q.   Okay.  The next thing that happens, it
15   appears, is that there's a notation about Food
16   City, and that notation is apparently delivered by
17   Agent Sharman, correct, at 2:19?
18   A.   Yes.
19   Q.   When Sharman delivers this at 2:19, this
20   statement, had you stayed at the warehouse?
21   A.   Yes, I was -- I was sitting near the
22   warehouse.
23   Q.   A block away?
24   A.   Uh-huh.
25   Q.   Okay.  But you're hearing what Sharman is

1  saying; right?

2  A.   That's correct.

3  Q.   And if you look at the log, he's now

4  indicating he sees 11 black men in three different

5  cars.

6  A.   Okay.

7  Q.   Is that fair?

8  A.   Let me see.  I'll count here.  Let's see.  He

9  sees four male black occupants in the red Ford

10 Expedition.

11 Q.   All right.

12 A.   And five male black occupants in the Cadillac

13 Escalade, and then two black males in the gold

14 Buick LeSabre.

15 Q.   That's 11.

16 A.   Okay.

17 Q.   Okay.  And my question then is, you were

18 observing, along with Fernandez and I guess

19 Klawenn, Food City leaving at about 2:06 p.m.;

20 right?

21 A.   Say that again.  I'm sorry.

22 Q.   You were at Food City observing the parking

23 lot, along with Fernandez and Klawenn, up until

24 about 2:06 p.m.

25 A.   2:06, right.

1    Q.   And at that point you left; right?

2    A.   Right.

3    Q.   And when you left, there was no indication of

4    any black males in these cars at Food City; right?

5    A.   That's correct.

6    Q.   Okay.  And the first indication that you have

7    about these vehicles being involved in this case

8    whatsoever is at 2:19, when you get this

9    information over the radio?

10   A.   That's correct.

11   Q.   Okay.  Was somebody -- and tell me how this

12   works.  Was somebody specifically assigned to

13   remain at Food City, then, throughout to watch the

14   Food City?

15   A.   No.  That was decisions that were being made

16   at the command post, and the direction was being

17   given to people, and I don't know who directed

18   Agent Sharman to go to the Food City, but he may

19   know that.

20   Q.   Okay.  Do you know when Sharman arrived at

21   Food City?

22   A.   No.

23   Q.   And there is really no way of telling that

24   from the surveillance log?

25   A.   Not from the log, no.

1    Q.   Okay.  You were present at the warehouse when
2    people were arrested there, or at least a block
3    away; right?
4    A.   Yes.
5    Q.   And that arrest took place at about 2:20 , is
6    that fair?
7    A.   I'm not sure.  Somewhere between, I would
8    say -- yeah, I'm not sure when they actually --
9    Q.   That's not indicated on the log?
10   A.   No.
11   Q.   Okay.  The next time you are indicated here is
12   at 2:40 p.m.; right?
13   A.   Yes.  The next time communicated is 2:47, or
14   2:40, correct.
15   Q.   2:40.
16   A.   Yeah.
17   Q.   And that's at the Circle K?
18   A.   That's correct.
19   Q.   Did you ever go back to the Food City?
20   A.   No.
21   Q.   You left the warehouse, and who directed you
22   where to go?
23   A.   Kent Hush, Agent Hush.
24   Q.   And he told you to go to the Circle K?
25   A.   He told me to assist in now new targets being

1  designated for surveillance, and he instructed me

2  to assist with those new targets.

3  Q.   And that would be the Escalade --

4  A.   The Escalade and the red Ford Explorer.

5  Q.   And were you hearing who was supposed to

6  assist in targeting the Buick LeSabre?

7  A.   No.

8  Q.   Is there any indication in the logs as to who

9  followed or who did anything with the Buick

10  LeSabre?

11  A.   No.  I believe that's one we missed.

12  Q.   Okay.  There is at least a partial license

13  plate for the LeSabre; correct?

14  A.   That's correct.

15  Q.   With I think six of the seven digits?

16  A.   Right.

17  Q.   Okay.

18  A.   I had a report of that being what I would term

19  in play, like, a target.

20  Q.   Right.

21  A.   But I never saw it.

22  Q.   You never saw the LeSabre; right?

23  A.   No.

24  Q.   That's because the LeSabre was at the Food

25  City.

1    A.   Okay.

2    Q.   Okay.  And you were not at the Food City when

3    it was there?

4    A.   No.

5    Q.   Okay.  You get to the Circle K, and one of the

6    -- one of the jobs that you had at the Circle K was

7    to take pictures; right?

8    A.   I was not assigned that job.  I mean, we are

9    always going to be taking pictures, if we are given

10   the opportunity.

11   Q.   Okay.  Maybe I should --

12   A.   And I saw an opportunity and so I took

13   pictures.

14   Q.   I should put it a different way.  While you're

15   at the Circle K, you were taking pictures; right?

16   A.   That is correct.

17   Q.   And one of the things that you described at

18   the Circle K is that you saw a Jeep Commander;

19   right?

20   A.   Yes.

21   Q.   Prior to 2:47, you had not been told to be

22   looking for a Jeep Commander; right?

23   A.   That is correct.

24   Q.   So you took pictures of this Jeep Commander

25   because there were -- there was interaction between

1    the black males from the Expedition and the
2    Escalade who were talking with a black man in the
3    Jeep Commander; right?
4    A.   Not exactly.  I -- when I pulled across the
5    street from the Circle K, I noticed -- well, it was
6    a very busy -- there was a lot of vehicles there,
7    just besides, you know, our two target vehicles,
8    and there were people walking around, people
9    standing around, people on the phone.
10        I started taking pictures of everyone.
11   Q.   Okay.
12   A.   You know, starting focusing first on the Ford
13   Explorer because that's the one I could see.
14   Q.   Right.
15   A.   I couldn't see the Escalade initially.
16   Q.   All right.
17   A.   So I focused on the Ford Explorer, started
18   taking pictures there.
19        If you look at the sequence of photos, they're
20   all in chronological order.  My focus went from
21   taking pictures around the Ford Explorer to now
22   people standing near a white Jeep Commander that
23   were black males --
24   Q.   Okay.
25   A.   -- and appear to be having, like, a huddled

1  conversation with somebody in the Commander, so I
2  started taking photos of them.  I did not know that
3  those people were involved at that moment.
4  Q.  Okay.  Do you know if they're involved to this
5  day?
6  A.  Well, I -- after --
7  Q.  I'm talking about the Jeep Commander person.
8  A.  No.  I don't know.
9  Q.  You, however, did get, from your vantage
10  point, a view of who was in the Jeep Commander;
11  right?
12  A.  No.
13  Q.  Well, if that person is described as a black
14  male --
15  A.  Where is that?
16  Q.  At 2:47 p.m.
17  A.  I didn't describe him.  Maybe Agent Sharman
18  did.  I didn't see that person.
19  Q.  Okay.  So it would be Sharman who saw the
20  black man?
21  A.  I don't know, possibly.
22  Q.  Well, if it's not you and it's not Sharman,
23  who would have said to put in the surveillance log
24  there's a black man in the Jeep Commander?
25  A.  I don't know.  You'd have to ask Agent

1  Fernandez who told him that.

2  Q.   Okay.  But it's there though; right?  Somebody

3  saw a black man in the Jeep Commander?

4  A.   That's what's written, yes.

5  Q.   Okay.  And you couldn't -- because of your

6  angle, you were taking shots, primarily rear shots;

7  correct?

8  A.   Of the Commander, you mean?

9  Q.   Right.

10 A.   Well, it's parked facing north into the Circle

11 K just on the east side, and I'm taking pictures

12 from the south, so yeah, I'm looking straight

13 north, and so I only can see the rear of the Jeep

14 Commander and the sides.

15 Q.   All right.  In the notation at 2:40 -- I'm

16 sorry -- at 2:47, where it says the black man is

17 talking with three black males, the Jeep Commander

18 black man --

19 A.   Yes.

20 Q.   -- that information is going out over the

21 radio; right?

22 A.   Yes.  I believe I even stated I put out over

23 the radio that I observed three black males

24 standing next to the Jeep Commander talking to

25 someone in the Jeep Commander.

1  Q.  And then that would have to be somebody else

2  who would be able to give the race of the person in

3  the Jeep Commander?

4  A.  Right.  I couldn't see that person.

5  Q.  All right.  But you did see the three black

6  men talking to somebody in the Jeep Commander?

7  A.  Yes.

8  Q.  All right.  When the Jeep left the Circle K,

9  was anybody assigned to follow it?

10  A.  No.

11  Q.  And you can tell that by looking at the

12  surveillance logs; right?

13  A.  Right.  I can remember nobody was assigned to

14  follow it.

15  Q.  Okay.

16  A.  I was the one that was alerting the command

17  post that it was departing.

18  Q.  Okay.

19  A.  And they did not assign anybody to follow it.

20  Q.  And let me ask you the -- I guess the pecking

21  order.

22      You can't leave where you are unless you're

23  told to leave; right?

24  A.  Yes, they -- the command post is going to

25  designate what targets we stay with and what

1  targets we let go.  That's going to be Kent Hush.

2  Q.  How many agents were near the Circle K at that

3  point watching what was going on?

4  A.  I'm not sure.  The ones that were close in

5  were myself and Agent Sharman.  The other ones were

6  a distance away, ready to assist when there was

7  movement, but I'm not sure how many.

8  Q.  Within blocks?

9  A.  Within blocks, right.

10  Q.  Okay.  And so the people making the decisions

11  as to who to follow aren't anywhere near the Circle

12  K?

13  A.  That's right.

14  Q.  Okay.  So the decision was made by somebody,

15  you know, a mile or two away or whatever, not to

16  follow the Jeep Commander?

17  A.  Yes.

18  Q.  And you had warned them, this Jeep Commander,

19  whoever's in it talking to the black guys is

20  leaving right now; right?

21  A.  Yes.  The reason I warned them is because I

22  believed that the Jeep Commander was now another

23  vehicle that was involved with these people.

24  Q.  You were watching interaction between --

25  A.  Right.

1    Q.   -- targets that you were assigned to look at;

2    right?

3    A.   Right.

4    Q.   And I assume, then, that the plane overhead

5    would be hearing this conversation?

6    A.   Yes.  Well, yes.  They'd be hearing all the

7    interaction between myself and the command post.

8    Q.   So the plane, had somebody ask them to, I

9    suppose, could have followed the Jeep to see where

10   it was going; right?

11   A.   Could have, yes.

12   Q.   To your knowledge, at least based on the

13   surveillance logs, that didn't happen; right?

14   A.   Right.

15   Q.   All right.  Then there's another -- shortly

16   after that, after the Jeep Commander leaves, your

17   attention was drawn to a black woman having a

18   conversation with people in Vehicle 4, which would

19   I believe would be the Escalade; right?

20   A.   Yes.

21   Q.   And you saw this conversation taking place;

22   right?

23   A.   What appears to be a conversation.  I couldn't

24   tell you if they were actually in a conversation,

25   but it appeared as though she was standing -- well,

1  I photographed her standing near the Escalade.

2  Q.   Looking into the window?

3  A.   Looking into the window, right?

4  Q.   I guess you weren't close enough to see her

5  lips moving or anything?

6  A.   Obviously not, yes.

7  Q.   But she was standing there, and it looks to me

8  like she was standing there for four or five

9  minutes.

10  A.   I couldn't be sure on that.  I don't know.

11  I'd have to look at the photographs.  The

12  photographs are all time stamped, so you could

13  figure that out, how long.

14  Q.   Did you photograph her when she walked over to

15  the car and began the conversation?

16  A.   No.

17  Q.   You saw the conversation in progress?

18  A.   Yeah.  Initially I couldn't see the Escalade

19  from where I was positioned.

20  Q.   Okay.

21  A.   I only saw it after it was repositioned and

22  they backed it up to a gas pump on the west side of

23  the Circle K.

24  Q.   Okay.

25  A.   And then, after that, I noticed it, started

photographing, and as soon as they were backing it
into the pump, she appeared, and that's when I was
photographing her.

Q.   At 2:52 is when you indicate, at the gas pump,
there's an unknown black female having a
conversation; right?

A.   That's correct.

Q.   But that conversation could have begun a
minute or two earlier?

A.   It could have.

Q.   And then the next thing is that this vehicle
leaves at 2:57?

A.   The Escalade?

Q.   Right.

A.   Yes.

Q.   And are you able to estimate how much time
before that those cars left did the woman stop the
conversation?

A.   No, but it is, I believe, in the series of
photographs, it shows her walking away from the
Escalade.

Q.   Okay.

A.   I'm not sure on that, but I'd have to look at
the photographs again.

Q.   And again, she's put into this surveillance

1    log because she was talking to people who were

2    targeted to look at; right?

3    A.   Right.

4    Q.   And again, there were at least two agents at

5    the Circle K watching or trying to watch what was

6    going on; right?

7    A.   Right.

8    Q.   And an unknown number of agents a block or two

9    away ready to move if something happened; right?

10   A.   Right.

11   Q.   And you're indicating to the agents who were a

12   mile away who were in charge of this that this

13   black woman had a conversation with these guys in

14   the car; right?

15   A.   Yes.

16   Q.   Okay.  And then you indicate the

17   conversation's over because these guys are leaving

18   the Circle K; right?

19   A.   That's correct.

20   Q.   And certainly, had they wanted to, somebody

21   could have said, Agent X, get over to the Circle K

22   and talk to that black woman right now; right?

23   A.   Somebody could have, yes.

24   Q.   Okay.  It appears from the surveillance log

25   that didn't happen; right?

1  A.  No, that didn't happen.

2  Q.  But you had told them about this conversation,

3  and then it's up to them to make that decision;

4  right?

5  A.  That's correct.

6  Q.  And that's your job as a surveillance agent,

7  is to give them information, and then they make the

8  decision about what to do?

9  A.  That's correct.

10  Q.  All right.  When the Jeep Commander left the

11  Circle K, were you able to see how many people were

12  in it?

13  A.  No, I couldn't.

14  Q.  So the only indication of who was in the Jeep

15  Commander that we have from the surveillance log

16  would be that there was a black man in the Jeep

17  Commander; right?

18  A.  In one of the photographs, the series of

19  photographs, as the Jeep Commander is departing,

20  you can see just a partial rear head area of the

21  driver.

22  Q.  Was that the black man?  Could you tell the

23  race?

24  A.  I couldn't tell.

25  Q.  Okay.  How about, was there anybody else in

1 the Jeep Commander besides the driver?

2 A.   I don't know.

3 Q.   You couldn't tell from the photos?

4 A.   No.

5 Q.   Or from your vantage point; right?

6 A.   No.   The windows are a dark tint.   I couldn't

7 tell.   I photographed it as it was leaving.

8      Had the windows been light, it probably would

9 have indicated people inside, if there were people

10 inside, but they were dark.

11 Q.   Okay.   So you don't know if there was a woman

12 inside, for instance?

13 A.   No.

14 Q.   Or children or anything like that?

15 A.   No.

16 Q.   Did you ever see at any point a Volvo or its

17 occupants or the occupants of a Volvo having an

18 interaction or talking with the people from the

19 Expedition or the Escalade?

20 A.   I didn't, but I didn't have full view of the

21 Escalade at all times.

22 Q.   Apparently nobody else saw that either, at

23 least, because there's no Volvo or occupants listed

24 in the surveillance log; right?

25 A.   That's correct.   There is no Volvo listed in

1  the log.

2  Q.   Okay.  What about a blue Kia?  Did you ever

3  see a blue Kia, where there were occupants

4  interacting with any of the targets, the Escalade,

5  the Expedition, the Jeep Commander, anything?

6  A.   No.

7  Q.   And nobody told you at any time, we've got to

8  watch this blue Kia or check it out, and you never

9  saw it; right?

10  A.   I don't recall any talk about a blue Kia.

11  Q.   How about a gold Lexus?  Did you ever see a

12  blue Lexus -- or I'm sorry -- a gold Lexus or the

13  occupants of a gold Lexus interacting with any of

14  the other vehicles or the occupants of any of the

15  vehicles?

16  A.   No.

17  Q.   And again, that's the sort of thing that you

18  were trying to document; right?

19  A.   Trying --

20  Q.   Trying to document interactions between target

21  vehicles and people --

22  A.   Right, exactly.

23  Q.   Okay.  And finally, there was -- during the

24  surveillance, and I -- under the individuals

25  observed, there's a classification of a lot of

1   people broken down by race; correct?

2       That would be on page one.

3   A.   Yes.  The way he has written it is basically,

4   yes, unknown, and then sex and then race.

5   Q.   And then there is one two, three, four, five,

6   six Hispanic males listed; right?

7   A.   Right.

8   Q.   And there is 13 black people listed?

9   A.   That's correct.

10  Q.   One female and 12 men?

11  A.   That's correct.

12  Q.   And during the entire time that you were

13  watching all the locations, the Circle K, the

14  warehouse, Food City, you never saw any interaction

15  between the Hispanics and the blacks; right?

16  A.   I didn't.

17  Q.   Okay.  And it's not noted in the log either,

18  is there?

19  A.   The only -- the only time I saw a Hispanic

20  individual near a black individual was when I

21  photographed the Commander at the Circle K.  There

22  is a Hispanic male standing on one side of the

23  Commander at one point after the black males

24  departed the other side the Commander.

25  Q.   But you never saw any interaction between --

1    A.   No.

2    Q.   -- that person photographed or any other black

3    male; right?

4    A.   No.

5         MR. COOPER:  Okay.  That's all I have.

6    Thank you.

7              CROSS-EXAMINATION

8    BY MR. ARMSTRONG:

9    Q.   Good morning.

10   A.   Good morning, sir.

11   Q.   I wanted to talk to you a little bit about the

12   initial meeting the FBI personnel who were assigned

13   to do the observations of the Food City had.

14        And I don't recall whether Ms. Hopkins went

15   over that with you.  Hopefully it's not -- it's

16   nothing we're going to repeat here.

17        When did you meet or did you, in fact, have a

18   -- sort of a briefing with the other FBI agents who

19   were going to be doing the surveillance?

20   A.   There was a briefing, I believe, that Agent

21   Hush attended that involved a large portion of the

22   other aspects of people involved in the takedown,

23   like, for instance, SWAT team, and the squad

24   agents, but I was not at that meeting.

25   Q.   Okay.  Did you have a meeting with any of the

1    other agents before you went to the Food City?

2    A.   Only Agent Hush.

3    Q.   Okay.  It was just Hush and you, or you and

4    Hush?

5    A.   I don't recall.  It may have been myself and

6    Russ Klawenn, but I don't recall.

7    Q.   And when did that meeting occur?

8    A.   The day prior.

9    Q.   I'm sorry?

10   A.   The day prior, so on March --

11   Q.   1st?

12   A.   1st, that's correct.

13   Q.   Do you remember the time of the day?

14   A.   No.

15   Q.   And Agent Hush told you to keep a look out for

16   a Murano and that was it, at least as far as cars

17   went?

18   A.   Right.

19   Q.   How long did your meeting last?

20   A.   Just a few minutes.

21   Q.   All right.  Do you know how many aircraft, FBI

22   aircraft, were being used to conduct surveillance

23   on March 2nd here in Tucson?

24   A.   Yes.

25   Q.   You do know?

1   A.   Yes.

2   Q.   Was it just one?

3   A.   Two.

4   Q.   There were two.  Okay.

5        Alex Jones was pilot of one?

6   A.   That's correct.

7   Q.   Do you know the pilot of the other?

8   A.   No.

9   Q.   Did Agent Hush explain to you what your --

10  well, your duties in regard to Food City were just

11  to keep an eye on the situation?

12  A.   Observe, collect any intelligence that

13  developed at that location, and --

14  Q.   You were not intending on arresting anybody at

15  the Food City parking lot; is that correct?

16  A.   That's correct.

17  Q.   I think you told Mr. Cooper that there were

18  FBI agents from Tucson conducting surveillance, but

19  there were also some Phoenix agents assigned to

20  this operation; is that right?

21  A.   That's correct.

22  Q.   And when you were at the Food City, I know you

23  got there early, Fernandez was across the street,

24  on east side of Sixth, keeping an eye -- he was on

25  the east side, and you were on the north side;

1  correct?

2  A.   That's correct.

3  Q.   And there were some other agents following the

4  Murano down out of Phoenix?

5  A.   That's correct.

6  Q.   Is that the extent of the agents that were

7  doing surveillance in Tucson that day?

8       I guess I'm trying to ask, was there anybody

9  else out there who, other than Fernandez and you

10  and then the folks following the Murano, was there

11  anybody else doing surveillance?

12  A.   Yeah, the only people doing surveillance in

13  Tucson are the ones indicated on the log here.

14  Q.   Okay.  All right.  And after the vehicle got

15  -- the Murano arrived in Tucson, do you know what

16  happened to those surveillance officers?

17  A.   No, I don't.  They eventually joined into the

18  surveillance of the Explorer and of the Escalade

19  because I heard them on the radio.

20  Q.   Well, I believe Mr. Sharman did.

21  A.   Yes.

22  Q.   Is that correct?

23  A.   Yes.

24  Q.   Who else joined in on the surveillance of

25  those two vehicles?

1    A.   I'm not sure.  A number of them, but I

2    couldn't tell you which ones.

3    Q.   Who else was at the Circle K, other than you

4    and Sharman?

5    A.   I don't know.  I can only say how we normally

6    operate.  I don't know exactly why, where they

7    would have been positioned that day.

8    Q.   Okay.  Do you know whether, in fact, other

9    than you and Sharman, anybody else was observing

10   the Cadillac and the Ford at the Circle K on the

11   afternoon of March 2nd?

12   A.   Yeah, the only other -- what the airplane was

13   observing, the activity going on.

14   Q.   Other than you two and the plane?

15   A.   No, I don't know.

16   Q.   All right.  You left for good -- and if I've

17   got the times wrong, tell me.

18       You left the Food City for good at 2:06?

19   A.   Right.

20   Q.   Okay.  You had not seen the Cadillac, the

21   black Cadillac pickup truck, or the Ford Expedition

22   by the time you left; is that right?

23   A.   That's correct.

24   Q.   The first time you saw those vehicles was at

25   the Circle K at 2:45-ish?

```
1   A.   That's correct.
2   Q.   All right.  And you were alerted to the
3   significance of those vehicles by someone in the
4   FBI?
5   A.   That's correct.
6   Q.   You observed -- when you were at the Circle K
7   watching those vehicles, you didn't observe
8   anything necessarily criminal in and of itself, did
9   you?
10  A.   I did not.
11  Q.   And I know Mr. Cooper went over this with you
12  before, but in that Buick, I think it's called
13  Vehicle No. 5 that you were observing --
14  A.   I wasn't observing it --
15  Q.   Excuse me.
16  A.   -- but somebody was.
17  Q.   Somebody was.  There was two black males in
18  that vehicle; correct?
19  A.   I can only tell you what's indicated on the
20  log.
21  Q.   Okay.  Take a look at, I think, 2:19.  It may
22  have been the first notation there.
23  A.   Yes, it's indicated in the log that there were
24  two black males in the Buick LeSabre observed by
25  Agent Sharman.
```

1    Q.   And is 2:19 the first time the Buick was

2    observed by anybody on your surveillance team?

3    A.   Yes.

4    Q.   Were you able to observe the black female at

5    the Circle K, what she did after she left the

6    immediate vicinity of the Cadillac?

7    A.   No, I could not observe her further.

8    Q.   You didn't see her leave?

9    A.   No.

10        MR. ARMSTRONG:  Thank you.  I have nothing

11   further.

12        THE COURT:  Okay.

13             CROSS-EXAMINATION

14   BY MR. YOUNG:

15   Q.   Sir, we'll go straight to 2:47 on the

16   surveillance log.

17        At 2:47, both yourself and James Sharman, you

18   both observed an unknown black male, M-18, in the

19   white Jeep Commander at the Circle K; is that

20   right?

21   A.   That is incorrect.  I did not observe anybody

22   in the Jeep Commander other than when I

23   photographed it departing, I could see, like I

24   said, a partial rear head area of the driver.

25   Q.   You are No. 30 on the surveillance log; right?

1  A.   That's correct.

2  Q.   And your initials are by the No. 30 and by

3  your name on the front of the surveillance log?

4  A.   That's correct.

5  Q.   And so you've initialed this surveillance log

6  as comporting with your observations?

7  A.   That's correct.

8  Q.   And at 2:47, I see the number 30 next to the

9  observation, "Unknown black male in a white 2007

10 Jeep Commander is observed talking with three black

11 males."

12 A.   I reported that observation as I observed

13 three black males talking to -- appeared to be

14 talking to somebody in the Jeep Commander.  I did

15 not give a description who that person was.

16      It could be that Agent Sharman did but I

17 didn't.

18 Q.   Well, your No. 30 is next to that entry;

19 right?

20 A.   Right.

21 Q.   And you've initialed this log?

22 A.   Well, I had part of that observation.  There's

23 two of us indicated.  Oftentimes one agent may see

24 part of it and the other agent may see the second

25 part of the observation.

1     I only saw the black males talking to the Jeep
2   Commander.  I did not see the -- other than when I
3   photographed them departing, I did not see anybody
4   in the Jeep Commander.
5   Q.   Fair enough.  And I'm already getting
6   sidetracked.  The point I wanted to get to was
7   that, at 2:47, the white Jeep Commander left?
8   A.   Yes.
9   Q.   So the white Jeep Commander was first seen at
10  2:47, and the white Jeep Commander left at 2:47?
11  A.   It could be a minute or so, you know,
12  difference there.  I believe the time stamps on the
13  photos may show -- yeah, probably.  By the time I
14  started snapping photos, from the time I first
15  snapped the photos of the three black males
16  standing next to the Jeep Commander to the time it
17  actually departed was maybe a minute or two,
18  possibly two minutes.
19  Q.   The point being it was a short conversation,
20  and the white Jeep Commander did not hang around
21  very long?
22  A.   That's correct.
23  Q.   Now, I notice from the surveillance log at
24  2:52 that both the Expedition and the Escalade were
25  still hanging around.

1    A.    That's correct.

2    Q.    At 2:52, Vehicle 4, the Escalade, they were

3    talking to a black female?

4    A.    Well, the -- I couldn't see who was talking to

5    a black female.  All I could see was a black female

6    standing next to the passenger side of the

7    Escalade, appearing to be talking to someone in

8    there, but I couldn't see.  Again, the windows were

9    dark in that vehicle.

10   Q.    And you said you snapped some photos of that?

11   A.    Yes, sir.

12   Q.    And in fact, there is a "P" next to that

13   paragraph in the surveillance log.  That probably

14   indicates that you took some photos.

15   A.    Yes, sir.

16   Q.    Those photos weren't particularly relevant to

17   the case, it didn't turn out?

18   A.    I don't know their relevancy, sir.

19   Q.    The female, she didn't factor in any further

20   surveillance in the case?

21   A.    I don't know that, sir.  I don't know.

22   Q.    Your team leader didn't have anybody follow

23   the female or anything like that?

24   A.    No.

25   Q.    So she, as far as you know, was just one of

1  the local females that they were talking to?

2  A.  Don't know.

3  Q.  In any case, nobody was concerned enough to

4  follow her?

5  A.  We had limited resources.  Somebody had to

6  make a split-second decision about where to direct

7  the resources.

