1        IN THE UNITED STATES DISTRICT COURT

2            DISTRICT OF ARIZONA

3    UNITED STATES OF AMERICA

4    vs.                          CR-11-1013-TUC-RCC

5    GHERMON LATEKE TUCKER, et al.,

6
          Defendants.
7    _____

8                                  August 15, 2012
                                   Tucson, Arizona
9

10

11

12

13              JURY TRIAL

14              DAY SIX

15   BEFORE THE HONORABLE RANER C. COLLINS
          UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22   Court Reporter:        Erica R. Grund, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                    translation

```
 1                    A P P E A R A N C E S

 2

 3   For the Government:      James T. Lacey
                              Kimberly E. Hopkins
 4                            Assistant U.S. Attorneys

 5

 6   For Ghermon Tucker:      Dan Cooper
                              Cooper & Udall PC
 7

 8

 9   For Jerome Ranger:       Stephen Jonathan Young
                              Williamson & Young
10

11

12   For Ja'Cory Ranger:      Bradley James Armstrong
                              Armstrong Law Office
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    EXAMINATION INDEX

2

JORGE ABEL MEDINA-SANTOS
3       CROSS BY MR. ARMSTRONG . . . . .   4
        CROSS BY MR. YOUNG . . . . . . .  21
4       REDIRECT BY MR. LACEY . . . . .   32

5   JON EDWARDS
        BY THE COURT . . . . . . . . .   35
6       FURTHER BY MR. ARMSTRONG . . . .  39
        FURTHER BY MR. YOUNG  . . . . .   44
7

JORGE ABEL MEDINA-SANTOS
8       DIRECT BY MR. LACEY . . . . . .   48
        CROSS BY MR. COOPER . . . . . . 105
9       CROSS BY MR. ARMSTRONG . . . . . 165
        CROSS BY MR. YOUNG . . . . . . .172
10      REDIRECT BY MR. LACEY . . . . . 184

11  SAMANTHA KOVAL
        DIRECT BY MS. HOPKINS . . . . . 191
12

SCOTT HUNTER
13      DIRECT BY MR. LACEY . . . . . . 201

14  CHRISTOPHER PAHL
        DIRECT BY MR. LACEY . . . . . . 225
15

DANIEL DOUGLASS
16      DIRECT BY MR. LACEY . . . . . . 251

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Show the absence of the jury,
 3     the presence of all counsel and the defendants.
 4                 Mr. Cooper, are you finished?
 5                 MR. COOPER:  I am, Your Honor.
 6                 THE COURT:  Mr. Armstrong, go ahead.
 7                 MR. ARMSTRONG:  Thank you, Your Honor.
 8     JORGE ABEL MEDINA-SANTOS, WITNESS, PREVIOUSLY SWORN
 9                     CROSS-EXAMINATION
10     BY MR. ARMSTRONG:
11     Q.  Good morning, sir.  How are you?
12     A.  Good.
13              THE COURT:  You need to get closer to the
14     mic.  You're too soft.
15     A.  I'm good.
16     Q.  There's water up there.  If you need a drink,
17     help yourself.
18     A.  No, I'm good.
19     Q.  I'm going to ask you a few questions.  Okay?
20     A.  Okay.
21     Q.  How are you feeling today?
22     A.  I'm good.
23     Q.  Yeah?
24          Based on your testimony yesterday -- do you
25     remember answering questions from this man over
```

1  here, Mr. Lacey, and this man over here,

2  Mr. Cooper?

3  A.   Yes.

4  Q.   Okay.  I was a little confused about a few

5  things, so I want to see if we can straighten them

6  out.

7       All right?

8  A.   All right.

9  Q.   When you went to the house in Phoenix where

10  you and Yovani and Mayco met up with the blacks,

11  were you inside the house or were you outside the

12  house or was it both?

13  A.   I don't remember if I was inside the house.

14  I'll be honest.  I think I was outside of the car,

15  like, with the car on.

16  Q.   You don't recall ever entering the house?

17  A.   Not that I remember.

18  Q.   Okay.  And you said you saw some people who

19  were inside the house come out of it; correct?

20  A.   Yeah.

21  Q.   How many did you see come out?

22  A.   Well, three of them.

23  Q.   All right.

24  A.   When Mayco was leaving the home.

25  Q.   Can you --

1  A.   When Mayco was leaving the home, I saw three

2  of them.

3  Q.   Okay.  I'm 49 years old, and I do not hear all

4  that well, so could you please speak up so I can

5  hear everything you're saying?

6  A.   I saw three of them when Mayco was leaving out

7  of the house.

8           THE COURT:  Now, when you say three of

9  them, does that mean three plus Mayco or Mayco made

10  three?

11          THE WITNESS:  No, three plus Mayco.

12  BY MR. ARMSTRONG:

13  Q.   They came outside of the house, those four

14  people?

15  A.   Yes.

16  Q.   Where did they go?

17  A.   Mayco jumped back in the car, and the other

18  ones stayed back in the house.

19  Q.   Okay.  And then you left?

20  A.   Yes.

21  Q.   Okay.  Yesterday I thought I heard you saying

22  you saw the black people loading guns.

23  A.   Yes.  When we were parked in the house, one

24  pulled -- like, I could see from, like, the -- I

25  could see the door.  One of them pulled out, like,

1   a shotgun.  I don't know.  It was, like, a

2   shotgun.  I saw it from far away.

3   Q.   You saw them loading a gun?

4   A.   In the Escalade.

5   Q.   Okay.  How many people did you see?  You saw

6   one person doing that?

7   A.   No, I saw two.

8   Q.   Okay.  And that truck was parked where?

9   A.   In the driveway.

10  Q.   In the driveway of the house?

11  A.   Yes.

12  Q.   So you saw one person loading a weapon?

13  A.   No.  There was two.

14  Q.   Okay.  You saw two people?

15  A.   Yeah.

16  Q.   Loading weapons outdoors?

17  A.   Uh-huh.

18  Q.   Is that your testimony?

19  A.   Yes.

20  Q.   What time of day was this?

21  A.   It was, like, 11 -- it was, like, early in the

22  afternoon because we had -- supposedly Mayco said

23  that we had to be here early, something like that.

24  Q.   So the sun was up and you could see clearly?

25  A.   Yeah.

1 Q. And is this a residential neighborhood?

2 A. Yes.

3 Q. Do you know what that means, houses and

4 things?

5 A. Yes.

6 Q. Were there other people around that day?

7 A. No.

8 Q. How long did it take for these people to load

9 weapons outdoors?

10 A. I'm not sure because we left. I just saw two

11 of them running inside the car, and they, like, put

12 something in the car, and we left with Mayco.

13 Q. Did you see them smoking marijuana?

14 A. Yeah, one of them.

15 Q. Okay.

16 A. It was -- yeah, I think it was marijuana

17 because he was rolling it. It was, like, a blunt.

18 Q. And that would have been outdoors too?

19 A. Yeah.

20 Q. Was that one of the same people that you saw

21 loading a gun?

22 A. No. He was -- there was him and two other

23 ones, so there's a skinny one and there's two

24 other, like, youngsters, like, younger persons.

25 There's the ones doing the -- they walked in the

```
 1  house and walked to the truck.  That's when they
 2  put them.
 3       And the other one was rolling, like, a blunt
 4  talking to Mayco, putting on a white shirt.
 5  Q.   Putting on a white shirt?
 6  A.   Yes.
 7  Q.   And I thought you said yesterday it was a
 8  long-sleeved white shirt?
 9  A.   Yeah, white shirt, yeah.
10  Q.   So you have -- there's one person smoking
11  marijuana outdoors and two people loading guns
12  outdoors?
13  A.   Uh-huh.
14  Q.   In broad daylight on a residential street in
15  Tucson?
16  A.   No, in Phoenix.
17  Q.   And you saw all that?
18  A.   Yeah.
19  Q.   Don't know how long it was that you were
20  watching them?
21  A.   No, because we left.
22  Q.   And I think you told Mr. Cooper or Mr. Lacey
23  that later again you saw these people at a Food
24  City in Tucson.
25  A.   Yes.
```

1  Q.  All right.  How long were you able to see the

2  people, the people that were, you know, in and

3  around the Escalade or the Ford Expedition?

4      How long did you have a chance to see those

5  people while you were in Tucson, in the parking lot

6  at Food City?

7  A.  Well, I saw them for a quiet minute because we

8  stayed there for a minute, like -- like, 20 seconds

9  we stayed there waiting for Mayco and my brother-

10  in-law, but they didn't came back.

11  Q.  They came back?

12  A.  No, they didn't came back.

13  Q.  Okay.  And how close were you to them?

14  A.  Like, like three cars away, three car lengths

15  away.

16  Q.  Were they in the car or out of the car or

17  both?

18  A.  They were talking back and forth from the

19  Escalade and the Expedition.

20  Q.  And you were looking at them?

21  A.  Yeah, because I was -- like, when I got off,

22  they were close to each other, and I was looking

23  like there was nothing to do, and I was just, like,

24  in the car.

25  Q.  And yesterday, do you remember telling -- I

1  think it was Mr. Cooper -- that the blacks, the

2  black people, did not hear you tell -- I believe it

3  was your brother-in-law -- that there had been an

4  arrest?

5  A.    I didn't tell my brother-in-law.

6  Q.    You told somebody?

7  A.    Yeah, when I was walking back to my car, they

8  told me what happened, and that's what I told them

9  that Mayco and my brother-in-law got arrested.

10 Q.    Who did you tell?

11 A.    The black people.

12 Q.    You told the black people?

13 A.    Yes.

14 Q.    Do you -- all of them?

15 A.    They were, like -- the Escalade and the

16 Expedition were together, and there's, like, a car

17 next to them, so I walked to the side and I said

18 it.

19 Q.    I want to jump back just a little bit.

20       Before February 8, up in Phoenix, had you ever

21 met Agent Edwards?

22 A.    When do you mean?  Can you tell me the

23 question again?

24 Q.    Do you know who Agent Edwards is?

25 A.    No, no, not by -- no.

1  Q.   Okay.  February 8 of this year, you were in
2  jail up in Phoenix?
3  A.   Yes.
4  Q.   Correct?
5  A.   Yes.
6  Q.   What were you in on, some traffic things?
7  A.   Yeah, a ticket.
8  Q.   Okay.  Did you meet with somebody from the FBI
9  at that time?
10  A.   Yeah, he came over.
11  Q.   He came over where?
12  A.   To the jail I was at.
13  Q.   Did he get you out?
14  A.   Yeah, he -- he took me to some other building
15  and told me, if that was me, that if I was driving
16  that day.  I told him yes.
17  Q.   Do you see that person that you had that
18  conversation with here in the courtroom?
19  A.   Yes.
20  Q.   And he's wearing a red tie this morning?
21  A.   Yes.
22  Q.   And then after that conversation, what
23  happened with you?
24  A.   I told him yes, that was me, and that's when
25  he told me, were you involved?  I'm like, well,

1  yes, because it was me in the Jeep, white Jeep

2  Liberty, Commander, I mean.

3  Q.  So you told him that, and then what happened

4  after that?  Did you go back to jail?

5  A.  Yeah, I went back to jail for the ticket, and

6  they let me go from there, and --

7           MR. LACEY:  I'm going to object, Your

8  Honor.  It's beyond the scope of anything as far as

9  the purpose of the hearing.

10          THE COURT:  It is.

11  BY MR. ARMSTRONG:

12  Q.  Okay.  I want to go back to your time here in

13  Tucson.  You left the Circle K, as I understand it,

14  and then you went -- sorry.

15       You left the Food City, and then you went to

16  Circle K?

17  A.  Yeah.

18  Q.  And just kind of coincidentally you ran into

19  some of the people you had seen at the Food City;

20  correct?

21  A.  Correct.

22  Q.  All right.  And did you have a conversation

23  with any of them there about what had happened,

24  that the other folks involved had been arrested?

25  A.  Yeah.  They walked up to me and told me, hey,

1  so what happened?

2      And that's when I told them, hey, they got

3  caught.

4      And they're like, so what do we do?

5      And I'm like, well, I'm leaving home.

6      They're like, all right then.

7      And that's when I left the Circle K

8  Q.  And how long a period of time did you have to

9  see any of those people, any of the black people

10  that came up to your car, according to your

11  testimony?

12      How long were they at your car and you were

13  looking at them?

14  A.  Like 15 minutes, I would say.

15  Q.  They were there 15 minutes?

16  A.  Yeah.

17          THE COURT:  At the Circle K, he's asking.

18          THE WITNESS:  Oh, I don't know how long

19  they were at the Circle K, but they just walked up

20  to my car and started talking to me, and that's

21  when I told them, I'm going to go home, and I left.

22  BY MR. ARMSTRONG:

23  Q.  Were you nervous?

24  A.  Yeah.

25  Q.  Were you nervous at the Circle K?

1    A.   Yes, that's why I left.

2    Q.   And were you nervous at the Food City?

3    A.   Yeah, because my brother-in-law wasn't coming,

4    and I was like -- so I didn't know what to do.  I

5    didn't have a license, you know, to drive back

6    home, and that's -- I called my mom and told them,

7    hey, can you guys come pick me up?

8         She's like, no.

9    Q.   Were you frightened while you were down here

10   at the Food City?

11   A.   Yes, because I was, like, by myself, and I

12   didn't have -- like, I don't know nobody over here.

13   Q.   And at the Circle K were you also frightened?

14   A.   Yeah.

15   Q.   When you were talking to the people, the black

16   people at the Circle K, were you nervous and

17   frightened?

18   A.   I was nervous, and I was, like, well, I didn't

19   know what to do.

20   Q.   At some point Agent Edwards showed you

21   photographs of people that he asked -- that he

22   wanted -- well, at some point Agent Edwards showed

23   you some photographs; correct?

24   A.   Correct.

25   Q.   Do you remember when that happened?

1    A.   When he showed me the photos?

2    Q.   Yes.

3    A.   When I -- when they took me out of the jail.

4    Q.   And you don't recall -- do you recall whether

5    he showed you a photograph with multiple pictures

6    of people or just one photograph?

7    A.   I'm not sure but he did show me a couple

8    photos.

9    Q.   And as I recall your testimony, you were able

10   to identify at least one of the photographs --

11   A.   Yes.

12   Q.   -- of someone that you saw smoking marijuana

13   up in Phoenix?

14   A.   Yes.

15   Q.   Have you seen that photograph since?

16   A.   Yeah, one -- twice I think I seen it.

17   Q.   Okay.  Since -- how many times have you met

18   with Agent Edwards in total?

19   A.   I can't count them.  A couple of times.

20   Q.   When was the most recent that you met with

21   Agent Edwards?

22   A.   Like a week, like a week ago, or something

23   like that.

24   Q.   And did he show you the photograph at that

25   time?

1    A.   Not those photos.

2    Q.   Both photos?

3    A.   Not those photos.

4    Q.   Not those photos?

5    A.   No.

6         MR. ARMSTRONG:  Your Honor, may I have

7    just a moment?

8    BY MR. ARMSTRONG:

9    Q.   So I want to -- just a few more questions

10   here, sir.

11        When you were at the Food City, who did you

12   tell there had been an arrest?

13   A.   They told me when I was walking in Food City,

14   so when I was walking back to my vehicle, they were

15   parked, like, on my right-hand side, on my right

16   side of, like, on the side of the -- where I was

17   walking, and that's when they told me, hey, what

18   happened?

19        And that's when I told them, hey, they got

20   arrested.

21        And he's like, for real?

22        And that's all I said, and I jumped back in my

23   vehicle, and that's when I drove to Phoenix, but I

24   stopped at a Circle K.

25   Q.   Okay.  Do you remember yesterday telling

1 Mr. Cooper that the black people did not overhear

2 what you said about the arrest?

3 A.   No.   They -- yeah.   When I said they got

4 stopped from -- there was, like, a four-door car.

5 The passenger's the one that heard.   And then from

6 the Escalade, the driver is the one that heard

7 that.

8           MR. ARMSTRONG:   Your Honor, may I approach

9 the witness?

10           THE COURT:   Sure.

11 BY MR. ARMSTRONG:

12 Q.   Do you remember the questions and answers you

13 gave yesterday?

14 A.   Yes.

15 Q.   Okay.   I'm going to tell you -- and you can

16 tell me if you disagree.   This is a transcript that

17 was prepared of what you said yesterday, the

18 questions that were asked.   It was prepared.

19 A.   Yeah.

20 Q.   And can you take a look at --

21 A.   I got trouble reading.

22 Q.   Do you?

23 A.   Yes.

24           MR. LACEY:   Your Honor, if I may, I think

25 the witness may have trouble reading.

```
 1              THE COURT:  He just said that.
 2              MR. LACEY:  Okay.  I'm sorry.  I was
 3  talking to Ms. Hopkins.
 4              THE COURT:  You can't hear either.
 5              MR. LACEY:  I've got hearing problems.
 6              THE COURT:  And you're older than 49.
 7              MR. LACEY:  Well, I'm not going there.
 8              But anyway, go ahead.  You're right, I am.
 9              MR. ARMSTRONG:  May I read this?
10              THE COURT:  You may.
11  BY MR. ARMSTRONG:
12  Q.   Okay.  I'm going to start.  Tell me if this
13  sounds familiar, the questions that you were asked
14  yesterday and the answers that you gave.
15        And if it doesn't, tell me that too.
16  A.   All right.
17  Q.   Start at the top of page 36.  There is a
18  question.  "And did you ever go over to the cars
19  where the black people were?"
20        There is an answer.  "No, I went -- I was
21  going inside the Food City, and then I saw him, so
22  I walked up to him, like, hey, what's up to him."
23        Then there's an answer.  Excuse me.  There's a
24  question.  "Your brother-in-law?"
25        There's an answer.  "No, Seco's brother-in-
```

1  law."

2      Does that sound familiar?

3  A.  Yes.

4  Q.  Like yesterday we talked to you about this?

5  A.  Yes.

6  Q.  Okay.  Another question.  "That's what I'm

7  asking.  Seco's brother-in-law?"

8      Answer, "Yeah."

9      Question, "Okay.  And that's when you got told

10 somebody got caught?"

11 A.  Yeah.

12 Q.  Answer, "Yes, he told me."

13     Question, "But that wasn't anywhere near where

14 the black people were?"

15     Answer, "No."

16     Question, "Okay.  And you weren't able to see

17 the black people, whether they heard anything;

18 right?"

19     Answer is, "No."

20     And then the question is, "And then you wind

21 up at Circle K?"

22 A.  No.  When I was walking back to my vehicle,

23 they, like, they -- they're like -- they looked at

24 me, and I'm like, nah, they got stopped, and that's

25 when I -- that's all I said, they got stopped, and

1  I get back in my vehicle, and I drove to Phoenix.
2  Q.   Okay.  Okay.  Would you agree that yesterday,
3  according to this transcript that I just read to
4  you, yesterday you said that you did not tell the
5  black people or they didn't overhear -- let me
6  rephrase that.
7       You were not close to the black people when
8  you learned that there had been an arrest?
9  A.   No, I wasn't.
10 Q.   And that you did not tell them that there had
11 been an arrest?
12 A.   No, I -- they didn't ask me that question.  I
13 did tell them that, like, when I was walking back
14 to my vehicle, I said, hey, they got stopped, and
15 that's when -- that's how I told them they got
16 arrested, and I jumped back in my vehicle.
17          MR. ARMSTRONG:  Nothing further, Your
18 Honor.
19          THE COURT:  Mr. Young?
20                CROSS-EXAMINATION
21 BY MR. YOUNG:
22 Q.   Sir, you were interviewed in this case on
23 February 8 of this year?
24 A.   Uh-huh.
25 Q.   And that was --

```
 1              THE COURT:  Say yes or no, please.
 2              THE WITNESS:  Yes.
 3   BY MR. YOUNG:
 4   Q.   And that was in Phoenix?
 5   A.   Yes, sir.
 6   Q.   Agent Edwards over here in the red tie, he was
 7   the person who interviewed you?
 8   A.   Yes.
 9   Q.   And there was also a Detective Gamez from the
10   Phoenix Police Department that was there?
11   A.   Yes.
12   Q.   And you said you were in custody at the time
13   for traffic tickets?
14   A.   Yes, sir.
15   Q.   Your brother-in-law, Yovani, he got
16   interviewed on the same day?
17              MR. LACEY:  I'm going to object, Your
18   Honor.  Let's get to the point of the hearing.
19              THE WITNESS:  I'm not sure.
20              THE COURT:  Objection will be sustained.
21   BY MR. YOUNG:
22   Q.   Was Yovani with you when you got interviewed?
23              MR. LACEY:  Objection.
24              THE COURT:  He can answer.
25   A.   He wasn't with me.
```

1    Q.   Was Yovani there too when you got interviewed?

2    A.   No.

3    Q.   Did you talk to Yovani after you were

4    interviewed?

5    A.   No, because I don't live close to him.

6    Q.   You guys didn't talk about the case?

7    A.   No.

8    Q.   Did you talk about the case before you got

9    interviewed?

10   A.   He used to tell me, hey, they want to talk to

11   you.  That's about it.

12   Q.   And you were interviewed again in Tucson on

13   February 15.

14   A.   Yes.

15   Q.   So you drove down to Tucson from Phoenix for

16   that interview?

17   A.   Yes.

18             THE COURT:  You have to answer louder.

19             THE WITNESS:  Yes.

20   BY MR. YOUNG:

21   Q.   And that interview took place over at the FBI

22   office?

23   A.   Yes.

24   Q.   You drove down with Yovani?

25   A.   Yes.

1    Q.   And the two of you talked about the case on

2    the way down from Phoenix that day?

3    A.   I just told him why they want to talk to me.

4    He's like, just go there.  They just want to talk

5    to you.

6    Q.   And then he told you what was going to

7    happen?

8    A.   No.

9    Q.   That's a two-hour drive down from Phoenix?

10   A.   Yes.

11   Q.   And when you got to the FBI office, Agent

12   Edwards was there again?

13   A.   Yes.

14   Q.   As was Mr. Lacey in the yellow tie?

15   A.   Yes.

16   Q.   And Ms. Hopkins was there as well?

17   A.   Yes.

18   Q.   And they asked you questions about the case?

19   A.   Yes.

20   Q.   And that was February 15, one week after the

21   first interview?

22   A.   Yes.

23   Q.   Let me ask you about the events of March 2 of

24   last year.

25        You were partying the night before; right?

1   A.   Yeah.

2   Q.   And how were you feeling that morning?

3   A.   I was, like, not trying to do nothing.

4   Q.   When you say you were partying, what were you

5   doing to party?

6   A.   I was just with my friends.  We went out.

7   Q.   And what kind of drugs were you hung over from

8   that morning?

9   A.   I wasn't on no drugs.

10   Q.   No hangover?

11   A.   No.  I was like -- we just went to, like,

12   Mexican clubs and stuff, but I was driving, so I

13   wasn't drinking or nothing.

14   Q.   You were partying but you weren't drinking?

15   A.   Yeah, because I was driving the vehicle.

16   Q.   Yovani called you the morning of March 2?

17   A.   Yes.

18   Q.   And he offered you $2,000 to drive to Tucson?

19   A.   Yeah.

20   Q.   You picked up Mayco.  Where did you pick up

21   Mayco?

22         MR. LACEY:  I'm going to object, Your

23   Honor.  Can we get to the photos, please?

24         THE COURT:  Yeah, please.

25         MR. YOUNG:  Well, I need to address his

1 opportunity to observe the blacks that he observed,

2 Your Honor.

3 THE COURT: Get to where he observed them.

4 BY MR. YOUNG:

5 Q. How did you get to the house?

6 A. Seco took us over there.

7 Q. Okay. Seco was driving?

8 A. No, Yovani.

9 Q. Yovani was driving?

10 A. Yeah.

11 Q. And what vehicle was that in?

12 A. The white Commander.

13 Q. I thought they called you to drive?

14 A. Yeah, but at the moment he was driving. I was

15 going to drive back if he was tired.

16 Q. And he knew where to go?

17 A. No. Seco was telling him where to go.

18 Q. And Seco directed him to the house?

19 A. Uh-huh.

20 THE COURT: Yes or no.

21 THE WITNESS: Yes.

22 BY MR. YOUNG:

23 Q. You didn't have to follow anybody else to the

24 house or anything?

25 A. No.

1  Q.   When you got to the house, what happened next?

2  A.   Seco went to talk to him.

3  Q.   The house, I think you said, was in the

4  neighborhood of 24th Street and Broadway?

5  A.   Yes.

6  Q.   How long were you at the house?

7  A.   It was not that long, like, 15 minutes, not

8  even.  I don't remember for sure, but it was not

9  that long.

10 Q.   Yesterday, if I understood you correctly, you

11 said you were there for about a minute?

12 A.   Yeah.

13 Q.   And while you were at that house, what

14 vehicles did you see there again?

15 A.   The four-door Cadillac.  It was, like,

16 grayish.  And the Escalade, the truck, was parked

17 reverse, and the other one was parked facing the

18 house.

19 Q.   And those were the only two vehicles at the

20 house?

21 A.   Yes.

22 Q.   And there was no red Expedition at that house?

23      MR. LACEY:  Objection, Your Honor.  Can we

24 get to the point?

25      THE COURT:  You can answer.

1  A.    No, no.  There was no red Expedition at the
2  house.
3  Q.    And with respect to the reliability of this
4  witness' observations, Your Honor, there was no --
5  after this you went to Miami's house?
6  A.    Yes.
7  Q.    And was no red Expedition there?
8  A.    No, there was no red Expedition.
9  Q.    On February 8 and on February 15, Agent
10  Edwards showed you some photos?
11  A.    Yes.
12  Q.    And those photos, before he showed you those
13  photos, did he read you an admonition first?
14  A.    Yes.
15  Q.    What did he read you?
16  A.    I don't remember, but yeah, it was like a
17  paper, and he's like, sign here and -- yeah.
18  Q.    That was for your rights?
19  A.    I don't remember what it was.  I have it at
20  home but I don't remember.
21  Q.    So he gave you a copy of what he read you?
22  A.    Yeah.
23  Q.    And that was something different telling you,
24  you had a right to be silent?
25  A.    I don't remember what it was for, to be

1  honest.

2  Q.   Did he read you an admonition that said that

3  the group of photos that he was going to show you

4  might or might not contain the picture of the

5  person who committed a particular crime?

6  A.   Explain that again to me.

7  Q.   Did he read you an admonition saying that the

8  group of photos he was about to show you might or

9  might not contain a picture of a person who

10 committed a crime?

11 A.   I don't remember that.

12 Q.   You don't remember anything like that?

13 A.   No, no.

14 Q.   Did he warn you that hairstyles and facial

15 hair might change?

16 A.   Yes, I think, yeah, yeah.

17 Q.   He might have talked to you about hairstyles?

18 A.   Yeah, yeah, yeah.

19 Q.   Did he warn you that the photo might be

20 lighter or darker than the person you remembered?

21 A.   Yes.

22 Q.   You do remember that?

23 A.   I remember that.

24 Q.   Did he tell you not to discuss your

25 identification with anyone else?

1   A.   Yes.

2   Q.   And did you discuss your identifications with

3   Yovani?

4   A.   No, because we don't live close to each other.

5   Q.   Let me ask you, this gentleman over here in

6   the black shirt, you do not recognize him, do you?

7           THE COURT:  If you need to stand up, you

8   can.

9   A.   I can't recognize him like that.  It's been a

10  long time, so I can't really recognize people that

11  good.

12  Q.   Let me ask you if you would take a look at

13  Exhibit -- I think it's 67 -- 67-A.  That would be

14  one of the pictures that Agent Edwards showed you.

15          Do you remember him showing you that picture?

16  A.   Yes.

17  Q.   And that picture is what we would call an 8-by

18  10 glossy photograph.

19  A.   Uh-huh.

20  Q.   And that is a photograph of a person who was

21  in custody; right?

22  A.   Right.

23  Q.   And you can tell because that person is

24  handcuffed behind the back?

25  A.   Yes.

1  Q.  Or at least that person's hands are behind
2  their back?
3  A.  Yes.
4  Q.  And when you viewed that picture, you did not
5  recognize that person in 67-A, did you?
6  A.  No, I didn't recognize him.
7  Q.  Okay.  Let me ask you to take a look at
8  Exhibit 67-B.  That is another 8-by-10 glossy color
9  photo.
10      Did you recognize the person in 67-B?
11  A.  No.
12  Q.  And that was on both February 8 and February
13  15, you did not recognize that person?
14  A.  No, I don't recognize him.
15  Q.  All of the pictures that Agent Edwards showed
16  you were 8-by-10 color glossy photos like those two
17  pictures; is that right?
18  A.  Yes.
19  Q.  The pictures were not six on one page or
20  anything like that, were they?
21  A.  I don't remember if there was -- he showed me
22  those, but I don't remember if he showed me the
23  six.
24  Q.  What he was showing you on February 15 and on
25  February 8 were the 8-by-10 pictures, one picture

1    per page; right?

2    A.   Yeah, I remember him showing me one person per

3    page.

4              MR. YOUNG:  That's all I have, Your Honor.

5              THE COURT:  Let me cut to the chase.

6              Is there anybody here that you recognize?

7              THE WITNESS:  No.  I don't really

8    recognize them.  Like, I'll be honest, like, I

9    remember -- like, I don't recognize them from face.

10             THE COURT:  All right.  So I want you to

11   stand up.  Take a look.  Make sure you see

12   everybody.

13             Do you recognize anybody in the courtroom?

14             THE WITNESS:  I don't recognize them

15   because I didn't really talk to them.  I just

16   remember hearing them by their names stuff.

17             MR. LACEY:  I had a couple more questions,

18   Your Honor.

19             THE COURT:  Go ahead.

20                  REDIRECT EXAMINATION

21   BY MR. LACEY:

22   Q.   Sir, one thing we didn't talk a lot about is,

23   after you went to the house back on March 2nd up in

24   Phoenix that you were directed to by Seco, you then

25   went to Miami's, and then you went to where while

1  you were still in Phoenix?

2  A.   We drove around the neighborhood looking for

3  someone else, but I don't remember who.

4  Q.   And did you go to any other stores in Phoenix,

5  then, before you left?

6  A.   Yeah, Sixth Street and Buckeye.

7  Q.   And what was there?

8  A.   A Circle K.

9  Q.   And who did you see there?

10  A.   We were parked on the side, and I saw the

11  Escalade and the Expedition there together.

12  Q.   Okay.  And did you see people at that time

13  when you saw the Escalade and Expedition at the

14  Circle K in Phoenix?

15  A.   Yeah.  They were like putting, like, water, I

16  think, in the back of their trucks or something

17  like that.

18          MR. LACEY:  We'd ask the witness be shown

19  Exhibit 61-C, please, as in Charlie.

20          MR. COOPER:  Judge, I object.  This is

21  beyond the scope of the cross.

22          THE COURT:  I have no idea what 61-C is,

23  so let me at least see it.

24          MR. LACEY:  There's been talk about this.

25          THE COURT:  Go ahead.

1    MR. LACEY:  Okay.  Thank you.

2    BY MR. LACEY:

3    Q.   Sir, can you identify the vehicle that's

4    parked -- that's in this picture?

5    A.   Yes.

6    Q.   And what vehicle is that that you -- can you

7    identify it?

8    A.   My brother-in-law's Jeep Commander.

9    Q.   That's the white vehicle to the left of

10   center?

11   A.   Yes.

12   Q.   And can we -- do you recognize this, where

13   this took place?

14   A.   Yeah.  It's here in Tucson.

15   Q.   At what store?

16   A.   Circle K.

17   Q.   And we'd ask you to look at 61-D.

18       And can we enlarge the area in the center,

19   please, of the faces of the people?

20       You mentioned to us that, while you were at

21   the Circle K here in Tucson, some people came up to

22   your car; is that correct?

23   A.   Correct.

24   Q.   Some black males?

25   A.   Yes.

1    Q.   Are these the black males that did that?

2    A.   That walked up to me?

3    Q.   Yes.

4    A.   Yes.  They're in the picture.

5    Q.   In the picture?

6    A.   Yeah.

7         MR. LACEY:  I have no further questions.

8         THE COURT:  Let's take about a 10-minute

9    recess, and then we'll bring the jury in.

10        Based upon this testimony, I don't

11   expected him to be making an in-court

12   identification.

13        MR. ARMSTRONG:  What about the out-of-

14   court identification using photographs?

15        THE COURT:  Let's put Edwards on the

16   stand.

17        You can step down.

18      JON EDWARDS, WITNESS, PREVIOUSLY SWORN

19        MR. LACEY:  What are you up there for?

20        THE COURT:  He's going to explain to me

21   what he did on February the 8th.

22                   EXAMINATION

23   BY THE COURT:

24        THE COURT:  What did you do on February 8

25   with regard to the last witness?

1          THE WITNESS:  I interviewed him at the

2    Phoenix Police Department.

3          THE COURT:  Did you show him photographs?

4          THE WITNESS:  Yes, I did.

5          THE COURT:  How many?

6          THE WITNESS:  I showed him two of each

7    individual that was arrested on February -- or

8    March 2nd.

9          THE COURT:  Does that mean you showed him

10   32 pictures?

11         THE WITNESS:  It was approximately that

12   many photographs, to include the black defendants,

13   the Mexican defendants, and a few other individuals

14   that were not arrested.

15         THE COURT:  Before you showed him the

16   photographs, did you tell him anything about what

17   he should do when looking at the photographs?

18         THE WITNESS:  No, I did not.

19         THE COURT:  How many people did he

20   identify in the photographs?

