1      IN THE UNITED STATES DISTRICT COURT

2          DISTRICT OF ARIZONA

3   UNITED STATES OF AMERICA

4   vs.                              CR-11-1013-TUC-RCC

5   GHERMON LATEKE TUCKER, et al.,

6
            Defendants.
7   _____

8                                   August 16, 2012
                                    Tucson, Arizona
9

10

11

12

13              JURY TRIAL

14              DAY SEVEN

15   BEFORE THE HONORABLE RANER C. COLLINS
            UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22   Court Reporter:        Erica R. Grund, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                    translation

1                    A P P E A R A N C E S

2

3   For the Government:      James T. Lacey
                             Kimberly E. Hopkins
4                            Assistant U.S. Attorneys

5

6   For Ghermon Tucker:     Dan Cooper
                            Cooper & Udall PC
7

8

9   For Jerome Ranger:      Stephen Jonathan Young
                            Williamson & Young
10

11

12  For Ja'Cory Ranger:     Bradley James Armstrong
                            Armstrong Law Office
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXAMINATION INDEX

DANIEL DOUGLASS
     DIRECT BY MR. LACEY . . . . . . .    7
     CROSS BY MR. COOPER . . . . . .   47
     CROSS BY MR. ARMSTRONG . . . . .   61
     CROSS BY MR. YOUNG . . . . . . .   76
     REDIRECT BY MR. LACEY . . . . .   95
     VOIR DIRE BY MR. COOPER . . . .  102
     FURTHER REDIRECT BY MR. LACEY .  103
     FURTHER BY MR. COOPER . . . . .  108

CARLOS ESTRADA
     DIRECT BY MR. LACEY . . . . . .  109
     CROSS BY MR. YOUNG . . . . . . . 120
     REDIRECT BY MR. LACEY . . . . .  122
     RECROSS BY MR. YOUNG . . . . .  125

JAMES REEVES
     DIRECT BY MR. LACEY . . . . . .  128
     CROSS BY MR. COOPER . . . . . .  133
     CROSS BY MR. ARMSTRONG . . . . . 139
     REDIRECT BY MR. LACEY . . . . .  140

SONJA FRUEH
     DIRECT BY MS. HOPKINS . . . . .  143
     CROSS BY MR. COOPER . . . . . .  150

MICHAEL SMITH
     DIRECT BY MR. LACEY . . . . . .  154
     CROSS BY MR. YOUNG . . . . . . . 161

JON EDWARDS
     DIRECT BY MS. HOPKINS . . . . .  174

1        P R O C E E D I N G S

2        THE COURT:  Show the absence of the jury,

3   presence of all counsel and the defendants.

4        Juror No. 42 called this morning.  He has

5   to go to a doctor's appointment this afternoon, so

6   we're going to break at three o'clock, and we'll

7   probably have a condensed lunch of about an hour to

8   sort of make up for that.

9        MR. ARMSTRONG:  Speaking of doctor's

10  appointments, tomorrow at one, my son has a

11  doctor's appointment.  I'd like to attend.  The

12  doctor is usually pretty punctual, but -- and the

13  exam should take about 10, 15 minutes.  It's up at

14  UMC.  If there is anyway to work our lunch around

15  that --

16       THE COURT:  We can probably do it.

17       MR. ARMSTRONG:  Thank you.

18       THE COURT:  How far behind are we,

19  Mr. Lacey?

20       MR. LACEY:  We're not.

21       THE COURT:  Okay.  We can do it.  What

22  about having Court on Monday?  Do we need to have

23  Court on Monday or not?  One of the jurors needs to

24  know about it so they can let the school know if

25  they need a substitute teacher.

1          MR. LACEY:  We're going to finish our case

2     by tomorrow, so I don't know.

3          THE COURT:  Even with stopping at three

4     o'clock today?

5          MR. LACEY:  Yep.

6          THE COURT:  Okay.

7          MR. YOUNG:  My only issue with Monday is

8     the DPS officer I have subpoenaed, his wife has a

9     doctor's appointment on Monday.  He'd like to be --

10          THE COURT:  So you don't want him to be

11     here Monday anyway.

12          MR. YOUNG:  It's no big deal to me.  I

13     have him sit in the hall.

14          THE COURT:  I'm being very accommodating

15     this morning, so why don't you talk to me while I

16     am.

17          MR. LACEY:  I can resolve that issue.

18     That's the DPS officer that stopped our witness?

19          MR. YOUNG:  Yes.  I don't know if we --

20          MR. LACEY:  We're going to call him as a

21     witness today.

22          MR. YOUNG:  Oh.  There it is.

23          MR. LACEY:  What else can I help you

24     with?

25          THE COURT:  Bring the jurors in.  We'll

 1  stop at three, have sort of an abbreviated lunch
 2  from, like, 12 to 1.  Okay?  And we may not meet --
 3  well, do we need to meet on Monday or not, because
 4  one of the jurors wants to know.  I'm here Monday
 5  either way.  I'm not taking the day off.
 6          MR. LACEY:  Does the defense know if
 7  they're going to call witnesses?
 8          MR. COOPER:  My witness list is still
 9  being prepared.
10          THE COURT:  I know.
11          MR. ARMSTRONG:  I don't know whether we'll
12  be calling anybody on Monday.
13          THE COURT:  All right.  Maybe we can meet
14  on Monday afternoon and talk about Tuesday without
15  the jury.
16          (Off the record.)
17          (The jury enters the courtroom.)
18          THE COURT:  Let the record reflect the
19  jury's returned back to the courtroom, the presence
20  of all counsel and the defendants.
21          Good morning.  Just so you all know, we're
22  going to break at three o'clock today.  One of you
23  has a doctor's appointment, so we'll probably only
24  have an hour for lunch.  Okay?
25          And this is starting on time, by the way.

1    This is probably the third or fourth time during

2    the trial we've done that.  We keep -- we're going

3    to strive for perfection.

4            Go ahead, Mr. Lacey.

5            MR. LACEY:  Thanks, Your Honor.

6        DANIEL DOUGLASS, WITNESS, PREVIOUSLY SWORN

7                  DIRECT EXAMINATION

8    BY MR. LACEY:

9    Q.   When we left off yesterday with a glaze over

10   everybody's eyes, given what we were covering here,

11   and it's something we've got to do, I want to

12   follow up on that.

13       It's going to be a little bit better where

14   we're not going through the drudgery yesterday.

15   Pardon -- nothing personal to you or me.

16       Based upon your research and reviewing the

17   computer, you had -- I'm sorry.  I'm a little

18   parched.

19       You had some computer programs that you used

20   in your analysis, did you not?

21   A.   Yes, I did.

22   Q.   And in that analysis, you talked about a

23   Pen-Link; is that right?

24   A.   Correct.

25   Q.   And what exactly does that do again?

1    A.   Pen-Link allows me to enter all the subpoena

2    results, the toll records, the call records, and

3    input into one program so that I can look at all of

4    them together, and I can look for links between

5    phone numbers and things like that.

6    Q.   And there were a few things I wanted to follow

7    up on from yesterday.  We talked about Exhibit No.

8    87 that we have in evidence regarding Mayco

9    Ledezma-Prieto, also known as Mayco, also known as

10   Seco.

11        Is there another number?  We have one number

12   you covered.  I belive it was (520)264-6030 as one

13   of his numbers.

14   A.   Correct.

15   Q.   Via Exhibit No. 87.

16        Was there another number for him that you had

17   come up with, based upon your investigation and the

18   analysis?

19   A.   Yes.

20   Q.   And what was that?

21   A.   (602)218-0143.

22   Q.   Now, these phone numbers, the first one,

23   264-6030, and the one we just covered, do they have

24   push-to-talk capabilities, those phones?

25   A.   Those phones do.

1   Q.   Would you tell us, as to the number 264-6030,

2   Mayco's phone, what was the push-to-talk number

3   that correlated with that?

4   A.   128*748*10100.

5   Q.   And as to the second number, the

6   (602)218-0143, was there a push-to-talk number in

7   correlation to that one with the same phone?

8   A.   Yes.

9   Q.   Which was?

10  A.   128*754*10067.

11  Q.   We talked about Ja'Cory Ranger's phone

12  yesterday, Exhibit No. 100, or the one that you

13  attribute to him based upon your investigation, and

14  we had the number (504)253-0220.

15       Again that's Exhibit 100.  There was a push-

16  to-talk for that then?

17  A.   Yes.

18  Q.   And what was that number?

19  A.   146*307*5352.

20  Q.   I want to skip down, and that was Exhibit No.

21  100 again.

22       Exhibit No. 92.  We talked about a phone you

23  attribute to Gregorio Guzman-Rocha, also known as

24  Gollo, his number being (602)349-4214.  Was there a

25  push-to-talk relating to that phone?

1    A.   Yes.

2    Q.   What was that?

3    A.   128*748*1031.

4    Q.   Did you do an analysis of certain calls

5    between certain dates for certain phones?

6    A.   Yes.

7    Q.   And based upon your investigation, did you --

8    what was the number for the confidential source

9    that the FBI was using?

10   A.   That number was (602)743-9719.

11   Q.   And did your investigation also include

12   records from the Circle K here in Tucson just down

13   the street?

14   A.   Yes, it did.

15   Q.   And the number for that particular phone?

16   A.   (520)622-9538.

17   Q.   Exhibit No. 13, we'd ask you to look at that

18   for a second, 13.

19        With these various numbers, Exhibit No. 13,

20   we'd ask you to identify that for us.

21   A.   Yes.  That's the phone records provided by

22   Qwest from the Circle K pay phone.

23   Q.   And that's the Circle K right here in Tucson?

24   A.   That's correct.

25             MR. LACEY:  We'd offer 13 at this time.

1        MR. ARMSTRONG:  No objection.

2        MR. COOPER:  The only objection, is this

3   just a one-page document?  Because I can only see

4   one page here.

5        MR. LACEY:  Are there additional pages on

6   this?  I believe there are.

7        MR. COOPER:  I'd like to see the

8   additional pages prior to --

9        NICOLE WILLIAMS:  There's 90-some-odd

10  pages.

11       MR. COOPER:  Oh, check that.

12       MR. LACEY:  "Check that" means we don't

13  have to do it?

14       MR. COOPER:  Nope.  No objection.

15       THE COURT:  Mr. Cooper changed his mind

16  about looking at 90 pages right now.  It'll be

17  admitted and can be published.

18       MR. LACEY:  Thank you we're not going to

19  publish 90 pages.

20  BY MR. LACEY:

21  Q.   The cover sheet which we see is the cover

22  sheet from Qwest that you received; is that

23  correct?

24  A.   That's correct.

25  Q.   For the pay phones from the Circle K here in

1 town?

2 A.    Correct.

3 Q.    For what period of time?

4 A.    The period of time was, from what I can see on

5 the cover sheet, was from February --

6 Q.    I'm sorry.  Go ahead.

7 A.    From February 21st, 2011, to the present.

8 Q.    And if you back out of that, you'll see the

9 date up on the top, do you not?  Correct?

10 A.    March 18, 2011.  That would have been what

11 they used for the present.

12 Q.    Based upon your input into the computer, all

13 this phone data, how many pages roughly of all the

14 raw data would you say you had collectively that

15 went into this computer?

16       Not that you went through it page by page, but

17 through all the emails from the phone companies and

18 all the other data you received, how many pages of

19 materials went into your system in order to

20 generate a chart?

21 A.    Roughly 700 pages.

22 Q.    And that's for a modified version that we're

23 going to cover today; is that correct?

24 A.    That's correct.

25 Q.    Were there other pages beyond that that you

1  input as well?

2  A.   Yes.

3  Q.   And how many pages would that be, roughly?

4  A.   I can give a rough estimate.  Probably another

5  thousand pages.

6  Q.   As a result of all this input, did you prepare

7  a chart showing certain phone numbers calling

8  certain phone numbers either back or forth during

9  certain time frames?

10  A.   Yes, I did.

11  Q.   I want to direct your attention first to

12  February 4 of last year, 2011.

13       What did you do with your system for 2/4/11

14  last year to connect certain phones?  What were the

15  phones -- whose phones, based upon your

16  investigation, did you input into your system to

17  generate a chart that resulted in Exhibit No. 113?

18  A.   The phone number attributed to Gregorio

19  Guzman-Rocha, a phone number attributed to Mayco

20  Ledezma-Prieto, and a phone number for Ghermon

21  Tucker and Jerome Ranger.

22  Q.   And would you look at Exhibit No. 113 for

23  identification please.

24       Can you identify this for us?

25  A.   Yes.  This is a phone chart that depicts the

1   calls between those numbers for the date of

2   February 4th, 2011.

3   Q.   And again, this chart was prepared as a result

4   of inputting all this data into your computer

5   system?

6   A.   That's correct.

7            MR. LACEY:  We'd offer 113.

8            MR. COOPER:  No objection.

9            MR. ARMSTRONG:  No objection.

10           MR. YOUNG:  No objection, Your Honor.

11           THE COURT:  113 can be admitted, can be

12  published.

13  BY MR. LACEY:

14  Q.   Sir, when we start at the top of this page,

15  and it's only two pages, for the jury's benefit,

16  after what we did yesterday to them, who do you see

17  on the top of this particular page, what name?

18  A.   Mayco Ledezma-Prieto and Ghermon Tucker.

19  Q.   Starting on -- the date is where?

20  A.   The date's the third column over.

21  Q.   And that's -- all these are for 2/4 on this

22  particular exhibit?

23  A.   That's correct.

24  Q.   113?

25  A.   That's correct.

1  Q.   And the call between a phone you attribute to

2  Mayco Ledezma-Prieto and Ghermon Tucker started at

3  what time?

4  A.   12:33 a.m.

5  Q.   On 2/4?

6  A.   That's correct.

7  Q.   And continued until about what time in this

8  series of calls?

9  A.   12:55 a.m.

10  Q.   And if you could get back out, please.

11       Are there any calls regarding Jerome Ranger on

12  this day, involving Jerome Ranger on the phone you

13  attribute to Mayco Ledezma-Prieto?

14  A.   Yes, there is.

15  Q.   And that was at what time?  Who was calling

16  whom on this one?

17  A.   That's Jerome Ranger calling Mayco

18  Ledezma-Prieto at 1:01 in the morning.

19  Q.   And it's only for two seconds?

20  A.   Does that show -- what does that tell you as

21  far as the duration of the call?

22  A.   To me, that tells me that Mayco Ledezma-Prieto

23  probably did not pick up that phone call.

24  Q.   Okay.  And that was Jerome Ranger calling at

25  what time again?

1  A.   1:01 in the morning.

2  Q.   There's another series of calls hereafter with

3  Mayco Ledezma-Prieto talking to Ghermon Tucker.

4  That's from 2/4 from 1:03 --

5           MR. COOPER:  Excuse me.  I'm going to

6  object to the use of the words "talking to."  There

7  is no evidence of that.

8           MR. LACEY:  I'll take that.

9           THE COURT:  The objection will be

10  sustained.

11           MR. LACEY:  I'll rephrase it.

12  BY MR. LACEY:

13  Q.   A phone attributed to Mayco Ledezma-Prieto

14  connecting up with a phone linked to Ghermon

15  Tucker, we don't know -- you don't know who was

16  talking on the phone, do you?

17  A.   That's correct.

18  Q.   The calls -- the most recent batch started at

19  1:03 in the morning?

20  A.   Correct.

21  Q.   Is that correct?

22  A.   Correct.

23  Q.   And continued until when, on this batch of

24  calls we're look at, until when?

25  A.   10:45 a.m.

1  Q.   And there was a gap then from roughly two

2  o'clock until 10:45?

3  A.   That's correct.

4  Q.   Okay.  If we can back out, please.

5       And at 11:34, what does your chart show?

6  Mayco is calling whom?

7  A.   That's the phone number attributed to Mayco

8  Ledezma-Prieto is making an outgoing call to the

9  phone number attributed to Gregorio Guzman-Rocha.

10 Q.   And that's what time?

11 A.   That's at 11:34:03 a.m.

12 Q.   And three minutes later, whose Mayco's phone

13 calling?  Whose other phone is -- whose phone is

14 connected to -- who's the other person?

15 A.   Ghermon Tucker.

16 Q.   And skipping down to 11:49 -- 11:45 was the

17 last call in that series between a phone attributed

18 to Mayco and attributable to Mr. Tucker; is that

19 correct?

20 A.   That's correct.

21 Q.   Four minutes later, who's being called by

22 Mayco?

23 A.   Gregorio Guzman-Rocha.

24 Q.   Also known as Gollo, as far as you're aware?

25 A.   Correct.

1  Q.  And after those series of calls between the

2  phone attributable to Mayco and Gollo, what happens

3  next?  Who's being called?

4  A.  The phone attributed to Mayco is making

5  outgoing calls to the phone attributed to Ghermon

6  Tucker.

7  Q.  And that's about a minute after Mayco's phone

8  called Gollo's phone?

9  A.  That's correct.

10 Q.  And after those two calls between the phone of

11 Mayco and the phone of Tucker, what happened next?

12 A.  The phone attributed to Gregorio Guzman-Rocha

13 placed an outgoing call to the CHS's phone.

14 Q.  At what time?

15 A.  It's at 12:07:47 p.m.

16 Q.  And right after the CS -- the CS's phone and

17 Gollo's phone talk, who comes in next?

18 A.  Mayco Ledezma-Prieto.

19 Q.  Is calling whom?

20 A.  Gregorio Guzman-Rocha.

21 Q.  And that's at what time, the last call?

22 A.  At 12:19:25 p.m.

23 Q.  And what's the next call you show with Mayco

24 involved thereafter?

25 A.  At 3:54 p.m., Mayco's phone received an

1  incoming call from Ghermon Tucker's phone.

2  Q.  I thought we had -- we left off with Mayco

3  Ledezma at 12:07 and then 12:19.

4      What comes after 12:19?  Mayco was calling at

5  12:19, Mayco's phone calling Gollo's phone.  Who

6  was called next at 2:14 in the afternoon?

7  A.  Those next two calls are from Jerome Ranger

8  receiving calls from Ghermon Tucker.

9  Q.  So when we have incoming, on the left is a

10 phone you attribute to Jerome Ranger; correct?

11 A.  Correct.

12 Q.  And when it says "incoming," what does that

13 mean?

14     I know what it means, but you tell me what it

15 means so we have it on the record.

16 A.  In this chart, the second column, that "Known

17 User," the "Direction" column is in reference to

18 that user's phone, so for instance, on that -- on

19 the top call in this sheet, where it says Mayco

20 Ledezma-Prieto, on the date of 2/4 at 12:33 a.m.,

21 and the "Outgoing" for the "Direction," that means

22 that Mayco Ledezma-Prieto is making an outgoing

23 call, so the "Direction" column is in reference to

24 the first "Known User" column.

25 Q.  So at 2:14 and 2:31, who's calling Jerome

1  Ranger?  Whose phone is calling a phone you

2  attribute to Jerome Ranger?

3  A.   Ghermon Tucker's phone is calling Jerome

4  Ranger.

5  Q.   And then at --

6          THE COURT:  Stop.  You confused me.

7          MR. LACEY:  I'll back out.  Sorry.

8          THE COURT:  At 2:14, which phone is

9  calling which phone?

10          THE WITNESS:  Ghermon Tucker's phone is

11  calling Jerome Ranger's phone.

12          THE COURT:  All right.  Thank you.

13  BY MR. LACEY:

14  Q.   And likewise at 2:31?

15  A.   That's correct.

16  Q.   Same thing?

17  A.   Yes, sir.

18  Q.   And then at 3:54 in the afternoon, who's

19  calling whom?  Whose phone is calling whose phone,

20  based upon your input?

21  A.   Ghermon Tucker's calling Mayco

22  Ledezma-Prieto's phone.

23  Q.   And that's at what time again?

24  A.   At 3:54 p.m.

25  Q.   And when's the next call where the phone

1  attributable to Ghermon Tucker is calling Mayco's

2  phone?

3  A.   At 3:58 p.m.

4  Q.   And is there a second page for this chart?

5  A.   Yes.

6  Q.   I want to direct your attention next to

7  5:08 p.m.  Who's calling whom on that occasion?

8  A.   That's Ghermon calling Mayco.

9  Q.   And at 6:34?

10  A.   That's Mayco calling Ghermon.

11  Q.   And that is at 6:34 p.m.?

12  A.   That's correct.

13  Q.   And at 7:27 p.m.?

14  A.   That's Ghermon calling Mayco.

15  Q.   And the other calls speak for themselves at

16  the end.

17       And then skipping down, at 8:15, who is

18  calling whom on that occasion?

19  A.   The source is calling Gregorio Guzman-Rocha.

20  Q.   Okay.  Next I would ask you to look at Exhibit

21  No. 114 for identification.

22       Did you prepare a similar chart for March 2nd

23  of 2011?

24  A.   Yes, I did.

25  Q.   Using your same computer system?

1   A.   That's correct.

2   Q.   And does this chart reflect, then, the data

3   that you generated as a result of doing this

4   analysis?

5   A.   Yes.

6           MR. LACEY:  We'd offer 114.

7           MR. COOPER:  No objection.

8           MR. ARMSTRONG:  No objection.

9           MR. YOUNG:  No objection.

10          THE COURT:  114 can be admitted, can be

11  published.

12  BY MR. LACEY:

13  Q.   We're now on March 2nd of last year.  Let's

14  start with the first call on this particular page

15  of analysis.

16          Who do you have calling -- whose phone do you

17  have calling whose phone starting at 12:07 a.m.,

18  that is, just after midnight, on March 2?

19  A.   That's Ja'Cory Ranger's phone calling Jerome

20  Ranger's phone.

21  Q.   And when's the next call after that?

22  A.   12:08:18 a.m.

23  Q.   And again, these are all outgoing where a

24  phone attributable to Ja'Cory Ranger, per your

25  investigation, was calling his brother, Jerome

1    Ranger; is that correct?

2    A.    That's correct.

3    Q.    At 1:05 a.m., who's calling whom on this

4    occasion?

5    A.    Ghermon is calling Ja'Cory.

6    Q.    At what time is that?

7    A.    At 1:05:22 a.m.

8    Q.    And the next one?

9    A.    Ghermon is calling Ja'Cory at 1:06:58 a.m.

10    Q.    And whose phone is calling whose phone next?

11    A.    At 1:09:16 a.m. Ja'Cory's phone is calling

12    Ghermon's phone.

13    Q.    Next?

14    A.    2:11:40 a.m., Ja'Cory's phone calls Ghermon's

15    phone.

16    Q.    Next?

17    A.    At 4:16:24 a.m., Ghermon's phone calls

18    Ja'Cory's phone.

19    Q.    After the 4:16 a.m. call where Ghermon

20    Tucker's phone is calling Ja'Cory Ranger's phone,

21    what happens next?

22    A.    Gregorio Guzman-Rocha receives a call from the

23    CHS at 5:16:44 a.m.

24    Q.    And after that, what happened next?

25    A.    Gregorio Guzman-Rocha places an outgoing call

1  to the source at 5:16:59 a.m.

2  Q.   And what do you have next, after 5:16 a.m.?

3  A.   Gregorio Guzman-Rocha places a call to Mayco

4  Ledezma-Prieto at 5:33:35 a.m.

5  Q.   So we have Gollo's phone calling one

6  attributable to Mayco at 5:33.

7       What do you have in the morning?  What do you

8  have next?

9  A.   Gregorio Guzman-Rocha receives a call from the

10  source at 6:41:16 a.m.

11  Q.   And then again at 6:42?

12  A.   That's correct.

13  Q.   What do you have next at 7:40?

14  A.   At 7:40 Gregorio Guzman-Rocha places a call to

15  Mayco.

16  Q.   And next?

17  A.   Mayco places a call to Gregorio Guzman-Rocha.

18  Q.   Next at 7:46?

19  A.   Mayco places a call to Ghermon Tucker.

20  Q.   And again, so we're not misleading anyone,

21  when you say he places a call to Ghermon Tucker,

22  the phone attributable to Ghermon Tucker is what

23  you're actually saying; correct?

24  A.   That's correct.

25  Q.   At 7:52, who's calling whom on that occasion?

1  A.  Mayco's phone is in contact with Ghermon

2  Tucker's phone.

3  Q.  Now, I see the time duration, for example, the

4  call from Mayco's phone to Mr. Tucker's phone at

5  7:46 was, it looks like, five seconds.

6      What does that suggest to you?

7  A.  There's a five-second phone call.

8  Q.  Is that long enough to talk, or hard to say?

9  A.  Hard to say.

10  Q.  The next call is for a zero duration.  That

11  tells you, obviously, what?

12  A.  Normally a zero duration call represents a

13  text message.

14  Q.  At 7:52 a.m., who's involved in -- whose phone

15  is involved or whose phones are involved in that?

16  A.  Mayco's phone's placing a call to Ghermon

17  Tucker's phone.

18  Q.  And next, what do you have?

19  A.  Gregorio Guzman-Rocha receives a call from the

20  source at 8:34:56 a.m.

21  Q.  Next?

22  A.  Gregorio Guzman-Rocha places a call to Mayco

23  Ledezma-Prieto at 8:38:14 a.m.

24  Q.  What do you have next after 8:38?

25  A.  Mayco places a call to Gregorio Guzman-Rocha.

1  Q.  And next?

2  A.  Mayco places a call to Ghermon Tucker at

3  8:40:37 a.m.

4  Q.  And when you say 8:40:37, that's 37 seconds,

5  correct, 8:40 in the morning?

6  A.  That's correct.

7  Q.  And after Mayco's phone calls Mr. Tucker's

8  phone at 8:40, what happens next?

9  A.  Ja'Cory receives an incoming call from Jerome

10  Ranger at 8:58 a.m.

11  Q.  And the next call?

12  A.  Ja'Cory receives a call from Jerome Ranger at

13  9:02 a.m.

14        MR. ARMSTRONG:  Your Honor, may I ask the

15  witness to rephrase?  I object to the answer.

16  There is no indication that they actually spoke.

17        THE COURT:  Just indicate that the phones

18  contacted each other or something.

19  A.  Yeah, there was telephone contact between the

20  phones attributed to Ja'Cory and Jerome Ranger,

21  those two telephone numbers on that chart.

22  Q.  And that was at 8:58 in the morning?

23  A.  Correct.

24  Q.  And at 9:02?

25  A.  At 9:02 the phone number attributed to Ja'Cory

1    Ranger received a call, yeah, a call from the phone
2    number attributed to Jerome Ranger.
3    Q.   At 9:06?
4    A.   The phone attributed to Mayco Ledezma-Prieto
5    placed an outgoing call to the phone attributed to
6    Ghermon Tucker.
7    Q.   9:18?
8    A.   The phone attributed to Gregorio Guzman-Rocha
9    received a call to the phone, the CHS's phone.
10   Q.   And is there another call from the CS at 9:19
11   and -- 9:19 from the CS to Gollo again?
12   A.   That's correct.
13   Q.   At 9:25, what happens then?
14   A.   The phone attributed to Mayco Ledezma-Prieto
15   has an outgoing call with a phone attributed to
16   Ghermon Tucker.
17   Q.   At 9:41?
18   A.   The phone attributed to Mayco Ledezma-Prieto
19   has contact with a phone attributed to Ghermon
20   Tucker.
21   Q.   At 9:46?
22   A.   The phone attributed to Ja'Cory Ranger
23   received a call from the phone attributed to Jerome
24   Ranger.
25   Q.   At 9:56?

