1          IN THE UNITED STATES DISTRICT COURT

2               DISTRICT OF ARIZONA

3   UNITED STATES OF AMERICA

4   vs.                              CR-11-1013-TUC-RCC

5   GHERMON LATEKE TUCKER, et al.,

6
                   Defendants.
7   _____

8                                    August 17, 2012
                                     Tucson, Arizona
9

10

11

12

13                  JURY TRIAL

14                  DAY EIGHT

15     BEFORE THE HONORABLE RANER C. COLLINS
              UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22   Court Reporter:          Erica R. Grund, RDR, CRR
                              Official Court Reporter
23                            405 W. Congress Street
                              Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                    translation

1                    A P P E A R A N C E S

2

3   For the Government:    James T. Lacey
                           Kimberly E. Hopkins
4                          Assistant U.S. Attorneys

5

6   For Ghermon Tucker:    Dan Cooper
                           Cooper & Udall PC
7

8

9   For Jerome Ranger:     Stephen Jonathan Young
                           Williamson & Young
10

11

12  For Ja'Cory Ranger:    Bradley James Armstrong
                           Armstrong Law Office
13

14

15

16

17

18

19

20

21

22

23

24

25

EXAMINATION INDEX

JON EDWARDS
      DIRECT BY MS. HOPKINS . . . . .     4
      CROSS BY MR. COOPER . . . . . .     9
      CROSS BY MR. ARMSTRONG . . . . .   71
      CROSS BY MR. YOUNG . . . . . . .   98
      REDIRECT BY MS. HOPKINS . . . .  127

1           P R O C E E D I N G S

2        (The jury enters the courtroom.)

3        THE COURT:  Let the record reflect the

4 jurors returned back to the courtroom, the presence

5 of all counsel and the defendants.

6        Good morning.  This is another on-time

7 start.  We're getting good at this.

8        Ms. Hopkins, you indicated you had some

9 other questions you wanted to ask Agent Edwards.

10 Go ahead.

11        MS. HOPKINS:  Yes, just a few more, yes.

12        And just for the record, Your Honor, the

13 parties did stipulate that the Cadillac CTS vehicle

14 was registered to Ghermon Tucker.  However, the

15 Government would like to have a copy of the

16 certified MVD records entered into evidence.

17        THE COURT:  Any objection, Mr. Cooper?

18        MR. COOPER:  No, Your Honor.

19        MR. ARMSTRONG:  No.

20        MR. YOUNG:  No, Your Honor.

21        THE COURT:  What exhibit number is that?

22        MS. HOPKINS:  51.

23        THE COURT:  51 will be admitted.

24     JON EDWARDS, WITNESS, PREVIOUSLY SWORN

25           DIRECT EXAMINATION

1  BY MS. HOPKINS:

2  Q.   Okay.  Agent Edwards, I would like to turn

3  your attention back to the February 4th meeting.

4       Where did that meeting occur?

5  A.   It occurred in Phoenix, near Seventh Avenue,

6  at a trailer park.

7  Q.   And was that Chivo's workplace?

8  A.   Yes.

9  Q.   All right.  Now, do you recall -- and now I'm

10  going to shift gears and get back to March 2nd.

11       Do you recall testimony regarding black males

12  purchasing water and drinks at a Circle K in

13  Phoenix?

14  A.   Yes.

15  Q.   If we could take a look at what's been

16  admitted as Government's Exhibit 63-B.

17          THE COURT:  It hasn't shown up yet.  The

18  machine has to warm-up.  It has to wake up in the

19  morning.

20  BY MS. HOPKINS:

21  Q.   Do you recognize this photograph?

22  A.   Yes.

23          THE COURT:  The whole system has to wake

24  up.  Still waking up.

25          Can everyone see it now?  All right.

BY MS. HOPKINS:

Q.   Do you recognize this photograph?

A.   Yes.

Q.   Now, is this photograph date stamped?

A.   Yes.

Q.   And what's the date on the photo?

A.   3/2/2011.

Q.   And was this photograph taken at the scene?

A.   Yeah.  It looks like it was along the highway along Interstate 10.

Q.   Can you describe what's depicted in this photo.

A.   It's the rear car door area of the Ford Expedition, and it has what looks like a cooler with what looks like a case of water behind the cooler.

Q.   Now, when you searched the Expedition later in May, did you find this same cooler in the back of the Ford Expedition?

A.   Yes.

Q.   Okay.  If you can take a look at what's been marked for identification as Government's Exhibits 122 and 123.

     Do you recognize those photographs?

A.   Yes.

Q.   What are they?

A.   Photographs that were taken during the search of that vehicle.

Q.   And do they accurately depict what you observed in the vehicle -- and which vehicle was it?

A.   This is the Ford Expedition.

Q.   Does it accurately depict what you observed in the Ford Expedition when you searched the vehicles in May of 2011?

A.   Yes.

        MS. HOPKINS:  The Government moves to admit Exhibits 122 and 123 into evidence.

        MR. COOPER:  No objection, Your Honor.

        MR. YOUNG:  No objection.

        MR. ARMSTRONG:  No objection.

        THE COURT:  It can be admitted, can be published.

        MS. HOPKINS:  And published to the jury?

BY MS. HOPKINS:

Q.   Can you please describe what's depicted in this photograph.

A.   It's the rear cargo area of the Ford Expedition, and right in the middle is the cooler, and to the left is the water, and then behind that

1  is looks like the black jackets.

2  Q.   Can we take a look at 123?

3  A.   That's a photograph of the contents inside the

4  cooler.

5  Q.   Okay.  And I'm assuming at this point it's

6  been removed from the Expedition?

7  A.   Yes.

8  Q.   Now, besides ammunition that was seized from

9  the vehicles on March 2nd, did you find any loose

10  ammunition in the Escalade or the Expedition when

11  you conducted the search in May of 2012?

12  A.   The extra rounds of ammunition were collected

13  at the time of the inventory search that was done

14  by Special Agent Hunter.  There were some extra

15  rounds obtained.

16  Q.   And where were the rounds -- what vehicle were

17  the rounds obtained from?

18  A.   The Escalade.

19  Q.   And what type of rounds and how many rounds?

20  A.   There were seven .223 rounds and one .357

21  round.

22         MS. HOPKINS:  May I have a minute, Your

23  Honor?

24         THE COURT:  You may.

25         MS. HOPKINS:  No further questions, Your

1  Honor.

2  　　　　THE COURT:  Mr. Cooper?

3  　　　　MR. COOPER:  And again, with the Court's

4  permission, I'm going to need to use the easel.

5  　　　　　　　　　CROSS-EXAMINATION

6  BY MR. COOPER:

7  Q.  Can you see this, Agent Edwards?

8  A.  Yes, sir.

9  Q.  Okay.  What I'd like to do, before beginning

10  the substance of the questioning, is there's times,

11  times that took place on March 2nd of 2011, a whole

12  series, probably 10 or 11 different times, that I'd

13  like to write down and discuss, and then we'll

14  refer to them as we go through the questioning.

15  　　　　Okay?

16  A.  Okay.

17  Q.  And the first time is 11:45 a.m., and that's

18  the time that the Murano arrived at the Food City;

19  correct?

20  A.  Correct.

21  Q.  And just so we're clear, I believe the

22  testimony is that's the time that the surveillance

23  of the Food City began, at 11:45, when the Murano

24  arrived at that parking lot; right?

25  A.  No.

1  Q.  When did the surveillance begin at Food City?

2  A.  Approximately 8:40 a.m.

3  Q.  Okay.  I guess I'm talking about the aerial

4  surveillance.

5  A.  My understanding is that's when they went on

6  target.  They were already in the area, but --

7  Q.  Okay.  "On target" meaning Food City?

8  A.  "On target" meaning when they picked up the

9  vehicle.

10  Q.  Okay.

11  A.  They're already in the area.

12  Q.  Okay.

13  A.  So the surveillance starts before that.

14  Q.  Okay.

15  A.  Well before that.

16  Q.  You all were in place early in the morning?

17  A.  That's fair to say.  The surveillance team was

18  in place.

19  Q.  Okay.  And then the Murano arrived at 11:45 in

20  the morning at Food City; correct?

21  A.  Correct.

22  Q.  The next time is at 2:05.  The Escalade and

23  the Expedition are -- and you're not exactly

24  certain when they arrive, but you know that they're

25  there because you have a photograph Bates

1  stamped/time stamped at 2:05 with the Expedition

2  and the Escalade at the parking lot at Food City;

3  correct?

4  A.   That's one time, but through the testimony,

5  they're there before that.

6  Q.   Okay.  But that's -- you do have a photograph

7  at 2:05?

8  A.   Correct, a photograph at 2:05.

9  Q.   And at 2:19, the surveillance team watching

10  the parking lot first notices and puts in their

11  report, this is when we see the Expedition and the

12  Escalade with nine black men in it; right?

13  A.   Correct.

14  Q.   Okay.  Then, according to the surveillance

15  logs by the FBI agents, at 2:20 there is a gold

16  LeSabre -- I guess they said it was a gold

17  LeSabre.  They didn't quite get all the license

18  plates -- that was parked side by side with two

19  black males in it, and it left at 2:20; right?

20  A.   Correct.

21  Q.   Okay.  2:24 there's an arrest at the

22  warehouse; right?

23  A.   Correct.

24  Q.   Okay.  And according to the phone logs that we

25  went over yesterday, 2:27, Mayco's final phone

1  call; right?

2  A.   I believe that that's correct.

3  Q.   To a 602 number in Phoenix?

4  A.   Correct.

5  Q.   And the FBI agents watching the parking lot at

6  Food City document that the Escalade and the

7  Expedition leave Food City at 2:34 p.m.; correct?

8  A.   Correct.

9  Q.   And again, from the phone records that we

10  talked about yesterday, at 2:44 p.m., you have

11  pictures and phone records of Ghermon making three

12  phone calls from a Circle K at 2:44 to Mayco;

13  right?

14  A.   Correct.

15  Q.   Okay.  And then the final two times on March

16  2nd we're going to talk about a little bit later

17  are the Escalade and Expedition were stopped on

18  I-10 at 4:13 p.m.; right?

19  A.   Approximately 4:13 p.m.

20  Q.   Okay.  And at 4:34 p.m., according to DPS

21  Officer Reeves, Jorge Medina was stopped near Casa

22  Grande with his sister and two children in the

23  vehicle; right?

24  A.   Correct.

25  Q.   Okay.  What I'd like to do now is, I'm going

1   to move this back over, and I'll refer to it, and

2   you can just turn over your shoulder to look at it

3   later on.

4   A.   Fair enough.

5   Q.   Okay.  One of the things you want to do as an

6   investigator or as an FBI agent is you want to be

7   fair; right?

8   A.   Yes.

9   Q.   And yesterday you testified about hoodies that

10  were found in the vehicles.  I think five hoodies,

11  maybe six hoodies?

12  A.   Yes.

13  Q.   Sweatshirts, whatever you call them.

14          THE COURT:  He called them sweatshirts.

15  He didn't call them hoodies.

16          THE WITNESS:  I understand, yes.

17  BY MR. COOPER:

18  Q.   And shortly after describing finding them, you

19  were asked by the prosecutor what the temperature

20  was in Phoenix on March the 2nd, 2011.

21          Remember that?

22  A.   Yes.

23  Q.   And I think you said that the high temperature

24  was 79 in Phoenix and 80 in Tucson.

25  A.   Correct.

1    Q.   Okay.  But the prosecutor didn't ask you about

2    the low temperature; right?

3    A.   No, he did not.

4    Q.   Okay.  And actually, when you look for the

5    temperature, you find a high and a low; right?

6    A.   Correct.

7    Q.   And so the low in Phoenix on March 2nd, 2011,

8    was 50 degrees?

9    A.   I believe that's correct.

10   Q.   And it was a little bit lower even in Tucson,

11   wasn't it?

12   A.   I believe it was -- the low was 44, if I

13   remember right.

14   Q.   And 44 for us who were born in Arizona can be

15   a little bit chilly; is that fair?

16   A.   I would say that would be fair.

17   Q.   There are photographs that were in evidence,

18   14-D.1 and 14-D.4, I think they are, that show

19   people from the Expedition and the Escalade at a

20   Circle K in Phoenix in the morning; right?

21   A.   You're referring to, like, the still photos of

22   the --

23   Q.   Yeah, the stills?

24   A.   Yes.

25            THE COURT:  Do you want them on the

1    screen?

2              MR. COOPER:  No, I don't.  That's fine.

3    BY MR. COOPER:

4    Q.   But the photos depict some of these

5    individuals wearing hoodies in the morning in

6    Phoenix, right, or the sweatshirts, whatever you

7    call them?

8    A.   Yes.

9    Q.   And the photos also depict -- well, the photos

10   we just saw show the cooler, and in the cooler are

11   multiple of those, I guess, 20-ounce bottles of

12   Gatorade and soda?

13   A.   Yeah, a sports drink.  I think they're

14   PowerAid.

15   Q.   PowerAid.

16   A.   I think there's a soda can in there too, but

17   yeah, for the most part, PowerAid, if I remember

18   right.

19   Q.   Okay.  And additionally, what we saw in the

20   Circle K photos were at least, at least that we

21   saw, two cases of Orange Crush being bought as

22   well?

23   A.   I believe that's correct.

24   Q.   Okay.  And I think the Circle K fellow said

25   they were 12-packs?

1   A.   Yes.

2   Q.   Okay.  So there was a lot of soda and drinks

3   that were at least traveling to Tucson; is that

4   fair?

5   A.   I would say, yeah, there is a fair amount of

6   soda and PowerAid and water.

7   Q.   Okay.  Additionally, I'd just briefly like to

8   talk to you about some of the other evidence that

9   was talked about yesterday.

10       There was one mask that was found in the -- in

11   one of the vehicles; right?

12   A.   Correct.

13   Q.   Like, a ski mask or -- I don't know what you

14   call it.

15   A.   I'm not sure what you -- I'm not sure what you

16   call it.  I'd say it's just a -- it's a mask.

17   Q.   Okay.  And one mask, and there were nine

18   people in the two cars; right?

19   A.   Correct.

20   Q.   Additionally, I tried to do the counting as

21   best I could, there were three gloves that were

22   purchased.  These gloves were never taken out of

23   their packaging; right?

24   A.   I'm not sure what you mean by the packaging.

25   Q.   When you all found them, they were still --

1 had the paper connected to them so they couldn't be
2 worn until you released them from their bindings.
3 A.   I understand now.  Yes, they still had that
4 type of packaging on them, yes.
5 Q.   And I think there was one pair of brown gloves
6 found in the Expedition; right?
7 A.   Yes.
8 Q.   And individual gloves scattered throughout the
9 vehicle, four individual gloves.
10 A.   Which vehicle are you talking about?
11 Q.   Well, I get mixed up.  I'm not sure.  Do you
12 remember?
13 A.   I can help you out.
14 Q.   Thank you.
15 A.   The Escalade, yes.
16 Q.   And they weren't matching pairs?  They were
17 just four individual gloves?
18 A.   Yes.
19 Q.   And then one pair; right?
20 A.   I believe so, yeah, one pair and then mix and
21 match.
22 Q.   So adding everything all together, including
23 the three gloves that were still in the package,
24 you have seven pair of gloves; right?
25 A.   I believe that's correct.

1    Q.    Okay.  And the four individual gloves that
2    were found were all over the car, at different
3    places in the car?
4    A.    Well, when I did the search, it was all in the
5    back of the Escalade.
6    Q.    In the back of the Escalade?
7    A.    Yes.
8    Q.    And do you know if they had been moved?
9    A.    From —— my understanding is they'd been moved
10   because they'd been photographed during the
11   inventory search shortly after they were arrested,
12   and then when I went back to do the search warrant,
13   they had been moved.
14        That was my understanding.
15   Q.    And you looked at the photos of the original
16   search?
17   A.    I have looked at some of those photos.
18   Q.    They weren't together as pairs.  They were
19   just kind of separate, four separate gloves in the
20   vehicle?
21   A.    I believe —— I believe that's right.  I
22   remember seeing them in different locations.
23   Q.    The other physical evidence in the car I'd
24   like to discuss with you is the guns that were in
25   the two vehicles were pretty much at random places

1    throughout the vehicles.

2        Like, one was in a console.  One was shoved in

3    the back of a seat.  There's some rifles that are

4    sort of in the -- I guess you'd call it the trunk-

5    type area of the Escalade?

6    A.   I would say that they are in the different

7    areas of the vehicle.

8    Q.   Okay.

9    A.   Not -- I wouldn't -- I don't know if it's

10   necessarily random.  I would agree that they are

11   different areas of the vehicle.

12   Q.   All right.  And upon arrest, however, when the

13   vehicles were stopped and the nine people were

14   immediately told, don't move, get out of this

15   vehicle, not one of them had a gun on their person;

16   right?

17   A.   I can answer that when they were pulled out of

18   the vehicle, they didn't have a gun on their

19   person.  Prior to the stop, I don't know.

20   Q.   Right.  That's all I'm asking.

21   A.   Yes.

22   Q.   When they were -- and the stop took place

23   pretty quickly, to your understanding?

24   A.   Yes.

25   Q.   And there were border patrol agents who the

1  cars drove up immediately next to these vehicles,

2  according to the testimony; right?

3  A.  Yes.

4  Q.  Guns drawn, orders to put your hands up;

5  right?

6  A.  I think guns drawn, and then once the vehicle

7  stopped, my understanding is then they, over the PA

8  system, they gave them the commands to put their

9  hands on the roof.

10  Q.  And I guess one of the other things -- I guess

11  what I'm asking is that nobody had a gun tucked in

12  their waistband; right?

