1        IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3   UNITED STATES OF AMERICA

4   vs.                           CR-11-1013-TUC-RCC

5   GHERMON LATEKE TUCKER, et al.,

6
         Defendants.
7   _____

8                                  August 21, 2012
                                   Tucson, Arizona
9

10

11

12

13                  JURY TRIAL

14                   DAY TEN

15      BEFORE THE HONORABLE RANER C. COLLINS
              UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22   Court Reporter:        Erica R. Grund, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24

25     Proceedings prepared by computerized realtime
                      translation

A P P E A R A N C E S

For the Government:      James T. Lacey
                        Kimberly E. Hopkins
                        Assistant U.S. Attorneys


For Ghermon Tucker:     Dan Cooper
                        Cooper & Udall PC


For Jerome Ranger:      Stephen Jonathan Young
                        Williamson & Young


For Ja'Cory Ranger:     Bradley James Armstrong
                        Armstrong Law Office

EXAMINATION INDEX

PHILLIP HOLGUIN
     DIRECT BY MR. YOUNG . . . . . .   8
     CROSS BY MR. LACEY . . . . . . .  18
     REDIRECT BY MR. YOUNG . . . . .  29

1  P R O C E E D I N G S

2         THE COURT:  Mr. Lacey wanted to bring

3  something to my attention.

4         What's that, Mr. Lacey?

5         MR. LACEY:  Yes, Your Honor.  As to Counts

6  3 and 4, the gun violations, when you look at the

7  jury instructions, --

8         THE COURT:  I combined the instruction.

9         MR. LACEY:  I know you did, but I think

10  it's confusing, at least it would be to the jury.

11         Two questions.  One, you said it

12  yesterday, and I think missed it.  Will they get

13  indictment and will they get the jury instructions?

14         THE COURT:  They'll get the jury

15  instructions.

16         MR. LACEY:  What about the indictment?

17         THE COURT:  They can have the indictment.

18         MR. LACEY:  I just wanted to make sure.

19  Okay.  Just covering the bases.

20         When you look to counts -- the jury

21  instruction, the defendants are charged in Counts 3

22  and 4 of the indictment with possession of a

23  firearm in furtherance of, you have first, the

24  defendant committed the crime of conspiracy to

25  possess with intent to distribute as charged in

```
 1    Count 1 or attempting to possess in Count 2;
 2    second, the defendant knowingly possessed -- then
 3    the weapons; third, the defendant possessed the
 4    firearms in furtherance of the crime of
 5    conspiracy.
 6            And I think what we should put in there,
 7    Count 1 should be inserted reference --
 8            THE COURT:  Add Count 1 by conspiracy?
 9            MR. LACEY:  Yes.  I'm just trying to
10    keep --
11            THE COURT:  And Count 2 by attempt?
12            MR. LACEY:  Yes.  I'm just trying to keep
13    it simple.
14            THE COURT:  Actually, you're confusing it.
15            MR. LACEY:  Well, I'm confusing myself,
16    but I don't want to confuse the jury.
17            THE COURT:  I don't think they're going to
18    be confused.
19            MR. LACEY:  Okay.
20            THE COURT:  I really don't.
21            MR. LACEY:  Well, I'm just -- I'm a simple
22    guy.
23            THE COURT:  Okay.  Mr. Young, you had some
24    witnesses you were going to call; is that correct?
25            MR. YOUNG:  That's right, Your Honor.
```

1     THE COURT:  Are they in the courtroom?

2     MR. YOUNG:  They are in the waiting room.

3     THE COURT:  Okay.  Mr. Cooper, you said

4  you had no witnesses?

5     MR. COOPER:  That's correct.

6     THE COURT:  I'll have you rest in front of

7  the jury.

8     Mr. Armstrong, you said you had no

9  witnesses.  I'll have you rest in front of the jury

10  also.

11     MR. ARMSTRONG:  Thank you.

12     THE COURT:  All right.

13     MR. COOPER:  I have one quick question.

14  After the testimony, will there be a slight break?

15     THE COURT:  Yes.

16     MR. COOPER:  I need a couple of exhibits

17  from Maureen.

18     THE COURT:  Yes, we'll take a slight

19  break.

20     (The jury enters the courtroom.)

21     THE COURT:  Good morning.  Show the jurors

22  returning back to the courtroom, the presence of

23  all counsel and the defendants.

24     At the conclusion of testimony on Friday,

25  the Government rested.  Is that correct, Mr. Lacey?

1    MR. LACEY:  That is correct, Your Honor,
2    we did.
3    THE COURT:  Mr. Cooper, any witnesses you
4    wish to call at this point in time?
5    MR. COOPER:  Your Honor, we rest.
6    THE COURT:  Mr. Armstrong?
7    MR. ARMSTRONG:  Mr. Ranger rests.
8    THE COURT:  Mr. Young?
9    MR. YOUNG:  I'll call Phillip Holguin,
10   Your Honor.
11   THE COURT:  All right.  Ask Mr. Holguin to
12   come in.
13         PHILLIP HOLGUIN, WITNESS, SWORN
14   THE COURT:  Sir, the Rule has been invoked
15   in this case.  That means, except during the time
16   that you're testifying, you must remain outside the
17   courtroom, and you're only allowed to discuss your
18   testimony with the attorneys involved in the case.
19   Do you understand?
20   THE WITNESS:  I do.
21   THE CLERK:  Please state your name for the
22   record and spell your lasts name.
23   THE WITNESS:  Phillip Holguin,
24   H-o-l-g-u-i-n.
25   THE CLERK:  Thank you.

1          THE COURT:  You may proceed Mr. Young.

2                    DIRECT EXAMINATION

3    BY MR. YOUNG:

4    Q.   Sir, what kind of work do you do?

5    A.   I work in the moving business.

6    Q.   And what business do you work for now?

7    A.   American Eagle Van Lines?

8    Q.   You're currently working for American Eagle

9    Van Lines?

10   A.   Correct.

11   Q.   Where were you working March 2nd of last year?

12   A.   For First Choice Moving and Storage.

13   Q.   And what was your position there?

14   A.   I was the sales manager there.

15   Q.   Do you know Jerome Ranger?

16   A.   I do.

17   Q.   Do you see him in the courtroom today?

18   A.   Yes, he's over there.

19   Q.   And could you tell me what he's wearing?

20   A.   He's wearing a blue shirt, oxford shirt.

21             MR. YOUNG:  May the record reflect that

22   the witness has identified Mr. Ranger, sir?

23             THE COURT:  He has some glasses; right?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Yes, it may so reflect.

BY MR. YOUNG:

Q.   Was Mr. Ranger working for you at that time?

A.   Yes, he was.

Q.   He was under your supervision?

A.   That's correct.

Q.   How long had you been working at First Choice Moving at that point?

A.   I had been working there since June -- no, no, May of '06.

Q.   And how long had Mr. Ranger been working there?

A.   Maybe since July of '07 or '08.  I don't recollect which year.

Q.   Had he been working there for a number of years?

A.   Yes.

Q.   Do you recall if he was working the morning hours March 2nd of 2011?

A.   Yes.

Q.   How do you recall that?

A.   Because he didn't come in the next day.

Q.   What was his job on March 2nd?

A.   He's a sales representative.

Q.   And as a sales repetitive, what does he do?

A.   He does a lot.  They do estimates.  They do

1  estimates over the phone, in home, mainly make

2  phone calls, but you know, at times they, depending

3  on what time of year, they go out to do, you know,

4  -- I'm sorry.  They go out to do jobs on site.

5  Q.   As a sales representative, is he working

6  hourly or how is he paid?

7  A.   No, he's a 1099.

8  Q.   By 1099, is that independent contractor?

9  A.   That's correct.

10  Q.   But he still comes into the office to work?

11  A.   Yes.

12  Q.   Is there a time card that he gets when he

13  comes into the office?

14  A.   No.

15  Q.   Is it possible to look at the work that he's

16  done and verify that he was actually working on

17  March 2nd of 2011?

18  A.   Yes, it is.

19  Q.   I'm going to ask you to take a look at what's

20  been marked as Exhibit 150.  It's not yet admitted,

21  so it will not be published, and I'll ask you if

22  you recognize what that is.

23  A.   This is a log for accounts that he's pulled.

24  That's basically a log for -- this is what -- the

25  leads that he's pulled.

1  Q.   How do leads come into the office?

2  A.   Well, basically the company purchases leads

3  from different lead providers online.  People go to

4  web sites, van lines.com, movers.com, et cetera.

5           THE COURT:  You have to speak up a little

6  bit.

7           THE WITNESS:  Excuse me.

8  A.   People go to online web sites like

9  vanlines.com or movers.com, and we as a company

10  purchase them within a certain area that we

11  service, and they come in, and he's able to pull

12  them.

13  Q.   Now, the parent company that you work for, is

14  that located in Arizona or is that in a different

15  state?

16  A.   That I currently work for?

17  Q.   That you used to work for.

18  A.   That is based here in Arizona.

19  Q.   That's First Choice Moving?

20  A.   That's correct.

21  Q.   The leads that they're getting, do they come

22  from a different state?

23  A.   Well, again, it comes from online, so if

24  someone is trying to move from Arizona, I take it

25  they just go to vanlines.com, I don't know exactly

1 where they're located or whatever web site,

2 movers.com or 123movers, and then that company

3 sends that information to us, to the service areas

4 that we service.

5     We service Washington -- well, we.  Not we.

6 When I was working for them, that company services

7 Washington, L.A., Arizona, Colorado, Texas.

8 Q.   Maybe I'm confusing the issue unnecessarily.

9     The question I have for you -- well, let's

10 start out with this.  Do you recognize what's been

11 marked as Exhibit 150 and is now on the Elmo?

12 A.   I do.

13 Q.   And what is that?

14 A.   These are leads that he pulled.

15 Q.   And are these leads that he pulled on March

16 the 2nd?

17 A.   Yes.

18     MR. YOUNG:  Move to admit Defense 150,

19 Your Honor.

20     MR. LACEY:  No objection.

21     THE COURT:  It can be admitted, can be

22 published.

23 BY MR. YOUNG:

24 Q.   And over on the right-hand column, there is

25 what I see as an open date; is that correct?

1    A.    That's correct.

2    Q.    And are these leads that Jerome Ranger opened

3    on March 2nd of 2011?

4    A.    That's correct.

5    Q.    Now, there's also a time with those leads.

6    Can you tell me if that is Arizona time or if that

7    is East Coast time?

8    A.    This would be East Coast time because this --

9    it works off the system, and the system is a Granot

10   moving system.

11   Q.    When you say the system, whose system is that?

12   A.    The software system that we have, it's a

13   moving software that we have called Granot, and

14   Granot is based on the East Coast, so that would be

15   East Coast time.

16   Q.    And in the wintertime, East Coast time is two

17   hours off Arizona time; is that right?

18   A.    That's correct.

19   Q.    So when we're looking at something that got

20   opened at 10:50, that's East Coast time, so that

21   would actually be 8:50 Arizona time?

22   A.    That's correct.

23   Q.    And if we're looking at something that got

24   opened at 11:57 East Coast time, that would

25   actually be 9:57 Arizona time?

1  A.   That's correct.

2  Q.   Does moving having a busy time of the year?

3  A.   Yeah.

4  Q.   When is the busy time of the year for movers?

5  A.   We're coming close to the end of it right now,

6  but basically the summertime is the busy time of

7  year.

8  Q.   People move during the summer?

9  A.   Yes.  Kids are out of school.  Families are

10 able to do things around that time.

11 Q.   You said that there are a number of things

12 that the sales representatives do.  Can you tell me

13 if they're sometimes involved in actual moves?

14 A.   They are.

15 Q.   And how do they become involved in the moves?

16 A.   Well, as a company, one of my jobs, one of the

17 things that I implemented was that our sales

18 representatives should go out and actually do the

19 moves.

20      There is a mandatory that they have to at

21 least do one week a year, but a lot of times,

22 especially during the slow season, during the slow

23 season, they go out to do it themselves as

24 training, to earn money, extra money outside of the

25 commission that they earn off the sale.

1  Q.  So you actually required your sales people to
2  go out and lift furniture?
3  A.  Yes.  That's probably the best way in order
4  for them to understand what happens outside in the
5  field, so that way, when they talk to a customer on
6  the phone, the customer knows, well, the
7  representative knows what the customer is asking.
8  Q.  And what do you expect them to learn from
9  lifting furniture?
10  A.  It's not just lifting furniture.  They have to
11  know how to protect it.  If there's cabinets that
12  have glass, they need to know how to protect that.
13  It's separate from blanket wrapping.  They need to
14  know how to pack items, whether it's a grandfather
15  clock, which is -- needs to be packed differently
16  from a regular wooden cabinet.
17        They need to know all that.
18  Q.  And you said during the slow season they can
19  earn extra money by being the actual movers?
20  A.  Yes, because they work off commission when
21  they do sales, but if they go out into the field
22  and do their own moves -- it doesn't have to
23  necessarily be their own move.  It can be anybody's
24  move that we're picking up as a company -- they can
25  earn extra money because it's slow.

1    Q.   If a job is their own move, will they

2    sometimes supervise one of their moves?

3    A.   They can.

4    Q.   And why would they do that?

5    A.   Well, if it's their customer, the customer may

6    feel -- it's just a little more comfortable, I

7    guess, for the customer.

8    Q.   Are some moves more complicated than others?

9    A.   Definitely.

10   Q.   Do people tip their movers?  Should people tip

11   their movers?

12   A.   Not everybody tips.  I believe if the company

13   does a good job, they definitely should be tipped.

14   Q.   So the guys are sometimes working for tips

15   too?

16   A.   Yes.  It's customary.

17   Q.   Tell me about gloves.  Do the movers sometimes

18   wear gloves?

19   A.   Yes.

20   Q.   And on occasion would they wear white gloves?

21   A.   Yes.

22   Q.   And why would they wear white gloves?

23   A.   For a number of reasons.  One, if it's a dirty

24   place, we would require everybody to wear gloves.

25   You know, sometimes people are hoarders.  Sometimes

1  people are elderly and they can't look after

2  themselves but they have pets, and pets -- there's

3  feces all over the place and urine.  We don't want

4  our movers touching that kind of stuff.

5  Q.   Do you have -- did you yourself institute a

6  white glove service?

7  A.   Yes.  We think that's a good service to have.

8  Q.   And is that something -- is that actually

9  something that costs extra?

10  A.   It is.  Basically, when we say white glove

11  service, you can also call it A to Z service, it

12  entails everything.  If you need -- a lot of times

13  people need to move fast and they don't want to do

14  anything.  You do everything for them, blanket

15  wrapping, shrink wrapping, disassembling,

16  assembling, loading, unloading, everything, taking

17  things off the walls, packing things, cleaning,

18  getting the place ready for the new tenants to come

19  in, absolutely everything.

20  Q.   So a clean pair of white gloves would not be

21  something unusual for your movers to use?

22  A.   Definitely not.

23          MR. YOUNG:  Can I have just a moment, Your

24  Honor?

25          THE COURT:  You may.

1       MR. YOUNG:  That's all I have for this

2   witness, Your Honor.

3           THE COURT:  Mr. Armstrong?

4           MR. ARMSTRONG:  Nothing.  Thank you, Your

5   Honor.

6           THE COURT:  Mr. Cooper?

7           MR. COOPER:  No, Your Honor.

8           THE COURT:  Mr. Lacey?

9           MR. LACEY:  Yes, Your Honor.

10                  CROSS-EXAMINATION

11  BY MR. LACEY:

12  Q.  Good morning.

13  A.  Good morning.

14  Q.  Sir, you've known Mr. Jerome Ranger for how

15  many years now?

16  A.  A lot of years.

17  Q.  More than five?

18  A.  Yes.

19  Q.  Socially as well as work-wise?

20  A.  Correct.

21  Q.  Fair to say you're friends?

22  A.  Yes.

23  Q.  What vehicle was Mr. Jerome Ranger driving

24  back in March of last year?

25  A.  He has a couple vehicles.  I wouldn't know

1   exactly.  Maybe the red truck.

2   Q.   Red Ford Expedition?

3   A.   Yes.

4         MR. LACEY:  We'd ask the witness be shown

5   Exhibit 61-E, as in Edward, please.

6         THE COURT:  If you look at the screen

7   you'll be able to see what he's talking about.

8   BY MR. LACEY:

9   Q.   Sir, it's not the greatest photograph on the

10  screen, but can you see Mr. Jerome Ranger in this

11  photograph wearing a dark shirt behind the two

12  fellows in the front?

13  A.   That would appear to be him.

14  Q.   And Exhibit 61-D, as in dog.

15        Can you -- if we focus in a little bit, does

16  that appear also, the fellow in the black shirt,

17  fourth one back in this picture, appear also to be

18  Jerome Ranger?

19  A.   I can't make it out the best, but I suppose I

20  would say yes.

21  Q.   When he's working for you, what kind of

22  clothes does he normally wear?

23  A.   He can come in -- as long as you've got shoes

24  on and a shirt and pants, you can --

25  Q.   No dress code?

1 A. No.

2 Q. Such as we have around here?

3 A. No.

4 Q. When he's going out and moving for the

5 company, does he wear a uniform?  Does he wear

6 street clothes?  What kind of clothes do the movers

7 or you all wear?

8 A. There's no uniform.

9 Q. Okay.  Would it be fair to say you've seen

10 Mr. Jerome Ranger in casual attire in the past?

11 A. Yes.

12    MR. LACEY:  We'd ask the witness be shown

13 Exhibit 67-A, please.

14 BY MR. LACEY:

15 Q. Can you identify this person?

16 A. That's Jerome Ranger.

17 Q. And the type of clothes he's wearing, have you

18 seen him wearing this kind of attire in the past?

19 A. Yes.

20 Q. And 67-B.  Can you identify this person for

21 us?

22 A. That's Jerome.

23 Q. You talked about some phone calls that were

24 made back in March, on March 2nd of last year.

25    Do you recall that testimony?

1   A.   Phone calls?

2   Q.   Yeah, from the work -- from the work site

3   location.  The records indicated 8:50:59 in the

4   morning, if you work on the local time, as opposed

5   to the eastern time zone; correct?

6   A.   That's correct.

7   Q.   And the second call was at 9:57 a.m.?

8   A.   That's correct.

9        MR. LACEY:  We'd ask the witness be shown

10  Exhibit No. 114, please.

11  BY MR. LACEY:

12  Q.   Sir, if you look down at 8:58 in the morning,

13  do you see that there, 8:58, where there is a

14  reference --

15  A.   I do.

16  Q.   And a reference to -- do you know Ja'Cory

17  Ranger?

18  A.   I do.  That's his brother.

19  Q.   Pardon?

20  A.   That's his brother.

21  Q.   And do you see him in court also?

22  A.   I do.

23  Q.   Wearing a blue shirt without glasses?

24  A.   He is right there, yes.

25  Q.   And sir, at 8:58 in the morning, these records

1    indicate an incoming call to Ja'Cory Ranger from

2    his brother Jerome Ranger, 8:58?

3    A.   Okay.

4    Q.   That would be approximately five minutes after

5    the phone call on your records, is that correct,

6    about 8:58 versus 8:50, the call from your

7    business?

8    A.   That's correct.

9            MR. COOPER:  Judge, I object.  I don't

10   believe there was testimony previously that there

11   was a phone call in the records.  I think he said

12   he opened, but there was no testimony about a phone

13   call.

14           THE COURT:  The objection is overruled.

15   BY MR. LACEY:

16   Q.   And if you look down to the following line, at

17   9:02 in the morning on March 2nd, did these records

18   indicate that a phone attributable to Jerome Ranger

19   called Ja'Cory Ranger at 9:02 a.m.?

20   A.   I see.

21   Q.   Do you see that?

22   A.   I do.

23   Q.   I want to direct you down to 9:46.  Do you see

24   that there?

25   A.   I do.

1    Q.   And do you see there, there is an incoming

2    call from Jerome Ranger to phone -- to Ja'Cory

3    Ranger's phone at 9:46 on March 2nd?

4        Do you see that there?

5    A.   I see an incoming call, yes.

6    Q.   I want to direct the witness' attention to the

7    next page of the same exhibit, 114, at 10:24 in the

8    morning.

9        Do you see that at 10:24?

10   A.   I do.

11   Q.   And that's a phone attributable to Ja'Cory

12   Ranger calling his brother Jerome Ranger; is that

13   correct?

14   A.   That's correct.

15   Q.   And skipping down to 10:26 in the morning,

16   it'll be an outgoing call, so Jerome Ranger's phone

17   calling a phone attributable to Ghermon Tucker, and

18   that's at what time?

19       Do you see that there in brown?

20   A.   Yes, at 10:26 a.m.

21   Q.   Okay.  If you skip down to 10:34 in the

22   morning on March 2nd, do you see that there, 10:34?

23   A.   I do.

24   Q.   The phone attributable to Jerome Ranger

25   calling Ghermon Tucker?  Do you see that there as

1   well for a two-minute-and-21-second phone call,

2   March 2nd?

3   A.   I do.  I do.

4   Q.   Now, you told us about a couple of phones

5   calls, and I'm not going to go through the rest of

6   the list with you, that took place at 8:50 and 9:57

7   in the morning at your business place; correct?

8   A.   No.  Those were leads that were pulled.

9   Q.   Okay.  And when you say leads were pulled,

10  where would the person, Mr. Jerome Ranger,

11  presumably, based upon those records -- is that

12  right?

13  A.   Correct.

14  Q.   Where would Mr. Jerome Ranger had to have been

15  in order to pull those leads?

16  A.   At his desk.

17  Q.   Okay.  And that's at your business in Phoenix?

18  A.   That's correct.

19  Q.   At what address?

20  A.   2804 North 29th Avenue, Phoenix 85009.

21  Q.   Now, do you monitor activities of your

22  employees, or are they on their own for whatever

23  work they want to do or not do?

24  A.   I monitor them to an extent.  If they're there

25  at the office, they're there.  Usually at around

1   two o'clock I would see what they've done.

2   Q.   Okay.  Do you know whether or not back on

3   March 2nd of last year Mr. Jerome Ranger came to

4   Tucson?

5        Do you know that?

6   A.   I do not.

7   Q.   Do you have any phone records other than the

8   two calls you've showed us back on March 2nd from

9   your business?

10        MR. COOPER:  Judge, I object again.

11   There's no testimony they were calls.

12        THE COURT:  I'll give you a chance to ask

13   him questions to clarify.

14   BY MR. LACEY:

15   Q.   Let's get that clarified.  Those two

16   references we had to leads at 8:50 in the morning

17   and 9:57, what does that mean?

18   A.   You pull a lead and you'll send an email out.

19   Q.   Okay.

20   A.   Hello, welcome, thank you for giving First

21   Choice the opportunity to service your move.  You

22   know, it's a greeting.

23   Q.   Okay.  And then after that particular phone

24   call or text message goes out, the greeting, what

25   happens next, or what happened based upon the

1    records that we looked at a few minutes ago?

2    A.    That just shows that he pulled.  That record

3    in particular didn't show anything else except that

4    he pulled.

5    Q.    And how long should it take to pull those two

6    leads that we talked about?

7    A.    Oh, a couple seconds.

8    Q.    And then after that, --

9    A.    You could send out an email.  You could give

10   the customer a call, if you like.  Different sales

11   people have different techniques, a different way

12   of handling.

13   Q.    Or on occasion other phone calls, as we've

14   seen from these charts, or engage in other private

15   activity outside of the business hours, the

16   business?

17   A.    If they wish.  They're 1099.

18   Q.    And when say "1099," meaning what?

19   A.    They are a self-contractor.

20   Q.    So if he wants -- somebody goes to your

21   office, checks in for a few seconds on some leads,

22   and then leaves and comes to Tucson, do you really

23   care?

24   A.    Yes, to an extent.

25   Q.    Well, you said a 1099, which means he's an

1    independent contractor?

2    A.   Well, yes.

3    Q.   So if they don't work, they don't get paid; is

4    that right?

5    A.   That's correct.

6    Q.   If they don't --

7    A.   If they don't -- he's a salesperson.  If he

8    doesn't sell something, he's not going to get paid.

9    Q.   Okay.  I want to direct your attention back to

10   114 again.  Second page.  Sorry.

11        Down towards the bottom, at 11:23 in the

12   morning -- do you see 11:23 there?

13   A.   I do.

14   Q.   And a phone attributable to Jerome Ranger

15   calling -- outgoing, calling Ghermon Tucker at

16   11:23.

17        Do you see that?

18   A.   I do.

19   Q.   And at 11:25, another phone call by Jerome

20   Ranger to Ghermon Tucker?

21   A.   I do.

22   Q.   The first lasting 36 seconds and the second

23   26?

24   A.   That's correct.

25   Q.   Have you ever been to the Circle K in Phoenix

1  on -- I think it's Broadway and 16th, roughly,

2  Circle K in Phoenix, Broadway and 16th Street,

3  approximately?

4  A.  Yes.

5  Q.  14-A.4, please.  I know this is not a great

6  photograph, but 14-A.4, can you identify Mr. Jerome

7  Ranger in this photograph to the left wearing a

8  baseball cap, the one you saw later in the day here

9  in Tucson at a Circle K?

10  A.  Yes.

11  Q.  Does that look like it's him?

12  A.  It's grainy again, but it -- knowing him

13  enough, that looks like him.

14  Q.  I want to direct your attention back to 114-A,

15  the third page, please.

16       The first number at 11:37 in the morning, do

17  you see a call from a phone attributable to Jerome

18  Ranger calling out to Ghermon Tucker at 11:37?

19  A.  I do.

20  Q.  And again, at 11:40, do you see a phone call

21  from a phone attributable to Jerome Ranger calling

22  Ghermon Tucker again?

23  A.  I do.

24  Q.  Lasting only five seconds.  The first one was

25  54.

1       And again, dropping down to 11:49 in the

2   morning, do you see another call by Jerome Ranger

3   to Ghermon Tucker lasting 33 seconds?

4   A.   I do.

5           MR. LACEY:  Nothing further.

6           THE COURT:  Mr. Young?

7                   REDIRECT EXAMINATION

8   BY MR. YOUNG:

9   Q.   Sir, you were just shown some exhibits that

10  were records of Jerome Ranger's cell phone

11  records.

12      Would you yourself have any knowledge of

13  Jerome Ranger's cell phone records?

14  A.   No.

15  Q.   And is that why you were looking kind of

16  perplexed?

17  A.   Possibly.

18  Q.   Does Jerome Ranger carry a cell phone with him

19  when he's at work?

20  A.   Most representatives do, yes.

21  Q.   I noticed you carry a cell phone.

22  A.   I do.

23          THE COURT:  It's not on right now, is it?

24          THE WITNESS:  No, I hope not.

25  BY MR. YOUNG:

1 Q. I notice that you're pretty attached to your

2 cell phone. In fact, you've usually got it in your

3 hand.

4 A. They were just doing an update this morning,

5 Verizon was, so --

6 Q. Other people in your office carry a cell phone

7 as well?

8 A. They do.

9 Q. And is it any surprise to you that Mr. Jerome

10 Ranger would be talking to his brother, Mr. Ja'Cory

11 Ranger, on March 2nd or any other day?

12 A. No.

13 Q. You were shown a picture of a Circle K.

14 Again, a perplexed look.

15 You were not at that Circle K that day; right?

16 A. No.

17 Q. And you were not shopping with Jerome Ranger

18 that day?

19 A. No.

20 Q. And just so I'm perfectly clear --

21 MR. YOUNG: Can we look at -- could we

22 publish 150 again?

23 THE COURT: 150?

24 MR. YOUNG: On the Elmo?

25 THE COURT: That's the one you had; right?

1      MR. YOUNG:  Yes.

2      THE COURT:  Just a second.  Let

3  everybody's monitor catch up.

4      Okay.

5  BY MR. YOUNG:

6  Q.   And Exhibit 150, the far right-hand column is

7  captioned "Open Date"?

8  A.   I'm sorry?

9  Q.   The far right-hand column --

10 A.   Yes.

11 Q.   And that is the date that the files are

12 opened; right?

13 A.   And it's the date that he pulled it, yes.

14 Q.   That's not necessarily a time that a phone

15 call was made, is it?

16 A.   No.

17 Q.   There are also some dates scheduled for

18 follow-up; is that correct?

19 A.   That's correct.

20 Q.   And would that follow-up be scheduled by

21 telephone or by email or do you know?

22 A.   That would be set by the representative

23 himself.

24      MR. YOUNG:  That's all I have, Your Honor.

25      THE COURT:  Mr. Armstrong?

1    MR. ARMSTRONG:  Nothing.  Thank you.

2    THE COURT:  Mr. Cooper?

3    MR. COOPER:  No, Your Honor.

4    THE COURT:  If the jurors have any

5  questions, please place them in writing.

6    It appears there are -- there's one.

7  Okay.

8    (The following proceedings occurred at the

9    bench.)

10    THE COURT:  "Is this application to pull

11  the calls available through a smart phone?"

12    "Is it email based?"

13    "Does the company have phones to use to

14  contact leads, or do they use their own cell

15  phone?"

16    Okay.

17    (End of bench conference.)

18    THE COURT:  I'm not sure if it's

19  somebody's writing or my eyes.

20    A couple of questions from a couple of

21  jurors.

22    THE WITNESS:  Sure.

23    THE COURT:  Is the application to pull the

24  leads available through a smart phone?

25    THE WITNESS:  Some.

1          THE COURT:  Is it email based?

2          THE WITNESS:  Is it email based?

3          THE COURT:  Yes.

4          THE WITNESS:  I don't understand the

5     question.

6          THE COURT:  That's the best I can do.

7          THE WITNESS:  It's an Internet-based

8     system.

9          THE COURT:  Okay.  Does the company have

10    phones to use to contact the leads, or do they use

11    their own cell phones?

12         THE WITNESS:  No, we have telephones.

13         THE COURT:  All right.

14         THE WITNESS:  I mean, a person could if

15    they wished to, if they weren't in the office, call

16    a customer if they need to or --

17         THE COURT:  Speak up so everybody can

18    hear.

19         THE WITNESS:  If you needed to, there's no

20    rule on where you can call from.

21         THE COURT:  All right.  Mr. Young,

22    anything further?

23         MR. YOUNG:  Nothing further, Your Honor.

24         THE COURT:  Mr. Armstrong?

25         MR. ARMSTRONG:  No, thank you.

1    THE COURT:  Mr. Cooper?

2    MR. COOPER:  No, Your Honor.

3    THE COURT:  Mr. Lacey?

4    MR. LACEY:  No, Judge.

5    THE COURT:  Thank you, sir.  You may step

6 down.

7    Any further witnesses, Mr. Young?

8    MR. YOUNG:  I'll rest Your Honor.

9    THE COURT:  Any rebuttal?

10    MR. LACEY:  No, Your Honor.

11    THE COURT:  Let's take about five

12 minutes.  Then we'll come back, and we'll prepare

13 for closing statements.

14    (The jury exits the courtroom.)

15    THE COURT:  And for the record, indicate

16 that, at the close of the Government's case,

17 Mr. Young, Mr. Armstrong, and Mr. Cooper each made

18 a motion for a Rule 29 directed verdict on behalf

19 of their client, which the Court denied.  I believe

20 it happened at sidebar.

21    And also indicate, at the close of all the

22 evidence, each attorney again renews that same

23 motion, which the Court renews its denial thereof.