8  Q.  The -- both vehicles, the Expedition and the

9  Escalade, they continued hanging around the Circle

10  K until 2:57, when they finally left?

11  A.  2:57, yes, sir.

12  Q.  So they were there at the Circle K.  They got

13  to the Circle K at 2:40, and they left the Circle K

14  at 2:57?

15  A.  That's correct.

16  Q.  So they spent 17 minutes total hanging out at

17  the Circle K?

18  A.  That's correct.

19  Q.  At 2:19 is when surveillance first noticed

20  them in the Food City parking lot?

21  A.  That's correct.

22  Q.  And I think testimony was that they eventually

23  left the Food City parking lot at 2:34.

24  A.  Can you -- can you rephrase that question?  At

25  2:34 is when, I guess, the Murano --

1  Q.  I'm jumping around a bit on you.

2  A.  Yeah.

3  Q.  2:34, we're back at the Food City now.

4  A.  Oh, okay.  You're talking about the red Ford

5  Expedition?

6  Q.  Yes, the Expedition and the Escalade, they

7  left the Food City at 2:34; is that right?

8  A.  That's correct.

9  Q.  So they were at the Food City for at least 15

10  minutes?

11  A.  They arrived there.  Let's see.  2:19 they

12  were noticed, right, and then they depart at 2:34.

13  Q.  So they didn't seem to be in any particular

14  hurry to leave the Food City?

15  A.  I don't know.

16  Q.  They spent 15 minutes there; right?

17  A.  It appears so from the log, yes.

18  Q.  Now, they were parked next to a gold Buick

19  LeSabre that was also noticed at 2:19; right?

20  A.  That's correct.

21  Q.  And that gold Buick LeSabre, that was out of

22  there at 2:20 right?

23  A.  2:20 it departed, according to the log, yes,

24  sir.

25  Q.  So the gold Buick LeSabre didn't wait around

1  for any length of time?

2  A.   It appears not.

3  Q.   And the white Jeep Commander also did not wait

4  around for any appreciable length of time; is that

5  correct?

6  A.   I don't know what you mean by waiting around.

7  It was there when I arrived, and it departed

8  shortly after I arrived.

9  Q.   The white Jeep Commander at the Circle K, it

10 was there at 2:47 and it left at 2:47.

11 A.   Yeah, within about a minute or two.

12 Q.   The surveillance team was watching the gray

13 Nissan Murano the entire time?

14 A.   Once the takedown occurred at the warehouse,

15 that vehicle was out of their surveillance,

16 obviously.  I believe it stayed there.

17 Q.   Well --

18 A.   Yeah.

19 Q.   Right.  Once you arrested everybody in the

20 vehicle, you quit watching the vehicle?

21 A.   Obviously, yes.

22 Q.   I'll accept that.

23      The occupants of the gray Nissan Murano never

24 went over and talked to anyone in the Expedition or

25 the Escalade, did they?

1  A.   No.  We didn't see any interaction between

2  those vehicles.

3  Q.   Vehicle 2 was the gold Chevy Optra driven by

4  the confidential informant?

5  A.   I don't know.

6  Q.   You don't know who the driver was.  But

7  Vehicle 2 was the gold Chevy Optra?

8  A.   That's correct.

9  Q.   And nobody from the gold Chevy Optra ever went

10 over and interacted with either the Expedition or

11 the Escalade?

12 A.   I don't know that.

13 Q.   Did you ever observe that?

14 A.   No, I did not.

15 Q.   Did anybody observe that?

16 A.   Not to my knowledge.

17 Q.   The blue Kia, nobody ever noticed a blue Kia,

18 did they?

19 A.   I did not notice any blue Kia.

20 Q.   And it's not listed as one of the vehicles

21 that was ever observed?

22 A.   It's not listed in the log, sir.

23 Q.   A gold Volvo, that's not listed in the logs

24 either?

25 A.   That's correct.

1  Q.  And a gold Lexus, nobody ever saw a gold

2  Lexus?

3  A.  I didn't see a gold Lexus.

4  Q.  And nobody noted a gold Lexus in the

5  surveillance log?

6  A.  That's correct.

7          MR. YOUNG:  That's all I have, Your Honor.

8                 REDIRECT EXAMINATION

9  BY MS. HOPKINS:

10  Q.  Agent Sharkey, if you could take a look at

11  what's been admitted as Government's Exhibit 61-E.

12      Now, this is a photo you were asked a few

13  questions about from defense counsel; right?

14  A.  Yes.

15  Q.  And this is the photo that you described as

16  the black males from the Expedition and the

17  Escalade were talking to an occupant of the Jeep

18  Commander?

19  A.  Yes.

20  Q.  And at this vantage point, can you tell who

21  the occupant of the Jeep Commander is?

22  A.  I cannot.

23  Q.  You can't determine his race from this

24  photograph, obviously?

25  A.  No.

1    Q.   Okay.  And if we could take a look at what's
2    been admitted as 61-G.
3         Now, you said that there was a sequence of
4    photographs; correct?
5    A.   That's correct.
6    Q.   And so there were a couple of photographs in
7    between, but the next photograph of the Jeep shows
8    a person standing close to it.
9              MR. COOPER:  Objection.  This is a leading
10   question.
11             THE COURT:  Overruled.
12   BY MS. HOPKINS:
13   Q.   Do you see the person --
14   A.   Yes.
15   Q.   -- standing close to the Jeep?
16   A.   Yes.
17   Q.   Now, if we could possibly make that a little
18   bigger, that person there.
19        Can you tell that person's nationality?
20   A.   It appears to be a Hispanic male.
21   Q.   And if you can zoom back out.
22        And the person that's standing a little ways
23   away from him, was that one of the people that you
24   observed talking to the occupant of the Jeep
25   Commander?

1    A.   Yes, the person to the right, with the hat.

2    Q.   And so the only people that you photographed

3    at or near the Jeep Commander were the people

4    that -- the black males that were talking to the

5    occupant and this Hispanic male, photographed right

6    there?

7    A.   That is correct.

8    Q.   Now, you testified that the Jeep wasn't there

9    that long?

10   A.   That's correct.

11   Q.   But was the Jeep there long enough for the

12   occupant to have a conversation with the black

13   males that you observed in the Circle K parking

14   lot?

15   A.   Yes.

16   Q.   Now, you testified that you observed a black

17   female at the Circle K; is that correct?

18   A.   The one speaking to -- appeared to be speaking

19   someone in the Escalade?

20   Q.   Yes.

21   A.   Yes, I did see that.

22   Q.   And did she get in the Escalade at any point?

23   A.   Not that I saw, but I did not see the Escalade

24   the entire time.

25   Q.   Okay.  And did her car follow -- the car that

1  she was in, did that car follow the Escalade and

2  the Expedition out of the Circle K parking lot?

3  A.   I didn't see her in any car.

4  Q.   Okay.  Now, during the course of surveillance

5  involving multiple vehicles, are there times when

6  you have to let certain vehicles go and remain at

7  your -- or remain on designated targets?

8  A.   Yes, because we have a limited number of

9  resources, and we've got to focus -- somebody's got

10 to determine what the primary focus is for that

11 moment.

12 Q.   And was that the situation in this case?

13 A.   Yes.

14       MS. HOPKINS:  I have no further questions.

15       THE COURT:  If the jurors have any

16 questions, please place them in writing.

17            There is at least one.

18            (A discussion was held at the bench.)

19       THE COURT:  "Clarify the time line.  The

20 warehouse arrest, what time?  The Prince Road

21 turnaround, what time?  The time of the Food City

22 departure?"  Okay.

23            "Is the red Explorer the same vehicle as

24 the red Expedition?  I keep hearing reference to

25 both models."

1    MR. YOUNG:  That's probably my bad, Your

2  Honor.

3    THE COURT:  Yeah, it is your bad.

4    (End of bench conference.)

5    THE COURT:  I have a couple of questions

6  from the jurors that I'm going to ask on their

7  behalf.

8    Is the red Explorer the same vehicle as

9  the red Expedition?

10    THE WITNESS:  I'm sorry?  Did I misspeak

11  on some of my testimony?  There is only one red SUV

12  that I observed.  It's an Expedition.

13    THE COURT:  All right.

14    THE WITNESS:  Yes.  I may have misspoke.

15    THE COURT:  Can you clarify the time

16  line?  What time was the arrest at the warehouse,

17  if you know?

18    THE WITNESS:  I don't know.

19    THE COURT:  Can you look at the log and

20  tell?  If you can't, you can't.

21    THE WITNESS:  I can only tell you when the

22  last time the Murano arrived at the warehouse.

23    THE COURT:  What time was that?

24    THE WITNESS:  It is 2:15.

25    THE COURT:  Can you tell what time the

1 Prince Road turnaround took place?

2         THE WITNESS:  Yes, 3:01.

3         THE COURT:  And the time of the departure

4 from Food City?

5         THE WITNESS:  For which --

6         THE COURT:  Both times.

7         THE WITNESS:  Well, there is a number of

8 departures from the Food City.  There's the Murano

9 departure.

10         THE COURT:  Okay.  What time was that?

11         THE WITNESS:  The first Murano departure

12 was 12:26 p.m.  The second Murano departure was

13 with -- when it left with the gold Optra.  That was

14 at 1:36 p.m.

15         THE COURT:  Okay.

16         THE WITNESS:  I'm sorry.  That was at

17 1:39 p.m.

18         THE COURT:  1:39, not 1:36?

19         THE WITNESS:  Yes.  The third -- the

20 Murano departs then again at 2:06.

21         And then the red Ford Expedition and the

22 black Escalade, well, first -- I would say the gold

23 Buick LeSabre departed the Food City at 2:20 p.m.

24 The red Ford Expedition and the black Escalade

25 depart the Food City at 2:34 p.m.

1          And I believe, Your Honor, that's all the

2   Food City departures.

3          THE COURT:  Do you have one of the

4   Expedition returning back and then leaving again?

5          THE WITNESS:  Oh, you're right, yes.

6   Yeah, the final departure for them, then, is

7   3:15 p.m.

8          THE COURT:  Ms. Hopkins, any further

9   questions based upon the jurors' questions?

10          MS. HOPKINS:  No, Your Honor.

11          THE COURT:  Mr. Cooper?

12          MR. COOPER:  No, Your Honor.

13          THE COURT:  Mr. Armstrong?

14          MR. ARMSTRONG:  No.

15          THE COURT:  Mr. Young?

16          MR. YOUNG:  No, Your Honor.

17          THE COURT:  You may step down.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  We'll take about a five-minute

20   recess, just five.

21          (The jury exits the courtroom.)

22          (Off the record.)

23          (The jury enters the courtroom.)

24          THE COURT:  Show the jurors returning to

25   the courtroom, the presence of all counsel and the

1  defendants.

2  You may call your next witness.

3  MR. LACEY:  Yes, Mr. -- Agent Cantu.

4  Please.

5  EDUARDO CANTU, WITNESS, SWORN

6  THE COURT:  Sir, the Rule has been invoked

7  in this case.  That means, except during the time

8  that you're testifying, you must remain outside the

9  courtroom, and you're only allowed to discuss your

10  testimony with the attorneys involved in the case.

11  THE CLERK:  Please state your name for the

12  record and spell your last name.

13  THE WITNESS:  Eduardo Cantu, last name

14  C-a-n-t-u.

15  THE COURT:  You may proceed.

16  MR. LACEY:  Thanks, Your Honor.

17  DIRECT EXAMINATION

18  BY MR. LACEY:

19  Q.  Agent Cantu, you're employed by whom?

20  A.  United States Border Patrol.

21  Q.  And you've been with the border patrol for how

22  long?

23  A.  Five years, sir.

24  Q.  And what's your training?  What training did

25  you have before you came to the border patrol, law

1  enforcementwise?

2  A.   I'm currently serving -- work for the border

3  patrol tactical unit.  I've been with them for the

4  last three years.

5  Q.   And border patrol tactical unit, what is that?

6  A.   It's a unit basically to respond to high-level

7  threat situations that -- we have specialized

8  skills, more training than any ordinary border

9  patrol agent.

10      We have, I guess, specialized weapons too,

11  training and gear, as far as to handle more

12  dangerous situations.

13  Q.   And when you say tactical unit, that's

14  comparable to a SWAT team from other law

15  enforcement agencies; is that correct?

16  A.   Correct.

17  Q.   I want to direct your attention back to March

18  2nd of last year.  Were you on duty back on that

19  date?

20  A.   Yes, sir.

21  Q.   Did you receive a call for assistance in a --

22  for stopping vehicles on I-10 back on that date?

23  A.   Yes, sir.

24  Q.   About what time of day was this?  Do you

25  remember offhand?

1  A.   That was near four o'clock in the afternoon on

2  the 2nd of March.

3  Q.   March 2nd?

4  A.   Yes.

5  Q.   And that took place at what location

6  approximately?

7  A.   It was near the town of Eloy, I want to say.

8  Actually, I have it in my report.  Near mile marker

9  200 on the westbound I-10.

10  Q.   Up roughly by the Casa Grande/Eloy area?

11  A.   Correct.

12  Q.   The vehicle or vehicles you were looking to be

13  involved in stopping that day, can you give us a

14  description of the vehicles and which one if any of

15  those you were involved in stopping.

16  A.   There was -- I was involved in stopping the

17  red -- a red Expedition, and there was also a black

18  Escalade/Avalanche type of vehicle.

19  Q.   How many agents were in the vehicle that you

20  were in when you got involved in this stop?

21  A.   Two.  Two vehicles were involved in stopping

22  the red Expedition, a Surburban and a Tahoe.  The

23  Suburban had three agents in it.  They were the

24  primary unit right behind the Expedition, and I was

25  in a Tahoe along with another agent behind them.

1  Q.  And when this stop took place, how did you go

2  about pulling over the Expedition, the one you were

3  involved with?

4  A.  The vehicle initiated the stop.  The vehicle

5  stopped.  We were right behind them.  The vehicle

6  in the front, one agent was addressing the subjects

7  in the vehicle with the public address system while

8  the other two were basically pulling security.

9  That means they were just making sure basically

10  nothing bad happened while the agent in my vehicle

11  and myself were putting hands-on as each of the

12  subjects were called out back towards where we

13  were.

14  Q.  And when you say hands-on, what do you mean by

15  that?

16  A.  As the subjects -- as the agent who was

17  addressing each of the subjects to come out of

18  their vehicle and basically walking them back

19  towards where we were, I was the one placing my

20  hands on them, handcuffing them, and placing them

21  in a secure location near our vehicles.

22  Q.  I want to direct your attention to Exhibit

23  63-C, as in Charlie, please.

24      I would ask you to look at this and tell us if

25  you can identify that.

1   A.   Yes.  That's the red Expedition I was involved
2   with stopping.
3   Q.   And in relation to the red Expedition, where
4   was your vehicle parked?
5   A.   Anywhere between 20 to 40 yards behind it.
6   Q.   And the other vehicle, the stopped vehicle,
7   was -- where was that positioned in relationship to
8   your vehicles and the Expedition?
9   A.   I'm sorry?  Repeat that again.
10  Q.   Yeah, the second vehicle you mentioned, was
11  there a Suburban involved?
12  A.   That was a little bit -- that was in front of
13  my vehicle, like I said, approximately anywhere
14  between 20 to 30 yards or feet, let's say, behind
15  it.
16  Q.   Okay.  In relationship to the vehicle, did the
17  vehicle pull over then?  When you moved to stop it,
18  did you use any lights on the vehicles?
19  A.   Yes.  The Suburban in front of us initiated
20  the stop with, you know, turning on the emergency
21  light equipment, along with myself in my vehicle.
22  The vehicle did pull over, and we pulled in behind
23  it.
24  Q.   And does this photograph accurately reflect
25  the vehicle that you were involved in stopping back

1  on March 2 of last year, up by Casa Grande/Eloy?

2  A.   Yes, sir.

3         MR. LACEY:  We'd offer 63-C, as in

4  Charlie, at this time.

5         MR. ARMSTRONG:  No objection.

6         MR. COOPER:  No objection.

7         MR. YOUNG:  No objection, Your Honor.

8         THE COURT:  It can be admitted, can be

9  published.

10  BY MR. LACEY:

11  Q.   In this vehicle, you said when you first

12  pulled up, you were behind the vehicle.  When you

13  came to do the hands-on arrest, where did you

14  position yourself?

15  A.   I was positioned myself behind -- the vehicle,

16  the initial vehicle in front of me who had the

17  emergency light equipment on, the door -- the

18  driver's door was open, and one of the agents was

19  pulling security.  I was right behind him.

20         As the first subject start walking backwards

21  towards us as he was instructed to do so, once he

22  got near within reach of where we were, I put

23  hands-on and placed him on the side of our vehicles

24  where they were secured.

25  Q.   Okay.  And after you put -- you put cuffs on,

1    I take it?

2    A.   Yes.

3    Q.   Behind the back?

4    A.   Yes.

5    Q.   And after you did that, where did you position

6    that person, the person that had been the driver

7    that you had taken out?

8    A.   There was just, I guess, on the driver's side

9    area of the second vehicle behind the first

10   vehicle, which was my vehicle, right behind, like I

11   said, that first vehicle.

12   Q.   Now, as you're on I-10, were you going towards

13   Phoenix, in that direction, or towards Tucson when

14   you were up in Eloy, Casa Grande?

15   A.   Yes, sir.  We were in the westbound lanes

16   towards Phoenix.

17   Q.   Westbound towards Phoenix?

18   A.   Yes.

19   Q.   Did you take any other photographs that day

20   during the course of this stop on the freeway?

21   A.   Yes.  After all the subjects who were taken

22   out of the vehicle were secured, I was assigned by

23   my TO to start taking pictures of the scene in

24   general, the vehicle, the subjects, and everything

25   that was going on in that area.

1  Q.  Now, after you took the driver out, as you've

2  told us, and placed him back by the vehicles,

3  behind the Expedition, who did you take out next?

4  Who was the next person out of the vehicle?

5  A.  The front passenger -- the front passenger was

6  called out next.

7  Q.  Okay.  And were you involved in that take-out

8  as well?

9  A.  Yes.

10  Q.  Hands-on, as you say?

11  A.  Yes.

12  Q.  And with that person, did you go through the

13  same process about moving that person?

14  A.  Yes.

15  Q.  Back -- back through in the general area of

16  where the first person, the driver, had gone?

17  A.  Yes, sir.

18  Q.  And how many other persons were in the

19  vehicle?

20  A.  Two others.

21  Q.  And they were in the back seat, obviously?

22  A.  Yes.

23  Q.  The same process?

24  A.  Yes.

25  Q.  I want to direct your attention to 63-A, as in

1   apple, and tell us -- look at that and see if you
2   can identify that.
3   A.   Yeah.  That's a picture I took of the plates
4   of the Expedition there.
5   Q.   Okay.
6           MR. LACEY:  We'd offer 63-A at this time.
7           MR. COOPER:  No objection.
8           MR. ARMSTRONG:  No objection.
9           MR. YOUNG:  No objection, Your Honor.
10          THE COURT:  It can be admitted, can be
11  published.
12  BY MR. LACEY:
13  Q.   AFA4844 was the license tag; is that correct?
14  A.   Correct.
15  Q.   We'd ask the witness be shown Exhibit 63-B, as
16  in boy.
17          Can you identify that for us?
18  A.   Yes.  That's the picture of the back of the
19  Expedition, while the back door was open.
20  Q.   And does that accurately depict the condition
21  of the Expedition as you saw it after you stopped
22  it on the I-10 freeway back on March 2nd?
23  A.   Yes.  After we made the scene clear, meaning
24  safe, doors were opened, and that's when I started
25  taking pictures.  That's how it looked.

1           MR. LACEY:  We'd offer 63-B at this time.

2           MR. ARMSTRONG:  No objection.

3           MR. YOUNG:  No objection, Your Honor.

4           MR. COOPER:  No objection, Judge.

5           THE COURT:  It can be admitted and

6    published.

7    BY MR. LACEY:

8    Q.   Now, I noticed in the back -- in the center of

9    the photograph but in the back of the vehicle is a

10   cooler, is that correct, an ice chest?

11   A.   Yes.

12   Q.   And was that back there then?

13   A.   Yes.

14   Q.   We'd ask you to look at Exhibit 63-D, as in

15   dog, please.

16        Can you identify this for us?

17   A.   That was a picture of the back seat.

18   Q.   Of the Expedition?

19   A.   Correct.

20   Q.   Can you tell if it's the driver's back seat or

21   passenger side back seat, or can you tell from this

22   photograph?

23   A.   If I recall correctly, I believe it was the

24   driver's side back seat.

25           MR. LACEY:  We'd offer 63-D at this time.

1    MR. ARMSTRONG:  No objection.

2    MR. COOPER:  No objection.

3    MR. YOUNG:  No objection, Your Honor.

4    THE COURT:  It can be admitted, can be

5 published.

6 BY MR. LACEY:

7 Q.   And so as we look at the photograph here, in

8 the center part of it, the top part, is that the

9 back seat, the back of the front seat that you can

10 see there?

11 A.   Yeah.  That's the bottom of the back seat of

12 the back area of the Expedition.

13 Q.   And this light green -- it looks like a piece

14 of clothing or whatever you want to call it -- had

15 some strings or straps through it; is that correct?

16 A.   Correct.

17 Q.   We'd offer -- we'd ask that the witness be

18 shown Exhibit 63-E as in Edward.

19    Can you identify that for us?

20 A.   Yes.  That's the picture of the -- that black

21 Tahoe that was my vehicle, and the subjects that

22 were taken out are being identified by those agents

23 right there that were -- that are shown there.

24    MR. LACEY:  And we'd offer 63-E at this

25 time.

1    MR. COOPER:  No objection.

2    MR. ARMSTRONG:  No objection.

3    MR. YOUNG:  No objection.

4    THE COURT:  It can be admitted, can be

5  published.

6  BY MR. LACEY:

7  Q.  And sir, just now that jury has been able to

8  look at the photograph, we see a lot of law

9  enforcement cars in this photograph, do we not,

10  alongside of the road, police cars?

11    Do you see police cars in this picture?

12  A.  Yes, sir.

13  Q.  And the black vehicle in the front of the

14  picture to the left, what vehicle is that?

15  A.  That was my vehicle.

16  Q.  Okay.  And the Expedition that we looked at

17  that you stopped, where was that positioned in

18  relationship to your vehicle then?

19  A.  Several feet in front of that vehicle.  In

20  front of that Tahoe was another Suburban that

21  initiated the stop, and then right in front of that

22  was the Expedition.

23  Q.  Now, I'm looking in this photograph.  Off

24  behind the second law enforcement car there, there

25  appears to be a red-topped truck.

1       Was traffic stopped at this point in time?

2  A.   I believe so.  There was a lot of things going

3  on that day, and if I remember correctly, traffic

4  was stopped for a while.  I don't remember how

5  long, but there was traffic stopped.

6  Q.   We'd ask the witness be shown Exhibit 63-F, as

7  in Frank, please.

8       Can you identify this for us?

9            MR. COOPER:  Judge, can we approach?

10           THE COURT:  Sure.

11           (The following proceedings occurred at the

12           bench.)

13           MR. COOPER:  What's the relevance of

14  showing the jury these guys in handcuffs sitting on

15  the side of the road with cops standing over them?

16           MR. LACEY:  The relevance is

17  identification as far as who's wearing what

18  clothes.  There is an issue about photographs from

19  Circle Ks and other things.  We'll identify who is

20  wearing what clothing.

21           MR. YOUNG:  I have better shots of them in

22  custody.

23           MR. COOPER:  There are pictures of them,

24  what they're wearing, without them in handcuffs

25  like that.

1          THE COURT:  Do you have better pictures?
2   Let's take a look at them.
3          MR. LACEY:  We have other pictures.
4          THE COURT:  Bring them and we'll take a
5   look at them.
6          MR. LACEY:  Just for the sake of time,
7   we'll not push it.  I'll just back this one out.
8          THE COURT:  Okay.
9          (End of bench conference.)
10  BY MR. LACEY:
11  Q.  We'd ask also the witness be shown 63-G, as in
12  George, please.
13      Can you identify that for us?
14  A.  Yes.  That was a red Expedition we were
15  involved in stopping.
16  Q.  The same one we've been talking about?
17  A.  Yes.
18          MR. LACEY:  We'd offer 63-G at this time.
19          MR. COOPER:  No objection.
20          MR. ARMSTRONG:  No objection.
21          MR. YOUNG:  No objection, Your Honor.
22          THE COURT:  It can be admitted, can be
23  published.
24  BY MR. LACEY:
25  Q.  The vehicle that we see here, what part of the

freeway was this vehicle stopped on?  Was it in the

center median, or was it off to the right side?

    Do you recall offhand?

A.  It was the center median.

Q.  And the vehicle doors, obviously nobody is in

the vehicle at this time.  Was this after the

people were taken out of the vehicle?

A.  Yes.  Once all four subjects were taken out of

the vehicle, we make sure no one else was in the

vehicle, and we -- it was clear.

Q.  We'd ask the witness be shown Exhibit 63-H, as

in Henry.

    We'd ask if you can identify that for us.

A.  That's the driver's seat, passenger seat, in

front of, you know, the red Expedition.

        MR. LACEY:  We'd offer 63-H at this time.

        MR. COOPER:  No objection, Judge.

        MR. ARMSTRONG:  No objection.

        MR. YOUNG:  No objection, Your Honor.

        THE COURT:  It'll be admitted.  It can be

published.

BY MR. LACEY:

Q.  So this is the front part of the red

Expedition; is that correct?

A.  Correct.

1   Q.   And there is a cell phone on the seat there;

2   is that correct?

3   A.   Yes, correct.

4   Q.   Was that phone there when you first saw the

5   vehicle or somebody else placed that there or do

6   you know?

7   A.   We -- as far as when we cleared the vehicle,

8   we didn't put hands-on the vehicle, as far as we

9   didn't search anything.  We just make sure there

10  was no bodies in it, and we were going to turn over

11  everything to FBI so they can search.

12  Q.   Okay.  And next 63-I, we'd ask the witness be

13  shown that, please.

14       Can you identify this for us?

15  A.   Yes.  That's the black Escalade that was also

16  stopped by other agents.

17  Q.   And where was that vehicle positioned in

18  relationship to the red Expedition and your

19  vehicle?

20  A.   That was a ways back from where we were, not

21  too far.  Within, I mean, if you see in one of the

22  pictures you showed earlier, you can kind of tell

23  where they were situated at.

24            MR. LACEY:  We'd offer 63-I at this time.

25            MR. COOPER:  No objection.

1        MR. ARMSTRONG:  No objection.

2        MR. YOUNG:  No objection, Your Honor.

3        THE COURT:  It can be admitted, can be

4   published.

5   BY MR. LACEY:

6   Q.   And in this 63-I, the people that were in

7   there, the passenger and driver, were already taken

8   out of there?

9   A.   Yes.  At that time the scene was already

10  considered safe, and special agents were doing what

11  they were doing, and I was just taking pictures of

12  the scene in general.

13  Q.   Okay.  63-J, we'd ask the witness be shown

14  that.

15        Can you identify this for us?

16  A.   That's a picture of the rear side of the black

17  Escalade or Cadillac.

18        MR. LACEY:  We'd offer 63-J at this time.

19        MR. COOPER:  Can we approach Your Honor?

20        (The following proceedings occurred at the

21        bench.)