21         THE WITNESS:  I want to say he made

22   approximately, off the top of my head, five

23   positive identifications.  A couple of them he said

24   looked familiar and thought they might be

25   associated with certain vehicles.

1          THE COURT:  Which were the five that you
2   considered to be positive?
3          THE WITNESS:  He identified Mayco
4   Ledezma.  He identified his brother-in-law, Andy
5   Pineda.  He discussed that Ghermon Tucker looked
6   familiar and also Ja'Cory Ranger.
7          THE COURT:  He said he looked familiar?
8   He didn't identify --
9          THE WITNESS:  I believe he positively --
10  if I could look at my report real quick --
11         THE COURT:  Go ahead.
12         THE WITNESS:  -- for Jorge, his report.
13         Okay.  He positively identified his
14  brother-in-law, Yovani.  He positively identified
15  Mayco or Seco.  He positively identified Ja'Cory
16  Ranger as the black male associated with the
17  Escalade, and he had a limp.  He positively
18  identified Jeremy Tucker.  He positively identified
19  Tyrees Seymour.  He positively identified Ghermon
20  Tucker.  He wasn't sure which vehicle Ghermon was
21  in.  He positively identified Ardawnn Bryant.  He
22  positively identified Mayco's brother-in-law.
23         THE COURT:  Who was that?
24         THE WITNESS:  Herminio Bonilla.  He wasn't
25  sure about a photograph of Miami.  He thought that

1   Ghermon and Miami did look similar.  He identified
2   the 1911 pistol as being Yovani's.  He thought
3   photographs of some of the weapons were similar to
4   the ones that were being loaded in the Escalade.
5           He positively identified photographs of
6   the Escalade and the Expedition as being the
7   vehicles that he observed in Phoenix and in Tucson
8   and as well as the Nissan Murano.
9           He did not recognize photographs of Jerome
10  Ranger, Rashad McCuin, Damond Reagan, Keith
11  Anderson, Phillip Jeffries, Juan Beltran, Orlando
12  Soto, Felipe Mendoza, Alejandro Gonzales, Omar
13  Fabian, Hiro Angulo, Roberto del Solar-Ramos,
14  Brandon Pineda, Andy Pineda, Jaime Lorenzo or
15  Chivo, Gregorio Guzman-Rocha, and Gregorio Ruiz.
16          THE COURT:  You showed him photographs
17  again a week later?
18          THE WITNESS:  Yes, sir.
19          THE COURT:  Which photographs were those?
20          THE WITNESS:  Same photographs.
21          THE COURT:  Did he make any different
22  identification at that point in time?
23          THE WITNESS:  No.
24          THE COURT:  Give me just a second.
25          Anything further, Mr. Lacey?

1    MR. LACEY:  No, Your Honor.

2    THE COURT:  Mr. Cooper?

3    MR. COOPER:  No further evidence, Your

4  Honor.

5    MR. ARMSTRONG:  I have a few questions,

6  Your Honor.

7    THE COURT:  Go ahead.

8                FURTHER EXAMINATION

9  BY MR. ARMSTRONG:

10  Q.  Can you take a look at 75-A, please, and then

11  also B.

12      Do you recall the number of the photo that you

13  showed of Ja'Cory Ranger, the two photos that you

14  showed Cochi?  I had them listed as 75-A and B, and

15  clearly I'm mistaken.

16  A.  I remember the photo.

17  Q.  Yeah.  Sorry.  Sorry, 74-A and B.  Sorry.

18  75-A --

19    THE COURT:  74-A.

20    MS. HOPKINS:  74-A.

21  BY MR. ARMSTRONG:

22  Q.  Is that 74-A --

23  A.  I don't have it up here, but I can see it back

24  behind you.

25  Q.  Okay.  Is that one of the images that you

1 showed Cochi?

2 A.  That is one of them of Ja'Cory Ranger, yes,

3 sir.

4 Q.  And then 74-B.

5 A.  I'm sorry.  I didn't hear the last question

6 if, you asked me one.

7 Q.  It wasn't much of a question.

8      74-B, is that another image that you showed

9 Ja'Cory Ranger -- or that you showed to Jorge?

10 A.  Yes, sir.

11 Q.  Okay.  Are those the only two images you

12 showed?

13 A.  Of Ja'Cory Ranger, yes.

14 Q.  All right.  How did he go about -- your

15 testimony is that Jorge or Cochi positively

16 identified Ja'Cory Ranger?

17 A.  Yes.

18 Q.  Was it after he looked at the second

19 photograph or after he looked at the first

20 photograph?

21 A.  I don't recall if it was before or after.  I

22 just know that, after viewing the photographs, he

23 made the identification.

24 Q.  How long a period of time did he have to look

25 at that photograph, either of those photographs?

1  A.  As long as he wanted to look at it.  I don't

2  remember the exact time, but he was provided the

3  photographs, and he was able to look at them.

4  Q.  Okay.  And where did this identification --

5  where did this meeting take place between you and

6  Jorge?

7  A.  The interview?

8  Q.  The interview.

9  A.  The interview, I interviewed him at the

10  Phoenix Police Department.

11  Q.  Was that on the 8th or -- the first meeting

12  was on the 8th?

13  A.  Yes.

14  Q.  The second meeting was on the 15th?

15  A.  The first interview was on the 8th; the second

16  interview was on the 15th.

17  Q.  Okay.  Did you -- did you help Jorge get out

18  of jail on the 8th?

19  A.  No, I did not.

20        MR. LACEY:  Objection, relevancy.

21        THE COURT:  The answer was no, he did not.

22  A.  Well, I take that -- just to clarify, I did

23  have to get him out of jail to do the interview,

24  but I took him back.

25  Q.  So by the 15th, he was out of jail?

```
1   A.   Yes.
2   Q.   And he met with you where?
3   A.   In Tucson, Arizona, at the FBI office.
4   Q.   No lawyer present?
5   A.   No.
6   Q.   I note that you --
7            THE COURT:  Other than the U.S. attorneys.
8            THE WITNESS:  Oh, yes.  They're -- sorry.
9   There were two U.S. attorneys present, yes.
10           MR. ARMSTRONG:  My apologies.
11  BY MR. ARMSTRONG:
12  Q.   I noticed that you also met with Yovani on
13  that day.
14  A.   Yes.
15  Q.   Did that interview occur in Tucson as well?
16  A.   Yes, it did.
17  Q.   Okay.  So Yovani and Cochi were both in Tucson
18  for purposes of free talks or interviews on
19  February 15, 2012?
20  A.   Yes.
21  Q.   Did Yovani and Cochi -- were they in the
22  building at the same time?
23  A.   Yes, they were in the building at the same
24  time.
25  Q.   And Yovani is out of custody, is he not?
```

```
1    A.   Correct.

2    Q.   And Cochi's obviously out of the custody?

3    A.   Correct.

4    Q.   Did you have a conversation with Jorge about

5    whether he'd spoken with Yovani about any of the

6    facts related to this case?

7    A.   I don't recall.

8    Q.   Did you have a conversation with Yovani about

9    whether he'd spoken with Cochi about any of the

10   facts related to this case?

11   A.   No.

12   Q.   You're recalling and the answer is no?

13   A.   No, no.  What I recalled is talking to him

14   about it, that he hadn't talked to him about it.

15   Q.   These two gentleman are related, are they not?

16   A.   Yes.

17        THE COURT:  We're talking about the ID.

18   We're not talking about their statements at this

19   point.

20        MR. ARMSTRONG:  Your Honor, I'm trying to

21   explore whether there was any communication

22   regarding the facts of this case that might have

23   tainted the identification.

24        May I proceed?

25        THE COURT:  Go ahead.
```

1    BY MR. ARMSTRONG:

2    Q.   Do you recall the question?

3    A.   Well, just to be safe, can you repeat it,

4    please?

5    Q.   Maybe not.

6         Do you have any concerns whether these two

7    have communicated -- well, they are related.

8    Yovani and Cochi are related; correct?

9    A.   Yes.

10   Q.   By marriage?

11   A.   I believe, yes, that's correct.

12   Q.   And do you have any information about how

13   often they communicate in general?

14   A.   No, I do not.

15   Q.   How long was your meeting with Cochi or Jorge

16   on the 8th?

17   A.   I don't recall exactly how long the interview

18   took place, but I would say it was at least an

19   hour.

20        MR. ARMSTRONG:   Thank you.   Nothing

21   further.

22              FURTHER EXAMINATION

23   BY MR. YOUNG:

24   Q.   Of the pictures that you showed Jorge on

25   February 8th and February 15th, were any of those

1 photographs of nonsuspects in this case?

2 A.   Yes.

3 Q.   And which photographs were they?

4 A.   Keith Anderson, Phillip Jeffries, Felipe

5 Mendoza, Alejandro Gonzales, Omar Fabian, Hiro

6 Angulo, and I don't know if I said Juan Beltran or

7 not, but --

8 Q.   Those other people, were they suspects in

9 other cases?

10          MR. LACEY:  Objection, Your Honor.

11 Relevancy.

12          THE COURT:  Sustained.

13 BY MR. YOUNG:

14 Q.   Did you show Jorge any pictures of

15 nonsuspects?

16          MR. LACEY:  Asked and answered.

17          MR. YOUNG:  It was asked and objected to,

18 Your Honor.

19          THE COURT:  Nonsuspects in the general

20 sense?

21          MR. YOUNG:  In the sense that --

22          THE COURT:  Usually if the police officers

23 have got a photograph, you're a suspect in

24 something.

25          MR. YOUNG:  Usually there's a line-up.

```
 1              THE COURT:  They don't run around with six
 2    packs of innocent people, do they?
 3              MR. YOUNG:  Well, five of the people would
 4    be innocent normally, Your Honor.
 5              THE COURT:  Where do they get pictures
 6    from?  Police files.  Let's not go there.
 7              MR. YOUNG:  In a six-pack line-up, five of
 8    the pictures come out of the DMV records.
 9              THE COURT:  Not his.
10              MR. YOUNG:  Well, that's what I'm driving
11    at, Your Honor, is that these are all suspects in
12    something that's being investigated.  I don't need
13    to know what's being investigated.  I just need to
14    know --
15              THE COURT:  Were these all suspect
16    pictures of some sort?
17              MR. YOUNG:  These were persons of
18    interest.
19              THE COURT:  Were they DMV photographs?
20              MR. YOUNG:  No, not all of them.
21    BY MR. YOUNG:
22    Q.   Keith B. Anderson, is that Miami?
23    A.   No.
24              MR. YOUNG:  That's all I have, Your Honor.
25              THE COURT:  Mr. Lacey?
```

1      MR. LACEY:  No questions.

2      THE COURT:  You may step down.

3      Mr. Armstrong, your question was does the

4   identification on February the 8th come in;

5   correct?

6      MR. ARMSTRONG:  Yes, sir.

7      THE COURT:  Give me five minutes while I

8   think about this.

9      (Off the record.)

10      THE COURT:  Show the absence of the jury,

11   presence of all counsel and the defendants.

12      I have considered defense counsels' motion

13   with regard to a suggestive identification.  In

14   erring on the side of caution, I'm not sure they're

15   necessarily unduly suggestive, but what I will

16   allow is the following.

17      I will allow testimony about the

18   identification procedure, what was done, that he

19   did identify some people, but not the names.

20      You can go get the jury.

21      MR. LACEY:  Do you want to get the witness

22   too?  I think the marshals --

23      THE COURT:  He's right back there.

24      MR. LACEY:  Okay.  You would know better.

25      (Off the record.)

1          (The jury enters the courtroom.)

2          THE COURT:  Let the record reflect the

3     jurors returning back to the courtroom, the

4     presence of all counsel and the defendants.

5          Good morning.  You all seem bright and

6     chipper this morning.  After I asked Mo to tell you

7     guys to go home at 4:30 and come back at 9:30, I

8     realized that was probably not going to be the time

9     we were ready to begin, but I didn't have your

10    phone numbers, so I couldn't call you and tell you,

11    so I'm sorry.

12         Mr. Lacey, your next witness.

13         MR. LACEY:  Thanks, Your Honor.

14   JORGE ABEL MEDINA-SANTOS, WITNESS, PREVIOUSLY SWORN

15                  DIRECT EXAMINATION

16   BY MR. LACEY:

17   Q.  Sir, would you give us your name for the

18   record and spell your last name.

19   A.  Jorge Abel Medina-Santos.

20         THE COURT:  I need you to get closer to

21   the microphone.

22         THE WITNESS:  Jorge Abel Medina-Santos.

23         THE COURT:  Sir, the Rule has been invoked

24   in this case, and that means, except during the

25   time that you are testifying, you must remain

outside the courtroom, and you are only allowed to discuss your testimony with the attorneys involved in the case.

Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: All right.

BY MR. LACEY:

Q. Sir, how old are you, age?

A. 20.

Q. And what's your educational background? How far did you go in school?

A. Eighth grade, but I went, like, a year to high school.

Q. Can you read and write?

A. I can read, but spell, like, I got to spell to read. I got to spell it out.

Q. Are you married?

A. Yes.

Q. And by marriage, do you know a person named Yovani?

A. Yes.

Q. And what's his full name?

A. Yovani Valenzuela.

Q. Is he your brother-in-law then?

A. Yes.

1    Q.   How long have you known -- I'll call him

2    Yovani for the sake of keeping it simple.  How long

3    have you known Yovani for, approximately?

4    A.   Since I was, like, nine years old, 10.

5    Q.   Sir, I want to direct your attention back to

6    March 2nd of last year, in 2011.

7         Do you recall that day?

8    A.   Yes.

9    Q.   How did your day start out that day?

10        Well, first, the night before, what were you

11   doing the night before?

12   A.   I went out to, like, parties.

13   Q.   And when you say out to parties, what kind of

14   partying were you doing that night?

15   A.   Like, going out to, like, Mexican parties,

16   like, where you go and dance and shit, like, not do

17   nothing --

18   Q.   Don't use any profanities, please.

19             MR. LACEY:  Sorry, Judge.

20             THE COURT:  Actually, talk the way you

21   normally talk.

22             MR. LACEY:  Okay.  Sorry.

23             THE COURT:  I don't want anybody to

24   misconstrue the meaning of anything because they're

25   not talking the way they normally talk, so talk the

1  way you normally talk.

2          MR. LACEY:  Okay.  Up to a point.

3          THE WITNESS:  Okay.

4  BY MR. LACEY:

5  Q.  Sir, the night before, when you went out

6  partying, did you do any drinking or do any drugs?

7  A.  No, because I was driving.

8  Q.  The next day, how did it start out, March

9  2nd?  When did you wake up, roughly?  Do you

10 remember?

11 A.  I woke up with a phone call.

12 Q.  Who was calling you?

13 A.  Yovani.

14 Q.  And when he called you, what was the

15 conversation about?

16 A.  If I wanted to come with him to Tucson.

17 Q.  And when he -- was this a wake-up call, so to

18 speak?

19 A.  Yeah.

20 Q.  And after the wake-up call came, what did you

21 say?  What happened?

22 A.  If I wanted to come to Tucson, he'll give me

23 $2,000 if I come with him.  I'm like, "So what's

24 up?"  That's what he told me, if I wanted to.

25 Q.  And after he said he'd give you 2,000 bucks

1  for coming to Tucson, did he tell you what he would

2  be doing in Tucson then, or did you later learn

3  what the purpose of coming here was?

4  A.   Well, I kind of figured it out because what he

5  was doing, like, I'm like, oh, well, he's going to

6  go, you know, do something bad, like a bust.

7       And I'm like, "So what am I going to do?"

8       He's like, "Nah, you're just going to stay in

9  the car."

10      And I'm like, "All right then."

11 Q.   Did you know anything about Yovani's past, the

12 kind of activities he had done before March 2nd of

13 last year, criminal activity?

14 A.   I could tell because he was bringing a lot of,

15 like, money home sometimes.

16 Q.   And did you come to find out how he was

17 getting this money?

18 A.   Yeah.

19 Q.   How was that?

20 A.   He was, like, every night he was, like, doing

21 home invasions and stuff.

22 Q.   Okay.  So getting back to March 2nd, when he

23 called you and offered you 2,000 to come to Tucson,

24 what did you do?  What did you say?

25 A.   I told him, "Hey what am I going to do?"

1    He's like, "Nah, you're just going to sit in
2  the car.  You're not going to do anything."
3    I'm like, "Sure."
4    He's like, "Do you want $2,000?"
5    I'm like, "Yeah."  I have kids, you know.  I
6  needed money, so --
7  Q.   How many kids do you have?
8  A.   Four.
9  Q.   You're 20?
10  A.   Yes.
11  Q.   Sir, after you agreed to come to Tucson for
12  $2,000, what happened then?
13  A.   He was talking to me about it, that he was
14  going to go with Seco, and I talked to him about
15  something else, I think.
16  Q.   And what next?  Did you get together with
17  anyone that day?
18  A.   Yes.  I got -- I drove myself to by where
19  Yovani was at, and I left my car there, and I got
20  with -- I jumped in Yovani's car.
21  Q.   And what kind of car did he drive?
22  A.   He drives a Dodge Commander.
23  Q.   What color is it?
24  A.   White.
25  Q.   After he -- after you jumped in his car, what

1　happened then?

2　A.　We drove to Seco's house, I think, or --

3　yeah.　I don't remember if -- I'm not quite sure if

4　we picked him up in the street or went to his

5　house, but we went to go get him.

6　Q.　We'd show you Exhibit No. 9 and ask if you can

7　identify this person.

8　A.　Yes.

9　Q.　And who is that?

10　　　　THE COURT:　Slow down.　Whoa, whoa, whoa.

11　Don't forget, the monitors over here are a little

12　bit delayed.

13　　　　Can you all see them?

14　BY MR. LACEY:

15　Q.　Sir, Exhibit 9 in evidence, can you identify

16　that person for us?

17　A.　Yeah.

18　Q.　Who's that?

19　A.　Seco.

20　Q.　Seco?

21　A.　Yes.

22　Q.　S-e-c-o?

23　A.　Yeah.

24　Q.　Had you known or ever seen Seco before March

25　2nd of last year?

1  A.   He used to go sometimes, like, when we used to

2  be on the street, he used to visit my brother-in-

3  law sometimes.

4  Q.   Yovani?

5  A.   Yeah.

6  Q.   Did you ever see where Seco was hanging out

7  with other people, or with your brother-in-law, did

8  you ever go to any of those locations and see them

9  together with other people?

10  A.   Well, when I used to go drop off my brother-

11  in-law to Seco's house, I used to see a bunch of

12  people at Seco's house.

13  Q.   What kind of people would you see there?

14  A.   I used to see most -- sometimes there was

15  black people.  Sometimes I'd just see Mexicans.

16  There's, like --

17  Q.   Where roughly was -- where was Mayco's house

18  back then?  What part of Phoenix?

19  A.   It was on 35th and -- was it -- yeah, Buckeye.

20  Q.   Is that 35th Avenue and Buckeye?

21  A.   Yeah, 35th Avenue and Buckeye.

22  Q.   Going back to March 2nd, after you got

23  together with your brother-in-law Yovani, what

24  happened then?

25  A.   Seco was talking to some people on what they

1  were going to do.

2  Q.   And when you say Seco was talking to some

3  people, was it in person or on the telephone?

4  A.   It was on the telephone.

5  Q.   And whose phone was he using back then, do you

6  know, at that time?

7  A.   Well, at the time when he got out of his house

8  or where we picked him up, he was using his.

9  Q.   His phone?

10  A.   Yeah.

11  Q.   And do you know who he was talking to or who

12  he was calling?

13  A.   Well, he was talking in English, so I don't

14  know who he was talking to, but he was talking in

15  English.

16  Q.   What was Seco saying?

17  A.   That they were going to get 50 kilos,

18  something like that, and they were going to divide

19  it in half.  I don't know.

20  Q.   50 kilos and divide in half?

21  A.   Yeah.

22  Q.   And after this conversation you heard, what

23  happened next?  Was there other conversations in

24  the car?

25  A.   Not really.  He was just telling my brother-

1  in-law, don't -- don't, like, how do you say, don't

2  trip, let me do this, and it's going to work out

3  fine.

4  Q.  Now, who was sitting where in the Jeep

5  Commander, the white Jeep?

6  A.  Yovani was driving, Seco was the passenger,

7  and I was in the back.

8  Q.  And you told us a little bit ago that you were

9  being asked to drive that day; is that correct?

10  A.  Yeah.  When -- after we left from the black

11  peoples' house, we went to Miami's, and they told

12  me to drive someone home to drop off their car.

13  Q.  So anyway, let's take it one step at a time.

14  After you pick up Seco, where do you go?  What's

15  the first location you go to?

16  A.  We're looking -- we went to 24th Street and

17  Broadway.

18  Q.  And what happened there?

19  A.  He talked to some people, and then we left

20  from there to -- I think it was to Miami's house.

21  Q.  Well, let's take it one step at a time.  When

22  you say you met some people, where did this

23  happen?  Was it a house?  Was it a store?  Who did

24  you meet up with and where?

25  A.  It was at a house.

1    Q.    And do you recall what part of Phoenix?

2    A.    24th Street and Broadway.  Broadway, yeah.

3    Q.    In that area?

4    A.    Yeah, around.

5    Q.    Do you know how to get to this house?

6    A.    I didn't know how to.

7    Q.    Who gave you directions or how did you get

8    there?

9    A.    I'm not sure if Seco knew where was the

10   house.  I'm not sure.

11   Q.    Did you know where to go?

12   A.    No, I didn't know.  I didn't know, like,

13   nobody there, so --

14   Q.    So when you go to this house, can you describe

15   the house for us?  Large house?  Small house?

16   A.    It was a medium house.  It was not large or

17   small.  It was like, like, a medium house, not that

18   big, not that small.

19   Q.    And when you get to the house, are we talking

20   what time of day, roughly, morning or afternoon?

21   A.    Like, around 10, around there, in the, like,

22   kind of afternoon.

23   Q.    10 or afternoon?

24   A.    Yeah.  Because we -- well, I don't remember.

25   Q.    Was it daylight?

1   A.   Yeah.

2   Q.   When you got to the house, what happened?  Did

3   anyone get out of the car, stay in the car?  What

4   happened?

5   A.   Seco got off the car.  Seco was the first

6   one.  He got off and started talking to them.

7   Q.   Talking to -- who was he talking to?

8   A.   The black people.

9   Q.   And where was this conversation taking place?

10   A.   In the house.

11   Q.   And where were you at this time, when the

12   conversation inside the house is taking place?

13   A.   I think I was -- I'm sure I was inside the

14   car, what I remember.  And there's -- when Seco was

15   walking out, there was three of them outside

16   already.

17   Q.   When you say "three of them," you're referring

18   to whom?

19   A.   Three black people outside the house.

20   Q.   And what about Yovani?  Where was he at that

21   time?  Do you know?

22   A.   I'm not sure if he went inside or if he was

23   with me.  I'm not sure.

24   Q.   Okay.  How long did this take place, when you

25   were staying at this house and Seco went in?

1  A.  It was quick, like, a minute.  It was quick.

2  He just went in and talked and came back out and

3  told Yovani what was going to happen.

4  Q.  And what did he tell Yovani -- what did Seco

5  tell Yovani was going to happen?

6  A.  That he was going to send them first and

7  then -- I don't know.  They were going to go first,

8  and then they were going to go second, I think.

9  Q.  And that was in reference to what, going first

10  and going second?

11  A.  Like, inside the house where they were going

12  to bust.

13  Q.  Where there was talk of 50 keys?

14  A.  Yeah.

15  Q.  After Seco gets back in your vehicle, where do

16  you guys go next?

17  A.  To Miami's house.

18  Q.  And where -- what part of Phoenix is that in,

19  roughly?

20  A.  It's around that neighborhood, like, a couple

21  blocks away from there, from the other house.

22  Q.  When you got to Miami's house, what happened

23  there?

24  A.  I just got there, and another car was pulling

25  up, and Seco talked to him, and then he's like --

1　that's when Yovani told me, "Hey, take them home

2　and bring them back.  They're going to go drop off

3　their car."

4　Q.　And who was being referred to as taking them

5　and dropping them off and dropping the car off?

6　Who are you talking about?

7　A.　It's a Mexican dude.

8　Q.　So when you get to Miami's, who was there?

9　Who do you see at that location?

10　A.　It was -- I think it was just him.  When we

11　were there, it was just him, and when we got off,

12　the car was pulling up, like, a Crown Vic, like,

13　with big rims was pulling up, and that's when my --

14　when Seco walked up to him and started talking to

15　him.

16　　　And then my brother-in-law told me, "Hey, take

17　them home, they're going to go drop off the car,

18　and bring him back."

19　　　And I'm like, "All right."

20　Q.　So what happened then?  Did you take somebody

21　to drop off a car?

22　A.　Yeah.

23　Q.　And what kind of -- was that the Crown Vic you

24　just told us about?

25　A.　Yeah.

1  Q.   And would you describe the person that was in

2  the that car.

3  A.   A Mexican, probably from -- he was, like, from

4  -- he was from Mexico.  Not that tall.  Not that --

5  he was, like, kind of short.  And he was with some

6  other young Mexican dude, skinny.

7  Q.   Okay.  When you left Miami's house and took --

8  went to drop off -- this other Hispanic male got

9  dropped off, what happened when you got -- where

10 was that location that you took the person to and

11 he dropped off his car?

12 A.   I know it was not Southern.  It's between --

13 I'm not quite sure.  I remember there was a park

14 close to there.

15 Q.   Okay.  Someplace in Phoenix?

16 A.   Yes.  It was on the south side.

17 Q.   Okay.  After you dropped him off, who got back

18 in your car after the other car was dropped off,

19 the Hispanic male?

20 A.   Yeah, the two Hispanic males got -- one got in

21 the front.  The one that was driving the car got in

22 the front.  The other one got in the back.

23 Q.   And you were driving?

24 A.   Back to Miami's house.

25 Q.   And you were driving the white Jeep Cherokee?

1  A.  Yeah.

2  Q.  And when you get back to Miami's house, what

3  happens?

4  A.  It looked like they were already talking

5  and --

6  Q.  When you say "they," who was talking?

7  A.  Seco and my brother-in-law and Miami.  They

8  were, like, almost done with their conversation, so

9  when I get there, they're like, "Let's go.  We're

10  trying to hurry up."

11      And I'm like, "All right then."

12  Q.  Okay.  At the time you got back to Miami's

13  house, you had the two Hispanic males in the

14  vehicle with you.  Did they get out of the car

15  then?

16  A.  Yeah.

17  Q.  And did you stay in the driver's seat, or did

18  you change positions?

19  A.  I went -- I went to the back of the car again.

20  Q.  And who got in the driver's seat at that time?

21  A.  Yovani.

22  Q.  And Seco was where?

23  A.  In the passenger.

24  Q.  What happened then?

25  A.  I think we drove looking for someone else, and

1    we couldn't find him, and that's where we're like,

2    oh, well, let's go, can't find him.

3    Q.   And who was looking for other persons at that

4    time?  Was it Seco, you, your brother-in-law

5    Yovani?

6    A.   We didn't really knew them, so it was Seco

7    looking for people.

8    Q.   And were those people found?

9    A.   I'm not quite sure if we -- if we found them

10   all, but he found some and -- no.

11   Q.   So when you're looking for people, was the

12   telephone being used in order for Seco to be

13   looking for people?

14   A.   His phone got -- like, his phone, his battery

15   died, and he's like, "Can I use your" -- my

16   brother-in-law told him, "Hey, let him borrow your

17   phone," and that's when they told me to let him

18   borrow my phone because Seco's phone died already.

19   Q.   So after this, you left Miami's house.  Where

20   did you go?

21   A.   To 16th Street and -- Buckeye?  Broadway, I

22   mean.  Yeah.

23   Q.   And what was at that location, 16th Street and

24   Broadway?

25   A.   Circle K.

1  Q.  When you got there, what did you do and what

2  did you see?

3  A.  I was inside the car the whole time we were

4  there, but Seco got off to talk to black people

5  from the Escalade and from the Expedition.

6  Q.  Now, this Escalade and Expedition, would you

7  describe the Escalade for us?  What color was that?

8  A.  It was black.

9  Q.  And what type of Escalade was it?

10  A.  Not that new.  It was, like, a 2004, 2003

11  Escalade.

12  Q.  And there's different types of Escalades.

13  Some are --

14  A.  It was a truck.

15  Q.  Okay.  And you mentioned an Expedition.  What

16  color was that?

17  A.  A red one with trimming.  The bottom trimming,

18  it was like grayish, gray.

19  Q.  Okay.  Where were those two vehicles, the red

20  Expedition and the black Escalade, parked in

21  relation to where you were parked in the white

22  Jeep?

23  A.  They were parked, like, pumps away, gas pumps

24  away, but they were together.

25  Q.  When you say they were together, you're

1  referring to whom, to the two vehicles?

2  A.   Yeah.   The Escalade and the Expedition were

3  side by side.

4  Q.   And what were they doing?

5  A.   Well, they were talking, and that's when Seco

6  got off the car and walked over there and was

7  talking to them.

8  Q.   Okay.  And you stayed in your car then?

9  A.   Yeah.

10  Q.   In the Jeep.

11      How long was Seco talking with the people in

12  the Expedition and the Escalade?

13  A.   Not that long, because he was trying to hurry

14  up to come to Tucson, so --

15  Q.   When Seco was talking with them, where was

16  Yovani?  Do you remember?

17  A.   I think he was in the car.  He didn't get off,

18  because I think Seco told him not to get off,

19  because there was a bunch of people, you know.  It

20  wouldn't look -- it wouldn't look like a bunch of

21  people in Circle K.

22      So I think just Seco got off and went to talk

23  to them.

24  Q.   Okay.  What else did you see while you were up

25  at the Circle K in Phoenix at 16th and Broadway?

1  A.   They were, like, putting water, I think, in

2  the back of the Escalade, something like that,

3  water.

4  Q.   When you say "they," you're referring to who?

5  A.   The black people were putting water in the

6  back of the Escalade.

7  Q.   Did you see anything else happen while you

8  were there at the Circle K besides water being put

9  in the back of the Cadillac Escalade?

10  A.   No, just Seco talking to them, and they were

11  like -- they were parked next to each other,

12  talking to each other.

13      And that's when Seco came back and said, "I

14  told them to be driving already to Tucson.  We're

15  going to catch up to them."

16  Q.   Okay.  Seco gets back in your vehicle, and

17  where do you guys go next?

18  A.   We didn't pump gas in that gas station.  We

19  pumped gas at 44th street and Broadway.

20  Q.   And who's in the vehicle, the same three of

21  you at that time?

22  A.   Yes.

23  Q.   I want to go back in time a little bit.

24      When you were back at the house in Phoenix

25  where Seco went into the house for a minute or so

1   or whatever it was, did you see anything taking

2   place at that time?

3   A.   Yeah.  There was two young black persons

4   walking with -- like, putting a gun in the

5   Escalade, and one was rolling a joint, one that had

6   a limp.  He had a limp and was putting on a white

7   long-sleeved shirt.

8   Q.   Okay.  Where was the black Escalade parked

9   where you saw two guys putting -- what kind of

10  gun?  How long was the weapon?

11  A.   One was a rifle.  I don't know.  It was, like,

12  an AK.  I don't know.

13  Q.   And whereabouts in the Escalade was that put?

14  Did you see where in the vehicle?

15  A.   In the back.

16  Q.   Okay.

17  A.   You know how it's got, like, the little

18  openings to open -- like, had the little push

19  things to, like, put stuff in there?

20  Q.   When you saw this being put in the back of the

21  Escalade at this house, where was Seco at this

22  point in time?

23  A.   Oh, he was already walking back to the

24  vehicle.

25  Q.   So right after he went in the house and spoke

1  to them, he came back out?

2  A.  Yeah.

3  Q.  And it was as he was coming back out after

4  speaking with them that this happened?

5  A.  Yeah.

6  Q.  Okay.  The fellow you saw putting on a white

7  shirt that had a limp, where did you see him

8  positioned?  Where was he in --

9  A.  He was in the front of the house.  He was

10  smoking, like, a blunt in front of the house.

11  Q.  And "blunt" meaning?

12  A.  Yeah, weed.  Like, he was talking to Seco and

13  smoking, like, rolling something.

14  Q.  Did you hear any conversation about -- while

15  you were there seeing all this happen, did you hear

16  the blacks saying anything to Seco while you were

17  there?

18  A.  When Seco opened the door, he's like, "All

19  right, all right, all right, all right then."  I

20  was, like, hearing, like, "All right then."  That's

21  it.

22      And that's when Seco got on the car and told

23  us what was going to go on.

24  Q.  And what did Seco then tell you after meeting

25  with the black males inside the house?

1  A.  That they were going to go half, half of the

2  drugs with them and half to Seco.

3  Q.  Half of the 50?

4  A.  Yeah.

5  Q.  Did you guys go and -- you and Yovani and Seco

6  go to 44th and Broadway and fill up at a gas

7  station?

8  A.  Yeah.  After we did all that, we went to go

9  fill up at a gas station.

10  Q.  And after this, what happened next?

11  A.  We filled up.  Me and Yovani and Seco got off,

12  got something to drink, filled up the gas tank, and

13  then jumped on the freeway to Tucson.

14  Q.  As you're coming to Tucson, what was being

15  said inside the car?  Was there any conversation or

16  phones being used?  What was happening?

17  A.  He got a phone call from some Mexicans.  I

18  could tell because they were talking Mexican.  And

19  he's like, "Don't worry.  They're going to take the

20  person that's inside."  And he was telling Yovani.