1   A.   Gregorio Guzman-Rocha, the phone attributed to

2   him placed an outgoing call to the phone attributed

3   to Mayco Ledezma-Prieto.

4   Q.   At 10:10?

5   A.   The phone attributed to Ja'Cory places a call

6   to the phone attributed to Ghermon Tucker.

7   Q.   At 10:17?

8   A.   The phone attributed to Mayco Ledezma-Prieto

9   places an outgoing call to the phone attributed to

10   Ghermon Tucker.

11   Q.   Two minutes later, who's in contact, whose

12   phones?

13   A.   Ja'Cory and Ghermon's.

14   Q.   At 10:20?

15   A.   Mayco and Ja'Cory's, those phones are in

16   contact with each other.

17   Q.   At 10:22?

18   A.   Ja'Cory and Ghermon's phones.

19   Q.   Is this the following page then?  We left off

20   at 10:22, so now we have --

21   A.   That's correct.

22   Q.   Okay.  At 10:22, another phone call.  Whose

23   phone is calling whose phone?

24   A.   Ja'Cory and Ghermon Tucker's, those phones.

25   Q.   At 10:23, whose phone is calling whose?

1    A.   The phone attributed to Mayco is making a

2    phone call to the phone attributed to Gregorio

3    Guzman-Rocha.

4    Q.   At 10:24?

5    A.   Ja'Cory and Jerome's phones were in contact.

6    Q.   And 10:25?

7    A.   Mayco and Gregorio Guzman-Rocha.

8    Q.   10:26?

9    A.   Jerome and Ghermon.

10   Q.   10:30?

11   A.   Ja'Cory and Ghermon.

12          THE COURT:   You missed 10:27.

13          MR. LACEY:   Sorry.  I'll go back.

14   BY MR. LACEY:

15   Q.   10:27?

16   A.   Ja'Cory and Ghermon.

17   Q.   10:30?

18   A.   Ja'Cory and Ghermon's phones.

19   Q.   10:34?

20   A.   Jerome and Ghermon's.

21   Q.   10:34 again?

22   A.   Ja'Cory and Jerome's.

23   Q.   10:35?

24   A.   Ja'Cory and Jerome's.

25   Q.   10:36?

1   A.   Mayco's and Ghermon's.

2   Q.   10:39?

3   A.   Mayco's and Gregorio Guzman-Rocha.

4   Q.   10:40?

5   A.   Mayco and Ja'Cory.

6   Q.   10:43?

7   A.   Ja'Cory and Ghermon.

8   Q.   10:49?

9   A.   Mayco and Ja'Cory.

10  Q.   10:49 again?

11  A.   Mayco and Ja'Cory.

12  Q.   10:50?

13  A.   Ja'Cory and Mayco.

14  Q.   10:56?

15  A.   Ja'Cory and Ghermon.

16  Q.   10:56 again?

17  A.   Mayco and Ghermon.

18  Q.   11:01?

19  A.   Ja'Cory and Jerome.

20  Q.   11:10?

21  A.   Mayco and Ghermon.

22  Q.   11:11?

23  A.   Mayco and Ghermon.

24  Q.   11:12?

25  A.   Mayco and Ja'Cory.

```
 1    Q.   11:15?

 2    A.   Ja'Cory and Ghermon.

 3    Q.   11:16?

 4    A.   Ja'Cory and Ghermon.

 5    Q.   11:16 again?

 6    A.   Ja'Cory and Ghermon.

 7    Q.   11:16 again?

 8    A.   Ja'Cory and Ghermon.

 9    Q.   11:17?

10    A.   Mayco and Ja'Cory.

11    Q.   11:18?

12    A.   Ja'Cory and Ghermon.

13    Q.   11:18 again?

14    A.   Ja'Cory and Ghermon.

15    Q.   11:21?

16    A.   Mayco and Ja'Cory.

17    Q.   11:23?

18    A.   Jerome and Ghermon.

19    Q.   11:25?

20    A.   Jerome and Ghermon.

21    Q.   11:26?

22    A.   Ja'Cory and Ghermon.

23    Q.   11:28?

24    A.   Gregorio and Mayco.

25    Q.   11:33?
```

A.   Mayco and Gregorio.

Q.   11:37 back on March 2 of last year, whose phone is calling whose?

A.   The phone attributed to Jerome Ranger is calling the phone attributed to Ghermon Tucker.

Q.   11:37 again?

A.   It's Mayco and Ghermon talking.

Q.   11:38?

A.   Ja'Cory and Ghermon's phones.

Q.   11:40?

A.   Jerome and Ghermon.

Q.   11:43?

A.   Mayco and Ghermon.

Q.   11:47?

A.   Ja'Cory and Ghermon.

Q.   11:49?

A.   Jerome and Ghermon.

Q.   11:56?

A.   Mayco and Ghermon.

Q.   12:02?

A.   Mayco and Ghermon.

Q.   12:07?

A.   Mayco and Ghermon.

Q.   12:21?

A.   Mayco and Ja'Cory.

```
 1   Q.   12:28?

 2   A.   Mayco and Ja'Cory.

 3   Q.   12:48?

 4   A.   Mayco and Ja'Cory.

 5   Q.   12:50?

 6   A.   Mayco and Ja'Cory?

 7   Q.   12:51?

 8   A.   Mayco and Ja'Cory.

 9   Q.   12:54?

10   A.   Ja'Cory and Ghermon.

11   Q.   1:01?

12   A.   Mayco and Ja'Cory.

13   Q.   1:03?

14   A.   Ja'Cory and Ghermon.

15   Q.   1:08?

16   A.   Mayco and Ja'Cory.

17   Q.   1:11?

18   A.   Ja'Cory and Mayco.

19   Q.   1:13?

20   A.   Ja'Cory and Ghermon.

21   Q.   1:18?

22   A.   Mayco and Ja'Cory.

23   Q.   1:41?

24   A.   Mayco and Ja'Cory.

25   Q.   1:54?
```

1  A.  Gregorio and the CHS.

2  Q.  2:04?

3  A.  Mayco and Ja'Cory.

4  Q.  2:44?

5  A.  2:44 is the Circle K pay phone.  The number

6  attributed to that phone has an outgoing call to

7  the phone attributed to Mayco Ledezma-Prieto.

8  Q.  You say the Circle K phone has an outgoing

9  call.  What do you mean?  Who's calling whose

10  number?

11  A.  The pay phone outside of the Circle K, there

12  is an outgoing call from that pay phone to the

13  phone attributed to Mayco Ledezma-Prieto.

14  Q.  That was 2:44 and 19 seconds?

15  A.  That's correct.

16  Q.  At 2:44 and 23 seconds, what phone is calling

17  what phone?

18  A.  The pay phone at the Circle K is again calling

19  the phone attributed to Mayco Ledezma-Prieto.

20  Q.  And at 2:44 and 24 seconds?

21  A.  The phone attributed to the Circle K pay phone

22  is calling the phone attributed to Mayco

23  Ledezma-Prieto.

24  Q.  We'd ask that the witness be shown Exhibit 115

25  for identification.

1       Can you identify that for us?

2  A.   Yes.  That's a page from the CART examination

3  of the phone attributed to Ja'Cory.

4            MR. LACEY:  We'd offer 115.

5            MR. COOPER:  No objection.

6            MR. ARMSTRONG:  Can we get some foundation

7  as to who it was sent to and who it was received --

8  or allegedly who it was -- whether this is an

9  incoming or outgoing --

10           THE COURT:  Tell us more about it.

11 BY MR. LACEY:

12 Q.   Which phone do you attribute the message being

13 sent from and what phone do you attribute the

14 message being sent to?

15 A.   This message is being sent from the phone

16 attributed Ja'Cory Ranger, and it's being sent to a

17 phone attributed Ghermon Tucker.

18           MR. LACEY:  We offer 115.

19           MR. ARMSTRONG:  No objection.

20           MR. COOPER:  No.

21           MR. YOUNG:  No objection, Your Honor.

22           THE COURT:  115 can be admitted.

23           MR. LACEY:  Published?

24           THE COURT:  And published.

25 BY MR. LACEY:

1  Q.  Sir, would you read the message for us?  This

2  is whose phone again texting another phone?  Who is

3  that again?

4  A.  The phone attributed to Ja'Cory Ranger is

5  placing a text to the phone attributed to Ghermon

6  Tucker at 10:32 a.m.

7  Q.  At 10:32 in the morning?

8  A.  That's correct.

9  Q.  On what date?

10  A.  March 2nd, 2011.

11  Q.  So at 10:32, what's the message?

12  A.  It says, "Hit me ASAP.  We going to Tucson in

13  30 minutes.  Your people just left me.  They're

14  ready."

15        THE COURT:  Stop.  "PPL" you interpreted

16  as "people"?

17        THE WITNESS:  That's correct.

18        THE COURT:  Do you want to lay more

19  foundation about how he can interpreter "PPL."

20  Q.  Sure.  It wouldn't come -- I'm not a big

21  texter.

22  BY MR. LACEY:

23  Q.  Tell us about "PPL."  Why do you attribute

24  "PPL" as "people"?

25  A.  Just as in context to that text, that that's

1  how you would abbreviate "people."

2  Q.   When people text, do they use abbreviations,

3  or do they spell the words out?

4  A.   They abbreviate because there's only some

5  characters you can enter in a text string.

6         THE COURT:  Does everyone abbreviate?

7         THE WITNESS:  I don't know.

8         THE COURT:  All right.  Go ahead.

9  BY MR. LACEY:

10 Q.   Did you also do some sort of a summary of

11 number of calls between certain parties that were

12 involved in this?

13 A.   Yes, I did.

14 Q.   These numbers we've looked at?

15 A.   Correct.

16 Q.   The phone attributable to Ghermon Tucker, per

17 your investigation, and Mayco Ledezma-Prieto, also

18 known as Mayco/Seco, what time frame did your

19 summary cover when you did that analysis?

20 A.   January 13th, 2011, through March 2nd, 2011.

21 Q.   January 13 to March 2nd?

22 A.   Correct.

23 Q.   And how many contacts one way or the other

24 were there between those two phones between those

25 dates?

A.    544.

Q.    I want to direct your attention next to the --
and just so we have this down, are there certain
phones, again, that you attributed to Ghermon
Tucker?

A.    Yes.

Q.    And what were those phones?

A.    Phone numbers (480)292-4572, phone number
(480)392-3443, and phone number (520)208-4935.

Q.    And likewise with Mayco Ledezma-Prieto?

A.    (520)264-6030 and (602)218-0143.

Q.    I want to break it down a little further as
far as your contacts between a phone attributable
to Mr. Tucker and Mr. Ledezma.

      From January 13 to 2/22/11, how many contacts
were there between the two phones?

A.    473.

Q.    From February 10 (sic) of 2011 to February 10
of '11, were there any contacts?

A.    There were four contacts in that date range
between the phone number attributed to Ghermon
Tucker at (520)208-4935 and the phone number
attributed to Mayco at (602)218-0143.

Q.    And the earlier contacts you had for 473, what
were the -- 473 contacts between January 13 and

1  February 22, what were the numbers there for

2  Mr. Tucker and Mr. -- we'll call him Mayco?

3  A.    Ghermon Tucker, the phone attributed to him

4  was at (480)292-4572, and the phone attributed to

5  Mayco for those contacts is (602)218-0143.

6  Q.    From February 23 to March 2nd, were there some

7  contacts between phones attributable to Mr. Tucker

8  and Mayco?

9  A.    Yes, sir, there were.

10  Q.    And what numbers did your examination connect

11  between those dates?

12  A.    (480)292-4572 and (520)264-6030.

13  Q.    And the 6030 was Mr. -- was Mayco's phone?

14  A.    That's correct.

15  Q.    And 4572 is the one you attribute to

16  Mr. Tucker?

17  A.    That's correct.

18  Q.    From February 26 to March 2nd, did you do an

19  analysis of the contact between a phone

20  attributable to Mr. Tucker and that of Mayco?

21  A.    Yes, I did.

22  Q.    And the numbers you had for Mr. Tucker, what

23  number?

24  A.    (520)208-4935.

25  Q.    And Mr. -- Mayco?

1  A.  (520)264-6030.

2  Q.  And how many contacts were there between

3  February 26 and March 2nd between those phones?

4  A.  60 contacts.

5  Q.  And that totaled up to the 544 you gave us?

6  A.  That's correct.

7  Q.  Contacts between a phone attributable to

8  Mr. Ja'Cory Ranger and Mayco from January 1st of

9  '11 to March 2nd of '11, did you do an analysis to

10  see what contacts there were between Ja'Cory

11  Ranger, a phone attributable to him or a push-to-

12  talk, and Mr. -- and Mayco?

13  A.  Yes, I did.

14  Q.  And what number did you attribute to

15  Mr. Ranger, Ja'Cory Ranger?

16  A.  Push-to-talk 146*307*5352.

17  Q.  And to Mr -- to Mayco?

18  A.  128*748*10100.

19  Q.  And how many contacts were there between --

20  this is on March 2nd.

21  A.  That's correct.

22  Q.  How many contacts?

23  A.  19 contacts.

24  Q.  On March 2?

25  A.  That's correct.

1    Q.   And this is push-to-talk to push-to-talk?

2    A.   Correct.

3    Q.   Now, what's the difference between a regular

4    phone call and a push-to-talk, when someone's

5    communicating from push-to-talk to push-to-talk as

6    opposed to a regular cell phone to cell phone?

7         Is there a difference, or is it just through a

8    different communication number or reference number?

9    A.   It's through a different number, and they go

10    through different towers, cell towers.

11    Q.   I want to direct your attention next to

12    connections between Mr. Jerome Ranger and Mayco.

13         From January 1st of '11 to March 2 of '11,

14    were there any contacts between Mr. Jerome Ranger

15    and Mayco on those dates?

16    A.   There was one contact.

17    Q.   And what number did you attribute to

18    Mr. Jerome Ranger?

19    A.   (480)220-7134.

20    Q.   And to Mr. -- to Mayco?

21    A.   (602)218-0143.

22    Q.   Did you show any contacts between Gregorio --

23    we'll call him Gollo -- and Mayco from February 2nd

24    of '11 to March 2 of '11?

25    A.   Yes, I did.

1    Q.   What were the total contacts on those -- on

2    those dates, just total, not breaking them down?

3    A.   There were 33 contacts from January 27, 2011,

4    to March 2nd 2011.

5    Q.   Between the CS and Gollo, as we'll call him,

6    Gregorio, how many contacts were there on March 2?

7    A.   15 contacts.

8    Q.   And that's between the CS and Gollo?

9    A.   That's correct.

10   Q.   Contacts between Gollo and Mayco on March 2,

11   would you give us a breakdown, a total for the

12   contacts between Gollo and Mayco on March 2nd?

13   A.   There were 11 contacts.

14   Q.   Contacts between Mayco and Ghermon Tucker's

15   phone on March 2?

16        Breaking this down separately, give us Mayco's

17   phone number and a phone you attribute to

18   Mr. Tucker?

19   A.   The phone I attribute to Mayco was

20   (520)264-6030, and then it had contacts with two

21   phones attributed to Ghermon Tucker, (480)292-4572,

22   two contacts, and then (520)208-4935, 15 contacts.

23   Q.   Between a phone attributable to Mayco and

24   Mr. Tucker?

25   A.   That's correct.

1  Q.  Contacts between Mayco and Mr. Ja'Cory Ranger

2  on March 2nd, were there contacts there, and if so,

3  would you give us the numbers first?

4  A.  The numbers attributed to Mayco was

5  128*748*10100, and the phone attributed to Ja'Cory

6  Ranger was 146*307*5352.

7  Q.  And on March 2nd, contacts between Mayco's --

8  the phone you attribute to Mayco, and Mr. Ja'Cory

9  Ranger, how many contacts total were there on March

10  2nd?

11  A.  19.

12  Q.  Contacts between Ghermon Tucker's phone and

13  Ja'Cory -- Mr. Ja'Cory Ranger's phone on March 2,

14  would you give us the numbers and the number of

15  total contacts on March 2 between Mr. Ghermon

16  Tucker and Mr. Ja'Cory Ranger?

17  A.  The phone attributed to Ghermon was

18  (480)392-3443, the phone attributed to --

19  Q.  Ja'Cory Ranger?

20  A.  (504)253-0220.

21  Q.  And how many contacts total on March 2nd

22  between Mr. Tucker and Mr. Ja'Cory Ranger?

23  A.  25.

24  Q.  Contacts on March 2nd between Mr. Ghermon

25  Tucker and Jerome, Mr. Jerome Ranger's phone, give

1  us the number for Mr. Ghermon Tucker on that date?

2  A.  (480)392-3443.

3  Q.  And the phone you attribute to Mr. Jerome

4  Tucker?

5  A.  Jerome Ranger.

6  Q.  I'm sorry.  Jerome Ranger.  I'm sorry.

7  A.  (480)220-7134.

8  Q.  And how many contacts on March 2nd between the

9  phone attributable to Mr. Tucker and Mr. Jerome

10 Ranger?

11 A.  Seven contacts.

12 Q.  Contacts between the phone attributable to

13 Mr. Ja'Cory Ranger and Mr. Jerome Ranger on March

14 2nd, would you give us the numbers and total

15 contacts on March 2?

16 A.  The number attributed to Ja'Cory was

17 (504)253-0220.  The number attributed to Jerome was

18 (480)220-7134.

19 Q.  Total contacts between the two of them, the

20 brothers, on March 2, were how many?

21 A.  13.

22 Q.  Contacts from the Circle K pay phone at

23 Congress and I-10 here and a phone attributable to

24 Mayco Ledezma on March 2nd?

25 A.  There were three contacts.

Q.   On February 4 of 2011, how many contacts were
there between the CS and Gregorio, Gollo's phones,
back on February 4 of 2011?

A.   Three.

Q.   And what were the -- what was the number for
Gollo back on that date, that you attribute to him?

A.   (602)349-4214.

Q.   On February 4, was there any contact between a
phone attributable to Gregorio -- to Gollo and
Mayco Ledezma-Prieto?

A.   Yes.

Q.   Would you give us the number for Gollo back on
that date and the number for Mayco and then the
total contacts?

A.   The number for Gollo was 128*748*1031.  The
number for Mayco was 128*754*10067.

Q.   On February 4 of '11, how many contacts
between Gollo and Mayco?

A.   Seven contacts.

Q.   Contacts between Mayco and the phone
attributable to Mr. Ghermon Tucker on February 4,
give us Mayco's number and then a phone you
attribute to Mr. Ghermon Tucker?

A.   The phone attributed to Mayco was
(602)218-0143.

1  Q.   And Mr. Tucker?

2  A.   (480)292-4572.

3  Q.   And the total contacts between those phones on

4  February 4 of 2011 were how many?

5  A.   34 contacts.

6  Q.   Contacts between a phone attributable to Mayco

7  and Mr. Jerome Ranger on February 4, give us the

8  number for Mayco and Mr. Jerome Ranger's phone on

9  that date, on February 4?

10  A.   For Mayco, (602)218-0143.

11  Q.   And Mr. Jerome Ranger?

12  A.   (480)220-7134.

13  Q.   And were there any calls between those two

14  phones and February 4, Mayco's and Mr. Jerome

15  Ranger?

16  A.   There was one contact.

17  Q.   Contacts between Ghermon, a phone attributable

18  to Ghermon Tucker, and Mr. Jerome Ranger on

19  February 4, would you give us the number for

20  Mr. Ghermon Tucker?

21  A.   (480)392-3443.

22  Q.   And Mr. Jerome Ranger?

23  A.   (480)220-7134.

24  Q.   Were there any contacts between Mr. Ghermon

25  Tucker's phone and Mr. Jerome Ranger's phone on

1  February 4 of last year?

2  A.   Two contacts.

3       MR. LACEY:  No further questions.

4                    CROSS-EXAMINATION

5  BY MR. COOPER:

6  Q.   Hello.  It's a cell phone; right?

7  A.   Correct.

8  Q.   Dangerous in some people's hands; right?  It's

9  a joke.

10      This is -- what's a land line?

11  A.   What I would consider a land line would be a

12  telephone in a house that is hooked up to a phone

13  cord.

14  Q.   Okay.  And land lines come into a specific

15  place and really can't be moved from that

16  residence.  The phone call comes from -- through

17  phone lines into the residence, period; right?

18  A.   The phone line does not move.  That's correct.

19  Q.   Okay.  And the phone -- the number for that

20  home that the land line goes to is that home,

21  period; right?

22  A.   No.

23  Q.   The number for the phone can move?

24  A.   You can move your phone number if you move

25  houses.

1  Q.   You can change your phone number, but what I'm

2  talking about is, you have a phone where a land

3  line comes into the house.  That phone has a

4  specific number for that house; right?

5  A.   The house isn't assigned a phone number.

6  Q.   The phone is, and the land line comes into the

7  house; right?

8  A.   The land line comes in the house, but I would

9  say that the phone is assigned to the subscriber of

10 that phone number.

11 Q.   All right.  So if there's a phone at a home

12 from a land line and one person is living in that

13 home, and let's say you're observing the home, and

14 nobody comes to visit but the one person is in

15 there, and the phone is being used from the home,

16 you can be pretty certain that phone is being used

17 by the person in the home; right?

18 A.   I can't answer who's on the phone.

19 Q.   You can if you know there's only one person in

20 the house and there is a land line in that home --

21 A.   If I knew that for certain, yes.

22 Q.   That's all I'm saying is, if you have land

23 line, you can have a little more certainty as to

24 who's using the phone based on who has access to

25 the home; right?

1   A.   True.

2   Q.   Okay.  Now, you did a lot of computer work and

3   the pen pack work to come up with these charts and

4   all of this, all these numbers that you came up

5   with; right?

6   A.   That's correct.

7   Q.   Okay.  Let me ask you about texting.  On the

8   charts that you created, are you able to tell the

9   difference when somebody makes a phone call versus

10   a text?

11   A.   What I can tell is the duration of a call, and

12   normally the zero duration call represents a text.

13   Q.   Zero duration?

14   A.   Correct.

15   Q.   Zero duration could mean somebody picked it up

16   and there's no answer, or would that be one second?

17   A.   I would understand that to be there would be

18   some type of duration if the two phone calls -- if

19   there were telephone contact.

20   Q.   Okay.  Well, let me ask you about texting

21   then.

22       If I text you right now, that counts as one

23   contact; right?

24   A.   Correct.

25   Q.   And you text me back, that's two; right?

1    A.   Correct.

2    Q.   So you and I could sit here for the next --

3    let's say we're -- let's say I'm not in this room.

4    Let's say I'm outside, I need to get ahold of you,

5    and I text you about something I want to talk

6    about, and you text me back, and we have a text

7    conversation for the next hour in which there are,

8    let's say, 20 texts from me, 20 to you.

9         That would count as 40 contacts under your

10   calculations; right?

11   A.   Correct.

12   Q.   And companies like Verizon and that sort of

13   thing make a lot of money based on plans for

14   texting; right?  And thousands of texts per month

15   take place on, let's say, one phone; right?

16   A.   That could happen.

17   Q.   Well, could and does.

18             THE COURT:  Depends on whose phone.

19             MR. COOPER:  Right.

20   BY MR. COOPER:

21   Q.   Let me ask you about when you prepared these

22   charts, because I'm a little bit confused about --

23   and I don't know if you have it in front of you.

24   I'll show it to you -- Bates stamp 9477, which was

25   one of the charts that you prepared.

1    And you attributed a number, (480)292-4572, to

2  Ghermon Tucker.  Do you have 9477 in front of you?

3  A.  I don't have anything Bates stamped in front

4  of me.

5         MR. COOPER:  May I approach, Judge?

6         THE COURT:  You may.

7  BY MR. COOPER:

8  Q.  This chart.

9  A.  Yes.

10  Q.  Okay.  And that number, 292-4572, you

11  attributed it Ghermon Tucker; right?

12  A.  Correct.

13  Q.  Okay.  What I don't understand is, right above

14  the second notation, which is attributed to Ghermon

15  Tucker, you say (480)292-4572 is attributed to

16  Jerome Ranger?

17  A.  Correct.  That was a typographical error.

18  Q.  So the FBI makes mistakes?

19  A.  There was a type -- I made a typographical

20  error on that chart, yes.

21  Q.  That's not a typographical error.  That's a

22  name error.  You've got Jerome Ranger's name

23  attribute to 292-4572.

24  A.  Correct, on that chart.

25  Q.  Okay.  And so this went out to the U.S.

1    Attorney's Office; right?

2    A.   It was given to them, yes.

3    Q.   And this chart was prepared how long ago?

4    A.   Roughly two weeks ago.

5    Q.   Okay.  And how long have you known about this

6    error?

7    A.   I discovered it probably a couple days after

8    preparing that chart.

9    Q.   Okay.  And there was never a correction made?

10   A.   No, not on that chart.

11   Q.   Okay.  You have attributed during a meeting --

12   this would be on Exhibit 113 -- there's a meeting

13   at roughly noon on February the 4th of 2011.

14        You're familiar with that meeting; right?

15   A.   I'm familiar that a meeting took place, yes.

16   Q.   Okay.  And during the meeting, present was

17   somebody named Gollo; correct?

18   A.   That's my understanding.

19   Q.   Okay.  Well, I mean, you've been part of this

20   investigation; right?

21   A.   Correct.

22   Q.   So you know that Gollo is Gregorio

23   Guzman-Rocha; right?

24   A.   Correct.

25   Q.   Okay.  And you also know that at that meeting

1  was the confidential source who testified last

2  week, Mr. Gutierrez; right?

3  A.  He was at that meeting, correct.

4  Q.  Okay.  Can you explain why during that meeting

5  you have listed under Exhibit 113 a phone call or a

6  text from Gregorio Guzman-Rocha to the confidential

7  source at 12:07, while the meeting's going on.

8  A.  All I can say is that there was telephone

9  contact between those two numbers at that time.

10  Q.  Okay.  So you can't explain why they'd be

11  talking to each other while they're standing next

12  to each other by phone; right?

13  A.  I wasn't at the meeting, sir, I cannot.

14  Q.  Okay.  You also -- what's a prepaid phone?

15  A.  A prepaid phone is a phone that you would --

16  you can go out and purchase minutes on and put

17  those minutes on that phone, and then you can use

18  that phone for those many minutes, and when those

19  minutes -- when you use up all those minutes, you

20  would have to buy more minutes to use the phone.