13  A.  At the time of their arrest, when they were

14  taken out of the vehicles, that is correct.

15  Q.  Okay.  And there was no border patrol agent

16  who testified they saw anybody drop a gun in the

17  vehicle; right?

18  A.  Correct.

19  Q.  Or saw that; right?

20  A.  Correct.

21  Q.  Let me now talk to you a little bit.  Let's

22  talk about surveillance at Food City.  I'm going to

23  jump around a little bit, but I'd like to talk

24  about Food City.

25      Exhibit 109 that we saw have Mayco and Yovani

1   Valenzuela entering the Food City, right, just

2   inside the door?

3   A.   Yes.

4   Q.   You can -- if you want to look at it --

5   A.   No, no.  I'm just -- I'm trying to remember.

6   It's Yovani, Mayco, and then right behind them is

7   Jorge.

8   Q.   Well, actually, 110 has Jorge entering also;

9   right?

10  A.   Well, I didn't remember the exact --

11  Q.   Well, I know there is one photograph where the

12  two guys, Mayco and Yovani, are together, and then

13  there is another one, and I can't remember whether

14  they're all three, but there is certainly one with

15  Jorge entering the Food City; right?

16  A.   There is some individual stills as well as a

17  clip, and it goes in sequence, but Jorge is right

18  behind them.

19  Q.   Okay.  And then Exhibit 29 is the aerial clip,

20  I guess it's a photograph, showing the cars of the

21  Escalade and Expedition and the Jeep Commander at

22  2:05 p.m.; right?

23  A.   Right.

24  Q.   And that's when Mr. Medina was testifying he

25  was pointing out where these vehicles were?

1    A.    Correct.

2    Q.    Okay.  Then we know that at four -- Exhibit

3    14-C.1, there is a photograph at 2:32 of Damond

4    Reagan leaving the Food City, as he's about to

5    exit; right?

6    A.    Yes.

7    Q.    And again, going backward in time, you saw a

8    photograph at 2:19 of the Expedition and Escalade

9    parked tail to front; right?

10   A.    I know that they're spotted when that

11   photograph was taken.  I know it was shortly

12   thereafter, but I'd say it was approximately 2:19,

13   yeah.

14   Q.    Okay.  And I'd like to ask you a little bit

15   about what we haven't seen.  There's no photograph

16   that I've seen, and maybe you can help, of Mayco's

17   brother-in-law, is there?

18   A.    No.  From -- well --

19   Q.    From Food City?

20   A.    Yes.  That's correct.

21   Q.    And what I'm asking, because I don't know

22   this, is you had conversations with Jorge Medina

23   February 8, February 15 of 2012; right?

24   A.    Yes.

25   Q.    And did you review -- and you had video from

1  Food City and photographs; right?

2  A.   I had -- yeah, I had the surveillance

3  photographs, as well as the Food City video.

4  Q.   Did you review those tapes or videos with him,

5  looking for him to identify the brother-in-law,

6  Mayco's brother-in-law?

7  A.   I didn't.  I don't -- I don't review the

8  surveillance footage with Jorge.

9  Q.   Okay.  Additionally, we've seen the aerial

10 photograph of the parking lot at 2:05, and we've

11 seen some aerial photographs.

12     Is there a photo of the parking lot after

13 2:20, an aerial photograph?  Because I don't think

14 we've seen it in the trial.

15 A.   I know that they have -- there would be an

16 aerial photograph when the air units followed the

17 Expedition and Escalade back to Food City at

18 3:12 p.m.  Then they leave at 3:15.  There is a

19 shot of the parking lot then, that brief shot.

20 Q.   Okay.

21 A.   And I believe that's it.

22 Q.   How about in any of the tapes or videos, did

23 you see a small blue car with its occupants having

24 any interaction with either Jorge or with the

25 blacks?

1  A.   I did not.

2  Q.   And is there any surveillance video from Food

3  City showing Jorge stopping to talk to anybody in

4  either a gray car or a LeSabre or with somebody

5  named Miami?

6  A.   I don't believe so.

7  Q.   I'd like to return now to February 4th and

8  talk a little bit about Mr. Gutierrez, okay, and

9  then we'll get back to Food City.

10 A.   Okay.

11 Q.   I'm talking about the informant.

12 A.   Yes.

13 Q.   And it's been only eight days, I think, since

14 I questioned you previously, but it seems like

15 eight months, so I can't exactly remember what I

16 asked you before, so let me know.  Okay?

17 A.   I'll do my best.

18 Q.   Can you remember?

19 A.   We'll see, I guess.

20 Q.   Okay.  I guess one of the things is, we

21 discussed that the informant was -- and I don't

22 remember if I asked you this.

23      The informant was paid something like $320,000

24 over a 12-year career; right?  Maybe more.  I can't

25 remember the exact amount.

```
 1   A.   I don't ever -- I don't remember a three.  I
 2   don't think -- I don't remember that number.
 3   Q.   We can add it up.
 4   A.   Okay.
 5   Q.   I think there's something like 158 -- wait --
 6   a 100,000-something in this case, 158,000
 7   previously?
 8   A.   So we're about 258.
 9   Q.   Yeah.  I've got those figures.
10   A.   Okay.
11   Q.   I'll get back to that with you, but I guess
12   what I was leading to is, you've indicated
13   previously you paid him in cash; right?
14   A.   That's -- yes.
15   Q.   The Government didn't write him a check.
16   A.   No.
17   Q.   And you gave it to him personally; right?
18   A.   I take that back.  He -- there's two
19   payments.  There is one for services and then one
20   for moving expenses.
21   Q.   All right.
22   A.   I think it's like 75,000 and 33,000.
23   Q.   Okay.
24   A.   The 75,000 services payment was in cash.
25   Q.   All right.
```

A.   And I believe the 33,000 for moving expenses
was in the form of a cashier's check.

Q.   All right.

A.   That's my understanding now.

Q.   But if he said he never received cash, that
wouldn't be right.

A.   If he's talking about the services payment,
that would be correct.

Q.   He did get cash?

A.   For services payment, yes.

Q.   I don't know what it was for, but whatever, he
got cash; right?

A.   Correct.

Q.   And apparently there's no W-2; is that right?

A.   There's no W-2?  That was the question?

Q.   Right.

A.   No, there's no W-2.

Q.   I have the figures I'd like to go over with
you now.

A.   Okay.

Q.   He received $158,000 for work he had
previously done before this case.  Okay?

A.   Okay.

Q.   And 108,000 for this case.  Okay?

A.   Okay.

1    Q.   That comes out to, I think, 266,000, roughly.

2    A.   Yes.

3    Q.   And then additionally, he received another

4    17,000 since working on this case, so we're now up

5    to 280 or 290,000; right?

6    A.   Yes.

7    Q.   Okay.  And correct me if I'm wrong, but he

8    also said the 158,000 was what the FBI had paid

9    him, and the DEA had paid him an additional 30 or

10   40,000 before he began working for the FBI?

11   A.   Correct.

12   Q.   That pushes him up to close to 320; right?

13   A.   Correct.

14   Q.   His job was to get this operation started one

15   way or another; is that fair?

16   A.   His job was to see if he had any information

17   involving individuals that were conducting home

18   invasions.

19   Q.   And if he did, he would report to you and the

20   case could get started?

21   A.   Yes.

22   Q.   And prior to February 4th, he had several

23   people lined up; right?

24   A.   Prior to February 4th, he had a meeting with

25   Roberto del Solar-Ramos and Chivo.  Those were

1  two --

2  Q.  Okay.

3  A.  -- individuals that he had spoken with

4  regarding home invasions.

5  Q.  And the idea of the February 4th meeting,

6  which the FBI was monitoring, was to be a planning

7  meeting; is that fair?

8  A.  Yes, that's fair.

9  Q.  The meeting -- and you've seen the transcript,

10  and it's timed, so it lasted approximately 40, 45

11  minutes; is that about right?

12  A.  That's fair.

13  Q.  And there were five individuals who wound up

14  at that meeting; right?

15  A.  Yes.

16  Q.  And four of them were Hispanic men, and one

17  was a black male; right?

18  A.  Yes.

19  Q.  Okay.  The black male was present for about 12

20  minutes; right?

21  A.  Correct.

22  Q.  And most of the meeting, not all, but most of

23  it was in Spanish?

24  A.  Correct.

25  Q.  And Mr. Gutierrez, the informant, testified

1  that -- and tell me if this is correct -- four of
2  the five people present spoke English; right?
3  A.   Yes.
4  Q.   And he also said he thought possibly the fifth
5  person, Gollo, spoke English as well; right?
6  A.   That's not correct.
7  Q.   I thought he said he had had -- he believed
8  that he might speak English.
9  A.   That wasn't his testimony, as far as I
10  understood it.
11  Q.   Okay.
12  A.   You have the name mixed up, I believe.
13       The way I understood it is I thought Gollo
14  spoke English.
15  Q.   Okay.
16  A.   Mayco.
17  Q.   Right.
18  A.   And the one that he wasn't sure about was
19  Chivo.  He didn't think Chivo --
20  Q.   Oh, okay.  He thought Chivo might speak
21  English but he wasn't sure?
22  A.   Yeah, he didn't think so.
23  Q.   I thought he said that he might but he didn't
24  know.
25  A.   Well, that's fair.  He wasn't sure.

1  Q. Okay.

2  A. He had spoken with him only in Spanish, but he

3  wasn't sure about the English.

4  Q. Okay.

5  A. That's my understanding.

6  Q. And there were approximately 45 words that

7  were spoken in English; right?

8  A. I believe that's right. I believe that's

9  correct.

10  Q. Including the words "65 birds"; right?

11  A. Right.

12  Q. And actually, that "65 birds" refers to the

13  amount of cocaine, according to intelligence or --

14  A. 65 kilos of coke, yes.

15  Q. Okay. Jorge Medina, when discussing this

16  case, said this case involved 50 birds; right?

17  A. That's correct. I remember him saying that.

18  Q. Okay. I have a question for you that I --

19  maybe you can help explain.

20  Apparently the blacks were represented by this

21  black individual at -- the blacks who were going to

22  be involved were represented by this black

23  individual at the meeting; right?

24  A. I would say -- well, my understanding was

25  Mayco was the representative, right along with the

1  black individual who was at that meeting.

2  Q.   Okay.  But the black people supposedly are

3  going to be involved in the deal.  That's the whole

4  idea of having a planning meeting; right?

5  A.   The black people were going to be involved,

6  yes.

7  Q.   And apparently the black person who was there

8  with the four Hispanics was to be involved in the

9  deal; right?

10  A.   Yes.

11  Q.   Okay.  And yet, even though at least three of

12  the others and maybe four of the other people there

13  spoke English, almost the whole thing was in

14  Spanish; right?

15  A.   Correct.

16  Q.   And Mayco was there; right?

17  A.   Correct.

18  Q.   And he -- Mayco speaks English; right?

19  A.   I believe he was translating, if I remember

20  right.

21  Q.   Also, during the course of this investigation,

22  you became aware -- I don't know whether you would

23  call it in-fighting, but were some comments from

24  some of the conspirators that the black guys

25  weren't going to be involved; right?

1    A.   There was conversation of that, yes.

2    Q.   And in fact, some of the comments were pretty

3    vulgar.  I think Chivo said something to the

4    effect, "I'm not going to take niggers"; right?

5    A.   Correct.

6    Q.   Gollo also says there's no blacks involved;

7    right?

8    A.   That's part of what he said.

9    Q.   Okay.  On March 2nd, about three hours before

10   he was arrested, Gollito, talking to the informant,

11   says there's nothing but Chicanos involved in this

12   thing; right?

13   A.   Correct.

14   Q.   Then let's jump a little bit to March 2nd and

15   Tony Gutierrez's involvement on March 2nd.

16        In part, what he needed to do on March 2nd,

17   and I think this -- I think you said this

18   yesterday, was he was trying to get all the people

19   that were involved to the warehouse; right?

20   A.   Right.

21   Q.   And in part, that's why the picture of the

22   cousin was shown; right?

23   A.   Correct.

24   Q.   And one of the reasons for this is because the

25   FBI had an enclosed area and a whole bunch of

1   agents surrounding it to make an arrest; right?

2   A.   That's part of it, yes.

3   Q.   Okay.  Well, additionally, it's a lot safer if

4   you can -- you don't know what you're going to get

5   when you make an arrest like this, whether

6   someone's going to pull a gun and start shooting;

7   right?

8   A.   Correct.  We want to try and make it as safe

9   as possible.

10  Q.   And so safety's a concern and being careful is

11  a concern.  You don't want to make an arrest, for

12  instance, in the Food City parking lot where

13  there's a whole lot of civilians and children

14  walking around; right?

15  A.   If you can avoid it, correct.

16  Q.   And so the plan was to make the arrest at the

17  warehouse of the people involved?

18  A.   That was the ideal plan, yes.

19  Q.   Okay.  And in fact, the informant sent Gollito

20  at 2:15 to leave the warehouse specifically to go

21  back to Food City; right?

22  A.   Yes.

23  Q.   Okay.  And the reason he was going back to

24  Food City was to get the people who were going to

25  participate and get them back to the warehouse so

1  they could go into the warehouse; right?

2  A.  I believe it was he was going to go back and

3  get the individuals that were involved and at least

4  the people that he had met in Phoenix.

5  Q.  Okay.

6  A.  That was --

7  Q.  Right.

8  A.  That was my memory, yes.

9  Q.  But at the Food City, when he went back there,

10 were two carloads of black guys; right?

11 A.  Correct.

12 Q.  Okay.  And he had previously said a short time

13 earlier black guys weren't involved; right?

14 A.  That's what Gollito had said.

15 Q.  Okay.  When he got to Food City, Yovani was

16 there; right?

17 A.  Yes.

18 Q.  Andy Pineda; right?

19 A.  Yes.

20 Q.  Okay.  Gollito didn't ask the black guys or

21 say anything to the black guys to follow him back

22 to the warehouse; right?

23 A.  Right.

24 Q.  Just a few more things about Tony.

25     When you were using him as an informant, you

1  actually -- you were aware that he'd been arrested

2  in Albuquerque with 50 pounds of marijuana; right?

3  A.   I was aware of an arrest.

4  Q.   Okay.

5  A.   I don't -- at that time I don't think I was

6  aware of the details of the arrest.  I just knew

7  that he had an arrest associated when he was

8  working for the DEA.

9  Q.   Okay.  And you were aware that he hadn't been

10 prosecuted; right?

11 A.   Yeah.  My understanding was that, at that

12 time, that it was a mixup.

13 Q.   Okay.

14 A.   That it was one field office not communicating

15 with the other, and they eventually got it

16 straightened out.

17 Q.   Okay.  Okay.

18 A.   When I started working with him, that was my

19 understanding.

20 Q.   Okay.  Back to February 4th.

21     The informant told you where he was going;

22 right?  So before the meeting, you knew the

23 location?

24 A.   I think I had a general idea of the location,

25 but how I remember it is, I believe we did actually

1    have an address.  We did have an address.

2          And then the surveillance followed him into

3    that location.

4    Q.   Well, that address is in Rubicalva's report;

5    right?

6    A.   I believe so.

7    Q.   It is --

8                MR. COOPER:  Could I approach the witness,

9    Your Honor?

10   BY MR. COOPER:

11   Q.   What is that address?

12   A.   8218 South Seventh Street, Phoenix, Arizona.

13   Q.   Okay.  So -- and you're a little bit familiar

14   with Phoenix; right?

15   A.   Not really.

16   Q.   Well, I can explain it.

17   A.   Okay.

18   Q.   Avenues are on the west side, streets are on

19   the east side, and they run north and south.

20         You're aware of that; right?

21   A.   I am now.

22   Q.   Okay.  Do you know where 536 South Fifth Place

23   is?

24   A.   No.

25   Q.   Do you know where that is -- why that's in the

1  surveillance log?

2  A.   I don't know.

3  Q.   You've seen that address though; right?

4  A.   Yeah.  I saw it in the surveillance log, yes.

5  Q.   And you're aware that 536 South Fifth Place

6  isn't within three miles of the actual address

7  where the meeting took place; right?

8  A.   I don't know that.

9  Q.   Okay.  Have you checked?

10  A.   No.

11  Q.   Okay.  But you know that there's an incorrect

12  address for where the meeting took place; right?

13  A.   I believe that this address is correct in this

14  report.

15  Q.   Okay.  And the surveillance has 536 South

16  Fifth Place on it; right?

17  A.   That's where they initiated their

18  surveillance.

19  Q.   Okay.  It does not have the Seventh Street

20  address?

21  A.   No.

22  Q.   The surveillance log, does it?

23  A.   No, it doesn't.

24  Q.   The other thing I'm a little bit curious about

25  is, the vehicles that were seen at the meeting on

1  February 4th, you don't know of anybody named Juan
2  Martinez who was at that meeting; right?
3  A.   No, I do not.
4  Q.   But there was a vehicle registered to Juan
5  Martinez parked outside the meeting; right?
6  A.   That was one of the vehicles, yes, that the
7  surveillance had observed and taken the license
8  plate from.
9  Q.   And Mayco Ledezma-Prieto was at the meeting;
10 right?
11 A.   Yes.
12 Q.   But there was no vehicle for Mayco
13 Ledezma-Prieto there, was there?
14 A.   That's the one that he was utilizing.
15 Q.   The Juan Martinez?
16 A.   That's what the surveillance log notes.
17 Q.   Okay.  Initially, the phone records, Exhibit
18 -- and you've gone over these, Exhibit 113.
19 Remember?
20 A.   Phone records, yes, I remember that.
21 Q.   Okay.  And yesterday there was some testimony
22 about Gollo calling the informant while they were
23 together during the meeting; right?
24 A.   Oh, yes.  I remember that.
25 Q.   Okay.  And you don't know why that -- the

1  phone records would show that; right?