24    MR. COOPER:  Thank you, Your Honor.

25    (Off the record.)

1          (The jury enters the courtroom.)

2          THE COURT:  Let record reflect the jury's

3    returned back to the courtroom, the presence of all

4    counsel and the defendants.

5          At this point in time we're now going to

6    begin with closing arguments in this case.  You'll

7    find that the Government will have a chance to

8    speak to you twice.  They'll have an opening

9    closing argument.  They'll have a rebuttal closing

10   argument.

11         The defense will only have a chance to

12   speak to you once.  That's because the Government

13   has the burden of proof, not to give them some sort

14   of unfair advantage.

15         You also may notice people in the

16   courtroom now who testified earlier in the trial as

17   witnesses.  Now that the case has been concluded

18   from an evidentiary standpoint, any witness who has

19   been put under the Rule can now come in and listen

20   to closing arguments if they wish to do so.  So if

21   you see a familiar face, that's why they're now

22   allowed to be in the courtroom.

23         What the attorneys have said in their

24   opening statements, what they're going to say in

25   their closing statements is not evidence.  It's

1    offered to help you understand their interpretation
2    of the evidence.  If they say something and it's
3    not the way you remember it, it's your memory that
4    controls, not theirs.  I'm sure that neither
5    attorney will intentionally misstate anything to
6    you.
7         At this point in time, Ms. Hopkins, on
8    behalf of the Government, you may begin with your
9    opening-closing statement.
10         MS. HOPKINS:  We've now come to that part
11   of the trial where the attorneys get to talk about
12   the evidence that's been presented during this
13   trial and the law that applies to this case, and
14   there was quite a bit of testimony and evidence
15   presented throughout the trial, and it was all
16   quite voluminous.  So on behalf of Mr. Lacey and
17   I, we thank you for your attentiveness during this
18   trial and for your copious note-taking that we did
19   see you do.
20         Now, from the beginning you've known that
21   this case involves four different crimes.  The
22   crimes are:  The first one is conspiracy to possess
23   with intent to distribute cocaine; attempt to
24   possess with intent to distribute cocaine; and two
25   counts of possession of firearms in furtherance of

a drug trafficking offense.

Now, in this case, the defendants, along with others, came to Tucson with the intent of committing a crime. And it doesn't matter that there wasn't a stash house, and it doesn't matter that there wasn't any drugs.

What matters is, they came to Tucson to rob what they believed was a stash house that they believed contained cash and cocaine. Now, let's take a minute to talk about the evidence. The evidence consists of testimony that you heard from the witness stand. It also includes recorded calls and meetings that you heard, the surveillance footage that you saw, and exhibits presented during the case.

The Government presented both direct and circumstantial evidence, and direct evidence is testimony of witnesses as to what they personally saw, heard, or did.

Circumstantial evidence is proof of one or more facts from which you could find another fact, and it's essentially like a puzzle piece. When put together, they show a fact.

Now what did we learn from the evidence that was presented in this case? And you may want

1  to consider taking notes, because especially when I
2  refer to exhibits, you can refer back to them
3  during your deliberations.

4      Now, at the beginning of the trial, you
5  heard from the source, and he explained how this
6  case began, and he testified that he was approached
7  by the FBI, and he was advised to keep his eyes
8  open regarding anyone involved in home invasions.

9      And in late December, the source had a
10 discussion with Roberto about home invasions, and
11 he testified that Roberto said that he used to rob
12 stash houses and that his friend Chivo had a crew.
13 Now, in January of 2011, Roberto introduced the
14 source to Chivo, and the three of them met in front
15 of a grocery store in Phoenix.  And Chivo told the
16 source that he robs houses, and then the source
17 told Chivo that he has access to a house in Tucson
18 that would have cocaine.

19     Now, after the meeting, the source
20 continued to talk to Chivo by phone, and they
21 decided to set up a meeting on February 4th, 2011
22 in Phoenix.

23     Now, that February 4th meeting was at
24 Chivo's workplace, and Chivo did maintenance work
25 for a trailer park.  The source recorded this

1  entire meeting, and the source testified in detail
2  about this meeting.  And you actually were able to
3  hear firsthand what happened in that meeting, and
4  that was at Exhibit 2-A.

5     So what happened at the meeting?  Well,
6  the source arrived at the trailer park, and Chivo
7  introduced him to Gollo.  The source told Gollo
8  that he rents houses in Tucson for a major drug
9  trafficker.  Gollo said home invasions are his
10  source of income.

11     So then the men walk into a little room,
12  and Gollo gets a phone call.  And you'll recall the
13  phone records from February 4th, and that was at
14  Exhibit 113.  The phone chart shows that Mayco
15  called Gollo six times between 11:34 a.m. and
16  11:53 a.m.

17     Gollo got a phone call when he was at the
18  meeting and had a guy on speakerphone, and you
19  heard a guy ask Gollo, and this was in Spanish, but
20  you heard him ask Gollo -- and now you can see it
21  on the screen, and I'll just state again that there
22  were six phone calls between -- or Mayco called
23  Gollo six times between 11:34 and 11:53 a.m.

24     So as I was saying, Gollo got a phone call
25  while he was at the meeting, and he had that phone

1  call on speaker, and the meeting was in Spanish,

2  and you could hear a guy ask Gollo, "Which

3  trailer?  Which trailer?  Are you in a trailer or

4  not?"

5          And after that last phone call at 11:53 in

6  the morning, a skinny guy walked into the room, and

7  that skinny guy introduced himself as Mayco.  And

8  shortly thereafter, a black male entered that

9  room.  Now, the black male wasn't introduced by

10  name, but the evidence demonstrates that it was the

11  defendant, Ghermon Tucker.  We'll come back to that

12  in a moment.

13          Now, what did they discuss at this

14  meeting?  Well, you heard that the source said that

15  65 kilograms of cocaine would be available, and the

16  source said that there would also be some meth.

17          And he testified that he said that so they

18  would think that there would be more money to be

19  made if they went in the stash house.

20          They also discussed how they were going to

21  split the proceeds.  The source was going to get 18

22  kilograms of cocaine, and Gollo, Mayco, and Chivo

23  all agreed to that.  And during the meeting, Gollo

24  said that both the Mexican and black males would be

25  involved, and Gollo also said in Spanish, but you

saw the translation, he said, "You just show us the house and we'll take it from there."

Now, you also heard Mayco and a black male talking to each other in English, and the meeting, again, was mostly in Spanish, but a few of the key words, the English words that you heard, were "65," "birds," and, "I rent houses." And the source testified that birds was a code word or another word for cocaine.

Now, back to Ghermon Tucker. How do we know that he was at the meeting? Well, first his Cadillac CTS was observed at the meeting location, and you heard testimony from Special Agent Edwards that the FBI was conducting surveillance of the February 4th meeting location, and both ground and aerial surveillance units were monitoring the meeting that day.

And ground units were tasked with following the cars from the meeting location to identify the people at the meeting. And they were still in the early stages of the investigation at that point, so they conducted surveillance from a distance so not to be made and compromise the investigation.

Now, agents followed one or more vehicles

1  after that meeting, and you heard testimony from
2  Special Agent Howell.  He testified that he
3  followed a Cadillac CTS to a residence on Chipman
4  Road in Phoenix, and he obtained the license plate
5  for that Cadillac CTS, and a records check revealed
6  that that Cadillac belonged to Ghermon Tucker.  And
7  the records did come into evidence for the
8  registration check for that vehicle, and that was
9  at Exhibit 51.
10     Second, we know that he was at the meeting
11 because the source positively identified Ghermon
12 Tucker as the black male that was present.  On
13 February 14th, 10 days after the February 4th
14 meeting, the source met with FBI, and Agent Edwards
15 had obtained a driver's license photo of Ghermon
16 Tucker, and the source was shown that photo, and
17 you can see it on your screen right now at Exhibit
18 4-A.
19     The source identified the person in that
20 photo as the black male at the meeting.  And the
21 source was able to get a good look at him.  He
22 testified that he was about three to four feet from
23 Tucker during the meeting.  The source also
24 identified Tucker in court, at trial, as the black
25 male at that meeting.

1          And the third way that we know that
2     Ghermon Tucker was at that meeting was through the
3     phone records.  Take a look at Exhibit 113 again.
4     On February 4th alone, there were 34 calls between
5     Mayco and the defendant Ghermon Tucker.  And if you
6     remember, Mayco showed up at the meeting at
7     approximately 11:53 in the morning, and as soon as
8     Mayco gets off the phone with Gollo, he calls
9     Ghermon Tucker two times.  And you can see that.
10    It's at 11:54 and 11:55.
11         Shortly thereafter, a black male enters
12    the room.  The phone chart shows that Tucker was in
13    contact with Mayco minutes before he arrived at
14    that meeting.  Defendant Ghermon Tucker was the
15    black male at that February 4th meeting.
16         Now, the source testified that he kept in
17    touch with Gollo and Chivo by phone after that
18    February 4th meeting, and those calls were recorded
19    by the source, and they further discussed the home
20    invasion plan.
21         And the next event that took place was a
22    February 22nd meeting at Chivo's workplace, and
23    that was also in Phoenix, at that trailer park.
24    Also present at that meeting was Gollo, Gollito,
25    and Andy, and they discussed who would be involved

1  in the home invasion that would take place in

2  Tucson, but at this meeting, Gollo said that the

3  black males that he had mentioned earlier were not

4  going to be involved in the home invasion.

5       Now, after the February 22nd meeting,

6  additional calls occurred between the source, Gollo

7  and Chivo and others, and the source recorded these

8  phone calls also.  And you heard a lot of these

9  calls during trial, so we're not going to replay

10  them for you.  They're Exhibits 30 through 44.  But

11  during these calls they further discussed the home

12  invasion that was going to take place in Tucson.

13       Now, if you recall, Exhibit 30-A was a

14  recorded call on February 26 where the source tells

15  Gollo that he'll text him when the drugs cross.

16       Exhibit 31-A is a recorded call on

17  February 28 between the source and Chivo, and they

18  discuss how they're going to split the money and

19  the cocaine, they talk about the kidnapping that

20  was to occur and about the -- and that the drugs

21  would be crossing soon.

22       Now, on the evening of March 1st, the

23  source began placing calls to Gollo and Chivo, and

24  Exhibit 32-A is a recorded call on 8:28 p.m. to

25  Gollo.  The source told Gollo they were about to

cross the cocaine into the United States through the Mariposa port of entry.

Exhibit 34-A, there's a recorded call at 11:35 p.m. to Gollo, and the source said they had crossed the checkpoint, and they were on their way to Tucson.

Now, I'd like to turn your attention to the day of the home invasion, and the source started making phone calls very early on March 2nd. Exhibit 35-A was a recorded call at 5:18 in the morning to Chivo. The source asked Chivo what time the crew was coming to Tucson. Chivo says he didn't know but he was going to call Andy.

Exhibit 38-A is another recorded call at 8:40 in the morning to Chivo, and Chivo tells the source that Mayco is coming.

Now, on the morning of March 2nd, FBI initiated surveillance, and FBI utilized both ground units and aerial surveillance planes. They had two planes up that day. And at approximately 8:40 in the morning, Agents Fernandez and Sharkey initiated surveillance near the Food City parking lot.

And as you know, the Food City was a Government predetermined meet location, and the

1  reason that they use that is because it was a

2  public and neutral meeting spot.  So after they met

3  at the Food City, the plan was to follow the

4  targets' drive to the warehouse where they would be

5  subsequently arrested.

6       At approximately nine o'clock in the

7  morning, agents also initiated surveillance along

8  I-10 eastbound between Phoenix and Tucson, and

9  there's a series of phone calls that occur starting

10 around 9:18 in the morning.  And if you take a look

11 at this phone chart in Exhibit 114, these phone

12 calls show the chain of events that occurred that

13 morning.

14      You see that the source contacts Gollo at

15 9:18 and 9:19 in the morning.  Mayco then contacts

16 defendant Ghermon Tucker at 9:25 in the morning and

17 9:41.  Then defendant Ja'Cory Ranger contacts his

18 brother, defendant Jerome Ranger, at 9:46, and

19 Gollo contacts Mayco at 9:56.

20      Now, you also heard testimony from Jorge

21 regarding the events that took place in Tucson on

22 the morning of March 2nd, and he testified that he

23 received a phone call from his brother-in-law

24 Yovani asking if he wanted to go to Tucson.  And

25 Yovani said that he'd pay Jorge $2,000, and Jorge

1  needed the money, so he agreed.

2  Now, Jorge learned there was plans to do a

3  home invasion in Tucson, but Jorge was going to

4  stay in the car during the home invasion.  He

5  wasn't going to participate other than driving the

6  Jeep.

7  Now, Jorge testified that he met up with

8  Yovani at an am/pm in Phoenix, and he jumped in

9  Yovani's white Jeep Commander.  They then picked up

10  Seco, who you also know is Mayco.

11  Jorge testified that Mayco was talking on

12  the phone while they were in the car, and Mayco was

13  saying some words in English and said something

14  about 50 kilos and dividing it in half.

15  The phone records show that, at

16  approximately 10:17 in the morning, Mayco contacts

17  defendant Ghermon Tucker.  Then, at approximately

18  10:20 in the morning, Mayco contacts defendant

19  Ja'Cory Ranger.

20  At approximately 10:23, Mayco contacts

21  Gollo.  At 10:24, defendant Ja'Cory Ranger contacts

22  defendant Jerome Ranger.  At approximately 10:26,

23  Jerome Ranger contacts Ghermon Tucker.

24  Now, Jorge testified that Mayco directed

25  Yovani to a residence near 24th and Broadway in

Phoenix, and they arrived at a house. Mayco went
inside the house, but Yovani -- or Jorge stayed
until the Jeep Commander.

Jorge observed Mayco talking to black
people in the house, and Jorge also observed a
black Cadillac Escalade in front of the house. He
then observed black males come out of the house and
saw two of them load weapons in the Cadillac
Escalade.

He testified that one of the black males
was wearing a long sleeved white T-shirt, had a
limp, and was talking to Mayco. The evidence
demonstrates that the black male with the limp was
defendant Ja'Cory Ranger.

Now, Mayco told the black males they were
going to split the drugs, and then Mayco came back
to the car, told Yovani the black guys are going in
the house first. Mayco, Yovani, and Jorge then
left the house, and they made a few stops.

Now, if you take a look at Exhibit 115,
this is an important exhibit. At approximately
10:32 in the morning, Ja'Cory Ranger texts Ghermon
Tucker and says, "Hit me ASAP. We going to Tucson
in 30 minutes. Yo people just left me. They
ready."

1    At approximately 10:34 in the morning,

2  defendant Jerome Ranger contacts defendant Ghermon

3  Tucker, and they have a conversation for two

4  minutes and 20 seconds.

5    Now, at approximately 11:05 in the

6  morning, Agents Howell and Sharman observe a Nissan

7  Murano driving at a high rate of speed on the

8  I-10.  Now, the next sequence of events to occur is

9  another series of phone calls.

10    At approximately 11:10 in the morning,

11  Mayco contacts Ghermon Tucker.  One minute later,

12  Ghermon Tucker contacts Mayco.  At approximately

13  11:12, Mayco contacts defendant Ja'Cory Ranger.  At

14  approximately 11:15, defendant Ja'Cory Ranger

15  contacts Ghermon Tucker six times.  At

16  approximately 11:21, Mayco contacts defendant

17  Ja'Cory Ranger.  The records show that there was a

18  lot of phone calls back and forth.

19    Now, Jorge testified he went to a Circle K

20  in Phoenix with Mayco and Yovani, and he observed

21  the same Cadillac Escalade that he saw at that

22  house at the Circle K, and he also saw a red Ford

23  Expedition, and he said the Escalade and Expedition

24  were parked together at the gas pumps.  He said

25  that Mayco went over and talked to the black males

1    while Yovani and Jorge stayed in the Jeep.

2            Jorge observed the black males loading

3    water into their cars.  Mayco came back to the Jeep

4    and said, drive to Tucson.  We'll meet up with them

5    there.

6            Now, Special Agent Edwards obtained the

7    surveillance footage from that Circle K in

8    Phoenix.  Now, at approximately 11:24 in the

9    morning, the surveillance footage shows black males

10   enter the Circle K, and they're buying sodas and

11   water.

12           At approximately 11:25 in the morning,

13   defendants Jerome Ranger and Ja'Cory Ranger are

14   seen entering the Circle K.  At approximately 11:28

15   in the morning, defendant Ghermon Tucker is seen

16   walking into that Circle K and shaking hands with

17   Josh Young, and that's at Exhibit 14-A.5.

18           At approximately 11:29 in the morning,

19   defendant Jerome Ranger is seen buying gloves, and

20   this is an important exhibit.  This is Exhibit

21   14-A.4.  He bought three pairs of gloves, and he

22   bought these gloves immediately before coming to

23   Tucson.

24           Now, at approximately 11:47 in the

25   morning, the source calls Chivo, and that's at

Exhibit 42-A.  Chivo tells the source that they're
on their way, and the source tells them to exit at
Sixth Avenue at the Food City.  Gollito tells him,
"The blacks aren't coming.  It's nothing but
Chicanos."

Chivo and Gollito are traveling in that
Nissan Murano that blew past the surveillance
agents on the I-10.  Shortly thereafter, Special
Agent Fernandez observes that gray Nissan Murano
arrive at the Food City.

Now, the next sequence of events is that
the Jeep Commander stops at another Circle K right
outside of Tucson in Marana, and Jorge testified
that, on the way to Tucson, Mayco was talking on
the phone in both English and Spanish, and he
testified that they stopped at a Circle K in
Marana.

Jorge observed a sedan pull up, and there
was two Mexican males inside.  He testified that
Mayco got in that sedan while Jorge and Yovani used
the restroom in the Circle K.

When they were back in the Jeep, Mayco
tells Yovani and Jorge that the guys in the sedan
were going to be the ones who were going to kidnap
the cartel member's son.

1    Now, Mayco is again on the phone, and he
2  says something to the effect of, keep on going.
3  I'll tell you where to get off.

4    Again, Special Agent Edwards obtained the
5  surveillance footage from that Circle K in Marana,
6  and between 1:18 and 1:30 p.m., the surveillance
7  footage captures Yovani, Brandon, Andy, and Jorge
8  entering and exiting that Circle K.

9    Now, at approximately 1:36 p.m., agents
10  observed the source arrive at the Food City, and
11  the source testified that he parked across from the
12  Nissan Murano, and the source told Chivo and Gollo
13  that he wanted them to come to his workplace, which
14  is a warehouse, and he wanted to show them a
15  picture of his cousin and provide details about the
16  stash house, specifically where the drugs and the
17  money were going to be located within the house.

18    At approximately 1:39 they're observed
19  departing the Food City and driving to the
20  warehouse.  Chivo is in the source's car.
21  Gollito's following behind in the Nissan Murano.
22  The source is recording the conversation that he's
23  having on the way to the warehouse with Chivo, and
24  you heard this recording during trial.  It was a
25  pretty lengthy recording, and it was at Exhibit

1  44-A.

2          Chivo tells the source that Andy came, as

3  well as all of Mayco's people.  He says Mayco's

4  back at the Food City, and there's about five other

5  cars.  Chivo says, the black guys came, and there

6  are about five cars.  And then he says again, Andy,

7  Mayco, and the homeboys came.

8          Now, at approximately 1:43 p.m.,

9  surveillance footage shows Yovani, Mayco, and Jorge

10  inside the Food City, and you saw those photos.

11  They're photo stills at Exhibit 110 and 111.

12          Jorge testified also that, when they were

13  at the Food City, he observed a four-door sedan, as

14  well as the Expedition and Escalade that he had

15  seen earlier in Phoenix.

16          Now, at approximately 1:51 p.m., the

17  source, Chivo, and Gollo arrive at the warehouse,

18  and the source is still recording the conversation

19  while they're in the warehouse, and the source

20  asked Gollito how many guns they have, and

21  Gollito's response is, we have a shit load.

22          Gollito then says there's 15 to 20 guys

23  that are coming, and he confirms that Mayco is

24  here.  The source then tells Gollito to go get

25  Mayco and whoever else he met at that February 4th

1   meeting because he wanted to show them a photograph
2   of his cousin.

3           Now, at approximately 1:57 a.m.,
4   surveillance agents observed Gollito getting in his
5   Nissan Murano and departing the warehouse, and at
6   2:04 p.m., the Murano arrives at the Food City and
7   picks up Andy Pineda.

8           And at approximately 2:05, the Murano
9   drives to another location within that Food City
10  parking lot and picks up Yovani and Mayco, and the
11  phone records will show around that same time Mayco
12  contacts Ja'Cory Ranger on the phone.

13          Now, let's take a look at Exhibit 29.  And
14  this is another important exhibit.  At
15  approximately 2:05, the aerial surveillance plane
16  is following the Nissan Murano within the Food City
17  parking lot, but this photo still also shows the
18  red Expedition, the black Cadillac Escalade, and
19  the white Jeep Commander in close proximity to each
20  other.

21          Now, at approximately 2:06 p.m., the
22  agents observe the Murano depart the Food City, and
23  Jorge testified that he stayed in that Jeep
24  Commander while Mayco and Yovani left the Food City
25  to apparently check out the place.

1          Now, during this time, Chivo and source

2     are still talking at the warehouse, and Chivo tells

3     the source that he thinks the black guy that Mayco

4     brought to the 2/4 meeting is also here in Tucson.

5          And Chivo said, those people are the ones

6     who have the guns, and they are the guys who have

7     the vests.  Chivo said Mayco told him, we're all

8     here, and everyone is parked at the Food City.

9     Now, at approximately 2:15 p.m., agents observed

10    the Murano arrive back at the warehouse, and the

11    occupants go inside.

12         Now, even though the Murano had left,

13    surveillance agents are still watching the Food

14    City parking lot, and at approximately 2:19 p.m.,

15    Special Agent Sharman observes additional vehicles

16    in that parking lot, and he's directed to drive

17    into that lot, and he takes photographs.

18         Now, you'll remember he testified that he

19    observed a red Ford Expedition and a black Cadillac

20    Escalade parked next to each other in the lot, and

21    he said that he observed multiple black males in

22    each vehicle.  And you saw these photographs.  This

23    one is Exhibit 57-A, and you also saw Exhibit 57-B.

24         He testified that those vehicles stood out

25    to him.  He observed one of the occupants hanging

1  out of the window, banging on another vehicle's
2  window, and he also testified that they were just
3  hanging out, and they didn't appear to be leaving
4  any time soon.
5          Now, let's shift gears back to the
6  warehouse.  The source shows Chivo, Gollito, Mayco,
7  Andy, and Yovani the photo of his cousin, and you
8  saw this photograph in Exhibit 46.  Mayco then
9  takes this photograph and puts it in his pocket.
10         The source then draws a map and points out
11 where the money and the drugs are going to be
12 located within the house, and you saw this in
13 Exhibit 47.
14         Now, after everyone was briefed on the
15 plan at the warehouse, the SWAT team entered the
16 warehouse and arrested everyone, and at
17 approximately 2:24 p.m., Chivo, Andy, and Yovani
18 are arrested inside the warehouse.
19         But Gollito and Mayco ran out of the
20 warehouse and broke through a glass door as they
21 were trying to get back to the Murano.  But the
22 SWAT team ended up arresting both of them outside
23 of the warehouse.
24         Somehow before getting arrested Mayco was
25 able to place a phone call to a family member in

Phoenix. When arrested, Mayco had the photograph
of the source's cousin in his pocket, and a map of
the stash house was found later on the floor of the
warehouse near where Mayco had been inside.

And you'll remember it was important for
Mayco to have that photograph and the map because
he was going to show it to the black males before
they entered the house, and you'll remember that he
said that the black males were going to enter the
house first.

Now, the source testified that,
immediately after the arrest at the warehouse, he
tried to get in contact with Special Agent
Rubicalva and Special Agent Edwards, and he told
them that there were more guys at the Food City.

And at the same time, Special Agent
Edwards received a phone call from Special Agent
Kent Hush advising him also that there were more
cars at the Food City.

Now, Jorge's still back at the Food City.
He's waiting in the Jeep Commander, and he goes to
the bathroom inside the store. And on the way out,
he bumps into Mayco's brother-in-law, and the
brother-in-law tells Jorge that Mayco had been
caught or stopped. You remember he said both

1    words.  He couldn't remember which one it was.

2          Jorge at this point is scared and he

3    doesn't know what to do, and so he decides to head

4    back to Phoenix, and he walks back to the Jeep

5    Commander, and as he's passing the black males in

6    the Expedition and the Escalade and in another

7    vehicle, he tells them, they got caught.  Jorge

8    testified that the driver of the black Escalade

9    heard him say that.  So Jorge leaves the Food City,

10   and he makes a stop nearby.

11         At approximately 2:30 p.m. surveillance

12   agents observe that the Escalade and the Expedition

13   are still parked in the Food City lot, and they

14   remain in that Food City parking lot for some time

15   after the Mexican males had been arrested at the

16   warehouse.

17         And you have to think to yourself, why did

18   they stay at that Food City parking lot?  Well,

19   they didn't know where the stash house was located,

20   and they were waiting to find out, to get that

21   information.

22         Mayco didn't come back to that Food City,

23   and the black males didn't know what to do at that

24   point.  At approximately 2:34 p.m., the Expedition

25   and the Escalade leave the Food City and arrive at

1  a Circle K, which is the one right down the street
2  off of Congress.

3          FBI aerial surveillance is following them
4  and so is -- ground surveillance is also in place
5  at the Circle K.  And you heard testimony from
6  Agent Sharkey who said he was positioned in a dirt
7  lot across from the Circle K.

8          At approximately 2:44 p.m., the aerial
9  surveillance agent observed Ghermon Tucker using a
10  pay phone at the Circle K.  And this is another
11  important exhibit.  It's 62-A.1.

12          Now, Special Agent Edwards obtained the
13  phone records from these pay phones, and you'll
14  notice that there was three calls made to Mayco's
15  telephone at this time.  And that -- the phone
16  records for the Circle K pay phones are at Exhibit
17  13.

18          Ghermon is trying to get in touch with
19  Mayco to find out where the house is, but Mayco's
20  not able to answer his phone because he's already
21  been arrested at the warehouse.  Aerial
22  surveillance then sees Ghermon Tucker walking from
23  the pay phones back to the Expedition.

24          At around this same time Jorge is driving
25  the Jeep Commander, and he's on the I-10.  He

testified that he saw that Mayco's brother-in-law
got pulled over by highway patrol and he got
scared, so he said that he gets off at Congress and
pulls into that Circle K.

He happens to see that same Escalade and
Expedition at the Circle K.  He testified they were
the same vehicles that he saw in Phoenix and at the
Food City parking lot.

At approximately 2:47 p.m. Special Agent
Sharkey observed occupants of the Expedition and
Escalade talking to an occupant in the Jeep, in the
vehicle, the white Jeep Commander.  And Sharkey
testified there was a lot of vehicles in that
parking lot and a lot of people there, but he was
focusing on that Expedition, and he only took
photographs of that Jeep because there was
interaction between the black males and the
occupant of that Jeep Commander.

Now, remember Jorge testified that the
black males came up to the Jeep, so he rolled the
window down.  And he testified that the black males
asked him, what happened?  What do we do?

Jorge told them, he got caught and he was
going home.  He was going back to Phoenix.  But the
black males didn't believe Jorge, and they said

1  something to the effect of, man, whatever, let's

2  go.

3        Now, the surveillance log states that the

4  occupant of the Jeep was a black male.  The agents

5  were wrong.  The occupant was not a black male.  It

6  was Jorge.  And you could see this in Exhibit

7  61-G.  Sharkey took photographs at that Circle K,

8  and you'll see those -- and if we could put that on

9  the screen, that's 61-D and 61-E.

10        Now, Special Agent Edwards identified the

11  black males that are standing outside of this Jeep

12  Commander, and he identified them as Josh Young.

13  He identified the person in the white shirt talking

14  on a cell phone as the defendant Ghermon Tucker and

15  the male in the dark T-shirt as Jerome Ranger.

16        At approximately 2:50 and 2:57 p.m.,

17  defendant Ghermon Tucker contacts Mayco, and at

18  approximately 2:57 p.m., the Escalade and

19  Expedition are seen departing the Circle K., and

20  both ground units and aerial surveillance units are

21  still following them.

22        The Expedition and the Escalade initially

23  head west on I-10 towards Phoenix.  At

24  approximately 2:59, Ghermon Tucker places another

25  call to Mayco.  Then the vehicles are observed

 1   exiting at Prince Road, and they make a u-turn, and

 2   they come back eastbound on I-10.

 3          At approximately 3:05 p.m., Ghermon Tucker

 4   contacts Mayco again, and at approximately

 5   3:12 p.m., the Expedition and the Escalade return

 6   to the Food City lot, and they're observed circling

 7   the Food City lot.  They're still looking for

 8   Mayco, and they're determined to find out where the

 9   stash house is located, but they can't reach Mayco,

10   and they can't find any of the Mexican males that

11   they've been in contact with or that they saw

12   earlier at the Food City.

13          At approximately 3:15, the Expedition and

14   Escalade depart the Food City and head westbound on

15   I-10 towards Phoenix, and at approximately

16   4:13 p.m., the Expedition and Escalade are stopped

17   by BORTAC agents on I-10 west of mile marker 194

18   near Casa Grande.  And as you heard the BORTAC

19   agents testify, they called the occupants out of

20   the vehicle, one by one.

21          So let's talk about the Escalade for a

22   minute.  The defendant Ja'Cory Ranger was the

23   driver and registered owner of the Escalade, and

24   you'll recall this picture as Exhibit 74-B.  Also

25   in the Escalade were Rashad McCuin, Joshua Young,

Tyrees Seymour, and Jeremy Tucker.  And that's
another photograph of Ja'Cory Ranger.

Agents seized five weapons from that
Escalade.  They seized a Colt AR-15 that was found
in the trunk, and that's Exhibit 76-A.  They found
an AK-47 in the trunk, Exhibit 77-A.  A Kel-Tec
AR-15 was found in the trunk.  A Colt .357 caliber
handgun was found in the glove compartment, and a
CZ 75 nine millimeter handgun was found also in the
back of the Escalade.  All of these guns were
loaded.

They also seized a pair of black gloves
and a white, green, black, and brown glove, as well
as a black ski mask, and you saw those exhibits,
Exhibits 16 through 20.

Now, let's talk about the Expedition for a
second.  Defendant Jerome Ranger was the driver and
registered owner of that Expedition.  Defendant
Ghermon Tucker was the front seat passenger in the
Expedition.  Also in that vehicle was Ardawwn
Bryant and Damond Reagan.

Agents seized three handguns from that
vehicle and two bulletproof vests.  A Ruger nine
millimeter handgun was found in the center console
of the Expedition, and you can see that in Exhibit

75-I.  A Glock 17 handgun was found in the back seat of the Expedition, and that's 75-D.  A Taurus .45 caliber handgun was tucked between the rear seats of the Expedition, and that's in 75-F and 75-G.

Now, all of the guns in the Expedition were loaded also, and the two bulletproof vests that were found, they were found on the floor of the Expedition behind the driver's seat.

They also seized three pairs of white gloves, the same white gloves that Jerome Ranger was seen purchasing at the Circle K in Phoenix immediately before he came to Tucson, and he also found a pair of black gloves in the Expedition.