22        MR. COOPER:  My objection is, this is not

23  how the guns were found.  This is after they've

24  been unloaded and put out there for viewing on the

25  tailgate, so I don't think it's relevant, and I

1  think where they're found is relevant, but this

2  photo is not relevant.

3          MR. LACEY:  We'll have other testimony.

4  This is just simply weapons that were found in the

5  vehicle.  We can clarify it through this witness,

6  if he can, that he didn't know where they were

7  found, that they were placed there for

8  photographing.

9          THE COURT:  Okay.  Objection is overruled.

10         (End of bench conference.)

11         THE COURT:  The objection is overruled.

12  It can be admitted, can be published.

13  BY MR. LACEY:

14  Q.  Sir, who took this photograph?

15  A.  I did, sir.

16  Q.  Okay.  And at the time this photograph was

17  taken, were these weapons that we see in the

18  photograph moved from someplace inside the vehicle

19  and put on the tailgate?

20  A.  I believe so, yes.

21  Q.  Are you familiar with weapons?

22  A.  Somewhat.

23  Q.  Can you tell us what type these two are?

24  A.  Well, both are -- one's an AK high-powered

25  weapon, and the other is like --

1    Q.   The other is what?

2    A.   One is an AK-47 type of weapon.  The other one

3    looks like it's an AR-15, M-4, M-16 type of weapon.

4    Q.   We'd ask the witness be shown 63-K for

5    identification.

6         Can you identify this for us?

7    A.   That's a picture of the same thing, in the

8    rear.  That's two -- I see two magazines with

9    rounds, ammunition in them, and there is the --

10   another AR-15 or the same.

11        As far as that picture goes, like, agents were

12   putting stuff there, and I was just taking

13   pictures --

14   Q.   For you to photograph.

15             MR. LACEY:  We'd offer 63-K at this time.

16             MR. COOPER:  No objection, Judge.

17             MR. ARMSTRONG:  Nothing.

18             MR. YOUNG:  No objection, Your Honor.

19             THE COURT:  It can be admitted, can be

20   published.

21   BY MR. LACEY:

22   Q.   And sir, you mentioned magazines.  We see in

23   the center of the photograph a weapon going across

24   the screen; is that correct?

25   A.   Yes.

1  Q.  And the two magazines there, are you familiar

2  with magazines and these in particular as to what

3  kind of weapon they would go with?

4  A.  They're similar to like the weapons we carry.

5  For example, like an M-4, the big magazine there

6  looks like a 30-round magazine.

7  Q.  Slow down a little bit.

8  A.  Okay.

9  Q.  Okay.  Go ahead.  So the bigger one is for

10 what now?

11 A.  The bigger magazine appears to be a possibly

12 30-round type magazine.

13 Q.  Did you say 30 what?

14 A.  30 rounds.

15         THE COURT:  30.

16         THE WITNESS:  30.

17 BY MR. LACEY:

18 Q.  I can't hear.

19 A.  I apologize.

20 Q.  And the other one, the smaller magazine, can

21 you tell from that picture how many bullets would

22 be able to be put in that?

23 A.  That appears to be a 20-round, two-zero,

24 magazine.

25 Q.  We'd next show the witness Exhibit 63-L.

1    Can you identify this for us?

2  A.   It's the same area.  I guess another weapon

3  was being placed there.

4  Q.   And this is in the same black Escalade; is

5  that correct?

6  A.   Correct.

7       MR. LACEY:  We'd offer 63-L at this time.

8       MR. COOPER:  No objection.

9       MR. ARMSTRONG:  No objection.

10      MR. YOUNG:  No objection, Your Honor.

11      THE COURT:  It can be admitted, can be

12  published.

13  BY MR. LACEY:

14  Q.   Now, sir, the weapons we see here, how many

15  rifles can you see here, the AKs, or can you

16  describe them for us?  Are there two or three?  How

17  many are in this photograph?

18  A.   There appear to be three rifle-type weapons.

19  Q.   In addition to the weapons, there are some

20  things that appear off to the left.

21       Can you tell what they are?  Are they articles

22  of clothing, or can you tell?

23  A.   I can't.

24  Q.   If you can't tell, don't worry about it.

25  A.   I can't tell.

1  Q.  Sir, after the Expedition was stopped by

2  yourself and other members of your BORTAC team and

3  you took these photographs, what other involvement

4  did you have after this?

5  A.  After --

6  Q.  If any.

7  A.  After that we went back to the station and

8  started writing our reports.

9  Q.  Okay.  In your report, did you identify which

10  persons were positioned where inside the red

11  Expedition?

12  A.  Yes.

13  Q.  And do you have a copy of your report in front

14  of you?

15  A.  Yes.

16  Q.  Did there come a time -- well, first off, did

17  there come a time when you were -- when you

18  prepared the report, did you place in your report

19  the persons as you believed that they were

20  positioned inside the car?

21  A.  Yes.

22  Q.  Did you later make any amendments or changes

23  to your report as to who was positioned where

24  within the car?

25  A.  Yes.  Two months later, I made an amendment as

1    to where an individual was situated as far as

2    placement in the vehicle.

3    Q.   Who did you have in your original report

4    positioned where within the vehicle?

5    A.   Initially, I had Ardawwn Bryant as being the

6    front passenger.

7    Q.   Ardawwn Bryant?

8    A.   Correct.

9    Q.   Okay.  And the driver?

10   A.   And driver as a Jerome Ranger.

11   Q.   How is it spelled?

12   A.   J-e-r-o-m-e, first name, Jerome.

13   Q.   And who did you have in the back of the

14   vehicle in your original report?

15   A.   In the original report, Tucker, Jerome; and I

16   can't really pronounce the second name, Damond

17   Reagan.

18   Q.   How do you spell the last name?

19   A.   R-e-a-g-a-n.

20   Q.   Now, you mentioned you made some changes to

21   your report.  What did you change at that point and

22   why did you make those changes?

23   A.   It was brought to my attention by Special

24   Agent Jon Edwards there might possibly be a mixup

25   with the individuals as far as to their seating

1  arrangements.

2  Q.   After he said that to you, what did you do to

3  determine whether or not your original report was

4  accurate?

5  A.   I went back and looked at pictures and

6  realized that I did, in fact, make a mistake as far

7  as writing the wrong name as far as who was sitting

8  on the front passenger seat.

9  Q.   And what picture -- what pictures did you go

10  back to to make that determination?

11  A.   The pictures you were showing.

12  Q.   The one that I pulled away later --

13  A.   Yes.

14  Q.   -- that we didn't publish?  And tell us how

15  you positioned the people after they were taken

16  from the vehicle that would have assisted you later

17  in determining who was positioned where within the

18  vehicle?

19  A.   If I remember correctly, as the driver was

20  taken out and he walked back towards us and I put

21  hands-on, he was placed inside, as you saw in the

22  picture, and the front passenger was placed right

23  next to him, left side, next to him, and so forth

24  with the next individuals as they were coming out.

25       And when we were writing our report, I didn't

1  look at any pictures.  It was just based on names

2  that we had written down, and I kind of got the

3  names mixed up.

4         MR. LACEY:  Okay.  I have no further

5  questions.

6         THE COURT:  Mr. Cooper?

7         MR. COOPER:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9  BY MR. COOPER:

10  Q.  Good morning.

11  A.  Good morning.  How are you doing, sir?

12  Q.  Thank you.  I'm fine.  I just have a few

13  questions for you.

14      The stop of the two vehicles was at milepost

15  194?

16  A.  The stop of the red Ford Expedition happened

17  around mile marker 195.

18  Q.  195.  Okay.  Was the other one at 194?

19  A.  That was a few, like, it was -- I can't really

20  tell you what the distance was, but it wasn't too

21  far back from where we were.

22  Q.  And are you stationed in Tucson?

23  A.  No, in El Paso.

24  Q.  In El Paso.  Do you know how far, for

25  instance, 194 is from the heart of Tucson,

1 downtown?

2 A. (Shaking head.)

3 Q. Don't know that?

4 A. No.

5 Q. Okay. There's a stamp on the photographs that

6 indicates what time the photographs were taken; is

7 that correct?

8 A. Yes.

9 Q. Okay. After the stop, how much time elapsed

10 before you started taking photos? Do you

11 remember?

12 A. It was in -- not a lot of time passed by once

13 the subjects were secured and they were placed in

14 the vehicle to be transported. During the time

15 they were secured, I was already taking pictures.

16 Q. So within 10 minutes?

17 A. Approximately.

18         MR. COOPER: Okay that's all I have.

19 Thank you.

20                 CROSS-EXAMINATION

21 BY MR. ARMSTRONG:

22 Q. Good morning.

23 A. Good morning, sir.

24 Q. I just have a few questions for you too.

25         Do you know whether the location where the

1   vehicles were stopped, the Ford and the Cadillac,

2   was it north or south of the I-8 interchange, if

3   you know where the I-8 interchange is?

4   A.   I don't recall, sir.  I'm somewhat familiar,

5   but not to where I can tell you exactly.

6   Q.   Do you know where the town of Casa Grande is.

7   On the -- here in central Arizona?

8   A.   I've been there.

9   Q.   Okay.  Did you see Casa Grande that day when

10  you pulled these two cars over?  Were you in the

11  Casa Grande area?

12  A.   We were in that area, yes.

13  Q.   Okay.  Were you north or south of Casa Grande,

14  if you know?

15  A.   I apologize.

16          THE COURT:  North.

17          MR. ARMSTRONG:  You say north?

18          THE COURT:  It's actually west, but north.

19          MR. ARMSTRONG:  Yeah, that east/west thing

20  is very confusing.

21  BY MR. ARMSTRONG:

22  Q.   Let me ask you this.  There is a Dairy Queen

23  in Casa Grande.

24          THE COURT:  That's right on the Florence

25  road, milepost 194.

1  BY MR. ARMSTRONG:

2  Q.  We all know where that's at.  Maybe you don't

3  because you're not from here.  I'll move on.

4      You were involved in pulling over the red

5  vehicle, the red Ford Expedition?

6  A.  Correct.

7  Q.  And that happened without incident, didn't

8  it?  I mean, there was no -- the vehicle didn't run

9  from you or try to elude you?

10  A.  Correct.

11  Q.  Just pulled over into the middle of the road?

12  A.  Correct.

13  Q.  And at that time there was construction going

14  on, wasn't there?

15  A.  I believe so, yes.

16  Q.  Did you see -- and you were not involved in

17  pulling over the black pickup truck, were you?

18  A.  No.

19  Q.  Did you have a conversation with anyone inside

20  the black pickup truck?

21  A.  No.

22          MR. ARMSTRONG:  Thank you.  I have nothing

23  further.

24                  CROSS-EXAMINATION

25  BY MR. YOUNG:

1    Q.   Sir, you showed us photographs of three

2    different rifles?

3    A.   Yes.

4    Q.   And if I count correctly, we also saw three

5    different rifle magazines?

6    A.   Yes.

7    Q.   And there was a 30-round ..223 magazine?

8    A.   That's what it looked like.

9    Q.   There was another that looked like a 20-round

10   ..223 magazine as well?

11   A.   Correct.

12   Q.   And in the AK-47 variant, there was what

13   appeared to be a 30-round 7.62x39 AK-47 magazine?

14   A.   From looking at it, that's what it appears to

15   be.

16   Q.   It appears to be a 30-round magazine; right?

17   A.   Correct.

18   Q.   And those were the three magazines that were

19   associated with those three rifles?

20   A.   I believe so.

21   Q.   Okay.  And those three rifles, they were found

22   in the black Escalade?

23   A.   Correct.

24          MR. YOUNG:  That's all I have, Your Honor.

25          MR. LACEY:  No further questions.

1          THE COURT:  If the jurors have any

2   questions, please place them in writing.  There is

3   at least one.

4          (The following proceedings occurred at the

5          bench.)

6          THE COURT:  "The place they were stopped

7   is about 60, 65 miles from the center of Tucson."

8          "AK-47, AR-15s, are these civilian

9   versions?"

10          I don't know if he checked them for that.

11          MR. LACEY:  I don't know either.

12          MR. COOPER:  What?

13          THE COURT:  "Are they civilian versions?"

14          "Are they semiautomatic, or are they

15   altered to full automatic?"

16          "Were there any rounds in the rifles?"

17          Does he know the answer to those

18   questions.

19          MR. LACEY:  I don't know that he would,

20   but I don't know.

21          MR. YOUNG:  Somebody would.

22          MS. HOPKINS:  He might know the last one.

23          MR. LACEY:  We have other witnesses

24   coming, but whether he knows, I don't know.  I

25   guess we can ask him.

1          THE COURT:  Do you want me to ask him?
2  I'll ask him.

3          MR. COOPER:  Which part?

4          THE COURT:  First I'll ask if these are
5  civilian versions of the AK-47 and AR-15, and if he
6  doesn't know, I won't ask him anything else.

7          MR. COOPER:  Okay.

8          (End of bench conference.)

9          THE COURT:  Sir, I have a couple of
10  questions from the jurors.

11          The AK-47 and AR15s, were these civilian
12  versions of the weapons?

13          THE WITNESS:  I don't know.  I didn't put
14  hands-on or look at them, but as far as AK-47s,
15  from what I'm aware of, I don't think those are
16  civilian.

17          THE COURT:  All right.

18          THE WITNESS:  I don't know, sir.

19          THE COURT:  You didn't test them to see or
20  check them?

21          THE WITNESS:  Correct.

22          THE COURT:  Didn't check to see if they
23  were loaded or not loaded?

24          THE WITNESS:  I didn't put hands-on.

25          THE COURT:  All right.  Any further

1  questions based upon the jurors' questions?

2        MR. LACEY:  No, Your Honor.

3        MR. COOPER:  No.

4        MR. ARMSTRONG:  May I just follow up with

5  something?

6                FURTHER EXAMINATION

7  BY MR. ARMSTRONG:

8  Q.  Agent, you did not locate those weapons within

9  the vehicle did you?

10 A.  Correct.

11 Q.  You were just a photographer?

12 A.  I was taking pictures, correct.

13        MR. ARMSTRONG:  Thank you.

14        THE COURT:  You're free to go.

15        THE WITNESS:  Thank you.

16          JONATHAN OMAN, WITNESS, SWORN

17        THE CLERK:  Thank you.  Please take a

18 seat.

19        THE COURT:  Sir, the Rule has been invoked

20 in this case.  That means, except during the time

21 that you're testifying, you must remain outside the

22 courtroom, and you are only allowed to discuss your

23 testimony with the attorneys involved in the case.

24        THE WITNESS:  Yes, sir.

25        THE CLERK:  Please state your name for the

1  record and spell your last name.

2        THE WITNESS:  It's Jonathan Oman, and

3  that's spelled O-m-a-n.

4        THE CLERK:  Thank you.

5        THE COURT:  You may proceed.

6        MR. LACEY:  Thanks.

7                    DIRECT EXAMINATION

8  BY MR. LACEY:

9  Q.   Who are you employed by, sir?

10  A.   U.S. Border Patrol.

11  Q.   In what capacity?

12  A.   I'm with the tactical unit, BORTAC, out of San

13  Diego.

14  Q.   And your training or law enforcement training

15  or military training prior to going -- you've been

16  with border patrol for how long now, BP for how

17  long?

18  A.   It would be 10 years.

19  Q.   And prior to that?

20  A.   I was seven years Marine Corps.

21  Q.   I want to direct your attention back to March

22  2nd of last year.

23        Were you involved in some stopping of vehicles

24  on I-10 back on March 2?

25  A.   Yes, sir.

1    Q.   And what vehicle or vehicles were you involved

2    with personally as far as the stop was concerned?

3    A.   It would have been the black Escalade.

4    Q.   And were you the one immediately pulling

5    behind the vehicle to stop it, or was that some

6    other vehicle?

7    A.   No, it was the vehicle that I was in.

8    Q.   Were you by yourself or with others?

9    A.   No, I was with two other agents.

10   Q.   And did the vehicle pull over then, when you

11   put on your lights?

12   A.   Correct.

13   Q.   What happened then?

14   A.   At that point, yeah, they immediately yielded

15   into the median of the highway.  Based on what we

16   received, they were --

17   Q.   Without going into what you received, what did

18   you do?

19   A.   We conducted a vehicle assault on that

20   vehicle.

21   Q.   What does that mean?

22   A.   That is a tactic we use if they're armed and

23   dangerous subjects, and if employed properly, the

24   way we train, it will mitigate any chance of

25   individuals using weapons against us.

1  Q.  And what process do you go through in order to
2  make that happen, to keep things safe?
3  A.  Well, we -- it requires a rather aggressive
4  posture.  We pulled up next to the vehicle.  The
5  agent in the back, Agent Jimenez, he had -- we
6  pulled up parallel along with the vehicle,
7  instructed Agent Jimenez in the back cab of our
8  vehicle to keep a weapon raised at all the
9  individuals, all the subjects in the rear row of
10  the Escalade.  And then I had a weapon on the
11  subjects in the front, the driver and the front
12  passenger.
13  Q.  And what did you ask or did you ask the
14  passengers or the persons inside the vehicle to do
15  when you were making this approach?
16  A.  At that point, we instructed them to get their
17  hands up on the roof of the vehicle so we could
18  clearly see their hands and you keep them up
19  there.  They all complied.
20  Q.  After that, what happened next?
21  A.  At that point, I instructed Agent Hernandez,
22  who was driving, to maintain a weapon on the front
23  two individuals, the driver and the passenger.  I
24  got out of the vehicle, walked around the passenger
25  side of my vehicle, got in the front of their

1 vehicle.

2      I kept a weapon on the driver.  I instructed

3 them to keep their hands up on the roof.  They all

4 complied.  And then I instructed Agents Jimenez and

5 Hernandez to get out and start one by one taking

6 subjects out of the vehicle in a contact cover

7 posture, meaning as each individual comes out of

8 the vehicle, one agent is assigned cover while the

9 other agent goes empty hands, hands-on, to search

10 and secure the subject, and we did that one by one.

11 Q.   Were you involved in that process at all?

12 A.   No.  I held -- while they were dealing with

13 one passenger at a time, I was -- my focus was on

14 mainly the driver, but I was basically responsible

15 for everybody else in that vehicle.

16 Q.   Who was in charge of your particular unit that

17 was taking on this vehicle on the side of the road,

18 on I-10?

19 A.   It would have been me.

20 Q.   And you mentioned the driver.  Did you have

21 any involvement in getting the driver out of the

22 vehicle or doing anything by way of a patdown

23 afterwards?

24 A.   Yes.  Once those two agents had all the

25 subjects in the rear seat out and searched and

1   secured and then the passenger, I came around and I

2   had, I don't remember which one, what agent covered

3   for me while I went hands-on the driver as he

4   exited the vehicle, did a brief search of his

5   person before securing him.

6   Q.   And when you say you did a search of his

7   person, was that a patdown?

8   A.   Yes, it was.  It was.  And due to -- he had

9   some baggy clothes on, so you check the cuffs of

10  the pants, and I -- and that's when I noticed he

11  had what appeared to me an impaired -- a physically

12  impaired right leg.

13  Q.   What do you mean by that?

14  A.   Well, it just -- it was --

15          MR. ARMSTRONG:  Objection.  Relevance.

16          THE COURT:  Overruled.

17  A.   It just -- it seemed, compared to the left

18  leg, it was much thinner, I guess.  It just struck

19  me as physically impaired.

20  Q.   Okay.  After you did this patdown, did you

21  inspect the vehicle at all for its contents?

22  A.   We did a brief search of the vehicle.  We

23  weren't going to start digging into the vehicle.  I

24  was going to leave that for the investigators

25  arriving on scene.  I already saw two weapons plain

1  sight.

2  Q.  Do you recall what weapons those were that you

3  saw in plain sight?

4  A.  Yes, it was -- it appeared to me one was an

5  M-16, and the other one, in the report I described

6  it as a Kel-Tec-type long rifle, but I was unsure

7  of the make.  And there was one full magazine of

8  .223 ammunition.

9  Q.  Of what kind?

10  A.  .223 or .556, same thing.

11  Q.  And that would fit which particular weapon?

12  A.  It would definitely fit that M-16.  The other

13  one I'm not sure.

14  Q.  How many people total were in the vehicle?

15  A.  Five.

16  Q.  Two in the front, three in the back?

17  A.  Correct.

18  Q.  Did you prepare any report about how the

19  persons were dressed that were in the vehicle, how

20  they were clothed?

21  A.  Yes.  Yes, I have it in the report here.

22  Q.  And do you have that in front of you --

23  A.  Yes, I do.

24  Q.  -- if you need to refresh your recollection?

25      Okay.  The driver, how was he dressed, other

1  than the baggy pants you told us about?

2  A.   Right.  One moment.  Sorry.

3      I have here the driver wore a white T-shirt,

4  and upon a brief search appeared to have a

5  physically impaired right leg.  So white T-shirt

6  was all I had.  I didn't describe the pants.

7  Q.   And the front passenger of this black

8  Escalade?

9  A.   Front passenger seat wore a black T-shirt and

10  had tattoos on his neck.

11  Q.   And the rear seat, starting from left to

12  right, if you had it broken down that way?

13  A.   Right.

14  Q.   And maybe behind the -- behind the driver's

15  side first, and then working across, if you have it

16  that way.

17  A.   I think I described them as they were coming

18  out of the vehicle, which would have been on the

19  passenger side.

20      I first instructed the right rear passenger to

21  exit the vehicle.  This subject was wearing gray

22  sweatpants and a white T-shirt.  Second subject

23  wearing all black, had dreadlocks.  Third subject

24  in the left rear passenger, so behind the driver,

25  was wearing a white tank top.

1  Q.  Did you take down any personal information
2  about these persons, their names or any of that
3  kind of detail?
4  A.  No, sir.  With this situation, my concern was
5  just to secure the scene, make a safe scene for
6  investigators.
7      After determining that we had the right
8  vehicle with the license plate, I didn't
9  investigate further on identifications.
10  Q.  So at this point in time, you're not able to
11  give us the names of the persons that were in the
12  vehicle?  Is that --
13  A.  No, sir.
14  Q.  Did you view any photographs of the persons
15  that were inside the vehicle?
16  A.  Yes.
17  Q.  After they had been taken out?
18  A.  Yes.
19  Q.  And just for the record, 65-H -- and for
20  identification purposes only, I'm not going to
21  offer this into evidence at this time, but for
22  identification, 65-H, can you identify the two
23  persons that are depicted here, were they two of
24  the people that were inside of the Escalade that
25  you had stopped?

1  A.   Right.   Unfortunately my memory is hazy on the

2  faces, on most of the faces.   However, the one in

3  the back there wearing black with the locks on the

4  back, I do recognize him.   I remember he sat in the

5  middle.   He was the rear middle passenger.

6  Q.   Okay.   And next --

7          MR. ARMSTRONG:   Your Honor, may we

8  approach?

9          (The following proceedings occurred at the

10          bench.)

11          MR. ARMSTRONG:   Okay.   That photograph is

12  plainly visible to the jury.

13          THE COURT:   I'm sorry?

14          MR. ARMSTRONG:   The jurors can all see

15  that photograph from the witness' monitor.

16          THE COURT:   They can't see that well.

17          MR. ARMSTRONG:   The folks on the end are

18  looking over at it.

19          MR. LACEY:   I don't know.   I'm not going

20  to put this in evidence at this time, but I want

21  them to establish --

22          MR. ARMSTRONG:   But it's visible to some

23  of the jurors.

24          MR. LACEY:   I'm not concerned about --

25          THE COURT:   Whoa, whoa, whoa, whoa, whoa.

1    MR. LACEY:  I'm sorry.

2    THE COURT:  How about you guys agree who

3  was where and be done with it?

4    MR. LACEY:  Okay.

5    THE COURT:  Think about it.

6    MR. ARMSTRONG:  Okay.  We can talk about

7  that later.

8    THE COURT:  Let's go ahead and --

9    MR. ARMSTRONG:  I imagine we probably

10  will.

11    MR. YOUNG:  I think Mr. Armstrong's point

12  is the witness' monitor was facing the jury.

13    THE COURT:  I got it.  So rather than have

14  that problem, let's just agree who is where and be

15  done with it.  All right?  Think about it.  Let me

16  know.

17    We'll take our lunch break.

18    MR. LACEY:  All right.

19    MR. YOUNG:  We already have photos --

20    THE COURT:  We're going to take our lunch

21  break.  We're going to take our lunch break.  You

22  guys decide.

23    MR. ARMSTRONG:  What are you having?

24    THE COURT:  Peanut butter and jelly and

25  potato chips.

1        MR. ARMSTRONG:  Plain?

2        THE COURT:  Yes.

3        (End of bench conference.)

4        THE COURT:  I know it's time to take a

5   break when the attorneys ask me what I'm having for

6   lunch, so we're going to take our lunch break.

7        We'll start back at 1:30.  1:30.  Remember

8   the admonitions I've given you before.

9        THE WITNESS:  Yes, sir.

10       (The jury exits the courtroom.)

11       (Off the record.)

12       THE COURT:  Show the absence of the jury,

13  the presence of all counsel and the defendants.

14       At sidebar counsel objected to possibly

15  one of the jurors being able to see the photograph

16  from where they're sitting, so let's find out.

17       Can you put a photograph back up on there?

18       THE COURT:  I can see it.

19       MR. LACEY:  You can or cannot?

20       THE COURT:  I can.  I still can.  At least

21  from this seat I can.  If I turn it this way, you

22  can't see it.

23       Now, I suggested to counsel, since there

24  is a desire not to show the defendants in the cage

25  or handcuffed on the side of the road that they

1    might want to discuss stipulating who was where and

2    be done with it.

3              Let me know at 1:30.  Okay?

4              (Off the record.)

5              (The jury enters the courtroom.)

6              THE COURT:  Show the jurors returning to

7    the courtroom, the presence of all counsel and the

8    defendants.

9              You may continue.

10             MR. LACEY:  Thanks, Your Honor.

11             And Your Honor, for the record, I talked

12   to counsel.  As far as the Cadillac Escalade, we're

13   going to stipulate as to who was positioned where

14   in the vehicle.

15             THE COURT:  All right.

16             MR. ARMSTRONG:  I don't agree.

17             MR. LACEY:  I'm sorry.  The Expedition.

18   Sorry.

19             THE COURT:  The Expedition.

20             MR. LACEY:  Yes, Judge.

21             THE COURT:  Go ahead.

22             MR. LACEY:  Okay.  The driver of the red

23   Ford Expedition was Jerome Ranger.  He wouldn't --

24   the witness wouldn't know this.  This is just a

25   stipulation between parties.

1          The right passenger was Ghermon Tucker,

2     and we have two other -- we won't go into the -- we

3     have Ardawwn Bryant in the rear seat of the

4     vehicle, and Damond Reagan was also in the rear

5     seat of the red Ford Expedition.

6          THE COURT:  A stipulation means that the

7     lawyers agree that that's a proven fact that need

8     not produce any further evidence about that.

9     You're to take it as a proven fact.

10          Go ahead, Mr. Lacey.

11          MR. LACEY:  Thanks, Your Honor.

12     BY MR. LACEY:

13     Q.   Sir, after you secured the people and made the

14     observations you told us about this morning, did

15     have you any further involvement in this particular

16     matter?

17     A.   Yes, sir.

18     Q.   After the stop on the highway?

19     A.   Yes, sir.  We transported those individuals,

20     only the passengers and driver in the Escalade, in

21     our border patrol service vehicle to Casa Grande

22     station.