21  Q.  Seco is telling Yovani and you're in the back

22  seat listening to this?

23  A.  Yeah.

24  Q.  That they're going to take the person?

25  A.  Yeah.

1   Q.   What did that mean to you?

2   A.   Like, kidnap him, take him.

3   Q.   Okay.

4   A.   Because they're saying, like, he was a son

5   from a big drug dealer, that the Mexicans were

6   going to take him.

7   Q.   Okay.  As you were driving down to Tucson,

8   were there many phone calls being made then during

9   the trip?

10   A.   Yeah.

11   Q.   Who was talking?

12   A.   Seco.

13   Q.   And do you know who else he was talking to?

14   A.   He was talking in English and in Spanish, so

15   he was talking to different people.

16   Q.   When he was speaking in English, do you recall

17   any of those conversations on your trip from

18   Phoenix down to Tucson, again, in English?

19   A.   I don't remember.  I don't know what they were

20   talking about.

21   Q.   When you start to come -- leave Phoenix, did

22   you stop at all before you got to Tucson?

23   A.   Yeah.  We stopped at a Circle K between

24   Phoenix and Tucson.

25   Q.   And was it close to Tucson or closer to

1    Phoenix?  Do you remember?

2    A.   Closer to Tucson.

3    Q.   When you stopped there, what happened?  What

4    did you see?  What did you do?

5    A.   We stopped right in the side of the Circle K,

6    and some four-door car pulled up next to us, and

7    through the front -- I couldn't see through the

8    side of the glass, but through the front, they were

9    Mexicans.

10        And Seco got off of the car and went inside

11   their car, and me and Yovani got off to use the

12   restroom.

13   Q.   And that was the Circle K?

14   A.   Uh-huh.

15   Q.   Now, describe -- you have to say yes.

16   A.   Yes.  I'm sorry.

17   Q.   Describe the other car that you saw with

18   Hispanic males in it.

19   A.   It was a gray car.  I don't know.  I don't

20   know what brand was it, but it was a gray car,

21   four-door.

22   Q.   As you're at the Circle K close to Tucson, who

23   else did you see at the store besides the ones

24   you've talked to us about already in this other

25   vehicle, the gray car?

1    A.   I just saw Mexicans in Tucson, and when Seco

2    jumped in the car, Seco started saying, "Oh, no,

3    no.  Keep on going.  Keep on going.  I'll tell you

4    guys where to get off."

5    Q.   You and Yovani go inside the Circle K?

6    A.   Yes.

7    Q.   And you're there for how long?  What are you

8    doing, just going to the bathroom?

9    A.   No, just going to the bathroom.

10   Q.   What happened then?

11   A.   We got back to the car, and that's when Seco

12   told us that the people from there wanted the

13   person that was inside of the house.

14   Q.   Okay.  Where did you go from the Circle K just

15   before Tucson?

16   A.   We came to Food City.

17   Q.   Had you ever been to Tucson before?

18   A.   No.

19   Q.   First trip?

20   A.   Yeah.

21   Q.   And when you get to Food City, who's in the

22   car at that time, the same three people?

23   A.   Yeah, same three people.

24   Q.   When you get to Food City, what time of day

25   was it?  Do you remember?

1    A.   No, I don't remember.

2    Q.   When you pull into Food City, what did you

3    see?

4    A.   It was a car.  I don't -- I don't remember the

5    color, but there was a four-door car, and there was

6    an Escalade and Expedition, and I was, like, a

7    little bit far away from them, and we were sitting

8    there in the car, waiting for someone to come.

9    Q.   So while you're at Food City, do you stay in

10   your vehicles, or what happened?  Does anyone get

11   out of your vehicle?

12   A.   Yeah, we got off to use the restroom.

13   Q.   We'd ask the witness to look at Exhibit 110

14   for identification.

15        Can you identify anybody in this photograph?

16   A.   Yeah, my brother-in-law and Seco.

17             MR. LACEY:  We'd offer 110 at this time.

18             MR. COOPER:  No objection.

19             MR. ARMSTRONG:  No objection.

20             MR. YOUNG:  No objection, Your Honor.

21             THE COURT:  110 can be admitted, can be

22   published.

23   BY MR. LACEY:

24   Q.   Sir, you mentioned you went to Food City.

25   Does this seem familiar to you?

1  A.  Yes.

2  Q.  What is this?

3  A.  I was walking in Food City to the restroom.

4  Q.  Okay.  And you mentioned there's two people in

5  the photograph here.

6  A.  Yes.

7  Q.  And which is which?  You mentioned Yovani and

8  Seco.  Which is which as we look at them?  Who is

9  closest to the screen down to you?

10  A.  The biggest one is my brother-in-law.  The

11  skinny one is Seco.  The one that had a long black

12  shirt is Seco, and the one that was -- you can't

13  really see if he had a long shirt, but next to him

14  is my brother-in-law.

15  Q.  And next Exhibit No. 111, please.

16      Can you identify what's in 111 please?

17  A.  It's me.

18          MR. LACEY:  We'd offer Exhibit 111,

19  please.

20          MR. COOPER:  No objection.

21          MR. ARMSTRONG:  No objection.

22          THE COURT:  It can be admitted, can be

23  published.

24          MR. YOUNG:  No objection

25          THE COURT:  Sorry, Mr. Young.

1  BY MR. LACEY:

2  Q.   And this is where, Food City as well?

3  A.   Yes.

4  Q.   And you don't recall the day -- what time it

5  was?  Was it daylight still?

6  A.   Yeah, it was daylight.

7  Q.   There's a time stamp in the top left corner of

8  this exhibit where it says 1343.  Do you know what

9  that means?

10  A.   No.

11  Q.   Okay.  Also Exhibit 109, it's a six-second

12  clip from the video at Food City.  We'd ask if you

13  can identify -- stop there, please.

14        Can you identify the persons that we just saw

15  on that little snippet of video?

16  A.   My brother-in-law and Seco in front of me.

17  Q.   And then anyone else?  Who's that now?

18  A.   Me in back.

19            MR. LACEY:  We'd offer 109.

20            MR. COOPER:  No objection, Judge.

21            MR. ARMSTRONG:  No objection.

22            MR. YOUNG:  No objection to that.

23            THE COURT:  109 can be admitted, can be

24  published.

25            MR. LACEY:  Thank you.

1          THE COURT:  Don't forget, slow down a

2    little bit.

3          MR. LACEY:  Okay.

4          Okay.  Stop it there.

5    BY MR. LACEY:

6    Q.   That's, again, your brother-in-law, the

7    heavier-set fellow?  That's Yovani and Seco?

8    A.   Yeah.

9    Q.   Keep playing, please.

10          And that's you?

11   A.   Yes.

12   Q.   And your purpose for going into Food City at

13   that time with your brother-in-law and Seco was

14   what again?

15   A.   Well, we went -- we got off to use the

16   restroom too.

17   Q.   Had you already seen the Expedition and

18   Escalade before you went into the restroom?

19   A.   Yeah.

20   Q.   Had you seen this Expedition and Escalade

21   earlier that day?

22   A.   Phoenix.

23   Q.   Was that at the Circle K?

24   A.   Yeah.

25   Q.   As you're at Food City, what happens?  How

1  long are you there for, roughly, and what happens

2  as you're at the Food City?

3  A.   When we got off the restroom, we walked back

4  to the car.  Seco and Yovani left with some -- with

5  a Nissan.  A Nissan Murano pulled up, and that's

6  when Seco got off, and he's like, hey, he told my

7  brother-in-law to let him borrow his gun.  And he

8  got off, and then he told my brother-in-law, "No,

9  you come too.  We'll fit."  And they got on the

10  Murano and left.

11  Q.   Your brother-in-law Yovani had a weapon.

12  Where was the weapon?

13  A.   It was in the car.

14  Q.   Whereabouts in the car?

15  A.   It was in the front, like, next to his seat.

16  Q.   And what type of weapon was that?

17  A.   It was a 1911 Colt .45.

18  Q.   And you say it was passed off from Yovani to

19  whom?

20  A.   To Seco.

21  Q.   Okay.  And did you see this happen?

22  A.   Yeah.  They were saying in the car, "I'm going

23  to go," and he's, like, "Go let me borrow the gun,"

24  and then at the end, when Seco opened the door,

25  he's like, "Hey, does he fit?  Oh, you fit too.

1  Come on.  Let's go."

2  Q.   Did they say before they left what they were

3  going to be doing?

4  A.   Yeah, that they were going to go check out the

5  place.

6  Q.   What place is that?

7  A.   What they were going to bust.  I don't know.

8  Q.   That home invasion you told about?

9  A.   Yeah.

10  Q.   After they left in this Murano, what happened

11  then?

12  A.   I stayed -- I stayed there by myself, hearing

13  music, and that's when I got off of the car, and I

14  was going to go use the restroom, and I saw Seco's

15  brother-in-law next to the Food City.

16  Q.   Do you know what Seco's brother-in-law's name

17  is?

18  A.   No.  I don't know his name.

19  Q.   Can you describe him for us?

20  A.   Mexican.  Cuts his hair like mine.  He was

21  kind of dirty because he came from work.

22  Q.   And that's right outside Food City?

23  A.   Yeah, he was --

24  Q.   Had you seen Seco's brother-in-law before this

25  day?

1   A.   Yeah.  One time we were eating at a Mexican

2   restaurant over at Phoenix.  That's where I first

3   met him.  He came up with Seco, and it was me and

4   Yovani, and Seco and him came up to us.

5   Q.   At some Mexican restaurant in Phoenix?

6   A.   Yeah.

7   Q.   How long before this did that happen, that you

8   had seen him before?

9   A.   Quite before -- quite a while before this

10  happened I seen him.

11  Q.   Okay.  So you see Yovani -- Seco's brother-in-

12  law outside Food City.  What do you talk about?

13  A.   Oh, he's -- that's when I walked up to him

14  like, "Oh, what's up?"  Like, "What's up?  What are

15  you doing?"

16       He's like, "Hey, they got stopped."

17       And I'm like, "Seco?"

18       And he's like -- that's when he told me his

19  name is not Seco.  It's Mayco.  And I'm like, "Oh,

20  Mayco?"

21       And he's like, "Yeah, they got stopped."

22       And that's when I told him, "So what do we

23  do?"

24       And I didn't know what to do because I don't

25  know Tucson, you know.  I didn't even know what's

1    -- how to go back to Phoenix.

2    Q.   So what happened then, after you heard this?

3         Where were you positioned in relationship to

4    Food City when you heard this from Seco's brother-

5    in-law?

6    A.   We were in front of Food City.

7    Q.   And was anyone else around when you heard this

8    from Seco's brother-in-law?

9    A.   No.

10   Q.   What was going through your mind when you

11   heard this?

12   A.   Like, what do I do?  And, like, I didn't -- I

13   didn't have a license, so I was, like, so if I

14   drive home, I might get stopped, you know.

15   Q.   What did you do then, after you heard this

16   from the brother-in-law?

17   A.   I told him, "So what are you going to do?"

18        He's like, "Well, I'm going to drive home."

19        I'm like, "How do you get home?"

20        He's like, "Just follow me."

21           THE COURT REPORTER:  Slow down, please.

22   BY MR. LACEY:

23   Q.   I'm sorry.  Go ahead.

24   A.   "Just follow me," he told me.

25   Q.   Okay.  What vehicle was he driving?

1    A.    It was, like, a blue car, but I don't know

2    what brand was it.

3    Q.    Okay.  Where was your car positioned in

4    relationship to the store at Food City at the time?

5    A.    It was far away from his car.

6    Q.    It was far away, you say?

7    A.    Yeah, from his car.

8    Q.    So you left Food City.  You talked with the

9    brother-in-law of Seco.  And hearing this news --

10   we'd ask you to look at Exhibit No. 29 for

11   identification.

12        Can you identify this parking lot?  I know it

13   doesn't show a lot of things there, but does that

14   seem familiar at all?

15   A.    Yeah.

16   Q.    And how so?  What do you -- where is this?

17   Can you tell us?  Or what is this?

18   A.    It's in front of Food City.

19   Q.    And do you recognize any vehicles there?

20   A.    Just the -- I can recognize the Expedition.

21   It's in the middle.

22   Q.    If you can touch it for us, if you touch the

23   screen, I think it will make a little marking.

24   A.    This one.

25   Q.    Okay.  And where was your car parked?  Can you

1    see that in this photograph or not?

2    A.   It's this one, this.

3    Q.   Touch it for us.

4    A.   Yeah.  And here is the's Escalade.

5           THE COURT:  Whoa, whoa.  Touch your car

6    there.  It didn't make a mark.

7           THE WITNESS:  Yeah, it did, a little dot.

8    There it is.

9    BY MR. LACEY:

10   Q.   And you mentioned an Escalade.  Can you see

11   that there?

12   A.   Yeah.  It's parked right here.

13   Q.   So you come out of the store.  Were the

14   vehicles always parked this way that day you were

15   at Food City, or did any of the vehicles change

16   positions?

17   A.   No.  The Escalade got next to the Expedition,

18   and they started talking, and I moved.

19   Q.   Can you show us where you moved to and where

20   the Expedition moved to?

21   A.   I moved, like, right here.  I moved and the

22   Escalade pulled up right here.

23   Q.   Facing what direction in relationship to

24   the --

25   A.   The same way as the Expedition was parked, the

1   Escalade parked right next to it.

2   Q.   So as you leave Food City, just having heard

3   the news about the arrests, where do you walk, in

4   what direction?

5   A.   I was walking --

6   Q.   Can you draw a little trail how you walked?

7   A.   Okay.  I was walking through here like that,

8   through here.  That's when I said it, right here.

9   Q.   What did you say?

10  A.   I told them, "They got stopped," and then I

11  just kept on going, walked all the way to my car.

12       Oh, sorry about the bottom one.

13       I walked all the way to my car right here,

14  because we moved the car that way.

15  Q.   Now, as you're walking by, had the black

16  Escalade moved back by the time you had this

17  conversation?

18  A.   Yes.

19  Q.   So as you walked by there --

20       MR. LACEY:  First I would offer 29 into

21  evidence.

22       MR. COOPER:  No objection.

23       MR. ARMSTRONG:  No objection.

24       MR. YOUNG:  No objection, Your Honor.

25       THE COURT:  29 can be admitted.  The jury

1    can now see it.

2           MR. LACEY:  And just -- will you explain

3    again, because I should have done this earlier.

4           I'm a little slow on the draw there.

5    Sorry, Judge.

6           THE COURT:  That's why Ms. Hopkins gave

7    you the note.

8           MR. LACEY:  It is.  We're a team.  Anyway,

9    it works both ways.  Sorry.

10          Anyway, will you point again --

11          THE COURT:  Why don't you do this.  Why

12   don't have you him clear the screen.

13          MR. LACEY:  Okay.  Thank you.

14   BY MR. LACEY:

15   Q.   Would you point again where you walked when

16   you first came out of the Food City?

17   A.   (The witness complied.)

18   Q.   And again, point to where the vehicles were

19   that you already told us about.

20   A.   This is the one we were driving, so I parked

21   right here, and the Escalade parked right here.

22   There's the Escalade.  And the Expedition stayed

23   there.

24   Q.   And the Expedition, will you put a dot or

25   something on the Expedition?

1  A.  There.

2  Q.  And there is a line on the front row of cars,

3  towards the bottom of the picture.  You have a

4  little line through a black vehicle, and what

5  vehicle is that again?

6  A.  The Escalade.

7  Q.  And is that the one you said moved later?

8  A.  Yeah, he moved next to the Expedition.

9  Q.  Where that empty space is currently but where

10  you put a red line?

11  A.  Yes.

12  Q.  And as you walked by there, were the windows

13  up or down on the Escalade and Expedition?

14  A.  They were -- the Escalade was closer to me,

15  but it was up, so when I was walking by, he put it

16  down, and there's a car next to it, but I'm not

17  sure what kind of car was it, but it was a four-

18  door, and it was a Mexican on the driver's side,

19  and he put his window down.

20  Q.  And when you spoke, did you speak in English

21  or Spanish?

22  A.  In English.

23  Q.  And what did you say?

24  A.  "They got caught."  And that's when I -- "Hey,

25  they got stopped.  They got caught."  And I just

1  kept on walking.

2  Q.  Okay.  You walked back to your car.  What

3  happens then?

4  A.  I was --

5  Q.  Before you -- after you said this, where

6  approximately were you positioned?  Can you put a

7  little X where you were when you mentioned that?

8  A.  I was, like, right here.  I can't really put

9  an X, but it was right there.

10 Q.  Did you say it loud enough, as far as you

11 know -- do you know whether the people inside the

12 vehicle heard you?

13 A.  Yeah, the driver from the Escalade heard me.

14 Q.  How do you know that?

15 A.  Because he put his window down.

16 Q.  Okay.

17 A.  And the passenger from the other car, I don't

18 remember the color, he put the -- his window down.

19 He was a Mexican.

20 Q.  Okay.  And after you said, "They got caught,"

21 went to your car, what happened then?  Where did

22 you go?

23 A.  I followed Seco's brother to a freeway,

24 because I didn't know where to get on.

25 Q.  Okay.  And where was Seco's brother-in-law's

1  car parked?

2  A.  He was parked right in this, way in the front,

3  like, over here, way in the front.

4  Q.  But you can't see it on this photograph?

5  A.  No.  It was way in the front.

6  Q.  You go back to your car, the white Jeep, and

7  drive where?

8  A.  Towards the freeway.

9  Q.  And where was the brother-in-law, Seco's

10  brother-in-law's car?  Did it come around to you,

11  or did it go --

12  A.  No, it was coming, like, through this, through

13  this side, like that, and I was getting out through

14  this side right there.

15  Q.  Okay.  So you guys -- the two cars leave.

16  Where do you go?

17  A.  We -- I was thirsty.  I told him if he could

18  have bought me something.  He bought me a Monster.

19  There was, like, a little gas station next door.

20  He's like, "Get a Monster.  I'll buy you a

21  Monster," because I didn't have no money.

22  Q.  Okay.  What happened then?

23  A.  He bought me a Monster and told me, "Hey" --

24  I'm like, "So what do we do?"

25       He's just, like, "Follow me," and I was

1  following.

2  Q.  Okay.  Once you started following, what

3  happened then?

4  A.  He was, like, a little way behind, like, in

5  front of me.  He got stopped.

6  Q.  By whom?

7  A.  By the highway patrols.

8  Q.  And after he got stopped, what did you do?

9  A.  I started panicking, because I didn't have a

10  license, so I was, like, getting off -- I got off

11  of the freeway.

12  Q.  When you got off the freeway, were you still

13  here in Tucson?

14  A.  Yes.

15  Q.  Where did you go?

16  A.  At a Circle K.

17  Q.  And when you went to the Circle K, what

18  happened there?  What did you see?  What did you

19  do?

20  A.  I parked, and that's when the black people

21  walked up to me and told me, like, so what happened

22  and what do we do?

23       And I told them I was going to go home.

24  Q.  When you said you saw the Expedition and

25  Escalade, are these the same two vehicles you saw

1  at Food City and earlier up at the Circle K in

2  Phoenix?

3  A.   Yes.

4  Q.   I want to show you 16-C, as in Charlie,

5  please.

6          THE COURT:  Touch that screen and take

7  those marks off, please.

8          MR. LACEY:  Bottom left.  If you'd

9  touch --

10 BY MR. LACEY:

11 Q.   Can you identify any vehicles in this picture?

12 A.   Yeah.  The white Commander.

13 Q.   And who was driving that car at that time?

14 A.   Me.

15 Q.   And what location are we looking at here?

16 A.   The Circle K.

17 Q.   The one in Tucson after you --

18 A.   The one in Tucson.

19 Q.   Okay.  Now, when you get to the Circle K, you

20 mentioned to us that you were talking with some

21 black males.

22      Where did this conversation take place?

23 A.   At the parking lot from the Circle K.

24 Q.   And was there anyone else inside your vehicle

25 with you?

1   A.   No.  I was by myself.

2   Q.   We see people positioned outside your car

3   here.  Was your window up or down when these people

4   were --

5   A.   I rolled it down.

6   Q.   And what did you all talk about?

7   A.   What happened, and I told them they got

8   caught.  They are like, "So what do we do?"

9        And I'm like, "Well, I'm leaving home.  I

10  don't know."

11  Q.   And what was the reaction by the people you

12  were talking with, the black males?

13  A.   They're like, like, like, "Man," like, you

14  know, like, not that good, like, not feeling that

15  happy.

16  Q.   Do you remember what they said or --

17  A.   Like, "Man, that's -- whatever."  And they're

18  just like, "Man, whatever.  Let's go."

19  Q.   Okay.  This is the second time, then, that you

20  told them the bust had taken place?

21  A.   Yeah, but the other one I just told them,

22  like, they got stopped, and this time I told them,

23  "Oh, they got caught."

24       And that's when they said, "What do we do?"

25       I'm like, "I don't know.  I'm leaving home."

1    They're like, "Man," and that's when they
2 left.
3 Q.   At this time, or even back in Food City, had
4 anyone at that point in time found out where this
5 house was that was going to have this 50 keys or so
6 of coke?
7 A.   No, no one, no.
8 Q.   Direct your attention next to 61-D, as in
9 dog.
10    Can you identify that for us?  Is that the
11 same vehicle?
12 A.   Yes, it's the same vehicle.
13 Q.   And the same people chatting with you at the
14 window?
15 A.   Yeah.
16 Q.   And 61-E as in Edward.
17    Same situation, where you're in the vehicle
18 and talking with some black males outside your car?
19 A.   Yes.
20 Q.   And we'd also show you 61-G, as in George.
21    Sir, while you're at the Circle K here in
22 Tucson, after hearing this news about your brother-
23 in-law and others, did you stay in your vehicle the
24 whole time?
25 A.   Well, in the picture, I got off of my vehicle.

1    Q.   And do you recall why you got out of your

2    vehicle at the Circle K here?

3    A.   I think because I got quarters, and I was

4    going to buy a water, I think, or something like

5    that.

6    Q.   Okay.  Earlier you said you didn't have any

7    money.  You had enough, obviously --

8    A.   No.  There was quarters in the middle glove

9    box, so --

10   Q.   Okay.  Can we zoom in on this, please, the

11   center part of it.

12        Now, is your -- are you shown in this

13   photograph?

14   A.   Yes.

15   Q.   Would you point to yourself, please?

16   A.   (The witness complied.)

17   Q.   Now, do you see any other persons in the

18   parking lot that you were talking with that day --

19   A.   Over here.

20   Q.   -- in this picture?

21        Point and put an X on the person.

22   A.   It was him.  I'm not sure if he walked up to

23   my truck.  I'm not sure if he walked up to my

24   truck.

25   Q.   With a white T-shirt, with a hat with some

1  sort of white or light-colored pattern on the top

2  of the hat?  Is that right?

3  A.   Yeah.

4  Q.   Can we go back to 61-D, please, and zoom in on

5  the middle section.

6       And 61-E, please, and if we can zoom in on

7  that.

8       And you see a person in a white T-shirt with

9  some sort of dark hat on, do you not, in this

10  picture?

11  A.   Yes.

12  Q.   With some sort of white in the front of the

13  hat?

14  A.   Yes.

15  Q.   After you -- after you had this conversation,

16  you mentioned that -- we saw that you got out of

17  your vehicle.  Did you get the water then?

18  A.   Yeah.

19  Q.   Did you go inside the Circle K and get the

20  water?

21  A.   I think, yeah, I went inside the Circle K.

22  Q.   And then you came back out?

23  A.   Yes.

24  Q.   And what happened then?

25  A.   I jumped back on the freeway.

1    Q.   I want to show you 61-N, as in Nancy.

2         Can you identify that for us?

3    A.   The Expedition.

4    Q.   And what is that?

5    A.   It's the Expedition that was with the

6    Escalade.

7    Q.   And that's the same one you told us about at

8    Food City and also up in Phoenix?

9    A.   Yes.

10   Q.   I want to show you 61-A as well.

11        Can you identify any vehicles in this

12   particular photograph?

13   A.   Yeah, the Expedition, the red Expedition.

14            THE COURT:  Be sure and speak into the

15   mic, would you please?

16            THE WITNESS:  Oh, the red Expedition.

17   BY MR. LACEY:

18   Q.   And there's a person with dark pants and a

19   reddish colored T-shirt.  Do you see that person

20   there in the center?

21   A.   Yes.

22   Q.   Do you know if he was involved in any of this,

23   in either of these vehicles?

24   A.   I don't know.  I hadn't seen him.

25   Q.   Okay.  I want to show you 61-B, as in boy.

1      Is this the Expedition you've told us about?

2 A.   Yes.

3 Q.   And 61-F.

4      Can you see the Expedition or Escalade in this

5 photograph?

6 A.   No.

7 Q.   And 61-H, as in Henry, if we can zoom in on

8 the area there.

9      Is this the Expedition you've talked about?

10 A.   Yes.

11 Q.   And someone with a dark hat, we can't see the

12 front of it, with a white T-shirt?

13 A.   Yes.

14 Q.   By the passenger, front passenger door?

15 A.   Yes.

16 Q.   Okay.  61-I.

17     Can you identify any vehicles in this?

18 A.   The Escalade.

19 Q.   And if we could zoom around the Escalade just

20 for a minute.

21     Is that the same Escalade you just talked

22 about?

23 A.   Yes.

24 Q.   Now, the person you told us about back in

25 Phoenix that you saw when you first went to this

1  house with Seco and Yovani, where you met up with

2  some black males in the Escalade truck, you

3  mentioned a person was limping.

4      Do you remember that, telling us about that,

5  limping?

6  A.   Yes.

7  Q.   Now, did you actually see the person putting

8  on a shirt, or did he already have on a shirt?

9  A.   No, I saw him putting on a shirt.

10  Q.   And what kind of shirt was it again?

11  A.   A long-sleeved white shirt.

12  Q.   Okay.  61-K, please.

13      Can you identify this vehicle for us?

14  A.   Yeah.  That's me leaving from Circle K.

15  Q.   And once you left the Circle K, where did you

16  go?

17  A.   Back on the freeway.

18  Q.   When you left the Circle K, had the Expedition

19  and Escalade we've just looked at and talked about,

20  were they still there, or had they already left?

21  A.   They were still there, I think.  I left and I

22  think they were still there.

23  Q.   You leave and go where?

24  A.   Back to Phoenix.

25  Q.   On the freeway?

1  A.   Yes.

2  Q.   And there's an entrance pretty close by to

3  where you got out of the Circle K?

4  A.   Yes.

5  Q.   As you start going back to Phoenix what's

6  going through your mind?

7  A.   Like, how I was going to get stopped or

8  something like that, because I saw a lot of cops

9  going back an forth, so --

10  Q.   So what did you do?

11  A.   I was just getting on and off the freeway,

12  because I was kind of like, you know, I was kind of

13  scared that they were going to stop me, you know.

14  Q.   And how long did you keep going on and off the

15  freeway as you headed back towards Phoenix?

16  A.   It was a while, like, every -- every -- every

17  exit, get on, off, on and off.

18  Q.   As you keep going back towards Phoenix, did

19  you see anything else?

20  A.   Yeah.  Other people got stopped.

21  Q.   What other vehicle or vehicles did you see get

22  stopped?

23  A.   The Escalade and the Expedition.

24  Q.   And are those the same vehicles you saw

25  earlier in Phoenix and then at the Circle K and

1  Food City?

2  A.   Yes.

3  Q.   As you passed by those vehicles, what's going

4  through your mind?

5  A.   That I was going to get stopped next, that --

6  because everybody that was at Food City was getting

7  pulled over, so I was like, oh, I'm going to get

8  stopped next.

9  Q.   So what happened?  Where do you go from there?

10  A.   I got off and on, off and on, and then I went

11  through -- by the Indian reservation.

12  Q.   And what happened at that time?

13  A.   I called my sister, who showed up, and then

14  she get on the car, and she was like, "Why are you

15  scared?"

16      I'm like, "Because everybody that was with me

17  at Food City got stopped."

18      And she's like -- I was like, "Well, let's

19  go."

20      She's like, "Nothing is going to happen.

21  Let's go."

22      So we went passing the bridge.  They pulled us

23  over.

24  Q.   Let's -- before we get to the bridge, your

25  sister, is she related to anybody, to Yovani?

1  A.  Yeah.  It's Yovani's wife.

2  Q.  Did you meet up with her before you got

3  stopped?

4  A.  Yeah.

5  Q.  Where did that take place?

6  A.  At a little, like, liquor store that was right

7  there, a little store that's right there.

8  Q.  In the Phoenix area or someplace in Phoenix?

9  A.  No, going to Phoenix.

10  Q.  What happens when you meet up with her?  Who

11  is in her vehicle?

12  A.  My brother dropped her off, and she had the

13  kids with them, so she changed them to the truck.

14  She changed the car seats to the Commander.

15  Q.  And what happened then?  Who was driving after

16  she came down and met with you and put the car

17  seats -- babies are in the car seats, I would

18  imagine?

19  A.  Yeah.

20  Q.  How old are the kids?

21  A.  One is -- one at that time, he was three,

22  going to three, and the other one was, like, five,

23  I think, five.

24  Q.  They're in the car seats.  Who's driving at

25  this point, after your sister comes down there?

1  A.  Me.

2  Q.  And what happens then?

3  A.  We left, and passing the bridge, they pulled

4  us over.

5  Q.  When you say "they," who pulled you over?

6  A.  The highway patrol pulled us over.

7  Q.  And what happened then?

8  A.  They got us off the car gun pointed.

9  Q.  Gun pointed?

10 A.  Yeah.

11 Q.  How many policemen or troopers or whatever

12 they were pulled you over?

13 A.  There was two, two cars, and there was two

14 people, two police.

15 Q.  And you're driving?

16 A.  Yes.

17 Q.  So what happens at that time?  You get out of

18 the car?

19 A.  Yeah.  They told us that they said that that

20 truck was with armed men that -- because I told

21 them, "Hey, why are you throwing my sister like

22 that?" because my sister was crying, and I'm like,

23 "Why are you guys doing that?"

24     And he's like, "This truck was notified to us

25 that there was armed men and people with guns in

1  this car."

2  Q.  And did they ask you any questions about what

3  you had done that day?

4  A.  Yeah.  They asked me where was I at.

5  Q.  And what did you tell them?

6  A.  That I was at my grandma's house in Tucson.

7  Q.  Was that the truth?

8  A.  No.

9  Q.  After you were stopped, was your vehicle

10  searched?

11  A.  Yes.

12  Q.  Were there any weapons in the car?

13  A.  No.

14  Q.  What happened then?

15  A.  They let us go.

16  Q.  And from there, where did you go?

17  A.  To Phoenix.

18  Q.  Now, sir, after you got back to Phoenix, what

19  was going through your mind then?  All these people

20  all around you, your brother-in-law and everything

21  else that happened that day, what were you

22  thinking?

23          MR. COOPER:  Your Honor, that's not

24  relevant.

25          THE COURT:  Sustained.

1    A.    Um --

2    Q.    You can't answer the question.

3          So what happened next as far as you were

4    concerned?  What did you do?  Did you stick around?

5    A.    No.  I left to Mexico.

6    Q.    And when you say you left to Mexico, how long

7    after March 2nd was it before you left?

8    A.    It was that same day.

9    Q.    Okay.  How long were you in Mexico for?

10   A.    A couple of months.  I don't remember.

11   Q.    And when you went down there, are you -- do

12   you have papers to -- are you a Mexican citizen or

13   Mexico national?  What's your immigration status?

14   A.    I'm from here.

15   Q.    Okay.  Born here?

16   A.    Yes.

17   Q.    When you went to Mexico, how did you get into

18   the country?

19   A.    To Mexico?

20   Q.    Yeah.  Did you drive through the port of

21   entry, or how did you get there?

22   A.    I jumped back to Mexico.

23   Q.    You say you "jumped"?

24   A.    To Mexico.

25   Q.    What did you jump?

1    A.    The borderline.

2    Q.    Okay.  And when you came back, how did you get

3    back?

4    A.    Jumped back.

5    Q.    Once you got back, did you later have any

6    encounters with anybody from law enforcement

7    thereafter?

8    A.    No.

9    Q.    Anybody from the FBI?

10    A.    No.  They just told me that they wanted to

11    talk to me.

12    Q.    And when was that roughly?  How long after

13    March a year ago?

14    A.    When I got back from Mexico, I don't remember.

15    Q.    Now, as far as criminal charges in this case,

16    have you ever been charged in this case?

17    A.    No.

18    Q.    Besides what your involvement was this day

19    that you've told us about, did you ever get charged

20    with any false statement or false reporting to

21    police officers up in northern Arizona?

22    A.    Yeah, one time.

23    Q.    When was that roughly?  Do you remember?

24    A.    It was when I was -- my birthday, when I was

25    turning 18.

1  Q.  It was your birthday?

2  A.  Yeah.  I think it was my birthday or I was

3  turning 18.

4  Q.  And what happened then?

5  A.  I lied about my name.

6        MR. COOPER:  It's not relevant.  The

7  conviction is.

8        THE COURT:  Overruled.

9  BY MR. LACEY:

10  Q.  What happened?

11  A.  I lied about my name.

12  Q.  Who did you lie to?

13  A.  The cops.

14  Q.  Why did you lie?

15  A.  Because I had juvenile --

16        MR. COOPER:  Objection.

17        THE COURT:  Sustained.

18        MR. LACEY:  Okay.

19  BY MR. LACEY:

20  Q.  As far as this case, you've been advised

21  you're not going to be charged; correct?