21  Q.  And the phone is given a phone number; right?

22  A.  Correct.

23  Q.  And are you able to tell whether any of the

24  phones you've looked at are prepaid phones?

25  A.  Yes.

1    Q.   And which phones that you've talked about this

2    morning are prepaid phones?  What numbers?

3    A.   A phone number attributed to Mayco

4    Ledezma-Prieto, (520)264-6030.  A phone number

5    attributed to (602)218-0143.

6    Q.   Who is the person that that phone number is

7    attributed to?

8    A.   Mayco Ledezma-Prieto.

9    Q.   Okay.

10   A.   The phone number (602)349-4211 -- or 4214

11   attributed to Gollo.  Phone number (602)388-5053

12   attributed to Gollo.  Phone number (520)208-4935

13   attributed to Ghermon Tucker.  Phone number

14   (480)292-4572 attributed to Ghermon Tucker.  Phone

15   number (504)253-0220 attributed to Ja'Cory Ranger.

16   Phone number (480)220-7134 attributed to Jerome

17   Ranger.

18        And that is all.

19   Q.   Okay.  So at least for Ghermon you have two

20   prepaid phones; right?

21   A.   That's correct.

22   Q.   And the way you've attributed these prepaid

23   phones or any of the phones to an individual is,

24   with respect to some of them, at least, you look at

25   other phones, and this is how the pen pack and the

1    computer system does it, and you would have, let's
2    say, a contact list.
3    A.    Uh-huh.
4    Q.    And in the contact list, somebody might have
5    Ghermon's name, for instance, in the contact list
6    and the number that might be the prepaid number for
7    instance; right?
8    A.    Correct.
9    Q.    And the computer would say, that would -- that
10   would attribute that phone to Ghermon, right, if
11   somebody else has his name in the contact list with
12   that number; right?
13   A.    Well, he would attribute that name on that
14   contact list associated with that phone number.
15   Q.    And that's one of the ways you determine that
16   the phone should be attributed to Ghermon?
17   A.    That's correct.
18   Q.    In fact, that would attribute the phone to
19   Ghermon if, in another person's phone, his name
20   was -- in the contact list, his name there was
21   there with the number of, let's say, the prepaid
22   phone; right?
23   A.    That would be one way, yes.
24   Q.    And you would attribute, say that's Ghermon's
25   phone, right, based on somebody else's action of

1    putting their name and number in their phone;

2    right?

3    A.   That would be one thing I would use, yes.

4    Q.   Okay.  But let's say the prepaid phones -- all

5    of these cell phones, actually, can be pretty

6    fungible.  I mean, somebody can get a prepaid

7    phone, use it, and then give it to a friend and

8    say, you know, I've got 30 more minutes on it and

9    you can have it; right?

10   A.   That's possible.

11   Q.   And that is one of the things about prepaid

12   phones and buying time is that you don't have a

13   bill coming in at the end of the month; right?

14   A.   That's correct.

15   Q.   Okay.  So you don't know when the contact on

16   the first phone, let's say Ghermon's name, was put

17   into that phone, do you?

18   A.   That's correct.

19   Q.   It could have been put in after he gets a

20   prepaid phone and tells somebody here's my new

21   number on a prepaid phone I've got for a month;

22   right?

23   A.   I do not know when that contact list was put

24   in.

25   Q.   And then certainly you knew that he had a

1  regular phone that he was paying for that's, I

2  believe, (480)292 -- I'm sorry.  (480)392-3443;

3  right?

4  A.  Correct.  That phone was subscribed to Ghermon

5  Tucker.

6  Q.  And when you say subscribed, that means he

7  goes to some carrier and says, bill me at the end

8  of the month, I'll pay my bill, and this is my cell

9  phone; right?

10  A.  Correct.

11  Q.  As opposed to the prepaid, where you put money

12  down and say, I want a hundred minutes; right?

13  A.  Correct.

14  Q.  Okay.  Let me ask you -- I'll let the other

15  lawyers deal with most of this, but let me ask you

16  a couple questions about the contacts between

17  people.

18      All you know is you have numbers and names

19  attributed to numbers; right?

20  A.  Correct.

21  Q.  You don't know anything in terms of the

22  background of who's calling whom; right?

23  A.  I do not know who's on the phone.  That's

24  correct.

25  Q.  So you don't know the relationship between

1 Mayco and Ghermon; right?

2 A.   Correct.

3 Q.   You don't know, for instance, if they grew up

4 next door to each other in Phoenix; right?

5 A.   I do not know where they grew up.

6 Q.   And you don't know what neighborhood the

7 Rangers are from either, do you?

8 A.   No.

9 Q.   Okay.  And I've got just basically one final

10 question for you.

11      If you look at Exhibit 114, if you look at the

12 last page, this is a chart that you developed,

13 right, from telephone contacts?

14 A.   Correct.

15 Q.   And it has to do with contacts on March 2nd;

16 right?

17 A.   Correct.

18 Q.   Between a variety of people; right?

19 A.   Correct.

20 Q.   Including Mayco Ledezma-Prieto; right?

21 A.   Correct.

22 Q.   And you have Mayco's phone calls throughout

23 the day, basically on a number that you have listed

24 as 128*748*10100; right?

25 A.   Correct.

1  Q.   And that's the number for -- well, there's

2  another number that he uses.  It's 264-6030.

3       Now, is that the same number?

4  A.   It's the same phone.

5  Q.   Same phone?

6  A.   Correct.

7  Q.   And throughout this chart, you basically have

8  Mayco using one phone the entire day; right?

9  A.   I believe there's one other phone also at

10 phone number (602)218-0143.

11 Q.   Okay.  So two phones during the course of the

12 day used by Mayco?

13 A.   That's correct.

14 Q.   Phones attributed to him?

15 A.   Correct.

16 Q.   Okay.  If you look at the last page that I was

17 talking about, on March 2nd, if you'll go to, let's

18 say, the time where it says 1:18 p.m.

19      Right?

20 A.   Uh-huh.

21 Q.   Do you see where I'm talking about?

22 A.   1:18:12 p.m.?

23 Q.   Correct.  At that point you have Mayco making

24 a call on the phone, and this is, like, one of

25 those push calls; right?

1    A.    A push-to-talk call.

2    Q.    Push-to-talk?

3    A.    Correct.

4    Q.    That's 128*748*10100; right?

5    A.    Correct.

6    Q.    And Mayco makes two calls at it looks like

7    1:18 and 1:41, at that time; right?

8    A.    Those phones are in telephonic contact; right.

9    Q.    Okay.  Or whoever has that phone.

10       Then you have another call, and this is --

11    again, you're being assisted by your computer in

12    generating this chart; right?

13    A.    I'm using my computer to do this; correct.

14    Q.    Okay.  And you're trying to demonstrate the

15    phone calls that are being made during the course

16    of the, well, the FBI looking at people at the

17    warehouse, for instance, on March the 2nd, 2011;

18    right?

19    A.    This chart was prepared to show contacts

20    between the phones that were seized that day.

21    Q.    And Mayco then makes a call at 2:04:41 p.m.;

22    right?

23    A.    The phone attributed to him.

24    Q.    Right.  Outgoing.

25       And the arrest in this case at the warehouse

1    where Mayco was arrested was 2:24 p.m.; right?

2    A.   I do not know that time.

3    Q.   Okay.  The next call after the 2:04 p.m. phone

4    call looks like a pay phone call at 2:44; correct?

5    A.   Correct.

6    Q.   There's no calls at all by anyone on this

7    chart, particularly not by Mayco, after

8    2:04:41 p.m., right?

9    A.   Correct.

10             MR. COOPER:  That's all I have.

11                    CROSS-EXAMINATION

12   BY MR. ARMSTRONG:

13   Q.   Good morning, Mr. Douglass.  How are you?

14   A.   Good.

15   Q.   Good.  A few more questions.

16        Do you know how long -- I'm stuck on the whole

17   business about one phone talking to another, and if

18   a person doesn't answer, if the receiving party

19   doesn't answer, whether that shows up as a phone

20   call.

21        Do you know the answer to that?

22   A.   No, I don't know the exact answer to that.  It

23   would depend on the phone company.

24   Q.   Would you agree that a two- or three- or even

25   a five-second phone call, it would be difficult to

1  communicate information during that phone call?

2  A.   It would be a quick call, yes.

3  Q.   And even a 10- or 15-second call, that would

4  be -- I mean, it's really difficult to say much

5  more than, hey, how are you doing, in under 10

6  seconds.

7       Would you agree with that?

8  A.   I don't know what you could say in 10 seconds.

9  Q.   Okay.  Well, you wouldn't say, hey, come with

10 me, let's go rip off a stash house in Tucson in 10

11 seconds and get a meaningful response.

12      Would you agree with that?

13 A.   No.

14 Q.   Okay.  You wouldn't agree with that?

15 A.   I can't say how many words can be said in 10

16 seconds.

17 Q.   If you take a look at Exhibit 113 --

18      THE COURT:  Do you want it published or do

19 you want him to take a look at it?

20      MR. ARMSTRONG:  If he would just take a

21 look at it.

22 BY MR. ARMSTRONG:

23 Q.   You and Mr. Lacey were talking about so many

24 phone calls so fast, I may have gotten myself

25 lost.

1    On Exhibit 113, that's dealing with phone

2 calls on February 4, 2011.  Did you note any

3 telephone calls between Ja'Cory Ranger's phone or a

4 phone attributed to Ja'Cory Ranger and anybody?

5 A.   No, I did not.

6 Q.   And on Exhibit 114, which is dealing with the

7 phone calls on the date we're talking about, March

8 2nd, 2011, did you notice or come across any

9 telephone calls between Ja'Cory Ranger's telephone

10 and the phone you attribute to the confidential

11 human source, Tony?

12 A.   No, I did not.

13 Q.   Okay.  Same question but for Gollo's phone and

14 Ja'Cory's phone.

15 A.   Were there any calls between Ja'Cory's phone

16 and Gollo's phone?

17 Q.   Yes.

18 A.   There were not.

19 Q.   Okay.  And just getting back, you're not sure

20 how long -- I mean if a person leaves a voice mail,

21 if I call you and leave a voice mail, and let's say

22 it's a minute long voice mail, does it show up as a

23 minute-long phone call, if you know?

24 A.   I don't know.

25 Q.   If you answer or if -- so you're not sure

1   whether the timing of these calls begins when, for

2   instance, I call you, and you see it's me, and

3   you're like, I'm not talking to that Armstrong

4   knucklehead, and you just let the phone ring, it

5   rings for 30 seconds and it goes dead, you don't

6   know whether that is a 30-second phone call or a

7   zero phone call or somewhere in between, do you?

8   A.   That's correct.

9   Q.   This is just a for instance here.  I want you

10  to, if you would take a look at 113, and maybe we

11  could publish that to the jury.

12          NICOLE WILLIAMS:  Which page?

13          MR. ARMSTRONG:  The first.  Excuse me.  I

14  don't need that right now.  Thank you.

15  BY MR. ARMSTRONG:

16  Q.   The way that you attribute -- well, during

17  your investigation -- and you've been involved in

18  this case for a year and a half, safe to say?

19  A.   Safe to say.

20  Q.   During your investigation, did you come across

21  any subscriber information to the telephone that

22  you attribute to Ja'Cory Ranger?

23  A.   Yes, I did.

24  Q.   And where did you obtain that information?

25  A.   From the telephone provider.

Q.  Sprint Nextel?

A.  Correct.

Q.  And who was -- was there some sort of record at Sprint Nextel saying that that phone was bought and paid for by Ja'Cory Ranger?

A.  Not that I -- not that I have in front of me. I don't know.

Q.  And you have a computer program Pen-Link, as I recall, and that helps you figure out which phones have contact information that's similar to other phones; correct?

A.  Pen-Link, I didn't use Pen-Link for that.

Q.  Okay.  Okay.  If I have Mr. Lacey's phone number in my phone and or in my phone or a phone you're trying to figure out who it belongs to, and you see Mr. Lacey's number in there, you might be able to -- and if you knew I knew Mr. Lacey, you might assume that that was his telephone number.

    Would you agree with that?  Let's say it says "Jim Lacey" on the contacts?

A.  I'd say that's safe.

Q.  Okay.  So you have, as I understand your testimony here, on a phone that you attribute to Mayco, there's a contact named Corty, C-o-r-t-y?

A.  Correct.

1  Q.  And in a contact from a phone that you

2  attribute to Rashad -- I assume that's Rashad

3  McCuin?

4  A.  That's correct.

5  Q.  You have a Cory, C-o-r-y?

6  A.  Correct.

7  Q.  And the other information that you use to

8  attribute this to this telephone to Ja'Cory is a

9  text that says "Whts up wit u dis Cory"?

10  A.  Correct.

11  Q.  Do you know when that -- do you know when that

12  text was sent?

13  A.  On March 28, 2011.

14  Q.  So Corty and Cory, you're assuming that's the

15  same person?

16  A.  I am -- that number is listed as the same from

17  both those contacts.

18        MR. ARMSTRONG:  May I have just one

19  moment?

20        THE COURT:  You may.

21  BY MR. ARMSTRONG:

22  Q.  You also looked at some texts related to

23  this -- this investigation, didn't you?

24  A.  Correct.

25  Q.  Okay.  You read a lot of texts.

1    If a telephone goes dead, runs out of juice,

2  does it still -- and a call comes into it, do you

3  know whether that -- you would be able to determine

4  whether the phone -- well, let me ask it a

5  different way.

6    If a phone has no juice, no power, and a call

7  comes in, would it show in your investigation, from

8  the information you got from the subscribers, would

9  it show that a phone call came into that phone?

10  A.   I do not know.

11  Q.   And back to the texts, if I showed you a

12  couple of texts that we received in disclosure and

13  asked you to take a look at them, do you think you

14  might be able to help me interpret what they mean?

15  A.   I can try.  I can take a look at them.

16  Q.   And thank you for that.

17        MR. ARMSTRONG:  Your Honor, may I approach

18  the witness?

19        THE COURT:  You may.

20  BY MR. ARMSTRONG:

21  Q.   And if you need additional information, I'm

22  happy to show it to you.  Maybe you already have it

23  there.  It's not Bates stamped, but it's -- let me

24  just hand it to you there.

25    It looks like four pieces of paper.  And if

1  you need others, let me know.

2  A.   So -- well, I'd like to have -- you've given

3  me 49, 51 and 53 and 55.  There should be --

4  there's some pages missing that go between them.

5          THE COURT:  Do you want to take a break

6  and get them in order?

7          MR. ARMSTRONG:  Yes.  Thank you.

8          THE COURT:  Lets take about 10 minutes.

9          (The jury exits the courtroom.)

10          (Off the record.)

11          (The jury enters the courtroom.)

12          THE COURT:  Show the jurors returned back

13  to the courtroom, the presence of all counsel and

14  the defendants.

15          You may continue.

16          MR. ARMSTRONG:  Thank you, Your Honor.

17  BY MR. ARMSTRONG:

18  Q.   Mr. Douglass, do you have some more papers

19  there in front of you --

20  A.   Yes, I do.

21  Q.   -- than what you had before we took a break?

22  A.   Yes, I do.

23  Q.   Okay.  And you had a chance to take a look at

24  the -- those documents, and they appear to be some

25  screen prints that were taken from a cell phone

1  that was seized by the FBI.

2      Is that safe to say?

3  A.  That's correct.

4  Q.  And are those screen prints from just one or

5  two different phones?

6  A.  One phone.

7  Q.  Okay.  And they show, tell me if I'm wrong,

8  but they show texting between an unknown phone --

9  I'm guessing you don't know anything about that

10  phone -- and a phone that you attribute to Ja'Cory

11  Ranger; is that right?

12  A.  That's correct.

13  Q.  Okay.  And those are -- the documents you have

14  there, those are photographs of the screen prints.

15      And did you take those screen prints yourself?

16  A.  I did not.

17  Q.  Someone else took the photographs of the

18  screen prints, I guess?

19  A.  Yeah.  This is from the CART exam.

20  Q.  CART?

21  A.  The exam that Chris Pahl would have taken.

22  Q.  Okay.

23      MR. ARMSTRONG:  And Your Honor, may I

24  approach the witness?

25      THE COURT:  You may.

1  BY MR. ARMSTRONG:

2  Q.   And for the benefit of the court reporter, I

3  might ask you to spell out some of the words here

4  if they're not maybe spelled the right way.

5       Does it look like there's some activity

6  between the unknown phone and the Ranger phone

7  beginning after midnight on February -- I'm

8  sorry -- March 2nd of 2011?

9  A.   Yes.

10  Q.   Okay.  What time does that activity begin?

11  A.   At 12:28 a.m.

12  Q.   And can you describe to the jury, you know,

13  what is being -- what information is being

14  communicated between the two phones?

15  A.   It's a text message conversation between a

16  phone number attributed to D-a-d-e in the contact

17  list of the phone attributed Ja'Cory Ranger, which

18  is (504)253-0220.

19       And there is a conversation, it's a text

20  conversation, in which Dade texts Ja'Cory's phone.

21  It says, "Waddup," w-a-d-d-u-p.

22  Q.   And you can pronounce that sort of "what up"?

23  A.   That's how I would interpret that.

24  Q.   Okay.  And the response?

25  A.   The reply to that is "Who you looking fo,"

1 "Who," the letter "u," "lookin," l-o-o-k-i-n, and

2 then "fo," f-o.

3 Q. So, "Who you looking fo," and then "waddup"

4 underneath that, or is "waddup" from the call

5 before?

6 A. "Waddup" is from the previous text. This is a

7 reply to that text.

8 Q. Okay. And then what's the reply back?

9 A. And that was at 12:31 a.m. And the reply to

10 that is, "Corey," C-o-r-e-y.

11 Q. So it looks like they're looking for Corey?

12 A. That's what the text message says.

13 Q. And then what's the response?

14 A. The response to that is, "I got his fone,"

15 f-o-n-e, "Ima tell him to hit," the letter "u,"

16 "wen," w-e-n, "I get back wit em," w-i-t e-m, and

17 then, "iight."

18 Q. And what time was that?

19 A. That was at 12:36 a.m.

20 Q. Is there any other communication between the

21 two phones?

22 A. Not that I have in front of me.

23 Q. Not that have you in front of you. Okay.

24 So what time was the call that said "I have

25 his fone"?

1   A.   At 12:36 a.m.

2   Q.   Okay.  And I want to -- just to clarify one

3   thing, I'm not sure whether I heard your testimony

4   correctly.

5       Going back to the information that you use to

6   match up contact -- the information that -- there

7   was a text message from Shrty, S-h-r-t-y, Shrty,

8   that says, "Whts up wit u dis Cory," C-o-r-y.

9       Did you say that was in February, that was

10   February 28th or did you say March 28th of 2011,

11   that that call --  that text was trapped?

12   A.   February 28th.

13   Q.   You were -- well, one of the agents, I believe

14   it was Pahl, Agent Pahl, talked about putting

15   phones in bags so they couldn't receive additional

16   information.

17       Are you familiar with that process?

18   A.   No, I'm not.

19   Q.   Okay.  Are these phones supposed to be turned

20   off when they're seized by the FBI and contained,

21   you know, retained in evidence?

22       Is the FBI -- is it protocol that you turn

23   these things off?

24   A.   I do not know.

25   Q.   All right.  And I want -- if you would take a

1    look at Exhibit No. 114, the first page, the very

2    first few entries there.

3            MR. ARMSTRONG:  Your Honor, may we publish

4    this?

5            THE COURT:  Sure.  Let the system warm-

6    up.  It went to sleep, took a break.  Okay.

7    BY MR. ARMSTRONG:

8    Q.   Very first entries at the very top -- thank

9    you -- you've got calls looking like ingoing and

10   outgoing between the Ranger brothers' telephones on

11   March 2nd, 2011.

12           Would you agree with that?

13   A.   There's three outgoing calls.

14   Q.   Okay.  Those -- right.  And the duration of

15   those calls, one is three seconds, one is five

16   second, one is four seconds, those first three.

17   Would you agree with that?

18   A.   That's correct.

19   Q.   Did you count those when you were telling --

20   in your testimony, you were telling Mr. Lacey, kind

21   of adding up the number of phone calls between the

22   people or between the phones here.

23           Did you include those, the calls of very short

24   duration, in the calls that you're counting between

25   these two phones?

1  A.   Yes, I did.

2  Q.   You included all calls?

3  A.   All telephonic contact.

4  Q.   Okay.  Thank you.

5       Do you know whether the phone that you

6  attribute to Ja'Cory Ranger is prepaid?  Is it a

7  prepaid phone?

8  A.   Yes, it is.

9  Q.   And you don't know -- do you have any payment

10 information on that phone?  Is the bill being paid

11 from a bank account or a checking account?

12 A.   I do not have any payment information on that

13 phone.

14 Q.   All right.  In your analysis of the phone

15 calls, the communication between the phones here,

16 did you ever determine whether anyone was

17 communicating with a phone attributable to Miami?

18 A.   I do recall there were calls to a phone

19 attributed to the contact list -- of Miami in a

20 contact list.

21 Q.   Is this --

22          MR. ARMSTRONG:  Your Honor, may I approach

23 the witness?

24          THE COURT:  You may.

25 BY MR. ARMSTRONG:

1    Q.   Is this something -- and I'm handing you --

2    showing you a couple hundred pieces of paper here.

3         Does this look like something you were

4    involved with?

5    A.   Yes.

6    Q.   Okay.  Did you prepare this?

7    A.   Yes.

8    Q.   All right.  And it's -- across the top, it

9    says "Calls involving Mayco Ledezma-Prieto," and

10   then it lists other parties' names here.

11        Do you recall off the top of your head how

12   many phones calls there were between Miami and

13   Mayco on March 2nd, 2011?

14   A.   No.  No, I do not.

15   Q.   If I showed you this document, I guess we can

16   have it marked, could you maybe take a look?

17   A.   I can take a look.  I don't believe it's in

18   there.

19             MR. ARMSTRONG:  May I approach the

20   witness, Your Honor?

21             THE COURT:  You may.

22   A.   You're asking me if I can count the amount of

23   calls for a phone number that I've attributed to

24   Mayco Ledezma-Prieto and a phone number that I've

25   attributed to Miami?

1  Q.  On that day, on March 2nd.

2  A.  Correct.  I can.

3  Q.  Would you?  Do you need a pen?  A calculator?

4  A.  May I borrow your pen?  I'll try and do it by

5  hand.

6  Q.  How many are you up to so far?

7  A.  29.

8  Q.  Okay.  We'll stop there.

9     So on that day, there was at least 29 phone

10 calls?

11 A.  Correct.

12     MR. ARMSTRONG:  Okay.  Thank you.  I have

13 nothing further.

14     THE WITNESS:  Do you want these back, sir?

15                 CROSS-EXAMINATION

16 BY MR. YOUNG:

17 Q.  Sir, we'll start with -- this should be March

18 2nd.  We're looking at the first page of Exhibit

19 114.

20     Can you see that on your monitor?

21 A.  Yes, I do.

22 Q.  And I'm going to ask for a lot of your help

23 here because this is a lot of columns of numbers,

24 and I'm not very good at this.

25     Going very slowly and starting at the first

1  line there is what looks like a phone call from

2  Ja'Cory Ranger's phone to Jerome Ranger's phone and

3  it looks like there's at 12:07 a.m.?

4  A.   That's correct.

5  Q.   That's the middle of the night; right?

6  A.   It's 12:07 a.m., yes, sir.

7  Q.   I'm sorry?

8  A.   Yes, sir.

9  Q.   And the duration on that call was three

10 seconds?

11 A.   That's correct.

12 Q.   Did we ever get a handle on whether or not a

13 three-second phone call was answered or denied or a

14 text or what that is?

15 A.   What that shows is that those two telephone

16 numbers had a three-second duration telephonic

17 contact with each other.

18 Q.   But it doesn't appear that it was answered,

19 does it?

20 A.   I can't determine that from that.

21 Q.   Could it have been a text message as well?

22 A.   No.

23 Q.   That's just a telephone-to-telephone phone

24 call?

25 A.   Correct.

1  Q.   And then at 12:08, it looks like there is

2  another telephone-to-telephone phone call came

3  through as five seconds, but again, in all

4  probability, not answered; right?

5  A.   I can't say whether it was answered or not.

6  Q.   But it was a five-second contact between the

7  phones?

8  A.   That's correct.

9  Q.   And looking at that, there's no indication

10 that that call got answered?

11 A.   The toll records do not determine whether a

12 call was -- any content was taking place.

13 Q.   And if it did get answered, it didn't get

14 answered for long?

15 A.   That's correct.

16 Q.   The third line on that, then, is another call

17 from Ja'Cory Ranger to his brother, Jerome Ranger,

18 also at 12:08, and again, that was very short

19 duration?

20 A.   Correct.

21 Q.   So again, that may not have been answered at

22 all?

23 A.   That is a possibility.

24 Q.   And if it did get answered, it was the third

25 very short conversation in the middle of the night?

1  A.  Correct.

2  Q.  So it's possible that Jerome Ranger was

3  sleeping while his phone was receiving these

4  contacts?

5  A.  I don't know what he was doing at that time.

6  Q.  Being the middle of the night, sleeping is a

7  possibility?

8  A.  It is a possibility.

9  Q.  He may have answered the phone long enough to

10  say, don't bother me anymore, but you can't really

11  tell?

12  A.  Correct.

13  Q.  The column of numbers goes down a ways.  The

14  next entry I see involving Jerome Ranger's name is

15  if we slide all the way down to 8:58?

16  A.  That's correct.

17  Q.  And at 8:58, if I'm interpreting this right,

18  it looks like Ja'Cory Ranger is getting a call from

19  his brother Jerome Ranger.

20  A.  Correct.

21  Q.  That's 8:58 in the morning, a.m.?

22  A.  Correct.

23  Q.  Now it looks like Ja'Cory Ranger's the one

24  that's not answering his phone.

25  A.  It's a short duration phone call.  Yes.

1  Q.  It's either a short duration or no answer;

2  right?

3      Was that correct?

4  A.  It's a short duration phone call.  I don't

5  know if it was answered or not.

6  Q.  There was -- the very next line, another try,

7  Ja'Cory Ranger got another short duration phone

8  call at 9:02 in the morning?

9  A.  That's correct.

10  Q.  So it looks like maybe at about 8:58 and at

11  9:02 Jerome Ranger was calling his brother Ja'Cory

12  Ranger back.

13  A.  There were two calls made from Jerome to

14  Ja'Cory at the time.

15  Q.  And since Jerome was calling Ja'Cory at that

16  time in the morning, we can maybe assume that

17  they're not hanging out together at that moment?

18  A.  I do not know that.

19  Q.  They're unlikely to be in the same room or

20  even the same house if they're calling each other;

21  right?

22  A.  I can't speak to the likeliness of that

23  happening.

24  Q.  But at nine o'clock in the morning, one is

25  calling -- Jerome is calling Ja'Cory?

1  A.  Correct.

2  Q.  And a reason for calling somebody on the

3  telephone is because they're not there with you;

4  right?