2  A.   I believe I do.

3  Q.   Mistaken touch?

4  A.   Pardon me?

5  Q.   A mistaken touch on the phone?

6  A.   No.  I believe it's to exchange phone numbers.

7  Q.   Okay.  There was no time elapsed on the call?

8  A.   Okay.

9  Q.   Have you seen it?

10 A.   I think that's correct.  I remember seeing it.

11 Q.   So if there's no time elapsed on the call, how

12 does that happen?

13 A.   Most likely it would be like if you're

14 exchanging a phone number, you call the one

15 person's phone, and then there's no answer.  You

16 just hang it up or mute it, and then you can save

17 that into your phone.

18 Q.   Well, it's the informant and Guzman-Rocha who

19 had this phone conversation while they were

20 together.

21      Did you ask the informant?  Did he call you or

22 what happened?

23 A.   I remember that he had obtained the -- his

24 phone number, so then he'd start recording his

25 phone conversations after that meeting.

1  Q.  Okay.  But you don't know when he got that.

2  That's a guess; right?

3  A.  It was at that meeting.

4  Q.  He got the --

5  A.  After that meeting is when I know that he had

6  the phone number for Gollo.

7  Q.  Okay.  At Food City, I think I counted up 12

8  agents on the ground, some of them with cameras;

9  right?

10  A.  I think there were 12 on the log, yes.

11  Q.  And there were at least two airplanes up

12  flying; right?

13  A.  Correct.

14  Q.  And one person is specifically assigned to

15  document times and places; right?

16  A.  Yes.

17  Q.  That would be Agent Fernandez?

18  A.  Yes.

19  Q.  And you were at a command center?

20  A.  Yes.

21  Q.  You weren't acting as a surveillance officer

22  at the time?

23  A.  No, I was not.

24  Q.  Surveillance agent.  I'm sorry.

25       And how many people were with you at the

1    command center?

2    A.    There was a lot.  I don't know.  There was a

3    whole SWAT team, support personnel for the

4    technical aspect.

5    Q.    15?  15 additional people?

6    A.    More than that.  I would guess approximately

7    40.

8    Q.    Okay.  So we've got 40 people, support staff,

9    with you.  We've got 12 agents on the ground.

10   We've got probably four people in the air, counting

11   the two pilots.

12        So we're talking 50 to 60 people involved in

13   this investigation on March the 2nd.

14   A.    There were a lot of people, yes.

15   Q.    Okay.  And at least the surveillance video,

16   according to Agent Flowers, from the airplane

17   standpoint at 11:45, I think she said?

18   A.    That's when she started the video.  I believe

19   that was what I remember.

20   Q.    Looking at the parking lot, right?

21   A.    Correct.

22   Q.    And there's a photo, Exhibit 29, showing the

23   vehicles in the lot; right?

24   A.    Is that the still of the Food City?

25   Q.    Right.  Exhibit 29.

1  A.   2:05?

2  Q.   Right.

3  A.   Correct.

4  Q.   And there is not an aerial photo, but Exhibit

5  57-A at 2:19 shows cars still in the lot with a

6  couple of black guys talking to each other between

7  cars.

8       The Escalade and Expedition are next to each

9  other at this point?

10 A.   2:19, yes.

11 Q.   Okay.  There are no surveillance photos that

12 you have seen or that I've seen showing blacks and

13 Mexicans together at Food City, are there?

14 A.   Not directly, no.

15 Q.   And there's none showing Jorge Medina with any

16 black people; right?

17 A.   Correct.

18 Q.   It is -- let me -- I'll just jump a little bit

19 to Circle K.  You saw Mr. Estrada yesterday, the

20 Circle K, the 656 person/guy?

21 A.   Yes.

22 Q.   And he testified about the number of cameras

23 in Circle Ks; right?

24 A.   Yes.

25 Q.   Okay.  Now, tell me if I'm wrong, but is it

1   fairly common knowledge that there are video

2   cameras in convenience stores?

3   A.   I would say yes, that's fair to say.

4   Q.   Don't most of them have it posted when you

5   walk in, "This store monitored by surveillance

6   cameras"?

7   A.   I'm sure.   I'm sure that they have something

8   like that.

9   Q.   I'm going to jump across town a little bit to

10   the warehouse, and there were, I think, five people

11   arrested at the warehouse.

12   A.   Yes.

13   Q.   And one of those arrested was Yovani

14   Valenzuela; right?

15   A.   Yes.

16   Q.   And shortly before his arrest, he was having a

17   discussion with the informant about not hurting the

18   cousin; right?

19   A.   Yes.

20   Q.   And one of the things Yovani Valenzuela said

21   before he knew he was going to get arrested was,

22   well, you might have one less cousin, but we're

23   going to have a lot more money.

24       Do you remember that?

25   A.   Yes.

1    Q.   And there, in fact, were guns recovered from

2    people arrested at the warehouse.

3    A.   Yes.

4    Q.   Two; is that right?

5    A.   Two guns, yes.

6    Q.   Including one from Yovani, a Springfield .45?

7    A.   Yes.

8    Q.   And the arrest, the time of the arrest was

9    documented; right?  And I think we've gone over the

10   chart.  The arrest was at 2:25 -- 2:24 at the

11   warehouse; right?

12   A.   That's when they make entry into the

13   warehouse, yes.

14   Q.   Okay.  And somehow Mayco Ledezma-Prieto wound

15   up getting off a phone call; right?

16   A.   Yes.

17   Q.   Okay.  This phone call -- again, we went over

18   the timing -- according to the phone records was

19   2:27:35, something like that; right?

20   A.   2:27, yes.

21   Q.   I was going to try to round it up.

22   A.   I think -- I remember that now.  I think you

23   tried that yesterday.

24   Q.   Now, let's go jump ahead to the I-10.  Okay?

25        As we've indicated on our little chart, the

1  arrest on the I-10 was at 4:13 p.m.; right?

2  A.   Yes.

3  Q.   And again, there had been talk among -- at

4  least among the Mexican conspirators prior to the

5  arrest, prior to March 2nd, that the blacks were

6  going to be used because of their resemblance to

7  police officers.

8  A.   That was part of it, yes.

9  Q.   Okay.  And when you did the searches and when

10  the two vehicles were stopped and people were

11  arrested, there were no, for instance, fake police

12  uniforms found; right?

13  A.   No.

14  Q.   There were no badges, fake badges, fake -- the

15  kind you can buy at a toy store or whatever found;

16  right?

17  A.   Correct.

18  Q.   And no badges of any sort found; right?

19  A.   No.

20  Q.   There were no goggles found either, were

21  there?

22  A.   I don't believe so, no.

23  Q.   There were a lot of officers who participated

24  in this arrest; right?

25  A.   Yes.

1  Q.  FBI agents as well as border patrol?  I'm

2  talking about the aftermath, the search as well.

3  A.  Yes.  Yes, that's fair.

4  Q.  And the vehicles were searched as thoroughly

5  as they could be searched; right?

6  A.  Yes.

7  Q.  Okay.  And after they were searched, that's

8  when the tow truck driver found a gun remaining in

9  one of the vehicles; right?

10  A.  Yes.

11  Q.  Part of the tools of the trade as a law

12  enforcement officer is to be aware of how to

13  collect physical evidence; correct?

14  A.  Yes.

15  Q.  And when you spend your four months in

16  Quantico, you're trained about the uses of things

17  like fingerprints or DNA; right?

18  A.  Yes.

19  Q.  And you continue as an agent to learn about

20  physical evidence and how to use it; right?

21  A.  Yes.

22  Q.  And you have -- is it called continuing legal

23  education or -- not legal.  Continuing -- what do

24  you call it?

25  A.  You're right, continuing education.  That's --

Q. Okay. And one of the reasons for that is both you want to find who's guilty and exonerate the innocent; is that fair?

A. I think a better explanation is you're just seeking the truth.

Q. And sometimes physical evidence can help you do that?

A. Yes, it can.

Q. And in this case, the guns and the vests were submitted for some type of testing.

A. The guns --

Q. The guns.

A. I'm sorry. I didn't let you finish your question.

Q. No. I interrupted you. Were the guns submitted?

A. Yes.

Q. How about, for instance, the vests?

A. No.

Q. Okay. So the vests weren't swabbed to see whose DNA were on them?

A. No.

Q. But the gloves were -- how about the gloves? Were the gloves submitted to see if anybody's DNA was on them?

1    A.   No.

2    Q.   And you're aware, are you not, that -- have

3    you heard of epithelial cells?

4    A.   Yes, I have.

5    Q.   You're aware that when you wear something like

6    gloves or even the shirt that I'm wearing now, that

7    skin cells, epithelial cells, come off and you can

8    get DNA from clothing?

9    A.   Skin and oil that's secreted, yes.

10   Q.   Okay.  There was no physical evidence,

11   fingerprints or DNA, relating to Ghermon Tucker on

12   any of those guns; right?

13   A.   No.

14   Q.   I'd like to talk with you a little bit about

15   Jorge Medina.

16   A.   Yes.

17   Q.   You interviewed Mr. Medina on two separate

18   occasions in 2012, the 8th and 15th of February;

19   right?

20   A.   Yes.

21   Q.   And he is related to Yovani Valenzuela by

22   marriage; right?

23   A.   Yes.

24   Q.   Okay.  Yovani Valenzuela is married to

25   Medina's sister, whose name is Carmen; right?

1    A.   Yes.

2    Q.   Okay.  And prior to interviewing Medina, you

3    had been interviewing Yovani since November; right?

4    A.   Correct.

5    Q.   And I think there were six separate times that

6    y'all sat down with Yovani from November until

7    February 15th?

8    A.   I'd say that's correct.

9    Q.   One of the subjects that came up during the

10   interviews that you had with Yovani was, where is

11   Jorge; right?

12   A.   Yes.

13   Q.   And you were looking for Jorge; right?

14   A.   Yes.

15   Q.   And Yovani had told you, actually looking at

16   the photographs, had identified Jorge in a

17   photograph; right?

18   A.   I believe so.

19   Q.   That's how you knew who it was, from Yovani?

20   A.   Well, I think we originally identified Jorge

21   through the traffic stop --

22   Q.   Okay.

23   A.   His name.

24   Q.   Okay.

25   A.   And then --

1  Q.  Then the picture --

2  A.  -- a lot of confirmation came through Yovani.

3  Q.  Okay.  And Yovani -- and you had learned at

4  some point that Jorge was in Mexico, however you

5  learned it; right?

6  A.  Correct.  I couldn't find him here.

7  Q.  Couldn't find him here.

8  A.  Right.

9  Q.  And you were looking; right?

10  A.  Yeah, we were trying to find him.

11  Q.  Okay.  The time that you were talking to

12  Yovani, all the time he was out of custody; right?

13  A.  Yes.

14  Q.  Okay.  At some point in February you received

15  information that Jorge Medina was in jail?

16  A.  Yes.

17  Q.  And you went, shortly after you got that

18  information, to the Maricopa County jail; right?

19  A.  Yes.

20  Q.  At the time you talked with him and beyond,

21  you were aware of certain times, because, for

22  instance, they had been documented, like Deputy --

23  DPS Officer Reeves; right?

24  A.  I was aware of a lot of information at that

25  time.

1    Q.   You later became aware of that information;

2    right?

3    A.   Well, you need to be more specific.

4    Q.   Sure.  I'd be happy to.

5         At some point you became aware -- and I think

6    you already said it -- that Medina had been stopped

7    by a DPS officer at 4:34 p.m.

8    A.   I knew that he had been stopped, but I hadn't

9    paid much attention to the time at that point in

10   the investigation.

11   Q.   Right.  Since February 15th, though, you'd

12   become aware that it was 4:34 p.m. near Casa

13   Grande; right?

14   A.   Correct.

15   Q.   You were aware of some other times as well

16   because of documentation by, let's say,

17   surveillance officers or surveillance agents;

18   right?

19   A.   Correct.

20   Q.   Including the time of 2:20 on March 2nd, when

21   a car with two black men leave the Food City;

22   right?

23   A.   Yes, I was aware of that.

24   Q.   And you were also aware that, when you were

25   talking with Yovani and Medina on February 15, they

1  driven down together from Phoenix to Tucson; right?

2  A.   Yes.

3  Q.   And they came to the FBI office where they --

4  on the 15th where they talked to you; right?

5  A.   Correct.

6  Q.   And Mr. Douglass was present; right?

7  A.   Correct.

8  Q.   And the two prosecutors behind me; right?

9  A.   Correct.

10 Q.   So there were at least four law enforcement

11 officials talking with Jorge on February 15th?

12 A.   Yes.

13 Q.   You knew around 2:20 that your agents had

14 documented that there was a car -- a gray car with

15 two black men in it parked side by side with the

16 Expedition and Escalade; right?

17 A.   Yes.

18 Q.   And you also knew that car left Food City at

19 2:20; right?

20 A.   Yes.

21 Q.   And you also knew that that was four minutes

22 before the arrest at the warehouse; right?

23 A.   Yes.

24 Q.   And you also knew that was seven minutes

25 before Mayco apparently made a call to somebody,

1  right, in Phoenix?

2  A.   I know now, yes.

3  Q.   Right.  I mean, since February 15.

4  A.   I didn't -- I didn't have Mayco's records at

5  that time.

6  Q.   Right.  You are also aware now that, when you

7  talked to Medina and when he testified, that he

8  said he had talked to Mayco's brother-in-law, who

9  just happened to show up at Food City to say that

10 Mayco had called saying he'd been stopped; right?

11 A.   Right.

12 Q.   Although you have no picture of the brother-

13 in-law at the Food City; right?

14 A.   Correct.

15 Q.   And he also testified -- well, you knew he

16 also had a conviction for false reporting; right?

17 A.   Who?  Jorge?

18 Q.   Medina, yeah.  Well, you know it now?

19 A.   I know it now, yes.

20 Q.   You also knew that -- he testified and I think

21 he had told you previously that he had a

22 conversation with a couple of black guys in, like,

23 a gray car that the blacks in the Escalade and

24 Expedition overheard saying there had been an

25 arrest; right?

1  A.   Right.

2  Q.   And looking at the time chart, you also know

3  that the blacks, according to the FBI, in the

4  LeSabre, the gray car, had already left before the

5  arrest; correct?

6  A.   No.

7  Q.   That's what the FBI says?

8  A.   You're talking about --

9  Q.   2:20 is when the LeSabre leaves?

10  A.   That gray car.

11  Q.   Okay.

12  A.   The LeSabre.  Making sure we're talking about

13  the same vehicle.

14  Q.   There is only one car -- only one gray car

15  with two black guys in it noted in the surveillance

16  log; right?

17  A.   Yes, but I don't think you're explaining it

18  accurately.

19  Q.   I'm just asking you about what the FBI has

20  explained, and let me ask you about that, okay,

21  because -- and we'll go over this.

22  A.   Okay.

23  Q.   The FBI surveillance officers are specific

24  about this, and what they say is -- we'll go over

25  this.

1    At 2:05, the Murano picks up people and
2 leaves?

3 A.   Yes.

4 Q.   And we'll jump ahead to 2:19, when the
5 surveillance agents originally see the Expedition
6 and the Escalade; right?

7 A.   Yes.

8 Q.   At the same time, at 2:19, these surveillance
9 agents say, we also saw the Expedition and the
10 Escalade sitting side by side with a gold Buick
11 LeSabre; right?

12 A.   Right.

13 Q.   Okay.  With two black males in it; right?

14 A.   Right.

15 Q.   That means we have 11 black males in cars side
16 to side to side; right?

17 A.   Right.

18 Q.   They then say at 2:20 the two black males
19 leave in that car; right?

20 A.   Yes.

21 Q.   And you have Mr. Medina testifying that he
22 told that he was standing there right where the
23 Escalade and Expedition are; right?

24 A.   Right.

25 Q.   Talking to black males in a gray rather than

1  gold car; right?

2  A.   Wrong.  That's not right.

3  Q.   That's not what he said?

4  A.   No.  He said that there was a Mexican male in

5  the car with Miami as well.

6  Q.   Okay.  There was a black man in a car -- in a

7  gray car; right?

8  A.   Yeah, and I can further explain it.

9  Q.   Go ahead.

10  A.   Okay.  So that's one car.  You're talking

11  about a gray -- first at 2:20 a gray Buick LeSabre,

12  and then there is another gray car that Jorge is

13  referring to.  Those are two different cars.

14  Q.   There's no notation in the surveillance, none,

15  by the FBI of Jorge out there talking to anybody in

16  any car, is there?

17  A.   No.

18  Q.   So this is what Jorge is saying has happened;

19  right?

20  A.   I would say that, from his testimony, yes, and

21  then through the course of the investigation what I

22  have learned.

23  Q.   Well, you have aerial photographs where Jorge

24  couldn't pick out -- picked out a car that was next

25  to -- he said here's a car where it moved, and you

1    knew that there was a gold LeSabre that had moved

2    next to the Expedition and the Escalade; right?

3    A.   You have it wrong.

4    Q.   That's what the agent said.

5    A.   Well, I'll explain it again.

6    Q.   No, no.  I don't want you to explain it.  I

7    want you to answer this.

8         Do your agents say the LeSabre is next to the

9    Expedition and the Escalade?

10   A.   At 2:20, that car takes off, but they say it's

11   next to it, that car, the LeSabre.

12   Q.   And is there any place -- and the Ford -- the

13   Escalade and Expedition stay in the parking lot;

14   right?

15   A.   Correct.

16   Q.   And they don't leave until 2:34 p.m.; right?

17   A.   Correct.

18   Q.   And they're being watched by the agents;

19   right?