Now, I have summarized the evidence that was submitted in this case, and the evidence is clear that, on March 2nd, 2011, the defendants came to Tucson to rob what they thought was a stash house.

And the evidence is clear that the defendants believed that the house contained cocaine and cash, and the evidence is also clear that the defendants possessed an arsenal of weapons to protect themselves and to do the job successfully.

The defendants conspired with others to possess with intent to distribute cocaine, as charged in Count 1; the defendants attempted to possess with the intent to distribute cocaine, as charged in Count 2; and the defendants possessed firearms in furtherance of a drug trafficking offense, as charged in Counts 3 and 4.

That's the evidence. Please look at the evidence, and please consider it. And I submit to you that, after you've looked at all the evidence, that you will find that the Government has proven that the defendants are guilty of Counts 1 through 4, as charged.

Thank you.

THE COURT: Mr. Cooper?

MR. COOPER: Thank you, Your Honor. Your Honor, do you know how to turn this on?

THE COURT: Do I know how to turn it on? No, I don't.

MR. COOPER: I've spent all of my adult life being a lawyer speaking for other people. I'm proud to do it. I'm proud to be standing in front of you now. I've considered it to be an honor, really an honor, and I'm proud to stand on behalf of Ghermon Tucker.

1   Ghermon Tucker is not guilty.  The
2   Government wants you to convict him based on the
3   testimony of a known liar who did everything he
4   could to avoid being charged in this case and on
5   Ghermon's presence in Tucson in a car with guns.

6   Think for just a second about Jorge
7   Medina.  Ghermon did exactly what Jorge Medina did
8   in this case, exactly, except Ghermon never
9   admitted he committed a crime, because he did not.
10  Otherwise, their behavior was the same.  Jorge
11  Medina was never charged with anything, even after
12  admitting to participating in this conspiracy.

13  Before talking about the evidence --
14  before talking about the facts in this case, I'd
15  like to discuss with you an instruction you're
16  going to get from Judge Collins in a little bit,
17  and keep it in mind as we go through talking about
18  the facts.

19  The instruction defines conspiracy.  You
20  folks decide the facts.  Judge Collins gives you
21  the law, and you apply the law to those facts.  The
22  conspiracy law, I'm not going to read all of it to
23  you, but the important parts of the conspiracy law
24  are that, first, beginning December 29th of 2010
25  until March the 3rd of 2011, there was an

agreement, and the Government has to prove there is
an agreement and that Ghermon was part of that
agreement, between two or more persons to commit
possession with intent to distribute cocaine, as
charged in the indictment;

And second, the defendants became members
of the conspiracy knowing of at least one of its
objects and intending to help accomplish it;

And third, one of the members of the
conspiracy performed at least one overt act, one
overt act for the purpose of carrying out the
conspiracy and agreement.

Juries decide cases based on the evidence,
based on the facts that you hear in court.  Let's
look at the facts.  Let's start where the case
began, with Tony Gutierrez.  In the fall of 2010,
he's working, he says, making 75-80,000 a year, as
a supervisor of janitors, and I think he said he
had 50-60 janitors he was supervising.

I guess that wasn't enough money for him,
because he supplemented his income for over 10
years, at the time this case began, for over 10
years as an informant for the Government.

Just by happenstance, he had a meeting
with one of his employees who said something to the

1    effect of, I don't like to work.  I'd rather be

2    dealing drugs like I used to, something to that

3    effect, I don't really like to work that much.

4            Tony, who was working at the time and was

5    in about his fifth or sixth year with the FBI, ran

6    with it and ran back to Agent Rubicalva, his

7    handler, and said, hey, I got something, let's get

8    going.

9            Now, let's talk about Tony.  The judge is

10   also going to instruct you about him, and what

11   Judge Collins is going to tell you once the lawyers

12   are finished arguing is that you have heard

13   testimony from Antonio Gutierrez, a witness who

14   received compensation from the Government in

15   connection with this case.

16           For this reason, in evaluating the

17   testimony of Antonio Gutierrez, you should consider

18   the extent to which or whether his testimony may

19   have been influenced by this factor.  In addition,

20   you should examine the testimony of Antonio

21   Gutierrez with greater caution than that of other

22   witnesses.

23           Well, what's one of the first things that

24   Tony Gutierrez told you when he testified?  He

25   admitted he's good at lying, and apparently that's

1   one of the job descriptions for an informant.

2          He also admitted he'd been paid $320,000

3   over the course of 12 years in his side job as a

4   Government informant and $110,000 total in this

5   case.

6          He also admitted he'd been arrested in

7   2003 while he was working as an informant for

8   another agency, for the DEA, in Albuquerque, while

9   traveling to Philadelphia with 50 pounds of

10  marijuana.

11         And what happened to this drug smuggler in

12  Albuquerque?  Nothing.  So you certainly could

13  assume that he plays both sides, couldn't you?

14         You know, one of the problems with

15  Gutierrez is that he mixes up fact and fiction, and

16  let me give you just one example, because I've got

17  a lot to talk to you about, and I don't want to

18  spend too much time giving you examples of

19  Gutierrez's problems with his testimony.

20         One -- just one example.  When he was

21  questioned, he was asked specifically, do you get

22  paid cash by the FBI?  He answered specifically, I

23  get a check.  I got a check in this case.  I didn't

24  get cash in this case.

25         Well, we knew that was wrong, and in fact,

1  the Government knew that was wrong.  And Agent

2  Edwards got up and testified honestly and said,

3  well, you know, he did get a check.  He got a check

4  for his moving expenses for 30,000 or $35,000, but

5  I handed him $70,000 in cash.

6       I don't know about you folks, but if

7  somebody handed me $70,000 in cash, I would

8  remember it forever.  It ain't going to happen, but

9  I would remember it forever.

10       But here's the Government informant, who's

11 conducting some pretty serious business with

12 people's lives on the line, who can't even remember

13 that Agent Edwards handed him $70,000 in cash.

14 Think about that.

15       You know, and I'll get off the amount of

16 money that this guy has been paid, but when you

17 listen to Judge Collins's instruction, I want you

18 to think of something.  The Government is allowed

19 to do this.  The Government is the allowed to pay

20 this guy.  And in this case, they found a guy who

21 had been working in this capacity for a long time.

22 If I offered somebody money, a witness, to testify,

23 I'd be going to jail, period.

24       So Tony gets started on the case and gets

25 wired.  There is a key fob wire, there's various

wires, and he's tape recording what's going on.
For the most part, for the most part, the
recordings that he makes are of the Mexican side of
the case.

He's dealing primarily through the month
of February with Gollo, with Chivo. February 4th
he meets this guy Mayco. Let's remember as you go
through and as the Government talks to you about
the recordings made by the informant Gutierrez,
none of the black guys are on these recordings.
This is a deal with the Mexican guys, with Gollo
and Chivo talking about, with the informant, we're
going to go rip off drug dealers.

It's not like they're going into a home
where you and I live, honest, law-abiding
citizens. They planned to rip off drug dealers.
And there's a reason for that. One is, there's lot
drugs in those homes; and two, those are people
that probably aren't going to want to call the
police on them. So they go into a place where
there's a lot of drugs, a lot of drug dealers, rip
them off, and those are the conversations going on
between Gollo and Chivo.

Most of the recordings that you hear
aren't really relevant to much of anything except

1 that three of the main players, three of the main

2 Mexican players, are talking about black guys. And

3 this is after the February 4th meeting. Okay?

4 And what they are saying, Chivo, no blacks

5 are coming.

6 February 22nd, Gollo says, I'm not going

7 to take niggers.

8 And in response, in response, what the

9 informant says is, yeah, the blacks are fucking

10 liars. Those are his words.

11 And you know, throughout -- throughout

12 these tapes, you have that kind of language. And

13 you know, Gutierrez when he's up on the stand says,

14 oh, yeah, I have to pretend. I have to pretend to

15 be like them. It wasn't pretend. That's who he is

16 and what he thinks because some of the language he

17 uses and some of the responses of these people

18 weren't necessary. They were just gratuitous

19 bigotry showing who he is. He didn't have to say,

20 yeah, the blacks are fucking liars.

21 You know, let's talk about the February

22 4th meeting, because there really are two main

23 dates in this case, February 4th and March 2nd.

24 The February 4th meeting was to be a planning

25 meeting -- that's what we were told. That's what

1   Gutierrez said.  That's what the evidence is -- of

2   people to be involved in what Gutierrez said was

3   going to be a ripoff.  Five people are present: the

4   informant; Chivo; Gollo; Seco, who's also Mayco;

5   and a black man.

6          Here's what's important.  If this is a

7   planning meeting where you're going to plan a

8   serious drug invasion of a home of drug dealers

9   where there might be weapons, you've got testimony

10  from the informant, from the snitch, that at least

11  four of the people at the meeting spoke English,

12  and possibly the fifth person as well.

13         So if all these people speak English, and

14  the black guy doesn't speak Spanish, and we know

15  that because the four Spanish speakers at the

16  meeting repeatedly were talking about monkeys and

17  niggers and blacks and they're liars, so you can

18  assume that the black guy didn't speak Spanish.

19  They wouldn't speak that way in front of him if he

20  did.

21         So if in fact -- if in fact this was a

22  planning meeting and you want to plan an invasion

23  and have black guys to act as police or whatever,

24  why don't you speak in a language where they can

25  understand the plan?

You know, maybe it was Ghermon there.
Maybe it wasn't. All I can tell you is this. The
snitch says the black guy is from Tucson, and he
was contradicted when he testified about whether or
not the black guy he saw had braids coming down,
clearly contradicted, because one of the things
that he testified to was he didn't see any hair
because the guy had a cap on, and then he changed
his story and said, yeah, yeah, I saw the braids
coming down.

And I caught them, and I pointed it out,
and I impeached him with it, and "impeachment"
means you catch him in an inconsistency, and he had
no answer for that, none. He was making it up as
he was going along.

Regardless, let's talk about why we don't
have pictures, because the FBI had seven agents
watching this. Not only seven agents, they had an
airplane up in the air taking photographs of it.

And we've seen from testimony about other
aspects of the case that the FBI has the ability to
take pictures from long range, so why do we not
have a single photograph of anybody walking into
that meeting on February 4th? There's no good
reason, none.

1          If they wanted to know exactly who was

2     there, they should have had those photographs, and

3     could have.  Whatever reason they gave -- there's

4     seven agents.  They've got the photographs from

5     above.  They've got agents all around that park.

6     They've got ground photos.  They've got aerial

7     photos.

8          They even have the wrong address on the

9     surveillance log.  The address of the meeting was

10    8218 South Seventh Street.  The community center,

11    536 South Fifth Place.  Well, maybe that really is

12    where the surveillance got started, but you would

13    think that at some point in the surveillance log

14    they would put the correct address of where they

15    were watching this meeting take place, and it ain't

16    there.

17         And you'd think they'd be able to take a

18    picture of people walking in and out since they

19    knew in advance that this meeting was going to take

20    place.  And now they want to say it was Ghermon

21    Tucker at the meeting because his car was there.

22    Well, Mayco's car wasn't there.  Mayco was driving

23    a car registered to somebody named Juan Martinez,

24    and the Government is certain Mayco was there.

25         And where does this car belonging to

1  Ghermon Tucker go after this meeting?  To an

2  address on Chipman that has been identified as

3  being the address of a black guy named Miami;

4  right?

5        And you've got a snitch who knows he's

6  wearing a wire, who's in a meeting talking almost

7  all in Spanish, where it's supposed to be planning

8  meeting.  And ask yourself this.  Tony hardly

9  speaks any English in the meeting, maybe 40 words

10  or so.  He turns to the black guy and says, well,

11  65 birds, something like that.  If the black guy is

12  there to plan, why not speak to him in English?

13        The guy's a professional informer.  Why

14  not say to him in English, because he knows the FBI

15  is listening, hey, man, you black guys are the guys

16  that are going to bust in the place with guns and

17  rip off the cocaine; and the black guy there says,

18  yeah, I can't wait to do it, that would be really

19  fun; and Tony says in English, yeah, we're going to

20  have a lot of money, we're going to make about a

21  million dollars, we'll split it in half, all in

22  English, all down pat, all on tape, none of which

23  was done because the black guys weren't supposed to

24  be part of this to begin with.

25        Ghermon was there, the black guy was

1   there, whoever was there, not to be part of a plan,

2   because they all spoke English, and if he was

3   planning something, you'd speak in the language he

4   understood.

5        So we go through the month of February,

6   and we have the -- sort of the arguments between

7   the Mexican guys that the niggers aren't coming.

8   Okay.  And why would the niggers need to come?  You

9   know, they've got six or seven bad Mexican guys

10  ready to do this who have weapons themselves.  Why

11  are they going to split this money?  They don't

12  need to.  And they're saying all along the black

13  guys aren't involved.

14        And as we go along, remember, at this

15  point, is there any evidence that you have heard

16  that there's an agreement?  There's a February 4th

17  meeting almost all in Spanish, but there is no

18  evidence of an agreement.  You have at least the

19  three main guys saying the black guys aren't

20  coming.

21        Now let's jump ahead to March the 2nd.

22  Okay?  Jorge Medina.  Jorge Medina basically is the

23  key to the Government's case.  Let's talk about

24  Mr. Medina's honesty, what we know about it, okay,

25  because if the Government's going to present this

1  guy, we need to know a little bit about him and
2  whether he's an honest witness we can trust.
3          First, we know he has a prior conviction
4  for giving false information to a police officer.
5  Second -- now, you saw him.  You saw his demeanor
6  on the witness stand.  He wasn't even embarrassed
7  to admit that he lies to his wife when he goes out
8  with his buddies chasing women.  You would think he
9  would show just a touch of embarrassment.  Not
10 even.
11         Third, March 2nd, the day he's involved,
12 when he's stopped by Officer Reeves, what's the
13 first thing he does to Reeves?  He lies to him.
14 Where are you going?  I'm going to Tucson to visit
15 my mom.
16         Okay.  So we've established he's a liar,
17 but the Government still needs to use him.  Okay.
18 But again, Judge Collins over here is going to
19 instruct you, and he's going to tell you, the
20 testimony of Jorge Medina was given in exchange for
21 a promise by the Government that the witness will
22 not be prosecuted.
23         In evaluating the testimony of Jorge
24 Medina, you should consider the extent to which or
25 whether his testimony may have been influenced by

1  this factor.  In addition, in addition, you should

2  examine the testimony of Jorge Abel Medina with

3  greater caution than that of other witnesses.

4         He's been given a pretty good get out of

5  jail free card.  You know what?  The guy had to lie

6  to save his neck, period.  And what's one of the

7  first thing he does after March 2nd?  He flees.  He

8  leaves.  He runs to Mexico.

9         He knew he was going to get nailed, and he

10  had to put someone else's neck in the noose.  And

11  how much time did he have to figure that out?  He

12  said he didn't even come back until January of

13  2012.

14         And throughout that time, Yovani

15  Valenzuela, his brother-in-law, was out of jail,

16  charged but not in jail, and he admits they talked,

17  and he admits that, when he came down on February

18  15 to talk to the FBI, he drove down with Yovani

19  Valenzuela.

20         And what does the Government do with this

21  man who has admitted, I am participating.  I am

22  participating in a crime.  I'm just going to be the

23  driver, but I'm participating.  The Government

24  says, if you cooperate with us, we will not charge

25  you with a crime.  Folks, if Jorge Medina says the

1  sun is shining, bring an umbrella.

2      Here's the question before we get into the

3  facts of what Medina has said to you.  Would you

4  trust the word of Jorge Medina in matters of

5  importance to you?  Think about that one.

6      Impeachment means showing inconsistency or

7  being demonstrated that you are loosey-goosey with

8  the truth.  Impeachment is when I catch, for

9  instance, Tony Gutierrez saying, I never got cash,

10  and Edwards comes on and says, yeah, I handed him

11  cash.

12      That means he's been impeached.  He's been

13  shown to be either not truthful or inconsistent.

14  You can't impeach a man who is telling the truth.

15  You can't shake him.  You can't wiggle him around.

16  Medina, shake and wiggle.  He's as crooked as a

17  dog's hind legs, and when you sleep with a dog, you

18  get flees.  And this is the person upon whose

19  testimony the Government wants you to convict these

20  people.

21      Let's look at his testimony.  One of the

22  first things he told you is that Yovani Valenzuela,

23  his brother-in-law, calls him early in the morning

24  on March 2nd, just out of the blue, out of the

25  blue.  Think about that.  Gosh, Jorge, Cochi, you

 1  want to do a home invasion with me?  You don't have
 2  to do anything but be the driver, but come on, come
 3  with me, out of the blue.
 4        And apparently he wasn't at home with his
 5  wife and kids because he'd been out chasing women
 6  the night before.  He was at the home of a friend.
 7        And what does he say about Valenzuela?
 8  Right from the start, what does he tell you?  I
 9  knew Yovani had been doing a bunch of home
10  invasions, so it really didn't surprise me when he
11  called me and asked me to be the driver of a home
12  invasion.
13        Okay.  Just because you're on a jury
14  doesn't mean you leave your common sense outside
15  the courtroom.  Think about it.  Do you call
16  somebody to be the driver who you know doesn't have
17  a driver's license in the first place?  He wasn't
18  going to be the driver.  That's the story he came
19  up with in the 10 months he was in Mexico and when
20  he came back.
21        He was a participant.  He was going to be
22  part of it.  He can't say that.  You know, he can't
23  say, I was just -- you know, I was just a little
24  driver.  They were going to pay me a little money,
25  a couple thousand bucks, even though I didn't have

1  a driver's license.

2         Then that morning he wakes up and just out

3  of the blue decides he's going to go participate in

4  a drug invasion/ripoff of drug dealers, which might

5  be dangerous business, maybe.  And he winds up at a

6  house where he says he sees three black men.

7         And what he says is, you know, but I never

8  got out of the car.  I was only there -- we were

9  only there for one minute.  And it was asked of him

10  about four different times.  He was there one

11  minute, and what does he say he sees?

12         Well, I saw one of the black guys, and he

13  says -- this is a neighborhood in Tucson (sic), a

14  bunch of houses around, cars, people.  One of the

15  guys walks outside and he's smoking a joint,

16  smoking marijuana, and the other -- a couple of

17  guys are loading guns into a vehicle, okay, the

18  three black guys.

19         Then he says he drove to Tucson only with

20  Yovani and Mayco in the Commander.  And I'm going

21  to get back to the "only" in just a minute, but

22  what he says is it was only with those guys.

23         And I've prepared sort of a time line of

24  what happened on the rest of March 2nd so that we

25  can sort of follow, and I'm going to be going back

1   and forth with this time line.

2           One of the first things that happens is

3   there's a Murano that's involved in this case, and

4   the Government knows it, and the Government has

5   agents surveilling what's going on, and there's a

6   surveillance log.

7           The Murano is picked up on the freeway, on

8   I-10.  I believe it's being driven by Gollito, and

9   perhaps Chivo's in the vehicle with him.  I forget

10  for certain, but I'm pretty sure that's what it

11  was.

12          Surveillance begins with the FBI watching

13  these guys.  Actually, the surveillance began

14  earlier on the freeway.  They arrive at Food City

15  at 11:45.

16          At about 11:36 until 11:39, close to -- or

17  11:40, I'm sorry -- the informant Gutierrez gets to

18  Food City, and he sees Chivo and Gollito there, and

19  they leave Food City in two cars, I believe, and

20  they go to the warehouse where the three men go

21  inside.

22          Okay.  This is important.  The two guys,

23  Chivo and Gollito, stay at the warehouse, but

24  Gollito is asked -- I'm sorry.  Gollito is asked to

25  leave the warehouse and go back to Food City, which

 1    he does, and gets there about 2:05.  All this time

 2    we're told by Medina that he's coming up in a Jeep

 3    Commander with only two other people in it.

 4         So by 2:05 Gollito gets back to Food City,

 5    and there is a bunch of texts going on about all

 6    the people who are there, texts beginning at 2:01.

 7    Well, the first time the FBI actually sees the

 8    black guys, the Escalade and the Expedition, is

 9    2:05.  Okay?  And there's no evidence that these

10    other people saw the black guys before then

11    either.

12         Exhibit 29.  This is going to be important

13    for Medina.  At about 2:05, Yovani, Mayco, and

14    Pineda are picked up standing in front of Food

15    City.  This is after we've seen photographs of

16    these guys going in and out of the Food City.  You

17    saw a picture of Mayco and Yovani and Jorge Medina

18    inside the Food City; right?  So you know, the FBI

19    and the Government has gotten those tapes, and

20    there's surveillance tapes from Food City.  We also

21    know there are agents surrounding, surrounding that

22    parking lot.

23         The Medina testimony is that he saw four

24    cars total in the parking lot.  And this is

25    critical.  The four cars really the Escalade, the

1  Expedition, the Commander that he says he was in,

2  and a gray car that wound up parked next to the

3  Expedition and the Escalade.

4         And why is that important?  It's important

5  because of the time.  The surveillance by the FBI

6  on the Escalade and Expedition, according to the

7  FBI's own agents, begins at 2:19.  And what they

8  write is, there's a red Ford Expedition and a black

9  Cadillac Escalade sitting in this parking lot side

10 by side with a gold Buick LeSabre with two black

11 men in the gold Buick LeSabre.

12        This is critical that you remember, that

13 you remember, and I'm going to go over this, that

14 Medina only sees four vehicles.  And what happens

15 at 2:20?  The gold LeSabre with two black men in it

16 parked side by side to the Escalade and Expedition

17 leaves the parking lot.  That's four minutes before

18 the arrests at the warehouse.

19        Why do we know that he says there's only

20 four cars?  Because Erica sitting over here, the

21 court reporter, prepared a transcript of his

22 testimony, and he said it in about five different

23 places.

24        "Well, so the FBI is mistaken in what you

25 told them?"

1      Answer, "Yes, because I was walking by,

2   and I told them, hey, they got caught.  And Miami's

3   car was right here, and the Escalade was on this

4   side.  They both heard me."

5      Question, "Well the FBI describes you

6   saying that they heard what you said to Miami.  You

7   were talking to Miami?"

8      Answer, "No, I wasn't just talking to

9   him.  I was talking -- I was just passing by and I

10  said it."

11     Okay.  Then you turn -- question by me,

12  "Here's what the FBI says you said."

13     Answer, "Uh-huh."

14     "Jorge then walked over to Miami in the

15  gray vehicle, and he said that Mayco and Yovani

16  were arrested and he was leaving.  Jorge indicated

17  that this should be that Miami was parked next to

18  the Escalade and Expedition."

19     "The car parked next to the Escalade and

20  Expedition," that's the LeSabre.

21     "And the occupants of these vehicles also

22  heard what he said to Miami.  Jorge then departed

23  Food City and he drove down the street to a gas

24  station where Mayco's brother-in-law purchased a

25  Monster drink for Jorge."

1    Answer, "Right."

2    Okay.  So that's two times already he

3  said, I warned the people in the car sitting next

4  to the Escalade and the Expedition that they'd been

5  stopped.

6    But it doesn't stop there.  You know, he

7  was asked multiple times, and he says the same

8  thing for once.

9    Question, "As you were walking out of the

10  Food City, you said you walked past those three

11  vehicles," three vehicles.

12    Answer, "Yes."

13    Question, "And if I understand correctly,

14  you said to the -- to Miami in the white vehicle or

15  the gray vehicle, or the gray vehicle that's off on

16  the right, you said to Miami -- you said what?"

17    Answer, "No, I didn't say nothing to him.

18  I was walking by, and that's what I said they got

19  caught, and the driver from the Escalade put down

20  his window, and the passenger from the little car,

21  the four-door car, put down his window.  That's

22  when I said, hey, they got caught, and I just

23  left."

24    But he doesn't stop there.  There's

25  another time that he's asked the same question by

1   Mr. Lacey.

2           Question, "Go ahead."

3           "That's when I was walking back.

4   There's -- I don't know.  It was a gray car.  I

5   don't know what color, but it was a four-door.

6   That was a Mexican dude that I drove over to

7   Miami's house.  So that was Miami, and the Escalade

8   was parked next to, like, a couple of cars.  When I

9   walked through, that's when I told them they got

10  stopped.  I didn't walk up to them and start

11  talking to them.  That's why both of them, the gray

12  car, the passenger from the car heard me, and the

13  driver from the Escalade heard me."

14          Four different times he's given the chance

15  to say there's another car besides the Escalade,

16  the Expedition, and the gray car, but it's the same

17  thing.  Why is that important?  Well, look at the

18  time.  Because the agents themselves say at 2:20

19  the gray car parked next to the Escalade and the

20  Expedition leaves the parking lot with the two

21  black men.

22          Okay.  Well, maybe the FBI really screwed

23  up and got those times wrong.  I don't think so.

24  The arrest is at 2:24, okay, so he couldn't have

25  known.  He couldn't have known there was an arrest

1  at this point, period, and he couldn't have told

2  the people in the gray car.  And there's no

3  evidence -- and that's how you decide these cases,

4  on evidence from the witness stand.

5         There's no evidence of another car based

6  on what Jorge Medina said.  He's got three cars and

7  his own car and that's it.  And he's got to have

8  these guys hearing, hearing that there was an

9  arrest.

10        Let's ask this.  Let's look at these

11  exhibits.  See that photo, that exhibit?  See

12  that?  You know when those are taken?  Those are

13  taken after 2:19, when the FBI agent testified, my

14  attention was caught by these two cars next to each

15  other, and I started watching them carefully after

16  2:19.

17        Did you hear one piece of testimony from

18  any agent or did you see one photograph from

19  anybody showing Jorge Medina in that parking lot?

20  Do you think, do you think that if the agents are

21  watching nine black guys in a parking lot whose

22  attention has been caught, and they notice that a

23  LeSabre is another car with black guys in it and

24  it's leaving, do you think they would have noticed

25  a little Mexican talking to them and maybe

1 photographed it?

2 There's another aerial photograph at

3 2:19. There is not a hint of Jorge Medina, none,

4 in that parking lot. I don't make these facts up.

5 This is from the Government itself.

6 So maybe there's another car, but that's

7 not what their witness said. 2:20 the LeSabre

8 leaves the parking lot. This is the LeSabre he

9 says I warned they got caught four minutes before

10 they got caught. That is called a lie, and it's a

11 lie because he talked to Yovani who knows what he

12 was told was taking place by the Government, and in

13 his own mind, he knew he had to have warned these

14 people.

15 That's not the only problems with his

16 testimony at all. If it were, maybe, maybe you

17 could say, gosh, there has to be -- there has to be

18 a mixup. You know, gosh, I can accept that maybe

19 he messed up. Maybe the Government agents messed

20 up. Maybe these highly trained FBI surveillance

21 guys didn't get 2:20 right. Maybe, maybe, since

22 they have 60 people, 40 of them sitting with Agent

23 Edwards, maybe they made a mistake as to when the

24 arrest was. Maybe it wasn't exactly at 2:24.

25 All I can go on is by what the Government

1  tells us the times are, and the times are

2  impossible for Medina to have done what he says he

3  did.  And not only that, the FBI had agents all

4  over the place, as you see, taking pictures of the

5  black guys and anybody coming near those cars, and

6  there's no Medina in the pictures.  He's a liar.

7  But let's go on.  The black guys,

8  according to Medina, are warned that there's been

9  an arrest, and what do they do, since these black

10  guys are there to participate in a serious crime,

11  with serious consequences?  According to Medina,

12  what do they do?  The answer is nothing.  They stay

13  at Food City.  Do you think it's possible because

14  Medina isn't telling the truth?

15  But put your -- again, just because you're

16  on a jury doesn't mean you have to become dumb.

17  Put yourself, if you were about to commit a serious

18  crime, and you're told your co-conspirators have

19  just been arrested, in a city where you're not

20  from, do you think you just sit in that stupid

21  parking lot and wait for somebody to come and

22  arrest you?  Probably not.

23  What else do they do?  Well, they go to a

24  Circle K, and you saw pictures that the Government

25  just put up of conversations going on at the Circle

1  K.  We have never seen, never, in any of this,

2  inside that Jeep Commander, have we?

3            You saw pictures of the Commander from the

4  rear.  You see a picture from Exhibit 29 from

5  above.  You don't see the Commander, what's inside

6  or who's inside.  Why is that important?

7            Well, the black guys, when they're at the

8  Circle K, Medina says, this is when I decided I

9  would tell them even more, and I told them, our

10  boys have been arrested.

11            Okay.  So what do you do if you're told

12  your co-conspirators have been arrested and there's

13  not going to be a home invasion because apparently

14  there's a huge bust and the cops are all out

15  looking for people?

16            You go back to the Food City, because

17  that's what the black guys did.  They returned to

18  the Food City after Medina says I told them there

19  was an arrest.  Does that make any sense?  No.  No.

20            Okay.  So let's look at the rest of what

21  Medina says happened and see if this makes any

22  sense.  And remember, he had 10 months to come up

23  with this story.  He claims he drove all the way to

24  Phoenix.

25            You know, we had Agent Edwards up here

saying, oh, gosh, sure, he never went to Phoenix.
He just went to Riggs Road 20-30 miles east of
Phoenix, east of Phoenix. Okay. Well, that's not
exactly what the testimony was.

What he says, the Expedition returns to
Food City and then leaves and is stopped on I-10.
At 4:34, about 21 minutes after the Escalade and
Expedition are stopped on I-10, Medina is stopped
with his sister and two children in the car, and
the testimony is, the black guys are stopped a
little bit past Casa Grande in that area, and the
Medina vehicle is stopped, according to the
officer, Riggs Road, 20-30 miles east of Phoenix.

So let's talk about whether that's
legitimate. I questioned him four different times
about this, and he was real clear, and there's a
reason he was real clear. He has to say he drove
all the way back to Phoenix. He has to say he
drove all the way back to Phoenix and picked up his
sister in Phoenix to avoid having her in Tucson
with a drug ripoff crew, period.

Otherwise, his sister has come to Tucson
with a drug ripoff crew with two children. And
frankly, folks, that's the only way, the only way
she could be in the car based on the time that the

1  car was stopped.  And let me go over that real

2  quickly.

3          When I questioned Medina, I asked him:

4          Question, "Let's just say you got there

5  three minutes after the 4:13 arrest; is that fair?"

6          Answer, "Yes."

7          Question, "Now, I'd like to talk with you

8  a little bit about Phoenix, because you went all

9  the way to Phoenix; right?"

10          There's nothing unclear about that

11  question.

12          And his answer is, "Uh-huh."

13          And the judge says, "You have to answer

14  yes or no," and he says, "Yes."

15          Okay.  But I didn't let that stop me.  I

16  wanted to pin him down.

17          Question, "And your sister, that's Carmen;

18  right?"

19          Answer, "Yes."

20          Question, "And what did you is, you went

21  to a place called 51st Avenue in Phoenix; right?"

22          Answer, "Right."

23          "And 51st Avenue basically turns into a

24  street called Riggs Road; right?"

25          Answer, "Right."

1          "So that's I-10 and Riggs Road; right?"

2          Answer, "Right."

3          "And from the point where you went, where

4   you saw these black people on the side of the road,

5   it's about 60 miles to get to 51st Avenue in

6   Phoenix."

7          Answer, "Right."

8          Question, "That's right, isn't it?"

9          Answer, "Right."

10          So he is precise.  He didn't go another 15

11   or 20 miles up the road and get stopped after he

12   saw the black people.  It was 60, all the way to

13   the west side of Phoenix.