23     Q.   And at that time they were turned over to

24     whom?

25     A.   I believe it was FBI.

1  Q.  Okay.  Was that then the end of your

2  involvement in this matter?

3  A.  Yes, sir.

4      MR. LACEY:  No further questions.

5              CROSS-EXAMINATION

6  BY MR. COOPER:

7  Q.  Good afternoon.  I just have a couple

8  questions for you.

9      You were -- you're stationed in San Diego?

10  That's your main place?

11  A.  Yes, sir.

12  Q.  But you were in the Tucson area working on

13  March 2nd of 2011.  Is that fair to say?

14  A.  Yes, sir.

15  Q.  Okay.  And your entire team?

16  A.  No.  We had detachments of agents from all

17  over the southern border working in Tucson at that

18  time.

19  Q.  Okay.  And you had been here for a while, but

20  are you part of -- is the BORTAC sort of like a

21  SWAT team?

22  A.  Yeah, that's about the closest description,

23  yes, sir.

24  Q.  Okay.  And how many members on the BORTAC

25  team?

1    A.   Nationwide, it's around -- it's around 150,

2    150 agents.

3    Q.   And the team that you're on has how many

4    agents?

5    A.   In San Diego we're at about 21 agents.

6    Q.   And were all of them here in Tucson?

7    A.   No, sir.

8    Q.   Okay.  So there were BORTAC agents from all

9    over here in Tucson at the time?

10   A.   Yes, sir.

11   Q.   Okay.  And you learned that you were going to

12   assist the FBI on March 2nd sometime after three

13   o'clock in the afternoon; is that fair?

14   A.   Pretty close to four p.m., yes.

15   Q.   Close to four.  And I think the actual stop

16   was made around 4:15, 4:13 p.m.

17   A.   That sound -- sounds correct, yes, sir.

18   Q.   So you were in action within 15, 20 minutes of

19   when you learned that you were going to be in

20   action?

21   A.   Yes.  It happened pretty quickly.  Yes, sir.

22        MR. COOPER:  That's all that I have.

23   Thank you.

24        THE COURT:  Mr. Armstrong?

25        MR. ARMSTRONG:  Thank you, Your Honor.

1      CROSS-EXAMINATION

2    BY MR. ARMSTRONG:

3    Q.   Can you -- good afternoon?

4    A.   Good afternoon, sir.

5    Q.   Can you tell me the time of day that you

6    pulled over the Cadillac off of -- off of the

7    interstate?

8    A.   It was probably very shortly after four p.m.

9    Q.   Do you have any way of knowing a more precise

10   time?  Did you write a report?

11   A.   The report here, the most precise time I have

12   here, sir, is at 3:48 p.m., one of the agents, a

13   BORTAC agent from Tucson sector --

14   Q.   I'm going to stop you there.  That's not the

15   time you pulled over the vehicle.

16   A.   No, it isn't, and so -- that's the only time

17   that I have in this report, okay, and as memory

18   serves, it happened very shortly after that, so I'm

19   sorry.  I do not have an actual time of the

20   pullover.

21   Q.   Do you know the mile marker or the location

22   here in -- on that interstate where they were

23   pulled over, where that vehicle was pulled?

24   A.   I-10 westbound around mile marker 200.

25   Q.   Around 200?  All right.

1   A.   Near -- yeah.

2   Q.   Was that north or south of Casa Grande, if you

3   know?

4   A.   If memory serves, I think it was still south

5   of Casa Grande, I believe.

6   Q.   Was it north --

7   A.   Unfortunately, I'm sorry, I don't know the

8   area that well, but as I recall, I thought it was

9   before you started hitting those Casa Grande exits

10  in the westbound lane there on the I-10, so I

11  thought we were still south of Casa Grande.

12  Q.   Was it north -- the place where you pulled the

13  vehicle over, was it north or south of the I-8

14  interchange, when you turn to go home, or go to San

15  Diego?

16  A.   They would have been north.

17  Q.   And you were talking about the people who were

18  located in the vehicle when you pulled it over.

19       And you mentioned there was a tattoo on

20  somebody's neck.  That wasn't the driver's neck,

21  was it?

22  A.   No, it was not.

23  Q.   And the driver was cooperative with you, was

24  he not?

25  A.   Yes, sir.  They were all cooperative.

1   Q.   Did you play any role in actually searching

2   the Escalade?

3   A.   No, sir, just a brief cursory search, and then

4   that's when we -- I think it was one of my agents,

5   Agent Hernandez, told me that he saw weapons in the

6   back, and so I went and I did see weapons in plain

7   sight.

8   Q.   Okay.  Where did you see the weapons?

9        And then shortly after that, law enforcement

10  got in and disturbed or moved the weapons around.

11  Would you agree with that?

12  A.   They -- I would imagine they secured the scene

13  for evidence, yes, but --

14  Q.   What weapons did you observe in the vehicle

15  before they were moved?

16  A.   The M-16 and the -- I still am not sure what

17  it is, but it's a Kel-Tec-type of assault rifle.

18  Q.   You saw those two?

19  A.   And a full magazine of ammunition.

20  Q.   Okay.  Where did you observe the two weapons?

21  Start with the M-16, what you're calling the M-16.

22  A.   Back seat driver's side.

23  Q.   The back seat?

24  A.   Yeah, the -- the Escalade is -- there's three

25  rows in an Escalade.  It was where all the

1  passengers, the three passengers were sitting,

2  which I guess would be the middle row.

3      Anyways, it was there, where those individuals

4  were sitting.  The weapons were on the driver's

5  side, as I recall.

6  Q.  So the M—16 and the Kel-Tec were near one

7  another?

8  A.  One was on top of the other.  The M—16 was on

9  the bottom.

10  Q.  Were they laying on the seat or on the floor?

11  A.  I don't 100 percent recall, and seeing the

12  picture that I took, I can't tell.  I can't tell.

13      I thought that they were on the ground, but

14  also I'm not a hundred percent sure on that.

15  Q.  Did you speak with the driver of the vehicle?

16  A.  Yes, giving instructions, get out of the

17  vehicle, and then as a cursory search, I asked him

18  if he had any weapons or anything on his person I

19  needed to know about, to which he stated no, he did

20  not.

21      And that was about it, sir.

22  Q.  Did you ask him if there was any weapons in

23  the vehicle?

24  A.  No, I did not.  One of the other agents asked

25  another passenger that, to which he replied that

1  there was.

2  Q.   The reply was there was?

3  A.   That there was weapons, yes.

4  Q.   Okay.  And you didn't locate any weapons on

5  the driver's person?

6  A.   No.

7         MR. ARMSTRONG:  Okay.  Thank you.

8         THE WITNESS:  Thank you.

9               CROSS-EXAMINATION

10  BY MR. YOUNG:

11  Q.   Sir, one of these weapons you've been

12  referring to is an M-16.

13  A.   Uh-huh.

14         THE COURT:  Is that a "yes"?

15         THE WITNESS:  Yes.  Sorry.  Yes, sir.

16  BY MR. YOUNG:

17  Q.   The M-16 is actually a military version of the

18  AR-15; is that right?

19  A.   Yes.

20  Q.   And being former military, being a former

21  Marine, you'd look at that weapon and immediately

22  spot it or think of an M-16; right?

23  A.   I did, yes, sir.

24  Q.   And an M-16 is what you probably carried while

25  you were in the Marine Corps?

1  A.  Yes, sir.

2  Q.  Did you -- it would be possible to look at the

3  fire selector switch on the left-hand side of the

4  receiver and identify that weapon either way as an

5  AR-15 or an M-16?

6  A.  Yes, you should be able to, yes, sir.

7  Q.  And if it were the M-16, the military version,

8  the fire selector switch would include positions

9  for safe, semiautomatic, possibly burst fire, and

10  fully automatic?

11  A.  Yes, sir.

12  Q.  And the civilian variation of that same weapon

13  has positions for safe and semiautomatic?

14  A.  Correct.

15  Q.  Civilian versions do not have burst fire or

16  fully automatic?

17  A.  That is correct, yes, sir.

18  Q.  And you didn't flip it over to identify the

19  fire selector switch as being either the M-16 type

20  or the AR-15?

21  A.  I did not, sir, no.

22  Q.  So as you look at the weapon by its

23  appearance, it could either be an M-16 or it could

24  be an AR-15?

25  A.  That is correct, yes it could.

1          MR. YOUNG:  Okay.  That's all I have, Your

2     Honor.

3          MR. LACEY:  No further questions.

4          THE COURT:  If the jurors have any

5     questions, please place them in writing.  I think

6     there is at least one.

7          Counsel?

8          (The following proceedings occurred at the

9          bench.)

10         THE COURT:  "The difference in your mind

11    between a long rifle and an assault rifle?"

12         MR. ARMSTRONG:  I don't --

13         THE COURT:  Okay.  We'll find out.

14         (End of bench conference.)

15         THE COURT:  Sir, I have a question from

16    one of the jurors.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Is there a difference in your

19    mind between a long rifle and an assault rifle?

20         THE WITNESS:  Oh, okay.  No, actually.  If

21    I called it a long rifle at some point, I would not

22    use that term for these weapons.  A long rifle,

23    usually that's associated with a -- like a longer,

24    like, hunting rifle or a precision rifle used by a

25    marksman or a sniper or something to that effect.

1           These are shorter barrel, shorter

2    weapons.  I would call those -- what I saw in

3    there, I would call those assault rifles.  If at

4    any point I called it a long gun or a long rifle, I

5    didn't mean that.  I would -- I would categorize

6    these as assault rifles.

7           THE COURT:  Mr. Lacey, any further

8    questions based upon the juror's questions?

9           MR. LACEY:  No, Your Honor.

10          THE COURT:  Mr. Cooper?

11          MR. COOPER:  No, Your Honor.

12          MR. ARMSTRONG:  None, thank you.

13          MR. YOUNG:  No, Your Honor.

14          THE COURT:  Thank you.  You may step down.

15          THE WITNESS:  Thank you, sir.

16          THE COURT:  As we get the next witness,

17   you may have noticed Mr. Young stands up every time

18   he says something.  That's because he has a bad

19   back.

20          MS. HOPKINS:  Your Honor, before we bring

21   another witness to the stand, the Government's

22   offering into evidence what's been previously

23   marked for identification as Government's Exhibits

24   59 and 60, copies of which have been disclosed to

25   defense counsel.

1          Just for defense counsel's purposes, it

2   looks like 59 starts at 3883, and I don't have a

3   Bates stamp for --

4          THE COURT:  Why don't you show them what

5   59 and 60 are so they'll know.

6          MS. HOPKINS:  The parties have come to an

7   agreement, actually.

8          THE COURT:  All right.

9          MS. HOPKINS:  And the parties will

10  stipulate that the Cadillac Escalade was registered

11  to Ja'Cory Ranger, and the red Ford Expedition is

12  registered to Jerome Ranger.

13         THE COURT:  All right.  The parties have

14  stipulated to those facts.  You may take them as a

15  proven fact.

16         Next witness?

17         MR. LACEY:  Yes, Your Honor.  Thank you.

18          JOSE DOMINGUEZ, WITNESS, SWORN

19         THE COURT:  Sir, the Rule has been invoked

20  in this case.  That means, except during the time

21  that you're testifying, you must remain outside the

22  courtroom, and you are only allowed to discuss your

23  testimony with the attorneys involved in the case.

24         Understood?

25         THE WITNESS:  Yes, sir.

1    THE CLERK:  Please state your name for the

2  record and spell your last name.

3    THE WITNESS:  Jose Dominguez,

4  D-o-m-i-n-g-u-e-z.

5    THE CLERK:  Thank you.

6                DIRECT EXAMINATION

7  BY MR. LACEY:

8  Q.  Sir, you're employed by whom?

9  A.  Department of Homeland Security, Customs and

10  Border Protection, United States Border Patrol.

11  Q.  And sir, you've been with the border patrol

12  for how many years?

13  A.  15 plus, since 1997.

14  Q.  Sir, did there come a time during March 2nd of

15  last year, 2011, when you became involved in an

16  investigation that entailed the stop of two

17  vehicles on I-10?

18  A.  Yes, I was.

19  Q.  And what kind of work were you doing at that

20  time?  What unit were you assigned to back in March

21  of last year?

22  A.  In March of last year, I was assigned to the

23  Tucson sector Disrupt unit.  That's their plain

24  clothes antismuggling unit, and we were working out

25  of the Casa Grande station at that time.

1    Q.   Did there come a time, then, when you actually

2    got involved in stopping vehicles or after the

3    vehicles were stopped you went to the scene?

4    A.   Yes.   Yes, I did.

5    Q.   What was that?   What did you do?

6    A.   Basically we got a call from our supervisor

7    advising us that we're going to assist the FBI in a

8    traffic stop, and our specialized unit, you know,

9    BORTAC, they were actual going to perform the

10    traffic stop, and we were going to assist them.

11        What happened is that, you know, I was working

12    out of Casa Grande.   You know, I got the radio

13    communications that they were coming up north, and

14    you know, I got on the freeway and started

15    following the vehicles as they attempted to make

16    the traffic stop.

17    Q.   When you -- when did you first stop the target

18    vehicles on I-10?

19    A.   I can't remember the actual exit, but they

20    were actually just I would say east or south,

21    southeast of the intersection of I-8 and I think

22    I-10.

23    Q.   I-8, where you shoot off to Yuma?

24    A.   Yes, yes.

25    Q.   What did you do once you saw the vehicle or

1 vehicles?

2 A.   I got behind the caravan, and then through

3 radio traffic I heard that they made the stop.

4 What I did, I stopped traffic on I-10 for -- to

5 establish a safe perimeter, and after the safe was

6 -- the scene was secure, I went back into the

7 median and assisted the unit on, you know, making

8 the traffic stop.

9 Q.   About how long was the traffic stop on I-10

10 then?

11 A.   Wow, that would be hard to say.  Several

12 minutes, maybe five, 10 minutes.  I couldn't be

13 sure.

14 Q.   How far from the stopped vehicles were you

15 positioned when you were able to stop the traffic?

16 A.   I was south of them, and I would say maybe

17 approximately 15, 20 yards, maybe.  Maybe.  I would

18 assume.

19 Q.   And what happened after the vehicles were

20 stopped?  Where did you go?  What did you do?

21 A.   I went into the median, and I assisted in the

22 search of the black Escalade.  I noticed at the

23 time that nobody was taking any photographs of the

24 actual stop or the actual search.

25       I asked one of the BORTAC guys if they wanted

1  me to do that.  They told me yes.  I went to the

2  back of my vehicle and picked up my camera and

3  started documenting the scene via photographs.

4  Q.  I want to show you first Exhibit 65-A for

5  identification.

6      Can you identify that for us.

7  A.  Yes, sir, I can.

8  Q.  And was that one of the photographs that you

9  took that day?

10 A.  Yes it was.

11 Q.  Of the black Escalade?

12 A.  Yes.

13      MR. LACEY:  We'd offer 65-A at this time.

14      MR. COOPER:  I have no objection, although

15 I can't tell what side it is.

16      Is this right side up?

17      MR. LACEY:  We can get some clarification.

18      MR. COOPER:  Okay.

19 BY MR. LACEY:

20 Q.  The photograph you're looking at there, can

21 you tell us how that is positioned?  Is this upside

22 down from the vehicle, or how does this come across

23 in real positioning?  Was the vehicle -- was the

24 rifle in the position as you see it here?

25      THE WITNESS:  May I move this?

1          THE COURT:  Yes.

2    A.   Basically the black box that you see that has

3    the wires, that would be the speaker box that

4    extends to the back of the Escalade, or I'm sorry,

5    the -- yeah, the Escalade.  I'm sorry.

6         And the actual long arm that's there is, I

7    believe, in between the seats, in the rear portion.

8    Q.   Was that where you found the weapon back on

9    that day, back on March 2nd?

10   A.   I personally did not find the weapon.  I got

11   called in by the other agents that were performing

12   the search, and I took the picture of the weapon

13   the way it was, yes.

14   Q.   Do you know if that was where the weapon was

15   initially when the stop took place, or had it been

16   moved, or do you know?

17   A.   I don't know.

18          MR. LACEY:  Okay.  We'd offer 65-A at this

19   time.

20          MR. COOPER:  No objection, Judge.

21          MR. ARMSTRONG:  None.

22          MR. YOUNG:  No objection.

23          THE COURT:  It can be admitted, can be

24   published.

25   BY MR. LACEY:

1  Q.  So would you explain to us again, now that

2  everybody's able to look at the photograph, and you

3  can point to the screen, and I think there will be

4  some red dot or something.

5      Can you show us where the back seat of the

6  vehicle is in relationship to this weapon that

7  we're looking at?

8  A.  It would be right here.

9          THE COURT:  If you touch it, it will make

10  a mark.

11  BY MR. LACEY:

12  Q.  You have to touch the screen, if you wouldn't

13  mind.

14  A.  Is there a mouse?

15  Q.  No, just touch the screen with your hand.

16          THE COURT:  It looks like you broke it.

17          THE WITNESS:  I'll get it taken out of my

18  paycheck.

19          THE COURT:  It's broken?  Or did I unplug

20  it?  We're going to reboot.  There we go.

21          (Off the record.)

22          MR. LACEY:  Okay.  If we don't have any

23  red marks, then we'll just have you do it orally so

24  we can understand.

25          As we're looking at the photograph, the

1  weapon's on the -- use -- there is an arrow there,

2  if you want to use the arrow.

3        Where is the back seat of the car in

4  relationship to the weapon?

5              THE COURT:  He's lost picture.

6              THE WITNESS:  Yeah.

7              THE COURT:  You guys still have it though,

8  don't you?

9              JUROR:  Yeah.

10             MR. LACEY:  And if you can't get the

11  picture, I'll just use a hard copy and do it that

12  way.

13             THE COURT:  It's still there but it's not

14  making a mark.

15  BY MR. LACEY:

16  Q.   Can you see it now?

17  A.   I can see it now.

18  Q.   As we're looking at the photograph, we see the

19  weapon there, the assault rifle.

20        Where is the back seat in relation to that, to

21  the left or to the right?

22  A.   It would be to the left.  That would be the

23  back, the back seat that was folded forward.

24  Q.   Okay.  And is it -- would this particular

25  Expedition that you were involved in inspecting and

1  photographing, were there two rows of seats, then,

2  a front row, the driver and passenger, and then a

3  rear seat --

4  A.   Yes.

5  Q.   -- section as well?

6  A.   Yes, sir.

7  Q.   And this photograph is behind the rear seat

8  section?

9  A.   Yes, sir.

10  Q.   Okay.  And off to the right, there's some

11  wires and a black box.  Is that a -- what is that?

12  A.   That would be a speaker, a speaker box.

13  Q.   I would ask to you look at Exhibit 65-B, as in

14  boy.

15       Can you identify this for us?

16  A.   Yes.  This is a close-up photograph of one of

17  the assault rifles that was in the black Escalade.

18            MR. LACEY:  We'd offer 65-B at this time.

19            MR. COOPER:  No objection, Judge.

20            MR. ARMSTRONG:  No objection.

21            MR. YOUNG:  No objection, Your Honor.

22            THE COURT:  It can be admitted, can be

23  published.

24  BY MR. LACEY:

25  Q.   And sir, what is depicted in this photograph?

1   A.   Basically the make, model, but more important,

2   the serial number.

3   Q.   And the serial number speaks for itself.

4       Next, 65-C, as in Charlie, we'd ask you to

5   look at that and tell us if you can identify that.

6   A.   Yes, sir.   These were the magazines that would

7   go to the assault rifles in the black Escalade.

8           MR. LACEY:   We'd offer 65-C.

9           MR. COOPER:   No objection.

10          MR. YOUNG:   No objection.

11          MR. ARMSTRONG:   No objection.

12          THE COURT:   It can be admitted, can be

13   published.

14   BY MR. LACEY:

15   Q.   Where in relationship to the rifles were these

16   two magazines with bullets in them?

17   A.   That I wouldn't know.

18   Q.   Okay.   65-D, we'd ask the witness be shown

19   that, please.

20       Can you identify that for us?

21   A.   Yes.   This was a handgun also that was found

22   in the black Escalade that was in the rear, the

23   rear passenger area of the Escalade and right

24   underneath the black covering between the pickup

25   bed area and the seat, the rear seat.

1          MR. LACEY:  We'd offer 65-D at this time.

2          MR. COOPER:  No objection.

3          MR. ARMSTRONG:  No objection.

4          MR. YOUNG:  No objection, Your Honor.

5          THE COURT:  It can be admitted, can be

6     published.

7     BY MR. LACEY:

8     Q.   Now, you mentioned that this pistol was

9     behind -- was it the back seat of the vehicle, the

10    Escalade?

11    A.   Yes.

12    Q.   Whereabouts behind the back seat?

13    A.   It was -- there was another picture that I

14    captured that had a black metal cover, trying to

15    cover the pistol.  That's where the agent

16    instructed me that he found it, and this would be

17    in the rear portion of the Escalade, in the

18    passenger area.

19    Q.   And to the left of the weapon that we see

20    here, the pistol, what is that?  Is that the seat?

21    A.   That would be the seat.  Yes, sir, that would

22    be the seat.

23    Q.   The rear seat of the vehicle?

24    A.   Yes.

25    Q.   We'd ask the witness be shown next 65-E,

1    please.

2       Can you identify that for us?

3    A.   Yes.   This is the black Escalade in question

4    that our guys performed a traffic stop on.

5         MR. LACEY:   We'd offer 65-E.

6         MR. COOPER:   No objection, Judge.

7         MR. ARMSTRONG:   No objection.

8         MR. YOUNG:   No objection, Your Honor.

9         THE COURT:   It can be admitted, can be

10   published.

11   BY MR. LACEY:

12   Q.   Next is 65-F, as in Frank.

13       Can you identify that for us?

14   A.   This is the same black Escalade.

15   Q.   Different vantage point?

16   A.   Yes.

17        MR. LACEY:   We'd offer 65-F.

18        MR. COOPER:   No objection.

19        MR. ARMSTRONG:   No objection.

20        MR. YOUNG:   No objection, Your Honor.

21        THE COURT:   It can be admitted, can be

22   published.

23   BY MR. LACEY:

24   Q.   And this, for the record, shows the right side

25   of the vehicle, does it not?

1  A.   Yes, sir, the passenger, passenger side.

2  Q.   65-G, as in George.

3       Can you identify that for us?

4  A.   This is the same black Escalade in question.

5  This is indicating the driver's side of the

6  vehicle.

7            MR. LACEY:  We'd offer 65-G.

8            MR. COOPER:  No objection, Judge.

9            MR. ARMSTRONG:  No objection.

10           MR. YOUNG:  No objection, Your Honor.

11           THE COURT:  It can be admitted, can be

12  published.

13  BY MR. LACEY:

14  Q.   And sir, when you showed us the speaker, where

15  was that in relationship, and the rear seat, where

16  did you have to go to take that picture?

17  A.   As we're looking at this picture, the rear

18  passenger's side door, you would open it up, and

19  it's between the seat and the rear portion of the

20  bed portion of the Escalade.

21  Q.   And when you say the bed portion, is there

22  actually a truck bed in the back of this vehicle?

23  A.   Yes.  Yes, sir.  That's particular to these

24  type of models of vehicles, that they have -- there

25  is an access to the back of the bed area.

1    MR. LACEY:  I have no further questions.

2  Thank you.

3         THE COURT:  Mr. Cooper?

4              CROSS-EXAMINATION

5  BY MR. COOPER:

6  Q.  Hello.

7  A.  Hello, sir.

8  Q.  I just have a few questions about the

9  locations of the weapons, where you found them in

10 the Escalade.  All right?

11 A.  Sure.

12 Q.  You don't have the hard copy -- or the copies

13 of the --

14         MR. COOPER:  Well, could I ask that 65-A

15 be put up on the screen, please?

16         THE COURT:  For everybody to see?

17         MR. COOPER:  Yes.

18         THE COURT:  Okay.

19 BY MR. COOPER:

20 Q.  Agent Dominguez, the rifle that you see in

21 this photograph, I think you described previously

22 that it is behind the rear seat, getting toward

23 the, I guess, sort of a trunk area before the bed

24 of the truck.

25      Is that fair to say?

1  A.  Yes, I would say so, yes.

2  Q.  And on this photograph, 65-A, to the left you

3  can almost see the back of the rear seat.  Is that

4  what that is?

5  A.  That would be correct, yes.

6  Q.  At the far left side of the photograph?

7  A.  Yes, sir.

8  Q.  Okay.  So this rifle is behind the four

9  passengers who are in the vehicle; right?

10 A.  Yes.

11 Q.  All right.  Then let me just ask you about

12 65-C, please.

13     These -- a magazine basically contains

14 ammunition; right?

15 A.  Yes, sir.

16 Q.  And these, in order for a gun to be fired,

17 certain types of guns to be fired, the magazine has

18 to be put into the gun?

19 A.  Yes, sir.

20 Q.  And these magazines, when you photographed

21 them, were not in weapons; right?

22 A.  No.

23 Q.  And in fact, this is how you found them in the

24 vehicle, or you were told this is where we found

25 them?

1   A.   Exactly.

2   Q.   And so it's protocol for you to photograph

3   evidence where it is found before it's moved;

4   right?

5   A.   Yes.

6   Q.   Okay.  And can you explain where these

7   magazines are in relationship to the rifles?

8   A.   Basically from this picture, I could kind of

9   venture to guess that they are right below the

10   front portion of the AR.

11   Q.   Okay.  And that's, again, getting toward the

12   trunk area of the vehicle?

13   A.   Yeah.  I -- just by this picture, I wouldn't

14   have recollection as to where, where it would be in

15   relation to the vehicle.

16   Q.   Then 65-D is a pistol that was located in the

17   Escalade?

18   A.   Yes.

19   Q.   And that pistol is, again, behind the rear

20   passenger area; right?

21   A.   Yes.

22   Q.   And there was a little -- I think you said

23   there was some covering that had to be moved in

24   order to see the pistol, right?

25   A.   Yes.  From my understanding, it was a black

1  metal covering that –– it's on a hinge.

2  Q.   So the hinges had to be taken off?

3  A.   No.  The hinge would provide it to be lifted

4  up and down.

5  Q.   Okay.  And again, to the left of the pistol on

6  65-D is the rear seat; right?

7  A.   Yes.

8  Q.   So the four passengers or the four people who

9  were in the vehicle were in front of this pistol;

10  right?

11  A.   From my understanding, yes.

12  Q.   And then this pistol –– as you go to the right

13  is when you get into sort of the trunk area.  The

14  beginning of the trunk is where the pistol is?

15  A.   Yeah, the beginning of the trunk, what you

16  would call the bed, bed area.

17           MR. COOPER:  Thank you.  That's all I

18  have.

19           THE WITNESS:  Okay.

20                CROSS-EXAMINATION

21  BY MR. ARMSTRONG:

22  Q.   Good afternoon.

23  A.   Good afternoon.

24  Q.   I also just have a real few questions for

25  you.