22  A.  Correct.

23        MR. LACEY:  I have nothing further.

24                CROSS-EXAMINATION

25  BY MR. COOPER:

1  Q.  You pled guilty on November 2nd, 2010, to

2  false reporting to law enforcement; right?

3  A.  Right.

4  Q.  And on March 2nd, 2011, about three months

5  after that, you were asked by your brother-in-law

6  to go to Tucson to commit a home invasion; right?

7  A.  Yeah, right.

8  Q.  For $2,000?

9  A.  Yes.

10  Q.  And you left your wife and four children in

11  Phoenix to go to Tucson to commit that crime;

12  right?

13  A.  Yes.

14  Q.  Well, they didn't come with you, did they?

15  A.  No, they didn't.

16  Q.  Let me ask you about some times.  All right?

17  And I'd like to ask you about returning back from

18  Tucson the afternoon of March 2nd.  All right?

19      You have to answer out loud, sir.

20  A.  Yes.

21      THE COURT:  Get a little bit closer to the

22  mic.

23      MR. COOPER:  Your Honor, I'd like to use

24  the easel now to -- I'll just put it out in the

25  middle of the courtroom, if that's all right,

1   Judge.

2   BY MR. COOPER:

3   Q.   Can you see the easel?

4   A.   Yes.

5   Q.   You --

6        THE COURT:   Counsel, you can all move to

7   see, if you need to.

8        MR. COOPER:   I can move back, Your Honor.

9        THE COURT:   They're still probably going

10  to need to move to see it.

11  BY MR. COOPER:

12  Q.   All right.   You've indicated, sir --

13       THE COURT:   And you're going to use this

14  microphone right here, or one of them.

15  BY MR. COOPER:

16  Q.   You indicated that you left Circle K and got

17  on and off --

18  A.   The freeway.

19  Q.   -- the freeway; right?

20  A.   Right.

21  Q.   And then at some point you saw the Escalade

22  and Expedition that had been stopped and was at the

23  side of the road; right?

24  A.   Yeah, right.

25  Q.   Okay.   Now, I'm going to write a time here.

1  All right?

2  A.  Right.

3  Q.  What time was it that you saw the Escalade and

4  the Expedition, sir?

5  A.  I wasn't checking the time.  I'm not sure.

6  Q.  Okay.  But you are certain that you saw them

7  at the side of the road under arrest with officers?

8  A.  Yeah.  I saw them, like, getting stopped

9  there.

10  Q.  Well, let's say that there had been testimony

11  that the arrest was at 4:13.  All right?

12  A.  Uh-huh.

13  Q.  These people had already been arrested.  They

14  were out of the vehicles; right?

15  A.  Right.

16  Q.  And they were sitting at the side of the road;

17  right?

18  A.  Right.

19  Q.  And there were officers around there; right?

20  A.  Right.

21  Q.  And there were a lot of police cars around

22  there; right?

23  A.  Right.

24  Q.  Okay.  So let's just say that you came across

25  these people, let's say, about five minutes after

1   the arrest.  Is that fair?

2       I mean, the arrest had already taken place;

3   right?

4   A.   Yeah, I'm not sure, because I was getting on

5   and off the freeway, so I'm not sure how long it

6   was.

7   Q.   Well, when you drove by, you saw that the

8   arrest had already taken place.

9   A.   Yes.

10  Q.   They were out of the car, and they were

11  handcuffed; right?

12          THE COURT:  You have to answer.

13          THE WITNESS:  Well, I don't know if they

14  were handcuffed, but I saw them getting pulled

15  over.

16  BY MR. COOPER:

17  Q.   And you saw them sitting on the ground outside

18  the vehicles.

19  A.    I don't know.  They were sitting on the

20  ground.  I was, like, going on the freeway, so I

21  was like -- I just saw them getting pulled over.

22  Q.   Let's just say that you drove -- well, the

23  cars were stopped.  They weren't getting pulled

24  over.

25  A.   Yeah, they were stopped.

1  Q.  Let's just say you got there three minutes

2  after the 4:13 arrest.  Okay?  Is that fair?

3       You have to say out loud.

4  A.  Yes.

5  Q.  Okay.  Now, I'd like to talk with you a little

6  bit about Phoenix, because you then went all the

7  way to Phoenix; right?

8  A.  Uh-huh.

9            THE COURT:  You have to answer yes or no.

10           THE WITNESS:  Yes.

11  BY MR. COOPER:

12  Q.  And what you did is, you went and met your

13  sister; right?

14  A.  Right.

15  Q.  Okay.  And your sister, that's Carmen; right?

16  A.  Yes.

17  Q.  And what you did is, you went to a place

18  called 51st Avenue in Phoenix; right?

19  A.  Right.

20  Q.  And 51st Avenue basically turns into a street

21  called Riggs Road; right?

22  A.  Right.

23  Q.  So that's I-10 and Riggs Road; right?

24  A.  Right.

25  Q.  And from the point where you went, where you

1  saw these black people on the side of the road --

2  A.   Uh-huh.

3  Q.   -- okay, it's about 60 miles to get to 51st

4  Avenue in Phoenix; right?

5  A.   Right.

6  Q.   That's right, isn't it?

7  A.   Right.

8  Q.   And you didn't have a license, did you?

9  A.   No.

10  Q.   So you were trying to be careful on the road;

11  right?

12  A.   Right.

13  Q.   And so you were not speeding; right?

14  A.   Yeah, right.

15  Q.   Because you didn't want to get stopped?

16  A.   Right.

17  Q.   And you were scared?

18  A.   Yeah.

19  Q.   Okay.  Don't go away.

20       And you indicated that you were then stopped

21  by DPS; right?

22  A.   Right.

23  Q.   In Phoenix; right?

24  A.   Right.

25  Q.   After picking up your sister; right?

1   A.   Right.

2   Q.   Okay.  And that you were the driver; right?

3   A.   Right.

4   Q.   Okay.  And this would have been after you got

5   the 60 miles; right?

6   A.   Right.

7   Q.   Okay.  Let me -- let me show you -- these are

8   Jencks-Bates 320 and 321.

9           MR. COOPER:  Could I approach the witness,

10   Your Honor?

11           THE COURT:  You may.

12   BY MR. COOPER:

13   Q.   Do you remember -- you received a warning

14   equipment repair order that day; right?

15   A.   Right.

16   Q.   Okay.  And this is your name, Jorge Abel

17   Santos-Medina; right?

18   A.   Right.

19   Q.   And that's at the time you were stopped;

20   right?

21   A.   Right.

22   Q.   And that's on March 2nd, 2011; right?

23   A.   Right.

24   Q.   And the time the officer writes is 1634;

25   right?

1   A.   Right.

2   Q.   And that translates to 4:34 p.m.; right?

3   A.   Right.

4   Q.   Okay.

5         THE COURT:   Can I see counsel for a

6   second?

7             (The following proceedings occurred at the

8             bench.)

9         THE COURT:   Before you go too far with the

10  60 miles, it's not 60 miles.

11        MR. COOPER:   It's not the Riggs Road

12  you're thinking of.  There is two Riggs Roads.  He

13  just said it's the 51st Avenue/Riggs Road in

14  Phoenix.

15        THE COURT:   Okay.  All right.  I want to

16  make sure you don't fall in it.

17        MR. COOPER:   All right.

18            (End of bench conference.)

19        THE COURT:   You may continue.

20        MR. COOPER:   Thank you.

21  BY MR. COOPER:

22  Q.   And again, that's 1634.  4:34 p.m. is when

23  that stop was made; right?

24  A.   Right.

25  Q.   And this is an area in Phoenix.  You know this

1  area somewhat; right?

2  A.   Well, I didn't know where to get off.

3  Q.   But it's an area where you went to meet your

4  sister; right?

5  A.   Right.

6  Q.   And Carmen lives in that area?  West side of

7  Phoenix; right?

8  A.   Yeah, right.

9  Q.   And what we're talking about is, in Phoenix,

10  the streets are on the east side and the avenues

11  are on the west side; right?

12  A.   Right.

13  Q.   You know that because you're from Phoenix?

14  A.   Yeah.

15  Q.   And 51st Avenue and Riggs Road basically

16  become the same road; right?

17  A.   Right.

18  Q.   Riggs ends and becomes 51st Avenue; right?

19  A.   Yeah, west side.

20  Q.   West side?

21  A.   Yeah.

22  Q.   And that's near where your sister lives;

23  right?

24  A.   Yes.

25  Q.   And that's where you went to go find her;

1    right?

2    A.    She met me at Riggs Road.

3    Q.    At Riggs Road/51st Avenue; right?

4    A.    Right.

5    Q.    Okay.  And that's after you drove all the way

6    where you saw the black people that stopped; right?

7    A.    Right.

8    Q.    A couple other -- actually, I'm going to --

9    could I put this back, Your Honor?  I'll use it

10   later.

11        Actually, you just indicated that you were the

12   driver when you were stopped by DPS.

13   A.    Yes, I was.

14   Q.    Okay.  I'd like to look -- ask you to look at

15   the DPS -- what the officer wrote.  Look at Bates

16   stamp 321.

17        Whose name is at the top of that page?

18   A.    My sister's.

19   Q.    Okay.  And what does it say she was doing that

20   day?

21   A.    I can't read, so I don't know.

22   Q.    It says she was the driver; right?  Do you see

23   that right there, d-r-i-v-e-r?

24   A.    Yes.

25   Q.    Okay.  And whose name is this up here?  Jorge

1  Abel Santos-Medina; right?

2  A.  Right.

3  Q.  Okay.  And on the front page where he has your

4  name, this is in parenthesis, and I'll read it to

5  you.  It says "passenger."

6      Right?

7  A.  No, but he told me -- me to drive.  He told me

8  drive, you drive, because she's fixing papers,

9  because she was fixing -- in the point that she was

10 fixing papers.

11 Q.  Well, what we're talking about, sir, is at the

12 time you were stopped by the officer.  Who was

13 driving?

14 A.  I remember that I was driving.

15 Q.  Okay.  That's not what the officer wrote

16 though, is it?

17 A.  Well, it's not, but I think I was sure I was

18 driving, and I drove back to Phoenix.

19 Q.  All right.  And you indicated just now that

20 you told the officer you had been -- already been

21 in Tucson visiting your grandmother.

22 A.  Yes.

23 Q.  Okay.  The officer wrote something different.

24 Let me just show you.

25     Going to Tucson to visit your mom.

1  A.   How was I going to Tucson if I was coming

2  back?  I told them I was visiting my mother.

3  Q.   So what you told the prosecutor about your

4  grandmother, that's not true?

5  A.   Well, I told them I visited my mom.

6  Q.   Okay.  Not your grandmother?

7  A.   It was my mom and my grandmother.

8  Q.   I'm sorry?

9  A.   I told them I was visiting my mom and my

10  grandmother because she was sick.

11  Q.   You said your mom and your grandmother?

12  A.   Yeah, because she was sick.

13  Q.   Okay.  So the officer just apparently didn't

14  write it down?

15  A.   Yes, yes, didn't write down.

16  Q.   Okay.  And that was a lie; right?

17  A.   Yes, it was a lie.

18  Q.   Okay.  And you -- in the car at the time when

19  you were stopped, at 4:34 p.m. --

20  A.   Uh-huh.

21  Q.   -- which is about 18 minutes or so after you

22  drove by the people being arrested --

23  A.   Uh-huh.

24  Q.   -- was your sister and two little children;

25  right?

1    A.   Right.

2    Q.   Okay.  Before you met your sister, you went to

3    a -- was it a store in Phoenix?

4    A.   Yeah.  I went to -- I stopped at a couple

5    stores going towards Phoenix.

6    Q.   Well, I'm talking about once you got near 51st

7    Avenue.  Where did you meet your sister?

8    A.   At a store.

9    Q.   Okay.  And your brother was there as well;

10   right?

11   A.   Right.

12   Q.   In another car?

13   A.   Yes.

14   Q.   And all that happened before you were stopped

15   by DPS at 4:34 p.m.; right?

16   A.   Right.

17   Q.   Okay.  And how much before you were stopped?

18   A.   I'm not sure because it was quick.  It was --

19   she came quick, and we left, like, fast.

20   Q.   Well, what I'm asking is, after your sister

21   got in the car with the children, how much time

22   passed before you were stopped?

23   A.   I'm not sure.

24   Q.   Not sure?

25   A.   No.

1   Q.   Okay.  Well, I mean, was it 10 minutes, two
2   minutes, five minutes?
3   A.   As fast as you put the car seats in the car
4   and leave.  That fast.
5   Q.   Yeah, but the car seats went in, and then you
6   started driving; right?
7   A.   Yeah, that fast.
8   Q.   And after you started driving, how much time
9   before you were stopped?
10  A.   Passing the bridge.
11  Q.   I'm talking -- I don't know where the bridge
12  is.
13  A.   Oh, I don't know how long, not that -- I
14  didn't drive that long.  I don't know.  I don't
15  know how -- I can't tell you what time that I got
16  stopped.  I can't tell you, oh, five minutes.  I
17  don't remember that good.
18  Q.   You don't remember that good?
19  A.   I'm not that good at time.
20  Q.   All right.  And then after that stop on March
21  2nd by the Department of Public Safety, you then
22  left for Mexico?
23  A.   Right.
24  Q.   And you came back to this country, you said, a
25  couple months later?

1   A.   Yes.

2   Q.   So that would have been in June, perhaps?

3   A.   Yeah.

4   Q.   Okay.  And when you left for Mexico, did you

5  take your wife and the kids with you?

6   A.   My kids -- I took my kids and my wife to

7  Mexico with me.

8   Q.   So the four kids and --

9   A.   No, I just got three with her and not four.

10   Q.   I thought you said you've got four kids.

11   A.   Yeah, I got four but another one with a

12  different mother.

13   Q.   Okay.  So you and your wife and the three kids

14  went to Mexico for two months?

15   A.   More than two months.

16   Q.   Okay.  When did you come back?

17   A.   Like, 15 days after they -- I went to jail,

18  like, yeah, around there.  I went for more than two

19  months to Mexico.

20   Q.   Okay.  Well, earlier you said it was just a

21  couple months, I believe.

22   A.   A couple months, but more than two months for

23  sure.

24   Q.   All right.  So you left March 2nd with your

25  wife and kids?

1  A.   Yes.

2  Q.   And how did you get to Mexico?

3  A.   I had to jump that way.

4  Q.   Yeah, but Phoenix is about 150 miles from

5  Mexico.  How did you get from Phoenix to Mexico?

6  A.   I drove to Mexico.

7  Q.   In whose car?

8  A.   My mom's car.

9  Q.   And your mom drove you?

10  A.   No.  My mom was going that way, but she didn't

11  know about the situation.  I'm like, "Well, I'll go

12  with you to Mexico," and that's when I drove with

13  her to Mexico.

14  Q.   So your mom stayed with you in Mexico?

15  A.   Yes but no.  She came back.

16  Q.   Okay.  And the kids and your wife were all in

17  the car with you on the way to Mexico?

18  A.   No.  They brought them later on.

19  Q.   Okay.  So it was just you and your mom?

20  A.   Yeah.

21  Q.   Okay.  And your kids and your wife came how

22  much later?

23  A.   I don't know how much later.

24  Q.   Okay.  You talked to the FBI on February 8th,

25  2012, for the first time?

1   A.   Right.

2   Q.   How long had you been back in this country

3   when you talked to the FBI?

4   A.   Like a month, probably, not even.

5   Q.   So you spent Christmas in Mexico then?

6   A.   Yeah.

7   Q.   Is that right?

8   A.   Right.

9   Q.   So you came back sometime, you think, in

10  January of 2012?

11  A.   Right.

12  Q.   Okay.  And you knew Yovani had been arrested;

13  right?

14  A.   Right.

15  Q.   And Yovani is married to your sister?

16  A.   Right.

17  Q.   Okay.  And you would see Yovani occasionally;

18  right?

19  A.   Yeah, well, when I used to go to my sister's

20  house.

21  Q.   You'd see him when you'd go to your sister's

22  house?

23  A.   Yes.

24  Q.   Okay.  And you knew that Yovani was facing a

25  lot of prison time; right?

1  A.  Right.

2  Q.  And Yovani was scared; right?

3  A.  Right.

4  Q.  And you were scared; right?

5  A.  Right.

6  Q.  Because you knew that you could get arrested;

7  right?

8  A.  Right, but we never talked about that.  I was

9  like -- he just told me, "They want to talk to

10  you."

11      "Oh, whatever."

12  Q.  Okay.  So Yovani's telling you, you need to go

13  talk to the FBI.  They want to find you.

14      Right?

15  A.  Yeah.

16  Q.  So Yovani is telling you the FBI is looking

17  for you; right?

18  A.  Right.

19  Q.  And you never went down and talked to the FBI,

20  did you?

21  A.  No.

22  Q.  Okay.  And this is for the entire month or so

23  that you were back; right?

24  A.  Right.

25  Q.  And you'd see Yovani, you know, two or three

1  times a week, at least; right?

2  A.   No.  I'd say longer than that, because I don't

3  live close to him.

4  Q.   But you guys would socialize and see each

5  other; right?

6  A.   When I used to go visit my sister.

7  Q.   And you knew at this point that Yovani was

8  cooperating with the FBI, didn't you?

9  A.   Well, yeah.  Yeah.

10  Q.   Because he was talking to the FBI; right?

11  A.   Right.

12  Q.   And he was telling you, you got to -- you got

13  to talk to the FBI about what happened; right?

14  A.   Right.

15  Q.   And he talked to you about what happened;

16  right?

17  A.   I knew what happened.

18  Q.   But you'd talk about it together, the two of

19  you.

20  A.   No, I never talked to him, because I was like,

21  in my mind, I'm like, oh, when they talk to me,

22  it's going to happen, you know.  When it happens,

23  it happens.

24       But I never talked to him.  Like, in my mind,

25  I never talked to him about that.  I'd just be

1    like, if it happens, it happens.

2    Q.   But you talked about what had happened and

3    what you'd seen and how he got arrested at the

4    warehouse, didn't you?

5    A.   Yeah.  He told me, he's like, "I got

6    arrested," but he didn't tell me, like, everything.

7    Q.   Yeah, not everything, but he told you it was

8    at a warehouse; right?

9    A.   Yeah.

10   Q.   And the FBI busted in; right?

11   A.   Right.

12   Q.   Okay.  And there were five or six other people

13   that got arrested with him; right?

14   A.   Well, I don't know how many other people were

15   with him.

16   Q.   Well, including Seco; right?

17   A.   Yeah, Seco, but I don't know how many people.

18   Q.   And you talked about the black guys getting

19   arrested because you saw him at the side of the

20   road; right?

21   A.   Right.

22   Q.   That would have been at 4:16 p.m., after

23   Yovani had gotten arrested; right?

24   A.   I'm not sure what time was it after Yovani got

25   arrested.

1    Q.  But -- yeah, but you knew.  You saw those
2    black guys arrested.
3    A.  Yeah.
4    Q.  Okay.  And you talked about that with Yovani
5    at some point; right?
6    A.  Yeah.
7    Q.  Okay.  And the reason you wound up talking to
8    the FBI is not because you went to them.  It's
9    because you wound up in jail over a traffic ticket;
10   right?
11   A.  Right.
12   Q.  And somehow the FBI found out you were in jail
13   over a traffic ticket; right?
14   A.  Right.
15   Q.  And Agent Edwards, sitting here in that loud
16   red tie, came to meet you at the jail; right?
17   A.  Right.
18         THE COURT:  I have to object.  His tie is
19   not loud.  It's just a red tie.
20         MR. COOPER:  Judge, I was going to say
21   ugly read tie.
22         THE COURT:  That's different.
23         MR. COOPER:  I know that's different.
24   BY MR. COOPER:
25   Q.  And all of a sudden, he showed up at the jail;

1  right?

2  A.  Right.

3  Q.  You didn't call him; right?

4  A.  No.

5  Q.  So somebody -- somebody told Agent Edwards you

6  were in custody; right?

7  A.  Right.  My mom, probably, because she always

8  used to tell me, "Go talk to them.  Go talk to

9  them."  And I didn't do nothing.  "Go talk to

10  them."

11  Q.  I guess that's my next question.  Did you ever

12  find out who called Agent Edwards or who called the

13  FBI?

14  A.  Probably my mom or --

15  Q.  Not probably.  I'm asking, did you ask?  Did

16  you find out?  Do you know?

17  A.  No, I don't know.

18  Q.  Okay.  That -- guessing and knowing are two

19  different things; right?

20  A.  Yeah.

21  Q.  Okay.  And that's on February 8th of 2012?

22  A.  Right.

23  Q.  And the first time you talked to Agent Edwards

24  on February 8th, he told you he knew you were

25  involved in a conspiracy to commit a home invasion;

1  right?

2  A.  Right.

3  Q.  Okay.  And he told you you could get charged;

4  right?

5  A.  Right.

6  Q.  And that was scary, wasn't it?

7  A.  Yeah.

8  Q.  And Agent Edwards said, basically, you can

9  help us out; right?

10  A.  Well, that's -- yeah, that's -- that's what

11  they --

12  Q.  That's what he told you?

13  A.  Yeah.

14  Q.  And you can help us out by talking about what

15  happened; right?

16  A.  Yeah.

17      THE COURT:  You have to get close to the

18  microphone and speak up.

19      THE WITNESS:  Yes, yes.

20  BY MR. COOPER:

21  Q.  And this is after you and Yovani had been

22  talking about this; right?

23  A.  We didn't -- yeah, yeah.

24  Q.  Okay.  That's February 8th.

25      And Agent Edwards said, basically, you know,

1    if you help us out, we're not going to charge you;

2    right?

3    A.   Well, they never told me that.  They never

4    talked to me about years or charging, what's the

5    possibility.  They never told me.  In my mind, I

6    knew they could have charged me.

7    Q.   You knew they couldn't?

8    A.   They could.

9    Q.   Well, you just told the prosecutor that you

10   were aware that, if you helped, they weren't going

11   to charge you.

12   A.   Yeah.  I was aware of that.

13   Q.   So they did tell you that?

14   A.   Yeah.

15   Q.   Okay.  Who told you that?

16   A.   Well, they gave me a paper and told me about

17   -- they gave me a paper.  I don't remember what the

18   paper said, but they -- he read it to me, and he

19   told me, look, this is this.  If you want to help,

20   if not, I don't know.

21        And I don't remember what it said.  If you

22   want to, sign right here.  This is showing me that

23   you know what's going on.

24        And that's when I signed.

25   Q.   And that would be in jail you signed it?

```
1   A.   Where?
2   Q.   Did you sign it while you were in jail?
3   A.   I'm not sure where did I sign it, but I did
4   sign.
5   Q.   Because actually, after the February 8th
6   meeting that you had where Agent Edwards got you
7   out of jail, you had another meeting seven days
8   later; right?
9   A.   Right.
10  Q.   And that's with the prosecutors and Agent
11  Edwards and somebody else from the FBI named
12  Douglass; right?
13  A.   Right.
14  Q.   And is that when they gave you the paper to
15  sign?
16  A.   I'm not sure when they gave it to me.  I'll be
17  honest with you.  But they did give it to me.
18  Q.   On February 15th, that's the day you had to
19  come from Phoenix to Tucson to the FBI office;
20  right?
21  A.   Right.
22  Q.   And you and Yovani drove down together; right?
23  A.   Right.
24  Q.   Same car; right?
25  A.   Right, because it was the only ride I had.
```

1  Q.   He gave you a ride?

2  A.   Yeah.

3  Q.   In the Jeep Commander?

4  A.   No.

5  Q.   Different car?

6  A.   He didn't have the Jeep Commander.

7  Q.   Okay.  Just the two of you riding down though;

8  right?

9  A.   Right.

10  Q.   Okay.  And you guys talked on the way down;

11  right?

12  A.   Yeah, we said a couple of things.  We talked.

13  Q.   Okay.  And you talked about what was going to

14  be happening that day; right?

15  A.   I told him, "What do you think they're going

16  to tell me?"

17      And he's like "No, well, like, go over there,

18  and they're going to tell you."

19  Q.   And you were talking about what had happened

20  in the case, and he was telling you what had

21  happened in the case; right?

22  A.   What do you mean?

23  Q.   Yovani was telling you what had happened, you

24  know, about the warehouse, about the Circle K, that

25  kind of thing.

1   A.   No.  The finding out of the Circle K, I found
2   out when he went and visited me in jail.  He showed
3   me a picture.  "Is that you?"
4   Q.   Who's "he"?  You're talking about Agent
5   Edwards?
6   A.   Yeah.  "Is that you?"
7        And that's when I told him, "Yes, that's me."
8   Q.   So that's February 8th?
9   A.   Yeah.
10  Q.   He took you pictures of the Jeep at the Circle
11  K; right?
12  A.   Right.
13  Q.   Okay.  And you agreed that was you at the
14  Circle K?
15  A.   Right.
16  Q.   And is it fair to say that the pictures we
17  just saw, I think 61-D, those pictures of the Jeep
18  at the Circle K, you can't see who's in the
19  vehicle, can you?
20  A.   No, but when I was getting on the freeway, you
21  could see half, like, part of my face.
22  Q.   Part of your face, but you can't see if
23  anybody's in the passenger seat, and you can't see
24  if anybody's in the rear seat, can you?
25  A.   No.

1   Q.   And when the black guys are at the window

2   looking in, you can't see then if anybody else is

3   in the vehicle, can you?

4   A.   No.

5   Q.   Because you can just see a rear shot of the

6   car; right?

7   A.   Right.

8   Q.   Okay.  The morning of March 2nd, you were not

9   home, were you?

10  A.   No.

11  Q.   You -- but you live with your wife and kids;

12  right?

13  A.   Right.

14  Q.   But you were at a friend's house?

15  A.   Yes.

16  Q.   Who's the friend?

17  A.   Do I got to say names or --

18           THE COURT:  Yes.

19           THE WITNESS:  It was a friend.

20           THE COURT:  Yes, you have to say names.

21           THE WITNESS:  Jose.

22  BY MR. COOPER:

23  Q.   Jose's last name?

24  A.   I don't know his last name.

25  Q.   Okay.  And you were at Jose's house because

1  you told the FBI you had been partying the night
2  before; right?
3  A.   Yeah, right.
4  Q.   Okay.  Partying doesn't mean just driving
5  around, does it?
6  A.   Getting girls.  It means, like, talking to
7  girls.  That's what "party" means to me.
8  Q.   Getting girls.  That's one way of partying;
9  right?
10  A.   Yeah.
11  Q.   Some people, "party" means doing drugs; right?
12  A.   Right.
13  Q.   Some people, it means drinking; right?
14  A.   Right.
15  Q.   Some people, it means all of the above; right?
16  A.   Right.
17  Q.   Okay.  You were driving to clubs; right?
18  A.   Right.
19  Q.   With how many of your buddies?
20  A.   Four or five.
21  Q.   Okay.  And what were the names of the clubs
22  you went to?
23  A.   We went to Cabaña, 602, Los Portales, and
24  that's it.  Yeah.
25  Q.   Whose car were you in?

1    A.    Mine.

2    Q.    And you didn't have a license?

3    A.    No.

4    Q.    Okay.  You were apparently worried about that

5    on March 2nd; right?

6    A.    Yeah.

7    Q.    But on March 1st, you weren't worried about

8    it?

9    A.    No, because my friend that was next to me had

10   a license, but he was drinking, so if a cop -- a

11   cop before pulled us over, and one time he was

12   drinking, and I'm like, "Well, I'm driving because

13   he's drinking, but he gots a license."

14        And the cop was like, "Oh, you can go."

15   Q.    Okay.  So you could drive because your friend

16   had a license?

17   A.    Yeah.  I was helping him out.

18   Q.    Okay.  And you got a call.  Did you have a

19   cell phone?

20   A.    Yes.

21   Q.    So you got a call sometime in the morning of

22   March 2nd from your brother-in-law Yovani; right?

23   A.    Right.

24   Q.    Okay.  And you told the FBI that you didn't

25   answer the phone right away because you were

1  partying the night before; right?

2  A.   I was asleep, and he was calling me and

3  calling me and calling me, and I picked up the

4  phone.

5  Q.   And the problem is, he was calling too early

6  and you were still tired; right?

7  A.   Yeah.

8  Q.   Okay.  Not because you'd been drinking?

9  A.   No.  I was tired.

10  Q.   Just tired.  And what time was it that he was

11  calling?

12  A.   Like, around -- I don't know.  Like, around

13  eight.  Around eight.  Around there.

14  Q.   Okay.  And you remember that; right?

15  A.   Yes.

16  Q.   Okay.  And he asked you over the phone if you

17  would commit a serious crime with him; right?

18  A.   Yeah.

19  Q.   Right?

20  A.   He told me if I wanted to go with him.

21  Q.   Okay.  And you knew that home invasion sort of

22  things, drug ripoffs, are serious; right?

23  A.   Right.

24  Q.   Okay.  And I think you told the prosecutor

25  that you were pretty aware that Yovani was involved

1   in this sort of behavior a lot; right?

2   A.   Right.

3   Q.   Because he always had money and didn't have a

4   job?

5   A.   Right.

6   Q.   Okay.  So you knew what he was -- what he'd

7   been doing; right?

8   A.   Right.

9   Q.   Well, he could have been just selling

10   marijuana; right?

11   A.   Right.  But he offered me money, so I was

12   like, yes.

13   Q.   But before March 2nd, you knew he was doing

14   these home invasions because he told you; right?

15   A.   Right.

16   Q.   So when he called you and told you, let's go

17   on a rip together, that didn't surprise you?

18   A.   No, because I was -- he always did things like

19   that, so --

20   Q.   Because what?

21   A.   He always was out at night doing home

22   invasions.

23   Q.   And you knew that because he had told you

24   about it.

25   A.   Yeah.

1   Q.   He didn't make a secret of it.

2   A.   No.

3   Q.   Okay.  And he had a lot of money because of

4   these; right?

5   A.   Right.

6   Q.   Okay.  And he offered you, I think, a couple

7   thousand bucks; right?

8   A.   Right.

9   Q.   Okay.  You were living at the time in the

10  Glendale area, close to 99th Avenue and Glendale;

11  right?

12  A.   No, I was living in, well, more over here.

13  Q.   I don't know where "over here" means.

14  A.   Well, I can't say where I live.

15          MR. LACEY:  I would object, Your Honor.

16          MR. COOPER:  I'm just talking about area

17  of town.

18          MR. LACEY:  Can we be seen at sidebar, if

19  we're going any further with this?

20          THE COURT:  Lunchtime.  1:30.  Remember

21  the admonitions I've given you before.

22          (The jury exits the courtroom.)

23          THE COURT:  Show the absence of the jury,

24  presence of all counsel and the defendants.

25          We're going to stay away from where he

1    lives.

2              MR. COOPER:  Well, I don't care where his

3    address is.  I want to know the part of town.

4              THE COURT:  East, west, north, central?

5              MR. COOPER:  Well, if it's Glendale,

6    because I need to know -- the testimony was from

7    the Government that they drove all the way to south

8    Phoenix to look for Seco, so I want to find out

9    where they were driving from and where, in fact,

10   Yovani was, in the same neighborhood, where they

11   have to go to be driving.

12             MR. LACEY:  Given the backdrop of this

13   case, we object to that.

14             MR. COOPER:  The Government started it.

15             THE COURT:  I'll let you get in generals,

16   not specifics.

17             MR. COOPER:  That's all I want.

18             THE COURT:  Generals.

19             You can just give the area.  Do you hear

20   me, sir?

21             THE WITNESS:  Yeah.

22             THE COURT:  If he asks you about it, just

23   give the area, not addresses.

24             THE WITNESS:  All right.

25             (Off the record.)

1          MR. COOPER:  Judge, one quick legal

2     issue --

3          THE COURT:  All right.

4          MR. COOPER:  -- before we begin.

5          At Bates stamp 292 of the Jencks material

6     we received, there's an issue as to an inconsistent

7     statement by the witness where previously he

8     testified that he didn't return to this country

9     from Mexico until sometime after Christmas, in

10    January of 2012.

11         And actually, at Bates 292, it indicates

12    that he was in this country sometime before

13    December of 2011, and the reason is that he says

14    that he ran into, apparently, Jeremy Tucker and

15    Tyrees Seymour.

16         I don't want to get into any of that, but

17    I do want to ask him the fact that he told the FBI

18    that he was in this country sometime before

19    December of 2011.

20         THE COURT:  Mr. Lacey?

21         MR. LACEY:  Yes, Your Honor.  If counsel's

22    going to open that door, I think we need a point of

23    reference.  You know, I don't know many people that

24    are good with dates looking back a year-plus,

25    trying to say whether -- what month of the year it

1  was.

2         But whatever the case, if it's going to

3  refresh the witness, if he says, I don't remember,

4  but then we have, well, was there a time when you

5  met with Mr. Tucker and whomever else, and he says,

6  oh, yeah, and put that in as a refresher, I think

7  it's important.

8         You know, Mr. Cooper is entitled to do

9  what he needs to do, but it's got to be putting

10  things in perspective for the witness, and I think

11  that's part of it.

12         I'm sorry.  Go ahead.

13         THE COURT:  I think I'd leave that door

14  alone.

15         MR. COOPER:  I will, but just show my

16  objection.

17         THE COURT:  All right.  I think if you

18  open the door, I have to let the Government show

19  the full context.

20         Unless you can prove it was a point in

21  time he couldn't have possibly seen Mr. Tucker.