5  A.  That would be a reason, yes.  I would think a

6  reason would be you want to talk to them on the

7  phone.

8  Q.  If they're in the same room with you, you'd

9  probably just talk to them?

10  A.  Correct.

11  Q.  I don't mean to argue the point.  I just --

12  A.  I understand.

13  Q.  It's just an argument when I see one.  The

14  point is they're calling each other.

15  A.  Correct.

16  Q.  It looks like at 9:46 Jerome Ranger called his

17  brother Ja'Cory Ranger again.

18  A.  That's correct.

19  Q.  And that is the next entry I see involving

20  Jerome Ranger on March 2nd; right?

21  A.  That's correct.

22  Q.  Again, it's a five-second duration phone call,

23  so very possibly not answered again?

24  A.  That is a possibility, correct.

25  Q.  And possibilities being for it not answered is

1  maybe Ja'Cory was on a phone call with somebody
2  else at the time?  Is that one possibility?
3  A.   That is a possibility.
4  Q.   Maybe Ja'Cory just wasn't answering it?
5  A.   That is a possibility.
6  Q.   Maybe Ja'Cory pushed the "end" button and
7  denied that phone call.
8       Is that a possibility?
9  A.   Yes.
10 Q.   So there's really no telling, except for that
11 we see that at 9:46 Jerome Ranger is calling his
12 brother Ja'Cory Ranger?
13 A.   That's correct.
14 Q.   And not to put too fine of a point on it, but
15 I'm going to put it out there, possibly, since
16 Jerome is calling Ja'Cory, they may not be at the
17 same location?
18 A.   That's correct.  That's a possibility.
19 Q.   Turning over the page, the next entry I see
20 involving Jerome Ranger is on page 2.  It looks
21 like the third line down is at 10:24.
22      Is that the next entry involving Jerome?
23 A.   Yes, it is?
24 Q.   And it looks like Jerome Ranger called Ja'Cory
25 Ranger again at 10:24 that morning.

1    A.   Ja'Cory Ranger called Jerome Ranger, correct.

2    Q.   Oh, I'm sorry.  It's the other way around.

3    You're right.  That's why I've got you helping me.

4         So it looks like Ja'Cory Ranger called Jerome

5    Ranger at 10:24 in the morning.

6    A.   That's correct.

7    Q.   And that duration, that was actually a

8    56-second phone call?

9    A.   Correct.

10   Q.   So it looks like they may have actually talked

11   at that point?

12   A.   Correct.

13   Q.   So at 10:24, Jerome and Ja'Cory finally got in

14   touch with each other; is that right?

15   A.   They were talking to each other on the phone.

16   Those two phones were in contact with each other at

17   that time.

18   Q.   Now, the next -- this is browned-out on mine a

19   little bit, but it looks like the next entry

20   involving Jerome Ranger is going to be in brown,

21   and that is to Ghermon Tucker's phone, and that is

22   at 10:28?

23   A.   10:26.

24   Q.   Okay.  Well, let's -- it's more clear on the

25   monitor.  So that's at 10:26?

1  A.   That's correct.

2  Q.   And that was a 32-second phone call?

3  A.   Correct.

4  Q.   So it looked like, if I'm reading that right,

5  Jerome called Ghermon at 10:26, and they spoke for

6  32 seconds?

7  A.   That's correct.

8  Q.   So it looks like that phone call was actually

9  answered?

10 A.   That's how it appears.

11 Q.   Jerome called to Ghermon it looks like, again,

12 at 10:34.  Is that the next phone call involving

13 Jerome Ranger?

14 A.   The next telephone call involving Jerome is

15 Ja'Cory Ranger received a call from Jerome at

16 10:32:53 a.m.

17 Q.   No, you're right.  So at 10:32 I should be

18 looking at; right?

19 A.   Correct.

20 Q.   And at 10:32, it is Jerome Ranger calling

21 Ja'Cory for six seconds?

22 A.   That's correct.

23 Q.   Very possibly Ja'Cory didn't answer that phone

24 call or was on another call or we can't really

25 tell?

A.   Correct.

Q.   Then at 10:34, Jerome Ranger, outgoing call to Ghermon Tucker; is that right?

A.   That's correct.

Q.   I need some help here.  I'm seeing something that doesn't make any sense to me.  Maybe you can help me out.

It looks like we were looking at 10:34 just a moment ago.  Is that the entry we were on?

A.   That's correct.

Q.   And it looked like Jerome Ranger called outgoing to Ghermon Tucker?

A.   Correct.

Q.   And they spoke for two minutes and 21 seconds?

A.   Correct.

Q.   I'm going to skip a couple of entries because it looks like Mayco also called Ghermon Tucker and was speaking to Ghermon Tucker at 10:36, at the same time.

A.   You're referring to the 10:36:02 a.m. phone call?

Q.   Yes.

A.   So if you'll look at the column we haven't talked about, the "Source Call," you'll see that the sources of those two calls are from two

1  different telephone records from different phone
2  companies.

3      So one possibility is that the phone companies
4  all, you know, don't have the same time, don't use
5  the same clock, so it's possible that, you know, if
6  Sprint captures a call at 10:30, T-Mobile can
7  capture the phone call at 10:30 with 15 second.
8  Q.   These cells phones aren't all linked to the
9  atomic clock in Colorado or whatever it is?
10 A.   I don't know where they're linked.
11 Q.   Cell phone time is not accurate?  Is that what
12 you're --
13 A.   What I'm saying is that different companies
14 choose to capture the time at different points in
15 the call, where some will capture it when the call
16 is placed or some will capture it when the call
17 hits the tower.

18     It just depends when the phone company records
19 that call exactly.
20 Q.   How long from the time you place a call does
21 it take for the call to hit the tower?

22     That should go at the speed of light; right?
23 A.   I don't exactly how long but it's not --
24 Q.   Just from here to the tower.
25 A.   I don't think it's traveling at light, so I

1  don't know how that speed.  I don't know the

2  infrastructure to how cell phones communicate with

3  towers, but I know that there is some time lapse.

4  Q.  It's going to be a radio frequency wavelength;

5  right?

6  A.  I don't know.

7  Q.  Well, it looks like the 10:34:00 phone call

8  that lasted two minutes and 21 seconds, that, by

9  the numbers, overlaps with this phone call at 10:36

10  and two second from Mayco to Ghermon Tucker.

11  A.  There could be a possibility of one call

12  coming in and flashing over to it on the phone or

13  perhaps putting one call on hold.

14  Q.  Since the call between Mayco and Ghermon is

15  between Mayco and Ghermon, I'm going to move back

16  to Jerome Ranger's calls.

17       So after 10:34, it looks like Cory gets

18  another call from Jerome Ranger, and that's at

19  10:34 and 15 seconds; right?

20  A.  Correct.

21  Q.  And that's a seven-second call?

22  A.  Correct.

23  Q.  So that's either a very short conversation or

24  it didn't get answered?

25  A.  Correct.

1    Q.  At 10:35, they try again, and they talk for 30
2    seconds?
3    A.  Ja'Cory places a call to Jerome; correct.
4    Q.  And at that 30 seconds, can we assume that the
5    phone got answered, or how long does it take to not
6    answer a call?
7        How long does that show up for?
8    A.  I don't know.  I mean, it could be if it's a
9    voicemail message, could be.
10   Q.  Okay.  The next call involving Jerome Ranger
11   -- well, let me back up.  I see calls we've gone
12   through on this page involving Jerome Ranger at
13   10:24, at 10:26, at 10:32, at 10:34, and 10:35.
14       So it looks like at those times Jerome Ranger,
15   unless he's calling people in the same room, and
16   we'll allow for that possibility, unless he's
17   calling people in the same room, Jerome Ranger is
18   likely not hanging out with either Ja'Cory Ranger
19   or with Ghermon Tucker so far that morning at those
20   times?
21   A.  That is a possibility.
22   Q.  Going down to the next, tell me if I'm missing
23   one, but the next entry I see involving Jerome
24   Ranger is at 11:01.
25   A.  That's correct.

1  Q.  And that is Ja'Cory Ranger calling Jerome
2  Ranger?
3  A.  Correct.
4  Q.  15 seconds.  I'm going to give up on whether
5  or not the phone got answered, and I'm just going
6  to suggest that maybe at that time, again, unless
7  they're in the same room, at 11:01, Ja'Cory and
8  Jerome are not hanging out together.
9  A.  That is a possibility.
10  Q.  And then sliding down that page, I see that
11  there are some calls in brown again.  It looks like
12  Jerome Ranger is again calling Ghermon Tucker at
13  11:23?
14  A.  Correct.
15  Q.  And again at 11:25?
16  A.  That's correct.
17  Q.  And then as the calls go on, we get into the
18  afternoon.  It looks like, if I'm reading this
19  correctly, Jerome Ranger does not talk to anybody
20  on his phone except for Ghermon Tucker and Ja'Cory
21  Ranger?
22  A.  That's correct.
23  Q.  And I'm sorry.  What happened there was I just
24  got tired of going through it line by line.
25       So that's who he's calling; right?

1    A.   Those two phones are in telephonic contact.

2    That's right.

3    Q.   And this doesn't show him contacting Gollo

4    ever?

5    A.   That's correct.

6    Q.   Not on May 2nd?  In fact, your compilation

7    here didn't show him contacting Gollo ever?

8    A.   That's correct.

9    Q.   And your compilation did not show any contact

10   between Jerome Ranger and Chivo; is that right?

11   A.   That's correct.

12   Q.   And your compilation did not show any contact

13   ever between the CI, the confidential human source,

14   the FBI would call it, and no contact between the

15   CI and Jerome Ranger ever?

16   A.   That's correct.

17   Q.   The name Miami comes up a bit in your

18   compilation; is that right?

19   A.   Yes.

20   Q.   And again, there's no contact between Jerome

21   and Miami ever?

22   A.   I don't know that.

23   Q.   Well, did you look for it?

24   A.   I did not.

25   Q.   So you didn't run the name Miami?

1    A.   I did run the name Miami, but I didn't run it

2    looking specifically to see if Jerome Ranger and

3    Miami had any telephonic contact.

4    Q.   If I understood your testimony, there was one

5    phone call between Jerome Ranger's phone and

6    Mayco's phone.

7    A.   That's correct.

8    Q.   And if I understood your testimony correctly,

9    that was one phone call ever.

10   A.   Correct.

11   Q.   And that one occurred on February 4?

12   A.   Correct.

13   Q.   And if we could publish Exhibit 113, the first

14   page.

15       If I'm looking at this right, on February 4,

16   at 1:01 in the morning, Jerome Ranger's phone

17   called Mayco for two seconds.

18   A.   Correct.

19   Q.   So there was a one two-second phone call

20   between Jerome Ranger and Mayco Ledezma-Prieto

21   ever?

22   A.   Correct, during that -- during the time frame

23   of January and March, January and February.

24   Q.   Time frame of when?

25   A.   January and February.

Q.   January and February.  And March too; right?

A.   Correct, up to March 2nd.

Q.   So for that quarter?

A.   Correct.

Q.   That's the only phone call that they ever had; correct?

A.   That's the only phone call that I'm aware of, correct.

Q.   And it was only two seconds, so it looks like it either didn't get answered or it was a text message or we don't know or -- could that be a text message or not?

A.   I do not believe it could be a text message, no.

Q.   Now, you did not find Jerome Ranger's contact information in Mayco's phone, did you?

A.   I did not.

Q.   And Mayco is not in Jerome Ranger's contact either, is it?

A.   It is not.

Q.   And as we sit here today, I understand you're really not able to tell me who it was that may have used Jerome Ranger's phone at one minute after one o'clock on February 4 to call Mayco for two seconds, are you?

1  A.   I am not.

2  Q.   Now, if we look at the very next line, we see

3  that Mayco called Ghermon two minutes later at

4  1:03.

5  A.   Mayco received a call from Ghermon at 1:03.

6  Q.   Okay.  Yeah, you're right.  And again at 1:05?

7  A.   That's correct.

8  Q.   But there was no further contact between

9  Jerome Ranger's phone and Mayco's phone ever after

10  that one contact?

11  A.   That's correct.

12  Q.   Mr. Cooper earlier pointed out that, in this

13  stack of documents, which I confess I have not

14  read, the first line of the first page, you saddle

15  Jerome Ranger with one of Ghermon Tucker's phone

16  calls?

17  A.   Repeat the question.

18       MR. YOUNG:  May I approach the witness,

19  Your Honor?

20       THE COURT:  You may.

21  BY MR. YOUNG:

22  Q.   That stack of documents that Mr. Cooper showed

23  you, it looks like, on the first line of the first

24  page, you erroneously put Jerome Ranger's name down

25  next to Ghermon Tucker's phone number?

1    A.   That's correct.

2    Q.   And that was a phone call to Mayco

3    Ledezma-Prieto?

4    A.   It's possible.  I don't have -- correct.

5    Q.   But it turned out that was not an actual call

6    from Jerome's phone.  That was a call from

7    Ghermon's phone.

8    A.   That's correct.

9    Q.   You testified that you compiled the number of

10   phone calls between Jerome Ranger and Ja'Cory

11   Ranger?

12   A.   On specific dates, yes.

13   Q.   On specific dates and overall did you compile

14   how often they talked to each other?

15   A.   I did not.

16   Q.   To your knowledge, Jerome Ranger and Ja'Cory

17   Ranger, they're brothers; is that right?

18   A.   That's my understanding.

19   Q.   So let me ask you, do you have a brother?

20   A.   Yes, I do.

21        MR. LACEY:  Objection.  Relevancy, Your

22   Honor.

23        THE COURT:  He can answer yes.  He's

24   probably going to ask if you talk to him on the

25   phone.

1          THE WITNESS:  Yes.

2          THE COURT:  How often?

3          THE WITNESS:  Weekly.

4          THE COURT:  Go ahead, Mr. Young.  I'm

5    sorry.

6    BY MR. YOUNG:

7    Q.   So it would not be unusual for one brother to

8    call another on the telephone?

9    A.   No.

10   Q.   And you may not know the answer to this

11   question, but hypothetically, if it is the case

12   that Jerome Ranger and Ghermon Tucker are cousins,

13   they might talk to each other on the phone as well?

14   A.   I would say that cousins would talk to each

15   other on the phone.

16   Q.   Do you have any information as to whether or

17   not they're cousins?

18   A.   I do not know that.

19          MR. YOUNG:  Maybe we can take that up with

20   a different witness.

21          That's all I have, Your Honor.

22          THE COURT:  Mr. Lacey?

23          MR. LACEY:  Thank you.

24                REDIRECT EXAMINATION

25   BY MR. LACEY:

1    Q.   You were asked some questions on cross-

2    examination by Mr. Cooper about land line phones.

3         Based upon the examination of the phones we've

4    talked about, were any of these phones land lines?

5    A.   No.

6    Q.   You were asked about this draft chart.  It's

7    not part of what we've -- not part of 113 and 114,

8    and you were asked a question by Mr. Young and also

9    Mr. Cooper about a phone call where you had the

10   wrong name?

11   A.   Uh-huh.

12   Q.   Do you recall that?

13   A.   I do.

14   Q.   And let's talk about the charts that we've put

15   into evidence, Exhibits 113 and 114.

16        When did you -- what did you do in order to

17   review those, that data, and most recently when did

18   you do this?

19        For example, yesterday after court, did you

20   meet with anybody and discuss those charts?

21   A.   Yes, I did.

22   Q.   Who was that?

23   A.   I met with you.

24   Q.   And after having done so, did we review the

25   data that was on the draft charts that you had?

1   A.   Yes.

2   Q.   Based upon our conversation, did you make

3   certain changes to the chart?

4   A.   Yes, I did.

5   Q.   And once you made those changes, what did you

6   then do thereafter?  What time did we break up our

7   meeting here at the courthouse?

8          MR. COOPER:  Your Honor, it's not

9   relevant.

10         THE COURT:  It'll show how hard he was

11  working.

12         MR. COOPER:  Oh, okay.  I withdraw the

13  objection.

14  BY MR. LACEY:

15  Q.   Go ahead.

16  A.   Six p.m.

17  Q.   And after that, what did you do?

18  A.   I went back to my office to work on these

19  charts.

20  Q.   And did you make the changes we talked about

21  to --

22  A.   I did.

23  Q.   And did you also review the data that was

24  there?

25  A.   I compared all these calls to the -- these are

1  all based off the original tolls, original call

2  records that were provided from the phone

3  companies.

4  Q.  So you went back to the original data to

5  prepare what later turned out to be 113 and 114?

6  A.  That's correct.

7  Q.  What time did you finish your work?

8  A.  Midnight.

9  Q.  And this morning, did you come to the office

10  with the revised or with the changes you made to

11  the charts?

12  A.  I did.

13  Q.  Based upon that review?

14  A.  I did.

15  Q.  And what time did you get here with that data?

16  A.  Approximately seven a.m.

17  Q.  What did you do to ensure the accuracy of

18  Exhibits 113 and 114 that are before this jury now?

19  A.  I went line by line and compared them directly

20  with the original telephone records that I received

21  from the telephone company.

22  Q.  And based upon that review of Exhibits 113 and

23  114, in your opinion, are they accurate?

24  A.  Yes, they are.

25  Q.  You were asked some questions about

1  Mr. Ghermon Tucker's phones, specifically about

2  what you did to connect back Mr. Ghermon Tucker to

3  the phones that we've talked about, specifically

4  the numbers (480)292-4572, (480)392-3443,

5  (520)208-4935, which you mentioned was a prepaid.

6      When you go through the review of that, how do

7  you come back to associate those phones with

8  Mr. Tucker, starting with ending 4572?

9  A.   (480)292-4572, it was listed in both Mayco's

10  and Rashad McCuin's contact list as G-Money.

11  Q.   G-Money?

12  A.   Correct.  And I know G-Money to be an AKA for

13  Ghermon Tucker.

14  Q.   What else did you do to come back with the

15  4572 number to associate that with Mr. Tucker?

16  A.   It was also found in the Ford Expedition.

17  Q.   Where Mr. Tucker was found?

18  A.   That's correct.

19  Q.   And what else?

20  A.   And then comparing that, those call patterns,

21  looking at that phone call -- that phone ending in

22  4572 was in contact with Mayco Ledezma.

23  Q.   And you say a call pattern.  What is that?

24  A.   So the call pattern appeared that that phone

25  had similarities to other phones attributed to

1    Ghermon Tucker, specifically the one that's

2    subscribed to him, called certain people in common.

3    Q.   And the one subscribed to him again was the

4    one ending 3443?

5    A.   (480)392-3443.  That number was subscribed to

6    him and found in the Ford Expedition.

7    Q.   So both those phones were found in the

8    Expedition then?

9    A.   That's correct.

10   Q.   Back on March 2?

11   A.   Correct.

12   Q.   And the (520)208-4935, how did you attribute

13   that to Mr. Tucker again?

14   A.   It was found in the Ford Expedition, and there

15   were some text messages on that phone that were

16   sent and received to contacts that were listed in

17   the phone that was subscribed to Ghermon Tucker,

18   and those contacts were a Baby D and a Tara.

19   Q.   And based on your investigation that you've

20   been part of, did those numbers, were those

21   numbers, those references, associated to

22   Mr. Tucker?

23   A.   Yes, they were.  Yes, they were.  And then

24   that phone was also found in the Ford Expedition.

25   Q.   You were asked also on cross-examination about

1    Mayco's last phone call at 2:04, on March 2nd at

2    2:04 p.m.

3        Do you recall that question?

4    A.   I do.

5    Q.   And that was the last call on your chart for

6    Mayco, is that correct, on your chart?

7    A.   On the chart, that's correct.

8    Q.   Did you look at other records, toll records

9    for that number, to see if Mayco had made other

10   calls after 2:04 p.m. on March 2nd?

11   A.   Yes, I did.

12   Q.   And were there any calls by the phone

13   associated with Mayco from the warehouse after

14   2:04 p.m.?

15   A.   Yes, there were.

16   Q.   How many calls do you see there and at what

17   times?

18   A.   There were three calls, at 2:06, 2:25, and

19   2:27.

20   Q.   And what were the area codes for those three

21   numbers?

22   A.   Two of them were 520, and one of them was 602.

23   Q.   And the last call, again, was what time?

24   A.   At 2:27.

25            MR. ARMSTRONG:  Your Honor, may I ask what

1  the witness is referring to?

2  BY MR. LACEY:

3  Q.  Sure.  What are you looking at there, sir?

4  A.  It's a -- it's basically a printout from the

5  subscriber -- the call records I received from the

6  phone company regarding (520) 264-6030.

7          THE COURT:  Do you have a Bates number?

8          MR. COOPER:  I'd object and ask to voir

9  dire the witness.  Foundation.

10          MR. LACEY:  Sure.

11                  VOIR DIRE EXAMINATION

12  BY MR. COOPER:

13  Q.  You testified previously that you put together

14  the charts for this trial based on using a

15  computer; correct?

16  A.  I used a computer to make the charts.  That's

17  correct.

18  Q.  And the charts would be including the calls

19  from Mayco Ledezma-Prieto?

20  A.  The charts I created were specifically between

21  Mayco, Gollo, Ghermon, Ja'Cory, and Jerome, just

22  those phones.

23  Q.  And you had Mayco calls that were not included

24  in the chart?

25  A.  Correct.  There were calls that were not

1  involving telephone numbers of any of those first

2  five people.  That's correct.

3  Q.  So the only calls you have are calls going

4  between the individuals?

5  A.  On these charts, that's correct.

6  Q.  Not to calls that are other numbers?

7  A.  Correct.

8          MR. COOPER:  That's all I have, Your

9  Honor.

10              FURTHER REDIRECT EXAMINATION

11  BY MR. LACEY:

12  Q.  You talked -- you were asked some questions on

13  cross-examination about the phone you attribute to

14  Ja'Cory Ranger.

15          Will you tell the number again?  Was that

16  (504)253-0220?

17  A.  To Ja'Cory Ranger, that's correct.

18  Q.  And how, again, do you attribute that phone to

19  Mr. Ja'Cory Ranger?

20  A.  It was listed in Mayco's contact list as

21  Corty, C-o-r-t-y.  It was listed in Rashad McCuin's

22  contact list as Cory.

23          There is a text message sent to Shrty,

24  S-h-r-t-y, that says, "What's up wif u dis Cory."

25  Q.  And where was this particular phone found, the

1  one you attributed to Ja'Cory Ranger?

2  A.   The Cadillac Escalade.

3  Q.   Back on March 2nd?

4  A.   That's correct.

5  Q.   And as long as we're doing this, let's cover

6  the phone for Mr. Jerome Ranger.

7       That number is (480)220-7134.  What are the --

8  what's the basis you use to associate this phone

9  with Mr. Jerome Ranger?

10 A.   It was listed in Ghermon's contact list as

11 Jay, J-a-y.

12      There is a text message that says -- there is

13 a text message on the phone, on the CART exam,

14 (480)220-7134, that states, "Jay, I got to take DD

15 to work."

16      So that text message and other text messages

17 on that phone use the -- refer to the person, the

18 subscriber, the user of that phone as Jay.

19      There is other text messages on that phone

20 that refer to the user of that phone as Jerome.

21 There is also photos on that phone that appear to

22 be self-portraits.

23 Q.   Of whom?

24 A.   Of Jerome Ranger.

25 Q.   And where was this particular phone found?

1    A.    The Ford Expedition.

2    Q.    Back on March 2nd?

3    A.    That's correct.

4    Q.    And that was another basis for your

5    concluding -- making the conclusions or coming to

6    the conclusions you did, where the phones were

7    located, in what vehicle, and who was in the

8    vehicle with those phones?

9    A.    That's correct.

10            MR. LACEY:  Nothing further.

11            THE COURT:  If the jurors have any

12   questions, please place them in writing.

13            There is at least one.

14            (The following proceedings occurred at the

15            bench.)

16            THE COURT:  "Did you try to align the text

17   time stamp information to the times indicated in

18   the call log data?"

19            "Can a text go out over a push-to-talk

20   number?"

21            "In Exhibit 114, were all of Jerome

22   Ranger's outgoing call times rounded to the nearest

23   minute?"

24            "Before yesterday, was your data input in

25   Exhibit 113 and 114 peer reviewed?"

1     Any objection to those questions?

2     MR. COOPER:  No.

3     THE COURT:  All right.

4     (End of bench conference.)

5     THE COURT:  I have several questions from

6     one of the jurors.

7     Did you try to align the text time stamp

8     information to the times indicated in the call log

9     data?

10    THE WITNESS:  Yes.

11    THE COURT:  Can a text go out over a push-

12    to-talk number?

13    THE WITNESS:  Not to my knowledge.

14    THE COURT:  In Exhibit 114, were all of

15    Jerome Ranger's outgoing call times rounded to the

16    nearest minute?

17    THE WITNESS:  Can you repeat that

18    question, please?

19    THE COURT:  In Exhibit 114, were all of

20    Jerome Ranger's outgoing call times rounded to the

21    nearest minute.

22    THE WITNESS:  No.

23    THE COURT:  Before yesterday, was your

24    data output in Exhibits 113 and 114 peer reviewed?

25    THE WITNESS:  No.

1          THE COURT:  Any questions based upon the

2  jurors' questions, Mr. Lacey?

3          MR. LACEY:  No, Your Honor.  Thank you.

4          THE COURT:  I have another question from

5  one of the jurors though.

6          (The following proceedings occurred at the

7          bench.)

8          THE COURT:  "The phone that was found at

9  the warehouse outside on the ground, were there

10  calls between 2:10 and 2:20?"

11          MR. LACEY:  Okay.

12          THE COURT:  All right.

13          (End of bench conference.)

14          THE COURT:  On the phone found at the

15  warehouse outside on the ground, were there calls

16  between 2:10 and 2:20?

17          THE WITNESS:  So that phone should be

18  (520)264-6030.  That phone was not activated until

19  February 23rd, so that would be no.

20          THE COURT:  That's not what he's asking.

21  Were there phone calls -- I guess the date they're

22  asking about is March 2nd.

23          THE WITNESS:  Okay.  I thought I heard

24  February --

25          THE COURT:  I said 2:10 and 2:20 and you

1    assumed month.  I'm talking about the time of day

2    on March 2nd.  I apologize for my confusion.

3              THE WITNESS:  So on March 2nd, there were

4    calls made from that phone between 2:10 and -- or

5    between 2:06 and 2:27 p.m.

6              THE COURT:  Mr. Lacey, anything further

7    based upon those questions by the jurors?

8              MR. LACEY:  No, Your Honor.

9              THE COURT:  Mr. Cooper?

10                  FURTHER EXAMINATION

11   BY MR. COOPER:

12   Q.   I'd like to know how many calls and at what

13   time were they made.  I think we just had that

14   testimony, but I'd like to look at them.

15   A.   So there were calls made at 2:06, 2:25 and

16   2:27.

17   Q.   That's not just 2:27 though.  It's 2:27 and

18   some seconds; right?