20   A.   Correct.

21   Q.   And there's not one sighting of Jorge Medina,

22   is there, talking to anybody in the parking lot, is

23   there?

24   A.   Yes, there is.

25   Q.   By the agents?

1  A.   Not by the agents, no.

2  Q.   Not by the agents?

3  A.   Correct.

4  Q.   These are the people who are watching, and

5  they testified, we were watching -- after 2:19, we

6  were eyeballing the Expedition and Escalade; right?

7  A.   Correct.

8  Q.   And he also told you about a blue car that the

9  brother-in-law was in; right?

10  A.   Yes.

11  Q.   Okay.  Did you look for a photo of a blue car

12  where the brother-in-law was in?

13  A.   I didn't see a photo of that.

14  Q.   And did you go with Jorge and look at the

15  entrance videos at Food City to have him pick out

16  the brother-in-law?

17  A.   No.

18  Q.   When you saw him at Circle K, you can't see in

19  the vehicle from the rear view picture, can you?

20  A.   No.

21  Q.   There's a -- there's a photograph of three or

22  four black men talking into a vehicle from the

23  passenger side; right?

24  A.   It's a photograph of Ghermon Tucker and Jerome

25  Ranger and Josh Young talking into the passenger

1    side of the vehicle.

2    Q.   And you couldn't see who was in the vehicle at

3    that time they were talking to, could you?

4    A.   You cannot.

5    Q.   Okay.  You actually interviewed him in

6    February of 2011 and asked him the questions I'm

7    asking you about what happened that day; right?

8    A.   Yes.

9    Q.   And he told you about why Carmen was in the

10   car, right, why his sister was in the car; right?

11   A.   Yes.

12   Q.   And he told you he had picked her up in

13   Phoenix; right?

14   A.   Let me refer to my report.

15   Q.   Sure.  I think it's Bates -- Jencks 299

16   maybe.

17   A.   What page on the report?

18   Q.   It's Jencks 292.  It's the middle of the page

19   292.

20            MR. LACEY:  You know, counsel, at the

21   top --

22   BY MR. COOPER:

23   Q.   I could show you.  This is Bates stamp --

24   A.   Just tell me if there is a number on the top

25   right of the page, just the page number of the

1    report.

2    Q.   Page 5.

3    A.   Thank you.

4    Q.   So he told you back in February of 2012 that

5    he had been afraid, so he kept exiting on and off,

6    and had driven all the way back to Phoenix; right?

7    A.   Yes.

8    Q.   And he said he exited -- he give you a

9    specific exit, right, 51st Avenue in Phoenix?

10        Avenues are on the west side of Phoenix;

11   right?

12   A.   That's what you said earlier, yes.

13   Q.   And that's what he told you, because you wrote

14   it down in your report; right?

15   A.   Correct.

16   Q.   And that's where he met Carmen and her

17   children; right?

18   A.   That's what I have in my report, yes.

19   Q.   And Carmen got in the Commander at that point;

20   right?

21   A.   Yes.

22   Q.   And began to drive back home; right?

23   A.   Yes.

24   Q.   And he was stopped at 4:34; right?

25   A.   Right.

1  Q.   And you specifically knew Carmen was in that

2  car because of Reeves' report; right?

3  A.   I believe that's correct.

4  Q.   And you heard him get up on the witness stand

5  and say the same thing, I drove all the way back to

6  Phoenix; right?

7  A.   I don't remember if he said Phoenix or Riggs

8  Road.  I can't recall.

9  Q.   And I had a dialogue with him about Riggs Road

10 being on the west side and turning into 51st

11 Avenue.

12      Remember?

13 A.   I remember you talking about that.

14 Q.   And he said that's where he wound up meeting

15 Carmen, because he said, yeah, my brother drove

16 her; remember?

17 A.   Yes.

18 Q.   And we know from the pictures that he was in

19 Tucson at 2:47 p.m. at a Circle K.; right?

20 A.   Yes.

21 Q.   It's a Circle K in downtown Tucson?

22 A.   Yes.

23 Q.   And he stopped in Casa Grande at 4:34, less

24 than two hours later?

25 A.   Correct.

1  Q.  Driving from Tucson to 51st Avenue in Phoenix

2  would take about two hours; right?

3  A.  I don't know.

4  Q.  Well --

5  A.  I'm not familiar with Phoenix.

6  Q.  Okay.  Can you explain how he picked her up in

7  Phoenix and then got back to Casa Grande to be

8  stopped by the police at 4:34?

9          MR. LACEY:  Judge, that wasn't the

10  testimony.  He said back to Casa Grande, and I

11  think he misspoke.

12          MR. COOPER:  Back to Casa Grande.  I

13  thought I said that, if I didn't.

14  BY MR. COOPER:

15  Q.  How did he get from Tucson starting at, let's

16  say --

17          THE COURT:  Why don't you make the

18  question from Tucson to wherever he picked up

19  Carmen to Riggs Road, where he was stopped at 4:34.

20  BY MR. COOPER:

21  Q.  Okay.  How did he get from Tucson starting at,

22  let's say, 2:50.

23  A.  Okay.

24  Q.  -- to 51st Avenue in Phoenix and back to Casa

25  Grande at 4:34.

1  A.   I think it's a simple explanation of he just

2  was mistaken of the area.  He went right to Riggs

3  Road.  That's where he was pulled over.  The 51st

4  Avenue is just a mistake.

5  Q.   That means he lied to you, because he lied to

6  me.  He said he went to Phoenix.

7       That's not a mistake, is it?

8  A.   There's a difference between just not knowing

9  or thinking that and actually outright lying.  I

10  don't believe that he was lying on that.

11  Q.   Well, is there a difference between Casa

12  Grande and Phoenix?

13       MR. LACEY:  Your Honor, could we have

14  clarification whether Riggs Road is in Casa Grande

15  or not?

16       MR. COOPER:  That's what the testimony

17  was, that it was right near Casa Grande where he

18  was stopped.

19       THE COURT:  Riggs Road is milepost 167.

20  The Casa Grande exit where the stop was, was

21  milepost 194, 195.

22  A.   It's about 26, 27 miles.

23  Q.   It's not near 51st Avenue, is it?

24  A.   I don't know where 51st Avenue is.

25  Q.   Well, did you try to investigate it to see if

1  this man was telling you the truth?

2  A.    Yes.

3  Q.    Well, then you know where 51st Avenue is.

4  A.    Well, I -- when I investigated it, I know

5  where he's pulled over, at Riggs Road, and if you

6  look at the timing, that matches.

7  Q.    That matches leaving from Tucson and not going

8  to 51st Avenue; right?

9  A.    It matches if you drive past the stop at

10  approximately 4:13 p.m., and you go from milepost

11  195 to milepost 167.  It's 26 miles.

12  Q.    Sure.  But let's get it straight now.  He told

13  you to your face, I went to 51st Avenue, right, in

14  Phoenix; right?

15  A.    That's what I have in my notes, yes.

16  Q.    And then he got on the witness stand and

17  testified under oath, I drove to Phoenix, 51st

18  Avenue.

19        Did he say that?

20  A.    I believe he did say that.

21  Q.    Okay.  And you know that when you go on the

22  I-10 --

23  A.    Well, I can't remember if he said -- or if

24  he's confusing -- I remember Riggs Road.  I don't

25  remember if you were asking him about 51st or if he

1  actually said 51st.

2  Q.   I'll tell you exactly what happened.  I asked

3  him --

4          MR. LACEY:  Objection, Your Honor.  Can we

5  have a question instead of testimony by counsel?

6          THE COURT:  I think it's a question, but

7  it sounds like him making a statement.

8          MR. LACEY:  That's what I gathered.

9          MR. COOPER:  It'll be a question.

10 BY MR. COOPER:

11 Q.   You remember, I had a dialogue with him where

12 he admitted there's a Riggs Road that runs into

13 51st Avenue?

14 A.   I believe he did say that.

15 Q.   And that's when he said, yeah, that's where I

16 picked up Carmen, on 51st Avenue; right?

17 A.   I don't recall for sure on that.

18 Q.   Carmen was in the vehicle when he was stopped

19 at 4:34?

20 A.   Yes.

21 Q.   Carmen lives in Glendale; right?

22 A.   I believe that's correct, yes.

23 Q.   Riggs Road, even if it's farther than Casa

24 Grande, is nowhere near Glendale, is it?

25 A.   I would say it's not near Glendale.

1  Q.  And he was stopped in Casa Grande at 4:34 p.m.

2  with his sister and two little children in the car;

3  right?

4  A.  Yes.

5  Q.  And there's certainly a chance that, if he

6  said 51st Avenue is where he picked her up, that's

7  not a mistake and it's just a lie; right?

8  A.  Again, I think it's just a mistake on his

9  part.

10  Q.  Okay.

11  A.  Just not knowing the area or not being

12  familiar with it.

13  Q.  Well, he knows 51st Avenue.

14  A.  I think he knows Riggs Road will run into that

15  and that's maybe the route that they were going to

16  take, but that's not where he was stopped.

17  Q.  He specifically told you that though; right?

18  A.  That's what I have here in my report.

19  Q.  He said it twice because he told it to me too;

20  right?

21  A.  He mentioned those names, yes, of the streets.

22  Q.  So if he's driving west toward Phoenix, where

23  did he pick up his sister, and why is he in Casa

24  Grande with his sister in the car?

25  A.  Because he was scared and he called her, and

1  they met at the smoke shop off Riggs Road, and

2  that's where he met her.

3  Q.   And she got there how?

4  A.   I believe he said there was another vehicle

5  there that helped, I can't remember if he said it

6  was his brother that came as well, but that she

7  came with his brother, and then she got -- moved

8  the car seats into the Commander, and then they

9  drove, drove away from that area.

10 Q.   And is there a chance that actually he brought

11 his sister and her children to a home invasion in

12 Tucson and dropped them off in Tucson?

13 A.   Not from the investigation I did up to now,

14 no.

15 Q.   You don't even know where 51st Avenue is.

16 A.   Well, you said in Tucson.  They weren't here

17 in Tucson.

18 Q.   Well, how do you know that?

19 A.   Through the investigation.

20 Q.   The physical evidence shows that they

21 absolutely were in Tucson, doesn't it?

22 A.   Who are you referring to now?

23 Q.   The sister.

24 A.   No, it does not.

25 Q.   Why not?  Tell me.  I want to hear this.

1      MS. HOPKINS:  Objection, Your Honor.

2      MR. COOPER:  It's a question.

3      THE COURT:  It is a question.  I want to
4   hear it too.

5   A.   Well, one, through the testimony.

6   Q.   His testimony?

7   A.   His testimony, as well as other interviews
8   I've conducted in this case, and then when you
9   examine the time line --

10  Q.   I'm just talking about the testimony that
11  we've heard at the trial.

12  A.   The time line doesn't match up for that to
13  happen like you're explaining.  For him to be
14  leaving right here in Tucson at that time and
15  driving from there, from the Circle K where he
16  leaves, it's about 2:47, driving along the highway,
17  viewing the stop at 4:13, that time is plausible.

18      Going on from that time to Riggs Road, being
19  stopped by DPS, given the mile markers, that can
20  add up.

21  Q.   It doesn't add up to him getting to Phoenix
22  and coming back with his sister, does it?

23  A.   No.  It's impossible given the times.

24  Q.   Right, exactly impossible, and that's what he
25  said happened; right?

1    A.    No.

2    Q.    He said he went to 51st in Phoenix?

3    A.    Again, we keep going over this, but I've

4    explained it.  I think it's a mistake on his part

5    where he's just confusing the area, but it

6    physically can't happen that way, and through the

7    testimony that we've had up to this point, that's

8    accurate.

9    Q.    When you wrote your report -- when you wrote

10   your report, when you first interviewed him in

11   February of 2012, he specifically said he exited at

12   51st Avenue in Phoenix.

13         Those are your words; right?

14   A.    Those are -- that's my report.  That's my

15   words that I've used to summarize his statement.

16   Q.    And he added that he met Carmen and her

17   children in this area.

18   A.    Correct.

19   Q.    And when he testified yesterday or two days

20   ago he said the same thing, 51st Avenue in Phoenix;

21   right?

22   A.    I don't recall that.

23   Q.    That's not possible to do, is it, under this

24   time line?

25   A.    Again, like I explained, that time line, like

1  I explained it, is accurate.  The way that you keep

2  referring back to, it can't happen.

3  Q.  It would be possible if the sister was in

4  Tucson.

5  A.  She wasn't in Tucson.

6  Q.  I'm not asking you to answer that question.

7  I'm asking if it would be possible if she were in

8  Tucson.

9      It would certainly be possible, wouldn't it,

10  for her to be in the car at 4:34 after they left

11  Tucson with him going off and on the freeway like

12  he said and taking his sweet time because he was so

13  scared; right?

14  A.  That could be possible.

15          MR. COOPER:  Thank you.

16          THE COURT:  Let's take about a 10-minute

17  recess.

18          (The jury exits the courtroom.)

19          THE COURT:  10 minutes.

20          (Off the record.)

21          (The jury enters the courtroom.)

22          THE COURT:  Show the jurors returned back

23  to the courtroom, the presence of all counsel and

24  the defendants.

25          Mr. Armstrong, you may proceed.

1          MR. ARMSTRONG:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. ARMSTRONG:

4   Q.   Good morning, Agent.  How are you?

5   A.   Fine.  Thank you.

6   Q.   Just a couple of quick things here.

7        The temperature in Tucson on March 2nd of 2011

8   I think you said was around 44 degrees.  That would

9   have been the low?

10  A.   I believe that, yes, that's correct.

11  Q.   Mr. Cooper was talking to you about Cochi and

12  some of the things that Cochi told you.  You're

13  aware that -- Cochi, you're aware that Cochi has a

14  criminal conviction for giving a false statement to

15  a law enforcement officer, don't you?

16  A.   Yes.

17  Q.   And you heard Cochi tell you that he lied to

18  the DPS officer on March 2nd also?

19  A.   Yes.

20  Q.   Did he do that here in court?  He told us that

21  here in court?

22  A.   Yes.

23  Q.   And he also told the jury that he lies to his

24  wife about what he does at night.  You heard that?

25  A.   Yes.

1  Q.  Yet you're convinced that the story he told

2  you about going to Phoenix, all the way up to the

3  west side of Phoenix during the time period in

4  question, that that was just a mistake on his part

5  and not a lie?

6  A.  Correct.

7  Q.  I want to talk about a few of the facts that

8  you testified to yesterday, and a lot of these have

9  been gone over already.

10  A.  Okay.

11  Q.  At the Circle K up in Phoenix, at 16th Street

12  and Broadway, the folks in the black Cadillac and

13  the red Escalade acquired a bunch of drinks and

14  ice, in addition to some other things, some gloves

15  and things, but they got a lot of drinks and some

16  ice.

17        Would you agree what that?

18  A.  Yes, in the black Escalade and red Expedition,

19  correct.

20  Q.  There's even a photo, I think, 14-A.4, that

21  you think is Jerome buying some drinks.  We've got

22  a photo 14 -- - Exhibit 14-A.3, Ja'Cory and Josh

23  buying ice at that store.

24        Is that right?

25  A.  I don't know the exhibit numbers, but I --

1  that sounds right.

2  Q.  So -- but even if I'm wrong on the exhibits,

3  the exhibit numbers, you see Ja'Cory Ranger buying

4  ice for the trip to Tucson; correct?

5  A.  Yeah.  He's buying -- yeah, correct.  I

6  believe ice is one of the things that he has.

7  Q.  Right.  And his brother is getting some

8  drinks?

9  A.  Jerome, yeah, I believe he has drinks next to

10  him and the gloves.

11  Q.  Okay.  I want to jump ahead to the Food City,

12  if I could see Exhibit 109, please.

13          MR. ARMSTRONG:  Is that up for the jury?

14          THE COURT:  Yes.

15          MR. ARMSTRONG:  Okay.  thank you.

16  BY MR. ARMSTRONG:

17  Q.  In that video, what do you see?  Who are the

18  first two people walking past?

19  A.  Mayco Ledezma-Prieto or Seco and Yovani

20  Valenzuela.

21  Q.  And you're pretty convinced that -- well,

22  you're absolutely certain at this point these guys

23  are involved in the home invasion?

24  A.  Yes.

25  Q.  And they're wearing black shirts?

1   A.   Yes.

2   Q.   Cochi's also wearing a black shirt following

3   closely behind them; correct?

4   A.   I believe that's correct.

5   Q.   Were you ever concerned that Cochi was

6   anything more than just the cabbie, the guy driving

7   Yovani and Mayco, according to his testimony,

8   driving Yovani and Mayco down to Tucson?

9   A.   From my investigation, no, I was not.

10  Q.   Okay.  This is a guy who lied to law

11  enforcement, had a record of it.  He's with two of

12  the more pronounced members of this Mexican

13  conspiracy.

14       Would you agree with that?

15  A.   Yes.

16  Q.   And he's doing nothing more than driving.

17  That's what he told you.  He was just simply the

18  driver and was going to be paid 2 or $4,000,

19  something like that?

20  A.   2,000, yeah.

21  Q.   It was just $2,000.  It's a pretty simple

22  task, driving -- driving down to Tucson.

23       I mean, could you identify any reason why

24  Yovani or Mayco couldn't drive themselves?

25  A.   Well, it would have to do with how it was

1    going to go down.  There's going to be, you know, a

2    kidnapping, so someone's going to have to drive

3    back the person that's going to be kidnapped.

4        There is also going to be cash in the house.

5    There's going to be money, and there's going to be

6    cocaine that's going to be split up.

7        So from my investigation, there's going to

8    have to be multiple cars.