14          Okay.  But I didn't want to stop there,

15   because I wanted to make sure this guy isn't going

16   to be messing around with me.

17          "Okay.  So 4:34 p.m.," I'm asking him, "is

18   when the stop was made; right?"

19          Answer, "Right."

20          "And this is an area in Phoenix.  You know

21   this area somewhat; right?"

22          Answer, "Well, I don't know where to get

23   off."

24          Question, "But it's an area where you went

25   to meet your sister; right?"

1  Answer, "Right."

2  "And Carmen lives in that area, the west

3  side of Phoenix; right?"

4  "Yeah, right."

5  "And what we're talking about is, in

6  Phoenix, the streets are on the east side and the

7  avenues are on the west side; right?"

8  "Right."

9  Then I continue.  "Riggs" -- Question,

10  "Riggs Road ends and becomes 51st Avenue; right?"

11  "Yeah, west side."  That's him

12  volunteering that.

13  Question, "West side?"

14  Answer, "Yeah."

15  "And that's near where your sister lives;

16  right?"

17  Answer, "Yes."

18  "And that's where you went to go find her;

19  right?"

20  "She met me at Riggs Road."

21  "At Riggs Road and 51st Avenue; right?"

22  "Right."

23  "And that's where -- after you drove all

24  the way from where you saw the black people that

25  got stopped; right?"

1           "Right."

2           And you know what?  He says it yet again,

3    and this is really important.

4           "That sister is Carmen?"

5           Answer, "Right."

6           "She met you in Phoenix at 51st Avenue?"

7           "Yes."

8           Question, "Okay.  That's not halfway;

9    right?"

10          Answer, "Right."

11          He's lying.  There's no way you can drive

12   -- and it's not a mistake.  It's not a mistake.

13   Anybody that lives in Phoenix knows where 51st

14   Avenue is on the west side.  He's 20 years old.

15   He's not completely stupid.  He's lying.  And the

16   reason he's lying is he doesn't want to put his

17   sister in that car in Tucson.

18          Maybe he's not smart enough to understand

19   that some old lawyer's going to actually look at

20   the times and show that it's not really possible,

21   but it's not possible, and he's lying, and we've

22   proved that he's lying.

23          All of this is an exercise primarily in

24   demonstrating who the person is that the Government

25   wants you to rely on and what -- what amount of

1    credibility you need to give him, and the answer is

2    just about zero. He's lied about just about every

3    major event in this case, including the fact that

4    he says in about less than an hour he drove all the

5    way from Tucson to the west side of Phoenix and

6    back to get stopped at Riggs Road by DPS Officer

7    Reeves.

8          It's not possible. He was in Tucson with

9    his sister and two kids in that car and left, saw

10    the black guys, and gets stopped about 20 minutes

11    later at 4:34 p.m. That's the only way it could be

12    possible.

13          You know, I'm almost finished, and let's

14    just talk a little bit about some of the physical

15    evidence in the case, because there really isn't,

16    at least physical evidence that ties Ghermon Tucker

17    to this case.

18          As you heard, there's no fingerprints of

19    Ghermon and no DNA on any of the weapons, and you

20    know, when Ghermon is questioned, he denied

21    knowledge of the guns in the car, and what you

22    heard from the Government is that these guns were

23    pretty well hidden in the car Ghermon was in.

24          One was in the back seat. The evidence is

25    Ghermon was sitting in the front seat. One was

another tucked in the rear seat, and another was in
the console. So his answer of denying knowledge of
guns in his car, you know, the guns weren't visible
in the car.

You know they've got a ski mask in this
car. That looks pretty horrible, it really does,
one ski mask for nine home invaders. That really
makes a lot of sense.

You know they've got guns scattered all
over the other car, you know, just kind of thrown
in. And with all due respect to our society, it is
a gun-driven society, and people have a lot of
guns, period. Whether that's good, whether that's
bad, that's not for me to decide, but there is a
bunch of guns in this vehicle. Fine. There's a
lot of guns in a lot of vehicles.

What I think is more important, however,
and what I'd like you to consider, when these guys
were arrested, nine guys at gunpoint by border
patrol agents, told to get out of the car with your
hands up and don't move, they all get out one by
one, hands up, and not one of them, not one of them
had a gun on his person, not one. The guns were
scattered about, basically willy-nilly throughout
the car, but not one of these guys had a gun on his

1  person.

2        You know, you heard a lot about some of

3  the other evidence, like sweatshirts.  Well, you

4  know what?  There's photographs you've seen at the

5  Circle K in the morning, when it's 50 degrees in

6  Phoenix, of guys wearing sweatshirts.  Okay.

7        You heard that there's supposed to be

8  goggles used during this event.  There's no

9  goggles.  You heard the black guys are supposed to

10  be dressed like police.  There is no police

11  uniforms.  There's no badges.

12        Ghermon tells the officers when they

13  question him -- and he agreed to talk to them -- he

14  doesn't know Mayco, Chivo, or Gollo.  You know,

15  there's no evidence -- if Ghermon is the black guy

16  in the February 4th meeting, think about that.

17  Look at the transcript.  Is there any evidence he's

18  introduced to anybody there or whoever the black

19  guy was?  No.

20        Mayco doesn't go by Mayco.  He goes by

21  Seco.  So the officers ask, do you know Mayco,

22  Chivo, and Gollo?  He goes no.  What else does he

23  say?  They ask him, did you meet these guys in the

24  park.  That's what Agent Frueh said when she got

25  up.  We asked him if he met these guys in the

1    park.

2            There's no evidence Ghermon met anybody in

3    a park or the black guy who was there, and he says

4    no.  That's not a lie.  They never asked him,

5    apparently, whether you're about to do a home

6    invasion, a drug invasion, about a warehouse,

7    anything like that.

8            You know, the gloves in the vehicle, if

9    you're about to rob drug dealers who have a bunch

10   of drugs, do you think these people are going to

11   call the police?  Who cares if you have

12   fingerprints in the place.  The police aren't going

13   to get called, so who cares if you have gloves on

14   or not?

15           You know, the Government has made a big

16   deal about the fact that guns are supposed to

17   arrive.  Well, there's at least two cars allegedly

18   that left where the guns probably were, and that's

19   in the LeSabre with -- supposedly with Miami and

20   with Mayco's brother-in-law, who supposedly is

21   there talking to Jorge at some point, and

22   apparently the FBI never stopped him that day, in a

23   blue car.  Do you think there could have been guns

24   in those cars?

25           You know, one of the problems with arguing

1   a case like this is that there's an awful lot of

2   evidence, and the last thing you want is for me to

3   go on for another hour talking about it. I could.

4         Just remember this. When Tony Gutierrez

5   is at the warehouse pretending to be a drug dealer

6   coordinating this event, he knew that the FBI

7   wanted the people who were going to be involved,

8   who were part of the conspiracy, to come to the

9   warehouse, because that makes it safer for

10   everybody, for citizens on the street, for the

11   agents, when the arrest is made.

12         And he sent Gollito back to Food City to

13   bring back the participants, and the Government can

14   argue until the cows come home. Gollito got there

15   and no black guys were asked to come back, none,

16   because they weren't part of this. And at 11:57 in

17   the morning on March 2nd, Gollito said, my dad

18   didn't want any black guys involved.

19         There's -- there's instructions I'm not

20   going to -- the judge is going to give you that I

21   was going to go over. I've talked too long. No

22   jury, no jury can find these men guilty on the

23   testimony of Jorge Medina and Tony Gutierrez, but

24   that is exactly what the Government wants you to

25   do.

1          I'm going to sit down now, and I have two

2    final things to say.  First, you know, I've been

3    doing this a long time, and there are -- as I am

4    told by my wife and kids all the time, I am not

5    perfect, certainly not as a lawyer.  If I have done

6    anything in this trial that you didn't like or that

7    I shouldn't have done or that you didn't approve

8    of, I do apologize, but remember, it's my failings

9    as a lawyer.  Don't take it out on Ghermon.

10         Second, I don't have the opportunity to

11   speak with you again.  Okay?  That's because of

12   what the judge just told you about the burden of

13   proof, which is on the Government.  It is not a

14   small burden.  And that's why the prosecutor over

15   here gets to talk twice.

16         As he speaks to you, as he stands up to

17   speak to you last, I want you to remember one

18   thing.  I could answer anything he or she says if I

19   were allowed to, but the system places a heavy

20   burden on the Government.  I don't get to talk to

21   you again, even though anything they say I could

22   answer.

23         But in this case -- you decide these cases

24   on the evidence and on the facts, and the facts

25   coupled with the instructions in this case allow

1  only one decision on all of these counts, and that

2  verdict and at that decision is that Ghermon Tucker

3  and the Ranger brothers are not guilty.

4         Thank you.

5         THE COURT:  We're going to break for

6  lunch.  We'll start back at 1:30.  Remember the

7  admonition I've given you before.  1:30.

8         (The jury exits the courtroom.)

9         THE COURT:  Mr. Armstrong, you'll be next.

10        MR. ARMSTRONG:  Thank you.

11        THE COURT:  If you need some exhibits, get

12  those a few minutes before we start.

13        (Off the record.)

14        (The jury enters the courtroom.)

15        THE COURT:  Show the jurors returned back

16  to the courtroom, the presence of all counsel and

17  the defendants.

18        At this point in time, Mr. Armstrong, you

19  may begin with your closing statement.

20        MR. ARMSTRONG:  Thank you very much, Your

21  Honor.

22        Good afternoon.  Can you hear me okay?

23        It's hard to follow an act like the

24  Rolling Stones, but we'll give it a shot.

25        So much of what I wanted to talk to you

1   about has been mentioned by Mr. Cooper.  I'm going

2   to try not to repeat everything, but I'm afraid

3   some of the things you're going to hear twice, and

4   you may hear them a third time from Mr. Young.

5   That's just how this is going to go.

6        I expect -- I'd like to have 30 to maybe

7   40 minutes of your time right now to just give you

8   an idea.  Again, I don't want to be redundant, but

9   you may hear it, and I hope you forgive me for

10   that.

11        And then I'm going to sit down, and then

12   you're going to see the most patient human beings

13   in the courtroom, that's Mr. Ranger and myself,

14   because, as you know, Mr. Lacey gets to talk to you

15   again.  And we are going, all six of us, the three

16   lawyers and the three men accused of these crimes,

17   will sit there and be polite, as if we were in

18   church, and listen, even though, as Mr. Cooper

19   says, we would love to get up and talk to you

20   again, but we're not going to get that chance.  So

21   right now, for the next half-hour, I'm all you got.

22        Proof of the conspiracy requires proof of

23   some agreement to commit a criminal crime, plus a

24   criminal act, plus an overt act.  There has to be

25   an overt act in addition to the agreement.

        You've heard the Government talk about why
they think they have convinced you or they have
enough evidence to convince you, and you've heard
from Mr. Cooper why that's just not true.

        The Government has said that Ja'Cory
Ranger conspired with six Mexicans -- they're
called Mexicans, although some of them I think are
from the United States, but for purposes of this
case, six Mexicans -- and a total of nine black
people to commit the offense of, well, to rip off a
stash house, a fake stash house here in Tucson.
That's -- as you know, that's a crime that the
Government has charged.

        The only proof that they have of a
criminal agreement, of an agreement, which is one
of the two critical things in order to -- you know,
in order for there to be a conviction, one of the
two critical things here, there has to be an
agreement to commit the crime.

        The only proof, the only witness who came
forward to testify about the existence of a
criminal agreement was the young man you've heard
all sorts of things about and you heard all sorts
of things from, Cochi, Jorge Medina.  That's the
only person who testified about the existence of

the agreement, which according to Cochi, he saw
hatched on the morning of March 2nd, 2011.

He saw it. He was there when Yovani and
Mayco went to some house in Tucson -- excuse me, --
in Phoenix, went to some house in Phoenix and had
whatever kind of conversation he now claims that
they had.

If you'll remember Cochi's testimony when
he was first asked -- and I don't know whether it
was Ms. Hopkins or Mr. Lacey asking him questions
about what he saw that day. If you recall, first
he said he might have gone in the house, and then
he said he wasn't sure, and he might have stayed
outside, stayed out in the street.

That seems to be a pretty basic fact that
an honest person would really have no difficulty
recalling and reciting here a few months later. He
couldn't remember that. He had two versions of the
events. It might have been inside; it might have
been outside.

Does that strike you as the testimony of
an honest person, somebody with a clear command of
what actually occurred? Eventually he settled in
on, I was outside. I was outside sitting in a
truck.

1          And from that vantage point he saw, within

2     a short period of time -- whether it was within a

3     minute or a short period of time, it's hard to

4     say.  What he saw was a black man, a young black

5     man who he described with a limp roll a joint in

6     broad daylight in front of somebody's house, maybe

7     his own, we don't know, but roll a joint and start

8     smoking it, at around the same time that either he

9     or a couple of his associates, fellows he knew,

10    started loading guns into a pickup truck in broad

11    daylight.

12         All right.  So that's Cochi's version of

13    events.  And then he talks about, well, we got into

14    a car, and I heard from Yovani, and I heard from

15    Mayco.  And you don't hear from -- you the jurors

16    don't hear from Yovani or Mayco.  All you hear from

17    is what Cochi says Yovani and Mayco said.  You

18    don't hear from the two most important people in

19    that car, according to Cochi, because he's just a

20    driver.  You don't hear from two of the top six

21    conspirators in this whole thing.  You don't hear

22    from them.  What you get to hear is some chewed on

23    version of events of what Yovani -- excuse me --

24    what Cochi is telling you he said.

25         And when Ms. Hopkins stands up here in her

1  opening remarks, she's talking about all the facts

2  that exist in this case.  Oh, my gosh, it's

3  overwhelming.  You start thinking, oh, my God, you

4  know.  Think.  Where is this coming from?  It's not

5  Ms. Hopkins.  She's a very fine lawyer, but what

6  she's telling you is stuff that she -- information

7  that she's getting from Cochi, and that's it.

8          You never hear from Yovani, and you never

9  hear from Mayco.  You don't hear from Gollo

10  either.  And you never hear from Ja'Cory Ranger.

11  You've got all sorts of phone calls, some lasting a

12  second or lasting no time at all.  The Government's

13  trying to tell you there's major communication

14  between conspirators.  Zero seconds on a phone

15  call, and that's a meaningful communication.  But

16  you've got -- you don't hear from Ja'Cory Ranger at

17  all, period in this case.  I'm getting sidetracked.

18          Back to Cochi.  He tells you what he did.

19  After they get back in the car that morning up in

20  Phoenix, they go -- eventually they go to Miami's

21  house.  They go to Miami's house.  And you're going

22  to hear -- you heard about Miami.  I'm going to

23  talk about Miami.  Mr. Young's going to talk about

24  Miami.

25          But what Cochi, as Mr. Cooper has pointed

1  out and what you got to hear, this is a young man
2  who was as involved in this crime as anybody else
3  in that car driving down to Tucson on March 2nd.
4  He's admitted his involvement to the FBI.

5        What did he do?  What did he do that day?
6  He drove Yovani, who's a guy who was going to bust
7  down the doors, and Mayco, who was another key
8  player, who is at the warehouse -- I mean, these
9  were dudes at the warehouse.  He drove those two
10  guys from Phoenix to Tucson, knowing one of them
11  had a gun.

12        They went to Mayco's -- excuse me.  They
13  all go to Miami's house and hear a conversation
14  with Miami, all about what was going on with
15  Miami.  He's there when they're recruiting Miami,
16  when they're getting Miami involved.

17        And he gives Agent Edwards, more
18  importantly -- and Agent Edwards believes this.
19  And that's okay.  That's okay.  But do you
20  believe?  That's all that matters.  It's not what I
21  believe.  It's not what Jon Edwards believes.  It's
22  not what the prosecutors believe.  Do you believe
23  that Cochi's telling you the truth, that he was
24  just a bit driver, that he was going to be paid a
25  few thousand dollars to drive down to Tucson to

 1   take two major parts of this ripoff crew down to

 2   Tucson?  Eh, maybe.

 3       Take a look -- if you'll recall the Food

 4   City video, the Food City still photos, he's

 5   dressed in black, just like the other two Mexican

 6   fellows who are apprehended at the warehouse.  He

 7   was going into that house.  He was as involved as

 8   anybody at that warehouse.

 9       You saw from the witness stand, not from

10   the defense table, you saw the one person in this

11   courtroom that you can be certain was there to rip

12   off a house in Tucson on March 2nd.  He told you he

13   drove a couple guys down and that was it.  That's

14   nonsense.  There's other words for it.  I'm going

15   to stop at nonsense.

16       If he was so frightened -- excuse me.  If

17   he was so certain that this wasn't such a big deal,

18   why, as he testified, would he flee?  Ja'Cory

19   Ranger, Ghermon Tucker, and Jerome Ranger didn't

20   flee.  They did not flee.  They stayed.  They

21   stayed, and they went back to the Food City.

22       So if Cochi is such, you know, a

23   tangential part of this whole thing, why did he run

24   initially?  Why did he lie to a DPS officer about

25   where he was headed, and why did he pack up his

1    family and move to Mexico for six or nine months,

2    or however long it was?  Why was he so afraid to

3    come back?  Why did he have to sneak out of his own

4    country?

5         You saw a criminal.  It was Cochi.  And

6    he's here telling you, here's what other people

7    were saying about the blacks' involvement in this

8    case.  And here's what I saw.  Believe me.  Here's

9    a man with a conviction for lying.  He told you he

10   lied to a DPS officer.  He also told you he lies to

11   members of -- to his wife.  When do you think he

12   stopped lying?  At what point in that young man's

13   life did he stop lying?  Has he stopped lying?

14        I don't think -- I don't think it ended

15   last week or as of last week, I don't know whether

16   he was here Tuesday or which day it was, but as you

17   saw, he described a situation running into the DPS

18   officer outside of Phoenix, that it's impossible

19   for him to be telling the truth.  It's impossible.

20        And it's also impossible for him to be

21   telling you, for his testimony, about what he saw

22   in the Food City parking lot to occur.  Mr. Cooper

23   spelled that out for you.  So the question is, when

24   did he stop lying?  I don't think he has.  It

25   didn't end last week.

1    We know that Cochi was somehow arrested, I

2  think, on a minor traffic offense of some sort,

3  February 8th of '11, the same day Yovani -- Yovani,

4  again, it would help if you knew who these people

5  were, if you'd seen them.

6    Yovani.  Yovani is a major player in this

7  whole thing.  Yovani is the guy who says he's going

8  to go bust down doors.  He's going to be the first

9  guy in the door of the stash house.  That's

10 Yovani.  He was arrested at the warehouse.

11   Yovani was in Phoenix and had a meeting

12 with Agent Edwards on the same day, February 8th,

13 that Cochi had his first meeting with Agent

14 Edwards.

15   And Yovani -- excuse me.  Cochi is telling

16 you, trying to tell you he really didn't have that

17 much information about the case.  He didn't really

18 talk to Yovani that much.

19   We talked a little bit, maybe here and

20 there.  We really didn't talk about this case.

21 Again, do you think he'd stopped lying before he

22 told you that?

23   I want to talk about Yovani's involvement

24 in this.  I think you heard on the transcript,

25 maybe that happened in the first week of the case,

1  when Tony, the -- Tony was up here, and he was

2  going through the transcript for about an hour, and

3  I think you saw it on your video, and it was

4  rolling past.  You saw it on your screens there,

5  and it was rolling past you.  About two weeks ago,

6  I think, is when you heard this testimony, or saw

7  it, because it was in Spanish.  But you saw the

8  translation.  And I think I'm going to show you

9  something about that here in a few minutes too.

10      Yovani is saying, I'm going to be the

11  first guy through the door.  He is a major player

12  in this whole thing.  He knows all sorts of

13  information about this.

14      And Cochi's, again, telling you that, I'm

15  married to Yovani's -- Yovani's married to my

16  sister, I guess it is, and Yovani feels comfortable

17  enough to call me on the phone and ask me if I want

18  to go commit a major felony or be a driver while I

19  go commit a major felony, and you're going to --

20  and Cochi's going to be present when Yovani and

21  Mayco have all sorts of discussions between the two

22  of them and over the telephone and with a bad dude

23  named Miami.

24      He trusts them that much to talk about the

25  case, but he also is not going to tell him -- he's

1　not going to discuss the facts after the case,

2　after Yovani has been arrested and is facing

3　serious prosecution, and more importantly, at a

4　time when Cochi is trying to figure what his next

5　step is.  Does he live the rest of his life in

6　Mexico, or does he return to his own country and

7　face criminal prosecution?

8　　　　He kind of got off easy.  He returned to

9　his own country, but he's not facing criminal

10　prosecution.  He is walking this earth completely

11　scot-free.  No consequences.  None.  And there

12　aren't going to be any.  There are not going to be

13　any.

14　　　　Excuse me just one moment here.  I want to

15　talk about from the initial meeting, February 4th

16　of 2011, the initial meeting with all the

17　Mexicans.  And Cooper has covered this, and I'm not

18　going to spend a lot of time on this.

19　　　　At that meeting, the purpose of that

20　meeting wasn't to discuss planning a home

21　invasion.  I mean, it really wasn't.  The purpose

22　of that meeting was for Tony to gather information

23　about people that he was BS-ing about the home

24　invasion.  That was the purpose of the meeting.  It

25　wasn't to plan a home invasion because there wasn't

1  going to be a home invasion.

2          The purpose of that meeting was Tony

3  wearing a wire someplace on his body, there to

4  dirty up everybody who appeared in that meeting

5  room, get information on them, turn it over to

6  Rubicalva or Edwards for later use.

7          You've heard for two weeks how it's not

8  logical to believe that the Mexican -- the Spanish-

9  language speakers in that room were using English

10  at really any significant point of the

11  conversation, because if they were, there would

12  have been a different outcome.  I mean, you know,

13  whatever black person is in that room is not going

14  to tolerate that kind of talk.  There is no

15  evidence that there was any sort of difficulties at

16  all.

17          And you know, probably the Mexican people

18  aren't going to speak the way they were speaking,

19  you know, being polite.  Although they're using the

20  N word, they're going to be polite and not talk

21  about that to his face.

22          So you know, they weren't -- and you know,

23  Mr. Lacey's going to get back up here again, and

24  I'm just going to have to sit here again and maybe

25  just chain myself to my desk and not stand up,

1  because I can't.  I'll be in a lot of trouble.

2          He's going to try to tell you about 65

3  birds and renting a house.  65 birds and renting a

4  house does not provide you with enough information

5  to make yourself a conspirator.  You can't jump

6  into a conspiracy by talking about 65 birds and I

7  rent houses.

8          But what Tony could have done -- because

9  the purpose of his meeting, again, is not to plan

10  the thing, but to get people committed with his

11  wire, wherever he was wearing it, is to get people

12  committed to the crime so he can turn the evidence

13  over to Edwards.

14          He never turned to Tony -- following up on

15  what Cooper said again, he never turned to -- Tony

16  never turned to the black man in the room and said,

17  well, what do you think?  Doesn't this sound

18  great?  Let's go make a million bucks.  Let's make

19  half a million bucks.  I'm going to cut your crew

20  in on this.  You're going to provide this and this

21  and this.  We're going to go on a certain day.  I'm

22  going to -- you know, give me your phone number.

23  Nothing like that.  Absolutely nothing like that.

24          If Tony is -- if that is his purpose, he

25  did a pretty miserable job at it.  There was no

1    conversation that the black person in that room

2    comprehended, period.

3             Jumping ahead a month.  Now, in that month

4    -- can I hit you up for some water?  Thank you.

5             During that month, you heard any number of

6    times Gollo, who again we don't know or we don't

7    see, and who never traveled -- although this was

8    his operation, Gollo stayed in Phoenix.  Gollo sent

9    Gollito, sent his son.

10             But Gollo says, we're not using the

11    blacks.  And you've heard the derogatory things

12    said about the blacks.  They were not part of the

13    deal.  All throughout the month of February, they

14    were not part of the deal.  I don't think they were

15    part of the deal February 4th, and they were not a

16    part of the deal anywhere in the rest of that

17    month, or even March 1st or on March 2nd.

18             I've got Bates 8240 up before the jury.

19    The circle is mine, and the check is probably mine

20    too.  That's from a conversation at 8:40 in the

21    morning, the morning of the deed, 8:40 in the

22    morning.  That's a conversation between Gollo and

23    Tony, and he says two blacks are going.  Two blacks

24    are going.  8:40 in the morning.

25             I suppose I could just read this to you.

1  Bates 8185, conversation three hours later, between

2  Gollito and Tony.

3          "Hey, did your dad send the black guys or

4  not?"

5          "No, no, no," Gollito says.  "It is

6  nothing but Chicanos."

7          The black guys were never part of this.

8  Ja'Cory Ranger was never part of this.  The two

9  blacks, I don't know.  Cochi might know.  Cochi

10  went to a black man's house named Miami to pick him

11  up -- or excuse me.  I didn't mean to say that.  He

12  didn't pick him up but went with Mayco and -- my

13  brain is fried.  I need a nap.

14          He goes with Mayco and the other fellow to

15  Miami's house the morning of March 2nd.  He's up

16  there with Mayco.  He goes to Miami's house.

17  That's one of the black people.  And there are two

18  black people, as you'll later see, and I think

19  Mr. Cooper covered this, in a car in the parking

20  lot of the Food City.  Two.  The FBI even spotted

21  them.  They left at 2:20.

22          So at 8:40 in the morning, the big cheese,

23  the big man Gollo is telling the snitch, excuse me,

24  Tony, the confidential human source, that there's

25  going to be two blacks.  Three hours later, in a

1  whole ball of confusion, I don't know what -- where

2  to come down on this, but three hours later the son

3  is saying, no, no, no, we're not using any blacks.

4  Jumping head again to the Food City.  Why

5  is the Food City so important?  Agent Edwards

6  testified about why it's so important.  The Food

7  City versus the warehouse.  The warehouse is key

8  because, if you go to the warehouse, you're going

9  to be arrested, because it's now clear what your

10 intentions are.  If you get to the warehouse,

11 you're part of the plan.  You're part of this

12 conspiracy.  Food City wasn't.

13 They were not making arrests at the Food

14 City.  They were monitoring the Food City.  And

15 they were not looking for the Rangers at the Food

16 City.  They didn't see them until much later, until

17 hours, hours later, after other people started to

18 arrive.  And they really didn't even see them until

19 the whole thing was almost over.

20 So the Food City -- going to the Food City

21 is not the criminal act.  It's the FBI wanted to

22 get you or get the person to the warehouse.  And I

23 know that they say, well, that was for safety

24 reasons.  Well, they could have made the Food City

25 a safe location or used another location that they

1   could have made safe, another abandoned property of

2   some sort.

3         You know, if they wanted to have this

4   two-step process, go to the Food City for whatever

5   purpose, but it's not a crime until you get to the

6   warehouse.  You know, if they wanted to arrest the

7   people at the Food City, they could have done

8   that.  Again, I understand the whole public safety

9   concept, but they could have moved the whole -- you

10   know, why did they want people at the Food City?

11   They could have taken that to another location.

12         They could have said, well, meet in an

13   abandoned property down on South Sixth, someplace

14   east of town.  You meet there.  Okay.  You meet

15   there.  You had FBI all around there to make the

16   arrests.

17         Now, Tony needed to get people, and Agent

18   Edwards told him, you need to get people -- the

19   people involved in this gotta get to the

20   warehouse.  And to state the obvious, Ja'Cory

21   Ranger was never at the warehouse, never got close.

22         So much of what I wanted to talk about,

23   I'll be darned, it's a half hour already,

24   Mr. Cooper has already gone over, but I have a few

25   points that I want to run over here first.

1          Throughout this whole process, throughout

2    all the conversations, African-Americans are

3    referred to as either blacks by the Mexican

4    conspirators or another awful word, niggers or

5    monkeys.

6          Towards the end of this, the warehouse

7    meeting, maybe about halfway through, there is

8    conversation.  The language changes.  They're no

9    longer calling them -- no longer calling African

10   -Americans black or the other word.  The people

11   that are going to be used in the -- to go in to the

12   residence, they're referred to as "the people." And

13   I'm referring to Bates 7935.

14          You also see here, "The people," "I'm

15   going to be in charge of the people."  That looks

16   like something Mayco said.  And Chivo, who again we

17   don't know, we don't see, says, "I'll just have to

18   tell the kids" -- "We just have to tell the kids,

19   man, don't do anything to anybody."  They're not

20   calling them blacks.

21          If they're going to use -- if the blacks

22   are really the people they're going to use, why

23   aren't they referring to them in the same way as

24   they were referring to them from February 4th, all

25   throughout the month of February and all throughout

1  that day?

2  Suddenly they're using "kids" and they're

3  using "people."  It's not -- they're not using --

4  they're not using the "niggers."  They're not using

5  "the blacks."

6  And Yovani, I might never speak about

7  Yovani again.  Yovani has said, and you heard on at

8  least two occasions, right toward, you know, sort

9  of at the warehouse, as things are winding down

10  over there, Bates 7938, Yovani is talking about

11  what he's going to do.

12  And remember, the whole fiction about the

13  warehouse is there's two guns.  Tony has told

14  people there are just two guns.  I forget the

15  caliber.  A .45 and I think they called it a .33,

16  which I don't know that you have those, but he says

17  there's two basically handguns.

18  Tony has got this whole thing, got

19  everybody thinking there's two handguns and five or

20  six people, including his cousin, who's probably,

21  you know, who you wouldn't -- everyone wouldn't

22  expect to put up any sort of a fuss.  And Tony

23  himself will be there.  He's not going to put up

24  much of a fuss.

25  You understand, he was going back to the

warehouse.  The whole fiction was he was going to

go back to the warehouse.  Excuse me.  He was going

to go to the stash house -- I'm not explaining this

well.  He was going to go to the stash house --

that's what he was telling folks -- and when he

came into the stash house, he was, you know, going

to act like, oh, I'm all surprised and that sort of

thing.  He needed to be there, and those people

needed to believe that he was going to be there, he

and his cousin.

So there's two handguns and a couple other

people, and that's what all of these folks believe,

until the very last, until Tony comes up with this

last-minute story about there's six other people

there with guns.

So I'm trying to imagine myself in the

mind of a person who's going to go commit a home

invasion.  I've got my own crew, four, five, six

guys.  Maybe I've got two blacks back in the

parking lot, Miami and the other guy.  And, like,

if I'm Yovani, I'm ready to bust in myself.

This is Yovani.  "YV" is Yovani.  They're

talking about the door.  It says, "I'll fucking

knock it down."  A little while later there he's

speaking with -- I think it's Chivo and Mayco.

1    Well, the whole gang is there.  He said, "As soon

2    as I take down the door, I'm going to be the first

3    one in the living room."

4              So Yovani is going to be the guy

5    accomplishing the entry of the house, a house

6    that's fairly lightly guarded.  You've got two

7    guys.  You don't have anybody, but the conspirators

8    think there is just two guys there with two guns.