1          How long was it after the vehicles were pulled
2     over until you arrived at their location?
3     A.   I would venture maybe to say -- again, this is
4     going to be an estimate -- maybe five minutes.
5     Q.   And the people -- you just dealt with the
6     folks in the black pickup truck, the black
7     Cadillac; correct?
8     A.   Yes.
9     Q.   Okay.  You had nothing to do with the red --
10    the red Expedition?
11    A.   No.  I took some pictures of the red
12    Expedition, but mainly those were outside pictures
13    of the perimeter and maybe one or two shots of the
14    interior of the vehicle, but that was it.
15    Q.   And as I understood from your testimony, you
16    initially saw the cars as they were coming up on
17    the I-8 interchange?
18    A.   They were on I-10 and they were approaching
19    the interchange.
20    Q.   Yeah, it's on I-10, but they were coming up on
21    the -- they were south or east of the turnoff to
22    San Diego?
23    A.   Yes.  Yes, they were.
24    Q.   So by the time the vehicles were pulled over,
25    it would have been north of the I-8 interchange?

1  A.  Exact location, I can't remember the exact

2  location of the stop, but that was primarily my

3  geographical remembering of the area that it was

4  at.

5  Q.  Okay.  Were you north of Casa Grande by the

6  time the vehicles were pulled over?

7  A.  I wouldn't remember.  I wouldn't remember.

8  Q.  All right.  Could I ask you to take a look at

9  65-G, please.

10      Do you see that?

11  A.  Yes, sir.

12  Q.  That's the driver's side of the Cadillac.

13  There's two rows of seats in that vehicle; correct?

14  A.  Yes, sir.

15  Q.  And then just a trunk compartment.  Is the

16  trunk compartment covered?  I can't tell from that

17  photograph.  Is there a cover over the trunk or the

18  bed of the truck?

19  A.  Usually there is a cover on top of the bed,

20  yes.

21  Q.  Do you recall whether there was a cover on

22  this truck?

23  A.  I couldn't be exact.  I couldn't be exact

24  whether there was or not.

25  Q.  All right.  When you arrived at the vehicle,

1   other agents had moved at least one of the

2   weapons.  Is that safe to say?

3        When you arrived at the Cadillac, the weapons

4   had been moved from where they were originally

5   found?

6   A.   When I arrived at the scene, they were in the

7   process of doing a search, and as they searched the

8   vehicle, they would call out where those weapons

9   were, and I would go out and capture the weapon in

10  the photograph.

11  Q.   Okay.  So the handgun had not been moved?

12  A.   Not to my knowledge, no.

13  Q.   And the handgun, again, was behind the second

14  row, the passenger seat compartment; correct?

15  A.   Yes.

16  Q.   And the rifle that was seen in 65-A, that too

17  was behind the passenger compartment?

18  A.   Yes.

19  Q.   And the magazines that were depicted in 65-C,

20  those had not been disturbed, as far as you know,

21  when you arrived to take the photograph?

22  A.   I don't know.  I wouldn't know.

23  Q.   Okay.

24  A.   I wouldn't know.

25              MR. ARMSTRONG:  Okay.  Thank you very

1  much.

2          THE WITNESS:  Okay.

3                  CROSS-EXAMINATION

4  BY MR. YOUNG:

5  Q.  Sir, if you'd take a look at Exhibit 65-B, as

6  in boy.

7  A.  It's on the screen.

8  Q.  That photograph identifies that particular

9  rifle as an AR-15; is that right?

10  A.  Yes, it does.

11  Q.  And the AR-15, that would be the civilian

12  version of the M-16?

13  A.  I would think so, yes.

14  Q.  And this particular one is manufactured by

15  Colt?

16  A.  Yes.

17  Q.  And Colt holds the patent on the AR-15?

18  A.  I don't know.

19  Q.  I digress.

20      This particular AR-15, if you take a look at

21  Exhibit 65-A, 65-A, if I understand correctly, is a

22  picture of that rifle in the trunk of that vehicle?

23  A.  I would say so, yes.

24  Q.  And I see one of the seats is folded down, but

25  the seats weren't folded down when the people were

1  sitting on them; right?

2  A.  No.

3  Q.  So in the course of searching that vehicle,

4  somebody folded down the seat and found that rifle

5  in the trunk of the vehicle?

6  A.  I would think so, yes.

7  Q.  There was also 65-D, as in dog, a handgun that

8  was found behind the back seat, in the trunk of the

9  vehicle?

10  A.  Yes.

11  Q.  And off to the left, I see what looks to be

12  the hinge of the seat that's folded forward?

13  A.  Yes.

14  Q.  65-C was pictures of two magazines that fit

15  two different rifles; is that right?

16  A.  I wouldn't be able to determine which ones

17  they would fit.

18  Q.  Now, both of these magazines appear to be

19  standard NATO-type magazines?

20  A.  Yes.

21  Q.  And they hold the standard NATO 5.56 round?

22  A.  Yes, I would think, yeah.

23  Q.  And either of those magazines will fit in any

24  of the NATO weapons?

25  A.  I don't know.

1   Q.   Okay.  But there's a large number of rifles

2   that would fit this particular magazine; is that

3   right?

4   A.   Sure.

5   Q.   And these two magazines, there were two rifles

6   that fit with these two magazines in this vehicle;

7   is that right?

8   A.   I would think they would fit, yes.

9   Q.   So I guess what I'm driving at is, the vehicle

10  had three rifles and three magazines in the

11  vehicle; does that sound right?

12  A.   Sure.

13          MR. YOUNG:  Okay.  That's all I have, Your

14  Honor.

15          THE COURT:  Mr. Lacey?

16          MR. LACEY:  No further questions.  Thank

17  you.

18          THE COURT:  If the jurors have any

19  questions, please place them in writing.

20          You may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  Next witness?

23          MR. LACEY:  Your Honor we have some

24  weapons we're going to be showing next.  We just

25  want to get -- want to take about a two-minute

 1  break to get them brought in here, or whatever is
 2  good for the Court.
 3        THE COURT:  Let's take a two-minute break.
 4        (The jury exits the courtroom.)
 5        (Off the record.)
 6        THE COURT:  Show the absence of the jury,
 7  presence of all counsel and the defendants.
 8        Mr. Cooper?
 9        MR. COOPER:  Your Honor, the next witness
10  is a Phoenix Police Department detective which is
11  fine.  However, we really would object to how
12  they're going to qualify him as to why he's in Casa
13  Grande picking up guns in an FBI case.
14        THE COURT:  He was asked to come down.
15        MR. LACEY:  Exactly.
16        MR. COOPER:  And if that's all there is,
17  that's fine.
18        THE COURT:  We're not getting into all
19  that other stuff.
20        MR. COOPER:  All right.
21        MR. LACEY:  We're not going there.
22        THE COURT:  All right.  They had half the
23  state of Arizona working this case.
24        MR. COOPER:  Apparently.
25        THE COURT:  And Texas and part of

1  California.

2         MR. LACEY:  And San Diego.  Surf's up.

3         THE COURT:  Bring the jurors in, Mo.

4         (Off the record.)

5         (The jury enters the courtroom.)

6         THE COURT:  The record shows the jurors

7  returned back to the courtroom, the presence of all

8  counsel and the defendants.

9         You may call your next witness.

10        MR. LACEY:  Yes, Detective Salgado,

11 please.

12        ARNULFO SALGADO, WITNESS, SWORN

13        THE COURT:  Sir, the Rule has been invoked

14 in this case.  That means, except during the time

15 that you're testifying, you must remain outside the

16 courtroom, and you are only allowed to discuss your

17 testimony with the attorneys involved in the case.

18        All right?

19        THE WITNESS:  Yes, sir.

20        THE CLERK:  Please state your name for the

21 record and spell your last name.

22        THE WITNESS:  Arnulfo Salgado,

23 S-a-l-g-a-d-o.

24                DIRECT EXAMINATION

25 BY MR. LACEY:

1   Q.   Sir, you're employed by the Phoenix Police
2   Department as a detective, are you not?  Yes or no?
3   A.   Yes, sir.
4   Q.   Were you asked to assist in this particular
5   case that resulted in seizure of weapons, among
6   other things, back on March 2 of last year?
7   A.   Yes, sir.
8   Q.   Did you go to the scene where two vehicles
9   were stopped back then?
10  A.   Yes, sir.
11  Q.   Do you recall what kind of vehicles they were?
12  A.   Both were SUVs, an Escalade and an Expedition.
13  Q.   And the colors?
14  A.   The Escalade was black, black in color, and
15  the Expedition is red.
16  Q.   When you went to the scene that day, were you
17  involved in acquiring possession of any weapons
18  that were found in those vehicles?
19  A.   Yes, sir.
20  Q.   Let's start with the red Expedition first.
21       Did you have a list prepared as to what
22  weapons you found in each of the two vehicles?
23  A.   Yes, sir.
24  Q.   And do you have that up there with you?
25  A.   I have my own.

1  Q.   Is it up here or do you need a refresher?

2  A.   Yes, I'd like to have it available, if

3  possible, so I can refresh my recollection.

4          MR. LACEY:  May I approach, Your Honor?

5          THE COURT:  You may.

6  BY MR. LACEY:

7  Q.   Sir, is that a report that was prepared that

8  references the weapons we're going to be talking

9  about?

10  A.   Yes, sir.

11  Q.   And does that refresh your recollection as to

12  what weapons were found at what locations?

13  A.   Yes, sir.

14  Q.   Or within which vehicles?

15  A.   Yes, sir.

16  Q.   Starting with the Expedition -- and that's the

17  one with Jerome Ranger driving and Ghermon Tucker

18  right passenger, front right, front passenger, what

19  weapons were found within that vehicle?

20  A.   They were handguns, sir.  There a Ruger P95

21  handgun.

22  Q.   And let's start with Exhibit 80-B, as in boy,

23  for identification.

24          THE WITNESS:  I'm going to have Agent

25  Edwards assist me, if it's okay with the Court.

1    THE COURT:  Go ahead.

2    MR. LACEY:  If you can bring 80-B for

3    identification purposes to the witness.

4    BY MR. LACEY:

5    Q.  Sir, can you identify that for us.

6    A.  Yes, sir.  That's a Glock 17 nine millimeter.

7    Q.  And that was found where within the -- which

8    vehicle again?

9    A.  The Expedition, sir.

10   Q.  Do you know where it was found within the

11   vehicle?

12   A.  I believe it was located in the back seat

13   behind the passenger -- excuse me -- behind the

14   other driver's seat on the little pocket in the

15   back seat.

16   Q.  Behind the seat?

17   A.  Yes, sir.

18   Q.  In the pocket?

19   A.  Yes, sir.

20   Q.  And what's the description of that weapon?

21   A.  It's a Glock 17 nine millimeter.  It has a

22   serial number on that.

23   Q.  What's that?

24   A.  N as in Nancy, U as in Union, S as in Sam,

25   513.

1  Q.  And do you see that serial number on the

2  weapon itself then?

3  A.  Yes, sir.

4        MR. LACEY:  We'd ask next the witness --

5  we'd offer Exhibit 80-B, 80-B at this time.

6        MR. COOPER:  No objection.

7        MR. YOUNG:  No objection, Your Honor.

8        MR. ARMSTRONG:  No objection.

9        THE COURT:  It can be admitted, can be

10  published.

11        That was 80-B; correct?

12        MR. LACEY:  80-B, as in boy, yes, Your

13  Honor.

14        Perhaps the easiest way to do it would be

15  just to have Agent Edwards hold it and walk in

16  front of the jury to see it, unless you want them

17  to pass it amongst themselves, but I'd just as soon

18  do it that way.

19        THE COURT:  He can hold it, not that we

20  don't trust you guys, but --

21        MR. LACEY:  And for the record, they've

22  been checked for safety and -- to make sure, and

23  they're also security locked.

24  BY MR. LACEY:

25  Q.  Next we'd direct your attention to 81-B, as in

1    boy.

2         Sir, can you identify that for us?

3    A.   That's the Taurus Millennium handgun, .45

4    caliber, model PT145 Pro.  Serial number is N as in

5    Nancy, C as in Charles, Y as in Young, 77905.

6    Q.   Sir, when you retrieved those guns that day

7    from the Ford Expedition, were they loaded at the

8    time?  Do you recall?

9    A.   They had magazines installed into the butt of

10   the handgun, the magazine well, and there were live

11   rounds inside the magazines, but there was not a

12   round chambered into the weapons.

13   Q.   As to both 80-B and 81-B; is that correct

14   then?

15   A.   Yes, sir.

16   Q.   And do you -- from your inspection of the

17   Expedition back on that day, where was 81-B, as in

18   boy, located within the vehicle?

19   A.   It was inside the center console, the glove --

20   the compartment between the two passengers, the two

21   front seats.

22   Q.   Between the driver's side --

23   A.   And the passenger side, yes, sir.

24   Q.   -- and the passenger side?

25   A.   Yes, sir.

1  MR. LACEY:  We'd offer 81-B at this time.

2  MR. COOPER:  No objection.

3  MR. ARMSTRONG:  No objection, although I

4  have that listed as a different item, and the

5  witness has identified it as a Taurus.

6  THE COURT:  What did you say?

7  THE WITNESS:  I'm sorry, sir.  That's

8  correct.  I identified it as a Taurus.  It is a

9  Ruger.  My mistake.

10  MR. ARMSTRONG:  No objection.

11  MR. YOUNG:  No objection, Your Honor.

12  MR. LACEY:  We'd ask also that that be

13  published in the same way.

14  THE COURT:  At this time we're publishing

15  the Ruger and that's 81 --

16  MR. LACEY:  B, as in boy, yes, Your Honor.

17  MR. ARMSTRONG:  Can we have a moment to

18  straighten that out.  What was 81?

19  MR. LACEY:  81-B is the Ruger that we just

20  looked at.

21  MR. ARMSTRONG:  80 was the Glock?

22  MR. LACEY:  80 is the Glock nine

23  millimeter, yes, correct.

24  A.  Sir, may I clarify something in reference to

25  the serial number?  I gave you the serial number

1  for the Taurus.

2  Q.  If you wouldn't mind, please.  We want the

3  record straight.

4  A.  Yes.  The Ruger serial number is 317-31859.

5  Q.  And that's for which gun again?

6  A.  The Ruger, sir, the P95.  It's a nine

7  millimeter also.

8  Q.  Okay.  Thank you.

9       MR. LACEY:  If you'd publish that, please.

10  BY MR. LACEY:

11  Q.  Next I'm going to direct your attention to

12  83-B, as in boy, and ask if you can identify that

13  for us.

14  A.  Yes, sir.  This is the Taurus I was talking

15  about previously.

16  Q.  And can you give us the serial number for that

17  one, again, just so it's clear on the record.

18  A.  N as in Nancy, C as in Charles, Y as in

19  Yankee, 77905.

20  Q.  And where was that particular weapon found

21  within the red Expedition back on March 2nd?

22  A.  It was in the back seat, between the -- it's

23  bucket seats, and it was tucked between the seats

24  themselves.

25       MR. LACEY:  Okay.  We'd offer 83-B at this

1  time.

2         MR. COOPER:  No objection.

3         MR. ARMSTRONG:  No objection.

4         MR. YOUNG:  No objection, Your Honor.

5         THE COURT:  Can be admitted.

6         MR. LACEY:  And published?

7         THE COURT:  And published.

8  BY MR. LACEY:

9  Q.  Sir, were there any other weapons found within

10  that red Expedition back on that day, back on March

11  2nd?

12  A.  No, sir, not by me.

13  Q.  Let's shift gears to the black Escalade.  Did

14  you have occasion to go to that particular vehicle

15  back on March 2, along I-10, up in the Casa Grande

16  area?

17  A.  Yes, sir.

18  Q.  While those are being -- while those weapons

19  are being put together here, staying with the

20  Expedition, were there any other pieces of

21  equipment or things used in relationship to weapons

22  that were found in the Expedition, the red

23  Expedition?

24  A.  Yes, sir.  I located two pieces of body armor

25  inside the vehicle.

1  Q.   And where were they located, the body armor?

2  A.   Just inside, in plain view.

3          THE COURT:  Wait a minute.  Wait a

4  minute.  Wait a minute.  All that rattling.  I

5  can't hear.

6          Go ahead.  Rattle.  We'll just wait.

7          MR. COOPER:  Excuse me.  Could I ask to

8  approach for just a minute?

9          (The following proceedings occurred at the

10         bench.)

11         MR. COOPER:  I just want to try to avoid

12 confusion as to which vehicle we're talking about.

13 In his report --

14         THE COURT:  It's the Expedition.

15         MR. COOPER:  Well, he wrote Explorer.

16         MS. HOPKINS:  He did an amended report

17 where he said Expedition.

18         MR. COOPER:  The Explorer has no body

19 armor.

20         MR. LACEY:  It was in there.  We have

21 other reports.  Counsel's got them.  We'd be happy

22 to retrieve them showing where he got them, and we

23 have where that was shown.

24         MR. COOPER:  I understand that.  I just

25 want to make sure that you're aware that, in his

1    original report, the body armor is in the other

2    vehicle.

3              MR. LACEY:  You can make a point out of it

4    if you want to, but we have pictures showing it in

5    the vehicle that we showed to the witness a few

6    minutes ago.

7              MR. COOPER:  All right.

8              MR. LACEY:  The report says it.

9              MR. COOPER:  I understand.

10             THE COURT:  Okay.  All right.

11             (End of bench conference.)

12             THE COURT:  Okay.  I think all the

13   rattling is now done.  You may continue.

14   BY MR. LACEY:

15   Q.   Yes.  You mentioned there was some body armor

16   found within the red Expedition, did you not?

17   A.   Yes, sir.

18   Q.   We'd ask you be shown --

19             MR. LACEY:  He had to put a tag on there.

20   We just rattled these first, since we hadn't

21   rattled them before we came to court today.  Now

22   we've got to put a sticker on them.

23             May I approach, Your Honor?

24             THE COURT:  You may.

25   BY MR. LACEY:

1  Q.  Sir, I show you Exhibit 104 for

2  identification, and there's two parts to that.  Can

3  you identify Exhibit 104?

4  A.  Exhibit 104 is camouflaged body armor that was

5  found inside the Expedition.  That's the camouflage

6  one.

7      And then have you another colored one, kind of

8  like army green, I guess.  Also the same thing.

9  It's body armor that was also found alongside with

10  the first item.

11  Q.  Okay.  And that was located where inside the

12  Expedition?

13  A.  Between the two front seats.

14  Q.  Were there any weapons found within the --

15  we're going to shift gears here.  We better take

16  those away so we don't clutter things up there.

17          THE COURT:  Are you moving to admit 104?

18          MR. LACEY:  Yes, Your Honor.  I was too

19  worried about -- I'm too concerned about shuffling

20  to the next item.

21          THE COURT:  Any objection to 104,

22  counsel?

23          MR. COOPER:  No, Your Honor.

24          MR. ARMSTRONG:  104 is two different

25  items?

1          THE COURT:  Two vests.

2          MR. ARMSTRONG:  No objection.

3          MR. YOUNG:  (Shaking head.)

4          MR. LACEY:  Thanks.

5          THE COURT:  One camouflage, one olive

6   green.

7          MR. YOUNG:  No objection.

8          THE COURT:  All right.  They'll be

9   admitted.  They've already been published.

10          MR. LACEY:  They have.  We're not going

11  there.

12  BY MR. LACEY:

13  Q.   Next we'd show you -- can I approach, Your

14  Honor?

15          THE COURT:  You may.

16  BY MR. LACEY:

17  Q.   I'm going to show you 78-B for identification.

18          THE COURT:  E or B.?

19          MR. LACEY:  B as in boy, Your Honor,

20  78-B.

21  BY MR. LACEY:

22  Q.   Sir, can you identify that for us?

23  A.   Yes, sir.  That's the Kel-Tec .223 rifle.

24  Q.   And that was found where?  Do you know?

25  A.   I believe it was found inside the black

1  Escalade.

2  Q.  Now, when you got to the Escalade, had any of

3  the weapons been moved from within the vehicle

4  before you got there?

5  A.  Yes, sir.

6  Q.  So you don't know where it was positioned when

7  it was first stopped, the vehicle?

8  A.  No, sir.

9  Q.  Okay.  When you saw that, where was it located

10  inside the vehicle when you first approached,

11  having had it moved before you got there?  Where

12  was it when you arrived at the Escalade?

13  A.  When I first observed the weapon, it was

14  sitting on the tailgate of the Escalade.

15          MR. LACEY:  Okay.  78-B, we'd offer that

16  at this time.

17          MR. COOPER:  No objection.

18          MR. ARMSTRONG:  No objection.

19          MR. YOUNG:  No.

20          THE COURT:  78-B can be admitted.

21          MR. LACEY:  And published?

22          THE COURT:  And published.  You can show

23  it to the jury first.

24          Next time turn the weapon this way.

25          AGENT EDWARDS:  Okay.

1          THE COURT:  Make sure, sort of north.

2          AGENT EDWARDS:  Got it, sir.

3   BY MR. LACEY:

4   Q.   77-B, we'd ask you to look at that, please,

5   and see if you can identify that, 77-B, as in boy.

6       Can you identify that for us?

7   A.   Yes, sir.  That's a Norinco .762 caliber

8   rifle.

9   Q.   And is it also called something else?  Is

10  there another term for it?

11  A.   It kind of looks like an AK-47-type rifle.

12  Q.   And do you know where that was originally

13  found in the vehicle, or did you later see it on

14  the tailgate when you arrived?

15  A.   On the tailgate too, sir.

16          MR. LACEY:  We'd offer 77-B at this time.

17          MR. COOPER:  No objection, Judge.

18          MR. ARMSTRONG:  No objection.

19          MR. YOUNG:  No objection, Your Honor.

20          THE COURT:  It can be admitted, can be

21  published.  All right.

22  BY MR. LACEY:

23  Q.   Next I'm going to ask you to look at 76 --

24  76-B.

25      And sir, in what vehicle was this one found?

1   A.   I believe it --

2   Q.   Was this also the Escalade?

3   A.   Yes, sir.

4   Q.   And can you identify that for us?

5   A.   It's an AR rifle.  It's a .223 round Sports --

6   Sportsman I think makes it.

7   Q.   And is there a serial number on that?

8   A.   Yes, sir.  That would be Serial Number S as in

9   Sam, P as in Paul, 354743.

10          MR. LACEY:  We'd offer 76-B at this time.

11          MR. COOPER:  No objection.

12          MR. ARMSTRONG:  No objection.

13          MR. YOUNG:  No objection, Your Honor.

14          THE COURT:  It can be admitted, can be

15   published.

16   BY MR. LACEY:

17   Q.   Next we'd ask you to look at Exhibit 79-B, as

18   in boy, and ask if you can identify that and which

19   vehicle it came from.

20   A.   Yes, sir.  That's a nine millimeter CZ model

21   75.  It came from also within the Escalade, the

22   black Escalade.

23          MR. LACEY:  We'd ask that it be published

24   at this time, Your Honor -- I'm sorry -- offered

25   into evidence and then published.

1    MR. COOPER:  No objection.

2    MR. ARMSTRONG:  No objection.

3    MR. YOUNG:  No objection, Your Honor.

4    THE COURT:  It can be admitted, can be

5  published.

6  BY MR. LACEY:

7  Q.  Do you know where inside the Escalade this

8  vehicle was located or this gun was located within

9  the vehicle?

10  A.  No, sir.  I don't.  It was also taken out of

11  the vehicle before my arrival.

12  Q.  Okay.  And lastly, 82-B, as in boy.  Can you

13  identify that for us?

14  A.  Yes, sir.  That's a Colt Python .357 revolver.

15  Q.  And the serial number on that one?

16  A.  That would be E, as in Edward, 22354.

17  Q.  And the same thing, you wouldn't know where it

18  was located within the vehicle because it was

19  already moved before you got there; is that

20  correct?

21  A.  No, sir.  That's not correct.  That was taken

22  out of the glove compartment.

23  Q.  Okay.  The glove compartment of the black

24  Escalade?

25  A.  Yes, sir.

1          MR. LACEY:  We'd offer 82-B at this time.

2          MR. COOPER:  Objection.

3          MR. YOUNG:  No objection.

4          MR. COOPER:  No objection.

5          MR. ARMSTRONG:  No objection.

6          THE COURT:  You wanted to see if we were

7   paying attention.

8          MR. COOPER:  I wanted to see if I was

9   paying attention.

10          THE COURT:  It can be admitted, can be

11   published.

12   BY MR. LACEY:

13   Q.  Sir, after you retrieved these weapons from

14   the two vehicles we've talked about, what did you

15   do with the weapons?

16   A.  I placed them in my vehicle and eventually

17   turned them over to FBI agents.

18   Q.  At what location?  Is that back here in

19   Tucson?

20   A.  Yes, sir.  It's back here in Tucson.  I think

21   it's Pinal County Sheriff's Office, one of their

22   facilities.

23   Q.  Okay.  Did you have occasion to take any

24   photographs that day?

25   A.  Yes, sir.

1    Q.   Of what?

2    A.   The weapons that I recovered from the

3    Expedition.

4    Q.   Okay.  I'll start with Exhibit 75-A.

5        Now, did you take any pictures of -- you

6    mentioned that there were certain bulletproof

7    vests, as I'll call them, inside the red

8    Expedition; is that correct?

9    A.   Yes, sir.

10   Q.   And did you take this photograph?

11   A.   Yes, sir.

12   Q.   Do you know whether the vests had been moved,

13   the bulletproof vests, before you took this

14   photograph, or do you know?

15   A.   No, sir, I don't.

16   Q.   So they could have been someplace else within

17   the vehicle before they were put here?

18   A.   Yes, sir.

19            MR. LACEY:  We'd offer 75-A at this time.

20            MR. COOPER:  Judge, I have an objection as

21   to the foundation, if he doesn't know where they

22   were originally located.

23            THE COURT:  (Indicating.)

24            (The following proceedings occurred at the

25            bench.)

1          THE COURT:  As I recall the testimony so

2     far, they were seen in the vehicle somewhere near

3     the seat area by one of the earlier witnesses.

4     Exactly where they're located at this point doesn't

5     appear to be that relevant.  They certainly weren't

6     wearing them.

7          MR. COOPER:  They weren't wearing them but

8     they were right in the middle where Mr. Tucker is.

9          THE COURT:  And he's already acknowledged

10    he doesn't know exactly where they were and that

11    they could have been moved, so this --

12         MR. COOPER:  Okay.

13         THE COURT:  All right.

14         MR. COOPER:  I guess it's overruled?

15         THE COURT:  Yes, overruled.

16         (End of bench conference.)

17         THE COURT:  The objection is overruled.

18    It can be admitted, can be published.

19         MR. LACEY:  75-A can be published?

20         THE COURT:  With the stipulation that he

21    doesn't know exactly where they were found.

22         MR. LACEY:  Of course.

23    BY MR. LACEY:

24    Q.   These are the two vests we just looked at in

25    person; correct?

1    A.   Yes, sir.

2    Q.   We'd next ask the witness be shown 75-B for

3    identification.

4         Can you identify this for us, sir, 75-B?

5    A.   Yes, sir.  That's the back pocket to the front

6    -- the driver's seat.

7    Q.   And who took that photograph?

8    A.   I did, sir.

9    Q.   Back on March 2nd?

10   A.   Yes, sir.

11   Q.   Along the freeway on I-10?

12   A.   Yes, sir.

13           MR. LACEY:  We'd offer 75-A at this time.

14           MR. COOPER:  No objection, Your Honor.

15           MR. LACEY:  I'm sorry.  75-B, as in boy.

16           MR. ARMSTRONG:  No objection.

17           MR. YOUNG:  No objection, Your Honor.

18           THE COURT:  It can be admitted, can be

19   published.