22  There's a possibility too.

23         MR. COOPER:  I don't want to get into it

24  with Mr. Tucker or anybody else.  I just want that

25  he told the FBI he was back well before January

1    2012.

2              But I won't go there.

3              THE COURT:  All right.  He said that today

4    too, for the record.

5              (The jury enters the courtroom.)

6              THE COURT:  Show the jurors returning back

7    to the courtroom, the presence of all counsel and

8    the defendants.

9              Mr. Cooper, you may continue.

10             MR. COOPER:  Thank you, Your Honor.

11   BY MR. COOPER:

12   Q.   Sir, before lunch, we were talking about your

13   March 2nd trip to Tucson; correct?

14   A.   Right.

15   Q.   And I'd like to go back to Phoenix the morning

16   of March 2nd, or late morning, early afternoon, and

17   you had gone to a house where you indicated that

18   you saw, you believe, three black guys come out of

19   the house; right?

20   A.   Right.

21   Q.   Okay.

22             THE COURT:  Close to the mic.

23             THE WITNESS:  Right.

24   BY MR. COOPER:

25   Q.   What you said also before lunch, and I want to

1    clarify this, is that you were there for just a
2    short period of time.  You said, I think, about a
3    minute.
4    A.    Yeah, right.
5    Q.    Okay.  And I think you also said that you
6    remained in the car; right?
7    A.    Right.
8    Q.    Okay.  And you also said -- let me clarify
9    this -- that you are not certain whether Yovani got
10   out of the car with Seco or not; right?
11   A.    Right.
12   Q.    You just don't remember that; right?
13   A.    No, I don't remember.
14   Q.    Okay.  But once you all got back in the car,
15   Seco was with you in the car; right?
16   A.    Right.
17   Q.    Okay.  And earlier that morning, you had
18   driven your car; right?
19   A.    Right.
20   Q.    And parked it at a -- I think at an AMPM;
21   right?
22   A.    Right.
23   Q.    And so you weren't too worried about driving
24   without a license at that point; right?
25   A.    Right.

1  Q.  And that was at AMPM, I think, at 99th Avenue;

2  is that right?

3  A.  Right.

4  Q.  Okay.  And when Seco got in the car, he was

5  talking in English, but you didn't have any idea

6  who he was talking to; right?

7  A.  Right, I didn't have no idea.

8  Q.  And Seco speaks Spanish and English; right?

9  A.  Right.

10  Q.  And you do also; right?

11  A.  Right.

12  Q.  Okay.  I'd like to go through right now the

13  places that you stopped before you left to go to

14  Tucson.  Okay?

15  A.  (Nodding.)

16  Q.  The first place that you stopped was at AMPM

17  at 99th Avenue; right?

18  A.  Right.

19  Q.  And that's where you drove your car, and you

20  hooked up with Yovani there; right?

21  A.  Right.

22  Q.  You left there with Yovani, and you went to

23  meet Seco somewhere; right?

24  A.  Right.

25  Q.  And did you pick him up at his house?

1    A.   I'm not sure.  I don't remember.  I know we

2    picked him up.  I don't know if we picked him up at

3    a gas station or his house.  I don't remember.

4    Q.   Let's just call that the second place that you

5    went to.  Okay?

6    A.   All right.

7    Q.   That's Seco's either corner or house.  You got

8    Seco.  That's number two.

9         The third place you went, which is after

10   getting Seco, was to the residence where you saw

11   the black people; right?

12   A.   Right.

13   Q.   Is that correct?

14   A.   Correct.

15   Q.   Okay.  Then after that, you went to a fourth

16   place, and that fourth place would be to Miami's

17   house; right?

18   A.   Right.

19   Q.   And I'm trying to go in order as to how you

20   proceeded before you left town; right?

21   A.   Right.

22   Q.   Okay.  So that's number four as to Miami's

23   house.

24        While you were at Miami's house, you were told

25   to take a Mexican to another house; right?

1  A.   Right.

2  Q.   And that would be at 16th Street in Phoenix;

3  right?

4  A.   Right.

5  Q.   And you were told to go drop this Mexican --

6  Mexican's car off; right?

7  A.   Right.

8  Q.   This is a guy from Mexico; right?

9  A.   Right.

10 Q.   That's the fifth stop, was his house; right?

11 A.   Right.

12 Q.   Okay.  Then the sixth place -- and when you

13 did that, Seco and Mayco -- I'm sorry -- Seco and

14 Yovani stayed at Miami's house; right?

15 A.   Right.

16 Q.   And you took the Commander, and the other

17 person dropped his car off at a 16th Street house;

18 right?

19 A.   Right.

20 Q.   So now we're up to five different places so

21 far; right?

22 A.   Right.

23 Q.   Okay.  Then you left, and you returned back to

24 Miami's house, but we won't count that again,

25 because it's a repeat.  Okay?

1      So we're at five houses; right?

2  A.   Right.

3  Q.   You then left Miami's and went to a Circle K;

4 right?

5  A.   Uh-huh.

6  Q.   At 16th and Broadway; right?

7  A.   Right.

8  Q.   That's sort of in south Phoenix; right?

9  A.   Right.

10  Q.   And at that point, I think you said you saw a

11 couple cars there that you had -- the Escalade and

12 Expedition, that sort of thing?

13  A.   Yeah, right.

14  Q.   And that's six.

15      And then, before you could leave town, you had

16 to get gas, so you stopped at a gas station at 32nd

17 and Broadway; right?

18  A.   Right.

19  Q.   So that's seven different places that you

20 went; right?

21  A.   Right.

22  Q.   And at that point, you then left town and

23 headed to -- headed to Tucson; right?

24  A.   Right.

25  Q.   And there were no other stops, other than the

1   ones we've talked about; right?

2   A.   Coming to Tucson at a Circle K?

3   Q.   No.  I'm talking in Phoenix.

4   A.   Oh, no.  No other stops.

5   Q.   Just those seven; right?

6   A.   Yeah.

7   Q.   Okay.  And there were three of you in the

8   vehicle; right?

9   A.   Right.

10  Q.   Before leaving Tucson, when you -- I want to

11  go back to stop number -- it would be stop number

12  three, the residence where you stayed for about a

13  minute, okay, where the black people were.

14  A.   Yeah.

15  Q.   Okay.  You got there because Seco knew how to

16  get there, right, and he directed you?

17  A.   No, I'm not sure if he knew -- I think he knew

18  how to get there.  I'm not sure if it was him

19  talking to someone on the phone.

20  Q.   Well, I guess all I'm talking about is, once

21  you left picking up Seco, you drove directly to

22  this residence.  Somebody told Yovani how to get

23  there.

24  A.   Yeah, Seco.

25  Q.   You drove -- after you picked up Seco, you

1   drove directly to this house, because Yovani was
2   told how to get there; right?
3   A.   Yeah.
4   Q.   And he was told by Seco?
5   A.   Yeah.
6   Q.   And you didn't have to meet up with anybody
7   else or follow anybody else to that residence;
8   right?
9   A.   I don't remember.  I'm not sure, but yeah.
10  Q.   Well, when you talked -- when you talked to
11  the FBI on February 8th and February 15th, you
12  never told them that you had to follow anybody
13  there, did you?
14  A.   No.
15  Q.   So you went directly from picking up Seco to
16  this house?
17        MR. LACEY:  Objection.  That's not the
18  testimony.  He said he didn't remember.
19        THE COURT:  Rephrase your question.
20  BY MR. COOPER:
21  Q.   You talked to the FBI; right?
22  A.   Right.
23  Q.   And they asked you how you wound up at this
24  house where black people were; right?
25  A.   Right.

1   Q.   And you never told them that he had to follow

2   anybody there, did you?

3   A.   No.

4   Q.   Okay.  And you don't -- what happened is you

5   picked up Seco; correct?

6   A.   Correct.

7   Q.   And from picking up Seco, you drove to this

8   house where the blacks were; right?

9   A.   Right.

10  Q.   No stops in between; right?

11  A.   Right.

12  Q.   You didn't see anybody or talk to anybody in

13  between; right?

14  A.   Not that I know of, no.

15  Q.   Well, you're the only one that would know;

16  right?

17  A.   Yeah, no.

18  Q.   And you didn't; right?

19  A.   No.

20  Q.   Seco went into the house; right?

21  A.   Yeah.

22  Q.   Okay.  At that residence that you say the

23  black people were at, you are really certain that

24  there were just two cars present; right?

25  A.   Yes.

1   Q.   Okay.  And those cars -- the problem, though,

2   is it's kind of hard to remember colors of cars;

3   right?

4   A.   Yeah.

5   Q.   Is that fair?

6   A.   Yes.

7   Q.   Okay.  And it's especially hard to remember

8   colors of cars from, you know, 15, 16, 17 months

9   ago; right?

10  A.   Yeah.

11  Q.   And so these two cars that you're certain were

12  there, I believe you indicated that one of them was

13  a Cadillac and one was a Buick; right?

14  A.   I don't know what the brand was.  I told them

15  it was a four-door car, but I don't know what

16  brand.

17  Q.   Okay.  Well, when you talked with -- let me

18  just --

19          MR. COOPER:  Can I approach the witness

20  Your Honor?

21          THE COURT:  You may.

22  BY MR. COOPER:

23  Q.   Let me read this to you.  See if you remember

24  this.

25          "When Jorge, Yovani, and Mayco arrived at the

1    residence, a black Cadillac Escalade truck was

2    parked out front.  Also parked outside of the

3    residence were two cars described as a Cadillac and

4    a Buick."

5        Do you remember telling that to the FBI?

6    A.   No.  I told them there was two cars, the

7    Escalade and some other car.  That's it.

8    Q.   Okay.  So apparently the FBI can't tell the

9    difference between a Buick and a Cadillac; is that

10   fair?

11   A.   No.  I told them it was a four-door, and I

12   don't know if it was a Cadillac or a Buick, but it

13   was one.

14   Q.   Okay.  So you did use the word "Buick" with

15   them; right?

16   A.   I wasn't -- I didn't know what brand of car

17   was it, but I know it was four doors.

18   Q.   Okay.  But you were certain there were just

19   two cars?

20   A.   Yes.

21   Q.   Okay.  So I'm a little confused though,

22   because what you've listed are three cars; right?

23   A.   I never listed three cars.

24   Q.   Well, you said, "Outside the residence, a

25   black Cadillac Escalade truck was parked out

1  front.  Also parked outside of the residence were

2  two cars described as a Cadillac and a Buick."

3  That's three.

4  A.  I never said -- I said a car.  I don't know

5  what brand was it, a Cadillac or a Buick.  It was a

6  four-door car.

7  Q.  So now you're pretty certain there were just

8  two cars?

9  A.  Two, yes.

10  Q.  Okay.  And the problem is, you didn't know the

11  colors of the cars; right?

12  A.  Right.

13  Q.  And you didn't know -- you don't remember if

14  it was a black Cadillac, do you?

15  A.  I know the truck was there, the black

16  Cadillac, the truck.

17  Q.  The black Cadillac truck and one other car or

18  two others?

19  A.  One other car, but I don't remember what brand

20  was the other car.

21  Q.  Okay.  So you know the color of one of the

22  cars?

23  A.  Yeah, but I didn't pay attention to the other

24  one.

25  Q.  Okay.  Let me read you again, if I could,

1  something else that you told the FBI.

2       Here it says --

3            MR. LACEY:  Your Honor, I would object to

4  the form of the question.  Asking him certain

5  questions, did you tell the FBI this, would be the

6  appropriate way, I think, and then he can follow up

7  on it later with other witnesses.

8            THE COURT:  The objection is overruled.

9  BY MR. COOPER:

10 Q.  The first sentence is, "When Jorge, Yovani,

11 and Mayco arrived, there was a black Cadillac

12 Escalade parked out front"; right?

13 A.  Uh-huh.

14           THE COURT:  You have to say yes or no.

15           THE WITNESS:  Yes.

16 BY MR. COOPER:

17 Q.  And you'd given the color of that car as

18 black?

19 A.  Yeah.

20 Q.  Then, "Also parked outside were two cars

21 described as a Cadillac and a Buick"; right?

22 A.  I didn't say two cars.  I said another car.  I

23 didn't know if it was a Buick or a Cadillac.  It

24 was a four-door.

25 Q.  Led me read this next sentence.  "Jorge was

1  not able to recall the colors of the cars."  It

2  doesn't say "of the car"; right?

3  A.   It was -- okay.

4  Q.   "Of the cars."

5  A.   Okay.

6          THE COURT:  For the record, whose report

7  was that?

8          MR. COOPER:  It's the Jencks report

9  written by Agent Edwards.

10          THE COURT:  All right.

11  BY MR. COOPER:

12  Q.   So when you say you couldn't remember the

13  color of the cars, you meant actually of just one

14  of the cars?

15  A.   It was just the Escalade and the other car.

16  There was no other car involved.

17  Q.   Okay.  Well, you testified at a previous

18  hearing -- and again, this is page 24.

19          And at the previous hearing, you indicated

20  that there were two Cadillacs out front.  Do you

21  remember saying that?

22  A.   Yeah, the car, I don't remember if it was a

23  Cadillac or a Buick, and the Cadillac truck.  I

24  know the Cadillac truck was there, but the other

25  one, I don't know what brand it was.

1  Q.  Well, at the previous hearing, you said

2  specifically two Cadillacs.

3  A.  Yeah, but I don't know if it was a Cadillac or

4  a Buick, the four-door that was there.

5  Q.  Okay.  And the four-door, though, you

6  remembered the color.  Do you remember what color

7  you said?

8  A.  No.

9       MR. COOPER:  May I approach, please?

10      THE COURT:  You may.

11 BY MR. COOPER:

12 Q.  Question, "One gray Cadillac.  Was that a

13 truck?"

14      Answer, "It was a vehicle."

15      Question, "Like a sedan?"

16      Answer, "Four-door vehicle."

17      Question, "A four-door vehicle?"

18      Answer, "Yeah."

19      Question, "That's a gray Cadillac four-door

20 vehicle?"

21      Answer, "Yeah."

22      "And the other one was what color?"

23      "It was red -- it was a black Escalade."

24      "A black Escalade?"

25      "Yes."

1    A.    Yeah.

2    Q.    Okay.  So at the previous hearing, you

3    remembered the color, and you indicated it was a

4    gray Cadillac.

5    A.    Yes.

6    Q.    And so you described the two cars out there as

7    one gray Cadillac and one black Cadillac; right?

8          Is that right?

9    A.    Right.

10   Q.    Okay.  I'd like to jump ahead.  And I'm almost

11   finished.

12         You indicated earlier that you had -- I think

13   you said after you learned that people had been

14   arrested, you were concerned about driving, because

15   you had no license; right?

16   A.    Right.

17   Q.    So you called your mom to come and get you.

18   A.    Not my mom.  My sister.

19   Q.    Oh, okay.  I must have misheard, because I

20   thought you said before lunch that you called your

21   mom.

22   A.    No, my sister.

23   Q.    Your sister.  Okay.

24              THE COURT:  Get closer to the mic, please.

25              THE WITNESS:  My sister.

1  BY MR. COOPER:

2  Q.   Okay.  And that sister is Carmen?

3  A.   Right.

4  Q.   But she did not come get you, did she?

5  A.   No.  She met me halfway.

6  Q.   Well, she met you in Phoenix at 51st Avenue.

7  A.   Yes.

8  Q.   Okay.  So that's not halfway; right?

9  A.   Right.

10 Q.   Let's go to the Food City.  You learned --

11 apparently Seco's brother-in-law told you that

12 people had been caught; right?

13 A.   Right.

14 Q.   And this is as you're about to walk into the

15 Food City?

16 A.   Right.

17 Q.   To go to the bathroom?

18 A.   Right.

19 Q.   Okay.  And you had been to the bathroom a

20 little bit earlier with -- apparently with Seco and

21 Yovani; right?

22 A.   Right.

23 Q.   But before you went in this time, you ran into

24 Seco's brother-in-law?

25 A.   Right.

1  Q.  And was this just a coincidence that you ran

2  into him?

3  A.  Yeah.  Well, I was just walking in, and I just

4  saw him next to the door.

5  Q.  And you didn't expect to see him there; right?

6  A.  Right.

7  Q.  And did you ask him, how would you know they

8  got caught?  You're not involved in this.

9  A.  Because Seco called him, I think.  I don't

10 know.

11 Q.  You don't know, do you?

12 A.  No, I don't know, but he told me.

13 Q.  Okay.  And what you said earlier at a previous

14 hearing is that the black people did not hear this

15 conversation; right?

16 A.  Right.

17 Q.  Okay.  But that later on, after you had this

18 conversation with Seco's brother-in-law, you went

19 and were in the parking lot; right?

20 A.  Right.

21 Q.  Do you remember that exhibit they showed,

22 Exhibit 29?

23 A.  Right.

24 Q.  The three cars?  There was the, what, the

25 Escalade, the Expedition, and your car.

1    A.    Right.

2    Q.    And you pointed those out; right?

3    A.    Right.

4    Q.    And you had a conversation near your car;

5    right?

6    A.    Right.

7    Q.    At that conversation was, again, with who?

8    A.    With the blacks, when I told them they got

9    caught.

10   Q.    You told the blacks?

11   A.    Yeah.

12   Q.    Okay.  And you told them directly; right?

13   A.    No.  I told them when I was walking back to my

14   vehicle.

15   Q.    That's what I mean.

16   A.    Yeah.

17   Q.    You were walking back to your car?

18   A.    Yeah.

19   Q.    And the blacks were parked next to each other;

20   right?

21   A.    Right.

22   Q.    And you stopped and had a conversation with

23   the black guys; right?

24   A.    I didn't have a conversation.  I just told

25   them, "They got caught," and that's it.

1  Q.  Okay.  Actually -- and that's how you

2  indicated they learned that somebody had been

3  caught; right?

4  A.  Right.

5  Q.  And before lunch you described how that

6  happened; right?

7  A.  Right.

8  Q.  Okay.  But what you didn't mention is

9  something you told the FBI in February of 2012.

10     Do you remember what that is?

11  A.  No.

12  Q.  Okay.  Well, I'll tell you.

13     What you said was, the reason the blacks

14  learned about this is because Miami was in the

15  parking lot in a gray car.

16     Do you remember saying that to the FBI?

17  A.  No.

18  Q.  Well, I'll show you -- I'll show you in just a

19  second.  And you told Miami about the arrest, and

20  that's how the blacks heard about it.

21  A.  No, I --

22  Q.  Let me --

23        MR. COOPER:  Can I approach, Your Honor?

24        THE COURT:  You may.

25  BY MR. COOPER:

Q.   Here's what the FBI says you said.

A.   Uh-huh.

Q.   "Jorge then walked over to Miami in the gray vehicle, and he said that Mayco and Yovani were arrested and he was leaving.  Jorge indicated that" -- this should be -- "that Miami was parked next to the Escalade and the Expedition, and the occupants of these vehicles also heard what he said to Miami.

     "Jorge then departed Food City, and he drove down the street to a gas station, where Mayco's brother-in-law purchased a Monster drink for Jorge."

A.   Right.

Q.   Okay.  So to the FBI in February, you said, I was talking to Miami who was in the parking lot in a gray car; right?

A.   No, I wasn't talking to him.  I passed by and said that.  I didn't sit down there and have a conversation with them.

Q.   Well, so the FBI is mistaken in what you told them?

A.   Yes, because I was walking by, and I told them, "Hey, they got caught," and Miami's car was right here, and the Escalade was on this side.  They both heard me.

1  Q.  Well, the FBI describes you saying that they

2  heard what you said to Miami.  You were talking to

3  Miami.

4  A.  No, I wasn't just talking to him.  I was

5  talking -- I was passing by and I said it.

6  Q.  Before lunch you never even mentioned that

7  Miami was in the parking lot, did you?

8  A.  Well, I didn't know it was Miami until you

9  told me the gray car that was there.  I didn't know

10  it was Miami.

11  Q.  Well, in February of 2012, you told the FBI it

12  was Miami.  That's eight months ago.

13  A.  Yeah, because he was with the Mexican dude

14  that put his window down, so I was knowing that the

15  Mexican was driving with Miami, but I didn't know

16  what vehicle he was in until I remembered he had a

17  gray car.

18  Q.  You never even mentioned that before lunch,

19  did you?

20  A.  No.

21  Q.  You never mentioned that Miami --

22          THE COURT:  Whoa, whoa.  One of you at a

23  time.

24  BY MR. COOPER:

25  Q.  You never even mentioned that Miami was in a

1    gray car in the parking lot near the Escalade and

2    the Expedition, did you?

3    A.    Well, you haven't asked me.

4    Q.    Well, the prosecutor asked you who was out

5    there in the parking lot; right?

6    A.    Yeah, but I can't tell -- from the view they

7    showed me, I couldn't tell what car was what.  I

8    could remember the Escalade and the Expedition, but

9    I can't -- well, the car I was driving, because it

10   looks -- I could tell.  But I couldn't tell the

11   other car.

12   Q.    Could I see Exhibit 29, please.

13         Do you remember this exhibit?

14   A.    Yes.

15   Q.    You looked at this exhibit for about 15

16   minutes before lunch; right?

17   A.    Right.

18   Q.    And you never mentioned once to the prosecutor

19   or to me that Miami was parked in this lot anywhere

20   near the blacks, did you?

21   A.    No.

22   Q.    And it was right in front of you; right?

23   A.    Right.

24   Q.    And right now you can't even say where Miami's

25   car was, can you?

A.   No.

          MR. COOPER:  That's all I have.

                    CROSS-EXAMINATION

BY MR. ARMSTRONG:

Q.   Good afternoon, sir.  Just a few questions for
you.

          MR. ARMSTRONG:  Could you put Exhibit 29
back up, please?  Thank you.

BY MR. ARMSTRONG:

Q.   This morning, when you were testifying about
Exhibit 29 -- do you see that on your screen there?

A.   Yes.

Q.   Okay.  You were asked to draw some -- mark
some cars and draw some lines.

A.   Right.

Q.   Okay.  That is not the same photograph -- or
that photograph doesn't depict where your -- where
you say the cars ended up later.

     Is that safe to say?

A.   Right.

          THE COURT:  Closer to the mic.

          THE WITNESS:  Right.

BY MR. ARMSTRONG:

Q.   And back to the topic of Miami, this morning,
did you not clearly say to this jury that you had a

1  conversation with the black people in the truck or

2  in the trucks about the fact that there had been an

3  arrest?

4  A.   Yes, in Circle K and Food City too, when I

5  told them that they got arrested.

6  Q.   Right.  At Food City --

7  A.   Yeah.

8  Q.   -- your testimony was that you went up to the

9  -- you went up to the black people and said there

10  had been an arrest.

11  A.   Right.

12  Q.   And six months ago you told Agent Edwards it

13  was Miami who you told, not the blacks.

14       Would you agree with that?

15  A.   Yes.  Can I explain myself?

16  Q.   Okay.  No, no.

17       Do you know whether Yovani, who is your

18  brother-in-law, has a valid driver's license?

19  A.   He does have a valid driver's license.

20  Q.   Okay.  And you don't?

21  A.   No.

22  Q.   Do you know anything about whether Mayco has a

23  valid driver's license?

24  A.   No.

25            THE COURT:  No he doesn't or no you don't

1    know?

2            THE WITNESS:  No, he doesn't.  Or I don't

3    know.

4    BY MR. ARMSTRONG:

5    Q.   And it's your testimony that your role in this

6    situation on March 2nd of 2011 was just to be the

7    driver?

8    A.   Right.

9    Q.   Like a cabbie, a very well-paid cabbie?

10   A.   Right.

11           MR. ARMSTRONG:  Could I see Exhibit 109,

12   please.  109.

13           Can you pause it right there, please.

14   BY MR. ARMSTRONG:

15   Q.   Is that you?

16   A.   Yes.

17   Q.   Okay.  You're wearing a black shirt?

18   A.   Yes.

19   Q.   The other fellows are wearing a black shirt?

20   A.   Yes.

21   Q.   When they were in the store, did either of

22   those two people have guns on them?

23   A.   No, I don't think so.

24   Q.   You don't think so?  Did you?

25   A.   No, I don't have a gun.

1  Q.   You knew Yovani did home invasions; correct?

2  A.   Yes.

3  Q.   You've been clear about that.

4  A.   Yes.

5  Q.   And it's your testimony that he, although he

6  had a valid driver's license and apparently his own

7  vehicle, he asked you to come along to be his

8  driver?

9  A.   Right.

10 Q.   Even though you didn't have a valid driver's

11 license?

12 A.   (Nodding.)

13 Q.   Yeah?

14 A.   Yes.

15 Q.   Did you tell him you didn't have a valid

16 driver's license?

17 A.   He knows.

18 Q.   You seem an odd choice of person to be just a

19 driver for a home invasion if you don't have a

20 valid driver's license.

21     Would you agree with that?

22 A.   Yeah, I would agree with that.

23 Q.   I'll talk about your brother-in-law Yovani.

24 A.   Uh-huh.

25 Q.   He's married to your sister, and your sister

1    is the person that came to pick you up after you

2    fled Tucson; correct?

3    A.   Correct.

4    Q.   And by the way, you exited a number of times.

5    When you left Phoenix -- or excuse me.  When you

6    left Tucson, you got off of the highway any number

7    of times --

8    A.   Right.

9    Q.   -- in order to avoid detection; correct?

10   A.   Right.

11   Q.   One of them, you even said you went to the

12   Dairy Queen.  You told the FBI you stopped at the

13   Dairy Queen in Casa Grande.

14   A.   Yeah, I think, yeah, I stopped.

15   Q.   And it was all because you knew something bad

16   had happened, you knew you were in trouble, and you

17   didn't want to get arrested; correct?

18   A.   Right.

19   Q.   So you called your sister to come pick you up,

20   and she picked you up somewhere in the west Phoenix

21   area.

22       Agree with that?

23   A.   Right.

24   Q.   You come from a close family.  Would you agree

25   with that?

1    A.   Yes.

2    Q.   Yovani was with you when you came to Tucson to

3    meet with Agent Edwards on February 15th; right?

4    A.   Right.

5    Q.   You two drove down together?

6    A.   Right.

7    Q.   You met Agent Edwards at the FBI building; is

8    that right?

9    A.   Correct.

10   Q.   Yovani was in the building at the time;

11   correct?

12   A.   Correct.

13   Q.   As far as you know, he met with the FBI

14   himself that day, didn't he?

15   A.   Right.

16   Q.   Right?

17   A.   Right.

18   Q.   You and Yovani talked about this case, didn't

19   you?

20   A.   I never wanted to talk about it because I was

21   always just like, oh, if they -- like, if they want

22   to talk to me, they're going to talk to me sooner

23   or later.

24   Q.   You just kind of thought, whatever is going to

25   happen is going to happen?

1  A.  Right.

2  Q.  Why did you run down to Mexico if you just

3  thought whatever is going to happen is going to

4  happen?

5  A.  No, because in that moment, I was scared, you

6  know.

7  Q.  So you didn't initially take your children or

8  your family with you, did you?

9  A.  Yeah, I did, but after a couple of months,

10  they left.

11  Q.  But I thought you said you jumped into Mexico

12  with your mother.

13  A.  Yes.

14  Q.  Your mother drove you down there?

15  A.  Yes.

16  Q.  The kids weren't with you?

17  A.  No.

18  Q.  So they didn't go with you at first, did they?

19  A.  No, not at first, no.

20  Q.  And then you snuck back into the United

21  States; is that right?

22  A.  Right.

23  Q.  You're a citizen; right?

24  A.  Correct.

25  Q.  How -- why did you feel the need to sneak back

1  into your own country?

2  A.  I don't know.

3  Q.  Just a few more questions.

4     There was testimony about what you were up to

5  the night before you went down to Tucson to

6  participate in the home invasion.

7     You were out partying; is that right?

8  A.  Right.

9  Q.  And we heard what partying means and all

10 that.  And you were out partying, and you were --

11 you had to sleep it off.  You had to sleep in that

12 morning; correct?

13 A.  Right.

14 Q.  Do you have a nickname?

15 A.  Cochi.

16 Q.  Can you repeat that?

17 A.  Cochi.

18     MR. ARMSTRONG:  Thank you.  Nothing

19 further.

20                 CROSS-EXAMINATION

21 BY MR. YOUNG:

22 Q.  Sir, I'm going to direct your attention to

23 March 2nd of last year.

24     Where we left off, you said you were partying

25 the night before?

1   A.   Yes.

2   Q.   And Yovani, you said, woke you up around eight

3   o'clock with his phone calls?

4   A.   Right.

5   Q.   He offered you $2,000 to drive to Tucson?

6   A.   Right.

7   Q.   So you met Yovani at an AMPM.  Was that at

8   99th and Glendale?

9   A.   Right.

10  Q.   And in fact, you left your red Jeep Cherokee

11  at that AMPM?

12  A.   Yes.

13  Q.   From there, you went with Yovani, your

14  brother-in-law, to pick up Mayco; right?

15  A.   Right.

16  Q.   And then you, Yovani, and Mayco started

17  looking for blacks near 24th Street and Broadway?

18  A.   Right.

19  Q.   And Mayco, Mayco/Seco, directed you to a

20  house?

21  A.   Right.

22  Q.   And I think we understood that Mayco knew the

23  directions to the house, or he got the directions

24  by telephone to the house?

25  A.   Right.

1  Q.  So you didn't have to follow another vehicle

2  to get to that house.  Was that your testimony?

3  A.  Not that I remember.

4  Q.  Now, when you went to that house, I think you

5  said you were at that house for about maybe a

6  minute.

7  A.  Right.

8  Q.  It was a pretty short stay at the house?

9  A.  (No response).

10        THE COURT:  He didn't answer, Mr. Young.

11        THE WITNESS:  Oh, right.

12        MR. YOUNG:  I'm sorry, Judge.  He nodded

13  his head.

14        THE COURT:  It doesn't do my court

15  reporter any good.

16        THE WITNESS:  Sorry.

17  BY MR. YOUNG:

18  Q.  Where was I?

19        So it was a short stay at the house where the

20  blacks were?

21  A.  Right.

22  Q.  And from there, you went on to Miami's house.

23  A.  Right.

24  Q.  Now, while you were at the blacks' house near

25  24th Street and Broadway, there was no red

1 Expedition at the blacks' house, was there?

2 A.   No.

3 Q.   And when you went to Miami's house, there was

4 no red Expedition at Miami's house?

5 A.   No.

6 Q.   And after you left Miami's house, you went to

7 another residence near 16th or 20th Street and

8 Southern?

9 A.   Right.

10 Q.   Is that approximately where you went?

11 A.   Yeah, I think so.

12 Q.   Because you had to drop off somebody's car

13 there that was with Miami?

14 A.   Yes.

15 Q.   And then you brought that person back to

16 Miami's house again?

17 A.   Right.

18 Q.   So that person's residence down near 16th or

19 20th Street and Southern, that -- there was no red

20 Expedition at that person's house either, was

21 there?

22 A.   No.

23 Q.   Okay.  And while you were at the blacks' house

24 near 24th Street and Broadway, you did not see the

25 gentleman there in the black shirt at that house?

1     MR. YOUNG: Would you stand up?

2 BY MR. YOUNG:

3 Q. You did not see him at the blacks' house?

4 A. No. He was not at the house.

5 Q. And in fact, if we could see Exhibit 67-A.

6    This person here depicted in Exhibit 67-A, you

7 did not see him at the blacks' house?

8 A. No.

9 Q. And if we could take a look at 67-B.

10    This person in 67-B you did not see at the

11 blacks' house; correct?

12 A. Correct.

13     MR. YOUNG: That's all I need.

14 BY MR. YOUNG:

15 Q. While you were at the blacks' house, you

16 testified that Mayco/Seco said he was going to give

17 half of the drugs to the blacks?

18 A. Right.

19 Q. Does Mayco have that kind of authority to give

20 away half of the drugs?

21 A. I don't know. It was -- he was the one saying

22 it, so I don't know.

23 Q. Well, you're saying that he said it; right?

24 A. Yeah, he said it, but I don't know if he has

25 the authority to.

1  Q.  That could be a lot of drugs; right?

2  A.  Yeah.

3  Q.  And you're saying -- your testimony today is

4  that Mayco promised somebody half of the drugs?

5  A.  Yes.

6  Q.  Now, while you were at the Food City, you were

7  notified by Mayco/Seco's brother-in-law that Mayco

8  had been arrested?

9  A.  Yes.

10  Q.  And if we could look at Exhibit No. 29,

11  please.

12      Looking at Exhibit 29, there are three

13  vehicles, as I understand it, in this picture.  One

14  is the red Expedition that you pointed out.

15  A.  Uh-huh.

16  Q.  The other is a black Escalade that is not

17  right now parked next to the red Expedition but you

18  said was parked next to it later?

19  A.  Yes.

20  Q.  And then just to the right of that parking

21  space is another vehicle.  It looks like a white

22  vehicle to me.

23  A.  Right.

24  Q.  And that may be a gray vehicle, for all I

25  know, but it's another vehicle.

1   A.   Right.

2   Q.   As you were walking out of the Food City, you

3   said you walked past those three vehicles?

4   A.   Yes.

5   Q.   And if I understand correctly, you said to the

6   -- to Miami in the white vehicle or the gray

7   vehicle that's off on the right, you said to

8   Miami -- you said what?

9   A.   No, I didn't say nothing to him.  I was

10   walking by, and that's when I said, "They got

11   caught," and the driver from the Escalade put down

12   his window, and the passenger from the little car,

13   the four-door car, put down his window.