19   A.   It's 2:27 and 35 seconds.

20   Q.   Okay.  Let's round it up to 2:28.

21   A.   2:27 and 35 seconds.

22             MR. COOPER:  Well, whatever.

23             THE COURT:  Mr. Armstrong?

24             MR. ARMSTRONG:  No, thank you.

25             THE COURT:  Mr. Young?

1    MR. YOUNG:  Nothing, Your Honor.

2    THE COURT:  You may step down.

3    We've got about 10 minutes before we

4    break.  Can we do something in those tens minutes?

5    MR. LACEY:  Yes.

6    THE COURT:  All right.

7    CARLOS ESTRADA, WITNESS, SWORN

8    THE COURT:  Sir, the Rule has been invoked

9    in this case, and that means, except during the

10   time that you're testifying, you must remain

11   outside the courtroom, and you are only allowed to

12   discuss your testimony with the attorneys involved

13   in the case.

14   THE WITNESS:  Yes, Your Honor.

15                  DIRECT EXAMINATION

16   BY MR. LACEY:

17   Q.   Sir, would you give us your name for the

18   record and spell your last name.

19   A.   Carlos Estrada, E-s-t-r-a-d-a.

20   Q.   And sir, you work for whom.

21   A.   I work for Circle K.

22   Q.   In what capacity?

23   A.   I'm a loss prevention manager for the 625

24   stores in Arizona and Las Vegas.

25   Q.   And the loss prevention manager means?  Can

1  you tell us what that is?

2  A.   Safety of the customers and employees first

3  and foremost, security of all assets beyond that,

4  so protection of the assets, from buildings, to

5  property, to cash, to merchandise, to money.

6  Q.   Are video cameras in place in the various

7  Circle Ks within your bailiwick?

8  A.   There are.

9  Q.   And are they set up in certain locations in

10  every store or just vary from store to store?

11  A.   With 20-plus years with the company, we have

12  lots of different footprints.  We have anywhere

13  from probably a minimum of four cameras in some

14  stores all the way up to 16.

15  Q.   16?

16  A.   Yes.

17  Q.   And where are those cameras normally placed?

18  A.   The most standard one is the front door

19  camera.  That was kind of -- we've always partnered

20  with the police department to have one where people

21  walk in the front door.

22       The next cameras views would be on the

23  registers, where people make purchases, focusing

24  primarily on the employees.  That would be two more

25  cameras.  And then the fourth camera which is a

1  standard would be a side-view camera for the
2  registers.
3  Q.  Were you asked to obtain video from certain
4  Circle K stores for the FBI?
5  A.  My employees, yes, in the stores were asked to
6  provide videos to the agency, yes.
7  Q.  And what three stores were those, do you
8  recall offhand?
9  A.  One was in Phoenix, one was in Marana, and one
10  was in Tucson, I believe.
11  Q.  And did you, in fact, direct your employees to
12  obtain that video for those stores?
13  A.  Yes.  I authorized -- they usually will check
14  with me.  I will authorize them to burn video.
15  Q.  And how is that set up where you have access
16  to all the videos?  Is there one central
17  depository, or do you have to go to each store, or
18  how does that function?
19  A.  Well, luckily we are now all DVRs, digital
20  video recording units.  They are hooked into our
21  mainframe, so they're all -- we're able to remotely
22  dial in at any time into any store.
23      We may burn videos remotely, and we're also
24  able to burn CDs, basically, or DVDs right there at
25  the store level.

1  Q.   Okay.  And at the request of the FBI, then,

2  did you obtain certain clips or a certain time

3  frame for the -- per the request?

4  A.   Yes.  We cooperate with all law enforcement.

5  They give us the time frames and dates that they

6  want, and we burn the videos for them.

7  Q.   And the video, when it's obtained, for

8  example, if it's a store, a Circle K here on

9  Congress right by the freeway, how many cameras are

10  at that location, or would you have to look in your

11  index?

12  A.   I would have to view it, but I'm thinking that

13  location has six to seven cameras, off the top of

14  my head.

15  Q.   Okay.  When the request came in to get these

16  various disks or to get this various video for a

17  certain time frame, what happened at that point?

18  How did you go about doing this?

19  A.   Again, most of the time the manager will just

20  call me or my security center to get the

21  authorization, and we'll authorize them right there

22  at the store level to burn the video for the police

23  departments.

24       So it's usually, again, you know, just a phone

25  call or an email.

1    Q.    Okay.

2              MR. LACEY:  May I approach Your Honor?

3              THE COURT:  You may.

4    BY MR. LACEY:

5    Q.    Can you identify Exhibit 14-A for us.

6    A.    These are the videos that were obtained by the

7    agent that I reviewed with him.  It looks like

8    they're copies of the video.

9              MR. LACEY:  May I approach with the

10   originals?

11             THE COURT:  You may.

12   A.    These are the originals.  These look like

13   copies.

14        Those are the originals.  You can tell by the

15   chicken scratch.

16   Q.    Who's chicken scratch is that?

17   A.    Most likely that is going to be the store

18   employee's, initially, and then I'm not sure

19   exactly who wrote on them, but they identify the

20   stores, dates, and times of the video.

21   Q.    The stores, dates, and times, please?

22   A.    Yes.  Circle K on Broadway.  Looks like my

23   writing.  I can't read it.  One says Marana, but I

24   can't read the other one here.

25   Q.    And it's your writing?

1  A.   No.  I said it looks like my writing, but I
2  still can't read it.
3  Q.   And are there dates, certain dates on those?
4  A.   Yes.  3/6 is on one.  That's the only one that
5  looks like it's dated.  It looks like another one
6  here dated 3/6, but it's hard to read again.
7  Q.   Now, the 3/6, is that the date that it was
8  processed?
9  A.   It may refer to the date that's on the disk.
10  I'm pretty sure when I reviewed it, again, with so
11  many stores and so many places to be, I would have
12  to look at the disk to tell you the date.
13  Q.   And I think we have that uploaded if we need
14  to.
15          THE COURT:  It's going to show up on the
16  screen.
17          THE WITNESS:  Thank you.
18  BY MR. LACEY:
19  Q.   14-A, can you identify this for us?  Is this
20  one of the videos from one of your stores?
21  A.   This is.  It's playing through a different
22  format.
23  Q.   And what does that mean?
24  A.   The disks usually have the software that will
25  bring up the store address on the top right.  This

1  is obviously playing through a different video

2  media playing.

3  Q.  And as to this particular video, do you need

4  to actually see your underlying original in order

5  to see the address, or how does that --

6  A.  Well, I can see on here the date and time, but

7  I cannot see the address of the store.

8  Q.  And the address -- the date and time is what?

9  A.  3/2 of '11 at 11:21 and 37 seconds.

10  Q.  Okay.

11  A.  A.m.

12  Q.  And that camera that we're looking at now,

13  where would that have been positioned?

14  A.  That's the front door camera.

15  Q.  Okay.

16  A.  That would face the front door as you walk in.

17  Q.  If we could play it a little further, please.

18      And what we're looking at here is still the

19  front door camera; is that correct?

20  A.  That is correct.

21  Q.  And --

22  A.  People entering and exiting.

23  Q.  And I believe it's going to change in just a

24  second, if you'll just hang in there, to a

25  different camera.

1  A.   Okay.

2          MR. LACEY:  I think it's lunchtime.

3          THE COURT:  That means he's going to

4  straighten this out so he can go where he wants to

5  go after lunch.

6          One o'clock.  We'll start back at one

7  o'clock.

8          (The jury exits the courtroom.)

9          (Off the record.)

10         THE COURT:  Show the jurors returned back

11 to the courtroom, the presence of all counsel and

12 the defendant, defendants.

13         We're another on-time start.

14         Mr. Lacey?

15         MR. LACEY:  Yes, Your Honor.  Thank you.

16 BY MR. LACEY:

17 Q.   Now that we had a lunch break, have you had a

18 chance to review certain exhibits during the

19 interim from when we broke before?

20 A.   Yes.

21 Q.   Direct your attention to 14-A.  We'd ask that

22 a clip be played at this time.

23         Can you identify this for us?

24 A.   This is the store in Phoenix on 3/2, about

25 11:20 in the morning?

1  Q.  March 2nd, about 11:20 or 21, it says on the

2  screen here?

3  A.  Yes.

4  Q.  So is there a time stamp, then, on the video

5  at the store so when something's recorded it shows

6  what the time is?

7  A.  Yes.

8  Q.  And you say in Phoenix.  Whereabouts in

9  Phoenix?

10 A.  Broadway is the street it's on.  I think it's

11 1540.  I'm not too sure exactly the address, but

12 Broadway.

13 Q.  You have 600 stores in your --

14 A.  625.

15 Q.  Sorry to cut you short there.

16 A.  Tomorrow might be 626.

17 Q.  And is this video, 14-A, is this part of the

18 video that was obtained from your store by the FBI

19 that shows a recording of the store back on March

20 2nd at 11:21 in the morning and beyond, as the

21 clock ticks?

22      Is that correct?

23 A.  Yes.

24      MR. LACEY:  We'd offer 14-A at this time.

25      MR. COOPER:  No objection.

1              MR. ARMSTRONG:  I don't have an objection.

2              MR. YOUNG:  No objection.

3              THE COURT:  It can be admitted.  Do you

4    want to play it now or play it later.

5              MR. LACEY:  Later, Judge.

6              THE COURT:  All right.

7    BY MR. LACEY:

8    Q.   14-B, please.  We'd ask if you can identify

9    this for us.

10   A.   I can.  This is the store in Marana.  It's a

11   little bit closer to home.  I live in Tucson, so

12   I'm in this store quite a bit.  It's on Sandario

13   Road.

14        This is for 3/2 of '11 at about 1:17 p.m.

15   Q.   And is this the store that's close to the

16   freeway?

17   A.   It is.

18   Q.   And is this excerpt you've seen, and you've

19   seen more beyond this, does that accurately reflect

20   the video camera footage from March 2nd of 2011 at

21   1:17 and before and after time frames?

22   A.   Yes.

23             MR. LACEY:  We'd offer 14-B.

24             MR. COOPER:  No objection, Judge.

25             MR. ARMSTRONG:  No objection.

1          MR. YOUNG:  No objection, Your Honor.

2          THE COURT:  It can be admitted.

3    BY MR. LACEY:

4    Q.   And lastly, 14-D as in dog.  We'd ask an

5    excerpt be played.

6          Can you identify this for us?

7    A.   This is the store right over here on Congress

8    and I-10.

9    Q.   And how can you tell that?

10   A.   Because they never took off the GE Security

11   label on I'd asked for.

12         This is the store I just left this morning.  I

13   know this store very well.

14   Q.   And the date and time for this particular

15   video footage?

16   A.   3/2/11 at 2:34 and 36 seconds p.m.

17   Q.   And does this Exhibit 14-D accurately reflect

18   the events that were filmed back on March 2nd,

19   2011, at 2:34 and thereafter?

20   A.   Yes.

21         MR. LACEY:  We'd offer 14-D.

22         MR. COOPER:  No objection, Judge.

23         MR. ARMSTRONG:  No objection, Judge.

24         MR. YOUNG:  No objection, Your Honor.

25         THE COURT:  It can be admitted.

1    MR. LACEY:  No further questions.

2    THE COURT:  Mr. Cooper?

3    MR. COOPER:  I have no questions, Your

4  Honor.

5    MR. ARMSTRONG:  Nothing, thank you.

6                    CROSS-EXAMINATION

7  BY MR. YOUNG:

8  Q.   Sir, you've worked with Circle K for a number

9  of years?

10  A.   20 years.

11  Q.   20 years?

12  A.   Yes, sir.

13  Q.   And you said each of the Circle Ks has a

14  minimum of four cameras in it?

15  A.   Yes.

16  Q.   So in addition to the cameras that we're

17  looking at, there would be cameras at the

18  registers, cameras of other areas of the store?

19  A.   Yes, sir.

20  Q.   Some of the stores have, you said, up to 16

21  cameras.  Those would be cameras inside, cameras

22  outside?

23  A.   That is correct.

24  Q.   Now, your having worked for Circle K that

25  long, you're familiar with the merchandise that

1  they sell?

2  A.   I'm sorry?  Say that again.

3  Q.   You're familiar with the merchandise that

4  Circle K sells?

5  A.   I am.

6  Q.   Among other things, Circle K sells gloves; is

7  that right?

8  A.   Yes, sir.

9  Q.   And they sell white gloves?  They sell brown

10  gloves?

11  A.   We sell a variety.  I think there is about

12  probably seven different varieties that they sell.

13  Q.   They have some mechanic's gloves that they

14  sell?

15  A.   Yes.

16  Q.   They even -- I'm thinking of getting a pair --

17  they have a pair of goat skin mechanic's gloves

18  that they sell?

19  A.   I'm sorry?

20  Q.   They have some goat skin mechanic's gloves

21  that they sell?

22  A.   I'm not too sure particularly.  I can --

23  again, I'd have to see it to see what they are.

24  Q.   But some of the gloves are nicer and some of

25  the gloves are at a lower price point?

1    A.   Yes.

2    Q.   They've certainly got the brown jersey

3    gardening gloves that you see; is that correct?

4    A.   Yes, I believe they have a brown glove.

5    Q.   And they also sell a white string glove;

6    right?

7    A.   Yes, that's a lower-end glove.

8    Q.   And the higher-end gloves, those would be in

9    the $15 price point?

10   A.   I'm not sure of the price, but I think the

11   leather ones are higher priced.

12   Q.   The goat skin ones?

13   A.   It may be.  You're saying goat skin?

14   Q.   Goat skin.

15   A.   I'm not sure if it's goat.

16        MR. YOUNG:  That's all I have, Your Honor.

17        MR. LACEY:  One follow-up.

18                   REDIRECT EXAMINATION

19   BY MR. LACEY:

20   Q.   We'd ask the witness be shown 14-A.4, please.

21        Sir, when we met after court about an hour

22   ago, did you look at certain receipts that were --

23   you mentioned to us that your store has the

24   capability of making photographs or filming the

25   cash register?

1    A.   Yes.

2    Q.   14-A.1, is that particular photograph that we

3    see still on the camera?

4    A.   This is a screen shot of what I'm used to

5    seeing.  The bottom-right hand corner, it's a data

6    device, and what it is is an interface to the

7    register.  It literally pulls off the register what

8    you see as a customer on the pole display.

9         So that's what you actually see on the pole

10   display that comes out on this data device.

11             MR. LACEY:  Can we first blow up the

12   persons in the photograph there?  Okay.  If you can

13   then go back to the receipt, please, and can you

14   blow that up for us.

15   BY MR. LACEY:

16   Q.   Sir, this shows what?  You were just asked

17   about some gloves.  Do you see anything here that

18   references purchases of gloves back on March 2nd at

19   the Circle K store in Phoenix, Arizona?

20   A.   Yeah.  The way it works is it basically

21   subtotals the total above, so when you see the

22   23.57, on pump five, they prepaid for fuel for

23   $35.  Then they added on gloves for a $1.85.  Then

24   there was a nylon glove for $1.69, and then the

25   white string glove, which is our cheapest glove, I

1  believe, for $1.59.  So a balance due of $55.43

2  cents.

3       Then it looks like they paid for another

4  prepaid fuel on four for $50, so now the total is

5  $55.43.

6  Q.   Can that particular receipt -- who would have

7  been at the register?  Can you tell from this

8  photograph who was at the register when these items

9  were being purchased?

10 A.   Our CSR but I don't know her name.

11 Q.   And across the counter from the CSR, as you

12 call it?

13 A.   That would be the customers.

14 Q.   And can you, when we enlarge this again, can

15 you tell who the customer would have been that was

16 purchasing these gloves back on March 2nd in

17 Phoenix, Arizona?

18 A.   I would have to probably play the video to be

19 absolutely positive who it is.

20 Q.   Okay.  And positioned across the counter from

21 where the person is that is in closest proximity to

22 the gloves across the counter, is that person

23 wearing a hat?

24 A.   Yes.

25            MR. LACEY:  Okay.  I have nothing further

1   at this time.

2           THE COURT:  Mr. Cooper?

3           MR. COOPER:  No, Your Honor.

4           THE COURT:  Mr. Armstrong?

5           MR. ARMSTRONG:  No.

6           THE COURT:  Since you brought up the

7   gloves, I'd figure you'd have something else,

8   Mr. Young.

9           MR. YOUNG:  Since this was beyond the

10  scope of cross, I do Your Honor, yes.

11          THE COURT:  Take your grain of salt and

12  live with it.

13          MR. YOUNG:  Could you back up that video a

14  bit?

15          NICOLE WILLIAMS:  It's a still shot, not a

16  video.

17          MR. YOUNG:  Okay.  Well, then this cross

18  will be abbreviated, Your Honor.

19                  RECROSS-EXAMINATION

20  BY MR. YOUNG:

21  Q.  Sir, given that this is a still shot that

22  we're looking at here, 14-A, 14-A.4, you cannot

23  tell from looking at that photograph who actually

24  took gloves off of the rack, can you?

25  A.   No.  I would have to track it from other

1  cameras to see how the product got to the camera.

2  Q.  In fact, looking at this camera, you can't

3  even see the rack with the gloves on it, can you?

4  A.  The wrappers of the gloves, you said?

5  Q.  The rack with the gloves.

6  A.  No, you cannot see the rack where the gloves

7  were taken from.

8  Q.  The rack with the gloves in this particular

9  store is far to the left of what we're viewing?

10  A.  I'm not sure.  I would have to be in the store

11  to see, let you know the placement.

12  Q.  You don't know if that rack would be over by

13  the coolers?

14  A.  Again, I'm not sure where the rack is.

15  Q.  And looking at that picture, you can't tell

16  who took the gloves off the rack?

17  A.  No.  I could see gloves on the counter, but I

18  can't tell whether or not they came off the rack.

19  Q.  Looking at the picture, it looks like there

20  are at least maybe three people in the background?

21  A.  Yes.

22  Q.  It looks like there are two -- are those 12

23  packs of Orange Crush?

24  A.  Those are Orange Crush.

25  Q.  And are those 12 packs that I'm looking at?

A.   Yes.

Q.   And looking at that picture, can you tell who put the gloves on the counter?

A.   Not by the picture, no.

Q.   And looking at that picture, can you tell who's actually paying for the fuel?

A.   Not by just looking at a still picture, no.

MR. YOUNG:  I guess that's all I have, Your Honor.

THE COURT:  Do the jurors have any questions for this witness?  If so, please place them in writing.

Thank you.

JAMES REEVES, WITNESS, SWORN

THE COURT:  Sir, the Rule has been invoked in this case.  That means, except during the time that you are testifying, you must remain outside the courtroom, and you are only allowed to discuss your testimony with the attorneys involved in the case.

THE WITNESS:  Yes, sir.

THE CLERK:  Please state your name for the record and spell your last name.

THE WITNESS:  James Reeves, R-e-e-v-e-s.

THE CLERK:  Thank you.

1    THE COURT:  You may proceed.

2    MR. LACEY:  Thanks Your Honor.

3    DIRECT EXAMINATION

4    BY MR. LACEY:

5    Q.   Sir, would you tell us who you're employed

6    by?  It's pretty obvious by your uniform, but put

7    it on the record.

8    A.   Arizona Department of Public Safety.

9    Q.   In what capacity?

10   A.   Highway patrol officer.

11   Q.   And you've been there for how long with the

12   patrol?

13   A.   Since 2001.

14   Q.   I want to direct your -- what's the turf that

15   you usually cover, more in particular, back in

16   March of 2011, March 2nd.  Where were you working

17   back on that day?

18   A.   Near the area of Casa Grande.  We cover Pinal

19   County.

20   Q.   Did you receive any communication to be

21   looking for a certain vehicle that day?

22   A.   I did.

23   Q.   And what type of vehicle was that?

24   A.   The vehicle was a white Jeep Commander.

25   Q.   And during the course of the day, did you

1  encounter that vehicle?

2  A.   I did.

3  Q.   Where?

4  A.   I located the vehicle in a parking lot at the

5  smoke shop off of Riggs Road off of I-10.

6       THE CLERK:  Will you pull the microphone

7  just a little closer?  Thanks.

8  BY MR. LACEY:

9  Q.   You say a smoke shop.  That's a store that

10 sells cigarettes, I would gather?

11 A.   Yes.

12 Q.   How far from the freeway is the shop located?

13 A.   Within a half a mile.

14 Q.   And Riggs Road is located where?  Is there a

15 mile marker, do you know offhand?

16 A.   Riggs Road is milepost 167 on I-10.

17 Q.   And about how far is that from Casa Grande?

18 A.   Casa Grande main exit is 194, Florence

19 Boulevard, so 25, 27 miles.

20 Q.   What time of day was it that you encountered

21 this white Jeep Commander?

22 A.   Mid-afternoon.

23 Q.   And what happened when you saw it?

24 A.   I saw the vehicle sitting in the parking lot.

25 I drove into the parking lot, confirmed the license

1  plate on the vehicle as I drove by, and the vehicle
2  immediately pulled out.
3  Q.   Once it did, what happened?
4  A.   I followed the vehicle westbound on Riggs Road
5  and conducted a traffic stop with myself and
6  Sergeant Swavely.
7  Q.   And what time that was?
8  A.   Approximately 4:34 p.m.
9  Q.   I'll show you Exhibit 120.  I would ask if you
10  can identify this for us.
11  A.   That would be the warning that I issued.
12  Q.   And you say you issued a warning, and who was
13  that?  Was it the person relating to the white Jeep
14  Cherokee (sic)?
15  A.   Yes, to the driver, Jorge Santos-Medina.
16  Q.   And what is the date and time of that
17  citation?
18  A.   It was March 2nd, 2011, at 16:34 hours, which
19  is 4:34 p.m.
20  Q.   When you pulled over that vehicle, was there
21  anyone else in the vehicle with this fellow we'll
22  call Jorge?
23  A.   Yes.  There was a female passenger and a
24  couple small children.
25  Q.   Was the citation issued by your fellow officer

1  who was with you at the time?

2  A.   Yes.

3  Q.   To the passenger?

4  A.   Yes, there was.

5  Q.   To a woman?

6          MR. LACEY:  May I approach, Judge.

7          THE COURT:  You may.

8  BY MR. LACEY:

9  Q.   Sir, 121 for identification, we'd ask you if

10 you can identify that.

11 A.   That would be the warning that Sergeant

12 Swavely issued to the female passenger.

13 Q.   And her name?

14 A.   Carmen Gonzales-Medina.

15         MR. LACEY:  We'd offer 120 and 121.

16         MR. COOPER:  No objection.

17         MR. ARMSTRONG:  None.

18         MR. YOUNG:  No objection, Your Honor.

19         THE COURT:  It can be admitted.

20 BY MR. LACEY:

21 Q.   When you pulled over this vehicle, what was

22 your -- why were you looking for this particular

23 vehicle?  Do you know?

24 A.   Tucson dispatch put out an attempt to locate,

25 ATL, on a white Jeep Commander with a given license

1  plate.  The vehicle was suspected to be involved in

2  a home invasion, and the subjects were supposedly

3  armed and dangerous.

4  Q.  When you encountered this vehicle, who was in

5  the vehicle?

6  A.  There was a male subject who identified

7  himself as Jorge Santos-Medina, a female subject

8  who identified herself as Carmen Gonzales-Medina,

9  and a couple small children.

10  Q.  And the kids, do you know their approximate

11  ages?

12  A.  Looking at the warning, Sergeant Swavely put

13  the kids were two and four -- two and four years

14  old.

15  Q.  And do you know who they belonged to or you

16  would have no idea?

17  A.  I don't recall, no.

18  Q.  Do you recall more details regarding this

19  event?  I know it's been quite a while ago.

20  A.  I don't.

21  Q.  About how many citations have you been

22  involved in issuing since March 2nd of '11?

23  A.  Probably well over a thousand.

24        MR. LACEY:  I have nothing further.  Thank

25  you.

1        THE COURT:  I was going to ask him about

2   whether or not he gave me a citation, but I decided

3   not to.

4        MR. LACEY:  Was that in the past or the

5   future?  I'm sure he can accommodate.

6        MR. COOPER:  Your Honor, may I approach

7   the easel?

8        THE COURT:  You may.

9                    CROSS-EXAMINATION

10  BY MR. COOPER:

11  Q.   Good afternoon.

12  A.   Good afternoon.

13  Q.   You're familiar with I-10; correct?

14  A.   Yes.

15  Q.   And are you familiar with I-10 from Tucson all

16  the way up past Phoenix?

17  A.   Tucson to the south end of Phoenix is where

18  I'm most familiar with.

19  Q.   How about the west side of Phoenix?

20  A.   No.

21  Q.   Do you know where 51st Avenue would be?

22  A.   I roughly know where it is, yes.

23  Q.   Okay.  And where I-10 would intersect that,

24  51st Avenue?

25  A.   Yes.

1    Q.   It's on the way to California?

2    A.   Correct.

3    Q.   Let me ask you about some timing and some

4    distances.   Okay?

5    A.   Okay.

6    Q.   Do you patrol through Tucson?

7    A.   No.  I patrol Pinal County.

8    Q.   Have you ever patrolled down this way?

9    A.   I've been through Tucson, yes.

10   Q.   Okay.  So you -- the milepost where you

11   stopped this vehicle was where?

12   A.   Milepost 167 on I-10, Riggs Road.

13   Q.   Milepost 167.  And on the -- I guess the

14   Exhibit 120 and 121, do you have those in front of

15   you?

16   A.   I do.

17   Q.   You indicated the time that the stop took

18   place; right?

19   A.   Yes.

20   Q.   And what time was that?

21   A.   16:34.

22   Q.   That's 4:34 p.m.?

23   A.   4:34 p.m.

24   Q.   It's fair to say, isn't it, that somebody

25   driving from this courthouse or let's say a Circle

```
1   K right next this courthouse going to 51st Avenue
2   and, oh, let's say I-10, that's about 120 miles,
3   give or take?
4       Is that fair?
5   A.   I guess.  I don't know the mileposts or the
6   distance off the top of my head.
7   Q.   Well, let's just say from right here where we
8   are to milepost 167.  Can you estimate 50 miles?
9   60 miles?
10  A.   I don't know without -- I don't know what exit
11  number Congress is or --
12  Q.   Okay.
13  A.   I don't know.  It's probably roughly 100 to
14  120 miles.
15              THE COURT:  From here to?
16              THE WITNESS:  From here to 51st Avenue.
17  BY MR. COOPER:
18  Q.   Okay.  So if somebody here is leaving, let's
19  say, downtown Tucson or Circle K in Tucson and
20  drives to 51st Avenue to pick somebody up and then
21  drives back to milepost 167, you can assume we're
22  talking close to three hours; is that fair?
23  A.   Probably roughly, yes.
24  Q.   So I know you spend your life catching
25  speeders, but if somebody left, let's say, at
```

quarter to three from downtown Tucson to go all the
way to 51st Avenue in Phoenix and then back to
milepost 167, and they left a quarter to three,
would you expect to find them at milepost 167 at
4:34 p.m.?