9    Q.    Okay.  And that would account for the Buick

10   and I think the Kia, the little blue Kia that you

11   saw?

12   A.    Well, we didn't see it that day, but through

13   the course of the investigation we learned of extra

14   vehicles.

15   Q.    So you thought Yovani was -- excuse me -- that

16   Cochi was a driver back and forth?

17   A.    He was going to be a driver after the home

18   invasion went down.

19   Q.    And you knew that he transported -- that

20   either Mayco or Yovani had a weapon when they were

21   driving down from Phoenix to Tucson, didn't you?

22   A.    Did I?  I don't understand the question,

23   really.

24   Q.    Mayco or Yovani had a weapon.

25   A.    Correct.

1  Q.  And when you met with Cochi in February, he

2  told you that he knew that Mayco or Yovani had a

3  weapon; right?

4  A.  I believe that that's correct.

5  Q.  And he's not been prosecuted?

6  A.  Correct.

7  Q.  So here's a guy who drives two of the head

8  conspirators down to Tucson, transporting one of

9  them with a gun, and he's going to play a

10  significant role in carrying out this whatever plan

11  had been hatched by Tony, by your confidential

12  source, yet he escapes all charges.

13     Is that true?

14  A.  At this point, yes.

15  Q.  Did you see -- back to the Food City, there's

16  a photo where you see -- you see Cochi walking

17  through in black.

18     Did you see Cochi -- are there any photographs

19  of Cochi in the parking lot, video or -- video

20  photographs or still photographs of Cochi in the

21  parking lot of the Food City any time that

22  afternoon?

23  A.  Himself?  Just of his person?

24  Q.  Just him.

25  A.  Not in the Food City parking lot.

1 Q.   Okay.  When Sharman, Agent Sharman, I believe,

2 drove through, entered into the Food City at

3 roughly 2:19, snapped some pictures, he got some

4 pretty clear pictures of people; right?

5 A.   Yes.

6 Q.   Of cars and folks.

7      There's nothing -- there's none of those

8 photos show Cochi, do they?

9 A.   No.

10          MR. ARMSTRONG:  May I see 57-A, please,

11 57-A.

12 BY MR. ARMSTRONG:

13 Q.   You see that's a photograph of the Cadillac

14 and the Escalade.  No.  The Cadillac and the Ford.

15 A.   Right.

16 Q.   Right.  Do you see Miami?

17 A.   No.

18 Q.   Do you see Cochi?

19 A.   No.

20 Q.   Thank you.

21      Moving ahead to the Circle K.  At the Circle

22 K, I believe your testimony was that you believe --

23          MR. ARMSTRONG:  Your Honor, may I approach

24 the witness?

25 BY MR. ARMSTRONG:

Q.  Exhibit 114.  Do you have that with you?

A.  No, I don't.

Q.  Okay.  It's the telephone contact chart that was prepared by Mr. Douglass?

A.  Yes.

Q.  All right.  I think on the third page there in pink is what we're talking about.

THE COURT:  Do you want it published?  Do you want to put it up?

MR. ARMSTRONG:  Is it on video?

MR. LACEY:  We have it on the screen.

MR. ARMSTRONG:  Yes, I'd like that.  I didn't know that.

Thank you, Your Honor.

BY MR. ARMSTRONG:

Q.  Do you see the pink lighted area?

A.  Yes.

Q.  All right.  You had said that there were three phone calls placed by -- you believe it was Ghermon calling Mayco?

A.  Yes.

Q.  Thank you.  That's been highlighted there.

I'm looking at the time period right in the middle of the screen.  The phone call at 2:44 and 19 seconds, that's the first phone call?

1  A.  Yes.

2  Q.  Phone call at 2:44 and 23 seconds, that's the

3  second phone call?  That's four seconds later?

4  A.  Yes.

5  Q.  Okay.  And then the third phone call is one

6  second later.

7  A.  Yes.

8  Q.  Okay.  How do you get three phone calls in --

9  would you say that's five seconds?

10  A.  Yes.  The question was it five seconds, yes,

11  and then how do you get that is the other part of

12  the question?

13  Q.  Yeah.

14  A.  Dial the number on the keypad and then the

15  phone call goes through, or you hit redial.  I'm

16  not sure.  But these are the records that we

17  obtained.

18  Q.  Okay.  Thank you.

19      The answer is you don't know how there are

20  three phone calls in under five seconds, do you?

21  A.  Well --

22  Q.  Or do you?

23  A.  Well, if you look, Ghermon Tucker's at the pay

24  phone.  I would say he -- Ghermon Tucker is making

25  phone calls to Mayco Ledezma's phone.

1    Q.   Okay.  But three of them?

2    A.   Three of them, yes.

3    Q.   In five seconds?

4    A.   Yes.

5    Q.   Okay.  All right.  Mr. Cooper talked to you a

6    little bit about the DNA, and there was a number of

7    gloves that were located within the Escalade.

8         There was no DNA testing done on those gloves;

9    am I correct?

10   A.   Correct.

11   Q.   And if you want to know exactly who something

12   belongs to, there's really -- or if someone had

13   contact with an item, there's really no better way

14   than a DNA test.  Would you agree what that?

15   A.   It's a very good way to positively identify

16   that, yes.

17   Q.   And you don't know -- we don't have DNA

18   testing.  Do you know if the location -- if any of

19   these gloves were actually located in the truck?

20        I mean, there may have been a location after

21   where the police pulled them out and photographed

22   them, but do you know where they were at the time

23   that the vehicles were pulled over up near Casa

24   Grande?

25   A.   I believe I only know where one pair was.

1   Q.   That was the set in the glove compartment?

2   A.   The set that was in the center console.

3   Q.   In the center console.  Right.

4   A.   In the Ford Expedition, on top of the Ruger .9

5   millimeter.

6   Q.   Other than that, you really don't know where

7   any of these gloves were because the -- both cars

8   were kind of tossed about by law enforcement.

9        Would you agree with that?

10  A.   Yes.

11  Q.   Now, Exhibit 117-A through E, the big laundry

12  basket or the bag full of the hoodies, do you know

13  where any of those were actually located within the

14  vehicle or vehicles?

15  A.   Not all of them.  I know that a few pictures

16  after the, you know, the stops that occurred, you

17  can see a few, I believe, back sweatshirts in the

18  back seat, but not all of them.

19  Q.   Okay.  Were those obtained from one or more of

20  -- from one of the cars or both of the cars, if you

21  know?

22  A.   Well, the first set of black hoodies that we

23  went through, that was the Escalade.

24  Q.   A through E?

25  A.   I believe that's correct.

1    And the other set where there's, I think,
2  three jackets in there, that was the Ford
3  Expedition.
4  Q.   And again, no DNA testing was conducted on
5  those?
6  A.   No.
7  Q.   And aside from the photographs, I mean, you
8  really -- do you have really in your mind a clear
9  picture of where those hoodies were in the
10  Escalade?  I mean, were they tossed in the trunk
11  portion?
12  A.   Yeah, that was --
13  Q.   Were they laying on the floor?
14  A.   My recollection is in the trunk portion of it
15  at the time when we collected it.
16  Q.   But at the time of the stop, you really can't
17  say, can you?
18  A.   Not for every one of those sweatshirts, no, I
19  cannot.
20  Q.   And I want to talk a little bit more about
21  Cochi and Yovani.
22  A.   Okay.
23  Q.   Cochi said here under oath that he hasn't
24  really talked about this case with Yovani, about
25  the facts of the case, didn't he?

1  A.  Correct.

2  Q.  And I noticed from some of the information

3  that I have, you met with Cochi and Yovani in

4  Tucson on February 15; correct?

5  A.  Yes.

6  Q.  They drove down together.  We heard that

7  part.  They actually drove down together?

8  A.  Yes.

9  Q.  From Tucson?

10  A.  From Phoenix.

11  Q.  From Phoenix.  Thanks.

12      They met at the -- you met with them at the

13  FBI office?

14  A.  Yes.

15  Q.  Did you meet with them individually?

16  A.  Yes.  They were separate.

17  Q.  And this is after a point -- you'd had a lot

18  of meetings with Yovani to this point.

19  A.  We had interviewed Yovani several times, yes.

20  Q.  Five, maybe six times at that point?

21  A.  Four, I think four, four or five, somewhere in

22  there.

23  Q.  You'd shown him photographs that you had?

24  A.  Yovani?

25  Q.  Yovani, right.

1  A.  Yes.

2  Q.  You showed Yovani a lot of the evidence that

3  you had against him in this case; correct?

4  A.  At that point it wasn't so much evidence

5  against him.

6  Q.  You showed him photographs.  You showed him

7  videos.

8  A.  Showed him mostly photographs.

9  Q.  Photographs of the Food City?

10  A.  I don't recall the Food City portion.

11  Q.  Did you show him any photographs of the Circle

12  K, the Circle K in Tucson?

13  A.  I don't recall if I showed those to Yovani or

14  not.

15  Q.  Did you show him any photographs of the Circle

16  K in Phoenix?

17  A.  I don't believe so.

18  Q.  How about the Circle K in Marana?  Now we're

19  all out of the Circle Ks.

20  A.  I think I did show him the one of Circle K in

21  Marana.

22  Q.  All right.  And when you met with Yovani on

23  February 15, his lawyer wasn't with him, was he?

24  A.  I would have to look at my report to answer

25  that accurately.

1  Q.  Do you have that with you?

2  A.  I do not.

3  Q.  Okay.

4  A.  But his lawyer was -- I do remember his lawyer

5  was there for several of the meetings, but whether

6  February -- February -- I think you said 15?

7  Q.  Correct.

8  A.  I can't remember exactly for sure right now.

9  Q.  Maybe we can straighten that out.

10  A.  Okay.

11  Q.  Who did you meet with first, Yovani or Cochi

12  on the 15th?

13  A.  I don't recall.

14  Q.  How long was the meeting with Yovani?

15  A.  Usually, you know, at least an hour, an hour

16  to an hour and a half.

17  Q.  And that's with Yovani, and this is after he's

18  been charged; correct?

19  A.  Correct.

20  Q.  Was Mr. Lacey or Ms. Hopkins -- Mr. Lacey or

21  Ms. Hopkins there, or both, at your meeting?

22  A.  The 15th, I believe they were both there.

23  Q.  How long was your meeting with Cochi?

24  A.  It was approximately the same time, you know,

25  an hour and a half to two hours, approximately two

1  hours.

2  Q.   He didn't have a lawyer at that time, did he?

3  A.   No, he did not.

4  Q.   In fact, to your knowledge, he still doesn't

5  have a lawyer?

6  A.   Correct.

7  Q.   Now, the information that you have about the

8  location of the cars -- the locations of the cars

9  at the Food City, I want to talk about that.

10       There's an aerial photograph that depicts what

11  Yovani is telling you are the locations of the

12  Cadillac and the Ford; correct?

13       And I forget the exhibit number, but it's an

14  aerial photograph.  Do you recall that?

15  A.   The one for Jorge.  I think you said Yovani

16  but Jorge.  Yes, that's correct.

17  Q.   Sorry.

18       So Cochi tells you where the cars are at the

19  Food City?

20  A.   Yes, yes.

21  Q.   In that aerial photograph?

22  A.   Yes.

23  Q.   How many planes were flying over -- FBI

24  surveillance planes were flying over Tucson that

25  day involved in this particular operation?

1  A.   From my understanding now two.

2  Q.   Okay.  Did you think it was just one?

3  A.   Yeah, I did.  I thought -- I didn't know that

4  they had that many up.  I thought it was just one.

5  Q.   Okay.  And the Food City parking lot was

6  really not a main focus of the FBI, other than you

7  had, I guess, it was Fernandez and Sharkey on, you

8  know, two of the four sides of the parking lot,

9  kind of waiting to see who showed up?

10 A.   The first part, is it the main focus, I would

11 say, yeah, it was, and then the second part was how

12 they were lined up.  I think that's correct as

13 well.

14 Q.   And you weren't planning on making any arrests

15 at anyone who showed up at the Food City, were you?

16 A.   Not initially, no.

17 Q.   Okay.  I want to jump back here just a little

18 bit.  Mr. Cooper brought it up, the clothing and I

19 believe there was some hats that were obtained.

20      None of them had any writing on them that said

21 "Security" or "Police" or "FBI" or anything like

22 that.

23      Would you agree?

24 A.   Yes, I'd agree with that.

25 Q.   There was a Diamondbacks hat --

1  A.   Correct.

2  Q.   -- and a scary mask, but that's really about

3  it.

4  A.   As far as, yeah, no police attire.

5  Q.   Right.  And aside from -- I mean, there's

6  nothing -- there was no -- absolutely no indication

7  of anyone trying to impersonate a law enforcement

8  officer.  There is no evidence of that located in

9  either of the cars.

10     Would you agree with that?

11  A.   The bulletproof vests can.  I would say it

12  leans towards it, not totally like a cop in a

13  uniform, but I would say a bulletproof vest can go

14  along those lines.

15  Q.   Well, those were camouflage and a khaki green

16  color; right?

17  A.   Yes.

18  Q.   Like a soldier would wear, not what a police

19  officer would wear.

20  A.   Well, the green -- our FBI bulletproof vests

21  are green.

22  Q.   They are?

23  A.   Yes.

24  Q.   Do you have one?

25  A.   Yes, I do.

1    Q.   Yours is green too?

2    A.   Yes.

3    Q.   All right.  You would agree, though, that the

4    soldiers, they wear camouflage, and they also wear

5    green camouflage bulletproof vests; would you not?

6    A.   Yes.

7    Q.   I believe it was -- was it Mr. Sharman or

8    Fernandez who said that the FBI had limited

9    resources available to monitor this observation.

10   One of those, somebody from FBI said that.

11        Would you agree with that?

12   A.   Yes, I remember that.

13   Q.   Now, you're the FBI; right?

14   A.   Well, I work for the FBI.

15   Q.   Well, yeah.  You're one of -- not yet, you're

16   not the FBI.

17   A.   Not -- no, right.

18   Q.   You handed $75,000 to a confidential informant

19   for essentially two months' worth of work; right?

20   You handed him 75,000 cash?

21   A.   He was paid $75,000 for his work, yes.

22   Q.   And he got another 34, almost $34,000 for some

23   moving expenses; right?

24   A.   Like 33 and change, something like that,

25   right.

1  Q.   $33,000 for some moving expenses?

2  A.   Correct.

3  Q.   You've got an office here full of FBI agents.

4  You've got a lot of FBI agents in Tucson; right?

5  A.   I think agents, there's approximately 80 FBI

6  agents in Tucson.

7  Q.   And I bet you've got more up in Phoenix.

8  A.   Yes, we do.

9  Q.   How many up in Phoenix?

10  A.   Agents?

11  Q.   Right.

12  A.   Just agents, I think there's, oh, probably

13  double Tucson, right around 150, 100, somewhere in

14  there.

15  Q.   And you've got two planes in the air, more

16  than you even realize.

17  A.   Right.

18  Q.   If you really wanted to know who was at the

19  Food City warehouse, you could have put more

20  resources out there, don't you think?

21     I'm sorry.  I misstated that.  The Food City

22  parking lot.  If you really wanted to know who was

23  going to the Food City parking lot, you -- there's

24  bodies available, FBI bodies available to get out

25  there and do more thorough surveillance.

1    Would you agree with?

2  A.   That we had essentially everybody out there

3  that we could from -- we could draw from.  We had a

4  lot of people out there that day.  Almost everybody

5  in our office and a few from Phoenix.  It was a lot

6  of people.

7  Q.   But there was really just two watching the

8  Food City parking lot?

9  A.   That was the surveillance.  That was their

10  approach.

11  Q.   And they didn't see Miami in the parking lot?

12  A.   No, they did not.

13  Q.   And they did not see Cochi in the parking lot?

14  A.   Not at the Food City, no.

15  Q.   Just a few more questions here.

16    Tony, he testified that, you know, he's been

17  doing -- been working for the FBI and before that

18  for the DEA for a number of years, and he just

19  happened to be having a conversation with a

20  coworker, I guess an employee of his, Roberto --

21  A.   Correct.

22  Q.   -- about ripping off stash houses.  The

23  subject just sort of came up.

24    Is that -- am I mistaking that?

25  A.   I don't know if the -- how the subject came

1  up, but the subject came up, if I remember right,

2  about drugs, and then it went on into the stash

3  house and robbing -- or home invasions.

4      I think initially it was about Roberto selling

5  drugs, and then it went into the home invasion.

6  Q.  So Tony's version of events is he tells you

7  that, my employee tells me he likes to -- you know,

8  he does sell drugs, and then in a short order

9  they're talking about ripping off a stash house?

10 A.  Something like that, like Roberto doesn't like

11 to work or something like that, and then something

12 develops.

13 Q.  Something every employer want to hear.

14 A.  I don't know about that.

15 Q.  You didn't know Tony before, I guess it was,

16 October of 2008 -- of '11?  Sorry.  I'm getting

17 that all wrong.

18     You met him a couple months before this

19 situation occurred; right?

20 A.  Yes.

21 Q.  Okay.  And you were introduced to him by Agent

22 Rubicalva; correct?

23 A.  Yes.

24 Q.  And when you heard that this was -- when Tony

25 came to you or came to Rubicalva and told you the

1   story about how it was that, you know, he had a --

2   some Mexican -- had he a Mexican rip crew ready to

3   go, were you suspicious about all, based upon how

4   he told you the information had come to them?

5      Did that sound fishy to you at all?

6   A.  No.

7   Q.  So I just want to -- before we finish this up

8   here, see if I understand the whole Tony's --

9   Tony's plan, all right, about how to -- how to get

10   everybody arrested on that day, March 2nd, 2011.