9              So remember back what Cochi had said.

10   Cochi said, I heard the plan, and it was to give

11   the black guys half of the cocaine and whatever

12   else was found at the house.  So why would you give

13   half a million dollars of cocaine for a job that

14   you can do yourself?  Why involve anybody else in

15   an operation that you're completely equipped to do,

16   a lightly guarded -- and again, there is no stash

17   house, but what these guys were believing until the

18   very last is this was a very lightly guarded stash

19   house with 50, maybe 65 kilograms of cocaine, and a

20   whole bunch of cash in the house.

21             Why cut anybody else in on it?  You don't

22   need anybody else, because if you use them, you're

23   going to have to give them half.

24             A few more points here.  Bates 7939 and

25   7940.  Mayco throws out what looks like a phone

1  call at the very last minute.  And again, I don't

2  -- the information I'm showing you here, it's not

3  correlated or it's not synchronized as to time, but

4  it does occur towards the very end of that maybe

5  50-minute transcript that you saw.

6          And if you recall the testimony from the

7  FBI translator, the italic words are English words,

8  and "ML" is Mayco.  And there's an aside, and in

9  English, it says, "The dude called.  Five more

10  fools are there, so scram, huh?"

11          I think that's Mayco talking to somebody

12  else, and it's not the phone call that the

13  Government says that they saw Mayco make at the

14  time of the arrest.  It's, I don't know, a minute

15  or two before the arrest.  "The dude called.  Five

16  more fools are there, so scram, huh?"

17          The next page, continuing on with the

18  transcript, it says, "Well, I'll call you.  I'll

19  call you in a half-hour."  And then he turns back

20  to the CHS -- I think it's what he did.  He says to

21  CHS, "So they called you," and then he's back

22  talking in Spanish.

23          I looked over all those phone calls, and I

24  think it's Exhibit 114, the chart you've seen.

25  There is no phone call from Mayco to Ja'Cory

1  Ranger, Ghermon Tucker, or Jerome Ranger, that
2  coincides with that conversation.  There is a man
3  saying, you know, there's five more -- Mayco, who's
4  there, one of the main guys trying to do this, just
5  before the arrest, he's having a conversation in
6  English, not Spanish, in English to somebody else,
7  minutes before the arrest.
8         And the conversation is, "There are five
9  more people here," so he's buying into this whole
10 thing Tony is saying.  And I think Tony, if you
11 recall, he said he told them that to keep them from
12 leaving, because Mayco was ready to do this by
13 himself, and he said, no, I've got to keep Mayco
14 here.
15         I've got to give that Tony credit.  That
16 man can lie.  By God he can lie.  He's around a
17 bunch guys of with guns who, if anyone found out
18 what he was up to, you can imagine what would
19 happen.
20         And just like that, there's Mayco ready to
21 go.  He figures out how to keep Mayco in the room.
22 Of course the door was locked and Mayco wasn't
23 going anywhere, but I think, if Mayco would have
24 found that out, there would have been more
25 trouble.

1      So Tony tells and comes up with this last
2  minute nonsense about five more guys with guns.
3  Mayco hears this and places a call in English to
4  somebody.  Again, I don't have access to when this
5  call occurred, but it's, I think, three pages
6  before the end of the transcript, and there's,
7  like, 41 pages in the whole transcript.
8      So minutes before the whole deal goes
9  down, Mayco's saying, I'll call you in a half
10  hour.  There's five more guys here.  Let's scram.
11  Kind of like he's calling this off.
12      Meanwhile, back in the parking lot, at
13  2:20 the gold Buick takes off.  Again, I don't know
14  the time of these phone calls, but I do know that
15  the Government's chart here, Exhibits 114 and 113.
16  113 doesn't matter, but 114 doesn't have that phone
17  call on there.  It was not a call to anybody in
18  this room.  It's not here.  It can't be.
19      So who was he calling?  I think he was
20  calling one of the two blacks that Gollo, Gollo,
21  not Gollito, Gollo had said we were going to send
22  two blacks, the two blacks that were observed in
23  the parking lot, neither Rangers, that left at 2:20
24  and have never been seen or heard from again.
25      I know Mr. Young is going to talk to you

about the jury instructions, and so I'm going to
let him finish with that, but I know one of the
jury instructions you're not going to see is the
old adage that the villain always returns to the
scene of the crime.  Sherlock Holmes or something
like that.

The Rangers returning and Mr. Tucker
returning to the Food City is not any indication of
guilt.  It's an acknowledgment on their part that
they're not worried about anything.  They go back
to the place that the black guy in the gold —— in
the Buick scrammed out of.  And if Cochi's to
believe —— to be believed, Cochi told everybody to
leave.  I don't think he did.

But everybody's gone from that location,
and the Rangers just sit there.  After there's been
an arrest, after people have left the Food City,
the Rangers sat there for a good —— and
Mr. Tucker —— sat there for a good 10 minutes.  And
then they come back 45 minutes later, roughly, give
or take, unlike everybody else in the case.

The guys —— the guys in the Buick took
off.  Cochi took off, took off all the way to
Mexico.  The Rangers don't leave quickly.  They
don't throw away their cell phones.  They don't

throw away any evidence. They don't discard their
jackets. They don't try to dump the guns. They
drive back, probably, on the same route that they
came down on.

They didn't -- they didn't go to Mexico.
They didn't head up to Globe, go out to Benson.
They can't cut off on Interstate 8 at the last
minute and try to get in through Benson or try to
get in town through Maricopa or Gila Bend.

I kept asking witness after witness -- and
maybe you were thinking, what's that knucklehead
doing? They were arrested after the point you turn
off to San Diego. They went home the normal
route. When they were arrested, they all had their
telephones on them.

The fact that they didn't destroy any
evidence, make any effort, no effort at all to
destroy any evidence in this case, and the fact
that they didn't leave quickly the Food City, the
scene that, you know, had something gone amiss,
terribly wrong at that Food City, they didn't leave
quickly -- and they went back. They went back, and
I don't know why, but they weren't afraid. They
weren't afraid of anything. They weren't afraid of
the FBI, and they weren't afraid of the police.

1  Other people had fled.  They go back to the place

2  that was a very dangerous place for all the

3  conspirators in this case.

4          I think it was two weeks ago I stood here,

5  and I told you Ja'Cory -- you're what Ja'Cory had

6  in this case.  The Government has made their

7  decision.  They've made their choices.  They're in

8  bed with Tony, $75,000 for two months worth of

9  work, plus a whole lot of moving expenses.

10 $108,000 for his testimony.  $108,000 for his

11 testimony.  And freedom, complete freedom for

12 Cochi, who is as guilty as any of the people at the

13 warehouse that day.  That's who they're in bed

14 with, and that's who they called.  That's who they

15 choose to believe, and that's their case.

16         You're all this young man has.  I know

17 jury service has been an imposition, and I know

18 when you go back to deliberate, you may be

19 thinking, I've got to -- you know, I've got my idea

20 here, but somebody else has got another idea.  You

21 know, I -- stand your ground.  Stand your ground.

22 If you're not buying this, don't be persuaded by --

23 or don't give into temptation just to resolve this

24 case.  Stand your ground.  Stand your ground for

25 Ja'Cory.

1   This has been a long two weeks, but I

2   guarantee you, this has been the most important two

3   weeks of this man's life, this young man's life.

4   We thank you for your time.

5   THE COURT:  Mr. Young, whenever you're

6   ready.  You can have your own cup of water too.

7   MR. YOUNG:  Thank you, Your Honor.

8   I harp at my children, ladies and

9   gentlemen.  I absolutely harp at them.  They're in

10  high school now, so they're pretty tired of hearing

11  it, but we still talk about it.  And Jerome, it

12  wouldn't hurt you to listen to this too.

13  If you're hanging out with hoodlums, if

14  your friends are troublemakers, it's not that

15  you're going to do something that you shouldn't.

16  That's not my worry.  But they are going to leave

17  you holding the bag for something.  I don't know

18  what and I don't know when, but I know they're

19  going to leave you holding the bag, and I know

20  what's going to happen.

21  They're going to want to leave their lunch

22  box in your locker.  They're going to want to leave

23  their backpack in your car.  They're going to want

24  a ride across town.  And they're going to know when

25  to turn off their phone and throw it away.

1    They will know to disappear when the guys

2  at the warehouse get stopped because "got stopped"

3  will have meaning to them.  And when that happens,

4  all of the different colored cars and all of the

5  brother-in-laws and everything else is all going to

6  melt away.

7    Mayco and Chivo are going to go through

8  the front door like Wile E. Coyote and Roadrunner

9  when SWAT comes through the wall, and the white car

10 and the gray car and the gold car and the Jeep

11 Commander will all be gone before surveillance even

12 sees them.

13   Miami's only going to hang around long

14 enough to ditch his and Mayco's vests, and he'll be

15 gone a minute later, before surveillance even gets

16 his full license plate.

17   And you will be left hanging around in an

18 empty parking lot and driving around in aimless

19 circles and eating lunch out in front of a Circle K

20 while you wonder where everybody went.

21   Your friend Mayco, he's not just screening

22 his calls, and he's not going to pick up his phone

23 just because you call from a number he doesn't

24 recognize.  I actually do that a lot, not screen my

25 calls, but -- my wife's my office manager.  She

1  does that for me.

2         But believe it or not, not everybody wants

3  to talk to their attorney, and so my office has a

4  blocked line, and I have an unblocked line.  And

5  normally I call on an unblocked line.  If I think

6  someone is screening my calls, I call from the

7  blocked line.

8         My mother does the same thing if she

9  thinks I'm screening her calls.  She calls from my

10  brother's phone, and she gets me every time, and

11  then we're going to talk about whatever she saw on

12  the Internet.  That's how caller ID works.

13         Now, I dislike Jorge.  I dislike him for

14  purely personal reasons.  The guy is a worm.  On

15  the other hand, Jorge does help me out by saying

16  that my client is not hanging around getting high

17  with his friends on a Wednesday morning.

18         I also noticed that Jerome Ranger was not

19  at the December 29, 2010 meeting in Phoenix.  I

20  notice that Jerome Ranger was not at the February

21  4, 2011 meeting in Phoenix.  Jerome Ranger was not

22  at the February 22nd, 2011 meeting, also in

23  Phoenix, in addition to not being there the morning

24  of March 2nd, 2011.

25         His phone never contacted Gollo's phone

ever.  Dan Douglass, who is the toll record guy, he
clarifies that, by "ever," he means the dates from
January 1, 2011, to March 2nd, 2011.  Those are the
dates that he has records for.

Jerome Ranger's phone has never contacted
Gollito's phone, again, ever.  Jerome Ranger's
phone has never contacted Chivo's phone ever.
Jerome Ranger's phone was used to contact Mayco's
phone once, again, ever.  That was on February 4 at
1:01 a.m. for two seconds, after which I couldn't
tell which, either Mayco's phone called Ghermon
Tucker's phone or the other way around.  I can't
tell which way those phones were calling each
other.  It's on Exhibit 113, whatever it is.

Point being, these are not Jerome Ranger's
friends.  Jorge also helps me out by saying that he
warned Miami that the guys at the warehouse were
stopped, which is why Miami ditched his vests and
broke contact the way that he did.

But Jorge is still a worm.  Just ask his
wife.  I don't need to go all the way to 51st
Avenue to prove that he is a lying liar.  I know
everything I need to know about Jorge just from
having met him.

And Judge Collins will instruct you in a

1  little bit to examine Jorge's testimony with

2  greater caution than that of an ordinary witness.

3  That applies to Tony's testimony too.  Jorge needs

4  to say that he got at least one of the blacks, that

5  at least one of the blacks was told about a drug

6  rip.  The black with the bad leg, for instance.

7        And from that, I guess you can just

8  speculate, because that's what they're asking you

9  to do, you could just speculate that all the blacks

10  must know because one of the blacks knew, according

11  to Jorge, and it just makes sense that, if one of

12  the blacks knew, then all of the blacks must know,

13  because, you know, I don't know, just speculating.

14        It's bad enough that the case against the

15  guy with the bad leg depends on Jorge's testimony,

16  and the case against everybody else, that case

17  depends on speculation that the black with the bad

18  leg must have told them.  Did it happen?  Well, it

19  doesn't fit any of the facts.

20        As my colleagues have pointed out to you,

21  who is standing around at the Food City 15 minutes

22  after everybody else has cleared out?  Who is still

23  there after Jorge has warned Miami about Mayco

24  getting stopped?  Who's eating lunch at the Circle

25  K?

1     Now, Jorge, he left the Circle K the same

2   minute that he got stopped, and he was sneaking on

3   and sneaking off the freeway, trying not to get

4   stopped because he was scared, and he was having

5   his sister come and pick him up and drive him

6   because he was scared.

7     And he moved to Mexico, not the next day.

8   He moved to Mexico the same day, because he was

9   scared, because Mayco getting stopped, that meant

10   something to him.  That was important.  He moved to

11   Mexico that very day and stayed a year.

12     Miami, he left a minute after he was

13   spotted at Food City.  Everybody else left Food

14   City before they were even spotted.  And who is

15   still driving around in circles looking for their

16   friends?  Who's still calling Mayco, trying to get

17   him to answer?

18     If Ghermon Tucker knew that Mayco was

19   doing a home invasion, and if Ghermon Tucker knew

20   that Mayco had been arrested, then Ghermon Tucker

21   would know that no kind of phone is ever going to

22   reach Mayco.  It's not a bad connection.  A land

23   line is not going to get through.  Mayco is never

24   going to answer that phone.

25     But Ghermon Tucker is still trying to

1  place that call, and the Government wants to tell

2  you that Ghermon Tucker knew that the person he was

3  calling was just arrested for a home invasion.  No,

4  Ghermon Tucker did not know that.  If he knew that,

5  there would be no point in calling.

6          Jerome Ranger, he's got a receipt for his

7  AK-47.  There is no real point in that either.

8  That is somebody who is missing an important part

9  of the big picture, like the home invasion part.

10  If you're robbing a load of drugs from a home, a

11  receipt is not going to do you any good.

12          And Jerome claims two vests.  Really?

13  Tell me about that.  How many vests can you wear at

14  once?  I would say for most people, probably just

15  one.  I might be able to figure out a way to get

16  into two of them.  But there's no reason for Jerome

17  to have two vests.  You can only wear one vest.

18          These are Mayco and Miami's vests.  Jerome

19  Ranger won't say so, but I will, because it makes

20  as least as much sense as Jerome Ranger wearing two

21  vests.

22          And let me add, if you're going to reach

23  into those bags and pull out those vests with a

24  fresh pair of latex gloves on, like you still might

25  get curious some day about whose vests they are and

go have them DNA tested, well, now is the time,

because we're talking about whose vests they are

today.

The red skull ski mask, I have to admit,

as soon as I saw that, I was thinking, that is

about the coolest hat I've ever seen.  These guys

bought that somewhere, and I'm going to figure out

where.  And after this trial is over, I'm going on

eBay.  I'm going to go to Spencer's at the mall.

I'm going to put it on my Amazon wish list.  I'm

going to find that hat someplace, and I'm going to

get me one too.  I probably could have ordered it

from my smart phone while Mr. Cooper was still

nailing down the mileage from 51st avenue.

I embarrass my kids enough already, and

I've reconsidered the red skull ski mask.  I should

probably mostly stay away from urban hip-hop

style.  But still, the hat, if you push it up onto

your head, which, if you've ever lived somewhere

cold, and I have lived someplace cold, you know

that you wear your ski mask most of the time up on

your head, or your balaclava, or if you're in

Canada, they would call it a toque.  You push it up

on your head.  And the ski mask I was looking at

was one of the coolest hats I've ever seen.  It's

1   style.

2          Zip-ties.  There were a lot of guys in a

3   lot of cars.  There were a lot of guys in the red

4   Expedition.  Again, the Government has had those

5   zip-ties for a year and a half.  And again, they're

6   still putting on fresh gloves before they handle

7   them, just in case they ever get curious about

8   who's been touching them and in case they're

9   curious about who laced them together.

10         The question, why do we carry guns?  I

11  could probably ask you all that question.  I

12  noticed that every hand, almost every hand, almost

13  every hand went up when Judge Collins asked you all

14  about gun ownership.  It was almost every hand

15  except for that one defense attorney with the John

16  Lennon glasses who was sitting down here.

17         The answer, I suppose, to why do we carry

18  guns is mostly because we can.  My daughter talked

19  me into taking her shooting this weekend.  Twisted

20  my arm, you can imagine.  We shot until we had

21  blisters.  Was there a point to it?  It's loud.

22  It's dirty.  It's dangerous.  It smells bad.  Those

23  are all terrific reasons in my book, but they're

24  probably not her reasons because she's 14, and her

25  favorite color is pink.

1            Me personally, about guns, I really like

2       the way the perfectly machined parts fit together.

3       And so for that reason, I really like the AR-15.

4       Some of you will know what I'm talking about here,

5       some of you won't, but I'm going to do it anyway.

6            The upper and the lower receiver are

7       machined instead of stamped.  The gas-operated

8       rotating bolt I think is genius, the way that the

9       bolt face rotates and the locking lugs connect up

10      with the chamber, I just think that's genius.

11           Again, some of you know what I'm talking

12      about.  Some of you might not.  The tolerances on

13      that weapon are very close, so it really likes to

14      be cleaned, which works for me because I'm one of

15      those people who really likes to clean.  That's how

16      I relax.

17           None of this is really a really compelling

18      argument for gun ownership.  We just like them, and

19      men have always liked projectiles for all of human

20      history.  It's just part of our DNA.  Try not to

21      mess it up with logic.

22           Mayco, a few words about Mayco.  Mayco is

23      barely invited on this misadventure.  He was in for

24      a while.  He was out for a while.  Maybe he can

25      bring his roommate Miami, but that's going to be

1 about it. Mayco could not have promised half of

2 the cocaine to the black guys. For one thing,

3 Gollo did not invite Mayco. Let me back up. Gollo

4 may have invited Mayco. Gollo did not invite the

5 black guys, and Gollo was very clear about that.

6 But what happened was that Jorge was not

7 there when Gollito, who's in charge, and Chivo told

8 Tony at 11:57 that morning that the blacks were not

9 coming. He could not have known that the blacks

10 were not in on the deal. I think the words were

11 that Gollito said his father did not send the

12 blacks.

13 Jorge did not know that, so he made some

14 assumptions, and he did what he could to shorten

15 his sentence or to get out of this completely. It

16 looks like get out of this completely. Tony did

17 say that you can't trust any of these guys, that

18 they're liars and they're thieves.

19 Another thing is that, if you do just a

20 little bit of math, half of the 65 kilograms of

21 cocaine is going to leave 32.5 kilograms for

22 everybody else, and Tony already says that he's

23 been promised 20 kilograms for setting the deal

24 up. Now that leaves 12 and a half kilograms of

25 cocaine for everybody else. Mayco cannot make that

1  kind of a deal with someone who's not even supposed

2  to be there.  He was in no position to give away

3  half of 65 kilograms of cocaine.

4          Everybody likes to party, especially with

5  these guys.  Gollo's parties, you heard, are

6  legendary.  He has to move after each one.

7          Chivo says he's going to save a kilogram

8  of cocaine for his own personal use, and they call

9  Jorge Cochi.

10          Mayco and Miami, I submit to you, are

11  going to rent a VIP room at one of our show club

12  establishments, and they are going to show the boys

13  an epic good time because parties are no fun alone.

14          That makes at least as much sense as what

15  the Government would have you speculate, which is

16  that Mayco promised half the cocaine to people who

17  were not supposed to be there, and that the guys in

18  the Expedition and the Escalade heard that Mayco

19  got arrested and that they knew it was a home

20  invasion and they could not figure out why Mayco

21  was not answering his phone and they kept on

22  looking for him.  And that makes as much sense as

23  Jerome Ranger trying to give the FBI a receipt for

24  his AK-47.

25          "Did your dad send the black guys or

1   not?"

2        "No, no, no. It is nothing but

3   Chicanos."

4        You have to know that that's going to be

5   one of the bookends for my argument, that and maybe

6   the fact that, on March 15, Chelo said that some of

7   the guys that were arrested were not part of it. I

8   think it's important too. And Gollito said his dad

9   Gollo would not send them. Gollito would know

10   because Gollito is the one who was in charge in

11   Tucson.

12        There are a couple of instructions that I

13   want to mention before I let you go. One of the

14   instructions is the mere presence instruction.

15   Judge Collins will tell you that mere presence at

16   the scene of a crime or mere knowledge that a crime

17   is being committed is not sufficient to establish

18   that the defendant committed the crime charged.

19   The defendant must be a participant and not merely

20   a knowing spectator.

21        I would add as an attorney that being

22   merely present is also remarkably a bad idea, but

23   that's not part of the instruction. That's my own

24   advice.

25        There is another instruction with respect

1  to conspiracy along the same lines.  A person does

2  not become a conspirator merely by associating with

3  one or more persons who are conspirators, nor

4  merely by knowing that a conspiracy exists.

5       My advice to my kids and my advice to

6  anyone who asks me is not to be present at all and

7  not to associate at all.  Technically it's not a

8  crime to be present, and technically it's not a

9  crime to associate, but you will get left holding

10 the bag.

11      Thank you.

12      MR. LACEY:  I need to set a few things up,

13 Your Honor.  It will take a couple, three minutes.

14      THE COURT:  Three minutes?  Do you want us

15 to wait here on you?

16      MR. LACEY:  We're going to be bringing

17 stuff in here, so you tell me if you want to tell

18 the jury to take a break.

19      THE COURT:  Do you guys need to go to the

20 bathroom?  Okay.

21      (The jury exits the courtroom.)

22      (Off the record.)

23      (The jury enters the courtroom.)

24      THE COURT:  Show the jurors returned back

25 to the courtroom, the presence of all counsel and

1  the defendants.

2          Mr. Lacey, you may make the rebuttal

3  argument.

4          MR. LACEY:  Thanks, Your Honor.

5          Ladies and gentlemen, on behalf of all the

6  parties involved in this, I want to thank you.

7          You've learned a lot, a lot more than CSI

8  Miami or whatever other shows are out there on TV.

9  This is part of our system of justice.  It's unique

10  unto the world, and without you, we wouldn't

11  function.  We have some old timers in the courtroom

12  that have been doing this for a while and some that

13  are not so.

14          But again, it's part of our system of

15  justice.  Although we're key to it, you are the

16  real catalysts for making justice happen.  Without

17  you, we don't go anywhere.  It's a freedom that we

18  have, and thank goodness that we do.  On behalf,

19  again, of all the parties, thank you.

20          When you look at why we're here, the

21  United States has the burden of proving these

22  charges beyond a reasonable doubt.  You've heard

23  testimony about a lot of resources that were spent

24  during the course of this investigation, a lot of

25  resources, planes, agents.

1    You now know that, in certain instances,
2  to take certain crimes and go after the people
3  involved in them is important for all of us, for
4  the obvious reasons.  People are at risk for home
5  invasions, not just for people inside the house,
6  but others.  That's why we're here.

7    You must determine whether or not back on
8  March 2nd and before there was a conspiracy to
9  commit violations as charged in the indictment.  As
10  I listen to defense counsel -- and we'll talk about
11  that in just a bit -- I think it's conceded that
12  there was an agreement to commit a home invasion
13  back on March 2nd here in Tucson.

14    Of course what you hear is that the
15  Mexican contingent was involved in a conspiracy to
16  commit these violations.  I think that's, from my
17  perspective and vantage point in listening to what
18  I heard, that's conceded.  There was a conspiracy
19  to commit a home invasion here in Tucson.

20    There was also an attempt to commit that,
21  as charged in Count 2 of the indictment.  Count 3
22  of the indictment is a gun violation that attaches
23  back to Count 1, the conspiracy, and Count 4 is a
24  gun violation that attaches back to Count 2, and
25  it's a little confusing, but I'll try and make it

1    simple.

2         You know, it's tough going last.  We've

3    been here for two-plus weeks now, and some of us

4    have made some sacrifices.  We haven't moved as

5    fast as perhaps you would have liked, as we've

6    noticed, just from some expressions and such, but

7    again, it's part of our system of justice.  We need

8    to give everyone a fair trial and present the cases

9    on behalf of our parties, Ms. Hopkins and I, on

10   behalf of the United States.

11        When you look at the evidence objectively,

12   I submit to you that, as we cover this in just a

13   minute, you will have been convinced beyond a

14   reasonable doubt that we've proven these charges.

15        Where do we start?  I guess we can go back

16   over the evidence, but I'm not going to rehash all

17   these key things.  Ms. Hopkins covered it and

18   defense counsel covered a lot of the events that

19   happened between late December of '10 and March

20   2nd.

21        In listening to Mr. Cooper get up here and

22   talk about what had happened, a lot of mud was

23   slung at Jorge.  And indeed, it should be slung.

24   You have to consider his testimony very carefully,

25   and if you can't corroborate it, I ask you to take

1    it off the table.  Just take it away.

2              When you look at someone like Jorge, what

3    do we have on the table to suggest whether he was

4    being candid with us?  What did he say happened?

5              He gets a phone call from his brother-in-

6    law Yovani back on March 2nd.  Jorge knew his

7    brother-in-law was into the cash and was doing home

8    invasions.  He thought he was being protected as a

9    driver, wouldn't be out in the front lines, being

10   put at risk for an initial entry into a house,

11   where certain things are required in order to

12   protect you or at least try and protect you from

13   anyone inside shooting back out at you.  He thought

14   he was going to be safe outside in the car.

15             He gets a phone call from Yovani, and what

16   does he do?  He tells us about the things that

17   happened on March 2nd.  And again, just go with

18   things that we can back up with independent

19   corroboration.  If it isn't there, take him out of

20   the equation entirely.

21             We're told by Mr. Cooper that Mr. Tucker

22   and Jorge are on the same par.  Not even close, and

23   we'll disclose -- we'll discuss why in just a

24   second.

25             We have, when you look at the evidence,

1  Mayco, who is a catalyst for the Mexican
2  contingent, dealing with Mr. Tucker, who brings the
3  black contingent to this home invasion party.

4          What was Jorge truthful about that we can
5  verify?  He said he went to see some blacks with
6  Mayco and his brother-in-law Yovani.  He said he
7  went to a house with blacks at the house in
8  Phoenix.  He said there was a black Escalade
9  there.  He said one of the people was limping that
10 put on a white long-sleeve shirt.  We know from
11 testimony that Ja'Cory Ranger has a limp, as was
12 evidenced by the patdown by the agent who was
13 involved in his arrest and by Agent Edwards, who
14 saw him in court on a prior occasion and saw him
15 limping.

16         What else did he tell us, Jorge, about
17 what happened on March 2nd?  He said he went to the
18 Circle K after driving around to Miami's house and
19 some other occasions.  Let's look to the Circle K
20 photographs.  And what does he say happened back at
21 the Circle K in Phoenix?  He said he saw the black
22 Expedition -- black Escalade that he'd seen at this
23 house with blacks, where he saw a gun being put in
24 the back of it.  And you'll recall later the
25 testimony where the AK-47 was found in the rear of

1    the vehicle.  Again, if you can't corroborate it,

2    it's out.

3         What does he say he sees happening at the

4    Circle K?  If you look through Exhibit 122, he said

5    that he saw the Escalade meet up with this red

6    Expedition that he had not seen before at the

7    Circle K parked side by side.  What does he

8    observe?

9         If you look to Exhibit 122 -- I'll use the

10   Elmo.  I'll keep it simple.  And again, you're

11   going to be asked to go back in deliberations and

12   review the evidence.  As Ms. Hopkins requested of

13   you before, I'd do the same.  It's tough when you

14   go back there and you have a lot of exhibits and

15   you try and piece them together, so taking notes

16   now will be helpful so when you're putting the

17   pieces of the puzzle together, as you're going to

18   go have to do in this case later during

19   deliberations, you'll see the connections.

20        What are we told that Yovani -- that Jorge

21   sees, he said, at the Circle K in Phoenix?  That

22   they were loading up on, among other things, some

23   water.  Well, we find out in Exhibit 122 later,

24   when the vehicle is searched -- and this is the red

25   Expedition -- there is a case of water in there.

1       We also know that when they were at the --
2   at the Circle K in Phoenix, certain things were
3   being purchased.  Now, again, let's look to only
4   what we can corroborate with Jorge as to what he
5   saw and what happened that day.
6       We have in Exhibit 140 -- 14-A.3 a
7   photograph showing Ja'Cory Ranger and Josh Young
8   inside the Phoenix Circle K at 11:28 in the
9   morning.  Again, that's Exhibit 14-A.3.  If it
10  isn't corroborated, it's off the table.
11      Now, Jorge tells us he was out in the car
12  and only saw water being brought out and whatever
13  else.  But what do we know because of the Circle K
14  personnel that brought us the film from the store?
15  Exhibit 14-A.4.
16      We have three pairs of white gloves being
17  purchased back on March 2nd, at the Circle K in
18  Phoenix, at 11:29 in the morning by Jerome Ranger.
19  Again, if it isn't corroborated.  11:29, gloves
20  being purchased.
21      Now, you've got to tell yourself, how do
22  we look in the mind of the people that were
23  involved in this violation?  How do we do it?
24      One of things you do is, direct evidence,
25  if you see somebody doing something, crashing into

1    a home invasion, that's one thing.  You've got a

2    witness that saw it.  Another thing, and you'll be

3    instructed, is circumstantial evidence,

4    circumstantial evidence.

5         What do we have that's circumstantial

6    evidence to show us the mind of what was the

7    thinking, being thought of by the people that were

8    perpetrating this crime?

9         When you buy gloves at a Circle K moments

10   before you get on the road and leave Phoenix and

11   come to our city, what does that tell you as far as

12   the state of mind of the people in that vehicle

13   coming to Tucson back on March 2nd?  Again, once

14   you put these pieces of the puzzle together, these

15   pictures say a lot words.

16        And what do we know also about different

17   people that were there?  Exhibit 14-A.  We have

18   Ghermon Tucker coming into the store.  Now, this --

19   I'm sorry.  This is the one -- this is the one on

20   Broadway in Phoenix at 11:28 in the morning.

21   11:28.

22        One of the things that's really important

23   in this case are phone records.  You've seen the

24   charts, Exhibits 113 and 114.  I want to direct

25   your attention to a few other things, and we'll

1  stay with Jorge first, just to address the issue,

2  but then talk about some other topics.

3      What else do we have that Jorge brought to

4  the table?  He talked about driving down to

5  Tucson.  He talked about stopping before he got to

6  Tucson at a store here in -- before he got to

7  Tucson, close to Tucson, out of Phoenix.

8      And we have -- and pardon me playing back

9  and forth with the equipment, and thank God I have

10  help doing it.  Old school.

11      Okay.  With the Circle K in Marana, we

12  have certain photographs that were part of our

13  Exhibits, and you see that up there.  This is on

14  Sandario Road in Marana at 1:18 on March 2nd.  Show

15  the next image.  That's image two.  We can stop

16  right there.  Image four.

17      Was Jorge telling us the truth when he

18  said he stopped outside of Tucson at a store?  We

19  have the photograph from the store.  Again, if it's

20  not corroborated, forget it.  It's not part of your

21  consideration as far as I'm concerned.

22      We have Jorge telling us that he goes to

23  the store, they hook up with a couple of Hispanic

24  males that were in the parking lot and were told to

25  follow them to Food City.  Jorge goes with Yovani

1　and Seco to Food City.