20           MR. LACEY:  Thank you.

21   BY MR. LACEY:

22   Q.   Sir, in the middle of this photograph, what

23   are we looking at, 75-B?

24   A.   Yes, sir.  There's a water bottle sitting

25   right there, and just to the right, there's a --

1   you can see just the butt of the -- right there --

2   of a Glock magazine, Glock handgun magazine.

3   Q.   And that's right behind the driver's seat

4   pocket, is that correct, from what you said?

5   A.   Yes.

6   Q.   Okay.  Next we'd ask the witness be shown

7   Exhibit 76 -- I'm sorry -- 75-C, as in Charlie.

8        Can you identify that for us?

9   A.   Yes, sir.  That's the Glock handgun that was

10  in -- tucked into that pocket.

11  Q.   In the side pocket?

12  A.   Behind the driver's seat.

13  Q.   So the same Glock we just looked at, this is

14  another photograph of it straight on, without it

15  being in the pocket?

16  A.   That's correct.

17          MR. LACEY:  We'd offer 75-C at this time.

18          MR. COOPER:  No objection.

19          MR. ARMSTRONG:  No objection.

20          MR. YOUNG:  No objection, Your Honor.

21          THE COURT:  It can be admitted, can be

22  published.

23  BY MR. LACEY:

24  Q.   We'd next direct your attention to 75-E, as in

25  Edward.  We'd ask if you can identify that for us.

1  A.   That's the back seat, the bucket seats of the

2  Expedition.

3  Q.   And did you take this photograph?

4  A.   Yes, sir.

5  Q.   Do you know whether anything had been moved

6  around in the vehicle before you got there?

7  A.   No, sir, I don't.

8  Q.   And what is depicted in this photograph?

9  A.   You can see between the seats a small portion

10 of a handgun.

11         MR. LACEY:  We'd offer 75-E at this time.

12         MR. COOPER:  No objection, Your Honor.

13         MR. ARMSTRONG:  No objection.

14         MR. YOUNG:  No objection, Your Honor.

15         THE COURT:  It can be admitted, can be

16 published.

17         MR. LACEY:  Can you enlarge that for us,

18 please.

19 BY MR. LACEY:

20 Q.   In the center of this photograph, what you can

21 see there?

22 A.   Yes, sir.  That's the, like, grip of a

23 handgun, a small portion of it.

24 Q.   The handle?

25 A.   Yeah, the handle.

1  Q.  And 75-F, please.  Can you identify that for

2  us?

3  A.  That is the, like, an overview or a shot from

4  the top going down.

5  Q.  Of the same weapon we just looked at?

6  A.  Yes, sir.

7          MR. LACEY:  We'd offer 75-F at this time.

8          MR. COOPER:  No objection.

9          MR. ARMSTRONG:  No objection.

10         MR. YOUNG:  No objection.

11         THE COURT:  It can be admitted, can be

12  published.

13  BY MR. LACEY:

14  Q.  Next, look at 75-G, as in George, please.

15         Can you identify that for us?

16  A.  Yes, sir.  That's the handgun that was just

17  shown on the previous picture that was tucked

18  between the seats.

19         MR. LACEY:  We'd offer 75-G.

20         MR. COOPER:  No objection.

21         MR. ARMSTRONG:  No objection.

22         MR. YOUNG:  No objection, Your Honor.

23         THE COURT:  It'll be admitted.

24         MR. LACEY:  And published, please?

25  BY MR. LACEY:

1   Q.   Sir, we see a handgun depicted here that's the

2   Taurus .45 caliber we talked about.  There is -- to

3   the right of the pistol, there is something else.

4   What is that there?

5   A.   That is a metal magazine that was in the

6   weapon when it was retrieved.

7   Q.   And do you know how many bullets would have

8   been inside that magazine?

9   A.   Not off the top of my head, sir.  I can look

10  and find out.

11  Q.   Okay.  Would you do that, then.

12  A.   Ten .45 caliber rounds.

13  Q.   And that was within the -- it was inside the

14  gun before you took it out and took this picture?

15  A.   Yes, sir.

16  Q.   Next 75-H.  Can you identify that for us?

17  A.   Yes, sir.  That's the Ruger, and that's inside

18  of the center -- I can't think of it -- console or

19  the center glove compartment between the two front

20  seats.

21          MR. LACEY:  We'd offer 75-H at this time.

22          MR. COOPER:  No objection.

23          MR. ARMSTRONG:  No objection.

24          MR. YOUNG:  No objection, Your Honor.

25          THE COURT:  It can be admitted, can be

1   published.

2   BY MR. LACEY:

3   Q.   Now, can you enlarge that a little bit,

4   please.

5        What can you -- what do you see from this

6   photograph here?  In reference to the pistol, can

7   you just see the handle part of it?

8   A.   Yes, sir.  There is a magazine inside as well.

9   Q.   What's to the right of it, something brown in

10  color?

11  A.   Yes, sir.  There's two cloth gloves.

12  Q.   Okay.  And these cloth gloves were covering up

13  part of the pistol, obviously?

14  A.   Yes, sir.

15  Q.   75-I, please.  Can you identify that for us?

16  A.   Yes, sir.  That's the gloves moved off to the

17  side before I took this picture of the same

18  handgun.

19          MR. LACEY:  We'd offer 75-I.

20          MR. COOPER:  No objection.

21          MR. ARMSTRONG:  No objection.

22          MR. YOUNG:  No objection.

23          THE COURT:  It can be admitted, can be

24  published.

25  BY MR. LACEY:

1  Q.  And who moved these gloves off to the side so

2  you can could see this pistol?  Was that you or was

3  that somebody else?

4  A.  It was me, sir.

5  Q.  75-J.  Can you identify that for us?

6  A.  Yes, sir.  That's the same Glock from the

7  previous picture with the magazine removed.

8          MR. LACEY:  We'd offer 75-J.

9          MR. COOPER:  No objection.

10          MR. ARMSTRONG:  No objection.

11          MR. YOUNG:  No objection.

12          THE COURT:  It can be admitted and

13  published.

14  BY MR. LACEY:

15  Q.  You mentioned the magazine's off to the side

16  of the weapon.

17      Does your report reflect how many bullets were

18  inside the magazine that was inside the weapon?

19  A.  Yes, sir.  15 nine millimeter rounds.

20          MR. LACEY:  No further questions, thank

21  you.

22                  CROSS-EXAMINATION

23  BY MR. COOPER:

24  Q.  Hi.

25  A.  Hi.

1  Q.  You -- one of the things -- you wrote a

2  report, a Phoenix Police Department report, after

3  taking part in the retrieval of the evidence from

4  the vehicle; correct?

5  A.  Yes, sir.

6  Q.  Okay.  And one of the things that you

7  indicated in the report is that three officers, I

8  believe, border patrol officers, submitted to

9  buccal swabbing or buccal swabbing; correct?

10  A.  Correct.

11  Q.  And that means that they had Q-Tips,

12  basically, put inside their mouths to eventually

13  check for DNA; correct?

14  A.  That's correct.

15  Q.  And that would be for elimination purposes for

16  just in case they had touched any of the evidence;

17  right?

18  A.  Yes, sir.

19  Q.  You didn't expect -- you weren't suspecting

20  them of committing any crimes?

21  A.  Excuse me?

22  Q.  You weren't suspecting them of committing any

23  crimes; right?

24  A.  That's correct.

25  Q.  But DNA testing is a method where law

1  enforcement can look to see if a suspect or

2  somebody has left basically evidence on an object;

3  right?

4  A.  Yes, sir.

5  Q.  And that would be basically molecular or

6  chemical evidence; right?

7  A.  I believe that's what it's called.

8  Q.  Okay.  Similarly, one of the things that would

9  happen as a detective, you look for physical

10  evidence like fingerprints; right?

11  A.  Yes, sir.

12  Q.  Well, DNA can be left at the scene or on an

13  object by a lot of different methods.  Is that fair

14  to say?

15     Let me ask -- I asked that the wrong way.

16  A.  Please.  That's kind of an open-ended

17  question.

18  Q.  Yeah.  It was poorly worded.

19     For instance, if I spit on something or while

20  I'm talking if I spit, there could be DNA in that

21  saliva that lands on --

22  A.  That's correct, yes, sir.

23  Q.  Similarly, there is DNA in blood, for

24  instance.

25  A.  Yes, sir.

1  Q.  And you can retrieve DNA that way or various

2  bodily fluids; right?

3  A.  Yes.

4  Q.  Okay.  Additionally, though, there's DNA that,

5  if you touch an object, there's what's called

6  epithelial cells in the skin that, when you touch,

7  you'll leave those epithelial cells on the object

8  that you touched, perhaps; is that fair?

9  A.  I don't know what an epithelial cell is, sir,

10  so I couldn't answer that.

11  Q.  Take my word for it.

12  A.  Okay.

13  Q.  But you know as a detective that you can look

14  for DNA in a lot of places where people might not

15  expect that they've left them; right?

16  A.  That's correct.

17  Q.  Okay.  And in fact, are you aware that, when

18  you sweat, you might leave epithelial -- or you

19  might leave DNA; right?

20  A.  Yes, sir.

21  Q.  Okay.  So the vests that were retrieved from

22  the vehicles could certainly have been checked for,

23  for instance, DNA; right?

24  A.  Yes.

25  Q.  You weren't -- you didn't take part in any of

1  that sort of thing; right?

2  A.   That's correct, I did not.

3  Q.   But the -- you know, the process is, it goes

4  to a laboratory, and somebody would swab the area

5  where somebody might sweat on a vest to see if they

6  had left DNA of some sort; right?

7  A.   If it's requested, yes.

8  Q.   Have you looked at your report recently?

9  A.   Yes, sir.

10 Q.   That's the report -- I think you wrote it

11 March 3rd.

12 A.   No, sir.

13 Q.   March 2nd?

14 A.   No.   That's when the incident happened.   The

15 report was written on the 11th, I believe.

16 Q.   On the 11th.   All right.

17     I'd like to ask you about a couple of the

18 things in the report that were a little bit

19 confusing.

20     The vests that were just introduced into

21 evidence were -- there are two of them; right?

22 A.   Yes, sir.

23 Q.   Okay.   In your report, which would be page

24 4. -- do you have that in front of you?

25 A.   Yes, sir.

1  Q.  These vests have serial numbers; right?

2  A.  Yes, sir.

3  Q.  And one of the things that you do when you

4  retrieve evidence is you write down what the serial

5  number is of various items, if they have it; right?

6  A.  Yes.

7  Q.  And in your report, you wrote down the serial

8  number of a vest; right?

9  A.  Yes, sir.

10  Q.  And the serial number that I have in front of

11  me is NSN8470015267917; right?

12  A.  Yes, sir.

13  Q.  That's for one vest; right?

14  A.  Yes, sir.

15  Q.  There doesn't appear to be a serial number for

16  another vest.

17  A.  That's correct.  There's a number next to the

18  name of the vest though.  It's the only one that

19  could be found.

20  Q.  Well, actually, what I'm asking is, in your

21  report, on page 4, I can only find a listing for

22  one vest.

23  A.  Point Blank Body Armor.

24  Q.  Yeah, number one.

25  A.  And then the one below it, it says a green

1  ballistic vest.

2  Q.  Oh, okay.  So they're different brands?

3  A.  Yes, sir.

4  Q.  Okay.  So that 8470, that's the serial number

5  for the second vest; is that right?

6  A.  That could be.  It kind of goes along with the

7  first one, but that was the number that was found.

8  Q.  All right.  Well, I guess, then, my next

9  question is, the -- in your report, you indicate

10  that those vests were found in the black Escalade.

11  A.  Initially, that's what it was, but I don't

12  know if you have my second report to clarify that.

13  I made a mistake on that.

14  Q.  Okay.

15  A.  The second supplement, as we call it, to my

16  initial report states that correction, that the

17  vests were found in the Expedition.

18  Q.  Okay.  So, this is when you wrote the initial

19  report, you had -- I guess you'd take handwritten

20  notes out there; is that right?

21  A.  Yes, sir.

22  Q.  Okay.  And so the vests were found in the --

23  in which vehicle?

24  A.  The Expedition, the red vehicle.

25  Q.  The red vehicle.  Okay.

1    And actually, there were a couple of weapons

2    that, after the search and everything was over,

3    were not located by law enforcement; isn't that

4    correct?

5    A.    There was one.

6    Q.    Okay.  Well, there's one weapon with rounds

7    that were in the weapon; right?

8    A.    Yes, sir.

9    Q.    And that would be the Python?

10   A.    Yes, sir.

11   Q.    And there were -- how many agents were out

12   there, that you saw?

13   A.    A lot.

14   Q.    A lot.  Okay.  And how many were participating

15   in the search, do you know, before you got there

16   even?

17   A.    I have no idea, sir.

18   Q.    Okay.  The -- apparently the Python, the Colt

19   Python, was found by the tow truck driver; right?

20   A.    Yes, sir.

21   Q.    And then he called it to, I guess, to your

22   attention?

23   A.    Yes, sir.

24   Q.    And it was then listed as being recovered from

25   the Escalade; right?

1   A.   Yes.

2   Q.   Okay.  And how much after the search did the

3   tow truck driver find the additional gun?

4   A.   I don't recall.

5        MR. COOPER:  Okay.  That's all.  Thank

6   you.

7                   CROSS-EXAMINATION

8   BY MR. ARMSTRONG:

9   Q.   Good afternoon, Detective.

10  A.   Good afternoon, sir.

11  Q.   Just a very few questions here.

12       Do you remember the time you arrived at the

13  scene where the Cadillac and the Ford had been

14  pulled over?

15  A.   No, sir, I don't.

16  Q.   Was it still light?

17  A.   Yes.

18  Q.   And I think you told Mr. Cooper and maybe

19  Mr. Lacey, there was other agents and other law

20  enforcement, there was border patrol agents, all

21  over the scene?

22  A.   That's correct.

23  Q.   How many folks were there, if you know, if

24  you're able to guess?

25  A.   I couldn't guess, sir.  There was so many

1  people walking around.

2  Q.  With regard to Exhibit 78-B, if we could take

3  a look at that.

4  Well, do we have the photo, maybe 78 -- is it

5  78-A, the commensurate photo?  Maybe I can do it

6  this way, without getting the weapon out.

7  The Kel-Tec .223?

8  A.  Yes, sir.

9  Q.  That was a weapon you said -- Mr. Lacey asked

10  you where you located it, and you said, "I believe

11  it was found in the Escalade."

12  Do you recall your testimony?

13  A.  Yes, sir.

14  Q.  You're not certain where it was located; is

15  that true?

16  A.  No, sir.  Like I mentioned before, the first

17  time I saw those weapons were on the tailgate of

18  the Escalade.

19  Q.  Okay.  Clearly -- were there two or three at

20  the time you saw them?

21  A.  Two or three what?

22  Q.  Two or three weapons on the tailgate.

23  A.  I believe all the weapons had been taken out.

24  They were being photographed.

25  Q.  Okay.  Okay.  So the scene had been altered?

1  Law enforcement had moved the weapons around the

2  vehicle; is that true?

3  A.  Yes, sir.

4  Q.  And had -- had they also moved the vests that

5  were in the Ford?

6  A.  I have no idea, sir.

7  Q.  Okay.  Did you speak with Ja'Cory Ranger that

8  day?

9  A.  No, sir.

10  Q.  So your role in this case was you took the --

11  put the rifles, I guess, and the weapons and other

12  items you seized, put it in the trunk of your car

13  or someplace in your vehicle, transported them to

14  Tucson?

15  A.  Yes, down here in Tucson, to the Pinal County

16  Sheriff's Office.

17  Q.  Pima?

18  A.  Pima.

19  Q.  We're Pima.

20  A.  Pima.

21  Q.  Okay.

22  A.  My mistake, sorry.

23  Q.  Came to the Pima County Sheriff's Department,

24  dropped off the weapons, and did that end your

25  involvement?

1  A.  Yes, sir.

2          MR. ARMSTRONG:  Okay.  Thank you, sir.

3          THE COURT:  You're welcome.

4                  CROSS-EXAMINATION

5  BY MR. YOUNG:

6  Q.  Sir, I'm going to ask you about Exhibit No.

7  78-B.  It is the Kel-Tec .223?

8  A.  Yes, sir.

9  Q.  And I'm not going to pull it out and handle

10 it, because in my experience, these things are

11 usually covered with fingerprint powder, and I've

12 learned my lessons about that.  I know I'll touch

13 my face as soon as I touch the weapon.

14         But the Kel-Tec .223, that was mated with a

15 30-round magazine?

16 A.  I believe so, sir, yes.

17 Q.  And your report reflects that; right?

18 A.  Yeah.  The magazine contained 24 rounds, sir.

19 I don't know if they make the 24-round magazines or

20 25.

21 Q.  That was my next question.  The 30-round

22 magazine had 24 rounds in it; correct?

23 A.  That's correct.

24 Q.  And there was no spare magazine for that

25 weapon?

1  A.  I didn't find one, sir, or I didn't see one, I

2  should say.

3  Q.  There was also an AR-15 .223 rifle in the

4  Escalade?

5  A.  Yes, sir.

6  Q.  And that rifle was mated with a 20-round

7  magazine?

8  A.  That's correct.

9  Q.  And that 20-round magazine had 20 rounds in

10  it?

11  A.  That's correct.

12  Q.  That weapon also had no spare magazine?

13  A.  I didn't see a spare magazine for that, sir.

14  Q.  There was a Norinco MAK-90 Sporter AK-47 also

15  in the Escalade.

16  A.  That's correct.

17  Q.  And that weapon was mated with a 30-round

18  magazine?

19  A.  I don't know how many -- how big the magazine

20  was or what the load capacity of it was, but it

21  contained 22 rounds.

22  Q.  And they don't make 22 round magazines for

23  that weapon, do they?

24  A.  I don't know, sir.

25  Q.  In all probability, you've really only heard

1  of 30 round magazines for that weapon; right?

2  A.   Yes, sir, 20 or 30 rounds.

3  Q.   Sometimes 20 rounds but mostly 30 rounds?

4  A.   Yes.

5  Q.   You've never heard of a 22-round magazine for

6  an AK-47?

7  A.   No, sir.

8  Q.   So that weapon as well, the magazine for that

9  weapon is also partially empty?

10  A.   I did not empty the weapon, sir, so I don't

11  know how the weapon was found.

12  Q.   But it was found with 22 rounds in it?

13  A.   Yes, sir.

14  Q.   And again, there was no spare magazine for

15  that weapon?

16  A.   I did not see one.

17  Q.   The Ruger P95 nine millimeter found in the

18  Expedition, that had no spare magazine; is that

19  correct?

20  A.   I did not see one, sir.

21  Q.   And in fact, the Ruger nine millimeter had not

22  a single spare nine millimeter bullet in either

23  vehicle?

24  A.   I don't know what -- how many weapons were in

25  the vehicle.  Excuse me.  I should rephrase that.

1    I don't know if there was any other ammo in the
2    vehicle.
3    Q.   You never saw any other ammunition in the
4    vehicle?
5    A.   No, sir, I did not.
6    Q.   The Taurus Millennium .45 that was in the
7    Expedition also had no spare magazine; is that
8    right?
9    A.   I did not see one, sir.
10   Q.   And in either vehicle, there was not a single
11   spare .45 bullet, was there?
12   A.   I don't know, sir.
13   Q.   But you never saw a single spare .45?
14   A.   I did not see one.
15   Q.   And you are the person who took the weapons
16   and the magazines and the bullets into evidence?
17   A.   What do you mean?  Yes, I did, yes.  Okay.  I
18   see.
19   Q.   You packaged them up; right?
20   A.   As best as I could, yes.
21   Q.   And you transported them from the scene?
22   A.   That's correct.  That was me.
23   Q.   The Glock 17 nine millimeter had no spare
24   magazine; is that correct?
25   A.   I did not see one.

1  Q.  And once again, there was not a single spare

2  nine millimeter bullet in either vehicle?

3  A.  I did not see one.

4  Q.  There was a CZ-75 nine millimeter that also

5  had no spare magazine?

6  A.  I did not see any spare magazines in the

7  vehicle, sir.

8  Q.  And still, no spare nine millimeter vehicle --

9  nine millimeter bullet in either vehicle?

10  A.  As I mentioned before, I didn't see any spare

11  magazines or bullets.

12  Q.  The Colt Python .357, now, that's a revolver;

13  is that right?

14  A.  Yes, sir.

15  Q.  And so revolvers don't really come with spare

16  magazines, do they?

17  A.  No, sir.  Speed loaders, maybe, but --

18  Q.  Well, okay.  Since you bring it up, there was

19  no speed loader for a Colt Python .357 in either

20  vehicle, was there?

21  A.  I didn't see one, no, sir.

22  Q.  And in fact, there might have been a spare

23  .357 bullet under one of the seats in the

24  Escalade.

25      Do you recall that?

1  A.   I didn't see any bullets.  I wasn't looking

2  for bullets after I retrieved the weapons.

3  Q.   So I'll have to address question to somebody

4  else?

5  A.   That's correct.

6  Q.   And just to be entirely fair, were you aware

7  or do you know if there were seven spare .223

8  rounds under the seats in the Escalade?

9  A.   I'm not aware of any of that, sir.

10  Q.   So you didn't search underneath the seats in

11  the Escalade?

12  A.   No, sir.

13  Q.   Okay.  So really, to your knowledge, there's

14  no spare magazines for any of these weapons?

15  A.   That's correct.

16  Q.   Two of the three rifles had partially empty

17  magazines; is that correct?

18  A.   That's correct.

19  Q.   To your knowledge, there's really no spare

20  bullets that you saw?

21  A.   That I could see.

22  Q.   Now, you testified that you took buccal

23  swabs.  Am I saying that right?

24  A.   Buccal swabs, buccal swabs, yes, either way.

25  Q.   Well -- either way is correct?

1  A.  Either way is correct.

2  Q.  You took swabs from Border Patrol Agents

3  Dominguez, Fernandez, and Burlinger?

4  A.  That's correct.

5  Q.  And that was because why?

6  A.  For elimination purposes, so that way the lab,

7  if the weapons are processed for DNA, they -- the

8  lab will know who those agents' DNA is and will

9  focus on the DNA that is not theirs.

10  Q.  Okay.  And for elimination purposes, there

11  were a lot more agents than that there; right?

12  A.  Yes, sir.

13  Q.  But those were the three agents that were

14  touching the weapons?

15  A.  Those were three that I saw touching weapons.

16  Q.  And they were touching the weapons without

17  gloves on?

18  A.  That's correct.

19  Q.  So you wanted to eliminate their DNA from the

20  weapons when you sent it to the lab?

21  A.  Yes, sir.

22  Q.  And in fact, you did take swabs off the

23  various weapons and sent it to the lab, did you

24  not?

25  A.  No, sir, I did not.

1    Q.    There was a report.  Did you -- the Phoenix

2    Police Department has a DNA lab, doesn't it?

3    A.    Yes, sir.

4    Q.    And are you the person who submitted the swabs

5    to the Phoenix Police Department lab?

6    A.    No, sir.

7    Q.    In any case, when you handled the weapons,

8    what precautions did you take to keep from

9    contaminating the weapons?

10    A.    I changed gloves every time I switched

11    weapons.

12    Q.    So you put on gloves before you touched the

13    weapons?

14    A.    That's correct.

15    Q.    And each time you touched a weapon, you took

16    off that pair of gloves, threw them away, and put

17    on another pair of gloves before you moved on to

18    the next weapon?

19    A.    That's correct.

20    Q.    And that's so you didn't take DNA from one

21    weapon to the next to the next to the next?

22    A.    That's correct.

23    Q.    The vests that you saw in the Expedition,

24    those could certainly contain DNA as well?

25    A.    That's correct.

1   Q.   In fact, sweat is an excellent source of DNA?

2   A.   That's correct.

3   Q.   And if anybody had been sweating inside of

4   those vests, the DNA lab would know about it?

5   A.   You would hope so, yes.

6   Q.   So the DNA lab could tell who's been wearing

7   those vests?

8   A.   Yes, sir.

9   Q.   In fact, the DNA lab could tell you who even

10  touched those vests.

11  A.   If they were wearing gloves or not.

12  Q.   If they were not wearing gloves, they could

13  tell who handled those vests with bare skin?

14  A.   Yes.

15  Q.   And those vests really don't breathe all that

16  well, do they?

17  A.   No, they don't.

18  Q.   So if you've got one on, people tend to sweat

19  under them a lot, don't they?

20  A.   Yes.

21  Q.   And that sweat would certainly be absorbed

22  into that vest from whoever was wearing it?

23  A.   If the skin came in contact with a vest, yes.

24  Q.   And that would be fairly easy to check at the

25  DNA lab?

1    A.   Yes.

2    Q.   In fact, the lab is so good that you don't

3    even need to see a fingerprint anymore to see who

4    has handled an item?

5    A.   It's just part of that -- I got prints on one

6    of my last cases instead of DNA, so --

7    Q.   But the DNA lab can tell who's handled a

8    firearm?

9    A.   If they were not wearing gloves or depending

10   on the circumstances, yes.

11   Q.   And they can tell who's handled a magazine?

12   A.   Yes.

13   Q.   And they can even tell who's handled the

14   bullets that went into the magazine?

15   A.   Yes.

16   Q.   And that's even if there's no visible

17   fingerprints on those items?

18   A.   Yes.

19   Q.   And that's why you're so careful when you

20   collect that evidence?

21   A.   That's correct.

22   Q.   So as you sit here right now, you have no idea

23   who's ever worn those two vests before?

24   A.   That's correct.

25            MR. YOUNG:  That's all I have, Your Honor.

REDIRECT EXAMINATION

BY MR. LACEY:

Q.   Sir, you were asked some questions about whether there were extra gun magazines and extra bullets.

     Do you recall those questions?

A.   Yes, sir.

Q.   Now, were all the guns that you've looked at here today, were they loaded with bullets in each one of them and magazines and otherwise.

A.   Yes, sir.

Q.   Every one of the guns was loaded then; is that right?

A.   Yes, sir.

Q.   Some with 22 instead of 30 bullets?

A.   Yes, sir.

Q.   You also mentioned when you were asked some questions about leaving DNA or leaving prints that gloves may impact that?

A.   Yes, sir.

Q.   Like the brown gloves that were found in the console in the car with the one pistol, in the glove box, in the center console?

A.   Yes, sir.

          MR. LACEY:  Nothing further.

1    THE COURT:  If the jurors have any

2  questions, please place them in writing.

3    There's at least one.

4    (The following proceedings occurred at the

5    bench.)

6    THE COURT:  "Is the Colt Sporter II equal

7  to an AR-15 and equal to an M-16?  If not, who had

8  the M-16?"

9    "Does a Norinco model MAK-90 equal an

10  AK-47?"

11    You guys are confusing everybody.

12    MS. HOPKINS:  We have a firearms expert

13  coming on next.

14    THE COURT:  Do you?

15    MR. LACEY:  Yes.

16    MR. ARMSTRONG:  I missed an objection, I

17  think, maybe.  Did you ask him about the weapons

18  being loaded?  Did you ask the witness whether --

19  I'm requesting permission to recross.

20    MR. LACEY:  Speak up.

21    THE COURT:  He asked if the weapons were

22  all loaded and he said yes, each one.