14       That's when I said, "Hey, they got caught,"

15   and I just left.

16   Q.   So the vehicles that rolled down their window

17   were the four-door car and the Escalade?

18   A.   Right.

19   Q.   But not the red Expedition?

20   A.   Well, the red Expedition was next to the

21   Escalade.

22   Q.   It was next to it, but it didn't roll down its

23   windows?

24   A.   No.

25   Q.   And correct me if I'm wrong, my notes from

1 this morning were that you were pretty clear that

2 the first time you told the blacks this, you said,

3 "They got stopped," and the second time at the

4 Circle K is when you said, "They got caught."

5     Is that --

6 A.   Yeah, the first time I said, "They got

7 stopped," and then I kept on leaving.  I left.  I

8 jumped in the car, and that's when I walked -- went

9 to the next door.

10 Q.   Okay.  So when you were at the Food City, if I

11 understand correctly, what you told the blacks that

12 you told this to, what you told them was, "They got

13 stopped"?

14 A.   Yes.

15 Q.   And when you were at the Circle K, what you

16 told the blacks you saw at the Circle K was, "They

17 got caught"?

18 A.   Yeah, "They got caught."

19 Q.   If we could take a look at Exhibit 61-E,

20 please.

21     In Exhibit 61-E, it looks like the gentleman

22 in the blue shirt, he appears to be having his

23 lunch.  Is he eating something?

24 A.   I don't know.  I can't tell.

25 Q.   Can you remember what he was eating that day?

1  A.  No.

2  Q.  Now, I believe that you told Mr. Lacey this

3  morning that you've already been convicted of lying

4  to the police; right?

5  A.  Right.

6  Q.  And that's something that happened up in

7  Winslow?

8  A.  Yes.

9  Q.  And I believe your testimony this morning was

10  also that, when you got stopped by DPS on your way

11  home, you told them that you were at your

12  grandmother's house in Tucson or your mother's

13  house in Tucson or something like that?

14  A.  Right.

15  Q.  Okay.  And that was also a lie?

16  A.  Right.

17  Q.  What do you tell your wife and the mother of

18  your children when you go out partying and looking

19  to pick up girls at various clubs in Phoenix?

20  A.  What do you want me to tell her?

21  Q.  I want to know if you tell her a lie.

22  A.  What do you want me to tell her?  What do you

23  want me to tell her?  Like, the truth or --

24  Q.  I just want --

25  A.  No, I don't tell her the truth.  What would I

1  tell her?

2  Q.  You don't tell her the truth, do you?

3  A.  No.

4  Q.  Where do you tell her you're going?

5  A.  What?

6  Q.  Where do you tell her you're going?

7  A.  To my brother's house.

8  Q.  So you lie to her too?

9  A.  (Nonverbal response.)

10  Q.  You said you went to Mexico the very same

11  day.

12  A.  Yeah.

13  Q.  Because you knew you were in a heap of trouble

14  for this.

15  A.  Yes.

16  Q.  And you didn't come back for very nearly a

17  year.

18  A.  Right.

19  Q.  Because you knew you were in a lot of

20  trouble.

21  A.  Right.

22  Q.  And you'd been talking to Yovani about how

23  much trouble you were in, hadn't you?

24  A.  Right.

25  Q.  And Yovani knew how much trouble he was in?

1  A.  Right.

2  Q.  And Yovani, in fact, probably relayed to you

3  that one of the reasons you really ought to go talk

4  to the FBI is because you could be facing a

5  mandatory minimum sentence of --

6          MR. LACEY:  Objection, Your Honor.

7  Sidebar on this, please?

8          (The following proceedings occurred at the

9          bench.)

10         MR. LACEY:  The question should be, do you

11  know what penalties you're looking at, not have

12  counsel broadcast to the jury something that this

13  witness knows nothing about.  It's improper.

14         THE COURT:  Rephrase your question,

15  Mr. Young.

16         MR. YOUNG:  Judge, I do want to cite the

17  Court to United States vs. Larson, which holds that

18  it is error, a confrontation error, for me to be

19  precluded from cross-examining a witness on a

20  mandatory minimum sentence that he --

21         THE COURT:  I'm not precluding you from

22  cross-examining him, but I'm -- first of all, ask

23  him if he knows how much time he was facing.  Did

24  Yovani and he discuss that?  Don't just put it out

25  there to begin with.  That's what I'm telling you

1    not to do.

2              Now, Yovani, I'm sure he knows.

3              MR. YOUNG:  I'm used to leading questions,

4    Your Honor, but I'll --

5              THE COURT:  Rephrase it.  Thank you.

6              (End of bench conference.)

7              THE COURT:  Rephrase your question,

8    Mr. Young.

9    BY MR. YOUNG:

10   Q.   Let me put it to you this way.  Do you have

11   any idea how much the minimum time would be for

12   this offense if you were to get convicted of it?

13   A.   No.

14   Q.   You haven't talked to Yovani about that?

15   A.   No.

16   Q.   Your mom was very anxious for you to talk to

17   the FBI, wasn't she?

18   A.   Right.

19   Q.   In fact, she was so anxious for you to talk to

20   the FBI that you think she actually called the FBI

21   to come talk to you while you were in custody for

22   traffic tickets?

23   A.   Right.

24   Q.   So somebody in your family has got some idea

25   of what minimum sentence you might be facing if you

1   were convicted of this offense?

2   A.   Right.

3            MR. YOUNG:  That's all I have, Your Honor.

4            THE COURT:  Mr. Lacey?

5            MR. LACEY:  Thanks, Your Honor.

6            Counsel, I don't know whose pen this is.

7            MR. COOPER:  It's mine.  Thank you.

8                    REDIRECT EXAMINATION

9   BY MR. LACEY:

10  Q.   Sir, you were asked by Mr. Armstrong, the

11  fellow with the blue and yellow tie and blue shirt

12  on, about Miami, and you wanted to explain

13  something about Food City and what happened

14  earlier.

15  A.   Yes.

16  Q.   Why don't you tell us now what you wanted to

17  explain.

18           MR. ARMSTRONG:  Object to the form of the

19  question.

20           THE COURT:  Overruled.

21  BY MR. LACEY:

22  Q.   Go ahead.

23  A.   That when I was walking back, there's -- I

24  don't -- it was a gray car or gray -- I don't know

25  what color, but it was a four-door.  That was a

1  Mexican dude that I drove over to Miami's house.

2      So that was Miami, and the Escalade was parked

3  next to, like, a couple of cars, and when I walked

4  through, that's when I told them, "They got

5  stopped."  I didn't walk up to them and started

6  talking to them.

7      That's why both of them, the gray car, the

8  passenger from that car heard, heard me, and the

9  driver from the Escalade heard me.  I didn't went

10 to talk to them.  They both heard me when I said it

11 when I was walking by.

12 Q.   Now, you mentioned that both cars, the black

13 Escalade and the four-door car next to it, rolled

14 down their windows?

15 A.   Yes.

16 Q.   Now, do you know if the red Expedition --

17 where was that?  Was that on the other side of the

18 Escalade?

19 A.   Yeah, on the other side of the Escalade.

20 Q.   Do you know if the windows were down or up on

21 that car?

22 A.   They were having a conversation with the

23 Escalade, so -- but I couldn't really hear.

24 Q.   So you don't know whether they heard what you

25 said then?

1   A.   Yeah, they probably -- they heard what I said.

2   Q.   Well, do you know if the windows were down on

3   the red Expedition?

4   A.   No, they were down.

5   Q.   How do you know that?

6   A.   Because when I was walking by, I'd seen them

7   on my right, right side, the passenger from the

8   Escalade was talking to the driver of the

9   Expedition.

10  Q.   As you were walking by?

11  A.   Yeah.

12  Q.   You were asked some questions on cross-

13  examination about, for example, how long you stayed

14  at this house in Phoenix where you saw three blacks

15  come out after Seco went inside.

16       Do you recall that, that house?

17  A.   Uh-huh.

18            THE COURT:  Yes or no.

19  BY MR. LACEY:

20  Q.   Yes?

21  A.   Yes.

22  Q.   And you said you stayed about a minute.  Now,

23  was a minute 60 seconds, or when you say a minute,

24  what do you mean?  Is it by the clock or -- you

25  just -- you tell me.

1    MR. COOPER:  Objection, Your Honor.

2  That's a compound question.

3    MR. YOUNG:  And leading, Your Honor.

4    THE COURT:  Mr. Armstrong?

5    MR. ARMSTRONG:  Both.

6    THE COURT:  Sustained.  Rephrase your

7  question.

8    MR. LACEY:  I will.

9  BY MR. LACEY:

10  Q.  A minute is how long?

11  A.  I can't -- I'm not good at time, but it was

12  pretty quick, so that's why I say a minute.  Real

13  fast they talked and he walked out.

14  Q.  Were you wearing a watch that day?

15  A.  What?  No, I wasn't wearing a watch, so --

16  Q.  Do you own a watch?

17  A.  No.

18  Q.  Pardon?

19  A.  No.

20    MR. LACEY:  I have nothing further.

21    THE COURT:  Jurors have any questions,

22  please place them in writing.  There is at least

23  one.

24    (The following proceedings occurred at the

25    bench.)

1          MR. COOPER:  Is Yovani next?

2          MR. LACEY:  I'm going to call somebody

3    from the FBI next.

4          THE COURT:  All right.

5          "Why did the police let you go when you

6    got pulled over and you had no driver's license?

7    Did you get a ticket?"

8          MR. LACEY:  That's fine.

9          THE COURT:  I'll ask.  Wait for another

10   one.

11         "How did you all end up at the Circle K?"

12         "Were all three of the cars at the Food

13   City facing the same direction, the gray car, the

14   black Cadillac, and the red Expedition?"

15         MR. LACEY:  Your Honor, first, I think as

16   far as the Circle K questions, there is a little

17   confusion.  We had a few different Circle Ks that

18   day, so it's pretty general.  It doesn't say

19   whether it's the one in Marana, the one in Phoenix,

20   or the one in Tucson.

21         THE COURT:  Mo, do you know which juror

22   asked this question?

23         THE CLERK:  No, because they gave me two

24   at the same time.

25         THE COURT:  All right.  I'll figure it

1    out.

2              (End of bench conference.)

3         THE COURT:  One of you asked a question

4    about a Circle K.  Which Circle K?

5              JUROR:  The Circle K that -- I forgot --

6    the video of it, where it showed him in front of

7    the --

8         THE COURT:  Enough.  Your juror number

9    is?

10             JUROR:  Four.

11        THE COURT:  All right.  Let's start with

12   the that question.  How did you all end up at the

13   Circle K?

14        THE WITNESS:  What Circle K?

15        THE COURT:  The one -- the one by the

16   interstate here in Tucson, where they took a

17   picture of you, supposedly.

18        THE WITNESS:  Oh, I don't know.  I was

19   just getting on and off the freeway because I was

20   scared, and when I got off, I saw them there at

21   that Circle K.

22        THE COURT:  Why did the police let you go

23   when you got pulled over and you had no driver's

24   license?

25        THE WITNESS:  Because they told me, do I

1   have tickets?  And I'm like, "No, I don't got no

2   tickets."

3           He's like, "Were you planning on getting a

4   driver's license?"

5           "Yeah."

6           He's like, "Go ahead.  Drive."

7           THE COURT:  Did you get a ticket that

8   day?

9           THE WITNESS:  No.

10          THE COURT:  Were all three of the cars at

11  the Food City facing the same direction?  By that

12  they mean the gray car, the black Cadillac, and the

13  red Expedition.

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Lacey, any questions based

16  upon the jurors' questions?

17          MR. LACEY:  No, Your Honor.  Thank you.

18          THE COURT:  Mr. Cooper?

19          MR. COOPER:  No, Your Honor.

20          THE COURT:  Mr. Armstrong?

21          MR. ARMSTRONG:  (Shaking head.)

22          MR. YOUNG:  No, Your Honor.

23          THE COURT:  Mr. Young?

24          MR. YOUNG:  No.

25          THE COURT:  You didn't give me a chance to

1  ask.

2          You may step down, sir.

3          MR. LACEY:  Do you want to take a recess

4  or are you okay?

5          THE COURT:  I'm okay.  He's going out the

6  back door.  Next witness.

7          MS. HOPKINS:  Your Honor, the next witness

8  is Special Agent Samantha Koval.

9          THE CLERK:  Take the stand, please.

10          SAMANTHA KOVAL, WITNESS, SWORN

11          THE COURT:  Ma'am, the Rule has been

12  invoked in this case.  That means, except during

13  the time that you are testifying, you must remain

14  outside the courtroom and you are only allowed to

15  discuss your testimony with the attorneys involved

16  in the case.

17          Understood?

18          THE WITNESS:  Yes, sir.

19          THE CLERK:  Please state your name for the

20  record and spell your last name.

21          THE WITNESS:  Samantha A. Koval,

22  K-o-v-a-l.

23          DIRECT EXAMINATION

24  BY MS. HOPKINS:

25  Q.  Good afternoon, Agent Koval.

1  A.   Hello.

2  Q.   Where do you work?

3  A.   I am employed with the Federal Bureau of

4  Investigation as a special agent.

5  Q.   And where?  In what city?

6  A.   I'm working in the Tucson resident agency,

7  which is out of the Phoenix division.

8  Q.   And are you assigned to a specific unit?

9  A.   Yes, I am.

10  Q.   And what unit's that?

11  A.   I work for the violent crime/major offender

12  group, and specifically I'm assigned to work crimes

13  that occur in Indian Country within the District of

14  Arizona.

15  Q.   And what kind of training did you receive to

16  become a special agent?

17  A.   I attended -- at the time it was approximately

18  16 weeks of training at Quantico, Virginia.

19  Q.   And what's your educational background?

20  A.   I have a bachelor's degree in elementary

21  education and a master's degree in special

22  education.

23  Q.   I'd like to turn your attention to March 2nd,

24  2011.

25       Did you become involved in a home invasion

1     investigation in Tucson?

2     A.    Yes, I did.

3     Q.    And what was your involvement on March 2nd?

4     A.    My job was to process evidence at the

5     warehouse and then to collect and process any

6     additional evidence.

7     Q.    And was that warehouse in Tucson?

8     A.    Yes, it was.

9     Q.    And do you know approximately what time you

10    arrived at the warehouse?

11    A.    It was approximately four p.m.

12    Q.    Okay.   And had the scene been secured at that

13    point?

14    A.    Yes, it had.

15    Q.    And to your knowledge, had any arrests been

16    made?

17    A.    Yes.

18    Q.    And what did you observe when you first

19    arrived at the warehouse?

20    A.    When we first arrived at the warehouse,

21    outside of the facility, there were a couple of

22    SWAT vehicles and SWAT members there.

23       Upon entering the warehouse, there were, I

24    believe, five individuals that were on the floor

25    and handcuffed.

1   Q.   And what did you do when you first arrived at
2   the warehouse?
3   A.   Myself and David Ellis, a support services
4   technician at my office, went inside the warehouse,
5   and we took photographs of the five individuals to
6   include profile photos, side, back, basically
7   overall photographs of those individuals.
8   Q.   And were you tasked with collecting evidence
9   inside that warehouse or outside of the warehouse?
10  A.   Inside the warehouse.
11  Q.   And were -- you said that photos were taken or
12  you were with David Ellis?
13  A.   Yes, uh-huh.
14  Q.   Now, were photos taken as you found evidence
15  or after it was collected?
16  A.   After we took photographs of the individuals
17  inside the warehouse, we -- the individuals were
18  all removed, and we took photographs of the door
19  going into the warehouse and then overall
20  photographs of the entire inside of the warehouse.
21  Q.   Now, did you sees any firearms from inside of
22  the warehouse?
23  A.   Yes, we did.
24  Q.   And do you recall what type of firearm that
25  was?

1    A.   It was a Springfield 1911.

2           MS. HOPKINS:  Your Honor, may I approach

3    the witness?

4           THE COURT:  You may.

5    BY MS. HOPKINS:

6    Q.   Showing you what's been marked for

7    identification as Government's Exhibit No. 84-B,

8    take a look at that.

9         Do you recognize that?

10   A.   Yes, I do.

11   Q.   What is that?

12   A.   That's the weapon that we seized from inside

13   the warehouse.

14          MS. HOPKINS:  Your Honor, the Government

15   moves to admit Exhibit 84-B into evidence.

16          MR. COOPER:  No objection.

17          MR. ARMSTRONG:  No objection.

18          MR. YOUNG:  No objection, Your Honor.

19          THE COURT:  It may be admitted, may be

20   published.

21   BY MS. HOPKINS:

22   Q.   Can you just hold the firearm up to show the

23   jury?  You can take it out of the box.  I don't

24   think it's -- I don't think -- I think you can

25   remove it.

1  A.  Do you have any gloves?

2  Q.  Oh, here.

3       MS. HOPKINS:  Can I walk it by them?

4       THE COURT:  We've got gloves.

5       THE WITNESS:  You've got gloves?  Okay.

6  Thank you.

7  BY MS. HOPKINS:

8  Q.  Now, what did you -- what did you do with the

9  firearm after you collected it?

10  A.  After we -- at the warehouse, when we located

11  the weapon, we took photographs of that weapon, and

12  then we took -- to include up-close photographs,

13  which indicated the make and model and serial

14  number on the weapon.

15       The weapon was then collected for evidence.

16  Q.  Was the gun loaded?

17  A.  When we came across the weapon in the

18  warehouse, the weapon was unloaded, but there was a

19  magazine that was containing rounds of ammunition,

20  and that was next to the weapon.

21  Q.  Had the gun been made safe before you came

22  upon it?

23  A.  Yes, it had.

24  Q.  Now, after you collected evidence from the

25  warehouse, from inside of the warehouse, what did

1    you do next?

2    A.   After we collected the evidence inside the

3    warehouse, there was another team that was

4    processing stuff outside the warehouse.

5        When we were all done, we collected all of the

6    evidence, and we left the warehouse, and we

7    returned to the Tucson FBI office, where the

8    evidence was entered into evidence control.

9    Q.   Now, once you were at the Tucson FBI office,

10   what were you directed to do after that?

11   A.   Shortly after that we were directed to meet

12   Detective Salgado from the Phoenix Police

13   Department at the Pima County Sheriff's Department

14   in Tucson to collect firearms that he had in his

15   possession.

16   Q.   Now, you testified, we were told.  Was there

17   someone else with you?

18   A.   Yes.  Special Agent Carolyn Middleton received

19   a phone call from Special Agent Scott Hunter

20   requesting that we go to the Pima County Sheriff's

21   Department to collect those items.

22   Q.   So what happened when you met with Detective

23   Salgado?

24   A.   When we met with Detective Salgado, he had

25   several weapons, eight weapons that he turned over

1   to our custody.  Additionally, he turned over two
2   ballistic vests and I believe three buccal swab
3   samples.
4       Those items were documented on a receipt for
5   property, which was signed by myself and Detective
6   Salgado.  A copy of the receipt was provided to
7   Detective Salgado.  The original and a second copy
8   I retained with the weapons.
9       I took them back to the Tucson resident agency
10  with Special Agent Middleton, and we entered the
11  items into evidence.
12  Q.  Now, did you take photos of those firearms at
13  any point?
14  A.  Yes, we did.
15  Q.  And when did you do that?
16  A.  I believe it was the next day we took
17  photographs of those items.
18  Q.  Okay.  I'd like to show you what's been marked
19  for identification as Government's Exhibits 76-A
20  through 85-A.
21      Do you recognize those photographs?
22  A.  Yes.  Those are photographs that I took at the
23  Tucson FBI office to document the weapons we
24  collected from Detective Salgado.
25          MS. HOPKINS:  Your Honor, at this time the

Government requests to move Exhibits 76-A through
85-A into evidence.

      MR. COOPER:  I object as redundant.

      MR. ARMSTRONG:  Join in that objection.

      MR. YOUNG:  I'll join in Mr. Cooper's
objection, Your Honor.

      THE COURT:  Objection is overruled.
They'll be admitted, can be published.

      MS. HOPKINS:  If you could just scroll
through the photos.

BY MS. HOPKINS:

Q.   Now, you also said you obtained two
bulletproof vests from Detective Salgado also?

A.   Yes, I did.

Q.   And did you bring those back to the FBI office
with the firearms as well?

A.   Yes.

Q.   And were they both submitted to evidence
control?

A.   Yes, they were.

      MS. HOPKINS:  May I have one moment, Your
Honor?

      THE COURT:  You may.

      MS. HOPKINS:  No further questions.

      THE COURT:  Mr. Cooper?

1          MR. COOPER:  No questions, Your Honor.

2          MR. ARMSTRONG:  Nothing, thank you.

3          MR. YOUNG:  No questions, Your Honor.

4          THE COURT:  Do the jurors have any

5  questions for this witness?  If so, please place

6  them in writing.

7          You may step down.

8          THE WITNESS:  Thank you.

9          SCOTT HUNTER, WITNESS, SWORN

10          THE COURT:  Sir, the Rule has been invoked

11  in this case.  That means, except during the time

12  that you're testifying, you must remain outside the

13  courtroom and you're only allowed to discuss your

14  testimony with the attorneys involved in the case.

15          I think I forgot to tell the last witness

16  that.

17          MR. LACEY:  You did but we'll tell him, or

18  tell her.

19          THE COURT:  Her.

20          MR. LACEY:  Her.  Sorry.

21          Judge, we have a lot of phones that are in

22  a cart.  Can we take a quick break?  And I have to

23  take a break for another reason too.  A quick

24  break.  No details.  Thanks.

25          THE COURT:  Ten minutes.  We'll take our

1   afternoon recess at this point.

2           (The jury exits the courtroom.)

3           (Off the record.)

4           (The jury enters the courtroom.)

5           THE COURT:  Show the jurors returned back

6   to the courtroom, the presence of all counsel and

7   defendants.

8           Mr. Lacey?

9           MR. LACEY:  Yes, Your Honor.  Thank you.

10          THE CLERK:  Please state your name for the

11  record and spell your last name.

12          THE WITNESS:  Scott Alan Hunter,

13  H-u-n-t-e-r.

14          THE COURT:  You may proceed.

15          MR. LACEY:  Yes, Your Honor.

16                  DIRECT EXAMINATION

17  BY MR. LACEY:

18  Q.   Sir, you're employed by whom?

19  A.   The Federal Bureau of Investigation.

20  Q.   And in what capacity?

21  A.   I am the team leader for evidence response

22  team, and I also work on the violent crime/major

23  offense squad.

24  Q.   Evidence response team, what is that?

25  A.   It's a team of individuals who are trained to

1  go to a scene and recover, identify, search for,

2  and recover evidence in a systematic matter.

3  Q.   I want to direct your attention back to March

4  2nd of last year, 2011.

5      Were you called out that day to assist in some

6  scene?

7  A.   Yes, I was.

8  Q.   What location was that initially?

9  A.   That was the 3226 46th Street warehouse.

10 Q.   And about what time was that?

11 A.   It was about four p.m. when we finally rolled

12 out.

13 Q.   Prior to your arriving at the warehouse

14 location, where had you been staged or where were

15 you located before that?

16 A.   We were standing by at our office, and we were

17 originally called and said -- given a green light

18 to come on in, but we were held back, because there

19 was some other things that were going on.

20 Q.   Like an arrest being made?

21 A.   Arrests being made, yes.

22 Q.   Now, who all was on your team when you went

23 out that day?

24 A.   It was myself -- at this location, it was

25 myself, Special Agent Middleton, Special Agent

Koval, SST David Ellis, Special Agent Jeremy

Nielson, and Special Agent William Urban.

Q.   So all of you were part of the evidence

response team then?

A.   Yes.

Q.   Once you got to the warehouse scene, were any

of the people that were arrested still there, or

had they already left?

A.   Yes, they were still there inside the

warehouse.

Q.   And were they in handcuffs, or what condition

were they in?

A.   They were detained by SWAT.  I didn't pay a

lot of attention to their presence.  The important

thing is we needed to get them out of the location

before we can actually begin searching the inside

of the warehouse.

Q.   And once you started searching, were you

directed to certain locations, or did you just walk

around willy-nilly?

     How did that work?

A.   When I first arrived, the special agent in

charge at the scene Lance Leising, who is a member

of the SWAT team, it was his responsibility to give

me a preliminary walk-through of the scene and

1  point out areas of interest.

2  Q.  When you walk through the warehouse of this

3  preliminary scene, where did you walk, inside,

4  outside, or where was that?

5  A.  Both inside and outside the warehouse.

6  Q.  And what about the rest of the evidence -- the

7  support team that was there?

8  A.  They would wait until I got out, and then I

9  would brief them on what I was shown and give

10  essentially assigned team responsibilities before

11  we actually initiate the search.

12  Q.  And what were your particular responsibilities

13  that day, besides giving guidance to the people on

14  your team?

15  A.  Well, one of the things that I did was helped

16  with the schedule and just essentially monitored

17  what was going on, making sure it was done.  I

18  would assist with the search as necessary.

19  Q.  After you did the walkaround and went inside

20  the warehouse, how long did that take, roughly,

21  just doing the perimeter and the interior?

22  A.  It didn't take very long.  The building wasn't

23  very big.  Most of the building was taken up by a

24  large bay on the inside, and there were some

25  interior rooms on the north side and the east side

1  of the warehouse, if I remember correctly.

2  Q.  Once you went through that process, what did

3  you do?

4  A.  I went outside and briefed the team.  I asked

5  that Special Agent Koval, who was there, and Dave

6  Ellis to go ahead and help process the arrestees by

7  taking photographs.

8  Q.  And Agent Koval was just in here moments ago?

9  A.  Uh-huh, yes.

10  Q.  When you started walking around the warehouse

11  on the interior, was there anything inside you

12  found?

13  A.  Yes.  Special Agent Leising indicated there

14  was a weapon found on the north side of the

15  interior of the bay.

16  Q.  The weapon that you've just described, what

17  was that weapon, the one you found inside

18  warehouse?

19  A.  My understanding, it was a .45 caliber.

20  Q.  And do you have any further description or

21  just a .45 caliber?

22  A.  45 caliber Springfield 1911.

23  Q.  And we've had testimony about that, so I won't

24  elaborate further at this time.

25      Were there any other weapons found that day at

1  the warehouse or outside the warehouse?

2  A.   Yes.

3  Q.   What was that and where?

4  A.   There was a weapon, a nine millimeter found

5  inside the center console of a gray Murano in the

6  north parking lot.

7        MR. LACEY:  May I approach, Your Honor?

8        THE COURT:  You may.

9  BY MR. LACEY:

10 Q.   I show you 85-B, as in boy, for

11 identification.  I would ask you to examine that

12 and tell us if you can identify that.

13 A.   Yes.  This appears to be the nine millimeter

14 that was found.

15 Q.   Inside the Murano?

16 A.   In the Murano, yes.

17       MR. LACEY:  I'd offer 85-B at this time.

18       MR. ARMSTRONG:  No objection.

19       MR. YOUNG:  No objection.

20       MR. COOPER:  No objection.

21       THE COURT:  It can be admitted, can be

22 published.

23 BY MR. LACEY:

24 Q.   Were there any assault rifles found at the

25 scene, the warehouse scene, where these persons

1  were under arrest?

2  A.   No.

3  Q.   Were there any bulletproof vests at that

4  location, inside the warehouse or in the vehicle or

5  vehicles outside the warehouse?

6  A.   Not recovered by my team, no.

7  Q.   Did you come across any cell phones at that

8  location?

9  A.   Yes.

10  Q.   Where was that or where were that phone or

11  those phones located?

12  A.   There was a single cell phone located just

13  west of the Nissan Murano out in the parking lot.

14          MR. LACEY:   May I approach, Your Honor.

15          THE COURT:   You may.

16  BY MR. LACEY:

17  Q.   I show you 87-A for identification.  I would

18  ask you if you would look at that and see if you

19  can identify that for us.

20  A.   A Boost Mobile cell phone found in front of

21  the building.

22  Q.   And where was that found?

23  A.   Out in the front of the warehouse.

24  Q.   When you say in front of the warehouse, inside

25  or outside?

1  A.   Outside.

2  Q.   And did you come to find out how that phone

3  got out there or who it was associated with?

4  A.   I don't recall.  I don't recall the exact

5  details.

6  Q.   And once you received this phone, what did you

7  do with it?  What's the process?

8  A.   Generally, what we would do is, once we find a

9  piece of evidence that we're interested in, we

10 would photograph it at various instances -- excuse

11 me -- distances and then apply an evidence marker

12 on it and photograph it with the evidence marker at

13 close range and then recover the item and place it

14 in a bag such as this, and we'd mark the

15 information of where we recovered it, the case file

16 number, description of the item, and identify who

17 found it and who witnessed it being recovered.

18 Q.   And that's Exhibit 87-A; is that correct?

19      Is there a sticker on there someplace, or --

20 I'm sorry --

21 A.   Yes.  It's just on the cover box.

22      MR. LACEY:  Okay.  We'd offer 87-A at this

23 time.

24      MR. COOPER:  No objection, Your Honor.

25      MR. ARMSTRONG:  No objection.

1    MR. YOUNG:  No objection.

2    THE COURT:  It'll be admitted.

3  BY MR. LACEY:

4  Q.  And sir, after it's taken from the warehouse

5  site outside the warehouse, it then winds up

6  ultimately back in the evidence room at the FBI?

7  A.  Yes.

8  Q.  And later, if it went out for testing, that

9  would be covered by somebody else?

10  A.  Yes.

11  Q.  Were there any other cell phones that you

12  received that day at the warehouse location?

13  A.  Not at the warehouse, no.

14  Q.  I want to show you 92-C, as in Charlie.

15    MR. LACEY:  May I approach, Your Honor?

16    THE COURT:  You may.

17  BY MR. LACEY:

18  Q.  First I want to ask you, is there some sort of

19  case identification number relating to this case

20  that you all use so there's a commonalty from one

21  exhibit to the next?

22  A.  Yes.

23  Q.  And what is that number?

24  A.  This is 1B115.

25  Q.  And 1B115, does that apply to all the phones

1  or all the weapons that were found that day?

2  A.   No.  Only to this particular item.

3  Q.   And is there -- is there a common link?  Is

4  there some sort of a code used for this particular

5  case with all --

6  A.   Yes, there is, yes.

7  Q.   And what is that code in this case?

8  A.   281D-PX-86143.

9  Q.   Is it fair to say, then, that all the exhibits

10  that pertain to this case would have that same

11  number with the evidence as it ultimately winds up

12  back in the FBI evidence room?

13  A.   Yes.

14  Q.   And does that particular exhibit have that

15  identifier on there?

16  A.   Yes, it does.

17  Q.   And can you tell us what kind of phone that

18  is?

19  A.   It does not have a description on the bag.

20  Q.   Can you open it for us, or do you need some

21  scissors?

22  A.   Yes, scissors and gloves, please.

23          MR. LACEY:  Mo, do you have some gloves?

24          THE WITNESS:  Thank you.

25  BY MR. LACEY:

1  Q.  Did you open that, sir?

2  A.  Yes, I did.

3  Q.  And can you identify the phone for us, what

4  type that is?

5  A.  It's a Nextel i670.

6  Q.  And as to that particular phone, now, you

7  didn't find this personally, but it wound up back

8  in the evidence room; correct?

9  A.  Correct.

10       MR. LACEY:  And just for the record, I

11  talked to counsel, and this came in from Gregorio

12  Guzman-Rocha, one of the people arrested back on

13  this day.

14       THE COURT:  All right.  So stipulated?

15       MR. ARMSTRONG:  Yes.

16       MR. COOPER:  No problem.

17       MR. YOUNG:  Yes, Your Honor.

18       MR. LACEY:  And we'd offer 92-A at this

19  time.

20       THE COURT:  Any objection to 92-A?

21       MR. COOPER:  No, Your Honor.

22       MR. ARMSTRONG:  No.

23       MR. YOUNG:  No, Your Honor.

24       MR. LACEY:  May I approach the witness?

25       THE COURT:  It can be admitted.  You may.

1  BY MR. LACEY:

2  Q.   Next, sir, I'm going to show you Government's

3  Exhibit 93, and that would be 93-A.

4          MR. LACEY:  May I approach?

5          THE COURT:  You may.

6          MR. LACEY:  Thank you.

7  BY MR. LACEY:

8  Q.   Sir, would you look at that and see if you can

9  identify that for us, 93-A, as in apple.

10      Can you, sir?

11  A.   I'm sorry.  Say again?

12  Q.   Can you identify that for us?

13  A.   Yes.  This is a -- where is the description?

14  It's a cell phone, Verizon HTC.

15  Q.   And as to that particular phone -- after the

16  warehouse scene, did you go to some other location

17  or get involved retrieving other evidence this day?

18  A.   Yes.

19  Q.   Where was that?

20  A.   We secured vehicles from Casa Grande, brought

21  them into Tucson, and accomplished an inventory

22  search at our alternate site.

23  Q.   And that's here in Tucson?

24  A.   Yes, it is.

25  Q.   And what are those vehicles?  What were the

1   descriptions of the vehicles that evidence was

2   retrieved from back then on March 2?

3   A.   There was a black Escalade, a red Expedition,

4   and a gray Nissan Murano that was found at the

5   warehouse.

6   Q.   As to Exhibit 93-C -- 93-A, I'm sorry -- that

7   phone was found by yourself; is that correct?

8   A.   It was found by Shawn Murphy.

9   Q.   And were you involved in that process?

10  A.   Yes.

11  Q.   And that was back at one of your sites here in

12  Tucson?

13  A.   Yes.

14  Q.   And that particular phone came from which

15  vehicle?