A.   Given the time and distance, probably not.

Q.   That would be pretty quick, wouldn't it?

A.   Yes, it would.

Q.   Okay.  Because we're talking 4:45 from --
that's -- they'd have to go 100 miles an hour,
potentially, a lot of the way; right?

A.   Correct.

Q.   Let me talk to you a little bit about, if you
could look at Exhibit 120.

     You were not the only officer at the scene;
right?

A.   I was not.

Q.   And the other officer has handwriting I can't
read.

A.   Sergeant Swavely.

Q.   That's Swavely?

A.   Swavely, yes.

Q.   And he wrote one form and you wrote one form;
right?

A.   Correct.

1  Q.  Swavely wrote the form for the woman; correct?

2  A.  Correct.

3  Q.  And on it, it says under "Driver's Signature"

4  it says "FI driver."  What does that mean?

5  A.  Field interview.

6  Q.  Okay.  That meant he was talking to the

7  driver; right?

8  A.  I believe so, correct.

9  Q.  And that driver would have been Carmen

10  Gonzales-Medina?

11  A.  Yes.

12  Q.  Okay.  So, when you stopped the vehicle, the

13  passenger was the person you've listed on the other

14  exhibit; correct?

15  A.  I believe so, yes.

16  Q.  That would be Jorge Santos-Medina?

17  A.  Correct.

18  Q.  And in fact, in the warning section, you have

19  in parenthesis the word "passenger"; right?

20  A.  Correct.

21  Q.  And Mr. Santos-Medina indicated to you that he

22  was going to Tucson to visit his mother; right?

23  A.  Yes.

24  Q.  The other question I have is, the direction of

25  travel section, you have both of the officers, you

1  and Swavely, have the direction of travel checked

2  as west.

3  A.   Correct.

4  Q.   Does that mean -- it is my understanding that

5  the vehicles were not on the freeway when you

6  stopped them.

7  A.   That is correct.  They were on Riggs Road

8  heading westbound.

9  Q.   Heading westbound, that would be away from

10 Tucson?

11 A.   That would be away from the freeway, heading

12 west on Riggs Road.

13 Q.   Okay.  Away from the freeway?

14 A.   Correct.

15 Q.   Okay.  And the kids were in car seats;

16 correct?

17 A.   I don't recall.

18 Q.   You don't recall.  Okay.  But there were two

19 children in the vehicle?

20 A.   There were.

21 Q.   And it's a Jeep Commander?

22 A.   I believe it was, yes.

23 Q.   Okay.  A male, a female, and two children at

24 4:34 p.m.; right?

25 A.   Correct.

1    MR. COOPER:  Okay.  Thank you.  That's all

2 I have.

3                    CROSS-EXAMINATION

4 BY MR. ARMSTRONG:

5 Q.   Good afternoon, sir.  Just a few questions.

6 A.   Good afternoon.

7 Q.   The reason you stopped the Jeep Commander was

8 because you had received some information, and I

9 believe your testimony was that the -- that you

10 received some information on an ATL -- I guess

11 that's an attempt to locate?

12 A.   Correct.

13 Q.   -- that the Jeep had been involved in a home

14 invasion.  Is that what you just said a little bit

15 ago?

16 A.   I believe that's what the scenario was.

17 Q.   Where did you receive that information or what

18 was the source of that information, if you recall?

19 A.   Tucson dispatch is the one who put out the

20 attempt to locate.  They're our dispatch center for

21 the Casa Grande area.

22      I don't know exactly where the information was

23 generated from.  I believe Phoenix PD was involved.

24 Q.   Was this some information that you just --

25 that you received over your radio in your car or on

1  your person?

2  A.  Yes.

3  Q.  You didn't speak with anybody from the FBI

4  directly about this case then?

5  A.  I did not, no.

6  Q.  Okay.  Do you recall whether Mr. Santos-Medina

7  had a driver's license on that day?

8  A.  I don't believe he did.

9  Q.  And who -- was he allowed to drive the car

10  after you had your business with him, or was

11  Carmen, was she permitted to drive?

12  A.  I don't recall who drove away from the scene.

13      MR. ARMSTRONG:  Okay.  Thank you.  Nothing

14  further.

15      MR. YOUNG:  No questions, Your Honor.

16      THE COURT:  Mr. Lacey?

17      MR. LACEY:  Yes.

18               REDIRECT EXAMINATION

19  BY MR. LACEY:

20  Q.  Just one question.  Were any weapons found in

21  the vehicle?

22  A.  No, sir.

23      MR. LACEY:  Nothing further.

24      THE COURT:  If the jurors have any

25  questions, please place them in writing.

1     At least one.

2         (The following proceedings occurred at the

3         bench.)

4         THE COURT:  "Testimony:  I think that 51st

5     Avenue is incorrect.  51st Street and Riggs is much

6     more likely.  I'm very familiar with Phoenix.  Big

7     difference between 51st Avenue and 51st Street."

8         It's not a question.  That's a statement

9     from one of the jurors.

10        MR. LACEY:  It is.

11        (End of bench conference.)

12        THE COURT:  I'm not sure that's a

13    question.

14        Mr. Lacey, any questions you want to ask

15    based upon the juror's comment?

16        MR. LACEY:  No, Your Honor.

17        THE COURT:  Mr. Cooper?

18        MR. COOPER:  No, Your Honor.

19        MR. ARMSTRONG:  Nothing, thank you.

20        MR. YOUNG:  Nothing, Your Honor.

21        THE COURT:  Okay.  Thank you.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  If you see a black Kia --

24        THE WITNESS:  What's the plate, sir?

25        THE COURT:  Just kidding.

1        You may call your next witness.

2        MS. HOPKINS:  The Government calls Sonja

3   Frueh to the stand.

4             SONJA FRUEH, WITNESS, SWORN

5        THE COURT:  Ma'am, the Rule has been

6   invoked in this case.  That means, except during

7   the time that you're testifying, you must remain

8   outside the courtroom, and you're only allowed to

9   discuss your testimony with the attorneys involved

10  in the case.

11       THE CLERK:  Please state your name for the

12  record and spell your last name.

13       THE WITNESS:  Sonja Frueh.  Last name

14  F-r-u-e-h.

15       THE CLERK:  And Sonja is S-o-n --

16       THE WITNESS:  -- -j-a.

17       MS. HOPKINS:  Your Honor, may we approach

18  sidebar?

19             (The following proceedings occurred at the

20             bench.)

21       MS. HOPKINS:  I should have done this

22  before she got on the stand.  This witness

23  interviewed -- this witness interviewed Ghermon

24  Tucker on March 2nd.  We already addressed the

25  issue of post-arrest statements at the pretrial

1   hearing.  We have this redacted version.  It's been
2   disclosed to defense counsel and to the Court.
3          Essentially she's just going to go off
4   what's on there.  I'm not going to ask her any
5   open-ended questions about --
6          THE COURT:  She knows what she's going
7   to --
8          MR. LACEY:  She's just going to read it.
9          MS. HOPKINS:  Yeah, she knows what she's
10  going to testify to.
11         THE COURT:  All right.
12         (End of bench conference.)
13         THE COURT:  You may continue.
14                DIRECT EXAMINATION
15  BY MS. HOPKINS:
16  Q.   Good afternoon, Ms. Frueh.
17  A.   Hi.
18  Q.   Where do you work?
19  A.   I'm a special agent with the Federal Bureau of
20  Investigation.
21  Q.   Here in Tucson or in Phoenix?
22  A.   Here in Tucson.
23  Q.   And how long have you been a special agent?
24  A.   Since 2005.
25  Q.   Okay.  I'd like to direct your attention to

1  March 2nd, 2011.  Did you come into contact with a
2  person later known to you as Ghermon Tucker?
3  A.  Yes, I did.
4  Q.  And where did that contact take place?
5  A.  We interviewed him at the border patrol Tucson
6  sector.
7  Q.  And what were the circumstances that brought
8  you into contact with him?
9  A.  Mr. Tucker had been arrested, and I just
10  conducted the post-arrest interview.
11  Q.  And do you recall approximately what time you
12  were summoned to the station to conduct interviews?
13  A.  It was late, approximately 8:45 p.m.
14  Q.  And did you respond to the -- were you aware
15  of the investigation that occurred?
16  A.  Yes.
17  Q.  And did you respond to the scene of the
18  investigation at all?
19  A.  Not where he was arrested, no.
20  Q.  Now, approximately what time did you arrive at
21  the station?
22  A.  I'm not sure.  We were there a little bit
23  earlier than when they arrived.
24  Q.  And how many people did you interview that
25  day?

1   A.   I think I just interviewed the one person.

2   Q.   And prior to the interview, were you briefed

3   on the facts of this case?

4   A.   Yes.

5   Q.   Now, did you also obtain personal property for

6   Mr. Tucker?

7   A.   Yes.

8   Q.   I'd like to show you what's been marked for

9   identification as Exhibit -- I think it's 119.

10         MS. HOPKINS:  May I approach, Your Honor?

11         THE COURT:  You may.

12  BY MS. HOPKINS:

13   Q.   Do you recognize that?

14   A.   Yes.

15   Q.   What is that?

16   A.   It's a baseball hat we obtained from

17  Mr. Tucker, along with a couple other items after

18  the post-arrest interview.

19         MS. HOPKINS:  Your Honor, at this time the

20  Government moves to admit into evidence what's been

21  marked for identification as Exhibit 119.

22         MR. COOPER:  No objection.

23         MR. ARMSTRONG:  No objection.

24         MR. YOUNG:  No objection, Your Honor.

25         THE COURT:  It can be admitted.  It's

1  already been published.

2  BY MS. HOPKINS:

3  Q.  Oh, I guess you don't need to hold it up

4  because it's facing the jury.

5      Now was there another agent present when you

6  interviewed him?

7  A.  Yes.

8  Q.  And who is that?

9  A.  Special Agent Scott Lobb

10  Q.  And where was the interview conducted?  I know

11  it was at the border patrol station, but

12  specifically was it in a room or --

13  A.  It was in a room.

14  Q.  And what time -- do you recall what time you

15  started the interview?

16  A.  Approximately 8:40 p.m.

17  Q.  And before you interviewed Mr. Tucker, was he

18  advised of his Miranda rights?

19  A.  Yes.

20  Q.  Who advised him of those rights?

21  A.  I did.  He was advised of his rights about

22  8:45 p.m.  I think actually Scott Lobb, Special

23  Agent Lobb, read him his rights, and he waived his

24  rights.

25  Q.  Is there a form that you use to advise people

1  of their rights?

2  A.   Yes.

3  Q.   And did he indicate whether he understood his

4  rights?

5  A.   He did.

6  Q.   Did he indicate whether or not he was willing

7  to waive his rights and make a statement without

8  the presence of an attorney?

9  A.   He did.  He waived his rights and signed the

10 form.

11 Q.   Now, after he waived his rights, was he

12 interviewed?

13 A.   Yes.

14 Q.   And approximately what time did the interview

15 begin?

16 A.   He waived his rights and signed about 8:49, so

17 then we started the interview right after that.

18 Q.   And what did Mr. Tucker say in the interview?

19 A.   Mr. Tucker advised that he drove down from

20 Phoenix to Tucson, that he was a passenger.

21 Q.   And if you want to just go ahead and read from

22 -- do you have a post-arrest statement in front of

23 you?

24 A.   I do.

25 Q.   Do you want to go ahead and just read from the

1    statement?

2    A.    Okay.

3              MS. HOPKINS:  May I approach, Your Honor?

4              THE COURT:  You may.

5    A.    "Okay.  Mr. Tucker stated that he came to

6    Tucson from Phoenix on that day, March 2nd, as a

7    passenger in a Ford Expedition.

8         "He wouldn't answer questions as far as why he

9    was -- what purpose he came to Tucson, and he

10   denied any knowledge of any firearms or body armor

11   being in the Expedition that he was riding in."

12             MS. HOPKINS:  Could I have one moment,

13   Your Honor?

14             THE COURT:  You may.

15   BY MS. HOPKINS:

16   Q.    And did you show Mr. Tucker any photographs

17   that day?

18   A.    Yes.  We showed him three photographs.

19   Q.    And is there a portion in that statement where

20   it discusses the fact that you showed him

21   photographs?

22   A.    Yes.

23   Q.    Why don't you go ahead and read that as well.

24   A.    Okay.  "Mr. Tucker was shown photographs of

25   nickname Chivo, also known to agents as Jaime

1  Lopez-Lorenzo Santiago; Gollo, also known to agents

2  as Alberto Perado-Guzman; and Seco, known to agents

3  is as Mayco Ledezma-Prieto.

4      "Mr. Tucker was asked if he knew them or if

5  he'd ever met any of them and was specifically

6  asked if he had met with any of the aforementioned

7  individuals in a park, and Mr. Tucker denied it.

8      "He was also asked if he had ever been pulled

9  over by law enforcement with any of the other --

10  any of these aforementioned vehicles, and he denied

11  knowing them or having met them."

12  Q.  Okay.  Now, can you please take a look around

13  the courtroom.

14      Do you see the person that you interviewed on

15  March 2nd, 2011, in the courtroom today?

16  A.  Yes.

17  Q.  Can you please point to him and describe what

18  he's wearing?

19  A.  He's sitting next to Mr. Cooper in a blue --

20  blue shirt and tie.

21          MS. HOPKINS:  For the record --

22          THE COURT:  For the record, how do you

23  know who Mr. Cooper is?

24          THE WITNESS:  We go way back, Your Honor.

25          THE COURT:  I don't know.  I just want to

1  make sure that everyone knew that you knew

2  Mr. Cooper.

3        All right.  He's the guy with most of the

4  hair.

5        THE WITNESS:  Correct.

6        MS. HOPKINS:  Would the record reflect

7  that the witness has identified Ghermon Tucker as

8  the person that she interviewed on March 2nd?

9        THE COURT:  It may so reflect.

10        MS. HOPKINS:  I have no further questions.

11        THE COURT:  Mr. Cooper?

12                CROSS-EXAMINATION

13  BY MR. COOPER:

14  Q.  Hello.

15  A.  Hello.

16  Q.  I just have a few questions.

17        You were present talking to Ghermon with

18  another FBI agent; right?

19  A.  Correct.

20  Q.  Scott Lobb?

21  A.  Yes.

22  Q.  Okay.  And it began about 8:40 at night, which

23  would have been, you know, four and a half hours

24  after the arrest, roughly?

25  A.  I'm not sure when they were actually arrested

1  because that was -- somebody else did the actual

2  arrest.

3  Q.  Okay.  You actually, or at least Lobb did, I

4  don't know about you, but did you arrive at the

5  same time to question Ghermon?

6  A.  I'm not sure if we were in the same vehicle

7  arriving to the border patrol station.

8  Q.  But the interview began at the same time with

9  both of you present?

10 A.  Yes.

11 Q.  Okay.  You've described three photos that were

12 shown, but actually there were some additional

13 photos that were shown him as well, weren't there?

14 A.  As far as I can recall, we showed the three

15 photographs.

16 Q.  Have you ever heard of a fellow named Andy

17 Pineda?

18 A.  The name sounds familiar but I'm not sure.

19 Q.  Okay.  I'm going to use some words that I'm --

20 see if you remember Mr. Lobb using them, not you.

21 A.  Okay.

22 Q.  Do you ever remember Mr. or Agent Lobb saying

23 to the effect to Ghermon, "You know that fat

24 motherfucker, don't you?"

25 A.  Yeah, I don't recall that.

1   Q.   And that was pointing to a picture of Andy

2   Pineda?

3   A.   I don't recall that.

4   Q.   Okay.  It appears from your report that

5   Ghermon was not asked about a home invasion; is

6   that right?

7   A.   Correct.

8   Q.   Okay.  And he was not asked if he knew that

9   Mayco was arrested; right?

10  A.   Correct.

11  Q.   Okay.  And he was not asked if he knew about a

12  warehouse in Tucson; right?

13  A.   Correct.

14  Q.   Okay.  The -- was there ever any mention made

15  to Ghermon about -- or did you ask him about --

16  well, let me -- he waived his rights and agreed to

17  talk with you; right?

18  A.   Correct.

19  Q.   Right from the start.

20       The FBI has a policy of not tape recording

21  interviews; right?

22  A.   That's correct.

23  Q.   Okay.  And that policy has gone on for years;

24  right?

25  A.   For as long as I've been in the bureau, yes,

1  sir.

2  Q.  And how long is that?

3  A.  Since 2005.

4  Q.  The other -- the other thing that you asked

5  Ghermon and that he replied in the negative is

6  whether he had met Chivo or Gollo or Seco in a park

7  on February 4th; right?

8  A.  Correct.

9  Q.  And he said no, he hadn't been in a park with

10 them on February 4th?

11 A.  That's correct.

12        MR. COOPER:  Okay.  Thank you.  That's all

13 I have.

14        THE WITNESS:  Thank you.

15        MR. ARMSTRONG:  Nothing.  Thank you.

16        MR. YOUNG:  No questions, Your Honor.

17        THE COURT:  Ms. Hopkins, anything further?

18        MS. HOPKINS:  No further questions.

19        THE COURT:  If the jurors have any

20 questions, please place them in writing.

21        It appears there are none.  You may step

22 down.

23        Call your next witness.

24        Leave the hat.

25          MICHAEL SMITH, WITNESS, SWORN

1          THE COURT:  Sir, the Rule has been invoked

2    in this case.  That means, except during the time

3    that you're testifying, you must remain outside the

4    courtroom, and you are only allowed to discuss your

5    testimony with the attorneys involved in the case.

6          THE CLERK:  Please state your name for the

7    record and spell your last name.

8          THE WITNESS:  Michael Smith, S-m-i-t-h.

9          THE COURT:  You may proceed.

10          MR. LACEY:  Thanks, Your Honor.

11                DIRECT EXAMINATION

12   BY MR. LACEY:

13   Q.   Sir, who are you employed by?

14   A.   The FBI.

15   Q.   In what capacity?

16   A.   I'm a special agent?

17   Q.   You've been with the FBI for how long?

18   A.   Approximately 10 years.

19   Q.   I want to direct your attention back to March

20   2nd of last year, 2011.

21          Did you have occasion back on that date to

22   interview a person named Jerome Ranger?

23   A.   Yes, I did.

24   Q.   Where did that take place?

25   A.   At the border patrol office in Tucson.

1  Q.  Who was present for this interview?

2  A.  It was myself and then another agent, Agent

3  Christopher McKinney.

4  Q.  Prior to conducting the interview, did you

5  advise Mr. Jerome Ranger of his Miranda rights?

6  A.  Yes, I did.

7  Q.  And was that -- how was that rights -- did he

8  read them and sign them, or did you read it to him

9  and have him sign?  How did that work?

10  A.  I use a standard Miranda advisory form, and I

11  read his rights to him.  He stated that he

12  understood them, and then he looked at the paper,

13  then signed it after he said he understood them.

14  Q.  And it was a back on March 2nd?

15  A.  Yes.

16  Q.  About what time?

17  A.  Approximately 7:30 in the evening.

18  Q.  Now, you wrote a report, did you not, that

19  memorialized that interview?

20  A.  Yes, I did.

21  Q.  And do you have that in front of you?

22  A.  Yes.

23  Q.  Is there any reference on the report as to

24  what time the interview would have taken place?

25  A.  Not in this report, no.

1 Q. Did Mr. Jerome Ranger speak with you after

2 waiving his Miranda rights?

3 A. Yes.

4 Q. Would you read to us from the report what he

5 told you.

6 A. I started asking him just basic general

7 biographical information, where he lived, et

8 cetera.  He stated that he lived up in Phoenix, and

9 I asked him what eventually led to his arrest that

10 day.

11 Q. What did he tell you?

12   And again, read from the report, if you

13 wouldn't mind?

14 A. Sure.  Mr. Ranger said he was telephonically

15 contacted around 10 o'clock that morning, earlier

16 that morning, asking if he would accompany him and

17 some of his friends for a trip to Tucson later that

18 day.

19   Mr. Ranger agreed to do so, and shortly

20 thereafter, some individuals arrived at

21 Mr. Ranger's residence.  There were approximately

22 12 people at Mr. Ranger's house.  He stated that he

23 knew everybody there.

24 Q. What else did he say?

25 A. Once everybody had arrived at his residence,

they then departed for Tucson. He stated he was
driving his own red Ford Expedition. I asked him
why he had traveled down to Tucson, and he stated
he was going down there just to check out Tucson.

He said that he'd been to Tucson only one time
before, and that was a business-related trip. He
stated he was employed by a moving company and
traveled to Tucson one time before to provide an
estimate for a customer.

Q. What else?

A. He stated around 12 o'clock noon was when he
left, along with another vehicle en route to
Tucson. He then stated to me that they were
planning on stopping by a mall and to see a couple
friends in Tucson later that day.

As they were departing Phoenix, they stopped
for some gas and some sodas on the way out of
town. When they reached the Marana area, the
northwest area of Tucson, he said he received a
telephone call advising him to exit at the Marana
exit and pull into a gas station.

At this point he said they met with four
Hispanic males driving a smaller Nissan vehicle. I
asked him if he knew any of these Hispanic males,
and he stated he had met one of these males

approximately four or five months ago in Phoenix.

At that point he said he followed the Hispanic males to a Food City parking lot in Tucson. When they arrived there, the Hispanic males left in their own vehicle while Mr. Ranger remained in the Food City parking lot.

He said that he waited approximately 20 to 30 minutes, but the Hispanic males in the other vehicle didn't return. After waiting these 20 to 30 minutes, he stated that he went to attempt to visit a friend, but the friend was not home.

After that he returned to the Food City parking lot to attempt to meet with the four Hispanic males, and they were not there. He said at that time, that's when he departed the area and began the drive back towards Phoenix, and on his travels back to Phoenix is when he said he was stopped by the police.

Q. Anything further?

A. I asked him if he was aware of any firearms in his vehicle. He told me that he had an AK-47 in the back area of his vehicle. He said he had purchased it from a private citizen in the Phoenix area, that it was registered in his name and that he had a receipt for it.

1      I then asked him if he routinely carried the

2    AK-47 in his vehicle.  He stated that he does not

3    routinely carry it but he put it in the vehicle

4    that morning before departing for Tucson.  He told

5    me that the reason he put the gun in his vehicle

6    was because of the news of recent shootings in

7    Tucson, and he was carrying it for personal

8    protection.

9    Q.  What else was said?

10   A.  I asked him if he was aware of any other

11   firearms in the vehicle besides the AK-47, and he

12   stated that one of the passengers in his vehicle

13   was carrying a Glock pistol.

14      I also asked him if he was aware of any body

15   armor that was located in his vehicle.  He stated

16   that he was familiar with that, that he had

17   purchased some body armor for $250 from an

18   individual off the street in the Phoenix area.

19      He stated that he put it in the back seat of

20   his vehicle, and he forgot the body armor was in

21   there on the date that he traveled to Tucson, and

22   he stated the reason that he purchased the body

23   armor was for protection.

24   Q.  Anything else?

25   A.  I did ask one additional question pertaining

1  to guns.  He said he was aware that there was an

2  AR-15 rifle that was in another vehicle, in a

3  separate vehicle that was traveling with him.

4  Q.    Anything on the last page?

5  A.    I asked Mr. Ranger if he had ever heard any

6  discussion about going to a warehouse or a house

7  for the purpose of a home invasion or a kidnapping.

8  Q.    And that last sentence there, just use

9  Mr. Ranger's name by itself, in that paragraph.

10  A.    Right.  Mr. Ranger said that he had never been

11  involved in that type of activity.

12          MR. LACEY:  I have nothing further.

13          THE COURT:  Mr. Cooper.

14          MR. COOPER:  Your Honor, may I have a

15  sidebar, please?

16          THE COURT:  Sure.

17          (The following proceedings occurred at the

18          bench.)

19          MR. COOPER:  I'd like to renew my motion

20  to sever at this time because I'd like to question

21  Jerome Ranger about why, if the FBI agent is

22  correct, he said to the FBI agent that the AK-47

23  was in the back of the vehicle that he was driving

24  when it was actually recovered from the other

25  vehicle.

1          There are multiple other questions that I

2    have for Mr. Ranger that this agent can't answer

3    that go to Ghermon Tucker, and now the Government's

4    going to be using this statement, so I would renew

5    my motion for severance.

6          MR. ARMSTRONG:  I would join in that

7    motion.  It's a statement about a gun being

8    involved in another vehicle.  I would join in this

9    motion to sever.  There is a statement about a gun

10   that's -- that was located in another vehicle.

11   Presumably that's Ja'Cory's.  I also have no

12   opportunity to cross-examine the maker of that

13   statement.

14          MR. LACEY:  We have nothing -- we've

15   already submitted this pretrial.

16          THE COURT:  All right.  The motion is

17   denied.

18          (End of bench conference.)

19          THE COURT:  Mr. Cooper?

20          MR. COOPER:  I have no questions, Your

21   Honor.

22          THE COURT:  Mr. Armstrong?

23          MR. ARMSTRONG:  I don't think I do

24   either.  Thank you.

25                    CROSS-EXAMINATION

1    BY MR. YOUNG:

2    Q.   Sir, you interviewed Jerome Ranger on March

3    2nd at the border patrol headquarters in Tucson?

4    A.   Yes, I did.

5    Q.   And you said Jerome Ranger was under arrest at

6    that point?

7    A.   Yes.

8    Q.   And being as how he was under arrest, you read

9    him his Miranda rights before you talked to him?

10   A.   Yes.

11   Q.   And you told him that anything he said was

12   going to be used against him?

13   A.   Yes.

14   Q.   And that being the case, he still answered all

15   of your questions?

16   A.   Yes, he did.

17   Q.   He never stopped answering your questions?

18   A.   That's correct.

19   Q.   There were no questions he refused to answer,

20   was there?

21   A.   I don't recall him refusing to answer any

22   questions.

23   Q.   So you asked him all the questions that you

24   had?

25   A.   Yes.

1    Q.   And he answered them all?

2    A.   Yes.

3    Q.   He trusted you to write down the answers

4    accurately?

5    A.   Could you repeat the question, please?

6    Q.   I said he trusted you to write down the

7    answers accurately?

8    A.   You're asking --

9    Q.   Let me rephrase it.

10        He didn't make you record the interview, did

11   he?

12   A.   No.

13   Q.   So you were writing down his answers, not

14   recording them?

15   A.   That's correct.

16   Q.   And he was trusting you to write down the

17   answers accurately?

18   A.   If that's your interpretation of it.

19   Q.   Well, he knew you weren't recording it; right?

20   A.   I don't know if he knew that or not.

21   Q.   And in any case, he answered all your

22   questions?

23   A.   Yes, he did.

24   Q.   And you did write it all down accurately;

25   right?

A.  Yes.

Q.  Now, one of the questions you asked him about, Jerome Ranger even claimed a rifle that was not in his vehicle; is that correct?