11      He's going to tell them to go to the Food City

12   parking lot, right, and then from the Food City

13   parking lot, he's going to get everybody who's

14   going to participate in the home invasion to the

15   warehouse a couple miles away.

16      That's correct?

17   A.  Yes.

18   Q.  And that's his idea or that's something you

19   two worked on together?

20   A.  Jerry and myself worked out a lot of it, and

21   then we also have to include Tony into that,

22   because he's part of the investigation, and you

23   know, we can give him the foundation, and he's --

24   it's up to him to try and work with it when he gets

25   out there and meets them.

1  Q.   And at the warehouse, there are two guns.
2  There's a .45 and a .380; correct?
3  A.   Correct.
4  Q.   And Tony had told people that there were two
5  guns in the house, this fake house, you know, fake
6  house with two fake guns with a bunch of fake
7  cocaine.
8       Was there fake meth there or not?
9  A.   I think there was.  They had indicated there
10 might be some meth at some point that was
11 mentioned.
12 Q.   And a fake person to kidnap was also at the
13 house, and a fake 3 or $700,000 also at the house;
14 right?
15 A.   Yes, that the buyer was coming, yes.
16 Q.   But there was a reward out for El Azul at the
17 time, wasn't there, a $5 million reward?
18 A.   That's correct.
19 Q.   That's the only part of this that's
20 legitimate; right?
21 A.   As far as the sting or the story?
22 Q.   Right, right.
23 A.   Yes.
24 Q.   I'm not saying you're not legitimate, no.
25      The only part of Tony's story that had any

1   truth to it at all was the reward, the $5 million
2   reward?
3   A.   I don't know if it's exactly 5 million now,
4   but I think that it's -- that's accurate.
5   Q.   I got off course a little bit.
6        So the plan was to -- he's telling folks
7   there's two guns at the house, the fake house.
8   A.   Yes.
9   Q.   All right.  And we also heard during the
10  course of the trial that the cocaine, I believe it
11  was from Cochi, that half of it was going to go to
12  the black crew; correct?
13  A.   Correct.
14  Q.   That's a lot; right?  I mean, any idea -- any
15  idea what the value of a load of cocaine like that
16  would be, if in fact, it existed?
17  A.   For -- for 65 kilos?
18  Q.   Or 50, or whichever, whichever there wasn't.
19  A.   Depending, you know, a million.
20  Q.   All right.
21  A.   Over a million dollars.
22  Q.   So the Mexican guys are looking to hand half a
23  million dollars or half -- half of their take to
24  the black crew, who they don't -- they don't even
25  know was in the Food City; right?

1    A.   I would say, well, that's wrong.  They do know

2    that they're in the Food City.

3    Q.   They weren't in the Food City -- what's the

4    earliest that they were -- according to the

5    confidential source and the information we heard,

6    what's the earliest that they were at the Food

7    City?

8    A.   Well, when they come back into the

9    warehouse -- well, the earliest, yeah, right when

10   Chivo gets in the car with them and says, they're

11   all here.

12   Q.   Okay.

13   A.   They're all here, five cars, 15 people.

14   Q.   Let me put it this way.  At 2:05, or I guess

15   maybe it was 2:06 -- excuse me.

16        It was just before two o'clock when Gollito is

17   sent back to the Food City to get everybody who's

18   going to participate in the rip crew; right?

19   Gollito made that trip; right?

20   A.   Yeah, at least the individuals, I think the

21   way that it was worded was, at least the

22   individuals that I met in Phoenix.

23        We wanted to get all the people into the

24   warehouse.  That was the goal.  And I believe Tony

25   said on the recording it's at least the individuals

1  that I met in Phoenix.

2  Q.  So Gollito is tasked with bringing back the

3  persons who were going to be -- everybody was going

4  to participate in the crew, and now you're saying

5  that maybe it wasn't everybody.  It was just the

6  people that they met up in Phoenix, a more

7  exclusive group.

8  A.  He didn't -- yeah, he didn't bring back the

9  entire group that was going to participate, just

10  some of them.

11  Q.  Well, he didn't bring back all the people that

12  were in Food City.  That's right?

13  A.  Correct.

14  Q.  And the plan was from Tony the snitch, did you

15  understand there was any ambiguity with what he was

16  telling Gollito about who to bring?  Bring back the

17  crew.  Bring back the people.

18  A.  At least the people that I met in Phoenix.

19  Q.  Is that what you heard on the transcripts?

20  A.  That's what I recall.

21  Q.  So would you agree that, shortly after 2:24,

22  folks take off out of -- and 2:24 is when the

23  warehouse is arrested -- folks go scattering out of

24  the Food City.  According to Cochi, Cochi, he took

25  off and beat it to wherever he went; right?

1   A.   Well, it was after that, whenever Herminio or

2   the brother-in-law came back.

3   Q.   And he -- Cochi said he told Miami, hey, let's

4   get out of here; right?

5   A.   He walked past Miami's vehicle and told Miami

6   to include the other individuals that were in the

7   Escalade and Expedition.

8   Q.   And the nine black men in the two cars stayed

9   in the Food City for 15 minutes or so, didn't they?

10   A.   Well, they left at 2:34.

11   Q.   Another 10 minutes?

12   A.   Yeah, some -- yeah.

13   Q.   They left. And then they returned. I mean,

14   you know, 45 minutes later or so. I don't want to

15   misstate the time, but they actually went back;

16   correct?

17   A.   They went back at 3:12.

18   Q.   So they were there twice. Everyone else has

19   scattered. Everyone else had either been arrested

20   or scattered, and they're there back in the Food

21   City.

22   A.   Right.

23           MR. ARMSTRONG: Thank you. Nothing

24   further.

25                 CROSS-EXAMINATION

1  BY MR. YOUNG:

2  Q.  Sir, there were a series of searches of the

3  Escalade and the Expedition; is that right?

4  A.  That's correct.

5  Q.  There was an initial search incident to arrest

6  when the BORTAC team stopped the vehicles and was

7  securing the weapons?

8  A.  Correct.

9  Q.  And earlier I think there was what you

10  described as an inventory search, which was when

11  the tow truck operator, assisted by the Phoenix

12  Police Department, found -- I think it was the

13  revolver in a glove compartment?

14  A.  Yeah.  Well, that was right -- I think that

15  was found right about the time of the incident to

16  arrest.  They were going to throw those out for the

17  inventory search.

18  Q.  And the inventory search is what happens when

19  the tow truck driver wants to know what's in the

20  vehicle and the police want to know what's in the

21  vehicle before they have it towed?

22  A.  I think, yeah, part of the tow truck driver

23  policy is, yeah, he doesn't want to have any

24  dangerous items or anything in there when he tows

25  it, so he probably does his own search as well.

1  Q.  And the tow truck operator, he took that to
2  your impound place?
3  A.  Initially he took those vehicles to the Casa
4  Grande border patrol station.
5  Q.  And then from there they wound up in an
6  impound yard place?
7  A.  Yeah, then they were towed to our FBI lot.
8  Q.  And then you went out and you got a search
9  warrant for those vehicles, and you came back with
10  your proverbial fine-toothed comb?
11  A.  We came back and searched those vehicles.
12  Q.  And you would have gone through them very
13  thoroughly?
14  A.  You try.  You try and be thorough, yes.
15  Q.  Looking for hair evidence, fiber evidence,
16  just --
17  A.  It depends on the case, not necessarily always
18  are you looking for trace evidence or DNA
19  evidence.  That's not necessarily always the case.
20  Q.  At the end of it all, there were a number of
21  weapons that were recovered?
22  A.  Yes.
23  Q.  And one of those weapons was the Kel-Tec .223
24  that we've been talking about?
25  A.  Yes.

Q.   And that particular weapon had a 30-round
magazine with 24 rounds in it?

A.   I believe that's correct.

Q.   And that particular weapon had no spare
magazine; right?

A.   Correct.

Q.   There was an AR-15 .223 which had a 20-round
magazine with 20 rounds in it; is that correct?

A.   I know that there was a magazine and 20
rounds.  They use the same ammunition.  I'm not
sure if the magazines are interchangeable or not.

Q.   There was also a Norinco MAK-90 Sporter AK-47
that had 22 rounds in a 30-round magazine?

A.   I believe that is correct.

Q.   And that magazine is certainly not
interchangeable with the other weapons?

A.   It's not.

Q.   There was no spare magazine for the AK-47, was
there?

A.   No.

Q.   So there were three rifles and there were
three magazines, two of which were partially empty?

A.   They weren't completely full, no, they were
not.

Q.   You're an optimist, aren't you?

1  A.  Well, yeah.  I didn't go there all the way,

2  but yeah.  I would say they're more full than they

3  are empty.

4  Q.  Okay.  So being an optimist, if you and I were

5  going to battle with the Sinaloa cartel, I'm

6  looking at this, and I'm thinking my magazine's

7  half empty, and you're thinking it's half full?

8  A.  I wouldn't go up against the Sinaloa cartel

9  with just two guys and two guns.  I wouldn't do

10 that.

11 Q.  No.  We'd have spare magazines, wouldn't we?

12 A.  If I was going to go up against the whole

13 Sinaloa cartel, we'd want to have a better plan

14 than that.

15 Q.  If I was a DPS officer patrolling I-10, would

16 I have spare magazines?

17 A.  I would -- I'd venture to say you should, yes.

18 Q.  Along those lines, there was also a Ruger nine

19 millimeter that also had no spare magazines and no

20 spare nine millimeter bullets anywhere in either

21 vehicle?

22 A.  Correct.

23 Q.  There was a Taurus Millennium .45 that also

24 had no spare magazine and not a single spare .45

25 bullet in either vehicle?

1   A.   Correct.

2   Q.   There was a Glock 17.  Again, no spare

3   magazine, and we already said not a single spare

4   nine millimeter bullet in either vehicle?

5   A.   I believe that's correct.

6   Q.   There was a CZ 75 nine millimeter.  It had no

7   spare magazine and no spare bullets?

8   A.   Correct.

9   Q.   The Colt Python .357, I think we covered there

10  were no spare speed loaders, but there was one

11  spare .357 bullet someplace in the Escalade?

12  A.   Right.

13  Q.   And you found that loose bullet, or was that

14  the tow truck driver?

15  A.   That was Scott Hunter after when it was towed

16  back to the FBI office.

17  Q.   That was part of the inventory search?

18  A.   I believe that's correct, yes.

19  Q.   And there was also seven spare .223 rounds

20  someplace in the Escalade?

21  A.   Yes.

22  Q.   And do you recall where those were under the

23  seats in the --

24  A.   I believe it was the center console.

25  Q.   Center console?

1  A.  Yeah.

2  Q.  Those were loose?  They weren't in a box or

3  anything?

4  A.  Correct, they were loose.

5  Q.  You heard testimony from the CI, Tony

6  Gutierrez, that the blacks had both vests and

7  goggles?

8  A.  Yes.

9  Q.  And I believe that you mentioned in your

10  search warrant affidavits that the blacks were

11  alleged to have both vests and goggles?

12  A.  Yes.

13  Q.  So goggles was certainly something that you

14  were looking for when you were serving those search

15  warrants?

16  A.  Yes.

17  Q.  Did you find any goggles?

18  A.  No.

19  Q.  What happened to the goggles?

20  A.  I don't know.

21  Q.  Well, it looks like the vests and the goggles

22  went two different directions, doesn't it?

23  A.  I can't answer that.  I don't know.

24  Q.  Does it make sense that somebody would ditch

25  the goggles and keep the vests?

1    A.    Yeah, I couldn't understand that.  If that did

2    happen, I don't know.

3    Q.    It would make more sense for somebody to ditch

4    the vests and keep the goggles?

5    A.    I guess.  I don't know.  I wouldn't --

6    Q.    The vests could be very well illegal for some

7    people to possess?

8    A.    I don't know that.  I'm not sure.

9    Q.    You testified a few moments ago that Miami was

10   outside Food City, I think in the four-door sedan,

11   and he was warned by Jorge that the people at the

12   warehouse had been stopped.

13   A.    Yes.

14   Q.    And Jorge was pretty clear that initially he

15   only said they were stopped, not arrested.

16   A.    I can't remember how he differentiated.

17   Stopped, caught, arrested, something along those

18   lines is how I remember it.

19   Q.    In any case, the testimony was that Jorge had

20   somehow warned Miami and that the window was down

21   on the Escalade and that the Escalade had heard the

22   warning as well?

23   A.    I believe that's correct.

24   Q.    Now, when Miami heard that the people were

25   stopped, that meant something to Miami, didn't it?

1  A.  I don't know.

2  Q.  He turned off his phone and was never heard

3  from again, was he?

4  A.  I don't know if he turned off his phone.

5  Q.  Did you have any further -- were you able to

6  locate him by -- if he turned his phone back on,

7  you would have located him immediately, wouldn't

8  you have?

9  A.  If that was an investigative technique that I

10  was going to try and use to locate him.

11  Q.  So he likely turned off his phone and threw it

12  away?

13  A.  I would say that's a possibility.

14  Q.  You could certainly find somebody by using

15  their cell phone, couldn't you?

16  A.  Yes.

17  Q.  That cell phone just keeps track of where you

18  are and where you've been and --

19  A.  Some cell phones, if they have the GPS locator

20  capability.

21  Q.  And even if they don't have the GPS on them,

22  the cell phone company knows what towers you're

23  closest to and can triangulate you pretty good?

24  A.  It can come close without that, depending on

25  the GPS towers, if it's single-cell tower, there's

1  -- you can use more than one cell tower to
2  triangulate the location, but single-cell towers
3  can just give you an area, so you can know the
4  general area, but you're not going to know exactly
5  where they are.
6  Q.   In any case, by the time you caught up with
7  the vests, they were no longer in proximity to the
8  goggles?
9  A.   I didn't find any goggles.
10  Q.   You testified a little bit earlier that you
11  did some DNA testing in this case.
12  A.   I did not submit any items myself for DNA
13  testing.
14  Q.   Well, somebody sent some of these items to the
15  Phoenix Police Department crime lab, didn't they?
16  A.   Not these items.
17  Q.   Was there some testing done on some of the
18  rounds that were in some of the magazines to see
19  who had loaded those magazines?
20      If you don't know, you can say you don't
21  know.
22  A.   I think you're confusing two different things.
23  Q.   Okay.  Tell me.
24      MR. LACEY:  May we be seen at sidebar,
25  Your Honor?  I think it's necessary.

1      (The following proceedings occurred at the

2      bench.)

3      MR. LACEY:  That door is going to open the

4  November incident and I didn't want him to go into

5  it without knowing he's going to step in it.

6      The DNA was tested back in the November

7  incident at Mayco's house.  There was DNA testing

8  done by the Phoenix Police Department regarding

9  items taken at that time in November, not in our

10  case.

11      He's going to -- I want him to know what

12  he's going to do if he goes through that door.

13  That's why we're here.

14      THE COURT:  Did you get it?

15      MR. LACEY:  There was no DNA testing in

16  this case.  The November incident by the PPD,

17  that's where the DNA was done.  If you want to go

18  there, have at it.

19      MR. YOUNG:  The disclosure is a jumble.

20      MR. COOPER:  I just saw bullets were

21  tested.

22      THE COURT:  Now you know.

23      While I've got you here, how much longer

24  do you think you've got?

25      MR. YOUNG:  It feels like 15 minutes, Your

1  Honor.

2          THE COURT:  How much redirect do you think

3  you've got?

4          MR. LACEY:  20 minutes maybe.

5          THE COURT:  And then you're going to

6  rest?

7          MR. LACEY:  Yes.

8          THE COURT:  Okay.  We'll keep going then.

9          (End of bench conference.)

10          THE COURT:  You may continue Mr. Young.

11  BY MR. YOUNG:

12  Q.   The vests I understand were never submitted

13  for DNA testing?

14  A.   Correct.

15  Q.   And the zip-ties, I take it, were never

16  submitted for DNA testing?

17  A.   Correct.

18  Q.   Whose DNA was on the ski mask?

19  A.   That wasn't submitted for DNA testing.

20  Q.   Were any hairs taken out of the ski mask to

21  see who had been wearing it?

22  A.   No.

23  Q.   I've got a note here that there were a sweater

24  and some hooded sweatshirts that were taken into

25  evidence, and I think we have them in the

1 courtroom.

2 A.  Yes, right there.

3 Q.  And those were the same sweaters and hooded

4 sweatshirts that people were seen wearing at the

5 Circle K in Phoenix?

6 A.  I believe so.

7 Q.  There has been a lot of testimony regarding a

8 gentleman named Miami.

9 A.  Yes.

10 Q.  His name comes up a lot?

11 A.  Yes.

12 Q.  And his name came up a lot during the course

13 of the investigation?

14 A.  Yes.

15 Q.  In fact, Tony Gutierrez told us that Miami was

16 actually Mayco's roommate?

17 A.  I'm not sure.  I don't remember if he said

18 that or not.

19 Q.  Miami's house, Miami's residence, was the

20 residence on Chipman Avenue?

21 A.  Chipman, yes.

22 Q.  And that was the residence that the Cadillac

23 drove back to after the February 4 meeting; is that

24 right?

25 A.  The Cadillac CTS, yes, not the Escalade, but

1    the car drove back to that address.

2    Q.    Right.   The Cadillac sedan CTS?

3    A.    Correct.

4    Q.    The CI, Tony, he described several phone calls

5    in which Miami was identified as going to be part

6    of the home invasion crew.

7    A.    I remember Miami's name being mentioned as

8    someone that was going to be here.

9    Q.    Let me help you.

10   A.    Okay.

11   Q.    He described a call in which Chilango said

12   that Chivo, his boss, Mayco and Miami would be

13   doing the ripoff.