2　　　　　We have photographs at Food City showing

3　Yovani, Jorge, and Seco/Mayco going into the

4　store.  Again, this is the Food City store, you

5　recall.  Seco or Mayco was in the front, Yovani

6　just behind him.  And the next -- and here is

7　Jorge.

8　　　　　Again, this is Exhibit 14-C.  And as

9　you're putting these exhibits together during

10　deliberations, it's important to make notes so

11　you'll be able to see the connections.  14-C is

12　Food City here in Tucson back on March 2nd with

13　Jorge going into the store.  Was he telling us the

14　truth about that?  Again, pictures, forgetting what

15　he said, spell it out.

16　　　　　What happened next?  He tells us that he

17　hears about his brother-in-law, whose car he,

18　Jorge, is driving and Seco/Mayco, that they got

19　stopped.  They get arrested.  He then takes off in

20　a rather panicked state, as you can imagine.  He

21　may be 20 now but he was 19 then.

22　　　　　He hops in the car, Yovani's car, and he

23　leaves.  He goes over ultimately to a Circle K here

24　in Phoenix (sic).  And we see photographs and we're

25　going to see them again just in passing to show you

what you can believe as far as what Jorge told us.
Circle K in Tucson -- sorry -- back on March 2nd.

You've got 61-G, as in George.  And again,
take notes.  It'll be helpful for you later.  Jorge
told us that he went to the Circle K before he
headed back out of town.  He headed there after the
Food City incident because he saw Seco's or Mayco's
brother-in-law getting pulled over.  He had just
seen that brother-in-law at Food City moments
before.

Now, whether that happened or not,
irrelevant.  I want you to stay with the facts you
can see, you can taste, you can feel.

61-G, we have -- and if you can focus in
on that square there -- we have Jorge telling us
that, yes, this is him.  Forget what he tells us.
61-G, it's Jorge at the Circle K in Tucson back on
March 2nd.

We also have off to the left, we have had
Agent Edwards tell us that this is Mr. Ghermon
Tucker off to the left wearing the white hat from
the Diamondbacks, as I believe it was.

Jorge tells us he met up with the blacks
again at Circle K here in Tucson, and he told them
they got arrested, they got stopped.  He then takes

1    off, Jorge does.

2         You say to yourself, why?  Why did he,

3    Jorge, take off.  Well, you know that he had to

4    believe -- I submit to you he had to believe that

5    arrests had taken place.  He's in his brother-in-

6    law's car saying goodbye to our fair city and

7    heading back to Phoenix, without any the guns in

8    the car, leaving his brother-in-law and Seco

9    behind.

10        I submit to you that says one thing,

11   circumstantially.  He knew or believed that they

12   had been arrested and that the information that he

13   heard from Seco's brother-in-law was true.  It

14   makes all the sense in the world.  And again, we

15   all have common sense that we bring to the table in

16   these types of cases and in our lives.

17        Why did we have the blacks stay at Food

18   City for some minutes after they heard this initial

19   talk about they we're stopped?  When you're coming

20   down from Phoenix expecting to do a certain job

21   here in our town and you're told that, oh, by the

22   way, the people you came down with to help the

23   Mexican crew, they've been arrested, you've got to

24   be saying yourself, I submit to you, and this is a

25   very logical explanation, hey, maybe they're doing

1  it without us.

2      Maybe they left us behind.  Maybe we
3  shouldn't leave, and we'll try and see if it's just
4  a con job or a cover up.  We brought all this stuff
5  for the party.  We want to go to the party.  Why
6  should we leave?

7      What does Jorge do next?  He takes off.
8  He tells us about his trip back to Phoenix.  And
9  again, if you can't corroborate it, don't look at
10  it.

11      We have Jorge telling us -- and there was
12  a transcript ordered.  You're not going to have
13  this during deliberations, but counsel have a copy
14  of the transcripts of his testimony.  That is
15  Jorge's.  I want to show you one of the pages of
16  this, and I have to flip back.

17      A big to-do was made about Jorge and
18  whether he was being candid about the times frames
19  about where he was pulled over by the police.  When
20  he was first asked about this -- and put yourself
21  in the shoes of this 19-year-old kid.

22      He comes to Tucson with his brother-in-
23  lawing, expecting his brother-in-law and others to
24  do a home invasion.  He's going to get 2,000 bucks
25  for driving the car.  His brother-in-law is

1  supposed to be arrested.  What does he do?

2          Well, as most people in that situation, he

3  panics.  He calls his sister, and he says, what do

4  I do.  Is he scared?  I would hope so.  Here you've

5  got a 19-year-old kid coming to our town to assist

6  in a home invasion.

7          "She's like, nothing's going to happen.

8  Let's go.  So we went passing the bridge.  They

9  pull us over."

10          And you heard about, from the trooper,

11  about how he stopped him by the bridge up in

12  Phoenix, before you get to Phoenix, on the

13  outskirts.

14          "Did you meet up with her before you got

15  stopped?"

16          "Yeah."

17          "Where did that take place?"

18          "At a little liquor store."

19          And you recall the testimony of the

20  trooper about the smoke shop store that he saw them

21  at just before he pulled them over.

22          Question, "In the Phoenix area or

23  someplace else?"

24          "No, going to Phoenix."

25          That was his testimony.

1    "Where"?

2    "I was going to Phoenix."

3    Skipping on to another page in the

4    transcript.  "And what you did is, you went to a

5    place called 51st Avenue in Phoenix; right?"

6    "Right."

7    "So that's I-10 and Riggs Road; right?"

8    "Right."

9    Here you've got some kid that's never been

10   to Tucson before being led down the path on cross-

11   examination about what road it was that he went

12   to.  It was before Phoenix.

13   But again, it's a non-issue.  He was

14   pulled over.  We know where he was pulled over.

15   The time frame, as you heard from Agent Edwards

16   when we looked at that time chart, fit to a tee.

17   Where the stop took place of the blacks by Casa

18   Grande, some 20 or so miles up the road was where

19   Jorge got pulled over.

20   It fit exactly or close to exactly with

21   the time frame of where someone would have gone

22   from one milepost to the next during that time

23   frame.  Was he on 51st Avenue, as he was asked

24   about on cross-examination?  Obviously not.

25   Again, I don't want you to believe

1   anything that Jorge says if it's not corroborated.

2   And I've shown you some of that corroboration.

3           One thing you'll also notice -- I'll do it

4   here because I hate playing ping-pong with going

5   back and forth here.  We have 61-E.  And again,

6   please take notes as we're doing this.

7           61-E, as in Edwards, you have a vehicle,

8   Yovani's vehicle, as we've heard testimony about,

9   at the Circle K here in Tucson back on March 2nd.

10          We have in this Jerome Ranger and Ghermon

11  Tucker depicted in this photograph.  We've already

12  seen in 61-G the photograph of Jorge and Ghermon

13  Tucker, again, at the same Circle K here in town

14  back on March 2nd.

15          Now, what's going through the minds of the

16  people that came to town to do what they were going

17  to do?  Did they believe Jorge when he said, oh, by

18  the way, they got arrested?  Obviously not.  What

19  did they do?

20          And again, in order to look into their

21  minds, look at the action that they followed and

22  what they did do.  On March 2nd, at the Food City,

23  after first hearing about this supposed "they got

24  stopped" from Jorge, they stuck around for 15, 19

25  minutes, whatever it was, a short period of time

1  before they took off.

2         They then went, ultimately, to the Circle

3  K, bumped into Jorge, again, by happenstance.  He

4  again reiterated what he had told them before,

5  "They got stopped."

6         Now, what are you thinking?  If you're all

7  prepared to go to a party here in town and do what

8  you're going to do, do you really want to put your

9  tail between your legs and drive back to Phoenix,

10  or do you want to score what was going to be a

11  million-dollars-plus hit of cocaine and cash here

12  in Tucson?

13         I submit to you that the blacks,

14  Mr. Tucker, the Rangers, did not believe Jorge when

15  he told them about the arrests.  How do we know

16  this?  How do we know there was disbelief on the

17  part of the people that brought all these armies to

18  our city from Phoenix?

19         Because what do they do?  They leave the

20  Circle K, get on the freeway, start heading back

21  towards Phoenix, but not too far.  The testimony

22  was, and they were followed the whole way, that

23  they get off at Prince Road, went under the

24  underpass, and came right back down into our city

25  and went to the Food City down Sixth Avenue here in

south Phoenix –– South Tucson.  That again tells
you what's going on in the minds of the people that
came to our town with all this stuff.

There was talk about what happened back on
February 4, and it's important up to a point,
although the real events of March 2nd spell out
everything.  A so-called planning meeting was
taking place up in Phoenix.  What do we know about
this?  And again, you're going to have –– certain
transcripts were generated as we heard the
conversations here in Court.

Now, bear in mind, when you go back to
deliberate, I don't believe you're going to have
those transcripts and recordings with you, and this
is important.  You're not going to have Exhibit 2
and 2-C, the transcript, with you in
deliberations.  But if you have any questions, and
I submit that you will, all you have to do is, in
writing, request to be able to examine 2-C, as in
Charlie, and you'll be brought back into the
courtroom, Nicole Williams will assist, and you'll
be able to review at that point Exhibit 2-C.

You're not going to have it with you in
deliberations so it's important to remember that.
2-C is important for a lot of reasons.  It's the

1  February 4 meeting that was recorded back in

2  Phoenix.

3        When you look at the transcript, which I

4  have here, we heard some words mentioned in

5  English, most in Spanish.  We heard about Chivo and

6  that no one said that he spoke English.  So here we

7  have our CS, who's trying to do some help for the

8  FBI, and people that are involved in very, very bad

9  activities, penetrating that organization.

10        What do we have?  We have him speaking in

11  Spanish primarily.  But it's important to note

12  certain things that happened leading up to this

13  meeting on February 4.  A black male, I submit

14  Mr. Tucker, now, they talk first -- Gollo talks

15  about the guy who is bring -- this is El Azul's

16  son -- the guy who is very powerful.

17        The black male, Mr. Tucker, "My homeboy,

18  he got his house out there."  "He got his house out

19  there."  And this is important for a couple of

20  reasons.  First, it's in English, but it's also

21  acknowledging on the part of the speaker that he

22  knew what was going on.  They're talking about

23  Tucson.

24        And again, common sense, and dissect this

25  as you go through your analysis of the evidence,

and when you do, you'll see why I'm putting this in front of you now to help you during deliberation, Exhibit 2-C, as in Charlie.

Mayco says -- first, Mr. Tucker, "My home boy, he," not Mr. Tucker, "he got his house out there."

Mayco, "No, we don't."

Mr. Tucker, "Oh, you do?"

They shift gears. Now, bear in mind, this is an introductory meeting for some of the parties involved in this future event to discuss 65 kilos of coke that's worth a million dollars plus. You heard probably close to two and a half at 20,000 bucks per kilogram, as the testimony was.

What do you have happen next? They're bragging, trying to assure the CS that everything was cool, that they would be able to perform what they said they could do, and they're trying to puff up a little bit with Mr. Tucker.

This is Mayco saying -- first the CS, "You can go the day before. Are you familiar with Tucson?"

Mayco, "No, this guy is from over there, Tucson."

So Mayco's trying to hype it up when, in

1  fact, Mr. Tucker just moments before said, "My

2  homeboy, he got his house out there." Again,

3  little things, but if you dissect it, it will paint

4  a picture as to what was going on.

5       Mayco is claiming, "He is from over

6  there."

7       Gollo then says, "My son is familiar with

8  Tucson."

9       One of the most insightful exhibits you're

10  going to have as to the 2/4 event and who was

11  present is Exhibit 113, and perhaps we can -- I can

12  do it on here. Exhibit 113, again, you're going to

13  have this during deliberations, but this is really

14  insightful as to what happened back on February 4.

15       We know about all the cell phones that

16  were gathered up on March 2nd from the Escalade and

17  the Expedition from our various defendants. When

18  you look to what was happening, we have, at

19  11:51 -- and you may want to take some notes on

20  this. The testimony is here, but as you've been

21  getting it, it's been sitting in the middle of all

22  these facts. Sometimes you lose track of how it

23  fits together. And that's part of our jobs is to

24  try and lay -- put an outline for you to follow

25  during deliberations.

1          Exhibit 113.  At 11:51, the source arrives

2     at Chivo's workplace for this so-called planning

3     meeting.  That's 11:51.  Now, what do we have

4     earlier that day?  We have, first off, at

5     1:01 a.m., a call that apparently didn't go

6     through.  But this is Jerome Ranger, his phone

7     calling Mayco's phone.

8          What does that tell us?  Well, it tells

9     us, first off, that Jerome Ranger is connected to

10    Mayco, our home invader that was arrested in the

11    warehouse.  That's one thing it tells us.

12         What else does it tell us?  If you look

13    down, we see at 11:34 in the morning, shortly

14    before the 11:51 arrival of our CS, Mayco was

15    calling Gollo.  He's Mr. Big in all of this, as

16    you'll gather from the testimony you've heard and

17    the transcripts you've seen.  Gollo is running the

18    show for the Mexican crew involved in this.

19         You then see Mayco calling Mr. Tucker at

20    11:37 for 42 second, at 11:41 for 43 seconds, and

21    11:45 for 48 seconds.  This is six minutes before

22    the CS arrives at this meeting.  Again,

23    circumstantial evidence.  When you put all these

24    pieces together, it paints only one picture, as

25    we'll discuss in just a minute.

1     You have then Mayco calling at 11:49 to

2  Gollo and several calls to Gollo up until 11:53.

3  Again, the source arrives at 11:51.

4     At 11:54, Mayco arrives in a green

5  Explorer to the meeting.  That's 11:54 at the 2/4

6  meeting, Mayco arrives, per the testimony.

7     At 11:54, Mayco is again calling

8  Mr. Tucker.  Right as Mayco arrives, his phone is

9  calling Mr. Tucker's phone.  And again, follow the

10  pieces of the puzzle as they're being put

11  together.  You're going to need to look at these

12  carefully during deliberations to see exactly what

13  happened back on 2/4.

14     At 11:55, Mayco -- and that's 16 seconds

15  at 11:54.  A minute later, Mayco is again, outgoing

16  call to Mr. Tucker, 11:55 for 34 seconds.  Mayco

17  has already arrived at 11:54, a minute before.

18  What is he doing?  Is he giving directions to

19  Mr. Tucker as to how to get there?  I submit that's

20  the logical conclusion you can draw.

21     Again, the phone records don't lie.  They

22  don't bring the baggage that Jorge brought with him

23  about his involvement in this.  These are phone

24  records and connections between these parties and

25  the other parties that they were in cahoots with.

1      At 11:55, Mr. Tucker, we submit, arrives

2  in a black Cadillac registered to him, and you have

3  the registration documents showing that the vehicle

4  that arrived at 11:55 on 2/4 was Mr. Tucker's.

5      I submit that paints only one picture with

6  all these calls leading up and connecting between

7  Mayco and Mr. Tucker back on 2/4 and Mr. Tucker's

8  car showing up at exactly 11:55, the same time as

9  the last phone call with Mayco about how to get to

10 where the meeting was taking place.

11      If you look to 12:07, you see Gollo

12 calling the CS.  Well, the meeting is still going

13 on.  But when you look to the transcript, and we'll

14 do that in just a bit, you see at the meeting

15 that's going on, that's being recorded back on 2/4,

16 at the end of the meeting, Gollo and the CS are

17 discussing a number and exchanging it in a recorded

18 -- in a recording.

19      And at the same time, there's a phone call

20 between the CS and Gollo, for the obvious reason.

21 They're putting the number into the phones so

22 they'll have future contact with each other.

23      After this meeting was over, Mayco then

24 calls Gollo, as we talked about, at 12:19.  Jerome

25 Ranger then plugs in at 2:14 with Mr. Tucker,

1  incoming call.  So we have Mr. Tucker's phone

2  calling Jerome Ranger's phone that same day, at

3  2:14 p.m. on February 4 and lasting two minutes and

4  six seconds.

5        What's Mr. Tucker telling Jerome Ranger at

6  that time?  We know what he discussed, and we've

7  talked about that previously, about the

8  conversation that took place in English and in

9  Spanish.

10       At 2:31, about 15 minutes later, Jerome

11  Ranger has another call from Mr. Tucker that lasted

12  a minute and 59 seconds, again on February 4.

13       There were several other calls on February

14  4 where Mayco is receiving a call from Mr. Tucker

15  at 5:08 for a minute and other calls thereafter.

16  That's for 2/4.

17       We discussed a little bit Exhibit 2-C, as

18  in Charlie, that you'll again have to ask for

19  during deliberations, where they're talking about

20  65 kilograms.  It can't be any more clear at this

21  meeting what's being discussed.  And it's not just

22  65 kilograms.  It's the CS saying 65 kilograms of

23  cocaine.  That's what's on the table at the 2/4

24  meeting for all that happens thereafter as far as

25  imputing knowledge of what was going to be the goal

for this operation.  On 2/4 they discussed cocaine,
65 kilograms.  That's 2/4 with Mayco and Mr. Tucker
present at that meeting.

Gollo then says 65.  Mayco then says, "My
friends, we can just bring it in."

The CS, "I rent houses and everything."
Again, this is 2/4.  And we talked about Mr. Tucker
saying, "My homeboy, he got his house out there."
Also in the 2/4 meeting, Mayco was saying there are
65 kilos of, again, the CS saying cocaine.  Mayco
then says, "Of cocaine?"

"Yes."

Mayco, then in English, because this is in
italics, and when you -- if you do come back and
look at the transcripts during your deliberations
here in court, when you see the italics, it's in
English.  Mayco's then saying, "Oh, there may be
some birds."

Mr. Tucker, "Okay."

Mayco is then saying "65."

Mr. Tucker is saying, "Yeah."

That's the 2/4 meeting about what's going
to happen later and what knowledge is placed into
the minds of the people involved in this incident.

Another exhibit you will not have with you

1    in deliberations, but again, you can ask for it,

2    and I submit you should, because if you're going to

3    get a complete picture, you really have to have

4    ahold of this transcript and review it as you're

5    discussing these key events.

6           Exhibit 44-B, as in boy, is the exhibit

7    number, and that's the recorded wire that was

8    prepared on -- that was worn by the CS back on

9    March 2nd, Exhibit 44-B.  You'll have to ask for

10   that specifically as to March 2nd.

11          JL, that's Chivo, "Well, he is going to

12   give Mayco some money too because he brought some

13   people with him."

14          Again this, is March 2nd.  We left

15   February 4 behind where they talked about 65 keys

16   of coke and, "My homeboy has a place down there."

17   This is March 2nd now, looking at some of the

18   transcripts, about who knew what and who was

19   involved in this incident back in Tucson on March

20   2nd.

21          Chivo is then saying, "Well, he is going

22   to give Mayco some money too because he brought

23   some people with him."

24          We know who Mayco's connection is.  You've

25   got the phone records from Exhibit 113, back on

1  February 4, the phone records showing the

2  connections.  And again, you have to put all these

3  pieces together, but they're there.

4          "He brought some people with him."

5          "Did he" -- and I hate -- you know this --

6  this language shouldn't be used, and I apologize,

7  and for a lot of reasons, it's totally improper.

8  The language was brought to the table by Chivo and

9  Gollo, and the CS played along.  It doesn't belong

10  in this courtroom, and I can't say anything more

11  about it.

12          But we're not to be diverted from the

13  facts.  We stay with the facts, and what's over

14  there as far as derogatory terms, again, it's

15  nothing that we embraced, but it's here.

16          "Did he bring the...who went over

17  there?" says the CS.

18          Chivo says, "I think so."

19          This, again, is on March 2nd, a body

20  recording worn by the CS back on March 2nd.

21          CS, "Which car did Mayco bring?"

22          Chivo, "I don't know, man.  I didn't see

23  him.  All he told me was, we're all here.  Everyone

24  is parked here at Food City."  "Everyone is parked

25  here at Food City."

1          Again, you have the pieces, I submit, and

2   when you put them together, it only paints one

3   picture as to what was going on in the minds of the

4   people that were here back on March 2nd.  The

5   pieces are here.  Please connect them when you look

6   at the evidence.

7          "I don't know, man.  I didn't see them.

8   All he told me was, we're all here.  We're all

9   parked at Food City."

10          Again, part of the March 2nd recording.

11   "Are you going to take the kids?" says the CS.

12          Gollo -- Gollito, "Oh, well as soon as

13   Mayco looks at the picture and gets a good look."

14          Well, what do we know?  Mayco was looking

15   at the picture.  In fact, he had it at the time of

16   his arrest back on March 2nd, in his pocket.

17          What does that tell you?  It tells you,

18   and when you look at the recorded conversations and

19   put the pieces together, why would all the people

20   in the warehouse, Chivo, Gollito and the other, why

21   would none of them have the picture, but only

22   Mayco?  Because he brought his people, and they're

23   at Food City.

24          The CS and the FBI discussed the game plan

25   as to how to -- how to get the people to a safe

1    location for the arrest back on March 2nd.  You

2    don't want this happening in some residential

3    neighborhood for obvious reasons and possible

4    consequences.

5          "Are you going to take the kids?" as soon

6    as Mayco looks at the picture and gets a good

7    look.  Why does Mayco of all people get reference

8    here as to having a good look at who's going to be

9    the victim of the kidnapping at this house of this

10   big drug lord's son?

11         "How many people did you say?  How many

12   are there?"

13         "No, well..."

14         And again, you'll have the entire

15   transcript.  It's going to be tough because when

16   you come back to court to see it, it's going to go

17   fast, and you may have to ask for it to be stopped

18   along the way so you can digest the words, as we're

19   dissecting them here for you, but do what you've

20   got to do to make sure you've got a firm grasp on

21   all the facts before you decide this case.

22         Mayco -- this is after Mayco arrives at

23   the warehouse, where the arrests are going to take

24   place in a little bit.

25         "You can before -- as soon as we get

there, man, as soon as we go, boom, we'll go, police, police."

Now, you'll recall earlier -- why is this important? Well, the Mexicans can't go to the house -- and put yourself in the mind of the victim that's possessing 65 kilograms of cocaine. If you have someone banging in the door, Yovani, who's going to crash through it and wind up in the living room, and that's in the transcript, what are you thinking?

Well, if you're thinking some bad guys are going to start ripping us off, you're going to start shooting, and we heard about the guns that were supposedly inside this house. And again, you've got to put the picture together and live it as though you were in the minds of the victims or the perpetrators, as the case may be.

So what are you thinking? As you go boom, boom, police, police, if you're inside and you hear police being spoken in Spanish, policia, policia, well, guess what? You would start doing something you think you should do.

But if you have someone that's yelling police and looking like a policeman, guess what? You're going to hesitate before you start shooting

1   at the people that are crashing through your door.

2          Again, don't leave your common sense

3   behind when you put together how this fits

4   together.  When you're inside, if you're the

5   victims of this home invasion and you hear police,

6   you're going to hesitate before you start shooting

7   at the people coming through the door.

8          That hesitation gives the people that are

9   coming in equipped with certain things time to get

10  in there and stop you before you start pulling the

11  trigger, as you may do if you think it's policia,

12  policia, and not really coming through the door.

13  Why do certain people get used in this case who

14  happen to speak English?  There's an obvious

15  reason.

16         Mayco again, "I'm going to talk to -- I'm

17  going to be in charge of the people."  This is

18  Mayco talking at the warehouse.  "I'm going to be

19  in charge of the people."  Well, we know back on

20  2/4 who Mayco was in charge of, as he had

21  Mr. Tucker come to the meeting in his own car.

22         Now, you may not have recordings of the

23  people that were going to be Mayco's people.  The

24  CS was recording the events that he had and the

25  exposure he had with the Mexican people he was

1  exposed to.  He wasn't dealing with Mr. Tucker or

2  the Rangers or the other blacks that came down from

3  Phoenix with all this armament.  Again, common

4  sense.  Put all the pieces together as you're

5  dissecting this case.

6         A big to-do was made about the number of

7  bullets that were in the guns.  And frankly, I was

8  a little miffed, but when you look at the facts in

9  this and you see that there's 160, 180 bullets in

10  these various guns, you don't need to have a full

11  30 bullets in the clip that goes with this weapon

12  or 20-plus in the other weapon.

13         You don't have to have them fully loaded.

14  What's going to happen back on March 2nd, if this

15  were a real event and wasn't a sting operation to

16  catch people involved in doing this home invasion?

17  When you crash through the door adequately

18  prepared, you're not going to have a shootout,

19  hopefully.  If you do, well, then all bets are off,

20  at least for people that are not wearing vests and

21  that get shot in someplace other than the chest.

22         What's going to happen is happening in

23  milliseconds.  As you crash through the door,

24  either people are going to stop and you're going do

25  have the drop on them or not.  That's what's going

on.  Put yourself inside this house.

If someone's got only 22 bullets, and I say "only" facetiously, guess what?  If you start pulling the trigger, 22 bullets in just one of these guns is going to go pretty darn fast from one of these semiautomatics.  I'm not a gun guy, but it doesn't matter.  What matters is who brought these guns to the table.  Whether there are 22 or 23 or 30 bullets, it's of no consequence.  They had 160, 180 bullets in these various guns that they brought to Tucson to do a home invasion.

There was a lot of conversation and a lot of summation that dealt with if they're coming or they're not coming.  You recall the 2/4 meeting. They were coming.  They were going to be used because they could gain entrance and not have it come back to the CS when this big drug lord's son, whom the CS knew supposedly, was kidnapped and the drugs taken.

There was a reason for not having the Mexicans go through there, but rather the blacks, so that there would be a buffer, so that the people, when they heard -- when this so-called drug lord in Mexico heard about the rip, he wouldn't start thinking it would come back to our CS or

1 anyone else that was Hispanic.

2   It changed a little bit on February 22nd

3 at the meeting we've heard testimony about.  What

4 happened there?  The transcript's not in evidence,

5 but you heard some references to it during trial

6 and also from the CS.  What does he tell you?  He

7 says, "They said the blacks aren't coming."  That

8 was at the February 22nd meeting.

9   But he went on and said something else.

10 I'll call him Tony, the CS, he said, "The blacks

11 aren't coming.  They're doing another job up

12 north," at the February 22nd meeting.

13   Now, the Mexicans that were in touch with

14 the CS didn't know when this crossing was going to

15 take place and the drugs coming to our city.  They

16 didn't know if it was going to be February 23rd or

17 the 24th.

18   And if somebody's up north doing another

19 job, obviously they're not going to be ready the

20 22nd or 23rd or 24th, perhaps, but when you go to

21 March 2nd, some week-plus later, guess what?

22 Things change.

23   You'll also see when you look through the

24 phone calls, they are coming, they're not coming.

25 Even the day of, you see Chivo talking, "I don't

1   think they're coming."  But that changes, of

2   course, as we look at the transcript, as things get

3   closer to coming together back on March 2nd.

4          Exhibit 2-C, as in Charlie.  Gollo, "If

5   there is someone at the house, they see these

6   guys."  That's what we just talked about.  Again,

7   this is a recording at the 2/4 meeting in Phoenix

8   that you have in evidence that you'll have to ask

9   for.

10          "Yes, the black guys."

11          "We're only taking these guys," says

12   Mayco.  Again this, is Mayco on 2/4.  "We're only

13   taking these guys."

14          CS, "Only blacks?"

15          Mayco, "Only black dudes will be there."

16          Gollo, "You can trust them."

17          Again, they're trying to convince the CS

18   that, hey, we've got this under control.  We can

19   trust them.

20          "That's why there's no problem with me."

21   This is Mayco talking, and he's talking about

22   Mr. Tucker.  Remember, Mayco arrived and then

23   shortly thereafter a black male, Mr. Tucker, as we

24   know from the phone records and his car and his ID

25   by the CS here in court.

1      "That's why there's no problem with me.

2   I've known him since we were kids."

3      Whether it's true or not, he's trying to

4   show and assure the CS that this is what's going

5   on.

6      "Well, then, dude, so you have somebody

7   who will buy everything?"  This is the CS asking.

8      Gollo, "The buyers are here in Phoenix."

9      Now, they're talking about the cocaine.

10  After they rip off the 65 keys, what are they going

11  to do with it?  Well, they'll want to sell it,

12  obviously, as you'll see discussed here.

13     Gollo says, "The buyers are in Phoenix."

14     The CS, "And how much are they paying for

15  the cocaine?  About 20 something; right?"

16     Mayco says, "About 20."

17     Gollo, "About 20-22."

18     So we now have a price established for the

19  65 keys of coke when you want to put a value on

20  what's on the table for this particular case and

21  why all these people came down from Phoenix to our

22  city back on March 2nd.

23     CS.  CS, "If you want -- did Mayco come or

24  not?"

25     And this is on March 2nd.  This is Exhibit

1  44-B, so I want to make sure we make the transition

2  from 2/4, where we just left, to 3/2.

3         CS, "Go ahead and bring those two men.

4  That way we can talk to them, and someone can be

5  made responsible for the kid and my cousin."

6         Now, you recall there was some talk about

7  who's going to come and did everybody come to the

8  warehouse to get arrested.  Well, obviously not,

9  but let's follow this transcript and see why and

10  see how it fits together about how only some

11  representatives came and others didn't.  Again,

12  Exhibit 44-B.

13         CS says, "Go ahead and bring those two

14  men.  That way we can talk to them, and someone can

15  be made responsible for the kid and my cousin."

16         CS, "Yeah, man.  If you want, go ahead and

17  bring Mayco and Gordito so that I can give them

18  that because I don't want to any...this guy is

19  going to come right now."

20         So here's the CS saying bring Mayco and

21  Gollito, Gollo's son.  They already had talked

22  about -- and there is talk on March 2nd about there

23  is a whole boatload of guns and people back at Food

24  City with five cars.

25         And the CS is asking to bring two of the

1    representatives to the warehouse, bring Mayco and

2    Gordito.

3            Chivo, "And so a lot of people came?"

4            CS, "Yeah, he brought -- yeah, man.

5    That's the problem, huh?"

6            "Yeah, well, there are only six."

7            There were six guys, and this is when

8    they're talking about how many people are inside

9    the target house, the target of the home invasion.

10           "But why did they bring so many,

11   man?" says the CS.

12           Chivo, "I don't know, man.  We would have

13   to talk to Gollo.  Well, we can talk to Gollo once

14   the job is done."

15           "But you guys are going to leave right

16   away?  Are you wanting to take the kid or not?"

17           That's what they were thinking of doing,

18   but they have to wait and see what Gollo says.

19   Whatever Gollo says is what's going to be done.  If

20   he says bring him, then the guys will do it.

21           We know from this conversation from Chivo

22   that Gollo's calling the shots back on March 2nd

23   about what's going to happen as far as kidnapping

24   here in Tucson.

25           Same conversation, same recorded meeting.

CS is asking, "What about Mayco?"

Chivo, "Well he is going to give Mayco some money too because he brought some people with him."

And we talked about this before, "Did he bring..."

"I think so."

So Chivo's obviously not in the full loop about who is in tune to what's going on. Gollo is the one who is pulling the strings from Phoenix with his local son here as the representative.

And we talked about this as well, "Which car did Mayco bring?"

"We're all here. Everyone is parked at Food City."

And again, Mayco, "I'm going to talk -- I'm going to be in charge of the people."

And again, we've talked about this, "they're going to show the picture to all those guys right now," says Mayco, all the guys that he's brought with him to this event.