23    MR. ARMSTRONG:  Okay.  May I -- I missed

24  the objection.  I think I missed the evidence.  He

25  wouldn't know if they were loaded or not.  By the

1 time he got there, the weapons were apart.  You

2 know, he was taking pictures of the magazines

3 laying next to weapons.  I'd like --

4          MR. LACEY:  I'll ask him.  I can clarify

5 that, or you can ask him.

6          THE COURT:  All right.

7          MR. ARMSTRONG:  Thank you.

8          (End of bench conference.)

9          THE COURT:  I have a couple of questions

10 from the jurors.

11          Is the Colt Model Sporter II equal to an

12 AR-15?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  And is that the same as an

15 M-16?

16          THE WITNESS:  No, sir.

17          THE COURT:  Was there an M-16 in the

18 case?

19          THE WITNESS:  No, sir.

20          THE COURT:  Does a Norinco model MAK-90

21 equal an AK-47?

22          THE WITNESS:  It's just the same type of

23 round.  It's like a derivative of that weapon.

24          THE COURT:  All right.  Mr. Armstrong?

25          MR. ARMSTRONG:  Thank you, Your Honor.

FURTHER EXAMINATION

BY MR. ARMSTRONG:

Q.   Very briefly, Detective, I just wanted to clarify something.

Mr. Lacey asked you about the weapons and whether they were loaded, the rifles and whether they were loaded, and I believe you testified that they were.

A.   Yes, sir.

Q.   Okay.  Do you know whether those -- the magazines -- when I'm talking about a weapon being loaded, I'm talking about the magazine being inside the actual rifle.

When you arrived on the scene, did you see loaded weapons?

A.   Not out of the Escalade, no.  When I arrived to the first vehicle, which is the black Escalade, the weapons had already been made safe.  The magazines, if there were magazines in the weapon itself, had been removed.

Q.   And you didn't have -- did you have any discussion with anyone from the border patrol about whether, in fact, the -- well, let me strike that.

So just to be clear, you never saw the magazines actually inside the weapons from the

1  Escalade?

2  A.  That's correct.

3      MR. ARMSTRONG:  Okay.  Thank you.  Nothing

4  further.

5      THE COURT:  You're gone.  Thank you.

6      MR. LACEY:  Just one follow up?

7      THE COURT:  You didn't move fast enough.

8      MR. LACEY:  It's the long legs, Judge.

9                 FURTHER EXAMINATION

10 BY MR. LACEY:

11 Q.  Sir, as to the Ford Expedition, did you see

12 those weapons before they had been -- any bullets

13 may or may not have been taken out?  Were they

14 still intact when you got there, to the Expedition?

15 A.  Yes, sir.  I was the one that cleared the red

16 Expedition.  In essence, I was the one that removed

17 all the weapons from within the vehicle and emptied

18 them out, made them safe.

19 Q.  And were all those weapons in the red

20 Expedition with Jerome Ranger and Ghermon Tucker in

21 the front seat, were all those weapons loaded?

22 A.  Yes, sir.

23      MR. LACEY:  Nothing further.

24      THE COURT:  We'll take about 10 minutes.

25      (The jury exits the courtroom.)

1          (Off the record.)

2          (The jury enters the courtroom.)

3          THE COURT:  Show the jury entering the

4   courtroom, the presence of all counsel and the

5   defendants.

6          You may call your next witness.

7          MS. HOPKINS:  The Government calls Brett

8   Mills to the stand.

9              BRETT MILLS, WITNESS, SWORN

10         THE COURT:  Sir, the Rule has been invoked

11  in this case.  That means, except during the time

12  that you're testifying, you must remain outside the

13  courtroom, and you're only allowed to discuss your

14  testimony with the attorneys involved in the case.

15         THE WITNESS:  Yes, sir.  Understood.

16         THE CLERK:  Please state your name for the

17  record and spell your last name.

18         THE WITNESS:  My name is Brett, B-r-e-t-t,

19  last name Mills, M-i-l-l-s.

20         THE CLERK:  Thank you.

21         THE COURT:  You may proceed.

22              DIRECT EXAMINATION

23  BY MS. HOPKINS:

24  Q.  Good afternoon, Mr. Mills.

25  A.  Good afternoon, ma'am.

1    Q.   Where do you work?

2    A.   I work at the FBI laboratory in Quantico,

3    Virginia.

4    Q.   And what is your title?

5    A.   I'm a forensic examiner in the firearms

6    toolmarks unit.

7    Q.   And how long have you been a forensics

8    examiner?

9    A.   A forensics examiner since 1995.

10   Q.   And what are some of your duties as a

11   forensics examiner?

12   A.   I examine firearms, bullets, cartridge cases,

13   other ammunition components; determine if firearms

14   operate in the manner they were designed to; to see

15   if bullets or cartridge cases were fired from or

16   within a firearm.

17        We also do tool cases, if a knife cut, say, a

18   piece of tubing, and we also do serial number

19   restoration on obliterated numbers.

20   Q.   Now, what kind of specialized training did you

21   receive to become a forensics examiner?

22   A.   The Bureau has a two-year comprehensive

23   program.  You start out -- it's basically you go

24   out and you read.  You study, study the

25   literature.  You learn the theory behind it.  You

1  will go and visit manufacturers of firearms to see

2  how the unique marks that are left on the bearing

3  surface of, say, the breechface and barrel are

4  produced.

5      You also go and visit tool factories, because

6  the tools themselves can actually impart those

7  marks on the surface of barrels, so you want to see

8  how the manufacturing process creates the unique

9  marks, which allows us to say something is or is

10 not fired from.

11     You then go through a side-by-side working

12 process with a qualified examiner working cases.

13 You're given mock cases.  You're given tests, oral

14 boards, and eventually moot courts, and then, if

15 you pass all of that, then you are deemed by the

16 bureau as a forensic examiner.

17 Q.   And what's your educational background?

18 A.   I have a bachelor's of science in biology from

19 Towson State University in Towson, Maryland.

20 Q.   And have you previously testified in federal

21 or state court as an expert witness regarding the

22 function, testing, or operability of firearms?

23 A.   Yes, ma'am, I have.

24 Q.   Approximately how many times?

25 A.   Strictly on operability of firearms, at least

1   50 times.

2   Q.   Now, would you please describe the procedure

3   that you follow to determine the operability of

4   firearms?

5   A.   When we receive -- or I receive particularly a

6   firearm in my unit, it's already gone through all

7   the other units that would have to examine it.

8       I would then open the box, inventory the item

9   in it so that the worksheet that I have lets me

10  know whether or not it's the true piece of

11  evidence.  I'll write all my general notes on it,

12  make, model, materials it's made of, did it have

13  black grips, did it have wood grips.

14      Once I have all my notes written, I'll go into

15  our ammunition room and pull test samples to test

16  fire.  Depending on the type of firearm, how many

17  magazines are submitted, or if ammunition submitted

18  with the case, we try and shoot one of each type,

19  so it could be anywhere from two test specimens to

20  four or five fired in each gun.

21      We'll shoot them into a water tank and recover

22  them, because when bullets go into water, they --

23  they're not abraded.  Even a cotton box that you

24  probably have seen on some CSIs, just a fine cotton

25  batting can actually rub and change the marks on

1  the surface of the bullets.  That's why we shoot in

2  water.

3      Then I go in and measure the lands and

4  grooves, which will give me a classification of

5  general rifling characteristics.

6  Q.  Have you had an opportunity to examine and

7  test fire the firearms in this case?

8  A.  Yes, ma'am, I have.

9  Q.  And when and where did this examination take

10  place?

11  A.  It took place in May 2011 at the FBI

12  laboratory in Quantico, Virginia.

13  Q.  And how many firearms did you test fire in

14  this case?

15  A.  A dozen.

16  Q.  Now, did you follow the procedure that you

17  previously described for the examination in this

18  case?

19  A.  Yes, ma'am.

20  Q.  And did you memorialize your findings in a

21  report?

22  A.  Yes, ma'am.

23  Q.  Okay.  I'd first like to show you what's been

24  admitted as Government's Exhibit No. 76-B.

25          MS. HOPKINS:  And if the case agent can

1  approach the witness, Your Honor?

2          THE COURT:  He can.

3  BY MS. HOPKINS:

4  Q.  And if you want to use gloves, there's some up

5  there for you.  It's up to you.

6      Would you please give us a description of this

7  firearm.

8  A.  This is a -- this is a Smith & Wesson.  I'm

9  sorry.  This is the Colt.  No, this is a Colt AR-15

10  A2 Sporter model.  It's a semiautomatic, shoots a

11  .223 or .556x45 round.

12      The design and everything about it is just

13  like the M-16.  The internal components prevent

14  select fire.  You can't fire this one full

15  automatic.  It's just a semiauto.

16  Q.  Now, did you examine this firearm?

17  A.  Yes, ma'am, I did?

18  Q.  And what did you determine based on your

19  examination?

20  A.  That this gun functioned as designed by the

21  manufacturer.

22  Q.  Okay.  Now, if we can get that gun back and

23  then also show you 77-B, and this has already been

24  admitted as well.

25      Can you please give a description of this

1  weapon.

2  A.   Yes, ma'am.  This is a Norinco MAK, M-A-K,

3  90.  It is based off the Kalashnikov AK-47, which

4  eventually became the AKM.

5     The Chinese, when they make those basically

6  Kalashnikov -- it's a type 56.  This is their

7  civilian market version of it.  It will shoot a

8  .762x3 nine millimeter.  Again, this one only

9  shoots in the semiauto.  It is -- all the

10  manufacturing parts inside are for semiauto only.

11  Q.   Now, did you examine this specific firearm?

12  A.   Yes, ma'am I did.

13  Q.   And what were the results of your examination?

14  A.   It functioned normally as designed.

15  Q.   Okay.  If we could take that one back and take

16  a look at 78-B.

17     Can you please give a -- that is 78-B, and

18  it's already been admitted.  Can you give a

19  description of this firearm.

20  A.   Yes, ma'am.  This is a Kel-Tec .223.  The

21  model I believe is the SU-16.  It's manufactured in

22  Florida.  It's a very lightweight gun, a lot of

23  polymers on this, polymers on the fore end,

24  polymers on the buttstock.  The magazine design's a

25  little bit different.  It shoots the .223 or the

1  .556x45.  It's a semiauto, and it functioned as

2  designed when I test fired it.

3  Q.  Okay.  If you could give that back, and then

4  we'll show you 79-B.  It's already been admitted.

5  Can you please give us a description of that

6  firearm.

7  A.  This is a CS model 75 manufactured by -- in

8  the Czech Republic.  I'm not going to attempt to

9  say the name of the manufacturing company.  It's a

10  very reliable gun.  It shoots 9x19 millimeter, also

11  known as nine millimeter Luger.  For a pistol, it's

12  a very good weapon, and this one functioned as

13  designed when tested in the FBI laboratory.

14  Q.  Okay.  I'll show you next what's been admitted

15  as Exhibit 80-B.

16  Can you give us a description of that

17  firearm.

18  A.  Yes, ma'am.  This is a Glock 17, manufactured

19  by Glock, Incorporated in Austria.  It's imported

20  to the United States and assembled in the United

21  States down in Smyrna, Georgia.

22  It fits -- the magazine fit in and functioned,

23  and the gun functioned as designed when test fired

24  in the laboratory.

25  Q.  Okay.  Take a look at 81-B.

1    Can you give a description of that firearm.

2  A.   Yes, ma'am.  This is a Ruger P95 manufactured

3  by the Ruger Corporation.  It's a semiautomatic

4  pistol, shoots the nine millimeter round, and this

5  one will function as designed as the manufacturer

6  deemed it.

7  Q.   Okay.  Next is 82-B, and it's already been

8  admitted.

9  A.   This is a .357 Magnum Colt Python revolver.

10  It's a higher-powered cartridge than the regular

11  .38 Special.

12    The hammer I noted was broken off on the back

13  end.  I'm not sure why.  But when I test fired it,

14  I could still shoot it in double action and single

15  action, so it did function as designed.

16  Q.   Okay.  The next exhibit is 83-B.  It's already

17  been admitted.

18    This is?

19  A.   This is a .45 auto.  It's a Taurus Millennium

20  pistol.  You can tell it's a little bit shorter.

21  Magazine capacity would be smaller than a normal

22  full-sized.  Manufactured in Brazil.  It's a good

23  quality weapon, and it functioned as designed.

24  Q.   The next firearm is what's been marked for

25  identification as Government's Exhibit No. 84-B,

1   and it has not yet been admitted into evidence, but

2   we're just going to show it to him right now.

3           THE COURT:  84-B?

4           MS. HOPKINS:  Yes.

5   BY MS. HOPKINS:

6   Q.   If you could please take a look at that and

7   describe what that firearm is.

8   A.   Yes, ma'am.  This is a .45 caliber Springfield

9   Armory.  It's a -- I wouldn't call it a replica,

10  but it's based on the design of the Colt 1911A1.

11  Q.   And did you have an opportunity to examine

12  that weapon?

13  A.   Yes, ma'am, I did.

14  Q.   And what were the results of that examination?

15  A.   The firearm functioned as designed when test

16  fired in the laboratory.

17  Q.   All right.  Thank you.  The last firearm is

18  Exhibit 85-B.  Again, it's marked for

19  identification as Exhibit 85-B and has not yet been

20  admitted.

21          If you could take a look at that and describe

22  what it is.

23  A.   This is a .380 auto.  It's a Jennings Firearms

24  pistol.  The model is referred to as Bryco.  When

25  it was test fired in the laboratory, it functioned

1  as designed.

2          MS. HOPKINS:  May I have one moment, Your

3  Honor?

4          THE COURT:  You may.

5          MS. HOPKINS:  No further questions for the

6  witness.

7          MR. COOPER:  I have no questions, Your

8  Honor.

9          THE COURT:  Mr. Armstrong?

10          MR. ARMSTRONG:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12  BY MR. ARMSTRONG:

13  Q.  Good afternoon.

14  A.  Good afternoon.

15  Q.  Just a few questions here.

16      The semiautomatic weapons, those can be

17  converted into fully automatic weapons.  It's

18  illegal to do so, but it can be done.

19      Correct?

20  A.  On certain models, yes, sir, they can.  I can

21  elaborate, if you'd like.

22  Q.  Well, Exhibit 76-B, the Colt semiautomatic, is

23  that a weapon that could be converted into a fully

24  automatic weapon?

25  A.  If you had all the component parts, yes, sir.

1  Q.  And again, it's illegal to do so, but it's not

2  a terribly difficult procedure.

3      Would you agree with that?

4  A.  For the Colt, I would say yes because you need

5  so many different parts and it's hard to get ahold

6  of them or you have to have knowledge on how to

7  manufacture, like, you would need a full auto sear,

8  a full auto trigger assembly group.  You have to

9  modify the bolt.

10     So that one is a little more difficult than

11 some of the other ones that are out there.

12 Q.  To be clear though, the Colt was -- it's a

13 semiautomatic weapon like you could buy at any

14 retailer that sells a semiautomatic rifle; correct?

15 A.  That is correct, yes, sir.

16 Q.  None of these guns had been altered?

17 A.  No, sir.

18 Q.  You'd mentioned -- you mentioned 82-B, the

19 Colt Python --

20 A.  Yes, sir.

21 Q.  -- that the hammer trigger had been -- the

22 hammer had been -- you thought it had been broken

23 off, but that's not something that a person would

24 do in any way to gain an advantage with that

25 weapon.

1    Would you agree with that?

2  A.   Oh, no, sir.  It would actually put you at a

3  disadvantage.

4  Q.   Right.  Okay.

5    The Kel-Tec .223, I believe it's Exhibit 78-B,

6  is that a weapon that can be converted into a fully

7  automatic?

8  A.   To my knowledge, no, sir, not that I know of.

9  Kel-Tec's never actually made a full auto machine

10  gun version of it.  I'm sure if someone had the

11  will and the way they probably could figure out a

12  way to convert it.

13    MR. ARMSTRONG:  Those are the only

14  questions I had.  Thank you.

15                CROSS-EXAMINATION

16  BY MR. YOUNG:

17  Q.   Sir, these are all weapons that you can get

18  down at the local Wal-Mart or the Sportsmans

19  Warehouse or something like that; right?

20  A.   Some of them, yes, sir, but some of them have

21  been discontinued and are no longer for sale.

22  Q.   But there's nothing special about any of these

23  weapons?

24  A.   No, sir.

25  Q.   They're readily available on the retail

1  market, or at least current versions of them are?

2  A.  I would agree with that, yes, sir.

3         MR. YOUNG:  That's all I have, Your Honor.

4         MS. HOPKINS:  Nothing further from the

5  Government.

6         THE COURT:  If the jurors have any

7  questions for the witness, if so, please place them

8  in writing.

9         Thank you.  You may step down.

10         THE WITNESS:  May I be excused, Your

11  Honor?

12         THE COURT:  You may.  Where are you going

13  back to?

14         THE WITNESS:  Virgina.  Thank you, sir.

15         THE COURT:  Not until tomorrow though?

16         THE WITNESS:  No, sir.  I can change my

17  flight, if you like.  It's 7:30 flight.

18         THE COURT:  I'm sorry.  I'm not asking for

19  you to change your flight.

20         THE WITNESS:  Thank you, sir.

21         THE COURT:  You may call your next

22  witness.

23         MR. LACEY:  Can we be seen at sidebar

24  first?  Sidebar?

25         THE COURT:  Sure.

1    (The following proceedings occurred at the

2    bench.)

3    MR. LACEY:  Your Honor, we have the

4 co-conspirator witness or witnesses coming on

5 next.  They're downstairs on the fourth floor.

6 We'll need to bring some of them -- they're being

7 watched by some FBI agents, so I didn't want them

8 up here, for obvious reasons, so we'll -- if you'd

9 give us five minutes, we'll bring them up and start

10 with one of them.

11    THE COURT:  Okay.

12    MR. LACEY:  Thank you.

13    (End of bench conference.)

14    THE COURT:  Five minute recess.

15    (The jury exits the courtroom.)

16    (Off the record.)

17    THE COURT:  Place him under oath, would

18 you please?

19    THE CLERK:  Sir, please stand and raise

20 your right hand.

21    JORGE ABEL MEDINA-SANTOS, WITNESS, SWORN

22    THE COURT:  Mr. Lacey, go ahead.  We were

23 going to do a Dessureault hearing before the jury

24 came in.

25    MR. LACEY:  Okay.

1          THE CLERK:  Please state your name for the

2     record.

3          THE WITNESS:  Jorge Abel Medina-Santos.

4          MR. LACEY:  Judge, can we move the screen

5     a little bit?  It's kind of blocking the witness.

6          THE COURT:  I'm not going to touch it

7     again.

8                    DIRECT EXAMINATION

9     BY MR. LACEY:

10    Q.  Sir, let me direct your attention back to

11    March of last year, March 2nd.

12         Did you get involved with other people to come

13    to Tucson and get involved in being a driver for

14    what was going to be a home invasion?

15    A.  Yes, sir.

16    Q.  Were you at some time shown some photographs

17    after all this happened, after you were approached

18    by law enforcement, and did you look at some

19    photographs?  Do you remember offhand?

20    A.  Yes.

21    Q.  And do you remember when that -- when that

22    took place, roughly?

23    A.  Yes.

24    Q.  When was that, about how long after March 2,

25    before anyone came to talk to you?

1  A.   It was a couple of months later.

2  Q.   At that point in time -- just for the record,

3  are you related to anybody that was involved in

4  this operation?

5  A.   Yes.

6  Q.   Who's that?

7  A.   Yovani Valenzuela.

8  Q.   Yovani Valenzuela.  And he's already pled

9  guilty in this case, as far as you're aware?

10  A.   Uh-huh.

11  Q.   You have to speak up.  Yes or no?

12  A.   Yes.

13  Q.   Did you know some of the other people,

14  Hispanic males, that were involved in this as well?

15  A.   Yes.

16  Q.   And was one of them Mayco?

17  A.   Yes.

18  Q.   Also known as Seco?

19  A.   (Nodding.)

20        THE COURT:  You have to answer.

21        THE WITNESS:  Yes.

22  BY MR. LACEY:

23  Q.   How long had you known Seco before this day,

24  back in March of last year, March 2nd?

25  A.   I'm not sure.

1    Q.   Had you seen him around from time to time?

2    A.   Yes, sir.

3    Q.   And who's present?  When you saw him, who else

4    was around?

5    A.   My brother-in-law.

6    Q.   Yovani?

7    A.   Yes.

8    Q.   Okay.  Did there come a time that particular

9    day, on March 2nd, when you went to a meeting that

10   took place in Phoenix before you came down to

11   Tucson?  Did you get together at somebody's house?

12   A.   Yes.

13   Q.   Did you see any black males at that location?

14   A.   Yes, sir.

15   Q.   Had you seen any of those black males in the

16   past, prior to that time?

17   A.   Probably once, at Seco's house.

18   Q.   Okay.  And that particular day, on March 2nd,

19   this meeting took place at somebody's house in

20   Phoenix; is that right?

21   A.   Yes.

22   Q.   Before you all came down to Tucson?

23   A.   Yes.

24   Q.   How many black males were present at that

25   meeting?

1 A. I'm not sure, but it was a couple of them.

2 Q. When you say "a couple," how many people did

3 you see at the meeting?

4 Or where did this take place? At somebody's

5 house?

6 A. Yes.

7 Q. Did you go in the house?

8 A. I don't remember if I went inside the house or

9 I was outside of the house. I'm not sure.

10 Q. Okay. And who was with you when you went to

11 that location where the house was -- where the

12 house was that we're talking about?

13 A. It was Mayco and Yovani.

14 Q. Mayco and Yovani?

15 A. And Yovani.

16 Q. Okay.

17 MR. COOPER: I'm sorry. I couldn't hear

18 the second name.

19 MR. LACEY: Yovani.

20 MR. COOPER: Yovani.

21 BY MR. LACEY:

22 Q. When you went to that location, to the house,

23 prior to that, had you had any conversations in the

24 car about what was going to be happening that day?

25 A. By what I could hear, they were talking about

1  what was going to happen.

2  Q.   And was that a home invasion?

3  A.   Yes.

4  Q.   In Tucson?

5  A.   Yes.

6  Q.   Now, after going to this house, you say you

7  saw some black male or males; is that correct?

8  A.   Yeah.

9  Q.   How long did you get to see them for back

10 then?

11 A.   I'm not sure, but it was a minute.

12 Q.   Okay.  And after this meeting at the house,

13 did you later come to Tucson?

14 A.   We went to another house.

15 Q.   Up in Phoenix?

16 A.   Uh-huh.

17 Q.   Was that somebody called Miami?

18 A.   Yes, sir.

19 Q.   And after going to that house, did you

20 ultimately come down to Tucson?

21       And we're skipping over a little bit just to

22 get some things we're going to talk to you about.

23 A.   Yeah.  We drove around a little bit longer.

24 Q.   Okay.

25            THE COURT:  Who's the "we"?

1          THE WITNESS:  Me, Yovani, and Mayco.

2    BY MR. LACEY:

3    Q.   Did you all three stay in the same car the

4    same day?

5    A.   Yes.

6    Q.   What car was that?

7    A.   A Jeep Commander, a white one.

8    Q.   And whose car was that?

9    A.   My brother-in-law's, Yovani's.

10   Q.   When you came to Tucson, where did you go?

11   A.   We went to a Food City?

12   Q.   Here in Tucson?

13   A.   Uh-huh.

14   Q.   When you got to the Food City, were the same

15   two people in the car with you, Yovani and Mayco?

16   A.   Yes, sir.

17   Q.   Once you got to Food City, did you see any

18   black males at that location?

19   A.   Yes.

20   Q.   Do you remember what kind of vehicle or

21   vehicles they were in?

22   A.   It was an Escalade, a truck, and it was an

23   Expedition, a red Expedition.

24   Q.   Okay.  And when you saw those vehicles, was

25   that in Food City then?

1  A.   Yes.

2  Q.   Did you -- when you saw those two vehicles,

3  did you see anybody that was inside those two

4  vehicles?

5  A.   Yeah.  It was just black people inside of the

6  vehicles.

7  Q.   Had you seen any of those black persons prior

8  to seeing them in the Food City parking lot,

9  meaning earlier that morning or some other

10  occasion?

11  A.   Yes.  I saw them in Phoenix.

12  Q.   And how many of them, approximately, were in

13  that position, that is, that you saw in Phoenix

14  that you also saw in Tucson at Food City?

15  A.   Two or three, a couple of them I saw.

16  Q.   Okay.  And when you saw them, how long did you

17  see them for in the parking lot?

18  A.   We were just right there at the parking lot,

19  just a long, like, a long minutes.

20  Q.   Okay.  And what happened then?

21        THE COURT:  I'm sorry.  You said "a long

22  minutes."  What does that mean?

23        THE WITNESS:  Like, a long time.

24        MR. COOPER:  How many did he say?  Five

25  minutes?

1    MR. LACEY:  He said "a long minutes."

2    THE WITNESS:  I'm not sure how long we

3  were there for.

4  BY MR. LACEY:

5  Q.  Okay.  And what happened then?  Did you stay

6  -- did somebody leave or you stayed there or what

7  happened?

8  A.  I was in the vehicles, and my brother-in-law

9  and Seco left.

10  Q.  Seco meaning Mayco?

11  A.  Yes.

12  Q.  When they left, what vehicle were you in?

13  A.  My brother-in-law's, the Jeep Commander.

14  Q.  Did you have the keys?

15  A.  Yes.

16  Q.  After they left, did they return?

17  A.  They didn't return.

18  Q.  And what did you ultimately do after that?

19  Did you talk with anybody else at the Food City

20  parking lot?

21  A.  Yes.

22  Q.  Who was that?

23  A.  Seco's brother-in-law.

24  Q.  Okay.  And after speaking with him, did you

25  find anything out?

1  A.   Yes.  That they got pulled over.

2  Q.   "They" meaning?

3  A.   Like, they got caught.

4  Q.   Meaning Yovani and Mayco?

5  A.   Yeah.

6  Q.   Did you have any conversation in the Food City

7  parking lot with any of the black males that you

8  had talked to us about earlier?

9  A.   Yes, when I was walking back to my vehicle.

10  Q.   And do you recall what vehicle or vehicles

11  those persons were in that you spoke to?

12  A.   I remember talking to the driver of the

13  Escalade.  Just, I told them, "Hey, they got

14  caught," and that's, like, about it.

15  Q.   Okay.  And after that conversation, did you

16  then leave the area?

17  A.   Yes.  I headed back to Phoenix.

18  Q.   Before heading back to Phoenix, did you stop

19  at any stores along the way?

20  A.   Yes, I stopped -- I got off two or three times

21  off the freeway, but I stopped at a Circle K.

22  Q.   Here in Tucson?

23  A.   Yes.

24  Q.   When you got off at the Circle K here in

25  Tucson, did you see anyone there that you'd seen

1  earlier that day?

2  A.  Yes.  I saw --

3  Q.  Who is that?

4  A.  The Escalade and the Expedition.

5  Q.  And when you saw those two vehicles, did you

6  talk with anyone that was related to those vehicles

7  at the Circle K?

8  A.  Yes, I was -- I was parking.  They walked up

9  to me.