16  A.   This one came from the red Expedition, center

17  console.

18          MR. LACEY:  Offer 93-A at this time.

19          MR. YOUNG:  No objection, Your Honor.

20          MR. COOPER:  No objection, Judge.

21          MR. ARMSTRONG:  No objection.

22          THE COURT:  It can be admitted.

23          MR. LACEY:  Next No. 94-A.  May I approach

24  again?

25          THE COURT:  You may.

1      MR. LACEY:  Thank you.

2  BY MR. LACEY:

3  Q.   Sir, I'd ask you to take a look at 94-A and

4  tell us if you can identify that.

5  A.   It is an LG flip phone found in the center

6  console, red Expedition.

7  Q.   Of the Expedition?

8  A.   Yes.

9  Q.   That was the red Expedition?

10  A.   Yes.

11      MR. LACEY:  We'd offer 94-A at this time.

12      MR. COOPER:  No objection.

13      MR. ARMSTRONG:  No objection.

14      MR. YOUNG:  No objection, Your Honor.

15      THE COURT:  It can be admitted.

16      MR. LACEY:  Next 95-A.  May I approach,

17  Judge?

18      THE COURT:  You may.

19  BY MR. LACEY:

20  Q.   Would you look at that 95-A and see if you can

21  identify that for us.

22  A.   This is a Blackberry touch screen, Verizon.

23  Q.   And that was found at what location?

24  A.   The red Expedition, in the center console.

25      MR. LACEY:  We'd offer 95-A at this time.

1    MR. COOPER:  No objection.

2    MR. YOUNG:  No objection.

3    MR. ARMSTRONG:  No objection, Your Honor.

4    THE COURT:  It'll be admitted.

5    MR. LACEY:  Next 96-A and B.  May I

6  approach again?

7    THE COURT:  You may.

8  BY MR. LACEY:

9  Q.   Sir, directing your attention to 96-A first,

10  can you identify that for us?

11  A.   This is listed as LG Brick found in the glove

12  compartment of the red Expedition.

13  Q.   Now, what is that exactly?  96-A, what is

14  that?

15  A.   96-A?

16  Q.   Yes, sir.  What is that?

17  A.   LG Brick phone, cell phone, found in the glove

18  compartment of the red Expedition.

19    MR. LACEY:  We'd offer 96-A at this time.

20    MR. COOPER:  No objection.

21    MR. YOUNG:  No objection.

22    It's not 96, Your Honor?

23    MR. LACEY:  96, yes.  96-A.

24    THE WITNESS:  96-A.

25    MR. YOUNG:  No objection.

1          THE COURT:  It can be admitted.

2    BY MR. LACEY:

3    Q.   96-B, what is that, sir?

4    A.   This is a SIM card, serial number TF64SIMT5,

5    last four numbers 5139.

6    Q.   And that was found where?

7    A.   Found in the front passenger floorboard of the

8    red Expedition.

9          MR. LACEY:  We'd offer 96-B at this time.

10         MR. COOPER:  No objection.

11         MR. ARMSTRONG:  No objection.

12         MR. YOUNG:  No objection.

13         Could I have a break for just a moment,

14   Your Honor?  Not -- I'm just confused on --

15         MR. LACEY:  What do you need?

16         MR. YOUNG:  Just one second.

17         MR. LACEY:  Sure.

18         (A discussion was held between counsel off

19         the record.)

20   BY MR. LACEY:

21   Q.   Sir, look at 96-A again.  Can you describe

22   that phone for us again?

23   A.   LG color Brick phone found in the glove

24   compartment of the red Expedition.

25   Q.   And the reason I ask you, the exhibit list we

1  have said it's a Motorolla i296, and obviously

2  that's not what you're giving us there.

3  A.    I'm going off of the packaging.  I would

4  actually have to open it to see further.

5  Q.    If you need to open it, open it.  I just need

6  to make sure whatever we have you say is accurate.

7  A.    It shows here LG.

8  Q.    And can you give us further identification

9  from that LG?  Is there any identifiers besides

10  just the LG from the phone, a model or anything

11  like that?

12  A.    I don't see a model number on it.

13  Q.    Okay.  But it's an LG phone, then, and not a

14  Motorola?

15  A.    No.

16  Q.    Correct?

17  A.    Correct.

18  Q.    And the SIM card, 96-B, is that a SIM card for

19  what phone?  Can you tell?

20  A.    No, I can't tell.

21  Q.    Was there a SIM or is there a SIM card in the

22  96-A phone you have there, the LG phone?

23        If you have to open it up and look, please do.

24  A.    There appears not to be a SIM card in this

25  phone.

1  Q.  And that phone was found again where, the LG

2  phone, 96-A?

3  A.  It was found in -- let me see.  Make sure I

4  got the right one here.

5      It was found in the glove compartment of the

6  red Expedition.

7  Q.  And the SIM card was found where?  And again,

8  in the Expedition.

9  A.  On the front passenger floorboard of the red

10  Expedition.

11          MR. LACEY:  Okay.  Thanks, counsel.

12          And so now we have the record straight.

13  Just the exhibit list was a little bit off, but I

14  appreciate that.  It's LG and not a Motorolla for

15  96-A.

16          THE COURT:  All right.

17          MR. LACEY:  Next 99-A.  Approach the

18  witness?

19          THE COURT:  You may.

20  BY MR. LACEY:

21  Q.  Can you identify that for us, 99-A?

22  A.  This is a cell phone, Nokia red.

23          MR. YOUNG:  Can we talk, Jim?

24          THE COURT:  You messed up again.

25          MR. LACEY:  I wouldn't be surprised.  It's

1    a lot of phones, but sorry.  We should have had it

2    better than this.

3              (A discussion was held between counsel off

4              the record.)

5    BY MR. LACEY:

6    Q.   99-A, that's a Nokia, you told us; is that

7    correct?

8    A.   Yes, a Nokia phone.

9    Q.   Pardon?

10   A.   A Nokia phone.

11   Q.   Yes.  And --

12   A.   On --

13   Q.   That was found where?

14   A.   Back seat of the black Escalade.

15             MR. LACEY:  We'd offer 99-A at this time.

16             MR. COOPER:  No objection.

17             MR. YOUNG:  No objection.

18             MR. ARMSTRONG:  No objection, Your Honor.

19             THE COURT:  It can be admitted.

20             MR. LACEY:  May I approach again, Your

21   Honor, 100-A.

22             THE COURT:  You may.

23             MR. LACEY:  Thank you.

24   BY MR. LACEY:

25   Q.   Sir, I direct your attention to 100-A.  Can

1  you identify that for us.

2  A.   It's listed as cell phone, Motorolla i465.

3  Q.   And that was found in what vehicle?

4  A.   In the center console of the black Escalade.

5           MR. LACEY:  We'd offer 100-A at this time.

6           MR. COOPER:  No objection.

7           MR. ARMSTRONG:  No objection.

8           MR. YOUNG:  No objection, Your Honor.

9           THE COURT:  It can be admitted.

10          MR. LACEY:  And may I approach one more

11 time, Your Honor?

12          THE COURT:  You may.

13 BY MR. LACEY:

14 Q.   Sir, it's 112-A for identification.

15      Would you open that up, and first, does it

16 have the same common number, the case number

17 assigned to it?

18 A.   Yes.

19 Q.   And then the case number, again, what is that

20 again?

21 A.   281D-PX-86143.  Kind of hard to see through

22 the tape.

23 Q.   Pardon?  The tape's giving a little bit of an

24 obstruction there?

25 A.   Yeah.

1  Q.   And this phone was also put into property that

2  day, and that one was seized from Guzman-Rocha,

3  Gregorio Guzman-Rocha; is that correct?

4      It wound up in evidence at the FBI's office?

5  A.   Yes, according to the 1-B number.

6  Q.   Pardon?

7  A.   According to the 1-B number.

8           MR. LACEY:  And that's 112-A, counsel.

9           We'd offer 112 at this time.

10          MR. COOPER:  No objection.

11          MR. ARMSTRONG:  No objection.

12          MR. YOUNG:  No objection.

13          THE COURT:  It can be admitted.

14 BY MR. LACEY:

15 Q.   Sir, after finding the phones you did and the

16 other items, including the weapon, weapons you told

17 us about, did you have occasion to go back to the

18 warehouse later that day, after the initial search

19 and taking of the certain items of evidence from

20 the scene?

21 A.   Yes.

22 Q.   What time was this?

23 A.   It was about midnight.

24 Q.   And when you went back there, who did you go

25 back with?

1  A.   I met Cliff Prater and Special Agent Larry
2  Sable at the warehouse.
3  Q.   I'm going to show you what's been marked
4  Exhibit 47.
5      Can you look at that and see if you can
6  identify that for us.
7  A.   Yes.  It appears to be an image on a piece of
8  paper found at the warehouse.
9  Q.   When you went back at about midnight or so,
10 did you see this particular item at that time?
11 A.   Yes.
12 Q.   Where was it found, within the warehouse or
13 outside?
14 A.   It was found inside the warehouse, north side
15 of the bay.
16 Q.   How far from the center of the warehouse?
17 A.   Oh, from the center, I couldn't tell you, but
18 it was closer to the north side of the bay than the
19 center.
20         MR. LACEY:  Okay.  We'd offer 47 at this
21 time.
22         MR. COOPER:  No objection.
23         MR. ARMSTRONG:  No objection.
24         MR. YOUNG:  No objection, Your Honor.
25         MR. LACEY:  And that it be published.

1    THE COURT:  It can be admitted, can be
2 published.
3 BY MR. LACEY:
4 Q.  This is a piece of paper with some writing on
5 it or a diagram; is that correct?
6 A.  Yes.
7 Q.  Now, you don't know who wrote that or who drew
8 that out, do you?
9 A.  No, I don't.
10    MR. LACEY:  Okay.  Nothing further.  Thank
11 you, sir.
12    MR. COOPER:  I have no questions, Your
13 Honor.
14    MR. ARMSTRONG:  Nothing.
15    MR. YOUNG:  No questions, Your Honor.
16    THE COURT:  If the jurors have any
17 questions, please place them in writing.
18    There's one, at least.
19    (The following proceedings occurred at the
20    bench.)
21    THE COURT:  "What is a SIM card?"
22    MR. LACEY:  Okay.
23    (End of bench conference.)
24    THE COURT:  Sir, I have a question from
25 one of the jurors.

1        The question is, what is a SIM card?

2        THE WITNESS:  I'm not a card examiner, but

3   essentially a SIM card is a small tiny card that

4   has, if you have a modern cell phone, most modern

5   cell phones have SIM cards in them, and it keeps

6   all your personal information, your contacts, you

7   know, anything that you stored in your phone, so a

8   lot of stuff goes on the SIM card.

9        THE COURT:  Any questions based upon the

10  juror's questions?

11       MR. LACEY:  No, Your Honor.

12       MR. ARMSTRONG:  No, thank you.

13       MR. COOPER:  No, Your Honor.

14       MR. YOUNG:  No, Your Honor.

15       THE COURT:  Thank you.  You may step down.

16       THE WITNESS:  Thank you.

17       THE COURT:  Counsel, I forgot to tell you

18  that one of the reasons that jurors have that space

19  between them, one of the monitors was acting up,

20  and they wanted to move down to the other monitor.

21  They're not fighting or anything.

22        CHRISTOPHER PAHL, WITNESS, SWORN

23       THE CLERK:  Thank you.  Please take a

24  seat.

25       THE COURT:  Sir, the Rule has been invoked

1  in this case.  That means, except during the time

2  that you're testifying, you must remain outside the

3  courtroom and you are only allowed to discuss your

4  testimony with the attorneys involved in the case.

5          THE CLERK:  Please state your name for the

6  record and spell your last name.

7          THE WITNESS:  Christopher L. Pahl,

8  P-a-h-l.

9          THE CLERK:  Thank you.

10                  DIRECT EXAMINATION

11  BY MR. LACEY:

12  Q.   Sir, you're employed by whom?

13  A.   The Federal Bureau of Investigation.

14  Q.   In what capacity?

15  A.   I'm a special agent.

16  Q.   And what -- how long have you been with the

17  bureau?

18  A.   Since 1996, 16 years.

19  Q.   And what is your current function or what do

20  you do with the bureau?

21  A.   Currently, I am a full-time computer forensic

22  examiner for the bureau.

23  Q.   And you've been in that position for how long?

24  A.   I've been certified to do computer forensic

25  exams for 10 years now.

1  Q.  Tell us about your training in computer

2  forensics.  When did that start?

3      First, what's your educational background?

4  A.  Educational background is an undergrad degree

5  in economics from Grinell College in Iowa, and then

6  I have a law degree from the University of

7  Wisconsin at Madison.

8  Q.  Is that one of the requirements or at least

9  one way to get into the FBI, with a law degree

10  then?

11  A.  Yes.

12  Q.  When did you start getting into the area of

13  computer forensics and computer sciences?

14  A.  As I say, I got into the bureau in 1996.  I

15  started doing computer forensics -- I think it was

16  about June of 2001.

17  Q.  And what kind of training did you go through

18  at that time, back in '01?

19  A.  I went through a period of training for

20  approximately 15 months.  That involved very close

21  oversight by a then-certified computer forensic

22  examiner, as well as attending several classes and

23  courses back in Quantico to develop skills

24  necessary to do what I do.

25  Q.  And after that -- it was a 15-month course,

1  roughly, you said?

2  A.   15 months on and off.  I don't know, four or

3  five different courses, anywhere from one, two, to

4  three weeks.

5  Q.   And after those courses, did you have any

6  additional training over the years from -- back '01

7  on?

8  A.   Yes.  Every year there's proficiency tests to

9  ensure that we are up-to-date with computer

10  forensics, computer technology, hardware, software,

11  skill set.

12      There's also mandatory classes that we have to

13  take, as well as nonbureau-sponsored classes that

14  we have to take every year, and I've had -- I don't

15  know the exact number, but I would say in excess of

16  a thousand hours of training in the time that I've

17  done it.

18  Q.   I want to direct your attention back to 2011,

19  last year.

20      What was your function with the bureau back

21  then, the same as it is now?

22  A.   Yes.

23  Q.   What kind of cases would you get involved

24  with?  What would your work entail?

25  A.   I get involved in any cases that our office

1  here in Tucson or even other offices might have
2  that involve digital evidence.  That could be
3  something on a computer, a CD, a thumb drive, even
4  a digital tape.
5      If we go out and we see something that's got
6  digital evidence on it or potential digital
7  evidence, it's my job to look at it and see what is
8  there or what isn't there.
9  Q.  When you make that kind of an examination, is
10 it done in the field?  When there's computers, they
11 you do a search of somebody's house that's doing
12 things they shouldn't be doing on the computer, do
13 you do it at their house, or do you bring it back
14 to your place?
15 A.  Most of the time, I would say more than 99
16 percent of the time, we seize it at the house, and
17 then it -- the examination is done back at my lab.
18 Q.  Have you had any involvement with phones in
19 the past, as far as examination of phones and
20 what's contained within a phone?
21 A.  Yes, I have.
22 Q.  Tell us about when you first started doing
23 that kind of work, working with phones.
24 A.  I believe that was approximately 2005.  Cell
25 phones and personal digital assistants, PDAs,

1   require special certification within the field of

2   computer forensics for the bureau, and I obtained

3   that certification in 2005.

4        Once I obtained that certification, then on a

5   search with the acquisition and seizure of a cell

6   phone or personal digital assistant device, which

7   we don't really see that much anymore, I'm able to

8   do a forensic exam on that.  I'm authorized to do

9   it.

10  Q.   What does a forensic exam on a phone entail?

11  You get a phone that we've looked at here today.

12  What do you do once you get it?

13  A.   Well, basically I obtain identifying

14  information from the phone, both physically by

15  looking at it, serial numbers, things like that.  I

16  photograph it, and very informally I obtain the

17  digital information that the phone contains and

18  provide it in a report to a case agent.

19  Q.   When you go through this process, what kind of

20  equipment do you have to aid you when you're trying

21  to suck data out of a phone, if you'll pardon the

22  expression.

23  A.   We have both hardware and software devices

24  that are specifically tailored to obtain data off

25  of phones.  It really depends on the phone, the

1  cell phone provider, which hardware and/or software

2  I'm using to obtain that information.

3      There's thousands of different kinds of phones

4  out there, well over a hundred different

5  proprietary connections even to a phone, and many

6  different operating systems as well as versions of

7  operating systems that yield some information with

8  some tools and other information with other tools.

9  Q.  And you talk about some of the equipment you

10 have.  Well, how does this equipment -- do you plug

11 a phone into this equipment, or how does that work?

12 A.  Basically most of the equipment is something

13 that connects directly to the phone and then pulls

14 the information off the phone, which is then

15 transferred to a forensic computer that I have that

16 is a standalone computer.  It does not go out to

17 the Internet.  And information from the case will

18 be stored there.  The results will be stored there.

19     As part of the process, I will then look at

20 that information that's derived from the phone, go

21 back to the phone and review the information to

22 ensure that it's a complete and accurate copy, to

23 the best of my ability, given time constraints, and

24 then provide that information and those case

25 results to the case agent.

1  Q.   Okay.  And did you do that with certain phones

2  that were involved in this particular

3  investigation?

4  A.   I did.

5  Q.   I want to start with Exhibit 87.

6          MR. LACEY:  May I approach, Your Honor?  I

7  have exhibits 87 and 92, but the other exhibits are

8  still up there.

9          THE COURT:  You may.

10  BY MR. LACEY:

11  Q.   Sir, Exhibit No. 87, can you identify that for

12  us, 87-A?

13  A.   It appears to be a phone that was examined in

14  the case, that I examined in the case.

15  Q.   And is that a Motorolla i296, or do you have

16  enough identifying data in your report or on the

17  back itself to indicate what type of phone it is?

18  A.   Without seeing it, yes, it's a Motorolla

19  i296.  I have that information.

20  Q.   And did you prepare any reports or have any

21  worksheets that correspond with the investigation

22  you did as to these phones?

23  A.   Yes.  As I say, when I start the exam on a

24  phone, one of the first things I do is I fill out a

25  computer forensic worksheet that describes the

1  phone with sufficient detail to differentiate it

2  the from the other different items of evidence I

3  might be looking at.

4  Q.   As to Exhibit 87-A, you say you did do an

5  examination of that particular phone; is that

6  correct?

7  A.   Yes, I did.

8  Q.   And I won't go through this with every phone,

9  but as to this particular phone, what tests or what

10  examination did you do?

11  A.   With this particular phone, the first thing I

12  did is, and what I typically do with all of the

13  phones, is I will put them into an RF bag or a

14  radio frequency bag.

15       Basically it allows me -- it's a mesh bag

16  that's almost transparent.  It allows me to turn

17  the phone on, and the phone will not be able to be

18  connect to the network.

19       The significant part of that is that it will

20  not update on a network, potentially pushing out

21  old text messages to make room for new text

22  messages, for example.

23       So as I say, I'll put it in this RF bag and

24  put the phone into airplane mode, which is

25  essentially turning off the ability of the phone to

1  reach out to the network, to transmit or receive

2  from the network.

3      I can then bring it out of the bag and

4  navigate the menu, obtain identifying information

5  about the phone, such as the phone number, perhaps

6  an electronic serial number and such.

7      I did that in this instance, and then in this

8  particular phone, I used a hardware tool called a

9  Cellebrite Universal Forensic Extraction Device.

10 Q.  I won't try and repeat that, but what does

11 that do?

12 A.  Basically it's a small device about the size

13 of something that you might see UPS carrying around

14 when they deliver packages, here, sign on this

15 device.  It's a small hand-held device that

16 connects to the phone and my forensic computer.

17     The Cellebrite will extract data from the

18 phone and then transfer it in a readable format to

19 my computer in a report, at which point I save it

20 there.

21     I then go and review that report, review the

22 phone, see if there's any discrepancies in the

23 amount of information that I have on my computer

24 and the phone and then decide from there whether or

25 not another tool needs to be used in order to bring

1  down additional information.

2  Q.   As to this particular exhibit, 87-A, besides

3  using the Cellebrite apparatus you've told us

4  about, were there any other examinations you

5  conducted with other hardware or software?

6  A.   Yes.  With this particular -- with this

7  particular phone, I also used what's called a

8  Fernico ZRT system.  I believe ZRT stands for Zippy

9  Reporting Tool.

10      Essentially what that is, is a camera

11  connected to another forensic computer, a laptop in

12  this instance, that interfaces with software

13  designed to capture and store images taken of the

14  phone screen.

15      So after I created the Cellebrite report and I

16  compared the phone with the data in the Cellebrite

17  report, I realized, for example, with this phone

18  that the Cellebrite did not pull everything off,

19  and the only other tool that I had, then, in order

20  to get that other additional information was the

21  Fernico ZRT system.

22      So that was, again, a matter of turning the

23  phone on, turning the camera to the screen of the

24  phone, and manually going through the menus on the

25  phone to capture that information and photograph on

1  that laptop computer.

2       That was then compiled in a report.

3  Q.   And what sort of data do you capture when

4  you're going through this process?  You say -- as

5  you flip through it, what are you -- the camera or

6  whatever other equipment you're using, what are you

7  taking out of this phone?

8  A.   Primarily contact lists, sometimes messages,

9  be they email messages, SMS text messages.  I can

10  also get pictures.  There may be videos that are

11  extracted.  If it was evidentiary, depending on the

12  phone and the tool, I might be able to get ring

13  tones or some sort of audio files off the phone.

14       I can sometimes also pull down address books,

15  to-do lists, memos, missed calls.  I can get call

16  logs, missed calls, outgoing calls, incoming calls,

17  often with a date and time associated with those

18  calls, as well as a number associated with those

19  calls, a phone number, who did this phone call or

20  who called this phone, where did the number come

21  from.

22  Q.   With all this data that's being taken out of

23  this particular phone, 87-A, for example, where

24  does it go then, from -- after you take it out,

25  does it go into your standalone computer or where

1  does it go?

2  A.   Yes.  It goes into my standalone computer.  I

3  then create or recreate, burn it, essentially, to a

4  CD or DVD, depending on the size of the data set,

5  and then that goes into evidence.

6  Q.   As to this particular phone and the others

7  we'll cover in a minute, did you prepare any disks

8  that were taken as a result of this examination

9  that reflect the data that you obtained from the

10  phone?

11  A.   I did.

12        MR. LACEY:  May I approach?

13        THE COURT:  You may.

14  BY MR. LACEY:

15  Q.   I show you exhibits -- Exhibit 87-B and also C

16  on there, but 87-B, can you identify that for us?

17  A.   It is a piece of optical media that contains

18  my forensic exam report, the results, essentially,

19  from my looking at the phone.

20  Q.   And that applies to Exhibit No. 87-A, the

21  Motorolla i296 phone?

22  A.   Yes.

23        MR. LACEY:  We'd offer 87-B at this time.

24        MR. COOPER:  No objection.

25        MR. ARMSTRONG:  That's the disk?

1    MR. LACEY:  That's the disk.

2    MR. YOUNG:  No objection.

3    THE COURT:  It can be admitted.

4  BY MR. LACEY:

5  Q.   And also that disk, 87-C, there's two --

6  there's one disk with two -- is there not, with two

7  reference numbers, 87-B and C?

8  A.   Yes.

9  Q.   And C is what?

10  A.   I believe C is the toll records associated

11  with the phone number that I did.

12  Q.   But you didn't do the toll records part?

13  A.   Correct.

14  Q.   Someone else did that?

15  A.   Correct.

16  Q.   But as for the 87-B, that was your product

17  that you obtained?

18  A.   Correct.  I reviewed this, and it appears to

19  be my product in its entirety and only my product.

20  Q.   I would next direct your attention to 92-A.

21    There should be a phone there to your -- there

22  should be a phone.  It's probably on the bottom of

23  the stack instead of the top, or maybe it is the

24  top one, 92.

25    Can you identify that for us?

1    A.   It's a Motorolla i670 cell phone.

2    Q.   And did you have occasion to also examine that

3    particular phone?

4    A.   I did.

5    Q.   Did you go through a similar process with that

6    examination as you did with 80 -- 87-A's phone?

7    A.   I did.

8    Q.   And it resulted in the same sort of a computer

9    printout ultimately or disk that was generated at

10   the other end?

11   A.   Yes, that's correct.

12           MR. LACEY:  May I approach, Your Honor?

13           THE COURT:  You may.

14   BY MR. LACEY:

15   Q.   I'll show you 92-B, as in boy.  We'd ask you

16   to examine that and see if you can identify that

17   for us.

18   A.   Yes.  It's a CD containing my forensic report

19   in its entirety.

20   Q.   And 92-C, again, that's not your product, but

21   that's toll records, correct, pertaining to that

22   phone?

23   A.   Correct.

24           MR. LACEY:  We'd offer 92-B at this time.

25           MR. COOPER:  No objection.

1    MR. ARMSTRONG:  No objection.

2    MR. YOUNG:  No, Your Honor.

3    THE COURT:  It'll be admitted.

4  BY MR. LACEY:

5  Q.  Next direct your attention to Exhibit No. 93.

6    Do you see that there?  If you'd open that,

7  please.

8  A.  Yes, I have it.

9  Q.  Can you examine that and tell us if you can

10  identify that for us, Exhibit 93-A.

11  A.  It is an HTC cell phone.  The model number is

12  XV6175.

13  Q.  Did you go through an examination as you --

14  similar to that of 87-A?

15  A.  I did.

16  Q.  And as a result of that examination, was it --

17  did your computer receive all that data and did it

18  result in being put on a disk?

19  A.  It did.

20  Q.  I'll show you Exhibit 93-B for

21  identification.

22    Would you look at that and see if you can

23  identify that for us.

24  A.  It is a piece of optical media containing my

25  forensic report.

1  Q.  And is there also a C, a 93-C with the toll

2  records on there as well?

3  A.  Yes, there is.

4       MR. LACEY:  I would offer 93-B at this

5  time.

6       MR. COOPER:  No objection.

7       MR. ARMSTRONG:  No objection.

8       MR. YOUNG:  No objection.

9       THE COURT:  It can be admitted.

10  BY MR. LACEY:

11  Q.  Next No. 94, please.  Can you identify that

12  for us?

13  A.  Yes, it is an LG model number UX220 cellular

14  telephone.

15  Q.  Did you go through a similar examination as to

16  that particular phone?

17  A.  I did.

18  Q.  Using relatively the same process as before?

19  A.  Yes.

20  Q.  And do you likewise have that -- go through

21  your computer and a disk be generated with that

22  data?

23  A.  Yes.

24  Q.  And this disk has three different reference

25  numbers for exhibit numbers, 94, 95, and 96, so

1  rather than show you this disk at this time, I'll
2  go on to the next exhibit, which would be Exhibit
3  No. 95.
4      We'd ask you to examine 95, 95-A, please.  Can
5  you tell us what type of phone that is.
6  A.   It's a Blackberry model 9530 cellular
7  telephone.
8  Q.   And was a similar examination conducted on
9  that particular phone?
10  A.   It was.
11  Q.   And did that also result in a disk -- being
12  put onto a disk that reflected the data you
13  obtained from that phone?
14  A.   Yes.
15  Q.   And I'd next direct your attention to 96-A.
16      And can you tell us, I believe this is an LG
17  phone, not a Motorolla, 96-A.  Would you examine
18  that?
19      And is that a Motorolla, I'm sorry, an LG
20  phone?
21  A.   Yes, it is an LG phone.
22  Q.   Is there a model number for that or can you
23  tell?
24  A.   It's in a couple of different pieces here.  I
25  can't tell immediately offhand.

1  Q.   Okay.  It's just an LG phone then.  We'll let

2  it go at that.

3  A.   Correct.

4  Q.   And 96-B, as in boy, can you examine that and

5  see if you can identify that for us.

6  A.   I believe it's the SIM card associated with

7  that phone.

8  Q.   And would you give us your definition of a SIM

9  card with your expertise?  What is that?

10  A.   A SIM card is a -- basically Subscriber

11  Identity Module.  That's what "SIM" stands for.  It

12  allows the network to identify the subscriber in

13  particular for a particular phone.

14  Q.   And what other kind of data can be obtained

15  from a SIM card?

16  A.   Well, typically, if anything is stored on a

17  SIM card, it might -- something that might be

18  useful to a case agent might be a contact list, but

19  a SIM card will also store things like personal

20  security keys, cell phone location, cell phone

21  number.

22       There can be a variety of information stored

23  on a SIM card, but the most obvious useful thing

24  would be a contact list.

25            THE COURT:  Let's take about a two-minute

1  recess, two-minute recess.

2          (The jury exits the courtroom.)

3          THE COURT:  Show the absence of the jury,

4  presence of all counsel and the defendants.

5          No offense, Mr. Lacey, but you're putting

6  one of the jurors to sleep.

7          MR. LACEY:  What can I say?  It's not the

8  most stimulating testimony, not because of the

9  witness or me, but because of the topic.

10          THE COURT:  You're almost through with

11  him?

12          MR. LACEY:  Yes, Your Honor.

13          (Off the record.)

14          (The jury enters the courtroom.)

15          THE COURT:  Show the jurors returning to

16  the courtroom, the presence of all counsel and the

17  defendants.

18          You may continue, Mr. Lacey.

19          MR. LACEY:  Thank you, Your Honor.

20  BY MR. LACEY:

21  Q.  When we left off, we were talking about the

22  SIM card.  Do you recall that?

23  A.  Yes.

24  Q.  96-B, as in boy?

25  A.  Yes.

1  Q.  And the data from that examination ultimately

2  was put together in a computer disk and from the

3  phone examination, as well as the SIM card, and

4  resulted in being put on a disk such as this one

5  here?

6  A.  Correct.

7          MR. LACEY:  May I approach, Your Honor?

8          THE COURT:  You may.

9  BY MR. LACEY:

10  Q.  94-B -- I'm sorry -- 94-C, 94-B, 96-B, and

11  96-C and D, I believe, C, what are those, sir?  Is

12  that your computer downloads, the computer download

13  data for the various phone examinations that we

14  just talked about?

15  A.  Yes.

16  Q.  And would you give us those exhibit numbers

17  again as to what's contained within that disk?

18  A.  I guess I don't understand.  You just want the

19  exhibit numbers?

20  Q.  The numbers on that disk, instead of just one

21  disk for one phone --

22  A.  Right.

23  Q.  -- that covers how many different phones?

24  A.  Three different phones.  Over Exhibit 94-B,

25  94-C, 95-B, 95-C, 96-C, 96-D.

1    Q.   And as to that disk, it also contains toll

2    records as well for the corresponding numbers that

3    were determined based upon your examination?

4    A.   Yes.

5    Q.   We'd offer those multiple exhibits at this

6    time, and again that's 94, is it?

7    A.   Yes 94-B.

8    Q.   94-B?

9    A.   95 and 96.

10   Q.   94, 95 and 96-Bs, with one exception of C?

11   A.   Yes, 96-C.

12            THE CLERK:  94, 95 and 96-B?

13            THE COURT:  Correct.

14            THE CLERK:  96-C?

15            THE COURT:  No.

16            MR. LACEY:  Actually, yes.

17            THE WITNESS:  Yes.

18            THE COURT:  Now you're confusing me.

19   Okay.  94, 95, and 96-B, and 96-C.

20            Mr. Cooper said no objection.

21            Mr. Armstrong?

22            MR. ARMSTRONG:  No objection.

23            THE COURT:  Mr. Young?

24            MR. YOUNG:  No objection.

25            THE COURT:  All right.  They'll be

1  admitted.

2          MR. LACEY:  Almost done.

3  BY MR. LACEY:

4  Q.  I want to direct your attention to 99 next,

5  please.

6          That particular phone is a Nokia, is it not?

7  A.  Yes.

8  Q.  And is there a model number for that?

9  A.  I believe it's a Nokia model 5130C-2.

10 Q.  And did you go through a similar examination

11 or was a similar examination done for that

12 particular phone?

13 A.  Yes.

14         MR. LACEY:  May I approach, Your Honor?

15         THE COURT:  You may.

16 BY MR. LACEY:

17 Q.  I show you 99-B.  Can you identify that

18 particular exhibit for us.

19 A.  Yes, it's a piece of optical media containing

20 my CART forensic exam.

21 Q.  And does that disk, does that reflect the data

22 you took through your computer system for phone

23 that was being examined on that occasion?

24 A.  Yes.

25 Q.  And that was the Nokia phone we talked about?

A.   Yes.

             MR. LACEY:  We'd offer 99-B at this time.

             MR. COOPER:  No objection, Judge.

             MR. ARMSTRONG:  No objection.

             MR. YOUNG:  No objection, Your Honor.

             THE COURT:  It'll be admitted.

BY MR. LACEY:

Q.   Next direct your attention to 100,

specifically 100-A, if you have that there.

A.   Yes.

Q.   And did you -- can you describe that phone for

us.

A.   It is a Motorolla cellular telephone.  If

you'll give me a moment, I can get the model number

for you, if you'd like.

Q.   Sure.

A.   The model is i465.

Q.   And was a similar examination conducted on

this phone?

A.   Yes.

             MR. LACEY:  May I approach?

             THE COURT:  You may.

BY MR. LACEY:

Q.   Show you 100-B for identification.  Can you

identify that for us?