A.  He told us about a rifle that was not in his vehicle, yes.

Q.  No, he claimed a rifle that was not in his vehicle, the AK-47.

A.  No.  He stated that was in his vehicle.

Q.  And I don't want to embarrass you with a minor inconsistency.  It's a small detail.  Your recollection is that he claimed the AK-47 was in his vehicle?

A.  Yes.

Q.  Assume just hypothetically for the moment that an entire BORTAC team and the Phoenix Police Department and FBI surveillance have all found and photographed and carefully collected with fresh gloves that AK-47 from the other vehicle, if you would.

    He claimed the AK-47 was his; right?

A.  Yes.

Q.  And he even said he had a receipt for that rifle?

A.  That's right.

1  Q.  So he was about to prove to you that it was

2  his?

3  A.  Correct.

4  Q.  And that's how sure he was that nothing was

5  going on was he was going to give you the receipt

6  and prove to you that the AK-47 was his?

7  A.  Yes, I agree.

8  Q.  And if in fact the AK-47 was found by all

9  those people in the other vehicle, it is the case

10  that he actually claimed a rifle that wasn't even

11  in his vehicle?

12  A.  If that's what occurred, then I would agree

13  with you.

14  Q.  Now, Jerome Ranger did claim the AK-47.  In

15  all fairness to Jerome Ranger, he told you he was

16  not going to rob anybody with it; right?

17  A.  He did not make that statement, no.

18  Q.  Well, he did tell you that he was not involved

19  in home invasion-type activity?

20  A.  Correct.

21  Q.  And that's what you were there to ask him

22  about; right?

23  A.  Yes.

24  Q.  And he answered all your questions about that?

25  A.  Yes, he did.

1  Q.  You asked him about the two vests that were in

2  his car?

3  A.  Yes.

4  Q.  He didn't offer you receipts for those vests,

5  did he?

6  A.  No, he didn't.

7  Q.  I believe he said he bought them from a

8  Mexican guy off the streets?

9  A.  Yes.

10  Q.  And that is his complete exact statement; is

11  that right?  He bought them from a Mexican guy off

12  the street?

13  A.  That's correct.

14  Q.  Now, that story is not very readily

15  verifiable, is it?

16  A.  No.

17  Q.  In fact, this may be even a little bit

18  cockamamie?

19  A.  That's what his statement was.

20  Q.  Did you take his word for it with respect to

21  those vests, or did you DNA test them?

22  A.  I did not DNA test them.  The statement that

23  he told me was the one that I put in my report.

24  Q.  So the case wasn't really your case, was it?

25  A.  No.

1  Q.   You were just called out to do the interview?

2  A.   Yes.

3  Q.   The vests were in his car, right, or in his

4  truck?

5  A.   I don't know.

6  Q.   You weren't briefed on that part of the case?

7  A.   No.

8  Q.   Well, assuming -- assuming hypothetically, I

9  guess, that the vests were, in fact, in his car.

10  You asked him about the vests; right?

11  A.   Yes.

12  Q.   And if Jerome Ranger had said they weren't

13  his, your very next question would have been what?

14  A.   I would probably ask whose vests they were.

15  Q.   Yeah, whose are they; right?  Because that's

16  what you wanted to know; right?

17  A.   It would seem to be a logical question.

18  Q.   And being as how they were in his car, if he

19  didn't claim them, you're going to ask whose they

20  were; right?

21  A.   Possibly, yes.

22  Q.   And if, in fact, they belonged to somebody

23  else, answering that question would have made him a

24  snitch?

25  A.   Is that a question?

1    Q.   Yes.

2    A.   I don't know if -- what you mean by the word

3    "snitch."

4    Q.   Maybe an informant, a tattletale.  Answering

5    that question would have made him tattletale, yes?

6    A.   According to me?

7    Q.   Maybe just according to common usage.

8    A.   I don't know.  I guess you'd have to ask him

9    that.

10   Q.   Well, if he told you that the vests belonged

11   to somebody else, he'd have been tattling on

12   somebody else, wouldn't he?

13   A.   His statement would be his statement, however

14   you interpret that to be, then.

15   Q.   Now, judging by the way they were pulled

16   over -- you're familiar with the way they were

17   pulled over; right?

18   A.   I'm sorry.  I'm not familiar.

19   Q.   Do you know what a vehicle assault is?

20   A.   I have a general idea.

21   Q.   Have you ever seen a vehicle assault?

22   A.   Yes.

23   Q.   These guys got to see a vehicle assault.

24        If you're pulled over in a vehicle assault, if

25   Mr. Ranger was pulled over in a vehicle assault, he

1  would have a good idea that somebody's in trouble;
2  right?
3  A.  I would suspect so.
4  Q.  The full-on BORTAC vehicle assault, that's not
5  every day?
6  A.  I don't know.  It may be.  I don't know.
7  Q.  Well, for Jerome Ranger it's maybe not every
8  day.  For BORTAC it might be every day.
9  A.  Right.
10  Q.  Gotcha.
11      And after he was stopped in that BORTAC
12  vehicle assault, he was not pointing the finger for
13  those vests at anybody who was in the back seat of
14  his car, was he?
15  A.  No.
16  Q.  And after getting stopped like that,
17  Mr. Ranger, Jerome Ranger, was not pointing the
18  finger for those vests at Miami and his roommate
19  Mayco?
20  A.  No.
21  Q.  You were briefed on the investigation somewhat
22  before you started asking questions; right?
23  A.  Yes.
24  Q.  You didn't just sit down and start
25  interviewing him?

1  A.   No.  I was briefed somewhat.

2  Q.   There are some people that are not supposed to

3  possess firearms; right?

4  A.   Yes.

5  Q.   And those people would be primarily -- the

6  basic categories are felons, insane people,

7  domestic violence convictions?  Those are the ones

8  we commonly run into?

9  A.   Yes.

10  Q.   Nothing is stopping Jerome Ranger from

11  possessing all the firearms he wants, is there?

12  A.   I'm not sure if he's a prohibited possessor.

13  I don't know.

14  Q.   Nothing that you know of prevents him from

15  possessing firearms?

16  A.   Not that I know of.

17  Q.   Certainly nothing in Arizona?

18  A.   Not that I know of.

19  Q.   These same people that are not allowed to

20  possess firearms, they're not allowed to possess

21  body armor either, are they?

22  A.   I don't know.

23  Q.   That could be a problem for certain people

24  with certain convictions that might not be allowed

25  to possess body armor?

1    A.   I don't know.

2    Q.   So even if Jerome Ranger said that the body

3    armor belonged to somebody else, that person could

4    themselves be a prohibited possessor of body armor?

5    A.   I suppose, if that's what the law reads.

6    Q.   And in any case, Mr. Ranger, when he was

7    answering your questions, he never gave you the

8    chance to ask, whose are they, did he?

9    A.   I don't recall asking that question, no.

10   Q.   And that's because, when you asked him about

11   them, he claimed them?

12   A.   He did claim them, yes.

13   Q.   And again, if he hadn't claimed them, you

14   certainly would have asked, well, whose are they?

15   A.   I probably would, yes.

16        MR. COOPER:  Judge, could we approach the

17   bench?

18        (The following proceedings occurred at the

19        bench.)

20        MR. COOPER:  I'm going to object and again

21   move for a severance and a mistrial because the

22   clear implication here is that Mr. Ranger claimed

23   that he had the body armor because he was

24   protecting somebody who was a prohibited possessor,

25   and --

1          THE COURT:  The person that's been

2   mentioned has been Mayco and Miami.

3          MR. COOPER:  Well, no.  The body armor was

4   recovered from the car.

5          THE COURT:  I understand that.

6          MR. COOPER:  And so the implication is

7   there would be somebody in the car who's

8   potentially a prohibited possessor, and I can't

9   cross-examine --

10          THE COURT:  The objection is overruled,

11   and the motion for mistrial is denied.

12          MR. COOPER:  Really?

13          THE COURT:  Really.

14          MR. COOPER:  Okay.

15          (End of bench conference.)

16          THE COURT:  Go ahead, Mr. Young.

17          MR. YOUNG:  That's all I have, Your Honor.

18          THE COURT:  Mr. Lacey?

19          MR. LACEY:  No, Your Honor, no questions.

20          THE COURT:  If the jurors have any

21   questions, please place them in writing.

22          There's at least one.

23          (The following proceedings occurred at the

24          bench.)

25          THE COURT:  "Was Mr. Ranger arrested at

1  this time?"

2          I think he said –– well, that may be

3  crossed out.  He says, "What is the original

4  charges or are the charges the same as presented

5  today?"  That's not a question for this witness.

6          "When he got the phone call, did he say

7  why he followed the Mexican men to Food City?"

8          Did you ask?  I don't think he said.  I

9  don't think he asked.

10          MR. LACEY:  He didn't.

11          THE COURT:  All right.

12          (End of bench conference.)

13          THE COURT:  The jurors have a question.

14          When he got the phone call from –– did he

15  say why he followed the Mexican men to Food City,

16  or did you ask?

17          THE WITNESS:  He said in the phone call he

18  was instructed to exit at a certain exit, and

19  that's why he exited at that point.

20          THE COURT:  Mr. Lacey, anything further?

21          MR. LACEY:  No, Your Honor.

22          THE COURT:  Mr. Cooper?

23          MR. COOPER:  No, Your Honor.

24          MR. ARMSTRONG:  Nothing.  Thank you.

25          MR. YOUNG:  Nothing further, Your Honor.

1    THE COURT:  You may step down.

2    MS. HOPKINS:  Your Honor, the Government

3  calls Special Agent Jon Edwards to the stand.

4    JON EDWARDS, WITNESS, PREVIOUSLY SWORN

5    THE COURT:  You're still under oath.

6    THE WITNESS:  Yes, sir.

7    DIRECT EXAMINATION

8  BY MS. HOPKINS:

9  Q.   I'd like to turn your attention back to the

10  home invasion sting and the kidnapping sting.

11    What was the source directed to do while he

12  was at the warehouse?

13  A.   He was directed to show a photograph of his

14  fictitious cousin to all the members that he could

15  try and get into the warehouse, as well as to draw

16  a map of the layout of the stash house.

17  Q.   And why was he directed to show a fictitious

18  photo of his cousin to them?

19  A.   It was an attempt to try and get the members

20  that were going to be involved in the home invasion

21  into the warehouse so he could, you know, use that

22  as a ruse to show them the picture so that he could

23  ensure that everybody saw that photograph.

24  Q.   And whose idea was that?

25  A.   We had discussed that between myself and Agent

1  Rubicalva.

2  Q.  And is Agent Rubicalva the source's handler?

3  A.  Yes.

4  Q.  And where did the picture come from?

5  A.  Actually, it came from the source.

6  Q.  And do you know if that photograph is really a

7  photo of his cousin?

8  A.  I do not.

9  Q.  Take a look at what's been already admitted as

10  Government's Exhibit No. 46.

11         MR. COOPER:  I couldn't hear the number.

12         THE COURT: 46.

13         MS. HOPKINS: 46.

14         MR. COOPER:  Thank you.

15  BY MS. HOPKINS:

16  Q.  Do you recognize this?

17  A.  Yes.

18  Q.  What is this?

19  A.  That is the photograph that the source was

20  going to show as being his fictitious cousin.  That

21  was what he was going to show to the individuals

22  who came to the warehouse.

23  Q.  And did he show that to them?

24  A.  Yes.

25  Q.  And were you observing the activity inside the

1  warehouse that day?

2  A.  Yes.

3  Q.  And how were you doing that?

4  A.  We had a live video and audio feed from the

5  warehouse to our location.

6  Q.  And did you observe the source give that

7  photograph to anybody?

8  A.  Yes.

9  Q.  Who did he give it to?

10  A.  Mayco Ledezma-Prieto.

11  Q.  And does Mayco have a nickname?

12  A.  Yeah, Seco.

13  Q.  Now, you said that the source was also

14  directed to draw a map for the targets?

15  A.  Yes.

16  Q.  And why was that?

17  A.  Same reason, so he could -- part of the ruse,

18  to get those individuals into the warehouse so he

19  could explain some of the details of the stash

20  house.

21      We were never actually going to give a real

22  location.  That was part of so he could explain

23  where the items were, like, the cocaine, the money,

24  the supplier of the drugs, where they were going to

25  be inside of the house, and he would draw that

layout and explain that to everybody when they were
in there.

Q.   And whose idea was it to have the source draw
a map?

A.   That was discussed again between myself and
Agent Rubicalva.

Q.   And did you also observe the source drawing
that map?

A.   Yes.

Q.   Could you please put on the screen what's
already been admitted as Exhibit 47.

Do you recognize this?

A.   Yes.

Q.   What is this?

A.   That's the map that he was drawing.

Q.   And what were the targets doing while he was
drawing this map?

A.   They were standing around him.  One might have
been seated and standing around him.

Q.   Did you observe anybody take the map?

A.   It was -- yes.  Mayco Ledezma had the map in
his hand.

Q.   And were the targets subsequently arrested at
the warehouse?

A.   Yes.

1  Q.  And how many targets again were --

2  A.  Five.

3  Q.  And who was arrested?

4  A.  Mayco Ledezma-Prieto, also known as Seco;

5  Gregorio Ruiz, also known as Gollito; Andy Pineda;

6  Jaime Lopez-Lorenzo Santiago, also known as Chivo;

7  and Yovani Valenzuela.

8  Q.  And after the arrest at the warehouse, was the

9  photograph of the source's cousin recovered?

10  A.  Yes.

11  Q.  And do you know who it was recovered by?

12  A.  Agent Hooton.

13  Q.  And do you know where he got it from?

14  A.  He obtained the photograph off of Mr. Prieto's

15  person.

16  Q.  And to your knowledge, was Mayco

17  Ledezma-Prieto on the phone at the time of the

18  arrests?

19  A.  I recall that he had a phone up to his ear

20  shortly before or right around the time that entry

21  was made by SWAT.

22  Q.  And did you observe this?

23  A.  Yes.

24  Q.  And what about at the time of the arrest?

25  A.  At the time of the arrest, I know that

1  Mr. Prieto was arrested actually in the front

2  parking lot area at the passenger side of the

3  Nissan Murano, and he had made it out front door.

4  Q.   And do you have any knowledge of whether or

5  not he was on the phone when he was --

6  A.   Yes.

7  Q.   -- outside?

8       And what's the basis of your knowledge?

9  A.   A SWAT operator observed him on the telephone

10  at the time of his arrest and observed him drop the

11  phone on the ground.

12  Q.   Now, was the map that was drawn by the source

13  also recovered?

14  A.   Yes.

15  Q.   And where was that recovered?

16  A.   That was recovered in the warehouse a little

17  while later that evening by Special Agent Hunter.

18  Q.   Now, were there additional arrests on March

19  2nd?

20  A.   Yes.

21  Q.   And where were those arrests?

22  A.   Along Interstate 10, near mile marker 195.

23  Q.   And just to back up, just to go back to the

24  warehouse, I believe you were shown pictures of the

25  warehouse when you testified earlier?

1  A.  Yes.

2  Q.  There was two pictures -- there was one

3  pictured -- do we have -- can you please take a

4  look at Exhibit 6-C, which has already been

5  admitted into evidence.

6      Now, what do you see in this photograph?

7  A.  That's the front door of the warehouse.

8  Q.  6-C?

9      MR. LACEY:  6-C, as in Charlie.

10      THE COURT:  6-C.

11  BY MS. HOPKINS:

12  Q.  I'm sorry.  What are you observing?

13  A.  That's the front door, the entrance area of

14  the warehouse.

15  Q.  And does it appear to be somewhat cracked?

16  A.  That's broken.

17  Q.  And do you know how -- what happened to the

18  door?

19  A.  The two individuals made it through the front

20  door, that was Gollito and -- or Gregorio Ruiz,

21  also known as Gollito, and then Mayco

22  Ledezma-Prieto, also known as Seco, they made it

23  out that front door.

24  Q.  Okay.  And broke the glass?

25  A.  Yes.  It actually was, like, a flap.  The

1  glass stayed together, but it just opened up from

2  the bottom.

3  Q.   Okay.  Thank you.

4       Now, turning -- going back again to the

5  additional arrests that were on March 2nd, where

6  did the arrests occur?

7  A.   Additional arrests occurred near mile marker

8  194 and mile marker 195 on the westbound lanes of

9  I-10 near Casa Grande.

10 Q.   And how many people were arrested?

11 A.   Nine.

12 Q.   And did the investigation end after the

13 arrests on March 2nd?

14 A.   No.

15 Q.   Did you subsequently obtain surveillance

16 footage from a Circle K in Phoenix?

17 A.   Yes.

18 Q.   And when did you obtain that?

19 A.   That was several weeks later, sometime in

20 April that I obtained that surveillance footage.

21 Q.   And how did you know to obtain a surveillance

22 footage from there?

23 A.   After reviewing statements made by

24 individuals, I went back to that Circle K to obtain

25 that video.

1  Q.  And did you review that surveillance footage?

2  A.  Yes.

3  Q.  And did you identify anyone in that

4  surveillance footage?

5  A.  Yes.

6  Q.  And did you identify them from this case?

7  A.  Yes.

8  Q.  And how were you able to identify them?

9  A.  I identified them through the course of the

10  investigation, had their photographs, and compared

11  that information that I had learned through the

12  course of the investigation with the video.

13  Q.  And who did you identify in that footage?

14  A.  The initial one, I observed Jerome Ranger,

15  Ja'Cory Ranger, Rashad McCuin, Tyrees Seymour,

16  Damond Reagan, Josh Young, Ardawwn Bryant, Jeremy

17  Tucker.  I believe all nine individuals are

18  observed going in that store.

19  Q.  Now, the actual -- the actual surveillance

20  footage was shown to a witness here a little bit

21  earlier, and it's already been admitted.  I believe

22  it was admitted into evidence.

23      But what I'd like to show you are photographic

24  stills taken from that footage.

25  A.  Okay.

1   Q. And that hasn't been admitted yet, so if you

2 could take a look at what's been marked for

3 identification as Government's Exhibit 14-A.1

4 through 14-A.5.

5     And actually, 14-A.4 has already been

6 admitted, but do you recognize these photos?

7   A. Yes.

8   Q. And what are they?

9   A. These are stills taken from that Circle K

10 surveillance footage at 16th and Broadway in

11 Phoenix.

12       MS. HOPKINS: Your Honor, the Government

13 moves to admit what's been marked for

14 identification as Government's Exhibits 14-A.1, 2,

15 3, and 5.

16       MR. COOPER: No objection.

17       THE CLERK: 4 was not admitted yet.

18       MS. HOPKINS: And 4.

19       MR. YOUNG: No objection.

20       MR. ARMSTRONG: No objection.

21       THE COURT: They can all be admitted and

22 published.

23 BY MS. HOPKINS:

24   Q. If we can look at 14-A.1.

25     Can you identify anyone in this photo?

1  A.    Yes.

2  Q.    Who?

3  A.    That is Rashad McCuin.

4  Q.    And what is he wearing?

5  A.    It looks like he's got a black zip-up

6  sweatshirt.

7  Q.    And what time is this?  Is there a time stamp

8  on this?

9  A.    Yes.

10  Q.    What time?

11  A.    It's 3/2 of '11 at 11:29 and three

12  seconds a.m.

13  Q.    Thank you.

14      Let's take a look at 14-A.2, and if we could

15  just blow up the individuals.

16      Do you recognize them?

17  A.    Yes.

18  Q.    And who's that?

19  A.    Damond Reagan with the white hat on, and to

20  his right is Tyrees Seymour.

21  Q.    And what are they wearing?

22  A.    Again, black -- it looks like black

23  sweatshirts.

24  Q.    And which is the one wearing the hat?

25  A.    Damond Reagan.

1    Q.   And is there a time stamp on here as well?

2    A.   Yes.  March 2nd, 2011, 11:26 and eight

3    seconds a.m.

4    Q.   Okay.  And if we could take a look at 14-A.3.

5    Just zoom in on the person.

6         Do you recognize anyone in this photograph?

7    A.   Yes.

8    Q.   Who do you recognize?

9    A.   Ja'Cory Ranger and in the background is Josh

10   Young.

11   Q.   And so the one in the front is Ja'Cory Ranger?

12   A.   Yes.  He's wearing the black sweatshirt.

13   Q.   And if we could zoom back out and look at the

14   time stamp.

15   A.   Again, it's March 2nd, 2011, 11:28 and nine

16   seconds a.m.

17   Q.   If we can take a look at 14-A.4.

18        If we could -- do you recognize the person in

19   this photograph?

20   A.   Yes.

21   Q.   And how do you recognize him?

22   A.   I recognize him through identifying him

23   through the course of the investigation.

24   Q.   And who is it?

25   A.   Jerome Ranger.

1   Q.   And if we could zoom back out for a second.

2      Is it -- is there a time stamp?

3   A.   Yes.

4   Q.   What time?

5   A.   It's again, March 2nd, 2011, 11:29 and three

6   seconds a.m.

7   Q.   Zoom out again, and maybe zoom in to what's on

8   the counter.  Maybe zoom out a little bit.  Okay.

9   That's perfect.

10      Now, do you recognize anything on the counter?

11   A.   Yes, the white gloves.

12   Q.   And if we can zoom back out and take a look at

13   the receipt on the side.

14      Does it indicate how many gloves were

15   purchased that day?

16   A.   Yes, three pair.

17   Q.   And what were the prices for those gloves?

18   A.   $1.69 for two of the pair and then $1.59 for

19   one of the pair.

20   Q.   Okay.  If we can take a look at 14-A.5.

21      Do you recognize the persons in this video?

22   A.   Yes.

23   Q.   And who are they?

24   A.   It's Ghermon Tucker entering the store, and to

25   his right is Josh Young.

1  Q.  And do you -- is the person that just entered

2  the store, is he wearing a hat?

3  A.  Yeah, he's wearing a black hat with the --

4  look likes the white emblem on the front.

5  Q.  And is that the same hat that we just observed

6  in Exhibit 119?

7  A.  Yes.

8  Q.  Okay.  And if we could zoom back out.

9       Oh, that's -- and is there a time stamp on

10  this video?

11  A.  Yes.

12  Q.  What time is it?

13  A.  March 2nd, 2011, 11:28 and 17 seconds a.m.

14  Q.  Okay.  Thank you.

15       Now, did you also subsequently obtain

16  surveillance footage from a Circle K in Marana?

17  A.  Yes.

18  Q.  And when did you obtain that?

19  A.  That was a couple weeks later, towards the

20  middle to the end of March.

21  Q.  And how did you know to obtain surveillance

22  footage from that Circle K?

23  A.  Again, from statements made, post-arrest

24  statements that were made.

25  Q.  And did you review the surveillance DVD?

1    A.    Yes.

2    Q.    And did you identify anyone involved in this

3    case in that footage?

4    A.    Yes.

5    Q.    And how were you able to identify them?

6    A.    I identified them through the course of the

7    investigation and then compared those photographs

8    of those individuals with the surveillance video.

9    Q.    And can you tell the jury who you identified?

10   A.    At that Circle K, that entered the store,

11   yes.  Yovani Valenzuela-Lopez, Jorge Santos-Medina,

12   and Andy Pineda.

13   Q.    And that was footage from inside the Circle K;

14   right?

15   A.    Yes.

16   Q.    And do you recall what time they were

17   observed?

18   A.    I believe they were first observed about

19   1:18 p.m. entering the store, and that was Yovani

20   that entered first.

21   Q.    Now, did you subsequently obtain surveillance

22   footage from a Food City in Tucson.

23   A.    Yes.

24   Q.    And did you review that surveillance DVD?

25   A.    Yes.

1   Q.   And did you identify anyone involved in this

2   case in that surveillance footage?

3   A.   Yes.

4   Q.   And how were you able to identify them?

5   A.   Same process.  I've identified them through

6   the course of the investigation, and then I

7   compared that to the video, surveillance video.

8   Q.   And who did you identify in that footage?

9   A.   I recall Ardawwn Bryant, Josh Young, Jerome

10  Ranger, Ja'Cory Ranger.

11  Q.   Actually in the surveillance footage from the

12  Food City?

13  A.   Oh, from the Food City?

14  Q.   Food City.

15  A.   Oh, Food City.  Sorry.  I jumped to the Circle

16  K.

17        In that one, in the Food City, I believe

18  it's —— I have Mayco Ledezma-Prieto, Seco; Yovani

19  Valenzuela; and Jorge Medina entering that one; and

20  I think Damond Reagan, I observed him going in and

21  out of that store as well.

22  Q.   If we can take a look at what's been admitted

23  as Government's Exhibits 109 and 110.  First take a

24  look at 109.  Go ahead and stop this there.

25            MR. COOPER:  I'm sorry.  What is this

1  number?

2      THE COURT:  109.

3  BY MS. HOPKINS:

4  Q.  Do you recognize this?

5  A.  Yes.

6  Q.  Can you tell us who's depicted in this?

7  A.  Yes.  On that spot right there, the closest

8  person is Mayco Ledezma-Prieto.  It looks like he

9  has the chain around his neck, the skinnier

10  individual with the black long-sleeved shirt.

11      And then behind him is Yovani Valenzuela,

12  black shorts and black T-shirt, it looks like.

13  He's a bigger, bigger individual.

14  Q.  And what's -- is there a time stamp on there?

15  A.  Yes.  1343.

16  Q.  Okay.

17  A.  1:43 p.m.

18  Q.  Okay.  Can we take a look at 110?

19      Oh, it's just a still.

20  A.  It's essentially the same.

21  Q.  And if we can go back to 109 and see the

22  footage of the third person walking in.  Stop right

23  there.

24      Do you recognize that person?

25  A.  Yes.

1  Q.   And who's that?

2  A.   That's Jorge Santos-Medina.

3  Q.   Okay.  Thank you.

4       Now, if you could take a look at what's been

5  marked for identification as Government's Exhibits

6  14-C.1 and 14-C.2.

7       Okay.  Let's see 14-C.1.  Do you recognize

8  this?

9  A.   Yes.

10 Q.   What is this?

11 A.   It's a still image of the Food City

12 surveillance video.

13 Q.   And do you recognize the person in this still?

14 A.   Yes.

15 Q.   Who do you recognize that to be?

16 A.   Damond Reagan.

17 Q.   And what's the time stamp on there?

18 A.   1432, it looks like, and it's got 10 seconds.

19 Q.   And so that would be what time?

20 A.   2:32 p.m.

21       MS. HOPKINS:  At this time the Government

22 moves to admit into evidence what's been marked for

23 identification as 14-C.1.

24       MR. COOPER:  No objection.

25       MR. ARMSTRONG:  No objection.

1        MR. YOUNG:  No objection.

2        THE COURT:  It can be admitted, can be

3   published.

4   BY MS. HOPKINS:

5   Q.   Now, at this point, is he leaving the store?

6   A.   Yes.

7   Q.   Do you see any groceries in his hands?

8   A.   No.

9   Q.   And do you recognize this person from

10  surveillance footage seen earlier today or earlier

11  that day?