14   A.    Okay.

15   Q.    I know he described a call on March 2nd in

16   which Chilango asks the CI about Miami, who he

17   describes as tall, clumsy, and black.

18   A.    Okay.

19   Q.    At Bates page 8120, there was a phone

20   conversation in which Chilango told the CI with

21   certainty that Miami was there with Mayco because

22   they're not answering their phones.

23   A.    Yes.

24   Q.    And I think that conversation was late in the

25   evening?

1    A.    Correct.

2    Q.    And so even late in the evening, Miami's not

3    turning his phone back on, is he?

4    A.    I'd say, yeah, according to that, he's not

5    answering or his phone's not on, one of the two.

6    Q.    Either that or he's run battery down?

7    A.    That's a possibility as well.

8    Q.    One possibility is he threw it away and he's

9    never going to use that phone again.

10   A.    Sure, yes.

11   Q.    We spent a lot of time going over phone

12   records in this case.  There were no conversations

13   between Jerome Ranger -- no phone calls between

14   Jerome Ranger and any of the Mexican codefendants,

15   were there?

16   A.    Yes, there were.

17   Q.    Except for the two-second call with Mayco.

18   A.    I mean, there's a lot -- I'd like to refer to

19   the chart if we're going to go over it that way.

20   It would be much easier for me to make sure I'm

21   going to be accurate.

22   Q.    Well, let me back it up little bit.

23   A.    Okay.

24   Q.    There were no telephone contacts between

25   Jerome Ranger and Gollo?

1  A.   I don't think so, but to be accurate, I would

2  like to look at the phone chart.

3  Q.   You'd need charts?

4  A.   To make sure, for accuracy purposes, yes.

5  Q.   I don't have charts.

6       There was -- the guy with all the columns of

7  numbers, he did identify one contact between Jerome

8  Ranger's telephone and Mayco's telephone very early

9  in the morning of February 4?

10 A.   Yes, I remember that.

11 Q.   And that was a two-second contact?

12 A.   I believe that's correct.

13 Q.   And after that, nothing further.

14      I have charts.  Would you like to look at

15 them?

16 A.   Sure.

17           THE COURT:  Take your time, Mr. Young.

18           THE WITNESS:  If he puts them up there, I

19 could take a look at it pretty quick.  If it's 113

20 or 114, I'm not sure what you're referring to.

21           MR. YOUNG:  113 and 114 are both in

22 evidence; right?

23           THE COURT:  Yes.

24           MR. YOUNG:  Then the jury has charts too.

25           THE WITNESS:  Okay.

1     THE COURT:  Do you want her to pull them
2  up, Mr. Young?
3     MR. YOUNG:  No, that's okay, Your Honor.
4  Thank you.
5  BY MR. YOUNG:
6  Q.   The meeting at the warehouse was for several
7  reasons, you testified?
8  A.   Yes.
9  Q.   And one of the reasons was obviously to lock
10  the people who were going to do the job inside of
11  the warehouse for you?
12  A.   Well, that was where we were going to arrest
13  them.
14  Q.   And Mayco, he turned out to be pretty fast.
15  He actually went through the glass and got out into
16  the parking lot as the entry team was coming in
17  through the side door?
18  A.   Yes.
19  Q.   Another reason for the home invasion was to --
20  or for the meeting at the warehouse, rather, was to
21  get everyone together and show them the pictures of
22  the CI's supposed cousin, who the CI supposedly did
23  not want injured?
24  A.   That was one of the reasons, yes.
25  Q.   Would it be fair to say that part of the

1  investigative plan was that you wanted to know if

2  all these guys were in on the plan, and part of the

3  way that you were going to determine that was when

4  they looked at the map and looked at the picture of

5  the cousin, and that's how you would know if they

6  were really going to carry out this home invasion.

7     Would that be fair to say?

8  A.  That was part of it, yes.

9  Q.  And part of what you were doing with the

10  warehouse was you wanted the CI to make sure that

11  everybody that was there, that they understood what

12  they were going to be getting into; right?

13  A.  That was part of it, yes.

14  Q.  And so that's why you had the CI, Tony

15  Gutierrez, get everyone over to the warehouse?

16  A.  That was part of the plan, yes.

17  Q.  And you didn't tell Tony Gutierrez to get part

18  of the people over to the warehouse?

19  A.  We told him to try and get as many of the

20  people as he could in the warehouse.

21  Q.  And he never told them to bring just the

22  people that he saw in Phoenix over to the

23  warehouse?

24  A.  I think that was one of the comments, that he

25  wanted to see everybody, and then at least the

1  people that he saw, that he had met in Phoenix.

2  Q.   That's what he told us in court; right?

3  A.   I believe that's -- it's on the recording as

4  well.

5  Q.   The recording, he's asking to see everybody,

6  isn't he?

7  A.   He says that in addition to at least the

8  people he met in Phoenix.

9  Q.   Now, while they are at the warehouse, the CI

10  told everyone that five more people with guns had

11  come over?

12  A.   Yes.

13  Q.   And at that point, a couple of the people,

14  Chivo and Yovani, wanted to think about this some

15  more?

16  A.   I think they wanted to -- they needed to plan

17  it out.  They needed to plan it out further.

18  Q.   They didn't want to just go running in without

19  a plan; right?

20  A.   That's fair to say.

21  Q.   Let me ask you about those white gloves.

22        There is a photograph that's in evidence, and

23  I don't have the number with me, but that's all

24  right.

25        There's a photograph of Jerome Ranger at the

1  cash register, and the white gloves are on the

2  counter.

3  A.   Yes.

4  Q.   There's also at least two other people in the

5  background in that photograph.

6  A.   I believe that's correct, yes.

7  Q.   And there are cartons of Orange Crush being

8  purchased?

9  A.   I think —— yeah, there was the two 12-packs in

10 the background as well.

11 Q.   And there's PowerAid that was purchased

12 moments earlier?

13 A.   I believe, yeah, PowerAid.  PowerAid was

14 purchased.

15 Q.   And they had paid for gas for vehicles?

16 A.   I believe that's correct.

17 Q.   There was no photograph of Jerome Ranger

18 taking those gloves off of the glove rack, was

19 there, off of the glove display?

20 A.   No.

21 Q.   And there was no photograph of anyone bringing

22 those gloves across the floor and putting them to

23 the cashier, was there?

24 A.   I believe there was.  I don't know —— in the

25 video clip, it's in the clip.

Q.   Okay.

A.   The photograph is right after Jerome hands them to the cashier and she scans them.

Q.   So we don't know who took those gloves off the rack?

A.   I don't know who took them off the rack, no.

Q.   And we don't know who brought those gloves across the store?

A.   I'm not sure where they were taken from in the store, so I don't know if it even would have gone across the store.  I don't know where the gloves were taken from.

Q.   Okay.  So they might have started out right there by the cash register?

A.   It's possible.

Q.   You don't know who handed those gloves to Jerome?

A.   No, I do not.

Q.   And you don't know who presented the money that paid for them?

A.   I believe it was -- I have to look at the video for sure, but I believe it was Jerome Ranger that paid for that.

Q.   Supposing that he did pay for those gloves -- we'll, imagine it.  Tell me about those gloves.

1   What size are they?

2   A.   I don't know exactly what size they are.

3           MR. LACEY:  Which pairs do you want?  The

4   Circle K ones or the other ones?

5           MR. YOUNG:  The white gloves.

6           (Off the record.)

7           MR. LACEY:  Exhibit 24.

8           MR. YOUNG:  May I approach, Your Honor?

9           THE COURT:  You may.

10          THE WITNESS:  Okay.

11  BY MR. YOUNG:

12  Q.   And what size are those gloves?

13  A.   Large, medium, small.

14  Q.   Large, medium, and small?

15  A.   Yes.

16  Q.   And what color are those gloves?

17  A.   White.

18  Q.   Okay.  They're the white gloves; right?

19  A.   Yeah.

20  Q.   What kind of -- what kind of jobs require a

21  person to wear white gloves, besides miming?

22          MS. HOPKINS:  Objection, Your Honor.

23          THE COURT:  Besides what?

24          MR. YOUNG:  Miming.

25          THE COURT:  Miming?

1        MS. HOPKINS:  Objection, Your Honor.

2        THE COURT:  Overruled.

3   A.   It could be used for a number of jobs.

4   Q.   White gloves specifically?

5   A.   Yeah.

6   Q.   Now, white gloves are not what your entry

7   teams normally wear?

8   A.   FBI, like, SWAT entry teams?

9   Q.   Yes.

10  A.   No.

11  Q.   They kind of like black gloves better for that

12  kind of thing?

13  A.   I'm not sure which kind of gloves they use,

14  but I doubt that they're going to be, like, a

15  cotton string glove like this.

16  Q.   You've been moved a couple of times.

17  Obviously you used to so work in Seattle, and then

18  you used to work in Montana?

19  A.   Yes.

20  Q.   And you moved to Tucson?

21  A.   Yes.

22  Q.   And when you got here, you had a moving

23  company that brought you; right?

24  A.   Yes.

25  Q.   And when the moving company packed you up,

1  what did the movers wear on their hands?

2  A.   I don't think they even used gloves.

3  Q.   They went through all your stuff and packed it

4  up with no gloves?

5  A.   Most of the stuff I know my wife packed up

6  because she wanted to make sure that she packed it

7  right, so she packed up a lot of it.  So I don't

8  remember -- I don't remember that, but I remember

9  the movers, when we came here to Tucson, unloading

10  the stuff did not have gloves.

11  Q.   And there was testimony that Mr. Ranger worked

12  for a moving company, if I understood right.

13  A.   Yes.

14  Q.   And that was part of his interview when he was

15  arrested by the FBI?

16  A.   Yes.

17  Q.   The agent who interviewed him, one of the

18  questions was, where do you work, and it was for a

19  moving company?

20  A.   Yes.

21  Q.   And if you're working for a moving company and

22  packing up people's houses, gloves is something

23  that maybe not everybody but some people might want

24  to wear?

25  A.   I'd say that would be fair.

1  Q.  If you have to pick up things like the couch
2  and the refrigerator, you might want gloves?
3  A.  Yes.  That would be fair to say.  Some people
4  may want to use them.
5  Q.  If you have to clean out underneath other
6  people's things and take all that stuff with you,
7  you're going to want gloves?
8  A.  I would say that some people may want to use
9  gloves, yes.
10  Q.  Everything's got to go in a house; right?
11  Even a toilet brush, it's all got to go.
12  A.  If you're moving out totally, I would say,
13  yeah, you want to move out, move all your stuff
14  out, yes.
15  Q.  And so gloves might be something that a moving
16  company employee would wear when they're moving?
17  A.  If he's moving, that could be something that
18  could be part of his attire, yes.
19  Q.  And if he has employees that work for him, he
20  may supply them with gloves as well?
21  A.  It's a possibility.
22  Q.  And if somebody is not packing up their own
23  dishes and their own linens and things but the
24  moving company is doing it, the movers would want
25  to use gloves that are obviously very clean while

1  they're touching linens and touching dishes; is

2  that right?

3  A.   That could be possible.  I'm not -- I'm not

4  for certain, but it could be possible, if you want

5  to use gloves to fold linens or something.  It's

6  possible is all I could say.  It could be possible.

7  Q.   I'm just asking.  I've never used a moving

8  company.

9  A.   I never have either.

10  Q.   There was a meeting on February 4 that was in

11  Phoenix?

12  A.   Yes.

13  Q.   And the confidential informant described the

14  black person that he was introduced to at the

15  meeting, described him as being from Tucson?

16  A.   I remember something like that being said,

17  yes.

18  Q.   And in fact, that's even part of the recorded

19  conversation, is he's from Tucson?

20  A.   I believe that's correct, yes.

21  Q.   We may have already covered this, but Ghermon

22  Tucker is not from Tucson; correct?

23  A.   He's from Phoenix.

24  Q.   Now, I think there was mention that Ghermon

25  Tucker's car was at the meeting?

1  A.  I think there was also mention that he was at
2  the meeting.  His car was there and he was there.
3  Q.  Well, his car went back to Miami's house?
4  A.  After the meeting, yes.  He drove that car
5  back to Miami's house.
6  Q.  Your surveillance team didn't get a picture of
7  that happening, did they?
8  A.  No.
9  Q.  So we're relying on Tony's recollection?
10  A.  That was part of it, yes.
11  Q.  Whoever was at the meeting clearly did not
12  speak Spanish, did they?
13  A.  It didn't appear that they spoke Spanish, no.
14  Q.  There was even an inquiry as to whether or not
15  that person spoke Spanish, and the answer was no,
16  he's black?
17  A.  Yes.
18  Q.  And there was a lot of fun that was had at the
19  expense of whoever was at the meeting?
20  A.  Yes.  There was laughter and derogatory terms
21  used, yes.
22  Q.  There was laughter and a lot of "monkey,"
23  "monkey," "monkey," "nigger," "nigger," "nigger,"
24  all in front of the person that was at the meeting?
25  A.  I don't think it was quite like that, but

1   there was some derogatory terms used, yes.

2   Q.   We covered this before.  There were two

3   different sets of information that Tony the CI was

4   getting.  One was that Chivo had told him on

5   February 22nd that Mayco and two blacks were going,

6   at page 7848.

7   A.   I'd have to see that.  I don't remember.  I

8   don't remember that, but I'd have to review it.

9   Q.   So you don't independently recollect that?

10  A.   Not right now at this time.

11  Q.   There was also considerable testimony that

12  there would be no blacks there at all, wasn't

13  there?

14  A.   Yes.  That was mentioned, that they would not

15  be participating and that they would and that they

16  wouldn't.  It went back and forth.

17  Q.   Chivo initially started out telling Chilango

18  that there would be a total of five people ripping

19  the load, at Jencks 437.

20  A.   Again, I don't remember that exact number.  I

21  remember they discussed numbers.  I don't remember

22  that exact number.

23  Q.   On February 22, there was a meeting that the

24  CI testified to where it was made quite clear that

25  the blacks were out.

1    A.    Which recording was that?

2    Q.    February 22.

3    A.    Oh, okay, yes.  It didn't sound like they were

4    at that meeting.  That's correct.

5    Q.    In fact, at that meeting, at page 7892, Gollo

6    told the CI and Chivo that he was not going to take

7    niggers.

8    A.    I don't know if that's exactly what he said,

9    but I remember conversations along those lines.

10             MR. YOUNG:  May I approach the witness,

11   Your Honor?

12             THE COURT:  You may.

13   BY MR. YOUNG:

14   Q.    Okay.  You've had a chance to refresh your

15   recollection?

16   A.    Yes.

17   Q.    And that was Gollo's statement, was it not?

18   A.    Yes.

19   Q.    "I'm" -- thank you.  "I'm not going to take

20   niggers"?

21   A.    Yes.

22   Q.    That was GGR, Gregorio Guzman-Rocha?

23   A.    Correct.

24   Q.    Also known to us as Gollo?

25   A.    Yes.

1   Q.  Gollo's son, younger, is Gollito.

2   A.  Yes.

3   Q.  And at the February 22 meeting, Gollo said

4   that his son Gollito would be in charge in Tucson?

5   A.  Yes.

6   Q.  Gollito said on the phone to the confidential

7   informant at 11:47 on March 2 with Chivo present,

8   he told the CI Tony that his father did not send

9   the black dudes.

10  A.  Correct.

11  Q.  There were two guns that were seized at the

12  warehouse?

13  A.  Yes.

14  Q.  One was a .45 and one was a .380 auto?

15  A.  Yes.

16  Q.  There was also testimony from the CI that

17  Chilango had told him that Chivo had obtained an

18  AK-47, that the guys from Sinaloa had good weapons

19  as well?

20  A.  Yes.

21          MR. YOUNG:  That's all I have, Your Honor.

22          THE COURT:  Ms. Hopkins.

23                  REDIRECT EXAMINATION

24  BY MS. HOPKINS:

25  Q.  Was there a reason why surveillance was

1  initiated quite a distance away from the 2/4

2  meeting location?

3  A.   Yes.

4  Q.   And what was that reason?

5  A.   It was the first meeting that we were going to

6  have with these guys, and there was no reason to

7  try and alert anyone that was going to that meeting

8  that any type of law enforcement was around or that

9  there was a any type of law enforcement presence or

10  involvement.

11      We wanted them to feel clean.  We didn't want

12  anything to stick out.

13  Q.   Why didn't you send the guns or the ballistic

14  vests or the gloves out for DNA testing?

15  A.   Because the weapons were in the vehicle.

16  Essentially those individuals were caught with

17  those items.

18  Q.   Now, during the course of your investigation,

19  did you learn what types of weapons would be used

20  for the home invasion?

21  A.   Yes.  There was some mention of weapons.

22  Q.   What -- which weapons were mentioned?

23  A.   I recall -- I remember AK-47 being mentioned.

24  Q.   And were the only two guns that were found at

25  the warehouse small handguns?

1  A.  Yes.

2  Q.  And did you also have knowledge that

3  bulletproof vests would be used?

4  A.  Yes.

5  Q.  Were there any bulletproof vests found in the

6  warehouse or in the Nissan Murano?

7  A.  No.

8  Q.  Now, I'd like to turn your attention to

9  fingerprints.

10     Were the guns sent out for fingerprints?

11  A.  Yes.

12  Q.  And what were the results?

13  A.  Negative results.

14  Q.  Now, in your experience as an agent, you don't

15  often get prints off of weapons, do you?

16  A.  It's very difficult.

17  Q.  And would any prints be left on weapons if

18  someone was wearing gloves?

19  A.  No.

20  Q.  And I'd like to give you a chance to explain,

21  because defense counsel didn't really give you that

22  opportunity, about the two vehicles.  I believe

23  there were two gray vehicles at the Food City.