There was some testimony about the quantity of drugs involved. We've seen at the 2/4 meeting where it's 65 and it's 65 later. For whatever reason Jorge thought there was 50 keys

1  involved, and maybe that's what he was told.  Maybe

2  the Mexicans were trying to shortchange the blacks

3  that they brought into this conspiracy and keep the

4  balance to themselves.  It doesn't matter in the

5  scheme of things.

6          Jorge testified back on August 15,

7  question, "What did Seco then tell you after the

8  meeting with the black males inside the house?"

9          Answer, "That they were going to go half,

10  half of the drugs with them and half to Seco."

11          "Half of the 50?"

12          "Yeah."

13          Again, whether that's true or not, it's of

14  no moment whether it's 50 or 65.  They came to

15  Tucson for a purpose.

16          "Mayco was going to give half of the drugs

17  to the blacks?"

18          "Right."

19          And again, I'm not going to repeat it, but

20  we talked about the 65 kilograms already.

21          The CS told one thing when he was on the

22  stand that was pretty insightful.  He testified he

23  didn't know who was going to show up on March 2nd

24  but that whoever did show up was coming here to

25  partake in this home invasion because he heard yes

1    and no as to whether certain people were going to

2    come.

3         We heard some summation talking about

4    DNA.  You heard from Agent Edwards.  Why is DNA

5    important in this case?  Well, you know, you watch

6    CSI -- or some people do.  I'm not there, but for

7    those that do, I guess it's a pretty helpful tool

8    about who touched certain weapons or who touched

9    certain vests.

10         But when you have your hand in the cookie

11   jar and you're caught with it in the cookie jar,

12   guess what?  You don't need DNA to see whose hand

13   was in the cookie jar or on the cookie jar or had

14   the cookies in his hand or in his vehicle.  It

15   speaks for itself.

16         Similarly with fingerprints.  They came

17   back -- the guns were tested.  They came back

18   negative.  What does that tell you?  It tells

19   you -- because we heard oftentimes you don't get

20   prints off of guns.  Well, we know obviously people

21   picked up the guns put them in the vehicles and

22   they were there.  They had gloves for later.

23         And let's talk about the gloves for a

24   minute.  Why did they buy these gloves?  Why did

25   Mr. Jerome Ranger buy the gloves back on 2/1?

1  Mr. Cooper says, well, when you go and do a home

2  invasion, the people you're going to attack,

3  they're not going to call the cops.

4         Well, that may be for two reasons:  One,

5  they're afraid; or two, something else happened.

6  And again, we're here for serious business, as the

7  Court's told you, despite the laughter, and I've

8  laughed with all of you and with the Court when

9  this happened, but this is serious business, and

10  the people involved in this are involved in

11  serious, serious crime.

12         Why is it important to not leave

13  fingerprints inside of a house and wear gloves?

14  Well, guess what?  If you go inside the house and

15  something doesn't go quite right when you yell

16  police, and they don't happen to put down their

17  guns and say okay, but rather something else

18  happens and there's a shoot out, guess what happens

19  when bullets start to fly?  Certain things as a

20  consequence from that happen.  People get shot.

21  People get killed.  Homicide investigations.

22         Do you want to leave your prints inside of

23  a house?  They might not call the cops if you

24  ripped off their drugs, but guess what?  If

25  somebody was killed, there's going to be a police

1    investigation.  If you leave prints, you've got

2    some issues.

3            The CS was paid a lot of money, a lot of

4    money.  How do you get around it?  It's a business

5    I wouldn't want to be in and I submit that you all

6    wouldn't want to be in.  It's a very, very risky

7    business when you put yourself in a position, a

8    compromised position, an exposed position, to

9    people that are involved in home invasion.

10           What do we know from Roberto?  Roberto was

11   talking about -- bragging to Chivo that he was

12   (gesturing) somebody's head off for 5,000 bucks.

13   This is what the CS is involved with.  For 108,000

14   bucks or 110, okay, I submit to you that most

15   people wouldn't be doing it.  No amount of money is

16   worth putting yourself at exposure to the kind of

17   people Roberto and Chivo were involved with.

18           Whether it's true or not or Roberto was

19   bragging to Chivo, that's what the CS is involved

20   with.  If he got paid 108,000 bucks, more power to

21   him.  The people involved in these types of crimes,

22   I submit to you, we should be paying a lot more

23   than that to get this off the streets and the

24   people involved in these crimes off the streets.

25           When we talked about the state of mind of

1  the various people, the phone calls are very, very

2  important.  When you look at the phone calls -- and

3  what I did for 3/2, that's Exhibit 114.  And again,

4  you'll have that with you in deliberations.  But I

5  broke out the calls by person to make it easy for

6  you to digest this.

7         But in Exhibit 114, you'll have all the

8  records and the time frames of these calls going

9  back and forth.  That paints a very, very clear

10  picture about what was going on.

11         Here's Mr. Jerome Ranger's calls back on

12  3/2.  These were extracted from Exhibit 114 to give

13  you a little chronology about what Mr. Jerome

14  Ranger was up to that day with his phone.

15         Starting it at 12:07 a.m., an outgoing

16  call to his brother Jerome.  12:08 the same thing.

17  Pretty short in duration.  Probably no

18  connections.  But this went on for some period of

19  time, and these were outgoing and then incoming.

20  So you can see Jerome Ranger calling his brother

21  back during certain key time frames back on March

22  2nd.

23         So one thing you may want to consider

24  doing is putting your own little time line together

25  with these events and when certain things

1    happened.

2         What else do we have by way of Jerome

3    Ranger's phone calls?  We have at 10:34 in the

4    morning -- and you recall the Circle K time frame

5    in Phoenix, and we'll cover that in just a bit.

6    I've got a little summary chart that shows you

7    those events that plug into this.

8         At 10:34 in the morning, an outgoing call,

9    Jerome Ranger is calling Ghermon Tucker.  This goes

10   back and forth.  Jerome Ranger again at 11:23, and

11   thereafter he's calling Mr. Tucker numerous times.

12        And later Ja'Cory Ranger and Jerome Ranger

13   at 4:08, connecting back and forth with each other

14   shortly before their arrests on the freeway up by

15   Casa Grande.

16        Also on Exhibit 113, those are the calls

17   from February 4.  What do we have connecting

18   Mr. Jerome Ranger to anyone back on February 4?

19   Again, this is a synopsis that I pulled from the

20   Exhibit 113.

21        Jerome Ranger at 1:01 a.m. calling Mayco.

22   Again, no connection, but what does that show you?

23   It shows Jerome Ranger connecting with Mayco, who

24   went to that meeting on 2/4, where Mr. Tucker

25   appears and talks about the 65 keys.

1        2/4 also, Jerome Ranger at 2:14 p.m., and

2    again, at 2:31, Mr. Tucker, again, incoming calls

3    to Jerome Ranger.

4        Mr. Young talked about a party that they

5    were going to have and the great pig parties the

6    Mexicans were going to have to celebrate all this.

7    In the 2/4 conversation, recorded meeting, the

8    conversation about where you're going to go after

9    this kidnapping and home invasion takes place that

10   took place up in Phoenix.

11       This is Chivo.  "No, we're going to take

12   two cars over there."  Obviously this is early on,

13   and things evolved from there.  "At that time, are

14   you going to come back here or are you going to

15   hide over there?"  I submit to you "over there"

16   being in Tucson.

17       "No, right away."

18       "No, we'll leave here.  We're from here."

19       "No, no, no, no, but are you bringing all

20   the stuff here?"

21       "We'll bring it here," says Mayco.

22       There is no party that's going to take

23   place in Tucson.  You can imagine, kidnapping and

24   all that involved, there was no party going on.

25   It's not a matter of choosing your friends.  It's a

1    matter of choosing your business associates.

2            The jury instruction you're going to get

3    about withdrawing from the conspiracy, let's talk

4    about that for a minute.  The Court will give you

5    that instruction, and you'll have that in

6    deliberations to see if the people involved in this

7    series of events withdrew from it, as is legally

8    required.

9            The CS, March 2nd, you recall the CS

10    talked about the people inside the warehouse are

11    starting to leave, and he had to get them back

12    inside, per the phone call from his FBI people on

13    the outside, so they could make the arrests.

14            He, the CS, is telling them, "More people

15    arrived with guns."  And this is important for you

16    when you consider the withdrawal, so look to this

17    Exhibit 44-B when you consider the withdrawal.

18            Mayco -- and again, here they're told by

19    the CS, "More people just arrived with guns."  So

20    what are you thinking?  You're a home invader.

21    You're Mayco.  You're the other people inside the

22    warehouse.  Well, let's see what did happen and

23    what they discussed.

24            Mayco, "Dude called.  Five more fools are

25    there.  So scram, huh?"

1    Gollito, "Yeah."

2    Gollito again, "With guns?"

3    "Yeah, man," said the CS.

4    Chivo, "Let's figure out a way to do

5    this."  "Let's figure out a way to do this."

6    Gollito, "Yeah, yeah."

7    Mayco, "Well, I'll call you.  I'll call

8    you in half an hour."

9    It appears that this is a phone call with

10    Mayco on the phone while they're in the warehouse.

11    Yovani, "We just have to go by in our

12    cars," and that's to check out the site, the home

13    invasion site.

14    Gollito, "Shall we go?"

15    Chivo, "Let's go."

16    Chivo, "So let's go look at the house

17    right now and we can see what's going on."

18    Yovani, "It's not like we can just go in

19    without planning."  Smart guy, at least up to a

20    point.

21    Mayco, "Or we can all go in quickly and go

22    vroom" here's Mayco with his connections saying

23    what he and his people are going to do after he

24    hears there's five more people showing up with guns

25    on top of the ones that were already there, the

1    six.  What does that tell you?

2          Mayco, "It's not like they're going to see

3    us."

4          Yovani, "It's not another job."

5          "We can all go in" -- this is Andy.  "We

6    can all go in wearing, like, everyone wearing

7    black." Everyone wearing black.  Well, we've seen

8    the sweatshirts, and I'm not going to make a big

9    issue of them, but there were a lot of black

10   sweatshirts in the cars of the defendants' who were

11   picked up on the freeway with all these armaments.

12   "We can all go in wearing black."

13          "And yeah, but the problem is my cousin,

14   man."

15          Mayco, "But they're going to show the

16   picture to all those guys right now."

17          Yovani, "One less cousin."

18          So what's Mayco saying they're going to

19   do?  I'm going to -- here's this 11 people inside

20   the target house, and he's saying I'm going to go

21   show the picture to those guys right now.  Are they

22   withdrawing?

23          Jorge testified about this particular

24   event, about when he got told that the people were

25   stopped.  "I told them they got caught.  They are

1  like, so what do we do?  Well, I'm leaving, I don't

2  know.  They're like, like, man, like, you know,

3  like, not that good, like, not feeling that happy."

4      Well, you can imagine yourselves being in

5  the position of people that brought all this stuff

6  to the home invasion party not being happy.  They

7  traveled all the way from Phoenix, brought the

8  water and all the other stuff.  They weren't

9  happy.

10      Did they believe Jorge?  Obviously they

11  did not want to believe Jorge because of what they

12  came ready to take with the million dollars plus in

13  bounty that they were going to seize from that

14  house.

15      We talked a little bit ago about Ja'Cory

16  Ranger.  Let's go to Mr. Ghermon Tucker.  We talked

17  about him a lot already, about 2/4 and how he was

18  at the planning meeting and the other events.

19      We know he and Jorge were together at the

20  Circle K., 61-G, as in George, that he was in the

21  right passenger, front passenger side of the

22  vehicle.

23      We're told by defense counsel in

24  summation, well, they didn't have guns when they

25  got out of the car.  Well, you know, when you're

1   pulled over in a vehicle, it works a certain way.

2   Sirens go.  There is a few seconds that transpire

3   from when the lights first come on and the sirens

4   start and you pull over.

5        What did Mr. Tucker do?  We know what he

6   did.  You may have forgotten about the cell phone

7   that was in the seat, in the glove box where he was

8   positioned, Mr. Tucker, but in that few seconds or

9   a minute or whatever it took to pull over and get

10  stopped, Mr. Tucker's phone was found inside the

11  glove box.

12       He had enough time, he thought enough

13  insight and foresight to take the SIM card out of

14  it so maybe it wouldn't connect back to him.  He

15  was wrong.  The SIM card was on the floor by his

16  feet.

17       So there was a little bit of advanced

18  planning before the police actually pulled him out

19  of the car, and that shows a state of mind of

20  Mr. Tucker back on March 2nd.  He's trying to

21  distance himself from things that would connect him

22  back to what happened.  His SIM card was on the

23  floor of the car.  His phone was in the glove box,

24  per the testimony.

25       We have a whole boatload of calls, and

1    again, I just took the ones involving Mr. Tucker

2    from Exhibit 113.  First dealing with 2/4, I'm not

3    going to kick that horse anymore, but the calls lay

4    out a very clear picture, and when you go through

5    your time line analyzing Exhibit 113 as to

6    Mr. Tucker, you will see the picture that was

7    painted and how he connects to Jerome Ranger, Mayco

8    on numerous times, starting in the wee hours of the

9    morning at 12:30, 12:30 a.m., going down through 12

10   o'clock, one o'clock in the morning, all the way

11   through until 11:55 in the morning, where

12   Mr. Tucker and Mayco are going back and forth on

13   the phone.

14        And again, that's on 2/4, leading right up

15   to the entrance into the meeting at 11:55, and the

16   calls by Jerome Ranger to Mr. -- from Ghermon

17   Tucker a little bit later that afternoon.

18        Exhibit 114, again, I extracted the phone

19   calls involving Mr. Tucker, which you can do as

20   you're analyzing each of the defendants, if you see

21   it appropriate.

22        What do we have on 2/14 -- I'm sorry -- on

23   March 2nd, Exhibit 114?  Starting at one o'clock in

24   the morning, Ja'Cory Ranger and Mr. Tucker going

25   back and forth, Mayco coming into the picture at

1  7:46 in the morning and continuing up through 9:41

2  in the morning on March 2nd with Mr. Tucker.

3       Ja'Cory Ranger then at 10:40 or at 10:10,

4  rather.  Mayco, Ja'Cory, Jerome Ranger at 10:26.

5  At 10:34, Jerome Ranger again and a whole series

6  of, as we have talked about, calls with Ja'Cory.

7  Then Mayco with Mr. Tucker on March 2nd.

8       If you want to see what each person is

9  doing back on March 2nd, you can look at this

10  analysis and see how it fits.  And what's pretty

11  fitting.  Here the arrests take place.  I believe

12  it's at 2:24 in the afternoon on March 2nd.

13       Now what do you do if you're Mr. Tucker?

14  You came prepared for a certain type of event, and

15  you're not happy.  Who do you connect back with but

16  Mayco, your connection from 2/4, and with all the

17  phone calls on 3/2.

18       Ja'Cory Ranger.  We have a whole boatload

19  of phone calls here, and I'm not go to go through

20  them all because it would take too much time.  On

21  March 2nd, a whole series of calls.  Ja'Cory first

22  with his brother at 12 o'clock and shortly

23  thereafter.  Incoming from Ghermon Tucker at one

24  o'clock, going back and forth.  Mayco plugs in at

25  10:20 in the morning with Ja'Cory Ranger, an

1    outgoing call.  Again, that's at 10:20.

2         Mayco, again, if you look down to push-to-

3    talk, at 10:40 in the morning, an outgoing from

4    Mayco to Ja'Cory Ranger that lasts one minute and

5    37 seconds, Mayco, the one who was caught in the

6    warehouse here in town.

7         Again, a bunch of calls.  Mayco calling

8    Ja'Cory Ranger at 10:49, Ja'Cory plugging in at

9    10:50.  These calls paint a very, very clear

10   picture about the connections between the parties

11   as all these events are going on in Phoenix, before

12   they leave, and then once they get down here to

13   Tucson.

14        Mayco, for example, at 1:01 in the

15   afternoon, outgoing to Ja'Cory, 40 seconds.  Mayco

16   again at 1:08 and 1:11.  One is Ja'Cory calling

17   Mayco at 1:11 in the afternoon.  Ja'Cory calling

18   two minutes later to Ghermon Tucker.  Mayco again

19   calling Ja'Cory Ranger at 1:18, 1:41, and 2:04.

20   And Ja'Cory calling his brother at 4:08 and 4:09,

21   just before they get stopped here in Tucson.

22        In your analysis in going through there --

23   and I'm not going to go through any of this with

24   you, but I'm just showing you that you can do it.

25        Exhibit 113, we extracted all of Mayco's

1  phone calls back on that date, and again on March

2  2nd, showing all the connections between Ja'Cory

3  Ranger, Mr. Tucker, and others throughout the day.

4          And what's important too as you're going

5  through this, because you'll have a complete list,

6  you can see Gregorio, Gollo, outgoing to Mayco at

7  1:58 in the afternoon, and we know Gollo is Mr. Big

8  in this thing, pulling the strings from Phoenix,

9  because he sent his kid down here.  He had

10  immigration issues and didn't want to put himself

11  at risk.

12          We have certain phone charts that we

13  talked about, and one of them, Exhibit 115, you

14  were told that there weren't any recordings made

15  between the black defendants and the CS, but when

16  certain things were extracted from phones -- and

17  you'll have this Exhibit 115, 115, with you.

18          This is Ja'Cory Ranger texting to Ghermon

19  Tucker at 10:32 in the morning back on March 2nd.

20  "Hit me ASAP.  We going to Tucson in 30 minutes.

21  Your people just left me.  They ready."

22          We have a little summary chart -- we may

23  have to transition back to Nicole -- which lay out

24  certain events in the phone calls to lay out some

25  time frames for you.

Starting with -- this is March 2nd, and you may want to take note of this, because when you're looking at the time line of all these calls, I know you have in your notes when certain things take place, but in order to aid you in analyzing all this data -- for example, we show an outgoing phone call from Ja'Cory Ranger at 11:26 to Ghermon Tucker.  At 11:28 defendants are seen at the Circle K on Broadway in Phoenix buying drinks, ice, multiple pairs of gloves.  And that's Exhibits 14-A.1 and 14-A.5.

So again, it gives you some time frame, when you put all these in the chronology, about how these things fit together with the phone calls leading to the Circle K in Phoenix before they came down here, about the connections going back and forth.

So forgetting for a moment what we heard from Jorge about what happened, the phone calls tell you exactly what happened as they lead up to the Circle K and the events there.

Next page, please.  At 1:18 in the afternoon, Jorge, Yovani, and Mayco meet members of the Mexican home invasion crew at the Circle K in Marana.  That's 1:18 p.m.

1           Leading up to that, we have Mayco, an

2   outgoing call to Ja'Cory Ranger at it looks like

3   1:18 or 1:16.  You have additional phone calls

4   right after that with Mayco, outgoing to Ja'Cory

5   Ranger at 1:41; Gollo, outgoing call to the CS at

6   1:54; Mayco calling at 2:04 to Ja'Cory Ranger.

7           At 2:05, you have the red Expedition,

8   Escalade and Commander and the silver Murano seen

9   at the Food City, Exhibit No. 29.  So as you're

10  making notes, when you look at Exhibit 29, that's

11  the overview when you saw the certain vehicles

12  pointed out in the parking lot by Jorge.

13          At 2:19, ground surveillance observes the

14  red Expedition and Escalade parked side by side at

15  Food City.  That's, again, the ground units looking

16  at the Food City parking lot.

17          At 2:24, Mayco, Yovani and other Mexican

18  members are arrested at the warehouse.  A picture

19  of the cousin was found in Mayco's back pocket and

20  a map of the house in Mayco's hand.

21          2:34, the red Expedition and black

22  Escalade leave Food City.  2:40, the Expedition and

23  Escalade pull into the Circle K on Congress, and

24  that's Exhibit No. 62-B, as in boy, and 62-C.

25          Again, so you have those time frames, you

1  see Mr. Tucker making phone calls at that same time

2  frame, at 2:44, or four minutes later.

3        2:57, the Expedition and Escalade leave

4  Circle K and head west towards Phoenix on I-10,

5  62-D, as in dog.

6        At 3:12, the defendants return in both

7  cars to Food City on Sixth Avenue, drive through

8  the parking lot and then return westbound on I-10

9  to return to Phoenix.  They came for an event, and

10  it wasn't happening, and they weren't happy.  They

11  were looking to see if they couldn't resurrect this

12  and that they weren't being stiffed by the people

13  that they came to town with.

14        The defendants made certain statements,

15  and you recall the testimony that took place here,

16  and what I did was put a little -- I had a synopsis

17  of what was testified to here put together.

18        Mr. Tucker was interviewed by the FBI here

19  in town back on the evening of March 2nd.  He

20  advised he lives with his mother in Phoenix.  He

21  came to Tucson as a passenger in a Ford

22  Expedition.

23        He was shown photographs of Chivo, Gollo,

24  and Seco, also known as Mayco.  So he was shown a

25  photograph of Seco at this interview back on March

2nd by the FBI and was asked if he knew them or had ever met any of them.  He denied knowing or meeting any of the people.

So here he is shown a photograph of Mayco, the person that he is in phone contact with many, many times on 2/4 and other times on 3/2, as we've talked about, but he says he doesn't know him.

He was asked if he met them at a park. Well, perhaps it's -- you heard about the -- it wasn't a park but rather a trailer park.  And he denied that as well.

Jerome Ranger was also interviewed, and again, I put together a little synopsis of what was testified to about what he told the FBI back on March 2nd.

At 12 o'clock he left Tucson -- he left the residence for Tucson.  He was driving his Expedition with three people riding with him.  The purpose was just to check out Tucson.  So here he is telling the FBI that the reason that they came here was to check out our city.

He had been to Tucson only once before, a business trip for the moving company.  They were planning on stopping by the mall and to see a couple of friends in Tucson.  That's why they came

1   back on March 2nd, or so he claimed when he lied to

2   the FBI.

3         When they departed Phoenix, they stopped

4   for some gas and sodas. Well, we know about that.

5   We've seen that at the Circle K in Phoenix. When

6   they reach Marana -- so here he is, talking about

7   reaching Marana -- he was telephonically contacted

8   and advised to exit at Marana and pull into a gas

9   station. He met four Hispanic males driving a

10   smaller Nissan vehicle.

11         So here he is claiming he's just coming

12   down here to check out Tucson, and yet he's hooking

13   up with four Hispanic males in Marana before they

14   come into our town.

15         He recalled -- he recalled meeting one of

16   the Hispanic males about four or five months ago in

17   Phoenix. He then followed the Hispanic male to the

18   Food City parking lot. After arriving, the

19   Hispanic males left in their vehicle. He waited 20

20   to 30 minutes. They never returned.

21         He left Food City to go visit a friend but

22   stated the friend was not home. We know that's

23   also a lie. The surveillance had him eyeballed

24   from the air and otherwise at the Food City, and

25   they never went to visit any friend. Again, he was

1 lying to the FBI agent back on March 2nd.

2          He returned to Food City to determine if

3 the Hispanic males had returned, which they had

4 not.  Ranger then departed the area and began to

5 drive back toward Phoenix.  They were stopped by

6 the police.

7          He was asked if he was aware of any

8 firearms.  He stated that he had an AK-47 in the

9 back.  He bought his AK-47 from a private citizen.

10 He said that with all of the news of the shootings

11 here in Tucson, he decided to bring the AK-47 with

12 him to our city.

13          MR. COOPER:  Judge, I'd like to object and

14 ask to approach, please.

15          (The following proceedings occurred at the

16          bench.)

17          MR. COOPER:  Your Honor, that's the

18 seventh time he's referred to "our city," and I let

19 it go for seven times.  It is a blatant attempt to

20 demonstrate that these criminals and hooligans are

21 coming to Tucson, to a place where they should not

22 come.

23          THE COURT:  Don't say "our city" again.

24          MR. LACEY:  I won't.

25          (End of bench conference.)

1          THE COURT:  You may continue.

2          MR. LACEY:  Thanks, Your Honor.

3          He stated he carries his AK-47 for

4    personal protection.  He was asked if there were

5    any other firearms in the vehicle, and he stated

6    someone else was carrying a pistol.

7          He was asked if he was aware of the body

8    armor in his vehicle.  Again, this is Mr. Jerome

9    Ranger in the red Ford Expedition.  He stated he's

10   familiar with the body armor in the vehicle.  He

11   purchased the body armor about two weeks ago from a

12   Mexican guy off the streets, paid 250 each.

13         When he purchased the armor, he put it in

14   the back seat of his vehicle.  He forgot the armor

15   was inside the vehicle until they departed for

16   Tucson.  He said he purchased the body armor for

17   protection.

18         Well, when you're getting body armor for

19   protection, as we heard from defense counsel, you

20   don't buy two.  If you have people going in to do a

21   home invasion, if there is more than one person

22   going through the door, there is more reason to

23   have more than one vest.  Again, look at all the

24   facts in reviewing the evidence in this case.  He

25   said he purchased the body armor for protection.

Well, indeed.

He was asked about whether he knew anything about a warehouse or a home invasion and he said he did not.

The Court's going to give you certain jury instructions. Count 1 is the conspiracy. From December 29 -- and again, you're going to have a copy of this with you in deliberations. When I finish, the judge will read these instructions to you, as we're reviewing them here, but more comprehensively than I'm going to cover.

First, there was an agreement between two or more persons to commit possession with intent to distribute cocaine, as charged in the indictment. So it's an agreement. Chivo and Gollo or Mayco and Mr. Tucker agreed to commit a violation, the violation to possess with intent to distribute cocaine, as they believed back on March 2nd.

Second, the defendants became members of the conspiracy knowing of at least one of its objects and intending to help accomplish it. Well, that's obvious as to what they were trying to accomplish and how they hoped to get there.

Third, one of the members of the conspiracy performed at least one overt act for the

purpose of carrying out the conspiracy, with all of
you agreeing on a particular overt act that you
find was committed.

An overt act, for example, coming to
Tucson with vests and automatic -- semiautomatic
rifles, or Mayco going to a warehouse meeting and
getting a picture he's going to bring back to his
people.

A conspiracy is a kind of criminal
partnership, an agreement of two or more persons to
commit one or more crimes. The crime of conspiracy
is the agreement to do something unlawful. It's
the agreement to do something unlawful. It does
not matter whether the crime was agreed on --
whether the crime agreed upon was committed.

So if it was a sting operation by the FBI
to get people involved in this kind of activity and
it couldn't actually happen in reality, that
doesn't matter. It was an agreement to do
something unlawful. It does not matter whether the
crime agreed upon was committed.

For a conspiracy to have existed it is not
necessary that the conspirators made a formal
agreement or that they agreed on every detail of
the conspiracy. It is enough, however, that they

1    simply met -- it is not enough, however, that they

2    simply met, discussed matters of common interests,

3    acted in similar ways or perhaps helped one

4    another.

5            You must find that there was a plan to

6    commit at least one of the crimes alleged in the

7    indictment as an object of the conspiracy, with all

8    of you agreeing as to the particular crime which

9    the conspirators agreed to commit.

10           One becomes a member by willfully

11   participating in the unlawful plan with the intent

12   to advance or further some object or purpose of the

13   conspiracy, even though the person does not have

14   full knowledge of all the details of the

15   conspiracy.

16           For example, Mr. Tucker may have been more

17   knowledgeable about what happened or what was going

18   to happen because of the 2/4 meeting he went to and

19   may not have conveyed all the details to the

20   Rangers and others he was involved with.

21           Furthermore, one who willfully joins an

22   existing conspiracy is as responsible for it as its

23   originators.  For example, people who came to

24   Tucson on 3/2 with the assault rifles and weren't

25   back at the 2/4 meeting, they joined an existing

1  conspiracy that had already begun back on 2/4 with

2  Chivo, Gollo, Mayco, and Mr. Tucker.

3          They don't have to have been members back

4  then.  They could have joined on March 2nd when

5  they decided to come to Tucson with these -- with

6  this armament, and that's when they joined an

7  existing conspiracy, and they're guilty as if they

8  joined it back on February 4th.

9          An overt act does not have to be

10  unlawful.  Example, driving to Tucson with

11  weapons.  A lawful act may be an element of the

12  conspiracy if it was done for the purpose of

13  carrying out the conspiracy.  The Government is not

14  required to prove that the defendant personally did

15  one of the overt facts.

16          Once a person becomes a member of a

17  conspiracy, that person remains a member until that

18  person withdraws from it.  There will be an

19  instruction about withdrawal the Court's going to

20  talk to you about.  One may withdraw by doing acts

21  which are inconsistent with the purpose of the

22  conspiracy -- so they have to do something

23  inconsistent with the purpose of the conspiracy --

24  and by making reasonable efforts to tell the

25  co-conspirators about those acts.

1    You may consider any definite positive

2 step that shows the conspirator is no longer a

3 member of the conspiracy to be evidence of the

4 withdrawal.

5    When you're frustrated because the person

6 that was going to show you where the house was that

7 you were going to do the home invasion on gets

8 arrested and you can't perform the act, that's not

9 withdrawal.  That's simply a frustration that you

10 have to experience, but it's not a withdrawal, as

11 the Court will instruct you when you look at the

12 facts that apply to the withdrawal jury

13 instruction.

14    The defendant is charged in Counts 3 and 4

15 of the indictment with possession of a firearm in

16 furtherance of a drug trafficking crime, in

17 violation of 924(C).  The Government must prove

18 beyond a reasonable doubt:  First, the defendant

19 committed the crime of conspiracy to possess with

20 intent to distribute cocaine, as charged in Count

21 1.

22    So what we have here is Count 3 of the

23 indictment.  Count 1 of the indictment is the

24 conspiracy count.  Count 2 is the attempt

25 violation.  On March 2nd in Tucson, these

1  defendants and others did knowingly and

2  intentionally attempt to possess with intent to

3  distribute five kilograms or more of cocaine, that

4  is, approximately 65 kilograms, a Schedule II

5  controlled substance.

6  Count 3, on March 2nd, at or near Tucson,

7  these defendants and others knowingly possessed

8  firearms and aided and abetted, counseled,

9  commanded, induced, and procured others to possess

10  these firearms, in furtherance of a drug

11  trafficking crime for which they may be prosecuted

12  in a Court of the U.S.

13  That is -- so Count 3, this conspiracy --

14  this particular gun violation connects back to

15  Count 1 of the drug conspiracy. In furtherance of

16  a drug trafficking crime for which they may be

17  prosecuted in a Court of the U.S., that is

18  conspiracy to possess with intent to distribute a

19  controlled substance, as alleged in Count 1 of the

20  indictment.

21  So that's Count 3, the gun violation that

22  attaches to Count 1, the conspiracy.

23  Count 4, is the same weapons, but as

24  you'll see, these defendants were charged with the

25  same weapons in furtherance -- that they used them

or had possessed them in furtherance of a drug trafficking crime as alleged in Count 2 of the indictment, in violation of 18 U.S. Code section 2.

So the first count, Count 3, attaches to Count 1. Count 4 attaches to Count 2. And that's the attempt violation in Count 2. Count 4, the gun violation, connects back to that particular statute and count.

Second, a defendant knowingly possessed these weapons; third the defendant possessed the firearms in furtherance of the crime of a conspiracy, as charged in Count 1, to possess with intent to distribute cocaine, or Count 2, attempt to possess cocaine with intent to distribute.