10 Q.  And do you remember how many persons walked up

11 to you there at the Circle K?

12 A.  I don't -- I don't remember.  It was, like,

13 five, four, around there.

14 Q.  Okay.  And do you -- were you in the vehicle

15 by yourself at this point in time?

16 A.  Yes.

17 Q.  In the white Jeep?

18 A.  Uh-huh.

19 Q.  Yes?

20 A.  Yes, sir.

21 Q.  Okay.  And about how long did that

22 conversation last at the Circle K here in town?

23 A.  It didn't last a lot because I jumped back on

24 the freeway.

25 Q.  After that meeting, when you met some black

1  males by your vehicle, were you inside the vehicle

2  or outside the vehicle?

3  A.   Inside of the vehicle.

4  Q.   Now, after these encounters, after the meeting

5  with the people, the black males we talked about up

6  until now, you said you were shown some photographs

7  later?

8  A.   Yeah.

9  Q.   About how much later was this?  You mentioned

10  a couple of months?

11  A.   Yeah, a couple of months.

12  Q.   And when you were shown those photographs, who

13  showed those to you?

14  A.   The --

15  Q.   The FBI?

16  A.   Yes, the FBI.

17  Q.   Mr. Edwards here?

18  A.   I don't know his name.  Yeah, he showed them

19  to me.

20  Q.   Agent Edwards.

21       And where did that take place?

22  A.   In Arizona, Phoenix.

23  Q.   Okay.  When you were shown those photographs,

24  were you able to make any identifications of anyone

25  that you saw there?

1    A.   Yes.

2    Q.   And who was that?

3    A.   My brother-in-law and Seco and the two or

4    three I saw at the home where we stopped here in

5    Phoenix.

6    Q.   And when you say "two or three," two or three

7    of the black males?

8    A.   Yes.

9    Q.   When you were shown those photographs, do you

10   recall how many you were shown at that time?

11   A.   No.  I don't remember.

12   Q.   Were there -- were there several?

13   A.   Yeah, there was several people.

14   Q.   After you were shown those photographs, were

15   there any other occasions after that time when you

16   were shown photographs again, that you can recall?

17          THE COURT:  Let's just send the jury home

18   for the day.

19          MR. LACEY:  Okay.

20          THE COURT:  Tell them to be back at 9:30.

21          MR. LACEY:  Do you want me to wait a

22   minute, Your Honor, or keep going?

23          THE COURT:  No.  Keep going.

24          MR. LACEY:  Okay.

25   BY MR. LACEY:

1    Q.   Do you recall any other occasions after that

2    first batch of photographs you were shown by Agent

3    Edwards -- were you shown photographs again that

4    you can recall?

5    A.   Yes.

6    Q.   About how much later?

7    A.   I'm not sure.  I'm not sure how long later,

8    how much later.

9    Q.   When you were shown the first batch of

10   photographs, you don't have a specific recollection

11   about how many were shown to you?

12   A.   No.

13   Q.   And you said you were shown additional

14   photographs later.  Were these of the same people

15   you saw earlier or different people or do you

16   remember?

17   A.   It was the people I saw earlier.

18   Q.   And when you were shown these photographs, was

19   it again by Agent Edwards at that time?

20   A.   Yes.

21   Q.   Did you recognize any people from that

22   photograph display you were shown the second time?

23   A.   Yes, the same people.

24   Q.   The same people you had identified the first

25   time --

1    A.    Yes --

2    Q.    -- in those photographs?

3    A.    Yes.

4    Q.    Were there any other occasions that you were

5    shown photographs besides those two times?

6    A.    When they got the photographs from here, from

7    Tucson.

8    Q.    You mean from stores or from different

9    locations?

10   A.    Yes, from different locations from here.

11   Q.    And when you were shown those photographs,

12   were those of people you had seen that day?

13   A.    Yes.

14   Q.    Were some of them of yourself and/or your

15   brother-in-law?

16   A.    It was myself and, yeah, a couple from my

17   brother-in-law and other people.

18   Q.    And the pictures you saw from stores down here

19   that day, were any of them black males?

20   A.    Yes.

21   Q.    And was that the Circle K photographs?

22   A.    Yes.

23   Q.    Were you able to identify anyone from those

24   photographs that you'd seen earlier, from the one

25   -- the Circle K photographs you were shown that

1  were taken locally here?

2  A.  Yeah.

3  Q.  Had you seen those same people earlier, and if

4  so, when?

5  A.  I saw them in Food City.

6  Q.  Okay.  When you were shown those photographs,

7  was anything said to you by the agent as far as

8  suggesting which photographs to pick out?

9  A.  No.

10  Q.  Do you recall what he told you or roughly what

11  he told you when he showed you some photographs?

12  A.  No.  I don't remember.

13       MR. LACEY:  Your Honor, for the sake of

14  the hearing, I don't have anything further at this

15  time.  I'll pass off to counsel.

16       THE COURT:  Mr. Cooper?

17            CROSS-EXAMINATION

18  BY MR. COOPER:

19  Q.  Sir, this is the year 2012; correct?

20  A.  Yes.

21  Q.  March 2nd of 2011 is when you agreed to

22  participate in a home invasion; right?

23  A.  Can you tell me the question again?

24  Q.  Sure.  This is 2012.  Okay.  You agreed to

25  participate in the home invasion, to come to Tucson

1    to help with the home invasion, on March 2nd of

2    2011, close to 18 months ago; right?

3    A.   Yeah.

4    Q.   And you actually didn't talk to anybody from

5    law enforcement or the FBI until February of 2012;

6    correct?

7    A.   Correct.

8    Q.   And that's because you had been arrested on a

9    traffic fine; right?

10   A.   Yes.

11   Q.   And at that point, three different FBI agents

12   talked to you, I believe, February 15th of 2012;

13   right?

14   A.   Yes.

15   Q.   Okay.  That's close to a year after you went

16   to this home where you say you saw black people;

17   right?

18   A.   Yeah.

19   Q.   And during that entire year, you were out of

20   custody.  You were not in jail, were you?

21   A.   No.

22   Q.   You were only in jail for that week or so in

23   February of 2012; right?

24   A.   Right.

25   Q.   How long were you in custody?

1    A.   Two days, a day.

2    Q.   And that was on -- you'd forgotten to pay a

3    traffic fine; right?

4    A.   Yes.

5    Q.   And that's when they came to talk to you about

6    what you had done a year before and what you had

7    seen; right?

8    A.   Yes.

9    Q.   And you then told them about being with

10   Yovani; right?

11   A.   Yeah.

12   Q.   And Yovani has a nickname, and his nickname is

13   Yogi; right?

14   A.   Yes.

15   Q.   And you have a nickname, too, don't you?

16   A.   Uh-huh.

17   Q.   Is it pronounced Cochi (phonetic)?

18   A.   Yeah.  Cokey (phonetic).

19   Q.   Cokey (phonetic).

20        Okay.  And the morning of the 2nd of March,

21   2011, you got a call from Yovani; right?

22   A.   Yes.

23   Q.   And Yovani said, asked you if you wanted to

24   earn money; right?

25   A.   Yes.

1    Q.   And he was going to pay you $2,000 to go to

2    Tucson; right?

3    A.   Yes.

4    Q.   Okay.  And you knew what you were getting

5    involved in; right?

6    A.   Yes.

7    Q.   Okay.  And you met Yovani and parked your car

8    at -- I believe it was at an AM/PM; right?

9    A.   Yes.

10   Q.   Okay.  And then you went to a house and got a

11   fellow whose name is Mayco; right?

12   A.   I don't know about that name.

13   Q.   But you knew somebody named Seco?

14   A.   Oh, yeah, Seco.

15   Q.   And you went down to south Phoenix to find

16   Seco; right?

17   A.   Right.

18   Q.   And you knew Seco before, hadn't you?

19   A.   Yeah, by my brother-in-law.

20   Q.   You knew him through Yovani?

21   A.   Yes.

22   Q.   Okay.  And you then were driving around a

23   neighborhood looking for people who were going to

24   go to Tucson; right?

25   A.   Yeah.

1  Q.  Okay.  And you knew that; right?

2  A.  From my point of view, Seco was talking, and

3  what was I hearing?  They were looking for a

4  person, people.

5  Q.  And this was in -- are you from south Phoenix?

6  A.  No.

7  Q.  Do you know -- do you know the area in south

8  Phoenix?

9          MR. LACEY:  I'm going to object, Your

10  Honor.  I think, for the scope of this hearing, I

11  don't think we need to go there.

12          THE COURT:  True.  Let's get to the

13  identification issues while we're talking to him.

14          MR. LACEY:  I will do that.

15          THE COURT:  I was wondering why Mr. Lacey

16  was waiting so long to mention it.

17          MR. LACEY:  I thought he'd get to the

18  point.

19  BY MR. COOPER:

20  Q.  You got the call at what time in the morning

21  from Yovani?

22  A.  I'm not sure about the time.

23  Q.  Were you working?

24  A.  I was at a friend's house.

25  Q.  Okay.  Who was the friend?

1    MR. LACEY:  Your Honor, I'm going to

2 object.  Why don't we get to the point of the

3 matter?

4    THE COURT:  Get to the identification,

5 Mr. Cooper.

6    MR. COOPER:  Well, I'm just trying to find

7 out what time this identification happened.

8    THE COURT:  You can ask him what time did

9 he see the people at the house.

10 BY MR. COOPER:

11 Q.  When you get to this home, where was the home

12 that you went to?

13 A.  It was, like, 24th Street and Broadway, I

14 think.

15 Q.  Okay.  And what street was the home on?

16 A.  I'm not sure.

17 Q.  Okay.  And you -- how many cars were in front

18 of the home?

19 A.  Two.

20 Q.  And what were the cars?

21 A.  A gray car.  Probably a Cadillac.  I'm not

22 sure.  And there was an Escalade.

23 Q.  And what color was the Cadillac?

24 A.  Probably gray.  I don't remember.

25 Q.  Probably gray?

1   A.   Yeah.  I don't remember the color.

2   Q.   Okay.  And what kind of Cadillac?

3   A.   There was a Cadillac truck too.

4   Q.   So there were two Cadillacs?

5   A.   Uh-huh.

6   Q.   One gray Cadillac.  Was that a truck?

7   A.   It was a vehicle.

8   Q.   Like a sedan?

9   A.   Four-door vehicle.

10  Q.   A four-door vehicle?

11  A.   Yeah.

12  Q.   That's a gray Cadillac four-door vehicle?

13  A.   Yeah.

14  Q.   And the other one was what color, the truck?

15  A.   It was a red -- it was a black Escalade.

16  Q.   A black Escalade?

17  A.   Yes.

18  Q.   Okay.  So you saw these two Cadillacs in front

19  of the house; right?

20       Any other vehicles in front of the house?

21  A.   No.

22  Q.   You're sure of that?

23  A.   Sure.

24  Q.   Okay.  And you absolutely remember the colors;

25  right?

1    A.   Yes.

2    Q.   Okay.  And you're sure there were two and not

3    three vehicles?

4    A.   There was two.  Three with the one we were

5    driving.

6    Q.   No.  I'm just talking -- not the vehicle you

7    were driving.  You remember that there were three;

8    right?  Or two?

9    A.   Two.

10    Q.   All right.  And you talked to the FBI about

11    what you saw when you got to the home; right?

12    A.   Yes.

13    Q.   Okay.  But this was almost a year later;

14    right?

15    A.   Yes.

16    Q.   All right.  And you indicated that you're not

17    sure you went inside the home; right?

18    A.   Yes.

19    Q.   You might have stayed outside?

20    A.   I don't remember if I went inside or out, if I

21    stayed outside.

22    Q.   Okay.  And if you were outside, how long were

23    you outside?

24    A.   Probably, like, 15 minutes, 20 minutes.

25    Q.   Okay.  And who were you outside with?

1  A.  I think my brother-in-law was with me.  I'm

2  not sure if he went inside or he was outside with

3  me.  I don't remember.

4  Q.  Okay.  You don't remember if he stayed with

5  you or went inside?

6  A.  Yes.  I don't remember.

7  Q.  Okay.  And so right now you're pretty sure you

8  just stayed outside; right?

9  A.  Yeah.

10  Q.  Okay.  And so you were outside for this 15

11  minutes, maybe by yourself?

12  A.  Uh-huh.

13  Q.  Or maybe with Yovani; right?

14  A.  Yeah.

15  Q.  But you're not sure?

16  A.  I'm not sure.

17  Q.  Okay.  And at some point, you saw some black

18  people; right?

19  A.  Yeah.

20  Q.  And since you were outside, I assume these

21  black people were just walking around outside?

22  A.  They were coming out of the home.

23  Q.  Okay.  I assume -- this is daylight; right?

24  A.  Uh-huh.

25  Q.  You're certain of that?

A.   Uh-huh.

             THE COURT:  Say yes or no.

             THE WITNESS:  Yes, uh-huh.

BY MR. COOPER:

Q.   And we're talking it's March; right?

A.   Yeah.

Q.   And you were not under the influence of any
drugs; right?

A.   No.

Q.   Okay.  And the people that you saw coming out
of the house, since it's outside, were not smoking
any marijuana or any dope outside the house; right?

A.   I was -- one probably was smoking.  One of
them was -- I don't know if he was smoking a
cigarette or marijuana.  One was smoking.

Q.   Okay.  One of these people was smoking
something?

A.   Yeah.

Q.   But you don't know what it was?

A.   Yeah.  I think it was marijuana because he was
rolling, you know.

Q.   He was rolling it?

A.   Yeah.

Q.   So you saw this fellow rolling?

A.   Yes.

1    Q.   What did this fellow look like who was

2    rolling?

3    A.   He was kind of skinny.  He was wearing a white

4    long-sleeved shirt.

5    Q.   Okay.  And he had hair?

6    A.   He limped a little bit.

7    Q.   Okay.  He was limping?

8    A.   Yeah.

9    Q.   And how tall?

10   A.   I'm not sure.  I was far away from him, so I

11   couldn't tell.

12   Q.   Did you ever see a picture of this fellow?

13   A.   Yes.

14   Q.   When?

15   A.   When they showed it to me, when they showed me

16   all the pictures.

17   Q.   Okay.  And so this fellow is the fellow you

18   think was smoking outside?

19   A.   Yeah.

20   Q.   Okay.  The other people were not?

21   A.   No.

22   Q.   But you don't remember how many other people

23   there were?

24   A.   I don't remember because they were just coming

25   out of the house.  I don't remember how many.

1  Q.  I think you saw -- do you know what a

2  prosecutor is?

3  A.  Him, yeah.

4  Q.  Him, right.

5  A.  I don't know.

6  Q.  When that fellow, Mr. Lacey, was talking with

7  you, you said you thought you saw two black people;

8  right?

9  A.  Yeah.

10  Q.  Okay.  So you saw one fellow with a limp and

11  one other black person?

12  A.  Yeah.  I saw two other persons.  One had

13  braids, kind of short, and one was skinny.

14  Q.  So you saw three black people?

15  A.  Yeah, outside the home.

16  Q.  Okay.  And that's it?

17  A.  And then they were coming out because Seco --

18  we were leaving, so they were coming out and

19  talking to Seco.

20  Q.  These three black people?

21  A.  Yeah.

22  Q.  And to this day, you're certain there were

23  just three of them?

24  A.  Yes.

25  Q.  And outside the home; right?

1    A.    Uh-huh.

2    Q.    Okay.  And how much -- so if they were coming

3    out, were you in the car at this time?

4    A.    Yes.

5    Q.    And so they came out, and you saw them for

6    maybe 30 seconds; is that fair?

7    A.    Yeah.

8    Q.    Okay.  And you were probably 20, 30 feet away

9    from them?

10   A.    I was in front of the house.

11   Q.    The car was?

12   A.    Yes.

13   Q.    And I'm asking you how far away.  20, 30 feet?

14   A.    Yeah, probably.

15   Q.    From me to you?

16   A.    A little bit farther.  Like, where the guy is

17   sitting on the chair.  Like, right there.

18   Q.    The fellow with the green shirt on, the

19   marshal?

20   A.    Yes.

21   Q.    Okay.  So this would be, maybe, let's say, 50

22   feet; is that fair?

23   A.    Yeah.

24   Q.    40 or 50 feet.  Okay.

25        And you saw them for 20, 30 seconds?

1   A.   Uh-huh.

2   Q.   Is that right?

3        THE COURT:  Yes?

4        THE WITNESS:  Yes.  Sorry.

5   BY MR. COOPER:

6   Q.   And you hadn't really seen these people

7   before, had you?

8   A.   No.

9   Q.   These black people; right?

10  A.   No.

11  Q.   Okay.  And then you went to Tucson, and I

12  think you say that, while you were in Tucson, you

13  were at a place called Food City; right?

14  A.   Yes.

15  Q.   And what time did you arrive at Food City?

16  A.   I'm not sure about the time, but it was day,

17  in the daylight.

18  Q.   It was daylight?

19  A.   Yeah.

20  Q.   Okay.  And you can't narrow it down?

21  A.   Like, around three, three or two, around

22  there.

23  Q.   Around three or two.  And why do you think it

24  was around three or two?

25  A.   Because we left from over there, like, around

1   12, so like three or two.

2   Q.   You left from over where?

3   A.   From Phoenix, like, at 12 or 11.

4   Q.   Okay.  And while you're at the Food City, you

5   believe that you saw black people in two vehicles?

6   A.   Yes.

7   Q.   And were they the same vehicles that you saw

8   earlier?

9   A.   Yes.

10  Q.   The two Cadillacs?

11  A.   No.  It was a Cadillac and an Expedition.  I

12  saw them in Phoenix.

13  Q.   Okay.  Well, you didn't say you saw an

14  Expedition in front of the house.

15  A.   No.  It was not in front of the house, the

16  Expedition.  I saw it later.

17  Q.   Where?

18  A.   At 16th Street and Broadway, at a Circle K.

19  Q.   Okay.  And the Cadillac was one of the

20  Cadillacs that was in front of the house?

21  A.   Yes.

22  Q.   And what color was that one?

23  A.   The truck, black.

24  Q.   Okay.  And how many people were in these two

25  cars at the Food City?

1  A.  I couldn't really tell because it was too

2  tinted.

3  Q.  You couldn't really see inside because of the

4  tint?

5  A.  Yes.

6  Q.  So you weren't able to see if the people you

7  -- the two or three people you had seen in Phoenix

8  were in the cars, could you?

9  A.  No, I couldn't really see if they were in the

10  car but, like, the front one, I can tell the one

11  that was driving because it was the one that was

12  smoking.

13  Q.  And which car was that?

14  A.  The black Cadillac.

15  Q.  And that's the Escalade?

16  A.  Yeah.

17  Q.  Okay.  And then did you see the black people

18  again?

19  A.  Yes.

20  Q.  When?

21  A.  Here in the Circle K.

22  Q.  Okay.  And how much after you left the Food

23  City did you go to the Circle K?

24  A.  Like, half an hour I was over there, after

25  they told me that they got caught, I left.

1  Q.  Who told you they got caught?

2  A.  Seco's brother-in-law.

3  Q.  And what's his name?

4  A.  I don't know his name.

5  Q.  You don't know his name?

6  A.  No.

7  Q.  And what kind of car was he driving?

8  A.  A little blue car.

9  Q.  A little blue car?

10 A.  Yeah.

11 Q.  And that car you saw where?

12 A.  At Food City.

13 Q.  Okay.  And you were parked where in relation

14 to the Escalade and the Expedition?

15 A.  I was parked a little bit far away from the

16 Escalade and Expedition.

17 Q.  You were parked far away?

18 A.  Yeah, like, I don't know how many -- yeah,

19 like, four or five cars away.

20 Q.  Four or five cars away?

21 A.  Yes.

22 Q.  Okay.  And when the Kia -- you say it was a

23 blue Kia?

24 A.  I don't know what brand.  I just said it's

25 blue.

1  Q.  Just a blue car?

2  A.  Yeah.

3  Q.  When that car came, were the other two cars

4  still there?

5  A.  What do you mean the other two?

6  Q.  The Ford or the Expedition.

7  A.  And the Escalade?

8  Q.  The Escalade.

9  A.  Yes.

10  Q.  They were still there?

11  A.  Yeah.

12  Q.  Okay.  They had not left?

13  A.  They had not left.

14  Q.  And this conversation, did the black people

15  hear what he was saying to you?

16  A.  No, because we're next door from Food City.

17  Q.  Okay.  And did you get out of your car?

18  A.  Yes.  I walked -- I was going inside Food City

19  because I had to use the restroom.

20  Q.  And did you go over to the cars, where the

21  black people were?

22  A.  No, I went -- I was going inside of Food City,

23  and then I saw him, so I walked up to him, like,

24  "Hey, what's up?" to him.

25  Q.  Your brother-in-law?

1  A.   No.  Seco's brother-in-law.

2  Q.   That's what I'm asking.  Seco's brother-in-

3  law.

4  A.   Yeah.

5  Q.   Okay.  And that's when you got told somebody

6  got caught?

7  A.   Yes.  He told me.

8  Q.   But that wasn't anywhere near where the black

9  people were?

10 A.   No.

11 Q.   Okay.  And you weren't able to see the black

12 people, whether they heard anything; right?

13 A.   No.

14 Q.   And then you wind up at a Circle K?

15 A.   Uh-huh.

16 Q.   And you were there for how long?

17 A.   Say 20 minutes, because I was scared.

18 Q.   Because you were scared?

19 A.   Yeah, because they caught my brother-in-law,

20 and I didn't have a license or nothing.

21 Q.   And you were by yourself?

22 A.   Yes.

23 Q.   And how close were you to the black people at

24 that point?

25 A.   I was in -- they walked up to me.

1  Q.  Who walked up to you?

2  A.  I don't know their names.

3  Q.  Well, were they the same people you saw in

4  Phoenix?

5  A.  Yes.  They were the ones from the Escalade and

6  the Expedition.

7  Q.  All -- how many people walked up to you?

8  A.  Like four or five.

9  Q.  And this is all the people that were in the

10  car?

11  A.  No.  There were more in there.

12  Q.  Well, I asked you, were some of those people

13  the people you saw in Phoenix?

14  A.  Yes.  Yes.

15  Q.  How many?

16  A.  Well, I saw one of them that was next to my

17  door.  I saw him in Phoenix.  I don't know his name

18  either.

19  Q.  So just one?

20  A.  Yeah, but there was more than one that walked

21  in, walked --

22  Q.  I understand that.  All I'm asking you is, of

23  the people you saw in Phoenix, you saw one of them

24  at the Circle K?

25  A.  Yeah, because I couldn't really see them in

1  Phoenix because of the tint of the cars.

2  Q.  Okay.  But you saw people outside the home in

3  Phoenix; right?

4  A.  Yes, but not all of them walked up to me, just

5  two or -- just four or five walked up to me, not

6  all of them.

7  Q.  Well, were the people outside the home part of

8  that group that came up to you at the Circle K?

9  A.  Yes, they were part of it.

10  Q.  How many?  One?

11  A.  Well, they were all in the Escalade and the

12  Expedition, all of them.  Like, they were all

13  related or together.

14  Q.  They were all related?

15  A.  Like, together.  The Escalade and the

16  Expedition, they were all together.

17  Q.  But listen to my question.

18      You say you saw either two or three people in

19  Phoenix before you even left.

20  A.  Uh-huh.

21  Q.  What I'm asking is, at the Circle K, did you

22  see any of them come up to your car?

23  A.  Yes.

24  Q.  One of them; right?

25  A.  No.  They -- like, four of them walked up to

1  my car.

2       THE COURT:  You're misunderstanding his

3  question.  You said you saw two or three guys in

4  Phoenix.

5       THE WITNESS:  Yes.

6       THE COURT:  He's asking you, of those two

7  or three guys you saw in Phoenix, how many of those

8  guys came up to the car at the Circle K in Tucson?

9       THE WITNESS:  Oh, one of them.

10 BY MR. COOPER:

11 Q.  And what did he look like?

12 A.  He had short hair.  He wasn't that dark.  He

13 had, like, a fade.

14 Q.  And then you left the Circle K; right?

15 A.  Yes.  Right.

16 Q.  And you never saw these black people again;

17 right?

18 A.  Right.

19 Q.  And then sometime in February of 2012, you

20 were shown pictures by an FBI agent?

21 A.  Yeah.

22 Q.  And you got arrested on February 8th of 2012;

23 right?

24 A.  Right.

25 Q.  And when was it that you were shown pictures

1  by the FBI agent?

2  A.  The same day I got arrested.

3  Q.  That would be on February 8th of 2012?

4  A.  Yes.

5  Q.  Okay.  So he came to see you at the jail?

6  A.  Yes.

7  Q.  Is that right?

8  A.  Yes.

9  Q.  And that would be this man sitting here, Agent

10  Edwards?

11  A.  Yes.

12  Q.  And that's when he showed you the pictures?

13  A.  Yes.

14  Q.  In the jail?

15  A.  Yeah.  No, it was not in the jail.  He took me

16  out of the jail to show me, like, from the

17  pictures, if that was me.

18  Q.  How many pictures did he show you?

19  A.  He showed me a couple of them.

20  Q.  Two?

21  A.  I don't know.  A couple of them.  I don't -- I

22  didn't count them.

23  Q.  You didn't count them?

24  A.  No.

25  Q.  And were they single pictures of individual

1  people?

2  A.   Yes.

3  Q.   There wasn't, like -- do you know what a line-

4  up is, six people in a line-up, like that?  Nothing

5  like that?

6  A.   I don't remember if it was a line-up.  I don't

7  know.

8  Q.   So it might have been a six person line-up?

9  A.   I don't remember.

10 Q.   And when he showed you these, did he tell you

11 why he was showing you these pictures?

12 A.   Yes, because I was involved in that, and they

13 knew I was involved in it, and who did I know.  And

14 I told them yes, and my brother-in-law and I was

15 involved in it.

16      "Were you involved in it"?

17      "Yes," I told them.

18 Q.   Okay.  And -- but you were never arrested;

19 right?

20 A.   No.

21 Q.   Okay.  What else did he tell you?

22 A.   If that was me, the one that was driving the

23 white Liberty.  I'm like yes, it's me.

24 Q.   And that's -- he told you that, in February

25 2012, he asked you if you were driving the white

1  Liberty?

2  A.   Yes, and I told him yes.

3  Q.   Okay.  And at that point, did you look at

4  these pictures and tell him who these people are?

5  A.   Yes.  I told him I recognize a couple of them,

6  like, from there.

7  Q.   From where?

8  A.   From, like, from Seco and my brother-in-law, I

9  recognized them, because -- you know.  But from

10  Phoenix, I -- like, from that house, I recognized a

11  couple of them too.

12          THE COURT:  We're going to have to stop.

13          MR. COOPER:  Okay.

14          THE COURT:  9:15.

15          MR. COOPER:  Okay.  Thank you.

16          THE COURT:  9:15 tomorrow.

17          (Proceedings concluded in this matter.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Erica R. Grund, do hereby certify that

4     I took the machine shorthand notes in the foregoing

5     matter; that the same was transcribed via computer-

6     aided transcription; that the preceding pages of

7     typewritten matter are a true, correct, and

8     complete transcription of those proceedings

9     ordered, to the best of my skill and ability.

10          Dated this 2nd day of January, 2013.

11

12                              s/Erica R. Grund
                                Erica R. Grund, RDR, CRR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25