1  A.  It's a piece of optical media containing my
2  forensic examination.
3  Q.  And again, as with the other examinations you
4  conducted, was a similar method used for this
5  particular phone?
6  A.  Yes.
7  Q.  And that was a Motorolla i465?
8  A.  Yes.
9  Q.  And Exhibit 100-B is the data that you
10 obtained from that phone after you -- based on your
11 examination?
12 A.  Yes.
13        MR. LACEY:  We'd offer 100-B at this
14 time.
15        MR. COOPER:  No objection.
16        MR. ARMSTRONG:  No objection.
17        MR. YOUNG:  No objection, Your Honor.
18        THE COURT:  It can be admitted.
19 BY MR. LACEY:
20 Q.  And do you see a 112 there, Exhibit 112?
21 A.  Yes, 112-A.
22 Q.  And what type of phone is that?
23 A.  It appears to be a Motorolla model i880
24 cellular telephone.
25 Q.  And did you do a similar examination on that

1  particular phone?

2  A.   I did.

3       MR. LACEY:  May I approach?

4       THE COURT:  You may.

5       MR. LACEY:  And for everybody's sake, this

6  is the last exhibit for this witness.

7  BY MR. LACEY:

8  Q.   Can you look at that and see if you can

9  identify that for us.

10 A.   It's a piece of optical media containing my

11 forensic examination results.

12 Q.   And again, based upon the examination of the

13 Motorolla phone you just told us about?

14 A.   Yes.

15 Q.   Same method that was used?

16 A.   Yes.

17      MR. LACEY:  We'd offer 112-B at this

18 time.

19      MR. COOPER:  No objection.

20      MR. ARMSTRONG:  No objection.

21      MR. YOUNG:  No objection, Your Honor.

22      THE COURT:  It can be admitted.

23      MR. LACEY:  No further questions.

24      THE COURT:  Mr. Cooper?

25      MR. COOPER:  No questions, Your Honor.

1    MR. ARMSTRONG:  Nothing.  Thank you, Your

2  Honor.

3    MR. YOUNG:  No questions, Your Honor.

4    THE COURT:  Any questions by the jury?

5  One.

6    (The following proceedings occurred at the

7    bench.)

8    THE COURT:  The question is, "Was the SIM

9  card 96-B for the phone 96-A, and did you plug it

10 into the phone to get the data?"

11    All right.

12    (End of bench conference.)

13    THE COURT:  Sir, I have a question from

14 one of the jurors I'm going to ask on their

15 behalf.

16    Was the SIM card Exhibit 96-B for the

17 phone Exhibit 96-A?

18    THE WITNESS:  Yes.

19    THE COURT:  Did you plug it into the phone

20 to get the data?

21    THE WITNESS:  I obtained the data by

22 examining the SIM card separately from the phone.

23    THE COURT:  You can plug that into

24 something else and get data from it?

25    THE WITNESS:  Yes.

1    THE COURT:  All right.  Any questions

2  based upon the juror's questions, Mr. Lacey?

3         MR. LACEY:  No, Your Honor.

4         MR. COOPER:  No, Your Honor.

5         MR. ARMSTRONG:  No, thank you.

6         MR. YOUNG:  No questions, Your Honor.

7         THE COURT:  Thank you, sir.  You may step

8  down.

9         You may call your next witness.

10          DANIEL DOUGLASS, WITNESS, SWORN

11         THE COURT:  Sir, the Rule has been invoked

12  in this case.  That means, except during the time

13  that you're testifying, you must remain outside the

14  courtroom and you are only allowed to discuss your

15  testimony with the attorneys involved in the case.

16         All right?

17         THE WITNESS:  Okay.

18         THE CLERK:  Please state your name for the

19  record and spell your last name.

20         THE WITNESS:  Daniel Douglass,

21  D-o-u-g-l-a-s-s.

22         THE CLERK:  Thank you.

23         THE COURT:  You may proceed.

24         MR. LACEY:  I'm sorry.  Thanks.

25                 DIRECT EXAMINATION

BY MR. LACEY:

Q.   You're employed by whom, sir?

A.   The FBI.

Q.   In what capacity?

A.   I'm a staff operations specialist.

Q.   What does that mean?

A.   I conduct -- I'm a tactical analyst, so I
conduct research for investigations, subject
background, telephone analysis, link chart
preparations, things like that.

Q.   Don't talk too fast on us.

A.   Okay.

Q.   Her fingers only go so fast.

        THE COURT:  Particularly at four o'clock
in the afternoon.

BY MR. LACEY:

Q.   Sir, what's you're educational background?

A.   I have a bachelor's degree from the University
of Arizona in business management.

Q.   And when did you obtain that degree?

A.   I graduated in 2008.

Q.   And since then, where have you been employed?

A.   The FBI.

Q.   Right after graduation?

A.   That's correct.

1  Q.   What kind of things do you do with the FBI for

2  -- with your position?

3  A.   Subject research, do a lot of working with the

4  case agents, going and preparing documents for

5  trials, exhibits, link charts, telephone analysis,

6  do research in trying to figure out sometimes who

7  people are, get photos, you know, things like that.

8  Q.   Do you work with computers as part of your job

9  description?

10  A.   I use computers, yeah.

11  Q.   In what capacity?  What do you use them for?

12  A.   A lot of spreadsheets, a lot of -- a couple

13  analytical programs, one being Pen-Link, which is

14  used for analyzing the telephone data, toll data,

15  and then i2 is an analyst's notebook used for

16  preparing charts.

17  Q.   Okay.  Now, with different programs, what kind

18  of programs do you use to assemble charts and put

19  data together?

20  A.   Mostly Pen-Link and Excel.

21  Q.   Now, what's Pen-Link?

22  A.   Pen-Link is an analytical software tool that's

23  used for managing and analyzing telephone data,

24  toll data.

25  Q.   So how does Pen-Link work?  It analyzes the

1    data.  What do you put in and what do you get out?

2    A.   You put in toll data that you request from the

3    phone company via subpoena, or also it could be

4    data from if you're up on a wire or up on a pen

5    register.  That data you can input.

6        And then what you get out is really just

7    spreadsheets, reports that you can actually,

8    instead of having to go line by line through 60,000

9    lines of telephone calls, you can say, hey, you

10   know, you can type in different parameters, say I

11   want to just a certain date.  It will go through

12   that data and pull me just that date.

13   Q.   Now, when you get -- you're doing an

14   investigation, have you ever worked with any of

15   your other computer people where they extract data

16   from telephones?

17   A.   Yes.

18   Q.   Agent Pahl just left.  Have you worked with

19   him in the past?

20   A.   Yes, I have.

21   Q.   What kind of product does he generate as far

22   as you're aware, and after he generates a product,

23   a disk, what if anything do you have to do with

24   that?

25   A.   He usually generates, or at least when I've

1    worked with him, he gives me these CART exams,

2    which is a forensic file from a Cellebrite machine,

3    it's my understanding, and usually that data will

4    have contact lists from cell phones, any kind of

5    phone logs or texting, text logs, also any kind of

6    images or videos or sound files that are on those

7    phones.

8    Q.   And when this data is given to you, is it

9    given to you on a disk, as we've seen here?

10   A.   That's correct.

11   Q.   And when you get that disk, what do you do

12   with it?

13   A.   Normally I just -- I'll open the files and

14   start looking at the data.

15   Q.   Do you look to determine whether there is an

16   identifying phone number that corresponds with a

17   certain phone that was found?

18   A.   Correct.  That's usually the first step,

19   because what I'll want to do is, once I've

20   identified that phone number, I'll want to subpoena

21   that telephone number and get the subscriber and

22   the toll records.

23   Q.   Did you do that in this particular case?

24   A.   I did.

25   Q.   We have certain exhibits that we've been

1  discussing here this afternoon with other

2  personnel, including Agent Pahl.

3      Did you obtain phone records, toll records,

4  for several phones that we'll go through in just a

5  moment?

6  A.  I did.

7  Q.  Starting with 87, that's a Motorolla i296?

8  A.  Yes.  I have that as QPX2 but also 87.

9  Q.  And was there a number associated with that?

10  A.  There was.

11  Q.  What was that?

12  A.  (520)264-6030.

13  Q.  And once you got that number, did you then go

14  out and obtain toll records for that?

15  A.  I did.

16  Q.  For what period of time?

17  A.  The period of time was from January 1st, 2011,

18  through March 2nd, 2011.

19  Q.  And once you got the toll records back -- what

20  form does it come to you in when you get the data

21  from the phone company?

22  A.  It comes in an electronic form.  It's a form

23  that's emailed to me.

24  Q.  And once I get the email, what do you do

25  with the data?

1   A.   The data, I would take the data and actually

2   upload it into Pen-Link.

3   Q.   And once you get the -- so the phone company

4   sends you an email with their electronic data. You

5   then put it into your computer system through this

6   Pen-Link program?

7   A.   Correct.

8   Q.   And what happens after that?

9   A.   I start analyzing the data, trying to -- I

10   mean, it depends what I'm trying to do with the

11   data, but in this case I was trying to find or

12   trying to link phone calls with all the phones that

13   were found on March 2nd.

14   Q.   87-C as in Charlie, I don't know if there's

15   still the disks up there. I think they are.

16       87-C, do you see that up there?

17   A.   Yes, I do.

18   Q.   Can you identify that for us?

19   A.   It's a disk that says -- it's got QPX2, CART

20   exam and tolls for January 1st, 2011, through March

21   2nd, 2011.

22   Q.   And does that pertain to the Motorolla i296

23   phone we talked about in 87-A?

24   A.   Yes, it does.

25          MR. LACEY: We'd offer 87-C at this time.

1          MR. YOUNG:  No objection.

2          MR. ARMSTRONG:  No objection.

3          MR. YOUNG:  No objection, Your Honor.

4          THE COURT:  It can be admitted, 87-C.

5    BY MR. LACEY:

6    Q.   Next direct your attention to 92-C, as in

7    Charlie.

8    A.   Yes.

9    Q.   Do you see 92-C there?

10   A.   I do.

11   Q.   Can you identify that for us?

12   A.   It's a disk that has the CART exam for QPX13

13   and tolls for February 9, 2011, to March 2nd, 2011.

14   Q.   And that's for the Motorolla i670 phone?

15   A.   Correct.

16   Q.   And 92-C has the toll information, as you've

17   indicated?

18   A.   That's correct.

19          MR. LACEY:  We'd offer 92-C.

20          MR. COOPER:  No objection.

21          MR. ARMSTRONG:  No objection.

22          MR. YOUNG:  No objection, Your Honor.

23          THE COURT:  It can be admitted, 92-C.

24   BY MR. LACEY:

25   Q.   Next direct your attention to 93-A, and more

1  particularly, 93-C, as in Charlie.  Can you

2  identify that for us?

3  A.  Yes.  It's a disk containing QPX8 and tolls

4  from January 1st, 2011, to March 2nd, 2011.

5  Q.  And that's for an HTC XV6175 cell phone?

6  A.  That's correct.

7          MR. LACEY:  We'd offer 93-C at this time.

8          MR. COOPER:  No objection.

9          MR. ARMSTRONG:  No objection.

10          MR. YOUNG:  No objection, Your Honor.

11          THE COURT:  It can be admitted.

12  BY MR. LACEY:

13  Q.  Next, 94-C, as in Charlie.  Can you identify

14  that for us?

15  A.  I do not see that disk up here.

16  Q.  There may be one disk with several numbers on

17  it.  Do you see it up there?

18  A.  I do not.

19  Q.  Okay.  We'll go on, come back to it.  I think

20  it may be up there.  If you -- and I hate throwing

21  you a curveball, but --

22          THE COURT:  See if you can help him find

23  it.

24          It's not there.  It's behind you.

25          MR. LACEY:  I knew it was someplace.

1  Sorry.  I didn't know we retrieved any back there.

2  Thanks, Judge.

3          May I approach one more time?

4          THE COURT:  You may.

5          MR. LACEY:  Thanks.

6  BY MR. LACEY:

7  Q.   94 -- sorry for the curve ball there.

8  A.   That's all right.

9  Q.   94-C, do you see that there?

10 A.   I do.

11 Q.   And can you identify that for us?

12 A.   It's a disk containing QPX29, Q2, QPX12, and

13 QPX9 and the toll records from January 1st, 2011,

14 to March 2nd, 2011.

15 Q.   And that's for the phone LG UX220, 94-A?

16 A.   Repeat the --

17 Q.   Sure.  It's LG UX220, which is Exhibit 94-A.

18 If you want to look at the envelope for 94-A, if

19 that would assist you, that would be fine too.

20 A.   That states it's an LG phone.

21 Q.   Okay.  And 94-C, is that the toll records for

22 that particular phone, 94-A?

23 A.   That's correct.

24 Q.   Next direct your attention to 95-C, as in

25 Charlie.

1    That's on the same disk?

2  A.   Correct.

3  Q.   Can you identify that for us?

4  A.   It's the same disk.  It's QPX -- containing

5  QPX29, Q2 --

6         THE COURT:  Slow down and enunciate.

7  A.   It's the dame disk that has QPX29, Q2, QPX12

8  and QPX9 and the toll records from January 1st,

9  2011, to February -- or March 2nd, 2011.

10  Q.   And that's for a Blackberry 9530?

11  A.   That's correct.

12  Q.   Next direct your attention to 96-D, as in

13  dog.  We'd ask if you can identify that for us.

14  A.   That's the disk containing the QPX29, Q2,

15  QPX12 and QPX9 and, again, the toll records from

16  January 1st, 2011, to March 2nd, 2011.

17         MR. LACEY:  We'd offer 94-C, 95-C and 96-D

18  at this time.

19         MR. YOUNG:  No objection.

20         MR. ARMSTRONG:  No objection, Your Honor.

21         THE COURT:  They can be admitted.

22         MR. LACEY:  And I think we've got 93-C in

23  evidence already.  Just --

24         THE COURT:  Is that correct, Mo?

25         THE CLERK:  Yes, sir.

1    THE COURT:  It is.

2    MR. LACEY:  Go to the source.

3  BY MR. LACEY:

4  Q.   Next direct your attention to 99-C, as in

5  Charlie.  Can you identify for us?

6  A.   It's a disk containing QPX3, and it's the CART

7  exam.

8  Q.   And 99-C is toll records; is that correct?

9  A.   No toll records on this disk.  It's just the

10  CART exam.

11  Q.   Okay.  On 99?

12  A.   Correct.

13  Q.   Okay.  And direct your attention to 100-C, as

14  in Charlie.

15  A.   Okay.

16  Q.   Do you see that there?

17  A.   I do.

18  Q.   Can you identify that for us?

19  A.   It's QPX4 and the toll records from January

20  1st, 2011, through March 2nd, 2011.

21  Q.   Okay.  And lastly, to Exhibit 112-B, as in

22  boy.

23  A.   Yes.

24  Q.   Can you identify that for us?

25  A.   It's QPX14 and toll records.

1    MR. LACEY:  We'd offer 112-B at this time

2  and 100-C.

3        MR. COOPER:  No objection.

4        MR. YOUNG:  No objection, Your Honor.

5        MR. ARMSTRONG:  No objection.

6        THE COURT:  They can be admitted.

7  BY MR. LACEY:

8  Q.   Sir, the one item we still need to address is

9  99-A.

10       What type of phone is that?  Is that a Nokia?

11  You may have to look through the actual -- if you

12  have it in your records, that's fine.  If you have

13  to look at the phone 99-A, that's fine too.

14  A.   Correct, it's a Nokia phone.

15  Q.   And did you obtain -- what's the number for

16  that phone?  You obtained that through your

17  examination of the records?

18  A.   I did.

19  Q.   And the phone number for that is what?

20  A.   (602)373-0347.

21  Q.   And did you obtain toll records for that

22  particular number?

23  A.   Toll records?

24  Q.   Yes, sir.

25  A.   I did.  Yes.

1   Q.   And is that in any exhibit you have in front
2   of you, or would that be in a separate location?
3   A.   It's in a separate location.
4   Q.   Those particular toll records for that, what
5   period of time was it for that particular phone,
6   the Nokia?
7   A.   It would have been January 1st, 2011, to March
8   2nd, 2011.
9   Q.   Did you do an examination -- after you got all
10  this raw data, all the toll records we're talking
11  about and the CART exam that came from Agent Pahl
12  and you put that into your system, what came out?
13  What did you do?
14  A.   Well, the first thing I did was try to figure
15  out who the user of that phone was.
16  Q.   What process did you go through in order to
17  try and make that determination?
18  A.   A couple different things.  Ordered the
19  subscriber records from -- we requested those for
20  the phone companies for the phones.  And then
21  looking, using the CART exams, the CART exams had
22  contact lists for all the phones.
23       So we started looking at the contact list to
24  find if any of the phones that were -- that we
25  received that day were on March 2nd came up in any

1    of the other contact lists that were seized that

2    day if there were any commonalities.

3    Q.   And we've just covered a bunch of exhibits

4    starting with Exhibit No. 87, 92, 93, 94, 95, 96,

5    99, 100, and 112; correct?

6         That's the Government's Exhibits that we've

7    just gone through and discussed, the various

8    phones; correct?

9    A.   Correct.

10   Q.   And those are the ones we just talked about?

11   A.   Correct.

12   Q.   With the data from those phones, you put them

13   into your programs, and how were you able to --

14   let's start with the first phone, 87-A.

15        What do you do to determine who that phone

16   came back to?

17        Now, of course when you get a phone, there's

18   no, this is the phone of Joe Schmo.  It's not on

19   the phone.  You have to do an examination to make

20   that determination, usually; correct?

21   A.   Correct.  Usually the first thing you do on

22   that is we'll order the subscriber records from the

23   telephone company.

24   Q.   Okay.  As to 87-A, that phone, what

25   examination do you to determine whose phone that --

1  who it came back to?

2  A.   That phone number, which is (520)264-6030 --

3  Q.   Subscriber was who?

4  A.   The subscriber was -- I'm going to go -- an

5  Elmo Rubio.

6  Q.   What's the name, Elmo?

7        THE COURT:  Elmo Rubio.

8  Q.   Okay.  Mr. Rubio's phone.

9        Is there an address for that?

10  A.   It's P.O. Box 54988, Irvine, California 92619.

11  Q.   Have you come across that Irvine, California,

12  address during the course of your work for the FBI?

13  A.   I have.

14  Q.   On a regular basis?

15  A.   Yes.

16  Q.   And what did you come to find out as far as

17  the Irvine, California, address for subscriber

18  information?

19  A.   That is an address that's associated with

20  Boost Mobile.  It's a Sprint pay-as-you-go service,

21  phone service.  That address is their billing

22  address.

23  Q.   When you say "their billing address," not for

24  the person, Mr. Rubio, but rather --

25  A.   Correct.

1  Q.   -- the phone company?

2  A.   Correct, for Boost Mobile.

3  Q.   So in other words, Mr. Rubio won't be able to

4  go -- doesn't get his mail at Irvine, California?

5  A.   That's correct.

6  Q.   So after making that determination, what did

7  you do next as to the phone number 87-A to

8  determine who it came back to?

9  A.   I took that phone number ending in 6030 and

10 ran it against the CART exams that I received from

11 Chris Pahl.

12 Q.   And a CART exam, that's the underlying exam he

13 testified about today, which you wouldn't know

14 about, but he does an examination, and that's

15 called a CART examination?

16 A.   Correct.

17 Q.   What happened then?  What did you do to make

18 the determination?

19 A.   Well, that phone number showed up in four

20 contact lists.

21 Q.   When you say "four contact lists," whose

22 lists, from other phones that were involved in this

23 or what?

24 A.   Correct.

25 Q.   Okay.  What do you do next to make the -- it's

1  sort of like being a private investigator where you

2  follow the lead, like Sherlock Holmes; basically?

3  A.   Correct, like a puzzle.

4  Q.   What did you do next?

5  A.   I read the -- also read the text messages

6  associated with that phone that were on the CART

7  exam.  Some of those text messages will ask

8  questions like, you know, who are you, and the

9  person on that, using that cell phone, will reply

10  with a name, El Seco or --

11  Q.   Based upon your examination of 87-A, what else

12  did you do to find -- to come to a conclusion as to

13  who you thought that person would be that was using

14  the phone?

15  A.   That and the location it was found.  It was

16  found at the warehouse on that day.

17  Q.   Outside the warehouse?

18  A.   Correct.

19  Q.   Based upon your investigation, did you

20  determine who was in the area of the phone when --

21  where it was found?

22  A.   Yes.

23  Q.   Who was that?

24  A.   Mayco Ledezma-Prieto.

25  Q.   Also known as Mayco?

1  A.   Correct.

2  Q.   Also known as Seco, or would you know that?

3  A.   Correct, Seco.

4  Q.   So tell us, you say it comes back to Mayco

5  Ledezma, Seco.  How do you say that?  What else led

6  you to that?  What exactly by way of text messages

7  besides the location of where it was found led you

8  to that conclusion?

9  A.   It was a text message that's on that CART exam

10  that says it's from Gabriel, "What up?  Who this?"

11       And the reply to that text message was, "El

12  Seco."

13       And then there was another text message that

14  says, (speaking in Spanish).  You know, they're

15  saying it was a text to Mayco.

16            THE COURT:  She has no idea what you just

17  said.  Is that Spanish or English?

18            THE WITNESS:  That's Spanish.

19            THE COURT:  Okay.  That was Spanish that

20  you were saying?

21            THE WITNESS:  Correct.

22            MR. LACEY:  I can't translate.

23  BY MR. LACEY:

24  Q.   Sorry.  Anyway without giving us any Spanish,

25  was the name Mayco used in that, at least in part?

1    A.    Correct.

2    Q.    We'll leave it at that.

3    A.    And then there was one other text message that

4    says, "Call me, I'm Mike."

5    Q.    "Call me, I'm Mike"?

6    A.    Uh-huh.

7    Q.    As in Mayco?

8    A.    As in Mayco.

9    Q.    Let's work on the next phone, 92-A.

10         Did you do an examination of the CART exam

11   plus the toll records and your examination of all

12   the raw data that was in the system and come to any

13   conclusions as to whose phone that was?

14         First, the number for the phone?

15   A.    For 92 it's (602)349-4214.

16   Q.    Okay.  And who was the subscriber on that

17   phone?

18   A.    Rodrigo Romero 2.3.

19   Q.    And was there an address for Mr. Rodrigo?

20   A.    P.O. Box 54988, Irvine, California 92619.

21   Q.    And what did you do then, after making that

22   determination as to who you concluded this phone

23   came back to?

24   A.    It was -- I know that in an affidavit that

25   phone was identified as Gregorio Guzman-Rocha's

271

phone, and it was found on him during the arrest of
him.
Q.   On his person?
A.   Correct.
Q.   Did you do a further examination besides that
as to 92-A, or did you go with the conclusion that
it was found on his person to conclude that that
was his phone?
A.   Correct, that he was the user of that phone.
Q.   Did you do any further examination besides the
possession aspect of it all?
A.   Just of his toll records, yes.
Q.   And who was the subscriber for that?  That was
the same Irvine, California, address we just talked
about?
A.   Correct.
Q.   So based upon who possessed the phone at the
time of his arrest, you concluded that was Gregorio
Guzman-Rocha's phone?
A.   Correct.
Q.   Let's go down do 93-A.
     Did you find a number as to that phone?
A.   I did.
Q.   And what's the phone number for that?
A.   (480)220-7134.

1   Q.   And subscriber?

2   A.   Michael Card.

3   Q.   And was there an address for that phone?

4   A.   Yes.  595 East Peppertree Avenue, Apache

5   Junction, Arizona 85119.

6   Q.   And what else did you do to determine or make

7   a conclusion, based upon your experience, as to who

8   the phone came back to?

9       What else did you do as to Exhibit 93-A?

10   A.   Well, I viewed other contact lists from the

11   CART exams that were received that day, and that

12   phone number showed up in one other contact list.

13   Q.   And the other contact list was one of the

14   phones that was seized that day, you say?

15   A.   Correct.

16   Q.   And the other phone, what did it list this

17   person's contact name as?

18   A.   Jay, J-a-y.

19   Q.   And did you, based upon your investigation,

20   determine where this phone was found, in what

21   vehicle or what location?

22   A.   It was found in the Ford Expedition.

23   Q.   What else did you do to conclude whose phone

24   this was?

25   A.   I read the text messages on that phone, and

1    there were several, but there was one that says,

2    "Jay, I got to take DD to work."

3        So that lists Jay.  And then another phone

4    that says -- that lists the name Jerome in a text

5    message, and there were additional text messages

6    that also use the word -- the name Jerome.

7    Q.   And based upon reviewing those text messages

8    that you've told us about and the other examination

9    you did, did you come to a conclusion as to who was

10   using that phone?

11   A.   Yes.

12   Q.   Who was that?

13   A.   Jerome Ranger.

14   Q.   I want to direct your attention next to 94-A.

15       Can you give us the number for that phone?

16   A.   It's (520)208-4935.

17   Q.   And subscriber?

18   A.   Subscriber on that phone is 1061888171.

19   Q.   That's a subscriber?

20   A.   That's what it says under customer name, yes,

21   sir.

22   Q.   Was there an address for that, that number?

23   A.   Just a state and a ZIP code of Florida 33122.

24   Q.   And that's the only identifiers as far as who

25   the subscriber was for that phone?

1  A.    That's correct.

2  Q.    What examination did you do on Exhibit 94-A to

3  make a determination or conclusion as to who was

4  using or possessed that phone?

5  A.    There was some text messages sent from that

6  phone that were common -- that had common -- the

7  text messages that were sent on that phone were

8  sent to phone numbers that were in common with

9  another phone that was seized that day, and were

10 sent to -- those phone numbers contact listed

11 showed up in a phone that was subscribed to Ghermon

12 Tucker.

13      There were messages sent to a Baby D in the

14 contact list and Tara in a contact list.

15 Q.    And what other information did you have to

16 come to any conclusion as to who was using this

17 particular phone?

18 A.    That phone was found in the Ford Expedition,

19 and that's all I have for that one.

20 Q.    And based upon your examination of all the

21 phones that day and what you've testified about

22 here today, who did you conclude 94-A came back to?

23 A.    Ghermon Tucker.

24 Q.    As to 95-A, can you give us a number for that

25 one, please?

1    A.   It's (480)392-3443.

2    Q.   And subscriber?

3    A.   Ghermon Tucker.

4    Q.   With what address?

5    A.   4113 East Frye Road, Phoenix, Arizona 85044.

6    Q.   Did you do any further examination of that

7    phone to determine who the person was that it came

8    back to?

9    A.   Just that it was also found in the Ford

10   Expedition.

11   Q.   And based upon that examination and the

12   subscriber data, who do you conclude was using that

13   phone again?

14   A.   Ghermon Tucker.

15   Q.   96-A, did you examine that phone, and if so,

16   what was the number?

17   A.   96-A is also (520)208-4935.  That's -- 94 and

18   96, one is the actual SIM card.  The other is the

19   actual telephone.

20   Q.   And there were separate examinations, then,

21   for the phone and the SIM card?

22   A.   That's correct.

23   Q.   And did you examine the data from both the SIM

24   card and the phone?

25   A.   Yes, I did.

1  Q.  And what did you do to conclude who that SIM

2  card and/or phone came back to?

3  A.  The SIM card itself came back with the phone

4  number.  That's how I got the phone number

5  (520)208-4935.

6      I sent a subpoena for that number.  The toll

7  records that came back, I compared them to the

8  phone records and the text records that were on 96,

9  Exhibit 96, and they're -- they showed

10  similarities.

11  Q.  Similarities as to what?

12  A.  The calls that were on the telephone

13  examination report matched the calls on the toll

14  records.

15  Q.  Okay.  Between the phone -- and that would

16  be the phone 96-A and 96-B, the SIM card, so based

17  upon that examination, you determined they were

18  connected together, one went with the other?

19  A.  Correct.

20  Q.  And what further examination did you do to

21  determine who was using that phone and the SIM card

22  that connected to that?

23  A.  Just the text messages and where it was found

24  earlier.

25  Q.  And text messages were what?

1  A.   The two text messages that were sent to Baby D

2  and Tara, which were also listed in the contact

3  list for Ghermon Tucker's phone, for (480)392-3443.

4  Q.   The one subscribed to by Mr. Tucker?

5  A.   That's correct.

6  Q.   And so based upon your examination, then, 96-A

7  and B, the SIM card and phone, they were found in

8  what vehicle?

9  A.   They were found in the Ford Expedition.

10  Q.   In what part of the vehicle?

11        To save some time, the SIM card we've had

12  testimony on was on the floorboard and the phone in

13  the glove box of the Expedition.

14        Does that help you?

15  A.   Yes, I believe that's what I've read.

16  Q.   And again, based upon that examination, the

17  phone came back to Mr. Tucker, you say?

18  A.   That's correct.

19  Q.   Mr. Ghermon Tucker?

20  A.   Yes, that's correct.

21  Q.   99-A.  Now, our original exhibit list had it

22  was a Motorolla.  It was examined.  It was a Nokia

23  phone.

24        Did you do an examination of that particular

25  phone?

1    A.   Yes.

2    Q.   And what examination did you do, and what did

3    you conclude after doing that examination?

4         First, what was the number for it?

5    A.   (480)292-4572.

6    Q.   What examination -- who is the subscriber for

7    that one?

8    A.   The subscriber for that one is

9    268435459300830202.

10   Q.   And where was that address for that particular

11   number?

12   A.   It lists a city as Phoenix, Arizona 85046.

13   Q.   But no name referenced in connection with

14   that, just a number; correct?

15   A.   That's correct.

16   Q.   What investigation did you do as to 99-A to

17   make -- to determine whether or not you could

18   conclude who was using that phone?

19   A.   All right.  So we're talking about 99?

20   Q.   99-A, correct.

21   A.   All right.  We need to back up then.  I gave

22   you the wrong phone number for that one.

23   Q.   Sorry.  Try it again then.

24   A.   For 99 it's (602)373-0347.

25   Q.   And take us through the investigation, then,

1  as to that phone, since you had a different number

2  you gave us last time.

3  A.   That one was subscribed to Ana Vasquez.

4  Q.   With an address of where?

5  A.   7215 West Carter Road, Laveen, Arizona 85339.

6  Q.   What examination did you do to conclude whose

7  phone that was?

8  A.   Looking at the CART exam, there were photos on

9  that phone, and they were what appeared as self-

10  portraits.

11  Q.   And were you, based upon those examinations of

12  those photos and your other investigation, making

13  any conclusion as to who was using that phone?

14  A.   Yes.  Comparing those photos to the booking

15  photos from March 2nd, it was Rashad McCuin was the

16  user of that phone.

17  Q.   Rashad McCuin?

18  A.   Uh-huh.

19          THE COURT:  Yes or no.

20          MR. LACEY:  You have to say yes.

21  A.   Yes, sir.

22  Q.   As to 100-A, what's the number for that one,

23  100-A?

24  A.   It's (504)253-0220.

25  Q.   And subscriber?

1    A.    Subscriber was JYT HGFTJ.

2    Q.    Address?

3    A.    P.O. Box 54988, Irvine, California 92619.

4    Q.    What investigation did you do as to Exhibit

5    100-A to determine who that came back to?

6    A.    That phone number showed up in other contact

7    lists that were of phones that were seized that

8    day.  There was a text message on that phone that

9    said, "What's up?  This is Cory," and it was found

10   in the Cadillac Escalade.

11   Q.    Anything else you looked at to make the

12   determination as to who you believe this phone

13   comes back to?

14   A.    No.

15   Q.    Exhibit 112-A.  Did you examine that

16   particular item?

17   A.    Yes.

18   Q.    And did you determine what the phone number to

19   that was?

20   A.    Yes, I did.

21   Q.    What was that?

22   A.    (602)388-5053.

23   Q.    Subscriber?

24   A.    Favian Gomez.

25   Q.    A, as in Alfred?

1    A.   F-a-v-i-a-n.

2    Q.   Okay.  Gomez?

3    A.   Gomez.

4    Q.   With what address?

5    A.   P.O. Box 54988, Irvine, California 92619.

6    Q.   What can you tell us about your investigation

7    and background into determining who that phone came

8    back to?

9    A.   I understand that phone was found on Gregorio

10   Guzman-Rocha during his arrest.

11   Q.   And he was arrested up in Phoenix, was he not?

12   A.   That's correct.

13   Q.   As to this particular phone, we'll go back to

14   Exhibit No. 100.  I hate taking you back there, but

15   I need to, just for a second.

16        Based upon your examination, again, who did

17   you say that -- the user was for that, based upon

18   your examination again?

19   A.   Ja'Cory Ranger.

20   Q.   And that was, again, based upon your analysis

21   of the data we've talked about?

22   A.   That's correct.

23   Q.   After making conclusions as to who you

24   believed were using these phones, as you've

25   testified about, what did you do next?

1    A.   The next thing I did is, I wanted to look at

2    which of these phones were in contact with each

3    other through the investigation.

4              THE COURT:  Let's stop at this point.

5              MR. LACEY:  Works for me.

6              THE COURT:  Can we start tomorrow at

7    9:15?  9:15.  Thank you.

8              Remember the admonitions I've given

9    before.  No Twittering, Tweeting, Facebook,

10   Internet research, anything like that.  Don't talk

11   about the case.

12             Tomorrow at 9:15.

13             (The jury exits the courtroom.)

14             (Proceedings concluded in this matter.)

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, Erica R. Grund, do hereby certify that

4    I took the machine shorthand notes in the foregoing

5    matter; that the same was transcribed via computer-

6    aided transcription; that the preceding pages of

7    typewritten matter are a true, correct, and

8    complete transcription of those proceedings

9    ordered, to the best of my skill and ability.

10          Dated this 2nd day of January, 2013.

11

12                              s/Erica R. Grund
                        Erica R. Grund, RDR, CRR
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25