12  A.   Yes.

13  Q.   From which surveillance footage?

14  A.   The Circle K in Phoenix, 16th and Broadway.

15  Q.   Now, what time were the Escalade and the

16  Expedition observed at Food City by ground units?

17  A.   2:19 p.m.

18  Q.   Now, is there footage from the aerial

19  surveillance team that the vehicles may have been

20  present at the Food City earlier than that?

21  A.   Yes.

22  Q.   And what time would that be?

23  A.   2:05 p.m.

24  Q.   And did you have an opportunity to review the

25  surveillance, the aerial surveillance footage, from

1    March 2nd?

2    A.    Yes.

3    Q.    And were you able to identify any vehicles in

4    that footage?

5    A.    Yes.

6    Q.    If we could take a look at what's been

7    admitted as Government's Exhibit 29.

8          Do you recognize this?

9    A.    Yes.

10   Q.    And what is this?

11   A.    That's the -- it's a still image of the aerial

12   surveillance footage.

13   Q.    Can you see a time stamp anywhere on this

14   page?

15   A.    Yeah, the bottom right, and it's a little

16   blurry, but I think it's 2105, and that's off by

17   seven, so it would be 2:05?

18   Q.    So it's what time?

19   A.    Yeah, it looks like 2105, which would be

20   2:05 p.m.

21   Q.    Okay.  Now, can you please point out the

22   vehicles that you identified.

23   A.    Initially, I noticed the Escalade, the

24   Expedition, and the Murano.  I wasn't sure about

25   the other vehicles until after speaking with Jorge

1  Medina.

2  Q.  And so after speaking with Jorge Medina, what

3  other vehicles?

4  A.  I learned that that was the Jeep Commander,

5  and then this was another vehicle that was

6  associated as well.

7  Q.  Okay.  And what vehicle was that?

8  A.  He described it as a gray vehicle.

9  Q.  All right.  If we can take a look at what's

10  been admitted as Exhibit 57-A.

11    Do you recognize this photo?

12  A.  Yes.

13  Q.  And can you identify anyone in this photo?

14  A.  Yes.

15  Q.  Who?

16  A.  It looks like Josh Young hanging out the rear

17  driver's side window.

18  Q.  Now, approximately what time was this

19  photograph taken, or when was this --

20  A.  That was at the time the grouped units

21  observed this vehicle.

22  Q.  Do you know what time?

23  A.  2:19 p.m.

24  Q.  And so that was 14 minutes later than the

25  aerial surveillance footage that we just saw?

1  A.   Yes.

2  Q.   And are they parked in different spots?

3  A.   Yes.

4  Q.   And which vehicle appears to have moved

5  between 2:05 and the 2:19?

6  A.   The Escalade.

7  Q.   Now, was the person depicted in this

8  photograph arrested on I-10 that day?

9  A.   Yes.

10  Q.   And what vehicle was he in?

11  A.   The Escalade.

12  Q.   And who was the driver of that vehicle?

13  A.   Ja'Cory Ranger.

14  Q.   If we could take a look at 57-B.

15       Do you recognize this?

16  A.   Yes.

17  Q.   And can you identify anyone in this photo?

18  A.   That's Damond Reagan walking behind the Ford

19  Expedition.

20  Q.   And did you also just identify him in two

21  prior surveillance footage videos?

22  A.   Yes.

23  Q.   And which surveillance footage videos?

24  A.   He was in the Food City -- or sorry.  Yeah, he

25  was just leaving the Food City there, and then also

1  he was in the Circle K in Phoenix, 16th and

2  Broadway.

3  Q.   And was he also later arrested on the I-10?

4  A.   Yes.

5  Q.   And whose vehicle was he in when he was

6  arrested?

7  A.   He was in the -- he was in Jerome Ranger's

8  Ford Expedition.

9  Q.   If you could take a look at 57-C.

10     Do you recognize this?

11 A.   Yes.

12 Q.   Can you tell from this photo, essentially,

13 based on the profile, can you tell who's driving

14 the Expedition?

15 A.   It appears to have the same profile as Jerome

16 Ranger.

17 Q.   How do you know this?

18 A.   I observed him through the course of this

19 investigation, observing this photograph, and

20 observing him in court.

21 Q.   And is this person here in court today?

22 A.   Yes.

23 Q.   And can you just point him out and --

24 A.   He's sitting at the far left, next to Jon

25 Young, with a blue shirt and yellowish tie.

1  Q.  I believe you already identified him --

2          THE COURT:  I see two guys with a blue

3  shirt and a yellowish tie.

4          THE WITNESS:  To Jon Young's right.  He's

5  at the very end of the table to my right, Jerome

6  Ranger.

7          THE COURT:  The record indicates he's been

8  identified.

9          MS. HOPKINS:  Okay.

10  BY MS. HOPKINS:

11  Q.  Now, if we could take a look at 57-D.

12      Do you recognize this photo?

13  A.  Yes.

14  Q.  Can you identify who the driver of this

15  vehicle is?

16  A.  I can't tell for sure from this, but he seems

17  to have the similar profile to that of Ja'Cory

18  Ranger.

19  Q.  Now, where did the vehicles go after they

20  departed the Food City parking lot?

21  A.  They drove to the Circle K at I-10 and

22  Congress.

23  Q.  I'd like to show you what I believe has

24  already been admitted as 62A.1 and A.3.

25      Do you recognize this?

1    A.   Yes.

2    Q.   And --

3    A.   It's a still image of the aerial surveillance

4    conducted that day.

5    Q.   And do you recognize anyone or can you tell

6    who's depicted in this photo?

7    A.   Yeah, from the outers and -- studying their

8    outer clothing and studying the surveillance video

9    and their photographs, it looks like you have

10    Ardawwn Bryant right here walking, and then you

11    have Ghermon Tucker up here at the pay phones.

12    Q.   And what's the date and time stamp on this

13    surveillance still?

14    A.   March 2nd, 2011, it's 2142, so that would be

15    2:42 p.m.

16    Q.   Okay.  If we could take a look at 62-A.3.

17        Do you recognize this?

18    A.   Yes.

19    Q.   What's -- what are we seeing in this

20    photograph?

21    A.   That's, again, the same outer for Ghermon

22    Tucker accessing the passenger side of the Ford

23    Expedition.

24    Q.   And based on your review of the surveillance

25    footage, is he returning to this red Expedition

1    after being at the pay phones?

2    A.    Yes.

3    Q.    Now, did you obtain phone records for that pay

4    phone?

5    A.    Yes.

6    Q.    And when did you do that, or when did you

7    obtain them?

8    A.    Again, it was several weeks later, after the

9    arrests.  After viewing the video, I obtained the

10   phone records from that location.

11   Q.    And where did you get the records from?

12   A.    At that time it was Qwest.

13   Q.    And did you request a certain time frame?

14   A.    Yes, for the 24-hour period from March 2nd.

15   Q.    Okay.  If we can show you what I believe has

16   also been admitted, Exhibit 13.

17         And do you recognize this?

18   A.    Yeah.  That's a cover sheet from Qwest

19   regarding those pay phones there at Circle K.

20   Q.    And are these the records that you obtained

21   from Qwest in response -- in regards to the pay

22   phones?

23   A.    Yes.

24   Q.    And were these records certified?

25   A.    Yes.

1  Q.   And did you have an opportunity to review the

2  records?

3  A.   Yes.

4  Q.   Can I have you take a look at page two of

5  those records.

6       What does this page show?

7  A.   It's showing the -- all the calls from those

8  pay phones.

9  Q.   And do you recognize any numbers in the "To"

10 column, "To Number" column?

11 A.   Yes.

12 Q.   Which numbers do you recognize?

13 A.   It's (520)264-6030, and there's three of them

14 right in a row for March 2nd, 2011.

15 Q.   And if we can just zoom in on those three

16 phone calls.

17      And what time was this?

18 A.   Looks like 1444 and 19 seconds, again 1444 and

19 23 seconds, and 1444 and 24 seconds, so 2:44.

20 Q.   2:44 p.m.?

21 A.   Yes.

22 Q.   And it appears that the left of -- or on the

23 right of the phone numbers there's a date.  If you

24 can zoom out again.

25      Now, is that -- is that 1/3/2002 or is that

1　March 2nd 2011?

2　A.　Yeah.　It's got the year, year kind of cuts

3　off, but it's '11, year '11, the month and the day.

4　Q.　And at the top of the page it depicts what the

5　date of the phone calls are; correct?

6　A.　Correct.

7　Q.　And during the course of your investigation,

8　did you learn who that telephone number was

9　associated or belonged to?

10　A.　Yes.

11　Q.　And who was that?

12　A.　To Mayco Ledezma-Prieto or Seco.

13　Q.　And was the phone that was associated with

14　that number seized on March 2nd?

15　A.　Yes.

16　Q.　From where?

17　A.　The parking lot of the warehouse.

18　Q.　Now, you said that the -- there were three

19　calls, and they were at 2:44?

20　A.　Yes.

21　Q.　Had Mayco already been arrested at the

22　warehouse at this time?

23　A.　Yes.

24　Q.　What time did the arrests occur at the

25　warehouse?

1  A.  Approximately 2:24 p.m.

2  Q.  So it was about 20 minutes later?

3  A.  Yes.

4  Q.  Now, if you can take a look at what's been

5  admitted as Government's Exhibit 61-E.

6      Do you recognize this?

7  A.  Yes.

8  Q.  Do you recognize -- what do you recognize this

9  as?

10  A.  This is the parking lot at the Circle K at

11  I-10 and Congress.

12  Q.  And what's depicted in this photo?

13  A.  The white Jeep Commander that's registered to

14  Yovani Valenzuela parked there in the parking lot

15  adjacent to the pay phones.

16  Q.  And do you recognize any of the individuals in

17  this photograph?

18  A.  Yes.

19  Q.  Who do you recognize?

20  A.  Standing in the back, in the dark-colored

21  shirt, is Jerome Ranger.  He has an item in his

22  hand.

23      And then right in the middle with the white

24  shirt, looks like he has his left hand up towards

25  his ear, again, wearing the dark hat with the

1  D-Backs symbol on the front is Ghermon Tucker.

2  Standing behind Ghermon Tucker is Joshua Young.

3  Q.   And is that D-Backs hat the same one that we

4  saw in Exhibit 119?

5  A.   Yes.

6  Q.   Now, was this photograph taken after Ghermon

7  Tucker was observed at the pay phones at the Circle

8  K?

9  A.   Yes.

10  Q.   And how do you know that?

11  A.   By reviewing the surveillance video, the

12  aerial surveillance video.

13  Q.   Okay.  Now, could we please take a look at

14  what's been marked for identification as 61 or

15  that's been admitted as 61-G.

16      Do you recognize this photo?

17  A.   Yes.

18  Q.   And what is this?

19  A.   That's Jorge Medina just left of the palm

20  tree, and then Ghermon Tucker again with the white

21  shirt and the black ball cap on right in the

22  middle.

23  Q.   Thank you.  If we can take a look at 61H.

24      Do you recognize this photo?

25  A.   Yes.

1  Q.   And what is it?

2  A.   That's Ghermon Tucker accessing the passenger

3  side of the Ford Expedition.

4  Q.   And what vehicle was Mr. Tucker arrested in?

5  A.   The Ford Expedition.

6  Q.   And at the time of his arrest, where was he

7  sitting?

8  A.   Passenger side, front passenger.

9  Q.   And who was the driver of that vehicle?

10  A.   Jerome Ranger.

11  Q.   Now, if you can take a look at 61-I, and it's

12  already been admitted.

13       Do you recognize this photo?

14  A.   Yes.

15  Q.   And what do you recognize it as?

16  A.   That's Ja'Cory Ranger at the driver's side of

17  the Cadillac Escalade.

18  Q.   Can you please describe, if you can tell, what

19  he's wearing.

20  A.   It looks like he has a white shirt on.

21  Q.   Okay.  And have you had an opportunity to see

22  Ja'Cory Ranger walk at any time?

23  A.   Yes.

24  Q.   And when was that?

25  A.   Shortly after their arrests, in court.

1  Q.  And did you notice anything unusual?

2  A.  Yes.

3  Q.  What was that?

4  A.  He walked with a limp.

5  Q.  Now I'd like to turn your attention to May of

6  2011.

7      Did you obtain a federal search warrant to

8  search the Escalade and the Expedition?

9  A.  Yes.

10  Q.  And had the vehicles been searched prior to

11  this?

12  A.  Yes.

13  Q.  So why did you search the vehicles again?

14  A.  Because I believed that there was additional

15  items of evidence still located in those vehicles.

16  Q.  And what types of items were you looking for?

17  A.  Any type of -- if there was extra rounds of

18  ammunition or any other type of digital media

19  device, any more cell phones, SIM cards, anything

20  like that, as well as clothing or gloves, hats, all

21  that.

22  Q.  And where were the vehicles located at this

23  time?

24  A.  The FBI.  They were located at one of our FBI

25  off-site locations.

1    Q.   In Tucson?

2    A.   Yes.

3    Q.   Now, I'd like to direct your attention to the

4    Escalade.

5         What did you personally seize from the

6    Escalade?

7    A.   On that day, the 4th of May?

8    Q.   Yes, in May, yes.  What did you seize in

9    general?

10   A.   In general?  I seized several black hooded

11   sweatshirts, some gloves, a ski mask, some paper

12   documents, and I think there was, like, a micro SD

13   card which ended up just being an adapter.

14        And in general, that's about it.

15             MS. HOPKINS:  Okay.  May I have one

16   moment, Your Honor?

17             THE COURT:  You may.

18   BY MS. HOPKINS:

19   Q.   Showing you what's been marked for

20   identification as Government's Exhibit 16, 17, 18,

21   and 19.

22        First take a look at Exhibit -- what's marked

23   as Exhibit 16.

24   A.   Yes.

25   Q.   Do you recognize that?

1  A.   Yes.

2  Q.   What is it?

3  A.   It's a pair of black mechanic's gloves?

4  Q.   And where did you find those gloves?

5  A.   In the Cadillac Escalade.

6        MS. HOPKINS:  Your Honor, the Government

7  moves to admit Exhibit 16 into evidence.

8        MR. COOPER:  No objection.

9        MR. ARMSTRONG:  No objection.

10        MR. YOUNG:  No objection, Your Honor.

11        THE COURT:  Can be admitted, Exhibit 16.

12        MS. HOPKINS:  May I publish it to the

13  jury?

14        THE COURT:  It may be published.

15  BY MS. HOPKINS:

16  Q.   Can you just hold them up for the jury to see?

17  A.   (The witness complied.)

18  Q.   Thank you.  Now, if we can take a look at

19  Exhibits 17, 18 and 19, if you can take a look at

20  them.

21        Do you recognize them?

22  A.   Yes.

23  Q.   And what is 17?

24  A.   17 is one white glove.

25  Q.   And what about 18?

1  A.   It's a latex, green latex glove.

2  Q.   And 19?

3  A.   A brown glove, and there's also a black glove

4  in here.

5  Q.   And where did you find those gloves?

6  A.   In the Escalade.

7        MS. HOPKINS:  Your Honor, at this time may

8  the Government -- may we admit Exhibits 17, 18, and

9  19 into evidence?

10        MR. COOPER:  No objection.

11        MR. ARMSTRONG:  If I could just ask for

12  clarification on what Exhibit 19 is?

13        THE COURT:  They've made one exhibit with

14  all the gloves.

15        MS. HOPKINS:  Well, it's different

16  exhibits but it's all in one bag.

17        MR. ARMSTRONG:  Well, I heard --

18  objection.

19        MR. YOUNG:  I don't understand either,

20  Judge, but I don't have an objection.

21        THE COURT:  Okay.  Tell --

22  BY MS. HOPKINS:

23  Q.   What's 17?

24  A.   17 is a white glove.

25  Q.   Why don't you hold --

1        MS. HOPKINS:  Is it admitted?

2        THE COURT:  They're admitted but we're

3   going to clarify.

4   BY MS. HOPKINS:

5   Q.   If you can hold up the white glove?

6   A.   (The witness complied.)

7   Q.   What about 18?

8   A.   Green latex glove.

9   Q.   And 19?

10  A.   I have it as one brown glove.

11  Q.   Okay.  Thank you.

12       THE COURT:  Was there a single black glove

13  too?

14       THE WITNESS:  Yeah, there is but --

15       THE COURT:  What exhibit number is that?

16       MS. HOPKINS:  I'll have to take a minute

17  to find out.

18       THE COURT:  19-A.

19       MS. HOPKINS:  19-A.

20  BY MS. HOPKINS:

21  Q.   Can you hold up 19-A for us?

22  A.   (The witness complied.)

23  Q.   And what is that?

24  A.   It's the one black glove.

25  Q.   Thank you.  And was that also found in the

1 Escalade?

2 A.   Yes.

3       MR. COOPER:   How many total gloves do we

4 have?  I lost count.

5       THE COURT:   If my math is correct four

6 individual gloves and one full pair, when it's all

7 said and done, but my math has been known to be

8 wrong.

9 BY MS. HOPKINS:

10 Q.   Showing you what's been marked for

11 identification as Government's Exhibit 20.

12       THE CLERK:   Judge, they were all

13 admitted?

14       THE COURT: Yes.

15 BY MS. HOPKINS:

16 Q.   Do you recognize what's in that bag?

17 A.   Yes.

18 Q.   What's in there?

19 A.   It's a —— it's a —— it's a black ski mask with

20 a red skull face on the front of it.

21 Q.   And where did you find that?

22 A.   In the Cadillac Escalade.

23       MS. HOPKINS:   Your Honor, the Government

24 moves to admit Exhibit 20 into evidence.

25       MR. ARMSTRONG:   No objection.

1    MR. COOPER:  No objection.

2    MR. YOUNG:  No objection Your Honor.

3    THE COURT:  It'll be admitted.

4    MS. HOPKINS:  Can we publish it to the

5  jury?

6    THE COURT:  You may.

7  BY MS. HOPKINS:

8  Q.   If you can hold that up.

9  A.   (The witness complied.)

10  Q.   Thank you.

11    I'd like to show you what's been marked for

12  identification as 17-A through E.

13  A.   Okay.  Do you want me to look?

14  Q.   Yes.

15  A.   Which ones?

16  Q.   17-A through E.

17    THE CLERK:  Is that 117?

18    MS. HOPKINS:  117-A through E.

19  A.   Through D?

20  Q.   E, one more.

21  A.   I believe that's -- that's A through E.

22  Q.   Okay.  Do you recognize those?

23  A.   Yes.

24  Q.   And what are they?

25  A.   They're sweatshirts that were taken out of the

1    black Cadillac Escalade.

2              MS. HOPKINS:  Your Honor, the Government

3    moves to admitted 117-A through E into evidence.

4              MR. COOPER:  No objection.

5              MR. ARMSTRONG:  No, no objection.

6              MR. YOUNG:  No objection.

7              THE COURT:  They can be admitted.  They've

8    already been published.

9              MS. HOPKINS:  Yes.

10             You can remove them from --

11   BY MS. HOPKINS:

12   Q.   Now, what did you personally seize from the

13   red Ford Expedition just in general?

14   A.   In general, gloves, zip-ties, some

15   sweatshirts, jackets, a cell phone battery,

16   baseball caps, things like that.

17   Q.   Showing you what's been marked first for

18   identification as Government's Exhibit No. 24.

19             Do you recognize that?

20   A.   Yes.

21   Q.   What's in there?

22   A.   Gloves, three pair of white gloves that were

23   obtained from the Expedition.

24             MS. HOPKINS:  Your Honor, the Government

25   moves to admit Exhibit 24 into evidence.

1          THE COURT:  24?

2          MR. LACEY:  Yes.

3          MR. COOPER:  No objection.

4          MR. ARMSTRONG:  No objection.

5          MR. YOUNG:  No objection.

6          THE COURT:  It can be admitted.

7          MS. HOPKINS:  Published to the jury?

8          THE COURT:  It may be published.

9    BY MS. HOPKINS:

10   Q.   Can you hold those up for the jury to see?

11   A.   (The witness complied.)

12   Q.   Are those the same gloves that Jerome Ranger

13   is seen purchasing at the Circle K in Phoenix on

14   March 2nd?

15   A.   Yes, they appear to be.

16   Q.   And how do you know this?

17   A.   By looking at the surveillance video.

18   Q.   Okay.  Could you take a look at what's been

19   marked for identification as Government's Exhibit

20   25.

21   A.   Yes.

22   Q.   What is it?

23   A.   It's a pair of brown gloves.

24   Q.   And did you seize those from the Expedition as

25   well?

1    A.   Yes.

2         MS. HOPKINS:   Your Honor, at this time the

3    Government moves to admit Exhibit 25.

4         MR. COOPER:   No objection.

5         MR. ARMSTRONG:   No objection.

6         MR. YOUNG:   No objection, Your Honor.

7         THE COURT:   It can be admitted, can be

8    published.

9    BY MS. HOPKINS:

10   Q.   Just hold those up for the jury.

11   A.   (The witness complied.)

12   Q.   Thank you.  If you can take a look at what's

13   been marked for identification as Government's

14   Exhibit 26.

15        Do you recall where those gloves were found?

16   A.   Yeah.  These I believe were all found in the

17   rear cargo area of the Expedition.  Items had been

18   moved around by the time that we had searched them.

19   Q.   Okay.  26, please.

20        Do you recognize that?

21   A.   Yes.

22   Q.   What's inside there?

23   A.   It's a set of zip-ties.

24   Q.   And where did you find the zip-ties?

25   A.   In the red Ford Expedition.

1        MS. HOPKINS:  Your Honor, the Government

2  moves to admit Exhibit 26 into evidence.

3        MR. COOPER:  No objection.

4        MR. ARMSTRONG:  No objection.

5        MR. YOUNG:  No objection, Your Honor.

6        THE COURT:  It can be admitted, can be

7  published.

8  BY MS. HOPKINS:

9  Q.  Do you want to hold that bag up for the jury

10 to see?

11 A.  (The witness complied.)

12 Q.  Now, did you notice anything about the

13 zip-ties when you discovered them?

14 A.  Yes.

15 Q.  What was that?

16 A.  Well, they're looped together.  Like, normally

17 they're straight.  They're looped together like

18 that (indicating).

19 Q.  Were they prearranged?

20 A.  Yeah.

21 Q.  Can you take a look at what's been marked for

22 identification as Government's Exhibits 118-A

23 through C.

24        THE COURT:  You know, before we open

25 another bag, I promised the jury we were going to

1   go at three o'clock.

2           MS. HOPKINS:  I have, like, three minutes.

3           THE COURT:  You have what.

4           MS. HOPKINS:  This is, like, the last

5   batch of exhibits that I have, but I can wait until

6   tomorrow.

7           THE COURT:  All right.  Go ahead.  The

8   juror is giving me the nod to go ahead.  He doesn't

9   want to see that bag tomorrow either.

10  A.   A through D?

11  Q.   A through C.

12  A.   A through C.

13  Q.   Okay.  What is A, B, and C?

14  A.   They are -- looks like a jacket, sweatshirts I

15  collected out of the Expedition.

16          MS. HOPKINS:  Government moves to admit

17  118-A to C into evidence.

18          MR. COOPER:  No objection.

19          MR. ARMSTRONG:  No objection.

20          MR. YOUNG:  No objection, Your Honor.

21  What number was that?

22          MS. HOPKINS:  118-A through C.

23          THE COURT:  118-A through C.  It can be

24  admitted, can be published.  Hold them up.

25  BY MS. HOPKINS:

1  Q.   Just hold them up real quick.  Thank you.

2       Now, did you have an opportunity to check any

3  web sites to see what the weather was like in

4  Tucson and Phoenix on March 2nd?

5  A.   Yes.

6  Q.   Which web sites did you look at?

7  A.   It's was a weather almanac.

8  Q.   And what was the high temperature for Phoenix

9  on March 2nd?

10  A.   79 degrees.

11  Q.   And what was the high temperature for Tucson

12  on March 2nd?

13  A.   80 degrees.

14          MS. HOPKINS:  May I have one moment, Your

15  Honor?

16          THE COURT:  You may.

17          MS. HOPKINS:  No further questions.

18          THE COURT:  We're going to start tomorrow

19  at 9:15 a.m.  9:15 a.m.  thank you.

20          (The jury exits the courtroom.)

21          THE COURT:  Did we agree we weren't going

22  to meet on Monday.

23          MR. COOPER:  We haven't agreed.  I think

24  we were waiting to see if the Government rests.

25          THE COURT:  They're going to rest

1   tomorrow, I think.

2          MR. LACEY:  Once this guy is over, we're

3   over.  We're finished.

4          THE COURT:  They're going to rest,

5   depending on how long you cross-examine this agent.

6          MR. LACEY:  Not to say we won't have

7   rebuttal after if the defense is going to put on a

8   case.  Perhaps we can solicit that so we'll know

9   what to put on, on our end, if they anticipate any

10  witnesses.

11         THE COURT:  Mr. Cooper is still working on

12  his list.

13         MR. COOPER:  I'm working on my list.

14         MR. ARMSTRONG:  We might.

15         THE COURT:  All right.

16         MR. YOUNG:  I anticipate witnesses,

17  Judge.  I don't know whether to bring them tomorrow

18  or --

19         THE COURT:  No.  I've got a feeling he'll

20  be the rest of the day, won't he?

21         MR. COOPER:  I'll be quite a while with

22  him, I assume.

23         THE COURT:  We'll just do him and let the

24  Government rest.

25         MR. YOUNG:  Okay.  Should I tell them

1 Monday, or should I tell them Tuesday.

2     THE COURT: There was a juror that needed

3 to know. Tell her we won't meet on Monday. It

4 will be Tuesday. Thank you.

5     We'll meet on Tuesday for the trial, but

6 I'm going to meet with you guys sometime on Monday,

7 and I'll tell you when tomorrow.

8     MR. COOPER: Okay.

9     MR. ARMSTRONG: Do you want the defendants

10 to be here on Monday?

11     THE COURT: We're going to be talking

12 about instructions, so if you want them to be here,

13 please say so. Otherwise you can waive. I usually

14 do them with the defendants present, so I don't

15 have a problem with them being here.

16     Mr. Young, you may want your client to

17 stay in Phoenix. I don't know. It's up to you and

18 him.

19     MR. YOUNG: It's up to him, Judge.

20     THE COURT: All right. He's welcome to be

21 here. I'll tell you what time tomorrow.

22     (Proceedings concluded in this matter.)

23

24

25

1          C E R T I F I C A T E

2

3          I, Erica R. Grund, do hereby certify that

4    I took the machine shorthand notes in the foregoing

5    matter; that the same was transcribed via computer-

6    aided transcription; that the preceding pages of

7    typewritten matter are a true, correct, and

8    complete transcription of those proceedings

9    ordered, to the best of my skill and ability.

10          Dated this 2nd day of January, 2013.

11

12                              s/Erica R. Grund
                                Erica R. Grund, RDR, CRR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25