24  A.  Yes, yes.

25  Q.  Do you want to go ahead and explain?

1    A.   Yes.   They're confusing the Buick LeSabre and

2    another gray car.   There's two cars that were

3    there.   One is a Volvo.

4            MR. COOPER:   Judge, I'm going to object to

5    him saying I'm confusing anything and --

6            THE COURT:   He cannot use the words that

7    you're confusing anything.   He can explain what he

8    means about the two cars.

9    A.   Well, there's -- there is a Buick LeSabre, and

10   the other one is a Volvo.   The Buick LeSabre

11   departs and the Volvo stays.   That's the vehicle

12   that Miami is in, is in the Volvo.

13   Q.   Now, you testified -- or actually, you

14   testified that there wasn't any surveillance

15   footage, whether it's photographs or aerial, of

16   Jorge stopping and talking to any individuals in

17   any of those vehicles, correct, at the Food City?

18   A.   There's no -- yes, correct.

19   Q.   And do you recall Jorge's testimony where he

20   said he -- as he was walking back from the Food

21   City, he -- what did he say as he was walking back

22   from the Food City?

23   A.   That I think it was the passenger side of the

24   gray car rolled a window down, and he told them

25   that they were either caught or had been arrested,

1  and --

2      MR. COOPER:  Judge, could I ask for

3  sidebar and approach, please?

4          (The following proceedings occurred at the

5          bench.)

6      MR. COOPER:  I'm going to object and ask

7  that his answers be stricken.  What happened is,

8  the snitch --

9      THE COURT:  Keep your finger down.

10     MR. COOPER:  Sorry.  The snitch they

11  decided not to call, Yovani, was talking about a

12  Volvo.  There is no testimony whatsoever,

13  including -- this agent never saw a Gold Volvo.

14         For him now to come to --

15     THE COURT:  Gray.

16     MR. COOPER:  Gold.

17     THE COURT:  He said gray, but anyway.

18     MR. COOPER:  For him now to come in and

19  say -- and give this explanation that there was a

20  Volvo there when there is no testimony of it and he

21  never saw it is improper.  And Yovani is the one

22  that they were going to use to talk about a Volvo,

23  even though the agents never saw a Volvo, but he

24  can't give an explanation when there is no evidence

25  of it and he never saw it.

1    THE COURT:  All right.  Let's move on.

2    MS. HOPKINS:  All right.

3    THE COURT:  Let's move on.

4    (End of bench conference.)

5    THE COURT:  You may continue.

6  BY MS. HOPKINS:

7  Q.  Now, based upon your investigation in this

8  case, what time were the Mexican males at the

9  Circle K in Marana?

10  A.  The circle K in Marana, approximately

11  1:18 p.m.

12  Q.  Now, you were asked a lot of questions

13  regarding Jorge's travels back to Phoenix.

14    Do you recall that?

15  A.  Yes.

16  Q.  How far is it from where the stop took place

17  on I-10 to Riggs Road, where Jorge was stopped by

18  DPS?

19  A.  Approximately 26 miles.

20  Q.  And did you do a DPS or a GPS check to confirm

21  this?

22  A.  Yes, I looked -- I looked on the Internet and

23  did a -- the Google Map search.

24  Q.  Now, as to the February 4th meeting, did you

25  listen to those tapes?

1   A.   No.

2   Q.   Did you review the transcripts?

3   A.   I did.

4   Q.   And were you able to tell if there was more

5   than one conversation going on at a time?

6   A.   Yes.

7   Q.   And was there a conversation in English?

8   A.   Yes.

9   Q.   And was the conversation at the same time as

10  the conversation in Spanish?

11  A.   Yes.

12  Q.   Do you have any information that -- or were

13  you able to confirm any information that Miami and

14  Mayco are or were roommates?

15  A.   No.

16  Q.   And you testified that Miami lived on -- or

17  lives on Chipman Road?

18  A.   I linked him to that address.

19  Q.   Okay.  And there was a Cadillac CTS that went

20  to the residence on Chipman Road on February 4?

21  A.   Yes.

22  Q.   Was the vehicle that Mayco was observed in

23  returned -- was it -- was that vehicle observed at

24  the Chipman Road residence on February 4th, after

25  the meeting?

1    A.   I don't know if it was.  I don't believe that

2    that vehicle was observed there, or if it was, they

3    didn't get the tag again.

4    Q.   When people are conducting home invasions,

5    what's the purpose for wearing gloves?

6    A.   To not leave behind latent prints.

7    Q.   Do you recall defense counsel Brad Armstrong

8    asking you if you believed what Jorge told you?

9    A.   Yes.

10   Q.   Why do you -- why did you believe Jorge?

11   A.   His statement matches up with the

12   investigation, and during the course of the

13   interview, what he provided us, I was able to go

14   back and match up in the investigation, for

15   example, locations where people stopped, Circle

16   Ks.  All of that matched up with what he was

17   telling me.

18   Q.   Now, you were asked questions about whether or

19   not during the investigation you knew whether black

20   males would be involved and whether black males

21   would not be involved.

22        Do you recall that?

23   A.   Yes.

24   Q.   If I can have you take a look at what's been

25   admitted as Government's Exhibit No. 44-B.

1      Do you recognize this?

2   A.   Yes.

3   Q.   What is it?

4   A.   That's the 3/2 translation for the recording

5   that -- Tony had conducted that recording.

6   Q.   Okay.  If we can turn to page 19.  Just take a

7   look at this.

8      Who -- have you reviewed this transcript?

9   A.   I have.

10  Q.   And so where's -- if you can just take a look

11  at this, at what point -- it looks like there's

12  multiple people in this conversation?

13  A.   Yes.

14  Q.   Who is depicted in this conversation right

15  here on this page?

16  A.   The confidential human source, Gregorio Ruiz

17  or Gollito, and then Chivo.

18  Q.   And to your knowledge, did this conversation

19  at this point, was that taking place at the

20  warehouse on March 2nd?

21  A.   Yes.

22  Q.   Now, what does the highlighted section read?

23  A.   "Go ahead and bring those two, man."

24  Q.   And what was that in context to?

25  A.   To bring people back to the warehouse.

1  Q.  Okay.  If we can take a look at page 21, and
2  if you can just take a look at that.
3     What does that highlighted section read?
4  A.  "If you want, go ahead and bring Mayco and
5  Gordito so that I can give them that because I
6  don't want any bullshit.  This guy is going to come
7  right now."
8  Q.  And what is the context of this statement?
9  A.  It's about bringing people to the warehouse
10 again.
11 Q.  And to your knowledge, do you know who Gordito
12 is?
13 A.  That's how they refer to Andy Pineda.
14 Q.  Okay.  If you can take a look at page 23.
15    What does that highlighted portion read?
16 A.  "And so a lot of people came."
17 Q.  And who made that statement?
18 A.  Chivo.
19 Q.  Take a look at page 24.  And what does that
20 highlighted section read?
21 A.  The source is asking, "What about Mayco?"
22    And Chivo responds, "Well, he is going to give
23 Mayco some money too because he brought some people
24 with him."
25    And the CHS responds, "Did he bring the nigger

1   who went over there?"

2       Chivo responds, "I think so."

3   Q.   And when he was talking about the N word that

4   went over there, what's the context of that

5   meeting?

6   A.   He's talking about the February 4th meeting.

7   Q.   Take a look at page 25.

8       Can you tell us what this conversation says

9   right here in the highlighted portion?

10  A.   Page 22?

11  Q.   22 -- well, yeah.  That's correct.

12          THE COURT:  It's both 25 and 22.

13          MS. HOPKINS:  Yeah, yeah.  It's 25 in the

14  computer, 22 on the actual transcript.

15  A.   Okay.  CHS asks, "Which car did Mayco bring?"

16      And Chivo responds, "I don't know, man.  I

17  didn't see him.  All he told me was we're all

18  here.  Everyone is parked here at the Food City."

19  Q.   Page 34.  Now, who -- you see a highlighted

20  portion.  Who is speaking at this point?

21  A.   Mayco Ledezma or Seco.

22  Q.   So at this point, to your knowledge, has

23  Gollito gone back to the warehouse and picked up

24  additional people?

25  A.   Yeah.  He had left the warehouse, went back to

1  Food City, and has returned back to the warehouse

2  now.

3  Q.  And what does this highlighted portion read

4  that Mayco is saying?

5  A.  It says, "I'm going to talk to" -- and then

6  it's unintelligible.  "I'm going to be in charge of

7  the people."

8  Q.  And lastly, if you could just take a look at

9  page 40, which is 37 on the transcript.

10     It appears that Mayco is talking again?

11 A.  Yes.

12 Q.  And what does he say?

13 A.  "But they're going to show the picture to all

14 those guys right now."

15 Q.  And what is he referring to?

16 A.  He's referring to he's going to show other

17 individuals involved in this the photograph of the

18 cousin.

19 Q.  And when -- after the arrests the photograph

20 of the cousin was recovered?

21 A.  Yes.

22 Q.  And where was it recovered from?

23 A.  From Mayco Ledezma.

24     MS. HOPKINS:  May I have one moment, Your

25 Honor?

```
 1              THE COURT:  You may.

 2              MS. HOPKINS:  No further questions.

 3              THE COURT:  Jurors, place your questions

 4    in writing, if you have any.

 5              Counsel?

 6              (The following proceedings occurred at the

 7              bench.)

 8              THE COURT REPORTER:  I can't hear you.

 9              MR. YOUNG:  I was pointing out that of

10    course I didn't know that DNA was in a developing

11    case.  They crossed out the number on the report.

12              THE COURT:  Okay.  It's not your fault.

13    You're okay.  It's not your fault.  You're okay.

14              We have several questions to talk about.

15    How far is your meeting?

16              MR. ARMSTRONG:  TMC.  I'm counting on the

17    doctor being a few minutes late, I guess.

18              THE COURT:  "What are the gun laws in

19    Arizona on carrying a gun in your car concealed or

20    in the open?"

21              There are no gun laws in Arizona.

22              THE COURT:  "Seco tells Medina the

23    Mexicans have been arrested.  What evidence

24    supports the communication of this fact to Seco and

25    who communicated it?"
```

1          I'm not going to ask that.

2          "Outside the warehouse, Mayco gets a call

3  off to who in Phoenix?"

4          I'll ask that, if he knows.

5          "Can you repeat who made it out from the

6  front door of the warehouse?"

7          Okay.  I'll ask that.

8          "Who is Mayco -- who is Mayco's brother-

9  in-law's name?"

10          I'll ask that.

11          "Zip-ties all prearranged.  Arranged for

12  what use?"

13          Do you know?

14          MR. YOUNG:  That would be speculation.

15          THE COURT:  I think it would be too.

16          MR. LACEY:  I'll let it go.

17          THE COURT:  I knew you would.

18          "What day of the week is 3/2/11?"

19          Okay.  I can probably find that out on the

20  calendar.  I may know too.

21          MR. LACEY:  I think he knows.

22          MS. HOPKINS:  He knows.

23          THE COURT:  "From your experience, why are

24  the gloves important, but in particular, why just

25  one glove?"

1    Because they lost the other one.  I'm not

2 going to ask that.

3    MR. LACEY:  Okay.

4    (End of bench conference.)

5    THE COURT:  The jurors have asked several

6 questions, some of which I will ask.

7    What day of the week is March 2nd, 2011?

8    THE WITNESS:  I believe it was Wednesday.

9 I believe it was Wednesday.  That's my best guess

10 at this point.  Tuesday or Wednesday.

11    THE COURT:  Do you have a calendar, Mo?

12    THE CLERK:  Yeah.

13    THE COURT:  It's a Wednesday.

14    Outside the warehouse, Mayco gets a call

15 off to who in Phoenix?

16    THE WITNESS:  From the investigation, I

17 believe it was a call off to one of his family

18 members.

19    THE COURT:  Can you repeat who made it out

20 the front door, the glass flap, at the warehouse.

21    THE WITNESS:  Mayco Ledezma-Prieto made it

22 out, and Gregorio Ruiz or Gollito made it out the

23 front door.

24    THE COURT:  What is Mayco's brother-in-

25 law's name?

1        THE WITNESS:  Herminio Bonilla.

2        THE COURT:  Those are the questions I'll

3  ask on behalf the jurors.

4        Ms. Hopkins, anything further?

5        MR. LACEY:  Your Honor, the United States

6  rests.  We have no further witnesses.

7        THE COURT:  Mr. Cooper, any further

8  questions of this witness?

9        MR. COOPER:  I'm sorry, no, no.

10        MR. ARMSTRONG:  No, thank you.

11        MR. YOUNG:  No questions, Your Honor.

12        MR. COOPER:  Well, actually, Your Honor,

13  can we approach?  I might, but I want to ask the

14  Court something first.

15            (The following proceedings occurred at the

16            bench.)

17        MR. COOPER:  This goes to my motion for

18  mistrial, which is that the Government asked him to

19  please explain the two cars in the parking lot, and

20  I should have objected right then, but the answer

21  that he gave was absolutely something he doesn't

22  know other than from the snitch Yovani about a gold

23  Volvo.

24        He never saw a gold Volvo, so he gave an

25  answer that is not in evidence.  I want to ask him

1  that now, but you know, basically it goes to a

2  witness that he never called.

3       THE COURT:  Well, if you ask him the

4  question now, it gives more credibility to that

5  particular statement, but I can make that --

6       MR. COOPER:  Well, I'd move for a mistrial

7  based on that answer, because the whole issue is

8  what the informant the Government is relying on,

9  Cochi, is claiming, and what he claimed is, there

10 was a car that was parked next to the Escalade

11 and --

12      THE COURT:  And an Expedition.

13      MR. COOPER:  And we have these people

14 leaving at 2:20.  There is no other testimony about

15 another car except with him all of a sudden

16 explaining, yeah, there's a second car when there

17 is no evidence of it, no testimony of a Volvo.

18 There's nothing in the surveillance reports, and

19 they didn't call Yovani, who was going to talk

20 about a Volvo.

21      THE COURT:  I will grant you the first

22 time the Volvo shows up is just a few moments ago.

23 He doesn't -- you guys kept talking about a Kia.

24      MR. COOPER:  Right, and I knew about the

25 Volvo because that's what Yovani was going to say.

1    MR. LACEY:  Your Honor, I don't know.  I

2  have to talk to Ms. Hopkins about this topic, but I

3  think about the car, the Volvo, I don't know what

4  the source of information is, if it's based upon a

5  statement or not.

6        Counsel is suggesting that it is.  That

7  may not be.  I don't know.  I'd have to talk with

8  the agent about it.

9        MR. COOPER:  But the agent doesn't know.

10  That's the problem.

11        THE COURT:  I'm not going to grant your

12  motion for mistrial.

13        MR. COOPER:  Again?

14        THE COURT:  Do you want to ask him any

15  other questions?  I'll let you think about it until

16  next week.

17        MR. COOPER:  Okay.

18        (End of bench conference.)

19        THE COURT:  You may step down.

20        THE WITNESS:  Thank you, sir.

21        MR. LACEY:  Your Honor, at this time -- I

22  announced prematurely, but we have no further

23  witnesses.  That's it.

24        THE COURT:  We're going to -- you may have

25  thought something was up when we went through the

1  lunch hour in the first place, and something was

2  up.  I knew we'd finish at about this time, so

3  we're going to stop for the day.

4          We're not going to reconvene until Tuesday

5  at 9:30.  All right.  Tuesday at 9:30.  Tuesday at

6  9:30.

7          No research, investigation, Twittering,

8  Tweeting, Facebook, whatever.  Don't do it.  See

9  you Tuesday at 9:30.

10          (The jury exits the courtroom.)

11          THE COURT:  Counsel, we'll meet on Monday

12  at three o'clock.

13          Mr. Cooper, do you want your client

14  present?

15          MR. COOPER:  Let me ask, Judge.

16          THE COURT:  We're going to be talking

17  about jury instructions at that point.

18          MR. COOPER:  He knows instructions but not

19  jury instructions, so he'd prefer not to be here.

20          THE COURT:  Okay.  Mr. Tucker, you don't

21  want to be here?

22          DEFENDANT GHERMON TUCKER:  No, sir.

23          THE COURT:  Mr. Ranger, do you want to be

24  here?  (This is Ja'Cory.)

25          DEFENDANT JA'CORY RANGER:  I think I'll

1    waive my presence, if that's all right with the

2    Court.

3            THE COURT:  It's okay with me.

4            MR. YOUNG:  Jerome Ranger will waive his

5    presence as well.

6            THE COURT:  All right.  So it will be me

7    and the lawyers.  We'll meet here in the courtroom,

8    three o'clock on Monday.

9            MR. COOPER:  I just need to find out

10   where -- are they going back to CCA or --

11           THE COURT:  They should be going back to

12   the same place they've been all work.

13           MR. COOPER:  FCI.  Okay.

14           THE COURT:  All right.  Thank you.

15           Oh, counsel, if you need any particular

16   instruction, if it's one of the normal Ninth

17   Circuit instructions, just give me the number.  I

18   don't need you to reproduce the instruction.  If

19   it's -- if it's something other than that, I need

20   you to reproduce the whole thing, but I think I

21   have most of the Ninth Circuit stuff covered

22   anyway, but just in case.

23           (Proceedings concluded in this matter.)

24

25

C E R T I F I C A T E

I, Erica R. Grund, do hereby certify that
I took the machine shorthand notes in the foregoing
matter; that the same was transcribed via computer-
aided transcription; that the preceding pages of
typewritten matter are a true, correct, and
complete transcription of those proceedings
ordered, to the best of my skill and ability.

Dated this 2nd day of January, 2013.


s/Erica R. Grund
Erica R. Grund, RDR, CRR
Official Court Reporter