A person possesses a firearm if the person knows of its presence and has physical control of it or knows of its presence and has the power and intention to control it. It's not necessary for you to find the defendant possessed more than one firearm.

Now, an important instruction -- and I know this is tough, because it's the law, and we may deal with it on a daily basis, and some of us for decades and others not so long, but it's not an

1  easy concept to grab ahold of, but you're going to

2  have these back in deliberations, the aiding and

3  abetting statute that applies to Counts 3 and 4 of

4  the gun violations.

5          A defendant may be found guilty of

6  knowingly possessing a firearm in furtherance of a

7  drug trafficking crime even if the defendant

8  personally did not commit the act or acts

9  constituting the crime but aided and abetted in its

10 commission.

11         To prove a defendant guilty of aiding and

12 abetting, the Government must prove:  First,

13 knowingly possessing the firearm was committed by

14 someone.

15         So for example, Mr. Tucker could have

16 possessed a weapon or Mr. Ranger, one of the

17 Rangers, but if they aided and abetted, they drove

18 the car or brought the vest or whatever it may have

19 been, then they're involved in that as well, even

20 if they didn't possess the gun themselves.

21         Second, the defendant knowingly and

22 intentionally aided, counseled, commanded, induced,

23 or procured that person to commit each element of

24 knowingly possessing a firearm.

25         Third, the defendant acted before the

1  crime was completed.  It's not enough that the

2  defendant merely associated with the person

3  committing the crime or unknowingly or

4  unintentionally did things that were helpful to the

5  person or was present at the scene of a crime.

6      The evidence must show beyond a reasonable

7  doubt the defendant acted with the knowledge and

8  intention of helping that person commit the crime

9  of knowingly possessing a firearm in furtherance of

10  a drug trafficking crime.

11      The Government is not required to prove

12  precisely which defendant actually committed the

13  crime and which aided and abetted.

14      Count 2.  Mere presence at the scene of a

15  crime or mere knowledge that a crime is being

16  committed is not sufficient to establish the

17  defendant committed the crime of attempted

18  possession with intent to distribute cocaine.  The

19  defendant must be a participant and not merely a

20  knowing spectator.  The defendant's presence may be

21  considered by the jury, along with other evidence

22  in the case.

23      For example, traveling to Tucson with

24  guns, bulletproof vests, gloves, et cetera, would

25  show knowledge and participation by those that came

1  down here.

2         You have heard testimony from Antonio

3  Gutierrez, a witness who received compensation --

4         THE COURT:  Slow down.

5         MR. LACEY:  Sorry.

6         You should consider the extent to which or

7  whether his testimony may have been influenced by

8  the compensation he received.  In addition, you

9  should examine the testimony of Gutierrez with

10  greater caution than that of other witnesses.

11         For example, look to the phone calls of

12  2/4.  Look at the meetings taped on 2/4 and 2 --

13  and 3/2.  The guns, the vests, the phone calls.

14         You've heard testimony that a witness has

15  previously been convicted of a crime.  You may

16  consider this evidence only as it may affect the

17  believability -- his believability, Jorge's, as a

18  witness.

19         Again, if you can't corroborate it with

20  the exhibits we've covered, don't consider it.  I'm

21  telling you, even though that's not the law, I'm

22  telling you to take it to an extreme as far as what

23  to take off the table from Jorge.

24         Ja'Cory limped.  Water in the truck.

25  Three defendants -- the three defendants and others

1  came to Tucson.  Taped meetings.  Numerous phone

2  contacts.  Jorge in Food City, Circle K.

3        This matter is for you to determine

4  whether the Government has proven the defendants'

5  guilt beyond a reasonable doubt.  The defendants'

6  guilt or innocence is not affected by the fact that

7  another person or persons might have participated

8  or cooperated in the crime and is not now on trial.

9        I'm going to finally leave you with this.

10 You've seen the work that goes into this by all the

11 parties involved in this, and we all take our jobs

12 very seriously, and for good reason.

13       The reason all these people came to Tucson

14 back on March 2nd was for either 50 or 65 kilos of

15 coke, although most of it was 65 kilos, as you

16 heard from the recorded testimony, the recordings

17 back on both February 4th and March 2nd.  65

18 kilograms is about $20,000 per kilograms, about

19 $1.3 million.  That's what they thought they were

20 going to be getting when they came back on March

21 2nd.

22       Also, in order to make it more enticing,

23 the CS threw another factor on the table, that the

24 buyer for the cocaine was going to be at the house

25 and bringing half the money or 700,000.  He also,

1  to make it even more enticing, said that the drug

2  trafficking kingpin's son was wearing a

3  Presidential Rolex and some other items of value

4  totaling about $2 million.

5      So when you wonder why people didn't leave

6  right away after they drove from Phoenix and had a

7  certain purpose in mind and why they left Food City

8  even after hearing that, hey, they got stopped and

9  going to the Circle K and being told, again, they

10  got arrested, they still got on the freeway, got

11  off at Prince Road, came back around to Food City

12  and cruised through the parking lot, looking to try

13  and score this $2 million bounty that they were

14  told was waiting for them.

15      It's been a long haul, and again, I want

16  to thank you on behalf of all of us for the

17  integral role you play in our system.  We can only

18  function and do our jobs as prosecutors or defense

19  attorneys and put the facts before you.

20      You then have the hardest job of all, the

21  hardest job of all, to go back and deliberate and

22  make a decision based upon the evidence you see in

23  front of you.

24      I submit to you -- and again, we thank you

25  in advance.  I submit to you that, based upon all

the evidence you have and all the circumstantial
evidence you have, the United States has proven
beyond a reasonable doubt the guilt of these
defendants.

Thank you.

THE COURT: I'm going to need your
attention for about 20 minutes, so I'm going to
give you about a five-minute recess so that you can
listen to me for 20 minutes. Then we're going to
come back, and I'll give you the instructions.
After we do that, though, I'm going to send you
home and let you come back tomorrow and begin
deliberations. All right?

So I need a five-minute break. Then I
need 20 minutes.

(The jury exits the courtroom.)

THE COURT: Counsel, I'm going to ask you
to come here tomorrow morning by, if you wish, by
8:45 to check and make sure all the proper exhibits
are going back to the jury.

MR. COOPER: Do you need us here?

THE COURT: Only if you want to check and
make sure the proper exhibits are going.

MR. COOPER: I absolutely trust Mo.

THE COURT: All right. And just so the

1   record is clear, if they ask to hear any of the

2   taped conversations, I'll have them brought to the

3   courtroom, and Nicole and Mo will play them.

4   Nobody else will be allowed to be around or say

5   anything while they're being played.

6          (Off the record.)

7          (The jury enters the courtroom.)

8          THE COURT:  Show the jury's returned back

9   to the courtroom, the presence of all counsel and

10  defendants.

11         At this point in time, I'm going to once

12  again point you to your black books.

13         Before I tell you this, I want to make

14  sure I don't forget to tell you something.  I have

15  instructed that the guns be taken away, so they

16  will not be back in the jury room with you unless

17  you specifically ask for them.  Okay?

18         If you decide that you wish to review

19  tapes or transcripts that you don't have back there

20  with you, let Mo know, and then she and Nicole will

21  play them for you, but neither one of them will be

22  allowed to talk to you.  All right?  So laying some

23  ground rules in case we need them and I forget

24  them.

25         I want you to turn to the yellow pages and

1    follow along with me.

2            Members of the jury, now that you've heard

3    all the evidence, it is my duty to instruct you on

4    the law which applies to this case.  A copy of

5    these instructions will be available in the jury

6    room for you to consult.  In fact, you will all

7    have your own individual copy.

8            It is your duty to find the facts from all

9    the evidence in the case.  To those facts you will

10   apply the law as I give it to you.  You must follow

11   the law as I give it to you, whether you agree with

12   it or not, and you must not be influenced by any

13   personal likes or dislikes, opinions, prejudice, or

14   sympathy.  That means you must decide the case

15   solely on the evidence before you.  You will recall

16   you took an oath promising to do so at the

17   beginning of the case.

18           In following my instructions, you must

19   follow all of them and not single out some and

20   ignore others.  They are all equally important.

21           You must not read into these instructions

22   or anything the Court may have said or done any

23   suggestion as to what your verdict should be.  That

24   is a matter entirely up to you.

25           The indictment is not evidence.  The

1  defendants have pleaded not guilty to the charges.

2  The defendant's presumed to be innocent and does

3  not have to testify or present any evidence to

4  presume innocence.

5      The Government has the burden of proving

6  every element of the charge beyond a reasonable

7  doubt.

8      And that just reminded me of something

9  else I wanted to tell you.  Where I speak in the

10 singular or a plural, use whichever one I should

11 have correctly used, whether it should have been

12 singular or plural.

13     All right.  In reaching your verdict, you

14 may consider only the testimony and exhibits

15 received into evidence.  Certain things are not

16 evidence, and you may not consider them in deciding

17 what the facts are.  I will list them for you.

18     Arguments and statements by lawyers are

19 not evidence.  The lawyers are not witnesses.  What

20 they have said in their opening statements, closing

21 arguments, and at other times is intended to help

22 you interpret the evidence, but it is not

23 evidence.

24     If the facts as you remember them differ

25 from the way the lawyers state them, your memory of

1  them controls.

2          Questions and objections by lawyers are

3  not evidence.  Attorneys have a duty to their

4  clients to object when they believe a question is

5  improper under the Rules of Evidence.  You should

6  not be influenced by the question, the objection,

7  or the Court's ruling on it.

8          Testimony that has been excluded or

9  stricken or that you have been instructed to

10  disregard is not evidence and must not be

11  considered.

12          In addition, some testimony and Exhibits

13  may have been received only for a limited purpose.

14  Where I've given a limiting instruction, you must

15  follow it.

16          Anything you may have seen or heard when

17  Court was not in session is not evidence.  You are

18  to decide the case solely on the evidence received

19  at the trial.

20          The evidence from which you are to decide

21  what the facts are consists of the sworn testimony

22  of any witness, the exhibits which have been

23  received into evidence; and any facts to which all

24  the lawyers have stipulated or agreed.

25          Evidence may be direct or circumstantial.

Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence. That is, it is proof of one or more facts from which one can find another fact. You are to consider both direct and circumstantial evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness' memory; the witness' manner while testifying; the witness' interests in the outcome of the case and any bias or prejudice; whether other evidence contradicted the witness' testimony; the reasonableness of the witness' testimony in light of all the evidence; and any other factors that bear on believability.

1    The weight of the evidence as to a fact
2  does not necessarily depend on the number of
3  witnesses who testify.

4    Proof beyond a reasonable doubt is proof
5  that leaves you firmly convinced that the defendant
6  is guilty.  It is not required that the Government
7  prove guilt beyond all possible doubt.  A
8  reasonable doubt is a doubt based upon reason and
9  common sense and not based purely on speculation.
10  It may arise from a careful and impartial
11  consideration of all the evidence or from lack of
12  evidence.

13    If after a careful and impartial
14  consideration of all the evidence you are not
15  convinced beyond a reasonable doubt that the
16  defendant is guilty, it is your duty to find the
17  defendant not guilty.

18    On the other hand, if after a careful and
19  impartial consideration of all the evidence you are
20  convinced beyond a reasonable doubt the defendant
21  is guilty, it is your duty to find the defendant
22  guilty.

23    A defendant in a criminal case has a
24  constitutional right not to testify.  No
25  presumption of guilt may be raised and no inference

1  of any kind may be drawn from the fact the

2  defendant did not testify.

3      You have heard testimony the defendant

4  made a statement.  It is for you to decide whether

5  the defendant made the statement and, if so, how

6  much weight to give to it.  In making those

7  decisions, you should consider all the evidence

8  about the statement, including the circumstances

9  under which the defendant may have made it.

10     Although the defendants are being tried

11 together, you must give separate consideration to

12 each defendant.  In doing so, you must determine

13 which evidence in the case applies to each

14 defendant, disregarding any evidence admitted

15 solely against some other defendant.

16     The fact that you may find one of the

17 defendants guilty or not guilty should not control

18 your verdict as to any other defendant.

19     An act is done knowingly if the defendant

20 is aware of the act and does not act or fails to

21 act through ignorance, mistake, or accident.

22     The Government is not required to prove

23 that a defendant knew that his or her acts or

24 omissions were unlawful.  You may consider evidence

25 of the defendant's words, acts, or omissions along

with all the other evidence in deciding whether the
defendant acted knowingly.

A separate crime is charged against the
defendant in each count.  You must decide each
count separately.  Your verdict on one count should
not control your verdict on any other count.

Now put your fingers right there at the
yellow pages, and we're going to go to the white
sheets that you now have.

The defendants are charged in Count 1 of
the indictment with conspiring to possess with the
intent to distribute cocaine, in violation of
Section 841 of Title 21 of United States Code.  In
order for the defendants to be found guilty of that
charge, the Government must prove each of the
following elements beyond a reasonable doubt:

First, beginning from December 29, 2010,
to on or about March 3rd, 2011, there was an
agreement between two or more persons to commit
possession with intent to distribute cocaine, as
charged in the indictment;

And second, the defendants became members
of the conspiracy knowing of at least one of its
objects and intending to help accomplish it; and
third, one of the members of the conspiracy

performed at least one overt act for the purpose of

carrying out the conspiracy, with all of you

agreeing on a particular overt act that you find

was committed.

A conspiracy is a kind of criminal

partnership, an agreement of two or more persons to

commit one or more crimes.  The crime of conspiracy

is the agreement to do something unlawful.  It does

not matter whether the crime agreed upon was

committed.

For a conspiracy to have existed, it is

not necessary that conspirators made a formal

agreement or that they agreed on every detail of

the conspiracy.  It is not enough, however, that

they simply met, discussed matters of common

interest, acted in similar ways, or perhaps helped

one another.

You must find that there was a plan to

commit at least one of the crimes alleged in the

indictment as an object of the conspiracy, with all

of you agreeing as to the particular crime which

the conspirators agreed to commit.

One becomes a member of a conspiracy by

willfully participating in the unlawful plan with

the intent to advance or further some object or

1   purpose of the conspiracy, even though the person

2   does not have full knowledge of all the details of

3   the conspiracy.

4        Furthermore, one who willfully joins an

5   existing conspiracy is as responsible for it as the

6   originators.  On the other hand, one who has no

7   knowledge of the conspiracy but happens to act in a

8   way which furthers some object or purpose of the

9   conspiracy does not thereby become a conspirator.

10       Similarly, a person does not become a

11   conspirator merely by association with one or more

12   persons who are conspirators, nor merely by knowing

13   that a conspiracy exists.

14       An overt act does not itself have to be

15   unlawful.  A lawful act may be an element of a

16   conspiracy if it was done for the purpose of

17   carrying out the conspiracy.  The Government is not

18   required to prove the defendant personally did one

19   of the overt acts.

20       The defendants are charged in Counts 3 and

21   4 of the indictment with possession of a firearm in

22   furtherance of a drug trafficking crime, in

23   violation of Section 924(C) of Title 18 of United

24   States Code.

25       In order for the defendant to be found

1  guilty of that charge, the Government must prove

2  each of the following elements beyond a reasonable

3  doubt:

4  First, the defendant committed the crime

5  of conspiracy to possess with intent to distribute

6  cocaine as charged in Count 1 or attempt to possess

7  cocaine as charged in Count 2, which I instruct you

8  are drug trafficking offenses;

9  Second, the defendant knowingly

10  possessed -- and I'm not going to read the list of

11  all those guns; and third, the defendant possessed

12  the firearms in furtherance of the crime of

13  conspiracy to possess with intent to distribute

14  cocaine or attempt to possess cocaine with intent

15  to distribute.

16  A person possesses a firearm if the person

17  knows of its presence and has physical control of

18  it or knows of its presence and has the power and

19  intention to control it.  It is not necessary for

20  you to find the defendant possessed more than one

21  firearm.

22  Once a person becomes a member of a

23  conspiracy, that person remains a member until that

24  person withdraws from it.  One may withdraw by

25  doing acts which are inconsistent with the purpose

1    of the conspiracy and by making reasonable efforts

2    to tell the co-conspirators about those acts.

3          You may consider any definitive positive

4    step that shows the conspirator is no longer a

5    member of the conspiracy to be evidence of

6    withdrawal.

7          The Government must prove beyond a

8    reasonable doubt that the defendant did not

9    withdraw from the conspiracy before the overt act

10   on which you all agree was committed by some member

11   of the conspiracy.

12         I see that there is an instruction that is

13   missing.  I will read it and make sure you have a

14   copy of it.

15         The defendants are charged in Count 2 of

16   the indictment with attempted possession with

17   intent to distribute cocaine, in violation of

18   Section 841(A)(1) and 846 of Title 21 of United

19   States Code.  In order for a defendant to be found

20   guilty of that charge, the Government must prove

21   each of the following elements beyond a reasonable

22   doubt:

23         First, the defendant intended to possess

24   cocaine with the intent to distribute it to another

25   person; and second, the defendant did something

that was a substantial step toward committing the crime.

Mere preparation is not a substantial step toward committing the crime. To constitute a substantial step, a defendant's act or actions must demonstrate that the crime will take place unless interrupted by independent circumstances.

To possess with intent to distribute means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

A defendant may be found guilty of knowingly possessing a firearm in furtherance of a drug trafficking crime even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its commission.

To prove a defendant guilty of aiding and abetting, the Government must prove beyond a reasonable doubt: First, knowingly possessed a firearm -- knowingly possessing a firearm was committed by someone; second, the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to

commit each element of knowingly possessing a
firearm; and third, the defendant acted before the
crime was completed.

It is not enough the defendant merely
associated with the person committing the crime or
unknowingly or unintentionally did things that were
helpful or was present at the scene of the crime.

The evidence must show beyond a reasonable
doubt that the defendant acted with the knowledge
and intention of helping that person commit the
crime of knowingly possessing a firearm in
furtherance of a drug tracking crime.

The Government is not required to prove
precisely which defendant actually committed the
crime and which defendant aided and abetted.

Mere presence at the scene of a crime or
mere knowledge that a crime is being committed is
not sufficient to establish the defendant committed
the crime of attempted possession with intent to
distribute cocaine. The defendant must be a
participant and not merely a knowing spectator.
The defendant's presence may be considered by the
jury along with other evidence in the case.

You have heard testimony from Antonio
Gutierrez, a witness who received compensation from

the Government in connection with this case.  For
this reason, in evaluating the testimony of Antonio
Gutierrez, you should considerate the extent to
which or whether his testimony may have been
influenced by this factor.

In addition, you should examine the
testimony of Antonio Gutierrez with greater caution
than that of other witnesses.

You have heard evidence that a witness has
previously been convicted of a crime.  You may
consider this evidence only as it may effect the
believability as a witness.

The only matter for you to determine is
whether the Government's proved the defendants'
guilt beyond a reasonable doubt.  The defendants'
guilt or innocence is not effected by the fact that
another person or persons might have participated
or cooperated in the crime and is not on trial
now.  You should not guess about the reason any
other person is absent from the courtroom.

You have heard testimony from Antonio
Gutierrez, an informant, who was involved in the
Government's investigation in this case.  Law
enforcement officials may engage in stealth and
deception, such as the use of informants and

1  undercover agents, in order to investigate criminal

2  activities.  Undercover agents and informants may

3  use false names and appearances and assume the

4  roles of members in criminal organizations.

5          You have heard testimony from Jorge Abel

6  Medina, a witness who testified in this case.  That

7  testimony was given in exchange for a promise by

8  the Government that the witness will not be

9  prosecuted.  For this reason, in evaluating the

10  testimony of Jorge Abel Medina, you should consider

11  the extent to which or whether his testimony may

12  have been influenced by this factor.

13          In addition, you should examine the

14  testimony of Jorge Abel Medina with greater caution

15  than that of another witnesses.

16          Certain charts and summaries have been

17  admitted in evidence.  Charts and summary are only

18  as good as the underlying supporting material.  You

19  should therefore give them only such weight as you

20  think the underlying material deserves.

21          Let's go back to where you left off in the

22  yellow pages.

23          When you begin deliberations, you should

24  elect one member of the jury as your foreperson.

25  That person will preside over deliberations and

1  speak for you here in court.  You will then discuss

2  the case with your fellow jurors to reach agreement

3  if you can do so.

4       Your verdict, whether guilty or not

5  guilty, must be unanimous.

6       Each of you must decide the case for

7  yourself, but you should do so only after you've

8  considered all the evidence, discussed it fully

9  with the other jurors, and listened to the views of

10  your fellow jurors.

11       Do not be afraid to change your opinion if

12  the discussion persuades you that you should, but

13  do not come to a decision simply because other

14  jurors think it is right.  It is important that you

15  attempt to reach a unanimous verdict but of course

16  only if each of you can do so after having made

17  your own conscientious decision.  Do not change an

18  honest belief about the weight and effect of the

19  evidence simply to reach a verdict.

20       Your verdict must be based solely on the

21  evidence and on the law as I've given to you in

22  these instruction.  However, nothing I have said or

23  done is intended to suggest what your verdict

24  should be.  That is entirely for you to decide.

25       The punishment provided by law for this

1  crime is for the Court to decide.  You may not

2  consider punishment in deciding whether the

3  Government's proved its case against the defendants

4  beyond a reasonable doubt.

5        A verdict form has been prepared for you.

6  After you've reached unanimous agreement on a

7  verdict, your foreperson will fill in the form that

8  has been given to you, sign it with the juror

9  number, date it, and advise the courtroom deputy

10  that you are ready to return to the courtroom.

11       If it becomes necessary during

12  deliberations to communicate with me, you may send

13  a note to the courtroom deputy signed by your

14  foreperson or by one or more other members of the

15  jury.

16       No member of the jury should ever attempt

17  to communicate with me except by signed writing,

18  and I will respond to the jury concerning the case

19  only in writing or here in open court.

20       If you send out a question, I will consult

21  with the lawyers before answering, which may take

22  some time.  You may continue your deliberations

23  while waiting for the answer to any question.

24       Remember, you are not to tell anyone,

25  including me, how the jury stands numerically or

1  otherwise on the question of the guilt of the

2  defendants until after you've reached a unanimous

3  verdict or have otherwise been discharged.

4        You will take back for each defendant four

5  forms of verdict.  One for each of the counts

6  charged.  I'm not going to read -- if my math is

7  correct, that means 12 different forms, but I will

8  read a representative sample of each of the forms

9  that applies to each of the defendants.

10       So I have three packets paper clipped

11  together.  I'm going to shuffle them, so I won't

12  know which one I'm going to read first because I'm

13  looking at you while I'm doing this.  So you can't

14  -- so there is no impetus you can give to which one

15  I read first or last.

16       I'm going to omit the formal caption.

17       We the jury find the defendant, Jerome

18  Noel Ranger, and there is a blank.  In that blank,

19  if you reach a verdict, either write "guilty" or

20  "not guilty" of conspiracy to possess with intent

21  to distribute cocaine, as charged in Count 1.

22       The verdict further reads:  If you find

23  the defendant guilty of conspiracy to possess with

24  intent to distribute cocaine, what do you find the

25  weight to be beyond a reasonable doubt?

1          There are several choices to be made that
2    you can make.  First one says less than five
3    kilograms of cocaine.  There is a blank for yes.
4    There is a blank for no.  More than five kilograms
5    of cocaine.  There is a blank for yes.  There is a
6    blank for no.  50 kilograms of cocaine.  There is a
7    blank for yes.  There is blank for no.  65
8    kilograms of cocaine.  There is a blank for yes.
9    There's a blank for no.  There is a place for the
10   foreperson's juror number.  There is a place for
11   the date.

12          The next form reads:  We the jury find the
13   defendant, Ghermon Lateke Tucker, and again, there
14   is blank.  In that blank, if you reach a verdict,
15   write "guilty" or "not guilty" of attempted
16   possession with intent to distribute cocaine, as
17   charged in Count 2.

18          It further reads:  If you find the
19   defendant guilty of attempted possession with
20   intent to distribute cocaine, what do you find the
21   weight of cocaine to be beyond a reasonable doubt?
22   Less than five kilograms of cocaine, a blank for
23   yes, a blank for no.  More than five kilograms of
24   cocaine, a blank for yes, a blank for no.  50
25   kilograms of cocaine, a blank for yes, a blank for

1  no.  65 kilograms of cocaine, a blank for yes, a

2  blank for no.  A place for the foreperson's

3  signature -- excuse me -- number and the date.

4        The next reads:  We the jury find the

5  defendant, Ja'Cory Dante Ranger, and again, there

6  is a blank.  In that blank, if you reach a verdict,

7  either write "not guilty" or "guilty" of possession

8  of one or more firearms as set forth and charged in

9  Count 3 during and in furtherance of a drug

10  trafficking crime, to wit: conspiracy to possess

11  with intent to distribute cocaine.  There is a

12  place for the foreperson's juror number.  There is

13  a place for the date.

14        The last form of verdict reads:  We the

15  jury find the defendant Ja'Cory Dante Ranger, and

16  again, there is a blank.  In that blank, if you

17  reach a verdict, either write "not guilty" or

18  "guilty" of possession of one or more firearms as

19  set forth and as charged in Count 4 during and in

20  furtherance of a drug trafficking crime, to

21  wit: attempted possession with intent to distribute

22  cocaine.  There is a place for the foreperson's

23  juror number.  There is a place for the date.

24        As I've indicated, there are four forms of

25  verdict for each defendant.

1        You're now going to be discharged as

2   jurors in just a moment, and I'm going to tell you,

3   you can take your notes back there with you, and

4   you can take your copy of the instructions.  Mo

5   will also bring back any exhibits that have been

6   admitted into evidence, and you can review those

7   exhibits.  If it was not admitted into evidence,

8   don't bother to ask for it because you can't have

9   it.

10       As I told you when this case began, we had

11  two alternate jurors.  We're now down to one.  And

12  I told you that only 12 jurors can actually decide

13  this case.  We'll now determine who the alternate

14  juror is.

15       With all the high technology you've seen

16  in this courtroom over the last couple of weeks,

17  the most telling way we have of determining whether

18  or not someone is going to be an alternate juror is

19  almost like the old bingo box.

20       Each of these -- each of you have had your

21  juror number placed on a slip of paper separately,

22  and all 13 numbers have been placed in.  After

23  appropriately mixing up the ballots, the courtroom

24  deputy reaches in, pulls out one, and it has a

25  number of --

1          THE CLERK:  Juror No. 46.

2          THE COURT:  Who is Juror No. 46?  Okay

3   Juror No. 46.

4          I'm going to ask the following:  That you

5   go home and come back tomorrow at 9:15?  9:30?

6   9:30.  9:30 tomorrow morning.  Leave your notes in

7   your chair.  You'll get them back tomorrow.  Leave

8   your books in your chair.  You'll get them back

9   tomorrow.  I will add the additional instruction

10  that was missing from your packets, so you'll have

11  that tomorrow also.  So I'll ask the 12 of you to

12  leave now.

13         Juror 46, I want you to hang around for a

14  few moments.

15         Don't forget the admonitions I've given

16  you before.

17         (The jury exits the courtroom.)

18         THE COURT:  Show the absence of the jury,

19  presence of Alternate Juror No. 46.

20         First of all, I want to thank you for your

21  time and for your attention in this case.  I want

22  to assure you that your time has not been wasted.

23  The reason why we have alternate jurors is because,

24  if we get down to a number less than 12, we have to

25  start all over.  So that's one reason why we use

1　alternate jurors.

2　　　　I still may need you, so I'm going to ask

3　you to do a couple of things.  Number one, I need

4　you to leave your notes here.  They're not going to

5　be read by anybody.  Number two, when Mo comes

6　back, she's going to ask you for a telephone number

7　where she can reach you if she needs to tell you to

8　come back and deliberate with your fellow jurors.

9　　　　If that happens, at that point in time,

10　you'll be given your notes back at that point in

11　time, and you'll begin deliberations anew with your

12　fellow jurors.

13　　　　If you're not needed to come back, you'll

14　still be called and told what happened, if

15　anything, in the case.  So either way, you're going

16　to be contacted, so make sure you give Mo a number

17　where you can be reached during the day tomorrow.

18　　　　And because you still may be needed,

19　please do not discuss the case or do any research

20　about the case or anything at all until you hear

21　further from the Court.  Okay?

22　　　　And I'm going to ask you to leave that

23　juror badge behind.  We're going to recycle it.

24　　　　If we don't meet again here in the

25　courtroom, if you're not needed to come back,

1  please, if you see myself or the attorneys walking

2  around in southern Arizona, feel free to say hi.

3  We're not near as mean as we look.  Thank you again

4  for your time and for your attention.  Make sure Mo

5  has your phone number.

6            If you want to contact attorneys, by the

7  way, Juror No. 46, if you want to contact the

8  attorneys, you can find the U.S. Attorney's Office

9  by going to the blue pages of the telephone book

10  under U.S. Attorney's Office.

11            You can find Mr. Cooper in -- the yellow

12  pages and the white pages, Mr. Cooper?

13            MR. COOPER:  Yes, Your Honor.

14            THE COURT:  You can find Mr. Armstrong in

15  the same place, correct, Mr. Armstrong?

16            MR. ARMSTRONG:  I hope so.

17            THE COURT:  And the same with Mr. Young.

18            Thank you again for your time and for your

19  attention.

20            (The alternate juror exits the courtroom.)

21            THE COURT:  Show the absence of the jury,

22  presence of all counsel and the defendants.

23            Show that each counsel, at the end of the

24  closing arguments, once again renew their motion

25  for Rule 29 verdict of acquittal.

1           MR. COOPER:  I have another motion as
2   well.
3           THE COURT:  All right.  I'll get there.
4   Don't hurt my train of thought just yet.
5           Mr. Jerome Ranger, I need you back here
6   tomorrow morning when the jury begins deliberations
7   at 9:30.  Okay?
8           DEFENDANT JEROME RANGER:  (Nodding.)
9           THE COURT:  Yes, Mr. Cooper?
10          MR. COOPER:  I renew my motion for
11  severance, Your Honor.
12          THE COURT:  You did.
13          MR. COOPER:  And for a motion for
14  mistrial, because I really wanted to cross-examine
15  Mr. Ranger regarding the statement that the
16  Government used to demonstrate consciousness of
17  guilt they imputed certainly to him and to all the
18  defendants, and there are not interlocking
19  confessions anymore.
20          THE COURT:  The motion has been renewed
21  and denied.
22          Counsel, be within 10 minutes or so once
23  you get a phone call.  Make sure Mo has a phone
24  number that she can reach you.
25          And if we don't meet again under these

1  circumstances, for me, I've enjoyed that you've
2  handled yourselves, each of you, in a very
3  professional way.  I think that each of you
4  represented your respective party very, very well.
5  I can't ever remember the last time I had five
6  lawyers talk and all of them made sense.
7            Thank you.
8            MR. COOPER:  Thank you, Your Honor.
9            (Proceedings concluded in this matter.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              C E R T I F I C A T E

2

3          I, Erica R. Grund, do hereby certify that

4     I took the machine shorthand notes in the foregoing

5     matter; that the same was transcribed via computer-

6     aided transcription; that the preceding pages of

7     typewritten matter are a true, correct, and

8     complete transcription of those proceedings

9     ordered, to the best of my skill and ability.

10          Dated this 2nd day of January, 2013.

11

12                          s/Erica R. Grund
                            Erica R. Grund, RDR, CRR
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25